# Exhibit A

J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Christman Rice, Esq. (*pro hac vice* forthcoming)
  rice@braunhagey.com
Lily (Haeun) Kim, Esq. (*pro hac vice* forthcoming)
  kim@braunhagey.com
Iqra Asghar, Esq. (*pro hac vice* forthcoming)
  asghar@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 403-4089

ATTORNEYS FOR PLAINTIFF

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/21/2024**
**Clerk of the Court**
BY: AUSTIN LAM
**Deputy Clerk**

**CGC-24-619152**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

|  |  |
|---|---|
| FORTIS ADVISORS LLC, a Delaware limited liability company, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc.,<br><br>        Plaintiffs,<br><br>v.<br><br>STRATASYS LTD., an Israeli corporation, STRATASYS, INC., a Delaware corporation, and YOAV ZEIF,<br><br>        Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**<u>UNREDACTED</u>** |

MAY NOT BE EXAMINED
WITHOUT COURT ORDER -
CONTAINS MATERIAL FROM
CONDITIONALLY SEALED
RECORD

MATERIALS SHALL BE
UNSEALED AFTER TEN (10)
DAYS ABSENT FILING OF A
MOTION TO SEAL PURSUANT
TO CRC 2.551(b)

Case No. _____

COMPLAINT

Plaintiff Fortis Advisors LLC, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc. (the "Shareholders") hereby allege against Defendants Stratasys Ltd., Stratasys, Inc., (collectively, "Stratasys") and Yoav Zeif as follows:

**INTRODUCTION**

1.      Origin Laboratories, Inc. ("Origin") was an innovative California startup company founded in 2015 by Chris Prucha and Joel Ong based on a simple insight: by developing sophisticated 3D-printing software, Origin could produce high-quality, usable parts that would bring 3D-printing out of the realm of hobbyists and into the much larger manufacturing market. Origin represented the culmination of Chris and Joel's engineering experience—Chris as an Apple engineer and previous co-founder of a separate collaboration platform; Joel as an engineer on moonshot initiatives at Google X.  Stratasys, a publicly traded Israeli technology conglomerate, approached Chris and Joel in 2020 with an unsolicited acquisition offer, and Stratasys ultimately purchased Origin for approximately $100 million pursuant to an Agreement and Plan of Merger and Reorganization, dated December 8, 2020 (the "Acquisition Agreement") (Ex. 1).

3.      Following the acquisition, Stratasys and its executives again repeatedly reassured the Shareholders that it would calculate their entitlement to the agreed-upon Earn-Out Payments

1                                    Case No. _____

COMPLAINT

based on the actual sales of Origin's products and services, and would thus re-set the EO Date. Accordingly, when Stratasys delayed the post-acquisition launch of Origin's products, Stratasys again promised, orally and in writing, that the EO Date would coincide with the general availability of Origin's products.  In reliance on those representations, promises, and agreements, the Shareholders continued to perform for the company, including by designing new technology and assisting with patent applications on novel concepts accruing to Stratasys's benefit.

4.      Stratasys finally made Origin's 3D printing products generally available to customers in February 2022—that is, seven months after the placeholder EO Date—and Origin's performance thereafter has exceeded all projections.  Stratasys touted Origin's success in its SEC filings and releases, claiming that Origin is responsible for the largest first-quarterly growth in Stratasys's history and is operating as "an important growth engine" for Stratasys.  Even beyond the sale of Origin-branded products, Stratasys has integrated Origin's sophisticated suite of intellectual property throughout its business and, as a result, Stratasys's enterprise value has substantially increased.

5.      Unfortunately, Stratasys's representations and inducements were not truthful, and Stratasys appears never to have had any intention of launching Origin's products by the placeholder EO Date or moving that date to coincide with the products' general availability.  Instead, Stratasys now insists on using the defunct July 1 placeholder date as the basis from which to calculate the Shareholders' Earn-Out—even though Stratasys *did not offer* the products for sale during that period.  By delaying the launch and now insisting that the EO Date remains unchanged, Stratasys has effectively helped itself to a 40% reduction in the purchase price for Origin and its intellectual property, because the later Earn Out Periods assume increasing growth targets.

6.      The Shareholders bring this suit to recover for Stratasys's fraud and bad faith dealings, including accelerated payment of the full $40 million in bargained-for earn-out payments that Stratasys has withheld and disgorgement of the amount by which Stratasys has unjustly profited from its misconduct, including all actual and expected revenue associated with Origin's products and services and the value of Origin's products, intellectual property, and services, estimated to be at least $400 million.  The Shareholders also seek the quantum meruit value of the

services that Stratasys unfairly induced Shareholders to provide.  Finally, unless and until Stratasys fully compensates the Shareholders in connection with any award hereunder, Stratasys should be enjoined from further use of any patents and intellectual property developed by Origin or the Shareholders.

8.    Because Stratasys has refused to submit to the jurisdiction of the arbitral Tribunal with respect to the Shareholders' fraud and equity claims, the Shareholders now bring those claims in this Court.

**PARTIES**

9.    Plaintiff Fortis Advisors LLC is a Delaware limited liability company that serves as the formal representative of the Shareholders of Origin in connection with the acquisition of Origin by Stratasys, as memorialized in the parties' Agreement and Plan of Merger and Reorganization dated December 8, 2020 (Ex. 1) (the "Acquisition Agreement"). Prior to Stratasys's acquisition of Origin, the Shareholders were shareholders of Origin Laboratories, Inc. ("Origin"), a corporation organized under the laws of Delaware that successfully developed innovative 3D printing technologies.  Origin was founded, headquartered, and had its principal place of business in San Francisco, California.

10. Defendant Stratasys Ltd. is a company incorporated under the laws of the State of Israel, with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

11. Defendant Stratasys, Inc. is a Delaware corporation and a wholly owned subsidiary of Stratasys Ltd., with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

12. Defendant Yoav Zeif is an individual domiciled in Israel. Mr. Zeif is the Chief Executive Officer of Stratasys.

## JURISDICTION AND VENUE

13. The Court has personal jurisdiction over Stratasys pursuant to California Code of Civil Procedure § 410.10 because: (a) Stratasys conducts business in California; (b) Stratasys has availed itself of the laws and markets of California by soliciting business from entities and individuals located within the state of California, including by soliciting, negotiating, and consummating the acquisition of a California-based corporation at issue in this action; (c) Stratasys has engaged in fraudulent and tortious conduct and misrepresentations within California; and (d) Stratasys targeted its fraudulent tortious conduct and misrepresentations at the Shareholders in California with the knowledge that such conduct would cause harm to the Shareholders in California.

14. The Court has personal jurisdiction over Zeif pursuant to California Code of Civil Procedure § 410.10 because: (a) Zeif conducts business in California; (b) Zeif has availed himself of the laws and markets of California by soliciting business from entities and individuals located within the state of California, including by soliciting, negotiating, and consummating the acquisition of a California-based corporation at issue in this action; (c) Zeif has engaged in fraudulent and tortious conduct and misrepresentations within California; and (d) Zeif targeted his fraudulent and tortious conduct and misrepresentations at the Shareholders in California with the knowledge that such conduct would cause harm to the Shareholders in California.

15. As described more fully below, Stratasys and Zeif made knowingly false misrepresentations to the Shareholders they knew to be located in California in order to induce the Shareholders to enter into the Acquisition Agreement with the intent and expectation that the Shareholders would rely on those misrepresentations when making a decision to sell Origin at their

4                                    Case No. _____

COMPLAINT

California place of business. Stratasys and Zeif also made knowingly false statements to the Shareholders after they acquired Origin, during which time Stratasys and Zeif operated the Origin business unit in California. Such false statements were intended to, and did, induce the Shareholders to provide valuable services for Stratasys's benefit. As a result, Stratasys and Zeif were able to avail themselves of the benefit derived from acquiring Origin and using Origin's valuable intellectual property, as well as from valuable post-acquisition work that the Shareholders performed in California, which unjustly enriched Stratasys and is the gravamen of this action. Moreover, many of the potential witnesses are located in California or can easily travel to California and California has strong interest in deciding the claims arising out of foreign defendants' tortious conduct aimed at acquiring California's innovative start-up companies without paying the fair price, as here.

16. Venue is proper in San Francisco County pursuant to California Code of Civil Procedure § 395.5 because Defendants made fraudulent statements to the Shareholders in San Francisco County and because the Shareholders' resulting injuries occurred in San Francisco County, among other reasons.

## FACTS

### I. ORIGIN'S BACKGROUND

17. Origin was founded in San Francisco, California, in 2015 by Christopher Prucha and Joel Ong based on their belief in the transformative potential of 3D printing. Chris and Joel both came to 3D printing from backgrounds in software engineering rather than in hardware or manufacturing, which provided them with a viewpoint that was unique in the industry.

18. Chris was an engineer at Apple before founding Notion Labs, Inc., a collaboration platform and file-management tool now valued in excess of $10 billion. Joel established his engineering credentials at Google, where he worked on a variety of moonshot projects at Google X, among other things. Together, they launched Origin to take a software-first approach to 3D printing that no other participant in the industry was pursuing.

#### A. Origin's Thesis: 3D Printing as Manufacturing

Case No. _____

COMPLAINT

19.    At the time of Origin's founding, the 3D printing industry was defined by two submarkets. Industry incumbents focused either on cheap, low-quality 3D printing as part of a temporary bubble of consumer interest, or they focused on more sophisticated 3D printing for the narrow purpose of rapid prototyping. Chris and Joel recognized the self-limiting nature of these approaches and concluded that 3D printing could reach its potential only if it could be used for manufacturing on a broad scale—a multitrillion-dollar industry that dwarfed both the nascent and unpredictable consumer market for 3D printing and the prototyping industry.

20.    But the existing technology was limited by unsophisticated software built around a "closed materials" model, and the existing printers were not good enough to allow users to efficiently print functional parts. Moreover, the industry incumbents hamstrung their own printers by strictly limiting the material inputs and controlling the sale of those materials. In other words, the incumbents focused on short-term profits over potential long-term gain, and they did not prioritize developing printers that could meet the needs of 3D-printing customers seeking production-scale manufacturing applications.

21.    These factors drove Chris and Joel to devise a simple thesis for Origin: 3D-printing technology could be improved and made less expensive by developing better software to guide and govern the 3D-printing process. They planned to achieve this in two ways: (i) by developing granular real-time feedback through a detailed sensor apparatus that would ensure reliable and precise printing, and (ii) by partnering with chemical companies to allow end users to print parts from a wide array of new and experimental materials.

**B.    Origin's Groundbreaking Intellectual Property**

22.    Chris and Joel soon discovered that in order to build Origin the way they wanted to, they would not be able to rely solely on the industry's incumbent hardware manufacturers because the focus-based limitations Chris and Joel had identified with respect to the incumbent businesses themselves were also baked into every aspect of the industry's equipment manufacturers. The only solution was for Origin to develop both the software and hardware necessary to implement Chris and Joel's vision.

23. Origin did so, and it began shipping its first units in 2017 to overwhelming acclaim from customers. Origin continued to hone and improve its hardware, software, and material inputs to increase the quality and applicability of the system and to allow customers to print an ever-greater variety of end-usable parts with greater quality and reliability. In the years since then, Origin has pursued and secured broad patent protection for its printing process both in the United States and internationally—including in Japan, China, the European Union, and Canada.

24. Key patents and patent applications include the following, for which Chris and Joel are inventors:

| Figure 1: Key Patents Issued to Origin Founders | | | | |
|---|---|---|---|---|
| Family Ref. No. | Title | Jurisdiction | Application No. | Date Filed |
| ORGN-M01 | Method for Window Separation in an Additive Manufacturing Process | Canada | 3118364 | 2019-11-01 |
| | | China | 2019900012861 | 2019-11-01 |
| | | Europe | 19879943.9 | 2019-11-01 |
| | | Japan | 2021-600065 | 2019-11-01 |
| | | Patent Cooperation Treaty | PCT/US2019/059564 | 2019-11-01 |
| | | United States of America | 62/754411 | 2018-11-01 |
| | | United States of America | 16/672410 | 2019-11-01 |
| | | United States of America | 16/900560 | 2020-06-12 |
| | | United States of America | 16/941464 | 2020-07-28 |
| | | United States of America | 17/404,966 | 2021-08-17 |
| ORGN-M02 | System for Window Separation in an Additive Manufacturing Process | United States of America | 62/754430 | 2018-11-01 |
| | | United States of America | 16/672415 | 2019-11-01 |
| | | United States of America | 17/388598 | 2021-07-29 |
| ORGN-M03 | Method for Regulating Temperature at a Resin Interface in an Additive Manufacturing Process | Canada | 3136654 | 2020-04-17 |
| | | China | 2020900006647 | 2020-04-17 |
| | | Europe | 20791068.8 | 2020-04-17 |
| | | Japan | 2021-600157 | 2020-04-17 |
| | | Patent Cooperation Treaty | PCT/US2020/028783 | 2020-04-17 |
| | | United States of America | 62/835444 | 2019-04-17 |
| | | United States of America | 16/852078 | 2020-04-17 |
| | | United States of America | 17/066249 | 2020-10-08 |
| | | United States of America | 17/066372 | 2020-10-08 |

Case No. _____

COMPLAINT

| Family Ref. No. | Title | Jurisdiction | Application No. | Date Filed |
|---|---|---|---|---|
| | **Figure 1: Key Patents Issued to Origin Founders** | | | |
| ORGN-M04 | Method for Interlayer Feedback Control and Failure Prevention in an Additive Manufacturing Process | Canada | | 2020-08-03 |
| | | China | | 2020-08-03 |
| | | Europe | 20850214.6 | 2020-08-03 |
| | | Japan | | 2020-08-03 |
| | | Patent Cooperation Treaty | PCT/US2020/044803 | 2020-08-03 |
| | | United States of America | 62/882464 | 2019-08-02 |
| | | United States of America | 16/984102 | 2020-08-03 |
| | | United States of America | 17/518,510 | 2021-11-03 |
| ORGN-M05 | Method for Evaluating Photocurable Resins for an Additive Manufacturing System | United States of America | 62/972573 | 2020-02-10 |
| | | United States of America | 17/173174 | 2021-02-10 |
| ORGN-M06 | Origin Swab Documentation | United States of America | 63/007296 | 2020-04-08 |
| ORGN-M07 | Layer Segmentation: Texture and Dimensional Accuracy | United States of America | 63/218,247 | 2021-07-02 |
| ORGN-M08 | Method for Polymerizing Superficial Features in 3D-Printed Parts | United States of America | 63/300,621 | 2022-01-18 |
| ORGN-D01 | Additive Manufacturing Station | United States of America | 29/803,459 | 2021-08-12 |

25.     As this chart shows, Origin has secured (or was in the process of seeking) patent protection for, among other things, (i) key components of the printing process, (ii) key portions of its physical hardware, (iii) the use of real-time sensor data to optimize the printing process, (iv) the multivariate testing of new materials and formulations, and (v) light control and other software techniques for improving the accuracy, quality, and repeatability of manufactured parts. In addition to these patent protections, Origin has developed a variety of proprietary technologies and protected trade secrets concerning its product and processes, and it maintains substantial documentation to protect that valuable intellectual property. And as explained below, Chris and Joel have continued to devote themselves to developing, expanding, and protecting Origin's patent portfolio even after the acquisition by Stratasys.

COMPLAINT

26.     The most important aspect of Origin's software-based approach to 3D printing is the patented "Programmable PhotoPolymerization" process, or the "P3" process. The P3 process allows inexpensive and rapid production of high-quality and functional end-use parts. Among other things, the P3 process eliminates non-scalable and time-consuming post-processing—that is, the need to extensively treat the product after printing, such as by sanding rough edges—which has historically inhibited 3D printing from being used for manufacturing at a large scale. Instead, the P3 process is capable of producing parts that are usable virtually straight out of the printer, increasing efficiency and operating with, in Stratasys's own words, "industry-leading accuracy, consistency, detail and throughput[.]"[1]

**C.     The Origin One Printer**

27.     In 2019, Origin combined its insight and intellectual property into a flagship product and launched the Origin One printer to overwhelming demand and uniformly positive reviews. The Origin One combined the P3 process with the open-material model to permit users to print high-quality, functional products out of nearly any material chemistry—including newly developed materials—with minimal post-processing.

28.     The unique combination of the P3 process and the open-material model disrupted the industry incumbents, whose businesses turned on the (now outdated) "closed" model, and who relied on tightly controlled sales of material inputs. The Origin One's success threw the deficiencies of the old model into stark relief, and it led to lucrative partnerships with major manufacturers in a variety of industries, ranging from the Ford Motor Company in the automotive industry and the shoe company ECCO Sko A/S in the apparel industry.

29.     Although the industry has since followed Origin's lead and the open-material model is now nearly ubiquitous, Origin's technology remains best-in-class.

**II.     STRATASYS'S ACQUISITION OF ORIGIN**

30.     In 2020, Stratasys acquired Origin for a total purchase price of approximately $100 million in recognition of Origin's paradigm-shifting 3D printing technology. Stratasys has since

---

[1] *Origin One 3D Printer Support*, Stratasys, https://support.stratasys.com/en/Printers/P3-Printers/Origin-One (last accessed October 15, 2024).

touted the acquisition, noting in multiple SEC filings that Origin's technology "has become an important growth engine for our company." (Ex. 2, Stratasys 2022 Annual Report.)

### A.    The Beginning of the Origin-Stratasys Relationship

31.    Stratasys and Origin first worked together in March 2020 to produce 3D-printed sterile nasal swabs for use with COVID-19 tests. At the time, near the beginning of the pandemic, Origin was among the very first companies to receive clinical-trial approval for its 3D-printed nasal swabs.

32.    Because Stratasys had tried, but failed, to receive approval for its own 3D-printed swabs, the two companies entered a partnership to produce and distribute Origin's swabs. Through this partnership, each company learned about the other's strengths, abilities, and expertise. Chris, Joel, and their Origin colleagues worked closely with Stratasys's sales and distribution teams, while Stratasys witnessed firsthand Origin's industry-leading design, products, and operations.

33.    Recognizing the value of further collaboration, Stratasys made Origin an unsolicited offer of acquisition in the spring of 2020. Origin was not initially interested, and the Origin board turned down Stratasys's offer without countering. Stratasys nevertheless presented an updated offer on more favorable terms, paving the way for negotiations that culminated in the acquisition six months later.

### B.    The Parties Negotiate the Terms of the Acquisition

34.    The Parties negotiated the terms of Stratasys's acquisition of Origin throughout the remainder of 2020.  During the early stages of those negotiations, Stratasys was largely represented by Ronen Lebi, its Vice President of Corporate Development.

35.    As part of the negotiations, Stratasys engaged in an extensive technical diligence review through which it analyzed and confirmed the value of Origin's software-driven approach to 3D printing.  This diligence review involved, among other things, multiple in-person visits to Origin's facilities in San Francisco by key Stratasys personnel, including Yoav Zeif (Stratasys's CEO), Guy Menchik (Stratasys's Chief Technology Officer), Richard Garrity (Stratasys's Chief Industrial Business Officer, then the President of Stratasys Americas), Omer Krieger (Stratasys's Executive Vice President), and Amir Kleiner (Stratasys's VP Global Operations), among others.

36.     Separate from the technical diligence process, the parties devoted substantial efforts to negotiating the mechanics and structure of the acquisition—including Stratasys's proposal to structure the consideration it would pay to Origin in two parts: Stratasys would pay approximately 60% of the $100 million purchase price up front, and would pay the remaining 40% over a three-year period, conditioned on Origin's post-acquisition performance.

COMPLAINT



12    Case No. _____

COMPLAINT



47.    In explicit reliance on these and other promises Stratasys made as part of "mechanisms of managing the EO risk," the Shareholders agreed to resume formal negotiations of the proposed acquisition.  The parties ultimately executed the Acquisition Agreement on December 8, 2020 and announced the acquisition shortly thereafter.

**C.    The Acquisition Agreement**

13                                        Case No. _____
COMPLAINT

48.     The Acquisition Agreement contemplated that a portion of the consideration for Origin and its intellectual property would take the form of three post-acquisition payments to the Shareholders keyed to the Origin business unit meeting certain revenue-based performance goals. (*Id*. § 2.3; Ex. D.)  In particular, the Acquisition Agreement established three "Earn-Out Periods" over three consecutive years, beginning with the EO Date. (*Id*. Annex I.)  The Acquisition Agreement then set out calculations of the applicable Earn-Out Payments based on whether the revenue attributable to Origin's products during each such period (the "Earn-Out Revenue") met the pre-determined threshold of the Earn-Out Target. (*Id*. Ex. D; § 7.)

49.     In devising this structure, the parties recognized that the date selected as the EO Date—that is, the date on which the parties would begin measuring Origin's post-acquisition performance—would have a direct and major effect on whether the Earn-Out Targets were satisfied.

50.     As they had discussed throughout negotiations of the acquisition—including at the October 2020 meeting—Stratasys and the Shareholders understood and agreed that production, sales, and shipment of Origin products and services following the acquisition might be delayed for some period while the new Origin business unit integrated into the larger Stratasys ecosystem and adapted to Stratasys's new strategic goals. The Acquisition Agreement therefore included a tentative EO Date of July 1, 2021—which itself was nearly seven months after the Acquisition Agreement was executed—but provided that that date could be easily changed to correspond to the post-acquisition business reality, without the need either for a formal amendment or even a signed agreement.

█████████████████████████████████████████████████████

52.    Reflecting the Parties' agreement—at the October 2020 meeting and elsewhere—that the Shareholders' entitlement to Earn-Out Payments would be calculated based on the sale of any products or services that incorporated Origin's intellectual property, the Acquisition Agreement also set out a broad definition of revenue sources that would count against the Earn-Out Targets.  Specifically, the Acquisition Agreement provided that "Revenue" for purposes of Earn-Out calculations would include:

> [S]ales or leases of Company Products and Company Services (in each case, including any and all amalgamations, derivatives, enhancements, further developments, improvements, new versions, rebranding, repackaging and updates which are substantially based on or derived from the Company Products and Company Services, or their respective updates and derivations, which shall be referred to collectively as "Derivatives") (including the sales or provision of other hardware, software, materials, services, subscriptions and warranties specifically (A) designed for, or (B) acquired, leased or licensed from Parent or its Affiliates (including the Business Unit) for, any Company Product, Company Service or Derivative)[.]

(*Id.*, Ex. D).

53.    The Acquisition Agreement further defined "Company Products" as "the products produced, developed, sold or licensed by [Origin] in the current operation of the business as of the date hereof, including the Primary Product[,]" which is in turn defined as "the Company's 'Origin One' printer, versions 2.6 and 2.6.1."  The Acquisition Agreement defined "Company Services" as "any and all services provided by [Origin] in the current operation of the business."  (*Id.* Annex I.)

54.    The parties also agreed on a mechanism through which Stratasys would keep the Shareholders apprised of Origin's progress towards satisfying the Earn-Out Target.  Specifically, once the EO Date has passed and the Earn-Out Period begins, the Acquisition Agreement requires Stratasys to deliver Quarterly Reports to the Shareholders within 60 days of the close of each quarter during each Earn-Out Period.  Those reports must "set[] forth [Stratasys's] good faith, non-binding, computation of the Revenue in respect of such quarterly period (the 'Quarterly Report'), together with such supporting documentation as reasonably determined by [Stratasys]."  (*Id.* § 2.3(c).)  This requirement provides transparency to the Shareholders and allows them to promptly

bring any issues or disagreements to Stratasys's attention as those issues arise. (*See id*. (providing that the Shareholders would "notify Parent in the event that [they] dispute[] any element of such Quarterly Report" within "twenty (20) Business Days" of receipt).)

55. The Shareholders explicitly relied on each of these representations (among others) by Stratasys in the Acquisition Agreement. Absent Stratasys's representations, the Shareholders would not have agreed to the acquisition.

56. The parties also agreed that if any provisions of the Acquisition Agreement "were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine[.]" (*Id.* § 11.7.) The parties further agreed that a non-breaching party "shall be entitled to specific performance of the terms [of the Acquisition Agreement], in addition to any other remedy to which they are entitled at law or in equity." (*Id.*)

**D. The Shareholders Work to Ensure a Successful Acquisition**

57. Stratasys's stock price skyrocketed following the acquisition announcement, increasing by more than 40% in the following two weeks from a low of $17.22 per share on December 8 to a high of $24.36 on December 23, 2020. From the outset, the Shareholders did everything they could to ensure a smooth transition—Chris even appeared on an investor call on December 9, 2020 to discuss the transaction with Stratasys shareholders and to lay out the plans for Origin's integration with Stratasys.

58. From those early days through the present, the Shareholders have taken every step to ensure a successful business combination—in large part because of the incentive provided by the Earn-Out Payments. For instance, Chris and Joel both worked around the clock during the period between executing the Acquisition Agreement and closing the transaction, including, among other things, negotiating assignments of all of Origin's customer contracts and retention agreements with the existing Origin team.

59. Post-closing, Stratasys operated Origin as a new business unit within Stratasys, operating out of Origin's pre-existing offices in San Francisco. The Shareholders ensured that Origin integrated its back-office functions, its operations and supply chain functions, and its tech

function with Stratasys's existing functions. Origin also integrated its valuable intellectual property operations while successfully continuing to file new provisional patent applications and to convert Origin's existing provisional applications.

60. All of these tasks—a few mere housekeeping logistics, many others complicated and intricate—were critical to Stratasys's ability to immediately benefit from the addition of Origin to its business line.

61. Throughout this transition, the Origin team in California also continued to produce and sell the Origin One printers. Although sales were temporarily halted following the acquisition, the supply chain and production process soon resumed, and the Origin business line was in full production by late spring 2021, in advance of the initial July 1, 2021 EO Date, as planned. Both new and old clients remained happy with the performance of the Origin One.

## III. STRATASYS REPRESENTS THAT IT HAS AGREED TO SET THE EARN-OUT COMMENCEMENT DATE TO REFLECT COMMERCIAL REALITY

62. In the run-up to July 1 placeholder EO Date, Stratasys made the strategic decision to stop manufacturing and selling Origin products and services while it prioritized its other product lines and revamped—and prepared to re-launch—the Origin One.

63. The Shareholders thus raised Stratasys's prior promises to adjust the Earn-Out Date (as reflected in the Agreement and Stratasys's repeated representations leading up thereto).

### A. Stratasys Delays the Sale of Origin Products

65. Although Origin was well-positioned to continue manufacturing and producing its printers beginning in spring 2021, Stratasys decided to pursue other strategic objectives. As a result, Stratasys instructed the Origin team in California to direct its focus away from production of

17 Case No. _____

COMPLAINT

the existing printer model and, instead, to focus on developing new hardware for the Origin One that would be relaunched as a Stratasys product.

66.     This included developing an updated version of the Origin One printer that physically conformed to Stratasys's specifications while also taking steps to develop a specialized version of the printer intended for use in the dental industry, where Stratasys saw a business opportunity. Stratasys further directed the Origin team to implement a suite of new features for the Origin One printers already in use by existing customers. As a result of these new directives, Stratasys halted production and sales of the Origin One printer entirely near the end of spring 2021.

67.     During this same period, Stratasys also began incorporating Origin's intellectual property into its own product and service lines and prioritized the development of those other lines of business over the Origin business unit.  In other words, Stratasys substantially delayed Origin's launch while it raced ahead with sales of its own competing products and services, giving rise to the precise issues that the Shareholders had foreseen and raised, including in the Parties' October 2020 meeting.

**B.      Stratasys Tells the Shareholders That It Agrees to a New EO Date Coinciding with the Launch of the Origin One Version 2.7**

68.     The interruption of Origin One sales had immediate and obvious implications for Origin's ability to meet its Earn-Out Targets under the Acquisition Agreement. That is because if the EO Date remained unchanged, there would be no Origin products or services offered for sale for most or all of the first Earn-Out Period, and Origin would be unable to meet its Earn-Out Target.

69.     The Shareholders foresaw this exact circumstance, and it is what led to the concerns they raised at the October 2020 meeting—in response to which Stratasys assured the Shareholders that it would treat them fairly and ensure that their earn out entitlement would be calculated fairly. Those promises were memorialized in writing and subsequently instantiated in the Acquisition Agreement, including the provision allowing the parties to easily change the EO Date to reflect commercial reality and the provision forbidding Stratasys from interfering with the Shareholders' ability to satisfy the Earn-Out Targets.



19    Case No. _____
COMPLAINT



20
Case No. _____

COMPLAINT



21                          Case No. _____

COMPLAINT

83. The only way to credit Stratasys's present litigation position that the EO Date has not been changed because the board did not approve it is to conclude—against all the evidence and common sense—both that (i) Stratasys's own CEO was so neutered that he somehow did not have the authority to negotiate and make commercial agreements on behalf of the company, and (ii) the Shareholders were wrong to rely on Stratasys's own CEO's representations to them that they had reached an agreement. Neither of these can possibly be true.

86. Following Stratasys's representation that it had agreed to re-set the EO Date to coincide with the GA Date, Stratasys made the Origin One 2.7 generally available in February 2022. (Ex. 9 (Stratasys 2022 Form 6-K) (describing the "launch of the Origin One in mid-February"); *see also* Ex. 2 (Stratasys 2022 Annual Report) (noting that the "Origin One 3D Printer" has been "generally available since the beginning of 2022").) Because the Acquisition Agreement requires the EO Date to "fall[] on the first day of a calendar month," Stratasys's written

representations concerning its agreement to move the EO Date to coincide with the GA Date results in re-setting the EO Date as February 1, 2022—that is, the "first day of a calendar month" capturing the general availability of the Origin One 2.7.

**C.    The Shareholders Rely on Stratasys' Representations and Agreement to Re-Set the EO Date**

87.    Based on Stratasys's conduct and repeated agreement, the Shareholders believed that Stratasys and the Shareholders shared an understanding that the EO Date had been changed.  In fact, Stratasys's own subsequent conduct reinforced the Shareholders' reasonable belief that Stratasys would abide by its promise to re-set the EO Date.

89.    In fact, Stratasys did not provide the reports until July 2022, after the Shareholders, through their counsel, demanded that Stratasys abide by its agreement and pointed out Stratasys's failure to provide the Quarterly Reports that would have been required if the parties had not re-set the EO Date. Stratasys, faced with this plain evidence either of its fraud or of the untrue nature of its position—and in a ham-fisted attempt to remake history—then issued all three of those reports simultaneously, as if somehow that would retroactively absolve Stratasys for its conduct. Stratasys's position is self-evidently false.

90.    The Shareholders themselves explicitly relied on Stratasys's representation that it had agreed to change the EO Date to correspond to the GA Date.  The full group of Shareholders relied on Stratasys's representations by, among other things, declining to take formal steps to challenge Stratasys's failure to provide the Quarterly Statements that it would have been required

to provide had the EO Date not been re-set.  For similar reasons, the Shareholders did not, at the time, pursue their legal remedies against Stratasys for its scheme to delay the launch of Origin's products and services because the Shareholders reasonably believed that they would nevertheless be given a full and fair opportunity to satisfy their Earn-Out Targets and received 40% of their bargained-for consideration by virtue of Stratasys's representations that it had agreed to re-set the EO Date.

91.     Individual Shareholders Chris, Joel, and Jeffrey Lee separately relied on Stratasys's representations, including by agreeing to continue their employment at Stratasys following the acquisition long after they were contractually obligated to do so, despite their many documented concerns about certain of Stratasys's strategic and operational decisions.  (*See, e.g.*, Ex. 3 (July 8, 2021 Email from Chris).)  They did so with the express expectation and understanding that the re-set EO Date would give them and the other Shareholders a full and fair opportunity to satisfy the Earn-Out Targets—and to receive the remainder of their bargained-for compensation under the Acquisition Agreement.

92.     Without the agreement to re-set the EO Date, Stratasys's decision to halt the sale of Origin printers would have made it nearly impossible for Origin to satisfy its Earn-Out Targets. But based on Stratasys's representations that it had agreed to re-set the EO Date, the Shareholders reasonably believed that Stratasys had aligned the parties' interests—and based on that understanding, Chris, Joel, and Jeffrey Lee continued to provide valuable services to Stratasys to ensure the success of the Origin business unit in California.

93.     During the months since Stratasys first represented that it had agreed to re-set the EO Date, Chris and Joel have not just contributed to the day-to-day operation of the company; they have also taken substantial steps to further expand Origin's portfolio of intellectual property. Among other things, Chris and Joel have developed new innovations and techniques and have filed new applications with the USPTO, while also taking steps to protect and secure Origin's existing suite of patents.  (*See supra* ¶¶ 47-51.)  Further, Chris and Joel have made extensive efforts far exceeding their contractual commitments to build out and train a robust new-technology process team to ensure the continued protection of Origin's (now Stratasys's) intellectual property.  Chris

and Joel's ongoing and future work in this regard has been—and is—expressly predicated on Stratasys's representations concerning its agreement to re-set the EO Date.



96.    Stratasys's success is directly attributable to Chris and Joel's post-acquisition efforts—which they undertook relying on Stratasys's representations concerning its agreement to re-set the EO Date, which would enable the Shareholders to earn their full bargained-for earn-out compensation. It would be fundamentally inequitable and unjust for Stratasys to keep for itself the massive benefits that Chris and Joel based on their reliance on Stratasys's false representations.

100.    Stratasys's effort to cheat the Shareholders out of their bargained-for consideration—now that Stratasys has enjoyed the benefits of that bargain—is flatly contrary to Stratasys's prior representations concerning the parties' agreement.  In light of Stratasys's misconduct, the Shareholders are entitled to both enforce the contract and to their equitable portion of the substantial value they created.

**D.    Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success**

101.    Stratasys itself has recognized the substantial concrete benefits derived from acquiring Origin and using Origin's valuable intellectual property—as well as from the post-acquisition services provided by Chris, Joel, and the other Shareholders. The company's Form 6-K for the first quarter of 2022 noted that Stratasys's product revenues "increased by $14.6 million, or 36.7%, for the three months ended March 31, 2022," and that this increase "reflected the highest first quarter total in five years, strengthened by the launch of the Origin One[.]" (Ex. 9 (Stratasys 2022 Form 6-K).)

102.    Stratasys's corresponding earnings release touted the "early momentum and contribution from our new Origin P3" system, which it further noted was "designed for high-volume production of end-use parts." (Ex. 10 (May 16, 2022 Earnings Stmt.).) In fact, Origin's Q1 2022 sales exceeded Stratasys's own internal estimates at double digit rates. That momentum

continued throughout 2022, with Stratasys noting that the Origin product line "continue[s] to ramp, with excellent customer engagement across all of our new technology offerings." (Ex. 11 (August 3, 2022 Earnings Stmt.).)

103.    Stratasys continued to tout Origin's value in subsequent filings, noting in its 2022 Annual Report that Origin's technology "has become an important growth engine for our company" and explaining that the Origin acquisition "significantly strengthened our leadership in mass production for polymer 3D printing" because "Origin's pioneering approach to additive manufacturing of end-use parts has enabled us to serve a large market with manufacturing-grade 3D printers." (Ex. 2 (Stratasys 2022 Annual Report).)

104.    Origin's contribution to Stratasys goes beyond the numbers of the Origin business unit. Since the acquisition, Stratasys has recognized the value proposition of Origin's core insight: a software-driven approach to printing coupled with an open-material model will open the door for 3D printing to jump from the limited prototyping industry into the multitrillion-dollar manufacturing industry. Based on this recognition that 3D printing can be reliably used for manufacturing, Stratasys has incorporated Origin's paradigm-shifting open-material model into the majority of its 3D-printing business lines, not just the Origin One, which has allowed Stratasys to charge a premium across its business units.

105.    Stratasys's 2022 performance was largely due to Origin's products and services. And Stratasys's more recent earnings releases and investor statements continue to tout the success of the Origin product line and Origin's intellectual property more broadly—including the new "P3 Business Unit" founded exclusively for the purpose of monetizing Origin's intellectual property. For instance, in its 2023 Annual Report, Stratasys extensively discussed the P3 technology, including that the "P3-based systems, which [Stratasys] added to [its] solutions portfolio via the acquisition of Origin, offer a best-in-class combination of detail, mechanical properties and throughput for mass manufacturing production parts" and that the P3 technology "dramatically expand the total addressable market across medical, dental, consumer goods, automotive, commercial goods, and service bureaus." (Ex. 19 (Stratasys 2023 Annual Report).)

**E.    Stratasys Cheats the Shareholders Out of Their Bargained-For Consideration**



107.    The only reason for this breach that Zeif provided was that the board had supposedly determined that there was "no benefit to Stratasys" to follow through on changing the EO Date, now that Stratasys had already enjoyed the benefits of the agreement. In other words, Stratasys reneged solely because it decided it would be in Stratasys's interest to do so. By refusing to honor its express representations and promises to the Shareholders, Stratasys completed its months-long scheme to dupe the Shareholders into creating massive benefits for the company while cheating them out of the compensation they are entitled to.

109.    Stratasys's effort to do so is contrary to its prior written representations, the plain language of the Acquisition Agreement, and the parties' post-acquisition course of performance. It is also contrary to any sense of fairness or good faith—both because Stratasys seeks to deprive the Shareholders of their bargained-for benefit while continuing to profit from Origin's valuable

Case No. _____

intellectual property, and because Stratasys seeks to drive a wedge between Chris and Joel and the remaining Shareholders.

110.    Chris and Joel did not accept Zeif's improper proposal, which was at odds with the deal Stratasys had already agreed to and was fundamentally unfair to the remaining Shareholders.

## IV.    STRATASYS VIOLATED ITS REPRESENTATIONS, PROMISES AND AGREEMENT(S)

111.    Stratasys repeatedly represented to the Shareholders that it would re-set the EO Date to coincide with the GA Date for version 2.7 of the Origin One printer. That representation is memorialized in multiple writings—and it therefore constitutes an effective agreement to re-set the EO Date under the plain language of the Acquisition Agreement.

### A.    The Parties' Emails Constitute Writings Under the Acquisition Agreement

112.    The Acquisition Agreement states that the EO Date is "July 1, 2021 or such other date that falls on the first day of a calendar month as mutually agreed in writing by Parent and Seller Representative."  (Acq. Agmt. Annex I.)

114.    These emails are more than sufficient to satisfy the "agreed in writing" requirement of the Acquisition Agreement, which was specifically designed to account for post-acquisition business reality.

29                    Case No. _____

COMPLAINT

████████████████████████████████████

**B.      Re-Setting the EO Date Does Not Require Board Approval**

116.    Despite its written representations, Stratasys has taken the position that its written promises to re-set the EO Date are somehow ineffective because they were not formally approved by the Stratasys board. But the Acquisition Agreement includes no such requirement—it simply requires Stratasys to agree to any change in writing. And as a commercially sophisticated party, Stratasys knows that a CEO does not need board approval prior to entering into an agreement on behalf of his company—it is well within the scope of a CEO's powers to enter into an agreement on behalf of his company and the corporation is bound by such agreement.

117.    Moreover, Zeif has repeatedly demonstrated broad decision-making powers and authority on behalf of Stratasys, including with respect to all sorts of issues relating to the relaunch of the Origin One printer. Without seeking or requiring the board's approval, Zeif has (i) made decisions regarding the production and sale of the Origin One printers, (ii) directed the Origin team to develop new hardware, (iii) allocated resources to address and resolve manufacturing and performance issues as they arose, (iv) directed the Origin team to prioritize a separate product targeting the dental industry over the Origin One printer, (v) restarted production, and (vi) set the GA Date.

118.    Along with these decisions, Zeif also negotiated and represented to the Shareholders that he had bound the company in writing to a revised EO Date. Stratasys's last-minute claim that Zeif needed board approval for that single item (but not the others) not only contradicts the plain language of the Acquisition Agreement, but it also deviates from the parties' course of post-acquisition performance over many months, from which Zeif's authority to re-set the EO Date is implied.

119.    Stratasys's claim also runs contrary to its Articles of Association, which contemplate the grant of significant powers to the CEO. (Ex. 12 (Amended and Restated Articles of Association of Stratasys Ltd.) § 81.3; *see also Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 127-28 (3d Cir. 1998) ("Express authority to act on behalf of the corporation is usually

manifested through a statute, the certificate of the corporation, the by-laws, or a board or shareholder action.").)

120.    Stratasys cannot undo Zeif's representations on the company's behalf by now claiming that only the board can make such a deal.

**C.    The Parties' Performance Evidences Stratasys's Representations that It Had Agreed to Change the EO Date**

121.    Finally, Shareholders relied on Stratasys's representations that it had agreed to move the EO Date—and from the Shareholders' perspective, Stratasys's conduct also appeared to reflect reliance on what they understood to be a mutual agreement.  As explained in Section III(C) above, Stratasys appeared to perform in accordance with that agreement by, among other things, not producing the Quarterly Reports that are mandated during the Earn-Out Periods until after it received the Shareholders demand letter on June 28, 2022.

122.    Stratasys's course of performance is consistent with its representations to the Shareholders that it had agreed to move the EO Date. In fact, had the parties not agreed to move the EO Date, Stratasys would have been in material breach of the Acquisition Agreement for failing to satisfy this requirement, with the result that the entire unpaid earn-out payments—$40 million—would be due immediately.

123.    And for their part, Shareholders Chris, Joel, and Jeffrey Lee contributed substantial time and effort to the success of the Origin business unit post-acquisition, which they did in direct reliance on Stratasys's repeated agreements to re-set the EO Date—and which conferred substantial benefits on Stratasys in reliance on the Shareholders' reasonable expectation that the re-set EO Date would provide them with a fair opportunity to satisfy the Earn-Out Targets.

124.    In other words, the course of conduct of both Parties would act to re-set the EO Date even in the absence of a written agreement.  The Parties' conduct evidences a plain intention to amend the placeholder EO Date in the Acquisition Agreement and substitute with the EO Date that coincides with the actual launch of the Origin products and services.

125.    The parties' conduct is therefore further evidence of a mutual, unambiguous agreement to re-set the EO Date—and that change was legally effective either as an agreement in

writing under the Acquisition Agreement or, alternatively, as a modification though their course of performance.[3]  Stratasys cannot undo its represented agreement by belatedly claiming its own CEO somehow did not have the authority to act on the company's behalf.

## V.    STRATASYS HAS DEFRAUDED THE SHAREHOLDERS

126.    Stratasys repeatedly and knowingly lied to the Shareholders in order to induce their reliance and to reap substantial ill-gotten gains.  By lying to the Shareholders, Stratasys was able to secure and monetize Origin's valuable intellectual property while paying only a fraction of the agreed-upon purchase price.  And by using that intellectual property, Stratasys has generated (and will continue to generate) hundreds of millions of dollars in revenue and increased enterprise value.

127.    Stratasys's fraud on the Shareholders takes at least three separate forms.

### A.    Stratasys Fraudulently Induced the Shareholders' Execution of the Acquisition Agreement

128.    Stratasys's false pre-acquisition promises fraudulently induced the Shareholders' execution of the Acquisition Agreement.  Indeed, the Shareholders had already "called off" the potential acquisition by the early fall of 2020—but Stratasys induced them to resume negotiations and ultimately consummate the transaction based on false pretenses.

[3] For the same reason, Stratasys's repeated practice of directing all substantive communications concerning the EO Date to Chris, Joel, and Jeffrey Lee as the representatives of the Shareholders—rather than to Fortis, the formal "Seller Representative"—effects a modification of the Acquisition Agreement's technical requirement that the "agreement in writing" be between Stratasys and the Seller Representative.



33    Case No. _____

COMPLAINT

130.    Each of those promises was false, and Stratasys knew that each promise was false at the time because Stratasys had no intention of fairly calculating the Shareholders' earn out entitlements—or of paying the Shareholders any Earn-Out Payment at all.  Instead, Stratasys planned to prevent the Shareholders from satisfying the Earn-Out Targets, including by delaying the launch of Origin's products, by illicitly funneling Origin's intellectual property into other Stratasys products that it refused to count towards the Earn-Out Target, and by prioritizing those (and other) Stratasys products over the Origin line.

132.    Were it not for Stratasys's repeated false statements, the Shareholders would never have entered into the Acquisition Agreement.

133.    In light of Stratasys's explicitly false statements—including the false statements incorporated into the Acquisition Agreement itself as Stratasys's explicit representations, warranties, and obligations—Stratasys cannot avail itself of any defenses based on purported contractual disclaimers of reliance or limitations of liability.  Among other reasons, a party may not contract around its own deliberate fraud or enjoy the benefits of clauses purporting to limit liability and/or reliance where such clauses appear in contracts that also include knowingly false representations by the wrongdoer.

**B.    Stratasys Defrauded the Shareholders by Lying About Its Intention to Re-Set the EO Date**

134.    Stratasys separately defrauded the Shareholders following the acquisition by, among other things, lying to the Shareholders both orally and in writing about Stratasys's agreement to re-set the EO Date so as to coincide with the general availability of Origin's products and services.

34    Case No. _____

COMPLAINT

135.   Were it not for Stratasys's repeated false statements, the Shareholders—acting through Chris, Joel, and Jeffrey Lee—would not have provided the extremely valuable services from July 2021 through February 2022 that allowed Stratasys to monetize Origin's intellectual property.

**C.   Stratasys Concealed Its Fraud and Other Misconduct Until At Least March 23, 2022**

136.   Stratasys also fraudulently concealed its misconduct until at least March 23, 2022, when it finally informed the Shareholders that it would not agree to re-set the EO Date—but only after Stratasys's lies had induced the Shareholders' reliance for more than a year.

138.   Were it not for Stratasys's repeated lies and efforts to hide the truth, the Shareholders would have discovered the truth much earlier.  But in light of those lies, the Shareholders could not have known they had been defrauded any earlier than March 23, 2022.

**VI.   STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER**

139.   Since this dispute has arisen, the Shareholders have repeatedly—and fruitlessly—tried to engage in a productive commercial dialogue concerning Stratasys's agreement to re-set the EO Date.

140.   Indeed, shortly after Stratasys informed the Shareholders in March 2022 that Stratasys would renege on its repeated written agreement to re-set the EO Date, Chris and Joel asked Zeif to reconsider that position and to abide by the Parties' prior agreement.

142.    Rather than engaging with the Shareholders or abiding by its unambiguous prior written agreements, Stratasys instead opted to double and triple-down on its position.  In an attempt to undermine the undisputed evidence of its agreement to re-set the EO Date, Stratasys sent a letter on July 15, 2022, in which it informed the Shareholders that it intended to provide the Quarterly Reports—which would have been due months prior had the Parties not agreed to move the EO Date—"by no later than Wednesday, July 20, 2022."  (Ex. 14 (July 15, 2022 Stratasys Letter).)

143.    Stratasys proceeded to provide "Quarterly Reports" that would have corresponded to the first, second, and third quarters of the first Earn-Out Period had the EO Date not been re-set. (Ex. 15 (July 20, 2022 Quarterly Statements).)  Those Quarterly Reports demonstrated precisely why the parties agreed to re-set the EO Date: Stratasys had not even made the Origin products available for sale during much of those periods of time.[4]  (*Id*.)

---

[4] Indeed, on August 29, 2022, Stratasys provided a purported "Earn-Out Schedule for the First Earn-Out Period" stating that the "First Earn-Out Payment is nil." (Ex. 16 (Aug. 29, 2022 Earn-Out Schedule).)



147.    Stratasys's conduct left the Shareholders with no choice but to seek legal recourse in order to hold Stratasys to its agreement, to disgorge the unfair benefits that Stratasys's and Zeif's deliberate misrepresentations conferred on Stratasys, and to recover their costs and attorneys' fees incurred in enforcing their rights.

**VII.    STRATASYS DISCLAIMS ALL ARBITRAL JURISDICTION OVER THE SHAREHOLDERS' FRAUD AND EQUITY CLAIMS**

148.    On May 19, 2023, the Shareholders filed an arbitration demand against Stratasys before the International Center for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA"), pursuant to the arbitration clause in the Acquisition Agreement. (Ex. 20.) The Shareholders filed an amended arbitration demand (the "Arbitration Demand") on August 2, 2024. (Ex. 21.)  The Arbitration Demand included three causes of action sounding in contract that are not at issue in this proceeding, as well as the fraud and equity claims herein.

COMPLAINT



151.    In other words, Stratasys has now waived any argument that the Shareholders' claims sounding in equity and fraud should be arbitrated.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Fraud)**

152.    The Shareholders reallege each paragraph of this Complaint as if fully set forth herein.

153.    As alleged herein, Stratasys engaged in deliberate fraud against the Shareholders intending to deprive them of the full purchase price for their company in at least three ways:  (a) by engaging in misrepresentations of material facts intending to induce the Shareholders to execute the Acquisition Agreement; (b) by engaging in misrepresentations of material fact intending to induce the Shareholders to perform valuable services for Stratasys's benefit after the acquisition and to refrain from challenging Stratasys's hidden misconduct intended to interfere with the Shareholders'

Case No. _____

Earn-Out rights; and (c) by withholding and omitting material facts before and after the acquisition which Stratasys was obligated to truthfully disclose and not conceal or otherwise refrain from disclosing.

155.    Stratasys memorialized each of these pre-acquisition promises in writing, including in the parties' joint, contemporaneous notes of the October 2020 meeting.  Stratasys also explicitly made each of these promises as part of the representations, warranties, and/or obligations explicitly set out in the Acquisition Agreement itself.  (*See, e.g.*, Acq. Agmt. § 2.3; Annex I; Ex. D.)

157.    Stratasys's pre-acquisition misrepresentations were intended to induce the Shareholders' execution of the Acquisition Agreement.

158.    The Shareholders reasonably relied on Stratasys's representations, including by agreeing to the terms of the Acquisition Agreement and by fully complying with their obligations thereunder by, among other things, transferring ownership of Origin and its valuable suite of intellectual property to Stratasys and ensuring a successful integration of Origin into Stratasys.

159.    Second, after the acquisition, Stratasys made deliberate, knowingly false representations of material facts with the intent to induce the Shareholders to provide valuable services to Stratasys.

161.    Stratasys memorialized these statements in writing, including in the correspondence between and among Zeif, Lebi, and representatives of the Shareholders in which Zeif and Lebi represented that Stratasys had agreed to, and would, re-set the EO Date as promised.

162.    Each of those statements—and many others—were false, and Stratasys knew of the falsity at the time.  Stratasys's false statements were intended to induce the Shareholders' reliance.

163.    The Shareholders reasonably relied on Stratasys's representations, including by not demanding that Stratasys provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set, by delaying in seeking to challenge Stratasys's fraudulent scheme, and by performing valuable services for Stratasys with the expectation that the Shareholders would receive the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such

satisfaction. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions.  Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

164.    Third, Stratasys concealed material facts from the Shareholders before, during, and following the Parties' execution of the Acquisition Agreement, as well as before, during, and following the Parties' negotiations regarding re-setting the EO Date.

165.    Among other things, Stratasys concealed until at least March 23, 2022 that the representations by which it had induced the Shareholders' reliance were knowingly false.  Stratasys accomplished this concealment by repeatedly reassuring the Shareholders that it had, in fact, re-set the EO Date to correspond with the launch of the Origin product line—including in written correspondence from Zeif, Lebi, and other representatives of Stratasys from July 2021 through February 2022.

166.    Stratasys further concealed its misconduct by failing to provide the Quarterly Reports that it was contractually obligated to provide following the EO Date.  Had Stratasys provided such reports, the Shareholders would have learned the truth: that contrary to what it had promised, Stratasys had not re-set the EO Date.



168.    Stratasys engaged in this concealment intentionally in order to delay the Shareholders' discovery of their fraud so that the Shareholders would (a) continue to provide the valuable services described herein and (b) delay in seeking to challenge Stratasys's fraudulent

scheme. Had the Shareholders known the truth, they would have uncovered Stratasys's fraud and misconduct earlier.

169. As a result of Stratasys's fraud, any of Stratasys's would-be protections or limitations on liability or reliance as set forth in the Acquisition Agreement or elsewhere were procured by fraud and are therefore void and unenforceable.

170. Further, as a result of Stratasys's fraud, the Shareholders have suffered damages in an amount to be determined by the Court.

171. Stratasys's conduct entitles the Shareholders to all remedies for fraud, including disgorgement of all unlawful earnings or enrichments received or retained by Stratasys as a result of its wrongful conduct—upon information and belief, an amount no less than $400 million dollars.

172. Stratasys's conduct was gross, oppressive, and/or aggravated and therefore entitles the Shareholders to punitive damages, pre-judgment and post-judgment interest, attorney's fees, costs, and such additional relief as the Court may deem appropriate. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076-77 (Del. 1983).

**SECOND CAUSE OF ACTION**
**(Promissory Estoppel)**

173. The Shareholders reallege each paragraph of this Complaint as if fully set forth herein.

COMPLAINT

175. These promises were clear and unambiguous, and Stratasys memorialized each of these pre-acquisition promises in writing, including in the parties' joint, contemporaneous notes of the October 2020 meeting. Stratasys also explicitly made each of these promises as part of the representations, warranties, and/or obligations explicitly set out in the Acquisition Agreement itself. (*See, e.g.*, Acq. Agmt. § 2.3; Annex I; Ex. D.)

176. Stratasys reasonably expected that the Shareholders would take action in reliance on these pre-acquisition promises regarding the EO mechanism. The Shareholders expressed concerns about the earn-out structure to Stratasys, and Stratasys made these specific promises to address those concerns and as part of "mechanisms of managing the EO risk."

177. The Shareholders reasonably relied on these promises, including by resuming formal negotiations of the acquisition, by agreeing to the terms of the Acquisition Agreement, and by fully complying with their obligations thereunder by, among other things, transferring ownership of Origin and its valuable suite of intellectual property to Stratasys and ensuring a successful integration of Origin into Stratasys.

178. In multiple written and oral communications between July 2021 and February 2022, Stratasys promised to re-set the EO Date to coincide with the GA Date. These promises were clear and unambiguous, and Stratasys reasonably expected that the Shareholders would take action (and/or forbear from taking certain actions) in reliance on Stratasys's promise to re-set the EO Date.

179. The Shareholders did, in fact, rely on Stratasys's promise. Among other things, Chris, Joel, and Jeffrey Lee relied on Stratasys's promise by devoting substantial time, effort, and resources for the benefit of Stratasys, all of which far exceeded any duties or obligations they owed to the company. During this period, Chris, Joel, and Jeffrey Lee provided extremely valuable services to Stratasys, at substantial burden and opportunity cost to themselves, in direct reliance on Stratasys's and Zeif's promises to them.

180. The Shareholders also relied on Stratasys's promise by not demanding that Stratasys provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set and by delaying in seeking to challenge Stratasys's fraudulent scheme.

181.    Stratasys's repudiation of its clear and unambiguous promises has caused and continues to cause the Shareholders significant harm, including without limitation to the extent they have been deprived of the full and fair opportunity to satisfy the relevant Earn-Out Targets.

182.    Stratasys's promises are binding and enforceable, and injustice can be avoided only by enforcement of the promises to re-set the EO Date and to fairly calculate the Shareholders' Earn-Out Payments by crediting the sale of all products and services incorporating Origin's intellectual property against the Earn-Out Targets as reflected in the Acquisition Agreement.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment)

183.    The Shareholders reallege each paragraph of this Complaint as if fully set forth herein.

184.    Stratasys's conduct has induced the Shareholders—including Chris, Joel, and Jeffrey Lee—to perform valuable services for Stratasys. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions.

185.    Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

186.    Stratasys's conduct also induced the Shareholders to not demand Stratasys to provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set and to delay in seeking to challenge Stratasys's fraudulent scheme. As a result, Stratasys generated substantial revenue and profits from products or services incorporating Origin's intellectual property, but only paid a fraction of the true cost.

187.    The Shareholders have been damaged by, among other things, losing the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction. Stratasys also induced Chris, Joel, and Jeffrey Lee

to assume significant personal burdens for Stratasys's benefit, including foregoing the opportunity to engage in other, more lucrative, professional endeavors.

188.    There is no justification for Stratasys's conduct: it knowingly induced the Shareholders to provide valuable services with the intention of profiting from those services to the Shareholders' detriment.

189.    Under principles of equity, Stratasys should not be permitted to retain the benefits it gained because of its wrongdoing.

190.    The Shareholders therefore seek disgorgement of the full amount by which Stratasys has been unjustly enriched as a result of the substantial time, effort, and resources the Shareholders contributed to Stratasys—upon information and belief, an amount no less than $400 million.

## FOURTH CAUSE OF ACTION
### (Quantum Meruit)

191.    The Shareholders reallege each paragraph of this Complaint as if fully set forth herein.

192.    Stratasys's conduct has induced Shareholders—including Chris, Joel, and Jeffrey Lee —to perform valuable services for Stratasys with the expectation that the Shareholders would receive recompence from Stratasys, including the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction.

193.    Shareholders performed those services under circumstances that put Stratasys on notice that the Shareholders had relied on Stratasys's promises.  Among other things, the Shareholders did not object to Stratasys's failure to provide the Quarterly Reports that would otherwise have been due, absent an agreement to re-set the EO Date.  The Shareholders also delayed in seeking to challenge Stratasys's fraudulent scheme.  Instead, Shareholders continued to provide valuable services to Stratasys in reliance on their mutual agreement.

194.    The Shareholders therefore seek fair recompence for the contributions that Zeif and Stratasys induced Shareholders, on false pretenses, to make for Stratasys's benefit, in an amount to be determined by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, the Shareholders pray that the Court issue the following relief:

A.      Damages in an amount to be determined at trial;

B.      Disgorgement of the full amount by which Stratasys has been unjustly enriched in an amount to be determined by the Court, but reasonably believed to exceed $400 million;

C.      Recompence for the value of the services provided by Shareholders to Stratasys in reliance on Stratasys's promise to re-set the EO Date to February 1, 2022;

D.      An injunction preventing Stratasys from using Origin's intellectual property until Stratasys fairly compensates the Shareholders, while also tolling the calculation of the EO Payments until a commercially reasonable date following the full re-introduction of the Origin product line into the market;

E.      Punitive and exemplary damages in the amount to be determined at Trial;

F.      Pre- and post-judgment interest;

G.      The Shareholders' attorneys' fees, expenses, and costs; and

H.      All such other and further relief as the Court may deem just and proper.

Dated: October 21, 2024

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By: _____
J. Noah Hagey

*Attorneys for Plaintiff Fortis Advisors LLC, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc.*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of all claims and causes of action triable before a jury.

Dated: October 21, 2024

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By: _____
     J. Noah Hagey

*Attorneys for Plaintiff Fortis Advisors LLC,* in *its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc.*

48                                         Case No. _____
COMPLAINT

# EXHIBIT 1

*Execution Version*

**AGREEMENT AND PLAN OF MERGER AND REORGANIZATION**

**BY AND AMONG**

**STRATASYS LTD.,**

**STRATASYS INC.,**

**ORIGIN MERGER, INC.,**

**ORIGIN LABORATORIES, INC.,**

**AND**

**FORTIS ADVISORS LLC, AS SELLER REPRESENTATIVE**

**DECEMBER 8, 2020**

## AGREEMENT AND PLAN OF MERGER AND REORGANIZATION

This AGREEMENT AND PLAN OF MERGER AND REORGANIZATION (this "Agreement"), dated as of December 8, 2020, by and among Stratasys Ltd., a company incorporated under the laws of the State of Israel ("Parent"), Origin Merger, Inc., a Delaware corporation and a wholly owned subsidiary of Parent ("Merger Sub I"), Stratasys Inc., a Delaware corporation and a wholly owned subsidiary of Parent ("SSYS Inc"), Origin Laboratories, Inc., a Delaware corporation (the "Company"), and Fortis Advisors LLC, a Delaware limited liability company,, solely in its capacity as the representative of Company Holders (the "Seller Representative").

RECITALS

**WHEREAS,** the board of directors of each of Parent, SSYS Inc, Merger Sub I and the Company has: (i) determined that the merger of Merger Sub I with and into the Company with the Company as the surviving corporation ("Merger I"), would be advisable and fair to, and in the best interests of, their respective stockholders, (ii) determined that immediately following the effectiveness of Merger I, the merger of the Company with and into SSYS Inc, with SSYS Inc as the surviving corporation ("Merger II" and together with Merger I, the "Transaction"), would be advisable and fair to, and in the best interests of, their respective stockholders, and (iii) approved the Transaction upon the terms and subject to the conditions set forth in this Agreement in accordance with applicable Legal Requirements;

**WHEREAS**, the Company Board has determined, subject to the terms of this Agreement, to recommend that the Company Stockholders adopt and approve this Agreement and approve the Transaction;

**WHEREAS,** pursuant to the Transaction, among other things, and subject to the terms and conditions of this Agreement, all of the issued and outstanding shares of Company Capital Stock, and each of the Vested Options, Company Warrants and Company Conversion Safes as existing immediately prior to the Effective Time of Merger I shall, in accordance with the terms hereof, be converted into the right to receive the consideration set forth herein;

**WHEREAS**, concurrently with the execution of this Agreement and as a condition and inducement to the willingness of Parent to enter into this Agreement, each of the Key Stockholders has entered into stockholder agreements substantially in the form attached hereto as Exhibit A with Parent (the "Stockholder Agreements"), executed copies of which have been delivered to the Parent;

**WHEREAS**, immediately after the execution and delivery of this Agreement, the Company shall submit this Agreement and the Transaction to the Company Stockholders for approval by written consent by the requisite majority, in the form attached as Exhibit B (the "Stockholder Written Consent"), in lieu of a special meeting of the Company Stockholders pursuant to Section 228 of the General Corporation Law of the State of Delaware (the "DGCL");

**WHEREAS**, as a condition and inducement to Parent to enter into this Agreement and incur the obligations set forth herein, at or prior to the execution and delivery of this Agreement, Mr. Chris Prucha and Mr. Joel Ong (the "Founders") and the Key Employees have accepted and entered into employment arrangements and non-solicitation, confidentiality and intellectual property assignment agreements with Parent contingent upon and effective as of the Closing; and

**WHEREAS**, the parties intend that Merger I and Merger II will be treated as a single integrated transaction and that the Transaction will constitute a "reorganization" within the meaning of Section 368(a) of the Code, and that this Agreement constitute a "plan of reorganization" within the meaning of Treasury Regulations Sections 1.368-2(g) and 1.368-3(a).

3

**NOW, THEREFORE**, in consideration of the foregoing and the respective covenants, agreements, representations and warranties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## THE MERGER; EFFECT OF THE MERGER



3







6



8





10



11





12

13





14



16



17







19

20





22



23



24



24

25



26



27





29



30





32





34





35



36







40

41



41

42



43



43

44





46



47











51



53



53



54







57



58













65



66



67



68



69





70



71

72



73



74





76



77











81

82





**ARTICLE XI**
**MISCELLANEOUS**





11.5 **Choice of Exclusive Forum; Consent to Jurisdiction**.

(a) The parties hereto understand and irrevocably agree that any and all claims, grievances, demands, controversies, causes of action or disputes of any nature whatsoever (including, but not limited to, tort and contract claims, and claims upon any Legal Requirement) (hereinafter "Disputes"), arising out of, in connection with, or in relation to this Agreement and the Ancillary Agreements shall be exclusively referred to and finally resolved by arbitration in Wilmington, Delaware. The arbitration will be conducted in English in accordance with the rules of the American Arbitration Association with one arbitrator. The parties hereto agree that a final determination of an arbitrator in accordance with the provisions hereof shall be conclusive and may be entered in any Court having jurisdiction.

(b) Service. Each of the parties irrevocably consents to service of process by first class certified mail, return receipt requested, postage prepaid, to the address at which such party is to receive notice in accordance with Section 11.8 hereof.

(c) Payment of Costs. The non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs.

(d) Waiver of Jury Trial. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY HERETO OR ITS SUCCESSORS AGAINST ANY OTHER PARTY HERETO OR ITS SUCCESSORS IN RESPECT OF ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY PROCEEDING BROUGHT PURSUANT TO SECTION 11.5. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (III) IT MAKES SUCH WAIVERS VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.5(d).

85



11.8    **Notices**.  All notices, requests, demands, claims and other communications hereunder shall be in writing (including by email).  Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (a) if personally delivered, when so delivered, (b) if mailed, five (5) Business Days after having been sent by first class, registered or certified U.S. mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below, (c) if given by facsimile, once such notice or other communication is transmitted to the facsimile number specified below, (d) if given by email, once such email is sent to the email address specified below, or (e) if sent through a nationally-recognized overnight delivery service that guarantees next day delivery, the Business Day following its delivery to such service in time for next day delivery, *provided that* (x) in the case of (c) or (d) the sending facsimile has generated a transmission report showing successful completion of such transaction, or in the case of an email no rejection of such email has been received, and (y) if such facsimile or email is sent after 5:00 p.m. local time at the location of the receiving facsimile, or is sent on a day other than a Business Day, such notice or communication shall be deemed given as of 9:00 a.m. local time at such location on the next succeeding Business Day, *provided further that* notices to the Seller Representative shall be delivered solely by facsimile or email, with confirmation of receipt:

(a)        if to Parent, Surviving Corporation I or Surviving Corporation II to:

Stratasys Ltd.
1 Holtzman St., Science Park,
P.O. Box 2496
Rehovot 76124
Israel
Attention: Vered Ben Jacob, Adv.
Email: vered.benjacob@stratasys.com
Telephone: +972-8-9314314
Facsimile No.: +972-8-9314315

with a copy (not constituting notice) to:

Meitar | Law Offices
16 Abba Hillel Silver Rd.
Ramat Gan 5250608, Israel
Telephone: + 972-3-6103190
Telecopy: + 972-3-6144872
Email: dchertok@meitar.com; jonathana@meitar.com
Attention: David Chertok, Adv.; Jonathan Atha, Adv.

(a)      if to the Company prior to the Closing, to:

Origin Laboratories, Inc.
75 14th St.
San Francisco, CA 94103
Email: chris@origin.io
Attention:  Chris Prucha

with a copy (not constituting notice) to:

Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP
550 Allerton Street
Redwood City, CA 94063
Email: jku@gunder.com
Telephone: +1 (650) 463-5428
Attention: Jerome Ku

(b)      if to the Seller Representative, to:

Fortis Advisors LLC

Email:        notices@fortisrep.com
Facsimile:    (858) 408-1843
Attention:    Notice Department (Project Octopus)

Any party entitled to notice hereunder may change the address or facsimile number to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other parties notice in the manner herein set forth.

87





[Signature Pages Follow]

**IN WITNESS WHEREOF**, the parties have executed and caused this Agreement and Plan of Merger to be executed and delivered on the date first above written.

PARENT:

STRATASYS, LTD.

By: _____

    Name:  Lilach Payorski          Yoav Zeif

    Title:    Cheif Financial Officer     Cheif Executive Officer

MERGER SUB I:

ORIGIN MERGER SUB, INC.

By: _____

    Name:       Lilach Payorski

    Title:       Chief Financial Officer

SSYS INC:

STRATASYS, INC.

By: _____

    Name:      Lilach Payorski

    Title:      Chief Financial Officer

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER AND REORGANIZATION

**IN WITNESS WHEREOF**, the parties have executed and caused this Agreement and Plan of Merger to be executed and delivered on the date first above written.

**THE COMPANY**:

**ORIGIN LABORATORIES, INC.**

By:

Name: Christopher Michael Prucha
Title: Chief Executive Officer

**SELLER REPRESENTATIVE**:

**FORTIS ADVISORS LLC**

By:

Name: Richard Fink
Title: Managing Director

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER AND REORGANIZATION

**IN WITNESS WHEREOF**, the parties have executed and caused this Agreement and Plan of Merger to be executed and delivered on the date first above written.

**THE COMPANY**:

**ORIGIN LABORATORIES, INC.**

By:_____
Name: Christopher Prucha
Title: Chief Executive Officer

**SELLER REPRESENTATIVE**:

**FORTIS ADVISORS LLC**

By:_____
Name: Richard Fink
Title: Managing Director

SIGNATURE PAGE TO AGREEMENT AND PLAN OF MERGER AND REORGANIZATION







GDSVF&H\5312668.19















GDSVF&H\5312668.19



GDSVF&H\5312668.19





GDSVF&H\5312668.19



GDSVF&H\312668.19







GDSVF&H\5312668.19

# EXHIBIT 2

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

# FORM 20-F

**(Mark One)**

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2022**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report ........................................

**Commission file number: 001-35751**

# STRATASYS LTD.

(Exact name of Registrant as specified in its charter)

**Not Applicable**
(Translation of Registrant's name into English)

**Israel**
(Jurisdiction of incorporation or Organization)

Table of Contents

|  |  |
|---|---|
| **c/o Stratasys, Inc.** | **1 Holtzman Street,** |
| | **Science Park** |
| **7665 Commerce Way** | **P.O. Box 2496** |
| **Eden Prairie,** | **Rehovot, Israel 76124** |
| **Minnesota 55344** | |

(Address of Principal Executive Offices)

**Richard Garrity, Chief Industrial Business Unit Officer**
**Tel: (952) 937-3000**
**E-mail: rich.garrity@stratasys.com**
**7665 Commerce Way**
**Eden Prairie, Minnesota  55344**
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Ordinary Shares, par value NIS 0.01 per share** | **SSYS** | **Nasdaq Global Select Market** |

Securities registered or to be registered pursuant to Section 12(g) of the Act.
**None**
(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.
**None**
(Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

**67,085,918 Ordinary Shares, NIS 0.01 par value, at December 31, 2022.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232,405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or an emerging growth company. See definition of "accelerated filer," "large accelerated filer" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Emerging Growth Company ☐ |

1

Table of Contents

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

   † The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

| U.S. GAAP☒ | International Financial Reporting Standards as issued by the International Accounting Standards Board ☐ | Other ☐ |
|---|---|---|

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow. Item 17 ☐ Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

1

**TABLE OF CONTENTS**

| | Page |
|---|---|
| **TABLE OF CONTENTS** | |
| **CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS** | 1 |
| **USE OF TRADE NAMES** | 3 |
| **CERTAIN TERMS AND CONVENTIONS** | 3 |
| | |
| **PART I** | |
| **ITEM 1.IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS.** | 4 |
| **ITEM 2.OFFER STATISTICS AND EXPECTED TIMETABLE.** | 4 |
| **ITEM 3.KEY INFORMATION.** | 4 |
| **ITEM 4.INFORMATION ON THE COMPANY.** | 35 |
| **ITEM 4A.UNRESOLVED STAFF COMMENTS.** | 72 |
| **ITEM 5.OPERATING AND FINANCIAL REVIEW AND PROSPECTS.** | 72 |
| **ITEM 6.DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES.** | 95 |
| **ITEM 7.MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS.** | 123 |
| **ITEM 8.FINANCIAL INFORMATION.** | 126 |
| **ITEM 9.THE OFFER AND LISTING.** | 128 |
| **ITEM 10.ADDITIONAL INFORMATION.** | 128 |
| **ITEM 11.QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.** | 139 |
| **ITEM 12.DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES.** | 140 |
| | |
| **PART II** | |
| **ITEM 13.DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES.** | 140 |
| **ITEM 14.MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS.** | 140 |
| **ITEM 15.CONTROLS AND PROCEDURES.** | 140 |
| **ITEM 16A.AUDIT COMMITTEE FINANCIAL EXPERT.** | 141 |
| **ITEM 16B.CODE OF ETHICS.** | 141 |
| **ITEM 16C.PRINCIPAL ACCOUNTANT FEES AND SERVICES.** | 142 |
| **ITEM 16D.EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES.** | 143 |
| **ITEM 16E.PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS.** | 143 |
| **ITEM 16F.CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT.** | 143 |
| **ITEM 16G.CORPORATE GOVERNANCE.** | 143 |
| **ITEM 16H.MINE SAFETY DISCLOSURE.** | 143 |
| **ITEM 16I. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS.** | 143 |
| **PART III** | |
| **ITEM 17.FINANCIAL STATEMENTS.** | 144 |
| **ITEM 18.FINANCIAL STATEMENTS.** | 144 |
| **ITEM 19.EXHIBITS.** | 145 |
| **SIGNATURES.** | 147 |

Table of Contents

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain information included or incorporated by reference in this annual report may be deemed to be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements are often characterized by the use of forward-looking terminology such as "may," "will," "expect," "anticipate," "estimate," "continue," "believe," "should," "intend," "project" or other similar words, but are not the only way these statements are identified.

These forward-looking statements may include, but are not limited to, statements relating to our objectives, plans and strategies, statements that contain projections of results of operations or of financial condition and all statements (other than statements of historical facts) that address activities, events or developments that we intend, expect, project, believe or anticipate will or may occur in the future.

Forward-looking statements are not guarantees of future performance and are subject to risks and uncertainties. We have based these forward-looking statements on assumptions and assessments made by our management in light of their experience and their perception of historical trends, current conditions, expected future developments and other factors they believe to be appropriate.

Important factors that could cause actual results, developments and business decisions to differ materially from those anticipated in these forward-looking statements include, among other things:

- the extent of our success at introducing new or improved products and solutions that gain market share;

- the extent of growth of the 3D printing market generally;

- the global macro-economic environment, including headwinds caused by inflation, rising interest rates, unfavorable currency exchange rates and potential recessionary conditions;

- changes in our overall strategy, including as related to any restructuring activities and our capital expenditures;

- the impact of shifts in prices or margins of the products that we sell or services we provide, including due to a shift towards lower margin products or services;

- the impact of competition and new technologies;

- impairments of goodwill or other intangible assets in respect of companies that we acquire;

- the extent of our success at efficiently and successfully integrating the operations of various companies that we have acquired or may acquire;

1

Table of Contents

- the degree of our success at locating and acquiring additional value-enhancing, inorganic technology that furthers our business plan to lead in the realm of polymers;

- the potential adverse impact that recent global interruptions and delays involving freight carriers and other third parties may have on our supply chain and distribution network and consequently, our ability to successfully sell both our existing and newly-launched 3D printing products;

- global market, political and economic conditions, and in the countries in which we operate in particular;

- government regulations and approvals;

- litigation and regulatory proceedings;

- infringement of our intellectual property rights by others (including for replication and sale of consumables for use in our systems), or infringement of others' intellectual property rights by us;

- potential cyber attacks against, or other breaches to, our information technologies systems;

- the extent of our success at maintaining our liquidity and financing our operations and capital needs;

- impact of tax regulations on our results of operations and financial condition; and

- any additional factors referred to in Item 3.D "Key Information - Risk Factors", Item 4 "Information on the Company", and Item 5 "Operating and Financial Review and Prospects", as well as in other parts of this Annual report.

Readers are urged to carefully review and consider the various disclosures made throughout this annual report, which are designed to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

Any forward-looking statements in this annual report are made as of the date hereof, and we undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

2

Table of Contents

## USE OF TRADE NAMES

Unless the context otherwise indicates or requires, "Stratasys," "PolyJet," "J8 Series," "J850," "J826," "J750," "J55," "FDM," "Fortus," "F900," "Fortus 450mc," "Fortus 380mc," "F123 Series," " "F770," "Origin," "Origin One," "$P^3$," "Stratasys Direct Manufacturing," "GrabCAD," "GrabCAD Print," "GrabCAD Shop," "GrabCAD Community," "GrabCAD Workbench," "MakerBot," "Method," "Method X," MakerBot CloudPrint," "Thingiverse," "Replicator," "Digital Anatomy," "TissueMatrix," "GelMatrix," "BoneMatrix," "Neo," "H350," "SAF" and all product names and trade names used by us in this annual report are our trademarks and service marks, which may be registered in certain jurisdictions. Although we have sometimes omitted the "®" and "TM" trademark designations for such marks in this annual report, all rights to such trademarks and service marks are nevertheless reserved. Furthermore, the Stratasys Signet design logo is our property. This annual report contains additional trade names, trademarks and service marks of other companies. We do not intend our use or display of other companies' tradenames, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by, these other companies.

## CERTAIN TERMS AND CONVENTIONS

In this annual report, unless the context otherwise requires:

- references to "Stratasys," "our company," "the Company," "the consolidated company," "the registrant," "we," "us," and "our" refer to Stratasys Ltd. (formerly known as Objet Ltd.), and its consolidated subsidiaries;

- references to "Objet" generally refer to Objet Ltd. and its consolidated subsidiaries prior to the effective time of the Stratasys, Inc.- Objet Ltd. merger on December 1, 2012. We may also use "Objet" to refer to the line of products previously sold by Objet Ltd. and the related current, ongoing operations that have continued following the Stratasys, Inc.-Objet Ltd. merger.

- references to "Stratasys, Inc." generally refer to Stratasys, Inc., a Delaware corporation, and its consolidated subsidiaries prior to the effective time of the Stratasys, Inc.-Objet Ltd. merger, but sometimes (as the context requires) refer to the current, ongoing operations of our Stratasys, Inc. subsidiary;

- references to "ordinary shares", "our shares" and similar expressions refer to our Ordinary Shares, par value NIS 0.01 per share;

- references to "dollars", "U.S. dollars", "U.S. $" and "$" are to United States Dollars;

- references to "shekels" and "NIS" are to New Israeli Shekels, the Israeli currency;

- references to the "articles" or "amended articles" are to our Amended and Restated Articles of Association, which became effective upon the closing of the Stratasys, Inc.- Objet Ltd. merger, as subsequently amended;

- references to the "Companies Law" are to the Israeli Companies Law, 5759-1999, as amended;

- references to the "Securities Act" are to the Securities Act of 1933, as amended;

- references to the "Exchange Act" are to the Securities Exchange Act of 1934, as amended;

- references to "Nasdaq" are to the Nasdaq Stock Market; and

- references to the "SEC" are to the United States Securities and Exchange Commission.

Table of Contents

**PART I**

**ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS.**

Not applicable.

**ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE.**

Not applicable.

**ITEM 3. KEY INFORMATION.**

**A. [Reserved]**

**B. Capitalization and Indebtedness.**

Not applicable.

**C. Reasons for the Offer and Use of Proceeds.**

Not applicable.

**D. Risk Factors.**

*You should carefully consider the risks described below, together with all of the other information in this annual report on Form 20-F. The risks described below are not the only risks facing us. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business operations. If any of these risks actually materializes, our business, financial condition and results of operations could suffer and the price of our shares could decline.*

4

Table of Contents

**Summary of Risk Factors**:

The following constitutes a summary of the material risks relevant to an investment in our company:

**Risks related to our business and financial condition**

- We may not succeed at introducing new or improved products and solutions that gain market share.
- Our annual and quarterly operating results and financial condition may fluctuate.
- Demand for our products and services may not grow as we expect.
- The 3D printing market generally may not grow as we expect.
- Global macro-economic trends such as inflation, rising interest rates and potential recessionary conditions, may have material adverse consequences for our operations, financial position, cash flows, and those of our customers and suppliers.

- Declines in the prices of our products and services, or in our volume of sales, together with our relatively inflexible cost structure, may adversely affect our financial results.
- To the extent that other companies are successful in developing or marketing consumables for use in our systems, our revenues and profits would likely be adversely affected.
- If our product mix shifts too far into lower margin products or our revenues mix shifts significantly towards our additive manufacturing ("AM") services business, our profitability could be reduced.
- Competition and new technologies may cut into our market share.
- Impairments of goodwill or other intangible assets in respect of companies that we acquire would adversely impact our results of operations for the periods in which they occur.
- Our failure to successfully consummate acquisitions of, or investments in, new business, technologies, products or services, to integrate them into our existing company, or to realize from them expected performance, may adversely affect our financial results.
- Our operations could suffer if we are unable to attract and retain key management, directors or other key employees.

5

Table of Contents

- Global interruptions and delays involving freight carriers and other third parties may interfere with our supply chain and distribution network and frustrate our ability to sell our existing and new products.
- If we do not maximize our recurring stream of revenues from the sale of consumables and service contracts, our operating results may be adversely affected.
- Global market, political and economic conditions, and in the countries in which we operate in particular, could adversely impact our operating results.
- Significant disruptions of our information technology systems, including management information systems for inventory management and distribution, or breaches of our data security could adversely affect our business.
- We own a number of our manufacturing and office facilities, which may limit our ability to move those operations.

6

Table of Contents

**Risks related to our intellectual property**

- Infringement of our intellectual property rights by others (including for replication and sale of consumables for use in our systems), or infringement of others' intellectual property rights by us, could lead to litigation, could necessitate a redesign of our products to avoid use of certain technology, and may have an adverse impact on our financial results.
- If we are unable to obtain patent protection for our products or otherwise protect our intellectual property rights, our business could suffer.
- As our patents expire, additional competitors using our technology could enter the market, which could offer competitive printers and consumables, require us to reduce our prices for our products and result in lost sales.

**Risks related to operations in Israel**

- Exchange rate fluctuations between the U.S. dollar and the New Israeli Shekel (in particular), the Euro, the Yen and other non-U.S. currencies may negatively affect the earnings of our operations.
- We are currently eligible for Israeli government tax benefits in respect of our Israeli operations. If we do not meet several conditions for receipt of those benefits, or if the Israeli government otherwise decides to eliminate those benefits, they may be terminated or reduced.

**Risks related to an investment in our ordinary shares**

- The market price of our ordinary shares may be subject to fluctuation, regardless of our operating results and financial condition. As a result, our shareholders could incur substantial losses.

- We do not anticipate paying any cash dividends in the foreseeable future.

7

Table of Contents

**Risks related to our business and financial condition**

***We may not be able to introduce new 3D printers, high-performance systems and consumables acceptable to customers or to improve the technology, software or consumables used in our current systems in response to changing technology and end-user needs.***

We derive most of our revenues from the sale of additive manufacturing systems and related consumables. The markets in which we operate are subject to rapid and substantial innovation and technological change, mainly driven by technological advances and end-user requirements and preferences, as well as the emergence of new standards and practices. Our ability to compete in these markets depends, in large part, on our success in enhancing our existing products and developing new additive manufacturing systems and new consumables that will address the increasingly sophisticated and varied needs of prospective end-users, and respond to technological advances and industry standards and practices on a cost-effective and timely basis or otherwise gain market acceptance. In keeping with our strategic goal of strengthening our position in polymers and in the fast-growing mass production parts market, we acquired Origin Laboratories, Inc., or Origin, and its P3™ Programmable PhotoPolymerization technology in December 2020, which we believe will help to further strengthen our position in that area. In order to further expand our polymer suite of solutions across the product life cycle, in 2021, we acquired UK-based RP Support Ltd., or RPS, a provider of industrial stereolithography 3D printers and solutions, and Xaar 3D Ltd., or Xaar, and its powder-based SAF™ technology, thereby accelerating our growth in production-scale 3D printing.

8

Table of Contents

Even if we successfully utilize new acquired technologies or organically developed technologies to create new systems or enhance our existing systems, it is likely that new systems and technologies that we develop will eventually supplant our existing systems or that our competitors will create systems that will replace our systems. As a result, any of our products may be rendered obsolete or uneconomical by our or others' technological advances.

***Our operating results and financial condition may fluctuate.***

The operating results and financial condition of our company may fluctuate from quarter to quarter and year to year and are likely to continue to vary due to a number of factors, many of which will not be within our control. Particularly, during the period of COVID-19 and thereafter, we have less visibility as to the expected movements of the global economy and, consequently, as to the expected changes in our operating results over time. As a result, we began analyzing our quarterly results on a linear basis, comparing consecutive quarters with one another, in addition to comparing each quarter with the corresponding quarter of the previous year, thereby enabling us to track the most updated economic trends and their impact on our operating results. After having suspended providing quarterly or annual guidance in the second quarter of 2020, we returned to providing more limited guidance in 2021 and 2022 and beyond. However, if our operating results do not meet that guidance or the expectations of securities analysts or investors, the market price of our ordinary shares will likely decline. Fluctuations in our operating results and financial condition may be due to a number of factors, including the latest global economic developments concerning inflation, interest rates and unemployment, as well as those additional factors listed below and those identified throughout this "Risk Factors" section:

- the degree of market acceptance of our products and services, particularly in the fast-growing sector of mass production parts;

- the mix of products and services that we sell during any period;

- the geographic distribution of our sales;

- our responses to price competition;

- long sales cycles;

- unforeseen liabilities or difficulties in integrating our acquisitions or newly acquired businesses;

- changes in the amount that we spend to develop, acquire or license new products, consumables, technologies or businesses;

- changes in the amounts that we spend to promote our products and services;

- changes in the cost of satisfying our warranty obligations and servicing our installed base of systems;

- delays between our expenditures to develop and market new or enhanced systems and consumables and the generation of sales from those products;

- delays in orders of our products from period to period due to outside factors, such as U.S. government shutdowns, which may delay orders by U.S. government agencies or other end-users whose business activities are heavily dependent on U.S. government agency contracts;

- global interruptions and delays involving freight carriers and other third parties, which may interfere with our supply chain and distribution network and frustrate our ability to sell our existing and new products;

9

Table of Contents

- development of new competitive products and services by others;

- difficulty in predicting sales patterns and reorder rates that may result from multi-tier distribution strategy associated with new product categories such as entry level desktop 3D printers;

- impairment charges that we may be required to record in respect of our goodwill and/or other long-lived assets;

- potential cyber attacks against, or other breaches to, our information technologies systems;

- litigation or threats of litigation, including intellectual property claims by third parties;

- changes in accounting rules and tax laws;

- tax benefit that we may record due to partial or full release of valuation allowances against our deferred tax assets;

- general economic and industry conditions that affect end-user demand and end-user levels of product design and manufacturing; and

- changes in dollar-shekel and dollar-Euro exchange rates that affect the value of our net assets, revenues and expenditures from and/or relating to our activities carried out in those currencies;

10

Table of Contents

Due to all of the foregoing factors, and the other risks discussed in this annual report, you should not rely on quarter-over-quarter and year-over-year comparisons of our operating results as an indicator of our future performance.

***If demand for our products and services, or in the 3D printing market generally, does not grow as expected, our revenues may stagnate or decline and our profitability may be adversely affected.***

The commercial marketplace for prototyping and manufacturing, which was once dominated by conventional production technologies, is gradually adopting additive manufacturing as a new production technology. This is true with respect to prototype development, and to a growing extent, with respect to direct digital manufacturing, or DDM, as an alternative to traditional manufacturing. If the commercial marketplace does not continue to transform towards the broader acceptance of 3D printing and DDM as alternatives for prototype development and traditional manufacturing, or if it adopts 3D printing based on technologies other than the technologies that we use, we may not be able to increase or sustain current or future levels of sales of our products and related materials and services, and our results of operations may be adversely affected as a result.

***Current macro-economic trends have been adversely affecting, and could continue to adversely affect, our business, results of operations and financial condition due to their impact on the industries in which we and our customers operate, and due to the unknown speed, extent and nature of the reversal of those trends.***

Certain global macro-economic trends that were triggered, in large part, by the COVID-19 pandemic and the world's reaction to it, have been adversely impacting the global economic environment in the post-pandemic period. Supply chain delays, initially caused by closures during the pandemic, and rising shipping costs, which were exacerbated by the ongoing Russian invasion of the Ukraine, have contributed towards inflationary pressures on many goods, commodities and services globally. The infusion of money into circulation as part of a "loose" monetary policy to encourage consumer spending, along with historically low interest rates for an extended period of time, which were designed to ease economic conditions during the pandemic, further triggered upwards pressure on prices of goods, commodities and services. The high rates of inflation globally have caused governments and central banks to act to curb inflation, including by raising interest rates, which is intended to temper economic activity and which, if more powerful than intended, could trigger recessionary conditions in individual countries or regions, or globally.

These macro-economic trends have been impacting our target markets and our results of operations. For example, rising interest rates, which are meant to slow down inflation, have been worsening credit/financing conditions for our customers and adversely impacting their ability to purchase our products.

In light of these uncertainties, we continue to monitor the cost-control measures that we first implemented in February 2020, when the COVID-19 pandemic began, some of which we have maintained in place since that time.

While we believe that we are well-positioned to withstand the current adverse macro-economic trends, given our balance sheet (primarily due to our cash reserves and lack of debt) and our emphasis on operational efficiencies and execution, we continue to monitor the situation, assessing further implications for our operations, supply chain, liquidity, cash flow and customer orders, in an effort to mitigate potential new adverse consequences should they arise. However, there is no assurance that we will succeed at doing so.

Current or future downturns could also have a material adverse impact on our business partners' stability and financial strength. Given the uncertainties associated with these trends in the current macro-economic environment, it is difficult to fully assess the magnitude of their effects on our, and our business partners', business, financial condition and results of operations.

The guidance that we provide for 2023 may lack the degree of certainty that we once had in providing guidance, due to the number of variables surrounding the current macro-economic environment.

The trends associated with the current economic environment may also have the effect of amplifying many of the other risks described herein.

11

Table of Contents

***Declines in the prices of our products and services, or in our volume of sales, together with our relatively inflexible cost structure and increased costs of producing and selling our products, may adversely affect our financial results.***

Our business is subject to price competition. Such price competition may adversely affect our ability to maintain the same degree of profitability, especially during periods of decreased demand. Decreased demand also adversely impacts the volume of our systems sales. If our business is not able to offset price reductions resulting from these pressures, or decreased volume of sales due to contractions in the market, by improved operating efficiencies and reduced expenditures, then our operating results will be adversely affected.

Certain of our operating costs are fixed and cannot readily be reduced, which diminishes the positive impact of our reorganization programs on our operating results. To the extent the market for our products slows, or the 3D printing market contracts, we may be faced with excess manufacturing capacity and excess related costs that cannot readily be reduced, which will adversely impact our results of operations. The impact of rising inflation on the cost of producing and selling our products has also made it more difficult for us to maintain our profit margins and thereby also adversely impacting our results of operations.

***To the extent that other companies are successful in developing or marketing consumables for use in our systems, our revenues and profits would likely be adversely affected.***

We sell a substantial portion of the consumables used in our systems. We attempt to protect against replication of our proprietary consumables through patents and trade secrets and provide that warranties on those systems may be invalid if customers use non-genuine consumables. Other companies have developed and sold, and may continue to develop and sell, consumables that are used with our systems, which may reduce our consumables sales and impair our overall revenues and profitability.

***If our product mix shifts too far into lower margin products or our revenues mix shifts significantly towards our AM services business, our profitability could be reduced.***

Sales of certain of our existing products have higher margins than others. For instance, some of our high-end systems and related consumables yield a greater gross margin than our entry-level systems. Sales of our entry-level systems may displace sales of our other systems. If sales of our entry-level systems have the effect of reducing sales of our higher margin products, or if for any other reason, our product mix shifts too far into lower margin products, and we are not able to sufficiently reduce the engineering, production and other costs associated with those products or substantially increase the sales of those products, our profitability could be reduced. A similar negative impact on our gross margins could result due to a significant shift towards revenues generated by our AM parts service business, Stratasys Direct Manufacturing, which are characterized by lower margins relative to our products.

12

Table of Contents

***The markets in which we participate are competitive. Our failure to compete successfully could cause our revenues and the demand for our products to decline.***

We compete with a wide variety of producers of systems that create 3D printed models, prototypes, manufacturing aids, medical guides and end-use parts as well as producers of materials and services for these systems, including both additive and subtractive manufacturing methodologies, such as metal extrusion, computer-controlled machining and manual modeling techniques. Our principal competition currently consists of other manufacturers of systems for prototype development and manufacturing processes, including 3D Systems Corporation, HP, Carbon, EOS GmbH, Formlabs, Markforged and Desktop Metal (following their acquisition of EnvisionTEC). For our broadened AM parts and services business, our chief competitors consist of 3D Systems, Materialise, Protolabs and many other smaller service providers. We may face additional competition in the future from other new entrants into the marketplace, including companies that may have significantly greater resources than we have that may become new market entrants or may enter through acquisition or strategic or marketing partnerships with current competitors.

Some of our current and potential competitors have longer operating histories and more extensive name recognition than we have and may also have greater financial, marketing, manufacturing, distribution and other resources than we have. Current and future competitors may be able to respond more quickly to new or emerging technologies and changes in end-user demands and to devote greater resources to the development, promotion and sale of their products than we can. Our current and potential competitors may develop and market new technologies that render our existing or future products obsolete, unmarketable or less competitive (whether from a price perspective or otherwise). We cannot assure that we will be able to maintain or enhance our current competitive position or continue to compete successfully against current and future sources of competition.

***If additional goodwill or other intangible assets that we have recorded become impaired, we could have to take future charges against earnings***

As of December 31, 2022, the carrying value of all of our goodwill and other intangible assets was approximately $186.3 million compared to a carrying value of $217.4 million as of December 31, 2021.

During the third quarter of 2020, we noted that indicators of potential impairment existed which required an interim goodwill impairment analysis for our Stratasys-Objet reporting unit. These indicators included longer and deeper than expected reduction in the business, refinement to our business focus into additional inorganic technologies and sustained decline in our market capitalization during the second and third quarters of 2020, all, primarily as a result of the COVID-19 impact on the global economy and our business.

As a result of those indicators, we revisited various assumptions supporting the cash flow projections for our Stratasys-Objet reporting unit. Based on the revised cash flow projections, the value of the reporting unit decreased below its carrying value, and we recorded in the third quarter of 2020 a goodwill impairment charge of $386.2 million, the reporting unit's entire goodwill.

In addition, in the third quarter of 2020, we tested the recoverability of our long-lived assets, including our purchased intangible assets. We concluded that the carrying amounts of certain of our purchased intangible assets were not recoverable. As a result, we recorded a non-cash impairment charge of $5.3 million, in order to reduce the carrying amounts of certain of our purchased intangible assets to their estimated fair value.

Under accounting principles generally accepted in the United States of America, or GAAP, we are required to review goodwill for impairment annually and whenever events or changes in circumstances indicate that the carrying amount of goodwill may not be recoverable.

Any impairment to our reporting units in the future could result in further significant charges against our earnings and could have a material adverse effect on our results of operations. For further information, please see Notes 7 and 8 to our consolidated financial statements included elsewhere in this annual report.

13

Table of Contents

***As part of our growth strategy, we have sought, and will continue to seek, to acquire or to make investments in other businesses, patents, technologies, products or services. Our failure to do so successfully (including, if applicable, to finance such acquisitions or investments on favorable terms, to avoid adverse financial consequences, and to realize expected results from such acquisitions or investments) may adversely affect our financial results.***

As part of our growth strategy, which is focused on polymers, we expect to continue to regularly evaluate acquisitions or investments to expand our suite of products and services. Even if we are able to identify a suitable acquisition or investment, we may not be able to consummate any such transaction if we cannot reach an agreement on favorable terms or if we lack sufficient resources to finance the transaction on our own and cannot obtain financing at a reasonable cost or if regulatory authorities prevent such transaction from being consummated. If we proceed with a particular acquisition or investment, we may have to use cash, issue new equity securities with dilutive effects on existing shareholders, incur indebtedness, assume contingent liabilities or amortize assets or expenses in a manner that might have a material adverse effect on our financial condition, results of operations or liquidity. Acquisitions will also require us to record certain acquisition-related costs and other items as current period expenses, which would have the effect of reducing our reported earnings in the period in which an acquisition is consummated. In addition, we could also face unknown liabilities or write-offs due to our acquisitions and investments, which could result in a significant charge to our earnings in the period in which they occur. We will also be required to record goodwill or other long-lived asset impairment charges (if any) in the periods in which they occur, which could result in a significant charge to our earnings in any such period. For further information on our quantitative assessment for goodwill impairment we performed in 2020 and the resulting impairments that we recorded, please see Notes 7 and 8 to our consolidated financial statements included elsewhere in this annual report. If an acquired entity or investment does not perform as projected and in accordance with our expectations, and is not accretive to our earnings, it may adversely impact our overall results of operations and hurt, rather than help, our business.

***Our operations could suffer if we are unable to attract and retain key management or other key employees in the Israeli market or other markets in which we operate where competition for highly skilled technical and other personnel is intense.***

Our success depends upon the continued service and performance of our senior management and other key personnel. Our executive team is critical to the management of our business and operations, as well as to the development of our strategy. The loss of the services of any members of our senior executive team could delay or prevent the successful implementation of our strategy, or our commercialization of new applications for our systems or other products, or could otherwise adversely affect our ability to manage our company effectively and carry out our business plan. During 2022 we experienced some personnel changes in our management team, including the promotion of individuals internally (including our chief financial officer, Eitan Zamir) and the hiring of others from outside of our company. There is no assurance that if we need to fill additional management positions in the future, that we will be able to rapidly do so, without any adverse impact on our operations.

Our dependence on key employees extends beyond our senior executive team, to our highly skilled scientific, technical (including software) and sales personnel. Our principal research and development as well as significant elements of our general and administrative activities are conducted at one of our two headquarters, in Israel, and we face significant competition for suitably skilled employees in Israel. While there has been intense competition for qualified human resources in the Israeli high-tech industry historically (including the additive manufacturing, or AM, industry in which we operate), the industry experienced record growth and activity in 2021, both at the earlier stages of venture capital and growth equity financings, and at the exit stage of initial public offerings and mergers and acquisitions. This flurry of growth and activity has caused an increase in job openings in both Israeli high-tech companies and Israeli research and development centers of foreign companies, and intensification of competition between these employers to attract qualified employees in Israel.  As a result, the high-tech industry in Israel has experienced significant levels of employee attrition and is currently facing a severe shortage of skilled human capital, including engineering, research and development, software, sales and customer support personnel. Similar shortages of key personnel also exist in the regions surrounding our Minnesota, New York, California, Texas and Boston facilities. Companies with which we compete for qualified personnel may have greater resources than we do, and we may not succeed in recruiting additional experienced or professional personnel, retaining  personnel or effectively replacing current personnel who may depart with qualified or effective successors. If we cannot attract and retain sufficiently qualified technical employees for our research and development and/or product development activities (including for the software in our products), we may be unable to achieve the synergies expected from mergers and acquisitions that we may effect from time to time, or to develop and commercialize new products or new applications for existing products.

14

Table of Contents

In addition, as a result of the intense competition for qualified human resources, the Israeli high-tech and other high-tech markets have also experienced and may continue to experience significant wage inflation.  Accordingly, our efforts to attract, retain and develop personnel may also result in significant additional expenses, which could adversely affect our profitability. Furthermore, in making employment decisions, particularly in the high-technology industry, job candidates often consider the value of the equity they are to receive in connection with their employment. Employees may be more likely to leave us if the shares they own or the shares underlying their equity incentive awards have significantly appreciated or significantly decreased in value. Many of our employees may receive significant proceeds from sales of our equity in the public markets, which may reduce their motivation to continue to work for us and could heighten the risk of employee attrition.

While we utilize non-competition agreements with our employees as a means of improving our employee retention, those agreements may not be effective towards that goal. These agreements prohibit our employees, if they cease working for us, from competing directly with us or working for our competitors for a limited period. We may be unable to enforce these agreements under Israeli law or the law of other jurisdictions, and it may be difficult for us to restrict our competitors from benefiting from the expertise our former employees developed while working for us.

In light of the foregoing, there can be no assurance that qualified employees will remain in our employ or that we will be able to attract and retain qualified personnel in the future. Failure to retain or attract qualified personnel could have a material adverse effect on our business, financial condition and results of operations.

***Defects in new products or in enhancements to our existing products could give rise to product returns or product liability, warranty or other claims that could result in material expenses, diversion of management time and attention, and damage to our reputation.***

Our products are complex and may contain defects or experience failures or unsatisfactory performance due to any number of issues in design, fabrication, packaging, materials, and/or use within a system. These defects or errors could result in significant warranty, support and repair or replacement costs, cause us to lose market share and divert the attention of our engineering personnel from our product development efforts to find and correct the issue.

This risk of product liability claims may also be greater due to the use of certain hazardous chemicals used in the manufacture of certain of our products. Those hazardous chemicals fall within three different categories (with several of the chemicals falling within multiple categories): irritants, harmful chemicals and chemicals dangerous for the environment. In addition, we may be subject to claims that our 3D printers have been, or may be, used to create parts that are not in compliance with legal requirements or that intellectual property posted by third parties on our GrabCAD website infringes the intellectual property rights of others.

Any claim brought against us, regardless of its merit, could result in material expense, diversion of management time and attention, and damage to our reputation, and could cause us to fail to retain existing end-users or to attract new end-users. Although we maintain product liability insurance, such insurance is subject to significant deductibles and there is no guarantee that such insurance will be available or adequate to protect against all such claims, or we may elect to self-insure with respect to certain matters. Costs or payments made in connection with warranty and product liability claims and product recalls or other claims could materially affect our financial condition and results of operations.

***Our sales of end-use parts to customers in the aerospace, medical, dental and automotive industries, and of 3D printing systems to customers in the aerospace industry, carry with them a greater potential for liability claims against us.***

Our manufacturing services business, Stratasys Direct Manufacturing, produces parts used as prototypes, benchmarks, and end-use parts. In the case of end-use parts, our sales to customers in the aerospace, medical, dental and automotive industries, in particular, makes us more susceptible to product and other liability claims, which characterize operations in those industries. Sales of our 3D printing systems to customers in the aerospace industry similarly carry with them potential liability claims if the parts produced by those systems do not function properly. Any such claims that are not adequately covered by insurance or for which insurance is not available may adversely affect our results of operations and financial condition.

15

Table of Contents

***If our relationships with suppliers for our products and services, especially with single source suppliers of components of our products, were to terminate or our manufacturing arrangements were to be disrupted, our business could be interrupted.***

We purchase components and sub-assemblies for our systems, raw materials that are used in our consumables, and AM systems, component parts and raw materials for our Stratasys Direct Manufacturing services business, from third-party suppliers, some of whom may compete with us. While there are several potential suppliers of most of these component parts, sub-assemblies and raw materials that we use, we currently choose to use only one or a limited number of suppliers for several of these components and materials. Furthermore, the suppliers of AM systems and materials used in our Stratasys Direct Manufacturing parts service may refuse to sell us additional AM systems or component parts and materials for AM systems that our Stratasys Direct Manufacturing service uses. Our reliance on a single or limited number of vendors involves a number of risks, including:

- potential shortages of some key components;

- product performance shortfalls, if traceable to particular product components, since the supplier of the faulty component cannot readily be replaced;

- discontinuation of a product or certain materials on which we rely;

- potential insolvency of these vendors; and

- reduced control over delivery schedules, manufacturing capabilities, quality and costs.

In addition, we require any new supplier to become "qualified" pursuant to our internal procedures. The qualification process involves evaluations of varying durations, which may cause production delays if we were required to qualify a new supplier unexpectedly. We generally assemble our systems and parts based on our internal forecasts and the availability of raw materials, assemblies, components and finished goods that are supplied to us by third parties, which are subject to various lead times. If certain suppliers were to decide to discontinue production of an assembly, component or raw material that we use, the unanticipated change in the availability of supplies, or unanticipated supply limitations, could cause delays in, or loss of, sales, increased production or related costs and consequently reduced margins, and damage to our reputation. If we were unable to find a suitable supplier for a particular component, material or compound, we could be required to modify our existing products or the end-parts that we offer to accommodate substitute components, material or compounds. While we have introduced periodic risk analysis internally concerning our sourcing (particularly concerning raw materials), which has increased the levels of our inventories, there is no guarantee that will sufficiently protect us if we suddenly lose access to supplies unexpectedly.

In particular, we rely on a sole supplier, Ricoh Printing Systems America, Inc., or Ricoh, for the printer heads for our PolyJet 3D printers. Under the terms of our agreement with Ricoh, we purchase printer heads and associated electronic components, and receive a non-transferable, non-exclusive right to assemble, use and sell these purchased products under Ricoh's patent rights and trade secrets. Due to the risk of a discontinuation of the supply of Ricoh printer heads and other key components of our products, we maintain excess inventory of those printer heads and other components. However, if our forecasts exceed actual orders, we may hold large inventories of slow-moving or unusable parts or raw materials, which could result in inventory write offs or write downs and have an adverse effect on our cash flow, profitability and results of operations. See "Item 4. Information on the Company-Business Overview-Manufacturing and Suppliers-Inventory and Suppliers-Ricoh Agreement" for further discussion of this agreement.

16

Table of Contents

***Discontinuation of operations at our manufacturing sites could prevent us from timely filling customer orders and could lead to unforeseen costs for us.***

We assemble and test the systems that we sell, and, in many cases, produce consumables for our systems, at single facilities in various locations that are specifically dedicated to separate categories of systems and consumables. We similarly rely on a single facility for assembly of the component parts and materials for AM systems that our Stratasys Direct Manufacturing service uses. Because of our reliance on all of these production facilities, a disruption at any of those facilities could materially damage our ability to supply 3D printers, other systems or consumable materials to the marketplace in a timely manner. Depending on the cause of the disruption, we could also incur significant costs to remedy the disruption and resume product shipments. Such disruptions may be caused by, among other factors, earthquakes, fire, flood and other natural disasters. While we plan to adopt an extensive disaster recovery plan in the near future, there are no assurances that will adequately protect us from any significant disruptions at our manufacturing sites. Accordingly, any such disruption could result in a material adverse effect on our revenue, results of operations and earnings, and could also potentially damage our reputation.

***A loss of, or reduction in revenues from, a significant number of our resellers and our independent sales agents would impair our ability to sell our products and services and could reduce our revenues and adversely impact our operating results.***

We rely heavily on our network of resellers and independent sales agents to sell and (in the case of resellers) to service our products for end-users in their respective geographic regions. These resellers and sales agents may not be as effective in selling our products or servicing our end-users as we are. Further, if our relationships with a significant number of these resellers and sales agents were to be terminated or if a significant number of these resellers and sales agents would otherwise fail or refuse to sell our products, we may not be able to find replacements that are as qualified or as successful in a timely manner, if at all. If these resellers and independent sales agents do not perform as anticipated or if we are unable to find qualified and successful replacements, our sales will suffer, which would have an adverse effect on our revenues and operating results. Additionally, a default by one or more resellers that have a significant receivables balance could have an adverse financial impact on our financial results.

***Global interruptions and delays involving freight carriers and other third parties has adversely impacted, and may continue to adversely impact our supply chain and distribution network, and, consequently, frustrate our ability to sell our 3D printing systems, especially those systems that are based on newly acquired technologies that we have recently launched.***

Circumstances surrounding and related to the COVID-19 pandemic have triggered unprecedented disruptions in global supply chains. Our business relies on an efficient and effective supply chain, including delivery of raw materials and parts for our 3D printing systems, and the manufacture and transport of those systems to resellers or end-users (as applicable). Impacts of the COVID-19 pandemic have placed strains on international supply chains that have negatively affected, and may continue to negatively affect the flow or availability of our products and may result in higher out-of-stock inventory positions due to difficulties in timely obtaining raw materials and parts from our suppliers, as well as transportation of our products after manufacture to our distribution destinations. Further, as a result of these delays, we may need to source raw materials and parts from different geographic locations or manufacturers, which could result in, among other things, higher product costs, increased transportation costs, delays in sales of our products or lower quality of our products. The adverse impact of these irregularities in our supply chain on our ability to distribute our 3D printing systems may be most acute for systems that are based on our three recently-acquired technologies, where we have just recently implemented our distribution channels. Our launch of these new technologies and related products during this period of interrupted supply chains may furthermore impose an enhanced burden on our capacity to meet our customers' demand.

Additionally, the operation of our manufacturing facilities, where our 3D printing systems are assembled, is crucial to our business operations. If our manufacturing facilities experience closures or worker shortages (due to COVID-19 or otherwise), whether temporary or sustained, we could sustain significant adverse impacts related to the distribution of our products to their destinations, whether to resellers or end-users (as applicable).

Any of these circumstances could adversely affect our ability to deliver our 3D printing systems in a timely manner, which could impair our ability to meet customer demand for products and result in lost sales and services revenues, increased supply chain costs, and, potentially, damage to our reputation.

17

Table of Contents

***Our business model is predicated in part on building an end-user base that will generate a recurring stream of revenues through the sale of our consumables and service contracts. If that recurring stream of revenues does not develop as expected, or if our business model changes as the industry evolves, our operating results may be adversely affected.***

Our business model is dependent in part on our ability to maintain and increase sales of our proprietary consumables and service contracts as they generate recurring revenues. Existing and future end-users of our systems may not purchase our consumables or related service contracts at the same rate at which end-users currently purchase those consumables and services. In addition, our entry-level systems generally use a lower volume of consumables relative to our higher end systems. If our current and future end-users purchase a lower volume of our consumables or service contracts, or if our entry level systems represent an increasing percentage of our future installed base mix uses less consumables than our current installed base, our recurring revenue stream relative to our total revenues would be reduced, and our operating results would be adversely affected.

***Global economic, political and social conditions may adversely impact our sales.***

Uncertainty with respect to the global economy, difficulties in the financial services sector and credit markets, geopolitical uncertainties and other macroeconomic factors all affect spending behavior of potential end-users of our products and services. The uncertain prospects for economic growth in some of the regions in which we sell our products may cause end-users to delay or reduce technology purchases. We also face risks that may arise from financial difficulties experienced by our end-users, suppliers and distributors, which may be exacerbated by continued uncertainty in the global economy or by other geopolitical factors, including:

- increased interest rates in many countries and regions throughout the world, including the regions where our customers are located;

- supply chain disruptions, which have slowed the delivery of raw materials, and which have increased the price of certain materials due to the significant increase in costs of raw materials and shipping costs;

- the possibility of an ongoing U.S.- China trade war may impact the cost of raw materials, finished products or components used in our products, and our ability to sell our products in China;

- threats of massive cyber attacks that could cause severe economic damage;

- extended U.S. federal government shutdowns (resulting from the failure to pass budget appropriations or adopt continuing funding resolutions) may delay orders of our products by U.S. government agencies or other end-users whose business activities are heavily dependent on U.S. government agency contracts;

- end-user demand for products and manufacturing activity levels may be reduced;

- distributors and end-users may be unable to obtain credit financing to finance purchases of our products;

- suppliers may be unable to obtain credit financing to finance purchases of sub-assemblies used to build components of products or purchases of raw materials to produce consumables;

- end-users or distributors may face financial difficulties or may become insolvent, which could lead to our inability to obtain payment for our products; and

- key suppliers of raw materials, finished products or components used in our products and consumables may face financial difficulties or may become insolvent, which could lead to disruption in the supply of systems, consumables or spare parts to our end-users.

***Our existing and planned international operations currently expose us and will continue to expose us to additional market and operational risks, and failure to manage these risks may adversely affect our business and operating results.***

We expect to derive a substantial percentage of our sales from international markets. We derived 36.2% of our revenues in 2022 from countries outside the Americas. Accordingly, we face significant operational risks from doing business internationally, including:

- fluctuations in foreign currency exchange rates;

18

Table of Contents

- potentially longer sales and payment cycles;

- potentially greater difficulties in collecting accounts receivable;

- potentially adverse tax consequences;

- reduced protection of intellectual property rights in certain countries, particularly in Asia and South America;

- difficulties in staffing and managing foreign operations;

- laws and business practices favoring local competition;

- costs and difficulties of customizing products for foreign countries;

- compliance with a wide variety of complex foreign laws, treaties and regulations;

- tariffs, trade barriers and other regulatory or contractual limitations on our ability to sell or develop our products in certain foreign markets; and

- being subject to the laws, regulations and the court systems of many jurisdictions.

Our failure to manage the market and operational risks associated with our international operations effectively could limit the future growth of our business and adversely affect our operating results.

19

Table of Contents

***Significant disruptions of our information technology systems or breaches of our data security could adversely affect our business.***

A significant invasion, interruption, destruction or breakdown of our information technology, or IT, systems and/or infrastructure by persons with authorized or unauthorized access could negatively impact our business and operations. We could also experience business interruption, information theft and/or reputational damage from cyber attacks, which may compromise our systems and lead to data leakage either internally or at our third party providers. Both data that has been inputted into our main IT platform, which covers records of transactions, financial data and other data reflected in our results of operations, as well as data related to our proprietary rights (such as research and development, and other intellectual property- related data), are subject to material cyber security risks. Our IT systems have been, and are expected to continue to be, the target of malware and other cyber attacks. To date, we are not aware that we have experienced any loss of, or disruption to, material information as a result of any such malware or cyber attack.

We have invested in advanced protective systems to reduce these risks, some of which have been installed and others that are still in the process of installation. Based on information provided to us by the suppliers of our protective systems, we believe that our level of protection is in keeping with the customary practices of peer technology companies. We also maintain back-up files for much of our information, as a means of assuring that a breach or cyber attack does not necessarily cause the loss of that information. We furthermore review our protections and remedial measures periodically in order to ensure that they are adequate.

Despite these protective systems and remedial measures, techniques used to obtain unauthorized access are constantly changing, are becoming increasingly more sophisticated and often are not recognized until after an exploitation of information has occurred. We may be unable to anticipate these techniques or implement sufficient preventative measures, and we therefore cannot assure you that our preventative measures will be successful in preventing compromise and/or disruption of our information technology systems and related data. We furthermore cannot be certain that our remedial measures will fully mitigate the adverse financial consequences of any cyber attack or incident.

***We are subject to environmental laws and export control laws due to the import and export of our products, as well as environmental, health, safety and medical device laws and regulations related to our operations and the use of our systems and materials, including requirements imposed due to use of our products by our customers, which could subject us to compliance costs and/or potential liability in the event of non-compliance.***

The export of our products internationally subjects us to environmental laws and regulations concerning the import and export of chemicals and hazardous substances such as the United States Toxic Substances Control Act, or TSCA, and the Registration, Evaluation, Authorization and Restriction of Chemical Substances, or REACH. These laws and regulations require the testing and registration of some chemicals that we ship along with, or that form a part of, our systems and other products. If we fail to comply with these or similar laws and regulations, we may be required to make significant expenditures to reformulate the chemicals that we use in our products and materials or incur costs to register such chemicals to gain and/or regain compliance. Additionally, we could be subject to significant fines or other civil and criminal penalties should we not achieve such compliance.

The export of our products is also subject to several export regulations, including but  not limited to the United States. Export Administration Regulations, the United States International Traffic in Arms Regulations, the United States Arms Export Control Act and regulations and orders administered by the United States Treasury Department's Office of Foreign Assets Control (which we refer to collectively as Export/Import Laws). Our products are governed by civil controls, but failure to comply with these Export/Import Laws may potentially lead to the imposition of greater restrictions on our ability to export those products and penalties if we fail to comply with our restrictions.

Table of Contents

We are furthermore subject to extensive environmental, health and safety laws, regulations and permitting requirements in multiple jurisdictions due to our use of chemicals and production of waste materials as part of our operations and in connection with the operation of our systems by our customers. In certain cases, the required compliance with health or safety regulations is imposed by our customers themselves. These laws, regulations and requirements (which include the Directive on Waste Electrical and Electronic Equipment of the European Union (EU) and the EU Directive on Restriction of Use of Certain Hazardous Substances) govern, among other things, the generation, use, storage, registration, handling and disposal of chemicals and waste materials, the presence of specified substances in electrical products, the emission and discharge of hazardous materials into the ground, air or water, the cleanup of contaminated sites, including any contamination that results from spills due to our failure to properly dispose of chemicals and other waste materials and the health and safety of our employees. Under these laws, regulations and requirements, we could also be subject to liability for improper disposal of chemicals and waste materials, including those resulting from the use of our systems and accompanying materials by end-users. These or future laws and regulations could potentially require the expenditure of significant amounts for compliance and/or remediation. If our operations fail to comply with such laws or regulations, we may be subject to fines and other civil, administrative or criminal sanctions, including the revocation of permits and licenses necessary to continue our business activities. In addition, we may be required to pay damages or civil judgments in respect of third-party claims, including those relating to personal injury (including exposure to hazardous substances that we generate, use, store, handle, transport, manufacture or dispose of), property damage or contribution claims. Some environmental laws allow for strict, joint and several liabilities for remediation costs, regardless of fault. We may be identified as a potentially responsible party under such laws. Effective as of February 2023, we are also subject to medical device regulations, such as the U.S. FDA Code of Federal Regulations, as a result of our launch of our first certified medical device with TrueDent resin in the United States. If we fail to comply with any such regulations or are subject to related liability, such developments could have a material adverse effect on our business, financial condition and results of operations.

***As a public company with significant operations in several countries, we are subject to regulation and must comply with reporting, privacy and other requirements in a number of jurisdictions and, to the extent that regulatory authorities assert that we are not in compliance, we could be subject to sanctions which, if material, could materially and adversely affect our business.***

As a public company with significant operations in Israel, the United States, Europe and many other countries, we are subject to regulation and must comply with reporting and other requirements in a number of jurisdictions. In particular, we are subject to the rules and regulations of the SEC and FINRA, which may elect from time to time to review or investigate our operations, various aspects of our financial statements, our disclosure practices and other matters. As such reviews progress, the regulating agencies may determine that we are and have been in compliance with applicable rules, or they may determine to pursue enforcement actions or other sanctions against us for alleged noncompliance.

New privacy laws are also beginning to impose on our company increased compliance costs. Our California operations are now subject to the California Consumer Privacy Act, or CCPA, a statute that went into effect on January 1, 2020. The CCPA imposes enhanced disclosure requirements for us vis-à-vis our interactions with customers that are residents of California, such as comprehensive privacy notices for consumers when we or our agents collect their personal information. We may be further required to ensure third party compliance, as under the CCPA we could be liable if third parties that collect, process or retain personal information on our behalf violate the CCPA's privacy requirements. The sanctions for non-compliance could include fines and/or civil lawsuits.

In addition to the imposition of U.S.-based regulations on our operations, our European activities are subject to the European Union General Data Protection Regulation, or GDPR, which has created additional compliance requirements for us. GDPR broadens the scope of personal privacy laws to protect the rights of European Union citizens and requires organizations to report on data breaches within 72 hours and be bound by stringent rules for obtaining the consent of individuals on how their data can be used. GDPR became enforceable on May 25, 2018, and non-compliance exposes entities such as our company to significant fines or other regulatory claims. While we have invested in, and intend to continue to invest in, reasonably necessary resources to comply with these new privacy standards (both in Europe and in California), to the extent that we fail to adequately comply, that failure could have an adverse effect on our business, financial conditions, results of operations and cash flows.

21

Table of Contents

***Failure to comply with the U.S. Foreign Corrupt Practices Act or other applicable anti-corruption legislation could result in fines, criminal penalties and an adverse effect on our business.***

We operate in a number of countries throughout the world, including countries known to have a reputation for corruption. We are committed to doing business in accordance with applicable anti-corruption laws. We are subject, however, to the risk that our affiliated entities or our and our affiliates' respective officers, directors, employees and agents (including distributors of our products) may take action determined to be in violation of such anti-corruption laws, including the U.S. Foreign Corrupt Practices Act of 1977 and the U.K. Bribery Act of 2010, as well as trade sanctions administered by the Office of Foreign Assets Control and the U.S. Department of Commerce. Any violation by any of these persons could result in substantial fines, sanctions, civil and/or criminal penalties, or curtailment of operations in certain jurisdictions, and might adversely affect our results of operations. In addition, actual or alleged violations could damage our reputation and ability to do business.

***We own a number of our manufacturing and office facilities, which may limit our ability to move those operations. If we were to move some or all of those operations, we could incur unforeseen charges.***

We own buildings in Eden Prairie, Minnesota, which we use to conduct our FDM manufacturing and assembly operations, as well as our office facility in Rehovot, Israel and manufacturing facility in Kiryat Gat, Israel. Ownership of these buildings and facilities may adversely affect our ability to move some or all of those operations to other locations that may be more favorable. If we were to move any of those operations to other locations, we may have difficulty selling or leasing the property that we vacate. This risk also applies to the facilities that we lease under non-cancellable lease agreements, where we cannot freely vacate the facilities. In order to combat these risks, we have limited our commitment under our leases by providing ourselves with a "break" option after three years or less. In most of our leases we have also obtained for ourselves the right to sublease a portion or all of the facilities under the lease.

These limitations on our ability to move could result in an impairment charge, as occurred in the prior periods in respect of some of our leased facilities, which negatively impacted our results of operations, and could, in future periods, once again have an adverse effect on our results of operations.

***Default in payment by one or more resellers or customers from which we have large account receivable balances could adversely impact our results of operations and financial condition.***

From time to time, our accounts receivable balances have been concentrated with certain resellers or customers. Default by one or more of these resellers or customers could result in a significant charge against our current reported earnings. We have reviewed our policies that govern credit and collections, and will continue to monitor them in light of current payment status and economic conditions. In addition, we try to reduce the credit exposures of our accounts receivable by credit limits and credit insurance for many of our customers. However, there can be no assurance that our efforts to identify potential credit risks will be successful. Our inability to timely identify resellers and customers that are credit risks could result in defaults at a time when such resellers or customers have high accounts receivable balances with us. Any such default would result in a significant charge against our earnings and adversely affect our results of operations and financial condition.

***We are, and have been in the recent past, subject to litigation. Any current or future lawsuits to which we are subject may have a significant adverse effect on our financial condition or profitability.***

We are currently, and have been in the recent past, subject to litigation, and could be subject to further litigation in the future.

We can provide no assurance as to the outcome of any future lawsuits, and any such actions may result in judgments against us for significant damages. Resolution of any such matters can be prolonged and costly, and the ultimate results or judgments are uncertain due to the inherent uncertainty in litigation and other proceedings. Moreover, our potential liabilities are subject to change over time due to new developments, changes in settlement strategy or the impact of evidentiary requirements. Regardless of the outcome, litigation has resulted in the past, and may result in the future, in significant legal expenses and require significant attention and resources of management. As a result, any present or future litigation could result in losses, damages and expenses that have a significant adverse effect on our financial condition or profitability.

22

Table of Contents

***Under applicable employment laws, we may not be able to enforce covenants not to compete and therefore may be unable to prevent our competitors from benefiting from the expertise of some of our former employees.***

We generally enter into non-competition agreements with our employees. These agreements prohibit our employees from competing directly with us or working for our competitors or clients for a limited period after they cease working for us. We may be unable to enforce these agreements under the laws of the jurisdictions in which our employees work and it may be difficult for us to restrict our competitors from benefiting from the expertise that our former employees or consultants developed while working for us. For example, Israeli courts have required employers seeking to enforce non-compete undertakings of a former employee to demonstrate that the competitive activities of the former employee will harm one of a limited number of material interests of the employer that have been recognized by the courts, such as the secrecy of a company's confidential commercial information or the protection of its intellectual property. If we cannot demonstrate that such interests will be harmed, we may be unable to prevent our competitors from benefiting from the expertise of our former employees or consultants and our ability to remain competitive may be diminished. In addition in California, where many employees of our Stratasys Direct Manufacturing parts service as well as Origin's employees, are located, non-competition agreements with employees are generally unenforceable after termination of employment.

***We rely on our management information systems for inventory management, distribution, and other key functions. If our information systems fail to adequately perform these functions, or if we experience an interruption in their operation, our business and operating results could be adversely affected.***

The efficient operation of our business is dependent on our management information systems. We rely on our management information systems: to, among other things, effectively manage our accounting and financial functions, including maintaining our internal controls; to manage our manufacturing and supply chain processes; and to maintain our research and development data. The failure of our management information systems to perform properly could disrupt our business and product development, which may result in decreased sales, increased overhead costs, excess or obsolete inventory, and product shortages, causing our business and operating results to suffer. Although we take steps to secure our management information systems, including our computer systems, intranet and internet sites, email and other telecommunications and data networks, the security measures we have implemented may not be effective and our systems may be vulnerable to theft, loss, damage and interruption from a number of potential sources and events, including unauthorized access or security breaches, natural or man-made disasters (such as floods or earthquakes), cyber-attacks, computer viruses, power loss, or other disruptive events. Our reputation, brand, and financial condition could be adversely affected if, as a result of a significant cyber event or otherwise, our operations are disrupted or shut down; our confidential, proprietary information is stolen or disclosed; we incur costs or are required to pay fines in connection with stolen customer, employee, or other confidential information; we must dedicate significant resources to system repairs or increase cyber security protection; or we otherwise incur significant litigation or other costs.

23

Table of Contents

**Risks related to our intellectual property**

*If we are unable to obtain patent protection for our products or otherwise protect our intellectual property rights, our business could suffer.*

 We rely on a combination of patent and trademark laws in the United States and other countries, trade secret protection, confidentiality agreements and other contractual arrangements with our employees, end-users and others to maintain our competitive position. In particular, our success depends, in part, on our ability, and the ability of our licensors, to obtain patent protection for our and their products, technologies and inventions, maintain the confidentiality of our and their trade secrets and know-how, operate without infringing upon the proprietary rights of others and prevent others from infringing upon our and their proprietary rights. As we acquire additional companies and their technologies, such as Origin and its $P^3$ technology, acquired in December 2020, RPS and its stereolithography technology, acquired in February 2021, and Xaar and its powder-based SAF technology, acquired fully in November 2021, the risks related to potential infringement of our proprietary rights in technology become more pronounced.

 Despite our efforts to protect our proprietary rights, it is possible that competitors or other unauthorized third parties may obtain, copy, use or disclose our technologies, inventions, processes or improvements. We cannot assure you that any of our existing or future patents or other intellectual property rights will not be challenged, invalidated or circumvented, or will otherwise provide us with meaningful protection. Our pending patent applications may not be granted, and we may not be able to obtain foreign patents or pending applications corresponding to our U.S. patents. The laws of certain countries, such as China, may not provide the same level of patent protection and intellectual property right enforcement as in the United States, so even if we enforce our intellectual property rights or obtain additional patents in China or elsewhere outside of the United States, enforcement of such rights may not be effective. If our patents and other intellectual property do not adequately protect our technology, our competitors may be able to offer additive manufacturing systems, consumables or other products similar to ours. Our competitors may also be able to develop similar technology independently or design around our patents, and we may not be able to detect the unauthorized use of our proprietary technology or take appropriate steps to prevent such use.

 If we attempt enforcement of our intellectual property rights, we may be (as we have been in the past) subject or party to claims, negotiations or complex, protracted litigation. Intellectual property disputes and litigation, regardless of merit, can be costly and disruptive to our business operations by diverting attention and energies of management and key technical personnel, and by increasing our costs of doing business. Any of the foregoing could adversely affect our operating results.

*We may be subject to claims that we are infringing, misappropriating or otherwise violating the intellectual property rights of others, especially in light of the heightened pace of adoption of new technologies in our industry and the multiple additional technologies that we have been acquiring.*

 Our products and technology, including technology that we acquire as a result of our ongoing acquisitions of other businesses and technology that we license from others, about which we may be less knowledgeable that our organically developed technology, may infringe, misappropriate or otherwise violate the intellectual property rights of third parties. This risk is especially relevant to our industry, where the pace of innovation and adoption of new technologies by industry players has been accelerated in recent years. Patent applications in the United States and most other countries are confidential for a period of time until they are published, and the publication of discoveries in scientific or patent literature typically lags actual discoveries by several months or more. As a result, the nature of claims contained in unpublished patent filings around the world is unknown to us, and we cannot be certain that we or our acquired companies were the first to conceive inventions covered by our self-developed or our acquired patents or patent applications or that we or our acquired companies were the first to file patent applications covering such inventions. Furthermore, it is not possible to know in which countries patent holders may choose to extend their filings under the Patent Cooperation Treaty or other mechanisms. In addition, we may be subject to intellectual property infringement claims from individuals, vendors and other companies, including those that have acquired patents in the fields of 3D printing or consumable production for the sole purpose of asserting claims against us.

24

Table of Contents

Under the Israeli Patent Law, 5727-1967, or the Patent Law, we may also be subject to royalty claims for "service inventions" conceived by employees in the course and as a result of or arising from their employment with us. Section 134 of the Patent Law provides that if there is no agreement between an employer and an employee as to whether the employee is entitled to consideration for service inventions, the Israeli Compensation and Royalties Committee, or the Committee, a body constituted under the Patent Law, shall determine these issues. We believe that virtually all of our employees have executed invention assignment agreements in which they have assigned to us their rights to potential inventions and acknowledged that they will not be entitled to additional compensation or royalties from commercialization of inventions. We may, nevertheless, face claims demanding remuneration in consideration for assigned inventions.

In addition to patent infringement and patent-related claims, we may be subject to other intellectual property claims, such as claims that we are infringing trademarks or misappropriating trade secrets. We may also be subject to claims relating to the content on our websites, including third-party content posted on our GrabCAD.com website. Any intellectual property claims, regardless of the merit or resolution of such claims, could cause us to incur significant costs in responding to, defending and resolving such claims, and may prohibit or otherwise impair our ability to commercialize new or existing products, including products developed by our acquired companies. Resolution of such claims may, among other things, require us to redesign infringing technology, enter into costly settlement or license agreements on terms that are unfavorable to us, pay royalties to employees or former employees, or indemnify our distributors and end-users. Any infringement by us, including our acquired companies, or our licensors of the intellectual property rights of third parties may have a material adverse effect on our business, financial condition and results of operations.

*If we are unable to protect the confidentiality of our trade secrets or know-how, such proprietary information may be used by others to compete against us, for instance, in developing consumables that could be used with our printing systems in place of our proprietary consumables.*

We have devoted substantial resources to the development of our technology, trade secrets, know-how and other unregistered proprietary rights. While we enter into confidentiality and invention assignment agreements intended to protect such rights, such agreements can be difficult and costly to enforce or may not provide adequate remedies if violated, and we may not have entered into such agreements with all relevant parties. Such agreements may be breached and confidential information may be willfully or unintentionally disclosed, including by employees who may leave our company and join our competitors, or our competitors or other parties may learn of the information in some other way. The disclosure to, or independent development by, a competitor of any of our trade secrets, know-how or other technology not protected by a patent or other intellectual property system could materially reduce or eliminate any competitive advantage that we may have over such competitor.

This concern could manifest itself in particular with respect to our proprietary consumables that are used with our systems. Portions of our proprietary consumables may not be afforded patent protection. Chemical companies or other producers of raw materials used in our consumables may be able to develop consumables that are compatible to a large extent with our systems, whether independently or in contravention of our trade secret rights and related proprietary and contractual rights. If such consumables are made available to owners of our systems, and are purchased in place of our proprietary consumables, our revenues and profitability would be reduced and we could be forced to reduce prices for our proprietary consumables.

*As our patents expire, additional competitors using our technology could enter the market, which could offer competitive printers and consumables, require us to reduce our prices for our products and result in lost sales.*

Some of our patents have expired and others will expire in coming years. Upon expiration of those patents, our competitors have introduced, and are likely to continue to introduce, products using the technology previously protected by the expired patents, which products may have lower prices than those of our products. To compete, we may need to reduce our prices for those products, which would adversely affect our revenues, margins and profitability. Additionally, the expiration of our patents could reduce barriers to entry into AM systems, which could result in the reduction of our sales and earnings potential.

Table of Contents

**Risks related to operations in Israel**

***Our Israeli headquarters and manufacturing and other significant operations may be adversely affected by political, economic and military instability in Israel.***

One of our dual corporate headquarters, as well as our PolyJet system manufacturing facility, all of our PolyJet research and development facilities, one of our two PolyJet consumables manufacturing facilities, one of our FDM manufacturing facilities, and some of our suppliers, are located in central and southern Israel. In addition, many of our key employees, officers and directors are residents of Israel. Accordingly, political, economic and military conditions in Israel may directly affect our business. Since the establishment of the State of Israel in 1948, a number of armed conflicts have taken place between Israel and its neighboring countries. Any hostilities involving Israel or the interruption or curtailment of trade between Israel and its trading partners could adversely affect our operations and results of operations. Over the past decade, Israel has been engaged in several armed conflicts with Hamas, a militia group and political party that controls the Gaza Strip, and during the summer of 2006, Israel was engaged in an armed conflict with Hezbollah, a Lebanese Islamist Shiite militia group and political party. These conflicts involved missile strikes against civilian targets in various parts of Israel, including areas where some of our manufacturing facilities are located, and negatively affected business conditions in Israel. Any armed conflicts, terrorist activities or political instability in the region, including Iranian involvement in Syria, could adversely affect business conditions and could harm our results of operations and could make it more difficult for us to raise capital. Parties with whom we have agreements involving performance in Israel may claim that they are not obligated to perform their commitments under those agreements pursuant to force majeure provisions in such agreements due to the political or security situation in Israel.

Furthermore, many of our male employees in Israel, including members of our senior management, are obligated to perform one month, and in some cases longer periods, of annual military reserve duty until they reach certain ages, and, in the event of a military conflict, may be called to active duty. Our operations could be disrupted by the absence of a significant number of Israeli employees or of one or more of our key Israeli employees who may be called to active duty due to a future military conflict. Such disruption could materially adversely affect our business and operations.

Our commercial insurance does not cover losses that may occur as a result of an event associated with the security situation in the Middle East. Although the Israeli government is currently committed to covering the reinstatement value of direct damages that are caused by terrorist attacks or acts of war, we cannot assure you that this government coverage will be maintained, or if maintained, will be sufficient to compensate us fully for damages incurred. Any losses or damages incurred by our Israeli operations could have a material adverse effect on our business. Any armed conflicts or political instability in the region would likely negatively affect business conditions generally and could harm our results of operations.

The Israeli government is currently pursuing changes to Israel's judicial system, which, if adopted, may have an adverse effect on the macroeconomic conditions in Israel and consequently on our business and our results of operations.

26

Table of Contents

***Your rights and responsibilities as a shareholder will be governed by Israeli law, which may differ in some respects from the rights and responsibilities of shareholders of U.S. companies.***

We are organized under Israeli law. The rights and responsibilities of the holders of our ordinary shares are governed by our amended and restated articles of association and Israeli law. These rights and responsibilities differ in some respects from the rights and responsibilities of shareholders in typical U.S.-based corporations. In particular, a shareholder of an Israeli company has a duty to act in good faith toward the company and other shareholders and to refrain from abusing its power in the company, including, among other things, in voting at the general meeting of shareholders on matters such as amendments to a company's articles of association, increases in a company's authorized share capital, mergers and acquisitions and interested party transactions requiring shareholder approval. In addition, a shareholder who knows that it possesses the power to determine the outcome of a shareholder vote or to appoint or prevent the appointment of a director or executive officer in the company has a duty of fairness toward the company. There is limited case law available to assist us in understanding the implications of these provisions that govern shareholders' actions. These provisions may be interpreted to impose additional obligations and liabilities on holders of our ordinary shares that are not typically imposed on shareholders of U.S. corporations.

***Provisions of Israeli law may delay, prevent or otherwise impede a merger with, or an acquisition of, our company, which could prevent a change of control, even when the terms of such a transaction are favorable to us and our shareholders.***

Israeli corporate law regulates mergers, requires tender offers for acquisitions of shares above specified thresholds, requires special approvals for transactions involving directors, officers or significant shareholders and regulates other matters that may be relevant to such types of transactions. For example, a merger may not be consummated unless at least 50 days have passed from the date on which a merger proposal is filed by each merging company with the Israel Registrar of Companies and at least 30 days have passed from the date on which the shareholders of both merging companies have approved the merger. In addition, a majority of each class of securities of the target company must approve a merger. Moreover, a tender offer for all of a company's issued and outstanding shares can only be completed if the acquirer receives positive responses from the holders of at least 95% of the issued share capital. Completion of the tender offer also requires approval of a majority of the offerees that do not have a personal interest in the tender offer, unless, following consummation of the tender offer, the acquirer would hold at least 98% of the company's outstanding shares. Furthermore, the shareholders, including those who indicated their acceptance of the tender offer, may, at any time within six months following the completion of the tender offer, petition an Israeli court to alter the consideration for the acquisition, unless the acquirer stipulated in its tender offer that a shareholder that accepts the offer may not seek such appraisal rights.

Furthermore, Israeli tax considerations may make potential transactions unappealing to us or to our shareholders whose country of residence does not have a tax treaty with Israel exempting such shareholders from Israeli tax. For example, Israeli tax law does not recognize tax-free share exchanges to the same extent as U.S. tax law. With respect to mergers, Israeli tax law allows for tax deferral in certain circumstances but makes the deferral contingent on the fulfillment of a number of conditions, including a holding period of two years from the date of the transaction during which sales and dispositions of shares of the participating companies are subject to certain restrictions.

Moreover, with respect to certain share swap transactions, the tax deferral is limited in time, and when such time expires, the tax becomes payable even if no disposition of the shares has occurred.

These and other similar provisions could delay, prevent or impede an acquisition of our company or our merger with another company, even if such an acquisition or merger would be beneficial to us or to our shareholders.

***Exchange rate fluctuations between the U.S. dollar and the New Israeli Shekel, the Euro and other non-U.S. currencies may negatively affect the earnings of our operations.***

We report our financial results and most of our revenues are recorded in U.S. dollars. However, substantially all of the manufacturing, research and development expenses of our Israeli operations, as well as a portion of the cost of revenues, selling and marketing, and general and administrative expenses of our Israeli operations, are incurred in New Israeli Shekels. As a result, we are exposed to exchange rate risks that may adversely affect our financial results. If the New Israeli Shekel appreciates against the U.S. dollar or if the value of the New Israeli Shekel declines against the U.S. dollar at a time when the rate of inflation in the cost of Israeli goods and services exceeds the rate of decline in the relative value of the New Israeli Shekel, then the U.S. dollar cost of our operations in Israel would increase and our results of operations would be adversely affected.

27

Table of Contents

During 2021 and the first quarter of 2022 in particular, the value of the U.S. dollar decreased significantly relative to the New Israeli Shekel and settled at a level that was near the all-time low, before rising over most of the remainder of 2022. The lower value of the U.S. dollar relative to the New Israeli Shekel had an adverse impact upon our dollar-denominated financial results, due to the relative increase in cost of the New Israeli Shekel denominated expenses of our Israeli operations. Our results of operations could be adversely affected if we are unable to effectively hedge against currency fluctuations in the future. We cannot predict any future trends in the rate of inflation or deflation in Israel or the rate of appreciation or devaluation of the New Israeli Shekel against the U.S. dollar. The Israeli annual rate of inflation amounted to 5.3%, 2.8%, and 0.7% for the years ended December 31, 2022, 2021 and 2020, respectively. The annual appreciation (devaluation) of the New Israeli Shekel in relation to the U.S. dollar amounted to (13.2)%, 3.3% and 7.0%  for the years ended December 31, 2022, 2021 and 2020, respectively.

We also have substantial revenues and expenses that are denominated in non-US currencies other than the New Israeli Shekel, particularly the Euro. Therefore, our operating results and cash flows are also subject to fluctuations due to changes in the relative values of the U.S. dollar and those foreign currencies. These fluctuations could negatively affect our operating results and could cause our revenues and net income or loss to vary from quarter to quarter. Furthermore, to the extent that our revenues increase in regions such as Asia Pacific, where our sales are denominated in U.S. dollars, a strengthening of the dollar against other currencies could make our products less competitive in those foreign markets and collection of receivables more difficult.

From time to time we engage in currency hedging activities. These measures, however, may not adequately protect us from material adverse effects due to the impact of inflation in Israel or from fluctuations in the relative values of the U.S. dollar and other foreign currencies in which we transact business, and may result in a financial loss. For further information, please see "Item 11. Quantitative And Qualitative Disclosures About Market Risk" in this annual report.

***Calculating our income tax rate is complex and subject to uncertainty. We are currently eligible for Israeli government tax benefits in respect of our Israeli operations. If we do not meet several conditions for receipt of those benefits, or if the Israeli government otherwise decides to eliminate those benefits, they may be terminated or reduced, which would impact our income tax rate and increase our costs.***

The computation of income taxes is complex because it is based on the laws of numerous taxing jurisdictions and requires significant judgment on the application of complicated rules governing accounting for tax provisions under GAAP. Income taxes for interim quarters are based on a forecast of our effective tax rate for the year, which includes forward-looking financial projections. Such financial projections are based on numerous assumptions, including the expectations of profit and loss by jurisdiction. It is difficult to accurately forecast various items that make up the projections, and such items may be treated as discrete accounting. Examples of items that could cause variability in our income tax rate include our mix of income by jurisdiction, changes in our uncertain tax positions, the application of transfer pricing rules, and tax audits. Future events, such as changes in our business and the tax law in the jurisdictions where we do business, could also affect our rate.

One important assumption that goes into calculation of our tax rate is the tax benefit that we are eligible for in respect of some of our operations in Israel, referred to as "Approved Enterprise", "Beneficiary Enterprise", "Preferred Enterprise" and/or "Preferred Technology Enterprise" (as applicable), under the Law for the Encouragement of Capital Investments, 5719-1959, or the Investment Law. Based on an evaluation of the relevant factors under the Investment Law, including the level of foreign (that is, non-Israeli) investment in our company, we have estimated that our average effective tax rate to be paid with respect to all profit from the Israeli operations under these benefit programs is 7.5% to 14%, based on the current balance of activity between our Rehovot, Israel and Kiryat Gat, Israel facilities and the available level of benefits under the law. If we do not meet the requirements for maintaining these benefits, they may be reduced or cancelled and the relevant operations would be subject to Israeli corporate tax at the standard rate, which for 2018 and onwards is set at 23%. In addition to being subject to the standard corporate tax rate, we would be required to refund any tax benefits that we have already received as adjusted by the Israeli consumer price index, plus interest or other monetary penalties. Even if we continue to meet the relevant requirements, the tax benefits that we are eligible for may not be continued in the future at their current levels or at all. If these tax benefits were reduced or eliminated, the amount of taxes that we pay would likely increase, as all of our operations would consequently be subject to corporate tax at the standard rate, which may cause our effective tax rate to be materially different than our estimates and could adversely affect our results of operations. Additionally, if we increase our activities outside of Israel, for example, via acquisitions, our increased activities may not be eligible for inclusion in Israeli tax benefit programs, and that could also adversely affect our effective tax rate and our results of operations.

Table of Contents

The Israeli government may furthermore independently determine to reduce, phase out or eliminate entirely the benefit programs under the Investment Law, regardless of whether we then qualify for benefits under those programs at the time, which would also adversely affect our effective tax rate and our results of operations.

*We received Israeli governmental grants for certain of our research and development activities. The terms of those grants may require us, in addition to payment of royalties, to satisfy specified conditions in order to manufacture products and transfer technologies outside of Israel, including increase of the amount of our liabilities in connection with such grants. If we fail to comply with the requirements of the Innovation Law (as defined below), we may be required to pay penalties in addition to repayment of the grants, and may impair our ability to sell our technology outside of Israel.*

Some of our research and development efforts were and are financed in part, through grants that we received from the Israeli Innovation Authority, to which we refer as the IIA or the Authority (formerly operating as Office of the Chief Scientist of the Ministry of Economy of the State of Israel, or the OCS). Since 2007 and through December 31, 2022, we have received funding from the Authority of approximately $9 million, in the aggregate, under several R&D programs to support certain research and development projects in Israel. In addition, we have received funding from the Europe authorities of approximately $1.8 million, to support certain projects in Europe.

We must comply with the requirements of the Encouragement of Research, Development and Technological Innovation in the Industry Law, 5744-1984 and related regulations rules, procedures and benefit tracks collectively or the "Innovation Law".

When a company develops know-how, technology or products using grants provided by the Authority, the terms of these grants and the Innovation Law restrict the transfer of such know-how, and the transfer of manufacturing or manufacturing rights of such products, technologies or know-how outside of Israel.

Under the Innovation Law and the regulations thereunder, a recipient of royalty-bearing grants from the IIA is required to return the grants by the payment of royalties of 3% to 5% on the revenues generated from the sale of products (and related services) developed (in whole or in part) under IIA program up to the total amount of the grants received from IIA, linked to the U.S. dollar and bearing interest at an annual rate of LIBOR applicable to U.S. dollar deposits, as published on the first business day of each calendar year.

The United Kingdom's Financial Conduct Authority, which regulates the London Interbank Offered Rate (LIBOR), announced that it will no longer persuade or require banks to submit rates for LIBOR after January 1, 2022. The grants received from the IIA bear an annual interest rate based on the 12-month LIBOR. Accordingly, there is considerable uncertainty regarding the publication of LIBOR beyond 2022. While it is not currently possible to determine precisely whether, or to what extent, the withdrawal and replacement of LIBOR would affect us, the implementation of alternative benchmark rates to LIBOR may increase our financial liabilities to the IIA. To date, IIA has not published a decision regarding an alternative benchmark to be used in the LIBOR's stead.

• *Transfer of IIA funded know-how outside of Israel*. Any transfer of the know-how that was developed with the funding of the Authority and related intellectual property rights, outside of Israel, including by way of license for research and development purpose requires prior approval of the Authority and imposes certain conditions, including, requirement of payment of a redemption fee calculated according to the formula provided in the Innovation Law which takes into account, among others, the consideration for such know-how paid to us in the transaction in which the technology is transferred, research and development expenses, the amount of IIA grants, the time of completion of IIA supported research project and other factors, while the redemption fee will not exceed 600% of the grants amount plus interest. No assurance can be given that approval to any such transfer, if requested, will be granted and what will be the amount of the redemption fee payable.

Transfer of IIA funded know-how and related intellectual property rights to an Israeli company requires a pre-approval by IIA and may be granted if the recipient undertakes to fulfil all the liabilities to IIA and undertakes to abide by the provisions of Innovation Law, including the restrictions on the transfer of know-how and the manufacturing rights outside of Israel and the obligation to pay royalties (note that there will be an obligation to pay royalties to IIA from the income received by us in connection with such transfer transaction as part of the royalty payment obligation). No assurance can be given that approval to any such transfer, if requested, will be granted.

29

Table of Contents

- *Local manufacturing obligation.* The terms of the grants under the Innovation Law require that the manufacturing of products resulting from Authority-funded programs be carried out in Israel, unless a prior written approval of the Authority is obtained (except for a transfer of up to 10% of the production rights, for which a notification to the Authority is sufficient). As a condition for obtaining approval to manufacture outside Israel, we would be required to pay increased royalties, which usually amount to 1% in addition to the standard royalties rate, and also the total amount of our liability to IIA may be increased to between 120% and 300% of the grants we received from IIA, depending on the manufacturing volume that is performed outside Israel (less royalties already paid to IIA). This restriction may impair our ability to outsource manufacturing rights abroad, however, it does not restrict export of our products that incorporate IIA funded know-how.

A company also has the option of declaring in its IIA grant application for funding its intention to exercise a portion of the manufacturing capacity abroad, thus avoiding the need to obtain additional approval for such declared funding. Such declaration may affect the increase in the total liability to the IIA following such manufacturing abroad.

The restrictions under the Innovation Law (such as with respect to transfer of manufacturing rights abroad or the transfer of IIA funded know-how and related intellectual property rights abroad) will continue to apply even our liabilities are repaid to IIA in full and will cease to exist only upon payment of the redemption fee described above.

Furthermore, in the event that we undertake a transaction involving the transfer to a non-Israeli entity of technology developed with IIA funding pursuant to a merger or similar transaction, the consideration available to our shareholders may be reduced by the amounts we may be required to pay to IIA. Any approval, if given, will generally be subject to additional financial obligations to the IIA. Failure to comply with the requirements under the Innovation Law may subject us to mandatory repayment of grants received by us (together with interest and penalties), as well as expose us to criminal proceedings.

In May 2017, IIA issued new rules for licensing know how developed with IIA funding outside of Israel, or the Licensing Rules, allowing us to enter into licensing arrangements or grant other rights in know-how developed under IIA programs outside of Israel, subject to the prior consent of IIA and payment of license fees to IIA, calculated in accordance with the Licensing Rules. The payment of the license fees will not discharge us from the obligations to pay royalties or other payments to IIA.

- *Certain reporting obligations*. We, as any recipient of a grant or a benefit under the Innovation Law, are required to file reports on the progress of activities for which the grant was provided as well as on our revenues from know-how and products funded by the Authority. In addition, we are required to notify the Authority of certain events detailed in the Innovation Law.

30

Table of Contents

***It may be difficult to enforce a U.S. judgment against us and our officers and directors in Israel or the United States, or to serve process on our officers and directors.***

We are organized in Israel. Most of our officers and most of our directors (as of December 31, 2022) reside outside of the United States, and a majority of our assets are located outside of the United States. Therefore, a judgment obtained against us or any of our executive officers and directors in the United States, including one based on the civil liability provisions of the U.S. federal securities laws, may not be collectible in the United States and may not be enforced by an Israeli court. It also may be difficult for you to effect service of process on these persons in the United States or to assert U.S. securities law claims in original actions instituted in Israel.

**Risks related to an investment in our ordinary shares**

***The market price of our ordinary shares may be subject to fluctuation, regardless of our operating results and financial condition. As a result, our shareholders could incur substantial losses.***

The market price of our ordinary shares since the Stratasys, Inc.- Objet Ltd. merger has been subject to substantial fluctuation. From the start of 2019 through the early part of 2023 (through February 24, 2023), our ordinary shares have traded with closing prices that have ranged from $11.07 to $54.37, which low and high prices were each recorded since the start of 2021, evidencing a trend towards greater share price fluctuations. The price of our ordinary shares may continue to be subject to substantial fluctuation regardless of our operating results or financial condition due to a number of factors, including:

- the extent of growth of the 3D printing market generally;

- changes in earnings estimates or recommendations by securities analysts;

- development of new competitive systems and services by others;

- success or failure of research and development projects of our company or our competitors;

- developments concerning our or our competitors' intellectual property rights;

- successes or failures of the acquisitions or dispositions that we consummate, as perceived by financial or industry analysts;

- the general tendency towards volatility in the market prices of shares of technology companies; and

31

Table of Contents

- general market conditions and other factors, including factors unrelated to our operating performance.

These factors and any corresponding price fluctuations may materially and adversely affect the market price of our ordinary shares and result in substantial losses being incurred by our shareholders.

Market prices for securities of technology companies historically have been very volatile. The market for these securities has from time to time experienced significant price and volume fluctuations for reasons unrelated to the operating performance of any one company. In the past, following periods of market volatility, public company shareholders have often instituted securities class action litigation, as was the case in February and March, 2015, when class actions of our shareholders, alleging violations of the Exchange Act, were initiated against the Company and certain of our officers as defendants. Any such additional securities litigation could result in substantial costs and divert the resources and attention of our management from our business.

***Raising additional capital by issuing securities or issuing securities pursuant to acquisitions of other companies or technologies may cause dilution to our shareholders, and may furthermore be difficult under certain market conditions.***

We may need or desire to raise substantial capital in the future. Our future capital requirements will depend on many factors, including, among others:

- the extent to which we acquire or invest in businesses, products or technologies (as we did in acquiring Origin in December 2020, RPS in February 2021, Xaar in November 2021, Riven in 2022, and expect to acquire the additive manufacturing materials business of Covestro AG in the second quarter of 2023) and other strategic relationships;

- our degree of success in capturing a larger portion of additive manufacturing demand;

- the costs of establishing or acquiring sales, marketing and distribution capabilities for our products;

- the costs of preparing, filing and prosecuting patent applications, maintaining and enforcing our issued patents and defending intellectual property-related claims; and

- the costs of financing unanticipated working capital requirements and responding to competitive pressures.

If we raise funds or pay for acquisitions of other entities by issuing equity or convertible debt securities, it will reduce the percentage ownership of our then-existing shareholders, and the holders of such new securities may have rights, preferences or privileges senior to those possessed by our then-existing shareholders.

The market price for our ordinary shares, which had declined significantly from its all-time high in periods following the Stratasys, Inc.- Objet Ltd. merger until reaching new lows in the middle part and late part of 2020 recovered strongly over the course of 2021, only to fall again over the course of 2022 to near all-time lows once again. Should our share price remain at these low levels, that would adversely impact our ability to raise funds in the capital markets or to utilize our securities as payment in an acquisition transaction.

***We do not anticipate paying any cash dividends in the foreseeable future. Therefore, if our share price does not appreciate, our shareholders may not recognize a return, and could potentially suffer a loss, on their investment in our ordinary shares.***

We intend to retain all available funds and any future earnings to fund the development and growth of our business. As a result, capital appreciation, if any, of our ordinary shares will be investors' sole source of a return on their investment for the foreseeable future.

32

Table of Contents

***Even if we decide to pay dividends on our ordinary shares, we may be restricted from doing so or payment of such dividends may have adverse consequences for our company.***

Under the Companies Law, dividends may only be paid out of our profits and other surplus funds (as defined in the Companies Law) as of the end of the most recent year or as accrued over a period of the most recent two years, whichever amount is greater, provided that there is no reasonable concern that payment of a dividend will prevent us from satisfying our existing and foreseeable obligations as they become due. In the event that we do not meet the profit and surplus funds criteria, we can seek the approval of an Israeli court in order to distribute a dividend. The court may approve our request if it is convinced that there is no reasonable concern that the payment of a dividend will prevent us from satisfying our existing and foreseeable obligations as they become due. Due to the acquisition method of accounting utilized, under GAAP, for the Stratasys, Inc.- Objet Ltd. merger and the Origin transaction, pursuant to which we were deemed to have acquired Objet's assets and Origin's assets, we have incurred and will continue to incur significant annual amounts of amortization expense in respect of those assets. We are also subject to the risk of impairment charges from time to time to our acquired assets. These significant annual expenses under GAAP have reduced, and may continue to reduce or eliminate, our profits and surplus funds as determined under the Companies Law, and, hence, may restrict our ability to pay dividends (absent court approval).

In general, the payment of dividends may also be subject to Israeli withholding taxes. In addition, because we receive certain benefits under the Israeli law relating to "Approved Enterprise" and "Beneficiary Enterprise", our payment of dividends (out of tax-exempt income) may subject us to certain Israeli taxes to which we would not otherwise be subject. See "Risks related to our operations in Israel—The government tax benefits that we currently receive require us to meet several conditions and may be terminated or reduced in the future, which would increase our costs."

***We are a foreign private issuer under the rules and regulations of the SEC and are therefore exempt from a number of rules under the Exchange Act and are permitted to file less information with the SEC than a domestic U.S. reporting company, which will reduce the level and amount of disclosure that you receive.***

As a foreign private issuer under the Exchange Act, we are exempt from certain rules under the Exchange Act, including the proxy rules, which impose certain disclosure and procedural requirements for proxy solicitations. Moreover, we are not required to file periodic reports and financial statements with the SEC as frequently or as promptly as domestic U.S. companies with securities registered under the Exchange Act; and are not required to comply with Regulation FD, which imposes certain restrictions on the selective disclosure of material information. In addition, our officers, directors and principal shareholders are exempt from the reporting and "short-swing" profit recovery provisions of Section 16 of the Exchange Act and the rules under the Exchange Act with respect to their purchases and sales of our ordinary shares. Accordingly, you receive less information about our company and trading in our shares by our affiliates than you would receive about a domestic U.S. company, and are afforded less protection under the U.S. federal securities laws than you would be afforded in holding securities of a domestic U.S. company.

33

Table of Contents

As a foreign private issuer, we are also permitted, and have begun, to follow certain home country corporate governance practices instead of those otherwise required under the Listing Rules of the Nasdaq Stock Market for domestic U.S. issuers. We have informed Nasdaq that we follow home country practice in Israel with regard to, among other things, director nomination procedure and approval of compensation of officers. In addition, we have opted to follow home country law instead of the Listing Rules of the Nasdaq Stock Market that require that a listed company obtain shareholder approval for certain dilutive events, such as the establishment or amendment of certain equity-based compensation plans, an issuance that will result in a change of control of the company, certain transactions other than a public offering involving issuances of a 20% or greater interest in the company, and certain acquisitions of the stock or assets of another company. Following our home country governance practices as opposed to the requirements that would otherwise apply to a United States company listed on The Nasdaq Global Select Market may provide our shareholders with less protection than they would have as shareholders of a domestic U.S. company.

Our status as a foreign private issuer is subject to an annual review and test, and will be tested again as of June 30, 2023 (the last business day of our second fiscal quarter of 2023). If we lose our status as a foreign private issuer, we will no longer be exempt from such rules. Among other things, beginning on January 1, 2024, we would be required to file periodic reports and financial statements on a periodic basis (including both an annual report in respect of 2023 and quarterly reports in respect of each of the quarters of 2024) as if we were a company incorporated in the U.S., which, among other things, would result in increased compliance and reporting costs to us.

***If we are classified as a passive foreign investment company, or PFIC, our U.S. shareholders may suffer adverse tax consequences.***

Generally, if for any taxable year, after applying certain look-through rules, 75% or more of our gross income is passive income, or at least 50% of the value of our assets are held for the production of, or produce, passive income, we may be characterized as a PFIC for U.S. federal income tax purposes. Passive income for this purpose generally includes, among other things, certain dividends, interest, royalties, rents and gains from commodities and securities transactions and from the sale or exchange of property that gives rise to passive income. If we are a PFIC, gain realized by a U.S. shareholder on the sale of our ordinary shares may be taxed as ordinary income (rather than as capital gain income), and an interest charge added to the tax. Rules similar to those applicable to the taxation of gains realized on the disposition of our stock would apply to distributions exceeding certain thresholds.

Although we do not believe that we were a PFIC in 2022, we cannot assure you that the IRS will agree with that conclusion or that we will not become a PFIC in 2023 or in a subsequent year. The tests for determining PFIC status are applied annually, and it is difficult to make accurate predictions of our future income and the future value of our assets. U.S. shareholders should consult with their own U.S. tax advisors with respect to the U.S. tax consequences of investing in our ordinary shares. For a discussion of how we might be characterized as a PFIC and related tax consequences, please see Item 10.E, "Additional Information-Taxation-U.S. Federal Income Tax Considerations-Tax Consequences if We Are a Passive Foreign Investment Company".

34

Table of Contents

**ITEM 4. INFORMATION ON THE COMPANY.**

**A. History and Development of the Company**

Our legal and commercial name is Stratasys Ltd., and we are the product of the 2012 merger of two leading additive manufacturing companies, Stratasys, Inc. and Objet Ltd. Stratasys, Inc. was incorporated in Delaware in 1989, and Objet Ltd. was incorporated in Israel in 1998. As part of that merger transaction, the ordinary shares of Stratasys Ltd. were listed on the Nasdaq Global Select Market under the trading symbol "SSYS". We have acquired (and, in certain cases, disposed of) a number of companies since that time, In July 2014 and August 2014, we acquired Solid Concepts and Harvest Technologies, respectively two leading providers of additive manufacturing services. Following those two acquisitions, in 2015, we introduced our branded Stratasys Direct Manufacturing, or SDM, service, which significantly broadened and increased our production and offering of AM parts, which are used by our customers as prototypes, benchmarks and end-use parts. In December, 2020, we acquired 3D printing start-up, Origin Inc., or Origin, and its proprietary $P^3$ Programmable PhotoPolymerization technology, which has become an important growth engine for our company. The acquisition was aimed at fortifying our leadership in polymers and production applications of 3D printing in industries such as dental, medical, tooling, and select industrial, defense, and consumer goods markets. In February 2021, we acquired UK-based RP Support Ltd., or RPS, a provider of industrial stereolithography 3D printers and solutions. RPS' complementary technology further expands our polymer suite of solutions across the product life cycle, from concept modeling to manufacturing. In April 2021, we introduced the Stratasys H350 3D printer, the first system powered by the powder-based SAF™ technology of Xaar 3D Ltd., or Xaar, and in November 2021, we acquired all remaining shares of Xaar from Xaar plc (we previously owned a 45% share in Xaar), thereby accelerating our growth in production-scale 3D printing. In September 2022, we disposed of our subsidiary MakerBot, a leader in desktop 3D printing, merging it with UltiMarker, after which transaction we hold a 46.5% equity interest in the combined company, which aims to provide easy-to-use and accessible 3D printing hardware, software, and materials for any application. In October 2022, we acquired the assets of the quality- assurance software company Riven and integrated its cloud-based software solution into our GrabCAD® additive manufacturing platform, which enables manufacturing customers to adopt our solutions for end-use parts production. We have announced, and expect to complete at the end of the second quarter of 2023, the aquisition of the additive manufacturing materials business of Covestro AG, which will expand our differentiated materials offerings in stereolithography, digital light processing (DLP), and powders. We furthermore expect to effect smaller acquisitions and investments in other companies from time to time to support execution of our strategy.

We have dual headquarters. Our registered office and one of our two principal places of business is located at 1 Holtzman Street, Science Park, P.O. Box 2496, Rehovot 76124, Israel, and our telephone number at that office is (+972)-74-745-4314. Our other principal place of business is located at 7665 Commerce Way, Eden Prairie, Minnesota, and our telephone number there is (952) 937-3000. Our agent in the United States is Richard Garrity, Chief Industrial Business Unit Officer of our Delaware subsidiary, Stratasys, Inc., whose address is c/o Stratasys, Inc. at the address of our Eden Prairie, Minnesota headquarters. Our web address is www.stratasys.com. The information contained on that website (or on our other websites, including stratasysdirect.com and makerbot.com) is not a part of this annual report. As an Israeli company, we operate under the provisions of the Companies Law.

In 2022, 2021 and 2020, our capital expenditures amounted to $19.8 million, $26.8 million and $29.0 million, respectively, of which $13.6 million, $25.0 million and $26.9 million, respectively, was principally related to the purchase and construction of property, plant and equipment.

During 2021, our principal property and equipment investment was the construction of our new facility, which we own, at our new property in Rehovot, Israel, where we moved our Israeli headquarters during January 2017. This new facility, towards which we paid $0.2 million and $11.1 million during 2022 and 2021, respectively, also houses research and development facilities. As of December 31, 2022, we had invested an aggregate of $119.5 million in our new facility in Israel and its related equipment.

During 2022, we made other purchases of property and equipment, mainly for the enhancement of our manufacturing capabilities to support new solution offerings, primarily for our facilities in Israel and the United States.

Table of Contents

**B. Business overview**

We are a global leader in polymer-based 3D printing solutions, which we provide at every stage of the product life cycle, with multiple technologies and complete solutions for superior application fit, across industrial, healthcare and consumer fields. We focus, in particular, on polymer 3D printing solutions that address the fastest-growing manufacturing solutions, which we view as the biggest potential growth opportunity in the 3D printing industry. Leveraging distinct competitive advantages that include a broad set of best-in-class 3D printing platforms, software, materials and technology partner ecosystems, innovative leadership, and a global GTM infrastructure, we are positioned to further expand our leadership in this significant and growing global marketplace.

Our approximately 1,700 granted and pending additive technology patents currently held (in addition to many others previously held) have been used to create models, prototypes, manufacturing tools, and production parts for a multitude of industries including aerospace, automotive, transportation, healthcare, consumer products, dental, medical, fashion and education. Our products and comprehensive solutions improve product quality, development time, cost, time-to-market and patient care. Our additive manufacturing ecosystem of solutions and expertise includes materials, software, expert services, and on-demand parts production.

Our acquisition, of Origin, a provider of photopolymer solutions for production-oriented applications, expanded our leadership through innovation in the fast-growing mass production parts segment by providing us with a next-generation photopolymer platform.  Origin's pioneering approach to additive manufacturing of end-use parts enables us to serve a large market with manufacturing-grade 3D printers, utilizing $P^3$™ Programmable PhotoPolymerization technology. This technology precisely controls light, heat, and force, among other variables, to produce parts with exceptional accuracy and consistency and enables a broad range of chemistry which turns into unique production grade properties.

Our acquisition of RPS, which closed in February 2021, has enabled us to leverage RPS' industry-leading go-to-market infrastructure to offer their Neo® line of systems to the global market with an expanded set of applications. Our Neo line of 3D printers feature dynamic laser beam technology that enables build accuracy, feature detail, and low variability across the full extent of a large build platform. As an open resin system, the Neo products provide customers materials with a wide range of properties such as chemical resistance, heat tolerance, flexibility, durability, and optical clarity, and can produce large parts up to 800 x 800 x 600 mm, providing a significant build area in a small footprint.

Our acquisition, in November 2021, of the remaining outstanding shares of Xaar that we had not already owned (we had held a 45% stake in Xaar) was aimed at accelerating our growth in production-scale 3D printing. In April 2021, we introduced the Stratasys H350™ 3D printer, the first system powered by Xaar's powder-based SAF™ technology. Representing the culmination of more than 10 years of research and development, SAF-based 3D printers are designed to deliver cost-competitive parts at production-level throughput. H Series™ Production Platform printers such as the H350 are designed to deliver part quality, consistency, and reliability that ensures customer satisfaction and high production yield. Using SAF technology, the printers execute key 3D printing steps in the same direction across the print bed to provide a uniform thermal experience – and therefore part consistency – for all printed parts regardless of their placement in the build, representing a significant improvement over traditional powder-bed fusion processes.

In August 2022 we signed a definitive agreement to purchase the assets of Covestro's AM materials business, including all of the SOMOS™ portfolio. This acquisition is expected to be completed at the beginning of the second quarter of 2023.

Table of Contents

We now offer a broader range of systems, consumables and services for additive manufacturing. Our wide range of solutions, based on our proprietary 3D printing technologies and materials, enhances the ability of designers, engineers and manufacturers to:

- visualize and communicate product ideas and designs;

- verify the form, fit and function of prototypes;

- manufacture tools, jigs, fixtures, casts and injection molds used in the process of manufacturing end-products;

- manufacture customized and short-to-medium-run end-products more efficiently, with greater agility, and more sustainably; and

- produce objects that could not otherwise be manufactured through subtractive manufacturing methodologies.

Our goal is to be the first choice for polymer 3D printing. Given our significant experience and proven operating history, we have many competitive advantages including:

- **Broadest offering of innovative technologies.**-We offer five different 3D printing technology platforms more than any other vendor in the industry, each of which have been optimized for specific industry applications. They are complemented by a technology-agnostic software platform, with an extensive and rapidly expanding ecosystem of software solutions and software partners for workflow and connectivity, as well as a robust range of advanced materials.

- **Expansive materials ecosystem.-** To ensure maximum performance and quality, as well as access to the broadest possible range of materials for our customers, we provide a robust range of materials in three distinct tiers: (i) Stratasys Preferred, which are engineered by us or our third-party material partners exclusively to provide the best combination of material and printer performance; (ii) Stratasys Validated, which are engineered by us or our third-party materials partners and validated by us with basic reliability testing to accelerate the expansion of material options available in the marketplace; and (iii) Open: Unvalidated materials accessed via an OpenAM Software License, which may offer unique attributes and the potential to address new applications but have not received validation testing or optimization relative to performance and functionality on a Stratasys printer. Our prospective acquisition of Covestro will further strengthen our differentiated materials offering in stereolithography, DLP, and powders, which additional materials are supported by a broad portfolio of patents.

- **Deep application engineering expertise**- We believe we have the most industry application engineers in the world who provide our deep quality and process certification expertise for tier-1 manufacturing OEMs. This is essential for meeting the rigorous demands of industries like aerospace, where there are over 300,000 Stratasys parts already flying around the world today, or healthcare, where we support multiple materials for biocompatible applications. We have multi-industry experience with multiple 3D printing technologies serving the aerospace, automotive, dental, consumer, education, and medical industries.

- **Unparalleled market access** -We believe our network of over 200 channel partners is the strongest and most experienced in the industry, covering every region and every major market. This network of resellers worldwide is exclusive to us and our technologies, and has been built over many years, making it unable to be quickly and easily duplicated. This channel network has focused primarily on selling and servicing our FDM and PolyJet solutions since the merger of Stratasys and Objet in 2012, and starting in 2021, included the Origin P$^3$, SAF, and Neo stereolithography technologies, which dramatically expand the total addressable market across medical, dental, consumer goods, automotive, commercial goods, and service bureaus.

- **Marquee customer base**- Many of the world's leading companies across aerospace, technology, automotive, consumer, energy, and healthcare are our strategic partners. These include: General Motors, whose new multi-million-dollar additive manufacturing facility in Michigan features Stratasys systems from low to high end; TE Connectivity, which is now using Origin One 3D printers to produce end use parts for aerospace connectivity; Airbus, which recently extended Stratasys' contract to include several more aircraft platforms as well as spare parts production; and the U.S. Navy, which signed a $20 million contract with Stratasys in 2021 for systems, materials, support and training for multiple locations around the world.

37

Table of Contents

- **Software/Digital manufacturing connectivity**- Through our GrabCAD Additive Manufacturing Platform, we have created a smart and connected software ecosystem to enable additive manufacturing at scale across the digital thread, from design through production. Our SDKs integrate with many different software partner solutions, allowing customers to turn data into intelligence by collecting important information that can be used to improve productivity. This level of integration expands the capabilities of 3D printers. In addition, many of our 3D printing systems are software-upgradable. As our largest customers increasingly adopt multiple Stratasys systems across multiple 3D printing technologies, the efficiency benefits of a single software platform to manage them increases.

We benefit from recurring revenues from the sale of resin and plastic consumables and related services. We provide products and services to our global customer base throughout our offices in North America and internationally, including: Baden-Baden, Germany; Shanghai, China; and Tokyo, Japan, as well as through our worldwide network of over 200 channel partners and resellers who are exclusive to us and our additive manufacturing technologies. We have over 2,000 employees worldwide, including what we believe is one of the largest additive manufacturing service bureaus in the United States.

**Industry overview**

Historically, prototype development and customized manufacturing have been performed by traditional methods using metal extrusion, computer-controlled machining, and manual modeling techniques, in which blocks of material are carved or milled into specific objects. These subtractive manufacturing methodologies have numerous limitations. They often require heavy involvement of specialist technicians and can be time- and labor-intensive, and traditional molds for injection molding are expensive. The time intensity of traditional modeling can leave little room for design error or subsequent redesign without meaningfully impacting a product's time-to-market and development cost. As a result, prototypes have traditionally been created only at selected milestones late in the design process, which prevents designers from truly visualizing and verifying the design and geometry of an object in the preliminary design stage. The inability to iterate a design rapidly hinders collaboration among design team members and other stakeholders and reduces the ability to optimize a design, as time-to-market and optimization become necessary trade-offs in the design process.

3D printing addresses many of the inherent limitations of traditional modeling technologies through its combination of functionality, quality, ease of use, speed and cost. 3D printing can be significantly more efficient and effective than traditional model-making techniques for use across the design process, from concept modeling and design review and validation, to fit and function prototyping, pattern making and tooling, to direct manufacturing of repeatable, cost-effective parts, short-run parts and customized end products. Introducing 3D modeling earlier in the design process to evaluate fit, form and function can result in faster time-to-market and lower product development costs, while keeping intellectual property in-house. As the 3D printing industry is maturing, its role in a product's lifecycle is further expanding, specifically into manufacturing solutions that follow the initial modeling and prototyping stages of the product lifecycle. This evolution opens a substantially larger total addressable market for additive manufacturing solutions.

In the medical industry as well, practitioners are rapidly embracing the cutting-edge production of 3D printed anatomical models for pre-operative procedural planning. 3D printed pre-procedural models are low-cost and are customized to individual patients. Created from medical scans, the printed models provide physicians the opportunity to map out their procedures in a no-risk surgical setting. The rapidly produced and quickly delivered models assist with procedure validation, ultimately improving patient outcomes.

For short and medium-run manufacturing, 3D printers eliminate the need for complex manufacturing set-ups and reduce the cost and lead-time associated with conventional tooling. Direct digital manufacturing, or DDM, involves the use of 3D production systems for the direct manufacture of parts that are subsequently incorporated into the user's end product or manufacturing process. DDM is particularly attractive in applications that require shorter-run or lower-volume parts or rapid turn-around, and for which tooling would not be appropriate due to small volumes.

Increasingly, attention is being paid to the potential sustainability benefits of additive manufacturing as well. By producing parts on-site and at scale, carbon emissions associated with transportation and delivery can be reduced. Additive manufacturing also reduces waste because the right number of products are created at the right time. One study has suggested that additive manufacturing could reduce industrial energy use by 2050. Light-weighting parts through additively designed polymer components save airlines fuel. – about 14,000 gallons of fuel per year per plane for every pound eliminated.

38

Table of Contents

New technologies, such as our P3 and SAF technologies, are beginning to significantly increase the volumes at which additive manufacturing is competitively advantageous up to tens of thousands and beyond in some cases. DDM also enables the production of objects that have been topologically designed, or designed on the basis of a computerized determination of where to place the key components of the object and how to connect them, a process that is generally unavailable using conventional subtractive manufacturing methodologies.

Desktop 3D printer usage has shown rapid growth in recent years, with the introduction and adoption of affordable entry-level 3D printers and increased availability and content. These entry-level desktop printers have increased market adoption by professional designers and education institutions. We expect that the adoption of desktop 3D printing will continue to increase in the future, in terms of design applications and engineering applications. We believe that the expansion of the market will be spurred by increased proliferation of 3D content and 3D authoring tools (3D computer-aided-design, or CAD, and other simplified 3D authoring tools), as well as increased availability of 3D scanners. We also believe that increased adoption of 3D printing will be facilitated by continued improvements in 3D printing technology and greater affordability of entry-level systems. We are active in facilitating the growth of the desktop 3D printing market by way of our investment in Ultimaker, a company created from the merger of our former subsidiary MakerBot with Ultimaker into a new combined desktop 3D printing market leader.

**Stratasys solutions**

### *Range of solutions*

We provide integrated solutions throughout a product's lifecycle for designers, engineers, manufacturers, and medical professionals, including compatible products and services designed for our customers' use to effectively solve their specific application needs. Our solutions consist of 3D printing systems, consumables, software, paid parts, and professional services and encompass everything from prototyping and design all the way through mass production.

Our solutions allow our end-users to print 3D models and parts that enhance their ability to visualize, verify and communicate product designs, thereby improving the design, development and validation processes and reducing time-to-market. Our systems create visual aids for concept modeling and functional prototyping to test fit, form and function, permitting rapid evaluation of product designs. Using presentation models developed with our systems, designers and engineers can typically conduct design reviews and identify potential design flaws earlier in the process and make improvements before incurring significant costs due to re-tooling and rework, allowing them to optimize a design much more rapidly and cost-effectively.

Our systems aid in the communication of ideas otherwise communicated in abstract or 2D media. For example, physicians use visually and/or biomechanically accurate 3D printed Stratasys models to plan surgical procedures. A model produced with our systems may be used as a sales tool, as a model or part display, or simply for use in conducting a focus group. It may also be used for accelerated collaboration in product design and manufacturing cycles at multiple locations, enabling visualization and tactile response, which can be critical to product development or sales process.

Our solutions also empower end-users to quickly and efficiently deploy parts to incorporate into their manufacturing process and improve its effectiveness while at the same time lowering costs. For instance, our solutions enable the production of manufacturing aids and tools such as jigs, fixtures, casts and injection molds aiding in the production and assembly process. These solutions are often faster to produce than through traditional methods, and frequently cost less. Materials like nylon carbon fiber enable these printed products to be both exceptionally strong and lightweight.

Additive manufacturing of end-use-parts, using our solutions, is a growing focus of our offerings to customers, and is attractive in applications requiring fast, short-run or low-mid-volume parts where tooling would not be cost-efficient. Our solutions enable the production of objects that generally could not otherwise be manufactured through subtractive manufacturing methodologies.

39

Table of Contents

In addition, our solutions enable doctors to train and plan medical procedures based on medical models, created by our printers, as well as create surgical guides to support complex surgeries. In the dental space, our PolyJet solutions enable dental labs to create dental and orthodontic, patient specific models and guides and devices for various applications, based on digital dentistry workflow.

Our solutions offerings are characterized by the following distinguishing qualities:

- material properties of printed objects, such as heat resistance, toughness, brittleness, elongation-to-break, color and flexibility;

- quality of printed objects measured by, among other things, resolution, accuracy and surface quality;

- Consistency of produced parts in a run or batch;

- multiple production-grade modeling materials;

- reliability of printing systems;

- fast time to part;

- efficiency of operations with software workflows;

- customer service;

- ease of use; and

- automatic, hands-free support removal and minimal post processing.

40

Table of Contents

*Range of technologies and differentiating factors*

Our solutions are driven by our proprietary technologies, which we have both developed organically and acquired over time through targeted acquisitions. We hold approximately 1,700 patents and pending patents internationally, and our 3D printing systems utilize our patented extrusion-based FDM®, inkjet-based PolyJet™, powder-bed-based SAF™, photopolymer-based P$^3$, and stereolithography technologies to enable the production of prototypes, tools used for production, and manufactured goods directly from 3D CAD files or other 3D content. We believe that our broad range of product and service offerings is a function of our 3D printing technology leadership.

**FDM.** A key attribute of our FDM$^®$ 3D printing technology is its ability to use a variety of production grade thermoplastic materials featuring surface resolution, chemical and heat resistance, color, and mechanical properties necessary for production of functional prototypes and parts for a variety of industries with specific demands and requirements. Use of these materials also enables the production of highly durable end parts and objects with soluble cores for the manufacture of hollow parts, the manufacture of which were previously dependent on slower and more expensive subtractive manufacturing technologies.

We believe this technology is differentiated by factors making it appropriate for 3D printing and additive manufacturing, including:

- ability to use FDM$^®$ systems in an office environment due to the absence of hazardous emissions;

- low post-production processing requirements;

- minimal material waste;

- build repeatability;

- ease of use, with minimal system set-up requirements;

- absence of costly replacement lasers and laser parts; and

- a high degree of precision and reliability.

**PolyJet.** We believe that our inkjet-based 3D printing technology is differentiated from other competing technologies in its ability to scale and deliver high-resolution and multi-material, full-color 3D printing, down to the voxel level, in an office environment system. Our easy-to-use PolyJet™ 3D printers create high-resolution, smooth surface finish models with the look, feel and functionality of the final designed product. We offer a wide variety of office-friendly resin consumables, including rigid and flexible (rubber-like) materials, materials for medical applications that simulate the biomechanical properties of human tissue, and bio-compatible materials for dental applications. Using our PolyJet digital materials technology, our solutions offer unique quality 3D printing systems depositing multiple materials simultaneously. This enables users, in a single build process, to print parts, assemblies, and composite materials made of multiple materials-each retaining its distinct mechanical and physical properties. For example, users can print objects with both rigid and flexible portions in a single build or mix different base colors to achieve a desired color tone. The PolyJet technology enables on-demand mixing of a variety of resins to create a broad range of pre-defined digital materials, which are composite materials with modified physical or mechanical and color properties. This includes 'Pantone® Validated' colors, allowing us to support more than 600,000 color and texture combinations, including the industry's clearest material, nearly as clear as glass, with a wide range of color and texture combinations, which is a key differentiating attribute of our 3D printers. In 2022, we began offering tailored PolyJet solutions with 3DFashion™ technology designed specifically for end-use apparel applications.

41

Table of Contents

**Stereolithography.** Our stereolithography technology enables the production of high-quality, durable parts that meet the requirements of a wide range of applications, as well as additive manufacturing prototypes and tools. Industrial stereolithography systems are well-established in the 3D printing industry for applications such as large prototypes, tooling, investment casting patterns, and orthodontic clear aligner molds. They provide quality surface finish, large build sizes, a fast time to print, and an affordable cost per part. We believe that the Neo line of systems (acquired via RPS in February 2021) is superior relative to other solutions currently available due to an open choice of resins, system reliability, low service requirements, simple day-to-day operation, and accurate builds. With access to our strong global channels, we believe we can bring these benefits to many more manufacturing organizations. Our latest acquisition of the Covestro Additive Manufacturing business unit (which is expected to close at the beginning of the second quarter of 2023) completes our stereolithography offering with the strong Somos® materials portfolio for stereolithography printers. Somos materials are widely known and appreciated for their mechanical properties, printing performance, high quality, and repeatable builds. These materials with our Neo systems offering will provide an attractive and differentiated offering over the current stereolithography solutions in the market.

**P3** Our P3 resin-based 3D printing technology, which we added to our solutions portfolio through our acquisition of Origin, provides a best-in-class combination of detail, mechanical properties and throughput for mass production parts. We believe we have the strongest materials portfolio in the category - including everything from aerospace-grade flame-resistant materials to biocompatible materials from leading companies like BASF, Henkel and Covestro. The P3 platform is software-based and cloud-connected so we can easily optimize our platform for our customers, including cloud-based upgrades. In October, we announced that the P3 printers can now use our GrabCAD Print software, which simplifies 3D printing workflows and brings a more consistent user experience across our technologies. Recently, we have also demonstrated automated large-scale production using our P3 technology together with post-processing units. We believe that such differentiated solutions, with the unique P3 platform and strong materials portfolio, will support wide adoption of the technology in the market by industrial production customers.

**SAF.** SAF Selective Absorption Fusion technology was developed via our joint venture with Xaar plc, Xaar 3D Ltd., which we acquired in 2021. SAF is an industrial-grade additive manufacturing technology designed to deliver production-level throughput for end-use parts. Representing the culmination of more than 10 years of research and development, SAF-based 3D printers can deliver a competitive cost per part with the part quality, consistency, and reliability that ensures satisfaction and high production yield. The SAF technology uses a counter-rotating roller to coat powder bed layers onto a print bed and prints absorber fluid to image the part layers. The imaged layers are fused by passing an infrared lamp over the entire span of the print bed. SAF technology executes these key process steps in the same direction across the print bed to provide a uniform thermal experience - and therefore part consistency - for all printed parts regardless of their placement in the build. H Series™ 3D printers using SAF use materials by leading third party materials providers, including PA11, which is derived from sustainable castor oil. We also plan to develop SAF materials internally via our prospective acquisition of Covestro Additive Manufacturing.

We believe that the range of 3D printing consumable materials, together with the broad set of materials in our materials ecosystem, that we offer, is the widest in the industry. Our consumable materials consist of over 61 FDM spool-based filament materials, 49 PolyJet cartridge-based resin materials, and 158 functional materials. These materials yield a large variety of digital materials that reflect over 600,000 color variations, transparency, opacity and flexibility levels.

**Our competitive strengths**

We believe that the following are our key competitive strengths:

42

Table of Contents

- **Differentiated product offerings with superior part quality.** Our portfolio of 3D printing systems is differentiated through a combination of superior printing qualities, accuracy, print speed, the ability to print a range of materials with varying levels of strength, chemical and heat resistance, color and mechanical properties, the ability to print multiple materials simultaneously and suitability for office environments. Our offering is focused on high-end solutions to address customer needs from prototyping applications to complex manufacturing operations.

- Our FDM-based systems enable the highly precise printing of engineering and high-performance thermoplastic materials, enabling a wide range of manufacturing applications with little or no post-production processing.

- Our PolyJet inkjet-based systems are used in multiple prototyping solutions as well as in manufacturing applications, particularly in higher growth industries such as healthcare and dental.  The systems jet ultra-thin layers of material, enabling voxel level control of the deposited materials, part realism (multi materials and colors), high accuracy and resolution and smooth finish to printed models. For use with these various types of systems we offer a wide variety of office-friendly resin consumables, including rigid, flexible (rubber-like), transparent and color materials.  This unique quality printing system utilizes the simultaneous jetting of up to six materials to enable end-users to print models, in virtually unlimited combinations, in a single build.

- Our P3-based systems, which we added to our solutions portfolio via the acquisition of Origin, offer a best-in-class combination of detail, mechanical properties and throughput for mass manufacturing production parts.  This addition allows us to expand our leadership through innovation in the fast-growing mass production parts segment in industries such as dental, medical, tooling, and select industrial, defense, and consumer good segments. The P3 technology is an advancement on DLP principles ,whereby liquid photopolymer resin is cured with light. Our Origin One 3D printers offer precisely controls light, heat, and force, among other parameters, via Origin's closed-loop feedback software. This new technology enables customers to build parts with industry-leading accuracy, consistency, size and detail, while using a wide range of commercial-grade, durable resins.

- Our powder bed fusion (PBF) SAF-based systems, which launched at the end of 2021, expand our total addressable market across multiple segments, including commercial goods (frequent demand for short and medium run production), automotive (production parts at competitive speeds), consumer goods (pre-production parts, short runs, and specialty production), and service bureaus (an excellent high-utilization environment for a wide variety of components.

- Our industrial stereolithography RPS' Neo line of systems/printers feature dynamic and variable laser beam technology that enables build accuracy, feature detail, excellent side wall quality and low variability across the full extent of a large build platform. As open resin systems, the Neo products provide customers a choice of materials that deliver a wide range of properties such as chemical resistance, heat tolerance, flexibility durability and optical clarity.

- **Integrated solutions offering/ecosystem**- We believe our customers are looking for primary partner for polymer additive manufacturing, which we believe we are uniquely able to provide. We provide integrated solutions offering that include compatible products and services that are designed to meet the full gamut of our clients' needs in an efficient manner, consisting of a broad range of systems, consumables, software and services, including:

  - 3D printers;

  - materials;

  - GrabCAD software;

  - professional services;

  - parts on demand;

  - vertical applications;

  - partnerships and alliances; and

  - enhanced collaboration among industry professionals, via our GrabCAD Community, which provides engineers and designers a resource for CAD models and helps them communicate ideas and share designs.

Table of Contents

- **Proprietary technology platforms with multidisciplinary technological expertise.** We believe that our proprietary 3D FDM, 3D inkjet-based PolyJet, P3 and SAF printing engines offer end users the versatility and differentiated features necessary for a wide variety of current and potential applications. We combine our proprietary hardware platforms, featuring widely-deployed inkjet printer heads or easy-to-use extrusion heads with integrated software and a wide range of proprietary materials to develop and produce leading 3D printing systems.

- **Leading Direct Manufacturing Business.** Our Stratasys Direct Manufacturing service business is one of the largest and leading AM parts service providers globally. This unit's knowledge of and experience in AM, including materials and systems know-how, and AM end-use parts production has enhanced our manufacturing offering suite. For example, the Stratasys Direct team has helped accelerate our product development for the Origin One and H350 3D printers to improve their performance in production environments. Furthermore, Stratasys Direct enables us to offer a broader solution to our customers, catering to more of their 3D printing needs, whether by supply of 3D printers or of 3D printed parts through cross-sell or infinite capacity extension. We believe this offering creates better customer intimacy and a competitive advantage for Stratasys.

- **Synergies between SDM and 3D printer sales businesses.** Our Stratasys Direct Manufacturing's AM parts service business has been capitalizing on the synergies between it and our 3D printer sales business. Stratasys Direct Manufacturing works closely with our North American sales organization and benefits from access to some of the largest customers for our 3D printing systems, who have been increasingly relying upon Stratasys Direct Manufacturing for production parts and development needs.

- **Diverse, global customer base.** We have a broad customer base, ranging from global market leading brands to small businesses and professionals and individuals. Our end-users include companies across a wide range of industries and applications, including automotive, aerospace, dental laboratories, consumer products, educational institutions, defense, medical analysis, medical systems, electronics, and heavy equipment.

- **Large and growing installed base.** Our differentiated offerings have led to a large and growing installed base. The significant installed base has resulted in greater distribution reach and enhanced opportunities for cross selling, given the significantly broadened and complementary product offerings. It furthermore presents us with an opportunity to generate recurring revenues from sales of consumables and services to the installed base.

- **Extensive global reach.** With over 200 channel partners around the world, we are well positioned to leverage the extensive geographic reach of our marketing, sales and support organization to serve customers and grow awareness of 3D printing for prototyping, design and manufacturing. This level of service and support is becoming an especially critical differentiator as our customers adopt 3D printing for more operationally critical manufacturing applications.  •

- **Increased accessibility and ease of use for customers.** Our GrabCAD Additive Manufacturing software platform and our GrabCAD Community enable designers, engineers, and machine operators to easily manage our 3D printing systems at scale.

- GrabCAD Print provides native CAD job programming along with traditional 3D file formats (STL, VRML), thereby reducing time and errors in job planning and resulting in high quality printed parts. We have also introduced a paid version with advanced features for the H350 3D printer that improve first print quality and reduce cost per part.

44

Table of Contents

- GrabCAD Shop provides scheduling, remote monitoring and analytics, which provides visibility to managers and operators across our technologies. That enables work order management for organizations that have dedicated operators, by providing centralized, 3D printing services to engineers and designers.

- GrabCAD Connect provides two-way SDK integration for a variety of third party software applications, dramatically extending the value of our platform

- GrabCAD Community is the online community of over 13 million professional engineers, designers, manufacturers and students who share best practices via tutorials, discussion forums, design/print challenges and 3D content.

**Our growth strategy**

We are focused on polymers, which we view as the biggest potential profit pool in the industry. Our solutions deliver value to every touchpoint across the product lifecycle. The key elements of our strategy for growth include the following:

- **Having the broadest technology offering in the sector.** We offer five best-in-class technologies for every step in the product lifecycle – from concept through manufacturing. We believe that the proliferation of 3D content, advancements in AM technology platforms and the introduction of improved materials will continue to drive growth in 3D printing. We expect to see that growth result in a major shift towards more manufacturing application solutions as compared to primarily focusing on design and prototyping. We will continue to invest in the identification of new applications (especially manufacturing applications) for which our proprietary printing technologies, software and materials are appropriate. This approach has resulted in the broadest offering of polymer 3D printing solutions in our industry, serving an unequalled array of end markets.

- **Possessing an unmatched Go-to-Market infrastructure.** We believe our network of over 200 channel partners is the largest and most experienced in the industry. This is a competitive advantage that we believe is not easily or inexpensively replicated. Our goal is to reach new customers and increase sales to existing customers by leveraging that network and providing access to new solutions that address customers' specific needs. These solutions include those offered by our Stratasys Direct Manufacturing service. As part of this strategy, we intend to grow awareness of 3D printing solutions for prototyping and manufacturing and to develop industry-specific sales channels as part of our effort to commercialize a broader range of new manufacturing and production applications.

- **Possessing deep application engineering experience.** Our people have the deepest application engineering expertise in the industry, which allows us to educate customers and drive future innovation. We have in place today an offering of solutions that includes the complete gamut of compatible systems, consumables, software and services (parts on-demand, professional and expert consulting services) that are designed to meet our clients' needs in an integrated, complete manner. We will seek to extend our technological capabilities by addressing manufacturing applications and continuing to invest in our R&D efforts, which focus on enhancing our 3D PolyJet and FDM printing technologies as well as developing new innovative solutions for 3D printing and exploring inorganic opportunities for new printing technologies. We believe that by enhancing our AM technological capabilities and by developing and introducing new materials for our 3D printing and production systems, we will be able to increase both the size of, and our share of, the 3D printing marketplace.

- **Having a resilient business model designed to scale as opportunities present themselves.** Our corporate and Go-to-Market infrastructures are positioned to effectively absorb, scale and create operating leverage for key opportunities that can complement and grow our leading position in polymers as they arise, all while providing operating leverage to the company. We are also positioned to weather unexpected downturns like the one we have seen from the pandemic, and to scale up during times of growth, capturing market share and increasing revenues, margins, and earnings. We are not dependent on any one client or end market, as evidenced by our not having any one customer represent greater than 5% of our revenues.

45

Table of Contents

- **Adding more value through software, both from our partners and ourselves.** We offer Industry 4.0-ready systems that include API integration to leading manufacturing software solutions.On the one hand, that makes it easier to add more systems and use them more intensively.("Connect one Stratasys printer– connect them all") and on the other hand, it enables our obtaining new value from our software partners. Enabling our customers to see the systems and materials usage in real time helps them to enhance our own technological offerings much easier. This enables us to provide our customers with advanced remote features like remote support, predictive support and materials replenishment. That, in turn, generates sales of our integrated solutions.

**Products and services**

**Our products**

We offer a dedicated suite of products for applications such as rapid prototyping (RP), tooling, and manufacturing parts. Our products include 3D printing systems, consumable materials, software and services.

Collectively, this portfolio of products offers a broad range of performance options for our customers, depending on their application, the nature and size of the designs, prototypes, and/or final parts desired. Our products are available at a variety of different price points and include entry-level desktop 3D printers, a range of mid-systems for prototyping and end use parts production, and large production systems for additive manufacturing at scale. We also offer a range of 3D printing materials (as described under "Consumable materials" below). The performance of our different systems varies in terms of capabilities, which are related to the following features:

- print speed;

- resolution;

- materials;

- resin cartridge capacity / filament spool size;

- maximum model (or tray) size;

- repeatability; and

- duty cycle, or the number of parts that a printer can produce over a given period of time without requiring maintenance.

Our systems are integrated with our software and are supported by services provided to our customers, both directly and through our reseller channel.

46

Table of Contents

***Printing systems***

We offer a series of printing systems that address the largest parts of the addressable market for polymer 3D printing.

Our 3D printing systems, which are based on our proprietary FDM-(Fused Deposition Modeling), PolyJet, P3, SAF and stereolithography technologies, are described below:

*PolyJet printers*

Our PolyJet technology-based, high-end printing systems offer the ability to print eight multiple materials including color printing in a single part build. The Stratasys J8 Series printers break restrictive technology barriers, enabling customers to print more than 500,000 different color shades and textures, including Pantone® Validated colors, and multiple material properties- ranging from rigid to flexible, and opaque to transparent. They also 3D prints concept models twice as fast as our previous generation printers, supported by a low-cost DraftGrey material.

Our J55 3D Printer makes that same fast, full-color design realism accessible to designers and teams everywhere in an office-friendly format and smaller footprint. At about a third the price of J8 Series printers, the J55 including high fidelity and five simultaneously printer materials enabling nearly 600,000 colors or a variety of materials providing tactile, textual, and sensory capabilities. We also introduced a complementary J35™ Pro 3D printer in 2021, which is an all-in-one, multi material desktop 3D printer for designers and engineers needing up to three materials.

Both J8 Series 3D printers and the J55 printer support KeyShot 3D rendering software, enabling designers to save KeyShot designs directly in the new 3MF format and produce 3D printed models in a single day, when traditional modeling can take one-to-three weeks.

The J55 3D printer is also now available in two industry-specific versions, the J5 DentaJet™ and the J5 MediJet™. The J5 DentaJet is the industry's 3D printer able to accommodate mixed trays of dental parts.  The J5 MediJet is designed to produce anatomic visual models and drilling and cutting guides that are sterilizable and biocompatible.

The Stratasys J850 Digital Anatomy™ printer helps medical device companies optimize design throughout the product lifecycle. It 3D prints with GelMatrix™ resin, TissueMatrix™ resin and BoneMatrix™ resin -three new materials which, when combined, form over 100 new, unique digital materials to suit anatomical applications. These materials, when used for 3D printing, produce medical models and anatomies that achieve a true-to-life feel and response. This includes both soft tissues, including organs and blood vessels as small as 1mm in diameter, as well as porous bone structures, fibrotic tissues, and ligaments. Recently, we released an additional unique software tool to our medical offering, the Digital Anatomy Creator, allowing seamless creation of different anatomical structures by customizing specific bio-mechanical properties and color using the available materials. This is an advanced differentiated extension of our GrabCAD software for medical users.

47

Table of Contents

*FDM printers*

Stratasys' market-leading FDM portfolio of printers has reached a milestone of 35,000 installed printers. FDM printers are designed to meet a wide range of applications, from prototyping to manufacturing tools, to production parts. The F-Series printers, made up of the F170, F370, F770, F190CR and F370CR models, are designed to meet end-to-end prototyping  jigs & fixtures. The Fortus Series, made up of the F450 and F900 models, largely suit the production of end parts as well as higher requirement jigs & fixtures, and tooling.

The F Series printers enable prototypes that range from rapid, economically-effective concept verification models in PLA material/ fast-draft mode, to advanced design validation prototypes using a 0.005-inch slice resolution and soluble support for unmatched precision, repeatability and aesthetics. The F Series product line allows users to create parts in PLA, ABS plus, ASA, TPU, ABS-ESD, Diran and PC-ABS materials, which parts therefore possess the strength required for true form, fit and functional testing. The F Series printers are designed to enable ease of use and maintenance while offering an easy-to-use, yet rich user experience with GrabCAD Print software. In 2022, we introduced the composite ready F190CR and F370CR hardened printers that can print Nylon 10CF. These new printers meet customer demand for manufacturing floor jigs, fixtures and tooling with a higher performance composite material.

The Stratasys Fortus 380mc and 450mc 3D printers build high-performance parts in customary materials, but with advanced complexity higher requirements needed for current-day production manufacturers. Fortus 450 has carbon filled composites for functional prototypes, production parts and rugged tooling. Additionally, an acceleration of material development—of Validated Materials—has significantly expanded the application set. Furthermore, an option to purchase OpenAM allows users to unlock and tune new custom materials. These systems are run via easy-to-use interfaces and software controls, making them user-friendly in producing complex parts more efficiently.

The Stratasys F900 offers a streamlined workflow and easier job-monitoring with an internal camera and GrabCAD Print software. Standard certifications are included, eliminating the effort and cost to qualify the 3D printer for the user's production floor. Additionally, the Aircraft Interiors Solution continues to qualify more materials, which allows a faster, simpler path for certifying additive manufactured parts for aircraft installation, and the Rail Industry Solutions.

In 2022, we divested our former subsidiary MakerBot, which was merged with Ultimaker. In connection with the merger, a distribution partnership was established whereby Stratasys-exclusive distributors can sell MakerBot and Ultimaker products.

*Stereolithography printers*

Our Neo® line of industrial stereolithography 3D printers feature dynamic laser beam technology that enables build accuracy, feature detail, and low variability across the full extent of a large build platform. As an open resin system, the Neo products provide customers materials with a wide range of properties, such as chemical resistance, heat tolerance, flexibility, durability, and optical clarity, as well as low service requirements, reliability and accurate builds. All Neo systems are Industry 4.0-ready with Titanium™ control software that includes a camera, network connectivity, support remote diagnostics, and mid-build parameter customization. The printers can automatically email progress reports on the job. The Neo line of printers provides a significant build area in a small footprint, with simple day-to-day operation. The largest printer, the Neo800, features a 31.5 x 31.5 x 23.6 in. build volume. The Neo450s and 450e address customer needs for smaller printers, at 17.72 x 17.72 x 15.75 in. We initiated sales of this line of systems following our acquisition of RPS in February 2021. Following our acquisition of Covestro Additive Manufacturing business unit (which is expected to close at the beginning of the second quarter of 2023), we will also offer the Somos® materials portfolio for stereolithography printers. Somos materials range from easy-to-use general purpose materials, like the WaterShed line, to high performance stiff materials for tooling and wind tunnel applications, like the PerFORM line, to Bio-Compatible materials for different medical applications.

Table of Contents

*Origin P3 printers*

The Origin One 3D printer, which is now be generally available since the beginning of 2022, uses P3™ (Programmable PhotoPolymerization) technology to precisely control light, heat, and force, among other variables, to produce parts with exceptional accuracy and consistency. Origin engages with a network of materials partners (like BASF, Henkel , Evonik, and Covestro), who work to develop a wide range of commercial-grade materials for this $P^3$ system, resulting in some of the toughest and most resilient materials in additive manufacturing. This addition adds Origin's software-centric additive manufacturing solution that offers best-in-class printing technology based on digital light processing for production-oriented polymer applications and accelerates our expansion into mass production additive manufacturing. We also previously announced a dental-specific version of the Origin One, the Origin One Dental, ideal for printing higher volumes of accurate, single-material dental parts.

*SAF printers*

At the end of 2021, we began shipping the first SAF technology-based 3D printer, the H350, in the U.S. and Europe. Throughout 2022, we shipped the H350 to wider territories, including Asia, Israel and New Zealand H Series™ Production Platform printers such as the H350 are designed to give manufacturers production consistency, a competitive and predictable cost per part, and complete production control for volumes of thousands of parts. The H350 printer itself was manufactured with a dozen different 3D printed parts made with SAF technology. The printer is designed to meet the needs of customers in industries such as commercial goods, automotive, and consumer goods and electronics that benefit from the ability to quickly produce large volumes of 3D-printed parts with compelling and predictable economics. The H350 provides several control features designed to ensure the system is production-ready. All build data is logged for process traceability and remains fully under the customer's control. Materials can be controlled, tracked and traced, and print settings can be fine-tuned for each customer's needs. We offer customers validated third-party materials, including PA11 and PA12. We announced GrabCAD Print software for the H350 in late 2021.

### Key vertical target markets for printing systems

To further strengthen our leadership position and following our strategy to deepen the focus on additive manufacturing, tooling and rapid prototyping for specific vertical markets, we have announced a variety of technology and go-to-market partnerships for various key vertical markets, such as automotive, aerospace, consumer products and healthcare.

### Consumable materials

We sell a broad range of 3D printing materials, consisting of over 61 FDM spool-based filament materials, 49 PolyJet cartridge-based resin materials, and 158 functional materials. These materials yield a large variety of digital materials that reflect over 600,000 color variations, transparency, opacity and flexibility levels, for use in our 3D printers and production systems. Our Polyjet color standards have been validated by Pantone® standards. The sale of these materials provides us with a recurring revenue stream from users of our 3D printers and production systems. Previously, in 2021, we announced a new hybrid ecosystem model for our 3D printing materials. The Stratasys Material Ecosystem is designed to enable manufacturing customers to address new applications with demanding requirements while also having dual sources for materials. The ecosystem includes:

- Stratasys Preferred: Preferred by Stratasys for its customers for the highest-performance applications. These materials are engineered specifically for Stratasys printers to provide the best combination of material and printer performance and are developed either by Stratasys or third-party material partners. All currently available Stratasys-made materials are Stratasys Preferred.

- Stratasys Validated: Materials validated by Stratasys with basic reliability testing to accelerate the expansion of material options available in the marketplace.

- Open: Unvalidated materials accessible via an annual OpenAM Software License (OASL). These materials may offer unique attributes and the potential to address new applications but they have not received validation testing or optimization on Stratasys printers.

Table of Contents

We believe this model will help accelerate the move to additive manufacturing at scale and encourage more utilization of its printers. Preferred and Validated materials are sold through Stratasys channels.

The materials we sell are described below:

*FDM materials*

The modeling and support filament used in the FDM-based 3D printers and production systems features a wide variety of production grade thermoplastic materials. We continue to develop filament modeling materials that meet our customers' needs for increased speed, strength, accuracy, surface resolution, chemical and heat resistance, color, and mechanical properties. These materials are processed into our proprietary filament form, which is then utilized by our FDM systems. Our spool-based system has proven to be a significant advantage for our products, because it allows the user to quickly change material by simply mounting the lightweight spool and feeding the desired filament into the FDM print and production devices. Currently, we have a variety of build materials in multiple colors commercially available for use with our FDM technology.

Each material has specific characteristics that make it appropriate for various applications. The ability to use different materials allows the user to match the material to the end use application, whether it is a pattern for tooling, a concept model, a functional prototype, a manufacturing tool, or an end use part.

*PolyJet materials*

Our resin consumables, which consist of our PolyJet family of proprietary acrylic-based photopolymer materials as well as our other inkjet-based systems, enable users to create highly accurate, finely detailed 3D models and parts for a wide range of prototype development and customized manufacturing applications. The wide variety of resins within the PolyJet family is characterized by transparent, colored, or opaque visual properties and flexible, rigid or other physical properties. Support materials that are used together with the model materials enable the 3D printing of models with a wide array of complex geometries. Our resin-based materials are produced in-house and are specially designed for our printing systems.

We have invested significant research and development efforts in optimizing our PolyJet materials for use with inkjet technology. These efforts are reflected in the properties of these materials, which enable them to be packaged, stored, combined and readily cured upon printing. Our PolyJet materials are packaged in cartridges for safe handling and are suitable for use in office environments. The polymerized materials can also be machined, drilled, chrome-plated or painted in most cases.

*Stereolithography materials*

Our stereolithography materials are primarily from the Covestro Additive Manufacturing SOMOS™ portfolio. The materials can offer a variety of functional prototyping solutions, by the way of delivering flexible, durable, rigid, high temperature or clear materials, to simulate production-targeted polymers. In August 2022 we signed a definitive agreement to purchase the assets of Covestro's AM materials business, including all of the SOMOS™ portfolio. This acquisition is expected to close at the beginning of the second quarter of 2023.

Additionally, several materials can be utilized for manufacturing applications, such as jigs and fixtures, investment casting, injection mold or composite tooling applications.

This range of materials enables us to offer a range of solutions from concept modeling and prototyping, to manufacturing.

Table of Contents

**Software**

Software is an integral part of our solutions-based, go-to-market strategy. Built on cloud, desktop and mobile technologies, the GrabCAD Additive Manufacturing Platform is an open and enterprise-ready software platform that enables manufacturers to manage production-scale additive manufacturing operations. Stratasys' platform is specifically designed for the unique needs of additive manufacturing across the entire digital thread - from design through production - while also integrating with Industry 4.0 infrastructure and enterprise applications. As of February, 2023, the platform consists of more than 42,200application users, 19,000 3D printers, and over 6,300 workflow users. The platform processes [35] gigabytes of data streams per day. Several components are included in the platform:

GrabCAD Print, our job programming software, enables the unique features of our 3D printing technologies such as creating lightweight, structurally sound infills for FDM, and multi-material and color and material management for PolyJet. The feature set of GrabCAD Print is designed to make the process of creating high-quality, highly detailed and accurate models accessible to users in Engineering and Design Offices, Enterprise Model Shops, Manufacturing and Health Care markets.

GrabCAD Print natively reads commonly used 3D CAD file formats as well as traditional STL and VRML files, transforming them into the appropriate code to operate our 3D printing systems. Our software provides a robust range of features, including structural toolpath and infill controls, color and appearance management, multi-material management, automatic support generation, part scaling, positioning and nesting, as well as geometric editing capabilities.

Our scheduling software includes capabilities to manage the operations of one or more printers including tray packing and optimization, job estimation, system availability, scheduling and monitoring via desktop, web or mobile devices. Additionally, analytics information is available in the form of standard utilization, material usage and job history reports enabling managers and operators to maximize the use of our 3D printing systems.

GrabCAD Streamline Shop simplifies the 3D Printing Shop workflow by substantially improving the way teams manage and collaborate on prototyping work orders. Engineers, designers and shop operators minimize time-to-part by sharing a common work space to simplify print work order management, communicating requirements accurately and focusing on delivering quality prints on time.

The GrabCAD Streamline Software Development Kit (SDK) enables companies and Independent Software Vendors (ISVs) to integrate Stratasys 3D printing at production scale with existing design and manufacturing software applications infrastructure to support enterprise goals such as system connectivity, compliance and workflow automation. The GrabCAD SDK leverages standard protocols such as MTConnect and provides Application Programming Interfaces (API's), documentation, sample code and a professional support network.

The GrabCAD Software Partner Program is available to Independent Software Vendors (ISVs) wishing to integrate into the GrabCAD AM Platform. The GrabCAD Software Partner Program makes up a robust ecosystem of software partners in Additive Manufacturing powered by Stratasys.  Stratasys provides access to GrabCAD SDK— a complete set of developer tools to support technical integration as well as world class support and joint marketing.

GrabCAD Community is the online community of over six million professional engineers, designers, manufacturers and students who share best practices via tutorials, discussion forums, design/print challenges and 3D content.

Our software is available in nine languages to promote usage in the regions worldwide in which we operate.

51

Table of Contents

**Online Community**

*GrabCAD Community*

We operate the GrabCAD Community for mechanical engineers, designers, manufacturers and students where members can share best practices via tutorials, discussion forums, and design/print challenges. They can also upload and download free CAD models and access our GrabCAD Print and Workbench software. This community had more than 13 million members and over 1.7 million CAD files available for free download as of the end of 2022.

**Our services**

***Support services and warranty***

*Customer support*

Our customer success department provides on-site system installation, operator training, a full range of maintenance and repair services and remote technical support to users of our products. We provide support to our customers directly and through our resellers, ensuring that support and parts may be readily obtained worldwide. We also offer advanced training to our customers and preventive maintenance, particularly on our high-performance systems. Our support network consists of the following:

- Stratasys-certified engineers who provide worldwide, on-site installation, training and support;

- direct support engineers through our company;

- indirect support engineers through certified partners, including third-party service organizations or selected resellers who provide support for our systems;

- phone and direct on-site company support in eight languages, and resellers indirect support in local languages;

- service logistics in key regional centers;

- training facilities and resources in regional centers;

- customer-relationship management (CRM) system and learning management system (LMS) to ensure high-quality support for our customers and resellers, including secure remote access to a customer service database containing service history and technical documentation to aid in troubleshooting and repairing systems;

52

Table of Contents

- free content on YouTube to help self-maintenance and troubleshooting;

- support, tools and up-to-date information to our direct customer and distribution channels from our product support engineering team;

- full range of commercial service programs to support the high utilization of our 3D printers and our customers' unique needs; and

- an e-commerce platform allowing for smooth and fast purchasing of our 3D printing materials.

Our goal is to ensure maximum uptime and productivity for our AM systems. In order to do so, we regularly update the technical documentation related to our systems, offer extensive training courses for operators and promote proactive knowledge sharing designed to help users maximize the value of their equipment and to expand the applications for which they employ our 3D printing and production systems.

We offer services on a time and materials basis, as well as a full range of post-warranty maintenance contracts with varying levels of support and pricing, as described below under "Extended support programs." Customer support is represented on cross-functional product development teams within our company to ensure that products are designed for serviceability and to provide our internal design and engineering departments with feedback on field issues. Failure analysis, corrective action, and continuation engineering efforts are driven by data collected in the field. Ongoing customer support initiatives include the development of advanced diagnostic and troubleshooting techniques and comprehensive preventative maintenance programs, an expanded training and certification program for Stratasys and Stratasys partners' technical personnel, and improved communication between the field and the factory.

53

Table of Contents

*Basic warranty*

Our printing systems are sold with warranties that range from 90 days to, typically, one year from installation, depending upon the product line and geographic location. Warranties are typically accompanied by on-site maintenance support. Receipt of maintenance and repair services after the warranty period is subject to the terms of our extended support programs, to the extent purchased by the end-user, as described below.

*Extended support programs*

Recognizing that our end-users have varying support needs, we offer a range of support programs that enable our end-users to continue to receive maintenance services beyond the initial warranty period. These support programs contain varying degrees of the support services described above and are priced accordingly.

*Leasing and other services*

We have arrangements, in certain countries, in which third-party financial institutions independently provide lease financing directly to our customers, on a non-recourse basis to the Company. In these arrangements, we sell and transfer title of the equipment to these financial institutions. Generally, we have no continuing ownership rights in the equipment subsequent to its sale. In addition, we provide pay-per-usage subscription services for our 3D printers and 3D production systems via partners in our global manufacturing network. The revenues generated from such program were insignificant.

We also offer a 'Try and Buy' program, which provides businesses the ability to try out a 3D printer prior to deciding whether or not it's the right fit for their company. The potential purchasers of a 3D printer receive customer support from our company during the trial period.

**Stratasys Direct Manufacturing paid-parts service**

Stratasys Direct Manufacturing is a contract manufacturing service provider of parts on-demand via polymer 3D printing processes. With over 30 years of experience, Stratasys Direct provides rapid prototyping and production parts using the broadest set of polymer additive technologies of any service bureau in North America and backed by experts ready for the most complex projects.  With Stratasys Direct, customers can quickly design, innovate and meet demands of any complexity or scale by accessing the right expertise, industrial-grade 3D printing technologies, and materials without the capital expense. Stratasys Direct pioneered additive manufacturing production applications and specializes in guiding customers from concept development and prototyping through short-run production and long-term manufacturing. Stratasys and Stratasys Direct work together to help Stratasys customers meet their needs with infinite manufacturing capacity or access to technologies they do not have in-house. Stratasys Direct Manufacturing also operates an ecommerce service for quick-turn parts, www.stratasysdirect.com, which enables its customers to obtain quotes and order parts around the clock, seven days a week.

**Customers**

We have a diverse set of customers worldwide, including, among other prominent companies: General Motors; BAE Systems; Boeing; Blue Origin, the U.S. Navy and the Mayo Clinic. No single customer or group of affiliated customers nor any individual sales agent or group of affiliated sales agents accounted for more than 5% of our sales in 2022, 2021 or 2020. Our solutions are used across a wide array of applications in a variety of different industries.

Table of Contents

**Marketing, sales and distribution**

*Marketing*

Our marketing strategies are focused on increasing awareness and thought leadership for our product and solution areas, strengthening our leadership brand position in the market, and in key vertical industries such as automotive, aerospace, medical, dental, fashion education and consumer goods, accelerating and supporting sales growth, and increasing customer loyalty and customer lifetime value. We initiate thought-leadership, public and industry analyst relations and product launch programs as well as integrated campaigns targeted to extend and deepen the relationship with our existing customers and win new customers, driving demand and lead generation throughout our strategic markets in which we and our resellers and agents operate.

We use a variety of inbound and outbound marketing methods to reach potential customers. Examples of inbound methods include digital marketing demand and lead generation programs such as blogs, social media, search marketing SEO, SEM, lead nurturing with webinars, white papers and other means. Outbound channel examples include digital and print communication programs, public relations, direct mail and e-mail campaigns, virtual and in-person tradeshows and roadshows, thought leadership events, newsletters, industry associations and referrals. In addition, we have built and maintain on-site product and technology demonstration capabilities in certain regional offices across the world.

Our resellers play a crucial role in the success of our business. To help them grow and thrive, we provide them with the necessary tools and support. We offer our resellers a range of marketing support, and services to help them effectively promote and sell our products. This includes providing access to our marketing materials, such as brochures and product guides, as well as offering co-marketing opportunities to help boost their visibility and drive sales. Additionally, we offer training and education programs to ensure that our resellers have the knowledge and skills necessary to effectively market and sell our products.

We measure and analyze the success of various marketing initiatives and strive to identify current and future customer needs. Based on our analysis, we create and update our product roadmaps and individual marketing plans to help optimize distribution while helping ensure a smooth process of release, ramp-up and sales of our products.

*Sales distribution methods*

Our sales organization sells, distributes and provides follow-up support services with respect to our AM systems and related consumables, through a worldwide sales and marketing infrastructure. We generally use two methods for distribution and support: (i) sales to resellers who purchase and resell our products and through whom follow-up support and maintenance services and replacement parts are provided to end-users; and (ii) direct sales of systems or services to end-users without the involvement of any intermediaries, for which all aspects of our sales and follow-up services are handled exclusively by our company. Our resellers are overseen by regional managers and operate on a non-exclusive basis, although we believe that most do not sell competing AM systems.

Almost all of the reseller locations that distribute our products have our AM systems available for tradeshows, product demonstrations, and other promotional activities. Additionally, many of them enjoy a long-term presence and offer third-party 3D CAD software packages in their respective territories, enabling them to cross-sell our systems to customers who purchase those other products.

In addition to traditional direct sales and reseller-based sales of our AM systems and related consumables, we also utilize an online customer/partner digital hub which serves as a direct digital method for distribution of our products. The online hub acts as a point of sale for consumables, software and spare parts to end-users who own our systems.

*Geographic structure of sales organization*

The primary sales organization for our 3D printers and production systems including related consumables, materials and services is divided into groups based on the following geographical regions: Americas; Europe and Middle East; North Asia and South Asia. This structure allows us to align our sales and marketing resources with our diverse customer base. Our sales organization in each region provides sales support to the network of independent reseller and sales agent locations throughout the particular region. We also operate sales and service centers in various locations throughout North America and internationally, including: Baden-Baden, Germany; Shanghai, China; and Tokyo, Japan.

55

Table of Contents

**Manufacturing and suppliers**

*Manufacturing*

The manufacturing process for our 3D printing and production FDM, PolyJet and stereolithography, or SL, technology systems consists of assembling those systems using both off-the-shelf and customized components manufactured specifically for us and producing and packaging the consumables products to be used by those systems. Our core competencies include FDM, PolyJet and SL systems assembly and integration, software installation and resin and filament manufacturing. The majority of those activities are done internally at our facilities. We currently operate on a build-to-forecast basis and obtain all parts used in the FDM and PolyJet systems manufacturing process from either distributors of standard electrical or mechanical parts or custom fabricators of our proprietary designs. Our manufacturers and suppliers are periodically assessed by us based on their on-time performance and quality.

We purchase major component parts for our FDM, PolyJet and SL systems from various suppliers, subcontractors and other sources, and test those parts in our U.S., Israeli and U.K facilities.

Computer-based Material Requirements Planning, or MRP, is used for reordering to better ensure on-time delivery of parts and raw materials. Operators and assemblers are trained on assembly and test procedures including Assembly Requirement Documents, which originate in engineering. In the manufacturing processes for our FDM, PolyJet and SL systems, and for our consumables, we employ a Quality Management System, or QMS, that meets international quality standards including ISO 9001:2008 and ISO 13485:2003, in the case of medical devices. We also outsource the manufacturing of main subassemblies up to fully assembled systems ready for integration.

The system assembly process for our FDM, PolyJet and SL systems includes semi-automated functional tests of key subassemblies. Key functional characteristics are verified through these tests, and the results are stored in a statistical database.

Upon completion of the assembly of our 3D printing and production FDM, PolyJet and SL systems, we perform a complete power up and final quality tests to help ensure the quality of those products before shipment to customers. The final quality tests must be run error-free before the FDM, PolyJet and SL systems can be cleared for shipment. We maintain a history log of all FDM, PolyJet and SL products that shows revision level configuration and a complete history during the manufacturing and test process. All identified issues on the FDM, PolyJet and SL systems during the manufacturing process are logged, tracked and used to make continuous production process improvements. The commonality of designs among our different FDM, PolyJet and SL product families eases the transition to manufacturing new designs.

Our filament production have used Factory Physics$^{®}$ techniques to manage critical buffers of time, capacity and inventory to ensure product availability. We also use the "5S" method (Sort, Set-in-order, Shine, Standardize and Sustain) and a continuous improvement system as part of our lean manufacturing initiatives to improve organization and efficiency.

Table of Contents

*Inventory and suppliers*

We maintain an inventory of parts to facilitate the timely assembly of products required by our production plan. While most components are available from multiple suppliers, certain components used in our systems and consumables are only available from single or limited sources. In particular, the printer heads for our PolyJet 3D printing systems are supplied by a sole supplier, Ricoh. We consider our single and limited-source suppliers (including Ricoh) to be reliable, but the loss of one of these suppliers could result in the delay of the manufacture and delivery of the relevant components (and, ultimately, of our products). This type of delay could require us to find and re-qualify the component supplied by one or more new vendors. Although we consider our relationships with our suppliers to be good, we continue to develop risk management plans for these critical suppliers. In order to hedge against the risk of a discontinuation of the supply of our inkjet printer heads in particular, we maintain a reasonable supply of excess inventory of printer heads.

*Ricoh Agreement*

We purchase the printer heads for our inkjet 3D printing systems from Ricoh pursuant to an OEM Purchase and License Agreement with Ricoh, or the Ricoh Agreement.

Under the Ricoh Agreement, we place orders for print heads and associated electronic components, or the Ricoh Products. Together with provision of these items, Ricoh provides us with a non-transferable, non-exclusive right to assemble, use and sell the Ricoh Products under Ricoh's patent rights and trade secrets.

Pricing under the Ricoh Agreement depends on the quantity of Ricoh Products that we purchase during any given month, and to the extent that we commit to a certain annual minimum prior to an upcoming year, we receive a set, discounted price for all Ricoh Products ordered during that upcoming year.

The Ricoh Agreement ran for an initial term of five years (which we renewed in September 2016) and automatically renews for additional one-year periods thereafter unless either party provides the other six months' advance written notice of termination prior to the end of the then-current term. The Ricoh Agreement may be cancelled by either party if (i) the other party substantially breaches any material provision of the agreement and has not cured such breach within 30 days of receipt of written notice thereof, or (ii) upon the occurrence of certain bankruptcy events, and may furthermore be cancelled by Ricoh if we fail to cure a breach of an undisputed payment obligation within thirty (30) days of the breach.

At any time during the term of the Ricoh Agreement, Ricoh may discontinue the manufacture and supply of a print head model, so long as it provides us with at least eighteen (18) months' prior written notice of such discontinuance and honors all of our purchase orders for the subject print head model within the notice period. During the period of five years from the earlier of either the termination of the Ricoh Agreement or the date of discontinuance of the manufacture of Ricoh Products (that is, following the 18-month notice period described in the previous sentence), we are entitled to purchase additional Ricoh Products for the sole purpose of providing replacements for the installed base of Ricoh Products, including one final purchase order that we may place in the final year of such five-year period and that must be filled by Ricoh within twelve months of when it is placed.

The Ricoh Agreement may not be assigned by either party without the other party's prior written consent, which may not be unreasonably withheld.

57

Table of Contents

**Research and development**

We maintain an ongoing program of research and development, or R&D, to develop new systems and materials and to enhance our existing product lines, as well as to improve and expand the capabilities of our systems and related software and materials. This includes significant technology platform developments for our FDM,  PolyJet, P$^3$, SAF and SL technologies, our AM systems, including our integrated software, and our family of proprietary acrylic-based photopolymer materials for PolyJet printing, and our family of proprietary thermoplastic materials for FDM printing. Our research aims to develop both incremental and disruptive improvements, as well as more affordable products. Our engineering development efforts also focus on customer requested enhancements, and development of new modeling processes, software and user applications. In particular, we have devoted significant time and resources to the development of a universally compatible and user-friendly software system.

Our R&D department is divided into groups based on scientific disciplines and product lines. We continue to standardize our product platforms, leveraging each new design so that it will result in multiple product offerings that are developed faster and at reduced expense.

We invest a significant amount of our resources in R&D, because we believe that superior technology is a key to maintaining a leading market position. Our net R&D expenses were approximately $92.9 million, $88.3 million and $84.0 million in the years ended December 31, 2022, 2021 and 2020, respectively. Our consumable materials development and production operations for our FDM and PolyJet systems are located at our facilities in Eden Prairie, MN, Rehovot, Israel, and Kiryat Gat, Israel. We regard the consumable materials formulation and manufacturing process as a trade secret and hold patent claims related to these products. We purchase and formulate raw materials for our consumables production from various polymer resin and thermoplastic materials suppliers with different levels of processing and value-add applied to the raw materials.

**Intellectual property**

We consider our proprietary technology to be important to the development, manufacture, and sale of our products and seek to protect such technology through a combination of patents, trade secrets, and confidentiality agreements and other contractual arrangements with our employees, consultants, customers and others. All patents and patent applications for additive manufacturing processes and apparatuses associated with our technology were assigned to us by those inventors. The principal granted patents relate to our FDM systems, our PolyJet technologies, our 3D printing processes and our consumables, certain of which have already expired and certain of which have expiration dates ranging from 2023 to 2039.

We are also a party to various licenses and other arrangements that allow us to practice and improve our technology under a broad range of patents, patent applications and other intellectual property, including a cross-license agreement with 3D Systems Corporation under which each party licensed certain patents of the other party, an assignment of rights to us related to UV polymer-based U.S. patents, which underlie certain technologies that compete with ours, and a patent license agreement with Cornell University providing access to certain tool changer patents.

In addition, we own certain registered trademarks and make use of a number of additional registered and unregistered trademarks, including "Stratasys," the Stratasys Signet logo, "Objet," "PolyJet," "Connex," "J8 Series," "J850," "J826," "J750," "J700," "J5," "J35," "J55", Vero," "VeroFlex," "VeroUltra," "VeroVivid," "Tango," "Durus," "Rigur," "Elastico," "FDM," "Fortus," "F123 Series," "F370," "F900," "F770," "Insight," "Antero," "Diran," "Origin," "Origin One," "P3," "Stratasys Direct Manufacturing," "Stratasys Direct," "GrabCAD," "GrabCAD Print," "GrabCAD Shop," "GrabCAD Community," "DentaJet," Medijet" "Digital Anatomy," "TissueMatrix," "GelMatrix," "BoneMatrix," "3DFashion," "TechStyle," "Neo," "Neo800," "Neo450," "H350," "SAF," "Big Wave," and "Selective Absorption Fusion."

We believe that, while our patents provide us with a competitive advantage, our success depends on our marketing, business development, applications know-how and ongoing research and development efforts, in addition to our rights under granted and pending patents. Accordingly, we believe that the expiration of any single patent, or the failure of any of single patent application to result in an issued patent, would not be material to our business or financial position. In any event, there can be no assurance that our patents or other intellectual property rights will afford us a meaningful competitive advantage. Please see the risk factor related to the expiration of our patents in "Item 3.D Risk Factors-Risks related to our intellectual property."

58

Table of Contents

**Competition**

Our principal competitors consist of other developers of additive manufacturing systems as well as other companies that use fused deposition modeling or inkjet-based or vat polymerization or digital light processing (DLP) or power bed fusion technologies to compete in additive manufacturing.

The companies that use these technologies to compete with us include, inter alia, 3D Systems Corporation, EOS GmbH, HP, Carbon, Inc., Formlabs, Markforged, Inc. and Desktop Metal (following their acquisition of EnvisionTEC).

These technologies, which compete for additive manufacturing users, possess various competitive advantages and disadvantages relative to one another within the key categories upon which competition centers, including resolution, accuracy, surface quality, variety and properties of the materials they use and produce, capacity, speed, color, transparency, the ability to print multiple materials and others. Due to these multiple categories, end-users usually make purchasing decisions as to which technology to choose based on the characteristics that they value most. This decision is often application specific. The competitive environment that has developed is therefore intense and dynamic, as players often position their technologies to capture demand in various verticals simultaneously.

We are positioned to compete in our industry mainly on the following bases, which we view as competitive strengths:

- material properties of printed objects, such as heat resistance, toughness, brittleness, elongation-to-break, color and flexibility;

- quality of printed objects measured by, among other things, resolution, accuracy and surface quality;

- multiple production-grade modeling materials;

- our offering of the best multi-color, multi-material 3D printing systems in the market;

- reliability and repeatability of our printing systems;

- ease of use, including of one-step automated modeling process.

- automatic, hands-free support removal;

- high level of customer service; and

- deep application domain know-how and expert services, including among our channel network.

We offer a wide range of systems with varying features, capacities and price points. We believe that this enables us to compete with the other additive manufacturing technologies for a wide range of customers with a variety of applications and goals for their additive manufacturing.

We also compete with companies that use traditional prototype development and customized manufacturing technologies, and expect future competition to arise from the development of new technologies or techniques.

Table of Contents

**Seasonality**

Historically, our results of operations have been subject to seasonal factors. Stronger demand for our products has historically occurred in our fourth quarter primarily due to our customers' capital expenditure budget cycles and our sales compensation incentive programs. Our first and third quarters have historically been our weakest quarters for overall unit demand. The first quarter is typically a slow quarter for capital expenditures in general. The third quarter is typically when we see our largest volume of educational related sales, which normally qualify for special discounts as part of our long-term penetration strategy.

The COVID-19 pandemic shifted our seasonality and we have not seen a steady pattern from year to year as to the level of demand in the various quarters since the second quarter of 2020.

We experience seasonality within individual fiscal quarters, as a substantial percentage of our system sales often occur within the last month of each fiscal quarter. This trend has the potential to expose our quarterly or annual operating results to the risk of unexpected, decreased revenues in the case of our inability to build systems, consummate sales and recognize the accompanying revenues prior to the end of a given quarter.

**Global operations**

We have offices in, among other locations, Brazil, China, Germany, Hong Kong, Israel, Japan, Korea, India, Mexico, the United Kingdom and the United States, and organize our operations by geographic region, focusing upon the following key regions: the Americas; Europe and Asia Pacific. Our products are distributed in each of these regions, as well as in other parts of the world. Our customers are dispersed geographically, and we are not reliant on any single country or region for most of our product sales and services revenues, although 63.8% of our 2022 revenues were generated in the Americas and our Stratasys Direct Manufacturing printed parts services are primarily based in the United States and therefore reliant on United States customers. A breakdown of our consolidated revenues by geographic markets and by categories of operations (that is system, consumables and services) for the years ended December 31, 2022, 2021 and 2020 is provided in "Item 5.A Operating and Financial Review and Prospects-Operating Results." In maintaining global operations, our business is exposed to risks inherent in such operations, including currency fluctuations, market conditions, and inflation in the primary locations in which our operating expenditures are incurred. Information on currency exchange risk, market risk, and inflationary risk appears elsewhere in this annual report in "Item 3.D Risk Factors" and in "Item 11. Quantitative and Qualitative Disclosure About Market Risk-Foreign Currency Exchange Risk".

**Employees**

The total number of our full-time equivalent employees, and the distribution of our employees (i) geographically and (ii) within the divisions of our company, in each case as of December 31, 2022, 2021 and 2020, are set forth in this annual report in "Item 6.D Directors, Senior Management and Employees—Employees".

**Government regulation**

We are subject to various local, state and federal laws, regulations and agencies that affect businesses generally. These include:

- regulations promulgated by federal and state environmental and health agencies;

- foreign environmental regulations, as described under "Environmental, Social and Governance Matters" immediately below;

- the federal Occupational Safety and Health Administration;

- the U.S. Foreign Corrupt Practices Act;

- laws pertaining to the hiring, treatment, safety and discharge of employees;

- export control regulations for U.S. made products;

- Israeli tax regulations, as described under "Israeli Tax Considerations and Government Programs" below; and

- CE regulations for the European market.

Table of Contents

Effective as of February 2023, as a result of the launch of our first certified medical device with TrueDent resin in the United States, we are now also subject to medical device regulations, such as the U.S. FDA Code of Federal Regulations.

**Environmental, Social and Governance Matters**

**Stratasys is Championing Mindful Manufacturing™, with a commitment to 3D Printing a Better Tomorrow™ for people and the planet**

In April 2021 Stratasys published its first-ever ESG & Sustainability report, declaring its environmental, social and governance (ESG) strategy, commitment and activities, based on the GRI ("Global Reporting Initiative") Standards for sustainability reporting.

Our commitment to strategic Environmental, Social and Governance (ESG) activity is a cornerstone of our purpose: to empower people to create without limits for an economic, personalized and sustainable world.

Stratasys, with broad input from both employees and customers and the support of our board of directors, prioritized four UN Sustainable Development Goals (SDGs) for our company:
1-Responsible consumption and production
2- Industry infrastructure and innovation
3-Climate action
4- Quality education

Today, we continue to advance our efforts to promote "Mindful Manufacturing." This means driving global growth in manufacturing through 3D printing in a way that promotes a positive social and environmental impact. In particular, 3D printing is uniquely positioned to address pressing climate issues— localizing supply chains to reduce the carbon footprint incurred by air and sea freight, enabling the production of strong but lighter weight parts, and reducing the energy requirements of the production process itself.  We are at work with improvement efforts, externally and internally, that bring value around our four UN SDGs and our Mindful Manufacturing™ mission.

*Environmental*

As a global leader in polymer additive manufacturing solutions, with the broadest portfolio in the industry, Stratasys is focused on making an impact, across industries. Our efforts in this arena are two-fold:

*(i) We target an improved circular economy*. This entails advancing the digital processes that support our additive technologies, for manufacturing. We focus on improved reliability, for less physical iterations; we support digital inventories that can be printed on-demand; we offer naturally sourced printing material. we look to improve the way in which finite natural resources are employed in our printing processes–energy and water; and, we offer recycling options as well.

*(ii) We aim to harness our expertise to drive innovation*. This means expanding our roadmap to include products that enable the production of parts that have a reduced carbon footprint. Imagine cars running with durable 3D printed parts that weigh 30% less than before and provide the same reliability at the same level of quality.

Manufacturing is resource-intensive by nature design. It is important to note, however, that  3D printing works in a manner that can be far more environmentally friendly than alternative, traditional production methods. Working with industry leaders in aerospace, automotive, healthcare, fashion and consumer production companies, Stratasys has the ability to enable our customers to reduce their carbon footprints in a meaningful way. We base our work on data and research and plan on publishing 'Life Cycle Analysis' reports to make the scientific case for greener manufacturing. To this end, we have become a founding member of the Additive Manufacturer Green Trade Association (AMGTA), which promotes the environmental case for the entire 3D printing industry.

Right now, Stratasys offers Scope 1 & 2 data on its activities – having collected data on our operations and internal consumption with the goal of improvement across our global sites, year-over-year. This includes installing solar panels and beginning to generate renewable energy or our manufacturing sites, for example. We have set our initial baseline (i.e., our initially measured emissions levels from which we seek to only improve), not because regulation and compliance require this, but rather because we believe this is a more

meaningful way for our business to make an impact; it is our corporate responsibility to create a world where future generations can thrive.

61

Table of Contents

*Environmental Compliance*

We are subject to various environmental, health and safety laws, regulations and permitting requirements, including (but not limited to) those governing the emission and discharge of hazardous materials into ground, air or water; noise emissions; the generation, storage, use, management and disposal of hazardous and other waste; the import, export and registration of chemicals; the cleanup of contaminated sites; and the health and safety of our employees. Based on information currently available to us, we do not expect environmental costs and contingencies to have a material adverse effect on our operations. The operation of our facilities, does however, entail risks in these areas. Significant expenditures could be required in the future to comply with environmental or health and safety laws, regulations or requirements. Certain of these compliance requirements are imposed by our customers, who at times require us to be registered with U.S. Health or Safety regulatory agencies, whether on the federal or state level.

Under environmental laws and regulations, we are required to obtain environmental permits from governmental authorities for certain operations. In particular, in Israel, where we assemble our inkjet-based PolyJet 3D printing systems and manufacture our resin consumables, businesses storing or using certain hazardous materials, including materials necessary for our Israeli manufacturing process, are required, pursuant to the Israeli Dangerous Substances Law 5753-1993, to obtain a toxin permit from the Ministry of Environmental Protection. We maintain the effectiveness of two Israeli toxin permits for our respective Israeli sites.

In the European marketplace, amongst others, electrical and electronic equipment is required to comply with the Directive on Waste Electrical and Electronic Equipment of the European Union (EU), which aims to prevent waste by encouraging reuse and recycling, and the EU Directive on Restriction of Use of Certain Hazardous Substances, which restricts the use of various hazardous substances in electrical and electronic products. Our products and certain components of such products "put on the market" in the EU (whether or not manufactured in the EU) are subject to these directives. Additionally, we are required to comply with certain laws, regulations and directives, including TSCA in the United States, as well as REACH, RoHS and CLP in the EU, governing chemicals. These and similar laws and regulations require, amongst others, the registration, evaluation, authorization and labeling of certain chemicals that we use and ship.

## Social

Per our defined SDG's, the Stratasys Sustainability commitment extends beyond environmental sustainability. For example, we are proud of our "People First" approach to business. We put environmental health and safety, or EHS, as a top priority, securing the health and safety of our employees, through clear policies and annual training, and this year will be implementing an EHS data management platform.  We also continue to be active members in our local communities, with meaningful Corporate Social Responsibility (CSR) activity around the world. Specifically, we are committed to leveraging the value of 3D printing to benefit our local communities through meaningful partnerships and personal employee contributions via our global volunteer network. Our main areas of focus are in leveraging Stratasys technologies in pursuing quality education (according to our commitment to SDG #4) and to advancement in patient care for medical cases.  For example, in the US, we leverage our technologies to advance next generation tech and robotics enthusiasts via our long-term partnership with FIRST Robotics. We launched our Diversity Equity and Inclusion program in 2021 and are a proud platinum sponsor of Technology, Industry, People, Economics (TIPE) Women in 3D Printing. We continue to advance an inclusion program to address internal opportunities across all human resource touch points (hiring, learning and development) with a KPI that calls for 100% candidate slates that include at least one female and one male, for director and more senior positions. In addition, we have substantial representation on our board of directors for women (25%) since well before it became a requirement.

## Governance

ESG, is strongly rooted in the structure of corporate management practices and the disclosure that creates transparency around them. We also publish a standardized ESG & Sustainability report, available to the public, around all ESG topics defined by the GRI standard and addressed in alignment with  a periodic materiality assessment. This is a foundation for our ethical global operations, as the 3D printing company with the largest install base among industry-leading companies. We have a long-standing Code of Ethics and have also extended our culture and values to our suppliers via a suppliers' code of conduct. We are required to report financial data as a public company, yet we extend beyond the minimum obligation and provide more comprehensive quarterly analysis of our results for the market, allowing us to better engage with the broader investment community. We conduct quarterly internal updates for employees and team leaders at our company to share business updates openly and share ongoing developments with our global teams.We also publish a standardized ESG & Sustainability report, available to the public, around all ESG topics defined by the GRI standard and addressed in alignment with  a periodic materiality assessment.

Table of Contents

We strive for clarity, engagement and care. It is our goal to deliver on our purpose, in everything we do: We live as a corporate body by our values: Innovate; Be Customer First; Aim Higher; Own It; and Make it Together.

| Nasdaq Board Diversity Matrix | | | | |
|---|---|---|---|---|
| Board Diversity Matrix for | Stratasys Ltd. | | | |
| As of | July 6, 2022 | | | |
| Total Number of Directors | 8 | | | |
| Part I: Gender Identity | Female | Male | Non-Binary | Did Not Disclose Gender |
| Directors | 2 | 6 | - | - |
| Part II: Demographic Background | | | | |
| African American or Black | - | - | - | - |
| Alaskan Native or American Indian | - | - | - | - |
| Asian | - | - | - | - |
| Nasdaq Board Diversity Matrix | | | | |
| Hispanic or Latinx | - | - | - | - |
| Native Hawaiian or Pacific Islander | - | - | - | - |
| White | 2 | 6 | - | - |
| Two or More Races or Ethnicities | - | - | | |
| LGBTQ+ | - | | | |
| Did Not Disclose Demographic Background | - | | | |

63

Table of Contents

***Israeli Tax Considerations and Government Programs***

Tax regulations also have a material impact on our business, particularly in Israel where we are organized and have one of our headquarters. The following is a summary of certain aspects of the current tax structure applicable to companies in Israel, with special reference to its effect on us (and our operations, in particular). The following also contains a discussion of the Israeli government programs applicable for us. To the extent that the discussion is based on new tax legislation that has not been subject to judicial or administrative interpretation, we cannot assure you that the tax authorities or the courts will accept the views expressed in this discussion. This discussion does not address all of the Israeli tax provisions that may be relevant to our Company. For a discussion of the Israeli tax consequences related to ownership of our capital stock, please see "Israeli Taxation Considerations" in Item 10.E below.

*General Corporate Tax Structure in Israel*

Generally, Israeli companies are subject to corporate tax on their taxable income. Since 2018, the corporate tax rate has been 23%. However, the effective tax rate payable by a company that derives income from an "Approved Enterprise", a "Beneficiary Enterprise" or a "Preferred Enterprise", a "Special Preferred Enterprise", a "Preferred Technology Enterprise" or "Special Preferred Technology Enterprise" as further discussed below, may be considerably lower. See "Law for the Encouragement of Capital Investments" in this Item below. Capital gains derived by an Israeli company are generally subject to the prevailing regular corporate tax rate.

Besides being subject to the general corporate tax rules in Israel, we have also, from time to time, applied for and received certain grants and tax benefits from, and participate in, programs sponsored by the Government of Israel, described below.

*Israeli Law for the Encouragement of Industry (Taxation), 1969*

The Company is an "Industrial Company" as defined by the Israeli Law for the Encouragement of Industry (Taxation), 1969, and, as such, is entitled to certain tax benefits including accelerated depreciation, deduction of public offering expenses in three equal annual installments and amortization of other intangible property rights for tax purposes.

*Law for the Encouragement of Capital Investments*

*Tax incentives programs which were relevant for the company until financial year 2020*

The Law for the Encouragement of Capital Investments, 5719-1959, to which we refer as the Investment Law, provides certain incentives for capital investments in a production facility (or other eligible assets). Generally, an investment program that is implemented in accordance with the provisions of the Investment Law, which may be either an "Approved Enterprise", a "Beneficiary Enterprise" or a "Preferred Enterprise", a "Special Preferred Enterprise", a "Preferred Technology Enterprise" or "Special Preferred Technology Enterprise", is entitled to benefits as discussed below. These benefits may include cash grants from the Israeli government and tax benefits, based upon, among other things, the location within Israel of the facility in which the investment and manufacture activity are made. In order to qualify for these incentives, an Approved Enterprise, a Beneficiary Enterprise or, a Preferred Enterprise, a Special Preferred Enterprise, a Preferred Technology Enterprise or Special Preferred Technology Enterprise, is required to comply with the requirements of the Investment Law.

64

Table of Contents

The Investment Law has been amended several times over the recent years, with the three most significant changes effective as of April 1, 2005, to which we refer as the 2005 Amendment, as of January 1, 2011, to which we refer as the 2011 Amendment, and as of January 1, 2017, to which we refer as the 2017 Amendment. Pursuant to the 2005 Amendment, tax benefits granted in accordance with the provisions of the Investment Law prior to its revision by the 2005 Amendment, remain in force, but any benefits granted subsequently are subject to the provisions of the amended Investment Law. Similarly, the 2011 Amendment introduced new benefits instead of the benefits granted in accordance with the provisions of the Investment Law prior to the 2011 Amendment, yet companies entitled to benefits under the Investment Law as in effect up to January 1, 2011, were entitled to choose to continue to enjoy such benefits, provided that certain conditions are met, or elect instead, irrevocably, to forego such benefits and elect for the benefits of the 2011 Amendment. The 2017 Amendment introduces new benefits for Technological Enterprises, alongside the existing tax benefits.

The following discussion is a summary of the Investment Law prior to its amendments as well as the relevant changes contained in the new legislations.

*Tax benefits for Approved Enterprises approved before April 1, 2005.*

Under the Investment Law prior to the 2005 Amendment, a company that wished to receive benefits on its investment program that is implemented in accordance with the provisions of the Investment Law, to which we refer as an "Approved Enterprise", had to receive an approval from the Israeli Authority for Investments and Development of the Industry and Economy, to which we refer as the Investment Center. Each certificate of approval for an Approved Enterprise relates to a specific investment program in the Approved Enterprise, delineated both by the financial scope of the investment, including sources of funds, and by the physical characteristics of the facility or other assets.

An Approved Enterprise may elect to forego any entitlement to the cash grants otherwise available under the Investment Law and, instead, participate in an alternative benefits program. We have chosen to receive the benefits through the alternative benefits program. Under the alternative benefits program, a company's undistributed income derived from an Approved Enterprise will be exempt from corporate tax for a period of between two and ten years from the first year of taxable income, depending on the geographic location within Israel of the Approved Enterprise, and a reduced corporate tax rate of between 10% to 25% for the remainder of the benefits period, depending on the level of foreign investment in the company in each year, as detailed below. The benefits commence on the date in which that taxable income is first earned. The benefits period under Approved Enterprise status is limited to 12 years from the year in which the production commenced (as determined by the Investment Center), or 14 years from the year of receipt of the approval as an Approved Enterprise, whichever ends earlier. If a company has more than one Approved Enterprise program or if only a portion of its capital investments are approved, its effective tax rate is the result of a weighted combination of the applicable rates. The tax benefits available under any certificate of approval relate only to taxable income attributable to the specific program and are contingent upon meeting the criteria set out in the certificate of approval. Income derived from activity that is not integral to the activity of the Approved Enterprise will not enjoy tax benefits. Our entitlement to the above benefits is subject to fulfillment of certain conditions, according to the law and related regulations.

A company that has an Approved Enterprise program is eligible for further tax benefits if it qualifies as a Foreign Investors' Company, to which we refer as an FIC. An FIC eligible for benefits is essentially a company with a level of foreign investment, as defined in the Investment Law, of more than 25%. The level of foreign investment is measured as the percentage of rights in the company (in terms of shares, rights to profits, voting and appointment of directors), and of combined share and loan capital, that are owned, directly or indirectly, by persons who are not residents of Israel. The determination as to whether or not a company qualifies as a FIC is made on an annual basis according to the lowest level of foreign investment during the year. An FIC that has an Approved Enterprise program will be eligible for an extension of the period during which it is entitled to tax benefits under its Approved Enterprise status (so that the benefits period may be up to ten years) and for further tax benefits if the level of foreign investment exceeds 49%. If a company that has an Approved Enterprise program is a wholly owned subsidiary of another company, then the percentage of foreign investments is determined based on the percentage of foreign investment in the parent company.

The corporate tax rates and related levels of foreign investments with respect to an FIC that has an Approved Enterprise program are set forth in the following table:

65

Table of Contents

| Percentage of non-Israeli ownership | Corporate Tax Rate |
| --- | --- |
| Over 25% but less than 49% | up to 25% |
| 49% or more but less than 74% | 20% |
| 74% or more but less than 90% | 15% |
| 90% or more | 10% |

A company that has elected to participate in the alternative benefits program and that subsequently pays a dividend (or deemed dividend, as described below) out of the income derived from the portion of its facilities that have been granted Approved Enterprise status during the tax exemption period will be subject to tax in respect of the amount of dividend distributed (grossed up to reflect such pre-tax income that it would have had to earn in order to distribute the dividend) at the corporate tax rate that would have been otherwise applicable if such income had not been tax-exempted under the alternative benefits program. This rate generally ranges from 10% to 25%, depending on the level of foreign investment in the company in each year, as explained above.

In addition, dividends paid out of income attributed to an Approved Enterprise (or out of dividends received from a company whose income is attributed to an Approved Enterprise) are generally subject to withholding tax at the rate of 15%, or at a lower rate provided under an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). The 15% tax rate is limited to dividends and distributions out of income derived during the benefits period and actually paid at any time up to 12 years thereafter. After this period, the withholding tax is applied at a rate of up to 30%, or at the lower rate under an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). In the case of an FIC, the 12-year limitation on reduced withholding tax on dividends does not apply.

The Investment Law also provides that an Approved Enterprise is entitled to accelerated depreciation on its property and equipment that are included in an approved investment program in the first five years of using the equipment. This benefit is an incentive granted by the Israeli government regardless of whether the alternative benefits program is elected.

The benefits available to an Approved Enterprise are subject to the continued fulfillment of conditions stipulated in the Investment Law and its regulations and the criteria in the specific certificate of approval, as described above. If a company does not meet these conditions, it would be required to refund the amount of tax benefits, adjusted to the Israeli consumer price index and interest, or other monetary penalty.

We have received the requisite approval, including a final approval, for our Approved Enterprise investment programs, in accordance with the Investment Law. The above-described benefits that accompany these investment programs and our Beneficiary Enterprise investment programs (for which accompanying benefits are described below) have had the effect, historically, up to 2020 of reducing our (and before the Stratasys, Inc.- Objet Ltd. merger, Objet's) effective consolidated tax rates considerably lower than the statutory Israeli corporate tax rate, which for 2018 and onwards has been set at 23%.

*Tax benefits under the 2005 Amendment that became effective on April 1, 2005.*

The 2005 Amendment applies to new investment programs and investment programs commencing after 2004, and does not apply to investment programs approved prior to April 1, 2005. The 2005 Amendment provides that terms and benefits included in any certificate of approval that was granted before the 2005 Amendment became effective (April 1, 2005) will remain subject to the provisions of the Investment Law as in effect on the date of such approval. Pursuant to the 2005 Amendment, the Investment Center will continue to grant Approved Enterprise status to qualifying investments. However, the 2005 Amendment limits the scope of enterprises that may be approved by the Investment Center by setting criteria for the approval of a facility as an Approved Enterprise.

An enterprise that qualifies under the new provisions is referred to as a "Beneficiary Enterprise", rather than "Approved Enterprise". The 2005 Amendment provides that the approval of the Investment Center is required only for Approved Enterprises that receive cash grants. As a result, a company is no longer required to obtain the advance approval of the Investment Center in order to receive the tax benefits previously available under the alternative benefits program. Rather, a company may claim the tax benefits offered by the Investment Law directly in its tax returns, provided that its facilities meet the criteria for tax benefits set forth in the 2005 Amendment. A company that has a Beneficiary Enterprise may, at its discretion, approach the Israel Tax Authority for a pre-ruling confirming that it is in compliance with the provisions of the Investment Law.

66

Table of Contents

Tax benefits are available under the 2005 Amendment to production facilities (or other eligible facilities) which are generally required to derive 25% or more of their business income from export to specific markets with a population of at least 14 million in 2012 (such export criteria will further be increased in the future by 1.4% per annum). In order to receive the tax benefits, the 2005 Amendment states that a company must make an investment which meets certain conditions set forth in the amendment for tax benefits and which exceeds a minimum amount specified in the Investment Law. Such investment entitles a company to receive a Beneficiary Enterprise status with respect to the investment and may be made over a period of no more than three years ending in the year in which the company chose to have the tax benefits apply to the Beneficiary Enterprise. The benefits period under the Beneficiary Enterprise status is limited to 12 years from the year the company chose to have its tax benefits apply. Where a company requests to have the tax benefits apply to an expansion of existing facilities, only the expansion will be considered to be a Beneficiary Enterprise and the company's effective tax rate will be the weighted average of the applicable rates. In such case, the minimum investment required in order to qualify as a Beneficiary Enterprise must exceed a certain percentage of the value of the company's production assets before the expansion.

The extent of the tax benefits available under the 2005 Amendment to qualifying income of a Beneficiary Enterprise depends on, among other things, the geographic location within Israel of the Beneficiary Enterprise. Such tax benefits include an exemption from corporate tax on undistributed income for a period of between two to ten years, depending on the geographic location of the Beneficiary Enterprise within Israel, and a reduced corporate tax rate of between 10% to 25% for the remainder of the benefits period, depending on the level of foreign investment in the company in each year, as explained above.

Dividends paid out of income attributed to a Beneficiary Enterprise will be treated similarly to payment of dividends by an Approved Enterprise under the alternative benefits program. Therefore, dividends paid out of income attributed to a Beneficiary Enterprise (or out of dividends received from a company whose income is attributed to a Beneficiary Enterprise) are generally subject to withholding tax at the rate of 15% or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). The reduced rate of 15% is limited to dividends and distributions out of income attributed to a Beneficiary Enterprise during the benefits period and actually paid at any time up to 12 years thereafter except with respect to an FIC, in which case the 12-year limit does not apply.

Furthermore, a company qualifying for tax benefits under the 2005 Amendment, which pays a dividend (or deemed dividend, as described below) out of income attributed to its Beneficiary Enterprise during the tax exemption period, will be subject to tax in respect of the amount of the dividend distributed (grossed-up to reflect the pre-tax income that it would have had to earn in order to distribute the dividend) at the corporate tax rate which would have otherwise been Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld. If such dividends are distributed to a foreign company and other conditions are met, the withholding tax rate will be applicable.

67

Table of Contents

The benefits available to a Beneficiary Enterprise are subject to the continued fulfillment of conditions stipulated in the Investment Law and its regulations. If a company does not meet these conditions, it would be required to refund the amount of tax benefits, as adjusted by the Israeli consumer price index and interest, or other monetary penalty.

In 2021, the Company gave notice to the Israeli tax authorities that it waived the Approved / Beneficiary Enterprise regime starting from tax year 2021.

*Tax incentives programs which may be relevant for the company as of financial year 2021*

*Tax benefits under the 2011 Amendment that became effective on January 1, 2011.*

The 2011 Amendment canceled the availability of the benefits granted in accordance with the provisions of the Investment Law prior to 2011 and, instead, introduced new benefits for income generated by a "Preferred Company" through its Preferred Enterprise (as such terms are defined in the Investment Law) as of January 1, 2011. A Preferred Company is defined as either (i) a company incorporated in Israel which is not wholly owned by a governmental entity, or (ii) a limited partnership that: (a) was registered under the Israeli Partnerships Ordinance and; (b) all of its limited partners are companies incorporated in Israel, but not all of them are governmental entities; which has, among other things, Preferred Enterprise status and is controlled and managed from Israel. Pursuant to the 2011 Amendment, a Preferred Company was entitled to a reduced corporate tax rate of 15% with respect to its preferred income attributed to its Preferred Enterprise in 2011 and 2012, unless the Preferred Enterprise was located in a certain development zone, in which case the rate was 10%. Such corporate tax rate was reduced to 12.5% and 7%, respectively, in 2013 and was increased to 16% and 9%, respectively, in 2014 until 2016. Pursuant to the 2017 Amendment, in 2017 and thereafter, the corporate tax rate for Preferred Enterprise which is located in a certain development zone was decreased to 7.5%, while the reduced corporate tax rate for other development zones remains 16%. Income derived by a Preferred Company from a 'Special Preferred Enterprise' (as such term is defined in the Investment Law) would be entitled, during a benefits period of 10 years, to further reduced tax rates of 8%, or to 5% if the Special Preferred Enterprise is located in a certain development zone. Since January 1, 2017, the definition for "Special Preferred Enterprise" includes less stringent conditions.

Dividends paid out of preferred income attributed to a Preferred Enterprise or to a Special Preferred Enterprise are generally subject to withholding tax at source at the rate of 20% or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld (although, if such dividends are subsequently distributed to individuals or a non-Israeli company, withholding tax at a rate of 20% or such lower rate as may be provided in an applicable tax treaty will apply). In 2018-2020, dividends paid out of preferred income attributed to a Special Preferred Enterprise, directly to a foreign parent company, were subject to withholding tax at source at the rate of 5% (temporary provisions).

The 2011 Amendment also provided transitional provisions to address companies already enjoying current benefits under the Investment Law. These transitional provisions provide, among other things, that unless an irrevocable request is made to apply the provisions of the Investment Law as amended in 2011 with respect to income to be derived as of January 1, 2011: (i) the terms and benefits included in any certificate of approval that was granted to an Approved Enterprise, which chose to receive grants, before the 2011 Amendment became effective, will remain subject to the provisions of the Investment Law as in effect on the date of such approval, and subject to certain conditions;. (ii) the terms and benefits included in any certificate of approval that was granted to an Approved Enterprise, that had participated in an alternative benefits program, before the 2011 Amendment became effective will remain subject to the provisions of the Investment Law as in effect on the date of such approval, provided that certain conditions are met; and (iii) a Beneficiary Enterprise can elect to continue to benefit from the benefits provided to it before the 2011 Amendment came into effect, provided that certain conditions are met.

Table of Contents

We have examined the possible effect, if any, of these provisions of the 2011 Amendment on our financial statements and have decided, at this time, not to opt to apply the new benefits under the 2011 Amendment.

*Tax benefits under the 2017 Amendment that became effective on January 1, 2017.*

The 2017 Amendment was enacted as part of the Economic Efficiency Law that was published on December 29, 2016, and was effective as of January 1, 2017. The 2017 Amendment provides new tax benefits for two types of "Technology Enterprises", as described below, and is in addition to the other existing tax beneficial programs under the Investment Law.

The 2017 Amendment provides that a technology company satisfying certain conditions will qualify as a "Preferred Technology Enterprise" and will thereby enjoy a reduced corporate tax rate of 12% on income that qualifies as "Preferred Technology Income," as defined in the Investment Law. The tax rate is further reduced to 7.5% for a Preferred Technology Enterprise located in development zone A. In addition, a Preferred Technology Company will enjoy a reduced corporate tax rate of 12% on capital gain derived from the sale of certain "Benefitted Intangible Assets" (as defined in the Investment Law) to a related foreign company if the Benefitted Intangible Assets were acquired from a foreign company on or after January 1, 2017 for at least NIS 200 million, and the sale receives prior approval from the IIA.

The 2017 Amendment further provides that a technology company satisfying certain conditions will qualify as a "Special Preferred Technology Enterprise" and will thereby enjoy a reduced corporate tax rate of 6% on "Preferred Technology Income" regardless of the company's geographic location within Israel. In addition, a Special Preferred Technology Enterprise will enjoy a reduced corporate tax rate of 6% on capital gain derived from the sale of certain "Benefitted Intangible Assets" to a related foreign company if the Benefitted Intangible Assets were either developed by the Special Preferred Technology Enterprise or acquired from a foreign company on or after January 1, 2017, and the sale received prior approval from the IIA. A Special Preferred Technology Enterprise that acquires Benefitted Intangible Assets from a foreign company for more than NIS 500 million will be eligible for these benefits for at least ten years, subject to certain approvals as specified in the Investment Law.

Table of Contents

Dividends distributed by a Preferred Technology Enterprise or a Special Preferred Technology Enterprise, paid out of Preferred Technology Income, are generally subject to withholding tax at source at the rate of 20% or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld. If such dividends are distributed to a foreign company and other conditions are met, the withholding tax rate will be 4%.

In 2021, the Company provided notice to the Israeli tax authorities that it waived the Approved / Beneficiary Enterprise regime starting from tax year 2021. The Company is currently considering its qualification for the 2017 amendment and the term and degree to which it may be qualified as a Preferred Technology Enterprise or Special Preferred Technology Enterprise.

*Tax benefits under 2021 Amendments*

On November 15, 2021, the Investment Law was amended to reduce the ability of companies to retain the tax-exempt profits. Effective August 15, 2021, dividend distributions (or deemed distribution, as described below), will be treated as if made on a pro-rata basis from all types of earnings, including Exempt Profits (as defined below).

In parallel to the above amendment, the Investment Law was amended to provide, on a temporary basis, a reduced corporate income tax on the distribution or release within a year from such amendment of tax-exempt profits derived by Approved and Benefited Enterprises, which we refer to as Exempt Profits. The amount of the reduced tax will be determined based on a formula. In order to qualify for the reduction, the Company must invest certain amounts in productive assets and research and development in Israel.

Following recent Israeli court ruling, certain transactions (such as acquisitions and intercompany loans) may be treated as deemed dividend distributions for the purpose of the Encouragement Law triggering corporate tax on the respective amount of the transaction.

On November 13, 2022, the Company released an amount of approximately $44.8 million out of its Exempt Profits and accordingly paid reduced tax of approximately $2.9 million.

As of December 31, 2022, we had accumulated tax-exempt income of approximately $160.6 million that is attributable to our various Approved and Beneficiary Enterprise programs. If such tax-exempt income were to be distributed, it would be taxed at the reduced corporate tax rate applicable to such income, which would have amounted to approximately $16.1 million of tax liability as of December 31, 2022.

70

Table of Contents

**C. Organizational Structure.**

Our corporate structure includes Stratasys Ltd., our Israeli parent company, and the following main active wholly-owned subsidiary entities:

- Stratasys, Inc., a Delaware corporation, which was formerly a publicly held company and which became our indirect, wholly-owned subsidiary as a result of the Stratasys, Inc.- Objet Ltd. merger. Following our acquisition of Origin in December 2020, Stratasys, Inc. now has offices and warehouses in San Francisco, California;
- Stratasys Direct, Inc. (our parts service business unit), a California corporation;
- Stratasys AP Limited, a Hong Kong limited company, which together with several other subsidiaries (including Stratasys Japan Co. Ltd., our Japanese subsidiary, and Stratasys Shanghai Ltd., our Chinese subsidiary), carries out most of our operations in the Asia Pacific region;
- Stratasys GMBH, a German limited liability company, which together with other subsidiaries (including Stratasys Schweiz AG (Stratasys Switzerland Ltd.), our Swiss subsidiary) carries out our European operations; and
- Stratasys Latin America Representacao De Equipamentos Ltd., a Brazilian subsidiary, which has commenced our Brazilian operations.

We also own a 46.5% interest in Ultimaker, which includes the operations of our former subsidiary, MakerBot, and which offers a comprehensive solution set of hardware, software and materials for Desktop 3D printing.

Please see the list of subsidiaries appended to this annual report as Exhibit 8 for a complete list of our subsidiaries as of the date of this annual report.

**D. Property, Plants and Equipment.**

We have dual headquarters, in Eden Prairie, Minnesota and Rehovot, Israel.

Our Eden Prairie, Minnesota headquarters (near Minneapolis) is comprised of executive offices and production facilities that encompassed, as of December 31, 2022, approximately 308,646 square feet, of which we owned 227,100 square feet, in three buildings. Those buildings served the following purposes: system assembly, inventory storage, operations and sales support; manufacturing for one of our Stratasys Direct Manufacturing paid parts service locations; research and development, filament manufacturing, administrative, marketing and sales activities; and expansion of our production capacity for systems and consumables. During 2022, we entered into a new lease of an additional 168,100 square feet for storage purposes, which increases our shipping efficiency and eliminates the cost increase for managing our inventory through third parties. We took that new space as part of our warehouse consolidation project. During 2022 we entered into a new lease of additional 168,100 square feet for storage purposes which increases our shipping efficiency and eliminate cost increase for managing our inventory by 3rd party as part of Warehouse consolidation project (3)

Our new building complex in Rehovot, Israel, which contains two buildings, is situated on a property that we purchased in 2015 and encompasses approximately 284,713 square feet. It houses our Israeli headquarters, research and development facilities and certain marketing activities. We entered the first building in January 2017 and the second building in May 2021.

71

Table of Contents

As of December 31, 2022, we lease office space (except with respect to our Eden Prairie headquarters facilities and our Rehovot, Israel and Kiryat Gat, Israel facilities, where we own the property) for various purposes, as set forth in the table below. Unless otherwise stated, all of our facilities are fully utilized. Our material tangible fixed assets include, among other things, the properties listed below.

| Location: | Primary Usage: | Area (Sq. Feet) |
|---|---|---|
| **Americas:** | | |
| Eden Prairie, Minnesota | U.S. headquarters | 308,646 |
| Valencia, California | Offices and warehouses | 55,035 |
| San Diego, California | Facilities | 56,383 |
| Belton, Texas | Offices and warehouses | 39,680 |
| Austin, Texas | Facilities | 33,178 (1 |
| Plymouth, Minnesota | Warehouse | 168,100 |
| Other facilities in Americas | | 36,543 (3 |
| **Europe and the Middle East:** | | |
| Rehovot, Israel | Israeli headquarters | 284,713 (2) |
| Kiryat Gat, Israel | Factories and warehouse | 126,617 |
| Rheinmunster, Germany | Europe main office | 55,027 |
| United Kingdom | Offices and lab space | 28,945 |
| Other facilities in EMEA | Offices and lab space | 16,758 |
| **Asia Pacific:** | | |
| Hong Kong | **Asia Pacific main office** | 4,994 |
| Japan | Sales office | 13,109 |
| China | Sales office | 15,018 |
| Other facilities in Asia Pacific | Office space | 14,913 |

(1)Makerbot- Brooklyn NY -36,950 sqf. Since Sep 1*st* Makerbot is no longer consolidated by Stratasys and therefore removed from the property list.

(1)This square footage includes the area of the two buildings of our new Israel headquarters in Rehovot, Israel. The second of those buildings was inhabited by us in May 2021, of which 92,400 square feet was leased by us to a third party under a long-term lease and another 12,119 of square feet was leased by us to another third party for a short term lease that will expire on December 31, 2023.

(3)The sites Skunkworks, RiverFalls and Pondview were shut down as part of Warehouse consolidation in MN. Origin office in SF will relocate to Israel headquarter during Q1-23. Valencia 2 was merged into Valencia 1

## ITEM 4A. UNRESOLVED STAFF COMMENTS.

None.

## ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS.

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and the related notes included in this annual report. The discussion below contains forward-looking statements that are based upon our current expectations and are subject to uncertainty and changes in circumstances. Actual results may differ materially from these expectations due to inaccurate assumptions and known or unknown risks and uncertainties, including those identified in "Cautionary Note Regarding Forward-Looking Statements" and in Item 3.D "Key Information – Risk Factors", above.*

Table of Contents

**A. Operating Results.**

**Overview of Business and Trend Information**

We are a global leader in connected, polymer-based 3D printing solutions, across the entire manufacturing value chain. Leveraging distinct competitive advantages that include a broad set of best-in-class 3D printing platforms, software, a materials and technology partner ecosystem, innovative leadership, and global GTM infrastructure, we are positioned to capture share in a significant and growing global marketplace, with a focus on manufacturing, which we view as having the largest and fastest growing total addressable market.

Our approximately 1,700 granted and pending additive technology patents to date have been used to create models, prototypes, manufacturing tools, and production parts for a multitude of industries including aerospace, automotive, transportation, healthcare, consumer products, dental, medical, fashion and education. Our products and comprehensive solutions improve product quality, development time, cost, time-to-market and patient care. Our 3D ecosystem of solutions and expertise includes 3D printers, materials, software, expert services, and on-demand parts production. By the end of 2022, we estimate that we derived over 32.5% of our revenues from manufacturing solutions.

A series of recent acquisitions and other transactions has strengthened our leadership in various facets of our business, and have added incremental growth engines to our platform. Our acquisition, in December 2020, of Origin Laboratories, Inc., or Origin, significantly strengthened our leadership in mass production for polymer 3D printing. Origin's pioneering approach to additive manufacturing of end-use parts has enabled us to serve a large market with manufacturing-grade 3D printers, utilizing $P^3$ Programmable PhotoPolymerization. Our acquisition, in the first quarter of 2021, of UK-based RP Support Ltd., or RPS, a provider of industrial stereolithography 3D printers and solutions, provided us with a complementary technology that further expanded our polymer suite of solutions across the product life cycle. Similarly, our acquisition, in November 2021, of all remaining shares of Xaar 3D Ltd. or Xaar, has begun to accelerate our growth in production-scale 3D printing. The recently completed transaction between our former subsidiary, MakerBot, a leader in desktop 3D printing, and Ultimaker, gave us a significant (approximately 46.5%) stake in a new entity that has a broad technology offering, a larger scale, and that is well-capitalized and is therefore better equipped to compete in the attractive desktop 3D printing segment. Our October 2022 asset acquisition from the quality assurance software company Riven, a Berkeley, California-based start-up, enables us to fully integrate its cloud-based software solution into our GrabCAD® Additive Manufacturing Platform, thereby enabling more manufacturing customers to adopt Stratasys solutions for end-use parts production. Our announced acquisition of Covestro's additive manufacturing business will give us the ability to accelerate innovative developments in 3D printing materials and to thereby further grow adoption of our newest technologies, including our Origin P3™, Neo® stereolithography, and H350™ printers, with which Covestro's resins can be used.

*Business Performance in Macro-Economic Environment*

Our current outlook, as well as our results of operations in the year ended December 31, 2022, should be evaluated in light of current global macroeconomic conditions, including challenging trends that have arisen in the post-COVID-19 period. Our revenues in 2022 evidenced improvement compared to 2021, during which our recovery from the COVID-19 pandemic was ongoing, but incomplete. Our revenues in 2022 grew by 7.3% on a year-over-year basis, compared to 2021, when the COVID-19 pandemic was still adversely impacting our revenues, which percentage revenue growth reflects the adverse impacts of (i) the disposition of our former subsidiary, MakerBot, in September 2022, as well as (ii) the depreciation of European currencies against the dollar. Our improved performance in 2022 was primarily driven by a 12.6% increase in systems revenues, a 4.3% increase in consumables revenues, and a 5.1% increase in services revenues compared to 2021. Our revenues in 2022 surpassed pre-COVID-19 levels (an improvement of 2.4% compared to 2019), signaling that we have achieved full recovery from the pandemic with respect to our top-line results.

73

Table of Contents

In 2022, we worked at full-capacity on a global basis, with a high percentage of our employees throughout the world having received vaccines against COVID-19 over the course of the previous year.

We continue to closely monitor macro-economic conditions, including the headwinds caused by supply chain problems, inflation, increased interest rates and other trends that have been adversely impacting economic activity on a global scale in the aftermath of the COVID-19 pandemic, and which have also adversely affected us. We have been assessing, on an ongoing basis, the implications of those global conditions for our operations, supply chain, liquidity, cash flow and customer orders, and have been acting in an effort to mitigate adverse consequences as needed. We estimate that those conditions have impacted us most notably by limiting our ability to increase our gross margins and our operating margins more significantly in the short-term, given the increased cost of goods and operating expenses associated with global supply chain problems and inflation. We have used price increases to offset those cost pressures. Assuming that those logistical issues and inflationary pressures ease, and the global economy remains relatively stable, we expect that those margins will improve, as we execute on our growth plans and as a result of a favorable products mix.

Specific developments that may potentially impact our operating performance in an adverse manner include:

- further actions taken by central banks in Europe and the U.S. to increase interest rates as a means to slow down inflation, which may worsen credit/financing conditions for our customers who purchase our products;

- potential contraction of economic activities and recessionary conditions that could arise as a result of interest rate increases and a decrease in consumer demand;

- any further government-mandated shutdowns in China due to COVID-19 outbreaks, which could slow down our supply chain; and

- the continued depreciated value of the Euro relative to the U.S. dollar, which has been having and may continue to have an adverse impact on the U.S.- denominated value of our European-derived revenues for purposes of our financial statements.

We cannot provide any assurances as to the extent of our resilience to the adverse impact of these specific developments in future periods.

We ended 2022 with $327.8 million in cash, cash equivalents and short-term deposits. We believe that we are well suited to continue to manage the current global macro-economic climate with a strong balance sheet and no debt, while focusing on cost controls and cash generation. We have continued to selectively apply certain cost controls, which we began doing at the start of the COVID-19 pandemic, while ensuring that our NPI programs are well-funded, and we plan to continue investing as needed in order to support our new product development programs.

Table of Contents

**Key measures of our performance**

***Revenues***

Our revenues results primarily from sales of (i) our products, which include both our AM systems and related consumable materials, (ii) provision of related services and (iii) our direct manufacturing service. We generate revenues and deliver services principally through the following channels:

- sales to resellers, who purchase and resell our products and who provide support services for our printing systems;

- sales of systems that are marketed by independent sales agents, pursuant to which we sell directly to end-users, pay commissions to such agents, and directly handle the sale of consumables and provision of support services; and

- sales of systems (and all related products and services) as well as our direct manufacturing solutions that we provide to our customers directly.

*Product revenues*

Product revenues are influenced by a number of factors, including, among other things, (i) the adoption rate for our products, (ii) end-user product design application and manufacturing activity, and (iii) the capital expenditure budgets of end-users and potential end-users, all of which may be significantly influenced by macroeconomic factors. Product revenues are also impacted by the mix of 3D printers that we sell. Purchases of our 3D printing and production systems, especially our higher-end, higher-priced systems, typically involve longer sales cycles.

Product revenues also depend upon the volume of consumables that we sell. Sales of our consumable materials are linked to the number of AM systems that are installed and active worldwide. Sales of consumables are also driven by system usage, which is generally a function of the size of the particular system and the level of design and manufacturing activity and budget of the particular end-user. Larger systems generally use greater amounts of consumables due to their greater capacity and the higher levels of design and production.

*Services revenues*

Services revenues derive from (i) maintenance contracts and initial systems warranty; (ii) direct manufacturing paid-parts services; and (iii) other professional service contracts. In addition, in connection with direct sales, we generally charge separately for installation and training. Additional services revenues are generated from services contracts most often entered into directly with end-users subsequent to the expiration of the initial warranty period.

75

Table of Contents

***Costs of revenues***

Our costs of revenues consist of costs of products and costs of services. Costs of products consist primarily of components and subassemblies purchased for the manufacture of our AM systems and raw materials, such as thermoplastic and photopolymer materials, for the manufacture of our consumables, as well as any royalties paid with respect to sales of certain of those consumables. Costs of products also include manufacturing and manufacturing-related labor costs, indirect production costs and depreciation, as well as amortization expense which is mainly related to developed technology assets acquired as part of our business combinations.

Our costs of services revenues consist primarily of costs of our service personnel, material and other production costs of our direct manufacturing service business, and installation costs, which include engineers dedicated to on-site training and support, and travel costs of these engineers. Both costs of products and costs of services include related facilities costs.

Our most significant components of costs of revenues are costs of materials used for our products, wages and related benefits costs, which together accounted for approximately 64% of our total direct cost of revenues for the year ended December 31, 2022. An additional significant component of our costs of revenues is the amortization expense that we primarily incur in connection with developed technology assets acquired as part of our business combinations. These amortization expenses vary based on the timing and type of acquisitions and estimated useful lives of the respective intangible assets. These amortization expenses were $28.2 million, $22.4 million and $15.6 million for the years ended December 31, 2022, 2021 and 2020, respectively. During the year ended December 31, 2020, we recorded under cost of revenues impairment charges $5.3 million, related to our definite life intangible assets. No impairment charges were recorded during 2022 and 2021. Refer to Note 8 of our consolidated financial statements included in Item 18 of this annual report.

For the year ended December 31, 2022, a hypothetical 10% rise in commodity prices for raw materials would have caused an approximate $16.5 million increase in costs of revenues in our Consolidated Statements of Operations and Comprehensive loss. As to wages and related benefits, a 10% increase in wages due to wage inflation would have caused an approximate $5.1 million increase in costs of revenues in our Consolidated Statements of Operations and Comprehensive loss. During 2022, we did not notice particular trends that changed, or were expected to change in the near future, the absolute or relative significance of the components of our costs of revenues in a material manner. We also believe that inflation has not had a material effect on our operations or on our financial condition during the three most recent fiscal years, as we have used price increases to offset the cost pressures caused by inflation.

Currently, we do not foresee a significant change in either the raw materials used for production or wage inflation that would materially impact our business. For further information, please see "Item 11. Quantitative And Qualitative Disclosures About Market Risk" in this annual report.

Table of Contents

### *Gross profit*

The gross profit and gross margin for our products are influenced by a number of factors. The most important of these is the mix of our products sold. Specifically, the gross margins on our higher-end AM systems, as well as on our consumables, are typically higher than the gross margins on our entry-level products and MakerBot desktop printers. Accordingly, an increase in the share of revenues of our entry-level products out of total revenues could cause our profit margins to decrease. Furthermore, we believe that as our worldwide installed base of AM systems increases, subsequent sales of our proprietary consumables will also increase. We also seek to reduce our costs of revenues by improving our ability to use less costly components, better management of our inventories levels and increasing manufacturing efficiencies in the production of our systems. In addition, we will also seek to achieve lower material costs and leverage our overall capabilities in our direct manufacturing service business.

Products gross margins are also impacted by the mix of revenues generated from sales to resellers based in different geographical areas as opposed to sales that are facilitated by independent sales agents or directly by us.

Service gross margins are influenced mainly by the volume of revenues generated from our direct manufacturing service business as well as the ratio of service engineers to our installed base in a given geographic area.

### *Operating expenses*

Our operating expenses for 2022 consisted of (i) research and development expenses, and (ii) selling, general and administrative expenses.

### *Research and development expenses, net*

Our research and development activities consist of projects aimed at developing new printing systems and materials and projects aimed at enhancing the capabilities of our existing product lines, as well as significant technology platform and applications, developments for our current technologies, including our integrated software. We also seek to develop disruptive technologies and other process improvement solutions in the additive manufacturing ecosystem. Our research and development expenses consist primarily of employee compensation and employee-related personnel expenses, materials, laboratory supplies, costs for related software and costs for facilities. Expenditures for research, development and engineering of products are expensed as incurred. Our research and development efforts are essential to our future growth and our ability to remain competitive in the AM market. We work closely with existing and potential customers, distribution channels and major resellers, who provide significant feedback for product development and innovation.

We are also entitled to reimbursements from certain government funding plans. These reimbursements are recognized as a reduction of expenses as the related cost is incurred. We are not required to pay royalties on sales of products developed using our government funding.

### *Selling, general and administrative expenses*

Our selling, general and administrative expenses include employee compensation and employee-related expenses for marketing, sales and other sales-operation positions, and for managerial and administrative functions, including executive officers, accounting, legal, information technology and human resources. This category of expenses also covers commissions, advertising and promotions expenses, professional service fees, respective depreciation, amortization expenses related to certain intangible assets, as well as associated overhead.

Commissions consist of sales-based commissions to independent sales agents and internal sales personnel. Commission rates vary, depending on the geographic location of the agent, type of products sold, and the degree of achievement of certain performance targets. Our advertising and promotion expenses consist primarily of media advertising costs, trade and consumer marketing expenses and public relations expenses which aim to strengthen the leadership of our brand in key vertical markets.

Facilities costs that are included in our selling, general and administrative expenses include an allocated portion of the occupancy costs for our facilities in countries where sales, marketing and administrative personnel are located. Professional service fees for accounting and legal services are also included in selling, general and administrative expenses.

Table of Contents

**2022 Financial Highlights**

Significant highlights of our financial performance in 2022 included:

• Revenues increased by $44.3 million, or 7.3%, compared to 2021. The increase reflects higher revenues in all revenue streams which resulted mainly from our new products offerings.

• Operating expenses decreased by $5.7 million, or 1.7% compared to 2021. The decrease was primarily attributable to a reduction in contingent consideration liabilities of $18.3 million partially offset by higher employee related expenses mainly as a result of higher headcount due to our recent acquisitions.

• Gain from deconsolidation of subsidiary of $39.1 million that resulted from the divestment of MakerBot, our previously consolidated subsidiary.

• Net loss amounted to $29.0 million or basic and diluted net loss per share of $0.44 in 2022, compared to net loss of $62.0 million, or basic and diluted net loss per share of $0.98, in 2021, which was reduction in net loss mainly due to our higher gross profit of $16.4 million, and a reduction in contingent consideration liabilities of $18.3 million partially offset by higher employee related expenses and higher tax expenses.

• Total cash and cash equivalents and restricted cash amounted to $150.5 million and short-term deposits amounted to $177.4 million as of December 31, 2022, which, when aggregated together, reflected a decrease of $174.3 million compared to the corresponding total amount as of December 31, 2021. The decrease in cash, cash equivalents, restricted cash and short-term deposits in 2022 was due to increased cash used in operating, investing and financing activities, which amounted to $75.4 million, $7.2 million and $2.8 million, respectively, in 2022.

**Results of Operations**

We are providing within this section a discussion and analysis of our historical statement of operations data in accordance with accounting principles generally accepted in the United State of America, or GAAP. While our financial statements included in Item 18 of this annual report include data for each of the three years ended December 31, 2022, 2021 and 2020, the discussion and analysis contained in this Item 5.A is limited to a comparison of our results of operations for the years ended December 31, 2022 and 2021. For a discussion and analysis of our results for the year ended December 31, 2020, and a comparison of those results with those of the year ended December 31, 2019, please see "Item 5. Operating and Financial Review and Prospects—A. Operating Results—Results of Operations" in our annual Report on Form 20-F for the year ended December 31, 2021, which we filed with the SEC on February 24, 2022.

The following table sets forth certain financial data derived from our consolidated statements of operations and comprehensive loss, presented as percentages of our revenues for the years indicated:

| | Year ended December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Revenues | 100.0% | 100.0% |
| Cost of revenues | 57.6% | 57.2% |
| Gross profit | 42.4% | 42.8% |
| Research and development, net | 14.3% | 14.5% |
| Selling, general and administrative | 37.0% | 41.3% |
| Operating loss | (8.8)% | (13.0)% |
| Gain from step acquisition | 0.0% | 2.4% |
| Gain from deconsolidation of subsidiary | 6.0% | 0.0% |
| Financial income (expenses), net | 0.0% | (0.3)% |
| Loss before income taxes | (2.7)% | (11.0)% |
| Taxes on income (tax benefit) | 0.8% | (0.6)% |
| Share in profits (losses) of associated companies | (0.9)% | 0.2% |
| Net loss | (4.4)% | (10.2)% |
| Net loss attributable to non-controlling interests | 0.0% | 0.0% |
| Net loss attributable to Stratasys Ltd. | (4.4)% | (10.2)% |

78

Table of Contents

**Discussion of Results of Operations**

The below tables and related discussion present an item by item comparison of our results of operations for each of the two years ended December 31, 2022 and 2021.

**Revenues**

Our products and services revenues for the last two years, as well as the percentage change from year to year, were as follows:

| | Year Ended December 31, | | % Change 2022-2021 |
|---|---|---|---|
| | **2022** | **2021** | |
| | **U.S. $ in thousands** | | |
| Products | $ 452,124 | $ 417,557 | 8.3% |
| Services | 199,359 | 189,662 | 5.1% |
| | $ 651,483 | $ 607,219 | 7.3% |

Our total consolidated revenues in 2022 were $651.5 million, an increase of $44.3 million, or 7.3%, compared to 2021.

79

Table of Contents

*Products Revenues*

Revenues derived from products (including systems and consumable materials) increased by $34.6 million, or 8.3%, in 2022 as compared to 2021 mainly due to new products offerings and higher usage of our systems, partially offset by $17.8 million as a result of unfavorable exchange rates and the impact of MakerBot divestiture.

Systems revenues increased by $25.1 million or 12.6% in 2022 as compared to 2021,partially offset by $11.4 million as a result of unfavorable exchange rates and the impact of MakerBot divestiture.

Consumables revenues increased by $9.5 million, or 4.3%, in 2022 as compared to 2021, due to higher usage of our systems, largely as a result of the return of our customers to full economic activity following the global recovery from the COVID-19 pandemic, partially offset by $6.4 million as a result of unfavorable exchange rates and the impact of MakerBot divestiture.

*Services Revenues*

Services revenues (including maintenance contracts and initial systems warranty, direct manufacturing paid-parts services and other professional service contracts) increased by $9.7 million, or 5.1%, in 2022 compared to 2021. Services revenues from systems warranty, maintenance contracts and other professional service contracts increased by 7.6% in 2022, due to there being a larger install base of our systems, partially offset by $3.2 million as a result of unfavorable exchange rates and the impact of MakerBot divestiture.

*Revenues by Region*

Revenue amounts and the percentage of our overall revenues by region for the last two years, as well as the percentage change in revenue amounts for each such region from year to year, were as follows:

| | Year Ended December 31, | | | |
| | 2022 | | 2021 | |
| | Revenue amount (U.S. $ in thousands) | % of overall revenues | Revenue amount (U.S. $ in thousands) | % of overall revenues |
|---|---|---|---|---|
| Americas* | $ 415,428 | 63.8% | $ 388,323 | 63.9% |
| EMEA | 141,660 | 21.7% | 130,296 | 21.5% |
| Asia Pacific | 94,395 | 14.5% | 88,600 | 14.6% |
| | $ 651,483 | 100.0% | $ 607,219 | 100.0% |

*Consists of the United States, Canada and Latin America

Revenues in the Americas region increased by $27.1 million, or 7.0%, to $415.4 million in 2022 compared to $388.3 million in 2021.The increase was in all revenue streams.

Revenues in the EMEA region increased by $11.4 million, or 8.7%, to $141.7 million in 2022 compared to $130.3 million in 2021.The increase was primarily driven by higher systems revenues.

Revenues in the Asia Pacific region increased by $5.8 million, or 6.5%, to $94.4 million in 2022 compared to $88.6 million in 2021.The increase was primarily driven by higher systems revenues.

Table of Contents

**Gross Profit**

Gross profit from our products and services for the last two years, as well as the percentage change from year to year, were as follows:

| | Year Ended December 31, | | Percentage Change (later year compared to earlier) |
|---|---|---|---|
| | **2022** | **2021** | **2022-2021** |
| | U.S. $ in thousands | | |
| **Gross profit attributable to:** | | | |
| Products | $217,523 | $206,616 | 5.3% |
| Services | 58,944 | 53,462 | 10.3% |
| | $276,467 | $260,078 | 6.3% |

Gross profit as a percentage of revenues for our products and services for the last two years, as well as the percentage change from year to year, were as follows:

| | Year Ended December 31, | | Change in % (relative to earlier year %) |
|---|---|---|---|
| | **2022** | **2021** | **2022-2021** |
| | U.S. $ in thousands | | |
| **Gross profit as a percentage of revenues from:** | | | |
| Products | 48.1% | 49.5% | (2.8)% |
| Services | 29.6% | 28.2% | 4.9% |
| Total gross profit | 42.4% | 42.8% | (0.9)% |

Gross profit attributable to products revenues increased by $11.0 million, or 5.3%, to $217.5 million in 2022, as compared to $206.6 million in 2021. Gross profit attributable to products revenues as a percentage of revenues decreased to 48.1% in 2022, as compared to 49.5% in 2021. Our gross profit from products revenues increased as a result of higher product revenues, as well as a favorable product mix, partially offset by higher amortization expenses of $5.8 million.

Gross profit attributable to services revenues increased by $5.5 million, or 10.3%, to $58.9 million in 2022 as compared to $53.5million in 2021. Gross profit from services as a percentage of services revenues in 2022 increased to 29.6% as compared to 28.2% in 2021. Our gross profit from services revenues increased as a result of higher revenues.

As the above percentages evidence, our gross margin, which has been a major focus for us, did not change in a material manner in 2022 compared to 2021, despite global economic headwinds caused by inflation and European currency depreciation against the U.S. dollar. This was largely due to our use of price increases on our products and services to help to offset cost pressures. As our new technologies ramp and our operational efficiencies continue, we expect that our gross margin will strengthen in the coming years.

Table of Contents

**Operating Expenses**

The amount of each type of operating expense for the last two years, as well as the percentage change between such annual periods, and total operating expenses as a percentage of our total revenues in each such year, were as follows:

| | Year Ended December 31, | | Change from earlier to later year, as a % of amount in earlier year |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2022-2021** |
| | **U.S. $ in thousands** | | |
| Research and development, net | $ 92,876 | $ 88,303 | 5.2% |
| Selling, general and administrative | 240,750 | 250,937 | (4.1)% |
| | $ 333,626 | $ 339,240 | (1.7)% |
| Percentage of revenues | 51.2% | 55.9% | |

Operating expenses were $333.6 million in 2022, compared to operating expenses of $339.2 million in 2021. The decrease in operating expenses resulted from a reduction in contingent consideration liabilities (related to our recent acquisitions of other companies) by $18.3 million, partially offset by higher employee related and other expenses due to our recent acquisitions of $12.6 million.

Research and development expenses, net, increased by $4.6 million, or 5.2%, in 2022 compared to 2021. Research and development expenses, net, as a percentage of revenues decreased to 14.3% in 2022 compared to 14.5% in 2021, reflecting a non-material reduction. The absolute increase in research and development expenses, net in 2022 was primarily attributable to $5.7 million increase employee-related expenses as a result of higher headcount following our recent acquisitions, partially offset by the impact of MakerBot divestiture.

Our research and development expenses were impacted by the timing of project spending and product launches based on our portfolio management. We continue to invest in strategic long-term initiatives that include advancements in our core FDM and Polyjet Technologies and in our new powder-based and photopolymer-based, SAF, P3 and stereolithography technologies, advanced composite materials, software and development of new applications that will enhance our current solutions offerings.

Selling, general and administrative expenses in 2022 decreased by $10.2 million, or 4.1%, to $240.8 million, compared to $250.9 million in 2021.The amount of selling, general and administrative expenses constituted 37.0% of our revenues in 2022, as compared to 41.3% in 2021. The decrease was mainly a result of a reduction in contingent consideration liabilities (related to our recent acquisitions) by $18.3 million, partially offset by $6.9 million higher employee related expenses and other expenses as a result of our recent acquisitions.
.

82

Table of Contents

**Operating Loss**

Operating loss and operating loss as a percentage of our total revenues for the last two years, as well as the percentage change in operating loss between those years, were as follows:

| | Year Ended December 31, | | Change from earlier to later year, as a % of amount in earlier year |
|---|---|---|---|
| | **2022** | **2021** | **2022-2021** |
| | U.S. $ in thousands | | |
| Operating loss | $  (57,159) | $  (79,162) | (27.8)% |
| Percentage of revenues | (8.8)% | (13.0)% | |

Operating loss for the year ended December 31, 2022 was $57.2 million as compared to an operating loss of $79.2 million for the year ended December 31, 2021. The decrease in operating loss was primarily attributable to our higher gross profit of $16.4 million, and a reduction in contingent consideration liabilities (related to our recent acquisitions) by $18.3 million, partially offset by higher employee related expenses as a result of higher headcount following our recent acquisitions.

**Gain from Step Acquisition**

On November 1, 2021 we acquired the remaining 55% of the equity of Xaar, for aggregate consideration of $29.3 million (we previously owned a 45% stake in Xaar). The transaction was accounted for as step acquisition and accordingly, we increased the value of our previously held equity investment to its fair value of $23.8 million, which resulted in a total purchase price of $53.1 million and a gain (in 2021) of approximately $14.4 million.

**Gain From Deconsolidation Of Subsidiary**

On August 31, 2022, we completed the previously-announced merger of our subsidiary MakerBot with Ultimaker, into a new company that had been created under the name Ultimaker. The transaction was accounted for as an equity method investment, and, accordingly, we recorded an investment of $105.6 million, and a net gain of $39.1 million from the deconsolidation of MakerBot.

**Financial Income (Expenses), net**

Financial expenses, net, which were primarily comprised of foreign currencies effects, interest income and interest expense, amounted to $0.23 million for the year ended December 31, 2022, compared to financial expenses, net, of $2.1 million for the year ended December 31, 2021.

Table of Contents

**Income Taxes**

Income tax expense and income tax expense as a percentage of net loss before income taxes for the last two years, as well as the percentage change in income taxes between those years, were as follows:

| | Year Ended December 31, | | 2022-2021 |
|---|---|---|---|
| | **2022** | **2021** | **Change as a % of amount in 2022** |
| | U.S. $ in thousands | | |
| Loss before income taxes | $ (17,794) | $ (66,837) | (73.4)% |
| Income tax benefit (expense) | $ (5,454) | $ 3,906 | (239.6)% |
| As a percent of loss before income taxes | (30.7)% | 5.8% | |

We had an effective tax rate of (30.7%) for the year ended December 31, 2022 as compared to an effective tax rate of 5.8% for the year ended December 31, 2021. Our effective tax rate in 2022 was primarily impacted by: (i) changes in the geographic mix of foreign taxable income and loss; (ii) a significant movement in valuation allowance and (iii) a change in uncertain tax position. Our effective tax rate in 2021 was primarily impacted by: (i) changes in the geographic mix of foreign taxable income and loss; (ii) a movement in valuation allowance; and (iii) the release of uncertain tax position due to settlement of tax audits.

Our effective tax rate is based on recurring factors, including the geographic mix of foreign taxable income and loss, as well as nonrecurring items that may not be predictable.

For a full reconciliation of our effective tax rate to the Israeli statutory rate of 23% and for further explanation of our provision for income taxes, refer to Note 9 to our consolidated financial statements included in Item 18 of this annual report.

**Share in Profit (Losses) of Associated Companies**

Share in profit (losses) of associated companies reflects our proportionate share of the profits of unconsolidated entities accounted for by using the equity method of accounting. During 2022, we had net losses of our equity method investments in a total amount of $5.7 million, compared to a profit of $0.9 million in 2021.The foregoing losses were mainly attributable to our equity investment in the new merged entity Ultimaker (which was the surviving entity following a merger between it and MakerBot) following the deconsolidation, in 2022, of MakerBot, which was previously held as a subsidiary of Stratasys.

Table of Contents

**Net Loss and Net Loss Per Share**

Net loss, net loss as a percentage of our total revenues, and diluted net loss per share, for the last two years, as well as the percentage change in net loss between those years, were as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2022-2021 Change (as a % of amount in 2022) |
| | U.S. $ in thousands | | |
| Net loss | $ (28,974) | $ (61,982) | (53.25)% |
| Percentage of revenues | (4.45)% | (10.21)% | |
| Basic and diluted net loss per share | $ (0.44) | $ (0.98) | (55.38)% |

Net loss for the year ended December 31, 2022 was $29.0 million, as compared to $62.0 million for the year ended December 31, 2021. The decrease in net loss was attributable to the decrease in our operating loss, partially offset by higher tax expenses.

Diluted net loss per share for the years ended December 31, 2022 and 2021 was $0.44 and $0.98, respectively. The weighted average, basic and diluted number of shares outstanding for the year ended December 31, 2022 was 66.5 million, compared to 63.5 million for the year ended December 31, 2021.

85

Table of Contents

**Non-GAAP Financial Measures**

The following non-GAAP data for the fiscal years ended December 31, 2022 and 2021, which excludes certain items as described below, are non-GAAP financial measures. Our management believes that these non-GAAP financial measures are useful information for investors and shareholders of our company in gauging our results of operations (i) on an ongoing basis after excluding mergers, acquisitions and divestments related expense or gains and restructuring-related charges or gains, legal provisions and (ii) excluding non-cash items such as stock-based compensation expenses, acquired intangible assets amortization, including intangible assets amortization related to equity method investments, impairment of long-lived assets and goodwill, revaluation of investments and the corresponding tax effect of those items. The items eliminated in our non-GAAP adjustments either do not reflect actual cash outlays that impact our liquidity and our financial condition or have a non-recurring impact on our statement of operations, as assessed by management. These non-GAAP financial measures are presented to permit investors to more fully understand how management assesses our performance for internal planning and forecasting purposes. The limitations of using these non-GAAP financial measures as performance measures are that they provide a view of our results of operations without including all items indicated above during a period, which may not provide a comparable view of our performance to other companies in our industry. Investors and other readers should consider non-GAAP measures only as supplements to, not as substitutes for or as superior measures to, the measures of financial performance prepared in accordance with GAAP. Reconciliation between results on a GAAP and non-GAAP basis is provided in the table below.

**Reconciliation of GAAP and Non-GAAP Results of Operations**

| | | | Twelve Months Ended December 31, | | |
| --- | --- | --- | --- | --- | --- |
| | | | 2022 GAAP | Non-GAAP Adjustments | 2022 Non-GAAP |
| | | | U.S. dollars and shares in thousands (except per share amounts) | | |
| | Gross profit (1) | $ | 276,467 | $ 36,016 | $ 312,483 |
| | Operating loss (1,2) | | (57,159) | 70,691 | 13,532 |
| | Net income (loss) attributable to Stratasys Ltd. (1,2,3) | | (28,974) | 39,235 | 10,261 |
| | Net loss per diluted share attributable to Stratasys Ltd. (4) | $ | (0.44) | $ 0.59 | $ 0.15 |
| | | | | | |
| (1) | Acquired intangible assets amortization expense | | | 28,158 | |
| | Non-cash stock-based compensation expense | | | 4,083 | |
| | Restructuring and other related costs | | | (174) | |
| | Impairment charges | | | 3,949 | |
| | | | | 36,016 | |
| | | | | | |
| (2) | Acquired intangible assets amortization expense | | | 8,950 | |
| | Non-cash stock-based compensation expense | | | 29,378 | |
| | Restructuring and other related costs | | | 2,737 | |
| | Revaluation of investments | | | 3,777 | |
| | Contingent consideration | | | (18,293) | |
| | Other expenses | | | 8,126 | |
| | | | | 34,675 | |
| | | | | 70,691 | |
| | | | | | |
| (3) | Corresponding tax effect | | | 4,989 | |
| | Equity method related amortization, divestments and impairments | | $ | 2,285 | |
| | Adjustments attributable to non-controlling interest | | | 406 | |
| | Gain from deconsolidation | | | (39,136) | |
| | | | | 39,235 | |
| | | | | | |
| (4) | Weighted average number if ordinary shares outstanding- Basic and diluted | | 66,491 | | 67,068 |

86

Table of Contents

| | Twelve Months Ended December 31, | | |
| --- | --- | --- | --- |
| | 2021 GAAP | Non-GAAP Adjustments | 2021 Non-GAAP |
| | U.S. dollars and shares in thousands (except per share amounts) | | |
| Gross profit (1) | $ 260,078 | $ 30,447 | $ 290,525 |
| Operating loss (1,2) | (79,162) | 77,479 | (1,683) |
| Net income (loss) attributable to Stratasys Ltd. (1,2,3) | (61,982) | 57,639 | (4,343) |
| Net loss per diluted share attributable to Stratasys Ltd. (4) | $ (0.98) | $ 0.91 | $ (0.07) |
| | | | |
| (1) Acquired intangible assets amortization expense | | 22,392 | |
| Non-cash stock-based compensation expense | | 3,093 | |
| Restructuring and other related costs | | 1,642 | |
| Impairment charges | | 3,320 | |
| | | 30,447 | |
| | | | |
| (2) Acquired intangible assets amortization expense | | 8,878 | |
| Non-cash stock-based compensation expense | | 27,884 | |
| Impairment of long-lived assets | | 1,447 | |
| Restructuring and other related costs | | 2,743 | |
| Revaluation of investments | | (1,303) | |
| Contingent consideration | | 570 | |
| Other expenses | | 6,813 | |
| | | 47,032 | |
| | | 77,479 | |
| | | | |
| (3) Corresponding tax effect | | (864) | |
| Equity method related amortization, divestments and impairments | | (4,576) | |
| Gain from step acquisition | $ | (14,400) | |
| | $ | 57,639 | |
| | | | |
| (4) Weighted average number if ordinary shares outstanding- Basic and diluted | 63,471 | | 63,471 |

Table of Contents

*Forward-looking Statements and Factors That May Affect Future Results of Operations*

See "Cautionary Note Regarding Forward-Looking Statements" at the beginning of this annual report (following the table of contents).

**Variability of Operating Results**

Our revenues and profitability may vary in any given year, and from quarter to quarter, depending on the timing, number and mix of products sold and the average selling price of the products, and are also affected by the seasonality of our business. In addition, due to competition, uncertain market acceptance and other factors, we may be required to reduce prices for our products in the future. In the wake of the COVID-19 pandemic, it is also useful to gauge the variability of our operating results on a linear basis, for each quarter compared to the previous one, in addition to on a year-over-year basis, compared to the corresponding period of the prior year. We have not seen a steady pattern as to the level of demand for our products in particular quarters of the year since the second quarter of 2020. Nevertheless, in our outlook for 2023, we expect our revenues to grow sequentially, largely because of expected new product introductions later as the year progresses.

Our future results will be affected by a number of factors, including our ability to: increase the number of products sold; develop, introduce and deliver new products on a timely basis; accurately anticipate customer demand patterns; and manage future inventory levels in line with anticipated demand. Our results may also be affected by competitive factors, the extent to which our cost controls plan succeeds, the availability of working capital, results of litigation, the enforcement of intellectual property rights, currency exchange rate fluctuations, commodity prices and economic conditions in the geographic areas in which we operate. Macro factors, including global economic headwinds caused by inflation, changes in interest rates, and supply chain conditions, as impacted by geopolitical developments such as the status of the Russian invasion of Ukraine and U.S.-China relations, and macro factors particular to our industry, such as the extent of growth of the 3D printing market generally, may also impact our operating results. There can be no assurance that our historical performance in revenues, gross profit and net income (loss) will improve, or that revenues, gross profit and net income (loss) in any particular quarter will improve, over the results reflected in preceding quarters, including comparable quarters of previous years. See Item 3.D - "Risk Factors" above

**Effective Corporate Tax Rate**

See "Israeli Tax Considerations and Government Programs — General Corporate Tax Structure in Israel" in Item 4.B above for a discussion of the general tax structure in Israel and applicable corporate tax rates.

In 2022, we generated losses mainly from our Israeli parent company and its US subsidiaries, with no tax benefit being recorded for those losses, as the near-term realization of these assets is uncertain.

As part of the process of preparing our consolidated financial statements, we must estimate our income taxes in each of the jurisdictions in which we operate. This process involves estimating our actual current tax exposure together with assessing temporary differences resulting from differing treatment of items for tax and accounting purposes. Actual income taxes could vary from these estimates due to future changes in income tax laws or the results of final tax examinations and reviews.

**Effects of Government Regulations and Location on our Business**

For a discussion of the effects of Israeli governmental regulation and our location in Israel on our business, see "Israeli Tax Considerations and Government Programs" in Item 4.B above and the "Risks related to operations in Israel" in Item 3.D above.

**Inflation**

We believe that inflation has not had a material effect on our operations or on our financial condition during the three most recent fiscal years.

**Foreign Currency Transactions**

See "Foreign Currency Exchange Risk" in Item 11 below for a discussion of foreign currency transactions.

Table of Contents

**B. Liquidity and Capital Resources**

A summary of our consolidated statement of cash flows for the last two years is set forth in the below table. While our financial statements included in Item 18 of this annual report include cash flow data for each of the three years ended December 31, 2022, 2021 and 2020, the discussion contained in this Item 5.B is limited to a comparison of our liquidity and capital resources— including cash flows— for the years ended December 31, 2022 and 2021. For a discussion of our cash flows for the year ended December 31, 2020, and a comparison of those cash flows with those for the year ended December 31, 2021, please see "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources" in our Annual Report on Form 20-F for the year ended December 31, 2021, which we filed with the SEC on February 24, 2022.

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | U.S $ in thousands | |
| Net loss | $ (28,974) | $ (61,982) |
| Impairment of other long-lived assets | 3,865 | 1,447 |
| Depreciation and amortization | 59,769 | 56,096 |
| Stock-based compensation | 33,461 | 30,977 |
| Foreign currency transactions gain (loss) | 9,090 | 3,446 |
| Gain from deconsolidation of subsidiary | (39,136) | - |
| Deferred income taxes, net and uncertain tax positions | 926 | (12,380) |
| Other non-cash items, net | (9,079) | (13,736) |
| Change in working capital and other items | (105,327) | 31,956 |
| Net cash provided by operating activities | (75,405) | 35,824 |
| Net cash used in investing activities | (7,213) | (291,165) |
| Net cash provided by financing activities | (2,769) | 227,311 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | (7,220) | (893) |
| Net change in cash, cash equivalents and restricted cash | (92,607) | (28,923) |
| Cash, cash equivalents and restricted cash, beginning of year | 243,293 | 272,216 |
| Cash, cash equivalents and restricted cash, end of year | $ 150,686 | $ 243,293 |

Our cash, cash equivalents and restricted cash balances decreased to $150.7 million as of December 31, 2022 as compared to $243.3 million as of December 31, 2021. The decrease in cash, cash equivalents and restricted cash in 2022 was mainly due to cash flows used in operating activities.

89

Table of Contents

***Cash flows from operating activities***

*Year ended December 31, 2022*

We used $75.4 million of cash in our operating activities during 2022. Cash used in operating activities reflected our net loss of $29.0 million, negative changes in our working capital of $105.3 million, depreciation, amortization and impairment charges of long-lived assets in an aggregate amount of $63.6 million, stock-based compensation of $33 million and foreign currency transactions gains of $9.1 million, which were partially offset by $39.1 million gain from deconsolidation of our former subsidiary MakerBot and $9.1 million of changes in other non-cash items, net. Changes in working capital of $105.3 million were mainly driven by an increase in inventory of $87.3 million as a result of increased purchases aimed at building up our inventory, as well as an increase in accounts receivables of $15.4 million, partially offset by an increase in accounts payable of $20.9 million, as a result of an increase in the level of our ongoing operations in the year ended December 31,2022.

*Year ended December 31, 2021*

We generated $35.8 million of cash from our operating activities during 2021. Cash generated in operations derived from our net loss of $62 million, as adjusted primarily due to non-cash items including depreciation, amortization and impairment charges of goodwill and long-lived assets in an aggregate amount of $57.5 million, and stock-based compensation of $31 million and foreign currency transactions gains and a movement in deferred income taxes, which were partially offset by $13.7 million movement in other non-cash items net. Favorable changes in our working capital balances were mainly driven by an increase in our accounts payable balance.

***Cash flows from investing activities***

*Year ended December 31, 2022*

We used $7.2 million of cash in our investing activities during 2022. The net cash use during 2022 mostly reflected $69.1 million used for investments in unconsolidated entities (mainly Ultimaker), and $13.6 million that we invested for the purchase of property and equipment, partially offset by net proceeds that we withdrew from short-term bank deposits.

*Year ended December 31, 2021*

We used $291.2 million of cash for our investing activities during 2021. We used $32.3 million of cash for recent acquisitions and investment in unconsolidated entities. An additional $25 million of cash was used to purchase property, equipment and intangibles and $232 million net was invested in short-term bank deposits. Our principal property and equipment purchases were for our new buildings complex under construction in Rehovot, Israel. The new facility in Rehovot, Israel, contains two buildings, housing our Israeli headquarters, research and development facilities and certain marketing activities.

***Cash flows from financing activities***

*Year ended December 31, 2022*

We used $2.8 million of cash in our financing activities during 2022. These financing activities were mostly related to contingent consideration that we paid for acquisitions.

*Year ended December 31, 2021*

We generated $227.3 million of cash from financing activities during 2021. The increase from financing activities was primarily due to the follow-on public offering of shares in a net amount of $218.9 million that we completed in March 2021.

Table of Contents

*Capital resources and capital expenditures*

Our total current assets amounted to $697.3 million as of December 31, 2022, of which $327.8 million consisted of cash, cash equivalents, short-term deposits and restricted cash. Total current liabilities amounted to $210.7 million as of December 31, 2022.

Most of our cash and cash equivalents are held in banks in Israel and the U.S.

The credit risk related to our accounts receivable is limited due to the relatively large number of customers and their wide geographic distribution. In addition, we seek to reduce the credit exposures of our accounts receivable by imposing credit limits, conducting ongoing credit evaluation, and by implementing account monitoring procedures, as well as by carrying credit insurance for many of our customers.

We believe that we will have adequate cash and cash equivalents to fund our ongoing operations and that these sources of liquidity will be sufficient to satisfy our working capital and capital expenditures needs, as well as our debt requirements, for the next twelve months.

*Additional factors potentially impacting capital resources*

We are obligated to our suppliers under ordinary course purchase orders in an aggregate amount of approximately $144.8 million as of December 31, 2022. All of those obligations will become due over the course of the 2023 year.

We have also committed to make potential future payments to third parties as part of our acquisitions of Origin and Xaar. These payments are contingent upon the occurrence of certain future events and, given the nature of these events, it is unclear when, if ever, we may be required to pay such amounts. The total contingent payments could reach an aggregate amount of up to $61 million.

**C. Research and Development, Patents and Licenses, Etc.**

For a discussion of our research and development policies, see "Research and Development" and "Regulation— Israeli Tax Considerations and Government Programs – Law for the Encouragement of Capital Investments" in Item 4.B above and the "Risks related to operations in Israel" in Item 3.D above.

**D. Trend Information.**

For trend information, see the Risk Factors described in Item 3.D above, the "Overview" and "Operating Results" sections of this Item 5 - "Operating and Financial Review and Prospects" and Item 4 - "Information on the Company" above.

**E. Critical Accounting Estimates**

For a description of our significant accounting policies, see note 1 to our consolidated financial statements included in Item 18 of this annual report.

The preparation of our consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions in certain circumstances that affect the amounts reported in the accompanying consolidated financial statements and related footnotes. Actual results may differ from these estimates. We base our judgments on our experience and on various assumptions that we believe to be reasonable under the circumstances.

91

Table of Contents

Of our policies, the following are considered the most critical to an understanding of our consolidated financial statements as they require the application of the most subjective and complex judgment, involving critical accounting estimates and assumptions impacting our consolidated financial statements. We have applied our policies and critical accounting estimates consistently across our businesses:

- Business combination

- Intangibles

- Goodwill

- Income taxes

We base our estimates on historical experience and on various other assumptions which we believe to be reasonable under the circumstances. Because of the uncertainty inherent in these matters, actual results could differ materially from the estimates we use in applying these policies.

***Business combination***

In accordance with ASC Topic 805, "Business Combination", we allocate the fair value of purchase consideration to the assets acquired and liabilities assumed based on their estimated fair values. The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill.

Fair value estimates are based on the assumptions management believes a market participant would use in pricing the asset or liability.

In the Company's recent acquisitions, intangible assets and goodwill represented a majority of the assets acquired. Assessing fair values of intangible assets acquired in a business combination involves significant judgment about future events and uncertainties and depends on estimates and assumptions. Significant estimates utilized in valuating intangible assets include discount rates and future expected cash flow, which rely upon assumptions such as the useful life of the assets, revenue growth rates and margins projections, technological obsolescence and income tax rate assumptions.

Contingent consideration incurred in a business combination is included as part of the consideration transferred and recorded at fair value as of the acquisition date. Estimating the fair value involves significant judgment and is based on significant assumptions relating to the estimate, such as discount rates, internal cash flows forecast for the relevant period during which the financial metrics should be achieved and the timing and amounts of the contingent payments.

Amounts recorded in a business combination in certain cases may be subject to revision based on the final determination of fair values during the measurement period, which may be up to one year from the acquisition date, as additional information about conditions existing at the acquisition date may become available. In addition, each reporting period thereafter, the Company revalues the contingent consideration payments and deferred payments which are classified as liabilities and records the changes in their fair value in the consolidated statements of operations and comprehensive loss.

On December 31, 2020 we acquired 100% of the outstanding shares of Origin Laboratories Inc. or "Origin" for an aggregate purchase price of $97.1 million, including cash and shares and we are obligated to pay additional payments (combination of cash and shares) subject to performance-based earnouts over 3 years.

On November 1, 2021 we acquired the remaining 55% equity interest of Xaar 3D, for aggregate consideration of $29.3 million. We paid cash upon closing and we are obligated to make additional earn-out payments and royalty payments on products and services sales for up to 15 years. We accounted for the transaction as a step acquisition and accordingly we increased the value of our previously held equity investment to its fair value of $23.8 million, which resulted in a total purchase price of $53.1 million and a gain of approximately $14.4 million.

See note 2 to our consolidated financial statements for further details on the business combination transactions.

Table of Contents

*Intangibles*

Most of our identifiable intangible assets were recognized as part of business combinations we have executed in the current and prior periods. Our identifiable intangible assets are considered definite life intangible assets and are primarily comprised of developed technology, trademarks and trade names, customer relationships and patents. Definite life intangible assets are amortized using the straight-line method over their estimated period of useful life.

Our determination of the fair value of the intangible assets acquired involves the use of significant estimates and assumptions. Refer to the "Business combination" section above. We believe that the fair value assigned to the assets acquired and liabilities assumed are based on reasonable assumptions and estimates that a market participant would use. Should conditions differ from management's estimates at the time of the acquisition, including changes in volume or timing to current expectations of future revenue growth rates and forecasted margins, or changes in market factors outside of our control, such as discount rates, material write-downs of intangible assets may be required, which would adversely affect our operating results.

We monitor events and changes in circumstances that could indicate carrying amounts of intangible assets may not be recoverable. We review the carrying amounts of our intangible assets for potential impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Impairment indicators may include any significant changes in the manner of our use of the assets or the strategy of our overall business, certain reorganization initiatives, significant negative industry or economic trends and significant decline in our share price for a sustained period.

When such events or changes in circumstances occur, we compare the carrying amounts of the asset or assets groups with their respective estimated undiscounted future cash flows. If the asset or assets group are determined to be impaired, an impairment charge is recorded in the amount by which the carrying amount of the asset or assets group exceed their fair value.

During the years ended December 31, 2022, and 2021, we did not record any impairment charges related to our definite life intangible assets.

In 2022, additional intangible assets of $5.2 million were recognized by us as part of our asset acquisition from Riven, a quality assurance company.

*Goodwill*

Goodwill reflects the excess of the consideration transferred plus the fair value of any non-controlling interest in the acquiree at the acquisition date over the fair values of the identifiable net assets acquired. Goodwill is not amortized but rather is tested for impairment annually at the reporting unit level, or whenever events or circumstances present an indication of impairment. The goodwill balance as of December 31, 2022 and 2021 resulted from our recent acquisitions. No goodwill impairment was recorded during the years ended December 31, 2022 and 2021.

Determining the fair value of our reporting units requires significant judgment, including judgments about the appropriate terminal growth rates, weighted average costs of capital and the amounts and timing of projected future cash flows. Fair value determinations are sensitive to changes in underlying assumptions, estimates, and market factors. Projected future cash flows are based on our most recent budget, forecasts and strategic plans as well as certain growth rate assumptions. Potential changes in our costs and operating structure, the expected timing of utilization of synergies, strategic opportunities, negative effect of exchange rates and overall weakness in the 3D printing marketplace, could negatively impact our near-term cash-flow projections and could trigger a potential impairment of our goodwill. In addition, failure to execute our strategic plans as well as increases in weighted average costs of capital could negatively impact the fair value of our reporting units, and increase the risk of goodwill impairment in the future.

Table of Contents

We will continue to monitor the fair value of our reporting units to determine whether events and changes in circumstances such as further deterioration in the business climate or operating results, further significant decline in our share price, changes in management's business strategy or downward changes of our cash flows projections, warrant further interim impairment testing.

See note 7 to our consolidated financial statements for further details on the goodwill impairment test in 2022.

### Income Taxes

Our effective tax rate is primarily impacted by the geographical mix of taxable income and loss. We record a tax provision for the anticipated tax consequences of our reported operating results. The provision for income tax is calculated based on our assumptions as to our entitlement to various benefits under the applicable tax laws and tax rates in the jurisdictions in which we operate. We are subject to income taxes in Israel, the U.S. and other foreign jurisdictions. Determination of taxable income in any jurisdiction requires the Company to interpret the related tax laws and regulations and the use of estimates and assumptions regarding significant future events, such as the amount, timing and character of deductions, permissible revenue recognition methods under the tax law and the sources and character of income and tax credits. Changes in tax laws, regulations, agreements and treaties, currency exchange restrictions or the Company's level of operations or profitability in each taxing jurisdiction could have an impact upon the amount of current and deferred tax balances and hence the Company's net income.

Significant judgment is required in evaluating our uncertain tax positions and determining our provision for income taxes. In evaluating the exposure associated with our various tax filing positions, we record reserves for uncertain tax positions in accordance with US GAAP, based on the technical support for the positions and our past audit experience with similar positions. For those tax positions where it is more likely than not that a tax benefit will be sustained, we record the largest amount of tax benefit with a greater than 50 percent likelihood of being realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information. For those income tax positions where it is not more likely than not that a tax benefit will be sustained, no tax benefit has been recognized in the financial statements. Although we believe our tax positions comply with applicable tax laws and we intend to defend our positions, no assurance can be given that the final tax outcome of these matters will not be different from that which is reflected in our historical income tax reserves and accruals. We adjust these reserves in light of changing facts and circumstances, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will impact the provision for income taxes in the period in which such determination is made. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate, as well as the related estimated interest and penalties. The Company's liability for these unrecognized tax benefits totaled $6.0 million at December 31, 2022 (see Note 9 to our consolidated financial statements for additional information).

We estimate the degree to which deferred tax assets will result in a benefit, after consideration of all positive and negative evidence, and provide a valuation allowance for deferred tax assets that we believe more likely than not will not be realized. In situations in which we are able to determine that our deferred tax assets will be realized, that determination generally relies on future reversals of taxable temporary differences and expected future taxable income. Significant judgment required in determining any valuation allowance recorded against deferred tax assets. In assessing the need for a valuation allowance, we considered all available evidence, including past operating results, the most recent projections for taxable income, and prudent and feasible tax planning strategies. We reassess our valuation allowance periodically and if future evidence allows for a partial or full release of the valuation allowance, we reverse the related valuation allowance. Any such reversals are recorded as a reduction of our tax provision. The tax valuation allowance totaled $699.7 million at December 31, 2022 (see Note 9 to our consolidated financial statements for additional information). Should our actual future taxable income by tax jurisdiction vary from estimates, additional allowances or reversals thereof may be necessary.

94

Table of Contents

**ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES.**

**A. Directors and Senior Management.**

The following table lists the names and ages of our current directors, as well as the names, ages and positions of the current members of our senior management, as of the filing date of this annual report:

| Name | Age | Position |
|---|---|---|
| Dov  Ofer | 68 | Chairman of the Board of Directors |
| S. Scott Crump | 69 | Director |
| John J. McEleney | 60 | Director |
| Ziva Patir | 72 | Director |
| David Reis | 62 | Director |
| Michael Schoellhorn | 57 | Director |
| Yair Seroussi | 67 | Director |
| Adina Shorr | 62 | Director |
| Yoav Zeif | 56 | Chief Executive Officer |
| Eitan Zamir | 46 | Chief Financial Officer |

*Dov Ofer* has served as our Chairman of the Board since May 2020 and as a director since July 2017. While serving as a director (prior to his appointment as our Chairman), Mr. Ofer served on the oversight committee of the Board, which guided our executive management during an interim period prior to the appointment of our current, permanent chief executive officer. Mr. Ofer served as the Chief Executive Officer of Lumenis Computerized Systems Ltd. From 2007 to 2013, Mr. Ofer served as Chief Executive Officer of Lumenis Ltd. (Nasdaq: LMNS), a medical laser device company. From 2005 to 2007, he served as Corporate Vice President and General Manager of HP Scitex (formerly a subsidiary of Scailex Corporation Ltd. (TASE: SCIX)), a producer of large format printing equipment. From 2002 to 2005, Mr. Ofer served as President and Chief Executive Officer of Scitex Vision Ltd. Prior to joining Scitex, Mr. Ofer held various managerial positions in the emerging Israeli high-tech sector and participated in different mergers and acquisitions within the industry. Currently, Mr. Ofer serves as chairman of Hanita Coatings RCA Ltd., chairman of Plastopil Hazorea Company Ltd. (TASE: PPIL), vice chairman of Scodix Ltd. and director of Kornit Digital Ltd. and Orbix Medical Ltd. He holds a B.A. in Economics from the Hebrew University in Israel as well as an M.B.A. from the University of California Berkeley in California.

*S. Scott Crump* has served as our director since November 2021. Mr. Crump previously served as our Chairman of the Executive Committee of the Board and our Chief Innovation Officer from February 2015 and February 2013, respectively, in each case until May 2020, at which time he was appointed our Chief External Affairs and Innovation Officer, which he served as through August 2020. Mr. Crump also served from June 2018 through March 2020 on the oversight committee of our Board that helped to support our interim chief executive officer in the management of our company during an interim period, and our current CEO, Mr. Yoav Zeif, during Mr. Zeif's initial period at our company. Since leaving his position as a director on the Board, has served as the technology consultant to the Board. Mr. Crump previously served as Chairman of the Board of our company from the Stratasys, Inc.- Objet Ltd. merger until February 2015, as Chairman, Chief Executive Officer, President, Treasurer and a director of Stratasys, Inc. from its inception in 1988 until the Stratasys, Inc.- Objet Ltd. merger, and as Chief Financial Officer of Stratasys from February 1990 to May 1997. Mr. Crump was, with Lisa H. Crump, his wife, a co-founder of Stratasys, Inc., and he is the inventor of our FDM technology. Mr. Crump holds a B.S. in mechanical engineering from Washington State University.

95

Table of Contents

*John J. McEleney* has served as a director of our Company since the Stratasys, Inc.- Objet Ltd. merger, and, before that, as a director of Stratasys, Inc. from 2007 until the Stratasys, Inc.- Objet Ltd. merger. He is the co-founder of Onshape Inc., a venture backed start-up company focused on applying modern computing to the 3D product design market. Prior to Onshape he was the Chief Executive of Cloud Switch, which was acquired by Verizon. He served as a director of SolidWorks Corporation, a wholly owned subsidiary of Dassault Systemes S.A. (Nasdaq: DASTY), from June 2000 to May 2008, and also served as its Chief Executive Officer from 2001 until June 2007. Mr. McEleney joined SolidWorks in 1996, serving in several capacities, including Chief Operating Officer and Vice President, Americas Sales. Prior to joining SolidWorks, Mr. McEleney held several key management positions at CAD software pioneer Computervision and at defense contractor Raytheon. Mr. McEleney also serves as a director of Newforma, a privately held software company. He holds a B.S. in Mechanical Engineering from the University of Rochester, an M.S. in Manufacturing Engineering from Boston University and an M.B.A. from Northeastern University.

*Ziva Patir* has served as our director since June 2013. Ms. Patir serves on the board of directors of ABRA, a public company providing IT services and IT consulting. She also serves on the board of directors of A. Luzon Real Estate & Finance, an investing and financing real-estate company. Ms. Patir serves as a consultant to governments on issues of strategy and compliance, risk-based regulatory enforcement activities, standardization and policy. Since 2022, she serves as the Chair of the Board of the HaBima National Theatre of Israel in Tel Aviv, Israel. Ms. Patir also serves as a member of the board of Lahav at Tel-Aviv University, the leading provider of executive education in Israel. Ms. Patir served as the Vice President of Standards, Policy and Sustainability for Better Place, an infrastructure electrical vehicles company providing technology design and service for switchable battery cars, a position that she held from 2008 until May 2013. From 2008 to 2010, she served as Chair of the Board of the Road Safety Authority (RSA) in Israel. From 1996 to 2008, Ms. Patir held the position of Director General of the Standard Institution of Israel (SII). From 2004 to 2008, Ms. Patir served as Vice President of the International Organization for Standardization (ISO), the world's largest developer and publisher of international standards, as well as chair of the Technical Management Board, leading overall management of ISO technical work.  From 1998 to 2000, Ms. Patir was a member of the International Electrotechnical Commission Council Board. Ms. Patir is a Certified Quality Engineer and holds a B.Sc. in Chemistry from Tel-Aviv University and a M.Sc. in Chemistry/Polymer Science from the Weizmann Institute of Science.

*David Reis* has served as our director from June 2013 to the present time. For parts of that period, he served as our Vice Chairman of the Board, as an Executive Director and as a key member of the oversight committee of the Board, which guided our executive management during an interim period prior to the appointment of our current, permanent chief executive officer. Since 2017, Mr. Reis serves as Chairman at Enercon Technologies Ltd., Tuttnauer Ltd and Highcon Ltd. He also served as a Director of Objet from 2003 until the closing of the Stratasys-Objet merger. Mr. Reis served as the Stratasys Chief Executive Officer from March 2009 until June 30, 2016 (and, prior to the Stratasys-Objet merger, as Objet's CEO). Previously, he served as Chief Executive Officer and President of NUR Macroprinters Ltd. (NURMF.PK), a wide format printer manufacturer that was acquired by HP, from February 2006 to March 2008. Prior to joining NUR, Mr. Reis served as the Chief Executive Officer and President of ImageID, an automatic identification and data capture solution provider, and of Scitex Vision (Nasdaq & TASE: SCIX), a developer and manufacturer of wide-format printers. Mr. Reis holds a B.A. in Economics and Management from the Technion-Israel Institute of Technology and an M.B.A. from the University of Denver. Reis is also a graduate of the Harvard Business School Advanced Management Program.

*Michael Schoellhorn* has served as our director since November 2020. Since February 2019 Mr. Schoellhorn has served as Airbus' (Toulouse, France) Chief Operating Officer and a member of its Executive Committee. He has been a member of the Supervisory Board of Airbus Operations GmbH, Hamburg since 2019 and was appointed as its chairman in 2020. Prior to joining Airbus, Mr. Schoellhorn served as Chief Operating Officer and a member of the Management Board at BSH Home Appliances GmbH (Munich, Germany), a leading manufacturer of home appliances owned by the Robert Bosch Group (Stuttgart,Germany), from January 2015 until 2019. Prior to that, Mr. Schoellhorn started his career as a management trainee with Bosch in 1999 and held various operational senior management positions in the automotive sector of Robert Bosch GmbH - in the US, the Czech Republic, and Germany, until he was appointed Executive Vice President for Manufacturing and Quality in 2012. Mr. Schoellhorn studied at IMD Business School (Lausanne, Switzerland), Tepper School of Business (Pittsburgh, USA), Bosch-Carnegie-Institute (Pittsburgh, USA), and the Robert-Bosch-Kolleg (Stuttgart, Germany). He holds a degree in Mechanical Engineering and a PhD in Control Engineering, both from the Helmut Schmidt University. Mr. Schoellhorn served in the German armed forces, as an officer and a helicopter pilot, from 1984 until 1994. He is a member of the presidency of BDLI (the German aerospace industries association), and of the Baden Baden Entrepreneur Talks, a discussion forum for German business and political leaders.

96

Table of Contents

*Yair Seroussi* has served as our director since July 2017. Mr. Seroussi has served as an independent director at DSP Group, Inc. (Nasdaq: DSPG) since February 2002. He serves as a Member of the Advisory Team at SkyFund, a leading mid-market Israeli private equity fund. He is a member of the Board of Governors of the Hebrew University, and Chairman of the Eli Hurvitz Strategic Management Institute at the Tel Aviv University. Mr. Seroussi served as chairman of the board of Bank Hapoalim from 2009 through 2016. Mr. Seroussi also served as the president of the Israeli Bank Association for four years. He served as a board member and as chairman of the audit committee of Bank Hapoalim from 1997 through 2002. Mr. Seroussi was the founder and head or Morgan Stanley Israel for 16 years. He was the founder and chairman of the Mustang Mezzanine Fund. He served as the chairman of the Investment Committee of Mivtachim, Israel's largest pension fund, and was a member of various investments committees of private equity funds. Mr. Seroussi served as a director of Israel Corp and Frutarom Industries. Mr. Seroussi also served for over a decade in Israel's Ministry of Finance, where he held several senior positions. Between the years 1988-199, he served as Head of the Office of the Ministry of Finance in the U.S. and Head of the Commodities Division in NY. In 1991-1992, Mr. Seroussi was a member of the team that created the Yozma Program that initiated the Venture Capital industry in Israel. He holds a Bachelor's degree in Economics and Political Science from the Hebrew University.

*Adina Shorr* has served as our director since having been appointed by the Board in July 2018, and was re-elected by our shareholders at our 2018 annual general meeting of shareholders. Ms. Shorr has been the Chief Executive Officer of Scodix, a company that provides solutions to commercial printers, since September 2018. Prior to that time, she served as Chief Executive Officer and Chairman of the Board of Lucidlogix Technologies Ltd. from November 2013 to August 2018. Before that, Ms. Shorr had served as the Chief Executive Officer of CellGuide Ltd. (which was acquired by Lucidlogix) from October 2009 through October 2013. Ms. Shorr served as the Chief Executive Officer and President of Objet Ltd. (formerly known as Objet Geometries, Ltd.), one of the two predecessor companies to Stratasys Ltd., for a six-year period ending in March 2009, and also served as its President. She has extensive experience in leadership and management of technology, systems and solutions stemming from her over twenty-year career in the high-tech sector, both in the United States and Israel. She served as Corporate Vice President of Leaf Products at Creo Inc. from March 2000 to March 2003, where she initiated and led in 2000 the establishment of Leaf Products, a start-up for professional digital photography within Creo. Prior to that time, Ms. Shorr served for nine years at Scitex, four years of which she served as the President of the Scitex Input Division. Beginning in 1991, she worked in the United States for IBM in a sales support capacity and for Unisys in Program Management and was responsible for the management of the business facets of the Unisys Network Computing Division. Ms. Shorr has served as a director of Advanced Vision Technology Ltd. since June 2014 and was a director of Objet Geometries Ltd. and then Stratasys Ltd. from May 2012 to June 2013. Ms. Shorr holds an MBA and a BA, both with honors, from Michigan State University in East Lansing, Michigan.

*Yoav Zeif* has served as our chief executive officer since February 18, 2020. Prior to joining our company, from 2018 until February 2020, Mr. Zeif was a partner in the New York office of McKinsey & Company, a global strategic advisory firm that is based in New York. Before serving in that role, Mr. Zeif served as President of the Americas Division, Head of Product Offering and Chief Commercial Officer at Netafim, the world's largest micro-irrigation company, from 2013 to 2018. Prior to that, he served as Senior Vice President of Products and Marketing at Makhteshim (now Adama Ltd.), a global crop-protection company, where he managed the entire portfolio of products and all global commercial relationships. Yoav obtained an Executive MBA from the Kellogg School of Management at Northwestern University and a Ph.D. in International Economics from Bar-Ilan University.

*Eitan Zamir* has served as our Chief Financial Officer since February 2022. He joined Stratasys in 2019 and thereafter has overseen all external financial reporting, accounting, tax, treasury, and Sarbanes-Oxley compliance for the organization along with extensive involvement in capital raising and M&A activities. Prior to joining Stratasys, Mr. Zamir was a Partner at Price Waterhouse Coopers (PwC), based in Tel Aviv and New York. Mr. Zamir is a certified public accountant who earned his bachelor's degree, with honors, in accounting and economics from the Hebrew University in Jerusalem, and a Master of Science with an emphasis in financial management from Tel Aviv University.

97

Table of Contents

**Arrangements for Election of Directors and Members of Management; Family Relationships**

There are no arrangements or understandings pursuant to which any of our directors or members of senior management were selected for their roles. There are also no family relationships among any directors or members of our senior management.

**B. Compensation.**

The following table presents all compensation that we paid, or accrued, during the year ended December 31, 2022 to all persons who served as a director or as a member of senior management of our company at any time during the year. The table includes amounts that we paid to reimburse any of these persons for costs incurred in providing us with services during that period.

| | Salaries, Fees, Bonuses Commissions, and Related Benefits Paid or Accrued [1] | Pension, Retirement and Other Similar Benefits Accrued |
|---|---|---|
| All directors and members of senior management as a group [2] | $          2,360,953[3] | $          254,319 |

*The amount 2,360,953 below should ONLY include payment related to 2021 (2021 bonus).

(1)    Does not include the value attributable to stock option or restricted stock unit (RSU) grants. For a discussion of stock option and RSU grants to our directors and members of senior management, see below.

(2)    Comprised of the current directors and senior management members listed in the table under "Directors and Senior Management" in Item 6.A above.

(3)    This compensation amount for the year ended December 31, 2022 excludes an aggregate of $0.8 million of bonuses that were paid in 2022 in respect of services that had been performed during the previous year.

Pursuant to the Companies Law, the fees payable to our directors and our chief executive officer require approval by (i) the compensation committee of our board, (ii) the board of directors and (iii) our shareholders (in that order). Please see "Compensation Policy and Committee" in Item 6.C ("Board Practices") below for further information regarding the requirements under the Companies Law in connection with the compensation of directors.

98

Table of Contents

### Director Compensation

The following table sets forth the directors' fees, salary or other compensation (excluding value attributable to RSU grants and stock option grants, and excluding reimbursement for reasonable expenses incurred in connection with services) that are payable to each of our current directors, as most recently approved by our shareholders at our November 2021 annual general meeting of shareholders:

| Name of Director | Annual Fee/Salary [1] | | Annual Board Committee Retainer (and/or Chairman Retainer) |
|---|---|---|---|
| Dov Ofer | $ | 200,000[2] | - |
| S. Scott Crump | $ | 60,000 | - |
| John J. McEleney | $ | 60,000 | $ 30,000[3] |
| Ziva Patir | $ | 60,000 | $ 10,000[4] |
| David Reis | $ | 60,000 | $ 10,000[5] |
| Michael Schoellhorn | $ | 60,000 | - |
| Yair Seroussi | $ | 60,000 | $ 20,000[6] |
| Adina Shorr | $ | 60,000 | $ 10,000[7] |

(1)   The amounts reflected in the "Annual Fee/Salary" column do not include additional annual retainer amounts payable to each director who serves (including as chairman) on a committee of our board of directors, which additional amounts are reflected in the "Annual Board Committee Retainer (and/or Chairman Retainer)" column.

(2)   Mr. Ofer's compensation as our Chairman of the Board was approved by our shareholders at our 2020 annual general meeting of shareholders in November 2020.

(3)   Consists of the $20,000 annual retainer for serving as chairman of the compensation committee, plus a $10,000 annual retainer for serving on the audit committee.

(4)   Constitutes the $10,000 annual retainer for serving on the compensation committee.

(5)   Constitutes the $10,000 annual retainer for serving on the compensation committee

(6)   Constitutes the $20,000 annual retainer for serving as chairman of the audit committee.

(7)    Constitutes the $10,000 annual retainer for serving on the audit committee.

99

Table of Contents

***Director/Officer Equity Compensation***

*Grants to independent/non-employee directors*

At our 2021 annual general meeting of shareholders, our shareholders (in addition to approving the above-listed annual cash fee amounts) approved the following annual equity package for each of our independent and/or non-executive directors, which, as of the present time, includes all current members of the board:

**Value of Grants:** Annual grants of $140,000 value, consisting of 50% RSUs (with $70,000 value) and 50% options to purchase ordinary shares (with $70,000 value).

**Deemed Value of RSUs/options**: The number of RSUs to be granted will be determined by dividing $70,000 by the fair market value of a single ordinary share, determined based on the average of the closing prices of an ordinary share on the trading days during the 30-day period following the annual general meeting at which the director is elected or re-elected. The number of options to be granted will be determined by dividing $70,000 by the Black-Scholes value of an option to purchase one ordinary share, as of the date of the annual general meeting of shareholders at which the director is elected or re-elected.

**Exercise Price (for options)**: Equal to the fair market value of our ordinary shares, determined based on the average of the closing prices of an ordinary share on the trading days during the 30-day period following the election or re-election of the director by our shareholders.

**Vesting Schedule**: Each of the RSUs and options vest equally on a monthly basis until the earlier of (i) the first anniversary of the grant date, or (ii) the end of the term of the applicable director at the next annual general meeting of shareholders after the grant date, at which such director's directorship may be extended or terminated (which we refer to as the Full Vesting Date), provided that all such RSUs and options shall be fully vested at the Full Vesting Date.

**Other Terms:** The other terms of the RSUs/ options to purchase ordinary shares granted annually to our non-employee directors shall be in accordance with our then-effective equity incentive plan (currently, our 2022 Share Incentive Plan(defined below)). For a description of the terms of our stock option and share incentive plans, see "Share Ownership - Stock Option and Share Incentive Plans" in Item 6.E below.

100

Table of Contents

*Office Holder Compensation*

The table below outlines the compensation granted to our five most highly compensated senior office holders during or with respect to the year ended December 31, 2022, in the disclosure format of Regulation 21 of the Israeli Securities Regulations (Periodic and Immediate Reports), 1970. We refer to the five individuals for whom disclosure is provided herein as our "Covered Executives."

For purposes of the table and the summary below, and in accordance with the above-mentioned securities regulations, "compensation" includes base salary, bonuses, equity-based compensation, retirement or termination payments, benefits and perquisites such as car, phone and social benefits and any undertaking to provide such compensation.

*Summary Compensation Table*

**Information Regarding the Covered Executive[1]**

| Name and Principal Position [2] | Base Salary | | Variable Compensation [3] | | Benefit and Perquisites [4] | | Total Compensation, Excluding Equity-Based Compensation | | Equity-Based Compensation [5] | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Yoav Zeif, CEO | $ | 626,158 | $ | 488,404 | $ | 246,628 | $ | 1,361,190 | $ | 2,075,994 | $ | 3,437,184 |
| Guy Yair, ROW President | | 339,298 | | 135,595 | | 132,373 | | 607,266 | | 580,829 | $ | 1,188,096 |
| Omer Kreiger, EVP Products | | 336,515 | | 131,229 | | 119,313 | | 587,058 | | 558,315 | $ | 1,145,373 |
| Richard Garrity, Chief Industrial Business Unit Officer | | 333,512 | | 145,107 | | 32,897 | | 511,516 | | 576,462 | $ | 1,087,978 |
| Yossi Azarzar, COO | $ | 322,024 | $ | 142,740 | $ | 109,683 | $ | 574,447 | $ | 465,608 | $ | 1,040,055 |

(1)    All amounts reported in the table are in terms of cost to the Company in U.S. dollars, as recorded in our financial statements.

(2)    All current executive officers listed in the table are full-time employees or consultants of our company. Cash compensation amounts denominated in currencies other than the U.S. dollar were converted into U.S. dollars at the average conversion rate for 2022.

(3)    Amounts reported in this column refer to commission, incentive and the maximum contractual bonus payments potentially payable for 2022.

Table of Contents

(4)    Amounts reported in this column include benefits and perquisites, including those mandated by applicable law. Such benefits and perquisites may include, to the extent applicable to the Covered Executive, payments, contributions and/or allocations for savings funds, pension, severance, vacation, house or house allowance, car or car allowance, medical insurances and benefits, risk insurances (e.g., life, disability, accident), convalescence pay, payments for social security, tax gross-up payments, sign-up and relocation bonus and other benefits and perquisites consistent with our guidelines.

(5)    Amounts reported in this column represent the expense recorded in our financial statements for the year ended December 31, 2022 with respect to equity-based compensation. Equity-based compensation is determined based on the awards' fair value on their grant date. Assumptions and key variables used in the calculation of such amounts are described in Note 11 to our audited consolidated financial statements, which are included in Item 18 of this annual report.

Members of our senior management are eligible for bonuses each year. The bonuses are payable upon meeting objectives and targets that are set annually by our Chief Executive Officer and approved by our compensation committee and our board of directors, in that order. These same corporate bodies also set the bonus targets for our Chief Executive Officer. In accordance with a December 2012 amendment to the Companies Law, we have adopted a compensation policy that governs the compensation of our directors and senior management and which has been approved (both initially, and then in updated form) by (i) the compensation committee of our board, (ii) the board of directors and (iii) our shareholders (most recently, at our September 2018 annual general meeting of shareholders) (in that order). Please see "Compensation Policy and Committee" in Item 6.C ("Board Practices") below for further information.

## C. Board Practices.

### Board of Directors

Under the Companies Law, the management of our business is vested in our board of directors. Our board of directors may exercise all powers and may take all actions that are not specifically granted to our shareholders or to management. Our board of directors serves as the primary corporate body responsible for risk management for our company, including cybersecurity risks, and periodically consults with the management of our company to obtain updates concerning, and internally discusses, the most material risks currently facing our company, and how those risks are being mitigated. Our executive officers are responsible for our day-to-day management and have individual responsibilities established by our board of directors. Our Chief Executive Officer is appointed by, and serves at the discretion of, our board of directors, subject to the employment agreement that we have entered into with him. All other executive officers are also appointed by our board of directors, subject to the terms of any applicable employment agreements that we may enter into with them.

Under our amended articles, our board of directors must consist of at least seven and not more than 11 directors, including, to the extent applicable, at least two external directors required to be elected under the Companies Law.

In May 2016, we elected to be governed by a then-newly-adopted exemption under the Companies Law regulations that exempts us from appointing external directors and from complying with the Companies Law requirements related to the composition of the audit committee and compensation committee of our board of directors. Our eligibility for that exemption is conditioned upon: (i) the continued listing of our ordinary shares on the Nasdaq Stock Market (or one of a few select other non-Israeli stock exchanges); (ii) there not being a controlling shareholder (generally understood to be a 25% or greater shareholder) of our company under the Companies Law; and (iii) our compliance with the Nasdaq Listing Rules requirements as to the composition of (a) our board of directors-which requires that we maintain a majority of independent directors (as defined under the Nasdaq Listing Rules) on our board of directors and (b) the audit and compensation committees of our board of directors (which require that such committees consist solely of independent directors (at least three and two members, respectively), as described under the Nasdaq Listing Rules). At the time that it determined to exempt our company from the external director requirement, our board affirmatively determined that we meet the conditions for exemption from the external director requirement, including that a majority of the members of our board, along with each of the members of the audit and compensation committees of the board, are independent under the Nasdaq Listing Rules.

Table of Contents

As a result of our election to be exempt from the external director requirement under the Companies Law, each of our directors is elected annually, at our annual general meeting of shareholders. The vote required for the election of each director is a majority of the voting power represented at the meeting and voting on the election proposal. Following our 2022 annual general meeting of shareholders that took place in September 2022, the current members of our board consist of the Chairman - Dov Ofer, S.Scott Crump, John J. McEleney (Chairman of the Compensation Committee), Ziva Patir, David Reis, Michael Schoellhorn, Yair Seroussi (Chairman of the Audit Committee) and Adina Shorr. For more information, please see "Election of Directors" in Item 10.B ("Memorandum and Articles of Association") below.

Our board of directors may appoint directors to fill vacancies on the board, for a term of office equal to the remaining period of the term of office of the director(s) whose office(s) have been vacated.

In accordance with the exemption available to foreign private issuers under the Nasdaq Listing Rules, we do not follow the requirements of the Nasdaq rules with regard to the process of nominating directors. Instead, we follow Israeli law and practice, in accordance with which our board of directors (based on the recommendation of the executive committee thereof) is authorized to recommend to our shareholders director nominees for election. Under the Companies Law and our amended articles, nominations for directors may also be made by any shareholder holding at least one percent (1%) of our outstanding voting power. However, any such shareholder may make such a nomination only if a written notice of such shareholder's intent to make such nomination (together with certain documentation required under the Companies Law) has been delivered to our registered Israeli office within seven days after we publish notice of our upcoming annual general meeting (or within 14 days after we publish a preliminary notification of an upcoming annual general meeting).

In addition to its role in making director nominations, under the Companies Law, our board of directors must determine the minimum number of directors who are required to have accounting and financial expertise. Under applicable regulations, a director with accounting and financial expertise is a director who, by reason of his or her education, professional experience and skill, has a high level of proficiency in and understanding of business accounting matters and financial statements. See "—External Directors" in this Item 6.C below. He or she must be able to thoroughly comprehend the financial statements of the company and initiate debate regarding the manner in which financial information is presented. In determining the number of directors required to have such expertise, our board of directors must consider, among other things, the type and size of our company and the scope and complexity of its operations. Our board of directors has determined that our company requires one director with such expertise.

*External Directors*

Under the Companies Law, the boards of directors of companies whose shares are publicly traded, including companies with shares traded in the United States, are generally required to include at least two members who qualify as external directors.

Our election to exempt our company from compliance with the external director requirement can be reversed at any time by our board of directors, in which case we would need to hold a shareholder meeting to once again appoint external directors, whose election would be for a three-year term. The election of each external director would require a majority vote of the shares present and voting at a shareholders meeting, provided that either:

- the majority voted in favor of election includes a majority of the shares held by non-controlling shareholders who do not have a personal interest in the election of the external director (other than a personal interest not deriving from a relationship with a controlling shareholder) that are voted at the meeting, excluding abstentions, which we refer to as a disinterested majority; or

- the total number of shares held by non-controlling, disinterested shareholders (as described in the previous bullet-point) voted against the election of the director does not exceed two percent (2%) of the aggregate voting rights in the company.

The term "controlling shareholder" is defined in the Companies Law as a shareholder with the ability to direct the activities of the company, other than by virtue of being an office holder. A shareholder is presumed to be a controlling shareholder if the shareholder holds 50% or more of the voting rights in a company or has the right to appoint the majority of the directors of the company or its general manager (i.e., its CEO).

For further information concerning the Companies Law provisions related to external directors, please see "Item 6. Directors, Senior Management and Employees-C. Board Practices-Board of Directors-External Directors" in our annual report on Form 20-F for the year ended December 31, 2015, which we filed with the SEC on March 21, 2016.

Table of Contents

***Board Committees***

*Audit Committee*

Under the Companies Law, the board of directors of a public company must appoint an audit committee. The audit committee must consist of at least three directors. To the extent a company is required to appoint external directors, this committee must include all of the external directors, one of whom must serve as chairman of the committee. There are additional requirements as to the composition of the audit committee under the Companies Law. However, when we elected to exempt our company from the external director requirement, we concurrently elected to exempt our company from all of such requirements (which exemption is conditioned on our fulfillment of all Nasdaq listing requirements related to the composition of the audit committee).

The members of our audit committee consist of John McEleney, Yair Seroussi and Adina Shorr. Mr. Seroussi serves as chairman of the committee. Our board of directors has determined that each of Messrs. McEleney and Seroussi, and Ms. Shorr, meets the independence requirements set forth in the Listing Rules of the Nasdaq Stock Market and in Rule 10A-3 under the Exchange Act.

Our board of directors has determined that Mr. Seroussi qualifies as an audit committee financial expert, as defined under Item 16A of the SEC's Form 20-F, and has the requisite financial sophistication set forth in the Nasdaq rules and regulations.

Our board of directors has adopted an audit committee charter that sets forth the responsibilities of the audit committee consistent with the rules of the SEC and the Listing Rules of the Nasdaq Stock Market, as well as the requirements for such committee under the Companies Law, including the following:

- oversight of our independent registered public accounting firm and recommending the engagement, compensation or termination of engagement of our independent registered public accounting firm to the board of directors in accordance with Israeli law;

- recommending the engagement or termination of the person filling the office of our internal auditor; and

- recommending the terms of audit and non-audit services provided by the independent registered public accounting firm for pre-approval by our board of directors.

Our audit committee provides assistance to our board of directors in fulfilling its legal and fiduciary obligations in matters involving our accounting, auditing, financial reporting, internal control and legal compliance functions by pre-approving the services performed by our independent accountants and reviewing their reports regarding our accounting practices and systems of internal control over financial reporting. Our audit committee also oversees the audit efforts of our independent accountants and takes those actions that it deems necessary to satisfy itself that the accountants are independent of management.

Under the Companies Law, our audit committee is responsible for (i) determining whether there are deficiencies in the business management practices of our company, including in consultation with our internal auditor or the independent auditor, and making recommendations to the board of directors to improve such practices, (ii) determining whether to approve certain related party transactions (including transactions in which an office holder has a personal interest and whether such transaction is extraordinary) (see "-Approval of related party transactions under Israeli Law" below in this Item 6.C), (iii) determining standards and policies for determining whether a transaction with a controlling shareholder or a transaction in which a controlling shareholder has a personal interest is deemed insignificant or not and the approval requirements (including, potentially, the approval of the audit committee) for transactions that are not insignificant including the types of transactions that are not insignificant, (iv) where the board of directors approves the working plan of the internal auditor, to examine such working plan before its submission to the board and propose amendments thereto, (v) examining our internal controls and internal auditor's performance, including whether the internal auditor has sufficient resources and tools to dispose of its responsibilities, (vi) examining the scope of our auditor's work and compensation and submitting a recommendation with respect thereto to our board of directors or shareholders, depending on which of them is considering the appointment of our auditor and (vii) establishing procedures for the handling of employees' complaints as to the management of our business and the protection to be provided to such employees. Our audit committee may not approve an action or a related party transaction, or take any other action required under the Companies Law, unless at the time of approval a majority of the committee's members are present, which majority consists of unaffiliated directors including at least one external director.

104

Table of Contents

*Compensation Committee and Compensation Policy*

Following the adoption of a December 2012 amendment to the Companies Law, we appointed a compensation committee and established a policy regarding the terms of engagement of office holders, or a compensation policy. Such compensation policy was set by our board, after considering the recommendations of our newly-appointed compensation committee, and was approved by our shareholders in September 2013. In February 2015 and again in September 2018 and November 2021, following approval by our compensation committee and board, our shareholders approved amended and restated versions of our compensation policy at an extraordinary general meeting of shareholders and at our 2018 and 2021 annual general meetings of shareholders (respectively).

The compensation policy serves as the basis for decisions concerning the financial terms of employment or engagement of our office holders, including exculpation, insurance, indemnification or any monetary payment or obligation of payment in respect of employment or engagement. The compensation policy also relates to certain factors, including advancement of our objectives, our business and our long-term strategy, and creation of appropriate incentives for executives. It also considers, among other things, our risk management, size and the nature of our operations. The compensation policy furthermore considers the following additional factors:

- the knowledge, skills, expertise and accomplishments of the relevant director or executive;

- the director's or executive's roles and responsibilities and prior compensation agreements with him or her;

- the relationship between the terms offered and the average compensation of the other employees of our company, including those (if any) employed through manpower companies;

- the impact of disparities in salary upon work relationships in our company;

- the possibility of reducing variable compensation at the discretion of the board of directors; and the possibility of setting a limit on the exercise value of non-cash variable compensation; and

- as to severance compensation, the period of service of the director or executive, the terms of his or her compensation during such service period, our company's performance during that period of service, the person's contribution towards our company's achievement of its goals and the maximization of its profits, and the circumstances under which the person is leaving our company.

The compensation policy also includes the following principles:

- the link between variable compensation and long-term performance and measurable criteria;

- the relationship between variable and fixed compensation, and the ceiling for the value of variable compensation;

- the conditions under which a director or executive would be required to repay compensation paid to him or her if it was later shown that the data upon which such compensation was based was inaccurate and was required to be restated in our financial statements; and

- the minimum holding or vesting period for variable, equity-based compensation.

The compensation policy must also consider appropriate incentives from a long-term perspective and maximum limits for severance compensation.

Table of Contents

Under the December 2012 amendment to the Companies Law, our compensation committee is responsible for recommending the compensation policy to our board of directors for its approval (and subsequent approval by our shareholders) and is charged with duties related to the compensation policy and to the compensation of our office holders as well as functions related to approval of the terms of engagement of office holders, including:

- recommending whether our compensation policy should continue in effect, if the then-current policy has a term of greater than three (3) years (approval of the continuation of an existing compensation policy for a company such as ours must in any case occur every three years);

- recommending to our board periodic updates to the compensation policy;

- assessing implementation of the compensation policy; and

- determining whether the compensation terms of the chief executive officer of our company need not be brought to approval of the shareholders (under special circumstances).

As to the composition of the compensation committee, under the Companies Law, if a company is required to appoint external directors, the committee must consist of at least three (3) members, including all of the external directors, one of whom must serve as chairman of the committee. There are additional requirements as to the composition of the audit committee under the Companies Law. However, when we elected to exempt our company from the external director requirement, we concurrently elected to exempt our company from all of such requirements (including the three-member minimum). Our exemption under the Companies Law is conditioned on our fulfillment of all Nasdaq listing requirements related to the composition of the compensation committee.

The compensation committee is subject to the same Companies Law restrictions as the audit committee as to who may not be present during committee deliberations (as described under "-Approval of Related Party Transactions Under Israeli Law—Fiduciary Duties of Directors and Executive Officers—Disclosure of Personal Interests of an Office Holder" below).

The Nasdaq Listing Rules also require that the compensation of the chief executive officer and all other executive officers of our company be determined, or be recommended to the board for determination, by a compensation committee consisting solely of independent directors (subject to a minimum of two committee members).

We initially appointed our compensation committee in mid-2013. The committee currently consists of John McEleney, Ziva Patir and David Reis. John McEleney serves as chairman of the committee. Our board of directors has determined that each of Mr. McEleney, Ms. Patir and Mr. Reis meets the independence requirements set forth in the Listing Rules of the Nasdaq Stock Market and in Rule 10C-1 under the Exchange Act.

*Nominating Committee*

Our board of directors does not currently have a nominating committee, as director nominations are made in accordance with the terms of our articles, as described in "-Board of Directors" above. We rely upon the exemption available to foreign private issuers under the Listing Rules of the Nasdaq Stock Market from the Nasdaq listing requirements related to independent director oversight of nominations to our board of directors and the adoption of a formal written charter or board resolution addressing the nominations process. Also see Item 16.G "Corporate Governance" below.

Table of Contents

*Internal Auditor*

Under the Companies Law, the board of directors of an Israeli public company must appoint an internal auditor recommended by the audit committee and nominated by the board of directors. An internal auditor may not be:

- a person (or a relative of a person) who holds more than 5% of the company's outstanding shares or voting rights;

- a person (or a relative of a person) who has the power to appoint a director or the general manager of the company;

- an office holder (including a director) of the company (or a relative thereof); or

- a member of the company's independent accounting firm, or anyone on his or her behalf.

The role of the internal auditor is to examine, among other things, our compliance with applicable law and orderly business procedures. Irena Ben-Yakar, of Deloitte Israel & Co. has served as our internal auditor since February 2021.

**Approval of Related Party Transactions Under Israeli Law**

***Fiduciary Duties of Directors and Executive Officers***

The Companies Law codifies the fiduciary duties that office holders owe to a company. Each person listed in the table under Item 6.A "Directors and Senior Management" is an office holder under the Companies Law.

An office holder's fiduciary duties consist of a duty of care and a duty of loyalty. The duty of care requires an office holder to act with the level of care with which a reasonable office holder in the same position would have acted under the same circumstances. The duty of loyalty requires that an office holder act in good faith and in the best interests of the company. The duty of care includes a duty to use reasonable means to obtain:

- information on the advisability of a given action brought for his or her approval or performed by virtue of his or her position; and

- all other important information pertaining to these actions.

The duty of loyalty requires an office holder to act in good faith and for the benefit of the company, and includes a duty to:

- refrain from any conflict of interest between the performance of his or her duties to the company and his or her other duties or personal affairs;

- refrain from any activity that is competitive with the company;

- refrain from exploiting any business opportunity of the company to receive a personal gain for himself or herself or others; and

- disclose to the company any information or documents relating to the company's affairs which the office holder received as a result of his or her position as an office holder.

107

Table of Contents

*Disclosure of Personal Interests of an Office Holder*

The Companies Law requires that an office holder promptly disclose to the board of directors any personal interest that he or she may have and all related material information known to him or her and any documents concerning any existing or proposed transaction with the company. An interested office holder's disclosure must be made promptly and in any event no later than the first meeting of the board of directors at which the transaction is considered. A "personal interest" includes an interest of any person in an act or transaction of a company, including a personal interest of one's relative or of a corporate body in which such person or a relative of such person is a 5% or greater shareholder, director or general manager or in which he or she has the right to appoint at least one director or the general manager, but excluding a personal interest stemming from one's ownership of shares in the company. A personal interest furthermore includes the personal interest of a person for whom the office holder holds a voting proxy or the interest of the office holder with respect to his or her vote on behalf of the shareholder for whom he or she holds a proxy even if such shareholder itself has no personal interest in the approval of the matter. An office holder is not, however, obliged to disclose a personal interest if it derives solely from the personal interest of his or her relative in a transaction that is not considered an extraordinary transaction. Under the Companies Law, an "extraordinary transaction" is defined as any of the following:

- a transaction other than in the ordinary course of business;

- a transaction that is not on market terms; or

- a transaction that may have a material impact on a company's profitability, assets or liabilities.

If it is determined that an office holder has a personal interest in a transaction, approval by the board of directors is required for the transaction, unless the company's articles of association provide for a different method of approval. Further, so long as an office holder has disclosed his or her personal interest in a transaction, the board of directors may approve an action by the office holder that would otherwise be deemed a breach of duty of loyalty. However, a company may not approve a transaction or action that is adverse to the company's interest or that is not performed by the office holder in good faith. Approval first by the company's audit committee and subsequently by the board of directors is required for an extraordinary transaction with an office holder. Compensation of, or an undertaking to indemnify or insure, an office holder, requires approval by the compensation committee, the board of directors and, in certain cases (for directors, the chief executive officer, and any executive officer whose compensation terms do not conform to the then-existing compensation policy) the shareholders, in that order. Compensation of an individual office holder, including the chief executive officer (but excluding a director), that does not conform to the company's compensation policy may be adopted under special circumstances despite failure to obtain shareholder approval if, following the relevant shareholder vote, the compensation committee followed by the board once again approves the compensation, based on renewed and specific analysis of relevant factors.

Generally, a person who has a personal interest in a matter which is considered at a meeting of the board of directors, the audit committee or compensation committee may not be present at such a meeting or vote on that matter unless a majority of the board, audit committee or compensation committee (as appropriate) has a personal interest in the matter, or unless the chairman of the board, audit committee or compensation committee (as appropriate) determines that he or she should be present in order to present the transaction that is subject to approval. If a majority of the members of the board, audit committee or compensation committee has a personal interest in the approval of a transaction, then all directors may participate in discussions of the board of directors, audit committee or compensation committee on such transaction and the voting on approval thereof, but shareholder approval is also required for such transaction.

108

Table of Contents

*Disclosure of Personal Interests of Controlling Shareholders*

Pursuant to Israeli law, the disclosure requirements regarding personal interests that apply to directors and executive officers also apply to a controlling shareholder of a public company. In the context of a transaction involving a shareholder of the company, a controlling shareholder also includes any shareholder who holds 25% or more of the voting rights if no other shareholder holds more than 50% of the voting rights. Two or more shareholders with a personal interest in the approval of the same transaction are deemed to be a single shareholder and may be deemed a controlling shareholder for the purpose of approving such transaction. Extraordinary transactions with a controlling shareholder or in which a controlling shareholder has a personal interest, or a transaction with a controlling shareholder or his or her relative, directly or indirectly, require the approval of the audit committee, the board of directors and the shareholders of the company, in that order. In addition, the shareholder approval must fulfill one of the following requirements:

- a disinterested majority; or

- the votes of shareholders who have no personal interest in the transaction and who are present and voting, in person, by proxy or by voting deed at the meeting, and who vote against the transaction may not represent more than two percent (2%) of the voting rights of the company.

To the extent that any such transaction with a controlling shareholder is for a period extending beyond three years, approval is required once every three years, unless the audit committee determines that the duration of the transaction is reasonable given the circumstances related thereto.

The engagement of a controlling shareholder as an office holder or employee requires the same approvals as are described immediately above, except that the approval of the compensation committee, rather than the audit committee, is required.

*Shareholder Duties*

Pursuant to the Companies Law, a shareholder has a duty to act in good faith and in a customary manner toward the company and other shareholders and to refrain from abusing his or her power in the company, including, among other things, in voting at the general meeting of shareholders and at class shareholder meetings with respect to the following matters:

- an amendment to the company's articles of association;

- an increase of the company's authorized share capital;

- a merger; or

- 

109

Table of Contents

In addition, a shareholder also has a general duty to refrain from discriminating against other shareholders.

In addition, certain shareholders have a duty of fairness toward the company. These shareholders include any controlling shareholder, any shareholder who knows that it has the power to determine the outcome of a shareholder vote or a shareholder class vote and any shareholder who has the power to appoint or to prevent the appointment of an office holder of the company or other power towards the company. The Companies Law does not define the substance of this duty of fairness, except to state that the remedies generally available upon a breach of contract will also apply in the event of a breach of the duty to act with fairness.

**Exculpation, Insurance and Indemnification of Directors and Officers**

Under the Companies Law, a company may not exculpate an office holder from liability for a breach of the duty of loyalty. An Israeli company may exculpate an office holder in advance from liability to the company, in whole or in part, for damages caused to the company as a result of a breach of duty of care but only if a provision authorizing such exculpation is inserted in its articles of association. Our amended articles include such a provision. The company may not exculpate in advance a director from liability arising out of a prohibited dividend or distribution to shareholders.

Under the Companies Law, a company may indemnify an office holder in respect of the following liabilities and expenses incurred for acts performed by him or her as an office holder, either in advance of an event or following an event, provided its articles of association include a provision authorizing such indemnification:

- financial liability incurred by or imposed on him or her in favor of another person pursuant to a judgment, including a settlement or arbitrator's award approved by a court. However, if an undertaking to indemnify an office holder with respect to such liability is provided in advance, then such an undertaking must be limited to events which, in the opinion of the board of directors, can be foreseen based on the company's activities when the undertaking to indemnify is given, and to an amount or according to criteria determined by the board of directors as reasonable under the circumstances, and such undertaking shall detail the above mentioned foreseen events and amount or criteria;

- reasonable litigation expenses, including attorneys' fees, incurred by the office holder as a result of an investigation or proceeding instituted against him or her by an authority authorized to conduct such investigation or proceeding, provided that (i) no indictment was filed against such office holder as a result of such investigation or proceeding; and (ii) no financial liability was imposed upon him or her as a substitute for the criminal proceeding as a result of such investigation or proceeding or, if such financial liability was imposed, it was imposed with respect to an offense that does not require proof of criminal intent; and

110

Table of Contents

- reasonable litigation expenses, including attorneys' fees, incurred by the office holder or imposed by a court in proceedings instituted against him or her by the company, on its behalf, or by a third party, or in connection with criminal proceedings in which the office holder was acquitted, or as a result of a conviction for an offense that does not require proof of criminal intent.

Under the Companies Law, a company may insure an office holder against the following liabilities incurred for acts performed by him or her as an office holder if and to the extent provided in the company's articles of association:

- a breach of the duty of loyalty to the company, provided that the office holder acted in good faith and had a reasonable basis to believe that the act would not harm the company;

- a breach of duty of care to the company or to a third party, to the extent such a breach arises out of the negligent conduct of the office holder; and

- a financial liability imposed on the office holder in favor of a third party.

Under the Companies Law, a company may not indemnify, exculpate or insure an office holder against any of the following:

- a breach of fiduciary duty, except for indemnification and insurance for a breach of the duty of loyalty to the company to the extent that the office holder acted in good faith and had a reasonable basis to believe that the act would not prejudice the company;

- a breach of duty of care committed intentionally or recklessly, excluding a breach arising out of the negligent conduct of the office holder;

- an act or omission committed with intent to derive illegal personal benefit; or

- a fine or forfeit levied against the office holder.

Under the Companies Law, exculpation, indemnification and insurance of office holders must be approved by our compensation committee and our board of directors and, with respect to directors or controlling shareholders, their relatives and third parties in which such controlling shareholders have a personal interest, also by the shareholders. See "-Approval of Related Party Transactions Under Israeli Law—Fiduciary Duties of Directors and Executive Officers" above in this Item 6.C.

Our amended articles permit us to exculpate, indemnify and insure our office holders to the fullest extent permitted or to be permitted by the Companies Law.

We have obtained directors and officers liability, or D&O, insurance for the benefit of our office holders and intend to continue to maintain such coverage and pay all premiums thereunder to the fullest extent permitted by the Companies Law. Under our amended compensation policy (as approved by our shareholders at our 2021 annual general meeting), our D&O insurance is governed by the following guidelines:

(i)     an aggregate maximum D&O insurance coverage level of $160 million comprised of up to $100 million of ABC (general) D&O insurance coverage and up to $60 million of Side A coverage, and

(i)     the payment of premiums and deductibles under each of the Company's D&O insurance policies (including D&O run-off and public offering insurance) that are consistent with market terms, and that are not material to our company.

. In addition, we have entered into agreements with each of our office holders undertaking to indemnify them to the fullest extent permitted by Israeli law.

**Directors' Service Contracts**

We are not presently party to any service contracts with any of our directors that provide for benefits upon termination of employment or other service.

111

Table of Contents

**D. Employees**

The number of our full-time equivalent employees, and the distribution of employees (i) geographically and (ii) within the divisions of our company, in each case as of December 31, 2022, 2021 and 2020 are set forth in the two tables below.

| Region | 2022 | 2021 | 2020 |
|---|---|---|---|
| Americas* | 1,098 | 1,148 | 1,182 |
| Israel | 531 | 477 | 458 |
| Europe | 302 | 269 | 192 |
| Asia Pacific | 131 | 145 | 149 |
| **Total** | **2,062** | **2,039** | **1,981** |

| | Number of full-time equivalent employees | | |
|---|---|---|---|
| **Division** | **2022** | **2021** | **2020** |
| Operations and support | 620 | 689 | 696 |
| Research and development | 360 | 358 | 358 |
| Customer service | 241 | 264 | 260 |
| Sales and marketing | 495 | 353 | 295 |
| General and administrative | 346 | 375 | 372 |
| **Total** | **2,062** | **2,039** | **1,981** |

\* Includes employees in Latin America.

112

Table of Contents

During the years covered by the above tables, we did not employ a significant number of temporary employees.

The size of our workforce did not change substantially in 2022 compared to 2021 The number of our employees in Israel and Europe grew slightly, whereas the number of employees in the Americas region (and in the United States in particular) decreased, mainly due to our divestiture of MakerBot (which was based in Brooklyn, New York). The changes in 2022 as to the divisions in which our employees worked primarily reflect the revised categorization of some of our employees' positions following certain organizational restructurings, which we effected based on the recommendations of an outside consultant.

The increase in the size of our workforce in 2021 was due to our acquisition of new companies as part of our implementation of our growth strategy. The growth was mainly in Europe, the location of our RPS-RP Support and Stratasys Powder Production teams. The increase in our sales and marketing employees was mainly due to the revised categorization of some of our positions (mainly application engineers) as within the sales and marketing group.

While our Israeli employees, and the vast majority of all of our employees globally are not, party to a collective bargaining agreement, certain provisions of the collective bargaining agreements between the Histadrut (General Federation of Labor in Israel) and the Coordination Bureau of Economic Organizations (including the Industrialists' Associations) are applicable to our employees in Israel by order of the Israel Ministry of Labor. These provisions primarily concern the length of the workday, minimum daily wages for professional workers, pension fund benefits for all employees, insurance for work-related accidents, procedures for dismissing employees, determination of severance pay and other conditions of employment. We generally provide our employees with benefits and working conditions beyond the required minimums.

We have never experienced any employment-related work stoppages. We believe that our relationship with our employees is good.

The employees of our subsidiaries are subject to local labor laws and regulations that vary from country to country.

113

Table of Contents

## E. Share Ownership.

The following table lists, as of February 14, 2023, the number of our ordinary shares owned, and stock options held, by each of the directors and members of our senior management who served as such during the year ended December 31, 2022:

| Name | Shares of Stratasys[1] Number of shares beneficially owned[3] | Percent of outstanding shares beneficially owned[3] | Stratasys stock options and RSUs[2] Number held[4] Already vested or vesting within 60 days | Not vesting within 60 days | Exercise price per Share (for options) | Expiration Date (for options) |
|---|---|---|---|---|---|---|
| Dov Ofer *Chairman of the Board* | 103,541 [5] | * | 10,000 | — | $ 23.41 | July 18, 2027 |
| | | | 10,000 | — | $ 21.82 | September 13,2028 |
| | | | 37,500 | — | $ 22.28 | October 4, 2028 |
| | | | 10,000 | — | $ 20.53 | December 31, 2029 |
| | | | 10,000 | — | $ 19.61 | November 30, 2030 |
| | | | 4,745 | — | $ 25.03 | November 23, 2031 |
| | | | — | 11,326 | $ 6.18 | December 26, 2032 |
| | | | — | 5,340 | $ — | December 26, 2032 |
| S. Scott Crump *Director* | 589,409 [6] | * | 100,000 | — | $ 82.15 | June 21, 2023 |
| | | | 100,000 | — | $ 19.96 | April 6, 2027 |
| | | | 4,745 | — | $ 25.03 | November 23, 2031 |
| | | | 2,948 | 4,422 | $ 9.50 | September 15, 2032 |
| | | | 1,947 | 2,921 | $ — | September 15, 2032 |
| John J. McEleney *Director* | 78,936 [7] | * | 16,500 | — | $ 82.15 | June 21, 2023 |
| | | | 10,000 | — | $ 21.44 | June 4, 2026 |
| | | | 10,000 | — | $ 23.41 | July 18, 2027 |
| | | | 10,000 | — | $ 19.59 | September 13, 2028 |
| | | | 10,000 | — | $ 20.53 | December 31, 2029 |
| | | | 10,000 | — | $ 19.61 | November 30, 2030 |
| | | | 4,745 | — | $ 25.03 | November 23, 2031 |
| | | | 2,948 | 4,422 | $ 9.50 | September 15 ,2032 |
| | | | 1,947 | 2,901 | $ — | September 15 ,2032 |
| Ziva Patir *Director* | 77,123 [8] | * | 29,582 | — | $ 82.15 | June 21, 2023 |
| | | | 10,000 | — | $ 21.44 | June 4, 2026 |
| | | | 10,000 | — | $ 23.41 | July 18, 2027 |
| | | | 10,000 | — | $ 20.53 | December 31, 2029 |
| | | | 10,000 | — | $ 19.61 | November 30, 2030 |
| | | | 4,745 | — | $ 25.03 | November 23, 2031 |
| | | | — | 11,326 | $ 6.18 | December 26, 2032 |
| | | | — | 5,340 | $ — | December 26, 2032 |
| David Reis *Director* | 73,541 [9] | * | 37,500 | — | $ 22.28 | October 4, 2028 |
| | | | 10,000 | — | $ 19.61 | November 30, 2030 |
| | | | 4,745 | — | $ 25.03 | November 23, 2031 |
| | | | — | 11,326 | $ 6.18 | December 26, 2032 |
| | | | — | 5,340 | $ — | December 26, 2032 |
| Michael Schoellhorn Director | 22,436 [10] | * | 10,000 | — | $ 19.61 | November 30, 2030 |
| | | | 4,745 | — | $ 25.03 | November 23, 2031 |
| | | | 2,948 | 4,422 | $ 9.50 | September 15, 2032 |
| | | | 1,947 | 2,921 | $ — | September 15, 2032 |
| Yair Seroussi Director | 47,541 [11] | * | 10,000 | — | $ 23.41 | July 18, 2027 |
| | | | 10,000 | — | $ 21.82 | September 13, 2028 |
| | | | 10,000 | — | $ 20.53 | December 31, 2029 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | 10,000 | — $ | | 19.61 | November 30, 2030 |
| | | | 4,745 | — $ | | 25.03 | November 23, 2031 |
| | | | — | 11,326 $ | | 6.18 | December 26, 2032 |
| | | | — | 5,340 $ | | — | December 26, 2032 |
| Adina Shorr | 71,011 [12] | * | 10,000 | — $ | | 22.47 | October 13, 2028 |
| Director | | | 10,000 | — $ | | 20.53 | December 31, 2029 |
| | | | 10,000 | — $ | | 19.61 | November 30, 2030 |
| | | | 4,745 | — $ | | 25.03 | November 23, 2031 |
| | | | — | 11,326 $ | | 6.18 | December 26, 2032 |
| | | | — | 5,340 $ | | — | December 26, 2032 |
| Yoav Zeif | 54,429 [13] | * | — | 150,000 $ | | 16.41 | February 18, 2030 |
| *Chief Executive Officer* | | | — | 150,000 $ | | 16.41 | February 18, 2030 |
| | | | 33,278 | 39,091 $ | | — | — |
| | | | 13,385 | 22,800 $ | | — | — |
| | | | — | 16,632 $ | | — | February 22, 2032 |
| | | | — | 33,264 $ | | — | February 22, 2032 |
| Eitan Zamir | *(14) | * | | | | | |
| *Chief Financial Officer* | | | | | | | |

114

Table of Contents

\*    Constitutes less than 1% of our outstanding shares.

(1)  All of our shares (including shares held by directors and members of senior management) have identical voting rights.

(2)  For a description of our equity incentive plans, please see "Stock Option and Share Incentive Plans" in this Item below. All options and RSUs granted under such plans have been granted without payment of any cash consideration therefor by the grantees thereof.

(3)  In accordance with Rule 13d-3 under the Exchange Act, the number of shares and the percentages shown for individual directors and officers include any ordinary shares underlying stock options and RSUs held by any such person that vest within 60 days of February 14, 2023 and that are also reflected in the column titled "Stratasys stock options and RSUs—Number held — Already vested or vesting within 60 days." Further in keeping with such Rule 13d-3, the computation of percentage ownership is based upon 67,420,973 ordinary shares outstanding at February 14, 2023, plus such number of ordinary shares as such person (but not any other person) had the right to receive upon the exercise or settlement of vested stock options or RSUs (as applicable) within 60 days thereof.

(4)  Each stock option is exercisable for one ordinary share, and each RSU represents the right to receive one ordinary share.

(5)  Consists of (i) 21,296ordinary shares that have been issued to Mr. Ofer following the vesting and settlement of RSUs, and (ii) 82,245 ordinary shares issuable to Mr. Ofer upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2023

(6)  Consists of (i) 200,679 ordinary shares held by Mr. Crump, (ii) 176,294 ordinary shares owned of record by Mr. Crump's wife, (iii) 2,796 ordinary shares that have been issued to Mr. Crump following the vesting and settlement of RSUs, 207,693 ordinary shares issuable to Mr. Crump upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2022, and (iv) 1,947 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2023.

(7)  Consists of (i) 2,796 ordinary shares that have been issued to Mr. McEleney following the vesting and settlement of RSUs, (ii) 74,193 ordinary shares issuable to Mr. McEleney upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2023, and (iii) 1,947 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2023.

(8)  Consists of (i) 2,796 ordinary shares that have been issued to Ms. Patir following the vesting and settlement of RSUs, and (ii) 74,327 ordinary shares issuable to Ms. Patir upon the exercise of options granted to her that have vested or will vest within 60 days of February 14, 2023

(9)  Consists of (i) 52,245 ordinary shares issuable to Mr. Reis upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2023, (ii) 15,129 ordinary shares underlying RSUs that have vested and may be settled within 60 days of February 14, 2023, and (iii) 6,167 ordinary shares underlying PSUs that have vested and may be settled within 60 days of February 14, 2023.

(10) Consists of (i) 2,796 ordinary shares that have been issued to Mr. Schoellhorn following the vesting and settlement of RSUs, (ii) 17,693 ordinary shares issuable to Mr. Schoellhorn upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2023, and (iii) 1,947 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2023.

(11) Consists of (i) 2,796 ordinary shares that have been issued to Mr. Seroussi following the vesting and settlement of RSUs, and (ii) 44,745 ordinary shares issuable to Mr. Seroussi upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2023.

(12) Consists of (i) 33,470 ordinary shares held by Ms. Shorr, (ii) 2,796 additional ordinary shares that have been issued to Ms. Shorr following the vesting and settlement of RSUs, and (iii) 34,745 ordinary shares issuable to Ms. Shorr upon the exercise of options granted to her that have vested or will vest within 60 days of February 14, 2023.

(13) Consists of (i) 7,766 ordinary shares held by Mr. Zeif, and (ii) 46,663 ordinary shares underlying RSUs that have vested and may be settled within 60 days of February 14, 2023.

(14) Because Mr. Zamir beneficially owns less than 1% of our outstanding ordinary shares and his beneficial ownership has not previously been disclosed to our shareholders or otherwise made public, it is being omitted from this annual report pursuant to an

allowance provided by the SEC's Form 20-F.

115

Table of Contents

**Stock Option and Share Incentive Plans**

On September 16, 2022, our existing 2012 Omnibus Equity Incentive Plan (the "2012 Plan"), which became effective at the effective time of the Stratasys, Inc.- Objet Ltd. merger in December 2012, expired. In order to enable our Company to continue to provide share-based long-term incentive compensation after the expiration of the 2012 Plan, our compensation committee and our Board each approved our 2022 Share Incentive Plan (the "2022 Plan"), which our shareholders approved at our annual general meeting held on September 15, 2022. Outstanding awards under the 2012 Plan will continue to be subject to the terms of the 2012 Plan, notwithstanding the expiration of that plan.

The following sets forth certain information with respect to our current stock option and share incentive plans. The following descriptions are only a summary of each plan and each is qualified in its entirety by reference to the full text of the respective plans, which serve as exhibits to this annual report.

Upon the expiration of each of our stock option and share incentive plans, no further grants may be made thereunder, although any existing awards will continue in full force in accordance with the terms under which they were granted.

*2012 Omnibus Equity Incentive Plan*

For a description of our 2012 Plan, please see "Item 6. Directors, Senior Management & Employees—E. Share Ownership— Stock Option and Share Incentive Plans— 2012 Omnibus Equity Incentive Plan" in our annual report on Form 20-F for the year ended December 31, 2021, which we filed with the SEC on February 24, 2022.

**2022 Share Inactive Plane**
Under the 2022 Plan, we may grant equity-based incentive awards to attract, motivate and retain the talent for which we compete. Following the adoption of the 2022 Plan, we will no longer grant any awards under the 2012 Plan, though previously granted awards under the 2012 Plan will remain outstanding and will still be governed by the terms of the 2012 Plan.

*Authorized Shares.*    Upon its effectiveness, the 2022 Plan had a total of 1,574,000 ordinary shares reserved and initially available for issuance, consisting of 1,296,494 newly authorized shares and 277,506 shares that will be rolled over from the 2012 Plan, which were already approved for issuance by our shareholders at previous annual general meetings (which shares will be unused under the 2012 Plan as of its expiration on September 16, 2022). Out of that initial pool of shares, the number of ordinary shares that may be issued upon the exercise of incentive stock options (within the meaning of Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**")) ("**Incentive Stock Options**") is capped at 1,574,000.

116

Table of Contents

In addition to the foregoing 1,574,000 ordinary shares initially available under the 2022 Plan, up to 5,432,789 ordinary shares that underlie outstanding awards under the 2012 Plan (and which were also already approved for issuance under the 2012 Plan by our shareholders at previous annual general meetings), may, (i) if the related award expires or is canceled, terminated, forfeited, repurchased or settled in cash in lieu of issuance of shares, for any reason, without having been exercised, or (ii) if permitted by us, if are tendered to pay (x) the exercise price of an award or (y) withholding tax obligations, will, in any such case, become available for issuance under the 2022 Plan. Similarly, ordinary shares from among the initial 1,574,000 shares reserved under the 2022 Plan that become subject to an award and are ultimately not issued (for any of the foregoing reasons) will become available once again under the 2022 Plan.

In keeping with the recommendation of institutional shareholder and proxy advisory groups, **the 2022 Plan does not contain an "evergreen" provision that provides for an automatic annual increase in the number of ordinary shares available under the plan.** Instead, we will request shareholder approval for any increase in the pool of shares available under the 2022 Plan.

*Administration.*    A duly authorized committee of our Board (which, based on prior authorization by our Board, is our compensation committee), or, in the absence of any such committee, the Board itself, will administer the 2022 Plan. Under the 2022 Plan, the administrator has the authority, subject to applicable law, to interpret the terms of the 2022 Plan and any award agreements or awards granted thereunder, designate recipients of awards, determine and amend the terms of awards and take all actions and make all other determinations necessary for the administration of the 2022 Plan.

*Eligibility.*    The 2022 Plan provides for granting awards under various tax regimes, including, without limitation, in compliance with Section 102 of the Israeli Tax Ordinance (the "**Ordinance**") and Section 3(i) of the Ordinance, and, for awards granted to our United States employees or service providers, including those who are deemed to be residents of the United States for tax purposes, Section 422 of the Code and Section 409A of the Code.

*Awards.*    The 2022 Plan provides for the grant of share options (including Incentive Stock Options and nonqualified stock options), ordinary shares, restricted shares, restricted share units and other share-based awards to employees, directors, officers, consultants, advisors and any other persons or entities who provides services to the company or any parent, subsidiary or affiliate thereof, subject to the terms and conditions of the 2022 Plan. Options granted under the 2022 Plan to our employees who are U.S. residents may qualify as Incentive Stock Options, or may be non-qualified stock options.

*Grant and Exercise.*    All awards granted pursuant to the 2022 Plan will be evidenced by an award agreement in a form approved, from time to time, by the administrator in its sole discretion. Unless otherwise determined by the administrator and stated in the award agreement, and subject to the conditions of the 2022 Plan, awards vest and become exercisable under the following schedule: 25% of the shares covered by the award, on the first anniversary of the vesting commencement date determined by the administrator (and in the absence of such determination, the date on which such award was granted), and 6.25% of the shares covered by the award at the end of each subsequent three-month period thereafter over the course of the following three years; provided that the grantee remains continuously as an employee or provides services to the Company throughout such vesting dates. The exercise period of an award will be ten years from the date of grant of the award, unless otherwise determined by the administrator and stated in the award agreement.

*Termination of Employment.*    In the event of termination of a grantee's employment or service with the Company or any of its affiliates (including by reason of death, disability or retirement), different rules apply as to the length of time during which all vested and exercisable awards held by such grantee as of the date of termination may be exercised after such date of termination. In the case of termination due to death during employment or service for the Company or any of its affiliates, or within the three month period (or such longer period of time as determined by the Board, in its discretion) after the date of termination, any outstanding awards shall automatically vest (to the extent not yet vested).

117

Table of Contents

Any awards which are unvested as of the date of such termination (other than in the case of death, as described above) or which are vested but not then exercised within the applicable period following such date, will terminate and the shares covered by such awards shall again be available for issuance under the 2022 Plan.

Notwithstanding any of the foregoing, if a grantee's employment or services with us or any of our affiliates is terminated for "cause" (as defined in the 2022 Plan), all outstanding awards held by such grantee (whether vested or unvested) will terminate on the date of such termination and the shares covered by such awards shall again be available for issuance under the 2022 Plan. In the case of termination for cause, any shares issued upon exercise or (if applicable) vesting of awards, shall be deemed to be irrevocably offered for sale to us.

*Adjustments due to Transactions.*     The 2022 Plan provides for appropriate adjustments to be made to the plan and to outstanding awards under the plan in the event of a share split, reverse share split, share dividend, distribution, recapitalization, combination, reclassification of our shares, consolidation, reorganization, extraordinary cash dividend or other similar occurrences.

In the event of a sale of all, or substantially all, of our ordinary shares or assets, a merger, consolidation amalgamation or similar transaction, or certain changes in the composition of the board of directors, or liquidation or dissolution, or such other transaction or circumstances that the Board determines to be a relevant transaction, then without the consent of the grantee, the administrator may make any determination as to the treatment of outstanding awards.

*Amendment and Termination.*     The Board may suspend, terminate, modify or amend the 2022 Plan at any time; provided that no termination or amendment of the 2022 Plan shall affect any then outstanding award unless expressly provided by the board. Shareholder approval of any amendment to the 2022 Plan will be obtained to the extent necessary to comply with applicable law. The administrator at any time and from time to time may modify or amend any award theretofore granted under the 2022 Plan, including any award agreement, whether retroactively or prospectively.

*Limitation on Option/Other Award Repricing.*     Consistent with our prior undertaking under the 2012 Plan to refrain from repricing options under that plan (which we undertook prior to our 2018 annual general meeting of shareholders), **the 2022 Plan, as well, generally does not allow us to reprice options that we grant under the plan.** In keeping with the recommendation of institutional shareholder and proxy advisory groups, however, the 2022 Plan does allow us to cancel an existing award and replace it with another award (even with a lower exercise price) if the aggregate value of the new award (as determined under the Black-Scholes methodology or other valuation methodology chosen by the compensation committee) does not exceed that of the award being canceled, subject to the approval of our shareholders. That could be accomplished, for example, through the grant of a substitute award for a lesser number of shares with a lower exercise price. Similarly, the exercise price per share of an existing award may be reduced by the compensation committee by the amount of a dividend that we declare on our ordinary shares while the award is outstanding. That would enable a grantee to benefit from a dividend that we declare and that all of our shareholders receive.

118

Table of Contents

By adopting the 2022 Plan and reserving 1,296,494 newly authorized shares for issuance under it (in addition to shares being carried over from the 2012 Plan, which were previously approved by our shareholders), we believe that we will have the flexibility to continue to provide equity incentives in amounts determined appropriate by the compensation committee, our Board, and our management, for an anticipated period of approximately one year. After that time, we will request shareholder approval for further reservation of shares under the 2022 Plan. We intend to file, soon after the filing of this annual report, a registration statement on Form S-8 to register the issuance of ordinary shares underlying options and RSUs granted or to be granted under the 2022 Plan.

### Employee Share Purchase Plan

Our Employee Share Purchase Plan, or ESPP, was approved by our shareholders at our 2021 annual general meeting of shareholders. The purpose of the ESPP is to enable eligible employees of the Company and its subsidiaries to use payroll deductions to purchase our ordinary shares and thereby acquire an ownership interest in the Company. The ESPP will be comprised of two distinct components: (1) the component intended to qualify for favorable U.S. federal tax treatment under Section 423 of the U.S. Internal Revenue Code of 1986, as amended (the "**Section 423 Component**"), and (2) the component not intended to be tax qualified under Section 423 of the Internal Revenue Code to facilitate participation for employees who are not eligible to benefit from favorable U.S. federal tax treatment and, to the extent applicable, to provide flexibility to comply with non-U.S. law and other considerations (the "**Non Section 423 Component**").

The maximum aggregate number of ordinary shares that may be purchased initially under the ESPP will be 5,200,000 shares (the "**ESPP Share Pool**"), subject to adjustment as provided for in the ESPP. There is furthermore no "evergreen" provision our ESPP.

*Administration*. Unless otherwise determined by the Board, the ESPP will be administered by the compensation committee, which will have the authority to interpret and determine eligibility under the plan, prescribe forms, rules and procedures relating to the plan, and otherwise do all things necessary or appropriate to carry out the purposes of the plan.

*Shares Subject to the ESPP*. As noted above, the ESPP Share Pool initially consists of 5,200,000 ordinary shares, subject to adjustment, as described below. Shares delivered upon exercise of purchase rights under the ESPP may be either shares of authorized but unissued share capital, treasury shares, or ordinary shares acquired in an open-market transaction. In the event of certain changes in our outstanding ordinary shares, including changes by reason of a share dividend, share split, reverse share split, split-up, recapitalization, merger, consolidation, reorganization, or other capital change, the aggregate number and type of shares available for purchase under the ESPP, the number and type of shares granted or purchasable during an offering period, and the purchase price per share under an outstanding purchase right shall be equitably adjusted as determined appropriate by the compensation committee.

If any purchase right granted under the ESPP expires or terminates for any reason without having been exercised in full or ceases for any reason to be exercisable in whole or in part, the unpurchased ordinary shares will again be available for purchase pursuant to offerings under the ESPP.

Table of Contents

*Eligibility*. Participation in the Section 423 Component may be limited in the terms of any offering to employees of the Company and any of its designated subsidiaries (a) who customarily work 20 hours or more per week, (b) whose customary employment is for more than five months per calendar year, and (c) who satisfy the procedural enrollment and other requirements set forth in the ESPP. Under the Section 423 Component, designated subsidiaries include any subsidiary (within the meaning of Section 424(f) of the Internal Revenue Code (sometimes referred to as the "**Code**") of the Company that has been designated by our Board or the compensation committee as eligible to participate in the plan (and if an entity does not so qualify within the meaning of Section 424(f) of the Code, it shall automatically be deemed to be a designated subsidiary in the Non-Section 423 Component). In addition, with respect to the Non-Section 423 Component, designated subsidiaries may include any corporate or non-corporate entity in which the Company has a direct or indirect equity interest or significant business relationship. Under the Section 423 Component, no employee may be granted a purchase right if, immediately after the purchase right is granted, the employee would own (or, under applicable statutory attribution rules, would be deemed to own) shares possessing 5% or more of the total combined voting power or value of all classes of shares of the Company or any of its subsidiaries. In addition, in order to facilitate participation in the ESPP, the compensation committee may provide for such special terms applicable to participants who are citizens or residents of a non-U.S. jurisdiction, or who are employed by a designated subsidiary outside of the United States, as the compensation committee may consider necessary or appropriate to accommodate differences in local law, tax policy or custom. Further to that allowance, we have filed an application with the Israeli Tax Authority for favorable treatment under Section 102 of the Israeli Tax Ordinance for shares purchased under the ESPP by employees who are Israeli residents. Except as permitted by Section 423 of the Code, with respect to the Section 423 Component, such special terms may not be more favorable than the terms of rights granted under the Section 423 Component to eligible employees who are residents of the United States.

*General Terms of Participation.*

- *Offering Periods*. The ESPP allows eligible employees to purchase ordinary shares during certain offering periods, which may extend to up to 27 months. Our Board has approved an initial offering period of six months. Each offering period may be comprised of multiple purchase periods, all as may be determined by the compensation committee. The terms and conditions applicable to each offering period shall be set forth in an "Offering Document" adopted by the compensation committee, containing such terms and conditions as the compensation committee deems appropriate. The provisions of separate offerings or offering periods under the ESPP need not be identical.

- *Method of Participation*. Shares will be purchased under the ESPP on the last day of each purchase period, each a purchase date, using accumulated payroll deductions, unless the compensation committee provides otherwise with respect to the employees of a designated subsidiary in a manner consistent with Section 423 of the Code. In order to participate in the ESPP, an eligible employee must complete and submit to the administrator of the ESPP a payroll deduction and participant authorization form in accordance with procedures and prior to the deadlines prescribed by the administrator of the ESPP. Participation will be effective as of the first day of an offering period.

  Participants may elect payroll deductions of up to 15% of the participant's total eligible earnings per payroll period within an offering period. A participant may increase or decrease the percentage of compensation designated in his or her subscription agreement, or may suspend his or her payroll deductions, at any time during an offering period. However, the compensation committee may limit the number of changes a participant may make to his or her payroll deduction elections during each offering period (and in the absence of any specific designation by the compensation committee, a participant shall be allowed to decrease (but not increase) his or her payroll deduction elections one time during each offering period). A participant may withdraw all but not less than all of the payroll deductions credited to his or her account and not yet used to exercise his or her rights under the ESPP at any time by giving written notice to the Company in such form and timing acceptable to the Company. Upon withdrawal, any amount withheld from a participant's compensation will be returned to the participant, without interest, as soon as administratively practicable.

Table of Contents

- *Grant and Exercise of Purchase Rights*. On the first day of each offering period, each participant automatically will be granted a right to purchase ordinary shares on the last day of each purchase period, subject to the limitations set forth in the ESPP. On the last day of each purchase period, the payroll deductions accumulated by each participant during such purchase period will be applied automatically to the purchase of ordinary shares at the purchase price in effect for that purchase period. However, no participant may, on any purchase date, purchase more than such number of ordinary shares as the compensation committee may prescribe. In addition, no participant will be granted a purchase right under the Section 423 Component that would permit the participant's right to purchase ordinary shares to accrue at a rate that exceeds $25,000 in fair market value for each calendar year, determined in accordance with Section 423 of the Internal Revenue Code.

- *Purchase Price*. The purchase price per share of our ordinary shares applicable to purchases during each purchase period under the ESPP will be eighty-five percent (85%) (or such greater percentage as the compensation committee may designate) of the lower of (i) the fair market value per share of our ordinary shares on the first day of the offering period or (ii) the fair market value per share of our ordinary shares on the last date of the purchase period.

- *Termination of Purchase Rights*. Upon the termination of a participant's employment with the Company or a designated subsidiary, or in the event the participant otherwise ceases to qualify as an eligible employee, any purchase right then held by the participant will be canceled. Payroll deductions accumulated by the participant during the offering period in which such purchase right terminates will be returned to the participant (or his or her designated beneficiary or legal representative), without interest, as soon as practicable thereafter, and the participant will have no further rights under the ESPP.

- *Shareholder Rights*. No participant will have any shareholder rights with respect to the ordinary shares covered by his or her purchase right until the shares are actually purchased on the participant's behalf. No adjustment will be made for dividends, distributions or other rights for which the record date is prior to the date of such purchase.

- *Transferability*. Purchase rights granted to participants under the ESPP are not assignable or transferable, other than by will, or the applicable laws of descent and distribution, and may be exercised only by the participant during his or her lifetime.

- *Amendment and Termination of the ESPP*. Our Board has the right to amend the ESPP to any extent and in any manner it may deem advisable, provided approval of the Company's shareholders shall be required to amend the ESPP to increase the aggregate number, or change the type, of shares that may be sold pursuant to rights under the ESPP (other than a permitted adjustments with respect to changes in the Company's capitalization) or to change the corporations or classes of corporations whose employees may be granted rights under the ESPP.

Our Board also has the right at any time to terminate the ESPP. In connection with such a termination or suspension, each participant's accumulated payroll deductions will be returned to the participant without interest, or the offering period may be shortened so that the purchase of shares occurs prior to the termination of the ESPP.

121

Table of Contents

- *Sub-Plans*. The compensation committee may adopt sub-plans applicable to particular designated subsidiaries or locations, which sub-plans may be designed to be outside the scope of Section 423 of the Code. The rules of such sub-plans may take precedence over other provisions of the ESPP, other than with respect to the number of shares available for issuance under the ESPP, but unless otherwise superseded by the terms of such sub-plan, the provisions of the ESPP shall govern the operation of such sub-plan.

- *Effective Date and Term*. The ESPP became effective in November 2021, upon approval by our 2021 annual general meeting of shareholders. No purchase rights will be granted under the ESPP after the earliest to occur of the date on which all shares available for issuance under the ESPP have been issued or the termination of the ESPP by our company.

- *Corporate Transactions*. In the event of certain transactions or events such as a consolidation, merger or similar transaction, a sale or transfer of all or substantially all of the Company's assets, or a dissolution or liquidation of the Company, the compensation committee may, in its discretion, provide that each outstanding purchase right will be assumed or substituted for a right granted by the acquirer or successor corporation or by a parent or subsidiary of such entity, will be cashed out, will be cancelled with accumulated payroll deductions returned to each participant, or that the offering period will end before the date of the proposed sale, merger or similar transaction.

- *New Plan Benefits*. Benefits and purchases of ordinary shares under the ESPP depend on elections made by employees and the fair market value of our ordinary shares on dates in the future. As a result, it is not possible to determine the benefits that will be received by executive officers and other employees in the future under the ESPP. As described above, no employee may purchase shares under the Section 423 Component at a rate that exceeds $25,000 in fair market value in any calendar year.

The following table presents certain share data information for the above-described share incentive and employee share purchase plans as at December 31, 2022:

| Plan | Total Ordinary Shares Reserved for Grant/Purchase | Aggregate Number of Awards Granted/Purchased out of Reserved, Net of Cancellations | Shares Available for Future Grants/Purchases | Aggregate Number of Awards/Shares Outstanding | Weighted Average Exercise Price of Outstanding Options |
|---|---|---|---|---|---|
| 2012 Plan | 10,000,000 | 9,041,427 | 958,573 | 4,337,657 | $27.62 |
| 2022 Plan | 1,296,494 | 353,170 | 943,324 | 339,125 | $13.46 |
| Employee Share Purchase Plan | 5,200,000 | 249,750 | 4,950,250 | 249,750 | |

122

Table of Contents

**ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS.**

**A. Major Shareholders**

*Ownership by Major Shareholders*

The following table presents the beneficial ownership of our ordinary shares by each person who is known by us to be the beneficial owner of 5% or more of our outstanding ordinary shares (to whom we refer as our major shareholders), based on the most recent beneficial ownership reports filed with the SEC by such persons on or before February 14, 2023. The data presented is based on information provided to us, or disclosed in public filings with the SEC, by the major shareholders.

Beneficial ownership of shares is determined under rules of the SEC and generally includes any shares for which a person exercises sole or shared voting or investment power, or for which a person has or shares the right to receive the economic benefit of ownership of the shares. To the extent applicable, the table below also includes as beneficially owned by any major shareholder shares underlying options, warrants or other convertible securities that are exercisable or convertible within 60 days after February 14, 2023. Shares issuable upon the exercise or conversion of such convertible securities are deemed to be outstanding for the purpose of computing the ownership percentage of the person, entity or group holding such securities, but are not deemed to be outstanding for the purpose of computing the ownership percentage of any other person, entity or group. The ownership percentages reflected below are based on 67,420,973 ordinary shares outstanding as of February 14, 2023.

Except where otherwise indicated, and except pursuant to community property laws, we believe, based on information furnished by such owners, that the beneficial owners of the shares listed below have sole investment and voting power with respect to, and the sole right to receive the economic benefit of ownership of, such shares. The shareholders listed below do not have any different voting rights from any of our other shareholders. We know of no arrangements that would, at a subsequent date, result in a change of control of our company.

| Beneficial Owner | Ordinary Shares | Percentage Ownership |
|---|---|---|
| Nano Dimension Ltd | 8,049,186(1) | 12.1% |
| Phoenix Holdings Ltd. | 3,978,945(2) | 5.9% |

(1)    Represents shares beneficially owned as of July 17, 2022, as indicated in a statement of beneficial ownership on Schedule 13G filed by Nano Dimension Ltd. on July 18, 2022. As indicated in that statement, Nano Dimension Ltd. possesses sole voting and investment power with respect to all such 8,049,186 ordinary shares beneficially owned by it.

(2)    Represents shares beneficially owned as of June 30, 2022, as indicated in the report of institutional investment manager on Form 13F filed by this shareholder on behalf of itself and Nikko Asset Management Americas, Inc. on July 26, 2022. The shares held by Sumitomo Mitsui Trust Holdings Inc. may be deemed to be beneficially owned by its subsidiaries (i)Nikko Asset Management Co., Ltd. and (ii)Nikko Asset Management Americas, Inc. Based on information available to us, we believe that the actual number of ordinary shares held by this shareholder is currently lower than the amount included in that report on Form 13F.

Table of Contents

*Changes in Percentage Ownership by Major Shareholders*

During 2020, the ownership of our ordinary shares by our former largest shareholder, ARK Investment Management LLC, increased to 21.9%. In 2021, that ownership percentage decreased, to 11.7%. In 2022, that ownership percentage decreased to 2.6%.

Nano Dimension Ltd. filed its initial Schedule 13G on July 18, 2022, disclosing an ownership of 8,049,186 ordinary shares, making it one of our major shareholders.

During 2020 and 2021, the ownership of our ordinary shares by PRIMECAP Management Company, one of our former major shareholders, decreased to 8.6% and 5.8%, respectively. In 2022, its ownership further declined to 4.8%.

In 2020, the ownership of our ordinary shares by Sumitomo Mitsui Trust Holdings, Inc., one of our former major shareholders, decreased from 10.7% to 7.3%, and in 2021 it further decreased to 6.9%. For 2022, its percentage ownership declined to 2.5%.

As of the end of 2022, a new significant shareholder, Phoenix Holdings Ltd., reported that together with its subsidiaries, it had acquired a 5.9% ownership stake in the Company.

*Record Holders*

Based upon a review of the information provided to us by our transfer agent, as of February 14, 2023, there were 84 holders of record of our shares, of which 58 record holders holding approximately 99.99% of our outstanding ordinary shares, had registered addresses in the United States. These numbers are not representative of the number of beneficial holders of our shares nor is it representative of where such beneficial holders reside, since many of these shares were held of record by brokers or other nominees. As of the said date, CEDE & Co, the nominee company of the Depository Trust Company (with a registered address in the United States), held of record approximately 99.3% of our outstanding ordinary shares on behalf of hundreds of firms of brokers and banks in the United States, who in turn held such shares on behalf of several thousand clients and customers.

**B. Related Party Transactions.**

Except as described below or elsewhere in this annual report, since January 1, 2022, we have had no transaction or loan, nor do we have any presently proposed transaction or loan, involving any related party described in Item 7.B of Form 20-F promulgated by the SEC.

*Indemnification Agreements*

Our amended articles permit us to exculpate, indemnify and insure each of our directors and office holders to the fullest extent permitted by the Companies Law. Effective upon the effective time of the Stratasys, Inc.- Objet Ltd. merger, we entered into indemnification agreements with each of our then-current directors and other office holders, under which we undertook to indemnify them to the fullest extent permitted by Israeli law, including with respect to liabilities resulting from the merger to the extent that these liabilities are not covered by insurance. We have entered into similar indemnification agreements with all directors and other office holders who have served as such since the Stratasys, Inc.- Objet Ltd. merger. We also put into place Directors and Officers liability insurance for each of our directors and other office holders upon the effectiveness of the Stratasys, Inc.-Objet Ltd. merger, and have renewed that policy as necessary to maintain continuous coverage since the merger.

Table of Contents

***Employment and Consulting Agreements with Directors and Executive Officers***

*Employment agreement with our Chief Executive Officer*

In conjunction with his appointment as our chief executive officer, or CEO, Yoav Zeif is party to an employment agreement with us, effective as of February 18, 2020. Under the agreement, Mr. Zeif serves as our full-time CEO for an indefinite period (subject to the termination provisions referenced further below) and receives, in respect thereof, a monthly salary of NIS 175,000 (approximately $50,140, based on the current NIS-dollar exchange ratio). Mr. Zeif may be entitled to an annual cash bonus within a range of 50% to 150% of his annual base salary, as to be determined by our board of directors (following requisite approval from the compensation committee thereof) based on achievement of company-related goals (and subject to the achievement of threshold level goals for the receipt of a minimum bonus).

In addition to cash compensation, Mr. Zeif receives annual grants of RSUs. For his initial year of employment, he will receive RSUs that are equal in value to $800,000 (subject to a cap of 55,000 RSUs). In subsequent years, Mr. Zeif will be entitled to grants of RSUs equal in value to $1.2 million or $800,000, depending on whether the average closing Stratasys share price for the 30-day period prior to the grant date is $20 or above, or below $20, respectively, and in the latter case, the number of RSUs to be granted to Mr. Zeif will be capped at 55,000. Two-thirds of the RSUs that are granted for any such year (whether initial or subsequent) will be subject to a four-year vesting schedule (commencing on the one-year anniversary of the relevant grant date, followed by 12 equal quarterly vesting periods thereafter). The vesting of the remaining one-third of the RSUs granted in any such year will be conditioned on the satisfaction of performance-based metrics that will be determined by our board of directors and that will cover not more than four calendar years.

125

Table of Contents

Besides annual equity compensation, Mr. Zeif received, within the first 14 days of his employment, a one-time, special upside grant of options to purchase 300,000 ordinary shares, with an exercise price that will equal the average of the Stratasys closing share price for the 30 days following his commencement of employment. These special upside options will vest and become exercisable in two groups of 150,000 options each, in accordance with the schedule described in the following sentence, if the average closing Stratasys share price reaches two respective levels— $10 or $20 above the 30-day average closing price prior to his commencement of employment— for a consecutive six-month period following the commencement of his employment. If and when the relevant closing price level is met for the requisite consecutive six-month period, the relevant 150,000 options will vest in equal installments of 18,750 each over the next eight consecutive quarters, assuming continued employment. Any options granted pursuant to the special upside grant that are not yet vested will be subject to accelerated vesting in the event that Mr. Zeif's employment is terminated or he resigns for good reason in connection with, or within 12 months following, a change of control transaction for which the value of our company (or our assets, if applicable) reflected in the transaction as of its closing date exceeds the respective price level that initially triggers vesting.

Under the employment agreement, Mr. Zeif is entitled to customary additional benefits, including a pension arrangement, disability insurance and severance pay contributions by us, study fund contributions by us, use of a car, annual vacation, sick leave and reimbursement for business-related, reasonably-necessary travel, lodging and related expenses. In the event of termination of Mr. Zeif's employment by our company (other than for cause, or due to Mr. Zeif's violation of his below-described undertakings) or by Mr. Zeif for good reason, Mr. Zeif will be entitled to an "adjustment" payment equal to six months' base salary, in addition to a three-month (in the first year of employment) or six-month (at any time thereafter) notice period (other than in a case of termination for cause, when that notice is not required).

In connection with his execution of the employment agreement, Mr. Zeif has agreed to certain customary undertakings in favor of our company that cover confidentiality, non-competition, non-solicitation and assignment of inventions.

In order to induce Mr. Zeif to accept our employment offer and in connection with his relocation from the United States to the our principal executive offices in Israel related to his hiring, we paid him a signing/relocation bonus of $300,000, of which $100,000 will be repayable if his employment is terminated by us for cause or he resigns other than for good reason during his first 12 months of employment.

*Employment agreement with our Chief Financial Officer*

In conjunction with his appointment as our chief financial officer, or CFO, effective as of March 1, 2022, Eitan Zamir is party to an employment agreement with us. Under the agreement, Mr. Zamir serves as our full-time CFO for an indefinite period (subject to the termination provisions under the agreement). The agreement provides for notice periods of varying duration for termination of the agreement by us or by Mr. Zamir, during which time he will continue to receive base salary and benefits (except for the accrual of vacation days). The agreement also contain customary provisions regarding non-competition, confidentiality of information and assignment of inventions. However, the enforceability of the non-competition provisions may be limited under applicable law.

**C. Interests of Experts and Counsel.**

Not required.

**ITEM 8. *FINANCIAL INFORMATION.***

**A. Consolidated Statements and Other Financial Information.**

The consolidated financial statements and other financial information for our company required by SEC are included in this annual report beginning on page F-1.

**Export Sales**

The following table presents total export sales by Stratasys, Ltd for each of the fiscal years indicated (in thousands):

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Total Export Sales* | $ 226,767 | $ 211,899 | $ 170,944 |
| *as a percentage of Total Sales* | 34.8% | 34.9% | 32.8% |

\* Export sales, as presented, are defined as sales to customers located outside of North America and Israel (where our dual headquarters are located).

126

Table of Contents

**Legal Proceedings**

We are a party to various legal proceedings incident to our business. Based upon the status of such cases, as determined with the advice of counsel, we have recorded provisions in our financial statements for amounts (if any) judged to be both quantifiable and probable to be paid. Except as noted below, there are no legal proceedings pending or threatened against us that we believe may have a significant effect on our financial condition, profitability and cash flows.

**Dividend Policy**

We have never paid cash dividends on our ordinary shares and do not anticipate that we will pay any cash dividends on our ordinary shares in the foreseeable future.

We intend to retain our earnings to finance the development of our business. Any future dividend policy will be determined by our board of directors based upon conditions then existing, including our earnings, financial condition, tax position and capital requirements, as well as such economic and other conditions as our board of directors may deem relevant. Pursuant to our articles of association, dividends may be declared by our board of directors. Dividends must be paid out of our profits and other surplus funds, as defined in the Companies Law, as of the end of the most recent year or as accrued over a period of the most recent two years, whichever amount is greater, provided that there is no reasonable concern that payment of a dividend will prevent us from satisfying our existing and foreseeable obligations as they become due. In addition, because we have received certain benefits under Israeli law relating to Approved Enterprises and Beneficiary Enterprises, our payment of dividends (out of tax-exempt income) may subject us to certain Israeli taxes to which we would not otherwise be subject. We are also restricted under our credit agreement with Bank of America from paying dividends. Please see the risk factors captioned "We do not anticipate paying any cash dividends in the foreseeable future. Therefore, if our share price does not appreciate, our shareholders may not recognize a return, and could potentially suffer a loss, on their investment in our ordinary shares," and "Even if we decide to pay dividends on our ordinary shares, we may be restricted from doing so or payment of such dividends may have adverse consequences for our company" in Item 3.D "Risk Factors-Risks related to an investment in our ordinary shares" above.

For a discussion of the applicable rates of withholding tax on dividends paid out of income derived from an Approved Enterprise or a Beneficiary Enterprise, see "Israeli Tax Considerations and Government Programs - The Law for the Encouragement of Capital Investments" in Item 4.B above.

**B. Significant Changes.**

Other than as otherwise described in this annual report, no significant change has occurred in our operations since the date of our consolidated financial statements included in this annual report.

Table of Contents

**ITEM 9. THE OFFER AND LISTING.**

**A. Listing Details and C. Market.**

Since December 3, 2012 (the first trading day after the effective time of the Stratasys, Inc.- Objet Ltd. merger), our ordinary shares have traded (and, prior to that time, Stratasys, Inc. common stock was traded) on the Nasdaq Global Select Market under the trading symbol "SSYS."

Our ordinary shares, par value NIS 0.01 per share, are registered on the books of our transfer agent, Continental Stock Transfer & Trust Company. There are no transfer restrictions apart from the requirement that any transfers comply with applicable securities laws and the rules of the Nasdaq Stock Market or any other securities exchange on which our ordinary shares may be listed in the future.

**ITEM 10. ADDITIONAL INFORMATION.**

**A. Share Capital.**

Not applicable

**B. Articles of Association.**

The information called for by this Item 10.B of Form 20-F has been provided in Exhibit 2.2 to this annual report. The content of Exhibit 2.2 is incorporated by reference herein.

128

Table of Contents

**C. Material Contracts.**

We have not entered into any material contract within the two years prior to the date of this annual report, other than contracts entered into in the ordinary course of business, or as otherwise described herein in Item 4.A-"History and Development of the Company", Item 4.B-"Business Overview", Item 5.B-"Operating and Financial Review and Prospects—Liquidity and Capital Resources", Item 6.C-"Board Practices-Director Service Contracts" and Item 7.B-"Related Party Transactions".

**D. Exchange Controls.**

There are currently no Israeli currency control restrictions on payments of dividends or other distributions with respect to our ordinary shares or the proceeds from the sale of ordinary shares, except for the obligation of Israeli residents to file reports with the Bank of Israel regarding certain transactions. However, legislation remains in effect pursuant to which currency controls can be imposed by administrative action at any time.

The ownership or voting of our ordinary shares by non-residents of Israel, except with respect to citizens of countries that are in a state of war with Israel, is not restricted in any way by our memorandum of association or amended articles or by the laws of the State of Israel.

**E. Taxation.**

*The following is a short summary of certain provisions of the tax environment to which shareholders may be subject. This summary is based on the current provisions of tax law. To the extent that the discussion is based on new tax legislation that has not been subject to judicial or administrative interpretation, we cannot assure you that the views expressed in the discussion will be accepted by the appropriate tax authorities or the courts.*

*The summary does not address all of the tax consequences that may be relevant to all purchasers of our ordinary shares in light of each purchaser's particular circumstances and specific tax treatment. For example, the summary below does not address the tax treatment of residents of Israel and traders in securities who are subject to specific tax regimes. As individual circumstances may differ, holders of our ordinary shares should consult their own tax adviser as to the United States, Israeli or other tax consequences of the purchase, ownership and disposition of ordinary shares. The following is not intended, and should not be construed, as legal or professional tax advice and is not exhaustive of all possible tax considerations. Each individual should consult his or her own tax or legal adviser.*

**Israeli Taxation Considerations**

Israeli law generally imposes a capital gains tax on the sale of any capital assets by residents of Israel, as defined for Israeli tax purposes, and on the sale of assets located in Israel, including shares of Israeli companies, by both residents and non-residents of Israel unless a specific exemption is available or unless a tax treaty between Israel and the seller's country of residence provides otherwise. The Tax Ordinance distinguishes between "Real Capital Gain" and "Inflationary Surplus". The Inflationary Surplus is a portion of the total capital gain which is equivalent to the increase of the relevant asset's purchase price which is attributable to the increase in the Israeli consumer price index or, in certain circumstances, a foreign currency exchange rate, between the date of purchase and the date of sale. The Real Capital Gain is the excess of the total capital gain over the Inflationary Surplus.

Table of Contents

***Israeli resident individuals***

*Capital Gain*

As of January 1, 2006, the tax rate applicable to Real Capital Gain derived by Israeli individuals from the sale of shares which had been purchased on or after January 1, 2003, whether or not listed on a stock exchange, is 20%, unless such shareholder claims a deduction for interest and linkage differences expenses in connection with the purchase and holding of such shares, in which case the gain will generally be taxed at a rate of 25%. Additionally, if such shareholder is considered a "Significant Shareholder" (*i.e.,* a person who holds, directly or indirectly, alone or together with another person who collaborates with such person on a permanent basis, 10% or more of any of the company's "means of control" (including, among other things, the right to receive profits of the company, voting rights, the right to receive the company's liquidation proceeds and the right to appoint a director)) at the time of sale or at any time during the preceding 12-month period, such gain will be taxed at the rate of 25%. Individual shareholders dealing in securities in Israel are taxed at their marginal tax rates applicable to business income (up to 47% in 2022, in addition to excess tax, if any, as described below) unless the benefiting provisions of an applicable treaty applies.

Notwithstanding the foregoing, pursuant to the Law for Change in the Tax Burden (Legislative Amendments) (Taxes), 2011, the capital gain tax rate applicable to individuals was raised from 20% to 25% from 2012 and onwards (or from 25% to 30% if the selling individual shareholder is a Significant Shareholder at any time during the 12-month period preceding the sale and\or claims a deduction for interest and linkage differences expenses in connection with the purchase and holding of such shares). With respect to assets (not shares that are listed on a stock exchange) purchased on or after January 1, 2003, the portion of the gain generated from the date of acquisition until December 31, 2011 will be subject to the previous capital gains tax rates (20% or 25%) and the portion of the gain generated from January 1, 2012 until the date of sale will be subject to the new tax rates (25% or 30%).

*Dividend Income*

Israeli residents who are individuals are generally subject to Israeli income tax for dividends paid on our ordinary shares (other than bonus shares or share dividends) at 25%, or 30% if the recipient of such dividend is a Significant Shareholder, at the time of distribution or at any time during the preceding 12-month period. However, dividends distributed from taxable income allocated and accrued during the benefits period of an Approved Enterprise or Beneficiary Enterprise are subject to withholding tax at the rate of 15% (and 20% with respect to Preferred Enterprise, Special Preferred Enterprise, Preferred Technology Enterprise and Special Preferred Technology Enterprise), if the dividend is distributed during the tax benefits period under the Investment Law or within 12 years after such period except with respect to an FIC, in which case the 12-year limit does not apply. An average rate will be set in case the dividend is distributed from mixed types of income (regular and Approved/ Beneficiary/ Preferred income).

***Israeli resident corporations***

*Capital Gain*

Under current Israeli tax legislation, the tax rate applicable to Real Capital Gain derived by Israeli resident corporations from the sale of shares of an Israeli company is the general corporate tax rate. As described in "Israeli Tax Considerations and Government Programs-General Corporate Tax Structure" in Item 4.B above, the corporate tax rate was 24% in 2017, and is 23% since 2018.

*Dividend Income*

Generally, Israeli resident corporations are exempt from Israeli corporate tax on the receipt of dividends paid on shares of Israeli resident corporations. However, dividends distributed from taxable income accrued during the benefits period of an Approved Enterprise or Beneficiary Enterprise are subject to withholding tax at the rate of 15%, if the dividend is distributed during the tax benefits period under the Investment Law or within 12 years after that period, except with respect to a FIC, in which case the 12-year limit does not apply.

130

Table of Contents

***Non-Israeli Residents***

*Capital Gain*

Israeli capital gains tax is imposed on the disposal of capital assets by a non-Israeli resident if such assets are either (i) located in Israel; (ii) shares or rights to shares in an Israeli resident company, or (iii) represent, directly or indirectly, rights to assets located in Israel, unless a tax treaty between Israel and the seller's country of residence provides otherwise. As mentioned above, Real Capital Gain is generally subject to tax at the corporate tax rate (24% in 2017 and 23% since 2018), if generated by a company, or at the rate of 25% (for any asset other than shares that are listed on a stock exchange - 20% with respect to the portion of the gain generated up to December 31, 2011) or 30% (for any asset other than shares that are listed on a stock exchange - 25% with respect to the portion of the gain generated up to December 31, 2011), if generated by an individual who is Significant Shareholder at the time of sale or at any time during the preceding 12-month period (or claims a deduction for interest and linkage differences expenses in connection with the purchase and holding of such shares) from the sale of assets purchased on or after January 1, 2003. Individual and corporate shareholders dealing in securities in Israel are taxed at the tax rates applicable to business income (a corporate tax rate for a corporation and a marginal tax rate of up to 50% for an individual in 2022) unless contrary provisions in a relevant tax treaty applies.

Notwithstanding the foregoing, shareholders who are non-Israeli residents (individuals and corporations) should generally exempt from Israeli capital gains tax on any gains derived from the sale, exchange or disposition of shares publicly traded on the Tel Aviv Stock Exchange or on a recognized stock exchange outside of Israel, provided, among other things, that (i) such gains are not generated through a permanent establishment that the non-Israeli resident maintains in Israel; (ii) the shares were purchased after being listed on a recognized stock exchange and (iii) with respect to shares listed on a recognized stock exchange outside of Israel, such shareholders are not subject to the Israeli Income Tax Law (Inflationary Adjustments) 5745-1985. However, non-Israeli corporations will not be entitled to the foregoing exemptions if Israeli residents (a) have a controlling interest of more than 25% in such non-Israeli corporation, or (b) are the beneficiaries of or are entitled to 25% or more of the revenues or profits of such non-Israeli corporation, whether directly or indirectly. Such exemption is not applicable to a person whose gains from selling or otherwise disposing of the shares are deemed to be business income.

In addition, a sale of shares may be exempt from Israeli capital gains tax under the provisions of an applicable tax treaty. For example, under the U.S.-Israel Tax Treaty, to which we refer as the U.S.-Israel Treaty, the sale, exchange or disposition of shares of an Israeli company by a shareholder who is a U.S. resident (for purposes of the U.S.-Israel Treaty) holding the shares as a capital asset is exempt from Israeli capital gains tax unless either (i) the shareholder holds, directly or indirectly, shares representing 10% or more of the voting rights during any part of the 12-month period preceding such sale, exchange or disposition, (ii) the shareholder, if an individual, has been present in Israel for a period or periods of 183 days or more in the aggregate during the applicable taxable year, (iii) the capital gains arising from such sale are attributable to a permanent establishment of the shareholder which is maintained in Israel, (iv) the capital gain arising from such sale, exchange or disposition is attributed to real estate located in Israel, or (v) the capital gains arising from such sale, exchange or disposition is attributed to royalties on copyright or film. In any such case, the sale, exchange or disposition of such shares would be subject to Israeli tax, to the extent applicable; however, under the U.S.-Israel Treaty, a U.S. resident would be permitted to claim a credit for the Israeli tax against the U.S. federal income tax imposed with respect to the sale, exchange or disposition, subject to the limitations in U.S. laws applicable to foreign tax credits. The U.S.-Israel Treaty does not provide such credit against any U.S. state or local taxes.

In some instances where our shareholders may be liable for Israeli tax on the sale of their Ordinary Shares, the payment of the consideration may be subject to the withholding of Israeli tax at source. Shareholders may be required to demonstrate that they are exempt from tax on their capital gains in order to avoid withholding at source at the time of sale. Specifically, in transactions involving a sale of all of the shares of an Israeli resident company, in the form of a merger or otherwise, the Israel Tax Authority may require from shareholders who are not liable for Israeli tax to sign declarations in forms specified by this authority or obtain a specific exemption from the Israel Tax Authority to confirm their status as non-Israeli resident, and, in the absence of such declarations or exemptions, may require the purchaser of the shares to withhold taxes at source.

Table of Contents

*Dividend Income*

Non-Israeli residents (whether individuals or corporations) are generally subject to Israeli income tax on the receipt of dividends paid on ordinary shares at the rate of 25% or 30% (if the dividend recipient is a Significant Shareholder at the time of distribution or at any time during the preceding 12-month period), 15% if the dividend is distributed from income attributed to our Approved Enterprise or Beneficiary Enterprise (and 20% with respect to Preferred Enterprise or 4% with respect to Preferred Technology Enterprise and Special Preferred Technology Enterprise if certain conditions are met). Such dividends are generally subject to Israeli withholding tax at a rate of 25% so long as the shares are registered with a nominee company (whether the recipient is a Significant Shareholder or not) and 15% if the dividend is distributed from income attributed to an Approved Enterprise or a Beneficiary Enterprise (and 20% if the dividend is distributed from income attributed to a Preferred Enterprise or 4% with respect to Preferred Technology Enterprise and Special Preferred Technology Enterprise if certain conditions are met), unless a reduced rate is provided under an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). For example, under the U.S.-Israel Treaty, the maximum rate of tax withheld at source in Israel on dividends paid to a holder of our ordinary shares who is a U.S. resident (for purposes of the U.S.-Israel Treaty) is 25%. However, generally, the maximum rate of withholding tax on dividends, not generated by our Approved Enterprise or Beneficiary Enterprise, that are paid to a U.S. corporation holding at least 10% or more of our outstanding voting capital from the start of the tax year preceding the distribution of the dividend through (and including) the distribution of the dividend, is 12.5%, provided that no more than 25% of our gross income for such preceding year consists of certain types of dividends and interest. Notwithstanding the foregoing, dividends distributed from income attributed to an Approved Enterprise or Beneficiary Enterprise are subject to a withholding tax rate of 15% for such U.S. corporation shareholder, provided that the condition related to our gross income for the previous year (as set forth in the previous sentence) is met. The aforementioned rates will not apply if the dividend income was generated through a permanent establishment of the U.S. resident that is maintained in Israel. If the dividend is attributable partly to income derived from an Approved Enterprise, a Beneficiary Enterprise or Preferred Enterprise, and partly to other sources of income, the withholding rate will be a blended rate reflecting the relative portions of the two types of income. U.S. residents who are subject to Israeli withholding tax on a dividend may be entitled to a credit or deduction for United States federal income tax purposes in the amount of the taxes withheld, subject to detailed rules contained in the Code.

A non-Israeli resident who receives dividends from which tax was withheld is generally exempt from the obligation to file tax returns in Israel with respect to such income, provided that (i) such income was not generated from business conducted in Israel by the taxpayer, (ii) the taxpayer has no other taxable sources of income in Israel with respect to which a tax return is required to be filed, and (iii) the taxpayer is not obligated to pay excess tax (as further explained below).

*Excess Tax*

Individuals who are subject to tax in Israel (whether any such individual is an Israeli resident or non-Israeli resident) are also subject to an additional tax at a rate of 3% on annual income exceeding NIS 647,640 for 2022, which amount is linked to the annual change in the Israeli consumer price index, including, but not limited to, dividends, interest and capital gain.

**U.S. Federal Income Tax Considerations**

Subject to the limitations described in the following paragraphs, the discussion below describes the material U.S. federal income tax consequences to a beneficial owner of our ordinary shares, referred to in this discussion as a U.S. holder that is:

- an individual who is a citizen or resident of the United States for U.S. federal income tax purposes;

- a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States or of any state or the District of Columbia;

- an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source; or

- a trust, if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or the trust has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

132

Table of Contents

This summary is not a comprehensive description of all of the tax considerations that may be relevant to each person's decision to purchase, hold or dispose of ordinary shares. This summary considers only U.S. holders that hold ordinary shares as capital assets.

This discussion is based on current provisions of the U.S. Internal Revenue Code of 1986, to which we refer as the Code, current and proposed Treasury regulations, and administrative and judicial decisions as of the date of this annual report, all of which are subject to change, possibly on a retroactive basis. This discussion does not address all aspects of U.S. federal income taxation that may be relevant to any particular shareholder based on the shareholder's individual circumstances. In particular, this discussion does not address the potential application of the alternative minimum tax or the U.S. federal income tax consequences to U.S. holders that are subject to special treatment, including U.S. holders that:

- are broker dealers or insurance companies;

- have elected mark-to-market accounting;

- are tax-exempt organizations;

- are financial institutions or financial services entities;

- are partnerships or other entities treated as partnerships for U.S. federal income tax purposes or partners thereof or members therein;

- hold ordinary shares as part of a straddle, hedge, conversion or other integrated transaction with other investments;

- own directly, indirectly or by attribution at least 10% of our voting power; or

- have a functional currency that is not the U.S. dollar.

In addition, this discussion does not address any aspect of state, local or non-U.S. tax laws, or the possible application of the U.S. federal estate or gift tax or any state inheritance, estate or gift tax.

Material aspects of U.S. federal income tax law relevant to a holder other than a U.S. holder, referred to in this discussion as a non-U.S. holder, are also discussed below.

**Each prospective investor is advised to consult his or her own tax adviser for the specific tax consequences to that investor of purchasing, holding or disposing of our ordinary shares.**

*Taxation of Dividends Paid on Ordinary Shares*

Subject to the discussion below under "Tax Consequences if We Are a Passive Foreign Investment Company," a U.S. holder will be required to include in gross income as ordinary income the gross amount of any distribution paid on ordinary shares, including any Israeli taxes withheld from the amount paid, on the date the distribution is actually or constructively received, to the extent the distribution is paid out of our current or accumulated earnings and profits as determined for U.S. federal income tax purposes." In addition, under the Patient Protection and Affordable Care Act, higher income taxpayers must pay an additional 3.8 percent tax on net investment income to the extent certain threshold amounts of income are exceeded. See "Tax on Net Investment Income" in this Item below.

133

Table of Contents

Dividends that are received by U.S. holders that are individuals, estates or trusts generally will be taxed at the rate applicable to long-term capital gains (a maximum rate of 15% or 20%, in case of taxpayers with annual taxable income which exceeds certain thresholds), provided those dividends meet the requirements of "qualified dividend income." Dividends that fail to meet these requirements, and dividends taxable to corporate U.S. holders, are taxed at ordinary income rates. No dividend received by a U.S. holder will be a qualified dividend (1) if the U.S. holder held the ordinary share with respect to which the dividend was paid for less than 61 days during the 121-day period beginning on the date that is 60 days before the ex-dividend date with respect to the dividend, excluding for this purpose, under the rules of Code Section 246(c), any period during which the U.S. holder has an option to sell, is under a contractual obligation to sell, has made and not closed a short sale of, is the grantor of a deep-in-the-money or otherwise nonqualified option to buy, or has otherwise diminished its risk of loss by holding other positions with respect to, the ordinary share (or substantially identical securities); or (2) to the extent that the U.S. holder is under an obligation (pursuant to a short sale or otherwise) to make related payments with respect to positions in property substantially similar or related to the ordinary share with respect to which the dividend is paid. If we were to be a "passive foreign investment company" (as that term is defined in the Code) for any year, dividends paid on our ordinary shares in that year or in the year following that year would not be qualified dividends. In addition, a non-corporate U.S. holder will be able to take a qualified dividend into account in determining its deductible investment interest (which is generally limited to its net investment income) only if it elects to do so, in which case the dividend will be taxed at ordinary income rates. Corporate holders will not be allowed a deduction for dividends received in respect of our ordinary shares.

Dividends on our ordinary shares will be foreign source passive income (or in some cases, general category income) for U.S. foreign tax credit purposes. Distributions in excess of earnings and profits will be applied against and will reduce, on a share-by-share basis, the U.S. holder's basis in the ordinary shares and, to the extent in excess of that basis, will be treated as gain from the sale or exchange of ordinary shares.

The amount of a distribution paid to a U.S. holder in a foreign currency will be the U.S. dollar value of the foreign currency calculated by reference to the spot exchange rate on the day the U.S. holder receives the distribution. A U.S. holder that receives a foreign currency distribution and converts the foreign currency into U.S. dollars after receipt will have foreign exchange gain or loss based on any appreciation or depreciation in the value of the foreign currency against the U.S. dollar, which will generally be U.S. source ordinary income or loss.

U.S. holders will have the option of claiming the amount of any Israeli income taxes withheld at source either as a deduction from gross income or as a dollar-for-dollar credit against their U.S. federal income tax liability. Individuals who do not claim itemized deductions, but instead utilize the standard deduction, may not claim a deduction for the amount of the Israeli income taxes withheld, but the amount may be claimed as a credit against the individual's U.S. federal income tax liability. The amount of foreign income taxes that may be claimed as a credit in any year is generally subject to complex limitations and restrictions, which must be determined on an individual basis by each shareholder. Those limitations include the provisions described in the following paragraphs, as well as rules that limit foreign tax credits allowable for a class of income to the U.S. federal income taxes otherwise payable on the net income in that class.

A U.S. holder will be denied a foreign tax credit for Israeli income tax withheld from dividends received on our ordinary shares:

- if the U.S. holder has not held the ordinary shares for at least 16 days of the 30-day period beginning on the date that is 15 days before the ex-dividend date; or

- to the extent that the U.S. holder is under an obligation to make related payments on substantially similar or related property.

Any days during which a U.S. holder has substantially diminished its risk of loss on the ordinary shares are not counted toward meeting the 16-day holding period required by the statute. A foreign tax credit for the Israeli tax can be deferred if the U.S. holder enters into certain types of arrangements to defer inclusion of the related dividend in income for tax purposes.

134

Table of Contents

*Taxation of the Disposition of Ordinary Shares*

Subject to the discussion below under "Tax Consequences if We Are a Passive Foreign Investment Company," upon the sale, exchange or other taxable disposition of our ordinary shares, a U.S. holder will recognize capital gain or loss in an amount equal to the difference between the U.S. holder's basis in the ordinary shares, which is usually the cost to the U.S. holder of the shares, and the amount realized on the disposition. Capital gain from the sale, exchange or other disposition of ordinary shares held more than one year is long-term capital gain and is eligible for a reduced rate of taxation in the case of non-corporate taxpayers. Gain or loss recognized by a U.S. holder on the sale, exchange or other disposition of ordinary shares generally will be treated as U.S. source income or loss for U.S. foreign tax credit purposes. The deductibility of capital losses is subject to limitations.

A U.S. holder that uses the cash method of accounting calculates the U.S. dollar value of foreign currency proceeds received on a sale as of the date on which the U.S. holder receives the foreign currency. However, a U.S. holder that uses an accrual method of accounting is required to calculate the value of the proceeds of the sale as of the date of sale and may therefore realize foreign currency gain or loss on a subsequent disposition of the foreign currency based on any subsequent appreciation or depreciation in the value of the foreign currency against the U.S. dollar. That gain or loss will generally be U.S. source ordinary income or loss.

*Tax Consequences if We Are a Passive Foreign Investment Company*

We will be a passive foreign investment company, to which we refer as a PFIC, if 75% or more of our gross income in a taxable year, including our pro rata share of the gross income of any corporation in which we are considered to own 25% or more of the shares by value (subject to certain exceptions in the case of a U.S. corporation), is passive income. Alternatively, we will be considered to be a PFIC if at least 50% of our assets in a taxable year, ordinarily determined based on the quarter-end average fair market value of our assets over the taxable year and including the pro rata share of the assets of any corporation in which we are considered to own 25% or more of the shares by value (subject to certain exceptions in the case of a U.S. corporation), produce or are held for the production of passive income.

If we were a PFIC, and a U.S. holder did not make, as described below, a timely election either to treat us as a qualified electing fund or, if the election is available, to mark our shares to market, any excess distributions we pay to a U.S. holder would be taxed in a special way. Excess distributions are amounts paid on shares in a PFIC in any taxable year that exceed 125% of the average distributions paid on those shares in the shorter of:

- the three previous years; and

- the U.S. holder's holding period for ordinary shares before the present taxable year.

Excess distributions must be allocated ratably to each day that a U.S. holder has held our ordinary shares. A U.S. holder would then be required to include amounts allocated to the current taxable year and each prior year in which we were not a PFIC (but not before our first taxable year beginning after December 31, 1986) in its gross income as ordinary income for the current year. Further, a U.S. holder would be required to pay tax on amounts allocated to each prior taxable year in which we were a PFIC at the highest rate in effect for that year on ordinary income, and the tax for each such year would be subject to an interest charge at the rate applicable to deficiencies for income tax.

135

Table of Contents

The entire amount of gain that is realized or treated as realized by a U.S. holder upon the sale or other disposition of ordinary shares (generally whether or not the disposition is a taxable transaction) will also be treated as an excess distribution and will be subject to tax as described in the preceding paragraph.

In some circumstances a U.S. holder's tax basis in our ordinary shares that were inherited from a deceased person who was a U.S. holder would not equal the fair market value of those ordinary shares as of the date of the deceased person's death but would instead be equal to the deceased's basis, if lower.

The special PFIC rules described above will not apply to a U.S. holder if that U.S. holder makes an election to treat us as a qualified electing fund, to which we refer as a QEF, in the first taxable year in which the U.S. holder owns ordinary shares, provided we comply with specified reporting requirements. Instead, a U.S. holder who has made such a QEF election is required for each taxable year in which we are a PFIC to include in income a pro rata share of our ordinary earnings as ordinary income and a pro rata share of our net capital gain as long-term capital gain, subject to a separate election to defer payment of the related tax. If deferred, the taxes will be subject to an interest charge. We would supply U.S. holders with the information needed to report income and gain under a QEF election if we were classified as a PFIC.

The QEF election is made on a shareholder-by-shareholder basis and can be revoked only with the consent of the Internal Revenue Service, to which we refer as the IRS. A shareholder makes a QEF election by attaching a completed IRS Form 8621, including the PFIC annual information statement, to a timely filed U.S. federal income tax return. If you are not required to file an income tax return or other return for the tax year, file the form directly with the IRS Service Center in Ogden, UT 84201-0201. Even if a QEF election is not made, a United States person who is a shareholder in a PFIC must file every year a completed IRS Form 8621 or other form as may be prescribed by the IRS pursuant to legislation requiring annual reports with respect to PFICs.

A U.S. holder of PFIC shares that are publicly traded may elect to mark the stock to market annually, recognizing as ordinary income or loss each year an amount equal to the difference as of the close of the taxable year between the fair market value of the PFIC shares and the U.S. holder's adjusted tax basis in the PFIC shares. Losses would be allowed only to the extent of net mark-to-market gain previously included in income by the U.S. holder under the election for prior taxable years. If the mark-to-market election were made, then the rules described above (other than the rules for excess distributions, which would apply to the first year the election is made if we were a PFIC in a prior year and a QEF election were not made for the first year we were a PFIC) would not apply for periods covered by the election.

Although we do not believe that we were a PFIC in 2022, we cannot assure you that the IRS will agree with that conclusion or that we will not become a PFIC in 2023 or in a subsequent year. The tests for determining PFIC status are applied annually, and it is difficult to make accurate predictions of future income and assets, which are relevant to this determination. U.S. holders who hold ordinary shares during a period when we are a PFIC will be subject to these rules, even if we cease to be a PFIC in later years, subject to specified exceptions for U.S. holders who made a QEF election in the first year they held our ordinary shares and we were a PFIC or if in a later year they made any of certain elections to purge the PFIC taint of our ordinary shares, which elections generally require the payment of tax. U.S. holders are urged to consult their tax advisers about the PFIC rules, including QEF and mark-to-market elections.

*Tax on Net Investment Income*

A U.S. holder that is an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from the tax, will be subject to a 3.8% tax on the lesser of (1) the U.S. holder's "net investment income" for the relevant taxable year and (2) the excess of the U.S. holder's modified adjusted gross income for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and $250,000, depending on the individual's circumstances). A U.S. holder's net investment income generally will include its dividends on our ordinary shares and net gains from dispositions of our ordinary shares, unless those dividends or gains are derived in the ordinary course of the conduct of trade or business (other than trade or business that consists of certain passive or trading activities). Net investment income, however, may be reduced by deductions properly allocable to that income. A U.S. holder that is an individual, estate or trust is urged to consult its tax adviser regarding the applicability of the Medicare tax to its income and gains in respect of its investment in our ordinary shares.

136

Table of Contents

*Tax Consequences for Non-U.S. Holders of Ordinary Shares*

Except as described in "Information Reporting and Backup Withholding" below, a non-U.S. holder of ordinary shares will not be subject to U.S. federal income or withholding tax on the payment of dividends on, and the proceeds from the disposition of, ordinary shares, unless:

- the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States and, in the case of a resident of a country that has an income treaty with the United States, the income is attributable to a U.S. permanent establishment, or, in the case of an individual, a fixed place of business in the United States;

- the non-U.S. holder is an individual who holds the ordinary shares as a capital asset and is present in the United States for 183 days or more in the taxable year of the disposition and does not qualify for an exemption; or

- the non-U.S. holder is subject to tax under the provisions of U.S. tax law applicable to U.S. expatriates.

A non-U.S. holder is a beneficial owner of our ordinary shares that is (1) a nonresident alien as to the United States for U.S. federal income tax purposes; (2) a corporation created or organized in or under the law of a country, or any of its political subdivisions, other than the United States; or (3) an estate or trust that is not a U.S. holder.

*Information Reporting and Backup Withholding*

U.S. holders generally are subject to information reporting requirements for dividends paid in the United States on ordinary shares. Dividends paid in the United States to a U.S. holder on ordinary shares are subject to backup withholding at a rate of 28% unless the U.S. holder provides IRS Form W-9 or establishes an exemption. U.S. holders generally are subject to information reporting and backup withholding at a rate of 28% on proceeds paid from the disposition of ordinary shares unless the U.S. holder provides IRS Form W-9 or establishes an exemption.

The Foreign Account Tax Compliance Act, or FATCA, was enacted during 2014. FATCA generally requires foreign financial institutions (FFIs) to identify U.S. account holders and report them to the IRS or pay a 30% withholding tax. Nonfinancial foreign entities (or NFFEs) are required to report their substantial U.S. owners to withholding agents or pay a 30% withholding tax. FATCA's objective is to prevent tax evasion by requiring the disclosure of account holder information to the IRS. Because Stratasys is a publicly traded company that is not a financial institution, FATCA has less impact than the rules discussed above that are still in effect for withholding tax purposes.

A non-U.S. holder who effects the sale of his ordinary shares by or through a U.S. office of a broker is subject to both information reporting and backup withholding tax on the payment of the proceeds unless he certifies, under penalties of perjury, that he is not a U.S. person or otherwise establishes an exemption. If a non-U.S. holder sells his ordinary shares through a non-U.S. office of a non-U.S. broker and the sales proceeds are paid to the holder outside the United States, then information reporting and backup withholding generally will not apply to that payment. However, information reporting requirements, but not backup withholding, will apply to a payment of sales proceeds, even if that payment is made to a non-U.S. holder outside the United States, if the holder sells his ordinary shares through a non-U.S. office of a broker that is a U.S. person or has some other contacts with the United States. Those information reporting requirements will not apply, however, if the broker has documentary evidence in its records that the holder is a non-U.S. person and certain other conditions are met, or the holder otherwise establishes an exemption.

Backup withholding is not an additional tax. Rather, the amount of any backup withholding will be allowed as a credit against a U.S. or non-U.S. holder's U.S. federal income tax liability, and a taxpayer generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed the taxpayer's U.S. federal income tax liability by filing a refund claim with the IRS, provided in each case that required information is furnished to the IRS.

Table of Contents

**Information Reporting by Certain U.S. Holders**

U.S. citizens and individuals taxable as resident aliens of the United States that own "specified foreign financial assets" with an aggregate value in a taxable year in excess of certain thresholds (as determined under Treasury regulations) and that are required to file a U.S. federal income tax return generally will be required to file an information report with respect to those assets with their tax returns. IRS Form 8938 has been issued for that purpose. "Specified foreign financial assets" include any financial accounts maintained by foreign financial institutions, foreign stocks held directly, and interests in foreign estates, foreign pension plans or foreign deferred compensation plans. Under those rules, our ordinary shares, whether owned directly or through a financial institution, estate or pension or deferred compensation plan, would be "specified foreign financial assets." Under Treasury regulations, the reporting obligation applies to certain U.S. entities that hold, directly or indirectly, specified foreign financial assets. Penalties can apply if there is a failure to satisfy this reporting obligation. A U.S. holder is urged to consult his tax adviser regarding his reporting obligation.

**F. Dividends and Paying Agents.**

Not applicable.

**G. Statement by Experts.**

Not applicable.

**H. Documents on Display.**

We are subject to the informational requirements of the Exchange Act. In accordance with these requirements, we are required to file reports and other information with the SEC. The SEC maintains a website that contains reports and information statements and other information about issuers, such as us, who file electronically with the SEC. The address of that website is *www.sec.gov*. The reports and other information filed by us with the SEC are also available at our website, at *investors.stratasys.com*. The web addresses of the SEC and our company have been included as inactive textual references only. Information on those websites is not part of this annual report.

Table of Contents

As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of proxy statements, and our officers, directors and principal shareholders are exempt from the reporting and "short-swing" profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we are not required under the Exchange Act to file periodic reports and financial statements with the SEC as frequently or as promptly as United States companies whose securities are registered under the Exchange Act.

## I. Subsidiary Information.

Not Applicable.

## J. Annual Report to Security Holders

Not Applicable.

## ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.

Market risk is the risk of loss related to changes in market prices, including mainly interest rates and foreign exchange rates, of financial instruments that may adversely impact our consolidated balance sheets, statements of operations or cash flows.

### *Foreign Currency Exchange Risk*

Due to our international operations, currency exchange rates impact our financial performance.

The majority of our balance sheet exposure relates to foreign currency assets and liabilities in entities which their functional currency is Euro. Our net Euro balance sheet exposure as of December 31, 2022 was approximately $28.8 million.

Our total revenues amounted to $651.5 million in 2022, of which approximately 14.5% were denominated in Euros. During 2022, our Euro-denominated revenues exceeded our Euro-denominated expenses. Conversely, our expenses denominated in shekels are higher than our expected shekel-denominated revenues. For those currencies which do not have a sufficient natural hedge within our operations (such as offsetting revenues and expenses recorded in a given currency, or some other hedge), we may choose to hedge in order to reduce the impact of currency fluctuations on our operating results. In 2022, we entered into hedging transactions to reduce our potential currency exposure related to the U.S. dollar against each of the Euro and the New Israeli Shekel. Our foreign exchange forward contracts in effect as of December 31, 2022 were for the conversion of $12.7 million Euro into USD and $64.4 million into NIS.

The net effect of these risks stemming from currency exchange rate fluctuations on our operating results can be quantified as follows:

(i) A change of 10% in the value of the Euro relative to the U.S. dollar in the year ended December 31, 2022 would have resulted in a change in the U.S. dollar reporting value of our consolidated operating income of $3.9 million for that year, mainly due to revenues earned in Euros.

(ii) A change of 10% in the value of the shekel relative to the dollar in the year ended December 31, 2022 would have resulted in a change in the dollar-reported value of our consolidated operating income of $14.4 million, mainly due to shekel-recorded expenses.

We will continue to monitor exposure to currency fluctuations. Instruments that may be used to protect us against future risks may include foreign currency forward and swap contracts. These instruments may be used to selectively manage risks, but there can be no assurance that we will be fully protected against material foreign currency fluctuations. We do not use derivative financial instruments for speculative or trading purposes.

Table of Contents

**Interest Rate Risk**

Our cash and cash equivalents are held primarily in bank deposits with maturities of less than 90 days, and our short-term bank deposits have maturities of more than 90 days. Both are subject to limited interest rate risk, with an average interest rate of 6.17%. A 10% change in interest rates would not have a material effect on our financial condition or results of operations.

**ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES.**

Not Applicable.

**PART II**

**ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES.**

None

**ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS.**

None

**ITEM 15. CONTROLS AND PROCEDURES.**

**(a) Disclosure Controls and Procedures**.

We carried out an evaluation under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of December 31, 2022, the end of the period covered by this annual report. We maintain disclosure controls and procedures designed to ensure that the information required to be disclosed by us in filings and submissions under the Exchange Act, is recorded, processed, summarized, and reported within the time periods specified by the SEC's rules and forms, and that information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and our management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on such evaluation, our chief executive officer and chief financial officer have concluded that our disclosure controls and procedures were effective as of December 31, 2022.

**(b) Management's Annual Report on Internal Control Over Financial Reporting.**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system was designed to provide reasonable assurance to our management and board of directors regarding the reliability of financial reporting and the preparation and fair presentation of its published consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2022. In making our assessment, our management used the criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment, management has concluded that, as of December 31, 2022, our internal control over financial reporting is effective based on those criteria.

Kesselman & Kesselman, an independent registered public accounting firm in Israel and a member of PricewaterhouseCoopers International Limited, to which we refer as PwC, which audited the financial statements included in this annual report containing the disclosure required by this Item 15 has issued an attestation report regarding the effectiveness of our internal control over financial reporting.

Table of Contents

**(c) Attestation Report of Registered Public Accounting Firm**.

PwC's attestation report regarding the effectiveness of our internal control over financial reporting is included in "Item 18-Financial Statements" on page F-1 of this annual report, which attestation report is incorporated by reference in this Item 15(c).

**(d) Changes in Internal Control over Financial Reporting.**

Based on the evaluation conducted by our management, with the participation of our chief executive officer and chief financial officer, pursuant to Rules 13a-15(d) and 15d-15(d) promulgated under the Exchange Act, our management (including such officers) have concluded that there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this annual report that have materially affected, or that are reasonably likely to materially affect, our internal control over financial reporting.

**ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT.**

Our board of directors has determined that Mr. Yair Seroussi, who serves on the audit committee of our board of directors, meets the requirements of an "audit committee financial expert", as defined in Item 407(d)(5) of SEC Regulation S-K and Item 16A of SEC Form 20-F and is an independent director, as defined in Rule 5600(a)(2) of the Nasdaq Listing Rules.

**ITEM 16B. CODE OF ETHICS.**

We have adopted a Code of Business Conduct and Ethics, which we to which we refer as the code of ethics, that applies to all directors, officers, and employees of our company and its subsidiaries, including our principal executive officer, principal financial officer, principal accounting officer or controller and other persons performing similar functions for us. A copy of the code of ethics has been posted on our Internet website, http://investors.stratasys.com/governance.cfm and is incorporated herein by reference. The foregoing website has been provided as an inactive textual reference only, and the content of that website is not a part of this annual report.

Table of Contents

**ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES.**

The following table sets forth, for the years ended December 31, 2021 and 2020, the fees billed to us and our subsidiaries by our principal accountant. [1]

| | Year ended December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Audit fees [2] | $ 843,700 | $ 793,200 |
| Audit-related [3] | 20,000 | 18,750 |
| Tax fees [4] | 140,000 | 123,500 |
| All other fees [5] | 19,800 | 18,300 |
| **Total** | **$ 1,023,500** | **$ 953,750** |

(1)    Comprised by fees billed by Kesselman & Kesselman, a member firm of PricewaterhouseCoopers International Limited, an independent registered public accounting firm, or Kesselman & Kesselman (which served as our principal accountant with respect to the years ended December 31, 2022 and 2021).

(2)    Audit fees consist of fees for professional services rendered by our principal accountant in connection with the audit of our consolidated annual financial statements and services that would normally be provided by our principal accountant in connection with statutory and regulatory filings or engagements.

(3)    The audit-related fees for the year ended December 31, 2022 and 2021 were for due diligence related to acquisitions.

(4)    Tax fees are fees for services rendered by our principal accountant in connection with tax compliance, tax planning and tax advice.

(5)    All other fees are fees for other consulting services (if any) rendered by our principal accountant to us.

142

Table of Contents

**ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES.**

None.

**ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS.**

None.

**ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT.**

Not applicable.

**ITEM 16G. CORPORATE GOVERNANCE.**

The Nasdaq Global Select Market requires companies with securities listed thereon to comply with its corporate governance standards. As a foreign private issuer, we are not required to comply with all of the rules that apply to listed domestic U.S. companies. Pursuant to Nasdaq Listing Rule 5615(a)(3), we have notified Nasdaq that with respect to the corporate governance practices described below, we will instead follow Israeli law and practice and accordingly will not follow the Nasdaq Listing Rules. Except for the differences described below, we do not believe there are any significant differences between our corporate governance practices and those that apply to a U.S. domestic issuer under the Nasdaq Global Select Market corporate governance rules.

- <u>Quorum for Shareholder Meetings</u>: As permitted under the Companies Law, under a recent amendment adopted to our amended and restated articles of association, the quorum required for an ordinary meeting of shareholders consists of at least two shareholders present in person, by proxy or by other voting instrument, who hold at least 25% of the voting power of our shares (and in an adjourned meeting, with some exceptions, two shareholders, regardless of the voting power associated with their shares), instead of 33 1/3% of the issued share capital required under the Nasdaq Listing Rules.

- <u>Executive Sessions of Independent Directors</u>: Under the Companies Law, our independent directors (as defined under the Nasdaq Listing Rules) do not need to meet regularly in sessions at which only they are present, as is required of U.S. domestic issuers under Nasdaq Listing Rule 5605(b)(2).

- <u>Independent Director Oversight of Nominations</u>: Under Israeli law, there is no requirement to have an independent nominating committee or the independent directors of a company select (or recommend for selection) director nominees, as is required under Nasdaq Listing Rule 5605(e) for a U.S. domestic issuer. Our board of directors (based on the recommendation of the executive committee thereof) handles this process, as is permitted by our amended articles and the Companies Law. We also need not adopt a formal board resolution or charter addressing the director nominations process and such related matters as may be required under the U.S. federal securities laws, as Nasdaq requires for a U.S. issuer.

- <u>Compensation Committee Charter</u>: Under Israeli law, we are not required to adopt, and our company has not adopted, a formal written compensation committee charter for the compensation committee of our board of directors, as is generally require Nasdaq Listing Rules related to the composition, responsibilities and authority of the compensation committee.

- <u>Shareholder Approval</u>: Pursuant to Israeli law, we seek shareholder approval for all corporate actions requiring such approval under the requirements of the Companies Law, which are different from, or in addition to, the requirements for seeking shareholder approval under Nasdaq Listing Rule 5635. See "Item 6. Directors, Senior Management and Employees—C. Board Practices — Fiduciary Duties of Office Holders" in this annual report for a description of the some of the transactions requiring shareholder approval under the Companies Law.

**ITEM 16H. MINE SAFETY DISCLOSURE.**

Not applicable.

**ITEM 16I. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTION.**

Not applicable.

Table of Contents

**PART III**

**ITEM 17. FINANCIAL STATEMENTS.**

We have elected to provide financial statements and related information pursuant to Item 18.

**ITEM 18. FINANCIAL STATEMENTS**

The consolidated financial statements and the related notes required by this Item are included in this annual report beginning on page F-1.

144

Table of Contents

**STRATASYS LTD.**

CONSOLIDATED FINANCIAL STATEMENTS

DECEMBER 31, 2022

| Index to Consolidated Financial Statements | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB name: Kesselman & Kesselman C.P.A and PCAOB ID:1309) | F-2 |
| Consolidated Balance Sheets at December 31, 2022 and 2021 | F-5 to F-6 |
| Consolidated Statements of Operations and Comprehensive Loss for the Years Ended December 31, 2022, 2021 and 2020 | F-7 |
| Consolidated Statements of Changes in Equity for the Years Ended December 31, 2022, 2021 and 2020 | F-8 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022, 2021 and 2020 | F-9 to F-10 |
| Notes to the Consolidated Financial Statements | F-11 to F-54 |

F-1

Table of Contents



# Report of Independent Registered Public Accounting Firm

To the board of directors and shareholders of Stratasys Ltd.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Stratasys Ltd. and its subsidiaries (the "Company") as of December 31, 2022 and 2021, and the related consolidated statements of operations and comprehensive loss, of changes in equity and of cash flows for each of the three years in the period ended December 31, 2022, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Annual Report on Internal Control over Financial Reporting appearing under Item 15(b). Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

F-2

Table of Contents

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

***Critical Audit Matters***
The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Goodwill Impairment Assessment – Stratasys-Core reporting unit*

As described in Note 7 to the consolidated financial statements, the Company's goodwill balance in respect of the Stratasys-Core reporting unit is $65 million as of December 31, 2022. Management conducts an impairment test in the fourth quarter of each year, or more frequently if events or circumstances indicate that the carrying value of goodwill may be impaired. Potential impairment is identified by comparing the fair value of a reporting unit to its carrying value, including goodwill. Fair value is estimated by management using a discounted cash flow model. Management's cash flow projections for the Stratasys-Core reporting unit includes significant judgments and assumptions relating to the cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate.

The principal considerations for our determination that performing procedures relating to the goodwill impairment assessment of the Stratasys-Core reporting unit is a critical audit matter are (i) the significant judgment by management when developing the fair value measurement of the reporting unit; (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumptions related to the cash flow projections (including revenue growth and associated operating profit margins), the long-term growth rates, and the discount rate; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

F-3

Table of Contents

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's goodwill impairment assessment, including controls over the valuation of the Company's reporting units. These procedures also included, among others, testing management's process for developing the fair value estimate of the reporting unit, evaluating the appropriateness of the discounted cash flow model, testing the completeness, accuracy, and relevance of underlying data used in the model, and evaluating the significant assumptions used by management, including the cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate. Evaluating management's assumptions related to cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate involved evaluating whether the assumptions used by management were reasonable considering (i) the current and past performance of the reporting unit, (ii) the consistency with external market and industry data, and (iii) whether these assumptions were consistent with evidence obtained in other areas of the audit. Professionals with specialized skill and knowledge were used to assist in the evaluation of the Company's discounted cash flow model and the discount rate assumption.

*Fair value measurement of the contingent consideration*

As described in Notes 2 and 4 to the consolidated financial statements, the Company has $38.3 million contingent consideration liabilities recorded as of December 31, 2022 representing the fair value of additional amounts that management believes are likely to be paid in cash and ordinary shares of the Company to the sellers of Origin and Xaar, upon the achievement of certain financial targets. Management applied significant judgment in estimating the fair value of the contingent consideration recorded, which also impacted the results of operations of the Company by approximately $14.8 million for the change in the fair value of such liabilities in the year ended December 31, 2022. Such fair value estimation involved the use of significant estimates and assumptions with respect to the achievement of the financial metrics and the related timing and amounts of the contingent payments.

The principal considerations for our determination that performing procedures relating to the fair value valuation of the contingent consideration is a critical audit matter are (i) the high degree of auditor judgment and subjectivity in performing procedures relating to the fair value measurement of the contingent consideration recorded, due to the significant judgment by management when developing the estimate; (ii) significant audit effort in evaluating the significant assumptions relating to the estimate, such as the achievement of the financial metrics and the related timing and amounts of the contingent payments, as well as the net cash flow projections and the discount rate used; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's valuation of the contingent consideration and controls over development of the cash flow projections and the discount rate assumptions utilized in the valuation of the contingent consideration. These procedures also included, among others (i) reading the related agreements and (ii) testing management's process for estimating the fair value of contingent consideration. Testing management's process included evaluating the appropriateness of the valuation methods, testing the completeness and accuracy of data provided by management, and evaluating the reasonableness of significant assumptions related to the cash flow projections and the discount rate for the contingent consideration. Evaluating the reasonableness of the cash flow projections involved considering the past performance of the acquired businesses, as well as economic and industry forecasts. The discount rate was evaluated by considering the cost of capital of comparable businesses and other industry factors. Professionals with specialized skill and knowledge were used to assist in the evaluation of the Company's discounted cash flow model and the discount rate assumptions.

/s/ Kesselman & Kesselman
Certified Public Accountants (Isr.)
A member firm of PricewaterhouseCoopers International Limited

Tel-Aviv, Israel
March 3, 2023

We have served as the Company's auditor since 2012.

Table of Contents

# STRATASYS LTD.
**CONSOLIDATED FINANCIAL STATEMENTS**
**Consolidated Balance Sheets**
(in thousands, except per share data)

| December 31, | | 2022 | | 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 150,470 | $ | 243,179 |
| Short-term bank deposits | | 177,367 | | 259,000 |
| Accounts receivable, net of allowance for credit losses of $0.9 million and $0.5 million as of December 31, 2022 and December 31, 2021, respectively | | 144,739 | | 129,382 |
| Inventories | | 194,054 | | 129,147 |
| Prepaid expenses | | 5,767 | | 6,871 |
| Other current assets | | 27,823 | | 33,123 |
| Total current assets | | 700,220 | | 800,702 |
| **Non-current assets** | | | | |
| Property, plant and equipment, net | | 195,063 | | 203,295 |
| Goodwill | | 64,953 | | 65,144 |
| Other intangible assets, net | | 121,402 | | 152,244 |
| Operating lease right-of-use assets | | 18,122 | | 14,651 |
| Long-term investments | | 141,610 | | 28,667 |
| Other non-current assets | | 18,420 | | 12,519 |
| Total non-current assets | | 559,570 | | 476,520 |
| **Total assets** | $ | 1,259,790 | $ | 1,277,222 |
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities** | | | | |
| Accounts payable | $ | 72,921 | $ | 51,976 |
| Accrued expenses and other current liabilities | | 45,912 | | 55,358 |
| Accrued compensation and related benefits | | 34,432 | | 44,684 |
| Deferred revenues - short-term | | 50,220 | | 51,174 |
| Operating lease liabilities - short term | | 7,169 | | 7,276 |
| Total current liabilities | | 210,654 | | 210,468 |
| **Non-current liabilities** | | | | |
| Deferred revenues - long-term | | 25,214 | | 21,133 |
| Deferred income taxes | | 5,638 | | 7,341 |
| Operating lease liabilities - long term | | 10,670 | | 7,693 |
| Contingent consideration | | 23,707 | | 53,478 |
| Other non-current liabilities | | 24,475 | | 21,095 |
| Total non-current liabilities | | 89,704 | | 110,740 |
| **Total liabilities** | $ | 300,358 | $ | 321,208 |

**Commitments and contingencies (see note 10)**

F-5

Table of Contents

| | | | | |
|---|---|---:|---|---:|
| **Equity** | | | | |
| Ordinary shares, NIS 0.01 nominal value, authorized 180,000 shares; 67,086 shares and 65,677 shares issued and outstanding at December 31, 2022 and 2021, respectively | $ | 187 | $ | 182 |
| Additional paid-in capital | | 3,048,915 | | 3,012,481 |
| Accumulated other comprehensive loss | | (12,818) | | (8,771) |
| Accumulated deficit | | (2,076,852) | | (2,047,878) |
| Total equity | | 959,432 | | 956,014 |
| **Total liabilities and equity** | $ | 1,259,790 | $ | 1,277,222 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-6

Table of Contents

**STRATASYS LTD.**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Consolidated Statements of Operations and Comprehensive Loss**
(in thousands, except per share data)

| Years Ended December 31, | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Products | $ | 452,124 | $ | 417,557 | $ | 339,782 |
| Services | | 199,359 | | 189,662 | | 181,035 |
| | | 651,483 | | 607,219 | | 520,817 |
| **Cost of revenues** | | | | | | |
| Products | | 234,601 | | 210,941 | | 171,235 |
| Services | | 140,415 | | 136,200 | | 130,188 |
| | | 375,016 | | 347,141 | | 301,423 |
| **Gross profit** | | 276,467 | | 260,078 | | 219,394 |
| **Operating expenses** | | | | | | |
| Research and development, net | | 92,876 | | 88,303 | | 84,012 |
| Selling, general and administrative | | 240,750 | | 250,937 | | 205,224 |
| Goodwill impairment | | - | | - | | 386,154 |
| | | 333,626 | | 339,240 | | 675,390 |
| **Operating loss** | | (57,159) | | (79,162) | | (455,996) |
| Gain from deconsolidation of subsidiary | | 39,136 | | - | | - |
| Gain from step acquisition | | - | | 14,400 | | - |
| Financial income (expenses), net | | 229 | | (2,075) | | (575) |
| **Loss before income taxes** | | (17,794) | | (66,837) | | (456,571) |
| Income tax benefit (expenses) | | (5,454) | | 3,906 | | 16,394 |
| Share in net profits (losses) of associated companies | | (5,726) | | 949 | | (3,939) |
| **Net loss** | $ | (28,974) | $ | (61,982) | $ | (444,116) |
| Net loss attributable to non-controlling interests | | - | | - | | (395) |
| Net loss attributable to Stratasys Ltd. | $ | (28,974) | $ | (61,982) | $ | (443,721) |
| **Net loss per share attributable to Stratasys Ltd. - basic and diluted** | $ | (0.44) | $ | (0.98) | $ | (8.08) |
| **Weighted average shares outstanding - basic and diluted** | | 66,491 | | 63,471 | | 54,918 |
| **Comprehensive Loss** | | | | | | |
| Net loss | | (28,974) | | (61,982) | | (444,116) |
| Other comprehensive income (loss), net of tax: | | | | | | |
| Foreign currency translation adjustments | | (2,175) | | (3,170) | | 533 |
| Unrealized gains (losses) on derivatives designated as cash flow hedge | | (1,872) | | 3,245 | | (1,663) |
| Other comprehensive income (loss), net of tax | | (4,047) | | 75 | | (1,130) |
| Comprehensive loss | | (33,021) | | (61,907) | | (445,246) |
| Less: Comprehensive loss attributable to non-controlling interests | | - | | - | | (395) |
| Comprehensive loss attributable to Stratasys Ltd. | $ | (33,021) | $ | (61,907) | $ | (444,851) |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**STRATASYS LTD.**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Consolidated Statements of Changes in Equity**

(in thousands)
**Years Ended December 31, 2022, 2021, and 2020**

| | Ordinary Shares | | | | | |
| | Number of shares | Par Value | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Equity |
|---|---|---|---|---|---|---|
| Balances, January 1, 2020 | 54,441 | 148 | 2,706,894 | (1,542,175) | (7,716) | 1,157,151 |
| Issuance of shares in connection with stock-based compensation plans | 688 | 2 | 226 | - | - | 228 |
| Stock-based compensation | - | - | 20,204 | - | - | 20,204 |
| Issuance of shares as part of the Origin acquisition | 1,488 | 5 | 26,631 | - | - | 26,636 |
| Comprehensive loss | - | - | - | (443,721) | (1,130) | (444,851) |
| Balance as of December 31, 2020 | 56,617 | 155 | 2,753,955 | (1,985,896) | (8,846) | 759,368 |
| Issuance of shares in connection with stock-based compensation plans | 1,129 | 3 | 8,052 | - | - | 8,055 |
| Stock-based compensation | - | - | 30,977 | - | - | 30,977 |
| Public offering of ordinary shares, net | 7,931 | 24 | 218,826 | - | - | 218,850 |
| Other items | - | - | 444 | - | - | 444 |
| Reduction of redeemable non-controlling interest | - | - | 227 | - | - | 227 |
| Comprehensive loss | - | - | - | (61,982) | 75 | (61,907) |
| Balance as of December 31, 2021 | 65,677 | 182 | 3,012,481 | (2,047,878) | (8,771) | 956,014 |
| Issuance of shares in connection with stock-based compensation plans | 1,159 | 4 | 262 | - | - | 266 |
| Issuance of Common stock under employee stock purchase plan | 250 | 1 | 2,978 | - | - | 2,979 |
| Stock-based compensation | - | - | 33,461 | - | - | 33,461 |
| Other | - | - | (267) | - | - | (267) |
| Comprehensive loss | - | - | - | (28,974) | (4,047) | (33,021) |
| Balance as of December 31, 2022 | 67,086 | 187 | 3,048,915 | (2,076,852) | (12,818) | 959,432 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-8

Table of Contents

**STRATASYS LTD.**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Consolidated Statements of Cash Flows**
**(in thousands)**

| Years ended December 31, | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Net loss | $ (28,974) | $ (61,982) | $ (444,116) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Goodwill impairment | - | - | 386,154 |
| Impairment of other long-lived assets | 3,865 | 1,447 | 6,985 |
| Depreciation and amortization | 59,769 | 56,096 | 49,560 |
| Stock-based compensation | 33,461 | 30,977 | 20,204 |
| Foreign currency transaction loss (gain) | 9,090 | 3,446 | (8,718) |
| Gain from step acquisition | - | (14,400) | - |
| Gain from deconsolidation of subsidiary | (39,136) | - | - |
| Share in net (profits) losses of associated companies | 5,726 | (949) | 3,939 |
| Revaluation of investments | 3,778 | (1,301) | - |
| Revaluation of contingent consideration | (15,805) | - | - |
| Deferred income taxes, net and uncertain tax positions | 926 | (12,380) | (20,299) |
| Other non-cash items, net | (2,778) | 2,914 | (2,552) |
| | | | |
| Change in cash attributable to changes in operating assets and liabilities: | | | |
| Accounts receivable, net | (28,877) | (25,003) | 29,465 |
| Inventories | (87,337) | (53) | 37,120 |
| Other current assets and prepaid expenses | 5,758 | (14,976) | 10,147 |
| Other non-current assets | 4,472 | 10,460 | 8,968 |
| Accounts payable | 19,614 | 28,492 | (24,534) |
| Other current liabilities | (17,707) | 38,952 | (10,033) |
| Deferred revenues | 6,577 | 8,872 | (6,398) |
| Other non-current liabilities | (7,827) | (14,788) | (10,903) |
| **Net cash provided by (used in) operating activities** | $ (75,405) | $ 35,824 | $ 27,802 |
| | | | |
| **Cash flows from investing activities** | | | |
| Cash paid for business combinations, net of cash acquired | - | (20,553) | (29,115) |
| Purchase of property and equipment | (13,635) | (24,981) | (26,943) |
| Investments in short-term bank deposits | (479,852) | (361,000) | (27,000) |
| Proceeds from short-term bank deposits | 561,485 | 129,000 | 28,300 |
| Proceeds from sale of equity method investment | - | - | 3,175 |
| Net proceeds from divestitures of subsidiaries and associated companies | - | - | 1,000 |
| Investments in non-marketable equity securities | (69,148) | (11,779) | - |
| Purchase of intangible assets | (6,117) | (1,770) | (2,070) |
| Other investing activities | 54 | (82) | 28 |
| **Net cash used in investing activities** | $ (7,213) | $ (291,165) | $ (52,625) |
| | | | |
| **Cash flows from financing activities** | | | |
| Proceeds from public offering, net of issuance costs | - | 218,850 | - |
| Proceeds from exercise of stock options | 266 | 8,055 | 228 |
| Payment of contingent consideration | (2,754) | - | - |
| Other financing activities | (281) | 406 | - |
| **Net cash provided by (used in) financing activities** | $ (2,769) | $ 227,311 | $ 228 |
| | | | |
| **Effect of exchange rate changes on cash, cash equivalents and restricted cash** | (7,220) | (893) | 3,214 |
| | | | |
| **Net change in cash, cash equivalents and restricted cash** | (92,607) | (28,923) | (21,381) |

| | | | | | |
|---|---|---|---|---|---|
| **Cash, cash equivalents and restricted cash, beginning of year** | | 243,293 | | 272,216 | 293,597 |
| **Cash, cash equivalents and restricted cash, end of year** | $ | 150,686 | $ | 243,293 | $ 272,216 |
| | | | | | |
| **Reconciliation of cash, cash equivalents and restricted cash reported in the consolidated balance sheets:** | | | | | |
| Cash and cash equivalents | | 150,470 | | 243,179 | 272,092 |
| Restricted cash included in other current assets | | 216 | | 114 | 124 |
| **Total cash, cash equivalents and restricted cash shown in the statement of cash flows** | $ | 150,686 | $ | 243,293 | $ 272,216 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-9

Table of Contents

**STRATASYS LTD.**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Consolidated Statements of Cash Flows**

(in thousands)

| Years ended December 31, | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| **Supplemental disclosure of cash flow information** | | | | | | |
| Cash paid during the year for: | | | | | | |
| Income taxes, net of tax refunds | $ | 12,550 | $ | 2,418 | $ | 1,140 |
| Non-cash investing and financing activities: | | | | | | |
| Transfer of inventories to fixed assets | | 9,212 | | 2,673 | | 4,138 |
| Transfer of fixed assets to inventories | | 123 | | 977 | | 410 |
| Contingent consideration | | - | | 17,985 | | 37,400 |
| Right-of-use assets obtained in exchange for new operating lease liabilities | | 12,057 | | 5,955 | | 10,008 |
| Issuance of Common stock under employee stock purchase plan | | 2,978 | | - | | - |
| Issuance of shares as part of Origin acquisition (Refer to Note 2) | | - | | - | | 26,636 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-10

Table of Contents

# STRATASYS LTD.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 1. Nature of Operations and Summary of Significant Accounting Policies**

**a. Nature of Operations**

Stratasys Ltd. (collectively with its subsidiaries, the "Company" or "Stratasys") is a global leader in connected, polymer-based 3D printing solutions, across the entire manufacturing value chain. The Company leverages its competitive advantages, which include a broad set of best-in-class 3D printing platforms, software, a materials and technology partner ecosystem, innovative leadership, and global GTM infrastructure, in order to position itself to capture share in a significant and growing global marketplace, with a focus on manufacturing. The Company's approximately 1,700 granted and pending additive technology patents to date have been used to create models, prototypes, manufacturing tools, and production parts for a multitude of industries including aerospace, automotive, transportation, healthcare, consumer products, dental, medical, fashion and education. Stratasys' products and comprehensive solutions improve product quality, development time, cost, time-to-market and patient care. The Company's 3D ecosystem of solutions and expertise includes 3D printers, materials, software, expert services, and on-demand parts production.

The Company has one operating segment, which generates revenues via the sale of its 3D printing systems, related services and consumables and by providing additive manufacturing ("AM") solutions. The Company operates mainly through offices in Israel, the United States, Germany, Hong Kong and Japan.

The global COVID-19 pandemic began adversely impacting the Company's financial results for its operations in all global regions already in the first quarter of 2020. The impact of COVID-19 on the Company's results of operations was most pronounced throughout the 2020 year. The Company's employees were often relegated to remote work and were reduced to a four-day work week, during the height of the pandemic, beginning during the second quarter, and through the end of, 2020. See also Note 7 for goodwill impairment in 2020. In 2021, the Company returned to work at full-capacity (a five-day work week) on a global basis, with a high percentage of its employees throughout the world receiving vaccines against COVID-19 over the course of the year. The annual results for 2021 evidenced those improvements on an aggregate basis, with revenues for 2021 approaching pre-COVID-19 levels, signaling a near-full recovery for the Company's top-line results. The Company's annual results for 2022 surpassed pre-COVID-19 levels with respect to revenues, reflecting the essential full recovery of the world economy from the pandemic in 2022.

The Company currently faces new uncertainties concerning macroeconomic headwinds that have arisen in the aftermath of the COVID-19 pandemic, including inflation, increased interest rates, currency exchange rate changes and supply chain difficulties. The Company has taken the approach of managing these challenges in a similar manner that it dealt with the pandemic, including via the strengthening of its balance sheet and cash assets, and avoidance of debt, while focusing on cost controls and cash generation. The Company has continued its significant investment in research and development to ensure that its strategically important product development programs have progressed.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**b. Summary of Significant Accounting Policies**

*Basis of Presentation*

The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP").

*Principles of Consolidation*

The accompanying consolidated financial statements include the accounts of Stratasys Ltd., and its subsidiaries. All intercompany balances and transactions, including profits from intercompany sales not yet realized outside the Company, have been eliminated in consolidation.

*Functional Currency and Foreign Currency Transactions*

A major part of the Company's operations is carried out by Stratasys Ltd. in Israel and its subsidiaries in the United States. The functional currency of these entities is the U.S. dollar ("dollar" or "$"). The functional currency of other subsidiaries is generally their local currency. The financial statements of those subsidiaries are included in the consolidated financial statements, based on translation into U.S. dollars. Assets and liabilities accounts are translated at year-end exchange rates, while revenues and expenses accounts are translated at average exchange rates during the year. The remeasurement adjustments of foreign currencies translation are included in the Company's shareholders' equity as a component of accumulated other comprehensive loss in the accompanying consolidated financial statements. Gains and losses arising from foreign currency remeasurements of monetary balances denominated in non-functional currencies are reflected in financial income, net in the consolidated statements of operations and comprehensive loss.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates using assumptions that affect the reported amounts of assets and liabilities and related disclosures at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates, and such differences may have a material impact on the Company's financial statements. As applicable to these consolidated financial statements, the most significant estimates relate to valuation allowance, uncertain tax positions, recoverability of intangibles and goodwill and purchase price allocation including contingent consideration.

In particular, a number of estimates have been and will continue to be affected by the trends that have arisen in the aftermath of the COVID-19 pandemic, including global events and other longer-term macroeconomic conditions, including rising inflation, increasing interest rates, tightening of capital markets and global supply chains. As a result, the accounting estimates and assumptions may change over time. Such changes could have an additional impact on the Company's long-lived asset and intangible asset valuation; and the allowance for expected credit losses. These consolidated financial statements reflect the financial statement effects based upon management's estimates and assumptions utilizing the most currently available information.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Fair Value Measurements*

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. A hierarchy has been established for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available.

Observable inputs are inputs that are developed using market data, such as publicly available information about actual events or transactions, and that reflect the assumptions that market participants would use when pricing the asset or liability. Unobservable inputs are inputs for which market data are not available and that are developed using the best information available about the assumptions that market participants would use when pricing the asset or liability. The fair value hierarchy categorizes into three levels. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity can access at the measurement date. Level 2 inputs include inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly. Level 3 inputs are unobservable inputs for the asset or liability.

The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets or liabilities (Level 1 inputs) and the lowest priority to unobservable inputs (Level 3 inputs). Categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

*Business Combinations*

The Company allocates the fair value of consideration transferred in a business combination to the assets acquired, liabilities assumed, and non-controlling interests in the acquired business based on their fair values at the acquisition date. Acquisition-related expenses and restructuring costs are recognized separately from the business combination and are expensed as incurred. The excess of the fair value of the consideration transferred plus the fair value of any non-controlling interest in the acquiree over the fair value of the assets acquired, liabilities assumed in the acquired business is recorded as goodwill. Fair value estimates are based on the assumptions management believes a market participant would use in pricing the asset or liability. The fair value of the consideration transferred may include a combination of cash, equity securities, earn out payments and deferred payments. The allocation of the consideration transferred in certain cases may be subject to revision based on the final determination of fair values during the measurement period, which may be up to one year from the acquisition date. The cumulative impact of revisions during the measurement period is recognized in the reporting period in which the revisions are identified. The Company includes the results of operations of the businesses that it has acquired in its consolidated results prospectively from the respective dates of acquisition. When the Company acquires net assets that do not constitute a business, as defined under U.S. GAAP, no goodwill is recognized and acquired IPR&D is expensed unless it has an alternative future use.

The Company records obligations in connection with its business combinations at fair value on the acquisition date. Key assumptions used to determine the estimated fair value of the continent consideration amounts include: (a) internal cash flows forecasts for the relevant period during which the financial metrics should be achieved; and (b) a discount rate which reflects the weighted average cost of capital adjusted for the relevant risk associated with the operations and the uncertainty inherent in the Company's internally developed forecasts. Each reporting period thereafter, the Company revalues earn-out payments and deferred payments which are classified as liabilities and records the changes in their fair value in the consolidated statements of operations and comprehensive loss under selling, general and administrative expenses.

Changes in the fair value of the obligations in connection with its business combinations can result from adjustments to the discount rates, the Company's shares price, sales and profitability targets. These fair value measurements represent Level 3 measurements, as they are based on significant inputs not observable in the market. Significant judgment is required in determining the assumptions utilized as of the acquisition date and for each subsequent measurement period. Accordingly, changes in the assumptions described above could have a material impact on the Company's consolidated results of operations.

F-13

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Cash and Cash Equivalents*

All highly liquid investments, which include short-term bank deposits that are not restricted as to withdrawal or use, with maturities of ninety days or less when acquired, are considered to be cash equivalents.

*Bank Deposits*

Bank deposits with original maturity dates of more than three months but at balance sheet date are less than one year are included in short-term bank deposits. The fair value of bank deposits approximates the carrying value since they bear interest at rates close to the prevailing market rates.

*Accounts Receivable, net*

The Company maintains the allowance for estimated losses resulting from the inability of the Company's customers to make required payments. The allowance represents the current estimate of lifetime expected credit losses over the remaining duration of existing accounts receivable considering current market conditions and supportable forecasts when appropriate. The estimate is a result of the Company's ongoing evaluation of collectability, customer creditworthiness, historical levels of credit losses, and future expectations.

Allowance for credit losses due to the Company's accounts receivable amounted to $0.9 million and $0.5 million as of December 31, 2022 and 2021, respectively. Changes in the allowance for credit losses are recognized in selling, general and administrative expenses. Accounts receivable are written-off against the allowance for credit losses when management deems the accounts are no longer collectible.

The balance and the changes in the allowance for expected credit losses are comprised as follows:

|  | Year ended December 31 | | |
| --- | --- | --- | --- |
|  | **2022** | **2021** | **2020** |
|  | U.S. $ in thousands | | |
| Balance at beginning of year | $ 517 | $ 870 | $ 939 |
| Increase during the year | 420 | 50 | 454 |
| Bad debt written off | (77) | (403) | (523) |
| Balance at end of year | $ 860 | $ 517 | $ 870 |

F-14

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

***Derivative Instruments and Hedge Accounting***

The Company conducts its operations globally and may be exposed to global market risks and to the risk that its earnings, cash flows and equity could be adversely impacted by fluctuations in foreign currency exchange rates. As part of the Company's risk management strategy, the Company enters into transactions involving foreign currency exchange derivative financial instruments. For its non-hedging transactions, the Company manages its foreign currency exposures on a consolidated basis, which allows the Company to net exposures and take advantage of any natural hedging. The transactions are designed to manage the Company's net exposure to foreign currency exchange rates and to reduce the volatility of earnings and cash flows associated with changes in foreign currency exchange rates. Financial markets and currency volatility may limit the Company's ability to hedge these exposures. The Company does not enter into derivative transactions for trading purposes.

The Company recognizes these derivative instruments as either assets or liabilities in the consolidated balance sheets at their fair value. Derivatives in a gain position are reported in other current assets in the consolidated balance sheets and derivatives in a loss position are recorded in accrued expenses and other current liabilities in the consolidated balance sheets, on a gross basis.

When the Company enters into a derivative contract, it designates the derivative for accounting purposes, as either a hedging instrument which qualifies for hedge accounting or as a non-hedging instrument which does not qualify for hedge accounting. In order to qualify for hedge accounting, the Company formally documents at the inception of each hedging relationship the hedging instrument, the hedged item, the risk management objective and strategy for undertaking each hedging relationship, and the method used to assess hedge effectiveness.

For each hedging instrument that hedges the exposure to variability in expected future cash flows and that is designated and effective as a cash flow hedge, both the effective and ineffective portion of the unrealized gain or loss on the derivative instrument are reported as a component of accumulated other comprehensive loss in the Company's shareholders' equity and are reclassified into earnings in the same period and in the same line item in which the hedged transaction affects earnings. The cash flows associated with these derivatives are reported in the consolidated statements of cash flows consistently with the classification of cash flows from the underlying hedged items that these derivatives are hedging.

For non-hedging instruments, the Company records the changes in fair value of derivative instruments in financial income (expenses), net in the consolidated statements of operations and comprehensive loss. The cash flows associated with these derivatives are reported in the consolidated statements of cash flows consistently with the classification of cash flows from the underlying hedged items that these derivatives are hedging. Refer to Note 12 for further information regarding the Company's derivative and hedging activities.

F-15

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Inventories*

Inventories are stated at the lower of cost or net realizable value. Cost is determined mainly using standard cost, which approximates actual cost, on a first-in, first-out basis. Inventory costs consist of materials, direct labor and overhead. Net realizable value is determined based on estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. The Company periodically assesses inventory for obsolescence and excess balances and reduces the carrying value by an amount equal to the difference between its cost and the net realizable value. The net realizable value is primarily estimated based on future demand forecasts, as well as, historical sales trends, product life cycle status and product development plans.

*Long-term Investments*

The Company's investments in non-marketable equity securities in which it has the ability to exercise significant influence, but does not control through variable interests or voting interests, are accounted for under the equity method of accounting. Under the equity method, the Company recognizes its proportionate share of the comprehensive income or loss of the investee. The Company's share of profit or losses from equity method investments is included in share in profit or losses of associated companies.

Other non-marketable equity securities without readily determinable fair value in which the Company does not have a controlling interest or significant influence are accounted for under the measurement alternative method. Under this method, the investments are carried at their original cost, less any impairment and adjusted for observable price changes for identical or similar instruments. Marketable securities are carried at fair value with changes in value recorded in Consolidated Statements of Operations and Comprehensive Loss.

Investments in convertible notes are carried at fair value utilizing a combination of discounted cash flows associated with the note and the fair value of the equity into which the note may be converted.

The Company reviews its unconsolidated long-term investments for potential impairment or other adjustments, which generally involves an analysis of the facts and changes in circumstances influencing the investments.

As of December 31, 2022 the amount presented under Long-term investments includes investment in equity investee in the amount of $100.2 million. see also Note 2. The balance represents mainly investment in non-marketable equity securities without readily determinable fair value.

F-16

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Property, Plant and Equipment, net*

Property, plant and equipment are stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, or in the case of leasehold improvements, the shorter of the lease term (including any renewal periods, if appropriate) or the estimated useful life of the asset. Repairs and maintenance are charged to expense as incurred, while betterments and improvements that extend the useful life or add functionality of property, plant and equipment are capitalized.

Depreciation is computed primarily over the following periods:

|  | Useful Life in Years |
| --- | --- |
| Buildings | 25 - 40 |
| Machinery and equipment | 5 - 10 |
| Buildings improvements | 5 - 10 |
| Computer equipment and software | 3 - 5 |
| Office equipment, furniture and fixtures | 5 - 14 |

The Company reviews the carrying amounts of property, plant and equipment for potential impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In evaluating recoverability, the Company groups assets and liabilities at the lowest level such that the identifiable cash flows relating to the group are largely independent of the cash flows of other assets and liabilities. The Company then compares the carrying amounts of the assets or asset groups with the related estimated undiscounted future cash flows. In the event impairment exists, an impairment charge is recorded at the amount by which the carrying amount of the asset or asset group exceeds the fair value. In addition, the remaining depreciation period for the impaired asset would be reassessed and, if necessary, revised.

F-17

Table of Contents

 **STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Other Intangible Assets, net*

Intangible assets and their useful lives are as follows:

|  | Useful Life in Years |
| --- | --- |
| Developed technology | 7-10 |
| Patents | 10 |
| Trade names | 5-10 |
| Customer relationships | 6-10 |

Definite life intangible assets are amortized using the straight-line method over their estimated period of useful life. Amortization of acquired developed technology is recorded in cost of revenues. Amortization of trade names, customer relationships and patents are recorded under selling, general and administrative expenses.

For definite life intangible assets, the Company reviews the carrying amounts for potential impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In evaluating recoverability, the Company groups assets and liabilities at the lowest level such that the identifiable cash flows relating to the group are largely independent of the cash flows of other assets and liabilities. The Company then compares the carrying amounts of the asset or assets groups with their respective estimated undiscounted future cash flows. If the definite life intangible asset or assets group are determined to be impaired, an impairment charge is recorded at the amount by which the carrying amount of the asset or assets group exceeds their fair value. Fair value is determined by using an applicable discounted cash flow model. In addition, the remaining amortization period for the impaired asset would be reassessed and, if necessary, revised. Refer to Note 8 for further information.

*Goodwill*

Goodwill reflects the excess of the consideration transferred plus the fair value of any non-controlling interest in the acquiree at the business combination date over the fair values of the identifiable net assets acquired. Goodwill is an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized. The Company allocates goodwill to its reporting units based on the reporting unit expected to benefit from the business combination.

The primary items that generate goodwill include the value of the synergies between the acquired companies and the Company and the acquired assembled workforce, neither of which qualifies for recognition as an intangible asset.

ASC 350, "Intangibles - Goodwill and other" ("ASC 350") requires goodwill to be tested for impairment at the reporting unit level at least annually or between annual tests in certain circumstances, and written down when impaired.

ASC 350 allows an entity to first assess qualitative factors to determine whether it is necessary to perform the two-step quantitative goodwill impairment test. If the qualitative assessment does not result in a more likely than not indication of impairment, no further impairment testing is required. If it does result in a more likely than not indication of impairment, the quantitative goodwill impairment test two-step impairment test is performed. Alternatively, ASC 350 permits an entity to bypass the qualitative assessment for any reporting unit and proceed directly to performing the quantitative first step of the goodwill impairment test. If the carrying value of the reporting unit exceeds its fair value, an impairment charge is recognized for the amount by which the carrying value exceeds the reporting unit's fair value. If the fair value of the reporting unit is determined to be greater than its carrying amount, the applicable goodwill is not impaired.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Retirement Plans and Employee Rights Upon Termination*

Under Israeli law, the Company is required to pay a severance payment to its employees in Israel upon dismissal of an employee or upon termination of employment in certain other circumstances. The Company makes ongoing deposits into its Israeli employee pension plans to fund their severance liabilities. For its employees who are employed under the Section 14 of the Severance Pay Law, 1963 ("Section 14"), the Company makes deposits with certain insurance companies for accounts controlled by each applicable employee in order to secure the employee's rights upon termination. In addition, the related obligations and amounts deposited on behalf of the applicable employees for such obligations are not presented on the Company's consolidated balance sheets, as the amounts funded are not under the control and management of the Company and the Company is legally released from the obligation to pay any severance payments to the employees once the required deposit amounts have been paid.

Severance pay liabilities with respect to for the Company's employees in Israel who are not subject to Section 14, as well as employees who have special contractual arrangements, are provided for in the Company's consolidated financial statements based on the length of time that they work for the Israeli entity and their latest monthly salary. The Company's liabilities for those Israeli employees, in the amounts of $2.8 million and $3.2 million as of December 31, 2022 and 2021, respectively, are presented as other non-current liabilities in the Company's consolidated balance sheets. These liabilities are recorded as if they were payable at each balance sheet date. These liabilities are partially funded by the purchase of insurance policies or by the establishment of pension funds with dedicated deposits in the funds. The amounts used to fund these liabilities are included in the Company's consolidated balance sheets under other non-current assets. As of December 31, 2022 and 2021, the Company had $2.3 million and $3.2 million, respectively, deposited in these insurance policies and pension funds. These policies are the Company's assets. However, under employment agreements and subject to certain limitations, any policy may be transferred to the ownership of the individual employee for whose benefit the funds were deposited.

In addition, the Company has liabilities for severance payments to its employees in other jurisdictions in accordance with local laws and practices of the countries in which they are employed.

Severance expenses for the years ended December 31, 2022, 2021 and 2020 were $3.9 million, $3.4 million and $9.1million, respectively.

For its employees in the United States, the Company has a defined contribution retirement plan (the "Plan") under the provisions of Section 401(k) of the Internal Revenue Code of 1986, as amended (the "Code") that covers eligible U.S. employees as defined in the Plan. Participants may elect to contribute both pre-tax or after-tax ("Roth") up to 50% of annual taxable compensation, as defined by the Plan, up to a maximum amount prescribed by the Code. The Company, at its discretion, makes matching contributions equal 4% of the participant's annual compensation. For the years ended December 31, 2022, 2021 and 2020 the Company made 401(k) Plan contributions of approximately $3.7 million, $4.0 million and $4.1 million respectively.

F-19

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Contingent Liabilities*

The Company is subject to various legal proceedings that arise from time to time in the ordinary course of business. The outcomes of the legal proceedings that are pending as of the date the financial statements are issued are subject to significant uncertainty. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company's management evaluates the perceived merits of any legal proceedings or unasserted claims as well as the perceived merits of the amount of relief sought or expected to be sought. Such assessment inherently involves an exercise of judgment. If the assessment of a contingency indicates that it is probable that loss would be incurred and the amount of the liability can be reasonably estimated, then the Company would record an accrued expense in the Company's financial statements based on its best estimate. Loss contingencies considered to be remote by management are generally not disclosed unless material. The respective legal fees are expensed as incurred.

*Revenue Recognition*

The Company derives revenues from sales of additive manufacturing systems, consumables and services. The Company sells its products directly through its sales force, independent sales agents and indirectly through authorized resellers.

The Company determines revenue recognition through the following steps:

- Identification of the contract, or contracts, with a customer

- Identification of the performance obligations in the contract

- Determination of the transaction price

- Allocation of the transaction price to the performance obligations in the contract

- Recognition of revenue when, or as, the Company satisfies a performance obligation

Revenue is measured as the amount of consideration expected to be received in exchange for transferring goods or providing services to the end customer or to the reseller. The amount of consideration is usually at fixed price at the contract inception. Consideration from Shipping and handling are recorded on a gross basis within product revenue. Revenues are recorded net of any taxes assessed by various government entities, such as sales, use and value-added taxes.

F-20

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Revenue from products, which consist of systems and consumables, is recognized when the customer has obtained control of the goods, generally at a point in time upon shipment or once delivery and risk of loss has transferred to the customer. The Company recognizes revenue on sales to resellers when the reseller has economic substance apart from the Company and the reseller is considered the principal for the transaction with the end-user customer. Service revenue derives from service type warranty and from the Company's direct manufacturing parts services. Revenue from service is recognized ratably on a straight-line basis over the time of the service, as control is transferred over time or as services are performed if not under contract.

The Company enters into contracts with customers that can include various combinations of products and services which are generally distinct and accounted for as separate performance obligations. Products or services that are promised to a customer can be considered distinct if both of the following criteria are met: (i) the customer can benefit from the products or services either on its own or together with other readily available resources, and (ii) the Company's promise to transfer the products or services to the customer is separately identifiable from other promises in the contract.

The transaction price is allocated to each distinct performance obligations on a relative standalone selling price ("SSP") basis and revenue is recognized for each performance obligation when control has passed. In most cases, the Company is able to establish SSP based on the observable prices of services sold separately in comparable circumstances to similar customers and for products based on the Company's best estimates of the price at which the Company would have sold the product regularly on a stand-alone basis. The Company reassesses the SSP on a periodic basis or when facts and circumstances change.

In assessing collectability as part of the revenue recognition process, the Company considers a number of factors in the evaluation of the creditworthiness of the customer, including past due amounts, payment history and financial condition. In some cases where collectability is not assured, payment terms are set partially or entirely as prepayment or customers may be required to furnish letters of credit.

See Note 3 for additional information related to disaggregation of revenue and other.

***Shipping and handling costs***

Shipping and handling costs are classified as cost of revenues.

F-21

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Advertising*

Advertising costs are expensed as incurred and were approximately $5.1 million, $4.5 million and $6.3 million, for the years ended December 31, 2022, 2021 and 2020, respectively.

***Research and Development Expenses***

Research and development costs consist primarily of employee compensation expenses, materials, laboratory supplies, costs for related software and costs for facilities and equipment. Expenditures for research and development are expensed as incurred. Government reimbursements and other participations for development of approved projects are recognized as a reduction of expenses as the related costs are incurred. The Company is not required to pay royalties on sales of products developed using its government funding.

*Income Taxes*

The Company and its subsidiaries are subject to income taxes in the jurisdictions in which they operate. The Company's provision for income taxes is based on income tax rates in the tax jurisdictions where it operates, permanent differences between financial reporting and tax reporting, and available credits and incentives.

Deferred taxes are determined utilizing the "asset and liability" method based on the estimated future tax effects of temporary differences between the carrying amount and tax bases of assets and liabilities under the applicable tax laws, and on enacted tax rates in effect when the deferred taxes are expected to be settled or realized. Deferred taxes for each jurisdiction are presented as a non-current net asset or liability, net of any valuation allowances.

Deferred taxes have not been provided on the following items:

1)  Taxes that would apply in the event of disposal of investments in first-tier foreign subsidiaries, as it is generally the Company's intention to hold these investments, not to realize them.

2)  Dividends distributable from the income of foreign companies as the Company does not expect these companies to distribute dividends in the foreseeable future. If these dividends were to be paid, the Company would have to pay additional taxes at a rate of up to 25% on the distribution, and the amount would be recorded as an income tax expense in the period the dividend is declared.

Amounts of tax-exempt income generated from the Company's current Approved Enterprises (see note 9c), as the Company intends to permanently reinvest these profits and does not intend to distribute dividends from such income. If these dividends were to be paid, the Company would have to pay additional taxes at a rate up to 10% on the distribution, and the amount would be recorded as an income tax expense in the period the dividend is declared.

F-22

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Valuation Allowances*

Valuation allowances are provided unless it is more likely than not that the deferred tax asset will be realized. In the determination of the appropriate valuation allowances, the Company considers future reversals of existing taxable temporary differences, the most recent projections of future business results, prior earnings history, carryback and carry forward and prudent tax strategies that may enhance the likelihood of realization of a deferred tax asset. Assessments for the realization of deferred tax assets made at a given balance sheet date are subject to change in the future, particularly if earnings of a subsidiary are significantly higher or lower than expected, or if the Company takes operational or tax positions that could impact the future taxable earnings of a subsidiary.

*Uncertain Tax Positions*

The Company takes a two-step approach to recognizing and measuring uncertain tax positions. The first step is to evaluate the tax position for recognition by determining whether the weight of available evidence indicates that it is more likely than not that, on an evaluation of the technical merits, the position will be sustained on audit, including resolution of related appeals or litigation processes, if any.

The second step is performed only if the tax position meets the more-likely-than-not recognition threshold and is to measure the tax benefit as the amount which is more than 50% likely of being realized upon ultimate settlement. The Company reevaluates these tax positions quarterly and makes adjustments as required. The liabilities relating to uncertain tax positions are classified as current in the consolidated balance sheets to the extent the Company anticipates making payments within one year. The Company classifies interest and penalties recognized in the financial statements relating to uncertain tax positions under the provision for income taxes.

The Company presents unrecognized tax benefits as a reduction to deferred tax asset where a net operating loss, a similar tax loss, or a tax credit carryforward that are available, under the tax law of the applicable jurisdiction, to offset any additional income taxes that would result from the settlement of a tax position.

*Stock-Based Compensation*

The Company measures and recognizes compensation expense for its equity classified stock-based awards, including stock-based option awards, restricted stock units ("RSUs") and performance stock units ("PSUs") under the Stratasys Ltd. 2012 Omnibus Equity Incentive Plan (the "2012 Plan") and the Stratasys Ltd. 2022 Share Incentive Plan (the "2022 Plan") based on estimated fair values on the grant date.

The Company calculates the fair value of stock-based option awards on the date of grant using the Black-Scholes option pricing model. The option-pricing model requires a number of assumptions, of which the most significant are the expected share price volatility and the expected option term. The computation of expected volatility is based on historical volatility of the Company's shares. The expected option term is calculated using the simplified method, as the Company concludes that its historical share option exercise experience does not provide a reasonable basis to estimate its expected option term. The interest rate for periods within the expected term of the award is based on the U.S. Treasury yield curve in effect at the time of grant. The Company's expected dividend rate is zero since the Company does not currently pay cash dividends on its shares and does not anticipate doing so in the foreseeable future.

F-23

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Each of the above factors requires the Company to use judgment and make estimates in determining the percentages and time periods used for the calculation. If the Company were to use different percentages or time periods, the fair value of stock-based option awards could be different. The fair values of the Company's RSUs and PSUs are measured based on the fair value of the Company's ordinary shares on the date of grant. The fair value of shares to be issued under the employee stock purchase plan ("ESPP") are estimated using the Monte Carlo valuation model.

The Company recognizes compensation expenses for its stock-based option awards (including awards under its ESPP program) and RSUs on a straight-line basis over the requisite service period (primarily 6-month period for the ESPP and a four-year period for the rest of the awards). The Company accounts for forfeitures as they occur. The Company recognizes compensation expenses for its PSUs based on the probability that the performance metrics will be achieved over the vesting period. At each reporting period the Company evaluates the probability that its PSUs will be earned and adjust its previously recognized compensation expense as necessary. If the achievement of the respective performance metrics is not probable or the respective performance are not met the Company reverses its previously recognized compensation expense.

### *Restructuring Plan*

The Company may incur restructuring charges in connection with certain initiatives designed to adjust the Company's cost and operating structure, improve efficiencies across the Company and to better align with the Company's long-term strategy and overall market conditions. Restructuring charges include employee severance and associated termination costs related to the reduction of workforce, costs related to facilities closures, impairment charges of the respective long-lived assets and contract termination costs. Restructuring charges for employees' termination costs are recognized when the required actions to execute the restructuring initiative were performed and the initiatives are probable and costs are estimable. Restructuring charges for facilities and contract terminations are recognized when the Company ceased using the rights conveyed by the contract. Significant judgments and estimates are involved in estimating the impact of restructuring plans on the Company's consolidated financial statements. Actual results may differ from these estimates.

### *Loss per Share*

Basic loss per share is computed by dividing net income (loss) attributable to ordinary shareholders of Stratasys Ltd. by the weighted average number of ordinary shares (including fully vested RSUs, PSUs and ordinary shares purchased under the Company's employee share purchase plan (the "ESPP")) outstanding for the reporting periods.

The denominator for diluted net loss per share is a computation of the weighted-average number of ordinary shares and the potential dilutive ordinary shares outstanding during the period. Potential dilutive shares outstanding include the dilutive effect of in-the-money options, ESPP and unvested RSUs using the treasury stock method. PSUs are considered contingently issuable shares for diluted net loss per share purposes and the dilutive impact, if any, is not included in the weighted average shares until the performance conditions are met.

### *Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, short term bank deposits, accounts receivables, and foreign currency exchange forward contracts. Most of the Company's cash and cash equivalents and bank deposits are invested in U.S. dollar instruments with major banks in the U.S., Israel and Europe. Management believes that the credit risk with respect to the financial institutions that hold the Company's cash and cash equivalents and bank deposits is low.

Concentration of credit risk with respect to accounts receivable is limited due to the relatively large number of customers and their wide geographic distribution. In addition, the Company seeks to mitigate its credit exposures to its accounts receivable by credit limits, credit insurance, ongoing credit evaluation and account monitoring procedures.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Leases*

The Company determines if an arrangement is a lease at inception. Lease classification is governed by five criteria in ASC 842-10-25-2. If any of these five criteria is met, The Company classifies the lease as a finance lease; otherwise, the Company classifies the lease as an operating lease. When determining lease classification, the Company's approach in assessing two of the mentioned criteria is: (i) generally 75% or more of the remaining economic life of the underlying asset is a major part of the remaining economic life of that underlying asset; and (ii) generally 90% or more of the fair value of the underlying asset comprises substantially all of the fair value of the underlying asset.

Operating leases are included in operating lease right-of-use ("ROU") assets and operating lease liabilities in the consolidated balance sheet.

ROU assets represent Stratasys's right to use an underlying asset for the lease term and lease liabilities represent its obligation to make lease payments arising from the lease. Operating lease ROU assets and liabilities are recognized at the commencement date based on the present value of lease payments over the lease term. The Company uses its incremental borrowing rate based on the information available at the commencement date to determine the present value of the lease payments.

The standard also provides practical expedients for an entity's ongoing accounting. The Company elected the short-term lease recognition exemption for all leases with a term shorter than 12 months. This means that for those leases, the Company does not recognize ROU assets or lease liabilities, including not recognizing ROU assets or lease liabilities for existing short-term leases of those assets in transition, but recognizes lease expenses over the lease term on a straight-line basis. The Company also elected the practical expedient to not separate lease and non-lease components for all of the Company leases.

Lease terms will include options to extend or terminate the lease when it is reasonably certain that Stratasys will exercise or not exercise the option to renew or terminate the lease.

The Company is a party to several lease agreements for its facilities, the latest of which has been extended until September 2026. The Company has the option to extend certain agreements for additional periods, the earliest of which is until the start of March 2023 and the latest is until the end of June 2029. During the extended lease period, the aggregate annual rental payments will increase by 2% to 4% each year.

The Company also leases vehicles for its employees with different commencement and ending periods in Israel and Germany solely. The latest lease agreement is until the start of July 2025.

F-25

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

***Recently issued accounting pronouncements***

*Accounting Pronouncements Adopted in 2022*

In August 2020, the FASB issued ASU 2020-06 "Debt – Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging – Contracts in Entity's Own Equity (Subtopic 815 – 40)." This guidance simplifies the accounting for certain financial instruments with characteristics of liabilities and equity, including convertible instruments and contracts on an entity's own equity. The amendments to this guidance are effective for fiscal years beginning after December 15, 2021, and interim periods within those fiscal years. The Company adopted this guidance effective January 1, 2022, with no material impact on its consolidated financial statements.

In November 2021, the FASB issued ASU 2021-10 "Government Assistance (Topic 832)," which requires annual disclosures that increase the transparency of transactions involving government grants, including (1) the types of transactions, (2) the accounting for those transactions, and (3) the effect of those transactions on an entity's financial statements. The Company applied the guidance prospectively to all in-scope transactions beginning fiscal year 2022. The adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

*Recently issued accounting pronouncements, not yet adopted*

In October 2021, the FASB issued ASU 2021-08 "Business Combinations (Topic 805), Accounting for Contract Assets and Contract Liabilities from Contracts with Customers", which requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606, Revenue from Contracts with Customers. The guidance will result in the acquirer recognizing contract assets and contract liabilities at the same amounts recorded by the acquiree. The guidance should be applied prospectively to acquisitions occurring on or after the effective date. The guidance is effective for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. Early adoption is permitted, including in interim periods, for any financial statements that have not yet been issued. The Company will adopt the new accounting standard effective January 1, 2023 and will apply the guidance prospectively to all business combinations with an acquisition date occurring on or after January 2023.The Company does not expect the adoption of this guidance to have a material impact on its consolidated financial statements.

F-26

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

<u>**Note 2. Certain Transactions**</u>

*Origin acquisition*

On December 31, 2020 (the "Origin transaction date") the Company acquired 3D printing start-up Origin Laboratories Inc. ("Origin") for an aggregate purchase price of $97.1 million ("Origin transaction"), including cash and shares. The acquisition enables Stratasys to expand its leadership through innovation in the fast-growing mass production parts market with a next-generation photopolymer platform. Stratasys expects Origin's proprietary Programmable PhotoPolymerization ($P^3$) technology to be an important growth engine for the Company. The acquisition was aimed at fortifying the Company's leadership in polymers and production applications of 3D printing in industries such as dental, medical, tooling, and select industrial, defense, and consumer goods markets.

In exchange for 100% of the outstanding shares of Origin the Company issued 1,488 thousand ordinary shares, paid cash upon closing and is obligated to pay additional payments (combination of cash and shares) subject to performance-based earnouts over 3 years.

The Origin transaction is reflected in accordance with ASC Topic 805, "Business Combinations", using the acquisition method of accounting with the Company as the acquirer.
The following table summarizes the fair value of the consideration transferred to Origin stockholders for the Origin transaction:

|  | U.S. $ in thousands |
| --- | --- |
| Cash payments | $ 33,025 |
| Issuance of ordinary shares to Origin stockholders | 26,636 |
| Contingent consideration at estimated fair value | 37,400 |
| Total consideration | $ 97,061 |

The fair value of the ordinary shares issued was determined based on the closing market price of the Company's ordinary shares on the Origin transaction date.

In accordance with ASC Topic 805, the estimated contingent consideration as of the Origin transaction date was included in the purchase price. The total contingent payments could reach to a maximum aggregate amount of up to $40.0 million. Approximately 50% of the payments shall be settled in cash, and 50% shall be settled through the issuance of ordinary shares. The estimated fair value of the contingent consideration is based on management's assessment of whether, and at what level, the financial metrics will be achieved, and the present value factors associated with the timing of the payments. This fair value measurement is based on significant unobservable inputs in the market and thus represents a Level 3 measurement within the fair value hierarchy. Changes in the fair value of contingent consideration are recorded in operating expenses. Refer to note 4.

An additional payment of $6.0 million, which is subject to the founders' retention over 3 years, is recorded as compensation expense over the retention period.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The allocation of the purchase price to assets acquired and liabilities assumed, including measurement period adjustments (refer to note 7), is as follows:

| | Allocation of Purchase Price |
|---|---|
| | (U.S. $ in thousands) |
| Cash and cash equivalents $ | 2,083 |
| Goodwill | 38,104 |
| Intangible assets | 71,120 |
| Other assets | 3,493 |
| Total assets acquired | 114,800 |
| | |
| Net deferred tax liabilities | 14,007 |
| Other labilities | 3,732 |
| Total liabilities assumed | 17,739 |
| | |
| Net assets acquired $ | 97,061 |

The allocation of the purchase price to net assets acquired and liability assumed resulted in the recognition of intangible asset related to developed technology of $71.0 million. This intangible asset has a useful-life of 10 years. The fair value estimate of the developed technology is determined using a variation of the income approach known as the "Multi-Period Excess Earnings Approach". This valuation technique estimates the fair value of an asset based on market participants' expectations of the cash flows an asset would generate over its remaining useful life. The net cash flows were discounted to present value.

*Investment in Xaar 3D Ltd. ("Xaar 3D")*

Xaar plc ("Xaar") and Stratasys had announced the formation of Xaar 3D in July 2018 for the purpose of developing Powder Bed Fusion ("PBF") additive manufacturing solutions that Stratasys can bring to the market. During the fourth quarter of 2019, the Company entered into an agreement with Xaar to purchase additional shares of Xaar 3D that will increase its stake from 15 percent to 45 percent, with Xaar retaining the remaining 55 percent. In addition, the agreement included an option for Stratasys to acquire the remaining shares of Xaar 3D.

Following the additional investment, the Company considered the FASB guidance in accordance with ASC Topic 810 "Consolidation" regarding the propriety of implementing consolidation, for both the variable interest entity and voting model, or equity method accounting. The Company concluded that it should continue accounting for the investment according to the equity method as it has retained the ability to exercise significant influence but does not control Xaar 3D. For its additional interest in Xaar 3D the Company paid approximately $15.7 million.

The investment was presented under other non-current assets in the Company's consolidated balance sheets.

F-28

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On November 1, 2021 (the "Xaar 3D transaction date") , the Company acquired the remaining 55% share of XAAR 3D, for an aggregate purchase price of $29.3 million. The Company paid cash upon closing and it is obligated to make additional earn-out payments and royalties on products and services sales for up to 15 years.

The Xaar 3D transaction is reflected in accordance with ASC Topic 805, "Business Combinations", using the acquisition method of accounting with the Company as the acquirer. The Company accounted for the acquisition of the remaining equity of Xaar 3D as a step acquisition, which required re-measurement of the Company's previous ownership interest to fair value prior to completing purchase accounting. Using step acquisition accounting the Company increased the value of its previously held equity investment to its fair value of $23.8 million, which resulted in a gain of approximately $14.4 million, recorded in the consolidated statements of operations in the fourth quarter of 2021. The acquisition of the remaining equity interest also resulted in the recognition of a previously unrealized foreign currency gain of $0.6 million, which was reclassified from accumulated OCI. The fair value of the previously held equity method investment was determined based upon a valuation of the acquired business, as of the date of acquisition, as detailed below.

The following table summarizes the fair value of the consideration transferred to Xaar 3D stockholders for the Xaar 3D transaction:

|  | U.S. $ in thousands |
|---|---|
| Cash payments | $ 13,967 |
| Contingent consideration at estimated fair value | 15,314 |
| Total consideration for 55% holding | 29,281 |
| Fair value of 45% holding | 23,775 |
| Total consideration | $ 53,056 |

In accordance with ASC Topic 805, the estimated contingent consideration as of the Xaar 3D transaction date was included in the purchase price. The total contingent payments could reach to a maximum aggregate amount of up to $21.0 million. The estimated fair value of the contingent consideration is based on management's assessment of whether, and at what level, the financial metrics will be achieved, and the present value factors associated with the timing of the payments. This fair value measurement is based on significant unobservable inputs in the market and thus represents a Level 3 measurement within the fair value hierarchy. Changes in the fair value of contingent consideration are recorded in operating expenses. Refer to note 4.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The allocation of the purchase price to assets acquired and liabilities assumed, is as follows:

|  | Allocation of Purchase Price (U.S. $ in thousands) |
|---|---|
| Cash and cash equivalents $ | 82 |
| Goodwill | 25,375 |
| Intangible assets | 45,000 |
| Other assets | 5,280 |
| Total assets acquired | 75,737 |
|  |  |
| Net deferred tax liabilities | 1,736 |
| Other liabilities | 20,945 |
| Total liabilities assumed | 22,681 |
|  |  |
| Net assets acquired $ | 53,056 |

The allocation of the purchase price ("PPA") to net assets acquired and liability assumed resulted in the recognition of intangible asset related to developed technology of $45.0 million. This intangible asset has a useful-life of 7 years. The fair value estimate of the developed technology is determined using a variation of the income approach known as the "Multi-Period Excess Earnings Approach". This valuation technique estimates the fair value of an asset based on market participants' expectations of the cash flows an asset would generate over its remaining useful life. The net cash flows were discounted to present value. In addition, as part of the PPA, the Company assumed a royalty liability to a third party in respect of the developed technology. Such liability amounting to $14.2 million was recorded based on a fair value estimate, which was determined using the valuation model used to value the developed technology and is recorded under other non-current liabilities.

*RPS acquisition*

On February 16, 2021 the Company acquired RP Support Limited ("RPS"), a provider of industrial stereolithography 3D printers and solutions. In exchange for 100% of the outstanding shares of RPS, the Company paid cash upon closing and paid earn-out payments.

F-30

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*MakerBot and Ultimaker transaction ("Ultimaker")*

On August 31, 2022, Stratasys completed the merger of MakerBot (previously, a fully owned subsidiary) with Ultimaker, which together formed a new entity under the name Ultimaker. The Company recorded a net gain of $39.1 million from deconsolidation of MakerBot, representing the difference between the book value of MakerBot's net assets and the fair value allocated to such net assets in the transaction as follows:

|  |  | (U.S. $ in thousands) |
|---|---|---|
| Fair value, net | $ | 55,751 |
| Net assets deconsolidated | | (14,146) |
| Transaction expenses | | (2,469) |
| Gain on deconsolidation of subsidiary | | 39,136 |

The Company accounts for its investment in the combined company Ultimaker according to the equity method in accordance with ASC Topic 323, as it has retained the ability to exercise significant influence but does not control the new entity. the Company recognized an equity method investment in a total amount of $105.6 million comprised of the assumed fair value of the MakerBot shares and additional amount invested in cash by the Company, representing a share of 46.5% in the new entity.

The preliminary allocation of the purchase price ("PPA") to net assets acquired and liability assumed resulted in the recognition of intangible asset of $57.8 million and goodwill of $22.3 million and other net assets of $25.5 million. The value assigned to intangible assets is amortized over a period of 5 to 10 years and the related amortization is included under share in net losses (profits) from associated companies. The estimated fair values are preliminary and based on the information that was available as of August 31, 2022. Thus, the measurements of fair value reflected are subject to changes and such changes could be significant.

As of December 31, 2022 the equity investment in Ultimaker amounts to $100.2 million which represents the original investment in Ultimaker, net of share in net losses for the period at the amount of $5.4 million. Following the acquisition, the Company will act as an agent to Ultimaker and will distribute products of Ultimaker. Transactions with Ultimaker for the period from the acquisition date through December 31, 2022 were immaterial.

F-31

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Covestro acquisition*

On August 8, 2022, the Company announced it has signed a definitive agreement to acquire the additive manufacturing materials business of Covestro AG. The acquisition is expected to close during the second quarter of 2023. The purchase price is approximately $42.3 million (43 million euros), plus additional inventory, less certain liabilities. In addition, there is a potential earnout payment of up to $36.4 million (37 million euros), subject to the achievement of various performance metrics.

*Other investments*

In addition to the investment in Ultimaker, other investments included under Long-term investments represents mainly investments in non-marketable equity securities of several companies without readily determinable fair value in which the Company does not have a controlling interest or significant influence. One entity from this group became public during the first quarter of 2021 and accordingly the investment is now treated as a marketable equity investment. During 2022 and 2021, the Company invested a total of $14.8 million and $11.8 million in non-marketable equity securities of several companies. In addition, in 2022, the Company invested $1.9 million in convertible notes of another entity.

*Restructuring plan*

On June 2, 2020, the Company announced a restructuring plan to reduce operating expenses as part of a cost realignment program to focus on profitable growth (the "Plan"). The Plan's cost-cutting measures included workforce reductions affecting approximately 10% of employees, as well as other cost-mitigation measures. The Company recorded $6.4 million and $3.9 million of employee-related charges and other related charges, respectively, during 2020. The plan was substantially completed in 2020.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 3. Revenues**

Disaggregation of Revenues

The following table present the Company's revenues disaggregated by geographical region (based on the Company's customers' location) and revenue type for the years ended December 31, 2022, 2021 and 2020:

| | | Year ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2022** | **2021** | **2020** |
| | | (U.S. $ in thousands) | | |
| **Americas** | | | | |
| **Systems** | | $ 130,959 | $ 124,311 | $ 98,884 |
| **Consumables** | | 130,775 | 121,245 | 106,857 |
| **Service** | | 153,694 | 142,767 | 137,736 |
| | **Total Americas** | **415,428** | **388,323** | **343,477** |
| | | | | |
| **EMEA** | | | | |
| **Systems** | | 53,527 | 42,077 | 29,584 |
| **Consumables** | | 61,703 | 61,192 | 48,521 |
| **Service** | | 26,430 | 27,027 | 23,479 |
| | **Total EMEA** | **141,660** | **130,296** | **101,584** |
| | | | | |
| **Asia Pacific** | | | | |
| **Systems** | | 40,106 | 33,110 | 22,266 |
| **Consumables** | | 35,054 | 35,623 | 33,670 |
| **Service** | | 19,235 | 19,867 | 19,820 |
| | **Total Asia Pacific** | **94,395** | **88,600** | **75,756** |
| | | | | |
| **Total Revenues** | | $ 651,483 | $ 607,219 | $ 520,817 |

F-33

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The following table present the Company's revenues disaggregated based on the timing of revenue recognized for the years ended December 31, 2022, 2021 and 2020:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| | (U.S. $ in thousands) | | |
| **Revenues recognized in point in time from:** | | | |
| **Products** | $    452,124 | $    417,557 | $    339,782 |
| **Services** | 53,152 | 46,049 | 40,405 |
| **Total revenues recognized in point in time** | 505,276 | 463,606 | 380,187 |
| | | | |
| **Revenues recognized over time from:** | | | |
| **Services** | 146,207 | 143,613 | 140,630 |
| **Total revenues recognized over time** | 146,207 | 143,613 | 140,630 |
| | | | |
| **Total Revenues** | $    651,483 | $    607,219 | $    520,817 |

Contract Assets and Contract Liabilities

Contract assets are recorded when the Company's right to consideration is conditional on constraints other than the passage of time. The Company had no material contract assets as of December 31, 2022 and 2021.

Contract liabilities include advance payments and billings in excess of revenue recognized. Contract liabilities are presented under deferred revenues. The Company's deferred revenues as of December 31, 2022 and 2021 were as follows:

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| | U.S. $ in thousands | |
| Deferred revenue* | $    75,434 | $    72,307 |

*Includes $25.2 million and $21.1 million under long term deferred revenue in the Company's consolidated balance sheets as of December 31, 2022 and December 31, 2021, respectively.

Revenue recognized in 2022 and 2021 that was included in deferred revenue balance as of January 1, 2022 and 2021, was $44.0 million and $48.7 million, respectively.

Remaining Performance Obligations

Remaining Performance Obligations ("RPO") represents contracted revenue that has not yet been recognized, which includes deferred revenue and amounts that will be invoiced and recognized as revenue in future periods. As of December 31, 2022 and 2021 the total RPO amounted to $104.6 million and $128.0 million, respectively. The Company expects to recognize $75.6 million of this RPO during the next 12 months, $15.8 million over the subsequent 12 months and the remaining $13.1 million thereafter.

F-34

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Incremental Costs of Obtaining a Contract

Sales commissions earned mainly by the Company's sales agents are considered incremental costs of obtaining a contract with a customer as the Company expects the benefit of those commissions to be longer than one year. The majority of the sales commissions are not subject to capitalization as the commission expense is recognized as the related revenue is recognized. Sales commissions for initial contracts related to the service type warranty are deferred and then amortized on a straight-line basis over the expected customer relationship period (generally 5 years) if the Company expects to recover those costs. The Company determined the period of benefit by taking into consideration customer contracts including renewals, the technology and other factors. Amortization expense is included in selling, general and administrative expenses in the consolidated statements of operations. As of December 31, 2022 and 2021, the deferred commission amounted to $9.6 million and $7.4 million, respectively and presented under Other current assets and Other non-current assets.

**Note 4. Fair Value Measurement**

The following tables summarize the Company's financial assets and liabilities that are carried at fair value on a recurring basis, on its consolidated balance sheets:

| | December 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| | Level 2 | Level 3 | Level 2 | Level 3 |
| | (U.S. $ in thousands) | | | |
| **Assets:** | | | | |
| Foreign exchange forward contracts not designated as hedging instruments | $ 159 | $ - | $ 82 | $ - |
| Foreign exchange forward contracts designated as hedging instruments | 3 | - | 910 | - |
| **Liabilities:** | | | | |
| Foreign exchange forward contracts not designated as hedging instruments | (38) | - | (89) | - |
| Foreign exchange forward contracts designated as hedging instruments | (1,640) | - | (60) | - |
| Convertible notes | - | 1,894 | - | - |
| Contingent consideration* | - | 38,341 | - | 55,919 |
| | $ (1,516) | $ 40,235 | $ 843 | $ 55,919 |

 *Includes $14.6 million and $2.4 million under Accrued expenses and other current liabilities in the Company's consolidated balance sheets as of December 31, 2022 and December 31, 2021, respectively.

The Company's foreign exchange forward contracts are classified as Level 2, as they are not actively traded and are valued using pricing models that use observable market inputs, including interest rate curves and both forward and spot prices for currencies (Level 2 inputs).

 Contingent consideration represents liabilities recorded at fair value in connection with acquisitions, and thus represents a Level 3 measurement within the fair value hierarchy (refer to Note 2).

Other financial instruments consist mainly of cash and cash equivalents, short term deposits, current and non-current receivables, accounts payable and other current liabilities. The fair value of these financial instruments approximates their carrying values.

The following table summarizes the activity for those financial assets and liabilities where fair value measurements are estimated utilizing Level 3 inputs.

**December 31,**

|                                                              | 2022 | 2021 |
| ------------------------------------------------------------ | ---: | ---: |
|                                                              | (U.S. $ in thousands) | |
| Fair value at the beginning of the period                    | $    55,919 | $    37,400 |
| Acquisitions                                                 | - | 17,985 |
| Revaluation of Contingent considerations and other adjustment | (14,824) | 534 |
| Settlements of Contingent considerations                     | (2,754) | - |
| Fair value at the end of the period                          | $    38,341 | $    55,919 |

F-35

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 5. Inventories**

Inventories consisted of the following:

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| | U.S. $ in thousands | |
| Finished goods | $ 81,564 | $ 58,784 |
| Work-in-process | 7,562 | 4,360 |
| Raw materials | 104,928 | 66,003 |
| | $ 194,054 | $ 129,147 |

**Note 6. Property, Plant and Equipment, Net**

Property, plant and equipment, net consisted of the following:

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| | (U.S. $ in thousands) | |
| Machinery and equipment | $ 157,602 | $ 157,692 |
| Buildings and improvements | 178,605 | 178,025 |
| Computer equipment and software | 52,503 | 51,311 |
| Office equipment, furniture and fixtures | 14,628 | 14,723 |
| Land | 18,927 | 19,079 |
| | 422,265 | 420,830 |
| Accumulated depreciation | (230,220) | (219,357) |
| | 192,045 | 201,473 |
| Construction work in progress | 3,018 | 1,822 |
| | $ 195,063 | $ 203,295 |

Depreciation expenses were $22.6 million, $24.8 million and $25.2 million in the years ended December 31, 2022, 2021 and 2020, respectively. During the years ended December 31, 2022 , 2021 and 2020, the Company recorded impairment charges of $3.8 million, $1.4 and $7.0 million, respectively which were recorded in the consolidated statements of operations and comprehensive loss under cost of sales.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 7. Goodwill**

Changes in the carrying amount of the Company's goodwill for the years ended December 31, 2022 and 2021 were as follows:

|  | 2022 | 2021 |
|---|---|---|
|  | (U.S. $ in thousands) | |
| Balance at January 1, | $    65,144 | $    35,694 |
| Goodwill acquired | - | 27,092 |
| Measurement period adjustments | - | 2,410 |
| Currency translation adjustments | (191) | (52) |
| Balance at December 31, | $    64,953 | $    65,144 |

(1)  In the third quarter of 2020, primarily as a result of the COVID-19 impact on the global economy and the Company's business, the Company recorded a goodwill impairment charge of $386.2 million, the entire reporting unit's goodwill balance at the time

(2) The goodwill balance as of December 31, 2021 and 2022 was acquired as part of Origin, RPS and XAAR acquisitions, see Note 2, and were allocated as part of Stratasys-Core reporting unit.

During the fourth quarter of 2021, the Company performed its annual impairment test for goodwill impairment. Based on the Company's qualitative analysis, which considered the Company's market valuation, its operation results and projections, and the timing of its goodwill acquisitions, no goodwill was determined to be impaired as of December 31, 2021.

*Goodwill impairment assessment for the year ended December 31, 2022*

During the fourth quarter of 2022, the Company noted that indicators of potential impairment existed which required an interim goodwill impairment analysis for Stratasys-Core reporting unit. These indicators included sustained decline in the Company's market capitalization during the last quarter, all, primarily as a result of  the global economy and the Company's business.

The Company performed a quantitative assessment for goodwill impairment for its Stratasys-Core reporting unit and concluded that the fair value of Stratasys-Core reporting unit exceeded its carrying amount by approximately 45% with a carrying amount of goodwill assigned to this reporting unit in the amount of $65.0 million. When evaluating the fair value of Stratasys-Core reporting unit under the income approach, the Company used a discounted cash flow model which utilized Level 3 measures that represent unobservable inputs. Key assumptions used to determine the estimated fair value include: (a) internal cash flows forecasts for 5 years following the assessment date, including expected revenue growth, costs to produce, operating profit margins and estimated capital needs; (b) an estimated terminal value using a terminal year long-term future growth determined based on the growth prospects of the reporting unit; and (c) a discount rate which reflects the weighted average cost of capital adjusted for the relevant risk associated with the Stratasys-Core reporting unit operations and the uncertainty inherent in the Company's internally developed forecasts.

In order to assess the reasonableness of its cash flow projections used for its goodwill impairment analysis, the Company compared the aggregate fair value of its reporting units to its market capitalization and calculated the implied control premium. The Company believes that its fair value assessment is reasonably supported by its calculated market capitalization.

Actual results may differ from those assumed in the Company's valuation method. It is reasonably possible that the Company's assumptions described above could change in future periods. If any of these were to vary materially from the Company's plans, it may record impairment of goodwill allocated to this reporting unit in the future.

Based on the Company's assessment as of December 31, 2022, no goodwill was determined to be impaired.

The Company will continue to monitor the fair value of its Stratasys-Core reporting unit to determine whether events and changes in circumstances such as further deterioration in the business climate or operating results, significant decline in the Company's share price, changes in management's business strategy or downward changes of the Company's cash flows projections, warrant further interim impairment testing.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 8. Other Intangible Assets, Net**

Other intangible assets consisted of the following:

| | December 31, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|
| | Carrying Amount, Net of Impairment | Accumulated Amortization | Net Book Value | Carrying Amount, Net of Impairment | Accumulated Amortization | Net Book Value |
| | U.S. $ in thousands | | | | | |
| Developed technology | $ 387,603 | $ (283,671) | $ 103,932 | $ 406,578 | $ (279,037) | $ 127,541 |
| Patents | 17,508 | (8,970) | 8,538 | 16,220 | (8,503) | 7,717 |
| Trademarks and trade names | 16,278 | (14,030) | 2,248 | 26,055 | (22,241) | 3,814 |
| Customer relationships | 93,609 | (86,925) | 6,684 | 100,731 | (87,559) | 13,172 |
| Capitalized software development costs | 7,066 | (7,066) | - | 7,410 | (7,410) | - |
| | $ 522,064 | $ (400,662) | $ 121,402 | $ 556,994 | $ (404,750) | $ 152,244 |

*Amortization expenses*

Amortization expense relating to intangible assets for the years ended December 31, 2022, 2021 and 2020, was approximately $37.1 million, $31.3 million and $24.3 million, respectively.

As of December 31, 2022, estimated future amortization expense relating to definite life intangible assets for each of the next five years and thereafter were as follows:

| | Estimated amortization expenses |
|---|---|
| **Year ending December 31,** | (U.S. $ in thousands) |
| 2023 | 23,409 |
| 2024 | 19,343 |
| 2025 | 16,851 |
| 2026 | 16,765 |
| 2027 | 15,797 |
| 2028 and thereafter | 29,237 |
| Total | 121,402 |

During the year ended December 31, 2020, the Company recorded impairment charges of $5.3 million, related to its definite life intangible assets. No impairment charges were recorded during 2022 and 2021.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

<u>Note 9. Income Taxes</u>

**a. Deferred Tax Assets and Liabilities**

The components of the Company's deferred tax assets and liabilities as of December 31, 2022 and 2021 were as follows:

| | | December 31, | | |
|---|---|---|---|---|
| | | **2022** | | **2021** |
| | | (U.S. $ in thousands) | | |
| **Deferred tax assets** | | | | |
| Tax losses carry forwards | $ | 678,334 | $ | 667,741 |
| Inventory related | | 157 | | 4,210 |
| Intangible assets | | 11,321 | | 12,783 |
| Provision for employee related obligations | | 927 | | 1,186 |
| Stock-based compensation | | 10,242 | | 9,528 |
| Deferred revenue | | 1,575 | | 2,257 |
| Property, plant and equipment | | 0 | | 630 |
| Allowance for credit losses | | 66 | | 143 |
| Foreign currency losses | | 0 | | 358 |
| Research and development credit carry forwards | | 17,658 | | 15,933 |
| Research and development capitalization (including Section 174) | | 11,454 | | 3,717 |
| Gross deferred tax assets | | 731,734 | | 718,486 |
| Valuation allowance | | (699,694) | | (693,120) |
| Total deferred tax assets | | 32,040 | | 25,366 |
| | | | | |
| **Deferred tax liabilities** | | | | |
| Intangibles assets | | (10,988) | | (12,533) |
| Property, plant and equipment | | (14,652) | | (17,991) |
| Basis difference in equity method investment | | (8,852) | | - |
| Other items | | (1,903) | | (882) |
| Total deferred tax liabilities | | (36,395) | | (31,406) |
| Net deferred tax assets (liabilities) | $ | (4,355) | $ | (6,040) |

The Company's deferred tax assets and liabilities are classified in the consolidated balance sheets as follows:

| | | December 31, | | |
|---|---|---|---|---|
| | | **2022** | | **2021** |
| | | (U.S. $ in thousands) | | |
| Deferred tax assets (under "Other non-current assets") | $ | 1,283 | $ | 1,301 |
| Deferred tax liabilities | | 5,638 | | 7,341 |
| Net deferred tax assets (liabilities) | $ | (4,355) | $ | (6,040) |

As of December 31, 2022 and 2021 the Company had tax net operating losses carry-forward of approximately $663.9 million and $628.5 million, respectively. In addition, the Company incurred capital losses of $2,203.2 million in 2020 due to a legal reorganization of certain entities in the group. Those tax losses carry-forward resulted in deferred tax assets of approximately $678.3 million and $667.7 million, as of December 31, 2022 and 2021, respectively. As a result of losses incurred in the last few years, and since the near-term realization of these assets is uncertain, the Company recorded a full valuation allowance for its deferred tax assets that are not likely to be realized.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Significant judgment is required in determining any valuation allowance recorded against deferred tax assets. In assessing the need for a valuation allowance, the Company considered all available evidence, including past operating results, the most recent projections for taxable income, and prudent and feasible tax planning strategies. The Company reassess its valuation allowance periodically and if future evidence allows for a partial or full release of the valuation allowance, a tax benefit will be recorded accordingly.

A reconciliation of the beginning and ending balances of valuation allowance is as follows:

|  | | Valuation allowance |
|---|---|---|
|  | | U.S. $ in thousands |
| **Balance at January 1, 2020** | $ | **151,771** |
| Additions | | 524,215 |
| Decrease | | (14,007) |
| **Balance at December 31, 2020** | | **661,979** |
| Additions | | 31,141 |
| **Balance at December 31, 2021** | | **693,120** |
| Additions | | 8,788 |
| Decrease | $ | (2,214) |
| **Balance at December 31, 2022** | $ | **699,694** |

Included in the net deferred tax are net operating loss and credit carryovers of $138.2 million which expire in years ending from December 31, 2032 through December 31, 2042, whereas some losses may be carried forward indefinitely, as discussed below

On December 22, 2017, the Tax Cuts and Jobs Act (the *"Act")* was enacted into law. The new legislation represents fundamental and dramatic modifications to the U.S. tax system. The Act contained several key tax provisions that impacted the Company's U.S. subsidiaries, including the reduction of the maximum U.S. federal corporate income tax rate from 35% to 21%, effective January 1, 2018. Other significant changes under the Act included, among others, a one-time repatriation tax on accumulated foreign earnings, a limitation of net operating loss deduction to 80% of taxable income, and indefinite carryover of post-2017 net operating losses. The Act also repealed the corporate alternative minimum tax for tax years beginning after December 31, 2017. Losses generated prior to January 1, 2018 will still be subject to the 20-year carryforward limitation and the alternative minimum tax. Other impacts due to the Act included the repeal of the domestic manufacturing deduction, modification of taxation of controlled foreign corporations, a base erosion anti-abuse tax, modification of interest expense limitation rules, modification of limitation on deductibility of excessive executive compensation, and taxation of global intangible low-taxed income.

The Act introduced new intangible income rules, Global Intangible Low-Taxed Income (GILTI) and Foreign Derived Intangible Income (FDII). The Company has analyzed the impact of GILTI/FDII and determined that no impact should be recorded due to the U.S. subsidiaries' net operating losses. Thus, the Company cannot elect to include these amounts in the measurement of its deferred taxes under U.S. GAAP.

F-40

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Effective in 2022, the Act requires all U.S. companies to capitalize, and subsequently amortize R&D expenses that fall within the scope of Section 174 over five years for research activities conducted in the United States and over fifteen years for research activities conducted outside of the United States, rather than deducting such costs in the year incurred for tax purposes. Although Congress may defer, modify, or repeal this provision, potentially with retroactive effect, we have no assurance that Congress will take any action with respect to this provision. As of financial year 2022, we have accounted for an estimate of the effects of the R&D capitalization, based on interpretation of the law as currently enacted. To the extent that this provision is not deferred, modified or repealed, and once our available Federal NOLs are fully utilized, we would incur an increase in our tax expenses and a decrease in our cash flows provided by operations. To date, we incurred immaterial tax expense and corresponding cashflow impact at State level only.

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") was enacted into law in response to the economic fallout of the COVID-19 pandemic in the United States.  Among the many business-related provisions, some of which related to non-income taxes, were changes made to net operating losses (NOLs).  The CARES Act amended Internal Revenue Code Section 172(b)(1) for tax years beginning in 2018, 2019 and 2020, requiring taxpayers to carry back NOLs arising in those years to the five preceding tax years, unless the taxpayer elects to waive or reduce the carryback period.  To the extent unused as a carryback, these NOLs are now carried forward indefinitely.  The CARES Act suspended the Tax Cuts and Jobs Act's 80% limitation on NOL deductions for tax years beginning in 2018, 2019 and 2020.  The 80% limitation will be reinstated for tax years beginning after 2020, for NOLs arising in tax years after 2017.

The Company believes that all future profits of its subsidiaries will be indefinitely reinvested or that there is no expectation to distribute any taxable dividends from these subsidiaries. The determination of the amount of the unrecognized deferred tax liability related to the undistributed earnings is estimated as an immaterial amount.

**b. Provision for Income Taxes**

Loss before income taxes for the years ended December 31, 2022, 2021 and 2020 was as follows:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
|  | (U.S. $ in thousands) | | |
| Domestic | $ (28,725) | $ (50,193) | $ (381,935) |
| Foreign | 10,931 | (16,644) | (74,636) |
|  | $ (17,794) | $ (66,837) | $ (456,571) |

The components of income taxes for the years ended December 31, 2022, 2021 and 2020 were as follows:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
|  | (U.S. $ in thousands) | | |
| **Current** | | | |
| Domestic | $ 7,301 | $ (14,146) | $ 4,992 |
| Foreign | 942 | 2,141 | (3,902) |
|  | 8,243 | (12,005) | 1,090 |
| **Deferred** | | | |
| Domestic | (1,440) | 8,745 | (4,112) |
| Foreign | (1,349) | (646) | (13,372) |
|  | (2,789) | 8,099 | (17,484) |
| Total income taxes | $ 5,454 | $ (3,906) | $ (16,394) |

F-41

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A reconciliation of the statutory income tax rate and the effective income tax rate for the years ended December 31, 2022, 2021 and 2020 is set forth below:

| | 2022 | 2021 | 2020 |
|---|---|---|---|
| Statutory tax rate | 23.0% | 23.0% | 23.0% |
| Reduced tax rate under Israeli benefit programs | (4.3) | 6.2 | (1.4) |
| Release of Exempt Profits (see below) | (16.0) | - | - |
| Goodwill impairment | - | - | (17.5) |
| Stock-based compensation expense | (16.1) | (3.5) | (0.5) |
| Non-deductible expenses | (0.8) | (0.1) | - |
| Earnings taxed under foreign law | 24.7 | 10.8 | (4.1) |
| Valuation Allowance | (18.6) | (42.7) | 3.1 |
| Changes in uncertain tax positions | (22.1) | 17.9 | 1 |
| Deferred Tax due to different tax rates | - | (6.1) | 0.1 |
| Other | (0.5) | 0.3 | (0.1) |
| Effective income tax rate | (30.7)% | 5.8% | 3.6% |

*Uncertain tax positions*

Significant judgment is required in evaluating the Company's tax positions and determining its provision for income taxes. During the ordinary course of business, there are many transactions and calculations for which the ultimate tax determination is uncertain. The Company establishes reserves for tax-related uncertainties based on estimates of whether, and the extent to which, additional taxes will be due. These reserves are established when the Company believes that certain positions might be challenged despite its belief that its tax return positions are fully supportable. The Company adjusts these reserves in light of changing facts and circumstances, such as the outcome of a tax audit or changes in the tax law. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate.

F-42

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

A reconciliation of the beginning and ending balance of uncertain tax positions is as follows:

| | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|
| | | (U.S. $ in thousands) | | | |
| Balance at beginning of year | $ 3,015 | $ | 23,389 | $ | 25,517 |
| Additions for tax positions related to the current year | 4,684 | | 3,826 | | 312 |
| Foreign currency impact | 181 | | 2,918 | | 3,017 |
| Decrease related to settlements with tax authorities and lapse of applicable statutes of limitation | (500) | | (26,685) | | (5,457) |
| Classification to deferred tax assets | (1,337) | | (433) | | - |
| Balance at end of year | $ 6,043 | $ | 3,015 | $ | 23,389 |

The Company's accrual for estimated interest and penalties was $0.3 million as of December 31, 2022.

The Company is subject to income taxes in the U.S., various states, Israel and certain other foreign jurisdictions. The Company files income tax returns in various jurisdictions with varying statutes of limitations. Tax returns of Stratasys Inc. submitted in the United States through 2015 tax year are considered to be final following the completion of the Internal Revenue Service examination. Tax returns of Stratasys Ltd. submitted in Israel through the 2019 tax year are considered to be final following the completion of the Israeli Tax Authorities examination upon audit. The expiration of the statute of limitations related to the various other foreign and state income tax returns that the Company and its subsidiaries file vary by state and foreign jurisdictions.

**c. Basis of taxation:**

The enacted statutory tax rates applicable to the Company's major subsidiaries outside of Israel are as follows:

Company incorporated in the U.S.— Federal tax rate of approximately 21%.
Company incorporated in Germany—tax rate of approximately 29%.
Company incorporated in Hong Kong—tax rate of approximately 16.5%.

A significant portion of the Company's income is taxed in Israel. The following is a summary of how the Company's income is taxed in Israel:

Corporate tax rates in Israel for 2018 and thereafter is 23%. The Company elected to compute its taxable income in accordance with Income Tax Regulations (Rules for Accounting for Foreign Investors Companies and Certain Partnerships and Setting their Taxable Income), 1986. Accordingly, the Company's taxable income or loss is calculated in U.S. dollars. Applying these regulations reduces the effect of foreign exchange rate fluctuations (of the NIS in relation to the U.S. dollar) on the Company's Israeli taxable income.

F-43

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Tax benefits under the Israeli Law for the Encouragement of Industry (Taxation), 1969*

The Company is an "Industrial Company" as defined by the Israeli Law for the Encouragement of Industry (Taxation), 1969, and, as such, is entitled to certain tax benefits including accelerated depreciation, deduction of public offering expenses in three equal annual installments and amortization of other intangible property rights for tax purposes.

*Tax benefits under the Law for Encouragement of Capital Investments, 1959 (the "Investment Law")*

*Tax incentives programs which were relevant for the company until financial year 2020*

Various industrial projects of the Company have been granted "Approved Enterprise" and "Beneficiary Enterprise" status, which provided certain benefits, including tax exemptions for undistributed income and reduced tax rates. Income not eligible for Approved Enterprise and Beneficiary Enterprise benefits is taxed at the regular corporate rate, which was 23% in 2021.

The Company is a Foreign Investors Company, or FIC, as defined by the Investment Law. FICs are entitled to further reductions in the tax rate normally applicable to Approved Enterprises and Beneficiary Enterprises, depending on the level of foreign ownership. When foreign (non-Israeli) ownership equal or exceeds 90%, the Approved Enterprise and Beneficiary Enterprise income is either tax-exempt for a limit period between two to ten years depending on the location of the enterprise or taxable at a tax rate of 10% for a 10-year period. The Company cannot assure that it will continue to qualify as a FIC in the future or that the benefits described herein will be granted in the future.

In the event of distribution of dividends (or deemed distribution, as described below) from the said tax-exempt income during the tax exemption period as described above, the amount distributed will be subject to tax in respect of the amount of dividend distributed (grossed up to reflect such pre-tax income that it would have had to earn in order to distribute the dividend) at the corporate tax rate that would have been otherwise applicable if such income had not been tax-exempted under the alternative benefits program. This rate generally ranges from 10% to 25%, depending on the level of foreign investment in the company in each year, as explained above, Dividends paid out of income attributed to Approved Enterprise or Beneficiary Enterprise (or out of dividends received from a company whose income is attributed to an Approved or Beneficiary Enterprise) are generally subject to withholding tax at the source at the rate of 15%, unless a lower rate is provided in a treaty between Israel and the shareholder's country of residence (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate).

The 15% tax rate is limited to dividends and distributions out of income derived during the benefits period and actually paid at any time up to 12 years thereafter. After this period, the withholding tax is applied at a rate of up to 30%, or at the lower rate under an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). In the case of an FIC, the 12-year limitation on reduced withholding tax on dividends does not apply.

On November 15, 2021, the Investment Law was amended to reduce the ability of companies to retain the tax-exempt profits. Effective August 15, 2021, dividend distributions (or deemed distribution, as described below), will be treated as if made on a pro-rata basis from all types of earnings, including Exempt Profits (as defined below).

In parallel to the above amendment, the Investment Law was amended to provide, on a temporary basis, a reduced corporate income tax on the distribution or release within a year from such amendment of tax-exempt profits derived by Approved and Benefited Enterprises, which we refer to as Exempt Profits. The amount of the reduced tax will be determined based on a formula. In order to qualify for the reduction, the Company must invest certain amounts in productive assets and research and development in Israel.

Following recent Israeli court ruling, certain transactions (such as acquisitions and intercompany loans) may be treated as deemed dividend distributions for the purpose of the Encouragement Law triggering corporate tax on the respective amount of the transaction.

On November 13, 2022, the Company released an amount of approximately $44.8 million out of its Exempt Profits and accordingly paid reduced tax of approximately $2.9 million.

As of December 31, 2022, remaining tax-exempt income of approximately $160.6 million is attributable to the Company's various Approved and Beneficiary Enterprise programs. If such tax-exempt income is distributed, it would be taxed at the reduced corporate tax rate applicable to such income, and taxes of approximately $16.1 million would be incurred as of December 31, 2022.

F-44

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Tax incentives programs which may be relevant for the company as of financial year 2021*

A January 2011 amendment to the Investment Law (the "2011 Amendment") created alternative benefit tracks to those previously in place, as follows: an investment grants track designed for enterprises located in certain development zones and two new tax benefits tracks ("Preferred Enterprise" and "Special Preferred Enterprise"), which provide for application of a unified tax rate to all preferred income of the company, as defined in the Investment Law.

The 2011 Amendment canceled the availability of the benefits granted in accordance with the provisions of the Investment Law prior to 2011 and, instead, introduced new benefits for income generated by a "Preferred Company" through its "Preferred Enterprise" (as such terms are defined in the Investment Law) effective as of January 1, 2011 and thereafter. A Preferred Company is defined as either (i) a company incorporated in Israel which is not wholly owned by a governmental entity, or (ii) a limited partnership that: (a) was registered under the Israeli Partnerships Ordinance, and (b) all of its limited partners are companies incorporated in Israel, but not all of them are governmental entities; which has, among other things, Preferred Enterprise status and is controlled and managed from Israel. Pursuant to the 2011 Amendment, a Preferred Company was entitled to a reduced corporate tax rate of 16% with respect to its preferred income attributed to its Preferred Enterprise, unless the Preferred Enterprise was located in a certain development zone, in which case the rate was 9%. In 2017 and thereafter, the corporate tax rate for Preferred Enterprise which is located in a certain development zone was decreased to 7.5%, while the reduced corporate tax rate for other development zones remains 16%.

Dividends paid out of preferred income attributed to a Preferred Enterprise is generally subject to withholding tax at source at the rate of 20%, or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld (although, if such dividends are subsequently distributed to individuals or a non-Israeli company, withholding tax at a rate of 20% or such lower rate as may be provided in an applicable tax treaty will apply.

*New Tax benefits under the 2017 Amendment that became effective on January 1, 2017.*

The 2017 Amendment was enacted as part of the Economic Efficiency Law that was published on December 29, 2016, and was effective as of January 1, 2017. The 2017 Amendment provides new tax benefits for two types of "Technology Enterprises", as described below, and is in addition to the other existing tax beneficial programs under the Investment Law.

The 2017 Amendment provides that a technology company satisfying certain conditions will qualify as a "Preferred Technology Enterprise" and will thereby enjoy a reduced corporate tax rate of 12% on income that qualifies as "Preferred Technology Income," as defined in the Investment Law. The tax rate is further reduced to 7.5% for a Preferred Technology Enterprise located in development zone A. In addition, a Preferred Technology Company will enjoy a reduced corporate tax rate of 12% on capital gain derived from the sale of certain "Benefitted Intangible Assets" (as defined in the Investment Law) to a related foreign company if the Benefitted Intangible Assets were acquired from a foreign company on or after January 1, 2017 for at least NIS 200 million, and the sale receives prior approval from the Israeli Innovation Authority, to which we refer as the IIA.

The 2017 Amendment further provides that a technology company satisfying certain conditions will qualify as a "Special Preferred Technology Enterprise" and will thereby enjoy a reduced corporate tax rate of 6% on "Preferred Technology Income" regardless of the company's geographic location within Israel. In addition, a Special Preferred Technology Enterprise will enjoy a reduced corporate tax rate of 6% on capital gain derived from the sale of certain "Benefitted Intangible Assets" to a related foreign company if the Benefitted Intangible Assets were either developed by an Israeli company or acquired from a foreign company on or after January 1, 2017, and the sale received prior approval from the IIA. A Special Preferred Technology Enterprise that acquires Benefitted Intangible Assets from a foreign company for more than NIS 500 million will be eligible for these benefits for at least ten years, subject to certain approvals as specified in the Investment Law

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Dividends distributed by a Preferred Technology Enterprise or a Special Preferred Technology Enterprise, paid out of Preferred Technology Income, are generally subject to withholding tax at source at the rate of 20% or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld. If such dividends are distributed to a foreign company and other conditions are met, the withholding tax rate will be 4%.

In 2021, the Company noticed the Israeli tax authorities that it waived the Approved / Beneficiary Enterprise regime starting from tax year 2021. The Company is currently considering its qualification for the 2017 amendment and the term and degree to which it may be qualified as a Preferred Technology Enterprise or Special Preferred Technology Enterprise.

**Note 10. Contingencies**

The Company is a party to various legal proceedings, the outcome of which, in the opinion of management, will not have a significant adverse effect on the financial position, profitability or cash flows of the Company.

**Note 11. Equity**

**a. Share capital**

The Company's issued share capital is composed of ordinary shares NIS 0.01 par value per share. Ordinary shares confer upon their holders the right to receive notice to participate and vote in general meetings of the Company, and the right to receive dividends if declared.

The Company's ordinary shares are traded in the United States on the Nasdaq Global Select Market under the ticker symbol "SSYS". As of December 31, 2022 and 2021, there were 67,086 thousand ordinary shares and 65,677 thousand ordinary shares issued and outstanding, respectively. The increase in the outstanding and issued ordinary shares during 2022 was attributable to exercises of stock options and RSUs under the Company's stock-based compensation plans (including its ESPP). During 2022 the reserve pool under 2022 plan was increased by 1.5 million shares.

**b. Stock-based compensation plans**

The Stratasys Ltd. 2012 Omnibus Equity Incentive Plan (the "2012 Plan"), which became effective upon closing of the Stratasys-Core merger, provides for the grant of options, restricted shares, RSUs, PSUs and other share-based awards to the Company's and its subsidiaries' respective directors, employees, officers, consultants, and to any other person whose services are considered valuable to the Company or any of its affiliates. Under the 2012 plan, options, RSUs and PSUs generally have a contractual term of ten years from the grant date. Options granted become exercisable and RSUs are vested over the requisite service period, which is normally a four-year period beginning on the grant date, subject to continued service to the Company. PSUs are vested only upon the achievement of certain pre-determined performance metrics. Once the performance metrics are met, vesting of PSUs is subject to continued service to the Company over the requisite service period, which is normally a two-year to four-year period. The 2012 Plan expired pursuant to its own terms in September 2022.

As of December 31, 2022, there were an aggregate of 9,041,427 ordinary shares subject to outstanding awards under the 2012 Plan, and no further shares available for future equity awards under the 2012 plan, as all remaining shares under the plan were transferred to the new 2022 Plan (as described below) upon the expiration of the 2012 Plan. All outstanding awards under the 2012 Plan continue to remain subject to the terms of the 2012 Plan, but upon cancellation, forfeiture or expiration of any such awards for any reason, the underlying shares will be automatically transferred and added to the pool of shares available for issuance under the 2022 Plan.

F-46

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Stratasys Ltd. 2022 Share Incentive Plan (the "2022 Plan") became effective upon approval by the Company's shareholders at the Company's 2022 annual general meeting of shareholders that took place on September 15, 2022. The 2022 Plan provides for the grant of options, restricted shares, RSUs, PSUs and other share-based awards to the Company's and its subsidiaries' respective directors, employees, officers, consultants, and to any other person whose services are considered valuable to the Company or any of its affiliates. Under the 2022 plan, options, RSUs and PSUs generally have a contractual term of ten years from the grant date. Options granted become exercisable and RSUs are vested over the requisite service period, which is normally a four-year period beginning on the grant date, subject to continued service to the Company. PSUs are vested only upon the achievement of certain pre-determined performance metrics. Once the performance metrics are met, vesting of PSUs is subject to continued service to the Company over the requisite service period, which is normally a two-year to four-year period. As of December 31, 2022, 1,296,494 ordinary shares were subject to existing awards under the 2022 Plan, and an additional 277,506 ordinary shares were available for future equity awards under the 2022 plan.

As of December 31, 2022, $1.5 million shares were available for future equity awards under the 2022 plan.

*Stock options*

A summary of the stock option activity for the year ended December 31, 2022 is as follows:

| | Number of Options | Weighted Average Exercise Price |
|---|---|---|
| Options outstanding as of December 31, 2021 | 1,732,368 | $ 28.85 |
| Granted | 78,740 | 13.59 |
| Exercised | (26,362) | 10.04 |
| Forfeited | (165,187) | 36.68 |
| Options outstanding as of December 31, 2022 | 1,619,559 | $ 27.62 |
| Options exercisable as of December 31, 2022 | 1,238,659 | $ 31.25 |

The following table summarizes information about stock options outstanding at December 31, 2022:

| Range of Exercise Prices | | Outstanding options at December 31, 2022 | Weighted-Average Remaining Contractual Life in Years | Weighted-Average Exercise Price | | Exercisable options at December 31, 2022 | Weighted-Average Exercise Price | |
|---|---|---|---|---|---|---|---|---|
| | | **Options Outstanding** | | | | **Options Exercisable** | | |
| $ 3.52 - $ 19.61 | | 464,419 | 7.68 | $ | 15.28 | 83,519 | $ | 18.94 |
| $ 19.66 - $ 22.47 | | 688,434 | 4.67 | | 20.36 | 688,434 | | 20.36 |
| $ 23.41 - $ 114.11 | | 466,480 | 2.57 | | 49.48 | 466,480 | | 49.48 |
| $ 120.51 - $ 120.51 | | 226 | 0.94 | | 120.51 | 226 | | 120.51 |
| | | 1,619,559 | 4.93 | $ | 27.31 | 1,238,659 | $ | 31.25 |
| Aggregate intrinsic value (U.S. $ in thousands) | | $ 46 | | | | $ 28 | | |

As of December 31, 2022, the weighted-average remaining contractual life of exercisable options was 4.1 years. The total intrinsic value of options exercised during 2022, 2021 and 2020 was approximately $0.3 million, $5.19 million and $0.04 million, respectively.

F-47

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company used the Black-Scholes option-pricing model to determine the fair value of options granted during 2022, 2021 and 2020. The following assumptions were applied in determining the options' fair value on their grant date:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Risk-free interest rate | 0.4%-3.9% | 0.4%-1.3% | 0.4%-1.8% |
| Expected option term (years) | 5.0-5.5 | 5.0-5.1 | 5.0-5.1 |
| Expected share price volatility | 52.8%-61.4% | 52.8%-58.7% | 52.5%-52.8% |
| Dividend yield | - | - | - |
| Weighted average grant date fair value | $11.36 | $14.99 | 8.09 |

As of December 31, 2022, the Company had 0.4 million unvested options. As of December 31, 2022, the unrecognized compensation cost related to all unvested, equity-classified stock options of $1.4 million is expected to be recognized as an expense on a straight-line basis over a weighted-average period of 2.1 years.

*Restricted Stock Units and Performance Stock Units*

A summary of the Company's RSUs and PSUs activity for the year ended December 31, 2022 is as follows:

|  | Number of RSUs and PSUs | Weighted Average Grant Date Fair Value |
|---|---|---|
| Unvested RSUs and PSUs outstanding as of December 31, 2021 | 3,082,798 | $ 26.36 |
| Granted | 2,178,650 | 21.21 |
| Vested | (1,122,041) | 24.86 |
| Forfeited | (643,308) | 24.46 |
| Unvested RSUs and PSUs outstanding as of December 31, 2022 | 3,496,099 | $ 23.98 |

The total vesting-date value of equity classified RSUs vested during 2022 was $24.8 million. As of December 31, 2022, the unrecognized compensation cost related to all unvested equity classified RSUs and PSUs of $54.3 million is expected to be recognized as an expense on a straight-line basis over a weighted-average period of 2.2 years.

F-48

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Stock-based compensation expense for stock options and equity classified RSUs included in the Company's Statements of Operations and Comprehensive Loss were allocated as follows:

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
|  | (U.S. $ in thousands) | | |
| Cost of revenues | $ 4,082 | $ 3,093 | $ 1,771 |
| Research and development, net | 7,113 | 6,564 | 6,102 |
| Selling, general and administrative | 22,266 | 21,320 | 12,331 |
| Total stock-based compensation expenses | $ 33,461 | $ 30,977 | $ 20,204 |

*Employee Stock Purchase Plan*

On October 2021, the Company adopted the 2021 Employee Stock Purchase Plan (the "ESPP"). As of December 31, 2022, the maximum aggregate number of ordinary shares that may be purchased initially under the ESPP will be 5,200,000 shares.

The ESPP is implemented through an offering every six months. According to the ESPP, eligible employees may use up to 15% of their salaries to purchase ordinary shares. The price of an ordinary share purchased under the ESPP is equal to 85% of the lower of the fair market value of the ordinary share on the beginning of each offering period or on the purchase date.

As of December 31, 2022, 249,750 shares of common stock had been purchased under the ESPP.

As of December 31, 2022, 4,950,250 shares of common stock are available for future issuance under the ESPP.

In accordance with ASC Topic 718, the ESPP is considered compensatory and, as such, results in recognition of stock-based compensation expenses.

**c. Accumulated other comprehensive loss**

The following tables present the changes in the components of accumulated other comprehensive loss, net of taxes for the years ended December 31, 2022, 2021 and 2020:

|  | Year ended December 31, 2022 | | |
|---|---|---|---|
|  | Net unrealized gain (loss) on cash flow hedges | Foreign currency translation adjustments | Total |
|  | U.S. $ in thousands | | |
| Balance as of January 1, 2022 | $ 1,572 | $ (10,343) | $ (8,771) |
| Other comprehensive loss before reclassifications | (1,566) | (2,176) | (3,742) |
| Amounts reclassified from accumulated other comprehensive loss | (305) | - | (305) |
| Other comprehensive income (loss), net of tax | (1,871) | (2,176) | (4,047) |
| Balance as of December 31, 2022 | $ (299) | $ (12,519) | $ (12,818) |

F-49

Table of Contents

 STRATASYS LTD.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | Year ended December 31, 2021 | | |
|---|---|---|---|
| | Net unrealized gain (loss) on cash flow hedges | Foreign currency translation adjustments | Total |
| | U.S. $ in thousands | | |
| Balance as of January 1, 2021 | $ (1,673) | $ (7,173) | $ (8,846) |
| Other comprehensive loss before reclassifications | 3,668 | (2,603) | 1,065 |
| Amounts reclassified from accumulated other comprehensive loss | (423) | (567) | (990) |
| Other comprehensive income (loss) | 3,245 | (3,170) | 75 |
| Balance as of December 31, 2021 | $ 1,572 | $ (10,343) | $ (8,771) |

| | Year ended December 31, 2020 | | |
|---|---|---|---|
| | Net unrealized gain (loss) on cash flow hedges | Foreign currency translation adjustments | Total |
| | U.S. $ in thousands | | |
| Balance as of January 1, 2020 | $ (10) | $ (7,706) | $ (7,716) |
| Other comprehensive loss before reclassifications | (1,024) | 533 | (490) |
| Amounts reclassified from accumulated other comprehensive loss | (639) | - | (639) |
| Other comprehensive income (loss) | (1,663) | 533 | (1,130) |
| Balance as of December 31, 2020 | $ (1,673) | $ (7,173) | $ (8,846) |

**d. Rights plan**

    On July 24, 2022, the Company's Board of Directors adopted a rights plan (the "Rights Plan") to protect the interests of the Company's shareholders. Each Right entitles the registered holder thereof to purchase from the Company one Ordinary Share at a price of  $0.01 per share, subject to adjustment, once the Rights become exercisable, and subject to the exercise terms and conditions thereof described in the Rights Agreement. The rights would become exercisable only if an entity, person, or group acquires beneficial ownership of 15% or more of the Company's outstanding ordinary shares in a transaction not approved by the Company's Board of Directors. The Rights Plan has a 364-day term, expiring on July 24, 2023.

   The adoption of the Rights Plan is intended to protect the long-term interests of Stratasys and all Stratasys shareholders. The Rights Plan is designed to reduce the likelihood that any entity, person, or group would gain control of, or significant influence over, Stratasys through the open-market accumulation of the Company's shares without appropriately compensating all Stratasys shareholders for control. The Rights Plan will encourage anyone seeking to gain a significant interest in Stratasys to negotiate directly with the Board prior to attempting to control or significantly influence the Company. Further to those goals, the Rights may cause substantial dilution to a person or group that acquires 15% or more of the ordinary shares of the Company or any existing holder of 15% or more of the Ordinary Shares who shall acquire any additional Ordinary Shares.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**e. Public offering of ordinary shares**

During March 2021, the Company completed a public offering of its ordinary shares in an amount of $218.9 million, net of $11.1 million underwriting discounts and offering expenses. The total number of shares sold by the Company in the public offering was 7,931,034. The Company recorded a deferred tax asset in respect of a tax benefit, arising from the underwriting discounts and offering expenses, as an increase to Additional Paid-In Capital.

**Note 12. Derivatives and Hedging Activities**

The Company carries out transactions involving foreign currency exchange derivative financial instruments. The transactions are designed to hedge the Company's exposure to change in relative value of currencies other than the U.S. dollar. The Company is primarily exposed to foreign exchange risk with respect to recognized assets and liabilities and forecasted transactions denominated in the New Israeli Shekel ("NIS") and, the Euro. Gains and losses on the hedging instruments offset losses and gains on the hedged items.

The following table summarizes the consolidated balance sheets classification and fair values of the Company's derivative instruments:

| | Balance sheet location | Fair Value December 31, 2022 | Fair Value December 31, 2021 | Notional Amount December 31, 2022 | Notional Amount December 31, 2021 |
|---|---|---|---|---|---|
| | | (U.S. $ in thousands) | | | |
| Assets derivatives -Foreign exchange contracts, not designated as hedging instruments | Other current assets | $ 159 | $ 82 | $ 101,733 | $ 12,380 |
| Assets derivatives -Foreign exchange contracts, designated as cash flow hedge | Other current assets | 3 | 910 | 4,900 | 60,408 |
| Liability derivatives -Foreign exchange contracts, not designated as hedging instruments | Accrued expenses and other current liabilities | (38) | (89) | 16,751 | 33,047 |
| Liability derivatives -Foreign exchange contracts, designated as cash flow hedge | Accrued expenses and other current liabilities | (1,640) | (60) | 72,273 | 26,320 |
| | | $ (1,516) | $ 843 | $ 195,657 | $ 132,155 |

Foreign exchange contracts not designated as hedging instruments

As of December 31, 2022, the notional amounts of the Company's outstanding exchange forward contracts, not designated as hedging instruments, were $118.5 million and were used to reduce foreign currency exposures of the Euro, New Israeli Shekel (the "NIS"),British Pound, Japanese Yen, Korean Won and Chinese Yuan. With respect to such derivatives, gain of $2.1 million and gain of $2.9 million were recognized under financial income (expenses) , net for the years ended December 31, 2022 and 2021, respectively. Such gains partially offset the revaluation losses of the balance sheet items, which are also recognized under financial income (expenses), net.

F-51

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Cash Flow Hedging—Hedges of Forecasted Foreign Currency Payroll and other operating expenses

As of December 31, 2022 and 2021, the Company had in effect foreign exchange forward contracts for the conversion of $64.4 million and $32.1 million, respectively, into NIS. These foreign exchange forward contracts were designated as cash flow hedge for accounting purposes. The Company uses short-term cash flow hedge contracts to reduce its exposure to variability in expected future cash flows resulting mainly from payroll costs denominated in New Israeli Shekels. The changes in fair value of those contracts are included in the Company's accumulated other comprehensive loss.

Cash Flow Hedging—Hedges of Forecasted Foreign Currency Revenue

The Company transact business in U.S. Dollars and in various other currencies. The Company may use foreign exchange or forward contracts to hedge certain cash flow exposures resulting from changes in these foreign currency exchange rates. These foreign exchange contracts, carried at fair value, have maturities of up to twelve months. The Company enters into these foreign exchange contracts to hedge a portion of its forecasted foreign currency denominated revenue in the normal course of business and accordingly, they are not speculative in nature.

As of December 31, 2022, the Company had in effect foreign exchange forward contracts, designated as cash flow hedge for accounting purposes, for the conversion of Euro 12.7 million into dollars .

To receive hedge accounting treatment, all hedging relationships are formally documented at the inception of the hedge, and the hedges must be highly effective in offsetting changes to future cash flows on hedged transactions. The Company record changes in fair value of these cash flow hedges in accumulated other comprehensive income (loss) in its consolidated balance sheets, until the forecasted transaction occurs. When the forecasted transaction occurs, we reclassify the related gain or loss to revenue. In the event the underlying forecasted transaction does not occur, or it becomes probable that it will not occur, the Company reclassifies the gain or loss on the related cash flow hedge from accumulated other comprehensive income (loss) to the same statement of operations line item as the hedged item. If the Company does not elect hedge accounting, or the contract does not qualify for hedge accounting treatment, the changes in fair value from period to period are recorded under financial income (expenses), net.

F-52

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Revenues | | Cost of revenues | | Research and development, net | | Selling, general and administrative | | Financial expenses (income), net | | Other comprehensive income (loss) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | December 31, 2022 | 2021 | December 31, 2022 | 2021 | December 31, 2022 | 2021 | December 31, 2022 | 2021 | December 31, 2022 | 2021 | December 31, 2022 | 2021 |
| | (U.S. $ in thousands) | | | | | | | | | | | |
| Line items in which effects of hedges are recorded | $(651,483) | (607,219) | $375,016 | $347,141 | $92,876 | $88,303 | $240,750 | $250,937 | $ (229) | $ 2,075 | $(4,047) | $ 75 |
| Foreign exchange contracts designated as a hedging instrument | 3,625 | 914 | 243 | (243) | 950 | (398) | 1,941 | (696) | - | - | (1,566) | 3,245 |
| Foreign exchange contracts not designated as a hedging instrument | - | - | - | - | - | - | - | - | (2,125) | (2,870) | - | - |

**Note 13. Entity-Wide Disclosure**

Revenues by geographic area for the years ended December 31, 2022, 2021 and 2020 were as follows*:

| | Year ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| | (U.S. $ in thousands) | | |
| Americas (primarily the United States) | $ 415,428 | $ 388,323 | $ 343,477 |
| EMEA | 141,660 | 130,296 | 101,584 |
| Asia Pacific | 94,395 | 88,600 | 75,756 |
| | $ 651,483 | $ 607,219 | $ 520,817 |

\* Revenues are attributed to geographic areas based on the location of customer.

No single customer accounted for 10% or more of Company's total revenues, or Company's net accounts receivable, in any fiscal year presented.

F-53

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Property, plant and equipment and right-of-use assets of lessees by geographical area were as follows:

|  | Year ended December 31, | |
| --- | --- | --- |
|  | **2022** | **2021** |
| Americas (primarily the United States) | $ 63,158 | $ 46,456 |
| EMEA | 146,208 | 162,576 |
| Asia Pacific | 3,819 | 8,914 |
|  | $ 213,185 | $ 217,946 |

Property, plant and equipment that were located in Israel amounted to $130.6 million and $136.4 million for the years ended December 31, 2022 and 2021, respectively and are included under the EMEA region in the above table.

Right-of-use assets of lessees that were located in Israel amounted to $1.0 million and $1.4 million for the years ended December 31, 2022 and 2021 respectively and are included under the EMEA region in the above table.

**Note 14. Net loss per Share**

The following table presents the computation of basic and diluted net loss per share:

|  | Year ended December 31, | | |
| --- | --- | --- | --- |
|  | **2022** | **2021** | **2020** |
|  | (In thousands, except per share amounts) | | |
| **Numerator:** | | | |
| Net loss attributable to Stratasys Ltd. for basic and diluted net loss per share | $ (28,974) | $ (61,982) | $ (443,721) |
| | | | |
| **Denominator:** | | | |
| Weighted average shares – denominator for basic and diluted net loss per share | 66,491 | 63,471 | 54,918 |
| | | | |
| Net loss per share Basic and diluted | $ (0.44) | $ (0.98) | $ (8.08) |

The computation of diluted net loss per share for the years ended December 31, 2022, 2021 and 2020 excluded share awards of 5.1 million, 4.8 million and 4.9 million, respectively, because their inclusion would have had an anti-dilutive effect on the diluted net loss per share.

Table of Contents

**STRATASYS LTD.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 15. Leases**

The Company's operating lease expenses are recognized on a straight-line basis. Operating lease cost for the years ended December 31, 2022, 2021 and 2020, were as follows:

| | December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| | (U.S. $ in thousands) | | |
| **Operating lease cost:** | | | |
| Fixed payments and variable payments that depend on an index or rate | $ 8,951 | $ 10,196 | $ 10,102 |
| **Total operating lease cost** | **$ 8,951** | **$ 10,196** | **$ 10,102** |

Cash flow and other information related to operating leases were as follows:

| | December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| | (U.S. $ in thousands) | | |
| Cash paid for amounts included in the measurement of lease liabilities | $ 8,372 | $ 9,829 | $ 10,559 |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ 12,057 | $ 5,955 | $ 10,008 |

| | December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| Weighted-average remaining lease term — operating leases | 4.11 years | 2.59 years | 3.00 years |
| Weighted-average discount rate — operating leases | 4.17% | 4.58% | 4.78% |

Maturities of operating lease liabilities were as follows:

| | December 31, |
|---|---|
| | **2022** |
| | (U.S. $ in thousands) |
| 2023 | $ 7,561 |
| 2024 | 4,430 |
| 2025 | 2,180 |
| 2026 | 1,678 |
| 2027 and thereafter | 2,879 |
| Total operating lease payments | 18,728 |
| Less: imputed interest | (889) |
| Present value of lease liabilities | $ 17,839 |

F-55

Table of Contents

## ITEM 19. EXHIBITS.

| Exhibit Number | Document Description |
|---|---|
| 1.1 | Amended and Restated Articles of Association of Stratasys Ltd. (1) |
| 1.2 | Memorandum of Association of Stratasys Ltd. (formerly known as Objet Ltd.) (2) |
| 2.1 | Specimen ordinary share certificate of Stratasys Ltd. (3) |
| 2.2 | Description of ordinary shares of Stratasys Ltd* |
| 4.1 | Stratasys Ltd. 2022 Share Incentive Plan, as amended (4) |
| 4.2 | Stratasys Ltd. 2012 Omnibus Equity Incentive Plan, as amended* |
| 4.3 | Stratasys Ltd. 2021 Employee Share Purchase Plan (5) |
| 4.4 | Form of Indemnification Agreement by and between Stratasys Ltd. (formerly known as Objet Ltd.) and each of its directors and executive officers (6) |
| 4.5 | OEM Purchase and License Agreement,effective as of May 5, 2011, by and between Stratasys Ltd. (formerly known as Objet Geometries Ltd.) and RicohPrinting Systems America, Inc. (7) |
| 4.6 | Assignment, dated June 1, 1994, from S. Scott Crump, James W. Comb, William R. Priedeman, Jr., and Robert Zinniel to Stratasys, Inc. (a subsidiary of Stratasys Ltd.) with respect to a patent application for a process and apparatus of support removal for three-dimensional modeling (8) |
| 4.7 | Stratasys Ltd. Compensation Policy for Executive Officers and Directors (9) |
| 4.8 | Employment Agreement, effective as of February 18, 2020, by and between Stratasys Ltd. and Yoav Zeif (10) |
| 8.1 | Subsidiary List of Stratasys Ltd.* |
| 12.1 | Certificate of Chief Executive Officer pursuant to Rule 13a-14(a)/Rule 15d-14(a) under the Exchange Act* |
| 12.2 | Certificate of Chief Financial Officer pursuant to Rule 13a-14(a)/Rule 15d-14(a) under the Exchange Act* |
| 13 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to Rule 13a-14(b)/Rule 15d-14(b) under the Exchange Act and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002* |
| 15.1 | Consent of Kesselman & Kesselman, a member firm of PricewaterhouseCoopers International Limited, an independent registered public accounting firm* |
| 101 | The following financial information from Stratasys Ltd.'s Annual Report on Form 20-F for the year ended December 31, 2022 formatted in XBRL (eXtensible Business Reporting Language): (i) Consolidated Balance Sheets at December 31, 2022 and 2021; (ii) Consolidated Statements of Operations and Comprehensive Income for the years ended December 31, 2022, 2021 and 2020; (iii) Consolidated Statements of Changes in Equity for the years ended December 31, 2022, 2021 and 2020; (iv) Consolidated Statements of Cash Flows for the years ended December 31, 2022, 2021 and 2020; and (v) Notes to Consolidated Financial Statements, tagged as blocks of text. |
| 104 | Cover Page Interactive Data File |

145

Table of Contents

(1)  Incorporated by reference to Appendix A to the registrant's proxy statement for its February 3, 2015 extraordinary general meeting of shareholders, attached as Exhibit 99.1 to the registrant's report of foreign private issuer on Form 6-K furnished to the SEC on January 6, 2015

(2)  Incorporated by reference to Exhibit 3.2 to the registrant's registration statement on Form F-4, SEC File No. 333-182025, filed with the SEC on June 8, 2012

(3)  Incorporated by reference to Exhibit 4.1 to Amendment No. 3 to the registrant's registration statement on Form F-4, SEC File No. 333-182025, filed with the SEC on August 6, 2012

(4)  Incorporated by reference to Exhibit 99.1 to the registrant's report of foreign private issuer on Form 6-K furnished to the SEC on August 26, 2022

(5)  Incorporated by reference to Appendix A to the registrant's proxy statement for its 2021 annual general meeting of shareholders, attached as Exhibit 99.2 to the registrant's report of foreign private issuer on Form 6-K furnished to the SEC on October 13, 2021

(6)  Incorporated by reference to Exhibit 10.7 to the registrant's registration statement on Form F-4, SEC File No. 333- 182025, filed with the SEC on June 8, 2012

(7)  Incorporated by reference to Exhibit 10.10 to the registrant's registration statement on Form F-4, SEC File No. 333-182025, filed with the SEC on June 8, 2012

(8)  Incorporated by reference to Amendment No. 1 to Stratasys, Inc.'s registration statement on Form SB-2 (SEC File No. 333-99108) filed with the SEC on December 20, 1995

(9)  Incorporated by reference to Appendix B to the registrant's proxy statement for its 2021 annual general meeting of shareholders, attached as Exhibit 99.2 to the registrant's report of foreign private issuer on Form 6-K furnished to the SEC on October 13, 2021

(10)  Incorporated by reference to Exhibit 4.8 to the registrant's annual report on Form 20-F for the year ended December 31, 2019, filed with the SEC on February 26, 2020

 *Filed herewith

# Portions of this exhibit have been omitted and filed separately with the SEC pursuant to a confidential treatment request.

146

Table of Contents

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report filed on its behalf.

STRATASYS LTD.

/s/ Yoav Zeif
_____
Yoav Zeif
Chief Executive Officer
March 3, 2023

147

Table of Contents

# EXHIBIT 3



# EXHIBIT 4





# EXHIBIT 5





# EXHIBIT 6



# EXHIBIT 7





# EXHIBIT 8



# EXHIBIT 9

**UNITED STATES**
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## Form 6-K

### REPORT OF FOREIGN PRIVATE ISSUER PURSUANT TO RULE 13a-16 OR 15d-16
### UNDER THE SECURITIES EXCHANGE ACT OF 1934

For the month of May 2022

Commission File Number 001-35751

# STRATASYS LTD.

(Translation of registrant's name into English)

| | |
|---|---|
| **c/o Stratasys, Inc.** | **1 Holtzman Street, Science Park** |
| **9600 West 76th Street** | **P.O. Box 2496** |
| **Eden Prairie, Minnesota 55344** | **Rehovot, Israel 76124** |

(Address of principal executive office)

Indicate by check mark whether the registrant files or will file annual reports under cover of Form 20-F or Form 40-F. Form 20-F ☒ Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1): ____

**Note**: Regulation S-T Rule 101(b)(1) only permits the submission in paper of a Form 6-K if submitted solely to provide an attached annual report to security holders.

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7): ____

**The contents of this Report of Foreign Private Issuer on Form 6-K (this "Form 6-K"), including Exhibits 99.1, 99.2 and 101 annexed hereto, are incorporated by reference into the Registrant's registration statements on Form S-8, SEC file numbers 333-190963, 333-236880, 333-253694, 333-262951 and 333-262952, filed by the Registrant with the SEC on September 3, 2013, March 4, 2020, March 1, 2021, February 24, 2022 and February 24, 2022, respectively, and Form F-3, SEC file numbers 333-251938 and 333-253780, filed by the Registrant with the SEC on January 7, 2021 and March 2, 2021, respectively, as amended, and shall be a part thereof from the date on which this Form 6-K is furnished, to the extent not superseded by documents or reports subsequently filed or furnished.**

### CONTENTS

On May 17, 2022, Stratasys Ltd., or Stratasys, released its financial results for the three months ended March 31, 2022.

Attached hereto as Exhibit 99.1 are the unaudited, condensed consolidated financial statements of Stratasys for the three months ended March 31, 2022 (including the notes thereto) (the "Q1 2022 Financial Statements").

Attached hereto as Exhibit 99.2 is Stratasys' review of its results of operations and financial condition for the three months ended March 31, 2022, including the following:

| | |
|---|---|
| (i) | Operating and Financial Review and Prospects |
| (ii) | Quantitative and Qualitative Disclosures About Market Risk |
| (iii) | Legal Proceedings |
| (iv) | Risk Factors |

Attached hereto as Exhibit 101 are the Q1 2022 Financial Statements, formatted in IXBRL (eXtensible Business Reporting Language), consisting of the following sub-exhibits:

| Exhibit Number | Document Description |
|---|---|
| 99.1 | Unaudited, Condensed Consolidated Financial Statements of Stratasys Ltd. as of, and for the quarter ended, March 31, 2022 |
| 99.2 | Review of Stratasys Ltd. Results of Operations and Financial Condition for the three months ended March 31, 2022 |
| EX-101.INS | IXBRL Taxonomy Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |
| EX-101.SCH | IXBRL Taxonomy Extension Schema Document |
| EX-101.CAL | IXBRL Taxonomy Calculation Linkbase Document |
| EX-101.DEF | IXBRL Taxonomy Extension Definition Linkbase Document |
| EX-101.LAB | IXBRL Taxonomy Label Linkbase Document |
| EX-101.PRE | IXBRL Taxonomy Presentation Linkbase Document |
| EX-104 | Cover Page Interactive Data File – the cover page interactive data file does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto

duly authorized.

Dated: May 17, 2022

**STRATASYS LTD.**

By:        /s/ Eitan Zamir
Name:      Eitan Zamir
Title:     Chief Financial Officer

3

**STRATASYS LTD.**

**CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS**

**FOR THE THREE MONTHS ENDED**

**MARCH 31, 2022**

**(UNAUDITED)**

---

**INDEX TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**FOR THE THREE MONTHS ENDED MARCH 31, 2022**
**(UNAUDITED)**

| Item | Page |
|---|---|
| **Consolidated Balance Sheets** | **2** |
| **Consolidated Statements of Operations and Comprehensive Loss** | **3** |
| **Consolidated Statements of Changes in Equity** | **4-5** |
| **Consolidated Statements of Cash Flows** | **6** |
| **Notes to Condensed Consolidated Interim Financial Statements** | **7-19** |

**STRATASYS LTD.**
**CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**(Unaudited)**
**Consolidated Balance Sheets**
(in thousands, except share data)

| | | March 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 293,649 | $ | 243,179 |
| Short-term deposits | | 182,000 | | 259,000 |
| Accounts receivable, net of allowance for credit losses of $0.7 million and $0.5 million as of March 31, 2022 and December 31, 2021, respectively | | 136,444 | | 129,382 |
| Inventories | | 143,116 | | 129,147 |
| Prepaid expenses | | 8,477 | | 6,871 |
| Other current assets | | 24,185 | | 33,123 |
| Total current assets | | 787,871 | | 800,702 |
| **Non-current assets** | | | | |
| Property, plant and equipment, net | | 200,627 | | 203,295 |
| Goodwill | | 65,089 | | 65,144 |
| Other intangible assets, net | | 143,317 | | 152,244 |
| Operating lease right-of-use assets | | 14,162 | | 14,651 |
| Long-term investments | | 28,667 | | 28,667 |
| Other non-current assets | | 16,651 | | 12,519 |
| Total non-current assets | | 468,513 | | 476,520 |
| **Total assets** | $ | 1,256,384 | $ | 1,277,222 |
| | | | | |
| **LIABILITIES AND EQUITY** | | | | |
| **Current liabilities** | | | | |
| Accounts payable | $ | 59,010 | $ | 51,976 |
| Accrued expenses and other current liabilities | | 44,198 | | 55,358 |
| Accrued compensation and related benefits | | 38,341 | | 44,684 |
| Deferred revenues - short term | | 52,337 | | 51,174 |
| Operating lease liabilities - short term | | 7,158 | | 7,276 |
| Total current liabilities | | 201,044 | | 210,468 |
| **Non-current liabilities** | | | | |
| Deferred revenues - long term | | 22,026 | | 21,133 |
| Deferred income taxes - long term | | 6,258 | | 7,341 |
| Operating lease liabilities - long term | | 7,220 | | 7,693 |
| Contingent consideration - long term | | 53,648 | | 53,478 |
| Other non-current liabilities | | 23,487 | | 21,095 |
| Total non-current liabilities | | 112,639 | | 110,740 |
| **Total liabilities** | $ | 313,683 | $ | 321,208 |
| | | | | |
| Contingencies (see note 12) | | | | |
| | | | | |
| **Equity** | | | | |
| Ordinary shares, NIS 0.01 nominal value, authorized 180,000 thousand shares; 66,408 thousand shares and 65,677 thousand shares issued and outstanding at March 31, 2022 and December 31, 2021, respectively | $ | 185 | $ | 182 |
| Additional paid-in capital | | 3,021,166 | | 3,012,481 |
| Accumulated other comprehensive loss | | (9,824) | | (8,771) |
| Accumulated deficit | | (2,068,826) | | (2,047,878) |
| **Total equity** | | 942,701 | | 956,014 |

| | | | |
|---|---|---|---|
| Total liabilities and equity | $ | 1,256,384 | $ 1,277,222 |

*The accompanying notes are an integral part of these condensed consolidated interim financial statements.*

2

**STRATASYS LTD.**
**CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**(Unaudited)**
**Consolidated Statements of Operations and Comprehensive Loss**
(in thousands, except per share data)

| | | Three Months Ended March 31, | |
|---|---|---|---|
| | | 2022 | 2021 |
| **Revenues** | | | |
| Products | $ | 113,073 | $ 90,324 |
| Services | | 50,356 | 43,865 |
| | | 163,429 | 134,189 |
| **Cost of revenues** | | | |
| Products | | 59,373 | 46,920 |
| Services | | 34,379 | 31,692 |
| | | 93,752 | 78,612 |
| **Gross profit** | | 69,677 | 55,577 |
| **Operating expenses** | | | |
| Research and development, net | | 23,998 | 20,601 |
| Selling, general and administrative | | 65,263 | 53,334 |
| | | 89,261 | 73,935 |
| **Operating loss** | | (19,584) | (18,358) |
| Financial expenses, net | | (1,362) | (377) |
| **Loss before income taxes** | | (20,946) | (18,735) |
| Income tax benefit | | 73 | 942 |
| Share in losses of associated companies | | (75) | (1,118) |
| **Net loss** | $ | (20,948) | $ (18,911) |
| Net loss per share - basic and diluted | $ | (0.32) | $ (0.32) |
| Weighted average ordinary shares outstanding - basic and diluted | | 65,721 | 58,616 |
| **Comprehensive loss** | | | |
| Net loss | | (20,948) | (18,911) |
| Other comprehensive income (loss), net of tax: | | | |
| Foreign currency translation adjustments | | (702) | (961) |
| Unrealized gains on derivatives designated as cash flow hedges | | (351) | 2,173 |
| Other comprehensive income (loss), net of tax | | (1,053) | 1,212 |
| **Comprehensive loss** | $ | (22,001) | $ (17,699) |

*The accompanying notes are an integral part of these condensed consolidated interim financial statements.*

3

**STRATASYS LTD.**
**CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**(Unaudited)**
**Consolidated Statements of Changes in Equity**
(in thousands )
**Three Months Ended March 31, 2022**

| | Ordinary Shares | | Additional Paid-In Capital | Accumulated deficit | Accumulated Other Comprehensive Loss | Total Equity |
|---|---|---|---|---|---|---|
| | Number of shares | Par Value | | | | |
| **Balance as of December 31, 2021** | 65,677 $ | 182 $ | 3,012,481 $ | (2,047,878) $ | (8,771) $ | 956,014 |
| **Issuance of shares in connection with stock-based compensation plans** | 731 | 3 | 152 | - | - | 155 |
| **Stock-based compensation** | - | - | 8,533 | - | - | 8,533 |
| **Comprehensive loss** | - | - | - | (20,948) | (1,053) | (22,001) |
| **Balance as of March 31, 2022** | 66,408 $ | 185 $ | 3,021,166 $ | (2,068,826) $ | (9,824) $ | 942,701 |

*The accompanying notes are an integral part of these condensed consolidated interim financial statements.*

4

**STRATASYS LTD.**
**CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**(Unaudited)**
Consolidated Statements of Changes in Equity
(in thousands )
**Three Months Ended March 31, 2021**

| | Ordinary Shares | | Additional Paid-In Capital | Accumulated deficit | Accumulated Other Comprehensive Loss | Total Equity |
|---|---|---|---|---|---|---|
| | Number of shares | Par Value | | | | |
| Balance as of December 31, 2020 | 56,617 $ | 155 $ | 2,753,955 $ | (1,985,896) $ | (8,846) $ | 759,368 |
| Issuance of shares in connection with stock-based compensation plans | 670 | 2 | 2,881 | - | - | 2,883 |
| Stock-based compensation | - | - | 7,205 | - | - | 7,205 |
| Public offering of ordinary shares, net | 7,931 | 24 | 218,851 | - | - | 218,875 |
| Deferred tax assets in connection with public offering expenses | - | - | 1,156 | - | - | 1,156 |
| Comprehensive income (loss) | - | - | - | (18,911) | 1,212 | (17,699) |
| Balance as of March 31, 2021 | 65,218 $ | 181 $ | 2,984,048 $ | (2,004,807) $ | (7,634) $ | 971,788 |

*The accompanying notes are an integral part of these condensed consolidated interim financial statements.*

5

**STRATASYS LTD.**
**CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS**
**(Unaudited)**
Consolidated Statements of Cash Flows
(in thousands)

| | Three Months Ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| **Cash flows from operating activities** | | |
| Net loss | $ (20,948) | $ (18,911) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation and amortization | 15,290 | 13,802 |
| Stock-based compensation | 8,533 | 7,205 |
| Foreign currency transaction loss | 2,792 | 4,181 |
| Share in losses of associated companies | 75 | 1,118 |
| Revaluation of investments | 1,061 | (3,670) |
| Other non-cash items, net | 83 | 193 |
| Change in cash attributable to changes in operating assets and liabilities: | | |
| Accounts receivable, net | (7,950) | 2,620 |
| Inventories | (14,775) | 7,046 |
| Other current assets and prepaid expenses | 7,386 | (3,775) |
| Other non-current assets | (85) | 1,595 |
| Accounts payable | 7,194 | 10,197 |
| Other current liabilities | (16,037) | 6,453 |
| Deferred revenues | 2,522 | (433) |
| Deferred income taxes, net and uncertain tax positions | (381) | (1,774) |
| Other non-current liabilities | (823) | (3,096) |
| Net cash provided by (used in) operating activities | (16,063) | 22,751 |
| **Cash flows from investing activities** | | |
| Cash paid for acquisitions, net of cash acquired | - | (6,356) |
| Purchase of property and equipment | (3,741) | (4,012) |
| Investments in short-term bank deposits | (40,000) | (109,000) |
| Proceeds from short-term bank deposits | 117,000 | 27,000 |
| Purchase of intangible assets | (444) | (278) |
| Other investing activities | (47) | (98) |
| Investments in unconsolidated entities | (5,030) | - |
| Net cash provided by (used in) investing activities | 67,738 | (92,744) |
| **Cash flows from financing activities** | | |
| Proceeds from public offering, net of issuance costs | - | 218,875 |
| Proceeds from exercise of stock options | 155 | 2,883 |
| Other financing activities | 866 | 407 |
| Net cash provided by financing activities | 1,021 | 222,165 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | (2,228) | (2,872) |
| Net change in cash, cash equivalents and restricted cash | 50,468 | 149,300 |
| Cash, cash equivalents and restricted cash, beginning of period | 243,293 | 272,216 |
| Cash, cash equivalents and restricted cash, end of period | $ 293,761 | $ 421,516 |

Supplemental disclosures of cash flow information:

| | | |
|---|---|---|
| Transfer of inventory to fixed assets | 188 | 884 |
| Transfer of fixed assets to inventory | 120 | 210 |

| Reconciliation of cash, cash equivalents and restricted cash reported in the consolidated balance sheets: | | |
|---|---|---|
| Cash and cash equivalents | 293,649 | 421,398 |
| Restricted cash included in other current assets | 112 | 118 |
| **Total cash, cash equivalents and restricted cash shown in the consolidated statement of cash flows** | $ 293,761 | $ 421,516 |

*The accompanying notes are an integral part of these condensed consolidated interim financial statements.*

6

**STRATASYS LTD.**
**NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)**

### Note 1. Business Description and Basis of Presentation

Stratasys Ltd. (collectively with its subsidiaries, the "Company" or "Stratasys") is a global leader in connected, polymer-based 3D printing solutions, across the entire manufacturing value chain. The Company leverages its competitive advantages, which include a broad set of best-in-class 3D printing platforms, software, a materials and technology partner ecosystem, innovative leadership, and global GTM infrastructure, in order to position itself to capture share in a significant and growing global marketplace, with a focus on manufacturing. The Company's approximately 1,700 granted and pending additive technology patents to date have been used to create models, prototypes, manufacturing tools, and production parts for a multitude of industries including aerospace, automotive, transportation, healthcare, consumer products, dental, medical, and education. Stratasys' products and comprehensive solutions improve product quality, development time, cost, and time-to-market. The Company's 3D ecosystem of solutions and expertise includes 3D printers, materials, software, expert services, and on-demand parts production.

The condensed consolidated interim financial information herein is unaudited; however, such information reflects all adjustments (consisting of normal, recurring adjustments), which are, in the opinion of management, necessary for a fair statement of results for the interim period. The condensed consolidated interim financial statements include the accounts of Stratasys Ltd. and its subsidiaries. All intercompany accounts and transactions, including profits from intercompany sales not yet realized outside the Company, have been eliminated in consolidation.

The Company's financial statements are prepared in conformity with U.S. generally accepted accounting principles ("GAAP"), which require the Company to make estimates based on assumptions about current and, for some estimates, future economic and market conditions which affect reported amounts and related disclosures in its financial statements. Although the Company's current estimates contemplate current and expected future conditions, as applicable, it is reasonably possible that actual conditions could differ from the Company's expectations, which could materially affect its results of operations and financial position.

In particular, a number of estimates have been and will continue to be affected by the COVID-19 pandemic and/or by macroeconomic conditions that have been triggered as a result of steps taken by governments to counter-act the pandemic. The global economic environment that has set in after the most severe period of the COVID-19 pandemic has passed - assuming that it has passed - remains uncertain, rapidly changing and difficult to predict. The magnitude and duration of, as well as the consequences of, global macroeconomic trends triggered, in large part, by the recovery from the pandemic, such as inflationary pressures and supply chain problems, remain ambiguous currently. As a result, the accounting estimates and assumptions may change over time in response to post-COVID-19 trends. Such changes could have an additional impact on the Company's long-lived asset and intangible asset valuation; inventory valuation; assessment of the annual effective tax rate; and the allowance for expected credit losses and bad debt.

The results of operations for the three months ended March 31, 2022 are not indicative of results that could be expected for the entire fiscal year. Certain financial information and footnote disclosures normally included in the annual consolidated financial statements prepared in accordance with GAAP have been condensed or omitted. The reader is referred to the audited consolidated financial statements and notes thereto for the year ended December 31, 2021, filed with the U.S. Securities and Exchange Commission (the "SEC") on February 24, 2022 as part of the Company's Annual Report on Form 20-F for such year.

### Note 2. New Accounting Pronouncements

*Accounting Pronouncements Adopted in 2022*

In August 2020, the FASB issued ASU 2020-06 "Debt – Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging – Contracts in Entity's Own Equity (Subtopic 815 – 40)." This guidance simplifies the accounting for certain financial instruments with characteristics of liabilities and equity, including convertible instruments and contracts on an entity's own equity. The amendments to this guidance are effective for fiscal years beginning after December 15, 2021, and interim periods within those fiscal years. The Company adopted this guidance effective January 1, 2022, with no material impact on its consolidated financial statements.

*Recently issued accounting pronouncements, not yet adopted*

In October 2021, the FASB issued ASU 2021-08 "Business Combinations (Topic 805), Accounting for Contract Assets and Contract Liabilities from Contracts with Customers", which requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with ASC 606, Revenue from Contracts with Customers. The guidance will result in the acquirer recognizing contract assets and contract liabilities at the same amounts recorded by the acquiree. The guidance should be applied prospectively to acquisitions occurring on or after the effective date. The guidance is effective for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. Early adoption is permitted, including in interim periods, for any financial statements that have not yet been issued.  The Company is currently evaluating this guidance to determine the impact it may have on its consolidated financial statements.

7

**STRATASYS LTD.**
**NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)**

### Note 3. Certain Transactions

*Investment in Xaar 3D Ltd. ("Xaar 3D")*

During the fourth quarter of 2019, the Company entered into an agreement with Xaar plc ("Xaar") to purchase additional shares of Xaar 3D that was to increase its stake from 15 to 45 percent, with Xaar retaining the remaining 55 percent. Xaar and Stratasys had announced the formation of Xaar 3D Ltd in July 2018 for the purpose of developing Powder Bed Fusion ("PBF") additive manufacturing solutions that Stratasys can bring to the market. In addition, the agreement included an option for Stratasys to acquire the remaining shares of Xaar 3D.

Following the additional investment, the Company considered the FASB guidance in accordance with ASC Topic 810 "Consolidation" regarding the propriety of implementing consolidation, for both the variable interest entity and voting model, or equity method accounting. The Company concluded that it should continue accounting for the investment according to the equity method, as it had retained the ability to exercise significant influence but did not control Xaar 3D. For its additional interest in Xaar 3D, the Company paid approximately $15.7 million.

The investment was presented under other non-current assets in the Company's consolidated balance sheets.

On November 1, 2021 (the "Xaar 3D transaction date") , the Company acquired the remaining 55% share of Xaar 3D, for an aggregate purchase price of $29.3 million. The Company paid cash upon closing and it is obligated to make additional earn-out payments and payments of royalties on products and services sales for up to 15 years.

The Xaar 3D transaction is reflected in accordance with ASC Topic 805, "Business Combinations", using the acquisition method of accounting, with the Company as the acquirer. The Company accounted for the acquisition of the remaining equity of Xaar 3D as a step acquisition, which required re-measurement of the Company's previous ownership interest to fair value prior to completing purchase accounting. Using step acquisition accounting, the Company increased the value of its previously-held equity investment to its fair value of $23.8 million, which resulted in a gain of approximately $14.4 million, recorded in the consolidated statements of operations in the fourth quarter of 2021. The acquisition of the remaining equity interest also resulted in the recognition of a previously unrealized foreign currency gain of $0.6 million, which was reclassified from accumulated other comprehensive income (OCI). The fair value of the previously held equity method investment was determined based upon a valuation of the acquired business, as of the date of acquisition, as detailed below.

The following table summarizes the fair value of the consideration transferred to Xaar 3D's stockholders for the Xaar 3D transaction:

|  | U.S. $ in thousands |
|---|---|
| Cash payments | $ 13,967 |
| Contingent consideration at estimated fair value | 15,314 |
| Total consideration for 55% holding | 29,281 |
| Fair value of 45% holding | 23,775 |
| Total consideration | $ 53,056 |

In accordance with ASC Topic 805, the estimated contingent consideration as of the Xaar 3D transaction date was included in the purchase price. The total contingent payments could reach a maximum aggregate amount of up to $21 million. The estimated fair value of the contingent consideration is based on management's assessment of whether, and at what level, the financial metrics will be achieved, and the present value factors associated with the timing of the payments. This fair value measurement is based on significant unobservable inputs in the market and thus represents a Level 3 measurement within the fair value hierarchy. Changes in the fair value of contingent consideration will be recorded in operating expenses.

8

**STRATASYS LTD.**
**NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)**

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the Xaar 3D transaction date. The estimated fair values are preliminary and based on the information that was available as of November 1, 2021. Thus, the measurements of fair value that are reflected are subject to changes, and such changes could be significant. The preliminary allocation of the purchase price to assets acquired and liabilities assumed is as follows:

|  | Allocation of Purchase Price (U.S. $ in thousands) |
|---|---|
| Cash and cash equivalents | $ 82 |
| Goodwill | 25,375 |
| Intangible assets | 45,000 |
| Other assets | 5,280 |
| Total assets acquired | 75,737 |
| Net deferred tax liabilities | 1,736 |
| Other liabilities | 20,945 |
| Total liabilities assumed | 22,681 |
| Net assets acquired | $ 53,056 |

*RPS acquisition*

On February 16, 2021 the Company acquired RP Support Limited ("RPS"), a provider of industrial stereolithography 3D printers and solutions. In exchange for 100% of the outstanding shares of RPS, the Company paid cash upon closing and is obligated to make additional payments (in cash), subject to performance-based criteria, via earn-out payments over two years.

*Marketable equity investment*

The Company recognized a loss of $1.1 million for revaluation of an equity investment in the first quarter of 2022 and a gain of $3.7 million in the first quarter of 2021. The entity in which the Company invested has become public during the first quarter of 2021 and accordingly the investment is treated as a marketable equity investment. Prior to the first quarter of 2021, the investment was treated as a non-marketable equity investment without readily determinable fair value.

*MakerBot and Ultimaker transaction*

On May 12, 2022, the company announced the creation of a new company ("the combined company") comprised of MakerBot and Ultimaker. Under the terms of

the agreement, Stratasys will contribute MakerBot assets, invest $47 million and own 45.6% of the combined company. While NPM Capital will contribute Ultimaker assets, invest $15.4 million, and own 54.4% of the combined company. The transaction expected to close within few months.

The Company will account for the investment, in the combined company according to the equity method in accordance with ASC topic 323, as it has retained the ability to exercise significant influence but does not control the new entity.

9

**STRATASYS LTD.**
**NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)**

**Note 4. Revenues**

Disaggregation of Revenues

The following table presents the Company's revenues disaggregated by geographical region (based on the Company's customers' locations) and revenue type for the three months ended March 31, 2022 and 2021:

| | Three months ended March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| | (U.S. $ in thousands) | |
| **Americas** | | |
| Systems | $ 28,982 | $ 21,357 |
| Consumables | 31,354 | 28,211 |
| Service | 38,231 | 32,545 |
| **Total Americas** | 98,567 | 82,113 |
| | | |
| **EMEA** | | |
| Systems | 15,076 | 9,698 |
| Consumables | 17,825 | 12,803 |
| Service | 7,153 | 6,417 |
| **Total EMEA** | 40,055 | 28,918 |
| | | |
| **Asia Pacific** | | |
| Systems | 10,458 | 8,825 |
| Consumables | 9,377 | 9,430 |
| Service | 4,972 | 4,903 |
| **Total Asia Pacific** | 24,807 | 23,158 |
| | | |
| **Total Revenues** | $ 163,429 | $ 134,189 |

The following table presents the Company's revenues disaggregated based on the timing of revenue recognition (at a specific point in time or over the course of time) for the three months ended March 31, 2022 and 2021:

| | Three months ended March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| | (U.S. $ in thousands) | |
| **Revenues recognized in point in time from:** | | |
| Products | $ 113,073 | $ 90,324 |
| Services | 12,492 | 10,601 |
| **Total revenues recognized in point in time** | 125,565 | 100,925 |
| | | |
| **Revenues recognized over time from:** | | |
| Services | 37,864 | 33,264 |
| **Total revenues recognized over time** | 37,864 | 33,264 |
| | | |
| **Total Revenues** | $ 163,429 | $ 134,189 |

10

**STRATASYS LTD.**
**NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)**

Contract Assets and Contract Liabilities

Contract assets are recorded when the Company's right to consideration is conditional on constraints other than the passage of time. The Company had no material contract assets as of March 31, 2022 and December 31, 2021.

Contract liabilities include advance payments and billings in excess of revenue recognized, which are primarily related to advanced billings for service type warranty. Contract liabilities are presented under deferred revenue. The Company's deferred revenue as of March 31, 2022 and December 31, 2021 was as follows:

| | March 31, 2022 | December 31, 2021 |
|---|---|---|
| | U.S. $ in thousands | |
| Deferred revenue* | $ 74,363 | $ 72,307 |

*Includes $22.0 million and $21.1 million under long term deferred revenue in the Company's consolidated balance sheets as of March 31, 2022 and December 31, 2021, respectively.

Revenue recognized in 2022 that was included in deferred revenue balance as of December 31, 2021 was $17.6 million for the three months ended March 31, 2022.

Remaining Performance Obligations

Remaining Performance Obligations ("RPO") represent contracted revenue that has not yet been recognized, which includes deferred revenue and amounts that will be invoiced and recognized as revenue in future periods. As of March 31, 2022, the total RPO amounted to $126 million. The Company expects to recognize $96.3 million of this RPO during the next 12 months, $18.3 million over the subsequent 12 months and the remaining $11.4 million thereafter.

Incremental Costs of Obtaining a Contract

Sales commissions earned mainly by the Company's sales agents are considered incremental costs of obtaining a contract with a customer, as the Company expects the benefit of those commissions to be longer than one year. The majority of the sales commissions are not subject to capitalization, as the commission expense is recognized as the related revenue is recognized. Sales commissions for initial contracts related to the service type warranty are deferred and then amortized on a straight-line basis over the expected customer relationship period if the Company expects to recover those costs. Amortization expense is included in selling, general and administrative expenses in the consolidated statements of operations. As of March 31, 2022 and December 31, 2021, the deferred commissions amounted to $7.9 million and $7.4 million, respectively.

11

**STRATASYS LTD.**
**NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)**

**Note 5. Inventories**

Inventories consisted of the following:

| | March 31, 2022 | December 31, 2021 |
|---|---|---|
| | U.S. $ in thousands | |
| Finished goods | $ 65,270 | $ 58,784 |
| Work-in-process | 4,461 | 4,360 |
| Raw materials | 73,385 | 66,003 |
| | $ 143,116 | $ 129,147 |

**Note 6. Goodwill and Other Intangible Assets**

*Goodwill*

Changes in the carrying amount of the Company's goodwill during the three months ended March 31, 2022 were as follows:

| | U.S. $ in thousands |
|---|---|
| Goodwill as of January 1, 2022 | $ 65,144 |
| Foreign currency translation adjustments | (55) |
| Goodwill as of March 31, 2022 | $ 65,089 |

12

**STRATASYS LTD.**

**NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)**

*Other Intangible Assets*

Other intangible assets consisted of the following:

| | March 31, 2022 | | | December 31, 2021 | | |
|---|---|---|---|---|---|---|
| | Carrying Amount, Net of Impairment | Accumulated Amortization | Net Book Value | Carrying Amount, Net of Impairment | Accumulated Amortization | Net Book Value |
| | U.S. $ in thousands | | | | | |
| Developed technology | $ 406,371 | $ (285,972) | $ 120,399 | $ 406,578 | $ (279,037) | $ 127,541 |
| Patents | 16,655 | (8,823) | 7,832 | 16,220 | (8,503) | 7,717 |
| Trademarks and trade names | 26,062 | (22,522) | 3,540 | 26,055 | (22,241) | 3,814 |
| Customer relationships | 100,619 | (89,073) | 11,546 | 100,731 | (87,559) | 13,172 |
| Capitalized software development costs | 7,066 | (7,066) | - | 7,410 | (7,410) | - |
| | $ 556,773 | $ (413,456) | $ 143,317 | $ 556,994 | $ (404,750) | $ 152,244 |

Amortization expenses relating to intangible assets for the three-month period ended March 31, 2022 and 2021 were approximately $9.2 million and $7.5 million, respectively.

As of March 31, 2022, the estimated amortization expenses relating to intangible assets for each of the following future periods were as follows:

| | Estimated amortization expense |
|---|---|
| | (U.S. $ in thousands) |
| Remaining 9 months of 2022 | $ 27,706 |
| 2023 | 22,164 |
| 2024 | 18,256 |
| 2025 | 15,662 |
| 2026 | 15,591 |
| 2027 and thereafter | 43,938 |
| Total | $ 143,317 |

13

## STRATASYS LTD.

### NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)

### Note 7. Net Loss Per Share

The following table presents the numerator and denominator of the basic and diluted net loss per share computations for the three months ended March 31, 2022 and 2021:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| | (In thousands, except per share amounts) | |
| **Numerator:** | | |
| Net loss for basic and diluted loss per share | $ (20,948) | $ (18,911) |
| | | |
| **Denominator:** | | |
| Weighted average shares - for basic and diluted net loss per share | 65,721 | 58,616 |
| | | |
| **Net loss per share** | | |
| Basic and diluted | $ (0.32) | $ (0.32) |

The computation of diluted net loss per share excluded share awards of 5.4 million shares for the three months ended March 31, 2022 and 2021, because the inclusion of those shares would have had an anti-dilutive effect on the diluted net loss per share.

### Note 8. Income Taxes

The Company had income tax benefit of $0.1 million for the three-month period ended March 31, 2022 compared to income tax benefit of $0.9 million for the three-month period ended March 31, 2021. The Company's effective tax rate as of March 31, 2022 was primarily impacted by the geographic mix of its earnings and losses, as well as its valuation allowance.

14

## STRATASYS LTD.
### NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)

### Note 9. Fair Value Measurements

The following table summarizes the Company's financial assets and liabilities that are carried at fair value on a recurring basis, in its consolidated balance sheets:

| | March 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| | Level 2 | Level 3 | Level 2 | Level 3 |
| | (U.S. $ in thousands) | | | |
| **Assets:** | | | | |
| Foreign exchange forward contracts not designated as hedging instruments | $ 41 | - | $ 82 | - |
| Foreign exchange forward contracts designated as hedging instruments | 981 | - | 910 | - |
| | | | | |
| **Liabilities:** | | | | |
| Foreign exchange forward contracts not designated as hedging instruments | (90) | - | (89) | - |
| Foreign exchange forward contracts designated as hedging instruments | (32) | - | (60) | - |
| Total contingent consideration* | - | 56,050 | - | 55,919 |
| | $ 900 | $ 56,050 | $ 843 | $ 55,919 |

*Includes $2.4 million under Accrued expenses and other current liabilities in the Company's consolidated balance sheets as of March 31, 2022 and December 31, 2021.

The Company's foreign exchange forward contracts are classified as Level 2, as they are not actively traded and are valued using pricing models that use observable market inputs, including interest rate curves and both forward and spot prices for currencies (Level 2 inputs).

Contingent consideration represents liabilities recorded at fair value in connection with acquisitions, and thus represents a Level 3 measurement within the fair value hierarchy (refer to Note 3).

Other financial instruments consist mainly of cash and cash equivalents, short-term deposits, current and non-current receivables, accounts payable and other current liabilities. The fair value of these financial instruments approximates their carrying values.

15

**STRATASYS LTD.**
NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)

### Note 10. Derivative instruments and hedging activities

Since the Company conducts its operations globally, it is exposed to global market risks and to the risk that its earnings, cash flows and equity could be adversely impacted by fluctuations in foreign currency exchange rates. The Company enters into transactions involving foreign currency exchange derivative financial instruments. The Company manages its foreign currency exposures on a consolidated basis, which allows the Company to net exposures and take advantage of any natural hedging. The transactions are designed to manage the Company's net exposure to foreign currency exchange rates and to reduce the volatility of earnings and cash flows associated with changes in foreign currency exchange rates. The Company does not enter into derivative transactions for trading purposes.

The Company is primarily exposed to foreign exchange risk with respect to recognized assets and liabilities and forecasted transactions denominated in the New Israeli Shekel ("NIS"), Euro, GBP, Korean Won, Chinese Yuan and the Japanese Yen. The gains and losses on the hedging instruments partially offset losses and gains on the hedged items. Financial markets and currency volatility may limit the Company's ability to hedge these exposures. These contracts mature through December 2022.

The following table summarizes the consolidated balance sheets classification and fair values of the Company's derivative instruments:

| | | Fair Value | | Notional Amount | |
|---|---|---|---|---|---|
| | Balance sheet location | March 31, 2022 | December 31, 2021 | March 31, 2022 | December 31, 2021 |
| | | U.S. $ in thousands | | | |
| Assets derivatives -Foreign exchange contracts, not designated as hedging instruments | Other current assets | $ 41 | $ 82 | $ 15,343 | $ 12,380 |
| Assets derivatives -Foreign exchange contracts, designated as cash flow hedge | Other current assets | 981 | 910 | 72,758 | 60,408 |
| Liability derivatives -Foreign exchange contracts, not designated as hedging instruments | Accrued expenses and other current liabilities | (90) | (89) | 26,852 | 33,047 |
| Liability derivatives -Foreign exchange contracts, designated as hedging instruments | Accrued expenses and other current liabilities | (32) | (60) | 10,355 | 26,320 |
| | | $ 900 | $ 843 | $ 125,309 | $ 132,155 |

*Foreign exchange contracts not designated as hedging instruments*

As of March 31, 2022, the notional amounts of the Company's outstanding exchange forward contracts, not designated as hedging instruments, were $42.2 million, and were used to reduce foreign currency exposures. With respect to such derivatives, gains of $0.7 million and of $2.2 million were recognized under financial income, net for the three-month period ended March 31, 2022 and 2021, respectively. Such gains or losses partially offset the foreign currency revaluation changes of the balance sheet items. These foreign currencies revaluation changes are also recognized under financial income, net.

*Cash Flow Hedging - Hedges of forecasted foreign currency payroll and other operating expenses*

As of March 31, 2022, the Company had in effect foreign exchange forward contracts, designated as cash flow hedges for accounting purposes, for the conversion of $42.0 million into NIS. The Company uses short-term cash flow hedge contracts to reduce its exposure to variability in expected future cash flows resulting mainly from payroll costs and other operating expenses denominated in NIS. The changes in fair value of those contracts are included in the Company's accumulated other comprehensive loss.

*Cash Flow Hedging - Hedges of forecasted foreign currency revenue*

As of March 31, 2022, the Company had in effect foreign exchange forward contracts, designated as cash flow hedges for accounting purposes, for the conversion of 41.1 million Euro into U.S. dollars. The Company transacts business in U.S. dollars and in various other currencies. The Company may use foreign exchange or forward contracts to hedge certain cash flow exposures resulting from changes in these foreign currency exchange rates. These foreign exchange contracts, carried at fair value, have maturities of up to twelve months. The Company enters into these foreign exchange contracts to hedge a portion of its forecasted foreign currency denominated revenue in the normal course of business, and, accordingly, they are not speculative in nature.

 **STRATASYS LTD.**

NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)

### Note 11. Equity

#### a. Stock-based compensation plans

Stock-based compensation expenses for equity-classified stock options, restricted share units ("RSUs") and performance-based restricted share units ("PSUs") were allocated as follows:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| | U.S $ in thousands | |
| Cost of sales | $ 900 | $ 634 |
| Research and development, net | 1,786 | 1,424 |
| Selling, general and administrative | 5,847 | 5,147 |
| Total stock-based compensation expenses | $ 8,533 | $ 7,205 |

A summary of the Company's stock option activity for the three months ended March 31, 2022 is as follows:

| | Number of Options | Weighted Average Exercise Price |
|---|---|---|
| Options outstanding as of January 1, 2022 | $ 1,732,368 | $ 28.85 |
| Granted | - | - |
| Exercised | (12,829) | 12.02 |

| | | |
|---|---|---|
| Forfeited | (13,605) | 25.11 |
| Options outstanding as of March 31, 2022 | 1,705,934 | 29.01 |
| Options exercisable as of March 31, 2022 | $ 1,374,696 | $ 32.04 |

As of March 31, 2022, the unrecognized compensation cost of $2.1 million related to all unvested, equity-classified stock options is expected to be recognized as an expense over a weighted-average period of 2.7 years.

**STRATASYS LTD.**
**NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)**

A summary of the Company's RSUs and PSUs activity for the three months ended March 31, 2022 is as follows:

| | Number of RSUs and PSUs | Weighted Average Grant Date Fair Value |
|---|---|---|
| Unvested as of January 1, 2022 | $ 3,082,798 | $ 26.36 |
| Granted | 1,377,792 | 22.13 |
| Vested | (721,316) | 27.30 |
| Forfeited | (68,830) | 26.87 |
| Unvested as of March 31, 2022 | $ 3,670,444 | $ 24.58 |

The fair value of RSUs and PSUs is determined based on the quoted price of the Company's ordinary shares on the date of the grant.

As of March 31, 2022, the unrecognized compensation cost of $75 million related to all unvested, equity-classified RSUs and PSUs is expected to be recognized as expense over a weighted-average period of 2.7 years.

**b. Accumulated other comprehensive loss**

The following tables present the changes in the components of accumulated other comprehensive income (loss), net of taxes, for the three months ended March 31, 2022 and 2021, respectively:

| | Three Months Ended March 31, 2022 | | |
|---|---|---|---|
| | Net Unrealized Gain (Loss) on Cash Flow Hedges | Foreign Currency Translation Adjustments | Total |
| | U.S. $ in thousands | | |
| Balance as of January 1, 2022 | $ 1,572 | $ (10,343) | $ (8,771) |
| Other comprehensive income (loss) before reclassifications | 271 | (702) | (431) |
| Amounts reclassified from accumulated other comprehensive loss | (622) | - | (622) |
| Other comprehensive income (loss) | (351) | (702) | (1,053) |
| Balance as of March 31, 2022 | $ 1,221 | $ (11,045) | $ (9,824) |

**STRATASYS LTD.**
**NOTES TO CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS (UNAUDITED)**

| | Three Months Ended March 31, 2021 | | |
|---|---|---|---|
| | Net Unrealized Gain (Loss) on Cash Flow Hedges | Foreign Currency Translation Adjustments | Total |
| | U.S. $ in thousands | | |
| Balance as of January 1, 2021 | $ (1,673) | $ (7,173) | $ (8,846) |
| Other comprehensive income (loss) before reclassifications | 1,607 | (961) | 646 |
| Amounts reclassified from accumulated other comprehensive loss | 566 | - | 566 |
| Other comprehensive income (loss) | 2,173 | (961) | 1,212 |
| Balance as of March 31, 2021 | $ 500 | $ (8,134) | $ (7,634) |

**c. Public offering of ordinary shares**

During March 2021, the Company completed a capital raise of $218.9 million, net of underwriting discounts and offering expenses. The total number of shares sold by the Company in the public offering was 7,931,034.

A deferred tax asset in an amount of $1.2 million was recorded in respect of a tax benefit, arising from the underwriting discounts and offering expenses, as an increase to Additional Paid-In Capital.

**Note 12. Contingencies**

During the fourth quarter of 2021, the Company reached preliminary settlement on an employee-related litigation matter in the US. The financial statements for the period ended March 31, 2022 and the year ended December 31, 2021 include a provision in respect of this settlement.

The Company is a party to various legal proceedings from time to time, the outcome of which, in the opinion of management, will not have a significant effect on the

financial position, profitability or cash flows of the Company.

19

**OPERATING AND FINANCIAL REVIEW AND PROSPECTS.**

The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our unaudited consolidated financial statements and the related notes included as Exhibit 99.1 to the Report of Foreign Private Issuer on Form 6-K to which this Operating and Financial Review and Prospects is attached, or the Form 6-K. The discussion below contains forward-looking statements (within the meaning of the United States federal securities laws) that are based upon our current expectations and are subject to uncertainty and changes in circumstances. Actual results may differ materially from these expectations due to inaccurate assumptions and known or unknown risks and uncertainties, including those identified in "Forward-Looking Statements and Factors that May Affect Future Results of Operations", below, as well in the "Risk Factors" in Item 3.D of our Annual Report on Form 20-F for the year ended December 31, 2021, filed with the Securities and Exchange Commission, or SEC, on February 24, 2022, or our 2021 Annual Report, as updated by the "Risk Factors" section below.

**Overview of Business and Trend Information**

We are a global leader in connected, polymer-based 3D printing solutions, across the entire manufacturing value chain. Leveraging distinct competitive advantages that include a broad set of best-in-class 3D printing platforms, software, a materials and technology partner ecosystem, innovative leadership, and global GTM infrastructure, we are positioned to capture share in a significant and growing global marketplace, with a focus on manufacturing, which we view as having the largest and fastest growing total addressable market.

Our approximately 1,700 granted and pending additive technology patents to date have been used to create models, prototypes, manufacturing tools, and production parts for a multitude of industries including aerospace, automotive, transportation, healthcare, consumer products, dental, medical, and education. Our products and comprehensive solutions improve product quality, development time, cost, and time-to-market. Our 3D ecosystem of solutions and expertise includes 3D printers, materials, software, expert services, and on-demand parts production.

A series of recent acquisitions and other transactions has strengthened our leadership in various facets of our business. Our acquisition, in December 2020, oOrigin Laboratories, Inc., or Origin, significantly strengthened our leadership in mass production forpolymer 3D printing. Origin's pioneering approach to additive manufacturing of end-use parts has enabled us to serve a large market with manufacturing-grade 3D printers, utilizing $P^3$ Programmable PhotoPolymerization. Our acquisition, in the first quarter of 2021, of UK-based RP Support Ltd., or RPS, a provider of industrial stereolithography 3D printers and solutions,provided us with a complementary technology that further expanded our polymer suite of solutions across the product life cycle. Similarly, our acquisition, in November 2021, of all remaining shares of Xaar 3D Ltd. or Xaar, is expected to accelerate our growth in production-scale 3D printing. The recently-announced transaction between our subsidiary, MakerBot, a leader in desktop 3D printing, and Ultimaker, gives us a significant (approximately 45.6%) stake in a new entity that has a broad technology offering, a larger scale, and that is well-capitalized and is therefore better equipped to compete in the attractive desktop 3D printing segment.

1

*COVID-19 Impact, Macro-Economic Trends and Business Strategy*

Our current outlook, as well as our results of operations for the first quarter of 2022, should be evaluated in light of the current state of the ongoing global COVID-19 pandemic and the complexities that it has presented. Our revenues for the first quarter of 2022 furthered a positive trend that began already in the first quarter of 2021 and that continued throughout 2021, and reflected 21.8% growth on a year-over-year basis, compared to the first quarter of 2021, when the COVID-19 pandemic adversely impacted our revenues more significantly. Our improved performance in the first quarter of 2022 was primarily driven by a 36.7% increase in system revenues, a 16.1% increase in consumables revenues, and a 14.8% increase in services revenues (in each case, compared to the corresponding quarter of 2021). Our revenues in the first quarter of 2022 surpassed pre-COVID-19 levels (an improvement of 5.2% compared to the first quarter of 2019), signaling that we continue to recover from the pandemic with respect to our top-line results.

In the first quarter of 2022, we worked at full-capacity on a global basis, with a high percentage of our employees throughout the world having received vaccines against COVID-19 over the course of the previous year.

We continue to monitor the impact of COVID-19, assessing implications for our operations, supply chain, liquidity, cash flow and customer orders, and have been acting in an effort to mitigate adverse consequences as needed. Assuming that the global economy continues to remain open generally, as it was during the first quarter of 2022, we do not anticipate that the COVID-19 pandemic itself will continue to have a significant, direct adverse impact on our results of operations going forward.

While no longer having a significant direct impact on our operating results, the pandemic has given rise to certain by-products— including supply chain problems, inflation and other trends— that have been impacting macro-economic activity on a global scale and that may also adversely affect us. We have been closely monitoring the potential impact of those trends on our operating performance. More specifically, government-mandated shutdowns in significant parts of China due to COVID-19 outbreaks, along with other factors, may slow down our supply chain and thereby adversely impacting our operations. Furthermore, recent depreciation of the Euro relative to the U.S. dollar may have an adverse impact on the U.S.- denominated value of our European-derived revenues for purposes of our financial statements. We cannot provide any assurances as to the extent of our resilience to the adverse impact of these global trends in future periods.

We ended the first quarter of 2022 with $475.6 million in cash, cash equivalents and short-term deposits. We believe that we are well suited to continue to manage the current global macro-economic climate with a strong balance sheet and no debt, while focusing on cost controls and cash generation. We have continued to selectively apply certain research and development cost controls, which we began doing at the start of the COVID-19 pandemic, while ensuringthat our NPI programsare well-funded, and we plan to continue investing as needed in order to support our new product development programs.

2

**Summary of Financial Results**

Our unaudited condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America, or GAAP. In the opinion of our management, all adjustments considered necessary for a fair statement of the unaudited condensed consolidated financial statements have been included herein and are of a normal recurring nature. The following discussion compares the actual results, on a GAAP basis, for the three months ended March 31, 2022 with the corresponding period in 2021.

**Results of Operations**

**Comparison of Three Months Ended March 31, 2022 to Three Months Ended March 31, 2021**

The following table sets forth certain statement of operations data for the periods indicated:

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2022 | | 2021 | |
| | U.S. $ in thousands | % of Revenues | U.S. $ in thousands | % of Revenues |

| | | | | |
|---|---|---|---|---|
| Revenues | $ 163,429 | 100.0% | $ 134,189 | 100.0% |
| Cost of revenues | 93,752 | 57.4% | 78,612 | 58.6% |
| Gross profit | 69,677 | 42.6% | 55,577 | 41.4% |
| Research and development, net | 23,998 | 14.7% | 20,601 | 15.4% |
| Selling, general and administrative | 65,263 | 39.9% | 53,334 | 39.7% |
| Operating loss | (19,584) | (12.0)% | (18,358) | (13.7)% |
| Financial expenses, net | (1,362) | (0.8)% | (377) | (0.3)% |
| Loss before income taxes | (20,946) | (12.8)% | (18,735) | (14.0)% |
| Income tax benefit | 73 | 0.0% | 942 | 0.7% |
| Share in losses of associated companies | (75) | 0.0% | (1,118) | (0.8)% |
| Net loss | (20,948) | (12.8)% | (18,911) | (14.1)% |

**Discussion of Results of Operations**

**Revenues**

Our products and services revenues in the three months ended March 31, 2022 and 2021, as well as the percentage change reflected thereby, were as follows:

| | Three Months Ended March 31, | | | | % Change |
|---|---|---|---|---|---|
| | **2022** | | **2021** | | |
| | U.S. $ in thousands | | | | |
| Products | $ | 113,073 | $ | 90,324 | 25.2% |
| Services | | 50,356 | | 43,865 | 14.8% |
| | $ | 163,429 | $ | 134,189 | 21.8% |

3

**Products Revenues**

Revenues derived from products (including systems and consumables materials) increased by $22.7 million, or 25.2%, for the three months ended March 31, 2022, as compared to the three months ended March 31, 2021.

Revenues derived from systems increased by $14.6 million, or 36.7%, for the three months ended March 31, 2022, as compared to the three months ended March 31, 2021. System revenues reflected the highest first quarter total in five years, strengthened by the launch of the Origin One in mid-February and the first full quarter of H350 sales.

Revenues derived from Consumables increased by $8.1 million, or 16.1%, for the three month ended March 31, 2022, as compared to the three months ended March 31, 2021. The increase in consumables reflects the impact of strong systems sales throughout 2021 and their expected flow-through as initial materials are replenished.

*Services Revenues*

Services revenues (including SDM, maintenance contracts, time and materials and other services) increased by $6.5 million for the three months ended March 31, 2022, or 14.8%, as compared to the three months ended March 31, 2021. Within services revenues, customer support revenue, which includes revenue generated mainly by maintenance contracts on our systems, increased by 10.1%.

*Revenues by Region*

Revenues and the percentage of revenues by region for the three months ended March 31, 2022 and 2021, as well as the percentage change in revenues in each such region reflected thereby, were as follows:

| | Three Months Ended March 31, | | | | % Change |
|---|---|---|---|---|---|
| | **2022** | | **2021** | | |
| | U.S.$ in thousands | % of Revenues | U.S.$ in thousands | % of Revenues | |
| Americas* | $ 98,567 | 60.3% | $ 82,113 | 61.2% | 20.0% |
| EMEA | 40,055 | 24.5% | 28,918 | 21.6% | 38.5% |
| Asia Pacific | 24,807 | 15.2% | 23,158 | 17.2% | 7.1% |
| | $ 163,429 | 100.0% | $ 134,189 | 100.0% | 21.8% |

\* Represent the United States, Canada and Latin America

Revenues in the Americas region increased by $16.5 million, or 20.0%, to $98.6 million for the three months ended March 31, 2022, compared to $82.1 million for the three months ended March 31, 2021. The increase was primarily driven by higher systems and services revenues.

Revenues in the EMEA region increased by $11.1 million, or 38.5%, to $40.1 million for the three months ended March 31, 2022, compared to $28.9 million for the three months ended March 31, 2021. The increase was primarily driven by higher products revenues and by the impact of our recent acquisition of RPS. On a constant currency basis when using prior period's exchange rates, revenues increased by $13.5 million, or 46.6%. The increase was primarily driven by increased products revenues.

Revenues in the Asia Pacific region increased by $1.6 million, or 7.1%, to $24.8 million for the three months ended March 31, 2022, compared to $23.2 million for the three months ended March 31, 2021. The increase was primarily driven by increased systems revenues.

4

**Gross Profit**

Gross profit from our products and services, as well as the percentage change reflected thereby, was as follows:

| | Three Months Ended March 31, | | Change in % |
|---|---|---|---|
| | **2022** | **2021** | |
| | U.S. $ in thousands | | |
| **Gross profit attributable to:** | | | |
| Products | $ 53,700 | $ 43,404 | 23.7% |

| | | | |
|---|---|---|---|
| Services | 15,997 | 12,173 | 31.2% |
| | $ 69,677 | $ 55,577 | 25.4% |

Gross profit as a percentage of revenues from our products and services was as follows:

| | Three Months Ended March 31, | |
|---|---|---|
| **Gross profit as a percentage of revenues from:** | **2022** | **2021** |
| Products | 47.5% | 48.1% |
| Services | 31.7% | 27.8% |
| Total gross profit | 42.6% | 41.4% |

Gross profit attributable to products revenues increased by $10.3 million, or 23.7%, to $53.7 million for the three months ended March 31, 2022, compared to gross profit of $43.4 million for the three months ended March 31, 2021. Gross profit attributable to products revenues as a percentage of products revenues decreased slightly to 47.5% for the three months ended March 31, 2022, compared to 48.1% for the three months ended March 31, 2021.

Gross profit attributable to services revenues increased by $3.8 million, or 31.2%, to $16.0 million for the three months ended March 31, 2022, compared to $12.2 million for the three months ended March 31, 2021. Gross profit attributable to services revenues as a percentage of services revenues in the three months ended March 31, 2022 increased to 31.7%, as compared to 27.8% for the three months ended March 31, 2021.

Margin improvement year over year was driven by higher revenues in systems, consumables and services. This was partially offset by macro issues related to logistical challenges and availability of materials.

5

**Operating Expenses**

The amount of each type of operating expense for the three months ended March 31, 2022 and 2021, as well as the percentage change reflected thereby, and total operating expenses as a percentage of our total revenues in each such quarter, were as follows:

| | Three Months Ended March 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **% Change** |
| | **U.S. $ in thousands** | | |
| Research and development, net | $ 23,998 | $ 20,601 | 16.5% |
| Selling, general and administrative | 65,263 | 53,334 | 22.4% |
| | $ 89,261 | $ 73,935 | 20.7% |
| Percentage of revenues | 54.6% | 55.1% | |

Operating expenses were $89.3 million in the first quarter of 2022, compared to operating expenses of $73.9 million in the first quarter of 2021. The increase in operating expenses was driven primarily by the impact of three recent acquisitions: Xaar, Origin, and RPS, as well as higher commissions based on the higher revenue.

Research and development expenses, net increased by $3.4 million, or 16.5%, to $24.0 million for the three months ended March 31, 2022, compared to $20.6 million for the three months ended March 31, 2021. The amount of research and development expenses constituted 14.7% of our revenues for the three months ended March 31, 2022, as compared to 15.4% for the three months ended March 31, 2021.

Our research and development expenses were impacted by the timing of project spending and product launches, based on our portfolio management. We continue to invest in strategic long-term initiatives that include advancements in our core FDM and PolyJet technologies and in our new powder-based and photopolymer-based, SAF and P3 technologies, advanced composite materials, software and development of new applications which will enhance our current solutions offerings.

Selling, general and administrative expenses increased by $11.9 million, or 22.4%, to $65.3 million for the three months ended March 31, 2022, compared to $53.3 million for the three months ended March 31, 2021. The increase in these expenses reflected the trend of increased in operating activity that occurred throughout 2021 and continued during the first quarter of 2022. The amount of selling, general and administrative expenses constituted 39.9% of our revenues for the three months ended March 31, 2022, as compared to 39.7% for the three months ended March 31, 2021, which we deem a non-material increase.

6

**Operating Loss**

Operating loss and operating loss as a percentage of our total revenues were as follows:

| | Three Months Ended March 31, | |
|---|---|---|
| | **2022** | **2021** |
| | **U.S. $ in thousands** | |
| Operating loss | $ (19,584) | $ (18,358) |
| Percentage of revenues | (12.0)% | (13.7)% |

Operating loss amounted to $19.6 million for the three months ended March 31, 2022, compared to an operating loss of $18.4 million for the three months ended March 31, 2021. While increasing on an absolute basis, our operating loss decreased as a percentage of our revenues in the first quarter of 2022 compared to the first quarter of 2021.

**Financial Expenses, net**

Financial expenses, net, which were primarily comprised of foreign currencies effects, interest income and interest expenses, were \1.4 million for the three months ended

March 31, 2022, compared to financial expenses, net of $0.4 million for the three months ended March 31, 2021.

**Income Taxes**

Income taxes and income taxes as a percentage of net loss before taxes, as well as the percentage change in each, year over year, reflected thereby, were as follows:

| | Three Months Ended March 31, | | Change in % |
|---|---|---|---|
| | 2022 | 2021 | |
| | U.S. $ in thousands | | |
| Income tax benefit | $ 73 | $ 942 | (92.3)% |
| As a percent of loss before income taxes | 0.3% | 5.0% | (93.1)% |

We had an effective tax rate of 0.3% for the three-month period ended March 31, 2022, compared to an effective tax rate of 5.0% for the three-month period ended March 31, 2021. Our effective tax rate in the first quarter of 2022 was primarily impacted by the geographic mix of foreign taxable earnings and losses, as well as our valuation allowance.

7

**Share in Losses of Associated Companies**

Share in losses of associated companies reflects our proportionate share of the losses of unconsolidated entities accounted for by using the equity method of accounting. During the three months ended March 31, 2022, the loss from our proportionate share of the losses of our equity method investments was $0.1 million, compared to a loss of $1.1 million in the three months ended March 31, 2021.

**Net Loss and Net Loss Per Share**

Net loss and net loss per share were as follows:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| | U.S. $ in thousands | |
| Net loss attributable to Stratasys Ltd. | $ (20,948) | $ (18,911) |
| Percentage of revenues | (12.8)% | (14.1)% |
| Basic and diluted net loss per share | $ (0.32) | $ (0.32) |

Net loss attributable to Stratasys Ltd. was $20.9 million for the three months ended March 31, 2022 compared to net loss of $18.9 million for the three months ended March 31, 2021. While increasing on an absolute basis, our net loss decreased as a percentage of our revenues in the first quarter of 2022 compared to the first quarter of 2021.

Net loss per share was $0.32 for each of the three month periods ended March 31, 2022 and 2021. The weighted average fully diluted share count was 65.7 million during the three months ended March 31, 2022, compared to 58.6 million during the three months ended March 31, 2021.

8

**Supplemental Operating Results on a Non-GAAP Basis**

The following non-GAAP data, which excludes certain items as described below, are non-GAAP financial measures. Our management believes that these non-GAAP financial measures are useful information for investors and shareholders of our company in gauging our results of operations (i) on an ongoing basis after excluding mergers, acquisitions and divestments related expense or gains and restructuring-related charges or gains, legal provisions and (ii) excluding non-cash items such as stock-based compensation expenses, acquired intangible assets amortization, including intangible assets amortization related to equity method investments, impairment of long-lived assets and goodwill, revaluation of our investments and the corresponding tax effect of those items.

The items adjusted in our non-GAAP results either do not reflect actual cash outlays that impact our liquidity and our financial condition or have a non-recurring impact on the statement of operations, as assessed by management. These non-GAAP financial measures are presented to permit investors to more fully understand how management assesses our performance for internal planning and forecasting purposes. The limitations of using these non-GAAP financial measures as performance measures are that they provide a view of our results of operations without including all items indicated above during a period, which may not provide a comparable view of our performance to other companies in our industry. Investors and other readers should consider non-GAAP measures only as supplements to, not as substitutes for or as superior measures to, the measures of financial performance prepared in accordance with GAAP. Reconciliation between results on a GAAP and non-GAAP basis is provided in the table below.

.

9

**Reconciliation of GAAP to Non-GAAP Results of Operations**

The following tables present the GAAP measures, the corresponding non-GAAP amounts and the related non-GAAP adjustments for the applicable periods:

| | Three Months Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2022 GAAP | Non-GAAP Adjustments | 2022 Non-GAAP | 2021 GAAP | Non-GAAP Adjustments | 2021 Non-GAAP |
| | U.S. dollars and shares in thousands (except per share amounts) | | | | | |
| Gross profit (1) | $ 69,677 | $ 7,689 | $ 77,366 | $ 55,577 | $ 7,069 | $ 62,646 |
| Operating income (loss) (1,2) | (19,584) | 21,607 | 2,023 | (18,358) | 15,785 | (2,573) |
| Net income (loss) attributable to Stratasys Ltd. (1,2,3) | (20,948) | 22,158 | 1,210 | (18,911) | 15,111 | (3,800) |
| Net income (loss) per diluted share attributable to Stratasys Ltd. (4) | $ (0.32) | $ 0.34 | $ 0.02 | $ (0.32) | $ 0.26 | $ (0.06) |
| (1) Acquired intangible assets amortization expense | | 6,966 | | | 5,356 | |

| | | |
|---|---|---|
| Non-cash stock-based compensation expense | 900 | 634 |
| Restructuring and other related costs | (177) | 1,079 |
| | 7,689 | 7,069 |
| | | |
| (2) Acquired intangible assets amortization expense | 2,225 | 2,192 |
| Non-cash stock-based compensation expense | 7,633 | 6,571 |
| Restructuring and other related costs | 555 | 1,810 |
| Revaluation of investments | 1,061 | (3,670) |
| Contingent consideration | 207 | 191 |
| Other expenses | 2,237 | 1,622 |
| | 13,918 | 8,716 |
| | 21,607 | 15,785 |
| | | |
| (3) Corresponding tax effect and other expenses | 551 | (674) |
| | | |
| | $ 22,158 | $ 15,111 |

(4) Weighted average number of ordinary shares outstanding- Basic and Diluted — 65,721 — 67,060 — 58,616 — 58,616

10

## Liquidity and Capital Resources

A summary of our statements of cash flows is as follows:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2022 | 2021 |
| | U.S $ in thousands | |
| Net loss | $ (20,948) | $ (18,911) |
| Depreciation and amortization | 15,290 | 13,802 |
| Stock-based compensation | 8,533 | 7,205 |
| Foreign currency transactions loss | 2,792 | 4,181 |
| Other non-cash items, net | 1,219 | 1,822 |
| Change in working capital and other items | (22,949) | 14,652 |
| Net cash provided by (used in) operating activities | (16,063) | 22,751 |
| Net cash provided by (used in) investing activities | 67,738 | (92,744) |
| Net cash provided by financing activities | 1,021 | 222,165 |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | (2,228) | (2,872) |
| Net change in cash, cash equivalents and restricted cash | 50,468 | 149,300 |
| Cash, cash equivalents and restricted cash, beginning of period | 243,293 | 272,216 |
| Cash, cash equivalents and restricted cash, end of period | 293,761 | 421,516 |

Our cash, cash equivalents and restricted cash balance increased to $293.8 million as of March 31, 2022 from $243.3 million as of December 31, 2021. The increase in cash, cash equivalents and restricted cash in the three months ended March 31, 2022 was primarily due to 67.7 million of cash generated by investing activities, partially offset by $16.1 million of cash used in operating activities.

### Cash flows from operating activities

We used $16.1 million of cash in operating activities during the three months ended March 31, 2022. That cash use reflects our $20.9 million net loss, as adjusted favorably to eliminate non-cash charges included in net loss, such as $15.3 million of depreciation and amortization expense and $8.5 million of stock-based compensation expenses, as offset, in part, by elimination of changes in our working capital balances, which adjustments had an unfavorable net impact of $22.9 million on our cash flows, which changes were mainly driven by increased inventory purchases and increase in accounts receivable.

### Cash flows from investing activities

We generated $67.7 million of cash from our investing activities during the three months ended March 31, 2022. The increase is mostly attributed to $77.0 million net proceeds from short-term bank deposit, partly offset by purchase of property and equipment and investment in unconsolidated entities.

### Cash flows from financing activities

We generated $1.0 million of cash from financing activities during the three months ended March 31, 2022.

11

### Capital resources and capital expenditures

Our total current assets amounted to $787.9 million as of March 31, 2022, of which $475.8 million consisted of cash, cash equivalents, short-term deposits and restricted cash. Total current liabilities amounted to $203.4 million. Most of our cash and cash equivalents and short term deposits are held in banks in Israel and in the U.S.

The credit risk related to our accounts receivable is limited due to the relatively large number of customers and their wide geographic distribution. In addition, we seek to reduce the credit exposure related to our accounts receivable by imposing credit limits, conducting ongoing credit evaluation, and by implementing account monitoring procedures, as well as credit insurance for many of our customers.

We believe that we will have adequate cash and cash equivalents to fund our ongoing operations and that these sources of liquidity will be sufficient to satisfy our capital expenditure and working capital needs for the next twelve months.

### Critical Accounting Policies

We have prepared our consolidated financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America. This has required us to make estimates, judgments and assumptions that affected the amounts we reported. Actual results may differ from those estimates. To better the understanding of our business activities and those accounting policies that are important to the presentation of our financial condition and results of operations and that require management's subjective judgements, please see our 2021 Annual Report. We base our judgements on our experience and various assumptions that we believe to be reasonable under the circumstances.

12

**Forward-Looking Statements and Factors That May Affect Future Results of Operations**

Certain information included in or incorporated by reference into the Report of Foreign Private Issuer on Form 6-K to which this Operating and Financial Review is appended, or the Form 6-K, may be deemed to be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements are those that predict or describe future events or trends and that do not relate solely to historical matters. You can generally identify forward-looking statements as statements containing the words "may," "will," "could," "should," "expect," "anticipate," "intend," "estimate," "believe," "project," "plan," "assume" or other similar expressions, or negatives of those expressions, although not all forward-looking statements contain these identifying words.

These forward-looking statements may include, but are not limited to, statements regarding our future strategy, future operations, projected financial position, proposed products, estimated future revenues, projected costs, future prospects, the future of our industry and results that might be obtained by pursuing management's current plans and objectives.

You should not place undue reliance on our forward-looking statements because the matters they describe are subject to certain risks, uncertainties and assumptions that are difficult to predict. Our forward-looking statements are based on the information currently available to us and speak only as of the date of the Form 6-K. Over time, our actual results, performance or achievements may differ from those expressed or implied by our forward-looking statements, and such difference might be significant and materially adverse to our shareholders. We undertake no obligation to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

Important factors that could cause actual results, developments and business decisions to differ materially from those anticipated in these forward-looking statements include, among other things:

- the extent of our success at introducing new or improved products and solutions that gain market share;

- the extent of growth of the 3D printing market generally;

- changes in our overall strategy, including as related to any restructuring activities and our capital expenditures;

- the impact of shifts in prices or margins of the products that we sell or services we provide;

- the impact of competition and new technologies;

- impairments of goodwill or other intangible assets in respect of companies that we acquire;

- the extent of our success at efficiently and successfully integrating the operations of various companies that we have acquired or may acquire;

- the degree of our success at locating and acquiring additional value-enhancing, inorganic technology that furthers our business plan to lead in the realm of polymers;

- the potential adverse impact that recent global interruptions and delays involving freight carriers and other third parties may have on our supply chain and distribution network, and, consequently, our ability to successfully sell both our existing and newly-launched 3D printing products;

- global market, political and economic conditions, and in the countries in which we operate in particular;

- government regulations and approvals;

- litigation and regulatory proceedings;

- infringement of our intellectual property rights by others (including for replication and sale of consumables for use in our systems), or infringement of others' intellectual property rights by us;

- potential cyber attacks against, or other breaches to, our information technologies systems;

- the extent of our success at maintaining our liquidity and financing our operations and capital needs;

- impact of tax regulations on our results of operations and financial conditions;

- the duration and severity of the global COVID-19 pandemic and/or adverse macro-economic trends that are, in part, by products of that pandemic, such as, inflation, and the strength of recovery from it and resilience to chose trends, which may have significant consequences for our operations, financial position, cash flows, and those of our customers and suppliers going forward; and

- those factors referred to in Item 3.D, "Key Information - Risk Factors", Item 4, "Information on the Company", and Item 5, "Operating and Financial Review and Prospects" in our 2021 Annual Report, as supplemented herein, as well as in other portions of the 2021 Annual Report Readers are urged to carefully review and consider the various disclosures made throughout the Form 6-K, our 2021 Annual Report, and in our other reports filed with or furnished to the SEC, which are designed to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

## QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

Reference is made to Item 11, "Quantitative and Qualitative Disclosures about Market Risk" in our 2021 Annual Report.

## LEGAL PROCEEDINGS

We are subject to various litigation and other legal proceedings from time to time. For a discussion of our litigation status, see Note 12-"Contingencies" in the notes to our unaudited condensed consolidated interim financial statements attached as Exhibit 99.1 to the Form 6-K.

## RISK FACTORS

*The global COVID-19 health pandemic has adversely affected, in the recent past, and could again directly or indirectly—through macro-economic trends triggered by it, such as inflation and supply chain problems— potentially severely adversely affect, our business, results of operations and financial condition in the future, due primarily to impacts on the industries in which we and our customers operate.*

The COVID-19 global pandemic has had numerous adverse effects on the global economy. Governmental shutdowns and "shelter-in-place" orders suggested or mandated by governmental authorities or otherwise elected by companies as a preventative measure, adversely affected workforces, customers, consumer sentiment, economies and certain financial markets, and, along with decreased consumer spending, led to an economic downturn in many of the markets into which we sell our products and services.

Those effects of the pandemic adversely impacted our results of operations in all global regions, beginning already in the first quarter of 2020 and continuing through the

remaining quarters of 2020 and, to a lesser extent, all four quarters of 2021.

We imposed counter-measures that succeeded, together with improved macro-economic conditions, in each progressive quarter, at mitigating the impact of the pandemic on our operating results, and our results have improved concurrently with the economic recovery in many of the markets into which we sell, to the point that our revenues have surpassed, for the first quarter of 2022, the corresponding pre-pandemic revenue levels (for the first quarter of 2019). Nevertheless, even assuming the success of the measures that we implemented and the stable success of vaccination and other means implemented to combat the pandemic on a global basis, there is no guarantee that economic recovery from the pandemic will be sustained.

Certain global macro-economic conditions that were triggered, in large part, by the COVID-19 pandemic now threaten a downturn in economic conditions that could ruin the improved economic outlook achieved by the recovery from the pandemic. Supply chain delays and rising shipping costs, along with inflationary pressures due to the infusion of money into circulation as part of a "loose" monetary policy and low interest rates designed to ease economic conditions during the pandemic, now threaten economic prosperity globally, including in our target markets. We cannot predict what impact these new economic trends may have on our target markets and our expected results of operations.

In light of these global macro-economic uncertainties, we continue to monitor the cost-control measures that we first began to implement in February 2020. We have maintained in place certain cost reduction mechanisms, although we have eliminated others, such as our four-day work week, which we eliminated when we returned to a full work week effective as of the start of 2021.

While we continue to monitor the situation, assessing further implications for our operations, supply chain, liquidity, cash flow and customer orders in an effort to mitigate potential new adverse consequences should they arise, there is no assurance that we can succeed at doing so.

15

We furthermore face uncertainty as to the degree and duration of the impact of these trends going forward, and as to the degree of successful macro-economic resistance to them. We do not know the impact of governmental measures (such as higher interest rates) targeted at maintaining economic prosperity in the aftermath of the trends triggered by the COVID-19 pandemic, or the degree of overall potentially permanent changes in consumer behavior that may have been caused by the pandemic. The inflationary trend, and higher interest rates in response to inflation, may contribute towards global economic weakness that is more than temporary and that could adversely affect demand for our products and services generally. A potential downturn could also have a material adverse impact on our business partners' stability and financial strength. Given the uncertainties associated with these trends in the aftermath of COVID-19, it is difficult to fully predict the magnitude of effects on our, and our business partners', business, financial condition and results of operations.

Any guidance that we may provide for 2022 lacks the certainty that we once had in providing that guidance, due to the number of variables surrounding the COVID-19/post-COVID-19 pandemic period.

The trends trigged by the COVID-19 pandemic may also have the effect of amplifying many of the other risks described under the caption "Item 3. Key Information— D. Risk Factors" in our 2021 Annual Report.

16

# EXHIBIT 10

May 16, 2022



# Stratasys Releases First Quarter 2022 Financial Results

- ***First quarter revenue of $163.4 million, 22% growth over first quarter 2021, highest first quarter revenue in six years***
- ***First quarter GAAP net loss of $20.9 million, or $0.32 per diluted share, and non-GAAP net income of $1.2 million, or $0.02 per diluted share***
- ***$475.6 million cash and equivalents and no debt as of March 31, 2022***

MINNEAPOLIS & REHOVOT, Israel--(BUSINESS WIRE)-- Stratasys Ltd. (Nasdaq: SSYS), a leader in polymer 3D printing solutions, today announced financial results for the first quarter of 2022.

**Summary - First Quarter 2022 Financial Results Compared to First Quarter 2021:**

- Revenue of $163.4 million, compared to $134.2 million.
- GAAP gross margin of 42.6%, compared to 41.4%.
- Non-GAAP gross margin of 47.3%, compared to 46.7%.
- GAAP operating loss of $19.6 million, compared to a GAAP operating loss of $18.4 million.
- Non-GAAP operating income of $2.0 million, compared to non-GAAP operating loss of $2.6 million.
- GAAP net loss of $20.9 million, or $0.32 per diluted share, compared to net loss of $18.9 million, or $0.32 per diluted share.
- Non-GAAP net income of $1.2 million, or $0.02 per diluted share, compared to non-GAAP net loss of $3.8 million, or $0.06 per diluted share.
- Adjusted EBITDA of $8.1 million, compared to $3.5 million.
- $16.1 million of cash used by, compared to $22.8 million of cash generated from, operating activities, reflecting more inventory purchasing and increase in accounts receivable.

Dr. Yoav Zeif, Stratasys' Chief Executive Officer, stated, "Our strong start to the year, with our highest first quarter revenue total in six years, was anchored by 22% revenue growth that included improved contributions from all our technologies. Importantly, systems was the main driver, up 36.7% for its strongest first quarter in five years, and 16.4% higher than the same period in pre-COVID 2019. We also achieved exceptional results in both consumables and services, driven by strength in our growing install base. And we are particularly excited by the early momentum and contributions from our new Origin P3, H350 SAF and Neo systems, designed for high-volume production of end-use parts."

Dr. Zeif continued, "We have advanced a number of strategic initiatives thus far in 2022, including the announced MakerBot business combination with Ultimaker, the publishing of our inaugural ESG Sustainability Report, and our annual flagship manufacturing event where we showcased new offerings in materials, upgrades to existing printing platforms, and an

expansion of our software capabilities. We are relentless about our focus on execution in our drive to grow our leadership position in polymer 3D printing. With our combination of best-in-class talent, systems offerings, Go-to-Market and support infrastructure, combined with a robust balance sheet, Stratasys is positioned to build on our first quarter growth across the balance of 2022 and beyond."

**Financial Outlook:**

Based on current market conditions and assuming that the impact of the COVID-19 pandemic or global supply chain costs do not impede economic activity further, the Company is tightening its revenue guidance range for 2022:

- Full year revenue of $685 million to $695 million.
- Sequential quarterly revenue growth.
- Second quarter revenue growth expected to reach low to mid-teens as a percentage over second quarter of 2021.
- Based on current logistics and materials costs, full-year gross margins of flat to slightly higher than in 2021, with improved year-over-year growth in the second half of 2022.
- Full year-operating expenses that are $20 million to $25 million higher than 2021, primarily due to ongoing investments in new products to drive higher revenue.
- Full year non-GAAP operating margins slightly above 2%.
- GAAP net loss of $74 million to $67 million, or ($1.11) to ($1.00) per diluted share.
- Non-GAAP net income of $10 million to $13 million, or $0.14 to $0.19 per diluted share.
- Adjusted EBITDA of $38 million to $41 million.
- Capital expenditures of $20 million to $25 million.

Non-GAAP earnings guidance excludes $37 million to $38 million of projected amortization of intangible assets, $31 million to $33 million of share-based compensation expense, and reorganization and other expenses of $14 million to $15 million. Non-GAAP guidance includes tax adjustments of $2 million to $1 million on the above non-GAAP items.

Appropriate reconciliations between GAAP and non-GAAP financial measures are provided in a table at the end of our press release and slide presentation, with itemized detail concerning the non-GAAP financial measures.

**Stratasys Ltd. First Quarter 2022 Webcast and Conference Call Details**

The Company plans to webcast its conference call to discuss its first quarter 2022 financial results on Monday, May 16, 2022, at 4:30 p.m. (ET).

The investor conference call will be available via live webcast on the Stratasys website at investors.stratasys.com, or directly at the following web address:

https://services.choruscall.com/mediaframe/webcast.html?webcastid=QiDdBAQK

To participate by telephone, the U.S. toll-free number is 877-407-0619 and the international dial-in is +1-412-902-1012. Investors are advised to dial into the call at least ten minutes prior to the call to register. The webcast will be available for six months at investors.stratasys.com, or by accessing the above-provided web address.

**Stratasys** is leading the global shift to additive manufacturing with innovative 3D printing solutions for industries such as aerospace, automotive, consumer products and healthcare. Through smart and connected 3D printers, polymer materials, a software ecosystem, and parts on demand, Stratasys solutions deliver competitive advantages at every stage in the product value chain. The world's leading organizations turn to Stratasys to transform product design, bring agility to manufacturing and supply chains, and improve patient care.

To learn more about Stratasys, visit www.stratasys.com, the Stratasys blog, Twitter, LinkedIn, or Facebook. Stratasys reserves the right to utilize any of the foregoing social media platforms, including the Company's websites, to share material, non-public information pursuant to the SEC's Regulation FD. To the extent necessary and mandated by applicable law, Stratasys will also include such information in its public disclosure filings.

Stratasys is a registered trademark and the Stratasys signet is a trademark of Stratasys Ltd. and/or its subsidiaries or affiliates. All other trademarks are the property of their respective owners.

**Cautionary Statement Regarding Forward-Looking Statements**

The statements in this press release regarding Stratasys' strategy, and the statements regarding Stratasys' projected future financial performance, including the financial guidance concerning its expected results for 2022 and beyond, are forward-looking statements reflecting management's current expectations and beliefs. These forward-looking statements are based on current information that is, by its nature, subject to rapid and even abrupt change. Due to risks and uncertainties associated with Stratasys' business, actual results could differ materially from those projected or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to: the degree of our success at introducing new or improved products and solutions that gain market share; the degree of growth of the 3D printing market generally; the impact of potential shifts in the prices or margins of the products that we sell or services that we provide, including due to a shift towards lower margin products or services; the impact of competition and new technologies; potential further charges against earnings that we could be required to take due to impairment of additional goodwill or other intangible assets; the extent of our success at successfully consummating and integrating into our existing business acquisitions or investments in new businesses, technologies, products or services; the degree of our success at locating and acquiring additional value-enhancing, inorganic technology that furthers our business plan to lead in the realm of polymers; the potential adverse impact that recent global interruptions and delays involving freight carriers and other third parties may have on our supply chain and distribution network, and, consequently, our ability to successfully sell both our existing and newly-launched 3D printing products; the strength and duration of, and degree of recovery from and resilience to, the COVID-19 pandemic and/or adverse macro-economic trends that are, in part, by-products of that pandemic, such as inflation, which may have significant consequences for our operations, financial position, cash flows, and those of our customers and suppliers going forward; potential changes in our management and board of directors; global market, political and economic conditions, and in the countries in which we operate in particular (including risks related to the impact of coronavirus on our supply chain and business); costs and potential liability relating to litigation and regulatory proceedings; risks related to infringement of our intellectual property rights by others or infringement of others' intellectual property rights by us; the extent of our

success at maintaining our liquidity and financing our operations and capital needs; the impact of tax regulations on our results of operations and financial condition; and those additional factors referred to in Item 3.D "Key Information - Risk Factors", Item 4, "Information on the Company", Item 5, "Operating and Financial Review and Prospects," and all other parts of our Annual Report on Form 20-F for the year ended December 31, 2021, which we filed with the U.S. Securities and Exchange Commission, or SEC, on February 24, 2022 (the "**2021 Annual Report**"). Readers are urged to carefully review and consider the various disclosures made throughout our 2021 Annual Report and the Reports of Foreign Private Issuer on Form 6-K that attach Stratasys' unaudited, condensed consolidated financial statements and its review of its results of operations and financial condition, for the quarterly periods throughout 2022, which will be furnished to the SEC throughout 2022, and our other reports filed with or furnished to the SEC, which are designed to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects. Any guidance provided, and other forward-looking statements made, in this press release are provided or made (as applicable) as of the date hereof, and Stratasys undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## Use of Non-GAAP Financial Measures

The non-GAAP data included herein, which excludes certain items as described below, are non-GAAP financial measures. Our management believes that these non-GAAP financial measures are useful information for investors and shareholders of our company in gauging our results of operations (i) on an ongoing basis after excluding mergers, acquisitions and divestments related expense or gains and reorganization-related charges or gains, legal provisions and (ii) excluding non-cash items such as stock-based compensation expenses, acquired intangible assets amortization, including intangible assets amortization related to equity method investments, impairment of long-lived assets and goodwill, revaluation of our investments and the corresponding tax effect of those items. These non-GAAP adjustments either do not reflect actual cash outlays that impact our liquidity and our financial condition or have a non-recurring impact on the statement of operations, as assessed by management. These non-GAAP financial measures are presented to permit investors to more fully understand how management assesses our performance for internal planning and forecasting purposes. The limitations of using these non-GAAP financial measures as performance measures are that they provide a view of our results of operations without including all items indicated above during a period, which may not provide a comparable view of our performance to other companies in our industry. Investors and other readers should consider non-GAAP measures only as supplements to, not as substitutes for or as superior measures to, the measures of financial performance prepared in accordance with GAAP. Reconciliation between results on a GAAP and non-GAAP basis is provided in a table below.

**Stratasys Ltd.**
**Consolidated Balance Sheets**
**(Unaudited)**
*(in thousands, except share data)*

| | March 31, 2022 | December 31, 2021 |
|---|---|---|

**ASSETS**

**Current assets**

|  |  |  |
|---|---:|---:|
| Cash and cash equivalents | $ 293,649 | $ 243,179 |
| Short-term deposits | 182,000 | 259,000 |
| Accounts receivable, net of allowance for credit losses of $0.7 million and $0.5 million as of March 31, 2022 and December 31, 2021 | 136,444 | 129,382 |
| Inventories | 143,116 | 129,147 |
| Prepaid expenses | 8,477 | 6,871 |
| Other current assets | 24,185 | 33,123 |
| Total current assets | 787,871 | 800,702 |

**Non-current assets**

|  |  |  |
|---|---:|---:|
| Property, plant and equipment, net | 200,627 | 203,295 |
| Goodwill | 65,089 | 65,144 |
| Other intangible assets, net | 143,317 | 152,244 |
| Operating lease right-of-use assets | 14,162 | 14,651 |
| Long-term investments | 28,667 | 28,667 |
| Other non-current assets | 16,651 | 12,519 |
| Total non-current assets | 468,513 | 476,520 |
| **Total assets** | **$ 1,256,384** | **$ 1,277,222** |

**LIABILITIES AND EQUITY**

**Current liabilities**

|  |  |  |
|---|---:|---:|
| Accounts payable | $ 59,010 | $ 51,976 |
| Accrued expenses and other current liabilities | 44,198 | 55,358 |
| Accrued compensation and related benefits | 38,341 | 44,684 |
| Deferred revenues - short term | 52,337 | 51,174 |
| Operating lease liabilities - short term | 7,158 | 7,276 |
| Total current liabilities | 201,044 | 210,468 |

**Non-current liabilities**

|  |  |  |
|---|---:|---:|
| Deferred revenues - long term | 22,026 | 21,133 |
| Deferred income taxes - long term | 6,258 | 7,341 |
| Operating lease liabilities - long term | 7,220 | 7,693 |
| Contingent consideration | 53,648 | 53,478 |
| Other non-current liabilities | 23,487 | 21,095 |
| Total non-current liabilities | 112,639 | 110,740 |
| **Total liabilities** | **313,683** | **321,208** |

**Equity**

|  |  |  |
|---|---:|---:|
| Ordinary shares, NIS 0.01 nominal value, authorized 180,000 thousands shares; 66,408 thousands shares and 65,667 thousands shares issued and outstanding at March 31, 2022 and December 31, 2021, respectively | 185 | 182 |
| Additional paid-in capital | 3,021,166 | 3,012,481 |
| Accumulated other comprehensive loss | (9,824) | (8,771) |
| Accumulated deficit | (2,068,826) | (2,047,878) |
|  | 942,701 | 956,014 |
| **Total liabilities and equity** | **$ 1,256,384** | **$ 1,277,222** |

**Stratasys Ltd.**
**Consolidated Statements of Operations**
*(in thousands, except per share data)*

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2022 (unaudited) | | 2021 (unaudited) | |
| **Net sales** | | | | |
| Products | $ | 113,073 | $ | 90,324 |
| Services | | 50,356 | | 43,865 |
| | | 163,429 | | 134,189 |
| **Cost of sales** | | | | |
| Products | | 59,373 | | 46,920 |
| Services | | 34,379 | | 31,692 |
| | | 93,752 | | 78,612 |
| **Gross profit** | | 69,677 | | 55,577 |
| **Operating expenses** | | | | |
| Research and development, net | | 23,998 | | 20,601 |
| Selling, general and administrative | | 65,263 | | 53,334 |
| | | 89,261 | | 73,935 |
| **Operating loss** | | (19,584) | | (18,358) |
| Financial expense, net | | (1,362) | | (377) |
| **Loss before income taxes** | | (20,946) | | (18,735) |
| Income tax benefit | | 73 | | 942 |
| Share in losses of associated companies | | (75) | | (1,118) |
| **Net loss** | $ | (20,948) | $ | (18,911) |
| **Net loss per share** | | | | |
| Basic | $ | (0.32) | $ | (0.32) |
| Diluted | $ | (0.32) | $ | (0.32) |
| **Weighted average ordinary shares outstanding** | | | | |
| Basic | | 65,721 | | 58,616 |
| Diluted | | 65,721 | | 58,616 |

| | | Three Months Ended March 31, | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2022 GAAP | Non-GAAP Adjustments | 2022 Non-GAAP | 2021 GAAP | Non-GAAP Adjustments | 2021 Non-GAAP |
| | | U.S. dollars and shares in thousands (except per share amounts) | | | | | |
| | Gross profit (1) | $ 69,677 | $ 7,689 | $ 77,366 | $ 55,577 | $ 7,069 | $62,646 |
| | Operating income (loss) (1,2) | (19,584) | 21,607 | 2,023 | (18,358) | 15,785 | $ (2,573) |
| | Net income (loss) attributable to Stratasys Ltd. (1,2,3) | (20,948) | 22,158 | 1,210 | (18,911) | 15,111 | $ (3,800) |
| | Net income (loss) per diluted share attributable to Stratasys Ltd. (4) | $ (0.32) | $ 0.34 | $ 0.02 | $ (0.32) | $ 0.26 | $ (0.06) |
| (1) | Acquired intangible assets amortization expense | | 6,966 | | | 5,356 | |
| | Non-cash stock-based compensation expense | | 900 | | | 634 | |
| | Restructuring and other related costs | | (177) | | | 1,079 | |
| | | | 7,689 | | | 7,069 | |
| (2) | Acquired intangible assets amortization expense | | 2,225 | | | 2,192 | |
| | Non-cash stock-based compensation expense | | 7,633 | | | 6,571 | |
| | Restructuring and other related costs | | 555 | | | 1,810 | |
| | Revaluation of investments | | 1,061 | | | (3,670) | |
| | Contingent consideration | | 207 | | | 191 | |
| | Other expenses | | 2,237 | | | 1,622 | |
| | | | 13,918 | | | 8,716 | |
| | | | 21,607 | | | 15,785 | |
| (3) | Corresponding tax effect and other expenses | | 551 | | | (674) | |
| | | | $ 22,158 | | | $ 15,111 | |
| (4) | Weighted average number of ordinary shares outstanding- Diluted | 65,721 | | 67,060 | 58,616 | | 58,616 |

View source version on businesswire.com:
https://www.businesswire.com/news/home/20220516005369/en/

Yonah Lloyd
CCO, VP Investor Relations
Yonah.Lloyd@stratasys.com

Source: Stratasys Ltd.

# EXHIBIT 11

August 3, 2022



# Stratasys Releases Second Quarter 2022 Financial Results

- ***Second quarter revenue of $166.6 million, 13.3% growth over second quarter 2021 (16.4% on a constant currency basis), highest second quarter revenue in four years***
- ***Second quarter GAAP net loss of $24.4 million, or $0.37 per diluted share, and non-GAAP net income of $1.2 million, or $0.02 per diluted share***
- ***$441.5 million cash and equivalents and no debt as of June 30, 2022***
- ***Updates 2022 full-year outlook adjusted for currency exchange impact***

MINNEAPOLIS & REHOVOT, Israel--(BUSINESS WIRE)-- Stratasys Ltd. (Nasdaq: SSYS), a leader in polymer 3D printing solutions, today announced financial results for the second quarter of 2022.

**Summary - Second Quarter 2022 Financial Results Compared to Second Quarter 2021:**

- Revenue of $166.6 million, compared to $147.0 million.
- GAAP gross margin of 40.5%, compared to 43.0%.
- Non-GAAP gross margin of 47.6%, compared to 47.5%.
- GAAP operating loss of $23.5 million, compared to a GAAP operating loss of $22.7 million.
- Non-GAAP operating income of $1.9 million, compared to non-GAAP operating loss of $2.6 million.
- GAAP net loss of $24.4 million, or ($0.37) per diluted share, compared to net loss of $20.2 million, or ($0.31) per diluted share.
- Non-GAAP net income of $1.2 million, or $0.02 per diluted share, compared to non-GAAP net loss of $1.6 million, or ($0.02) per diluted share.
- Adjusted EBITDA of $7.4 million, compared to $3.5 million.
- $22.8 million of cash used by, compared to $5.6 million of cash generated from, operating activities, reflecting a continued augmentation of inventories.

"Our continued focus on execution delivered strong growth in revenue, margin, and earnings per share," commented Dr. Yoav Zeif, Stratasys' Chief Executive Officer. "Systems was again the main driver of robust performance, growing 29.2% from the prior year period and 9.7% over the same period in 2019. Our new Origin P3 and H350 SAF mass production manufacturing systems continue to ramp, with excellent customer engagement across all of our new technology offerings."

Dr. Zeif continued, "We are advancing our leadership position by executing on our strategic initiatives and steadily expanding our reach into Fortune 500 manufacturing facilities worldwide. We continue to provide best-in-class, full-scale 3D printing solutions through our innovative and growing ecosystem of polymer additive manufacturing systems, expanding variety of materials, end-to-end software and top quality service. With our robust balance

sheet and leading go-to-market strategy, we are well-positioned to navigate challenging supply issues and global inflation in our efforts to create long-term value for all of our shareholders."

**Financial Outlook:**

Based on current market conditions and assuming that the impact of the COVID-19 pandemic, global supply chain costs, currency risk and inflation do not impede economic activity further, the Company is updating its outlook for 2022 as follows:

- Full year revenue of $675 million to $685 million, as compared to a previous range of $685 million to $695 million. The reduction is primarily due to unexpected and adverse currency exchange rates which are expected to impact third and fourth quarter results relatively equally.
- Revenue growth in the second half of the year approximately 6%-7% higher than the second half of 2021, with fourth quarter anticipated to grow at a higher rate than third quarter.
- Based on current logistics and materials costs, third quarter gross margins relatively flat compared to third quarter of 2021, and full-year gross margins of flat to slightly higher than 2021.
- Full year-operating expenses that are $18 million to $23 million higher than 2021, primarily due to ongoing investments in new products to drive higher revenue.
- Full year non-GAAP operating margins slightly above 2%.
- GAAP net loss of $78 million to $69 million, or ($1.17) to ($1.04) per diluted share.
- Non-GAAP net income of $10 million to $13 million, or $0.14 to $0.19 per diluted share.
- Adjusted EBITDA of $38 million to $41 million.
- Capital expenditures of $20 million to $25.

Non-GAAP earnings guidance excludes $37 million to $38 million of projected amortization of intangible assets, $33 million to $35 million of share-based compensation expense, and reorganization and other expenses of $14 million to $16 million. Non-GAAP guidance includes tax adjustments of $2 million to $1 million on the above non-GAAP items.

Appropriate reconciliations between GAAP and non-GAAP financial measures are provided in a table at the end of our press release and slide presentation, with itemized detail concerning the non-GAAP financial measures.

**Stratasys Ltd. Second Quarter 2022 Webcast and Conference Call Details:**

The Company plans to webcast its conference call to discuss its second quarter 2022 financial results on Wednesday, August 3, 2022, at 8:30 a.m. (ET).

The investor conference call will be available via live webcast on the Stratasys website at investors.stratasys.com, or directly at the following web address:

https://event.choruscall.com/mediaframe/webcast.html?webcastid=mUfZ38Qo

To participate by telephone, the U.S. toll-free number is 877-407-0619 and the international dial-in is +1-412-902-1012. Investors are advised to dial into the call at least ten minutes

prior to the call to register. The webcast will be available for six months at investors.stratasys.com, or by accessing the above-provided web address.

**Stratasys** is leading the global shift to additive manufacturing with innovative 3D printing solutions for industries such as aerospace, automotive, consumer products and healthcare. Through smart and connected 3D printers, polymer materials, a software ecosystem, and parts on demand, Stratasys solutions deliver competitive advantages at every stage in the product value chain. The world's leading organizations turn to Stratasys to transform product design, bring agility to manufacturing and supply chains, and improve patient care.

To learn more about Stratasys, visit www.stratasys.com, the Stratasys blog, Twitter, LinkedIn, or Facebook. Stratasys reserves the right to utilize any of the foregoing social media platforms, including the Company's websites, to share material, non-public information pursuant to the SEC's Regulation FD. To the extent necessary and mandated by applicable law, Stratasys will also include such information in its public disclosure filings.

Stratasys is a registered trademark and the Stratasys signet is a trademark of Stratasys Ltd. and/or its subsidiaries or affiliates. All other trademarks are the property of their respective owners.

**Cautionary Statement Regarding Forward-Looking Statements**

The statements in this press release regarding Stratasys' strategy, and the statements regarding Stratasys' projected future financial performance, including the financial guidance concerning its expected results for 2022 and beyond, are forward-looking statements reflecting management's current expectations and beliefs. These forward-looking statements are based on current information that is, by its nature, subject to rapid and even abrupt change. Due to risks and uncertainties associated with Stratasys' business, actual results could differ materially from those projected or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to: the degree of our success at introducing new or improved products and solutions that gain market share; the degree of growth of the 3D printing market generally; the impact of potential shifts in the prices or margins of the products that we sell or services that we provide, including due to a shift towards lower margin products or services; the impact of competition and new technologies; potential further charges against earnings that we could be required to take due to impairment of additional goodwill or other intangible assets; the extent of our success at successfully consummating and integrating into our existing business acquisitions or investments in new businesses, technologies, products or services; the degree of our success at locating and acquiring additional value-enhancing, inorganic technology that furthers our business plan to lead in the realm of polymers; the potential adverse impact that recent global interruptions and delays involving freight carriers and other third parties (including due to the Russian invasion of Ukraine) may have on our supply chain and distribution network, and, consequently, our ability to successfully sell both our existing and newly-launched 3D printing products; the strength and duration of, and degree of recovery from and resilience to, the COVID-19 pandemic and/or adverse macro-economic trends that are, in part, by-products of that pandemic, such as inflation, which may have significant consequences for our operations, financial position, cash flows, and those of our customers and suppliers going forward; potential changes in our management and board of directors; global market, political and economic conditions, and in the countries in which we operate in particular (including risks related to the impact of coronavirus on our supply chain and

business); costs and potential liability relating to litigation and regulatory proceedings; risks related to infringement of our intellectual property rights by others or infringement of others' intellectual property rights by us; the extent of our success at maintaining our liquidity and financing our operations and capital needs; the impact of tax regulations on our results of operations and financial condition; and those additional factors referred to in Item 3.D "Key Information - Risk Factors", Item 4, "Information on the Company", Item 5, "Operating and Financial Review and Prospects," and all other parts of our Annual Report on Form 20-F for the year ended December 31, 2021, which we filed with the U.S. Securities and Exchange Commission, or SEC, on February 24, 2022 (the "**2021 Annual Report**"). Readers are urged to carefully review and consider the various disclosures made throughout our 2021 Annual Report and the Reports of Foreign Private Issuer on Form 6-K that attach Stratasys' unaudited, condensed consolidated financial statements and its review of its results of operations and financial condition, for the quarterly periods throughout 2022, which will be furnished to the SEC throughout 2022, and our other reports filed with or furnished to the SEC, which are designed to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects. Any guidance provided, and other forward-looking statements made, in this press release are provided or made (as applicable) as of the date hereof, and Stratasys undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## Use of Non-GAAP Financial Measures

The non-GAAP data included herein, which excludes certain items as described below, are non-GAAP financial measures. Our management believes that these non-GAAP financial measures are useful information for investors and shareholders of our company in gauging our results of operations (i) on an ongoing basis after excluding mergers, acquisitions and divestments related expense or gains and reorganization-related charges or gains, legal provisions and (ii) excluding non-cash items such as stock-based compensation expenses, acquired intangible assets amortization, including intangible assets amortization related to equity method investments, impairment of long-lived assets and goodwill, revaluation of our investments and the corresponding tax effect of those items. These non-GAAP adjustments either do not reflect actual cash outlays that impact our liquidity and our financial condition or have a non-recurring impact on the statement of operations, as assessed by management. These non-GAAP financial measures are presented to permit investors to more fully understand how management assesses our performance for internal planning and forecasting purposes. The limitations of using these non-GAAP financial measures as performance measures are that they provide a view of our results of operations without including all items indicated above during a period, which may not provide a comparable view of our performance to other companies in our industry. Investors and other readers should consider non-GAAP measures only as supplements to, not as substitutes for or as superior measures to, the measures of financial performance prepared in accordance with GAAP. Reconciliation between results on a GAAP and non-GAAP basis is provided in a table below.

**Stratasys Ltd.**

**Consolidated Balance Sheets**
**(Unaudited)**

*(in thousands, except share data)*

| | June 30, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| **Current assets** | | |
| Cash and cash equivalents | $ 255,886 | $ 243,179 |
| Short-term deposits | 182,429 | 259,000 |
| Accounts receivable, net of allowance for credit losses of $1.0 million and $0.5 million as of June 30, 2022 and December 31, 2021 | 132,343 | 129,382 |
| Inventories | 153,702 | 129,147 |
| Prepaid expenses | 8,225 | 6,871 |
| Other current assets | 49,615 | 33,123 |
| Total current assets | 782,200 | 800,702 |
| **Non-current assets** | | |
| Property, plant and equipment, net | 192,630 | 203,295 |
| Goodwill | 64,959 | 65,144 |
| Other intangible assets, net | 133,657 | 152,244 |
| Operating lease right-of-use assets | 12,319 | 14,651 |
| Long-term investments | 31,191 | 28,667 |
| Other non-current assets | 12,886 | 12,519 |
| Total non-current assets | 447,642 | 476,520 |
| **Total assets** | $ 1,229,842 | $ 1,277,222 |
| **LIABILITIES AND EQUITY** | | |
| **Current liabilities** | | |
| Accounts payable | $ 61,316 | $ 51,976 |
| Accrued expenses and other current liabilities | 52,049 | 55,358 |
| Accrued compensation and related benefits | 30,513 | 44,684 |
| Deferred revenues - short term | 49,511 | 51,174 |
| Operating lease liabilities - short term | 6,111 | 7,276 |
| Total current liabilities | 199,500 | 210,468 |
| **Non-current liabilities** | | |
| Deferred revenues - long term | 22,727 | 21,133 |
| Deferred income taxes - long term | 4,511 | 7,341 |
| Operating lease liabilities - long term | 6,165 | 7,693 |
| Contingent consideration - long term | 50,299 | 53,478 |
| Other non-current liabilities | 22,931 | 21,095 |
| Total non-current liabilities | 106,633 | 110,740 |
| **Total liabilities** | 306,133 | 321,208 |
| **Equity** | | |
| Ordinary shares, NIS 0.01 nominal value, authorized 180,000 thousands shares; 66,744 thousands shares and 65,677 thousands shares issued and outstanding at June 30, 2022 and December 31, 2021, respectively | 186 | 182 |
| Additional paid-in capital | 3,030,088 | 3,012,481 |
| Accumulated other comprehensive loss | (13,354) | (8,771) |
| Accumulated deficit | (2,093,211) | (2,047,878) |
| | 923,709 | 956,014 |

**Total liabilities and equity**                                        $ 1,229,842  $  1,277,222

**Stratasys Ltd.**

**Consolidated Statements of Operations**

*(in thousands, except per share data)*

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | **2022** (unaudited) | **2021** (unaudited) | **2022** (unaudited) | **2021** (unaudited) |
| **Net sales** | | | | |
| Products | $ 115,721 | $ 100,305 | $ 228,794 | $ 190,629 |
| Services | 50,882 | 46,700 | 101,238 | 90,565 |
| | 166,603 | 147,005 | 330,032 | 281,194 |
| **Cost of sales** | | | | |
| Products | 61,132 | 49,731 | 120,505 | 96,651 |
| Services | 38,078 | 34,004 | 72,457 | 65,696 |
| | 99,210 | 83,735 | 192,962 | 162,347 |
| **Gross profit** | 67,393 | 63,270 | 137,070 | 118,847 |
| **Operating expenses** | | | | |
| Research and development, net | 24,346 | 22,437 | 48,344 | 43,038 |
| Selling, general and administrative | 66,592 | 63,557 | 131,855 | 116,891 |
| | 90,938 | 85,994 | 180,199 | 159,929 |
| **Operating loss** | (23,545) | (22,724) | (43,129) | (41,082) |
| Financial expenses, net | (1,170) | (372) | (2,532) | (749) |
| **Loss before income taxes** | (24,715) | (23,096) | (45,661) | (41,831) |
| Income tax benefit | 429 | 4,368 | 502 | 5,310 |
| Share in losses of associated companies | (99) | (1,431) | (174) | (2,549) |
| **Net loss** | $ (24,385) | $ (20,159) | $ (45,333) | $ (39,070) |
| **Net loss per share** | | | | |
| Basic | $ (0.37) | $ (0.31) | $ (0.69) | $ (0.63) |
| Diluted | $ (0.37) | $ (0.31) | $ (0.69) | $ (0.63) |
| **Weighted average ordinary shares outstanding** | | | | |
| Basic | 66,568 | 64,908 | 66,151 | 61,796 |
| Diluted | 66,568 | 64,908 | 66,151 | 61,796 |

| | | | **Three Months Ended June 30,** | | | |
|---|---|---|---|---|---|---|
| | **2022 GAAP** | **Non-GAAP Adjustments** | **2022 Non-GAAP** | **2021 GAAP** | **Non-GAAP Adjustments** | **2021 Non-GAAP** |
| | **U.S. dollars and shares in thousands (except per share amounts)** | | | | | |
| Gross profit (1) | $ 67,393 | $ 11,914 | $ 79,307 | $ 63,270 | $ 6,616 | $ 69,886 |
| Operating income (loss) (1,2) | (23,545) | 25,479 | $ 1,934 | (22,724) | 20,133 | $ (2,591) |
| Net income (loss) (1,2,3) | (24,385) | 25,560 | $ 1,175 | (20,159) | 18,581 | $ (1,578) |
| Net income (loss) per diluted share (4) | $ (0.37) | $ 0.39 | $ 0.02 | $ (0.31) | $ 0.29 | $ (0.02) |

| | | | | |
|---|---|---|---|---|
| (1) | Acquired intangible assets amortization expense | 6,954 | | 5,518 |
| | Non-cash stock-based compensation expense | 1,080 | | 788 |
| | Restructuring and other related costs | 15 | | 310 |
| | Impairment charges | 3,865 | | - |
| | | 11,914 | | 6,616 |
| | | | | |
| (2) | Acquired intangible assets amortization expense | 2,218 | | 2,200 |
| | Non-cash stock-based compensation expense | 7,751 | | 7,189 |
| | Restructuring and other related costs | - | | 350 |
| | Revaluation of investments | 1,255 | | 2,201 |
| | Contingent consideration | 596 | | 202 |
| | Other expenses | 1,745 | | 1,375 |
| | | 13,565 | | 13,517 |
| | | 25,479 | | 20,133 |
| | | | | |
| (3) | Corresponding tax effect and other expenses | 81 | | (1,552) |
| | | $ 25,560 | | $ 18,581 |
| | | | | |
| (4) | Weighted average number of ordinary shares outstanding - Diluted | 66,568 | 67,070 | 64,908 | 64,908 |

| | Six Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2022 GAAP | Non-GAAP Adjustments | 2022 Non-GAAP | 2021 GAAP | Non-GAAP Adjustments | 2021 Non-GAAP |
| | U.S. dollars and shares in thousands (except per share amounts) | | | | | |
| Gross profit (1) | $137,070 | $ 19,603 | $ 156,673 | $118,847 | $ 13,685 | $ 132,532 |
| Operating income (loss) (1,2) | (43,129) | 47,086 | $ 3,957 | (41,082) | 35,918 | $ (5,164) |
| Net income (loss) (1,2,3) | (45,333) | 47,718 | $ 2,385 | (39,070) | 33,692 | $ (5,378) |
| Net income (loss) per diluted share (4) | $ (0.69) | $ 0.73 | $ 0.04 | $ (0.63) | $ 0.54 | $ (0.09) |

| | | | |
| --- | --- | --- | --- |
| (1) | Acquired intangible assets amortization expense | 13,920 | 10,873 |
| | Non-cash stock-based compensation expense | 1,980 | 1,422 |
| | Restructuring and other related costs | (162) | 1,390 |
| | | 3,865 | - |
| | Impairment charges | | |
| | | 19,603 | 13,685 |
| | | | |
| (2) | Acquired intangible assets amortization expense | 4,443 | 4,393 |
| | Non-cash stock-based compensation expense | 15,384 | 13,760 |
| | Restructuring and other related costs | 555 | 2,159 |
| | Revaluation of investments | 2,316 | (1,469) |
| | Contingent consideration | 803 | 393 |
| | Other expenses | 3,982 | 2,997 |
| | | 27,483 | 22,233 |
| | | 47,086 | 35,918 |
| | | | |
| (3) | Corresponding tax effect and other expenses | 632 | (2,226) |
| | | $ 47,718 | $ 33,692 |

| | | | | |
| --- | --- | --- | --- | --- |
| (4) | Weighted average number of ordinary shares outstanding - Diluted | 66,151 | 67,071 | 61,796 | 61,796 |

**Stratasys Ltd.**

**Reconciliation of GAAP to Non-GAAP Forward Looking Guidance**

**Fiscal Year 2022**

(in millions, except per share data)

| | |
| --- | --- |
| **GAAP net loss** | ($78) to ($69) |
| **Adjustments** | |
| Stock-based compensation expense | $33 to $35 |
| Intangible assets amortization expense | $37 to $38 |
| Reorganization and other | $14 to $16 |
| Tax expense (benefit) related to Non-GAAP adjustments | ($2) to ($1) |
| **Non-GAAP net income** | $10 to $13 |
| **GAAP loss per share** | ($1.17) to ($1.04) |
| **Non-GAAP diluted earnings per share** | $0.14 to $0.19 |

View source version on businesswire.com:
https://www.businesswire.com/news/home/20220803005028/en/

Yonah Lloyd
CCO, VP Investor Relations
Yonah.Lloyd@stratasys.com

Source: Stratasys Ltd.

# EXHIBIT 12

## ADDITIONAL INFORMATION

Our 2013 Annual Report, which was filed with the SEC on March 3, 2014, is available for viewing and download on the SEC's website at *www.sec.gov* as well as under the Investor Relations section of our website at *www.stratasys.com*. In addition, on December 29, 2014, we issued a press release and furnished a related report on Form 6-K giving notice of the Extraordinary Meeting.  Shareholders may obtain a copy of these documents without charge at *www.stratasys.com*.

We are subject to the information reporting requirements of the U.S. Securities Exchange Act of 1934, as amended, applicable to foreign private issuers. We fulfill these requirements by filing reports with the SEC. Our filings with the SEC may be inspected without charge at the SEC's Public Reference Room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Information on the operation of the Public Reference Room can be obtained by calling the SEC at 1-800-SEC-0330. Our SEC filings are also available to the public on the SEC's website at *www.sec.gov*. As a foreign private issuer, we are exempt from the rules under the Exchange Act related to the furnishing and content of proxy statements. The circulation of this Proxy Statement should not be taken as an admission that we are subject to those proxy rules.

Eden Prairie, Minnesota
January 6, 2015

15

**Appendix A**

## ARTICLES OF ASSOCIATION

## OF

## STRATASYS LTD.

A COMPANY LIMITED BY SHARES

UNDER THE COMPANIES LAW - 1999

1.    **INTERPRETATION**.

1.1.    In these Articles, unless the context requires another meaning the words in the first column of the following table shall have the meanings set opposite them in the second column:

| | |
|---|---|
| "**Articles**" | these Articles of Association, as amended from time to time by a Resolution (as defined below); |
| "**Auditors**" | the auditors of the Company; |
| "**Board of Directors**" or the "**Board**" | all of the directors of the Company, ~~including elected directors and the chairman,~~ holding office pursuant to these Articles, including alternates, substitutes or proxies; |
| "**Cause**" | ~~shall mean any of the following: (A) conviction (including conviction on a *nolo contendere* plea) of (i) a crime involving the commission by an Office holder of a felony or (ii) a criminal act intended to result directly or indirectly in substantial gain or personal enrichment to an Office Holder at the expense of the Company, but excluding any such conviction that results solely from such Office Holder's title or position with the Company and is not based on his or her personal conduct; or (B) willful misconduct or gross negligence in connection with the business of the Company or an affiliate that results in material damage to the Company or the affiliate or to their respective businesses, whether monetary or otherwise;~~ |

| | |
|---|---|
| "**Chief Executive Officer**" | chief executive officer of the Company; |
| "**Chairman of the Board of Directors**" | as defined in Article 79; |
| "**Class A Directors**" | all of the directors of the Company appointed by Objet under the Merger Agreement, which classification is applicable only during the Initial Term; |
| "**Class B** | |

A-1

| | |
|---|---|
| ~~**Directors**~~" | all of the directors of the Company appointed by Stratasys under the Merger Agreement, which classification is applicable only during the Initial Term; |
| "**Class A External Director**" | the External Director nominated by Objet pursuant to the terms of the Merger Agreement and any successor person nominated by the Class A Directors as an External Director in accordance with these Articles; |
| "**Class B External Director**" | the External Director nominated by Stratasys pursuant to the terms of the Merger Agreement and any successor person nominated by the Class B Directors as an External Director in accordance with these Articles; |
| "**Companies Law**" or the "**Law**" | the Companies Law, 5759-1999, of the State of Israel, as amended from time to time, or any other law which may come in its stead, including all amendments made thereto; |
| "**Company**" | Stratasys Ltd~~., which was named Objet Ltd. prior to the Effective Time;~~.; |
| "**Effective Time**" | the closing of the Merger as defined in the Merger Agreement, at which time these Articles shall first become effective. |
| "**Elected Director/s**" | a member or members of the Board of Directors elected to hold office as director(s); |
| "**External Directors**" | as defined in the Companies Law; |
| "**General** ~~**Meetings**~~" | ~~all~~**Meeting**" any annual ~~and~~or extraordinary ~~meetings~~meeting of the shareholders of the Company; |
| "**Merger**" | the merger of Sun, Inc. with and into Oaktree Merger, Inc., a Delaware corporation and wholly owned indirect subsidiary of the Company ("**Merger Sub**"), pursuant to the General Corporation Law of Delaware and pursuant to which Stratasys, Inc. will become a wholly owned indirect subsidiary of the Company; |
| "**Merger Agreement**" | the Agreement and Plan of Merger dated as of April 13, 2012, among Stratasys Inc. the Company and Merger Sub; |
| "**Incapacitated Person**" | according to the meaning thereof under the Legal Capacity and Guardianship Law, 5722-1962, of the State of Israel, as amended from time to time, including a minor who has not yet attained the age of 18 years, a person unsound of mind and a bankrupt in respect of whom no rehabilitation has been granted; |
| "**Initial Term**" | such period commencing at the Effective Time and ending on the second anniversary of the Effective Time; |

A-2

| | |
|---|---|
| "**Month**" or "**Year**" | according to the Gregorian calendar; |
| "**NIS**" | New Israeli Shekels; |
| "**Office**" | the registered office of the Company at that time; |
| "**Office Holder**" | as defined in the Companies Law; |
| "**Person**" | includes an individual, corporation, company, cooperative society, partnership, trust of any kind or any other body of persons, whether incorporated or otherwise; |
| "**Register**" | the Register of Shareholders administered in accordance with Section 127 of the Law; |
| "**Resolution**" | a resolution of shareholders of the Company, including a resolution approving a merger, which, except as required under the Law or these Articles, shall be adopted by a majority of voting power present and voting at the applicable General Meeting, in person or by proxy; |
| "~~**Stratasys,Inc**~~" | ~~Stratasys, Inc, a Delaware corporation;~~ |
| "**U.S. Rules**" | the rules of the NASDAQ Stock Market (or other stock exchange on which the Company's shares are then listed) and the U.S. securities rules and regulations, as amended from time to time; |
| "**writing**" | handwriting, typewriting, photography, telex, email or any other legible form of writing. |

1.2.   Words and expressions defined in the Memorandum of Association of the Company shall have the meanings in these Articles as ascribed to them therein.

1.3.   Subject to the provisions of this Article 1, in these Articles, unless the context necessitates another meaning, terms and expressions which have been defined in the Companies Law shall have the meanings ascribed to them therein.

1.4.   Words in the singular shall also include the plural, and vice versa. Words in the masculine shall include the feminine and vice versa, and words which refer to persons shall also include corporations, and vice versa.

1.5.   The captions to articles in these Articles are intended for the convenience of the reader only, and no use shall be made thereof in the interpretation of these Articles.

## LIMITED LIABILITY

2.   The Company is a limited liability company and ~~therefore~~ each shareholder's obligations for the Company's obligations shall be limited to the payment of the nominal value of the shares held by such shareholder, subject to the provisions of the Companies Law.

## THE COMPANY'S OBJECTIVES

3.   The Company's objectives are to conduct all types of business as are permitted by law. The Company may donate a reasonable amount of money for any purpose that the Board of Directors finds appropriate, even if the donation is not for business considerations or for the purpose of achieving profits for the Company.

A-3

## THE BUSINESS

4.   Any branch or type of business that the Company is authorized to engage in, either expressly or implied, may be commenced or engaged in by the Board of Directors at all or any time as it deems fit. The Board of Directors, at its own discretion, shall be entitled to cease the conduct of any such branch or type of business, whether or not the actual conduct thereof has commenced.

## REGISTERED OFFICE

5.      The registered office shall be at such place as is decided from time to time by the Board of Directors.

**SHARE CAPITAL**

6.      ~~Pursuant to the reclassification of the share capital of the Company as constituted immediately prior to the Effective Time in accordance with the articles of association of the Company as in effect immediately prior to the Effective Time (the "**Prior Articles**"), at the Effective Time,~~The share capital of the Company consists of NIS 1,800,000 divided into 180,000,000 Ordinary Shares, of a nominal value of NIS 0.01 each (the "**Ordinary Shares**"). The powers, preferences, rights, restrictions, and other matters relating to the Ordinary Shares are as set forth in the Articles.

7.      **RIGHTS ATTACHING TO THE ORDINARY SHARES**.

   7.1.   The Ordinary Shares in respect of which all calls have been fully paid shall confer on the holders thereof the right to attend and to vote at General Meetings of the Company, both ordinary as well as extraordinary meetings. At General Meetings of the Company every holder of an Ordinary Share in respect of which all of the calls on such share have been paid in full, who is personally present or represented by proxy, shall have 1 (one) vote in respect of such Ordinary Share held by him, without reference to the nominal value thereof.

   7.2.   The Ordinary Shares shall confer on a holder thereof the right to receive a dividend, to participate in a distribution of bonus shares and to participate in the distribution of the assets of the Company upon its winding-up, pro rata to the nominal amount paid up on the shares or credited as paid up in respect thereof, and without reference to any premium which may have been paid in respect thereof.

   7.3.   Except as may expressly provided in these Articles, all Ordinary Shares shall rank pari passu in all respects.

8.      **MODIFICATION OF CLASS RIGHTS**.

   8.1.   Subject to applicable law, if at any time the share capital of the Company is divided into different classes of shares and unless the terms of issue of such class of shares otherwise stipulate, the rights attaching to any class of shares (including rights prescribed in the terms of issue of the shares) may be altered, modified or canceled, by a Resolution passed at a separate General Meeting of the shareholders of that class.

   8.2.   The provisions contained in these Articles with regard to General Meetings shall apply, mutatis mutandis as the case may be, to every such General Meeting of the holders of each class of the Company's shares.

   8.3.   The special rights conferred on the holders of shares or any class of shares which have been issued, including without limitation shares issued with preferential rights or other special rights, shall not be deemed to have been altered by the creation or issue of additional shares ranking pari passu with them, unless otherwise stipulated in the conditions of issue of such shares.

A-4

9.      **ISSUANCE OF PREFERRED SHARES**

Without prejudice to the special rights conferred on the holders of shares or debentures of the Company, the Company may issue shares having preferred or deferred rights, or may issue redeemable preference shares and may redeem same on such conditions and in such manner as the Company shall decide, subject to the provisions of any applicable law, from time to time, or may issue shares having special rights in regard to the distribution of dividends, voting rights, rights on winding-up or in connection with any other matters, as the Company may from time to time decide.

10.     **UNISSUED SHARE CAPITAL**

The unissued shares in the capital of the Company shall be under the control of the Board of Directors, which shall be entitled to allot or otherwise grant the same to such persons under such restrictions and conditions as it shall deem fit, whether for consideration or otherwise, and whether for consideration in cash or for consideration which is not in cash, above their nominal value or at a discount, all on such conditions, in such manner and at such times as the Board of Directors shall deem fit, subject to the provisions of the Law. The Board of Directors shall be entitled, *inter alia*, to differentiate between shareholders with regard to the amounts of calls in respect of the allotment of shares (to the extent that there are calls) and with regard to the time

for payment thereof. The Board of Directors may also issue options or warrants for the purchase of shares of the Company and prescribe the manner of the exercise of such options or warrants, including the time and price for such exercise and any other provision which is relevant to the method for distributing the issued shares of the Company amongst the purchasers thereof.

11. The Board of Directors shall be entitled to prescribe the times for the issue of shares of the Company and the conditions therefor and any other matter which may arise in connection with the issue thereof.

12. In every case of a rights offering the Board of Directors shall be entitled, in its discretion, to resolve any problems and difficulties arising or that are likely to arise in regard to fractions of rights, and without prejudice to the generality of the foregoing, the Board of Directors shall be entitled to specify that no shares shall be allotted in respect of fractions of rights, or that fractions of rights shall be sold and the (net) proceeds shall be paid to the persons entitled to the fractions of rights, or, in accordance with a decision by the Board of Directors, to the benefit of the Company.

## INCREASE OF AND ALTERATIONS TO CAPITAL

13. The Company may, from time to time, by a Resolution, increase its share capital by way of the creation of new shares, whether or not all the existing shares have been issued up to the date of the Resolution, whether or not it has been decided to issue same, and whether or not calls have been made on all the issued shares.

14. The increase of capital shall be in such amount and divided into shares of such nominal value, and with such restrictions and conditions and with such rights and privileges as the Resolution dealing with the creation of the shares prescribes, subject to the special rights of an existing class of shares, and if no provisions are contained in the Resolution, then as the Board of Directors shall prescribe.

15. Unless otherwise stated in the Resolution approving the increase of the share capital, the new shares shall be subject to those provisions in regard to issue, allotment, alteration of rights, payment of calls, liens, forfeiture, transfer, transmission and other provisions which apply to the shares of the Company.

16. By Resolution, the Company may, subject to any applicable provisions of the Law:

16.1. consolidate its existing share capital, or any part thereof, into shares of a larger denomination than the existing shares:

16.2. sub-divide its share capital, in whole or in part, into shares of a smaller denomination than the nominal value of the existing shares and without prejudice to the foregoing, one or more of the shares so created may be granted any preferred or deferred rights or any special rights

A-5

with regard to dividends, participation in assets upon winding-up, voting and so forth, subject to the provisions of these Articles;

16.3. reduce its share capital; or

16.4. cancel any shares which on the date of passing of the Resolution have not been issued and to reduce its share capital by the amount of such shares.

17. In the event that the Company shall adopt any of the Resolutions described in Article 16 above, the Board of Directors shall be entitled to prescribe arrangements necessary in order to resolve any difficulty arising or that is likely to arise in connection with such Resolutions, including in the event of a consolidation, in which it shall be entitled to prescribe which shares shall be consolidated into a particular class of shares, and may cause the transfer of fractional shares by certain shareholders of the Company to other shareholders thereof so as to most expediently preclude or remove any fractional shareholdings, and cause the transferees of such fractional shares to pay the transferors thereof the fair value thereof, and the Board of Directors is hereby authorized to act in connection with such transfer, as agent for the transferors and transferees of any such fractional shares, with full power of substitution, for the purposes of implementing the provisions of this Article 17.

## SHARE CERTIFICATES

18. To the extent shares are certificated, share certificates evidencing title to the shares of the Company shall be issued under the seal or rubber stamp of the Company, and together with the signatures of two members of the Board of Directors, or one director

together with the Chief Executive Officer. The Board of Directors shall be entitled to decide that the signatures be effected in any mechanical or electronic form, provided that the signature shall be effected under the supervision of the Board of Directors in such manner as it prescribes.

19. Every shareholder shall be entitled, free of charge, to one certificate in respect of all the shares of a single class registered in his name in the Register.

20. The Board of Directors shall not refuse a request by a shareholder to obtain several certificates in place of one certificate, unless such request is, in the opinion of the Board of Directors, unreasonable. Where a shareholder has sold or transferred some of his shares, he shall be entitled, free of charge, to receive a certificate in respect of his remaining shares, provided that the previous certificate is delivered to the Company before the issuance of a new certificate.

21. Every share certificate shall specify the number of the shares in respect of which such certificate is issued and also the amounts which have been paid up in respect of each share.

22. No person shall be recognized by the Company as having any right to a share unless he is the registered owner of the shares in the Register. The Company shall not be bound by and shall not recognize any right or privilege pursuant to the laws of equity, or a fiduciary relationship or a chose in action, future or partial, in any share, or a right or privilege to a fraction of a share, or (unless these Articles otherwise direct) any other right in respect of a share, except the absolute right to the share as a whole, where same is vested in the owner registered in the Register.

23. A share certificate registered in the names of two or more persons shall be delivered to one of the joint holders, and the Company shall not be obliged to issue more than one certificate to all the joint holders of shares and the delivery of such certificate to one of the joint holders shall be deemed to be delivery to all of them.

24. If a share certificate should be lost, destroyed or defaced, the Board of Directors shall be entitled to issue a new certificate in its place, provided that the certificate is delivered to it and destroyed by it,

A-6

or it is proved to the satisfaction of the Board of Directors that the certificate was lost or destroyed and security has been received to its satisfaction in respect of any possible damages and after payment of such amount as the Board of Directors shall prescribe.

**CALLS ON SHARES**

25. The Board of Directors may from time to time, in its discretion, make calls on shareholders in respect of amounts which are still unpaid in respect of the shares held by each of the shareholders (including premiums), and the terms of issue which do not prescribe that same be paid at fixed times, and every shareholder shall be obliged to pay the amount of the call made on him, at such time and at such place as stipulated by the Board of Directors.

26. In respect of any such call, prior notice of at least 14 (fourteen) business days shall be given, stating to whom the amount called is to be paid, the time for payment and the place thereof, provided that prior to the due date for payment of such call, the Board of Directors may, by written notice to the shareholders to which the call was made, cancel the call or extend the date of payment thereof.

27. If according to the terms of issue of any share, or otherwise, any amount is required to be paid at a fixed time or in installments at fixed times, whether the payment is made on account of the share capital in respect of the share or in form of a premium, every such payment or every such installment shall be paid as if it was a call duly made by the Board of Directors, in respect of which notice was duly given, and all the provisions contained in these Articles in regard to calls shall apply to such amount or to such installment.

28. Joint holders of a share shall be jointly and severally liable for the payment of all installments and calls due in respect of such share.

29. In the event that a call or installment due on account of a share is not paid on or before the date fixed for payment thereof, the holder of the share, or the person to whom the share has been allotted, shall be obliged to pay linkage differentials and interest on the amount of the call or the installment, at such rate as shall be determined by the Board of Directors, commencing from the

date fixed for the payment thereof and until the date of actual payment. The Board of Directors may, however, waive the payment of the linkage differentials or the interest or part thereof.

30.    A shareholder shall not be entitled (i) to receive a dividend or (ii) to exercise any right as a shareholder, including but not limited to, the right to attend and vote at a General Meeting of any type and to transfer the shares to another; unless he has paid all the calls payable from time to time and which apply to any of his shares, whether he holds same alone or jointly with another, plus linkage differentials, interest and expenses, if any.

31.    The Board of Directors may, if it deems fit, accept payment from a shareholder wishing to advance the payment of all moneys which remain unpaid on account of his shares, or part thereof which are over and above the amounts which have actually been called, and the Board of Directors shall be entitled to pay such shareholder linkage differentials and interest in respect of the amounts paid in advance, or that portion thereof which exceeds the amount called for the time being on account of the shares in respect of which the advance payment is made, at such rate as is agreed upon between the Board of Directors and the shareholder, with this being in addition to dividends payable (if any) on the paid-up portion of the share in respect of which the advance payment is made.

The Board of Directors may, at any time, repay the amount paid in advance as aforesaid, in whole or in part, in its sole discretion.

A-7

---

**FORFEITURE AND LIEN**

32.    If a shareholder fails to make payment of any call or other installment on or before the date fixed for the payment thereof, the Board of Directors may, at any time thereafter and for as long as the part of the call or installment remains unpaid, serve on him a notice demanding that he make payment thereof, together with the linkage differentials and interest at such rate as is specified by the Board of Directors and all the expenses incurred by the Company in consequence of such non-payment.

33.    The notice shall specify a further date, which shall be at least 14 business days after the date of the delivery of the notice, and a place or places at which such call or installment is to be paid, together with linkage differentials and interest and expenses as aforesaid. The notice shall further state that, if the amount is not paid on or before the date specified, and at the place mentioned in such notice, the shares in respect of which the call was made, or the installment is due, shall be liable to forfeiture.

34.    If the demands contained in such notice are not complied with the Board of Directors may treat the shares in respect of which the notice referred to in Articles 32 and 33 was given as forfeited. Such forfeiture shall include all dividends, bonus shares and other benefits which have been declared in respect of the forfeited shares which have not actually been paid prior to the forfeiture.

35.    Any share so forfeited or waived shall be deemed to be the property of the Company and the Board of Directors shall be entitled, subject to the provisions of these Articles and the Law, to sell, re-allot or otherwise dispose thereof, as it deems fit, whether the amount paid previously in respect of that share is credited, in whole or in part.

36.    The Board of Directors may, at any time before any share forfeited as aforesaid is sold or re-allotted or otherwise dispose of, cancel the forfeiture on such conditions as it deems fit.

37.    Any person whose shares have been forfeited shall cease to be a shareholder in respect of the forfeited shares, but shall, nonetheless remain liable for the payment to the Company of all calls, installments, linkage differentials, interest and expenses due on account of or in respect of such shares on the date of forfeiture, in respect of the forfeited shares, together with interest on such amounts reckoned from the date of forfeiture until the date of payment, at such rate as the Board of Directors shall from time to time specify. However, his liability shall cease after the Company has received all the amounts called in respect of the shares. The Board of Directors shall be entitled to collect the moneys which have been forfeited, or part thereof, as it shall deem fit, but it shall not be obliged to do so.

38.    The provisions of these Articles in regard to forfeiture shall also apply to cases of non-payment of any amount, which, according to the terms of issue of the share, or which under the conditions of allotment the due date for payment of which fell on a fixed date, whether this be on account of the nominal value of the share or in the form of a premium, as if such amount was payable pursuant to a call duly made and notified.

39. The Company shall have a first and paramount lien over all the shares which have not been fully paid up and which are registered in the name of any shareholder (whether individually or jointly with others) and also over the proceeds of the sale thereof, as security for the debts and obligations of such shareholder to the Company and his contractual engagements with it, either individually or together with others. This right of lien shall apply whether or not the due date for payment of such debts or the fulfillment or performance of such obligations has arrived, and no rights in equity shall be created in respect of any share, over which there is a lien as aforesaid. The aforesaid lien shall apply to all dividends or benefits which may be declared, from time to time, on such shares, unless the Board of Directors shall decide otherwise.

40. In order to foreclose on such lien, the Board of Directors may sell the shares under lien at such time and in such manner as, it shall deem fit, but no share may be sold unless the period referred to below has elapsed and written notice has been given to the shareholder, his trustee, liquidator, receiver, the executors of his estate, or anyone who acquires a right to shares in consequence of the bankruptcy of

A-8

a shareholder, as the case may be, stating that the Company intends to sell the shares, if he or they should fail to pay the aforesaid debts, or fail to discharge or fulfill the aforesaid obligations within 14 business days from the date of the delivery of the notice.

41. The net proceeds of any such sale of shares, as contemplated by Article 40 above, after deduction of the expenses of the sale, shall serve for the discharge of the debts of such shareholder or for performance of such shareholder's obligations (including debts, undertaking and contractual engagements, the due date for the payment or performance of which has arrived) and the surplus, if any, shall be paid to the shareholder, his trustee, liquidator, receiver, guardians, or the executors of his estate, or to his successors-in-title.

42. In every case of a sale following forfeiture or waiver, or for purposes of executing a lien by exercising all of the powers conferred above, the Board of Directors shall be entitled to appoint a person to sign an instrument of transfer of the shares sold, and to arrange for the registration of the name of the buyer in the Register in respect of the shares sold.

43. An affidavit signed by the Chairman of the Board of Directors that a particular share of the Company was forfeited, waived or sold by the Company by virtue of a lien, shall serve as conclusive evidence of the facts contained therein as against any person claiming a right in the share. The purchaser of a share who relies on such affidavit shall not be obliged to investigate whether the sale, re-allotment or transfer, or the amount of consideration and the manner of application of the proceeds of the sale, were lawfully effected, and after his name has been registered in the Register he shall have a full right of title to the share and such right shall not be adversely affected by a defect or invalidity which occurred in the forfeiture, waiver, sale, re-allotment or transfer of the share.

**TRANSFER AND TRANSMISSION OF SHARES**

44. No transfer of shares shall be registered unless a proper instrument of transfer is delivered to the Company or to such other place specified for this purpose by the Board of Directors. Subject to the provisions of these Articles, an instrument of transfer of a share in the Company shall be signed by the transferor and the transferee. The transferor shall be deemed to remain the holder of the share up until the time the name of the transferee is registered in the Register in respect of the transferred share.

45. Insofar as the circumstances permit, the instrument of transfer of a share shall be drawn up in the form set out below, or in any other form that the Board of Directors may approve (the "**Deed of Transfer**").

I            , I.D.            of            (the "**Transferor**"), in consideration for an amount of NIS            (in words) paid to me by            I.D.            of            (hereinafter: the "**Transferee**"), hereby transfer to the Transferee shares of nominal value NIS            each, marked with the numbers            to            (inclusive) of a company known as Stratasys Ltd., to be held by the Transferee, and his successors-in title, under all the same conditions under which I held the same prior to the signing of this instrument, and I, the Transferee, hereby agree to accept the aforementioned share in accordance with the above mentioned conditions.

In witness whereof we have hereunto signed this      day of      20  .

Transferor  _____          Transferee  _____

Witnesses to Signature _____

46.    The Company may close the transfer registers and the Register for such period of time as the Board of Directors shall deem fit, provided that such period of time shall not in total exceed 30 (thirty) days each year.

A-9

47.    Every instrument of transfer shall be submitted to the Office or to such other place as the Board of Directors shall prescribe, for purposes of registration, together with the share certificates to be transferred, or if no such certificate was issued, together with a letter of allotment of the shares to be transferred, and/or such other proof as the Board of Directors may demand in regard to the transferor's right of title or his right to transfer the shares. The Board of Directors shall have the right to refuse to recognize an assignment of shares until appropriate security under the circumstances has been provided, as shall be determined by the Board of Directors in a specific case or from time to time in general. Instruments of transfer which serve as the basis for transfers that are registered shall remain with the Company.

48.    The executors of the will or administrator of a deceased shareholder's estate (such shareholder not being one of a joint owners of a share) or, in the absence of an administrator of the estate or executor of the will, shall be entitled to demand that the Company recognize them as owners of rights in the share. The provisions of Article 47 above shall apply, *mutatis mutandis*, also in regard to this Article.

49.    In the case of a share registered in the names of two or more Persons, the Company shall recognize only the surviving owners as Persons having rights in the share. However, the aforementioned shall not be construed as releasing the estate of a deceased joint shareholder from any and all undertakings in respect of the shares. Any Person who shall become an owner of shares following the death of a shareholder shall be entitled to be registered as owner of such shares after having presented to an officer of the Company to be designated by the Chief Executive Officer an inheritance order or probation order or order of appointment of an administrator of estate and any other proof as required - if these are sufficient in the opinion of such officer - testifying to such Person's right to appear as shareholder in accordance with these Articles, and which shall testify to his title to such shares. The provisions of Article 47 above shall apply, *mutatis mutandis*, also in regard to this Article.

50.    The receiver or liquidator of a shareholder who is a company or the trustee in bankruptcy or the official receiver of a shareholder who is bankrupt, upon presenting appropriate proof to the satisfaction of an officer of the Company to be designated by the Chief Executive Officer that he has the right to appear in this capacity and which testifies to his title, may, with the consent of the Board of Directors (the Board of Directors shall not be obligated to give such consent) be registered as the owner of such shares. Furthermore, he may assign such shares in accordance with the rules prescribed in these Articles. The provisions of Article 47 above shall apply, *mutatis mutandis*, also in regard to this Article.

51.    A Person entitled to be registered as a shareholder following assignment pursuant to this Article shall be entitled, if approved by the Board of Directors and to the extent and under the conditions prescribed by the Board of Directors, to dividends and any other monies paid in respect of the shares, and shall be entitled to give the Company confirmation of the payments; however, he shall not be entitled to be present or to vote at any General Meeting of the Company or, subject to the provisions of these Articles, to make use of any rights of shareholders, until he has been registered as owner of such shares in the Register.

## GENERAL MEETING

52.    A General Meeting shall be held at least once in every year, not later than 15 (fifteen) months after the last General Meeting, at such time and at such place as the Board of Directors shall determine. Such General Meeting shall be called an annual meeting, and all other meetings of the Company's shareholders shall be called extraordinary meetings.

A-10

53.    The Board of Directors may call an extraordinary General Meeting whenever it sees fit to do so.

54.    The Board of Directors shall be obliged to call an extraordinary General Meeting upon a request in writing in accordance with the Law.

55.    The Company shall provide prior notice in regard to the holding of an annual meeting or an extraordinary meeting in accordance with the requirements of these Articles, the Law and the regulations promulgated thereunder. Subject to the provisions of the Law and the regulations promulgated thereunder, in counting the number of days of prior notice given, the day of publication of notice shall not be counted, but the day of the meeting shall be counted. The notice shall specify those items and contain such information as shall be required by the Companies Law, the regulations promulgated thereunder and any other applicable law and regulations. Subject to Article 6364 below, in the event that the Company has established that an adjourned meeting shall be held on such date which is later than the date provided for in Section 78(b) of the Law, such later date shall be included in the notice. The Company may add additional places for shareholders to review the full text of the proposed resolutions, including an internet site.  The notice shall be provided in the manner prescribed below under the heading "Notices" in Articles 128 to 131 below.

56.

56.1    Any shareholder or shareholders of the Company holding at least one percent (1%) of the voting rights of the Company (the "**Proposing Shareholder(s)**") may request, subject to the Companies Law, that the Board of Directors include a matter on the agenda of a General Meeting to be held in the future, provided that the Board determines that the matter is appropriate to be considered at a General Meeting (a "**Proposal Request**"). In order for the Board of Directors to consider a Proposal Request and whether to include the matter stated therein in the agenda of a General Meeting, notice of the Proposal Request must be timely delivered, and the Proposal Request must comply with the requirements of these Articles (including this Article 56) and any applicable law and stock exchange rules and regulations. The Proposal Request must be in writing, signed by all of the Proposing Shareholders making such request, delivered, either in person or by certified mail, postage prepaid, and received by the Secretary (or, in the absence thereof by the Chief Executive Officer) of the Company. To be considered timely, a Proposal Request must be received within the time periods prescribed by applicable law. The announcement of an adjournment or postponement of a General Meeting shall not commence a new time period (or extend any time period) for the delivery of a Proposal Request as described above. In addition to any information required to be included in accordance with applicable law, a Proposal Request must include the following: (i) the name, address, telephone number, fax number and email address of the Proposing Shareholder (or each Proposing Shareholder, as the case may be) and, if an entity, the name(s) of the person(s) that controls or manages such entity; (ii) the number of shares held by the Proposing Shareholder(s), directly or indirectly (and, if any of such shares are held indirectly, an explanation of how they are held and by whom), which shall be in such number no less than as is required to qualify as a Proposing Shareholder, accompanied by evidence satisfactory to the Company of the record holding of such shares by the Proposing Shareholder(s) as of the date of the Proposal Request, and a representation that the Proposing Shareholder(s) intends to appear in person or by proxy at the meeting; (iii) the matter requested to be included on the agenda of a General Meeting, all information related to such matter, the reason that such matter is proposed to be brought before the General Meeting, the complete text of the resolution that the Proposing Shareholder proposes to be voted upon at the General Meeting and, if the Proposing Shareholder wishes to have a position statement in support of the Proposal Request, a copy of such position statement that complies with the requirement of applicable law (if any), (iv) a description of all arrangements or

A-11

understandings between the Proposing Shareholders and any other Person(s) (naming such Person or Persons) in connection with the matter that is requested to be included on the agenda and a declaration signed by all Proposing Shareholder(s) of whether any of them has a personal interest in the matter and, if so, a description in reasonable detail of such personal interest; (v) a description of all Derivative Transactions (as defined below) by each Proposing Shareholder(s) during the previous twelve (12) month period, including the date of the transactions and the class, series and number of securities involved in, and the material economic terms of, such Derivative Transactions; and (vi) a declaration that all of the information that is required under the Companies Law and any other applicable law and stock exchange rules and regulations to be provided to the Company in connection with such matter, if any, has been provided to the Company. The Board of Directors, may, in its discretion, to the extent it deems necessary, request that the Proposing Shareholder(s) provide additional information necessary so as to include a matter in the agenda of a General Meeting, as the Board of Directors may reasonably require.

A "**Derivative Transaction**" means any agreement, arrangement, interest or understanding entered into by, or on behalf or for the benefit of, any Proposing Shareholder or any of its affiliates or associates, whether of record or beneficial: (1) the value of which is derived in whole or in part from the value of any class or series of shares or other securities of the Company, (2) which otherwise provides any direct or indirect opportunity to gain or share in any gain derived from a change in the value of securities of the Company, (3) the effect or intent of which is to mitigate loss, manage risk or benefit from security value or price changes, or (4) which provides the right to vote or increase or

decrease the voting power of, such Proposing Shareholder, or any of its affiliates or associates, with respect to any shares or other securities of the Company, which agreement, arrangement, interest or understanding may include, without limitation, any option, warrant, debt position, note, bond, convertible security, swap, stock appreciation right, short position, profit interest, hedge, right to dividends, voting agreement, performance-related fee or arrangement to borrow or lend shares (whether or not subject to payment, settlement, exercise or conversion in any such class or series), and any proportionate interest of such Proposing Shareholder in the securities of the Company held by any general or limited partnership, or any limited liability company, of which such Proposing Shareholder is, directly or indirectly, a general partner or managing member.

56.2    The information required pursuant to this Article shall be updated as of (i) the record date of the General Meeting, (ii) five business days before the General Meeting and (iii) three business days before the General Meeting, and any adjournment or postponement thereof.

## PROCEEDINGS AT GENERAL MEETING

56.57. No business shall be conducted at a General Meeting unless a quorum is present, and no resolution shall be passed unless a quorum is present at the time the resolution is voted on. Except in cases where it is otherwise stipulated, a quorum shall be constituted when there are personally present, or represented by proxy, at least 2 (two) shareholders who hold, in the aggregate, at least a majority twenty-five percent (25%) of the voting rights in the Company. A proxy may be deemed to be 2 (two) or more shareholders pursuant to the number of shareholders he represents.

57.58. If within half an hour from the time appointed for the meeting, a quorum is not present, without there being an obligation to notify the shareholders to that effect, the meeting shall be adjourned to the same day, in the following week, at the same hour and at the same place or to a later time and date if so specified in the notice of the meeting, unless such day shall fall on a statutory holiday (either in Israel

A-12

or in the U.S.), in which case the meeting will be adjourned to the first business day afterwards which is not a statutory holiday.

If the original meeting was convened upon requisition under Section 63 of the Law, one or more shareholders, present in person or by proxy, and holding the number of shares required for making such requisition, shall constitute a quorum at the adjourned meeting, but in any other case any two (2) shareholders present in person or by proxy, shall constitute a quorum at the adjourned meeting.

58.59. The Chairman of the Board of Directors, or any other Person appointed for this purpose by the Board of Directors, shall preside at every General Meeting. If within 15 (fifteen) minutes from the time appointed for the meeting, the designated chairman for the meeting shall not be present, the shareholders present at the meeting shall elect one of their number to serve as chairman of the meeting.

59.60. Resolutions at the General Meeting shall be passed in accordance with the definition of ""Resolution"" set forth in Article 1.1 above, unless otherwise required by Law or these Articles. Every vote at a General Meeting shall be conducted according to the number of votes to which each shareholder is entitled on the basis of the number of Ordinary Shares held by him which confer on him a right to vote at the General Meeting.

60.61. Where a poll has been demanded, the chairman of the meeting shall accede to the demand. Where the chairman of the meeting held a poll, such poll shall be held in such manner, at such time and at such place as the chairman of the meeting directs, either immediately or after an interval or postponement, or in any other way, and the results of the vote shall be deemed to be the resolution at the meeting at which the poll was demanded. A person demanding a poll may withdraw his demand prior to the poll being held.

61.62. A demand for the holding of a poll shall not prevent the continued business of the meeting on all other questions apart of the question in respect of which a poll was demanded.

62.63. The announcement by the chairman of the meeting that a Resolution has been passed unanimously or by a particular majority, or has been rejected, and a note recorded to that effect in the Company's minute book, shall serve as *prima facie* proof of such fact.

63.64. The chairman of a General Meeting may adjourn the meeting from time to time and from place to place if approved by a consent of the holders of a majority of the voting power represented in person or by proxy and voting on the question of adjournment

(and shall if so directed by the meeting), but at an adjourned meeting no other matters shall be considered or decided apart from the matters which were on the agenda of the meeting at which it was decided on the adjournment and in respect of which no Resolution was taken. The Company shall not deliver nor shall it be required to give notice in regard to the adjournment or in regard to the matters on the agenda of the adjourned meeting, unless the adjourned meeting is to be held more than 30 (thirty) days after the date of the original meeting, in which case a notice shall be published by the Company.

## VOTES OF SHAREHOLDERS

64.65. The voting rights of every shareholder entitled to vote at a General Meeting shall be as set forth in Article 7 of these Articles or to any other article herein governing voting rights.

65.66. In the case of joint shareholders, the vote of the senior joint holder, given personally or by proxy, shall be accepted, to the exclusion of the vote of the remaining joint shareholders, and for these purposes the senior of the joint shareholders shall be the Person amongst the joint holders whose name appears first in the Register.

66.67. A shareholder who is an Incapacitated Person may vote solely through his guardian or other person who fulfills the function of such guardian and who was appointed by a court, and any guardian or

A-13

other person as aforesaid shall be entitled to vote by way of a proxy, or in such manner as the court directs.

67.68. Any corporation which is a shareholder of the Company shall be entitled, by way of resolution of its directors or another organ which manages said corporation, to appoint such person which it deems fit, whether or not he is a shareholder of the Company, to act as its representative at any General Meeting of the Company or at a meeting of a class of shares in the Company which such corporation is entitled to attend and to vote thereat, and the appointed as aforesaid shall be entitled, on behalf of the corporation whom he represents, to exercise all of the same powers and authorities which the corporation itself could have exercised had it been a natural person holding shares of the Company.

68.69. Every shareholder of the Company who is entitled to attend and vote at a General Meeting of the Company, shall be entitled to appoint a proxy. A proxy can be appointed by more than one shareholder, and he can vote in different ways on behalf of each principal.

The instrument appointing a proxy shall be in writing signed by the Person making the appointment or by his authorized representative, and if the Person making the appointment is a corporation, the power of attorney shall be signed in the manner in which the corporation signs on documents which bind it, and a certificate of an attorney with regard to the authority of the signatories to bind the corporation shall be attached thereto. The proxy need not be a shareholder of the Company.

69.70. The instrument appointing a proxy, or a copy thereof certified by an attorney, shall be lodged at the Office, or at such other place as the Board of Directors shall specify, not less than forty-eight (48) hours prior to the meeting at which the proxy intends to vote on the strength of such instrument of proxy. Notwithstanding the above, the chairman of the meeting shall have the right to waive the time requirement provided above with respect to all instruments of proxies and to accept any and all instruments of proxy until the beginning of a General Meeting. A document appointing a proxy shall be valid for every adjourned meeting of the meeting to which the document relates.

70.71. Every instrument appointing a proxy, whether for a meeting specifically indicated, or otherwise, shall, as far as circumstances permit, be in the following form, or in any other form approved by the Board of Directors:

I          of          being a shareholder holding voting shares in Stratasys Ltd., hereby appoint Mr./Ms.          of          or failing him/her, Mr./Ms.          or          , or failing him/her, Mr./Ms.          of          , to vote in my name, place and stead at the (ordinary/extraordinary) General Meeting of the Company to be held on the     of     20  , and at any adjourned meeting thereof.

In witness whereof I have hereto set my hand on the     day of

71.72. No shareholder shall be entitled to vote at a General Meeting unless he has paid all of the calls and all of the amounts due from him, for the time being, in respect of his shares.

72.73. A vote given in accordance with the instructions contained in an instrument appointing a proxy shall be valid notwithstanding the death or bankruptcy of the appointer, or the revocation of the proxy, or the transfer of the shares in respect of which the vote was given as aforesaid, unless notice in writing of the death, revocation or transfer is received at the Office of the Company, or by the chairman of the General Meeting, prior to such vote.

73.74. Subject to the Law, an instrument appointing a proxy shall be deemed revoked (i) upon receipt by the Company or the chairman of the meeting, subsequent to receipt by the Company of such instrument, of written notice signed by the person signing such instrument or by the Shareholder appointing such proxy canceling the appointment thereunder (or the authority pursuant to which such instrument was signed) or of an instrument appointing a different proxy, provided such notice of cancellation or

A-14

instrument appointing a different proxy were so received at the place and within the time for delivery of the instrument revoked thereby as referred to in Article 69̶70 hereof, or (ii) if the appointing shareholder is present in person at the meeting for which such instrument of proxy was delivered, upon receipt by the Chairman of such meeting of written notice from such shareholder of the revocation of such appointment, or if and when such shareholder votes at such meeting. A vote cast in accordance with an instrument appointing a proxy shall be valid notwithstanding the revocation or purported cancellation of the appointment, or the presence in person or vote of the appointing shareholder at a meeting for which it was rendered, unless such instrument of appointment was deemed revoked in accordance with the foregoing provisions of this Article 73̶74 at or prior to the time such vote was cast.

## THE BOARD OF DIRECTORS

74.75.

74.1    ~~Subject to the appointment of persons to fill vacancies pursuant to Article 77, and except for the election of a tenth director (who shall be neither a Class A Director nor a Class B Director) at the annual General Meetings of the Company held in the years 2013 and 2014, as provided in Article 74.3 , the number and identity of directors as in effect at the Effective Time shall remain unchanged for the Initial Term, provided, however, that the term and the procedure for election of each External Director shall be as mandated by and subject to the Companies Law.~~

74.2    ~~Unless the annual General Meeting to be first held in the year 2014 is to be held after the second anniversary of the Effective Time of the Merger, the Company shall convene a General Meeting within 60 days of such second anniversary, and in connection with either such meeting, the Board of Directors of the Company shall resolve by a majority vote, which majority shall include the affirmative vote of at least two Class A Directors and two Class B Directors (other than, for the sake of clarity, the Class A External Director and the Class B External Director), the names of between seven (7) and eleven (11) persons to be proposed to the shareholders of the Company for election as directors of the Company at such meeting to serve until the next annual General Meeting.~~

74.3    ~~In addition to the nine (9) directors serving as of the Effective Time, a tenth director, who shall be neither a Class A Director nor a Class B Director shall be recommended by the Executive Committee and nominated by the Board of Directors for election by the shareholders at the annual General Meetings to be held in the years 2013 and 2014.~~

74.4    ~~This Article 74 may be amended only by the vote of all members of the Board of Directors then in office less one and the vote of the shareholders as provided in Article 138.~~

75.    Following the Initial Term, and unless otherwise resolved by a Resolution of the General Meeting of the Company:

75.1.    The number of directors of the Company (including the External Directors) shall be between seven (7) and eleven (11), as determined from time to time by the Board of Directors. Any director shall be eligible for re-election upon termination of his term of office. For as long as the Company is a Public Company, as defined in the Law, the Company shall appoint at least 2 (two) External Directors to office, of which at least 1 (one) should possess Accounting and Financial Expertise, as defined in the Law.

75.2.    Prior to every annual ~~meeting~~General Meeting of the Company ~~after the Initial Term~~, the Board of Directors of the Company shall resolve by a majority vote the names of the persons

A-15

to be proposed to the shareholders of the Company for election as directors of the Company ~~until the next annual meeting (the "Nominees"). Except for the Nominees, no candidate for the office of a director of the Company may be proposed at an annual General Meeting of the Company unless by no later than January 31st of the calendar year in which the upcoming annual General Meeting will be convened, a notice in writing, signed by shareholders entitled to attend a meeting in respect of which notice has been sent and who are entitled to vote thereat and who hold such number of shares or of voting power in the Company entitling, subject to all law then applicable, said shareholder(s) to propose a candidate for the office of a director of the Company , is delivered to the Office stating the name of candidates for the office of directors instead of the Nominees proposed by the Board of Directors ("Alternate Nominees").~~ at such annual General Meeting for a term that lasts until the next annual General Meeting (the "**Nominees**"). Notwithstanding the foregoing, the term and the procedure for election of each External Director shall be as mandated by and subject to the Companies Law.

75.3.   ~~The~~Any Proposing Shareholder requesting to include on the agenda of a General Meeting a nomination of a Person to be proposed to the Shareholders for election as Director (such person, an "**Alternate Nominee**"), may so request provided that it complies with this Article 75.3 and Article 56 and applicable law. Unless otherwise determined by the Board, a Proposal Request relating to Alternate Nominee is deemed to be a matter that is appropriate to be considered only at an annual General Meeting. In addition to any information required to be included in accordance with applicable law, such a Proposal Request shall include information required pursuant to Article 56, and shall also set forth: (i) the name, address, telephone number, fax number and email address of the Alternate Nominee and all citizenships and residencies of the Alternate Nominee; (ii) a description of all arrangements, relations or understandings between the Proposing Shareholder(s) or any of its affiliates and each Alternate Nominee; (iii) a declaration signed by the Alternate Nominee that he or she consents to be named in the Company's notices and proxy materials relating to the General Meeting, if provided or published, and, if elected, to serve on the Board of Directors and to be named in the Company's disclosures and filings, (iv) a declaration signed by each Alternate Nominee as required under the Companies Law and any other applicable law and stock exchange rules and regulations for the appointment of such an Alternate Nominee and an undertaking that all of the information that is required under law and stock exchange rules and regulations to be provided to the Company in connection with such an appointment has been provided (including, information in respect of the Alternate Nominee as would be provided in response to the applicable disclosure requirements under Form 20-F, Schedule 14A or any other applicable form or schedule prescribed by the U.S. Securities and Exchange Commission (the "**SEC**"); (v) a declaration made by the Alternate Nominee of whether he or she meets the criteria for an independent director and/or External Director of the Company under the Companies Law and/or under any applicable law, regulation or stock exchange rules, and if not, then an explanation of why not; and (vi) any other information required at the time of submission of the Proposal Request by applicable law, regulations or stock exchange rules. In addition, the Proposing Shareholder shall promptly provide any other information reasonably requested by the Company. The Board of Directors may refuse to acknowledge the nomination of any person not made in compliance with the foregoing. The Company shall be entitled to publish any information provided by a Proposing Shareholder pursuant to this Article 75.3 and Article 56, and the Proposing Shareholder shall be responsible for the accuracy and completeness thereof.

~~75.3.~~   One or more Nominees or Alternate Nominees shall be elected by a Resolution at every annual General Meeting, for a term of office ~~which~~that shall conclude at the end ~~upon the~~

~~convening~~ of the first annual ~~meeting~~ General Meeting held after the date of ~~their~~his or her election~~.~~

75.4.   ~~Every Director shall hold office until the end~~ and upon the election and qualification of ~~the next annual General Meeting following the General Meeting at which he was elected~~his or her successor, unless his or her office is vacated in accordance with Article~~s~~ 77 or Article 80 below.

75.5.   If at the annual General Meeting no ~~Nominees~~Nominee or Alternate ~~Nominees are~~Nominee is elected, the directors then in office shall continue to hold office until the convening of a General Meeting at which Nominees or Alternate Nominees ~~shall be~~are elected.

76.   The directors in their capacity as such shall be entitled to receive remuneration as shall be determined in compliance with the Law and the regulations promulgated thereunder.  The conditions (including remuneration) of the terms of office of members of

the Board of Directors shall be decided by the Board of Directors, but the same shall be valid only if ratified in the manner required under the Law.  The remuneration of directors may be fixed as an overall payment or other consideration and/or as a payment or other consideration in respect of attendance at meetings of the Board of Directors.  In addition to his or her remuneration, each director shall be entitled to be reimbursed, retroactively or in advance, in respect of his or her reasonable expenses connected with performing his or her functions and services as a director.  Such entitlement shall be determined in accordance with, and shall be subject to, a specific resolution or policy adopted by the Board of Directors regarding such matter.

77.

77.1.    Subject to the provisions of the Law with regard to External Directors and subject to Article 80 below, the office of a ~~member of the Board of Directors~~director shall be vacated in any one of the following events:

77.1.1.    if he resigns his office by way of a letter signed by him, submitted to the Office of the Company;

77.1.2.    if he is declared bankrupt;

77.1.3.    if he becomes an Incapacitated Person;

77.1.4.    upon his death;

77.1.5.    if he is prevented by applicable law from serving as a director of the Company;

77.1.6.    if the Board terminates his office according to Section 231 of the Law;

77.1.7.    if a court order is given in accordance with Section 233 of the Law;

77.1.8.    if he is removed from office by a Resolution at a General Meeting of the Company; ~~*provided, however, that during the Initial Term, a Class A Director may be removed only for Cause by the unanimous vote of all other Class A Directors and a Class B Director may be removed only for Cause by the unanimous vote of all other Class B Directors; or*~~ or

77.1.9.    if his period of office has terminated in accordance with the provisions of these Articles.

~~77.2.~~

~~77.2.1.    Until the end of the Initial Term, (i) if the office of one or more of the Class A Directors should be vacated, the remaining Class A Directors (other than, for the sake of clarity, the Class A External Director) shall appoint additional director(s), so that the number of the Class A Directors shall be four (4), *provided, that,* that with respect to the External Director nominated by Objet under the Merger Agreement (or his or her successor), all other requirements under the Law with respect to the appointment, vacation of office and the removal of External Directors have been met; (ii) if the office of one or more of the Class B Directors should be vacated, the remaining Class B Directors (other than, for the sake of clarity, the Class B External Director) shall appoint additional director(s), so that the number of the Class B Directors shall be five (5); *provided, that,* that with respect to the External Director nominated by Stratasys under the Merger Agreement (or his or her successor), all other requirements under the Law with respect to the appointment, vacation of office and the removal of External Directors have been met; and *provided, further, that* such nomination shall be subject to the prior approval of all of the Class A Directors other than, for the sake of clarity, the Class A External Director; and (iii) if the office of the tenth, unclassified director elected at the annual General Meetings held in the years 2013 and 2014 should be vacated, the remaining directors, voting together, shall appoint a replacement director who has been nominated by the Executive Committee.~~

~~77.3.~~77.2.  ~~Following the end of the Initial Term, if~~If the office of a member of the Board of Directors ~~should be~~is vacated, the remaining members of the Board of Directors shall be entitled to appoint additional director(s) in place of the director(s) whose office(s) have been vacated, for a term of office equal to the remaining period of the term of office of the director(s) whose office(s) have been vacated and/or also to act for all purposes for a term of office equivalent to the

remaining period of the term of office of the director whose office has been vacated, for as long as their number does not fall below the minimum, for the time being, specified for the directors, as prescribed in Article 75.1 above. Should their number fall below the aforesaid minimum, the directors shall not be entitled to act, except for the appointment of additional directors, or for the purpose of calling a General Meeting for the appointment of additional directors, or for the purpose of calling a General Meeting for the appointment of a new Board of Directors. Notwithstanding the foregoing, the office of an External Director shall be vacated only in accordance with the provisions for the vacation of office and the removal of External Directors under the Law.

### OTHER PROVISIONS REGARDING DIRECTORS

78.

78.1.    Subject to any mandatory provisions of applicable law, a director shall not be disqualified by virtue of his office from holding another office in the Company or in any other company in which the Company is a shareholder or in which it has any other form of interest, or of entering into a contract with the Company, either as seller or buyer or otherwise. Likewise, no contract made by the Company or on its behalf in which a director has any form of interest may be nullified and a director shall not be obliged to account to the Company for any profit deriving from such office, or resulting from such contract, merely by virtue of the fact that he

A-18

serves as a director or by reason of the fiduciary relationship thereby created, but such director shall be obliged to disclose to the Board of Directors the nature of any such interest at the first opportunity.

A general notice to the effect that a director is a shareholder or has any other form of interest in a particular firm or a particular company and that he must be deemed to have an interest in any business with such firm or company shall be deemed to be adequate disclosure for purposes of this Article in relation to such director, and after such general notice has been given, such director shall not be obliged to give special notice in relation to any particular business with such firm or such company.

78.2.    Subject to the provisions of the Law and these Articles, the Company shall be entitled to enter into a transaction in which an Office Holder of the Company has a personal interest, directly or indirectly, and may enter into any contract or otherwise transact any business with any third party in which contract or business an Office Holder has a personal interest, directly or indirectly.

79.    ~~Following the Effective Time and until the end of the Initial Term, Mr. S. Scott Crump shall serve in the position of the Chairman of the Board of Directors (the "**Chairman of the Board of Directors**"). Following the end of the Initial Term, the~~The Board of Directors shall elect one (1) or more of its members to serve as Chairman of the Board of Directors, provided that, subject to the provisions of Section 121(c) of the Law, the Chief Executive Officer of the Company shall not serve as Chairman of the Board of Directors. Notwithstanding anything to the contrary herein, the office of Chairman of the Board of Directors shall be vacated in each of the cases mentioned in Article~~s~~ 77.1 above and Article 80 below. ~~If, prior to the end of the Initial Term, there shall be a vacancy in the office of Chairman of the Board of Directors, then Mr. Elan Jaglom shall become Chairman of the Board of Directors. If, (x) subsequent to Mr. Jaglom assuming such position or (y) Mr. Jaglom fails to become Chairman of the Board of Directors for any reason, and prior to the end of the Initial Term there shall again be a vacancy in the office of Chairman of the Board of Directors, the Board of Directors of the Company shall appoint a person to fill such vacancy by a majority vote, which majority shall include the affirmative vote of at least two Class A Directors and two Class B Directors (other than, for the sake of clarity, the Class A External Director and the Class B External Director).~~ The Board of Directors may also elect (a) member(s) to serve as Vice Chairman, who shall have such duties and authorities as the Board of Directors may assign to him or her.

80.    Subject to the provisions of ~~Articles 75,~~ Article 77 ~~above and 138 below~~, the Company may, in a General Meeting, by a Resolution, dismiss any ~~Director within the meaning thereof under Article 1.1 of these Articles,~~ director prior to the end of his or her term of office, and it shall be entitled, by a Resolution, to appoint another individual in his or her place as a director of the Company. The individual so appointed shall hold such office only for that period of time during which the director whom he or she replaces would have held office.

### CHIEF EXECUTIVE OFFICER

81.

81.1. The Board of Directors shall, from time to time, appoint a Chief Executive Officer and subject to the provisions of the Law delineate his powers and authorities and his remuneration. Subject to the provisions of any contract between the Chief Executive Officer and the Company, the directors may dismiss him or replace him at any time they deem fit. Notwithstanding the foregoing, following the Effective Time and until the end of the Initial Term, or unless otherwise determined by a Resolution adopted by a majority vote, which shall

A-19

include the affirmative vote of all Class A Directors and two Class B Directors, Mr. David Reis shall serve as Chief Executive Officer or her at any time they deem fit.

81.2. The Chief Executive Officer need not be a director or shareholder of the Company.

81.3. Subject to Article 81.1 above and Subject to the provisions of any contract between the Chief Executive Officer and the Company, all of the same provisions with regard to appointment, resignation and removal from office shall apply to the Chief Executive Officer if he or she is also a director, as apply to the Elected Directors. all other directors. The directors shall be entitled from time to time to delegate to the Chief Executive Officer for the time being such of the powers they have pursuant to these Articles as they deem appropriate, and they shall be entitled to grant such powers for such period and for such purposes and on such conditions and with such restrictions as they deem expedient, and they shall be entitled to grant such powers without renouncing the powers and authorities of the Board of Directors in such regard, and they may, from time to time, revoke, annul and alter such delegated powers and authorities, in whole or in part.

81.4. Subject to the provisions of the Law, the remuneration of the Chief Executive Officer shall be fixed from time to time by the Board of Directors (and shall be approved by together with any committees of the Audit Board of Directors (each, a "**Committee of Directors** or a compensation Committee of Directors composed solely of individuals fit to serve on the Audit Committee of Directors,") as may be prescribed by the Law) and it may be in the form of a fixed salary or commissions or a participation in profits, or in any other manner which may be decided by the Board of Directors (and approved by the any relevant Committee(s) of Directors).

**PROCEEDINGS OF THE BOARD OF DIRECTORS**

82.

82.1. The Board of Directors shall convene for a meeting at least once every fiscal quarter.

82.2. The Board of Directors may meet in order to exercise its powers pursuant to Section 92 of the Law, including without limitation to supervise the Company's affairs, and it may, subject to the provisions of the Law, adjourn its meetings and regulate its proceedings and operations as it deems fit. It may also prescribe the quorum required for the conduct of business. Until otherwise decided a quorum shall be constituted if a majority of the directors holding office for the time being are present.

82.3. Should a director or directors be barred from being present and voting at a meeting of the Board of Directors by virtue of the contents of Section 278 of the Law, the quorum shall be a majority of the directors entitled to be present and to vote at the meeting of the Board of Directors.

83. Any director or the Auditors, in the event stipulated in Section 169 of the Law, may, at any time, demand the convening of a meeting of the Board of Directors. The Chairman of the Board shall be obliged, on such demand, to call such meeting on the date requested by the director or Chief Executive Officer soliciting such a meeting, provided that proper notice pursuant to Article 84 is given.

84. Every director shall be entitled to receive notice of meetings of the Board of Directors, and such notice may be in writing or by facsimile, telegram or electronic mail, sent to the last address (whether physical or electronic) or facsimile number given by the director for purposes of receiving notices, provided that the notice shall be given at least a reasonable amount of time prior to the meeting and in no event less than 48 (forty eight) hours prior notice, unless the urgency of the matter(s) to be discussed at the meeting reasonably require(s) a shorter notice period.

A-20

85. Every meeting of the Board of Directors at which a quorum is present shall have all the powers and authorities vested for the time being in the Board of Directors.

86. Subject to the provisions of these Articles, questions which arise at meetings of the Board of Directors shall be decided by a simple majority of the members of the Board of Directors attending such meeting and voting on such matter. In the case of an equality of votes of the Board of Directors, the Chairman of the Board of Directors shall not have a second or casting vote, and the proposal shall be deemed to be defeated.

If the Chairman of the Board of Directors is not present within 30 (thirty) minutes after the time appointed for the meeting, the directors present shall elect one of their members to preside at such meeting.

87. The Board of Directors may adopt resolutions, without convening a meeting of the Board of Directors, in any manner permitted by the Law.

88. The Board of Directors may hold meetings by use of any means of communication, on condition that all participating directors can hear each other at the same time. In the case of a resolution passed by way of a telephone call or any such other means of communication, a copy of the text of the resolution shall be sent, as soon as possible thereafter, to the directors.

### GENERAL POWERS OF THE BOARD OF DIRECTORS

89. The supervision of the Company's affairs shall be in the hands of the Board of Directors, which shall be entitled to exercise all of the powers and authorities and to perform any act and deed which the Company is entitled to exercise and to perform in accordance with its Memorandum of Association and these Articles or according to law, and in respect of which there is no provision or requirement in these Articles, or in the Law or/and in the U.S. Rules, that same be exercised or done by the shareholders in a General Meeting or by a Committee of Directors.

90. The Board of Directors may, as it deems fit and subject to any applicable law, delegate to a ~~committee (a "~~Committee of Directors~~")~~ certain of its powers and authorities, in whole or in part to the fullest extent provided by any applicable law. The curtailment or revocation of the powers and authorities of a Committee of Directors by the Board of Directors shall not invalidate a prior act of such Committee of Directors or an act taken in accordance with its instructions, which would have been valid had the powers and authorities of the Committee of Directors not been altered or revoked by the Board of Directors. Subject to applicable law, a Committee of Directors may be comprised of one (1) director or of several directors, and in the case of a Committee of Directors that is appointed to advise the Board of Directors only, persons who are not directors may be appointed to it. ~~Notwithstanding the foregoing, during the Initial Term, unless otherwise agreed in writing by a majority of the Board of Directors, including at least two Class A Directors and two Class B Directors (other than, for the sake of clarity, the Class A External Director and the Class B External Director), each Committee of Directors shall have an equal number of Class A Directors or Class A External Director, on the one hand, and Class B Directors or Class B External Director, on the other hand. In addition, the powers of any chairman of a Committee of Directors (including the Executive Committee)~~<u>The powers of any chairman of a Committee of Directors</u> with respect to the operation of such committee shall be the same as the Chairman of the Board of Directors hereunder and under the Law, *mutatis mutandis*.

91. The meetings and proceedings of every such Committee of Directors which is comprised of ~~2 (two~~ <u>(2)</u> or more members shall be conducted in accordance with the provisions contained in these Articles in regard to the conduct of meetings and proceedings of the Board of Directors to the extent that the same are suitable for such committee, and so long as no provisions have been adopted in replacement thereof by the Board of Directors.

A-21

92. ~~Notwithstanding anything else herein to the contrary, at the Effective Time, the Company shall constitute an Executive Committee whose duties will be to implement the Company's business strategy and the post-Merger integration following the Effective Time, subject to approval by the Company's Board of any actions to be taken outside of the ordinary course of the Company's business. During the Initial Term and unless otherwise resolved by a majority of the Board anytime thereafter (a) the Executive Committee shall consist of four members of the Board of Directors as listed in the Merger Agreement; (b) any vacancies on the Executive Committee during the Initial Term will be filled as follows: should there be a vacancy of a Class A Director or Class A External Director on the Executive Committee, then the Chairman of the Executive Committee shall~~

~~nominate another director to serve on the committee, with the consent of the Chairman of the Board of Directors, and should there be a vacancy of a Class B Director on the Executive Committee, then the Chairman of the Board of Directors shall nominate another director to serve on the committee, with the consent of the Chairman of the Executive Committee and]; (c) Mr. Elan Jaglom will serve as Chairman of the Executive Committee; and (d) the Company's Chief Executive Officer will be an observer to the Executive Committee. Unless otherwise resolved by the Executive Committee, the chairman of the Executive Committee may and, upon request of any member serving on the Executive Committee, shall convene a meeting of said committee, and set the agenda thereof. A quorum for a convened meeting shall be a majority of the members thereof. Meetings may be held in the same manner as permitted by Article 88 hereof. The Executive Committee shall record minutes of its meetings.~~

92. The Board of Directors may constitute an Executive Committee to oversee the implementation of the Company's business strategy, subject to approval by the Board of any actions to be taken outside of the ordinary course of the Company's business, and to exercise such other duties as the Board may resolve from time to time.

## RATIFICATION OF ACTIONS

93. Subject to the Law, all acts taken in good faith by the Board of Directors and/or a Committee of Directors or by an individual acting as a member thereof shall be valid even if it is subsequently discovered that there was a defect in the appointment of the Board of Directors, the Committee of Directors or the member, as the case may be, or that the members, or one of them, was/were disqualified from being appointed as a director/s or to a Committee of Directors.

94.

94.1. The Board of Directors or any Committee of Directors may ratify any act the performance of which at the time of the ratification was within the scope of the authority of the Board of Directors or the relevant Committee of Directors.

94.2. The General Meeting shall be entitled to ratify any act taken by the Board of Directors and/or any Committee of Directors without authority or which was tainted by some other defect.

94.3. From the time of the ratification, every act ratified as aforesaid, shall be treated as though lawfully performed from the outset.

95. The Board of Directors may, from time to time, in its absolute discretion, borrow or secure any amounts of money required by the Company for the conduct of its business.

96. The Board of Directors shall be entitled to raise or secure the repayment of an amount obtained by them, in such way and on such conditions and times as they deem fit. The Board of Directors shall be entitled to issue documents of undertaking, such as options, debentures or debenture stock, whether linked or redeemable, convertible debentures or debentures convertible into other securities, or

A-22

debentures which carry a right to purchase shares or to purchase other securities, or any mortgage, pledge, collateral or other charge over the property of the Company and its undertaking, in whole or in part, whether present or future, including the uncalled share capital or the share capital which has been called but not yet paid.

The deeds of undertaking, debentures of various types or other forms of collateral security may be issued at a discount, at a premium or otherwise and with such preferential or deferred or other rights, as the Board of Directors shall, from time to time, decide.

## SIGNING POWERS

97. Subject to any other resolution on the subject passed by the Board of Directors, the Company shall be bound only pursuant to a document in writing bearing its seal or its rubber stamp or its printed name, and the signature of whomever may be authorized by the Board of Directors, which shall be entitled to empower any person, either alone or jointly with another, even if he is not a shareholder of the Company or a director, to sign and act in the name and on behalf of the Company.

98. The Board of Directors shall be entitled to prescribe separate signing power in regard to different businesses of the Company and in respect of the limit of the amounts in respect of which various persons shall be authorized to sign.

**SECRETARY, OFFICE-HOLDERS, CLERKS AND REPRESENTATIVES**

99.   The Board of Directors shall be entitled, from time to time, to appoint, or to delegate to the Chief Executive Officer, either alone or together with other persons designated by the Board of Directors, the ability to appoint Office Holders (other than directors), a Secretary for the Company, employees and agents to such permanent, temporary or special positions, and to specify and change their titles, authorities and duties, and may set, or delegate to the Chief Executive Officer, either alone or together with other persons designated by the Board of Directors, the ability to set salaries, bonuses and other compensation of any employee or agent who is not an Office Holder.  Salaries, bonuses and compensation of Office Holders who are not directors shall be determined and approved by the Chief Executive Officer, and/or in such other manner as may be required from time to time under the Law. The Board of Directors, or the Chief Executive Officer, either alone or together with other persons designated by the Board of Directors, (in the case of any Office Holder, employee or agent appointed thereby), shall be entitled at any time, in its, his or their (as applicable) sole and absolute discretion, to terminate the services of one of more of the foregoing persons (in the case of a director, however, subject to compliance with Article 77 above).

100.  The Board of Directors and the Chief Executive Officer may from time to time and at any time empower any person to serve as representative of the Company for such purposes and with such powers and authorities, instructions and discretions for such period and subject to such conditions as the Board of Directors (or the Chief Executive Officer, as the case may be) shall deem appropriate. The Board of Directors may (or the Chief Executive Officer, as the case may be) grant such person, *inter alia*, the power to transfer the authority, powers and discretions vested in him, in whole or in part. The Board of Directors may (or the Chief Executive Officer, as the case may be), from time to time, revoke, annul, vary or change any such power or authority, or all such powers or authorities collectively.

**DIVIDENDS, BONUS SHARES, FUNDS AND CAPITALIZATION OF FUNDS AND PROFITS**

101.  The Board of Directors may, prior to recommending any dividend, set aside out of the profits of the Company such amounts as it deems fit for a reserve fund for extraordinary purposes or for the equalization of dividends or for special dividends, or for the repair, improvement, maintenance or

A-23

replacement of the property of the Company, or for any other purpose, as the Board of Directors, in its sole and absolute discretion, shall deem expedient.

102.  The Board of Directors shall be entitled to invest the amounts set aside as aforesaid in Article 101 above in any investments whatsoever, as it may deem fit, and from time to time deal with such investments and vary same, and make use thereof, as it deems fit, and it may divide the reserve fund into special funds in such manner as it deems fit, and may utilize a fund or part thereof for the business of the Company, without being obliged to keep same separate from the remaining assets of the Company.

103.  Unless otherwise permitted by the Law, no dividends shall be paid other than out of the Profits of the Company as such term is defined in the Law.

104.  The Board of Directors may decide on the payment of a dividend or on the distribution of bonus shares.

105.  A dividend in cash or bonus shares shall be paid or distributed, as the case may be, equally to the holders of the Ordinary Shares registered in the Register, pro rata to the nominal amount of capital paid up or credited as paid up on the shares, without reference to any premium which may have been paid thereon. However an amount paid on account of a share prior to the payment thereof having been called, or prior to the due date for payment thereof, and on which the Company is paying interest, shall not be taken into account for purposes of this Article as an amount paid-up on account of the share.

106.  Unless other instructions are given, it shall be permissible to pay any dividend by way of a check or payment order to be sent by post to the registered address of the shareholder or the Person entitled thereto, or in the case of joint shareholders being registered, to the shareholder whose name stands first in the Register in relation to the joint shareholding. Every such check shall be made in favor of the person to whom it is sent. A receipt by the person whose name, on the date of declaration of the dividend, was registered in the Register as the owner of the shares, or in the case of joint holders, by one of the joint holders, shall serve as a discharge with regard to all the payments made in connection with such share.

The directors shall be entitled to invest any dividend which has not been claimed for a period of ~~1~~ (one (1) year after having been declared, or to make use thereof in any other way for the benefit of the Company until such time as it is claimed. The Company shall not be obliged to pay interest or linkage in respect of an unclaimed dividend.

107. Unless otherwise specified in the terms of issue of shares or of securities convertible into, or which grant a right to purchase, shares, any shares that are fully paid-up or credited as paid-up shall at any time confer on their holders the right to participate in the full dividends and in any other distribution for which the determining date for the right to receive the same is the date at which the aforesaid shares were fully paid-up or credited as fully paid-up, as the case may be, or subsequent to such date.

108. A dividend or other beneficial rights in respect of shares shall not bear interest.

109. The Board of Directors shall be entitled to deduct from any dividend or other beneficial rights, all amounts of money which the holder of the share in respect of which the dividend is payable or in respect of which the other beneficial rights were given, may owe to the Company in respect of such share, whether or not the due date for payment thereof has arrived.

110. The Board of Directors shall be entitled to retain any dividend or bonus shares or other beneficial rights in respect of a share in relation to which the Company has a lien, and to utilize any such amount or the proceeds received from the sale of any bonus shares or other beneficial rights, for the discharge of the debts or liabilities in respect of which the Company has a lien.

A-24

111. The Board of Directors may decide that a dividend is to be paid in whole or in part, by way of a distribution of assets of the Company in kind, including by way of debentures or debenture stock of the Company, or shares or debentures or debenture stock of any other company, or in any other way.

112.

112.1. The Board of Directors may, at any time and from time to time, decide that any portion of the amounts standing for the time being to the credit of any capital fund (including a fund created as a result of a revaluation of the assets of the Company), or which are held by the Company as Profits available for distribution, shall be capitalized for distribution subject to and in accordance with the provisions of the Law and of these Articles, amongst those shareholders who are entitled thereto and pro rata to their entitlement under these Articles, provided that the same shall not be paid in cash but shall serve for the payment up in full either at par or with a premium as prescribed by the Company, of shares which have not yet been issued or of debentures of the Company which shall be allotted and distributed amongst the shareholders in the aforesaid ratio as fully paid-up shares or debentures.

112.2. The Board of Directors shall be entitled to distribute bonus shares and to decide that the bonus shares shall be of the same class which confers on the shareholders or the Persons entitled thereto the right to participate in the distribution of bonus shares, or may decide that the bonus shares shall be of a uniform class to be distributed to each of the shareholders or Persons entitled to shares as aforesaid, without reference to the class of shares conferring the right to participate in the distribution on the holders of the shares or the Persons entitled thereto as aforesaid.

113.

113.1. In every case that the Company issues bonus shares by way of a capitalization of profits or funds at a time at which securities issued by the Company are in circulation and confer on the holders thereof rights to convert the same into shares in the share capital of the Company, or options to purchase shares in the share capital of the Company (such rights of conversion or options shall henceforth be referred to as the "**Rights**"), the Board of Directors shall be entitled (in a case that the Rights or part thereof shall not be otherwise adjusted in accordance with the terms of their issue) to transfer to a special fund designated for the distribution of bonus shares in the future (to be called by any name that the Board of Directors may decide on and which shall henceforth be referred to as the "**Special Fund**") an amount equivalent to the nominal amount of the share capital to which some or all of the Rights holders would have been entitled as a result of the issue of bonus shares, had they exercised their Rights prior to the determining date for the right to receive bonus shares, including rights to fractions of bonus shares, and in the case of a second or additional distribution of bonus shares in respect of which the Company acts pursuant to this Article, including entitlement stemming from a previous distribution of bonus shares.

113.2. In the case of the allotment of shares by the Company as a consequence of the exercise of entitlement by the owners of shares in those cases in which the Board of Directors has made a transfer to the Special Fund in respect of the Rights

pursuant to Article 113.1 above, the Board of Directors shall allot to each such shareholder, in addition to the shares to which he is entitled by virtue of having exercised his rights, such number of fully paid-up shares the nominal value of which is equivalent to the amount transferred to the Special Fund in respect of his rights, by way of a capitalization to be effected by the Board of Directors of an appropriate amount out of the Special Fund.  The Board of Directors shall be entitled to decide on the manner of dealing with rights to fractions of shares in its sole discretion.

A-25

113.3.    If after any transfer to the Special Fund has been made the Rights should lapse, or the period should end for the exercise of Rights in respect of which the transfer was effected without such Rights being exercised, then any amount which was transferred to the Special Fund in respect of the aforesaid unexercised Rights shall be released from the Special Fund, and the Company may deal with the amount so released in any manner it would have been entitled to deal therewith had such amount not been transferred to the Special Fund.

114.    For the implementation of any resolution regarding a distribution of shares or debentures by way of a capitalization of profits as aforesaid, the Board of Directors may:

114.1.    Resolve any difficulty which arises or may arise in regard to the distribution in such manner as it deems fit and may take all of the steps that it deems expedient in order to overcome such difficulty.

114.2.    Issue certificates in respect of fractions of shares, or decide that fractions of less than an amount to be decided by the Board of Directors shall not be taken into account for purposes of adjusting the rights of the shareholders or may sell the fractions of shares and pay the proceeds (net) to the Persons entitled thereto.

114.3.    Sign, or appoint a Person to sign, on behalf of the shareholders on any contract or other document which may be required for purposes of giving effect to the distribution, and, in particular, shall be entitled to sign or appoint a Person who shall be entitled to appoint and submit a contract as referred to in Sections 291 and 292 of the Law.

114.4.    Make any arrangement or other scheme which is required in the opinion of the Board of Directors in order to facilitate the distribution.

115.    The Board of Directors shall be entitled, as it deems appropriate and expedient, to appoint trustees or nominees for those registered shareholders who have failed to notify the Company of a change of their address and who have not applied to the Company in order to receive dividends, shares or debentures out of capital, or other benefits during the aforesaid period. Such trustees or nominees shall be appointed for the use, collection or receipt of dividends, shares or debentures out of capital and rights to subscribe for shares which have not yet been issued and which are offered to the shareholders but they shall not be entitled to transfer the shares in respect of which they were appointed, or to vote on the basis of holding such shares.  In all of the terms and conditions governing such trusts and the appointment of such nominees it shall be stipulated by the Company that upon the first demand by a beneficial holder of a share being held by the trustee or nominee, such trustee or nominee shall be obliged to return to such shareholder the share in question and/or all of those rights held by it on the shareholder's behalf (all as the case may be). Any act or arrangement effected by any such nominees or trustee and any agreement between the Board of Directors and a nominee or trustee shall be valid and binding in all respects.

116.    The Board of Directors may from time to time prescribe the manner for payment of dividends or the distribution of bonus shares and the arrangement connected therewith. Without derogating from the generality of the foregoing, the Board of Directors shall be entitled to pay any dividends or moneys in respect of shares by sending a check via the mails to the address of the holder of registered shares according to the address registered in the register of shareholders of the Company. Any dispatch of a check as aforesaid shall be done at the risk of the shareholder.

In those cases in which the Board of Directors specifies the payment of a dividend, distribution of shares or debentures out of capital, or the grant of a right to subscribe for shares which have not yet been issued and which are offered to the shareholders against the delivery of an appropriate coupon attached to any share certificate, such payment, distribution or grant of right to subscribe against a suitable coupon to the holder of such coupon, shall constitute a discharge of the Company's debt in

A-26

respect of such operation as against any person claiming a right to such payment, distribution or grant of right to subscribe, as the case may be.

117. If two (2) or more Persons are registered as joint holders of a share, each of them shall be entitled to give a valid receipt in respect of any dividend, share or debenture out of capital, or other moneys, or benefits, paid or granted in respect of such share.

## BOOKS OF THE COMPANY

118. The Board of Directors shall comply with all the provisions of the Law in regard to the recording of charges and the keeping and maintaining of a register of directors, register of shareholders and register of charges.

119. Any book, register and record that the Company is obliged to keep in accordance with the Law or pursuant to these Articles shall be recorded in a regular book, or by technical, mechanical or other means, as the Board of Directors shall decide.

120. Subject to and in accordance with the provisions of Sections 138 to 139, inclusive, of the Law, the Company may cause supplementary registers to be kept in any place outside Israel as the Board of Directors may think fit, and, subject to all applicable requirements of law, the Board of Directors may from time to time adopt such rules and procedures as it may think fit in connection with the keeping of such branch registers.

## BOOKS OF ACCOUNT

121. The Board of Directors shall keep proper books of account in accordance with the provisions of the Law. The books of account shall be kept at the Office, or at such other place or places as the Board of Directors shall deem expedient, and shall at all times be open to the inspection of members of the Board of Directors. A shareholder of the Company who is not a member of the Board of Directors shall not have the right to inspect any books or accounts or documents of the Company, unless such right has been expressly granted to him by the Law, or if he has been permitted to do so by the Board of Directors or by the shareholders based on a Resolution adopted at a General Meeting.

122. The Board of Directors shall from time to time arrange and submit to the General Meeting a balance sheet and statement of income of the Company.

A copy of the balance sheet and the statement of income shall be delivered to the shareholders registered in the Register in the manner prescribed in regard to the giving of notices, at least seven days prior to the meeting.

The provisions of this Article shall not make it obligatory to send a copy of the aforesaid documents to a shareholder whose address is unknown to the Company, or to more than one joint holder of a share. Any shareholder to whom a copy of the aforesaid documents is not sent, and also a person who produces to the Company a certificate from a bank to the effect that shares of the Company are held for him at such bank, shall be entitled to request to receive copies of such documents at the Office of the Company.

123. At least once each year the accounts of the Company and the correctness of the statement of income and the balance sheet shall be audited and confirmed by an independent auditor or auditors.

124. The Company shall, in an annual General Meeting, appoint an independent auditor or auditors who shall hold such position until the next annual General Meeting, and their appointment, remuneration and rights and duties shall be subject to the provisions of the Law, provided, however, that in exercising its authority to fix the remuneration of the ~~auditor~~Auditor(s), the shareholders in an annual General Meeting may, by a Resolution, act (and in the absence of any action in connection therewith shall be deemed to have so acted) to authorize the Board of Directors to fix such remuneration subject

A-27

to such criteria or standards, if any, as may be provided in such Resolution, and if no such criteria or standards are so provided, such remuneration shall be fixed in an amount commensurate with both the volume and nature of the services rendered by the ~~auditor~~Auditor(s). By an act appointing such ~~auditors~~Auditors, the Company may appoint the auditor(s) to serve for a period of up to the end of completion of the audit of the yearly financial statements for the three (3) year period then ended.

125. The ~~auditors~~Auditors shall be entitled to receive notices of every General Meeting of the Company and to attend such meetings and to express their opinions on all matters pertaining to their function as the ~~auditors~~Auditors of the Company.

126.    Subject to the provisions of the Law and the U.S. Rules, any act carried out by the ~~auditors~~Auditors of the Company shall be valid as against any person doing business in good faith with the Company, notwithstanding any defect in the appointment or qualification of the ~~auditors~~Auditors.

127.    For as long as the Company is a Public Company, as defined in the Law, it shall appoint an internal auditor possessing the authorities set forth in the Law. The internal auditor of the Company shall present all of its proposed work plans to the Audit Committee of Directors, which shall have the authority to approve them, subject to any modifications in its discretion.

**NOTICES**

128.

128.1.    The Company may serve any written notice or other document on a shareholder by way of delivery by hand, by facsimile transmission or by dispatch by prepaid registered mail to his address as recorded in the Register, or if there is no such recorded address, to the address given by him, her or it to the Company for the sending of notices ~~to him~~.

128.2.    Any shareholder may serve any written notice or other document on the Company by way of delivery by hand at the Office, by facsimile transmission to the Company or by dispatch by prepaid registered mail to the Company at the Office.

128.3.    Any notice or document which is delivered or sent to a shareholder in accordance with these Articles shall be deemed to have been duly delivered and sent in respect of the shares held by him (whether in respect of shares held by him alone or jointly with others), notwithstanding the fact that such shareholder has died or been declared bankrupt at such time (whether or not the Company knew of his death or bankruptcy), and shall be deemed to be sufficient delivery or dispatch to heirs, trustees, administrators or transferees and any other persons (if any) who have a right in the shares.

128.4.    Any such notice or other document shall be deemed to have been served:

128.4.1.    in the case of mailing, 48 hours after it has been posted, or when actually received by the addressee if sooner than 48 hours after it has been posted;

128.4.2.    in the case of overnight air courier, on the next day following the day sent, with receipt confirmed by the courier, or when actually received by the addressee if sooner;

128.4.3.    in the case of personal delivery, when actually tendered in person to such shareholder;

128.4.4.    in the case of facsimile or other electronic transmission (including email), the next day following the date on which the sender receives automatic electronic confirmation by the recipient's facsimile machine

A-28

or computer or other device that such notice was received by the addressee; or

128.4.5.    in the case a notice is, in fact, received by the addressee, when received, notwithstanding that it was defectively addressed or failed, in some other respect, to comply with the provisions of this Article 128.

129.    Any shareholder whose address is not described in the Register, and who shall not have designated in writing an address for the receipt of notices, shall not be entitled to receive any notice from the Company.  In the case of joint holders of a share, the Company shall be entitled to deliver a notice by dispatch to the joint holder whose name stands first in the Register in respect of such share.

130.    Notwithstanding anything to the contrary contained herein, notice by the Company of a General Meeting, containing the information required by applicable law and these Articles to be set forth therein, that is published, within the time otherwise required for giving notice of such meeting, in a press release via an international wire service and furnished in a Report of Foreign Private Issuer on Form 6-K (or an equivalent form subsequently adopted by the SEC) to the SEC shall be deemed to be

notice of such meeting duly given, for the purposes of these Articles, to any Shareholder whose address as registered in the Register of Shareholders (or as designated in writing for the receipt of notices and other documents) is located either inside or outside the State of Israel, if the Company's shares are then listed for trading on a national securities exchange in the United States or quoted in an over-the-counter market in the United States.

~~130.~~131.    Whenever it is necessary to give notice of a particular number of days or a notice for another period, the day of delivery shall be counted in the number of calendar days or the period, unless otherwise specified.

~~131    Written notice by the Company of a General Meeting, containing the information required to be set forth in such notice under these Articles, shall be delivered to every shareholder on the Register at least 21 (twenty-one) days prior to its being convened and otherwise as provided in Section 69 of the Companies Law.~~

**INSURANCE, INDEMNITY AND EXCULPATION**

132.    Subject to the provisions of the Law, the Company shall be entitled to enter into a contract to insure all or part of the liability of an Office Holder of the Company, imposed on him in consequence of an act which he has performed by virtue of being an Office Holder, in respect of any of the following:

132.1.    The breach of a duty of care to the Company or to any other Person;

132.2.    The breach of a fiduciary duty to the Company, provided that the Office Holder acted in good faith and had reasonable grounds for believing that the action would not adversely affect the best interests of the Company;

132.3.    A pecuniary liability imposed on him in favor of any other person in respect of an act done in his capacity as an Office Holder.

133.    Subject to the provisions of the Law, the Company shall be entitled to indemnify an Office Holder of the Company, to the fullest extent permitted by the Law.  Subject to the provisions of the Law, including the receipt of all approvals as required therein or under any applicable law, the Company may resolve retroactively to indemnify an Office Holder with respect to the following liabilities and expenses, _provided_, in each of the below cases, that such liabilities or expenses were incurred by such Office Holder in such Office Holder's capacity as an Office Holder of the Company:

A-29

133.1.    a monetary liability imposed on him in favor of a third party in any judgment, including any settlement confirmed as judgment and an arbitrator's award which has been confirmed by the court, in respect of an act performed by the Office Holder by virtue of the Office Holder being an Office Holder of the Company; provided, however, that: (a) any indemnification undertaking with respect to the foregoing shall be limited (i) to events which, in the opinion of the Board of Directors, are foreseeable in light of the Company's actual operations at the time of the granting of the indemnification undertaking and (ii) to an amount or by criteria determined by the Board of Directors to be reasonable in the given circumstances; and (b) the events that in the opinion of the Board of Directors are foreseeable in light of the Company's actual operations at the time of the granting of the indemnification undertaking are listed in the indemnification undertaking together with the amount or criteria determined by the Board of Directors to be reasonable in the given circumstances;

133.2.    reasonable litigation expenses, including legal fees, paid for by the Office Holder, in an investigation or proceeding conducted against such Office Holder by an agency authorized to conduct such investigation or proceeding, and which investigation or proceeding: (i) concluded without the filing of an indictment against such Office Holder and without there having been a monetary liability imposed against such Office Holder in lieu of a criminal proceeding; (ii) concluded without the filing of an indictment against such Office Holder but with there having been a monetary liability imposed against such Office Holder in lieu of a criminal proceeding for an offense that does not require proof of criminal intent; or (iii) involves financial sanction; and

133.3.    reasonable litigation expenses, including legal fees, paid for by the Office Holder, or which the Office Holder is obligated to pay under a court order, in a proceeding brought against the Office Holder by the Company, or on its behalf, or by a third party, or in a criminal proceeding in which the Office Holder is found innocent, or in a criminal proceeding in which the Office Holder was convicted of an offense that does not require proof of criminal intent.

133.4.    For purposes of Article 133.2 above:

133.4.1.    the "*conclusion of a proceeding without the filing of an indictment*" regarding a matter in which a criminal proceeding was initiated, means the closing of a file pursuant to Section 62 of the Israeli Criminal Procedure Law [Consolidated Version], 5742-1982 (the "**Criminal Procedure Law**") or a stay of process by Israel's Attorney General pursuant to Section 231 of the Criminal Procedure Law; and

133.4.2.    a "*monetary liability imposed…in lieu of a criminal proceeding*" means a monetary obligation imposed by law as an alternative to a criminal proceeding, including, without limitation, an administrative fine pursuant to the Israeli Administrative Offenses Law, 5746-1982, a fine for committing an offense categorized as a finable offense pursuant to the provisions of the Criminal Procedure Law, or a penalty.

133.5.    The Company may undertake to indemnify an Office Holder as aforesaid: (i) prospectively, provided that the undertaking is limited to categories of events which in the opinion of the Board of Directors can be foreseen when the undertaking to indemnify is given, and to an amount set by the Board of Directors as reasonable under the circumstances, and (ii) retroactively.

134.    Subject to the provisions of the Companies Law including the receipt of all approvals as required therein or under any applicable law, the Company may, to the maximum extent permitted by law,

A-30

exempt and release, in advance, any Office Holder from any liability for damages arising out of a breach of a duty of care towards the Company.

135.

136.

136.1.135.1.    Any amendment to the Companies Law adversely affecting the right of any Office Holder to be indemnified or insured pursuant to Articles 132 to 134 and any amendments to Articles 132 to 134 shall be prospective in effect, and shall not affect the Company's obligation or ability to indemnify or insure an Office Holder for any act or omission occurring prior to such amendment, unless otherwise provided by applicable law.

136.2.135.2.    The provisions of Articles 132 to 134 are not intended, and shall not be interpreted so as to restrict the Company, in any manner, in respect of the procurement of insurance and/or in respect of indemnification and/or exculpation, in favor of any person who is not an Office Holder, including, without limitation, any employee, agent, consultant or contractor of the Company who is not an Office Holder; and/or any Office Holder to the extent that such insurance and/or indemnification is not specifically prohibited under law.

**WINDING-UP AND REORGANIZATION**

137.136.    Should the Company be wound up and the assets of the Company made available for distribution among shareholders be insufficient to repay all of the Company's paid-up capital, such assets shall be divided in a manner whereby the losses shall, as far as possible, be borne by the shareholders pro rata to the nominal value of the paid-up capital on the shares held by each of them, and, if at the time of the winding-up, the property of the Company available for distribution among the shareholders should exceed the amount sufficient for the repayment of the full nominal value of the paid-up capital at the time of commencement of the winding-up, the surplus shall be distributed to the shareholders pro rata to the paid-up capital held by each of them.  In furtherance of the foregoing, the holders of Ordinary Shares shall be entitled to share equally, on a per share basis, all assets of the Company of whatever kind available for distribution to the holders of Ordinary Shares upon such winding up.

138.137.    Upon the sale of the Company's assets, the directors may, or in the case of a liquidation, the liquidators may, if authorized to do so by a Resolution of the Company, accept fully or partly paid-up shares, or securities of another company, Israeli or non-Israeli, whether in existence at such time or about to be formed, in order to purchase the property of the Company, or part thereof, and to the extent permitted under the Law, the directors may (or in the case of a liquidation, the liquidators may) distribute the aforesaid shares or securities or any other property of the Company among the shareholders without realizing the same, or may deposit the same in the hands of trustees for the shareholders, and the General Meeting by a Resolution may decide, subject to the provisions of the Law, on the distribution or allotment of cash, shares or other securities, or the property of the Company and on the valuation of the aforesaid securities or property at such price and in such manner as the shareholders at

such General Meeting shall decide, and all of the shareholders shall be obliged to accept any valuation or distribution determined as aforesaid and to waive their rights in this regard, except, in a case in which the Company is about to be wound-up and is in the process of liquidation, for those legal rights (if any) which, according to the provisions of the Law, may not be changed or modified.

**SPECIAL VOTE RELATING TO INITIAL TERM**

A-31

139.   ~~During the Initial Term, the provisions of any Article under these Articles which applies only during the Initial Term, including, without limitation, Articles 74, 77.2.1, 79, 80, 81, 91, 99 and this Article 138, may only by amended, replaced or suspended by a Resolution adopted by a majority of 75% of the voting power in the Company.~~

A-32

**Appendix B**

**Stratasys Ltd.**
**Compensation Policy for Executive Officers and Directors**
~~August 5, 2013~~ December 22, 2014

This document sets forth the compensation policy of Stratasys Ltd. and its subsidiaries (collectively, "**Stratasys**" or the "**Company**") for its executive officers and directors.

For purposes of this policy, "executive officers" shall mean "office holders," as such term is defined in the Israeli Companies Law, 5759-1999 (the "**Israeli Companies Law**"), including Stratasys' Chief Executive Officer (the "**CEO**") and Executive Vice Presidents, but excluding Stratasys' directors, unless otherwise expressly indicated (as referenced above, directors are, nevertheless, subject to this policy).  It is hereby clarified that this policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from provisions of applicable law that may not be limited or derogated from. Pursuant to the Israeli Companies Law, shareholder approval is generally required to approve compensation to Stratasys' CEO and its directors.

The Compensation Committee of Stratasys' Board of Directors (the "**Committee**") and Stratasys' Board of Directors (the "**Board**") will periodically review this policy to ensure that its provisions and implementation are aligned with the Company's compensation philosophy and with applicable legal and regulatory requirements. This policy shall apply to any compensation arrangement (including amendment of an existing compensation arrangement) of an executive officer or director that is approved following its adoption by the Company's shareholders, and shall not impact, in any manner, any compensation arrangement approved prior to such adoption.

## Compensation Objectives

Stratasys executive officers' compensation objectives, as outlined below, should be designed to: (i) encourage pay-for-performance; (ii) align executive officers' interests with those of the Company and its shareholders over the long term; (iii) encourage balanced risk management; and (iv) provide a competitive compensation package.

*Pay-for-performance*: Stratasys aims to incentivize its executive officers by strengthening the link between their compensation and performance. Therefore, a significant portion of the total compensation package provided to executive officers is based on measures that reflect both Stratasys' short- and long-term performance, as well as the executive officer's individual performance and impact on shareholder value. In order to strengthen this link, Stratasys defines clear and measurable quantitative and qualitative objectives that, in combination, are expected to improve Company results and returns to shareholders.

*Aligning executive officers' interests with those of the Company and its shareholders*: In order to promote retention and motivate executive officers to focus on long-term objectives and performance of the Company's shares, a portion of the compensation packages of Stratasys' executive officers should be comprised of equity-based compensation, in order to create a direct link between the interests of executive officers and the interests of Stratasys and its shareholders.

# EXHIBIT 13

# BRAUNHAGEY & BORDEN LLP

San Francisco & New York

**Douglas S. Curran, Esq.**
Partner
curran@braunhagey.com

June 28, 2022

**VIA EMAIL AND FIRST-CLASS CERTIFIED MAIL**

Ms. Vered Ben Jacob, Adv.
VP & General Counsel
Stratasys Inc.
1 Holtzman St., Science Park
P.O. Box 2496
Rehovot 76124, Israel
Email: vered.benjacob@stratasys.com

> **Re:**   **Earn-Out Commencement Date Under the Stratasys-Origin
> Merger Agreement**

Dear Ms. Ben Jacob:

We are litigation counsel to Fortis Advisors LLC as representative of the shareholders of Origin Laboratories, Inc. (the "Shareholders"). We write concerning a dispute with Stratasys Inc. regarding the Earn-Out Commencement Date (the "EO Date") under the Agreement and Plan of Merger and Reorganization dated December 8, 2020 (the "Merger Agreement"). Stratasys has declared that the EO Date remains July 1, 2021, despite the parties' agreement to re-set it. This position is contrary to the parties' performance, violates the Merger Agreement, and will wrongly deprive the Shareholders of millions of dollars they are entitled to under that contract. The Shareholders are hopeful this dispute can be resolved amicably, but they will take all steps necessary to protect their rights.



Following the merger, Stratasys decided to delay the launch of the new Stratasys-branded products produced by the Origin business unit for its own business reasons that had nothing to do with Origin. This strategic delay pushed the products' availability far beyond the tentative July 1, 2021 EO Date. As a result, Origin's ability to satisfy the Merger Agreement's performance metrics would have been frustrated if the EO Date had not been re-set to correspond to the products' new launch date.

**San Francisco**
351 California St., 10th Floor
San Francisco, CA 94104
Tel. & Fax: (415) 599-0210

**New York**
118 W. 22nd St., 12th Floor
New York, NY 10011
Tel. & Fax: (646) 829-9403

June 28, 2022
Page 2



\*        \*        \*

This letter sets forth Origin's background that led to the merger with Stratasys, and explains the irrefutable course of performance and written communications memorializing the parties' agreement to re-set the EO Date to February 2022.  The Shareholders anticipate that this letter will provide all the information necessary for Stratasys to honor its agreement and to rectify its material breaches, such that no formal dispute-resolution is necessary.

## I.        ORIGIN'S BACKGROUND

Chris Prucha and Joel Ong founded Origin in 2015 driven by a belief in the transformative potential of 3D printing.  Both Chris and Joel came to 3D printing from backgrounds in software engineering rather than in hardware or manufacturing, which provided

June 28, 2022
Page 3

them with a viewpoint that was unique in the industry. Chris was an engineer at Apple before founding Notion Labs, Inc., a collaboration platform and file-management tool now valued in excess of $10 billion. Joel established his engineering credentials at Google, where he worked on a variety of moonshot projects at Google X, among other things. Together, they launched Origin to take a software-first approach to 3D printing that no other participant in the industry was pursuing.

### A.    Origin's Thesis: 3D Printing as Manufacturing

At the time of Origin's founding, the 3D printing industry was defined by two sub-markets. Industry incumbents either focused on cheap, low-quality 3D printing as part of a temporary bubble of consumer interest, or they focused on more sophisticated 3D printing for the narrow purpose of rapid prototyping. Chris and Joel recognized the self-limiting nature of these approaches and concluded that 3D printing could reach its potential only if it could be used for manufacturing on a broad scale—a multitrillion-dollar industry that dwarfed both the nascent and unpredictable consumer market for 3D printing and the prototyping industry.

But the existing technology was limited by unsophisticated software built around a "closed materials" model, and the existing printers were not good enough to allow users to efficiently print functional parts. Moreover, the industry incumbents hamstrung their own printers by strictly limiting the material inputs and controlling the sale of those materials. In other words, the incumbents focused on short-term profits over potential long-term gain, and they did not prioritize developing printers that could meet the needs of 3D-printing customers seeking production-scale manufacturing applications.

This reality drove Chris and Joel to found Origin based on a simple thesis: 3D-printing technology could be improved and made less expensive by developing better software to guide and govern the 3D-printing process. They planned to achieve this in two ways: (i) by developing granular real-time feedback through a detailed sensor apparatus that would ensure reliable and precise printing, and (ii) by partnering with chemical companies to allow end users to print parts from a wide array of new and experimental materials.

### B.    Origin's Groundbreaking Intellectual Property

Early on, Chris and Joel discovered that in order to build Origin the way they wanted to, they would not be able to rely solely on the industry's incumbent hardware manufacturers. Like the incumbent businesses themselves, the focus-based limitations Chris and Joel had identified were baked into every aspect of the industry's equipment manufacturers, too. The only solution, then, was for Origin to develop both the software *and* hardware necessary to implement Chris and Joel's vision. Origin did so, and it began shipping its first units in 2017 to overwhelming acclaim from customers. Origin continued to hone and improve its hardware, software, and material inputs to increase the quality and applicability of the system and to allow customers to print an ever-greater variety of end-usable parts with greater quality and reliability.

In the years since then, Origin has pursued and secured broad patent protection for its printing process both in the United States and internationally—including in Japan, China, the European Union, and Canada. (*See* Appendix A, attached hereto, for a listing of the substantial

June 28, 2022
Page 4

intellectual property Chris and Joel have pursued and secured on behalf of Origin, now Stratasys).   Among other things, Origin has secured (or is in the process of securing) patent protection for (i) key components of the printing process, (ii) key portions of its physical hardware, (iii) the use of real-time sensor data to optimize the printing process, and (iv) the multivariate testing of new materials and formulations.  In addition to these patent protections, Origin has developed a variety of proprietary technologies and protected trade secrets concerning its product and processes, and it maintains substantial documentation to protect that valuable intellectual property.  And as explained below, Chris and Joel have continued to devote themselves to developing, expanding, and protecting Origin's patent portfolio even after the merger with Stratasys.

Among Origin's many innovations, the most important aspect of its software-based approach to 3D printing is the patented "Programmable PhotoPolymerization" process, or the "P3" process.  The P3 process allows inexpensive and rapid production of high-quality and functional end-use parts.  Among other things, the P3 process eliminates non-scalable and time-consuming post-processing—that is, the need to extensively treat the product after printing, such as by sanding rough edges—which has historically inhibited 3D printing from being used for manufacturing at a large scale.  Instead, the P3 process is capable of producing parts that are usable virtually straight out of the printer, increasing efficiency and operating with, in Stratasys's own words, "industry-leading accuracy, consistency, detail, and throughput."[1]

## C.    The Origin One Printer

In 2019, Origin combined its insight and intellectual property into a flagship product and launched the Origin One printer to overwhelming demand and uniformly positive reviews.  The Origin One combined the P3 process and the open-material model to permit users to print high-quality functional products out of nearly any material chemistry—including newly developed materials—with minimal post-processing.

The unique combination of the P3 process and the open-material model immediately threatened the industry incumbents, whose business turned on the (now outdated) "closed" model, and who relied on tightly controlled sales of material inputs.  The Origin One's success threw the deficiencies of the old model into stark relief, and it led to lucrative partnerships with major manufacturers in a variety of industries, including the Ford Motor Company and ECCO Sko A/S.  Although the industry has since followed Origin's lead and the open-material model is now nearly ubiquitous, Origin's technology remains best-in-class.

## II.    STRATASYS'S MERGER WITH ORIGIN

### A.    The Beginning of the Origin-Stratasys Relationship

Stratasys and Origin first worked together in March 2020, and maintained a friendly relationship thereafter.  At the time, near the beginning of the pandemic, Origin was among the very first companies to receive clinical-trial approval for its 3D-printed sterile nasal swabs for

---

[1] https://www.stratasys.com/en/3d-printers/printer-catalog/p3/origin-one-printer/

June 28, 2022
Page 5

use with COVID-19 tests.  Because Stratasys had not received, and was not in a position to seek, approval for its own swabs, the two companies entered a partnership to produce and distribute Origin's swabs.  Through this partnership, each company learned about the other's strengths, abilities, and expertise.  Chris, Joel, and their Origin colleagues worked closely with Stratasys's sales and distribution teams, while Stratasys witnessed firsthand Origin's industry-leading design, products, and operations.

Recognizing the value proposition of further collaboration, Stratasys made Origin an unsolicited offer of acquisition in the spring of 2020.  Origin was not initially interested, and the Origin board turned down Stratasys's opening offer without countering.  Stratasys nevertheless presented an updated offer on more favorable terms, paving the way for negotiations that culminated in the merger six months later.

As part of the negotiations, Stratasys engaged in an extensive technical diligence review through which it confirmed the value of Origin's software-driven approach to 3D printing.  Separate from the IP diligence, substantial negotiations also concerned the mechanics and structure of the merger—including Stratasys's proposal to structure the consideration it would pay to Origin in two parts: Stratasys would pay approximately 60% of the $100 million purchase price up front, and would pay the remaining 40% over a three-year period, conditioned on Origin's post-merger performance.

The parties ultimately executed the Merger Agreement on December 8, 2020 and announced the merger shortly thereafter.

**B.      The Merger Agreement**



June 28, 2022
Page 6



Finally, the parties also agreed to a dispute-resolution mechanism, pursuant to which the parties must submit any disputes for binding arbitration under Delaware law and the rules of the American Arbitration Association.  (*Id.* § 11.5(a)).  That provision also provides that the non-prevailing party is obligated "to pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs."  (*Id.* § 11.5(c)).

### C.    Chris and Joel Work to Ensure a Successful Merger

Stratasys's stock price skyrocketed following the merger announcement, increasing by more than 40% in the following two weeks, from a low of $17.22 per share on December 8, to a high of $24.36 on December 23.  From the outset, Chris and Joel did everything they could to ensure a smooth transition—Chris even appeared on an investor call on December 9, 2020, announcing the merger to discuss the transaction with Stratasys shareholders and to lay out the plans for Origin's integration with Stratasys.

From those early days through the present, Chris and Joel have taken every step possible to ensure a successful business combination.  For instance, they both worked around the clock during the period between executing the Merger Agreement and closing the transaction—

June 28, 2022
Page 7

Throughout this transition, the Origin team also continued to produce and sell the Origin One printers. Although sales were temporarily halted following the merger, the supply chain and production process soon resumed, and the Origin business line was in full-blown production by late spring 2021. Both new and old clients remained happy with the performance of the Origin One.

## III.    STRATASYS AGREES TO CHANGE THE EARN-OUT COMMENCEMENT DATE TO REFLECT COMMERCIAL REALITY

### A.    Stratasys Imposes a Strategic Delay on Sales of Origin Products

Although Origin was well-positioned to continue manufacturing and producing its printers beginning in spring 2021, Stratasys had other strategic objectives that were intended to fully integrate the Origin printers under the Stratasys name. As a result, Stratasys instructed the Origin team to direct its focus away from production of the existing printer model, and to instead focus on developing new hardware for the Origin One that would be relaunched as a Stratasys product. This included developing an updated version of the Origin One printer that conformed physically to Stratasys's specifications, while also taking steps to develop a specialized version of the printer intended for use in the dental industry, where Stratasys saw business opportunity. Stratasys further directed the Origin team to implement a suite of new features for the Origin One printers already in use by existing customers.

Stratasys was within its rights to make these changes to the Origin team's focus, as it had acquired the company and sought to implement its own strategy and vision for its future. But, as a result of these new priorities, Stratasys halted production and sales of the Origin One printer entirely near the end of spring 2021.

### B.    Stratasys Agrees to a New EO Date Coinciding with the Launch of the Origin One Version 2.7



June 28, 2022
Page 8



June 28, 2022
Page 9



*       *       *

June 28, 2022
Page 10



    **C.**    **Stratasys and the Origin Shareholders Relied on Their Written Agreement to Re-Set the EO Date**

June 28, 2022
Page 11



**D.    Origin Has Contributed Substantially to Stratasys's Ongoing Success**

Stratasys itself has recognized the substantial concrete benefits derived from acquiring Origin and from the post-merger services provided by Chris, Joel, and the other Shareholders.

June 28, 2022
Page 12

The company's most recent Form 6-K noted that Stratasys's product revenues "increased by $14.6 million, or 36.7%, for the three months ended March 31, 2022," and that this increase "reflected the highest first quarter total in five years, strengthened by the launch of the Origin One." (Stratasys 2022 Q1 Form 6-K).

E.      **Stratasys Tries to Renege on the Parties' Agreement**

June 28, 2022
Page 13

███████████████████████████████████████████████████████

**IV.    STRATASYS MUST HONOR ITS AGREEMENT**

███████████████████████████████████████████████████████

      **A.    The Parties' Email Agreements Constitute Writings Under the Merger Agreement**

███████████████████████████████████████████████████████

███████████████████████████████████ Delaware recognizes a public policy in favor of giving full effect to the unambiguous intentions of businesspeople without placing undue emphasis on formalistic requirements. Because of that policy, Delaware courts hold that emails are sufficient to satisfy a "writing" requirement of the sort in the Merger Agreement. *See, e.g., Camden Fitness, LLC v. Wandless Enterprises, Inc.*, 2013 WL 8854873, at *3 n.7 (Del. Com. Pl. Feb. 11, 2013) ("Emails may be considered writings."); *see also* 2 Del. Code § 12A-107(c) ("If a law requires a record to be in writing, an electronic record satisfies the law."); Black's Law Dictionary (11th ed. 2019) (defining "writing" as "any intentional recording of words in a visual form," including "e-mails, and any other media on which words can be recorded"). Indeed, Delaware courts routinely find that essentially <u>any</u> unambiguous writing can be sufficient to reflect the parties' agreement. *See, e.g., Zayo Grp., LLC v. Latisys Holdings, LLC*, 2018 WL 6177174, at *14 (Del. Ch. Nov. 26, 2018) ("Toshiba's October 1, 2014 email . . . would have constituted written notice to Latisys that Toshiba intended to 'materially modify' that contract."); *Triple H Fam. Ltd. P'ship v. Neal*, No. CV 12294-VCMR, 2018 WL 3650242, at *13 (Del. Ch. July 31, 2018), aff'd, 208 A.3d 703 (Del. 2019) ("This email exchange constitutes the written consent of the members to dissolve Omni."); *Camden Fitness*, 2013 WL 8854873, at *3 ("[E]ven if the contract modification should have been in writing, the emails of December 29, 2010, and February 26, 2011, constitute written modifications to the contract, evidencing [an] agreement to the new contract price of $155,000.00").

June 28, 2022
Page 14

[REDACTED]

**B.    Re-Setting the EO Date Does Not Require Board Approval**

[REDACTED]

*See, e.g.*, *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 81 (1995) ("[A] corporation is bound by contracts entered into by its officers and agents acting on behalf of the corporation and for its benefit, provided they act within the scope of their express or implied powers." (citation omitted)).

[REDACTED]

. *See, e.g.*, *Hessler, Inc. v. Farrell*, 226 A.2d 708, 711–12 (Del. 1967) ("It is the law of this State that when, in the usual course of the business of a corporation, an officer or agent has been allowed to manage certain of its affairs, and when this is known to the other party to the contract, the authority of the officer to act for the corporation is implied from the past conduct never challenged by the corporate officials."); *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 128 (3d Cir. 1998) ("Implied actual authority . . . may be found through evidence as to the manner in which the business has operated in the past[.]"). [REDACTED]

(Amended and Restated Articles of Association of Stratasys Ltd., § 81.3; *see also Schoonejongen*, 143 F.3d at 127-28 ("Express authority to act on behalf of the corporation is usually manifested through a statute, the certificate of the corporation, the by-laws, or a board or shareholder action.")). [REDACTED]

June 28, 2022
Page 15

**C.      The Parties' Performance Evidences Their Agreement to Change the EO Date—or, Alternatively, Constitutes a Modification of the Merger Agreement**



*See, e.g., S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.*, 2021 WL 3925937, at *3 (Del. Ch. Sept. 1, 2021) (authorizing contract claim by shareholder representative to proceed against acquiring company that sought as damages "the *sum total* of all unpaid earn-out payments" (emphasis added)).  Stratasys's performance plainly shows its agreement.



Further, because Delaware law permits contract-modification through course of performance, the parties' conduct itself would act to re-set the EO Date <u>even in the absence of a written agreement</u>.  Delaware law gives substantial weight to the ways in which the businesspeople actually perform under a given contract.  When, like here, a party's conduct evidences a plain intention to amend the terms of a written agreement, that implied amendment is binding.  *See, e.g., Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 567 (D. Del. 1993) ("The Delaware Supreme Court has held that . . . the parties may, 'by their conduct, substitute a new oral contract without a formal abrogation of the written agreement,' even if that agreement contains an explicit clause to the contrary.'"); *Pepsi-Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972) (holding that "a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement" because "the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit"—"including a change in the provisions of the written agreement by the course of conduct of the parties").



June 28, 2022
Page 16

## V.    PROPOSED RESOLUTION

The Shareholders will take all steps necessary to protect their interests and to enforce the parties' contract.  But the Shareholders sincerely hope to find an amicable resolution to this dispute and to continue their relationship with Stratasys on terms that are beneficial to all parties.  That relationship, however, must be predicated on trust and fair-dealing.  To that end, the Shareholders demand that Stratasys:



\*        \*        \*

We look forward to Stratasys's response promptly, and by all events by **July 7, 2022** at the latest.  In the meantime, please confirm that Stratasys and all of its officers, directors, employees, and affiliates have been directed to preserve, are preserving, and will continue to preserve all documents and information relating to any of the foregoing matters, including physical files and electronically stored information on any electronic devices.  Nothing herein shall constitute a waiver of any of the Shareholders' rights or remedies, all of which are expressly reserved.

Sincerely,

Douglas S. Curran

Encls.

CC:    David Chertok, Adv. (dchertok@meitar.com)
        Jonathan Atha, Adv. (jonathana@meitar.com)





















**Item Description (Nature de l'envoi)**
- ☑ Registered Article (Envoi recommandé)
- ☐ Letter (Lettre)
- ☐ Printed Matter (Imprimé)
- ☐ Other (Autre)
- ☐ Recorded Delivery (Envoi à livraison attestée)
- ☐ Express Mail International

☐ Insured Parcel (Colis avec valeur déclarée)

Insured Value (Valeur déclarée)

Article Number: RE 998 077 978 US

Office of Mailing (Bureau de dépôt)

Date of Posting (Date de dépôt): 06-29-2022

Addressee Name or Firm (Nom ou raison sociale du destinataire): Meitar | Law Offices

Street and No. (Rue et No.): 16 Abba Hillel Silver Rd.

Place and Country (Localité et pays): Ramat Gan 5250608, Israel

This receipt must be signed by: (1) the addressee; or, (2) a person authorized to sign under the regulations of the country of destination; or, (3) if those regulations so provide, by the employee of the office of destination. This signed form will be returned to the sender by the first mail.

(Cet avis doit être signé par le destinataire ou par une personne y autorisée en vertu des règlements du pays de destination, ou, si ces règlements le comportent, par l'agent du bureau de destination, et renvoyé par le premier courrier directement à expéditeur).

Postmark of the office of destination (Timbre du bureau de destination)

☐ The article mentioned above was duly delivered. (L'envoi mentionné ci-dessus a été dûment livré.)

Date

Signature of Addressee (Signature du destinataire)

Office of Destination Employee Signature (Signature de l'agent du bureau du destination)

PS Form **2865**, February 1997 (Reverse)

---

**Item Description (Nature de l'envoi)**
- ☒ Registered Article (Envoi recommandé)
- ☐ Letter (Lettre)
- ☐ Printed Matter (Imprimé)
- ☐ Other (Autre)
- ☐ Recorded Delivery (Envoi à livraison attestée)
- ☐ Express Mail International

☐ Insured Parcel (Colis avec valeur déclarée)

Insured Value (Valeur déclarée)

Article Number: RE 998 077 981 US

Office of Mailing (Bureau de dépôt)

Date of Posting (Date de dépôt): 06-29-2022

Addressee Name or Firm (Nom ou raison sociale du destinataire): Meitar | Law Offices

Street and No. (Rue et No.): 16 Abba Hillel Silver Rd.

Place and Country (Localité et pays): Ramat Gan 5250608, Israel

This receipt must be signed by: (1) the addressee; or, (2) a person authorized to sign under the regulations of the country of destination; or, (3) if those regulations so provide, by the employee of the office of destination. This signed form will be returned to the sender by the first mail.

(Cet avis doit être signé par le destinataire ou par une personne y autorisée en vertu des règlements du pays de destination, ou, si ces règlements le comportent, par l'agent du bureau de destination, et renvoyé par le premier courrier directement à expéditeur).

Postmark of the office of destination (Timbre du bureau de destination)

☐ The article mentioned above was duly delivered. (L'envoi mentionné ci-dessus a été dûment livré.)

Date: 12.07.22

Signature of Addressee (Signature du destinataire)

Office of Destination Employee Signature (Signature de l'agent du bureau du destination)

PS Form **2865**, February 1997 (Reverse)

# EXHIBIT 14



**MEITAR | LAW OFFICES**

16 Abba Hillel Silver Road, Ramat Gan, 5250608, Israel
Tel. + 972 3 6103100  Fax. + 972 3 6103111  www.meitar.com

July 15, 2022

Mr. Douglas S. Curran
Braunhagey & Borden LLP
Email: curran@bruanhagey.com

Via email

### Re: <u>Your Letter Dated June 28, 2022</u>

We write on behalf of Stratasys, Inc. ("**Stratasys**") in response to your letter dated July 8, 2022, (the "**Letter**"). Capitalized terms not defined in this letter shall have the meanings ascribed to them in the Agreement and Plan of Merger and Reorganization (the "**Merger Agreement**").

1. Stratasys anticipates providing the relevant Quarterly Reports to Seller Representative by no later than Wednesday, July 20, 2022.

2. Pursuant to Section 2.3(c) of the Merger Agreement "the Quarterly Report shall not be binding or determinative of the Revenue for the applicable Quarterly Period". Section Section 2.3(c)) of the Merger Agreement further stipulates that "any failure by the Seller Representative to dispute a Quarterly Report shall not prejudice in any way the Seller Representative's rights under Section 2.3(d), (e) and (f)". Therefore, any delay in the provision of the Quarterly Reports following the Earn-out Commencement Date, could not have prejudiced Seller Representative's rights.

3. Nothing in this letter shall be construed as an admission of or an agreement with any of the claims or arguments raised in your Letter or your June 28, 2022 letter. In response to your question, Stratasys rejects your contention that the Earn-Out Commencement Date was "re-set" to February 1, 2022. All of Stratasys's rights and claims are expressly reserved.

Sincerely,
B/ Or Baron Gil, Adv.
Meitar | Law Offices

# EXHIBIT 15

**- Confidential -**

To:     Fortis Advisors LLC
        ATTN: Notice Department (Project Octopus)
        notices@fortisrep.com

*Via email*

Re: <u>**Quarterly Report – First Quarter of the First Earn-Out Period**</u>



**Very truly yours,**

**STRATASYS LTD.**

By:
Name: Eshkol Amor
Title: VP Finance

- Confidential -

## APPENDIX A

### Calculation of the Total Revenue



- Confidential -

## APPENDIX B

## Supporting Data

**CONFIDENTIAL INFORMATION SUBJECT TO NON-DISCLOSURE AGREEMENT**



- Confidential -

To:    Fortis Advisors LLC
       ATTN: Notice Department (Project Octopus)
       notices@fortisrep.com

*Via email*

### Re: <u>Quarterly Report – Second Quarter of the First Earn-Out Period</u>



**Very truly yours,**

**STRATASYS LTD.**

By:
Name: Eshkol Amor
Title: VP Finance

- Confidential -

## APPENDIX A

## Calculation of the Total Revenue



- Confidential -

APPENDIX B

Supporting Data

**CONFIDENTIAL INFORMATION SUBJECT TO NON-DISCLOSURE AGREEMENT**



- Confidential -

To:     Fortis Advisors LLC
        ATTN: Notice Department (Project Octopus)
        notices@fortisrep.com

*Via email*

### Re: <u>Quarterly Report – Third Quarter of the First Earn-Out Period</u>



Very truly yours,

**STRATASYS LTD.**

By:
Name: Eshkol Amor
Title: VP Finance

- Confidential -

## APPENDIX A

## Calculation of the Total Revenue



- Confidential -

**APPENDIX B**

**Supporting Data**















CONFIDENTIAL INFORMATION SUBJECT TO NON-DISCLOSURE AGREEMENT

**Revenue recognition**



# EXHIBIT 16

To:   Fortis Advisors LLC
      ATTN: Notice Department (Project Octopus)
         notices@fortisrep.com

*Via email*

**Re: <u>Earn-Out Schedule for the First Earn-Out Period</u>**



**Very truly yours,**

**STRATASYS LTD.**

By:
Name: Eshkol Amor
Title: VP Finance

- 2 -

**APPENDIX A**
**Calculation of Earn-Out Revenue for the First Earn-Out Period**

[*SEE SEPARATE ATTACHMENT*]

- 3 -

**APPENDIX B**
**Supporting Data**

[*SEE SEPARATE ATTACHMENT*]

# EXHIBIT 17



**MEITAR** | LAW OFFICES

16 Abba Hillel Silver Road, Ramat Gan, 5250608, Israel
Tel. + 972 3 6103100  Fax. + 972 3 6103111  www.meitar.com

August 08, 2022

Mr. Douglas S. Curran
Braunhagey & Borden LLP

**Via email** curran@bruanhagey.com

**Re: Your Letter Dated June 28, 2022**

We write on behalf of Stratasys, Inc. ("**Stratasys**") in response to your letter dated June 28, 2022 (the "**Letter**"). Capitalized terms not defined in this letter shall have the meanings ascribed to them in the Agreement and Plan of Merger and Reorganization dated December 8, 2020 (the "**Merger Agreement**").

Stratasys has carefully considered the allegations raised in your Letter, and rejects them in their entirety as frivolous and devoid of any basis in the record or in the language of the Merger Agreement.



Not one of these conditions are met.

1. **Stratasys and the Seller Representative Never Reached An Agreement to Amend the Earn-Out Commencement Date**

The correspondence that the Letter attaches as proof of the alleged 'agreement' actually demonstrates, unambiguously, that *no* agreement has been reached to amend and postpone the Earn-Out Commencement Date.





Therefore the record makes clear that no 'agreement' to amend the Merger Agreement and change the Earn-Out Commencement Date has ever been reached.

**2. Fortis Advisors LLC was Not a Party to Any 'Agreement'**



**3. The 'Agreement' Alleged in The Letter was not in Writing**



**4. The 'Agreement' Alleged in The Letter Did Not Include an Alternative Date**



██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████

**The 'Background' Alleged in The Letter is False and Stratasys Reserves Its Right to File a Claim Notice**

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

████████████ These damages are currently being assessed and quantified, and Stratasys reserves its right to submit a Claim Notice in due course.

Sincerely,
B/ Or Baron Gil, Adv.
Meitar | Law Offices

# EXHIBIT 18

# BRAUNHAGEY & BORDEN LLP

San Francisco & New York

**Douglas S. Curran, Esq.**
Partner
curran@braunhagey.com

**CONFIDENTIAL SETTLEMENT COMMUNICATION**
**PROTECTED BY FEDERAL RULE OF EVIDENCE 408 & ANALOGOUS DOCTRINES**

January 13, 2023

**VIA EMAIL**

Vered Ben Jacob, Adv.
VP & General Counsel
Stratasys, Inc.
1 Holtzman St., Science Park
P.O. Box 2496
Rehovot 7612401
Israel
Email: vered.benjacob@stratasys.com

> **Re:** **Earn-Out Dispute – Memorialization of Stratasys's Settlement Proposal**

Dear Ms. Ben Jacob:

We represent Fortis Advisors LLC as representative of the shareholders of Origin Laboratories, Inc. (the "Shareholders") in connection with a dispute concerning the Earn-Out Commencement Date (the "EO Date") under the Agreement and Plan of Merger and Reorganization dated December 8, 2020 (the "Merger Agreement").

**San Francisco**
351 California Street, 10th Floor
San Francisco, CA 94104
Tel.: (415) 599-0210
Fax: (415) 276-1808

**New York**
118 W 22nd Street, 12th Floor
New York, NY 10011
Tel.: (646) 829-9403
Fax: (646) 403-4089

January 13, 2023
Page 2



January 13, 2023
Page 3

\*        \*        \*

This letter is a settlement communication that is subject to the protections of Federal Rule of Evidence 408 and any other similar rule of settlement privilege.  Nothing herein constitutes a waiver of any of the Shareholders' rights or remedies, all of which are expressly reserved.  We look forward to your prompt response.

Sincerely,

Douglas S. Curran

CC:    J. David Chertok, Adv. (dchertok@meitar.com)
       Jonathan Atha, Adv. (jonathana@meitar.com)

# EXHIBIT 19

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

**WASHINGTON, DC 20549**

# FORM 20-F

**(Mark One)**

☐     **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

or

☒     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2023

or

¨     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

or

¨     **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of event requiring this shell company report .......................................**

**Commission file number 001-35751**



## STRATASYS LTD.

(Exact name of Registrant as specified in its charter)

**Not Applicable**

(Translation of Registrant's name into English)

**Israel**

(Jurisdiction of incorporation or Organization)

| c/o Stratasys, Inc<br>7665 Commerce Way<br>Eden Prairie,<br>Minnesota<br>55344 | 1 Holtzman Street,<br>Science Park<br>P.O. Box 2496<br>Rehovot,<br>Israel<br>76124 |
|---|---|

(Address of Principal Executive Offices)

**Richard Garrity, Chief Industrial Business Unit Officer**

**Tel: (952) 937-3000**

**E-mail: rich.garrity@stratasys.com**

**7665 Commerce Way**

**Eden Prairie, Minnesota 55344**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act.

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| **Ordinary Shares, par value NIS 0.01 per share** | **SSYS** | **Nasdaq Global Select Market** |

Securities registered or to be registered pursuant to Section 12(g) of the Act.

**None**

(Title of Class)

Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act.

**None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

69,656,074 **Ordinary Shares, NIS 0.01 par value, at December 31, 2023.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232,405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or an emerging growth company. See definition of "accelerated filer," "large accelerated filer" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒ Accelerated filer ☐

Non-accelerated filer ☐ Emerging Growth Company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒ International Financial Reporting Standards as issued by the International Accounting Standards Board ☐ Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow. Item 17 ☐ Item 18 ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

**TABLE OF CONTENTS**

CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS    1
USE OF TRADE NAMES    1
CERTAIN TERMS AND CONVENTIONS    1

PART I

ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS.    2
ITEM 2.OFFER STATISTICS AND EXPECTED TIMETABLE.    2
ITEM 3. KEY INFORMATION    2
ITEM 4. INFORMATION ON THE COMPANY    30
ITEM 4A. UNRESOLVED STAFF COMMENTS    70
ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS    71
ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES    92
ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS    112
ITEM 8. FINANCIAL INFORMATION    118
ITEM 9. THE OFFER AND LISTING    120
ITEM 10. ADDITIONAL INFORMATION    120
ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK    131
ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES    132

PART II

ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES    133
ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS    133
ITEM 15. CONTROLS AND PROCEDURES.    133
ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT    134
ITEM 16B. CODE OF ETHICS    134
ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES    134
ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES    135
ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS    135
ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT    135
ITEM 16G. CORPORATE GOVERNANCE    135
ITEM 16H. MINE SAFETY DISCLOSURE    136
ITEM 16I. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTION    136
ITEM 16J. INSIDER TRADING POLICIES    136

ITEM 16K. CYBERSECURITY    136

PART III

ITEM 17. FINANCIAL STATEMENTS.    139
ITEM 18. FINANCIAL STATEMENTS    139
ITEM 19. EXHIBITS.    152
SIGNATURES    153

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain information included or incorporated by reference in this annual report may be deemed to be "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933, and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements are often characterized by the use of forward-looking terminology such as "may," "will," "expect," "anticipate," "estimate," "continue," "believe," "should," "intend," "project" or other similar words, but are not the only way these statements are identified.

These forward-looking statements may include, but are not limited to, statements relating to our objectives, plans and strategies, statements that contain projections of results of operations or of financial condition and all statements (other than statements of historical facts) that address activities, events or developments that we intend, expect, project, believe or anticipate will or may occur in the future.

Forward-looking statements are not guarantees of future performance and are subject to risks and uncertainties. We have based these forward-looking statements on assumptions and assessments made by our management in light of their experience and their perception of historical trends, current conditions, expected future developments and other factors they believe to be appropriate.

Important factors that could cause actual results, developments and business decisions to differ materially from those anticipated in these forward-looking statements include, among other things:

- the extent of our success at introducing new or improved products and solutions that gain market share;

- the extent of growth of the 3D printing market generally;

- the global macro-economic environment, including headwinds caused by inflation, relatively high interest rates, potentially unfavorable currency exchange rates and uncertain economic conditions;

- changes in our overall strategy, including as related to any restructuring activities and our capital expenditures;

- the impact of shifts in prices or margins of the products that we sell or services we provide, including due to a shift towards lower margin products or services;

- the impact of competition and new technologies;

- the outcome of our board of directors' comprehensive process to explore strategic alternatives for our company;

- impairments of goodwill or other intangible assets in respect of companies that we acquire;

- the extent of our success at efficiently and successfully integrating the operations of various companies that we have acquired or may acquire;

- the degree of our success at locating and acquiring additional value-enhancing, inorganic technology that furthers our business plan to lead in the realm of polymers;

- the potential adverse impact that recent global interruptions and delays involving freight carriers and other third parties may have on our supply chain and distribution network and consequently, our ability to successfully sell both our existing and newly-launched 3D printing products;

- global market, political and economic conditions, and in the countries in which we operate in particular;

- the degree to which our company's operations remain resistant to potential adverse effects of Israel's war against the terrorist organization Hamas;

- government regulations and approvals;

- litigation and regulatory proceedings;

- infringement of our intellectual property rights by others (including for replication and sale of consumables for use in our systems), or infringement of others' intellectual property rights by us;

- potential cyber attacks against, or other breaches to, our information technologies systems;

- the extent of our success at maintaining our liquidity and financing our operations and capital needs;

- impact of tax regulations on our results of operations and financial condition; and

- any additional factors referred to in Item 3.D "Key Information - Risk Factors", Item 4 "Information on the Company", and Item 5 "Operating and Financial Review and Prospects", as well as in other parts of this Annual report.

Readers are urged to carefully review and consider the various disclosures made throughout this annual report, which are designed to advise interested parties of the risks and factors that may affect our business, financial condition, results of operations and prospects.

Any forward-looking statements in this annual report are made as of the date hereof, and we undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## USE OF TRADE NAMES

Unless the context otherwise indicates or requires, "Stratasys", "PolyJet", "J8 Series", "J850", "J55", "J35", "Vero", "TrueDent", "FDM", "Fortus", "F900", "F370", "Fortus 450mc", "F123 Series", "F770", "Origin", "Origin One", "P3", "Stratasys Direct Manufacturing", "GrabCAD", "GrabCAD Print", "GrabCAD Shop", "GrabCAD Streamline Pro", "OpenAM", "DentaJet", "MediJet", "Digital Anatomy", "TissueMatrix", "GelMatrix", "BoneMatrix", "Neo", "Neo800", "Neo450", "H350", "H Series", "SAF", "Somos", "WaterShed", "PerFORM", "Addigy" and all product names and trade names used by us in this annual report are our trademarks and service marks, which may be registered in certain jurisdictions. Although we have sometimes omitted the "®" and "TM" trademark designations for such marks in this annual report, all rights to such trademarks and service marks are nevertheless reserved. Furthermore, the Stratasys Signet design logo is our

property. This annual report contains additional trade names, trademarks and service marks of other companies. We do not intend our use or display of other companies' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by, these other companies.

## CERTAIN TERMS AND CONVENTIONS

In this annual report, unless the context otherwise requires:

- references to "Stratasys", "our company", "the Company", "the consolidated company", "the registrant", "we", "us", and "our" refer to Stratasys Ltd. (formerly known as Objet Ltd.), and its consolidated subsidiaries;

- references to "Objet" generally refer to Objet Ltd. and its consolidated subsidiaries prior to the effective time of the Stratasys, Inc.- Objet Ltd. merger on December 1, 2012. We may also use "Objet" to refer to the line of products previously sold by Objet Ltd. and the related current, ongoing operations that have continued following the Stratasys, Inc.-Objet Ltd. merger.

- references to "Stratasys, Inc." generally refer to Stratasys, Inc., a Delaware corporation, and its consolidated subsidiaries prior to the effective time of the Stratasys, Inc.- Objet Ltd. merger, but sometimes (as the context requires) refer to the current, ongoing operations of our Stratasys, Inc. subsidiary;

- references to "ordinary shares", "our shares" and similar expressions refer to our Ordinary Shares, par value NIS 0.01 per share;

- references to "dollars", "U.S. dollars", "U.S. $" and "$" are to United States Dollars;

1

- references to "shekels" and "NIS" are to New Israeli Shekels, the Israeli currency;

- references to the "articles" or "amended articles" are to our Amended and Restated Articles of Association, which became effective upon the closing of the Stratasys, Inc.- Objet Ltd. merger, as subsequently amended;

- references to the "Companies Law" are to the Israeli Companies Law, 5759-1999, as amended;

- references to the "Securities Act" are to the Securities Act of 1933, as amended;

- references to the "Exchange Act" are to the Securities Exchange Act of 1934, as amended;

- references to "Nasdaq" are to the Nasdaq Stock Market; and

- references to the "SEC" are to the United States Securities and Exchange Commission.

## PART I

## ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS

Not applicable.

## ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE

Not applicable.

## ITEM 3. KEY INFORMATION.

### A. [Reserved]

### B. Capitalization and Indebtedness.

Not applicable.

### C. Reasons for the Offer and Use of Proceeds.

Not applicable.

### D. Risk Factors.

*You should carefully consider the risks described below, together with all of the other information in this annual report on Form 20-F. The risks described below are not the only risks facing us. Additional risks and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business operations. If any of these risks actually materializes, our business, financial condition and results of operations could suffer and the price of our shares could decline.*

**Summary of Risk Factors:**

The following constitutes a summary of the material risks relevant to an investment in our company:

**Risks related to our business and financial condition**

- We may not succeed at introducing new or improved products and solutions that gain market share.

- Our annual and quarterly operating results and financial condition may fluctuate.

- Demand for our products and services may not grow as we expect.

- The 3D printing market generally may not grow as we expect.

- Global macro-economic trends such as inflation, rising interest rates and potential recessionary conditions, may have material adverse consequences for our operations, financial position, cash flows, and those of our customers and suppliers.

- Declines in the prices of our products and services, or in our volume of sales, together with our relatively inflexible cost structure, may adversely affect our financial results.

- To the extent that other companies are successful in developing or marketing consumables for use in our systems, our revenues and profits would likely be adversely affected.

- If our product mix shifts too far into lower margin products or our revenues mix shifts significantly towards our additive manufacturing ("AM") services business, our profitability could be reduced.

- Competition and new technologies may cut into our market share.

- Impairments of goodwill or other intangible assets in respect of companies that we acquire would adversely impact our results of operations for the periods in which they occur.

- Our failure to successfully consummate acquisitions of, or investments in, new business, technologies, products or services, to integrate them into our existing company, or to realize from them expected performance, may adversely affect our financial results.

- Our operations could suffer if we are unable to attract and retain key management, directors or other key employees.

- Global interruptions and delays involving freight carriers and other third parties may interfere with our supply chain and distribution network and frustrate our ability to sell our existing and new products.

- If we do not maximize our recurring stream of revenues from the sale of consumables and service contracts, our operating results may be adversely affected.

- Global market, political and economic conditions, and in the countries in which we operate in particular, could adversely impact our operating results.

- Potential hostile actions by a shareholder or other third party, such as Nano Dimension Ltd. or 3D Systems Corporation, including a legal challenge to our shareholder rights plan, a potential additional unsolicited tender offer, or a potential additional attempt to remove and replace our directors with its own nominees, could materially adversely impact our shareholders' investment in our company and could also strain our cash resources.

- Significant disruptions of our information technology systems, including management information systems for inventory management and distribution, or breaches of our data security could adversely affect our business.

- We own a number of our manufacturing and office facilities, which may limit our ability to move those operations.

## Risks related to our intellectual property

- Infringement of our intellectual property rights by others (including for replication and sale of consumables for use in our systems), or infringement of others' intellectual property rights by us, could lead to litigation, could necessitate a redesign of our products to avoid use of certain technology, and may have an adverse impact on our financial results.

- If we are unable to obtain patent protection for our products or otherwise protect our intellectual property rights, our business could suffer.

- As our patents expire, additional competitors using our technology could enter the market, which could offer competitive printers and consumables, require us to reduce our prices for our products and result in lost sales.

## Risks related to operations in Israel

- Israel's war against the terrorist organization Hamas and its hostilities with additional regional terrorist groups may adversely affect our operations.
- Exchange rate fluctuations between the U.S. dollar and the New Israeli Shekel (in particular), the Euro, the Yen and other non-U.S. currencies may negatively affect the earnings of our operations.
- We are currently eligible for Israeli government tax benefits in respect of our Israeli operations. If we do not meet several conditions for receipt of those benefits, or if the Israeli government otherwise decides to eliminate those benefits, they may be terminated or reduced.

## Risks related to an investment in our ordinary shares

- The market price of our ordinary shares may be subject to fluctuation, regardless of our operating results and financial condition. As a result, our shareholders could incur substantial losses.

- We do not anticipate paying any cash dividends in the foreseeable future.

## Risks related to our business and financial condition

*We may not be able to introduce new 3D printers, high-performance systems and consumables acceptable to customers or to improve the technology, software or consumables used in our current systems in response to changing technology and end-user needs.*

We derive most of our revenues from the sale of additive manufacturing systems and related consumables. The markets in which we operate are subject to rapid and substantial innovation and technological change, mainly driven by technological advances and end-user requirements and preferences, as well as the emergence of new standards and practices. Our ability to compete in these markets depends, in large part, on our success in enhancing our existing products and developing new additive manufacturing systems and new consumables that will address the increasingly sophisticated and varied needs of prospective end-users, and respond to technological advances and industry standards and practices on a cost-effective and timely basis or otherwise gain market acceptance. In keeping with our strategic goal of strengthening our position in polymers and in the fast-growing mass production parts market, we acquired Origin Laboratories, Inc., or Origin, and its P3™ Programmable PhotoPolymerization technology in December 2020, which we believe will help to further strengthen our position in that area. In order to further expand our polymer suite of solutions across the product life cycle, in 2021, we acquired UK-based RP Support Ltd., or RPS, a provider of industrial stereolithography 3D printers and solutions, and Xaar 3D Ltd., or Xaar, and its powder-based SAF™ technology, thereby accelerating our growth in production-scale 3D printing.

Even if we successfully utilize new acquired technologies or organically developed technologies to create new systems or enhance our existing systems, it is likely that new systems and technologies that we develop will eventually supplant our existing systems or that our competitors will create systems that will replace our systems. As a result, any of our products may be rendered obsolete or uneconomical by our or others' technological advances.

2

***Our operating results and financial condition may fluctuate.***

The operating results and financial condition of our company may fluctuate from quarter to quarter and year to year and are likely to continue to vary due to a number of factors, many of which will not be within our control. We do not always have visibility as to the expected movements of the global economy and, consequently, as to the expected changes in our operating results over time. This began during the COVID pandemic, during which we began analyzing our quarterly results on a linear basis, comparing consecutive quarters with one another, in addition to comparing each quarter with the corresponding quarter of the previous year, thereby enabling us to track the most updated economic trends and their impact on our operating results.After having suspended providing quarterly or annual guidance in the second quarter of 2020, we returned to providing guidance (initially, on a more limited basis) in subsequent years. However, if our operating results do not meet that guidance or the expectations of securities analysts or investors, the market price of our ordinary shares will likely decline. Fluctuations in our operating results and financial condition may be due to a number of factors, including the latest global economic developments concerning inflation, interest rates and unemployment, as well as those additional factors listed below and those identified throughout this "Risk Factors" section:

- the degree of market acceptance of our products and services, particularly in the fast-growing sector of mass production parts;

- the mix of products and services that we sell during any period;

- the geographic distribution of our sales;

- our responses to price competition;

- long sales cycles;

- unforeseen liabilities or difficulties in integrating our acquisitions or newly acquired businesses;

- changes in the amount that we spend to develop, acquire or license new products, consumables, technologies or businesses;

- changes in the amounts that we spend to promote our products and services;

- changes in the cost of satisfying our warranty obligations and servicing our installed base of systems;

- delays between our expenditures to develop and market new or enhanced systems and consumables and the generation of sales from those products;

- delays in orders of our products from period to period due to outside factors, such as U.S. government shutdowns, which may delay orders by U.S. government agencies or other end-users whose business activities are heavily dependent on U.S. government agency contracts;

- global interruptions and delays involving freight carriers and other third parties, which may interfere with our supply chain and distribution network and frustrate our ability to sell our existing and new products;

- development of new competitive products and services by others;

- difficulty in predicting sales patterns and reorder rates that may result from multi-tier distribution strategy associated with new product categories such as entry level desktop 3D printers;

- impairment charges that we may be required to record in respect of our goodwill and/or other long-lived assets;

- potential cyber attacks against, or other breaches to, our information technologies systems;

- litigation or threats of litigation, including intellectual property claims by third parties;

- changes in accounting rules and tax laws;

- tax benefit that we may record due to partial or full release of valuation allowances against our deferred tax assets;

3

- general economic and industry conditions that affect end-user demand and end-user levels of product design and manufacturing; and

- changes in dollar-shekel and dollar-Euro exchange rates that affect the value of our net assets, revenues and expenditures from and/or relating to our activities carried out in those currencies;

Due to all of the foregoing factors, and the other risks discussed in this annual report, you should not rely on quarter-over-quarter and year-over-year comparisons of our operating results as an indicator of our future performance.

***If demand for our products and services, or in the 3D printing market generally, does not grow as expected, our revenues may stagnate or decline and our profitability may be adversely affected.***

The commercial marketplace for prototyping and manufacturing, which was once dominated by conventional production technologies, is gradually adopting additive manufacturing as a new production technology. This is true with respect to prototype development, and to a growing extent, with respect to direct digital manufacturing, or DDM, as an alternative to traditional manufacturing. If the commercial marketplace does not continue to transform towards the broader acceptance of 3D printing and DDM as alternatives for prototype development and traditional manufacturing, or if it adopts 3D printing based on technologies other than the technologies that we use, we may not be able to increase or sustain current or future levels of sales of our products and related materials and services, and our results of operations may be adversely affected as a result.

***Adverse macro-economic trends such as inflation and higher interest rates have been adversely affecting, and may continue to adversely affect, potentially in a more material manner our business, results of operations and financial condition.***

Certain recent global macro-economic trends have been adversely impacting the global economic environment. The infusion of money into circulation as part of a "loose" monetary policy to encourage consumer spending, along with historically low interest rates for an extended period of time, which were designed to ease economic conditions during the COVID-19 pandemic, triggered upwards pressure on prices of goods, and services. The high rates of inflation globally caused governments and central banks to act to curb inflation, including by raising interest rates, which may potentially stifle economic activity to a large enough extent to cause a recession, whether in individual countries or regions, or globally. In certain cases, shifts in interest rates have impacted investor preferences as to investments in different countries, which has triggered shifts in exchange rates between various currencies, which has, in turn, exerted an unsteady impact on our results of operations.

Since 2022, these macro-economic trends have been adversely impacting our target markets and our results of operations. For example, higher interest rates, which were imposed by central banks to slow down inflation, have been worsening credit/financing conditions for our customers and adversely impacting their ability to purchase our products.

In light of these uncertainties, we continue to monitor the cost-control measures that we first implemented in February 2020, when the COVID-19 pandemic began, some of which we have maintained in place since that time.

While we believe that we remain well-positioned to withstand the current adverse macro-economic trends, given our balance sheet (primarily due to our cash reserves and lack of debt) and our emphasis on operational efficiencies and execution, we continue to monitor the situation, assessing further implications for our operations, supply chain, liquidity, cash flow and customer orders, in an effort to mitigate potential new adverse consequences should they arise. However, there is no assurance that we will continue to succeed at doing so.

A potential downturn could also have a material adverse impact on our business partners' stability and financial strength. Given the uncertainties associated with these macroeconomic trends, it is difficult to fully predict the magnitude of their effects on our, and our business partners', business, financial condition and results of operations.

4

The guidance that we provide for 2024 and for future periods (including medium term guidance) may lack the degree of certainty that we once had in providing guidance, due to the number of variables surrounding the current macro-economic environment.

The trends associated with the current economic environment may also have the effect of amplifying many of the other risks described herein.

***Declines in the prices of our products and services, or in our volume of sales, together with our relatively inflexible cost structure and increased costs of producing and selling our products, may adversely affect our financial results.***

Our business is subject to price competition. Such price competition may adversely affect our ability to maintain the same degree of profitability, especially during periods of decreased demand. Decreased demand also adversely impacts the volume of our systems sales. If our business is not able to offset price reductions resulting from these pressures, or decreased volume of sales due to contractions in the market, by improved operating efficiencies and reduced expenditures, then our operating results will be adversely affected.

Certain of our operating costs are fixed and cannot readily be reduced, which diminishes the positive impact of our reorganization programs on our operating results. To the extent the market for our products slows, or the 3D printing market contracts, we may be faced with excess manufacturing capacity and excess related costs that cannot readily be reduced, which will adversely impact our results of operations. The impact of rising inflation on the cost of producing and selling our products has also made it more difficult for us to maintain our profit margins and thereby also adversely impacting our results of operations.

***To the extent that other companies are successful in developing or marketing consumables for use in our systems, our revenues and profits would likely be adversely affected.***

We sell a substantial portion of the consumables used in our systems. We attempt to protect against replication of our proprietary consumables through differentiation patents and trade secrets and provide that warranties on those systems may be invalid if customers use non-genuine consumables. We have also acquired companies that sell our materials, as a means to broaden our official materials offerings. Other companies have nevertheless developed and sold, and may continue to develop and sell, consumables that are used with our systems, which may reduce our consumables sales and impair our overall revenues and profitability.

***If our product mix shifts too far into lower margin products or our revenues mix shifts significantly towards our AM services business, our profitability could be reduced.***

Sales of certain of our existing products have higher margins than others. For instance, some of our high-end systems and related consumables yield a greater gross margin than our entry-level systems. Sales of our entry-level systems may displace sales of our other systems. If sales of our entry-level systems have the effect of reducing sales of our higher margin products, or if for any other reason, our product mix shifts too far into lower margin products, and we are not able to sufficiently reduce the engineering, production and other costs associated with those products or substantially increase the sales of those products, our profitability could be reduced. A similar negative impact on our gross margins could result due to a significant shift towards revenues generated by our AM parts service business, Stratasys Direct, which are characterized by lower margins relative to our products.

5

***The markets in which we participate are competitive. Our failure to compete successfully could cause our revenues and the demand for our products to decline.***

We compete with a wide variety of producers of systems that create 3D printed models, prototypes, manufacturing aids, medical guides and end-use parts as well as producers of materials, services and software for these systems, including both additive and subtractive manufacturing methodologies, such as metal extrusion, computer-controlled machining and manual modeling techniques. Our principal competition currently consists of other manufacturers of systems for prototype development and manufacturing processes, including 3D Systems Corporation, HP, Carbon, EOS GmbH, Formlabs, Markforged and Desktop Metal (following their acquisition of EnvisionTEC). For our broadened AM parts and services business, our chief competitors consist of 3D Systems, Materialise, Protolabs and many other smaller service providers. We may face additional competition in the future from other new entrants into the marketplace, including companies that may have significantly greater resources than we have that may become new market entrants or may enter through acquisition or strategic or marketing partnerships with current competitors.

Some of our current and potential competitors have longer operating histories and more extensive name recognition than we have and may also have greater financial, marketing, manufacturing, distribution and other resources than we have. Current and future competitors may be able to respond more quickly to new or emerging technologies and changes in end-user demands and to devote greater resources to the development, promotion and sale of their products than we can. Our current and potential competitors may develop and market new technologies that render our existing or future products obsolete, unmarketable or less competitive (whether from a price perspective or otherwise). We cannot assure that we will be able to maintain or enhance our current competitive position or continue to compete successfully against current and future sources of competition.

***If additional goodwill or other intangible assets that we have recorded become impaired, we could have to take future charges against earnings***

As of December 31, 2023, the carrying value of all of our goodwill and other intangible assets was approximately $227.8 million compared to a carrying value of $186.3 million as of December 31, 2022.

Under accounting principles generally accepted in the United States of America, or GAAP, we are required to review goodwill for impairment annually and whenever events or changes in circumstances indicate that the carrying amount of goodwill may not be recoverable. Intangible assets are generally amortized into earning based on their useful life, but are also reviewed for impairment whenever events or changes in circumstances indicate that their carrying value may not be recoverable.

Any impairment to our goodwill and intangible assets in the future could result in further significant charges against our earnings and could have a material adverse effect on our results of operations. For further information, please see Notes 8 and 9 to our consolidated financial statements included elsewhere in this annual report.

6

***As part of our growth strategy, we have sought, and will continue to seek, to acquire or to make investments in other businesses, patents, technologies, products or services. Our failure to do so successfully (including, if applicable, to finance such acquisitions or investments on favorable terms, to avoid adverse financial consequences, and to realize expected results from such acquisitions, investments or divestments) may adversely affect our financial results.***

Our growth strategy, which we sometimes refer to as our "North Star" strategy, is focused on providing a complete portfolio offering of products and services within additive manufacturing, initially in polymers, and after which we expect to add other areas, including metal printing, in the near future. In order to implement this strategy, we expect to continue to regularly evaluate acquisitions or investments to expand our suite of products and services. Even if we are able to identify a suitable acquisition or investment, we may not be able to consummate any such transaction if we cannot reach an agreement on favorable terms or if we lack sufficient resources to finance the transaction on our own and cannot obtain financing at a reasonable cost or if regulatory authorities prevent such transaction from being consummated. If we proceed with a particular acquisition or investment, we may have to use cash, issue new equity securities with dilutive effects on existing shareholders, incur indebtedness, assume contingent liabilities or amortize assets or expenses in a manner that might have a material adverse effect on our financial condition, results of operations or liquidity. Acquisitions will also require us to record certain acquisition-related costs and other items as current period expenses, which would have the effect of reducing our reported earnings in the period in which an acquisition is consummated. In addition, we could also face unknown liabilities or write-offs due to our acquisitions and investments, which could result in a significant charge to our earnings in the period in which they occur. We will also be required to record goodwill or other long-lived asset impairment charges (if any) in the periods in which they occur, which could result in a significant charge to our earnings in any such period. If an acquired entity or investment does not perform as projected and in accordance with our expectations, and is not accretive to our earnings, it may adversely impact our overall results of operations and hurt, rather than help, our business. We may decide to divest the acquired assets in such a situation, in order to generate cash or even merely to stop potential future losses.

***Our operations could suffer if we are unable to attract and retain key management or other key employees in the Israeli market or other markets in which we operate where competition for highly skilled technical and other personnel is intense.***

Our success depends upon the continued service and performance of our senior management and other key personnel. Our executive team is critical to the management of our business and operations, as well as to the development of our strategy. The loss of the services of any members of our senior executive team could delay or prevent the successful implementation of our strategy, or our commercialization of new applications for our systems or other products, or could otherwise adversely affect our ability to manage our company effectively and carry out our business plan. During 2023 we experienced minimal changes within our management team, which provided a year for the team to mature. There can be no assurance that we will be able to keep up our retention rate in the future, and if we need to fill additional management positions in the future, that we will be able to rapidly do so, without any adverse impact on our operations.

7

Our dependence on key employees extends beyond our senior executive team, to our highly skilled scientific, technical (including software) and sales personnel. Our principal research and development as well as significant elements of our general and administrative activities are conducted at one of our two headquarters, in Israel, and we face significant competition for suitably skilled employees in Israel. While there has been intense competition for qualified human resources in the Israeli high-tech industry historically (including the additive manufacturing, or AM, industry in which we operate), the industry experienced record growth and activity in the last couple of years, both at the earlier stages of venture capital and growth equity financings, and at the exit stage of initial public offerings and mergers and acquisitions. This flurry of growth and activity has caused an increase in job openings in both Israeli high-tech companies and Israeli research and development centers of foreign companies, and intensification of competition between these employers to attract qualified employees in Israel. As a result, the high-tech industry in Israel has experienced significant levels of employee attrition and is currently facing a severe shortage of skilled human capital, including engineering, research and development, software, sales and customer support personnel. This trend has moderated in the 2nd half of 2023. Similar shortages of key personnel also exist in the regions surrounding our Minnesota facilities. Companies with which we compete for qualified personnel may have greater resources than we do, and we may not succeed in recruiting additional experienced or professional personnel, retaining personnel or effectively replacing current personnel who may depart with qualified or effective successors. If we cannot attract and retain sufficiently qualified technical employees for our research and development and/or product development activities (including for the software in our products), we may be unable to achieve the synergies expected from mergers and acquisitions that we may effect from time to time, or to develop and commercialize new products or new applications for existing products.

In addition, as a result of the competition for qualified human resources, the Israeli high-tech and other high-tech markets have also experienced and may continue to experience significant wage inflation. Accordingly, our efforts to attract, retain and develop personnel may also result in significant additional expenses, which could adversely affect our profitability. Furthermore, in making employment decisions, particularly in the high-technology industry, job candidates often consider the value of the equity they are to receive in connection with their employment. Employees may be more likely to leave us if the shares they own or the shares underlying their equity incentive awards have significantly appreciated or significantly decreased in value. Many of our employees may receive significant proceeds from sales of our equity in the public markets, which may reduce their motivation to continue to work for us and could heighten the risk of employee attrition.

While we utilize non-competition agreements with our employees in jurisdictions where non-compete undertakings are lawful, as a means of improving our employee retention, those agreements may not be effective towards that goal. These agreements prohibit our employees, if they cease working for us, from competing directly with us or working for our competitors for a limited period. We may be unable to enforce these agreements under Israeli law or the law of other jurisdictions, and it may be difficult for us to restrict our competitors from benefiting from the expertise our former employees developed while working for us.

In light of the foregoing, there can be no assurance that qualified employees will remain in our employ or that we will be able to attract and retain qualified personnel in the future. Failure to retain or attract qualified personnel could have a material adverse effect on our business, financial condition and results of operations.

*Defects in new products or in enhancements to our existing products could give rise to product returns or product liability, warranty or other claims that could result in material expenses, diversion of management time and attention, and damage to our reputation.*

Our products are complex and may contain defects or experience failures or unsatisfactory performance due to any number of issues in design, fabrication, packaging, materials, and/or use within a system. These defects or errors could result in significant warranty, support and repair or replacement costs, cause us to lose market share and divert the attention of our engineering personnel from our product development efforts to find and correct the issue.

8

This risk of product liability claims may also be greater due to the use of certain hazardous chemicals used in the manufacture of certain of our products. Those hazardous chemicals fall within three different categories (with several of the chemicals falling within multiple categories): irritants, harmful chemicals and chemicals dangerous for the environment. In addition, we may be subject to claims that our 3D printers have been, or may be, used to create parts that are not in compliance with legal requirements or that intellectual property posted by third parties on our GrabCAD website infringes the intellectual property rights of others.

Any claim brought against us, regardless of its merit, could result in material expense, diversion of management time and attention, and damage to our reputation, and could cause us to fail to retain existing end-users or to attract new end-users. Although we maintain product liability insurance, such insurance is subject to significant deductibles and there is no guarantee that such insurance will be available or adequate to protect against all such claims, or we may elect to self-insure with respect to certain matters. Costs or payments made in connection with warranty and product liability claims and product recalls or other claims could materially affect our financial condition and results of operations.

### *Our sales of end-use parts to customers in the aerospace, medical, dental and automotive industries, and of 3D printing systems to customers in the aerospace industry, carry with them a greater potential for liability claims against us.*

Our manufacturing services business, Stratasys Direct Manufacturing, produces parts used as prototypes, benchmarks, and end-use parts. In the case of end-use parts, our sales to customers in the aerospace, medical, dental and automotive industries, in particular, makes us more susceptible to product and other liability claims, which characterize operations in those industries. Sales of our 3D printing systems to customers in the aerospace industry similarly carry with them potential liability claims if the parts produced by those systems do not function properly. Any such claims that are not adequately covered by insurance or for which insurance is not available may adversely affect our results of operations and financial condition.

### *If our relationships with suppliers for our products and services, especially with single source suppliers of components of our products, were to terminate or our manufacturing arrangements were to be disrupted, our business could be interrupted.*

We purchase components and sub-assemblies for our systems, raw materials that are used in our consumables, and AM systems, component parts and raw materials for our Stratasys Direct Manufacturing services business, from third-party suppliers, some of whom may compete with us. While there are several potential suppliers of most of these component parts, sub-assemblies and raw materials that we use, we currently choose to use only one or a limited number of suppliers for several of these components and materials. Furthermore, the suppliers of AM systems and materials used in our Stratasys Direct Manufacturing parts service may refuse to sell us additional AM systems or component parts and materials for AM systems that our Stratasys Direct Manufacturing service uses. Our reliance on a single or limited number of vendors involves a number of risks, including:

- potential shortages of some key components;

- product performance shortfalls, if traceable to particular product components, since the supplier of the faulty component cannot readily be replaced;

- discontinuation of a product or certain materials on which we rely;

- potential insolvency of these vendors; and

- reduced control over delivery schedules, manufacturing capabilities, quality and costs.

9

In addition, we require any new supplier to become "qualified" pursuant to our internal procedures. The qualification process involves evaluations of varying durations, which may cause production delays if we were required to qualify a new supplier unexpectedly. We generally assemble our systems and parts based on our internal forecasts and the availability of raw materials, assemblies, components and finished goods that are supplied to us by third parties, which are subject to various lead times. If certain suppliers were to decide to discontinue production of an assembly, component or raw material that we use, the unanticipated change in the availability of supplies, or unanticipated supply limitations, could cause delays in, or loss of, sales, increased production or related costs and consequently reduced margins, and damage to our reputation. If we were unable to find a suitable supplier for a particular component, material or compound, we could be required to modify our existing products or the end- parts that we offer to accommodate substitute components, material or compounds. While we have introduced periodic risk analysis internally concerning our sourcing (particularly concerning raw materials), which has increased the levels of our inventories, there is no guarantee that will sufficiently protect us if we suddenly lose access to supplies unexpectedly.

In particular, we rely on a sole supplier, Ricoh Printing Systems America, Inc., or Ricoh, for the printer heads for our PolyJet 3D printers. Under the terms of our agreement with Ricoh, we purchase printer heads and associated electronic components, and receive a non-transferable, non-exclusive right to assemble, use and sell these purchased products under Ricoh's patent rights and trade secrets. Due to the risk of a discontinuation of the supply of Ricoh printer heads and other key components of our products, we maintain excess inventory of those printer heads and other components. However, if our forecasts exceed actual orders, we may hold large inventories of slow- moving or unusable parts or raw materials, which could result in inventory write offs or write downs and have an adverse effect on our cash flow, profitability and results of operations. See "Item 4. Information on the Company-Business Overview-Manufacturing and Suppliers-Inventory and Suppliers-Ricoh Agreement" for further discussion of this agreement.

***Discontinuation of operations at our manufacturing sites could prevent us from timely filling customer orders and could lead to unforeseen costs for us.***

We assemble and test the systems that we sell, and, in many cases, produce consumables for our systems, at single facilities in various locations that are specifically dedicated to separate categories of systems and consumables. We similarly rely on a single facility for assembly of the component parts and materials for AM systems that our Stratasys Direct Manufacturing service uses. Because of our reliance on all of these production facilities, a disruption at any of those facilities could materially damage our ability to supply 3D printers, other systems or consumable materials to the marketplace in a timely manner. Depending on the cause of the disruption, we could also incur significant costs to remedy the disruption and resume product shipments. Such disruptions may be caused by, among other factors, earthquakes, fire, flood and other natural disasters. There are no assurances that we will be adequately protected from any significant disruptions at our manufacturing sites. Accordingly, any such disruption could result in a material adverse effect on our revenue, results of operations and earnings, and could also potentially damage our reputation.

10

***A loss of, or reduction in revenues from, a significant number of our resellers and our independent sales agents would impair our ability to sell our products and services and could reduce our revenues and adversely impact our operating results.***

We rely heavily on our network of resellers and independent sales agents to sell and (in the case of resellers) to service our products for end-users in their respective geographic regions. These resellers and sales agents may not be as effective in selling our products or servicing our end-users as we are. Further, if our relationships with a significant number of these resellers and sales agents were to be terminated or if a significant number of these resellers and sales agents would otherwise fail or refuse to sell our products, we may not be able to find replacements that are as qualified or as successful in a timely manner, if at all. If these resellers and independent sales agents do not perform as anticipated or if we are unable to find qualified and successful replacements, our sales will suffer, which would have an adverse effect on our revenues and operating results. Additionally, a default by one or more resellers that have a significant receivables balance could have an adverse financial impact on our financial results.

***Global interruptions and delays involving freight carriers and other third parties have adversely impacted, and may once again adversely impact our supply chain and distribution network, and, consequently, frustrate our ability to sell our 3D printing systems, especially those systems that are based on newly acquired technologies that we have recently launched.***

Our business relies on an efficient and effective supply chain, including delivery of raw materials and parts for our 3D printing systems, and the manufacture and transport of those systems to resellers or end-users (as applicable). International supply chains were adversely impacted by the COVID-19 pandemic, which negatively affected the flow and availability of our products. While global supply chains have generally returned to normal function since that time, future delays and interruptions, similar to those caused by the recent Houthis attacks in the area of the Red Sea-Suez Canal trade route, could once again adversely the distribution of our products. That may also result in higher out-of-stock inventory positions due to difficulties in timely obtaining raw materials and parts from our suppliers, as well as transportation of our products after manufacture to our distribution destinations. Further, as a result of such delays, we may need to source raw materials and parts from different geographic locations or manufacturers, which could result in, among other things, higher product costs, increased transportation costs, delays in sales of our products or lower quality of our products. The adverse impact of these irregularities in our supply chain on our ability to distribute our 3D printing systems may be most acute for systems that are based on our three recently-acquired technologies, where we have just recently implemented our distribution channels.

Additionally, the operation of our manufacturing facilities, where our 3D printing systems are assembled, is crucial to our business operations. If our manufacturing facilities experience closures or worker shortages (similar to what occurred during the COVID-19 pandemic), whether temporary or sustained, we could sustain significant adverse impacts related to the distribution of our products to their destinations, whether to resellers or end-users (as applicable).

Any of these circumstances could adversely affect our ability to deliver our 3D printing systems in a timely manner, which could impair our ability to meet customer demand for products and result in lost sales and services revenues, increased supply chain costs, and, potentially, damage to our reputation.

11

***Our business model is predicated in part on building an end-user base that will generate a recurring stream of revenues through our sale of consumables and service contracts. If that recurring stream of revenues does not continue, or if our business model changes as the industry evolves, our operating results may be adversely affected.***

Our business model is dependent in part on our ability to maintain a differentiated portfolio of proprietary consumables, and to increase our sales of our proprietary and third-party consumables and service contracts as that generates recurring revenues. Existing and future end-users of our systems may not purchase our consumables or related service contracts at the same rate at which end-users currently purchase those consumables and services. In addition, the use of our systems for prototyping applications, which is often carried out with entry-level systems generally requires a lower volume of consumables relative to the use of our systems for manufacturing, which is usually carried out with our higher end systems. If our current and future end-users do not transition towards manufacturing applications for our systems that are handled through our high end systems and do not, therefore, purchase a higher volume of our consumables, or if our end users do not enter into an increasing number of service contracts with us, our recurring revenue stream relative to our total revenues would be reduced, and our operating results would be adversely affected.

***Global economic, political and social conditions may adversely impact our sales.***

Uncertainty with respect to the global economy, difficulties in the financial services sector and credit markets, geopolitical uncertainties and other macroeconomic factors all affect spending behavior of potential end-users of our products and services. The uncertain prospects for economic growth in some of the regions in which we sell our products may cause end-users to delay or reduce technology purchases. We also face risks that may arise from financial difficulties experienced by our end-users, suppliers and distributors, which may be exacerbated by continued uncertainty in the global economy or by other geopolitical factors, including:

- increased interest rates in many countries and regions throughout the world, including the regions where our customers are located;

- supply chain disruptions, which have slowed the delivery of raw materials, and which have increased the price of certain materials due to the significant increase in costs of raw materials and shipping costs;

- the ongoing U.S.- China trade war may impact the cost of raw materials, finished products or components used in our products, and our ability to sell our products in China;

- threats of massive cyber attacks that could cause severe economic damage;

- extended U.S. federal government shutdowns (resulting from the failure to pass budget appropriations or adopt continuing funding resolutions) may delay orders of our products by U.S. government agencies or other end-users whose business activities are heavily dependent on U.S. government agency contracts;

- end-user demand for products and manufacturing activity levels may be reduced;

- distributors and end-users may be unable to obtain credit financing to finance purchases of our products;

- suppliers may be unable to obtain credit financing to finance purchases of sub-assemblies used to build components of products or purchases of raw materials to produce consumables;

- end-users or distributors may face financial difficulties or may become insolvent, which could lead to our inability to obtain payment for our products; and

- key suppliers of raw materials, finished products or components used in our products and consumables may face financial difficulties or may become insolvent, which could lead to disruption in the supply of systems, consumables or spare parts to our end-users.

12

***Our existing and planned international operations currently expose us and will continue to expose us to additional market and operational risks, and failure to manage these risks may adversely affect our business and operating results.***

We expect to derive a substantial percentage of our sales from international markets. We derived 37.9% of our revenues in 2023 from countries outside the Americas. Accordingly, we face significant operational risks from doing business internationally, including:

- fluctuations in foreign currency exchange rates;

- potentially longer sales and payment cycles;

- potentially greater difficulties in collecting accounts receivable;

- potentially adverse tax consequences;

- reduced protection of intellectual property rights in certain countries, particularly in Asia and South America;

- difficulties in staffing and managing foreign operations;

- laws and business practices favoring local competition;

- costs and difficulties of customizing products for foreign countries;

- compliance with a wide variety of complex foreign laws, treaties and regulations;

- tariffs, trade barriers and other regulatory or contractual limitations on our ability to sell or develop our products in certain foreign markets; and

- being subject to the laws, regulations and the court systems of many jurisdictions.

Our failure to manage the market and operational risks associated with our international operations effectively could limit the future growth of our business and adversely affect our operating results.

***Significant cybersecurity disruptions of our information technology systems or breaches of our data security could adversely affect our business.***

A significant invasion, interruption, destruction or breakdown of our information technology, or IT, systems and/or infrastructure by persons with authorized or unauthorized access could negatively impact our business and operations. We could also experience business interruption, information theft and/or reputational damage from cyber attacks, which may compromise our systems and lead to data leakage either internally or at our third party providers. Both data that has been inputted into our main IT platform, which covers records of transactions, financial data and other data reflected in our results of operations, as well as data related to our proprietary rights (such as research and development, and other intellectual property- related data), are subject to material cyber security risks. Our IT systems have been, and are expected to continue to be, the target of malware and other cyber attacks. To date, we are not aware that we have experienced any loss of, or disruption to, material information as a result of any such malware or cyber attack.

We have invested in advanced protective systems to reduce these risks, some of which have been installed and others that are still in the process of installation. Based on information provided to us by the suppliers of our protective systems, we believe that our level of protection is in keeping with the customary practices of peer technology companies, market standards and best practice. We also maintain back-up files for much of our information, as a means of assuring that a breach or cyber attack does not necessarily cause the loss of that information. We furthermore review our protections and remedial measures periodically in order to ensure that they are adequate.

13

Despite these protective systems and remedial measures, techniques used to obtain unauthorized access are constantly changing, are becoming increasingly more sophisticated and often are not recognized until after an exploitation of information has occurred. We may be unable to anticipate these techniques or implement sufficient preventative measures, and we therefore cannot assure you that our preventative measures will be successful in preventing compromise and/or disruption of our information technology systems and related data. We furthermore cannot be certain that our remedial measures will fully mitigate the adverse financial consequences of any cyber attack or incident.

***We are subject to environmental laws and export control laws due to the import and export of our products, as well as environmental, health, safety and medical device laws and regulations related to our operations and the use of our systems and materials, including requirements imposed due to use of our products by our customers, which could subject us to compliance costs and/or potential liability in the event of non-compliance.***

The export of our products internationally subjects us to environmental laws and regulations concerning the import and export of chemicals and hazardous substances such as the United States Toxic Substances Control Act, or TSCA, and the Registration, Evaluation, Authorization and Restriction of Chemical Substances, or REACH. These laws and regulations require the testing and registration of some chemicals that we ship along with, or that form a part of, our systems and other products. If we fail to comply with these or similar laws and regulations, we may be required to make significant expenditures to reformulate the chemicals that we use in our products and materials or incur costs to register such chemicals to gain and/or regain compliance. Additionally, we could be subject to significant fines or other civil and criminal penalties should we not achieve such compliance.

The export of our products is also subject to several export regulations, including but not limited to the United States. Export Administration Regulations, the United States International Traffic in Arms Regulations, the United States Arms Export Control Act and regulations and orders administered by the United States Treasury Department's Office of Foreign Assets Control (which we refer to collectively as Export/Import Laws). Our products are governed by civil controls, but failure to comply with these Export/Import Laws may potentially lead to the imposition of greater restrictions on our ability to export those products and penalties if we fail to comply with our restrictions.

We are furthermore subject to extensive environmental, health and safety laws, regulations and permitting requirements in multiple jurisdictions due to our use of chemicals and production of waste materials as part of our operations and in connection with the operation of our systems by our customers. In certain cases, the required compliance with health or safety regulations is imposed by our customers themselves. These laws, regulations and requirements (which include the Directive on Waste Electrical and Electronic Equipment of the European Union (EU) and the EU Directive on Restriction of Use of Certain Hazardous Substances) govern, among other things, the generation, use, storage, registration, handling and disposal of chemicals and waste materials, the presence of specified substances in electrical products, the emission and discharge of hazardous materials into the ground, air or water, the cleanup of contaminated sites, including any contamination that results from spills due to our failure to properly dispose of chemicals and other waste materials and the health and safety of our employees. Under these laws, regulations and requirements, we could also be subject to liability for improper disposal of chemicals and waste materials, including those resulting from the use of our systems and accompanying materials by end-users. These or future laws and regulations could potentially require the expenditure of significant amounts for compliance and/or remediation. If our operations fail to comply with such laws or regulations, we may be subject to fines and other civil, administrative or criminal sanctions, including the revocation of permits and licenses necessary to continue our business activities. In addition, we may be required to pay damages or civil judgments in respect of third-party claims, including those relating to personal injury (including exposure to hazardous substances that we generate, use, store, handle, transport, manufacture or dispose of), property damage or contribution claims. Some environmental laws allow for strict, joint and several liabilities for remediation costs, regardless of fault. We may be identified as a potentially responsible party under such laws. Effective as of February 2023, we are also subject to medical device regulations, such as the U.S. FDA Code of Federal Regulations, as a result of our launch of our first certified medical device with TrueDent resin in the United States. We also have plans to expand the countries and products that we certify as medical devices in the coming years.

If we fail to comply with any such regulations or are subject to related liability, such developments could have a material adverse effect on our business, financial condition and results of operations.

14

***As a public company with significant operations in several countries, we are subject to regulation and must comply with reporting, privacy and other requirements in a number of jurisdictions and, to the extent that regulatory authorities assert that we are not in compliance, we could be subject to sanctions which, if material, could materially and adversely affect our business.***

As a public company with significant operations in Israel, the United States, Europe and many other countries, we are subject to regulation and must comply with reporting and other requirements in a number of jurisdictions. In particular, we are subject to the rules and regulations of the SEC and FINRA, which may elect from time to time to review or investigate our operations, various aspects of our financial statements, our disclosure practices and other matters. As such reviews progress, the regulating agencies may determine that we are and have been in compliance with applicable rules, or they may determine to pursue enforcement actions or other sanctions against us for alleged noncompliance.

New privacy laws are also beginning to impose on our company increased compliance costs. Our California operations are now subject to the California Consumer Privacy Act, or CCPA, a statute that went into effect on January 1, 2020. The CCPA imposes enhanced disclosure requirements for us vis-à-vis our interactions with customers that are residents of California, such as comprehensive privacy notices for consumers when we or our agents collect their personal information. We may be further required to ensure third party compliance, as under the CCPA we could be liable if third parties that collect, process or retain personal information on our behalf violate the CCPA's privacy requirements. The sanctions for non-compliance could include fines and/or civil lawsuits.

In addition to the imposition of U.S.-based regulations on our operations, our European activities are subject to the European Union General Data Protection Regulation, or GDPR, which has created additional compliance requirements for us. GDPR broadens the scope of personal privacy laws to protect the rights of European Union citizens and requires organizations to report on data breaches within 72 hours and be bound by stringent rules for obtaining the consent of individuals on how their data can be used. GDPR became enforceable on May 25, 2018, and non-compliance exposes entities such as our company to significant fines or other regulatory claims. While we have invested in, and intend to continue to invest in, reasonably necessary resources to comply with these new privacy standards (both in Europe and in California), to the extent that we fail to adequately comply, that failure could have an adverse effect on our business, financial conditions, results of operations and cash flows.

***Failure to comply with the U.S. Foreign Corrupt Practices Act or other applicable anti-corruption legislation could result in fines, criminal penalties and an adverse effect on our business.***

We operate in a number of countries throughout the world, including countries known to have a reputation for corruption. We are committed to doing business in accordance with applicable anti-corruption laws. We are subject, however, to the risk that our affiliated entities or our and our affiliates' respective officers, directors, employees and agents (including distributors of our products) may take action determined to be in violation of such anti-corruption laws, including the U.S. Foreign Corrupt Practices Act of 1977 and the U.K. Bribery Act of 2010, as well as trade sanctions administered by the Office of Foreign Assets Control and the U.S. Department of Commerce. Any violation by any of these persons could result in substantial fines, sanctions, civil and/or criminal penalties, or curtailment of operations in certain jurisdictions, and might adversely affect our results of operations. In addition, actual or alleged violations could damage our reputation and ability to do business.

***We own a number of our manufacturing and office facilities, which may limit our ability to move those operations. If we were to move some or all of those operations, we could incur unforeseen charges.***

We own buildings in Eden Prairie, Minnesota, which we use to conduct our FDM manufacturing and assembly operations, as well as our office facility in Rehovot, Israel and manufacturing facility in Kiryat Gat, Israel. Ownership of these buildings and facilities may adversely affect our ability to move some or all of those operations to other locations that may be more favorable. If we were to move any of those operations to other locations, we may have difficulty selling or leasing the property that we vacate.

This risk also applies to the facilities that we lease under non-cancellable lease agreements, where we cannot freely vacate the facilities. In order to combat these risks, we have limited our commitment under our leases by providing ourselves with a "break" option after three years or less. In most of our leases we have also obtained for ourselves the right to sublease a portion or all of the facilities under the lease.

These limitations on our ability to move could result in an impairment charge, as occurred in the prior periods in respect of some of our leased facilities, which negatively impacted our results of operations, and could, in future periods, once again have an adverse effect on our results of operations.

***Default in payment by one or more resellers or customers from which we have large account receivable balances could adversely impact our results of operations and financial condition.***

From time to time, our accounts receivable balances have been concentrated with certain resellers or customers. Default by one or more of these resellers or customers could result in a significant charge against our current reported earnings. We have reviewed our policies that govern credit and collections, and will continue to monitor them in light of current payment status and economic conditions. In addition, we try to reduce the credit exposures of our accounts receivable by credit limits and credit insurance for many of our customers. However, there can be no assurance that our efforts to identify potential credit risks will be successful. Our inability to timely identify resellers and customers that are credit risks could result in defaults at a time when such resellers or customers have high accounts receivable balances with us. Any such default would result in a significant charge against our earnings and adversely affect our results of operations and financial condition.

***We are, and have been in the recent past, subject to litigation. Any current or future lawsuits to which we are subject may have a significant adverse effect on our financial condition or profitability.***

We are currently, and have been in the recent past, subject to litigation, and could be subject to further litigation in the future.

We can provide no assurance as to the outcome of any future lawsuits, and any such actions may result in judgments against us for significant damages. Resolution of any such matters can be prolonged and costly, and the ultimate results or judgments are uncertain due to the inherent uncertainty in litigation and other proceedings. Moreover, our potential liabilities are subject to change over time due to new developments, changes in settlement strategy or the impact of evidentiary requirements. Regardless of the outcome, litigation has resulted in the past, and may result in the future, in significant legal expenses and require significant attention and resources of management. As a result, any present or future litigation could result in losses, damages and expenses that have a significant adverse effect on our financial condition or profitability.

***Potential hostile actions by a shareholder or other third party, such as Nano Dimension Ltd. or 3D Systems Corporation, including a legal challenge to our shareholder rights plan, a potential additional unsolicited tender offer, or a potential additional attempt to remove and replace our directors with its own nominees, could materially adversely impact our shareholders' investment in our company and could also strain our cash resources.***

16

We are currently subject to litigation in Israel initiated by Nano in which Nano is challenging the validity, under Israeli law, of our shareholder rights plan, which we adopted once again, on December 21, 2023, for limited duration (one year) with enhanced shareholder protections. Our new shareholder rights plan is designed to give all shareholders (other than an offeror) a way to voice their position directly to our board of directors on certain types of offers and whether the plan should apply to those offers, and in other circumstances, to exempt an offer from the applicability of the rights altogether. The Israeli courts have not previously ruled on the legality of a shareholder rights plan or so-called "poison pill" under the Israeli Companies Law, 5759-1999, or the Companies Law. On July 18, 2023, in the context of an interim procedural decision, the court expressed its preliminary view that: it is inclined to rule that rights plans are permissible under Israeli law; the adoption of a rights plan by a board should be viewed "with suspicion"; and a board bears the burden of proving that it was informed, that it acted in good faith, that experts were consulted, and that it considered the interests of the company and its shareholders, rather than acting for the sake of entrenching itself, when adopting a shareholder rights plan. While this interim ruling opens the way for a potential final court ruling that our shareholder rights plan was valid and validly adopted, there can be no assurance that the Israeli court will determine that our board of directors actually met the requisite burden of proof for upholding such validity.

In addition to its legal challenge to Stratasys' shareholder rights plan, Nano may also launch, in the future, a hostile tender offer that may be similar to the Nano tender offer that it launched on May 25, 2023 and that expired on July 31, 2023, pursuant to which it may seek to acquire our ordinary shares which, together with any ordinary shares that it already owns, may represent a majority or, even if less than a majority, a significant percentage of the outstanding ordinary shares. Nano has recently re-initiated its pursuit of an acquisition of our company, announcing on December 23, 2023 a preliminary proposal to purchase all outstanding shares of our company that it does not currently own for $16.50 per share in cash. We have acknowledged receipt of Nano's, offer and have indicated that our board of directors would consider it as part of the process to explore strategic alternatives for our company, which process was initiated by our board, together with our independent financial and legal advisors, on September 28, 2023. There can be no assurances that if our board determines that pursuit of an alternative strategic option, rather than an acquisition by Nano, would better maximize value for our shareholders, that Nano would not once again attempt a hostile tender offer or other action to attempt to take over our company in a manner that would not maximize shareholder value.

Nano may also utilize its rights pursuant to the provisions of the Companies Law to demand, as a greater-than 5% shareholder, to call an extraordinary general meeting of shareholders at which the removal of some or all of our then-incumbent directors and the election of Nano's nominees in their stead would be on the agenda. The relevant majority for approval of any such proposal would be an ordinary majority of shares represented in person or by proxy and voting at a general meeting, without excluding the shares of interested shareholders. If Nano were to hold a substantial portion of our ordinary shares when doing so, Nano's votes in favor of such a proposal would give it an advantage in having the proposal approved.

To the extent that the Israeli court invalidates our shareholder rights plan, declares or provides any further remedies to Nano that facilitate, and thereby allow, Nano to launch a new tender offer that is similar to the expired Nano tender offer, that may result in Nano having another opportunity to attempt to become a majority or significant shareholder of our company. Nano would then have significant ability to impact the operations of Stratasys. Similarly, if Nano succeeds in the future in replacing any of our directors, that would also give it significant influence over the management and policies of Stratasys. Either or both of those outcomes would enable Nano to influence the operations of Stratasys for its own interests, which may be to the detriment of our public/minority shareholders. Nano could use its voting power, whether as a substantial (or even controlling) shareholder or on the Stratasys board, to significantly influence the policies of our company in a manner that benefits Nano and adversely impacts the company and its results of operations in a material way. Nano's possession of a substantial or controlling interest in Stratasys could also adversely impact trading in Stratasys' ordinary shares and liquidity for Stratasys' public/minority shareholders, potentially causing a decline in the value of public shareholders' investment in Stratasys.

17

***Under applicable employment laws, we may not be able to enforce covenants not to compete and therefore may be unable to prevent our competitors from benefiting from the expertise of some of our former employees.***

We generally enter into non-competition agreements with our employees in jurisdictions where non-compete undertakings are lawful and enforceable. These agreements prohibit our employees from competing directly with us or working for our competitors or clients for a limited period after they cease working for us. We may be unable to enforce these agreements under the laws of the jurisdictions in which our employees work and it may be difficult for us to restrict our competitors from benefiting from the expertise that our former employees or consultants developed while working for us. For example, Israeli courts have required employers seeking to enforce non-compete undertakings of a former employee to demonstrate that the competitive activities of the former employee will harm one of a limited number of material interests of the employer that have been recognized by the courts, such as the secrecy of a company's confidential commercial information or the protection of its intellectual property. If we cannot demonstrate that such interests will be harmed, we may be unable to prevent our competitors from benefiting from the expertise of our former employees or consultants and our ability to remain competitive may be diminished. As to our U.S. operations, in California, where many employees of our Stratasys Direct Manufacturing parts service as well as Origin's employees, are located, non-competition agreements with employees are generally illegal, void and unenforceable after termination of employment, regardless of when the agreement was signed or whether it was signed in California. Other states as well have been expanding laws restricting the use of non-compete clauses. On the U.S. federal level, there was movement in 2023 by federal agencies to make noncompete agreements unenforceable in general. The Federal Trade Commission proposed a new rule to ban employers nationwide from using non-compete agreements with their employees and independent contractors, and the General Counsel of the National Labor Relations Board issued a memo in March 2023 opining that many types of non-compete and non-solicitation restrictions unlawfully interfere with employees' protected rights under Section 7 of the National Labor Relations Act. If any of these proposed new U.S. federal restrictions becomes effective, or if more states in which we have operations continue to expand restrictions or bans on use of non-compete restrictions, that could adversely impact our ability to protect our investment in our key employees in our U.S. locations, and harm our competitive position.

***We rely on our management information systems for inventory management, distribution, and other key functions. If our information systems fail to adequately perform these functions, or if we experience an interruption in their operation, our business and operating results could be adversely affected.***

The efficient operation of our business is dependent on our management information systems. We rely on our management information systems: to, among other things, effectively manage our accounting and financial functions, including maintaining our internal controls; to manage our manufacturing and supply chain processes; and to maintain our research and development data. The failure of our management information systems to perform properly could disrupt our business and product development, which may result in decreased sales, increased overhead costs, excess or obsolete inventory, and product shortages, causing our business and operating results to suffer.

Although we take steps to secure our management information systems, including our computer systems, intranet and internet sites, email and other telecommunications and data networks, the security measures we have implemented may not be effective and our systems may be vulnerable to theft, loss, damage and interruption from a number of potential sources and events, including unauthorized access or security breaches, natural or man-made disasters (such as floods or earthquakes), cyber-attacks, computer viruses, power loss, or other disruptive events. Our reputation, brand, and financial condition could be adversely affected if, as a result of a significant cyber event or otherwise, our operations are disrupted or shut down; our confidential, proprietary information is stolen or disclosed; we incur costs or are required to pay fines in connection with stolen customer, employee, or other confidential information; we must dedicate significant resources to system repairs or increase cyber security protection; or we otherwise incur significant litigation or other costs.

18

**Risks related to our intellectual property**

***If we are unable to obtain patent protection for our products or otherwise protect our intellectual property rights, our business could suffer.***

We rely on a combination of patent and trademark laws in the United States and other countries, trade secret protection, confidentiality agreements and other contractual arrangements with our employees, end-users and others to maintain our competitive position. In particular, our success depends, in part, on our ability, and the ability of our licensors, to obtain patent protection for our and their products, technologies and inventions, maintain the confidentiality of our and their trade secrets and know-how, operate without infringing upon the proprietary rights of others and prevent others from infringing upon our and their proprietary rights. As we acquire additional companies and their technologies, such as Origin and its P3 technology, acquired in December 2020, RPS and its stereolithography technology, acquired in February 2021, Xaar and its powder-based SAF technology, acquired fully in November 2021, and our latest acquisition of the Covestro Additive Manufacturing business unit in April 2023,the risks related to potential infringement of our proprietary rights in technology become more pronounced.

Despite our efforts to protect our proprietary rights, it is possible that competitors or other unauthorized third parties may obtain, copy, use or disclose our technologies, inventions, processes or improvements. We cannot assure you that any of our existing or future patents or other intellectual property rights will not be challenged, invalidated or circumvented, or will otherwise provide us with meaningful protection. Our pending patent applications may not be granted, and we may not be able to obtain foreign patents or pending applications corresponding to our U.S. patents. The laws of certain countries, such as China, may not provide the same level of patent protection and intellectual property right enforcement as in the United States, so even if we enforce our intellectual property rights or obtain additional patents in China or elsewhere outside of the United States, enforcement of such rights may not be effective. If our patents and other intellectual property do not adequately protect our technology, our competitors may be able to offer additive manufacturing systems, consumables or other products similar to ours. Our competitors may also be able to develop similar technology independently or design around our patents, and we may not be able to detect the unauthorized use of our proprietary technology or take appropriate steps to prevent such use.

If we attempt enforcement of our intellectual property rights, we may be (as we have been in the past) subject or party to claims, negotiations or complex, protracted litigation. Intellectual property disputes and litigation, regardless of merit, can be costly and disruptive to our business operations by diverting attention and energies of management and key technical personnel, and by increasing our costs of doing business. Any of the foregoing could adversely affect our operating results.

19

***We may be subject to claims that we are infringing, misappropriating or otherwise violating the intellectual property rights of others, especially in light of the heightened pace of adoption of new technologies in our industry and the multiple additional technologies that we have been acquiring.***

Our products and technology, including technology that we acquire as a result of our ongoing acquisitions of other businesses and technology that we license from others, about which we may be less knowledgeable that our organically developed technology, may infringe, misappropriate or otherwise violate the intellectual property rights of third parties. This risk is especially relevant to our industry, where the pace of innovation and adoption of new technologies by industry players has been accelerated in recent years. Patent applications in the United States and most other countries are confidential for a period of time until they are published, and the publication of discoveries in scientific or patent literature typically lags actual discoveries by several months or more. As a result, the nature of claims contained in unpublished patent filings around the world is unknown to us, and we cannot be certain that we or our acquired companies were the first to conceive inventions covered by our self-developed or our acquired patents or patent applications or that we or our acquired companies were the first to file patent applications covering such inventions. Furthermore, it is not possible to know in which countries patent holders may choose to extend their filings under the Patent Cooperation Treaty or other mechanisms. In addition, we may be subject to intellectual property infringement claims from individuals, vendors and other companies, including those that have acquired patents in the fields of 3D printing or consumable production for the sole purpose of asserting claims against us.

Under the Israeli Patent Law, 5727-1967, or the Patent Law, we may also be subject to royalty claims for "service inventions" conceived by employees in the course and as a result of or arising from their employment with us. Section 134 of the Patent Law provides that if there is no agreement between an employer and an employee as to whether the employee is entitled to consideration for service inventions, the Israeli Compensation and Royalties Committee, or the Committee, a body constituted under the Patent Law, shall determine these issues. We believe that virtually all of our employees have executed invention assignment agreements in which they have assigned to us their rights to potential inventions and acknowledged that they will not be entitled to additional compensation or royalties from commercialization of inventions. We may, nevertheless, face claims demanding remuneration in consideration for assigned inventions.

In addition to patent infringement and patent-related claims, we may be subject to other intellectual property claims, such as claims that we are infringing trademarks or misappropriating trade secrets. We may also be subject to claims relating to the content on our websites, including third-party content posted on our GrabCAD.com website. Any intellectual property claims, regardless of the merit or resolution of such claims, could cause us to incur significant costs in responding to, defending and resolving such claims, and may prohibit or otherwise impair our ability to commercialize new or existing products, including products developed by our acquired companies. Resolution of such claims may, among other things, require us to redesign infringing technology, enter into costly settlement or license agreements on terms that are unfavorable to us, pay royalties to employees or former employees, or indemnify our distributors and end-users. Any infringement by us, including our acquired companies, or our licensors of the intellectual property rights of third parties may have a material adverse effect on our business, financial condition and results of operations.

***If we are unable to protect the confidentiality of our trade secrets or know-how, such proprietary information may be used by others to compete against us, for instance, in developing consumables that could be used with our printing systems in place of our proprietary consumables.***

We have devoted substantial resources to the development of our technology, trade secrets, know-how and other unregistered proprietary rights. While we enter into confidentiality and invention assignment agreements intended to protect such rights, such agreements can be difficult and costly to enforce or may not provide adequate remedies if violated, and we may not have entered into such agreements with all relevant parties. Such agreements may be breached and confidential information may be willfully or unintentionally disclosed, including by employees who may leave our company and join our competitors, or our competitors or other parties may learn of the information in some other way. The disclosure to, or independent development by, a competitor of any of our trade secrets, know-how or other technology not protected by a patent or other intellectual property system could materially reduce or eliminate any competitive advantage that we may have over such competitor.

20

This concern could manifest itself in particular with respect to our proprietary consumables that are used with our systems. Portions of our proprietary consumables may not be afforded patent protection. Chemical companies or other producers of raw materials used in our consumables may be able to develop consumables that are compatible to a large extent with our systems, whether independently or in contravention of our trade secret rights and related proprietary and contractual rights. If such consumables are made available to owners of our systems, and are purchased in place of our proprietary consumables, our revenues and profitability would be reduced and we could be forced to reduce prices for our proprietary consumables.

*As our patents expire, additional competitors using our technology could enter the market, which could offer competitive printers and consumables, require us to reduce our prices for our products and result in lost sales.*

Some of our patents have expired and others will expire in coming years. Upon expiration of those patents, our competitors have introduced, and are likely to continue to introduce, products using the technology previously protected by the expired patents, which products may have lower prices than those of our products. To compete, we may need to reduce our prices for those products, which would adversely affect our revenues, margins and profitability. Additionally, the expiration of our patents could reduce barriers to entry into AM systems, which could result in the reduction of our sales and earnings potential.

## Risks related to operations in Israel

*The recent attack by Hamas and other terrorist organizations from the Gaza Strip and Israel's war against them and its hostilities with additional regional terrorist groups may adversely affect our operations.*

In October 2023, Israel was attacked by Hamas and other terrorist organizations operating out of the Gaza Strip and declared war in response. As part of the war, Israel has also had hostilities with Hezbollah, a Lebanese terrorist group. Our senior executives, some of our board members and some of our employees live in Israel. A small group of our employees have been called for military service, and such persons may be unavailable for extended periods of time. Our operations may be disrupted by such absence, which, if involving several senior executives or board members (although not currently the case) may materially affect our operations in an adverse manner. In the event that our facilities are damaged as a result of hostile actions, or hostilities otherwise disrupt our ongoing operations, our ability to deliver or provide products and services in a timely manner to meet our contractual obligations towards customers and vendors could be affected.

Currently, our activities in Israel remain largely unaffected, and we maintain business continuity plans backed by our inventory levels located outside of Israel. As of the date herein, the impact of the war on our results of operations and financial condition is not material, but such impact may increase, and could become material, as a result of the continuation, escalation or expansion of the war.

21

*Our Israeli headquarters and manufacturing and other significant operations may be adversely affected by military economic and political, instability in Israel.*

One of our dual corporate headquarters, as well as our PolyJet system manufacturing facility, all of our PolyJet research and development facilities, one of our two PolyJet consumables manufacturing facilities, one of our FDM manufacturing facilities, and some of our suppliers, are located in central and southern Israel. In addition, many of our key employees, officers and directors are residents of Israel. Accordingly, military, economic and political conditions in Israel may directly affect our business. Since the establishment of the State of Israel in 1948, a number of armed conflicts have taken place between Israel and its neighboring countries, and between Israel and nearby terrorist groups. Any hostilities involving Israel or the interruption or curtailment of trade between Israel and its trading partners could adversely affect our operations and financial condition. Currently, and several additional times over the past two decades, Israel has been engaged in armed conflicts with Hamas, a terrorist group and political party that has controlled the Gaza Strip, and currently (to a more limited extent) and during the summer of 2006, Israel has been engaged in an armed conflict with Hezbollah, a Lebanese Islamist Shiite terrorist group and political party. These conflicts have involved missile strikes against civilian targets in various parts of Israel, including areas where some of our manufacturing facilities are located, and negatively affected business conditions in Israel. Armed conflicts, terrorist activities and political instability in the region, including Iranian involvement in Syria, have, to a certain extent, adversely affected business conditions and could harm our results of operations and our ability to raise capital. Parties with whom we have agreements involving performance in Israel may claim that they are not obligated to perform their commitments under those agreements pursuant to force majeure provisions in such agreements due to the political or security situation in Israel.

Furthermore, many of our male employees in Israel, including members of our senior management, are obligated to perform one month, and in some cases longer periods, of annual military reserve duty until they reach certain ages, and, in the event of a military conflict such as the current war, have been, and may again be, called to active duty. Our operations could be disrupted by the absence of a significant number of Israeli employees or of one or more of our key Israeli employees who may be called to active duty due to the current (or any future) military conflict. Such disruption could materially adversely affect our business and operations.

Our commercial insurance does not cover losses that may occur as a result of the current war or any other event associated with the security situation in the Middle East. Although the Israeli government is currently committed to covering the reinstatement value of direct damages that are caused by terrorist attacks or acts of war, we cannot assure you that this government coverage will be maintained, or if maintained, will be sufficient to compensate us fully for damages incurred. Any losses or damages incurred by our Israeli operations could have a material adverse effect on our business. The current (and any future) armed conflicts or political instability in the region could negatively affect business conditions generally and harm our results of operations.

22

***Your rights and responsibilities as a shareholder will be governed by Israeli law, which may differ in some respects from the rights and responsibilities of shareholders of U.S. companies.***

We are organized under Israeli law. The rights and responsibilities of the holders of our ordinary shares are governed by our amended and restated articles of association and Israeli law. These rights and responsibilities differ in some respects from the rights and responsibilities of shareholders in typical U.S.-based corporations. In particular, a shareholder of an Israeli company has a duty to act in good faith toward the company and other shareholders and to refrain from abusing its power in the company, including, among other things, in voting at the general meeting of shareholders on matters such as amendments to a company's articles of association, increases in a company's authorized share capital, mergers and acquisitions and interested party transactions requiring shareholder approval. In addition, a shareholder who knows that it possesses the power to determine the outcome of a shareholder vote or to appoint or prevent the appointment of a director or executive officer in the company has a duty of fairness toward the company. There is limited case law available to assist us in understanding the implications of these provisions that govern shareholders' actions. These provisions may be interpreted to impose additional obligations and liabilities on holders of our ordinary shares that are not typically imposed on shareholders of U.S. corporations.

***Provisions of Israeli law may delay, prevent or otherwise impede a merger with, or an acquisition of, our company, which could prevent a change of control, even when the terms of such a transaction are favorable to us and our shareholders.***

Israeli corporate law regulates mergers, requires tender offers for acquisitions of shares above specified thresholds, requires special approvals for transactions involving directors, officers or significant shareholders and regulates other matters that may be relevant to such types of transactions. For example, a merger may not be consummated unless at least 50 days have passed from the date on which a merger proposal is filed by each merging company with the Israel Registrar of Companies and at least 30 days have passed from the date on which the shareholders of both merging companies have approved the merger. In addition, a majority of each class of securities of the target company must approve a merger. Moreover, a tender offer for all of a company's issued and outstanding shares can only be completed if the acquirer receives positive responses from the holders of at least 95% of the issued share capital. Completion of the tender offer also requires approval of a majority of the offerees that do not have a personal interest in the tender offer, unless, following consummation of the tender offer, the acquirer would hold at least 98% of the company's outstanding shares.

Furthermore, the shareholders, including those who indicated their acceptance of the tender offer, may, at any time within six months following the completion of the tender offer, petition an Israeli court to alter the consideration for the acquisition, unless the acquirer stipulated in its tender offer that a shareholder that accepts the offer may not seek such appraisal rights.

Furthermore, Israeli tax considerations may make potential transactions unappealing to us or to our shareholders whose country of residence does not have a tax treaty with Israel exempting such shareholders from Israeli tax. For example, Israeli tax law does not recognize tax-free share exchanges to the same extent as U.S. tax law. With respect to mergers, Israeli tax law allows for tax deferral in certain circumstances but makes the deferral contingent on the fulfillment of a number of conditions, including a holding period of two years from the date of the transaction during which sales and dispositions of shares of the participating companies are subject to certain restrictions.

Moreover, with respect to certain share swap transactions, the tax deferral is limited in time, and when such time expires, the tax becomes payable even if no disposition of the shares has occurred.

These and other similar provisions could delay, prevent or impede an acquisition of our company or our merger with another company, even if such an acquisition or merger would be beneficial to us or to our shareholders.

23

***Exchange rate fluctuations between the U.S. dollar and the New Israeli Shekel, the Euro and other non-U.S. currencies may negatively affect the earnings of our operations.***

We report our financial results and most of our revenues are recorded in U.S. dollars. However, substantially all of the manufacturing, research and development expenses of our Israeli operations, as well as a portion of the cost of revenues, selling and marketing, and general and administrative expenses of our Israeli operations, are incurred in New Israeli Shekels. As a result, we are exposed to exchange rate risks that may adversely affect our financial results. If the New Israeli Shekel appreciates against the U.S. dollar or if the value of the New Israeli Shekel declines against the U.S. dollar at a time when the rate of inflation in the cost of Israeli goods and services exceeds the rate of decline in the relative value of the New Israeli Shekel, then the U.S. dollar cost of our operations in Israel would increase and our results of operations would be adversely affected.

During 2023, the value of the New Israeli Shekel decreased significantly relative to the U.S. dollar during most of the year and settled at a level that was near the all-time low, before rising somewhat in late 2023, after market conditions stabilized in Israel in the midst of Israel's war against the terrorist organization Hamas. The weakening of the New Israeli Shekel relative to the U.S. dollar had a positive impact upon our dollar-denominated financial results, due to the relative decrease in cost of the New Israeli Shekel denominated expenses of our Israeli operations. That positive impact, however, may have been short-lived, and the New Israeli Shekel could strengthen significantly once again relative to the U.S. dollar if Israel successfully completes its war against Hamas and experiences renewed economic growth, which may increase the U.S. dollar cost of our New Israeli Shekel denominated Israeli expenses once again. Our results of operations could be adversely affected if we are unable to effectively hedge against currency fluctuations in the future. We cannot predict any future trends in the rate of inflation or deflation in Israel or the rate of appreciation or devaluation of the New Israeli Shekel against the U.S. dollar. The Israeli annual rate of inflation amounted to 3.0%, 5.3%, and 2.8% for the years ended December 31, 2023, 2022 and 2021, respectively. The annual appreciation (devaluation) of the New Israeli Shekel in relation to the U.S. dollar amounted to (2.4%), (13.2%) and 3.3% for the years ended December 31, 2023, 2022 and 2021, respectively.

We also have substantial revenues and expenses that are denominated in non-US currencies other than the New Israeli Shekel, particularly the Euro. Therefore, our operating results and cash flows are also subject to fluctuations due to changes in the relative values of the U.S. dollar and those foreign currencies. These fluctuations could negatively affect our operating results and could cause our revenues and net income or loss to vary from quarter to quarter. Furthermore, to the extent that our revenues increase in regions such as Asia Pacific, where our sales are denominated in U.S. dollars, a strengthening of the dollar against other currencies could make our products less competitive in those foreign markets and collection of receivables more difficult.

From time to time we engage in currency hedging activities. These measures, however, may not adequately protect us from material adverse effects due to the impact of inflation in Israel or from fluctuations in the relative values of the U.S. dollar and other foreign currencies in which we transact business, and may result in a financial loss. For further information, please see "Item 11. Quantitative And Qualitative Disclosures About Market Risk" in this annual report.

***Calculating our income tax rate is complex and subject to uncertainty. We are currently eligible for Israeli government tax benefits in respect of our Israeli operations. If we do not meet several conditions for receipt of those benefits, or if the Israeli government otherwise decides to eliminate those benefits, they may be terminated or reduced, which would impact our income tax rate and increase our costs.***

The computation of income taxes is complex because it is based on the laws of numerous taxing jurisdictions and requires significant judgment on the application of complicated rules governing accounting for tax provisions under GAAP. Income taxes for interim quarters are based on a forecast of our effective tax rate for the year, which includes forward-looking financial projections. Such financial projections are based on numerous assumptions, including the expectations of profit and loss by jurisdiction. It is difficult to accurately forecast various items that make up the projections, and such items may be treated as discrete accounting. Examples of items that could cause variability in our income tax rate include our mix of income by jurisdiction, changes in our uncertain tax positions, the application of transfer pricing rules, and tax audits.

24

Future events, such as changes in our business and the tax law in the jurisdictions where we do business, could also affect our rate.

One important assumption that goes into calculation of our tax rate is the tax benefit that we are eligible for in respect of some of our operations in Israel, referred to as "Approved Enterprise", "Beneficiary Enterprise", "Preferred Enterprise" and/or "Preferred Technology Enterprise" (as applicable), under the Law for the Encouragement of Capital Investments, 5719-1959, or the Investment Law. Based on an evaluation of the relevant factors under the Investment Law, including the level of foreign (that is, non-Israeli) investment in our company, we have estimated that our average effective tax rate to be paid with respect to all profit from the Israeli operations under these benefit programs is 7.5% to 15%, based on the current balance of activity between our Rehovot, Israel and Kiryat Gat, Israel facilities and the available level of benefits under the law. If we do not meet the requirements for maintaining these benefits, they may be reduced or cancelled and the relevant operations would be subject to Israeli corporate tax at the standard rate, which for 2018 and onwards is set at 23%. In addition to being subject to the standard corporate tax rate, we would be required to refund any tax benefits that we have already received as adjusted by the Israeli consumer price index, plus interest or other monetary penalties. Even if we continue to meet the relevant requirements, the tax benefits that we are eligible for may not be continued in the future at their current levels or at all. If these tax benefits were reduced or eliminated, the amount of taxes that we pay would likely increase, as all of our operations would consequently be subject to corporate tax at the standard rate, which may cause our effective tax rate to be materially different than our estimates and could adversely affect our results of operations. Additionally, if we increase our activities outside of Israel, for example, via acquisitions, our increased activities may not be eligible for inclusion in Israeli tax benefit programs, and that could also adversely affect our effective tax rate and our results of operations.

The Israeli government may furthermore independently determine to reduce, phase out or eliminate entirely the benefit programs under the Investment Law, regardless of whether we then qualify for benefits under those programs at the time, which would also adversely affect our effective tax rate and our results of operations.

***We received Israeli governmental grants for certain of our research and development activities. The terms of those grants may require us, in addition to payment of royalties, to satisfy specified conditions in order to manufacture products and transfer technologies outside of Israel, including increase of the amount of our liabilities in connection with such grants. If we fail to comply with the requirements of the Innovation Law (as defined below), we may be required to pay penalties in addition to repayment of the grants, and may impair our ability to sell our technology outside of Israel.***

Some of our research and development efforts were and are financed in part, through grants that we received from the Israeli Innovation Authority, to which we refer as the IIA or the Authority (formerly operating as Office of the Chief Scientist of the Ministry of Economy of the State of Israel, or the OCS). Since 2007 and through December 31, 2023, we have received funding from the Authority of approximately $9 million, in the aggregate, under several R&D programs to support certain research and development projects in Israel. In addition, we have received funding from the Europe authorities of approximately $1.8 million, to support certain projects in Europe.

We must comply with the requirements of the Encouragement of Research, Development and Technological Innovation in the Industry Law, 5744-1984 and related regulations rules, procedures and benefit tracks collectively or the "Innovation Law".

When a company develops know-how, technology or products using grants provided by the Authority, the terms of these grants and the Innovation Law restrict the transfer of such know-how, and the transfer of manufacturing or manufacturing rights of such products, technologies or know-how outside of Israel.

25

Under the Innovation Law and the regulations thereunder, a recipient of royalty-bearing grants from the IIA is required to return the grants by the payment of royalties of 3% to 5% on the revenues generated from the sale of products (and related services) developed (in whole or in part) under the IIA program up to the total amount of the grants received from the IIA; Those obligations are linked to the U.S. dollar. Pursuant to the latest IIA regulations, grants received from the IIA before June 30, 2017, bear an annual interest rate that applied at the time of the approval of the applicable IIA file, and that interest rate will apply to all of the funding received under that IIA approval. Grants received from the IIA after June 30, 2017, bear an annual interest rate based on the 12-month London Interbank Offered Rate, or LIBOR, until December 31, 2023, and as of January 1, 2024, bear an annual interest rate based on the 12-month Secured Overnight Financing Rate, or the SOFR, or at an alternative rate published by the Bank of Israel, with the addition of 0.71513%. Grants approved after January 1, 2024, will bear the higher of (i) the 12 months SOFR interest rate, plus 1%, or (ii) a fixed annual interest rate of 4%.

- Transfer of IIA funded know-how outside of Israel. Any transfer of the know-how that was developed with the funding of the Authority and related intellectual property rights, outside of Israel, including by way of license for research and development purpose requires prior approval of the Authority and imposes certain conditions, including, requirement of payment of a redemption fee calculated according to the formula provided in the Innovation Law which takes into account, among others, the consideration for such know-how paid to us in the transaction in which the technology is transferred, research and development expenses, the amount of IIA grants, the time of completion of IIA supported research project and other factors, while the redemption fee will not exceed 600% of the grants amount plus interest. No assurance can be given that approval to any such transfer, if requested, will be granted and what will be the amount of the redemption fee payable.

- Transfer of IIA funded know-how and related intellectual property rights to an Israeli company requires a pre-approval by IIA and may be granted if the recipient undertakes to fulfil all the liabilities to IIA and undertakes to abide by the provisions of Innovation Law, including the restrictions on the transfer of know-how and the manufacturing rights outside of Israel and the obligation to pay royalties (note that there will be an obligation to pay royalties to IIA from the income received by us in connection with such transfer transaction as part of the royalty payment obligation). No assurance can be given that approval to any such transfer, if requested, will be granted.

- Local manufacturing obligation. The terms of the grants under the Innovation Law require that the manufacturing of products resulting from Authority-funded programs be carried out in Israel, unless a prior written approval of the Authority is obtained (except for a transfer of up to 10% of the production rights, for which a notification to the Authority is sufficient). As a condition for obtaining approval to manufacture outside Israel, we would be required to pay increased royalties, which usually amount to 1% in addition to the standard royalties rate, and also the total amount of our liability to IIA may be increased to between 120% and 300% of the grants we received from IIA, depending on the manufacturing volume that is performed outside Israel (less royalties already paid to IIA). This restriction may impair our ability to outsource manufacturing rights abroad, however, it does not restrict export of our products that incorporate IIA funded know-how.

- A company also has the option of declaring in its IIA grant application for funding its intention to exercise a portion of the manufacturing capacity abroad, thus avoiding the need to obtain additional approval for such declared funding. Such declaration may affect the increase in the total liability to the IIA following such manufacturing abroad.

- The restrictions under the Innovation Law (such as with respect to transfer of manufacturing rights abroad or the transfer of IIA funded know-how and related intellectual property rights abroad) will continue to apply even our liabilities are repaid to IIA in full and will cease to exist only upon payment of the redemption fee described above.

26

Furthermore, in the event that we undertake a transaction involving the transfer to a non-Israeli entity of technology developed with IIA funding pursuant to a merger or similar transaction, the consideration available to our shareholders may be reduced by the amounts we may be required to pay to IIA. Any approval, if given, will generally be subject to additional financial obligations to the IIA. Failure to comply with the requirements under the Innovation Law may subject us to mandatory repayment of grants received by us (together with interest and penalties), as well as expose us to criminal proceedings.

In May 2017, IIA issued new rules for licensing know how developed with IIA funding outside of Israel, or the Licensing Rules, allowing us to enter into licensing arrangements or grant other rights in know-how developed under IIA programs outside of Israel, subject to the prior consent of IIA and payment of license fees to IIA, calculated in accordance with the Licensing Rules. The payment of the license fees will not discharge us from the obligations to pay royalties or other payments to IIA.

- Certain reporting obligations. We, as any recipient of a grant or a benefit under the Innovation Law, are required to file reports on the progress of activities for which the grant was provided as well as on our revenues from know-how and products funded by the Authority. In addition, we are required to notify the Authority of certain events detailed in the Innovation Law.

It may be difficult to enforce a U.S. judgment against us and our officers and directors in Israel or the United States, or to serve process on our officers and directors.

We are organized in Israel. Most of our officers and most of our directors (as of December 31, 2023) reside outside of the United States, and a majority of our assets are located outside of the United States. Therefore, a judgment obtained against us or any of our executive officers and directors in the United States, including one based on the civil liability provisions of the U.S. federal securities laws, may not be collectible in the United States and may not be enforced by an Israeli court. It also may be difficult for you to effect service of process on these persons in the United States or to assert U.S. securities law claims in original actions instituted in Israel.

**Risks related to an investment in our ordinary shares**

*The market price of our ordinary shares may be subject to fluctuation, regardless of our operating results and financial condition. As a result, our shareholders could incur substantial losses.*
The market price of our ordinary shares since the Stratasys, Inc.- Objet Ltd. merger has been subject to substantial fluctuation. From the start of 2020 through the early part of 2024 (through February 24, 2024), our ordinary shares have traded with closing prices that have ranged from $10.02 to $54.37, which low and high prices were each recorded since the start of 2021, evidencing a trend towards greater share price fluctuations. During 2023, in particular, our share price was subject to frequent movements based on developments regarding potential merger and acquisition, and hostile takeover, activities involving our company. The price of our ordinary shares may continue to be subject to substantial fluctuation regardless of our operating results or financial condition due to a number of factors, including:

- the extent of growth of the 3D printing market generally;

- changes in earnings estimates or recommendations by securities analysts;

- developments regarding potential friendly or hostile merger, acquisition or takeover activities involving our company and other companies in the 3D printing industry, including Nano and 3D Systems;

- development of new competitive systems and services by others;

- success or failure of research and development projects of our company or our competitors;

- developments concerning our or our competitors' intellectual property rights;

- successes or failures of the acquisitions or dispositions that we consummate, as perceived by financial or industry analysts;

- the general tendency towards volatility in the market prices of shares of technology companies; and

27

- general market conditions and other factors, including factors unrelated to our operating performance.

These factors and any corresponding price fluctuations may materially and adversely affect the market price of our ordinary shares and result in substantial losses being incurred by our shareholders.

Market prices for securities of technology companies historically have been very volatile. The market for these securities has from time to time experienced significant price and volume fluctuations for reasons unrelated to the operating performance of any one company. In the past, following periods of market volatility, public company shareholders have often instituted securities class action litigation, as was the case in February and March, 2015, when class actions of our shareholders, alleging violations of the Exchange Act, were initiated against the Company and certain of our officers as defendants. Any such additional securities litigation could result in substantial costs and divert the resources and attention of our management from our business.

***Raising additional capital by issuing securities or issuing securities pursuant to acquisitions of other companies or technologies may cause dilution to our shareholders, and may furthermore be difficult under certain market conditions.***

We may need or desire to raise substantial capital in the future. Our future capital requirements will depend on many factors, including, among others:

- the extent to which we acquire or invest in businesses, products or technologies(as we did in acquiring Origin in December 2020, RPS in February 2021,Xaar in November 2021, Riven in 2022, and Covestro AG in April 2023) and other strategic relationships;

- our degree of success in capturing a larger portion of additive manufacturing demand;

- the costs of establishing or acquiring sales, marketing and distribution capabilities for our products;

- the costs of preparing, filing and prosecuting patent applications, maintaining and enforcing our issued patents and defending intellectual property-related claims; and

- the costs of financing unanticipated working capital requirements and responding to competitive pressures.

If we raise funds or pay for acquisitions of other entities by issuing equity or convertible debt securities, it will reduce the percentage ownership of our then-existing shareholders, and the holders of such new securities may have rights, preferences or privileges senior to those possessed by our then-existing shareholders.

The market price for our ordinary shares, which had declined significantly from its all-time high in periods following the Stratasys, Inc.- Objet Ltd. merger and had vacillated in recent years, including in 2023 due to potential merger and acquisition activity, fell in the fourth quarter of 2023 to near all-time lows before slowly recovering towards the end of 2023. Should our share price remain at relatively low levels, that would adversely impact our ability to raise funds in the capital markets or to utilize our securities as payment in an acquisition transaction.

***We do not anticipate paying any cash dividends in the foreseeable future. Therefore, if our share price does not appreciate, our shareholders may not recognize a return, and could potentially suffer a loss, on their investment in our ordinary shares.***

We intend to retain all available funds and any future earnings to fund the development and growth of our business. As a result, capital appreciation, if any, of our ordinary shares will be investors' sole source of a return on their investment for the foreseeable future.

28

*Even if we decide to pay dividends on our ordinary shares, we may be restricted from doing so or payment of such dividends may have adverse consequences for our company.*

Under the Companies Law, dividends may only be paid out of our profits and other surplus funds (as defined in the Companies Law) as of the end of the most recent year or as accrued over a period of the most recent two years, whichever amount is greater, provided that there is no reasonable concern that payment of a dividend will prevent us from satisfying our existing and foreseeable obligations as they become due. In the event that we do not meet the profit and surplus funds criteria, we can seek the approval of an Israeli court in order to distribute a dividend. The court may approve our request if it is convinced that there is no reasonable concern that the payment of a dividend will prevent us from satisfying our existing and foreseeable obligations as they become due. Due to the acquisition method of accounting utilized, under GAAP, for the Stratasys, Inc.- Objet Ltd. merger and the Origin transaction, pursuant to which we were deemed to have acquired Objet's assets and Origin's assets, we have incurred and will continue to incur significant annual amounts of amortization expense in respect of those assets. We are also subject to the risk of impairment charges from time to time to our acquired assets. These significant annual expenses under GAAP have reduced, and may continue to reduce or eliminate, our profits and surplus funds as determined under the Companies Law, and, hence, may restrict our ability to pay dividends (absent court approval).

In general, the payment of dividends may also be subject to Israeli withholding taxes. In addition, because we receive certain benefits under the Israeli law relating to "Approved Enterprise" and "Beneficiary Enterprise", our payment of dividends (out of tax-exempt income) may subject us to certain Israeli taxes to which we would not otherwise be subject. See "Risks related to our operations in Israel—The government tax benefits that we currently receive require us to meet several conditions and may be terminated or reduced in the future, which would increase our costs."

*We are a foreign private issuer under the rules and regulations of the SEC and are therefore exempt from a number of rules under the Exchange Act and are permitted to file less information with the SEC than a domestic U.S. reporting company, which will reduce the level and amount of disclosure that you receive.*

As a foreign private issuer under the Exchange Act, we are exempt from certain rules under the Exchange Act, including the proxy rules, which impose certain disclosure and procedural requirements for proxy solicitations. Moreover, we are not required to file periodic reports and financial statements with the SEC as frequently or as promptly as domestic U.S. companies with securities registered under the Exchange Act; and are not required to comply with Regulation FD, which imposes certain restrictions on the selective disclosure of material information. In addition, our officers, directors and principal shareholders are exempt from the reporting and "short-swing" profit recovery provisions of Section 16 of the Exchange Act and the rules under the Exchange Act with respect to their purchases and sales of our ordinary shares. Accordingly, you receive less information about our company and trading in our shares by our affiliates than you would receive about a domestic U.S. company, and are afforded less protection under the U.S. federal securities laws than you would be afforded in holding securities of a domestic U.S. company.

As a foreign private issuer, we are also permitted, and have begun, to follow certain home country corporate governance practices instead of those otherwise required under the Listing Rules of the Nasdaq Stock Market for domestic U.S. issuers. We have informed Nasdaq that we follow home country practice in Israel with regard to, among other things, director nomination procedure and approval of compensation of officers. In addition, we have opted to follow home country law instead of the Listing Rules of the Nasdaq Stock Market that require that a listed company obtain shareholder approval for certain dilutive events, such as the establishment or amendment of certain equity- based compensation plans, an issuance that will result in a change of control of the company, certain transactions other than a public offering involving issuances of a 20% or greater interest in the company, and certain acquisitions of the stock or assets of another company. Following our home country governance practices as opposed to the requirements that would otherwise apply to a United States company listed on The Nasdaq Global Select Market may provide our shareholders with less protection than they would have as shareholders of a domestic U.S. company.

29

Our status as a foreign private issuer is subject to an annual review and test, and will be tested again as of June 30, 2024 (the last business day of our second fiscal quarter of 2023). If we lose our status as a foreign private issuer, we will no longer be exempt from such rules. Among other things, beginning on December 31, 2024, we would be required to file periodic reports and financial statements on a periodic basis (including both an annual report in respect of 2024 and quarterly reports in respect of each of the quarters of 2025) as if we were a company incorporated in the U.S., which, among other things, would result in increased compliance and reporting costs to us.

*If we are classified as a passive foreign investment company, or PFIC, our U.S. shareholders may suffer adverse tax consequences.*

Generally, if for any taxable year, after applying certain look-through rules, 75% or more of our gross income is passive income, or at least 50% of the value of our assets are held for the production of, or produce, passive income, we may be characterized as a PFIC for U.S. federal income tax purposes. Passive income for this purpose generally includes, among other things, certain dividends, interest, royalties, rents and gains from commodities and securities transactions and from the sale or exchange of property that gives rise to passive income. If we are a PFIC, gain realized by a U.S. shareholder on the sale of our ordinary shares may be taxed as ordinary income (rather than as capital gain income), and an interest charge added to the tax. Rules similar to those applicable to the taxation of gains realized on the disposition of our stock would apply to distributions exceeding certain thresholds.

Although we do not believe that we were a PFIC in 2023, we cannot assure you that the IRS will agree with that conclusion or that we will not become a PFIC in 2024 or in a subsequent year. The tests for determining PFIC status are applied annually, and it is difficult to make accurate predictions of our future income and the future value of our assets. U.S. shareholders should consult with their own U.S. tax advisors with respect to the U.S. tax consequences of investing in our ordinary shares. For a discussion of how we might be characterized as a PFIC and related tax consequences, please see Item 10.E, "Additional Information-Taxation-U.S. Federal Income Tax Considerations- Tax Consequences if We Are a Passive Foreign Investment Company".

## ITEM 4. INFORMATION ON THE COMPANY

### A.  History and Development of the Company

Our legal and commercial name is Stratasys Ltd., and we are the product of the 2012 merger of two leading additive manufacturing companies, Stratasys, Inc. and Objet Ltd. Stratasys, Inc. was incorporated in Delaware in 1989, and Objet Ltd. was incorporated in Israel in 1998. As part of that merger transaction, the ordinary shares of Stratasys Ltd. were listed on the Nasdaq Global Select Market under the trading symbol "SSYS". We have acquired (and, in certain cases, disposed of) a number of companies since that time. In July 2014 and August 2014, we acquired Solid Concepts and Harvest Technologies, respectively two leading providers of additive manufacturing services. Following those two acquisitions, in 2015, we introduced our branded Stratasys Direct Manufacturing, or SDM, service, which significantly broadened and increased our production and offering of AM parts, which are used by our customers as prototypes, benchmarks and end-use parts. In December, 2020, we acquired 3D printing start-up, Origin Inc., or Origin, and its proprietary P3 Programmable PhotoPolymerization technology, which has become an important growth engine for our company. The acquisition was aimed at fortifying our leadership in polymers and production applications of 3D printing in industries such as dental, medical, tooling, and select industrial, defense, and consumer goods markets. In February 2021, we acquired UK-based RP Support Ltd., or RPS, a provider of industrial stereolithography 3D printers and solutions. RPS' complementary technology further expands our polymer suite of solutions across the product life cycle, from concept modeling to manufacturing. In April 2021, we introduced the Stratasys H350 3D printer, the first system powered by the powder-based SAF™ technology of Xaar 3D Ltd., or Xaar, and in November 2021, we acquired

30

all remaining shares of Xaar from Xaar plc (we previously owned a 45% share in Xaar), thereby accelerating our growth in production-scale 3D printing. In September 2022, we disposed of our subsidiary MakerBot, a leader in desktop 3D printing, merging it with UltiMarker, after which transaction we hold a 46.5% equity interest in the combined company, which aims to provide easy-to-use and accessible 3D printing hardware, software, and materials for any application. In October 2022, we acquired the assets of the quality- assurance software company Riven and integrated its cloud-based software solution into our GrabCAD® additive manufacturing platform, which enables manufacturing customers to adopt our solutions for end-use parts production. (and which itself had been acquired by us in September 2014). We completed, in April 2023, the acquisition of the additive manufacturing materials business of Covestro AG, which has expanded our differentiated materials offerings in stereolithography, digital light processing (DLP), and powders. We furthermore expect to effect smaller acquisitions and investments in other companies from time to time to support execution of our strategy.

We have dual headquarters. Our registered office and one of our two principal places of business is located at 1 Holtzman Street, Science Park, P.O. Box 2496, Rehovot 76124, Israel, and our telephone number at that office is (+972)-74-745-4314. Our other principal place of business is located at 7665 Commerce Way, Eden Prairie, Minnesota, and our telephone number there is (952) 937-3000. Our agent in the United States is Richard Garrity, Chief Industrial Business Unit Officer of our Delaware subsidiary, Stratasys, Inc., whose address is c/o Stratasys, Inc. at the address of our Eden Prairie, Minnesota headquarters. Our web address is www.stratasys.com. The information contained on that website (or on our other websites, including stratasysdirect.com and makerbot.com) is not a part of this annual report. As an Israeli company, we operate under the provisions of the Companies Law.

In 2023, 2022 and 2021, our capital expenditures amounted to $15.0 million, $19.8 million and $26.8 million, respectively, of which $13.6 million,$13.6 million and $25.0 million, respectively, was principally related to the purchase and construction of property, plant and equipment.

In 2022 and 2021, we had capital expenditures related to our facility in Rehovot, Israel, which we own, and where our Israeli headquarters have been situated since January 2017. This relatively new facility, towards which we paid $0.2 million and $11.1 million during 2022 and 2021 respectively, also houses research and development facilities. In 2023 we didn't have any capital expenditure related to the new facility. As of December 31, 2023, we had invested an aggregate of $119.5 million in our new facility in Israel and its related equipment.

During 2023, we made other purchases of property and equipment, mainly for the enhancement of our manufacturing capabilities to support new solution offerings, primarily for our facilities in Israel and the United States.

During 2023, one of our shareholders, Nano Dimension Ltd., or Nano, launched a hostile, unsolicited tender offer pursuant to which it offered to acquire (based on the last amendment to the offer) up to 25,266,458 of our outstanding ordinary shares which, together with ordinary shares that it already owned, would have provided it with a 51% interest in our outstanding ordinary shares. The offer (as last amended) was subject to Nano's holding at least 46% of our outstanding ordinary shares upon consummation of the offer, and to at least 5% of our outstanding ordinary shares being tendered by our other shareholders in the offer. The offer was launched on May 25, 2023 at a price of $18.00 per share (at which point the offer was for Nano to achieve between 53% and 55% ownership of our company upon consummation). The offer was amended to prices of $20.05, $24.00, and $25.00 per share on June 27, 2023, July 10, 2023 and July 18, 2023, respectively (accompanied by a reduction in the number of shares offered to purchase and in the percentage ownership of our ordinary shares to be held by Nano upon consummation to between 46% and 51%). The offer expired, after multiple extensions, on July 31, 2023. None of our ordinary shares were purchased pursuant to Nano's tender offer, as there were insufficient acceptances to meet the minimum conditions of the offer.

31

### B. Business overview

We are a global leader in polymer-based 3D printing solutions, which we provide at every stage of the product life cycle, with multiple technologies and complete solutions for superior application fit, across industrial, healthcare and consumer fields. We focus, in particular, on polymer 3D printing solutions that address the fastest- growing manufacturing solutions, which we view as the biggest potential growth opportunity in the 3D printing industry. Leveraging distinct competitive advantages that include a broad set of best-in-class 3D printing platforms, software, materials and technology partner ecosystems, innovative leadership, and a global GTM infrastructure, we are positioned to further expand our leadership in this significant and growing global marketplace.

Our approximately 2,600 granted and pending additive technology patents currently held (in addition to many others previously held) have been used to create models, prototypes, manufacturing tools, and production parts for a multitude of industries including aerospace, automotive, transportation, healthcare, consumer products, dental, medical, fashion and education. Our products and comprehensive solutions improve product quality, development time, cost, time-to-market and patient care. Our additive manufacturing ecosystem of solutions and expertise includes materials, software, expert services, and on-demand parts production.

Our acquisition, of Origin, a provider of photopolymer solutions for production-oriented applications, expanded our leadership through innovation in the fast-growing mass production parts segment by providing us with a next-generation photopolymer platform. Origin's pioneering approach to additive manufacturing of end-use parts enables us to serve a large market with manufacturing-grade 3D printers, utilizing P3™ Programmable PhotoPolymerization technology. This technology precisely controls light, heat, and force, among other variables, to produce parts with exceptional accuracy and consistency and enables a broad range of chemistry which turns into unique production grade properties.

Our acquisition of RPS, which closed in February 2021, has enabled us to leverage RPS' industry-leading go-to-market infrastructure to offer their Neo® line of systems to the global market with an expanded set of applications. Our Neo line of 3D printers feature dynamic laser beam technology that enables build accuracy, feature detail, and low variability across the full extent of a large build platform. As an open resin system, the Neo products provide customers materials with a wide range of properties such as chemical resistance, heat tolerance, flexibility, durability, and optical clarity, and can produce large parts up to 800 x 800 x 600 mm, providing a significant build area in a small footprint.

Our acquisition, in November 2021, of the remaining outstanding shares of Xaar that we had not already owned (we had held a 45% stake in Xaar) was aimed at accelerating our growth in production-scale 3D printing. In April 2021, we introduced the Stratasys H350™ 3D printer, the first system powered by Xaar's powder-based SAF™ technology. Representing the culmination of more than 10 years of research and development, SAF-based 3D printers are designed to deliver cost-competitive parts at production-level throughput. H Series™ Production Platform printers such as the H350 are designed to deliver part quality, consistency, and reliability that ensures customer satisfaction and high production yield. Using SAF technology, the printers execute key 3D printing steps in the same direction across the print bed to provide a uniform thermal experience – and therefore part consistency – for all printed parts regardless of their placement in the build, representing a significant improvement over traditional powder-bed fusion processes

In April 2023, we purchased the assets of Covestro's AM materials business, including all of the SOMOS™ portfolio. The materials, IP portfolio, and talent we acquired from Covestro will help us address new applications in key technology categories such as stereolithography, P3/DLP, and powder bed fusion, including SAF™ technology.

We now offer a broader range of systems, consumables and services for additive manufacturing. Our wide range of solutions, based on our proprietary 3D printing technologies and materials, enhances the ability of designers, engineers and manufacturers to:

- visualize and communicate product ideas and designs;

32

- verify the form, fit and function of prototypes;

- manufacture tools, jigs, fixtures, casts and injection molds used in the process of manufacturing end-products;

- manufacture customized and short-to-medium-run end-products more efficiently, with greater agility, and more sustainably; and

- produce objects that could not otherwise be manufactured through subtractive manufacturing methodologies.

Our goal is to be the first choice for polymer 3D printing. Given our significant experience and proven operating history, we have many competitive advantages including:

- Versatile offering of innovative technologies.-We offer five different 3D printing technology platforms, each of which has been optimized for specific industry applications, which provides us with a versatile, deep offering for end users within the 3D printing industry They are complemented by a technology-agnostic software platform, with an extensive and rapidly expanding ecosystem of software solutions and software partners for workflow and connectivity, as well as a robust range of advanced materials.

- Expansive materials ecosystem.- To ensure maximum performance and quality, as well as access to the broadest possible range of materials for our customers, we provide a robust range of materials in three distinct tiers: (i) Stratasys Preferred, which are engineered by us or our third-party material partners exclusively to provide the best combination of material and printer performance; (ii) Stratasys Validated, which are engineered by us or our third-party materials partners and validated by us with basic reliability testing to accelerate the expansion of material options available in the marketplace; and (iii) Open: Unvalidated materials accessed via an OpenAM Software License, which may offer unique attributes and the potential to address new applications but have not received validation testing or optimization relative to performance and functionality on a Stratasys printer. Our acquisition of Covestro in April 2023 has further strengthened our differentiated materials offering in stereolithography, DLP, and powders, which additional materials are supported by a broad portfolio of patents.

- Deep application engineering expertise- We believe we have the most industry application engineers in the world who provide our deep quality and process certification expertise for tier-1 manufacturing OEMs. This is essential for meeting the rigorous demands of industries like aerospace, where there are over 500,000 Stratasys parts already flying around the world today, or healthcare, where we support multiple materials for biocompatible applications. We have multi-industry experience with multiple 3D printing technologies serving the aerospace, defense, automotive, industrial, dental, consumer, education, and medical industries.

- Unparalleled market access. We believe our network of over 130 resellers and value added channel partners is the strongest and most experienced in the industry, covering every region and every major market. This network of resellers worldwide is exclusive to us and our technologies, and has been built over many years, making it unable to be quickly and easily duplicated. This channel network has focused primarily on selling and servicing our FDM and PolyJet solutions since the merger of Stratasys and Objet in 2012, and starting in 2021, included the Origin P3, SAF, and Neo stereolithography technologies, which dramatically expand the total addressable market across medical, dental, consumer goods, automotive, commercial goods, and service bureaus.

- Marquee customer base- Many of the world's leading companies across aerospace, technology, automotive, consumer, energy, and healthcare are our strategic partners. These include: General Motors, whose new multi-million-dollar additive manufacturing facility in Michigan features Stratasys systems from low to high end; TE Connectivity, which is now using Origin One 3D printers to produce end use parts for aerospace connectivity; Airbus, which recently extended Stratasys' contract to include several more aircraft platforms as well as spare parts production; and the U.S. Army, which signed an

33

approximate $8 million contract with Stratasys in 2023 for a purchase that included systems from all five Stratasys platforms, given the distinct capabilities of each platform to address varying applications.

- Software/Digital manufacturing connectivity- Through our GrabCAD Additive Manufacturing Platform, we have created a smart and connected software ecosystem to enable additive manufacturing at scale across the digital thread, from design through production. Our SDKs integrate with many different software partner solutions, allowing customers to turn data into intelligence by collecting important information that can be used to improve productivity. This level of integration expands the capabilities of 3D printers. In addition, many of our 3D printing systems are software-upgradable. As our largest customers increasingly adopt multiple Stratasys systems across multiple 3D printing technologies, the efficiency benefits of a single software platform to manage them increases.

We benefit from recurring revenues from the sale of resin and plastic consumables and related services. We provide products and services to our global customer base throughout our offices in North America and internationally, including: Baden-Baden, Germany; Shanghai, China; and Tokyo, Japan, as well as through our worldwide network of over 130 resellers and channel partners who are exclusive to us and our additive manufacturing technologies. We have approximately 1,980 employees worldwide, including what we believe is one of the largest additive manufacturing service bureaus in the United States.

**Industry overview**

Historically, prototype development and customized manufacturing have been performed by traditional methods using metal extrusion, computer-controlled machining, and manual modeling techniques, in which blocks of material are carved or milled into specific objects. These subtractive manufacturing methodologies have numerous limitations. They often require heavy involvement of specialist technicians and can be time- and labor-intensive, and traditional molds for injection molding are expensive. The time intensity of traditional modeling can leave little room for design error or subsequent redesign without meaningfully impacting a product's time-to-market and development cost. As a result, prototypes have traditionally been created only at selected milestones late in the design process, which prevents designers from truly visualizing and verifying the design and geometry of an object in the preliminary design stage. The inability to iterate a design rapidly hinders collaboration among design team members and other stakeholders and reduces the ability to optimize a design, as time-to-market and optimization become necessary trade-offs in the design process.

3D printing addresses many of the inherent limitations of traditional modeling technologies through its combination of functionality, quality, ease of use, speed and cost. 3D printing can be significantly more efficient and effective than traditional model-making techniques for use across the design process, from concept modeling and design review and validation, to fit and function prototyping, pattern making and tooling, to direct manufacturing of repeatable, cost-effective parts, short-run parts and customized end products. Introducing 3D modeling earlier in the design process to evaluate fit, form and function can result in faster time-to-market and lower product development costs, while keeping intellectual property in-house. As the 3D printing industry is maturing, its role in a product's lifecycle is further expanding, specifically into manufacturing solutions that follow the initial modeling and prototyping stages of the product lifecycle. This evolution opens a substantially larger total addressable market for additive manufacturing solutions.

In the medical industry as well, practitioners are rapidly embracing the cutting-edge production of 3D printed anatomical models for pre-operative procedural planning. 3D printed pre-procedural models are low-cost and are customized to individual patients. Created from medical scans, the printed models provide physicians the opportunity to map out their procedures in a no-risk surgical setting. The rapidly produced and quickly delivered models assist with procedure validation, ultimately improving patient outcomes.

34

For short and medium-run manufacturing, 3D printers eliminate the need for complex manufacturing set-ups and reduce the cost and lead-time associated with conventional tooling. Direct digital manufacturing, or DDM, involves the use of 3D production systems for the direct manufacture of parts that are subsequently incorporated into the user's end product or manufacturing process. DDM is particularly attractive in applications that require shorter-run or lower-volume parts or rapid turn-around, and for which tooling would not be appropriate due to small volumes.

Increasingly, attention is being paid to the potential sustainability benefits of additive manufacturing as well. By producing parts on-site and at scale, carbon emissions associated with transportation and delivery can be reduced. Additive manufacturing also reduces waste because the right number of products are created at the right time. One study has suggested that additive manufacturing could reduce industrial energy use by 2050. Light-weighting parts through additively designed polymer components save airlines fuel. – about 14,000 gallons of fuel per year per plane for every pound eliminated.

New technologies, such as our P3 and SAF technologies, are beginning to significantly increase the volumes at which additive manufacturing is competitively advantageous up to tens of thousands and beyond in some cases. DDM also enables the production of objects that have been topologically designed, or designed on the basis of a computerized determination of where to place the key components of the object and how to connect them, a process that is generally unavailable using conventional subtractive manufacturing methodologies.

Desktop 3D printer usage has shown rapid growth in recent years, with the introduction and adoption of affordable entry-level 3D printers and increased availability and content. These entry-level desktop printers have increased market adoption by professional designers and education institutions. We expect that the adoption of desktop 3D printing will continue to increase in the future, in terms of design applications and engineering applications. We believe that the expansion of the market will be spurred by increased proliferation of 3D content and 3D authoring tools (3D computer-aided-design, or CAD, and other simplified 3D authoring tools), as well as increased availability of 3D scanners. We also believe that increased adoption of 3D printing will be facilitated by continued improvements in 3D printing technology and greater affordability of entry-level systems. We are active in facilitating the growth of the desktop 3D printing market by way of our investment in Ultimaker, a company created from the merger of our former subsidiary MakerBot with Ultimaker into a new combined desktop 3D printing market leader.

**Stratasys solutions**

*Range of solutions*

We provide integrated solutions throughout the production cycle for designers, engineers, manufacturers, and medical professionals, including compatible products and services designed for our customers' use to effectively solve their specific application needs. Our solutions consist of 3D printing systems, consumables, software, paid parts, and professional services and encompass everything from prototyping and design all the way through mass production.

Our solutions allow our end-users to print 3D models and parts that enhance their ability to visualize, verify and communicate product designs, thereby improving the design, development and validation processes and reducing time-to-market. Our systems create visual aids for concept modeling and functional prototyping to test fit, form and function, permitting rapid evaluation of product designs. Using presentation models developed with our systems, designers and engineers can typically conduct design reviews and identify potential design flaws earlier in the process and make improvements before incurring significant costs due to re-tooling and rework, allowing them to optimize a design much more rapidly and cost-effectively.

Our systems aid in the communication of ideas otherwise communicated in abstract or 2D media. For example, physicians use visually and/or biomechanically accurate 3D printed Stratasys models to plan surgical procedures. A model produced with our systems may be used as a sales tool, as a model or part display, or simply for use in conducting a focus group. It may also be used for accelerated collaboration in product design and manufacturing cycles at multiple locations, enabling visualization and tactile response, which can be critical to product development or sales process.

Our solutions also empower end-users to quickly and efficiently deploy parts to incorporate into their manufacturing process and improve its effectiveness while at the same time lowering costs. For instance, our solutions enable the production of manufacturing aids and tools such as jigs, fixtures, casts and injection molds aiding in the production and assembly process. These solutions are often faster to produce than through traditional methods, and frequently cost less. Materials like nylon carbon fiber enable these printed products to be both exceptionally strong and lightweight.

Additive manufacturing of end-use-parts, using our solutions, is a growing focus of our offerings to customers, and is attractive in applications requiring fast, short-run or low-mid-volume parts where tooling would not be cost-efficient. Our solutions enable the production of objects that generally could not otherwise be manufactured through subtractive manufacturing methodologies.

In addition, our solutions enable doctors to train and plan medical procedures based on medical models, created by our printers, as well as create surgical guides to support complex surgeries. In the dental space, our PolyJet solutions enable dental labs to create dental and orthodontic, patient specific models and guides, including permanent dentures and temporary crowns and bridges, as well as devices for various applications, based on digital dentistry workflow.

Our solutions offerings are characterized by the following distinguishing qualities:

- material properties of printed objects, such as heat resistance, toughness, brittleness, elongation-to-break, color and flexibility;

- quality of printed objects measured by, among other things, resolution, accuracy and surface quality;

- consistency of produced parts in a run or batch;

- multiple production-grade modeling materials;

- reliability of printing systems;

- fast time to part;

- efficiency of operations with software workflows;

- customer service;

- ease of use; and

- automatic, hands-free support removal and minimal post processing.

*Range of technologies and differentiating factors*
Our solutions are driven by our proprietary technologies, which we have both developed organically and acquired over time through targeted acquisitions. We hold approximately 2,600 patents and pending patents internationally, and our 3D printing systems utilize our patented extrusion-based FDM®,inkjet-based PolyJet™, powder- bed-based SAF®, photopolymer-based P3™, and stereolithography technologies to enable the production of prototypes, tools used for production, and manufactured goods directly from 3D CAD files or other 3D content. We believe that our broad range of product and service offerings is a function of our 3D printing technology leadership.

36

**FDM**. A key attribute of our FDM® 3D printing technology is its ability to use a variety of production grade thermoplastic materials featuring surface resolution, chemical and heat resistance, color, and mechanical properties necessary for production of functional prototypes and parts for a variety of industries with specific demands and requirements. Use of these materials also enables the production of highly durable end parts and objects with soluble cores for the manufacture of hollow parts, the manufacture of which were previously dependent on slower and more expensive subtractive manufacturing technologies.

We believe this technology is differentiated by factors making it appropriate for 3D printing and additive manufacturing, including:

- ability to use FDM® systems in an office environment due to the absence of hazardous emissions;
- low post-production processing requirements;
- minimal material waste;
- build repeatability;
- ease of use, with minimal system set-up requirements;
- absence of costly replacement lasers and laser parts; and
- a high degree of precision and reliability.

**PolyJet**. We believe that our inkjet-based 3D printing technology is differentiated from other competing technologies in its ability to scale and deliver high-resolution and multi-material, full-color 3D printing, down to the voxel level, in an office environment system. Our easy-to-use PolyJet™ 3D printers create high-resolution, smooth surface finish models with the look, feel and functionality of the final designed product. We offer a wide variety of office-friendly resin consumables, including rigid and flexible (rubber-like) materials, materials for medical applications that simulate the biomechanical properties of human tissue, and bio-compatible materials for dental applications. Using our PolyJet digital materials technology, our solutions offer unique quality 3D printing systems depositing multiple materials simultaneously. This enables users, in a single build process, to print parts, assemblies, and composite materials made of multiple materials-each retaining its distinct mechanical and physical properties. For example, users can print objects with both rigid and flexible portions in a single build or mix different base colors to achieve a desired color tone. The PolyJet technology enables on-demand mixing of a variety of resins to create a broad range of pre-defined digital materials, which are composite materials with modified physical or mechanical and color properties. This includes 'Pantone® Validated' colors, allowing us to support more than 600,000 color and texture combinations, including the industry's clearest material, nearly as clear as glass, with a wide range of color and texture combinations, which is a key differentiating attribute of our 3D printers. In 2022, we began offering tailored PolyJet solutions with 3DFashion™ technology designed specifically for end-use apparel applications. In 2023, we began offering FDA-cleared PolyJet-based dental parts such as dentures, crowns and bridges parts through our TrueDent resin.

**Stereolithography**. Our stereolithography technology enables the production of high-quality, durable parts that meet the requirements of a wide range of applications, as well as additive manufacturing prototypes and tools. Industrial stereolithography systems are well-established in the 3D printing industry for applications such as large prototypes, tooling, investment casting patterns, and orthodontic clear aligner molds. They provide quality surface finish, large build sizes, a fast time to print, and an affordable cost per part. We believe that the Neo line of systems (acquired via RPS in February 2021) is superior relative to other solutions currently available due to an open choice of resins, system reliability, low service requirements, simple day-to-day operation, and accurate builds. With access to our strong global channels, we believe we can bring these benefits to many more manufacturing organizations. Our latest acquisition of the Covestro Additive Manufacturing business unit in April 2023 completed our stereolithography offering with the strong Somos® materials portfolio for stereolithography printers. Somos materials are widely known and appreciated for their mechanical properties, printing performance, high quality, and repeatable builds. These materials with our Neo systems offering will provide an attractive and differentiated offering over the current stereolithography solutions in the market.

37

**P3.** Our P3 resin-based 3D printing technology, which we added to our solutions portfolio through our acquisition of Origin, provides a best-in-class combination of detail, mechanical properties and throughput for mass production parts. We believe we have the strongest materials portfolio in the category - including everything from aerospace-grade flame-resistant materials to biocompatible materials from leading companies like BASF, Henkel and Covestro. The P3 platform is software-based and cloud-connected so we can easily optimize our platform for our customers, including cloud-based upgrades. In October, we announced that the P3 printers can now use our GrabCAD Print software, which simplifies 3D printing workflows and brings a more consistent user experience across our technologies. Recently, we have also demonstrated automated large-scale production using our P3 technology together with post-processing units. We believe that such differentiated solutions, with the unique P3 platform and strong materials portfolio, will support wide adoption of the technology in the market by industrial production customers.

**SAF**. SAF Selective Absorption Fusion technology was developed via our joint venture with Xaar plc, Xaar 3D Ltd., which we acquired in 2021.SAF is an industrial-grade additive manufacturing technology designed to deliver production-level throughput for end-use parts. Representing the culmination of more than 10 years of research and development, SAF-based 3D printers can deliver a competitive cost per part with the part quality, consistency, and reliability that ensures satisfaction and high production yield. The SAF technology uses a counter-rotating roller to coat powder bed layers onto a print bed and prints absorber fluid to image the part layers. The imaged layers are fused by passing an infrared lamp over the entire span of the print bed. SAF technology executes these key process steps in the same direction across the print bed to provide a uniform thermal experience - and therefore part consistency - for all printed parts regardless of their placement in the build. H Series™ 3D printers use SAF materials developed by leading third party materials providers, including PA11, which is derived from sustainable castor oil, and PA12, which is stiffer than PA11 and is ideal for applications where rigidity is important. We also plan to develop SAF materials internally as a result our acquisition of Covestro Additive Manufacturing.

We believe that the range of 3D printing consumable materials, together with the broad set of materials in our materials ecosystem, that we offer, is the widest in the industry. Our consumable materials consist of over 61 FDM spool-based filament materials, 49 PolyJet cartridge-based resin materials, and 158 functional materials. These materials yield a large variety of digital materials that reflect over 600,000 color variations, transparency, opacity and flexibility levels.

### Our competitive strengths

We believe that the following are our key competitive strengths:

- Differentiated product offerings with superior part quality. Our portfolio of 3D printing systems is differentiated through a combination of superior printing qualities, accuracy, print speed, the ability to print a range of materials with varying levels of strength, chemical and heat resistance, color and mechanical properties, the ability to print multiple materials simultaneously and suitability for office environments. Our offering is focused on high-end solutions to address customer needs from prototyping applications to complex manufacturing operations.

- Our FDM-based systems enable the highly precise printing of engineering and high-performance thermoplastic materials, enabling a wide range of manufacturing applications with little or no post-production processing.

- Our PolyJet inkjet-based systems are used in multiple prototyping solutions as well as in manufacturing applications, particularly in higher growth industries such as healthcare and dental. The systems jet ultra-thin layers of material, enabling voxel level control of the deposited materials, part realism (multi materials and colors), high accuracy and resolution and smooth finish to printed models. For use with these various types of systems we offer a wide variety of office-friendly resin consumables, including rigid, flexible (rubber-like), transparent and color materials. This unique quality printing system utilizes the simultaneous jetting of up to six materials to enable end-users to print models, in virtually unlimited combinations, in a single build.

38

- Our P3-based systems, which we added to our solutions portfolio via the acquisition of Origin, offer a best-in-class combination of detail, mechanical properties and throughput for mass manufacturing production parts. This addition allows us to expand our leadership through innovation in the fast-growing mass production parts segment in industries such as dental, medical, tooling, and select industrial, defense, and consumer good segments. The P3 technology is an advancement on DLP principles ,whereby liquid photopolymer resin is cured with light. Our Origin One 3D printers offer precisely controls light, heat, and force, among other parameters, via Origin's closed-loop feedback software. This new technology enables customers to build parts with industry-leading accuracy, consistency, size and detail, while using a wide range of commercial-grade, durable resins.

- Our powder bed fusion (PBF) SAF-based systems, which launched at the end of 2021, expand our total addressable market across multiple segments, including commercial goods (frequent demand for short and medium run production), automotive (production parts at competitive speeds), consumer goods (pre-production parts, short runs, and specialty production), and service bureaus (an excellent high-utilization environment for a wide variety of components).

- Our industrial stereolithography RPS' Neo line of systems/printers feature dynamic and variable laser beam technology that enables build accuracy, feature detail, excellent side wall quality and low variability across the full extent of a large build platform. As open resin systems, the Neo products provide customers a choice of materials that deliver a wide range of properties such as chemical resistance, heat tolerance, flexibility durability and optical clarity.

- Integrated solutions offering/ecosystem- We believe our customers are looking for primary partner for polymer additive manufacturing, which we believe we are uniquely able to provide. We provide integrated solutions offering that include compatible products and services that are designed to meet the full gamut of our clients' needs in an efficient manner, consisting of a broad range of systems, consumables, software and services, including:

  - 3D printers;
  - materials;
  - GrabCAD software;
  - professional services;
  - parts on demand;
  - vertical applications;
  - partnerships and alliances; and
  - enhanced collaboration among industry professionals, via our GrabCAD Community, which provides engineers and designers a resource for CAD models and helps them communicate ideas and share designs.

- Proprietary technology platforms with multidisciplinary technological expertise. We believe that our proprietary 3D FDM, 3D inkjet-based PolyJet, P3 and SAF printing engines offer end users the versatility and differentiated features necessary for a wide variety of current and potential applications. We combine our proprietary hardware platforms, featuring widely-deployed inkjet printer heads or easy-to-use extrusion heads with integrated software and a wide range of proprietary materials to develop and produce leading 3D printing systems.

39

- Leading Direct Manufacturing Business. Our Stratasys Direct Manufacturing service business is one of the largest and leading AM parts service providers globally. This unit's knowledge of and experience in AM, including materials and systems know-how, and AM end-use parts production has enhanced our manufacturing offering suite. For example, the Stratasys Direct team has helped accelerate our product development for the Origin One and H350 3D printers to improve their performance in production environments. Furthermore, Stratasys Direct enables us to offer a broader solution to our customers, catering to more of their 3D printing needs, whether by supply of 3D printers or of 3D printed parts through cross-sell or infinite capacity extension. We believe this offering creates better customer intimacy and a competitive advantage for Stratasys.

- Synergies between SDM and 3D printer sales businesses. Our Stratasys Direct® AM parts service business has been capitalizing on the synergies between it and our 3D printer sales business. Stratasys Direct Manufacturing works closely with our North American sales organization and benefits from access to some of the largest customers for our 3D printing systems, who have been increasingly relying upon Stratasys Direct for production parts and development needs.

- Diverse, global customer base. We have a broad customer base, ranging from global market leading brands to small businesses and professionals and individuals. Our end-users include companies across a wide range of industries and applications, including automotive, aerospace, dental laboratories, consumer products, educational institutions, defense, medical analysis, medical systems, electronics, and heavy equipment.

- Large and growing installed base. Our differentiated offerings have led to a large and growing installed base. The significant installed base has resulted in greater distribution reach and enhanced opportunities for cross selling, given the significantly broadened and complementary product offerings. It furthermore presents us with an opportunity to generate recurring revenues from sales of consumables and services to the installed base.

- Extensive global reach. With 130 value added channel partners around the world, we are well positioned to leverage the extensive geographic reach of our marketing, sales and support organization to serve customers and grow awareness of 3D printing for prototyping, design and manufacturing. This level of service and support is becoming an especially critical differentiator as our customers adopt 3D printing for more operationally critical manufacturing applications.

- Increased accessibility and ease of use for customers. Our GrabCAD Additive Manufacturing software platform and our GrabCAD Community enable designers, engineers, and machine operators to easily manage our 3D printing systems at scale.

- GrabCAD Print provides native CAD job programming along with popular CAD and common 3D file formats (3MF, STL, VRML), thereby reducing time and errors in job planning and resulting in high quality printed parts. We also introduced a paid version with advanced features for FDM printers and for the H350 3D printer that improve first print quality and reduce cost per part.

- GrabCAD Shop provides work order management for organizations with centralized, 3D printing services for engineers and designers. GrabCAD Shop includes scheduling, job tracking and analytics, providing insights to requestors, operators, and managers across our technologies.

- GrabCAD Software Development Kits provide the means to create two-way integrations with third party software applications, including our GrabCAD Software Partners and our customers business systems, dramatically extending the value of our platform.

- GrabCAD Community is the online community of over 13 million professional engineers, designers, manufacturers, and students who share best practices via tutorials, discussion forums, design/print challenges and 3D content.

40

**Our growth strategy**

We are guided by our "North Star" strategy, pursuant to which we are initially focused on providing a complete offering of polymers, which we view as the biggest potential profit pool in the industry, and after which we intend to expand to metals. By following this strategy, we expect to build a portfolio that can solve all customer needs related to 3D printing. Our solutions deliver value to every touchpoint across the product lifecycle.

At the heart of our strategy lies the development of end-to-end solutions tailored to specific manufacturing applications and use cases. These solutions empower our customers to fully leverage the benefits of Additive Manufacturing at scale. Our approach involves providing a full suite of all five polymer technologies, boasting the industry's most extensive materials portfolio, alongside an advanced software platform. We continuously augment our offerings to ensure a seamless and efficient workflow. Leveraging our profound expertise in application engineering, coupled with our unparalleled Go-to-Market infrastructure and resilient business model, we collaborate closely with customers to devise tailored solutions that meet their unique needs. Subsequently, we effectively scale these solutions to serve broader market demands.

The key elements of our strategy for growth include the following:

- Offering a full suite of all five polymer technologies. We offer five best-in-class technologies for every step in the product lifecycle – from concept through manufacturing, alongside the most expansive materials portfolio in the industry. We believe that the proliferation of 3D content, advancements in AM technology platforms and the introduction of improved materials will continue to drive growth in 3D printing. We expect to see that growth result in a major shift towards more manufacturing application solutions as compared to primarily focusing on design and prototyping. We will continue to invest in the identification of new applications (especially manufacturing applications) for which our proprietary printing technologies, software and materials are appropriate. This approach has resulted in the broadest offering of polymer 3D printing solutions in our industry, serving an unequalled array of end markets.

- Having the industry's most extensive materials portfolio, enabling us to address various applications effectively. We continuously bolster our portfolio through extensive in-house research and development efforts, leveraging our expertise to innovate and introduce new materials tailored to emerging market demands. Furthermore, strategic partnerships with third-party entities further enrich our portfolio, allowing us to access specialized materials and technologies. Additionally, we remain committed to strategic acquisitions that align with our portfolio expansion goals, ensuring that we remain at the forefront of material innovation within the industry.

- Adding more value through software, both from our partners and ourselves. We offer Industry 4.0-ready systems that include API integration to leading manufacturing software solutions. On the one hand, that makes it easier to add more systems and use them more intensively ("Connect one Stratasys printer– connect them all") and on the other hand, it enables our obtaining new value from our software partners. Enabling our customers to see the systems and materials usage in real time helps them to enhance our own technological offerings much easier. This enables us to provide our customers with advanced remote features like remote support, predictive support and materials replenishment. That, in turn, generates sales of our integrated solutions.

41

- Possessing deep application engineering experience. Our people have the deepest application engineering expertise in the industry, which allows us to educate customers and drive future innovation. We have in place today an offering of solutions that includes the complete gamut of compatible systems, consumables, software and services (parts on-demand, professional and expert consulting services) that are designed to meet our clients' needs in an integrated, complete manner. We will seek to extend our technological capabilities by addressing manufacturing applications and continuing to invest in our R&D efforts, which focus on enhancing our current printing technologies as well as developing new innovative solutions for 3D printing and exploring inorganic opportunities for new printing technologies. We believe that by enhancing our AM technological capabilities and by developing and introducing new materials for our 3D printing and production systems, we will be able to increase both the size of, and our share of, the 3D printing marketplace.

- Possessing an unmatched Go-to-Market infrastructure. We believe our network of 130 value-adding channel partners is the largest and most experienced in the industry. This is a competitive advantage that we believe is not easily or inexpensively replicated. Our goal is to reach new customers and increase sales to existing customers by leveraging that network and providing access to new solutions that address customers' specific needs. These solutions include those offered by our Stratasys Direct Manufacturing service. As part of this strategy, we intend to grow awareness of 3D printing solutions for prototyping and manufacturing and to develop industry-specific sales channels as part of our effort to commercialize a broader range of new manufacturing and production applications.

- Having a resilient business model designed to scale as opportunities present themselves. Our corporate and Go-to-Market infrastructures are positioned to effectively absorb, scale and create operating leverage for key opportunities that can complement and grow our leading position in polymers as they arise, all while providing operating leverage to the company. We are also positioned to weather unexpected downturns like the one we have seen from the pandemic, and to scale up during times of growth, capturing market share and increasing revenues, margins, and earnings. We are not dependent on any one client or end market, as evidenced by our not having any one customer represent greater than 5% of our revenues.

- Collaborating closely with customers to devise tailored solutions. We prioritize collaboration with our esteemed blue-chip customers to develop tailored solutions that meet their unique needs. Our deep relationships with these key stakeholders allow us to gain valuable insights into their challenges and requirements, enabling us to co-create innovative solutions together. By closely engaging with customers throughout the product development process, we identify opportunities to replace traditional manufacturing methods with cutting-edge additive manufacturing solutions. Together, we explore new use cases and applications, leveraging our combined expertise to drive efficiency, cost savings, and competitive advantages. Through this collaborative approach, we not only address immediate needs but also anticipate future industry trends, positioning ourselves as trusted partners in our customers' journey towards manufacturing excellence.

## Products and services

### Our products

We offer a dedicated suite of products for applications such as rapid prototyping (RP), tooling, and manufacturing parts. Our products include 3D printing systems, consumable materials, software, paid 3D printed parts service, and support services.

42

Collectively, this portfolio of products offers a broad range of performance options for our customers, depending on their application, the nature and size of the designs, prototypes, and/or final parts desired. Our products are available at a variety of different price points and include entry-level desktop 3D printers, a range of mid-systems for prototyping and end use parts production, and large production systems for additive manufacturing at scale. We also offer a range of 3D printing materials (as described under "Consumable materials" below). The performance of our different systems varies in terms of capabilities, which are related to the following features:

- print speed;

- resolution;

- materials;

- resin cartridge capacity / filament spool size;

- maximum model (or tray) size;

- repeatability; and

- duty cycle, or the number of parts that a printer can produce over a given period of time without requiring maintenance.

Our systems are integrated with our software and are supported by services provided to our customers, both directly and through our reseller channel.

### *Printing systems*

We offer a series of printing systems that address the largest parts of the addressable market for polymer 3D printing.

Our 3D printing systems, which are based on our proprietary FDM-(Fused Deposition Modeling), PolyJet, P3, SAF and stereolithography technologies, are described below:

#### *FDM printers*

Stratasys' market-leading FDM portfolio of printers have exceeded a milestone of 35,000 installed printers. FDM printers are designed to meet a wide range of applications, from prototyping to manufacturing tools, to production parts. The F-Series printers, made up of the F170, F370, F770, F190CR and F370CR models, are designed to meet end- to-end prototyping jigs & fixtures. The Fortus Series, made up of the Fortus 450mc and F900 models, largely suit the production of end parts as well as higher requirement jigs & fixtures, and tooling.

The F Series printers enable prototypes that range from rapid, economically-effective concept verification models in PLA material/ fast-draft mode, to advanced design validation prototypes using a 0.005-inch slice resolution and soluble support for unmatched precision, repeatability and aesthetics. The F Series product line allows users to create parts in PLA, ABS plus, ASA, TPU, ABS-ESD, Diran and PC-ABS materials, which parts therefore possess the strength required for true form, fit and functional testing. The F Series printers are designed to enable ease of use and maintenance while offering an easy-to-use, yet rich user experience with GrabCAD Print software. In 2022, we introduced the composite ready F190CR and F370CR hardened printers that can print Nylon 10CF. These new printers meet customer demand for manufacturing floor jigs, fixtures and tooling with a higher performance composite material.

43

The Stratasys Fortus 450mc 3D printer builds high-performance parts in customary materials, but with advanced complexity higher requirements needed for current-day production manufacturers. Fortus 450mc printer has carbon filled composites for functional prototypes, production parts and rugged tooling. Additionally, an acceleration of material development—of Validated Materials—has significantly expanded the application set. Furthermore, an option to license the Stratasys OpenAM™ parameter generator allows users to unlock and tune new custom materials. These systems are run via easy-to-use interfaces and software controls, making them user-friendly in producing complex parts more efficiently.

The Stratasys F900 printer offers a streamlined workflow and easier job-monitoring with an internal camera and GrabCAD Print software. Standard certifications are included, eliminating the effort and cost to qualify the 3D printer for the user's production floor. Additionally, the Advanced Industrial Solution continues to qualify more materials, which allows a faster, simpler path for certifying additive manufactured parts for aerospace and transportation industry solutions.

In 2022, we divested our former subsidiary MakerBot, which was merged with Ultimaker. In connection with the merger, a distribution partnership was established whereby Stratasys-exclusive distributors can sell MakerBot and Ultimaker products.

*PolyJet printers*

Our PolyJet technology-based, high-end printing systems offer the ability to print multiple materials including color printing in a single part build. The Stratasys J8 Series printers break restrictive technology barriers, enabling customers to print eight different materials at the same time with more than 500,000 different color shades and textures, including Pantone® Validated colors, and multiple material properties- ranging from rigid to flexible, and opaque to transparent. They also 3D prints concept models twice as fast as our previous generation printers, supported by a low-cost DraftGrey material.

The J8 series of printers includes also the J850 TechStyleTM printer that allows 3D printing directly on different kinds of fabrics, enabling series productions in the fashion industry. With the J850 TechStyleTM we also offer our VeroEcoFlex range of materials developed for optimized performance on fabrics while meeting the fashion industry key sustainability standards (defined by leading companies in the industry).

Our J55 3D Printer makes that same fast, full-color design realism accessible to designers and teams everywhere in an office-friendly format and smaller footprint. At about a third the price of J8 Series printers, the J55 utilizes five printer materials simultaneously, enabling nearly 600,000 colors or a variety of materials providing tactile, textual, and sensory capabilities. We also introduced a complementary J35™ Pro 3D printer in 2021, which is an all-in-one, multi material desktop 3D printer for designers and engineers needing up to three materials.

Both J8 Series 3D printers and the J55 printer support KeyShot 3D rendering software, enabling designers to save KeyShot designs directly in the new 3MF format and produce 3D printed models in a single day, when traditional modeling can take one-to-three weeks.

The J55 3D printer is also now available in two industry-specific versions, the J5 DentaJet™ and the J5 MediJet™. The J5 DentaJet is the industry's 3D printer able to accommodate mixed trays of dental parts. The J5 MediJet is designed to produce anatomic visual models and drilling and cutting guides that are sterilizable and biocompatible.

44

The Stratasys J850 Digital Anatomy™ printer helps medical device companies optimize design throughout the product lifecycle. It 3D prints with GelMatrix™ resin, TissueMatrix™ resin and BoneMatrix™ resin -three new materials which, when combined, form over 100 new, unique digital materials to suit anatomical applications. These materials, when used for 3D printing, produce medical models and anatomies that achieve a true-to-life feel and response. This includes both soft tissues, including organs and blood vessels as small as 1mm in diameter, as well as porous bone structures, fibrotic tissues, and ligaments. Recently, we released an additional unique software tool to our medical offering, the Digital Anatomy Creator, allowing seamless creation of different anatomical structures by customizing specific bio-mechanical properties and color using the available materials. This is an advanced differentiated extension of our GrabCAD software for medical users.

*Stereolithography printers*

Our Neo® line of industrial stereolithography 3D printers feature dynamic laser beam technology that enables build accuracy, feature detail, and low variability across the full extent of a large build platform. As an open resin system, the Neo products provide customers materials with a wide range of properties, such as chemical resistance, heat tolerance, flexibility, durability, and optical clarity, as well as low service requirements, reliability and accurate builds. All Neo systems are Industry 4.0-ready with Titanium™ control software that includes a camera, network connectivity, support remote diagnostics, and mid-build parameter customization. The printers can automatically email progress reports on the job. The Neo line of printers provides a significant build area in a small footprint, with simple day-to-day operation. The largest printer, the Neo800, features a 31.5 x 31.5 x 23.6 in. build volume. The Neo450s and Neo450e address customer needs for smaller printers, at 17.72 x 17.72 x 15.75 in. We initiated sales of this line of systems following our acquisition of RPS in February 2021. Following our acquisition of Covestro Additive Manufacturing business unit, which closed in April 2023, we also offer the Somos® materials portfolio for stereolithography printers. Somos materials range from easy-to-use general purpose materials, like the WaterShed line, to high performance stiff materials for tooling and wind tunnel applications, like the PerFORM line, to Bio-Compatible materials for different medical applications.

*Origin P3 printers*

The Origin® One 3D printer uses P3™ (Programmable PhotoPolymerization) technology to precisely control light, heat, and force, among other variables, to produce parts with exceptional accuracy and consistency. We engage with a network of materials partners (like BASF, Henkel , Evonik, and Arkema), who work to develop a wide range of commercial-grade materials for this P3 system, resulting in some of the toughest and most resilient materials in additive manufacturing, as well as materials dedicated to specific applications that meet different industries' standards. The Origin One printer and the range of available materials offer best-in-class printing technology based on digital light processing for production-oriented polymer applications and accelerates our expansion into mass production additive manufacturing. A dental-specific version of the Origin One, the Origin One Dental, is also part of our P3 technology offering, and is ideal for printing higher volumes of accurate, single-material dental parts, using dedicated materials for various dental applications.

*SAF printers*

45

At the end of 2021, we began shipping the first SAF technology-based 3D printer, the H350, in the U.S. and Europe.Throughout 2023, we shipped the H350 printer to wider territories, including Asia, Israel and New Zealand H Series™ Production Platform printers such as the H350 are designed to give manufacturers production consistency, a competitive and predictable cost per part, and complete production control for volumes of thousands of parts. The H350 printer itself was manufactured with a dozen different 3D printed parts made with SAF technology. The printer is designed to meet the needs of customers in industries such as commercial goods, automotive, and consumer goods and electronics that benefit from the ability to quickly produce large volumes of 3D-printed parts with compelling and predictable economics. The H350 provides several control features designed to ensure the system is production-ready. All build data is logged for process traceability and remains fully under the customer's control. Materials can be controlled, tracked and traced, and print settings can be fine-tuned for each customer's needs. We offer customers validated third-party materials, including PA11 and PA12. We announced GrabCAD Print software for the H350 in late 2021.

*Key vertical target markets for printing systems*

To further strengthen our leadership position and following our strategy to deepen the focus on additive manufacturing, tooling and rapid prototyping for specific vertical markets, we have announced a variety of technology and go-to-market partnerships for various key vertical markets, such as automotive, aerospace, consumer products and healthcare.

*Consumable materials*

We sell a broad range of Stratasys proprietary 3D printing materials, consisting of over 61 FDM spool-based filament materials, 49 PolyJet cartridge-based resin materials, 41 hybrid photopolymer resins for SL and DLP and 4 powder materials for PBF. These materials yield a large variety of digital materials that reflect over 600,000 color variations, transparency, opacity and flexibility levels, for use in our 3D printers and production systems and provide our customers with all the tools needed to meet their broad application needs. Various of our printing materials are validated or certified in accordance with internationally-recognized standards. The sale of these materials provides us with a recurring revenue stream from users of our 3D printers and production systems. In addition, in 2021, we announced a new hybrid ecosystem model for materials which also enables sales of differentiated 3rd party materials for use in Stratasys systems as well. This Stratasys Material Ecosystem is designed to enable manufacturing customers to address new applications with demanding requirements through accelerated access to leading industry materials. The ecosystem includes the following material categories:

- Stratasys Preferred: Preferred by Stratasys for its customers for the highest-performance applications. These materials are engineered specifically for Stratasys printers to provide the best combination of material and printer performance and are developed either by Stratasys or third-party material partners. All currently available Stratasys-made materials are Stratasys Preferred.

- Stratasys Validated: Materials validated by Stratasys with basic reliability testing to accelerate the expansion of material options available in the marketplace.

- Open: Unvalidated materials accessible via an annual OpenAM™ Software License. These materials may offer unique attributes and the potential to address new applications but they have not received validation testing or optimization on Stratasys printers.

We believe this model will help accelerate the move to additive manufacturing at scale and encourage more utilization of its printers. Preferred and Validated materials are sold through Stratasys channels.

The materials we sell are described below:

46

*FDM materials*

The modeling and support filament used in our FDM 3D printers and production systems features a wide variety of production grade thermoplastic materials. We continue to develop filament modeling materials that meet our customers' needs for increased speed, strength, accuracy, surface resolution, chemical and heat resistance, color, and mechanical properties. These materials are processed into our proprietary filament form, which is then utilized by our FDM systems. Our canister-based system has proven to be a significant advantage for our products, because it allows the user to quickly change material by simply mounting the lightweight spool and feeding the desired filament into the FDM print and production devices. Currently, we have a variety of build materials in multiple colors commercially available for use with our FDM technology.

Each material has specific characteristics that make it appropriate for various applications. The ability to use different materials allows the user to match the material to the end use application, whether it is a pattern for tooling, a concept model, a functional prototype, a manufacturing tool, or an end use part.

*PolyJet materials*

Our resin consumables, which consist of our PolyJet family of proprietary acrylic-based photopolymer materials, enable users to create highly accurate, finely detailed 3D models and parts for a wide range of prototype development and customized manufacturing applications. The wide variety of resins within the PolyJet family is characterized by transparent, colored, or opaque visual properties and flexible, rigid or other physical properties. Support materials that are used together with the model materials enable the 3D printing of models with a wide array of complex geometries. Our resin-based materials are produced in-house and are specially designed for our printing systems.

We have invested significant research and development efforts in optimizing our PolyJet materials for use with inkjet technology. These efforts are reflected in the properties of these materials, which enable them to be packaged, stored, combined and readily cured upon printing. Our PolyJet materials are packaged in cartridges for safe handling and are suitable for use in office environments. The polymerized materials can also be machined, drilled, chrome-plated or painted in most cases.

*Stereolithography materials*

Our stereolithography materials came to Stratasys from the acquisition of the Covestro Additive Manufacturing SOMOS™ portfolio, which closed in early April 2023. These hybrid epoxy-acrylate materials offer a variety of functional prototyping solutions, by delivering flexible, durable, rigid, high temperature or clear properties, to simulate production-targeted polymers.

Additionally, several materials can be utilized for manufacturing applications, such as jigs and fixtures, investment casting, injection mold or composite tooling applications.

This range of materials enables us to offer a range of solutions from concept modeling and prototyping, to manufacturing In addition, Stratasys holds a leading patent position in the industry as a result of this portfolio.

*Other Stratasys materials*

Beyond this extensive breadth of materials for Stratasys technology platforms, Stratasys also has the capability to supply materials for non-Stratasys platforms in powder bed fusion. Stratasys acquired the Addigy® material brand from Covestro. Addigy® powder materials are validated on Powder bed fusion open system printers (PBF). These PBF technology powder materials are sold by Stratasys to customers who operate selective laser sintering printers. This powder materials portfolio includes three elastomeric materials (2 TPU and 1 TPE) for various flexible application needs and the first-ever PBT powder for small series production. (These powders are not yet validated on Stratasys' own powder-based SAF technology).

47

*Third-party materials partnerships*

Further augmenting the Stratasys materials portfolio described above, Stratasys has developed an ecosystem of third-party materials partnerships. Today, these partnerships include the top materials companies in the AM industry,such as BASF, Henkel, Arkema, ALM, Kimya and more. Not only do these partnerships provide our customers with expanded application potential from the validated materials they offer, but they also provide us the opportunity to speed materials innovation through targeted collaboration.

## Software

Software is an integral part of our solutions-based, go-to-market strategy. Built on cloud, desktop and mobile technologies, the GrabCAD Additive Manufacturing Platform is an open and enterprise-ready software platform that enables manufacturers to manage production-scale additive manufacturing operations. Stratasys' platform is specifically designed for the unique needs of additive manufacturing across the entire digital thread - from design through production - while also integrating with Industry 4.0 infrastructure and enterprise applications. As of February, 2024, the platform consists of more than 42,200 application users, 19,000 3D printers, and over 6,300 workflow users. The platform processes [35] gigabytes of data streams per day. Several components are included in the platform:

GrabCAD Print, our job programming software, enables the unique features of our 3D printing technologies such as creating lightweight, structurally sound infills for FDM, and multi-material and color and material management for PolyJet. The feature set of GrabCAD Print is designed to make the process of creating high-quality, highly detailed and accurate models accessible to users in Engineering and Design Offices, Enterprise Model Shops, Manufacturing and Health Care markets.

GrabCAD Print natively reads commonly used 3D CAD file formats as well as traditional STL and VRML files, transforming them into instructions to drive our 3D printing systems. Our software provides a robust collection of features, including structural toolpath and infill controls, color and appearance management, multi-material management, automatic support generation, part scaling, positioning and nesting, as well as geometric editing capabilities.

The GrabCAD Print scheduling software includes capabilities to manage the operations of one or more printers including tray packing and optimization, job estimation, system availability, scheduling and monitoring via desktop, web or mobile devices. Additionally, analytics information is available in the form of standard utilization, material usage and job history reports enabling managers and operators to maximize the use of our 3D printing systems.

GrabCAD Shop simplifies the 3D printing shop workflows by improving the way teams manage and collaborate on work orders for prototyping, tooling and end-use parts. Engineers, designers and shop operators minimize time-to-part by sharing a common work space to simplify print work order management, communicating requirements accurately and focusing on delivering quality prints on time.

The GrabCAD Software Development Kit (SDK) enables companies and Independent Software Vendors (ISVs) to integrate Stratasys 3D printing at production scale with existing design and manufacturing software applications infrastructure to support enterprise goals such as system connectivity, compliance and workflow automation. The GrabCAD SDK leverages standard protocols such as MTConnect and provides Application Programming Interfaces (API's), documentation, sample code and a professional support network.

The GrabCAD Software Partner Program is available to Independent Software Vendors (ISVs) wishing to integrate into the GrabCAD AM Platform. The GrabCAD Software Partner Program makes up a robust ecosystem of software partners in Additive Manufacturing powered by Stratasys. Stratasys provides access to the GrabCAD SDK— a complete set of developer tools to support system integration as well as support and joint marketing.

The GrabCAD Community is an online community of over 13 million professional engineers, designers, manufacturers and students who share best practices via tutorials, discussion forums, design/print challenges and 3D content.

Our software is available in nine languages to promote usage in the regions worldwide in which we operate.

## Online Community

### *GrabCAD Community*

We operate the GrabCAD Community for mechanical engineers, designers, manufacturers and students where members can share best practices via tutorials, discussion forums, and design/print challenges. They can also upload and download free CAD models and access our GrabCAD Print and Workbench software. This community had more than 13 million members and over 1.7 million CAD files available for free download as of the end of 2023.

## Our services

### *Support services and warranty*

#### *Customer support*

Our customer success department provides on-site system installation, operator training, a full range of maintenance and repair services and remote technical support to users of our products. We provide support to our customers directly and through our resellers, ensuring that support and parts may be readily obtained worldwide. We also offer advanced training to our customers and preventive maintenance, particularly on our high-performance systems. Our support network consists of the following:

- Stratasys-certified engineers who provide worldwide, on-site installation, training and support;
- direct support engineers through our company;
- indirect support engineers through certified partners, including third-party service organizations or selected resellers who provide support for our systems;
- phone and direct on-site company support in eight languages, and resellers indirect support in local languages;
- service logistics in key regional centers;
- training facilities and resources in regional centers;
- customer-relationship management (CRM) system and learning management system (LMS) to ensure high-quality support for our customers and resellers, including secure remote access to a customer service database containing service history and technical documentation to aid in troubleshooting and repairing systems;
- free content on YouTube to help self-maintenance and troubleshooting;
- support, tools and up-to-date information to our direct customer and distribution channels from our product support engineering team;
- full range of commercial service programs to support the high utilization of our 3D printers and our customers' unique needs; and
- an e-commerce platform allowing for smooth and fast purchasing of our 3D printing materials.

49

Our goal is to ensure maximum uptime and productivity for our AM systems. In order to do so, we regularly update the technical documentation related to our systems, offer extensive training courses for operators and promote proactive knowledge sharing designed to help users maximize the value of their equipment and to expand the applications for which they employ our 3D printing and production systems.

We offer services on a time and materials basis, as well as a full range of post-warranty maintenance contracts with varying levels of support and pricing, as described below under "Extended support programs." Customer support is represented on cross-functional product development teams within our company to ensure that products are designed for serviceability and to provide our internal design and engineering departments with feedback on field issues. Failure analysis, corrective action, and continuation engineering efforts are driven by data collected in the field. Ongoing customer support initiatives include the development of advanced diagnostic and troubleshooting techniques and comprehensive preventative maintenance programs, an expanded training and certification program for Stratasys and Stratasys partners' technical personnel, and improved communication between the field and the factory.

### Basic warranty

Our printing systems are sold with warranties that range from 90 days to, typically, one year from installation, depending upon the product line and geographic location.

Warranties are typically accompanied by on-site maintenance support. Receipt of maintenance and repair services after the warranty period is subject to the terms of our extended support programs, to the extent purchased by the end-user, as described below.

### Extended support programs

Recognizing that our end-users have varying support needs, we offer a range of support programs that enable our end-users to continue to receive maintenance services beyond the initial warranty period. These support programs contain varying degrees of the support services described above and are priced accordingly.

As part of our support programs, in light of our being subject to FDA regulation with respect to our first certified medical device with TrueDent resin, we have in place suitable processes to support customer complaints under the FDA's standards.

### Leasing and other services

We have arrangements, in certain countries, in which third-party financial institutions independently provide lease financing directly to our customers, on a non-recourse basis to the Company. In these arrangements, we sell and transfer title of the equipment to these financial institutions. Generally, we have no continuing ownership rights in the equipment subsequent to its sale. In addition, we provide pay-per-usage subscription services for our 3D printers and 3D production systems via partners in our global manufacturing network. The revenues generated from such program were insignificant.

We also offer a 'Try and Buy' program, which provides businesses the ability to try out a 3D printer prior to deciding whether or not it's the right fit for their company.

The potential purchasers of a 3D printer receive customer support from our company during the trial period.

Stratasys Direct Manufacturing paid-parts service

Stratasys Direct Manufacturing is a contract manufacturing service provider of parts on-demand via polymer 3D printing processes. With over 30 years of experience, Stratasys Direct provides rapid prototyping and production parts using the broadest set of polymer additive technologies of any service bureau in North America and backed by experts ready for the most complex projects. With Stratasys Direct, customers can quickly design, innovate and meet demands of any complexity or scale by accessing the right expertise, industrial-grade 3D printing technologies, and materials without the capital expense. Stratasys Direct pioneered additive manufacturing production applications and specializes in guiding customers from concept development and prototyping through short-run production and long-term manufacturing. Stratasys and Stratasys Direct work together to help Stratasys customers meet their needs with infinite manufacturing capacity or access to technologies they do not have in-house.

Stratasys Direct Manufacturing also operates an ecommerce service for quick-turn parts, www.stratasysdirect.com, which enables its customers to obtain quotes and order parts around the clock, seven days a week.

## Customers

We have a diverse set of customers worldwide, including, among other prominent companies: General Motors; BAE Systems; Boeing; Blue Origin, the U.S. Navy and the Mayo Clinic. No single customer or group of affiliated customers nor any individual sales agent or group of affiliated sales agents accounted for more than 10% of our sales in 2023, 2022, or 2021. Our solutions are used across a wide array of applications in a variety of different industries.

## Marketing, sales and distribution

### *Marketing*

Our marketing strategies are tailored to achieve several key objectives. These include elevating awareness and establishing thought leadership in our solutions and product areas, and solidifying our leadership brand position across multiple industries, including automotive, aerospace, medical, dental, fashion, education, and consumer goods. Furthermore, we are committed to expediting and enhancing sales growth while enhancing customer loyalty and lifetime value.

To attain these goals, we execute a multifaceted approach that encompasses thought leadership initiatives, relations with industry analysts, and impactful product launches. Integrated campaigns serve to deepen connections with our existing customer base while expanding our reach to attract new clients. This approach stimulates demand and generates leads across our strategic markets, encompassing both our direct operations and our extensive network of resellers.

Our marketing arsenal combines inbound and outbound strategies for maximum impact. Inbound tactics leverage digital platforms, including blogs, social media, search engine optimization (SEO), search engine marketing (SEM), and engaging webinars and white papers to nurture leads. On the outbound front, we deploy digital and print communication campaigns, execute public relations efforts, initiate direct mail and email outreach, host virtual and in-person tradeshows and roadshows, and orchestrate thought leadership events. We maintain an active presence in newsletters, industry associations, and leverage referrals to bolster our engagement.

Additionally, our regional offices across the globe house state-of-the-art product and technology demonstration facilities, reinforcing our commitment to showcasing our solutions effectively.

Our resellers are integral to our success, and we prioritize their growth by providing essential tools and support. We offer a comprehensive suite of marketing resources, including brochures and product guides, and extend co-marketing opportunities to enhance their visibility and drive sales. To ensure their competence in marketing and selling our products, we offer training and education programs.

51

We closely monitor and assess the outcomes of our marketing initiatives, continuously striving to discern evolving customer needs. This analysis informs our product roadmaps and individual marketing plans, enhancing distribution optimization and facilitating seamless product release, ramp-up, and sales processes.

### Sales distribution methods

Our sales organization sells, distributes and provides follow-up support services with respect to our AM systems and related consumables, through a worldwide sales and marketing infrastructure. We generally use two methods for distribution and support: (i) sales to resellers who purchase and resell our products (including materials) and through whom follow-up support and maintenance services and replacement parts are provided to end-users; and (ii) direct sales of systems or services to end-users without the involvement of any intermediaries, for which all aspects of our sales and follow-up services are handled exclusively by our company. Our resellers are overseen by regional managers and some resellers operate on a non-exclusive basis, although we believe that most do not sell competing AM systems.

Almost all of the reseller locations that distribute our products have our AM systems available for tradeshows, product demonstrations, and other promotional activities. Additionally, many of them enjoy a long-term presence and offer third-party 3D CAD software packages in their respective territories, enabling them to cross-sell our systems to customers who purchase those other products.

In addition to traditional direct sales and reseller-based sales of our AM systems and related consumables, we also utilize an online customer/partner digital hub which serves as a direct digital method for distribution of our products. The online hub acts as a point of sale for consumables, software and spare parts to end-users who own our systems.

### Geographic structure of sales organization

The primary sales organization for our 3D printers and production systems including related consumables, materials and services is divided into groups based on the following geographical regions: Americas; Europe and Middle East; APAC. This structure allows us to align our sales and marketing resources with our diverse customer base. Our sales organization in each region provides sales support to the network of independent reseller and sales agent locations throughout the particular region. We also operate sales and service centers in various locations throughout the Americas and internationally, including: Baden-Baden, Germany; Shanghai, China; and Tokyo, Japan.

## Manufacturing and suppliers

### Manufacturing

The manufacturing process for our 3D printing and production FDM, PolyJet, stereolithography (or SLA), and P3 (digital light printing) technology systems consists of assembling those systems using both off-the-shelf and customized components manufactured specifically for us and producing and packaging the consumables products to be used by those systems. Our core competencies include FDM, PolyJet, SLA and DLP systems assembly and integration, software installation and resin and filament manufacturing. The majority of those activities are done internally at our facilities. We currently operate on a build-to-forecast basis and obtain all parts used in the FDM and PolyJet systems manufacturing process from either distributors of standard electrical or mechanical parts or custom fabricators of our proprietary designs. Our manufacturers and suppliers are periodically assessed by us based on their on-time performance and quality.

We purchase major component parts for our FDM, PolyJet SLA and DLP systems from various suppliers, subcontractors and other sources, and test those parts in our U.S., Israeli and U.K facilities.

52

Computer-based Material Requirements Planning, or MRP, is used for reordering to better ensure on-time delivery of parts and raw materials. Operators and assemblers are trained on assembly and test procedures including Assembly Requirement Documents, which originate in engineering. In the manufacturing processes for our FDM, PolyJet, SLA and DLP systems, and for our consumables, we employ a Quality Management System, or QMS, that meets international quality standards including ISO 9001:2008 and ISO 13485:2003, in the case of medical devices. We also outsource the manufacturing of main subassemblies up to fully assembled systems ready for integration.

The system assembly process for our FDM, PolyJet, SLA and DLP systems includes semi-automated functional tests of key subassemblies. Key functional characteristics are verified through these tests, and the results are stored in a statistical database.

Upon completion of the assembly of our 3D printing and production FDM, PolyJet, SLA and DLP systems, we perform a complete power up and final quality tests to help ensure the quality of those products before shipment to customers. The final quality tests must be run error-free before the FDM, PolyJet, SLA and DLP systems can be cleared for shipment. We maintain a history log of all FDM, PolyJet, SLA and DLP products that shows revision level configuration and a complete history during the manufacturing and test process. All identified issues on the FDM, PolyJet, SLA and DLP systems during the manufacturing process are logged, tracked and used to make continuous production process improvements. The commonality of designs among our different FDM, PolyJet, SLA and DLP product families eases the transition to manufacturing new designs.

Our filament production have used Factory Physics® techniques to manage critical buffers of time, capacity and inventory to ensure product availability. We also use the "5S" method (Sort, Set-in-order, Shine, Standardize and Sustain) and a continuous improvement system as part of our lean manufacturing initiatives to improve organization and efficiency.

### Inventory and suppliers

We maintain an inventory of parts to facilitate the timely assembly of products required by our production plan. While most components are available from multiple suppliers, certain components used in our systems and consumables are only available from single or limited sources. In particular, the printer heads for our PolyJet 3D printing systems are supplied by a sole supplier, Ricoh. We consider our single and limited-source suppliers (including Ricoh) to be reliable, but the loss of one of these suppliers could result in the delay of the manufacture and delivery of the relevant components (and, ultimately, of our products). This type of delay could require us to find and re-qualify the component supplied by one or more new vendors. Although we consider our relationships with our suppliers to be good, we continue to develop risk management plans for these critical suppliers. In order to hedge against the risk of a discontinuation of the supply of our inkjet printer heads in particular, we maintain a reasonable supply of excess inventory of printer heads.

### Ricoh Agreement

We purchase the printer heads for our inkjet 3D printing systems from Ricoh pursuant to an OEM Purchase and License Agreement with Ricoh, or the Ricoh Agreement.

Under the Ricoh Agreement, we place orders for print heads and associated electronic components, or the Ricoh Products. Together with provision of these items, Ricoh provides us with a non-transferable, non-exclusive right to assemble, use and sell the Ricoh Products under Ricoh's patent rights and trade secrets.

Pricing under the Ricoh Agreement depends on the quantity of Ricoh Products that we purchase during any given month, and to the extent that we commit to a certain annual minimum prior to an upcoming year, we receive a set, discounted price for all Ricoh Products ordered during that upcoming year.

53

The Ricoh Agreement ran for an initial term of five years (which we renewed in September 2016) and automatically renews for additional one-year periods thereafter unless either party provides the other six months' advance written notice of termination prior to the end of the then-current term. The Ricoh Agreement may be cancelled by either party if (i) the other party substantially breaches any material provision of the agreement and has not cured such breach within 30 days of receipt of written notice thereof, or (ii) upon the occurrence of certain bankruptcy events, and may furthermore be cancelled by Ricoh if we fail to cure a breach of an undisputed payment obligation within thirty (30) days of the breach.

At any time during the term of the Ricoh Agreement, Ricoh may discontinue the manufacture and supply of a print head model, so long as it provides us with at least eighteen (18) months' prior written notice of such discontinuance and honors all of our purchase orders for the subject print head model within the notice period. During the period of five years from the earlier of either the termination of the Ricoh Agreement or the date of discontinuance of the manufacture of Ricoh Products (that is, following the 18-month notice period described in the previous sentence), we are entitled to purchase additional Ricoh Products for the sole purpose of providing replacements for the installed base of Ricoh Products, including one final purchase order that we may place in the final year of such five-year period and that must be filled by Ricoh within twelve months of when it is placed.

The Ricoh Agreement may not be assigned by either party without the other party's prior written consent, which may not be unreasonably withheld.

## Research and development

We maintain an ongoing program of research and development, or R&D, to develop new systems and materials and to enhance our existing product lines, as well as to improve and expand the capabilities of our systems and related software and materials. This includes significant technology platform developments for our FDM, PolyJet, P3, SAF and SLA technologies, our AM systems, including our integrated software,3 our family of proprietary acrylic-based photopolymer materials for PolyJet, SL and P3 technologies, and our family of proprietary thermoplastic materials for FDM printing. Our research aims to develop both incremental and disruptive improvements, as well as more affordable products. Our engineering development efforts also focus on customer requested enhancements, and development of new modeling processes, software and user applications. In particular, we have devoted significant time and resources to the development of a universally compatible and user-friendly software system.

Our R&D department is divided into groups based on scientific disciplines and product lines. We continue to standardize our product platforms, leveraging each new design so that it will result in multiple product offerings that are developed faster and at reduced expense.

We invest a significant amount of our resources in R&D, because we believe that superior technology is a key to maintaining a leading market position. Our net R&D expenses were approximately $94.4 million, $92.9 million and $88.3 million in the years ended December 31, 2023, 2022 and 2021, respectively. Our consumable materials development and production operations for our FDM, PolyJet, P3, SLA and SAF systems are located at our facilities in Eden Prairie, Minnesota; Rehovot, Israel; Kiryat Gat, Israel; Elgin, Illinois; Geleen, Netherlands; and Lengwil, Switzerland. We regard the consumable materials formulation and manufacturing process as a trade secret and hold patent claims related to these products. We purchase and formulate raw materials for our consumables production from various polymer resin and thermoplastic materials suppliers with different levels of processing and value-add applied to the raw materials.

**Intellectual property**

We consider our proprietary technology to be important to the development, manufacture, and sale of our products and seek to protect such technology through a combination of patents, trade secrets, and confidentiality agreements and other contractual arrangements with our employees, consultants, customers and others. All patents and patent applications for additive manufacturing processes and apparatuses associated with our technology were assigned to us by those inventors. The principal granted patents relate to our FDM systems, our PolyJet technologies, our 3D printing processes and our consumables, certain of which have already expired and certain of which have expiration dates ranging from 2024 to 2039.

We are also a party to various licenses and other arrangements that allow us to practice and improve our technology under a broad range of patents, patent applications and other intellectual property, including a cross-license agreement with 3D Systems Corporation under which each party licensed certain patents of the other party, an assignment of rights to us related to UV polymer-based U.S. patents, which underlie certain technologies that compete with ours, and a patent license agreement with Cornell University providing access to certain tool changer patents.

In addition, we own certain registered trademarks and make use of a number of additional registered and unregistered trademarks, including "Stratasys", the Stratasys Signet logo, "Objet", "PolyJet", "Connex", "J8 Series", "J850", "J826", "J750", "J700", "J5", "J35", "J55", "Vero", "VeroFlex," "VeroEco," "VeroUltra", "VeroVivid", "Tango", "Durus", "Rigur", "Elastico", "TrueDent", "FDM", "Fortus", "F123 Series", "F370", "F900", "F770", "Insight", "Antero", "Diran", "Origin", "Origin One", "P3", "Stratasys Direct Manufacturing", "Stratasys Direct", "GrabCAD", "GrabCAD Community", "GrabCAD Print", "GrabCAD Shop", "GrabCAD Steamline", "OpenAM", "ProtectAM", "DentaJet", Medijet", "Digital Anatomy", "TissueMatrix", "GelMatrix", "BoneMatrix", "RadioMatrix", "3DFashion", "TechStyle", "FabriX", "Neo", "Neo800", "Neo450", "Titanium", "Titanium Assistant", "H350", "H Series", "SAF", "Big Wave", "Selective Absorption Fusion", "Somos", "WaterClear", "WaterShed", "PerFORM", "Addigy", "Mindful Manufacturing", "3D Printing a Better Tomorrow" and "Make additive work for you".

We believe that, while our patents provide us with a competitive advantage, our success depends on our marketing, business development, applications know-how and ongoing research and development efforts, in addition to our rights under granted and pending patents. Accordingly, we believe that the expiration of any single patent, or the failure of any of single patent application to result in an issued patent, would not be material to our business or financial position. In any event, there can be no assurance that our patents or other intellectual property rights will afford us a meaningful competitive advantage. Please see the risk factor related to the expiration of our patents in "Item 3.D Risk Factors-Risks related to our intellectual property."

**Competition**

Our principal competitors consist of other developers of additive manufacturing systems as well as other companies that use fused deposition modeling or inkjet-based or vat polymerization or digital light processing (DLP) or power bed fusion technologies to compete in additive manufacturing.

The companies that offer these technologies to compete with us include, inter alia, 3D Systems Corporation, EOS GmbH, HP, Carbon, Inc.,Formlabs, Markforged, Inc. and Desktop Metal (following their acquisition of EnvisionTEC).

These technologies, which compete for additive manufacturing users, possess various competitive advantages and disadvantages relative to one another within the key categories upon which competition centers, including resolution, accuracy, surface quality, variety and properties of the materials they use and produce, capacity, speed, color, transparency, the ability to print multiple materials and others. Due to these multiple categories, end-users usually make purchasing decisions as to which technology to choose based on the characteristics that they value most. This decision is often application specific. The competitive environment that has developed is therefore intense and dynamic, as players often position their technologies to capture demand in various verticals simultaneously.

We are positioned to compete in our industry mainly on the following bases, which we view as competitive strengths:

- material properties of printed objects, such as heat resistance, toughness, brittleness, elongation-to-break, color and flexibility;

- quality of printed objects measured by, among other things, resolution, accuracy and surface quality;

- multiple production-grade modeling materials;

- our offering of the best multi-color, multi-material 3D printing systems in the market;

- reliability and repeatability of our printing systems;

- ease of use, including of one-step automated modeling process.

- automatic, hands-free support removal;

- high level of customer service; and

- deep application domain know-how and expert services, including among our channel network.

We offer a wide range of systems with varying features, capacities and price points. We believe that this enables us to compete with the other additive manufacturing technologies for a wide range of customers with a variety of applications and goals for their additive manufacturing.

We also compete with companies that use traditional prototype development and customized manufacturing technologies, and we expect future competition to arise from the development of new technologies or techniques.

**Seasonality**

Historically, our results of operations were subject to seasonal factors. Stronger demand for our products historically occurred in our fourth quarter primarily due to our customers' capital expenditure budget cycles and our sales compensation incentive programs. Our first and third quarters historically were our weakest quarters for overall unit demand. The first quarter was typically a slow quarter for capital expenditures in general. The second quarter was typically when we would see our largest volume of educational related sales, which normally qualified for special discounts as part of our long-term penetration strategy.

Since prior to the COVID-19 pandemic (ever since 2019), however, our historical seasonality pattern has been disrupted, and we have not seen a steady pattern as to the level of demand in the various quarters from year to year.

We experience seasonality within individual fiscal quarters, as a substantial percentage of our system sales often occur within the last month of each fiscal quarter. This trend has the potential to expose our quarterly or annual operating results to the risk of unexpected, decreased revenues in the case of our inability to build systems, consummate sales and recognize the accompanying revenues prior to the end of a given quarter.

**Global operations**

We have offices in, among other locations, Brazil, China, Germany, Hong Kong, Israel, Japan, Korea, India, Mexico, the United Kingdom and the United States, and organize our operations by geographic region, focusing upon the following key regions: the Americas; Europe and Asia Pacific. Our products are distributed in each of these regions, as well as in other parts of the world. Our customers are dispersed geographically, and we are not reliant on any single country or region for most of our product sales and services revenues, although 62.1% of our 2023 revenues were generated in the Americas and our Stratasys Direct Manufacturing printed parts services are primarily based in the United States and therefore reliant on United States customers. A breakdown of our consolidated revenues by geographic markets and by categories of operations (that is system, consumables and services) for the years ended December 31, 2023, 2022 and 2021 is provided in "Item 5.A Operating and Financial Review and Prospects- Operating Results." In maintaining global operations, our business is exposed to risks inherent in such operations, including currency fluctuations, market conditions, and inflation in the primary locations in which our operating expenditures are incurred. Information on currency exchange risk, market risk, and inflationary risk appears elsewhere in this annual report in "Item 3.D Risk Factors" and in "Item 11. Quantitative and Qualitative Disclosure About Market Risk-Foreign Currency Exchange Risk".

**Employees**

The total number of our full-time equivalent employees, and the distribution of our employees (i) geographically and (ii) within the divisions of our company, in each case as of December 31, 2023, 2022 and 2021, are set forth in this annual report in "Item 6.D Directors, Senior Management and Employees—Employees".

**Government regulation**

We are subject to various local, state and federal laws, regulations and agencies that affect businesses generally. These include:

- regulations promulgated by federal and state environmental and health agencies;
- foreign environmental regulations, as described under "Environmental, Social and Governance Matters" immediately below;
- the federal Occupational Safety and Health Administration;
- the U.S. Foreign Corrupt Practices Act;
- laws pertaining to the hiring, treatment, safety and discharge of employees;
- export control regulations for U.S. made products;
- Israeli tax regulations, as described under "Israeli Tax Considerations and Government Programs" below;and
- CE regulations for the European market.

Effective as of February 2023, as a result of the launch of our first certified medical device with TrueDent resin in the United States, we are now also subject to medical device regulations, such as the U.S. FDA Code of Federal Regulations.

**Environmental, Social and Governance Matters**

**Stratasys is Championing Mindful Manufacturing™, with a commitment to 3D Printing a Better Tomorrow™ for people and the planet**

**Stratasys is committed to ESG & Sustainability best practices, with a strategy in place to advance the Company by addressing the need for ongoing Environmental, Social and Governance stewardship.**

Today, the challenges posed by geo-political and economic shifts put pressure on businesses. Stratasys, and its Board of Directors, are committed to achieving our success metrics in this complex environment, with the understanding that the definition of a strong sustainable business is broadening.

With this understanding, we clearly outlined our mission to improve how parts are made, processes are optimized, and products are delivered so that manufacturing impacts people and our planet in a positive way. Our approach is data-driven and evidence-based, knowing that "what you can't measure, you can't improve".

In 2021 Stratasys was a first in its industry to publish a comprehensive ESG & Sustainability report, declaring its environmental, social and governance (ESG) strategy, commitment and activities, based on the Global Reporting Initiative (GRI) Standards for sustainability reporting.

Our commitment to strategic Environmental, Social and Governance (ESG) activity is a cornerstone of our purpose: to empower people to create without limits for an economic, personalized and sustainable world.

Stratasys, with broad input from both employees and customers and the support of our board of directors, prioritized four UN Sustainable Development Goals(SDGs) for our company:

1- Responsible consumption and production

2- Industry infrastructure and innovation

3- Climate action

4- Quality education

Today, we continue to advance our efforts to promote "Mindful Manufacturing™." This means driving global growth in additive manufacturing by 3D printing in ways that promote a positive social and environmental impact. In particular, 3D printing is uniquely positioned to address pressing climate issues— localizing supply chains to reduce the carbon footprint incurred by air and sea freight, enabling the production of strong but lighter weight parts, and reducing the energy requirements of the production process itself. We are at work with improvement efforts, externally and internally, that bring value around our four UN SDGs and our Mindful Manufacturing™ mission.

*Environmental*

As a global leader in polymer additive manufacturing solutions, with the broadest portfolio in the industry, Stratasys is focused on making an impact, across industries. Our efforts in this arena are three-fold:

(i) We push the industry towards greater sustainability, through awareness, standardization, and shared best practices performing research and setting improvement targets with our peers and customers. As part of this mission, Stratasys become a Founding Member of the Additive Manufacturer Green Trade Association (AMGTA) in 2021, spearheading the shift to a better understanding and execution of sustainability across the entire Additive Manufacturing eco-system, and value chain.

(ii) We target an improved circular economy. This entails advancing the digital processes that support our additive technologies, for manufacturing. We focus on improved reliability, for less physical iterations; we support digital inventories that can be printed on-demand; we offer naturally sourced printing material. we look to improve the way in which finite natural resources are employed in our printing processes–energy and water; and, we offer recycling options as well.

58

(iii)    We aim to harness our expertise to drive innovation. This means expanding our roadmap to include products that enable the production of parts that have a reduced carbon footprint. Imagine cars running with durable 3D printed parts that weigh 30% less than before and provide the same reliability at the same level of quality, which enables production that reduces fuel consumption and emissions of parts, when implemented in machines.

Manufacturing is resource-intensive by nature. It is important to note, however, that 3D printing works in a manner that can be far more environmentally friendly than alternative, traditional production methods. Working with industry leaders in aerospace, automotive, healthcare, fashion and consumer production companies, Stratasys has the ability to enable our customers to reduce their carbon footprints in a meaningful way. We base our work on data and research and plan on publishing 'Life Cycle Inventory' reports to make the scientific case for greener manufacturing. To this end, we have become a founding member of the Additive Manufacturer Green Trade Association (AMGTA), which promotes the environmental case for the entire 3D printing industry.

Right now, Stratasys offers Scope 1 & 2 data on its activities – having collected data on our operations and internal consumption with the goal of improvement across our global sites, year-over-year. This includes installing solar panels and beginning to generate renewable energy or our manufacturing sites, for example. We have set our initial baseline (i.e., our initially measured emissions levels from which we seek to only improve), not because regulation and compliance require this, but rather because we believe this is a more meaningful way for our business to make an impact; it is our corporate responsibility to create a world where future generations can thrive. We seek to continuously expand our monitoring capabilities for environmental, social and governance metrics.

We have begun our Scope 3 data collection, and reporting, too. In September 2023, the first Stratasys Lifecyle Analysis report was published, based on a customer use case and collaboration with Dyloan (D-Bond), of the Pattern Group. The Additive Manufacturing Green Trade Association (AMGTA) commissioned this report prepared by Reeves Insight, entitled "Comparative Analysis: Material Jetting vs. Traditional Methods for Designer Luxury Goods". It details results following a year-long study of the transition to industrial AM from traditional methods of manufacture for a specific application. Key takeaways from the study include a 24.8% reduction in CO2e emissions, when compared with traditional processes; a 49.9% reduction of stock material across the supply chain, also reducing and streamlining related transportation needs; and 50.0% less material in the resulting 3D printed logo component. The study also revealed the savings of more than 300,000 liters of water across the 16,000 components, and a 64.3% reduction in electrical energy consumption.

### *Environmental Compliance*

As of 2023, our Israel headquarters and Israel manufacturing locations are certified as ISO 14001 environmental management systems (EMS) compliant. We hope to leverage that existing EMS compliance to support the EMS accreditation of our facilities in Rheinmunster, Germany and in Eden Prairie, Minnesota during the first half of 2024, as part of our plans to obtain global ISO certification.

ISO certification demonstrates our commitment to reduce environmental impact, measured by international standards that set out the requirements for more effective EMS. Our desire for meaningful impact, yet reduced footprint, is achieved through more efficient use of resources and reduction of waste by implementing renewable energy solutions, water management systems, waste recycling that uses composter, and many others initiatives.

59

We are subject to various environmental, health and safety laws, regulations and compliance requirements, including (but not limited to) those governing the emission and discharge of hazardous materials into ground, air or water; noise emissions; the generation, storage, use, management and disposal of hazardous and other waste; the import, export and registration of chemicals; the cleanup of contaminated sites; and the health and safety of our employees. Based on information available to us, we do not expect environmental costs and contingencies to have a material adverse effect on our operations. The operation of our facilities, does, however, entail certain potential risks in these areas. Significant expenditures could be required in the future to comply with environmental or health and safety laws, regulations or requirements as ESG practices and controls become more prominent. Certain of these compliance requirements are imposed by our customers, who at times require us to be registered with U.S. health or safety regulatory agencies, whether on the federal or state level. Others may be related to ESG reporting and rising environmental compliance trends in Europe.

Under environmental laws and regulations, we are required to obtain environmental permits from governmental authorities for certain operations. In particular, in Israel, where we assemble our inkjet-based PolyJet 3D printing systems and manufacture our resin consumables, businesses storing or using certain hazardous materials, including materials necessary for our Israeli manufacturing process, are required, pursuant to the Israeli Dangerous Substances Law 5753-1993, to obtain a toxin permit from the Ministry of Environmental Protection. We maintain the effectiveness of two Israeli toxin permits for our respective Israeli sites. Our United States-based facilities, as well, are required to maintain various site permits in compliance with state and local laws and regulations.

In the European marketplace, amongst others, electrical and electronic equipment is required to comply with the Directive on Waste Electrical and Electronic Equipment of the European Union (EU), which aims to prevent waste by encouraging reuse and recycling, and the EU Directive on Restriction of Use of Certain Hazardous Substances, which restricts the use of various hazardous substances in electrical and electronic products. Our products and certain components of such products "put on the market" in the EU (whether or not manufactured in the EU) are subject to these directives. Additionally, we are required to comply with certain laws, regulations and directives, including TSCA in the United States, as well as REACH, RoHS and CLP in the EU, governing chemicals. These and similar laws and regulations require, amongst others, the registration, evaluation, authorization and labeling of certain chemicals that we use and ship.

*Social*

Per our defined SDG's, the Stratasys Sustainability commitment extends beyond environmental sustainability. For example, we are proud of our "People First" approach to business. We put environmental health and safety (EHS) as a top priority, securing the health and safety of our employees, through clear policies and annual training, backed by our EHS data management platform. We also continue to be active members in our local communities, with meaningful Corporate Social Responsibility (CSR) activity around the world. Specifically, we are committed to leveraging the value of 3D printing to benefit our local communities through meaningful partnerships and personal employee contributions via our global volunteer network. Our main areas of focus are in leveraging Stratasys technologies in pursuing quality education (according to our commitment to SDG #4) and to advancement in patient care for medical cases. For example, in the US, we leverage our technologies to advance next generation STEM learning initiatives, with tech and robotics enthusiasts via our long-term partnership with FIRST aRobotics. We have a robust Diversity Equity and Inclusion (DE&I) program, launched in 2021 and are a proud platinum sponsor of Technology, Industry, People, Economics (TIPE) Women in 3D Printing. We continue to advance an inclusion program to address internal opportunities across all human resource touch points (hiring, learning and development) with a key performance indicator (KPI) that calls for 100% candidate slates that include at least one female and one male, for director and more senior positions.

60

With a global presence, Stratasys is attuned to and supportive of the needs of all citizens of this world. That's why we initiate our "Stratasys Cares" disaster relief programs to support communities impacted by natural disasters, pandemics and war. We actively supported the Turkish people and our Turkish employees and partner network during the devastation that ensued following the 2023 earthquake. We support our people during the Iron Swords War in Israel, as well.

*Governance*

ESG, is strongly rooted in the structure of corporate management practices and the disclosure that creates transparency around them. We also publish a standardized ESG & Sustainability report, available to the public, around all ESG topics defined by the GRI standard and addressed in alignment with a periodic materiality assessment. This is a foundation for our ethical global operations, as the 3D printing company with the largest install base among industry-leading companies. We have a long-standing Code of Ethics and have also extended our culture and values to our suppliers via a suppliers' code of conduct. We are required to report financial data as a public company, yet we extend beyond the minimum obligation and provide more comprehensive quarterly analysis of our results for the market, allowing us to better engage with the broader investment community. We conduct quarterly internal updates for employees and team leaders at our company to share business updates openly and share ongoing developments with our global teams.We also publish a standardized ESG & Sustainability report, available to the public, around ESG topics defined by the GRI standard and addressed in alignment with a periodic materiality assessment.

We strive for clarity, engagement and care. It is our goal to deliver on our purpose, in everything we do: We live as a corporate body by our values: Innovate; Be Customer First; Aim Higher; Own It; and Make it Together.

*ESG Key Performance Indicators*

We take a data-based approach to our sustainability activity, introducing disclosures, certifications, evidence and research on our value proposition across ESG areas of activity. For starters, we set clear KPIs in the area of DE&I (described under "Social" above) that have proven to positively impact our goal of employing more women in management and tech roles, as detailed in our GRI reporting. In addition, we believe in performing the deep work required to manage our enterprise as a sustainable one, for generations to come. As such our KPIs call for on-going expansion of our data collection and disclosures (additional shared customer LifeCycle Analyses, ISO 14001 certification global extension, and product DfE – designed for environment) projects. The emissions KPIs will follow our scope 1, 2 and eventually 3 data collection and publications.

| *Nasdaq Board Diversity Matrix* | | | | |
|---|---|---|---|---|
| *Country of Principal Executive Offices* | Israel | | | |
| *Foreign Private Issuer* | Yes | | | |
| *Disclosure Prohibited under Home Country Law* | No | | | |
| *Total Number of Directors* | 8 | | | |
| | **As of December 31, 2023** | | **As of December 31, 2022** | |
| | **Female** | **Male** | **Female** | **Male** |
| *Part I: Gender Identity* | | | | |
| *Directors* | 1 | 7 | 2 | 6 |
| *Part II: Demographic Background* | | | | |
| *Underrepresented Individual in Home Country Jurisdiction* | - | - | - | - |
| *LGBTQ+* | - | - | - | - |
| *Did Not Disclose Demographic Background* | - | - | - | - |

61

Israeli and Multinational Tax Considerations and Government Programs

Tax regulations also have a material impact on our business, particularly in Israel where we are organized and have one of our headquarters. The following is a summary of certain aspects of the current tax structure applicable to companies in Israel, with special reference to its effect on us (and our operations, in particular). The following also contains a discussion of the Israeli government programs applicable for us. To the extent that the discussion is based on new tax legislation that has not been subject to judicial or administrative interpretation, we cannot assure you that the tax authorities or the courts will accept the views expressed in this discussion. This discussion does not address all of the Israeli tax provisions that may be relevant to our Company. For a discussion of the Israeli tax consequences related to ownership of our capital stock, please see "Israeli Taxation Considerations" in Item 10.E below.

General Corporate Tax Structure in Israel

Generally, Israeli companies are subject to corporate tax on their taxable income. Since 2018, the corporate tax rate has been 23%. However, the effective tax rate payable by a company that derives income from an "Approved Enterprise", a "Beneficiary Enterprise" or a "Preferred Enterprise", a "Special Preferred Enterprise", a "Preferred Technology Enterprise" or "Special Preferred Technology Enterprise" as further discussed below, may be considerably lower. See "Law for the Encouragement of Capital Investments" in this Item below. Capital gains derived by an Israeli company are generally subject to the prevailing regular corporate tax rate.

Besides being subject to the general corporate tax rules in Israel, we have also, from time to time, applied for and received certain grants and tax benefits from, and participate in, programs sponsored by the Government of Israel, described below.

Israeli Law for the Encouragement of Industry (Taxation), 1969

The Company is an "Industrial Company" as defined by the Israeli Law for the Encouragement of Industry (Taxation), 1969, and, as such, is entitled to certain tax benefits including accelerated depreciation, deduction of public offering expenses in three equal annual installments and amortization of other intangible property rights for tax purposes.

Law for the Encouragement of Capital Investments

*Tax incentives programs which were relevant for the company until financial year 2020*

The Law for the Encouragement of Capital Investments, 5719-1959, to which we refer as the Investment Law, provides certain incentives for capital investments in a production facility (or other eligible assets). Generally, an investment program that is implemented in accordance with the provisions of the Investment Law, which may be either an "Approved Enterprise", a "Beneficiary Enterprise" or a "Preferred Enterprise", a "Special Preferred Enterprise", a "Preferred Technology Enterprise" or "Special Preferred Technology Enterprise", is entitled to benefits as discussed below. These benefits may include cash grants from the Israeli government and tax benefits, based upon, among other things, the location within Israel of the facility in which the investment and manufacture activity are made. In order to qualify for these incentives, an Approved Enterprise, a Beneficiary Enterprise or, a Preferred Enterprise, a Special Preferred Enterprise, a Preferred Technology Enterprise or Special Preferred Technology Enterprise, is required to comply with the requirements of the Investment Law.

62

The Investment Law has been amended several times over the recent years, with the three most significant changes effective as of April 1, 2005, to which we refer as the 2005 Amendment, as of January 1, 2011, to which we refer as the 2011 Amendment, and as of January 1, 2017, to which we refer as the 2017 Amendment. Pursuant to the 2005 Amendment, tax benefits granted in accordance with the provisions of the Investment Law prior to its revision by the 2005 Amendment, remain in force, but any benefits granted subsequently are subject to the provisions of the amended Investment Law. Similarly, the 2011 Amendment introduced new benefits instead of the benefits granted in accordance with the provisions of the Investment Law prior to the 2011 Amendment, yet companies entitled to benefits under the Investment Law as in effect up to January 1, 2011, were entitled to choose to continue to enjoy such benefits, provided that certain conditions are met, or elect instead, irrevocably, to forego such benefits and elect for the benefits of the 2011 Amendment. The 2017 Amendment introduces new benefits for Technological Enterprises, alongside the existing tax benefits.

The following discussion is a summary of the Investment Law prior to its amendments as well as the relevant changes contained in the new legislation.

*Tax benefits for Approved Enterprises approved before April 1, 2005.*

Under the Investment Law prior to the 2005 Amendment, a company that wished to receive benefits on its investment program that is implemented in accordance with the provisions of the Investment Law, to which we refer as an "Approved Enterprise", had to receive an approval from the Israeli Authority for Investments and Development of the Industry and Economy, to which we refer as the Investment Center. Each certificate of approval for an Approved Enterprise relates to a specific investment program in the Approved Enterprise, delineated both by the financial scope of the investment, including sources of funds, and by the physical characteristics of the facility or other assets.

An Approved Enterprise may elect to forego any entitlement to the cash grants otherwise available under the Investment Law and, instead, participate in an alternative benefits program. We have chosen to receive the benefits through the alternative benefits program. Under the alternative benefits program, a company's undistributed income derived from an Approved Enterprise will be exempt from corporate tax for a period of between two and ten years from the first year of taxable income, depending on the geographic location within Israel of the Approved Enterprise, and a reduced corporate tax rate of between 10% to 25% for the remainder of the benefits period, depending on the level of foreign investment in the company in each year, as detailed below. The benefits commence on the date in which that taxable income is first earned. The benefits period under Approved Enterprise status is limited to 12 years from the year in which the production commenced (as determined by the Investment Center), or 14 years from the year of receipt of the approval as an Approved Enterprise, whichever ends earlier. If a company has more than one Approved Enterprise program or if only a portion of its capital investments are approved, its effective tax rate is the result of a weighted combination of the applicable rates. The tax benefits available under any certificate of approval relate only to taxable income attributable to the specific program and are contingent upon meeting the criteria set out in the certificate of approval. Income derived from activity that is not integral to the activity of the Approved Enterprise will not enjoy tax benefits. Our entitlement to the above benefits is subject to fulfillment of certain conditions, according to the law and related regulations.

63

A company that has an Approved Enterprise program is eligible for further tax benefits if it qualifies as a Foreign Investors' Company, to which we refer as an FIC. An FIC eligible for benefits is essentially a company with a level of foreign investment, as defined in the Investment Law, of more than 25%. The level of foreign investment is measured as the percentage of rights in the company (in terms of shares, rights to profits, voting and appointment of directors), and of combined share and loan capital, that are owned, directly or indirectly, by persons who are not residents of Israel. The determination as to whether or not a company qualifies as a FIC is made on an annual basis according to the lowest level of foreign investment during the year. An FIC that has an Approved Enterprise program will be eligible for an extension of the period during which it is entitled to tax benefits under its Approved Enterprise status (so that the benefits period may be up to ten years) and for further tax benefits if the level of foreign investment exceeds 49%. If a company that has an Approved Enterprise program is a wholly owned subsidiary of another company, then the percentage of foreign investments is determined based on the percentage of foreign investment in the parent company.

The corporate tax rates and related levels of foreign investments with respect to an FIC that has an Approved Enterprise program are set forth in the following table:

| Percentage of non-Israeli ownership | Corporate Tax Rate |
| --- | --- |
| Over 25% but less than 49% | up to 25% |
| 49% or more but less than 74% | 20 % |
| 74% or more but less than 90% | 15 % |
| 90% or more | 10 % |

A company that has elected to participate in the alternative benefits program and that subsequently pays a dividend (or deemed dividend, as described below) out of the income derived from the portion of its facilities that have been granted Approved Enterprise status during the tax exemption period will be subject to tax in respect of the amount of dividend distributed (grossed up to reflect such pre-tax income that it would have had to earn in order to distribute the dividend) at the corporate tax rate that would have been otherwise applicable if such income had not been tax-exempted under the alternative benefits program. This rate generally ranges from 10% to 25%, depending on the level of foreign investment in the company in each year, as explained above.

In addition, dividends paid out of income attributed to an Approved Enterprise (or out of dividends received from a company whose income is attributed to an Approved Enterprise) are generally subject to withholding tax at the rate of 15%, or at a lower rate provided under an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). The 15% tax rate is limited to dividends and distributions out of income derived during the benefits period and actually paid at any time up to 12 years thereafter. After this period, the withholding tax is applied at a rate of up to 30%, or at the lower rate under an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). In the case of an FIC, the 12-year limitation on reduced withholding tax on dividends does not apply.

The Investment Law also provides that an Approved Enterprise is entitled to accelerated depreciation on its property and equipment that are included in an approved investment program in the first five years of using the equipment. This benefit is an incentive granted by the Israeli government regardless of whether the alternative benefits program is elected.

The benefits available to an Approved Enterprise are subject to the continued fulfillment of conditions stipulated in the Investment Law and its regulations and the criteria in the specific certificate of approval, as described above. If a company does not meet these conditions, it would be required to refund the amount of tax benefits, adjusted to the Israeli consumer price index and interest, or other monetary penalty.

64

We have received the requisite approval, including a final approval, for our Approved Enterprise investment programs, in accordance with the Investment Law. The above-described benefits that accompany these investment programs and our Beneficiary Enterprise investment programs (for which accompanying benefits are described below) have had the effect, historically, up to 2020 of reducing our (and before the Stratasys, Inc.- Objet Ltd. merger, Objet's) effective consolidated tax rates considerably lower than the statutory Israeli corporate tax rate, which for 2018 and onwards has been set at 23%.

*Tax benefits under the 2005 Amendment that became effective on April 1, 2005.*

The 2005 Amendment applies to new investment programs and investment programs commencing after 2004, and does not apply to investment programs approved prior to April 1, 2005. The 2005 Amendment provides that terms and benefits included in any certificate of approval that was granted before the 2005 Amendment became effective (April 1, 2005) will remain subject to the provisions of the Investment Law as in effect on the date of such approval. Pursuant to the 2005 Amendment, the Investment Center will continue to grant Approved Enterprise status to qualifying investments. However, the 2005 Amendment limits the scope of enterprises that may be approved by the Investment Center by setting criteria for the approval of a facility as an Approved Enterprise.

An enterprise that qualifies under the new provisions is referred to as a "Beneficiary Enterprise", rather than "Approved Enterprise". The 2005 Amendment provides that the approval of the Investment Center is required only for Approved Enterprises that receive cash grants. As a result, a company is no longer required to obtain the advance approval of the Investment Center in order to receive the tax benefits previously available under the alternative benefits program. Rather, a company may claim the tax benefits offered by the Investment Law directly in its tax returns, provided that its facilities meet the criteria for tax benefits set forth in the 2005 Amendment. A company that has a Beneficiary Enterprise may, at its discretion, approach the Israel Tax Authority for a pre-ruling confirming that it is in compliance with the provisions of the Investment Law.

Tax benefits are available under the 2005 Amendment to production facilities (or other eligible facilities) which are generally required to derive 25% or more of their business income from export to specific markets with a population of at least 14 million in 2012 (such export criteria will further be increased in the future by 1.4% per annum). In order to receive the tax benefits, the 2005 Amendment states that a company must make an investment which meets certain conditions set forth in the amendment for tax benefits and which exceeds a minimum amount specified in the Investment Law. Such investment entitles a company to receive a Beneficiary Enterprise status with respect to the investment and may be made over a period of no more than three years ending in the year in which the company chose to have the tax benefits apply to the Beneficiary Enterprise. The benefits period under the Beneficiary Enterprise status is limited to 12 years from the year the company chose to have its tax benefits apply.

Where a company requests to have the tax benefits apply to an expansion of existing facilities, only the expansion will be considered to be a Beneficiary Enterprise and the company's effective tax rate will be the weighted average of the applicable rates. In such case, the minimum investment required in order to qualify as a Beneficiary Enterprise must exceed a certain percentage of the value of the company's production assets before the expansion.

The extent of the tax benefits available under the 2005 Amendment to qualifying income of a Beneficiary Enterprise depends on, among other things, the geographic location within Israel of the Beneficiary Enterprise. Such tax benefits include an exemption from corporate tax on undistributed income for a period of between two to ten years, depending on the geographic location of the Beneficiary Enterprise within Israel, and a reduced corporate tax rate of between 10% to 25% for the remainder of the benefits period, depending on the level of foreign investment in the company in each year, as explained above.

65

Dividends paid out of income attributed to a Beneficiary Enterprise will be treated similarly to payment of dividends by an Approved Enterprise under the alternative benefits program. Therefore, dividends paid out of income attributed to a Beneficiary Enterprise (or out of dividends received from a company whose income is attributed to a Beneficiary Enterprise) are generally subject to withholding tax at the rate of 15% (increased to 20% on the profits accumulated from January 1, 2014) or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). The reduced rate of 15% or 20% are limited to dividends and distributions out of income attributed to a Beneficiary Enterprise during the benefits period and actually paid at any time up to 12 years thereafter except with respect to an FIC, in which case the 12-year limit does not apply.

Furthermore, a company qualifying for tax benefits under the 2005 Amendment, which pays a dividend (or deemed dividend, as described below)out of income attributed to its Beneficiary Enterprise during the tax exemption period, will be subject to tax in respect of the amount of the dividend distributed (grossed-up to reflect the pre-tax income that it would have had to earn in order to distribute the dividend) at the corporate tax rate which would have otherwise been Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld. If such dividends are distributed to a foreign company and other conditions are met, the withholding tax rate will be applicable.

The benefits available to a Beneficiary Enterprise are subject to the continued fulfillment of conditions stipulated in the Investment Law and its regulations. If a company does not meet these conditions, it would be required to refund the amount of tax benefits, as adjusted by the Israeli consumer price index and interest, or other monetary penalty.

In 2021, the Company gave notice to the Israeli tax authorities that it waived the Approved / Beneficiary Enterprise regime starting from tax year 2021.

*Tax incentives programs which may be relevant for the company starting from financial year 2021*

Tax benefits under the 2011 Amendment that became effective on January 1, 2011.

The 2011 Amendment canceled the availability of the benefits granted in accordance with the provisions of the Investment Law prior to 2011 and, instead, introduced new benefits for income generated by a "Preferred Company" through its Preferred Enterprise (as such terms are defined in the Investment Law) as of January 1, 2011. A Preferred Company is defined as either (i) a company incorporated in Israel which is not wholly owned by a governmental entity, or (ii) a limited partnership that: (a) was registered under the Israeli Partnerships Ordinance and; (b) all of its limited partners are companies incorporated in Israel, but not all of them are governmental entities; which has, among other things, Preferred Enterprise status and is controlled and managed from Israel. Pursuant to the 2011 Amendment, a Preferred Company was entitled to a reduced corporate tax rate of 15% with respect to its preferred income attributed to its Preferred Enterprise in 2011 and 2012, unless the Preferred Enterprise was located in a certain development zone, in which case the rate was 10%. Such corporate tax rate was reduced to 12.5% and 7%, respectively, in 2013 and was increased to 16% and 9%, respectively, in 2014 until 2016. Pursuant to the 2017 Amendment, in 2017 and thereafter, the corporate tax rate for Preferred Enterprise which is located in a certain development zone was decreased to 7.5%, while the reduced corporate tax rate for other development zones remains 16%. Income derived by a Preferred Company from a 'Special Preferred Enterprise' (as such term is defined in the Investment Law) would be entitled, during a benefits period of 10 years, to further reduced tax rates of 8%, or to 5% if the Special Preferred Enterprise is located in a certain development zone. Since January 1, 2017, the definition for "Special Preferred Enterprise" includes less stringent conditions.

66

Dividends paid out of preferred income attributed to a Preferred Enterprise or to a Special Preferred Enterprise are generally subject to withholding tax at source at the rate of 20% or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld (although, if such dividends are subsequently distributed to individuals or a non-Israeli company, withholding tax at a rate of 20% or such lower rate as may be provided in an applicable tax treaty will apply). In 2018-2020, dividends paid out of preferred income attributed to a Special Preferred Enterprise, directly to a foreign parent company, were subject to withholding tax at source at the rate of 5% (temporary provisions).

The 2011 Amendment also provided transitional provisions to address companies already enjoying current benefits under the Investment Law. These transitional provisions provide, among other things, that unless an irrevocable request is made to apply the provisions of the Investment Law as amended in 2011 with respect to income to be derived as of January 1, 2011: (i) the terms and benefits included in any certificate of approval that was granted to an Approved Enterprise, which chose to receive grants, before the 2011 Amendment became effective, will remain subject to the provisions of the Investment Law as in effect on the date of such approval, and subject to certain conditions;. (ii) the terms and benefits included in any certificate of approval that was granted to an Approved Enterprise, that had participated in an alternative benefits program, before the 2011 Amendment became effective will remain subject to the provisions of the Investment Law as in effect on the date of such approval, provided that certain conditions are met; and (iii) a Beneficiary Enterprise can elect to continue to benefit from the benefits provided to it before the 2011 Amendment came into effect, provided that certain conditions are met.

We have examined the possible effect, if any, of these provisions of the 2011 Amendment on our financial statements and have decided, at this time, not to opt to apply the new benefits under the 2011 Amendment.

Tax benefits under the 2017 Amendment that became effective on January 1, 2017.

The 2017 Amendment was enacted as part of the Economic Efficiency Law that was published on December 29, 2016, and was effective as of January 1, 2017. The 2017 Amendment provides new tax benefits for two types of "Technology Enterprises", as described below, and is in addition to the other existing tax beneficial programs under the Investment Law.

The 2017 Amendment provides that a technology company satisfying certain conditions will qualify as a "Preferred Technology Enterprise" and will thereby enjoy a reduced corporate tax rate of 12% on income that qualifies as "Preferred Technology Income," as defined in the Investment Law. The tax rate is further reduced to 7.5% for a Preferred Technology Enterprise located in development zone A. In addition, a Preferred Technology Company will enjoy a reduced corporate tax rate of 12% on capital gain derived from the sale of certain "Benefitted Intangible Assets" (as defined in the Investment Law) to a related foreign company if the Benefitted Intangible Assets were acquired from a foreign company on or after January 1, 2017 for at least NIS 200 million, and the sale receives prior approval from the IIA.

The 2017 Amendment further provides that a technology company satisfying certain conditions will qualify as a "Special Preferred Technology Enterprise" and will thereby enjoy a reduced corporate tax rate of 6% on "Preferred Technology Income" regardless of the company's geographic location within Israel. In addition, a Special Preferred Technology Enterprise will enjoy a reduced corporate tax rate of 6% on capital gain derived from the sale of certain "Benefitted Intangible Assets" to a related foreign company if the Benefitted Intangible Assets were either developed by the Special Preferred Technology Enterprise or acquired from a foreign company on or after January 1, 2017, and the sale received prior approval from the IIA. A Special Preferred Technology Enterprise that acquires Benefitted Intangible Assets from a foreign company for more than NIS 500 million will be eligible for these benefits for at least ten years, subject to certain approvals as specified in the Investment Law.

67

Dividends distributed by a Preferred Technology Enterprise or a Special Preferred Technology Enterprise, paid out of Preferred Technology Income, are generally subject to withholding tax at source at the rate of 20% or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld. If such dividends are distributed to a foreign company and other conditions are met, the withholding tax rate will be 4%.

In 2021, the Company provided notice to the Israeli tax authorities that it waived the Approved / Beneficiary Enterprise regime starting from tax year 2021. The Company is currently considering its qualification for the 2017 amendment and the term and degree to which it may be qualified as a Preferred Technology Enterprise or Special Preferred Technology Enterprise.

*Tax benefits under 2021 Amendments*

On November 15, 2021, the Investment Law was amended to reduce the ability of companies to retain the tax-exempt profits. Effective August 15, 2021, dividend distributions (or deemed distribution, as described below), will be treated as if made on a pro-rata basis from all types of earnings, including Exempt Profits (as defined below).

In parallel to the above amendment, the Investment Law was amended to provide, on a temporary basis, a reduced corporate income tax on the distribution or release within a year from such amendment of tax-exempt profits derived by Approved and Benefited Enterprises, which we refer to as Exempt Profits (the "Temporary Provision"). The amount of the reduced tax will be determined based on a formula. In order to qualify for the reduction, the Company must invest certain amounts in productive assets and research and development in Israel.

Following recent Israeli district court ruling (which is subject to deliberation of the Supreme Court), certain transactions (such as acquisitions and intercompany loans) may be treated as deemed dividend distributions for the purpose of the Encouragement Law triggering corporate tax on the respective amount of the transaction.

On November 13, 2022, according to the Temporary Provision, the Company released an amount of approximately $44.8 million out of its Exempt Profits and accordingly paid reduced tax of approximately $2.9 million.

As of December 31, 2023, we had accumulated tax-exempt income of approximately $157.6 million that is attributable to our various Approved and Beneficiary Enterprise programs. If such tax-exempt income were to be distributed, it would be taxed at the reduced corporate tax rate applicable to such income, which would have amounted to approximately $15.8 million of tax liability as of December 31, 2023.

*Pillar Two Taxation*

The OECD introduced Base Erosion and Profit Shifting ("BEPS") Pillar Two rules that impose a global minimum tax rate of 15% for large multinational corporations. On December 12, 2022, the EU Council announced that EU member states had reached an agreement to implement the minimum taxation component of 15% of the OECD's reform of international taxation. Other countries have also enacted or are expected to enact legislation to be effective as early as January 1, 2024, with general implementation of a global minimum tax by January 1, 2025. The OECD continues to release additional guidance and the Company is monitoring the new rules and country agreements. The Company is currently evaluating the potential impact on its consolidated financial statements and related disclosures and does not expect Pillar Two to have a material impact on its effective tax rate or consolidated financial statements in the foreseeable future.

### C. Organizational Structure.

Our corporate structure includes Stratasys Ltd., our Israeli parent company, and the following main active wholly-owned subsidiary entities:

- Stratasys, Inc., a Delaware corporation, which was formerly a publicly held company and which became our indirect, wholly-owned subsidiary as a result of the Stratasys, Inc.- Objet Ltd. merger. Following our acquisition of Origin in December 2020, Stratasys, Inc. now has offices and warehouses in San Francisco, California;

- Stratasys Direct, Inc. (our parts service business unit), a California corporation;

- Stratasys AP Limited, a Hong Kong limited company, which together with several other subsidiaries (including Stratasys Japan Co. Ltd., our Japanese subsidiary, and Stratasys Shanghai Ltd., our Chinese subsidiary), carries out most of our operations in the Asia Pacific region;

- Stratasys GMBH, a German limited liability company, which together with other subsidiaries (including Stratasys Schweiz AG (Stratasys Switzerland Ltd.), our Swiss subsidiary) carries out our European operations; and

- Stratasys Latin America Representacao De Equipamentos Ltd., a Brazilian subsidiary, which has commenced our Brazilian operations.

We also own a 46.5% interest in Ultimaker, which includes the operations of our former subsidiary, MakerBot, and which offers a comprehensive solution set of hardware, software and materials for Desktop 3D printing.

Please see the list of subsidiaries appended to this annual report as Exhibit 8 for a complete list of our subsidiaries as of the date of this annual report.

### D. Property, Plants and Equipment.

We have dual headquarters, in Eden Prairie, Minnesota and Rehovot, Israel.

Our Eden Prairie, Minnesota headquarters (near Minneapolis) is comprised of executive offices and production facilities that encompassed, as of December 31, 2023, approximately 308,646 square feet, of which we owned 227,100 square feet, in three buildings. Those buildings served the following purposes: system assembly, inventory storage, operations and sales support; manufacturing for one of our Stratasys Direct Manufacturing paid parts service locations; research and development, filament manufacturing, administrative, marketing and sales activities; and expansion of our production capacity for systems and consumables. During 2022, we entered into a new lease of an additional 168,100 square feet for storage purposes, which increases our shipping efficiency and eliminates the cost increase for managing our inventory through third parties.

Our new building complex in Rehovot, Israel, which contains two buildings, is situated on a property that we purchased in 2015 and encompasses approximately 284,713 square feet. It houses our Israeli headquarters, research and development facilities and certain marketing activities. We entered the first building in January 2017 and the second building in May 2021.

As of December 31, 2023, we lease office space (except with respect to our Eden Prairie headquarters facilities and our Rehovot, Israel and Kiryat Gat, Israel facilities, where we own the property) for various purposes, as set forth in the table below. Unless otherwise stated, all of our facilities are fully utilized. Our material tangible fixed assets include, among other things, the properties listed below.

| Location: | Primary Usage: | Area (Sq. Feet) |
|---|---|---|
| **Americas:** | | |
| Eden Prairie, Minnesota | U.S. headquarters | 308,646 |
| Valencia, California | Offices and warehouses | 3,035 |
| Belton, Texas | Offices and warehouses | 39,680 |
| Plymouth, Minnesota | Warehouse | 168,100 |
| Other facilities in Americas | | 80,943[1,2] |
| **Europe and the Middle East** | | |
| Rehovot, Israel | Israeli headquarters | 284,713[3] |
| Kiryat Gat, Israel | Factories and warehouse | 126,617 |
| Rheinmunster, Germany | Europe main office | 55,027 |
| United Kingdom | Manufacturing, offices and lab space | 28,445 |
| Other facilities in EMEA | Offices and lab space | 25,437 |
| **Asia Pacific** | | |
| Hong Kong | Asia Pacific main office | 4,994 |
| Japan | Sales office | 13,109 |
| China | Sales office | 17,142 |
| Other facilities in Asia Pacific | Office space | 18,252 |

---

[1] Direct Manufacturing sites in California – Poway and Valencia 1— were shut down as part of SDM optimization during 2023. SFO was relocated to our Israeli headquarters during the first quarter of 2023.

[2] In 2023 as part of our acquisition of Covestro Additive Manufacturing, we acquired three new sites-Elgin, Illinois, with 27,384 square feet, Geleen in the Netherlands, with 6,941 square feet, and Shanghai China, with 2,799 square feet.

[3] This square footage includes the area of the two buildings of our new Israel headquarters in Rehovot, Israel. The second of those buildings was inhabited by us in May 2021, of which 92,400 square feet was leased by us to a third party under a long-term lease and another 9,938 of square feet was leased by us to another third party for a short term lease that will expire in April 2024.

69

**ITEM 4A. UNRESOLVED STAFF COMMENTS.**

None.

70

**ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS.**

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our consolidated financial statements and the related notes included in this annual report. The discussion below contains forward-looking statements that are based upon our current expectations and are subject to uncertainty and changes in circumstances. Actual results may differ materially from these expectations due to inaccurate assumptions and known or unknown risks and uncertainties, including those identified in "Cautionary Note Regarding Forward-Looking Statements" and in Item 3.D "Key Information – Risk Factors", above.*

**A.  Operating Results.**

*Overview of Business and Trend Information*

We are a global leader in connected, polymer-based 3D printing solutions, across the entire manufacturing value chain. Leveraging distinct competitive advantages that include a broad set of best-in-class 3D printing platforms, software, a materials and technology partner ecosystem, innovative leadership, and global GTM infrastructure, we are positioned to capture share in a significant and growing global marketplace, with a focus on manufacturing, which we view as having the largest and fastest growing total addressable market.

Our approximately 2,600 granted and pending additive technology patents to date have been used to create models, prototypes, manufacturing tools, and production parts for a multitude of industries including aerospace, automotive, transportation, healthcare, consumer products, dental, medical, fashion and education. Our products and comprehensive solutions improve product quality, development time, cost, time-to-market and patient care. Our 3D ecosystem of solutions and expertise includes 3D printers, materials, software, expert services, and on-demand parts production. By the end of 2023, we estimate that we derived over 34.0% of our revenues from manufacturing solutions.

A series of recent acquisitions and other transactions has strengthened our leadership in various facets of our business, and has added incremental growth engines to our platform. Our acquisition, in December 2020, of Origin Laboratories, Inc., or Origin, significantly strengthened our leadership in mass production for polymer 3D printing. Origin's pioneering approach to additive manufacturing of end-use parts has enabled us to serve a large market with manufacturing-grade 3D printers, utilizing P3 Programmable PhotoPolymerization. Our acquisition, in the first quarter of 2021, of UK-based RP Support Ltd., or RPS, a provider of industrial stereolithography 3D printers and solutions, provided us with a complementary technology that further expanded our polymer suite of solutions across the product life cycle. Similarly, our acquisition, in November 2021, of all remaining shares of Xaar 3D Ltd. or Xaar, has begun to accelerate our growth in production-scale 3D printing. The recently completed transaction between our former subsidiary, MakerBot, a leader in desktop 3D printing, and Ultimaker, gave us an approximately 46.5% stake in a new entity that has a broad technology offering, a larger scale, and that is well-capitalized and is therefore better equipped to compete in the desktop 3D printing segment. Our October 2022 asset acquisition from the quality assurance software company Riven, a Berkeley, California-based start-up, enables us to fully integrate its cloud-based software solution into our GrabCAD® Additive Manufacturing Platform, thereby enabling more manufacturing customers to adopt Stratasys solutions for end-use parts production. Our acquisition, in April 2023, of Covestro's additive manufacturing business gives us the ability to accelerate innovative developments in 3D printing materials and to thereby further grow adoption of our newest technologies, including our Origin P3™, Neo® stereolithography, and H350™ printers, with which Covestro's resins can be used. Also, as part of this acquisition we acquired an IP portfolio comprised of hundreds of patents and pending patents.

*Recent Developments- Potential Business Combinations and Strategic Alternatives*

Throughout 2023, we were involved in, and were the subject of, potential business combination transactions that would have been potentially transformative to the additive manufacturing industry. Towards the end of the fiscal year, after none of such transactions had been completed (for various reasons), we initiated a whole-scale, comprehensive analysis of our strategic options, which we have been conducting together with our advisors since the fourth quarter of 2023, carrying over into the first quarter of 2024. We provide a brief overview of recent developments concerning strategic transactions and processes below.

71

*Termination of Merger Agreement with Desktop Metal*

On May 25, 2023, we and Desktop Metal, Inc. ("Desktop Metal"), jointly announced our entry into a merger agreement, whereby our wholly-owned Delaware subsidiary was to merge with and into Desktop Metal, with Desktop Metal surviving the merger as a wholly-owned subsidiary of ours. On September 28, 2023, we held an extraordinary general meeting of shareholders, at which the merger was presented for the approval of our shareholders. The merger proposal was not approved by our shareholders at that meeting, and accordingly, pursuant to our rights under the merger agreement, we terminated the merger agreement with Desktop Metal, effective immediately on September 28, 2023. As a result, we were required to pay, and recorded in our financial statements, a termination fee of $10.0 million, which was included under selling, general & administrative expenses.

*Nano Dimension Uncompleted Tender Offer and Unsuccessful Board Contest*

On May 25, 2023, following the announcement of our then-prospective merger with Desktop Metal, Nano Dimension Ltd, ("Nano"), a 14.1% shareholder of our company, launched a hostile partial tender offer whereby it sought to acquire—including shares already held by it— between 53% and 55% of our outstanding ordinary shares, at a price of $18.00 per share. The tender offer was subject to various conditions and was originally set to expire on June 26, 2023. Over the course of subsequent periods of time, the price offered by Nano in its tender offer was ultimately raised to $25.00 per share, with an accompanying reduction as to the percentage of our shares to be held by it upon consummation of the offer, to between 46% and 51%, and the offer was extended ultimately through July 31, 2023. The offer expired on July 31, 2023 and Nano did not receive enough tendered shares and was therefore unable to complete the purchase of any of our ordinary shares pursuant to the offer.

Nano also requested from our company, pursuant to its rights under the Israeli Companies Law as a 5% or greater shareholder, that we convene an extraordinary shareholder meeting at which a vote would be held on the removal of all of our directors (except for S, Scott Crump) and their replacement with officers of Nano whom it had nominated. After discussions with Nano and related court proceedings, we ultimately brought to a vote at our annual general meeting of shareholders held on August 8, 2023 a contested election of directors, at which our board's eight nominees and Nano's seven nominees were subject to election on a nominee-by-nominee basis, with the eight nominees receiving more "FOR" votes than "AGAINST" votes to be deemed elected. Based on that agreed voting format, at the annual meeting, each of our board's eight nominees, and none of Nano's seven nominees, were elected. We have also been subject to litigation with Nano in an Israeli district court regarding our shareholder rights plan, Nano's uncompleted tender offer, and the above-described contested board election. The litigation has not changed the outcome of any of the developments described above.

*3D Systems Offers*

On May 30, 2023, and then again on June 27, 2023, we received an unsolicited non-binding indicative proposal from 3D Systems Corporation ("3D Systems") to merge with us. On July 13, 2023, we received an updated proposal from 3D Systems, pursuant to which it would merge with our company for $7.50 in cash and 1.5444 newly issued shares of common stock of 3D Systems per Stratasys ordinary share. Our board initially determined that the 3D Systems proposal of July 13 would reasonably be expected to result in a "Superior Proposal" under the merger agreement with Desktop Metal and authorized our management to enter into discussions with 3D Systems with respect to the proposal. Following an extensive due diligence process, however, we communicated our concerns regarding the 3D Systems' proposal to 3D Systems and indicated that the last proposal was not itself a transaction that we would be prepared to enter into. 3D Systems revised its proposal on September 6, 2023, offering $7.00 in cash and 1.6387 newly issued shares of common stock of 3D Systems per Stratasys ordinary share. After consultation with our outside financial and legal advisors, our board of directors unanimously determined that the September 6 proposal continued to significantly undervalue our company and did not constitute a "Superior Proposal" pursuant to the terms of our then effective merger agreement with Desktop Metal, and the board accordingly terminated discussions with 3D Systems.

*Initiation of Strategic Alternatives Process*

72

On September 28, 2023, following the failure of the vote for approval of the merger with Desktop Metal and our consequent termination of the related merger agreement, we announced that we had initiated a comprehensive process to explore strategic alternatives for our company. We noted that we are no longer subject to restrictions under that merger agreement regarding the solicitation of or entry into potential transactions.

Business Performance in Macro-Economic Environment

Our current outlook, as well as our results of operations in the year ended December 31, 2023, should be evaluated in light of current global macroeconomic conditions, including certain challenging trends that have also impacted the additive manufacturing industry. Our revenues in 2023 decreased by 3.7% on a year-over-year basis, compared to 2022. The decrease is driven by the divestment of Makerbot in 2022 and from the divestment of certain SDM businesses. These revenue results also evidence macroeconomic pressure on capital expenditure budgets of our customers, which has been causing longer sales cycles for our systems and occasional deferral of orders of our systems. On the other hand, these results also evidence stronger utilization of our installed systems by our customers, which drove higher revenues in consumables, as well as increase in consumables revenue based on sales of consumables to customers of our recently acquired entities.

We continue to closely monitor macroeconomic conditions, including the headwinds caused by inflation, increased interest rates and other trends that have been adversely impacting economic activity on a global scale, and which have also adversely affected the additive manufacturing industry generally and our company, in particular. We have been assessing, on an ongoing basis, the implications of those global conditions for our operations, supply chain, liquidity, cash flow and customer orders, and have been acting in an effort to mitigate adverse consequences as needed. We estimate that those conditions have impacted us most notably by limiting our ability to increase our gross margins and our operating margins more significantly in the short-term, given the increased cost of goods and operating expenses associated with inflation. We have used price increases to offset those cost pressures. Assuming that those inflationary pressures ease, and the global economy remains relatively stable, we expect that those margins will improve, as we execute on our growth plans and as a result of a favorable products mix.

Specific developments that may potentially impact our operating performance in an adverse manner include:

• Israel's retaliatory war against the terrorist organization, which up to the present time has had a limited impact on our Israeli and global operations. However, given the fact that one of our global headquarters and one of our manufacturing facilities are located in Israel, in case the war widens into a regional conflict and/or worsens Israeli or global economic conditions, that could have an adverse impact on our operations;

• reluctance of central banks in Europe and the U.S. to reduce interest rates, due to a fear that it would trigger upwards inflationary pressure, which would leave interest rates at their current relatively high levels, thereby leaving in place unfavorable credit/financing conditions for our customers who purchase our products; and

• potential contraction of economic activities and recessionary conditions that could arise as a result of persistently high interest rates, which could eventually cause a decrease in consumer demand.

We ended 2023 with $162.6 million in cash, cash equivalents and short-term deposits. We believe that we are well suited to continue to manage the current global macro- economic climate with a strong balance sheet and no debt, while focusing on cost controls and cash generation. We have continued to selectively apply certain cost controls, which we began doing at the start of the COVID-19 pandemic, while ensuring that our NPI programs are well-funded, and we plan to continue investing as needed in order to support our new product development programs.

**Key measures of our performance**

*Revenues*

73

Our revenues results primarily from sales of (i) our products, which include both our AM systems and related consumable materials, (ii) provision of related services and (iii) our direct manufacturing service. We generate revenues and deliver services principally through the following channels:

- sales to resellers, who purchase and resell our products and who provide support services for our printing systems;

- sales of systems that are marketed by independent sales agents, pursuant to which we sell directly to end-users, pay commissions to such agents, and directly handle the sale of consumables and provision of support services; and

- sales of systems (and all related products and services) as well as our direct manufacturing solutions that we provide to our customers directly.

### *Product revenues*

Product revenues are influenced by a number of factors, including, among other things, (i) the adoption rate for our products, (ii) end-user product design application and manufacturing activity, and (iii) the capital expenditure budgets of end-users and potential end-users, all of which may be significantly influenced by macroeconomic factors. Product revenues are also impacted by the mix of 3D printers that we sell. Purchases of our 3D printing and production systems, especially our higher-end, higher-priced systems, typically involve longer sales cycles.

Product revenues also depend upon the volume of consumables that we sell. Sales of our consumable materials are linked to the number of AM systems that are installed and active worldwide. Sales of consumables are also driven by system usage, which is generally a function of the size of the particular system and the level of design and manufacturing activity and budget of the particular end-user. Larger systems generally use greater amounts of consumables due to their greater capacity and the higher levels of design and production.

### *Services revenues*

Services revenues derive from (i) maintenance contracts and initial systems warranty; (ii) direct manufacturing paid-parts services; and (iii) other professional service contracts. In addition, in connection with direct sales, we generally charge separately for installation and training. Additional services revenues are generated from services contracts most often entered into directly with end-users subsequent to the expiration of the initial warranty period.

### *Costs of revenues*

Our costs of revenues consist of costs of products and costs of services. Costs of products consist primarily of components and subassemblies purchased for the manufacture of our AM systems and raw materials, such as thermoplastic and photopolymer materials, for the manufacture of our consumables, as well as any royalties paid with respect to sales of certain of those consumables. Costs of products also include manufacturing and manufacturing-related labor costs, indirect production costs and depreciation, as well as amortization expense which is mainly related to developed technology assets acquired as part of our business combinations.

Our costs of services revenues consist primarily of costs of our service personnel, material and other production costs of our direct manufacturing service business, and installation costs, which include engineers dedicated to on-site training and support, and travel costs of these engineers. Both costs of products and costs of services include related facilities costs.

Our most significant components of costs of revenues are costs of materials used for our products, wages and related benefits costs, which together accounted for approximately 64% of our total direct cost of revenues for the year ended December 31, 2023. An additional significant component of our costs of revenues is the amortization expense that we primarily incur in connection with developed technology assets acquired as part of our business combinations. These amortization expenses vary based on the timing and type of acquisitions and estimated useful lives of the respective intangible assets. These amortization expenses were $19.6 million, $28.2 million and $22.4 million for the years ended December 31, 2023, 2022 and 2021, respectively. No impairment charges were recorded during 2023 and 2022. Refer to Note 9 of our consolidated financial statements included in Item 18 of this annual report.

For the year ended December 31, 2023, a hypothetical 10% rise in commodity prices for raw materials would have caused an approximate $15.4 million increase in costs of revenues in our Consolidated Statements of Operations and Comprehensive loss. As to wages and related benefits, a 10% increase in wages due to wage inflation would have caused an approximate $6.8 million increase in costs of revenues in our Consolidated Statements of Operations and Comprehensive loss. During 2023, we did not notice particular trends that changed, or were expected to change in the near future, the absolute or relative significance of the components of our costs of revenues in a material manner. We also believe that inflation has not had a material effect on our operations or on our financial condition during the three most recent fiscal years, as we have used price increases to offset the cost pressures caused by inflation.

Currently, we do not foresee a significant change in either the raw materials used for production or wage inflation that would materially impact our business. For further information, please see "Item 11. Quantitative And Qualitative Disclosures About Market Risk" in this annual report.

### *Gross profit*

The gross profit and gross margin for our products are influenced by a number of factors. The most important of these is the mix of our products sold. Specifically, the gross margins on our higher-end AM systems, as well as on our consumables, are typically higher than the gross margins on our entry-level products and MakerBot desktop printers. Accordingly, an increase in the share of revenues of our entry-level products out of total revenues could cause our profit margins to decrease. Furthermore, we believe that as our worldwide installed base of AM systems increases, subsequent sales of our proprietary consumables will also increase. We also seek to reduce our costs of revenues by improving our ability to use less costly components, better management of our inventories levels and increasing manufacturing efficiencies in the production of our systems. In addition, we will also seek to achieve lower material costs and leverage our overall capabilities in our direct manufacturing service business.

Products gross margins are also impacted by the mix of revenues generated from sales to resellers based in different geographical areas as opposed to sales that are facilitated by independent sales agents or directly by us.

Service gross margins are influenced mainly by the volume of revenues generated from our direct manufacturing service business as well as the ratio of service engineers to our installed base in a given geographic area.

### *Operating expenses*

Our operating expenses for 2023 consisted of (i) research and development expenses, and (ii) selling, general and administrative expenses.

*Research and development expenses, net*

Our research and development activities consist of projects aimed at developing new printing systems and materials and projects aimed at enhancing the capabilities of our existing product lines, as well as significant technology platform and applications, developments for our current technologies, including our integrated software. We also seek to develop disruptive technologies and other process improvement solutions in the additive manufacturing ecosystem. Our research and development expenses consist primarily of employee compensation and employee-related personnel expenses, materials, laboratory supplies, costs for related software and costs for facilities. Expenditures for research, development and engineering of products are expensed as incurred. Our research and development efforts are essential to our future growth and our ability to remain competitive in the AM market. We work closely with existing and potential customers, distribution channels and major resellers, who provide significant feedback for product development and innovation.

We are also entitled to reimbursements from certain government funding plans. These reimbursements are recognized as a reduction of expenses as the related cost is incurred. We are not required to pay royalties on sales of products developed using our government funding.

*Selling, general and administrative expenses*

Our selling, general and administrative expenses include employee compensation and employee-related expenses for marketing, sales and other sales-operation positions, and for managerial and administrative functions, including executive officers, accounting, legal, information technology and human resources. This category of expenses also covers commissions, advertising and promotions expenses, professional service fees, respective depreciation, amortization expenses related to certain intangible assets, as well as associated overhead.

Commissions consist of sales-based commissions to independent sales agents and internal sales personnel. Commission rates vary, depending on the geographic location of the agent, type of products sold, and the degree of achievement of certain performance targets. Our advertising and promotion expenses consist primarily of media advertising costs, trade and consumer marketing expenses and public relations expenses which aim to strengthen the leadership of our brand in key vertical markets.

Facilities costs that are included in our selling, general and administrative expenses include an allocated portion of the occupancy costs for our facilities in countries where sales, marketing and administrative personnel are located. Professional service fees for accounting and legal services are also included in selling, general and administrative expenses.

*2023 Financial Highlights*

Significant highlights of our financial performance in 2023 included:

- Revenues decreased by $23.9 million, or 3.7%, compared to 2022. The decrease is driven by the divestment of Makerbot in 2022 and from the divestment of certain SDM businesses. These revenue results also evidence macro-economic pressure on capital expenditure budgets of our customers, which has been causing longer sales cycles for our systems and occasional deferral of orders of our systems.

- Operating expenses increased by $21.0 million, or 6.3% compared to 2022. The increase in operating expenses was primarily driven by costs related to prospective and potential mergers and acquisitions, our defense against a hostile tender offer and a proxy contest, and related professional fees of $32.9 million, restructuring costs and higher costs driven by our recent acquisitions, partially offset by reduction in expenses due to our divestiture of MakerBot in late August 2022.

76

- Net loss amounted to $123.1 million or basic and diluted net loss per share of $1.79 in 2023, compared to net loss of $29.0 million, or basic and diluted net loss per share of $0.44, in 2022, which was mainly attributable to higher costs related to prospective and potential mergers and acquisitions, termination costs related to the termination of our merger transaction with Desktop Metal, our defense against a hostile tender offer and our proxy contest and related professional fees, lower gross profit and increased amounts for our share in losses of associated companies.

Total cash and cash equivalents and restricted cash amounted to $82.9 million and short-term deposits amounted to 80.0 million as of December 31, 2023, which, when aggregated together, reflected a decrease of 165.3 million compared to the corresponding total amount as of December 31, 2022. The decrease in cash, cash equivalents, restricted cash and short-term deposits in 2023 was due to increased cash used in operating, investing and financing activities, which amounted to $61.6 million, $3.8 million and $1.5 million, respectively, in 2023.

## Results of Operations

We are providing within this section a discussion and analysis of our historical statement of operations data in accordance with accounting principles generally accepted in the United State of America, or GAAP. While our financial statements included in Item 18 of this annual report include data for each of the three years ended December 31, 2023, 2022 and 2021, the discussion and analysis contained in this Item 5.A is limited to a comparison of our results of operations for the years ended December 31, 2023 and 2022. For a discussion and analysis of our results for the year ended December 31, 2022, and a comparison of those results with those of the year ended December 31, 2021, please see "Item 5. Operating and Financial Review and Prospects—A. Operating Results—Results of Operations" in our annual Report on Form 20-F for the year ended December 31, 2022, which we filed with the SEC on March 3, 2023.

The following table sets forth certain financial data derived from our consolidated statements of operations and comprehensive loss, presented as percentages of our revenues for the years indicated:

|  | Year ended December 31, | |
|---|---|---|
|  | **2023** | **2022** |
| Revenues | 100.0% | 100.0% |
| Cost of revenues | 57.5% | 57.6% |
| Gross profit | 42.5% | 42.4% |
| Research and development, net | 15.0% | 14.3% |
| Selling, general and administrative | 41.5% | 37.0% |
| Operating loss | (14.0%) | (8.8%) |
| Gain from deconsolidation of subsidiary | 0.0% | 6.0% |
| Financial income, net | 0.5% | 0.0% |
| Loss before income taxes | (13.5%) | (2.7%) |
| Taxes on income | 0.9% | 0.8% |
| Share in net losses of associated companies | (5.2%) | (0.9%) |
| Net loss | (19.6%) | (4.4%) |
| Net loss attributable to Stratasys Ltd. | (19.6%) | (4.4%) |

## Discussion of Results of Operations

The below tables and related discussion present an item by item comparison of our results of operations for each of the two years ended December 31, 2023 and 2022.

**Revenues**

Our products and services revenues for the last two years, as well as the percentage change from year to year, were as follows:

| | Year Ended December 31, | | | | % Change 2023-2022 |
|---|---|---|---|---|---|
| | **2023** | | **2022** | | |
| Products | $ | 433,741 | $ | 452,124 | (4.1)% |
| Services | | 193,857 | | 199,359 | (2.8)% |
| | $ | 627,598 | $ | 651,483 | (3.7)% |

Our total consolidated revenues in 2023 were $627.6 million, a decrease of $23.9 million or 3.7%, compared to 2022.

**Products Revenues**

Revenues derived from products (including systems and consumable materials) decreased by $18.4 million, or 4.1%, in 2023 as compared to 2022 mainly due to longer sales cycles and the divestiture of MakerBot in August 2022 (the latter of which accounted for a decrease of $18.9 million), partially offset by higher revenues driven from our recently acquired entities, and higher consumables revenues as a result of higher usage of our systems in an aggregate amount of $22.9 million.

Systems revenues decreased by $36.9 million or 16.5% in 2023 as compared to 2022. The decrease was mainly attributable to longer sales cycles as well as the impact of the divestiture of MakerBot of $14.8 million.

Consumables revenues increased by $18.5 million, or 8.2%, in 2023 as compared to 2022. The increase was mainly attributable to revenues driven from our recently acquired entities, and higher utilization rates of systems as initial materials are replenished in an aggregate amount of $22.9 million, partially offset by the impact of divestiture of MakerBot of $4.1 million.

**Services Revenues**

Services revenues (including Stratasys Direct, maintenance contracts, time and materials and other services) decreased by $5.5 million, or 2.8%, in 2023 as compared to 2022. The decrease in services revenues was mainly driven by the impact of divestiture of MakerBot (which accounted for a decrease of $4.2 million), and a decrease in SDM revenues as a result of divestitures of several businesses in SDM, partially offset by higher revenues generated from maintenance contracts on our systems, which increased by 4.5%.

**Revenues by Region**

Revenue amounts and the percentage of our overall revenues by region for the last two years, as well as the percentage change in revenue amounts for each such region from year to year, were as follows:

78

| | Year Ended December 31, | | | |
| | 2023 | | 2022 | |
| | Revenue amount (U.S. $ in thousands) | % of overall revenues | Revenue amount (U.S. $ in thousands) | % of overall revenues |
|---|---|---|---|---|
| Americas* | $ 389,770 | 62.1 % | $ 415,428 | 63.8 % |
| EMEA | 155,942 | 24.8 % | 141,660 | 21.7 % |
| Asia Pacific | 81,886 | 13.0 % | 94,395 | 14.5 % |
| | $ 627,598 | 100.0 % | $ 651,483 | 100.0 % |

*Consists of the United States, Canada and Latin America

Revenues in the Americas region decreased by $25.7 million, or 6.2%, to $389.8 million in 2023 compared to $415.4 million in 2022. The decrease was mainly attributable to the divestiture of MakerBot, decrease in SDM revenues and longer sales cycles, partially offset by higher revenues driven from our recently acquired entities and higher utilization rates of systems which requires that initial materials be replenished.

Revenues in the EMEA region increased by $14.3 million, or 10.1%, to $155.9 million in 2023 compared to $141.7 million in 2022. The increase was primarily driven by higher consumables revenues attributable to our recently acquired entities and higher utilization rates of systems which requires that initial materials be replenished, partially offset by the divestiture of MakerBot.

Revenues in the Asia Pacific region decreased by $12.5 million, or 13.3%, to $81.9 million in 2023 compared to $94.4 million in 2022. The decrease was mainly attributable to longer sales cycles and unfavorable exchange rates, partially offset by higher revenues provided by our recently acquired entities.

**Gross Profit**

Gross profit from our products and services for the last two years, as well as the percentage change from year to year, were as

| | Year Ended December 31, | | Percentage Change (later year compared to earlier) |
| | 2023 | 2022 | 2023-2022 |
|---|---|---|---|
| **Gross profit attributable to:** | | | |
| Products | $ 207,231 | $ 217,523 | (4.7)% |
| Services | $ 59,793 | $ 58,944 | 1.4 % |
| | $ 267,024 | $ 276,467 | (3.4)% |

Gross profit as a percentage of revenues for our products and services for the last two years, as well as the percentage change from year to year, were as follows:

79

| Gross profit as a percentage of revenues from: | Year Ended December 31, | | Percentage Change (later year compared to earlier) |
|---|---|---|---|
| | U.S. $ in thousands | | |
| | 2023 | 2022 | 2023-2022 |
| Products | 47.8 % | 48.1 % | (0.7)% |
| Services | 30.8 % | 29.6 % | 4.3 % |
| Total gross profit | 42.5 % | 42.4 % | 0.3 % |

Gross profit attributable to products revenues decreased by $10.3 million, or 4.7%, to $207.2 million in 2023 compared to $217.5 million in 2022. Gross profit attributable to products revenues as a percentage of revenues decreased to 47.8% in 2023 compared to 48.1% in 2022. Our gross profit from products revenues decreased mainly as a result of lower year over year products sales and the divestiture of MakerBot, partially offset by lower amortization expenses and higher revenues driven by our recent acquisitions.

Gross profit attributable to services revenues increased by $0.8 million, or 1.4%, to $59.8 million in 2023 compared to $58.9 million in 2022. Gross profit from services as a percentage of services revenues in 2023 increased to 30.8% as compared to 29.6% in 2022. Our gross profit from services revenues increased mainly as a result of favorable product mix and our restructuring of SDM, in an aggregate amount of $7.6 million partially offset by higher restructuring cost.

As the above percentages evidence, our gross margin, which has been a major focus for us, did not change in a material manner in 2023 compared to 2022, despite global economic headwinds caused by inflation and European currency depreciation against the U.S. dollar. This was largely due to our use of price increases on our products and services to help to offset cost pressures. As our new technologies ramp and our operational efficiencies continue, we expect that our gross margin will strengthen in the coming years.

**Operating Expenses**

The amount of each type of operating expense for the last two years, as well as the percentage change between such annual periods, and total operating expenses as a percentage of our total revenues in each such year, were as follows:

| | Year Ended December 31, | | | | Change from earlier to later year, as a % of amount in earlier year |
|---|---|---|---|---|---|
| | 2023 | | 2022 | | 2023-2022 |
| | U.S. $ in thousands | | | | |
| Research and development, net | $ | 94,425 | $ | 92,876 | 1.7 % |
| Selling, general and administrative | | 260,179 | | 240,750 | 8.1 % |
| | $ | 354,604 | $ | 333,626 | 6.3 % |
| Percentage of revenues | | 56.5 % | | 51.2 % | |

80

Operating expenses were $354.6 million in 2023 compared to operating expenses of $333.6 million in 2022. The increase in operating expenses was primarily driven by costs related to prospective and potential mergers and acquisitions, our defense against a hostile tender offer and a proxy contest, and related professional fees, restructuring costs of $32.9 million and higher costs driven by our recent acquisitions in an amount of $11.7 million, partially offset by reduction in expenses due to our divestiture of MakerBot in late August 2022.

Research and development expenses, net, increased by $1.5 million, or 1.7%, in 2023 compared to 2022. Research and development expenses, net, as a percentage of revenues increased to 15.0% in 2023 compared to 14.3% in 2022. The increase in research and development expenses, net in 2023 was mainly attributable to higher costs driven by our recent acquisitions of $5.8 million partially offset by the divestiture of MakerBot.

We continue to invest in strategic long-term initiatives that include advancements in our core FDM and PolyJet technologies and in our new powder-based and photopolymer-based, SAF and P3 technologies, advanced composite materials, software and development of new applications that will enhance our current solutions offerings.

Selling, general and administrative expenses in 2023 increased by $19.4 million, or 8.1%, to $260.2 million, compared to $240.8 million in 2022.The amount of selling, general and administrative expenses constituted 41.5% of our revenues in 2023, as compared to 37.0% in 2022. The increase was mainly attributable to costs related to prospective and potential mergers and acquisitions, defense against hostile tender offer, proxy contest and related professional fees of $32.9 million, as well as restructuring costs, partially offset by a reduction of selling, general and administrative costs due to our divestiture of MakerBot in August 2022 and reduction in contingent consideration liabilities in amount of $4.0 million.

**Operating Loss**

Operating loss and operating loss as a percentage of our total revenues for the last two years, as well as the percentage change in operating loss between those years, were as follows:

|  | Year Ended December 31, | | Change from earlier to later year, as a % of amount in earlier year |
|---|---|---|---|
|  | 2023 | 2022 | 2023-2022 |
|  | U.S. $ in thousands | | |
| **Operating loss** | (87,580) | (57,159) | 53.2 % |
| **Percentage of revenues** | (14.0 %) | (8.8 %) | |

Operating loss for the year ended December 31, 2023 was $87.6 million as compared to an operating loss of $57.2 million for the year ended December 31, 2022. Our operating loss increased both on an absolute basis, and as a percentage of our revenues in the twelve months ended December 31, 2023 compared to the twelve months ended December 31, 2022, for the reasons described in the discussion of the above line items.

**Gain From Deconsolidation Of Subsidiary**

On August 31, 2022, we completed the previously-announced merger of our subsidiary MakerBot with Ultimaker, into a new company that had been created under the name Ultimaker. The transaction was accounted for as an equity method investment, and, accordingly, we recorded an investment of $105.6 million, and a net gain of $39.1 million from the deconsolidation of MakerBot.

**Financial Income (Expenses), net**

Financial income, net, which were primarily comprised of foreign currencies effects, interest income and interest expense, amounted to $3.0 million for the year ended December 31, 2023, compared to financial income, net, of $0.2 million for the year ended December 31, 2022.

**Income Taxes**

Income tax expense and income tax expense as a percentage of net loss before income taxes for the last two years, as well as the percentage change in income taxes between those years, were as follows:

| | Year Ended December 31, | | | | 2023-2022 |
|---|---|---|---|---|---|
| | **2023** | | **2022** | | **% Change in 2023** |
| | U.S. $ in thousands | | | | |
| Loss before income taxes | $ | (84,587) | $ | (17,794) | 375.4 % |
| Income tax benefit (expense) | $ | 5,782 | $ | 5,454 | 6.0 % |
| As a percentage of loss before income taxes | | (6.8 %) | | (30.7 %) | |

We had an effective tax rate of (6.8)% for the year ended December 31, 2023 as compared to an effective tax rate of (30.7)% for the year ended December 31, 2022. Our effective tax rate in 2023 was primarily impacted by the geographic mix of foreign taxable earnings and losses, our valuation allowance as well as changes in uncertain tax position.

Our effective tax rate is based on recurring factors, including the geographic mix of foreign taxable income and loss, as well as nonrecurring items that may not be predictable.

For a full reconciliation of our effective tax rate to the Israeli statutory rate of 23% and for further explanation of our provision for income taxes, refer to Note 10 to our consolidated financial statements included in Item 18 of this annual report.

**Share in net Losses of Associated Companies**

Share in net losses of associated companies reflects our proportionate share of the net losses of unconsolidated entities accounted for by using the equity method of accounting. During 2023, we had net losses of our equity method investments in a total amount of $32.7 million, compared to a loss of $5.7 million in 2022. The foregoing losses including impairment charges in amount of $13.9 million, were mainly attributable to our equity investment the new merged entity Ultimaker (which was the surviving entity following a merger between it and MakerBot) following the deconsolidation, in 2022, of MakerBot, which was previously held as a subsidiary of Stratasys. refer to Note 2 to our consolidated financial statements included in Item 18 of this annual report.

**Net Loss and Net Loss Per Share**

Net loss, net loss as a percentage of our total revenues, and diluted net loss per share, for the last two years, as well as the percentage change in net loss between those years, were as follows:

82

| | Year Ended December 31, | | 2023-2022 |
|---|---|---|---|
| | 2023 | 2022 | |
| | U.S. $ in thousands | | % Change in 2023 |
| **Net loss** | (123,074) | (28,974) | 324.8 % |
| **Percentage of revenues** | (19.6)% | (4.4)% | |
| **Basic and diluted net loss per share** | $ (1.79) | $ (0.44) | (55.4)% |

Net loss for the year ended December 31, 2023 was $123.1 million, as compared to $29.0 million for the year ended December 31, 2022. The increase was mainly attributable to higher costs related to prospective and potential mergers and acquisitions, termination costs related to the termination of our merger transaction with Desktop Metal, our defense against a hostile tender offer and our proxy contest and related professional fees of 32.9 million, lower gross profit and increased amounts for our share in losses of associated companies

Diluted net loss per share for the years ended December 31, 2023 and 2022 was $1.79 and $0.44, respectively The weighted average, basic and diluted number of shares outstanding for the year ended December 31, 2023 was 68.7 million, compared to 66.5 million for the year ended December 31, 2022.

### Non-GAAP Financial Measures

The following non-GAAP data for the fiscal years ended December 31, 2023 and 2022, which excludes certain items as described below, are non-GAAP financial measures. Our management believes that these non-GAAP financial measures are useful information for investors and shareholders of our company in gauging our results of operations (i) on an ongoing basis after excluding mergers, acquisitions and divestments related expense or gains and restructuring-related charges or gains, legal provisions and (ii) excluding non-cash items such as stock-based compensation expenses, acquired intangible assets amortization, including intangible assets amortization related to equity method investments, impairment of long-lived assets and goodwill, revaluation of investments and the corresponding tax effect of those items. The items eliminated in our non-GAAP adjustments either do not reflect actual cash outlays that impact our liquidity and our financial condition or have a non-recurring impact on our statement of operations, as assessed by management. These non-GAAP financial measures are presented to permit investors to more fully understand how management assesses our performance for internal planning and forecasting purposes. The limitations of using these non-GAAP financial measures as performance measures are that they provide a view of our results of operations without including all items indicated above during a period, which may not provide a comparable view of our performance to other companies in our industry. Investors and other readers should consider non-GAAP measures only as supplements to, not as substitutes for or as superior measures to, the measures of financial performance prepared in accordance with GAAP. Reconciliation between results on a GAAP and non-GAAP basis is provided in the table below.

*Reconciliation of GAAP and Non-GAAP Results of Operations*

| | | Twelve Months Ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2023 GAAP | Non-GAAP Adjustments | 2023 Non-GAAP |
| | | U.S. dollars and shares in thousands (except per share amounts) | | |
| Gross profit (1) | $ | 267,024 $ | 35,764 $ | 302,788 |
| Operating income (loss) (1,2) | | (87,580) | 100,207 | 12,627 |
| Net income (loss) attributable to | | | | |
| Stratasys Ltd. (1,2,3) | | (123,074) | 130,783 | 7,709 |
| Net income (loss) per diluted share attributable | | | | |
| to Stratasys Ltd. (4) | $ | (1.79) $ | 1.90 $ | 0.11 |

| | | | |
| --- | --- | --- | --- |
| (1) | Acquired intangible assets amortization expense | | 19,603 |
| | Non-cash stock-based compensation expense | | 3,701 |
| | Restructuring and other related costs | | 12,460 |
| | Impairment charges | | — |
| | | | 35,764 |
| | | | |
| (2) | Acquired intangible assets amortization expense | | 9,167 |
| | Non-cash stock-based compensation expense | | 27,917 |
| | Impairment of long-lived assets | | 7,087 |
| | Revaluation of investments | | 4,880 |
| | Contingent consideration | | (22,331) |
| | Legal and other expenses | | 37,723 |
| | | | 64,443 |
| | | | 100,207 |
| | | | |
| (3) | Corresponding tax effect | | 3,894 |
| | Equity method related amortization, divestments and impairments | | 24,871 |
| | Finance expenses | | 1,811 |
| | | $ | 130,783 |
| | | | |
| (4) | Weighted average number of ordinary | | |
| | shares outstanding- Diluted | 68,666 | 69,233 |

84

| | | Twelve Months Ended December 31, | | |
|---|---|---|---|---|
| | | 2022 GAAP | Non-GAAP Adjustments | 2022 Non-GAAP |
| | | U.S. dollars and shares in thousands (except per share amounts) | | |
| Gross profit (1) | $ | 276,467 $ | 36,016 $ | 312,483 |
| Operating income (loss) (1,2) | | (57,159) | 70,691 | 13,532 |
| Net income (loss) attributable to | | | | |
| Stratasys Ltd. (1,2,3) | | (28,974) | 39,235 | 10,261 |
| Net income (loss) per diluted share attributable | | | | |
| to Stratasys Ltd. (4) | $ | (0.44) $ | 0.59 $ | 0.15 |

| | | | |
|---|---|---|---|
| (1) | Acquired intangible assets amortization expense | | 28,158 |
| | Non-cash stock-based compensation expense | | 4,083 |
| | Restructuring and other related costs | | (174) |
| | Impairment charges | | 3,949 |
| | | | 36,016 |
| | | | |
| (2) | Acquired intangible assets amortization expense | | 8,950 |
| | Non-cash stock-based compensation expense | | 29,378 |
| | Restructuring and other related costs | | 2,737 |
| | Revaluation of investments | | 3,777 |
| | Contingent consideration | | (18,293) |
| | Legal and other expenses | | 8,126.3 |
| | | | 34,676 |
| | | | 70,691 |
| | | | |
| (3) | Corresponding tax effect | | 4,988 |
| | Equity method related amortization, divestments and impairments | | 2,285 |
| | Finance expenses | | 406 |
| | Net gain from sale of business | | (39,136) |
| | | | 39,235 |
| | | | |
| (4) | Weighted average number of ordinary | | |
| | shares outstanding- Diluted | 66,491 | 67,068 |

85

*Forward-looking Statements and Factors That May Affect Future Results of Operations*

See "Cautionary Note Regarding Forward-Looking Statements" at the beginning of this annual report (following the table of contents).

### Variability of Operating Results

Our revenues and profitability may vary in any given year, and from quarter to quarter, depending on the timing, number and mix of products sold and the average selling price of the products, and are also affected by the seasonality of our business. In addition, due to competition, uncertain market acceptance and other factors, we may be required to reduce prices for our products in the future. Since 2019, it has also been useful to gauge the variability of our operating results on a linear basis, for each quarter compared to the previous one, in addition to on a year-over-year basis, compared to the corresponding period of the prior year. We have not seen a steady pattern as to the level of demand for our products in particular quarters of the year since 2019. Nevertheless, in our outlook for 2024, we expect our revenues to grow sequentially, largely because of expected new product introductions later as the year progresses.

Our future results will be affected by a number of factors, including our ability to: increase the number of products sold; develop, introduce and deliver new products on a timely basis; accurately anticipate customer demand patterns; and manage future inventory levels in line with anticipated demand. Our results may also be affected by competitive factors, the extent to which our cost controls plan succeeds, the availability of working capital, results of litigation, the enforcement of intellectual property rights, currency exchange rate fluctuations, commodity prices and economic conditions in the geographic areas in which we operate. Macro factors, including global economic headwinds caused by inflation, changes in interest rates, and supply chain conditions, as impacted by geopolitical developments such as the status of the Russian invasion of Ukraine and U.S.-China relations, and macro factors particular to our industry, such as the extent of growth of the 3D printing market generally, may also impact our operating results. There can be no assurance that our historical performance in revenues, gross profit and net income (loss) will improve, or that revenues, gross profit and net income (loss) in any particular quarter will improve, over the results reflected in preceding quarters, including comparable quarters of previous years. See Item 3.D - "Risk Factors" above

### Effective Corporate Tax Rate

See "Israeli Tax Considerations and Government Programs — General Corporate Tax Structure in Israel" in Item 4.B above for a discussion of the general tax structure in Israel and applicable corporate tax rates.

In 2023, we generated losses mainly from our Israeli parent company and its major subsidiaries, with no tax benefit being recorded for those losses, as the near-term realization of these assets is uncertain.

As part of the process of preparing our consolidated financial statements, we must estimate our income taxes in each of the jurisdictions in which we operate. This process involves estimating our actual current tax exposure together with assessing temporary differences resulting from differing treatment of items for tax and accounting purposes. Actual income taxes could vary from these estimates due to future changes in income tax laws or the results of final tax examinations and reviews.

### Effects of Government Regulations and Location on our Business

For a discussion of the effects of Israeli governmental regulation and our location in Israel on our business, see "Israeli Tax Considerations and Government Programs" in Item 4.B above and the "Risks related to operations in Israel" in Item 3.D above.

86

**Inflation**

We believe that inflation has not had a material effect on our operations or on our financial condition during the three most recent fiscal years.

**Foreign Currency Transactions**

See "Foreign Currency Exchange Risk" in Item 11 below for a discussion of foreign currency transactions.

**B.  Liquidity and Capital Resources**

A summary of our consolidated statement of cash flows for the last two years is set forth in the below table.While our financial statements included in Item 18 of this annual report include cash flow data for each of the three years ended December 31, 2023, 2022 and 2021, the discussion contained in this Item 5.B is limited to a comparison of our liquidity and capital resources— including cash flows— for the years ended December 31, 2023 and 2022. For a discussion of our cash flows for the year ended December 31, 2021, and a comparison of those cash flows with those for the year ended December 31, 2022, please see "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources" in our Annual Report on Form 20-F for the year ended December 31, 2022, which we filed with the SEC on March 3, 2023.

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2023** | **2022** |
| | U.S $ in thousands | |
| Net loss | $          (123,074) | $          (28,974) |
| Impairment of other long-lived assets | 4,443 | 3,865 |
| Depreciation and amortization | 48,973 | 59,769 |
| Stock-based compensation | 31,614 | 33,461 |
| Foreign currency transactions gain (loss) | 636 | 9,090 |
| Gain from deconsolidation of subsidiary | — | (39,136) |
| Deferred income taxes, net and uncertain tax positions | (1,764) | 926 |
| Other non-cash items, net | 18,051 | (9,079) |
| Change in working capital and other items | (40,524) | (105,327) |
| Net cash used in by operating activities | (61,645) | (75,405) |
| Net cash used in investing activities | (3,834) | (7,213) |
| Net cash used in financing activities | (1,516) | (2,769) |
| Effect of exchange rate changes on cash, cash equivalents and restricted cash | (827) | (7,220) |
| Net change in cash, cash equivalents and restricted cash | (67,822) | (92,607) |
| Cash, cash equivalents and restricted cash, beginning of year | 150,686 | 243,293 |
| Cash, cash equivalents and restricted cash, end of year | $82,864 | $150,686 |

Our cash, cash equivalents and restricted cash balances decreased to $82.9 million as of December 31, 2023 as compared to $150.7 million as of December 31, 2022.

The decrease in cash, cash equivalents and restricted cash in 2023 was mainly due to cash flows used in operating activities.

87

*Cash flows from operating activities*

Year ended December 31, 2023

We used $61.6 million of cash in our operating activities during 2023. Cash used in operating activities reflected our net loss of $123.1 million and negative changes in our working capital of $40.5 million, partially offset by depreciation, amortization and impairment charges of long-lived assets in an aggregate amount of $53.4 million, stock-based compensation of $31.6 million, deferred income taxes of $1.8 million and $18.1 million of changes in other non-cash items, net. Changes in working capital of 40.5 million were mainly driven by an increase in accounts receivables of $25.7 million, decrease in accounts payable of $27.4 million and decrease in other non current liabilities of $9.2 million, partially offset by an increase in other non current assets of $11.0 million.

Year ended December 31, 2022

We used $75.4 million of cash in our operating activities during 2022. Cash used in operating activities reflected our net loss of $29.0 million, negative changes in our working capital of $105.3 million, depreciation, amortization and impairment charges of long-lived assets in an aggregate amount of $63.6 million, stock-based compensation of $33 million and foreign currency transactions gains of $9.1 million, which were partially offset by $39.1 million gain from deconsolidation of our former subsidiary MakerBot and $9.1 million of changes in other non-cash items, net. Changes in working capital of $105.3 million were mainly driven by an increase in inventory of $87.3 million as a result of increased purchases aimed at building up our inventory, as well as an increase in accounts receivables of $15.4 million, partially offset by an increase in accounts payable of $20.9 million, as a result of an increase in the level of our ongoing operations in the year ended December 31,2022.

*Cash flows from investing activities*

Year ended December 31, 2023

We used $3.8 million of cash in our investing activities during 2023. The net cash use during 2023 mostly reflected $72.1 million used for investments in consolidated entities and $13.6 million that we invested for the purchase of property and equipment, partially offset by net proceeds from short-term bank deposits of $97.4 million.

Year ended December 31, 2022

We used $7.2 million of cash in our investing activities during 2022. The net cash use during 2022 mostly reflected $69.1 million used for investments in unconsolidated entities (mainly Ultimaker), and $13.6 million that we invested for the purchase of property and equipment, partially offset by net proceeds that we withdrew from short-term bank deposits.

*Cash flows from financing activities*

Year ended December 31, 2023

We used $1.5 million of cash in our financing activities during 2023. These financing activities were mostly related to contingent consideration that we paid for acquisitions.

Year ended December 31, 2022

We used $2.8 million of cash in our financing activities during 2022. These financing activities were mostly related to contingent consideration that we paid for acquisitions.

*Capital resources and capital expenditures*

Our total current assets amounted to $560.1 million as of December 31, 2023, of which $162.9 consisted of cash, cash equivalents, short-term deposits and restricted cash. Total current liabilities amounted to $176.4 million as of December 31, 2023.

Most of our cash and cash equivalents are held in banks in Israel and the U.S.

The credit risk related to our accounts receivable is limited due to the relatively large number of customers and their wide geographic distribution. In addition, we seek to reduce the credit exposures of our accounts receivable by imposing credit limits, conducting ongoing credit evaluation, and by implementing account monitoring procedures, as well as by carrying credit insurance for many of our customers.

We believe that we will have adequate cash and cash equivalents to fund our ongoing operations and that these sources of liquidity will be sufficient to satisfy our working capital and capital expenditures needs, as well as our debt requirements, for the next twelve months.

*Additional factors potentially impacting capital resources*

We are obligated to our suppliers under ordinary course purchase orders in an aggregate amount of approximately $140.8 million as of December 31, 2023. All of those obligations will become due over the course of the 2024 year.

We have also committed to make potential future payments to third parties as part of our acquisitions. These payments are contingent upon the occurrence of certain future events and, given the nature of these events, it is unclear when, if ever, we may be required to pay such amounts. The total contingent payments could reach an aggregate amount of up to $104.4 million.

C. **Research and Development, Patents and Licenses, Etc.**

For a discussion of our research and development policies, see "Research and Development" and "Regulation— Israeli Tax Considerations and Government Programs – Law for the Encouragement of Capital Investments" in Item 4.B above and the "Risks related to operations in Israel" in Item 3.D above.

D. **Trend Information.**

For trend information, see the Risk Factors described in Item 3.D above, the "Overview" and "Operating Results" sections of this Item 5 - "Operating and Financial Review and Prospects" and Item 4 - "Information on the Company" above.

E. **Critical Accounting Estimates**

For a description of our significant accounting policies, see note 1 to our consolidated financial statements included in Item 18 of this annual report.

The preparation of our consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions in certain circumstances that affect the amounts reported in the accompanying consolidated financial statements and related footnotes. Actual results may differ from these estimates. We base our judgments on our experience and on various assumptions that we believe to be reasonable under the circumstances.

89

Of our policies, the following are considered the most critical to an understanding of our consolidated financial statements as they require the application of the most subjective and complex judgment, involving critical accounting estimates and assumptions impacting our consolidated financial statements. We have applied our policies and critical accounting estimates consistently across our businesses:

- Business combination
- Intangibles
- Goodwill

We base our estimates on historical experience and on various other assumptions which we believe to be reasonable under the circumstances. Because of the uncertainty inherent in these matters, actual results could differ materially from the estimates we use in applying these policies.

### *Business combination*

In accordance with ASC Topic 805, "Business Combination", we allocate the fair value of purchase consideration to the assets acquired and liabilities assumed based on their estimated fair values. The excess of the fair value of purchase consideration over the fair values of these identifiable assets and liabilities is recorded as goodwill.

Fair value estimates are based on the assumptions management believes a market participant would use in pricing the asset or liability.

In the Company's recent acquisitions, intangible assets and goodwill represented a majority of the assets acquired. Assessing fair values of intangible assets acquired in a business combination involves significant judgment about future events and uncertainties and depends on estimates and assumptions. Significant estimates utilized in valuating intangible assets include discount rates and future expected cash flow, which rely upon assumptions such as the useful life of the assets, revenue growth rates and margins projections, technological obsolescence and income tax rate assumptions.

Contingent consideration incurred in a business combination is included as part of the consideration transferred and recorded at fair value as of the acquisition date.

Estimating the fair value involves significant judgment and is based on significant assumptions relating to the estimate, such as discount rates, internal cash flows forecast for the relevant period during which the financial metrics should be achieved and the timing and amounts of the contingent payments.

Amounts recorded in a business combination in certain cases may be subject to revision based on the final determination of fair values during the measurement period, which may be up to one year from the acquisition date, as additional information about conditions existing at the acquisition date may become available. In addition, each reporting period thereafter, the Company revalues the contingent consideration payments and deferred payments which are classified as liabilities and records the changes in their fair value in the consolidated statements of operations and comprehensive loss.

On August 31, 2022, Stratasys completed the merger of MakerBot (previously, a fully owned subsidiary) with Ultimaker, which together formed a new entity under the name Ultimaker. The Company accounts for its investment in the combined company Ultimaker according to the equity method in accordance with ASC Topic 323, as it has retained the ability to exercise significant influence but does not control the new entity. The Company recognized an equity method investment in a total amount of $105.6 million comprised of the assumed fair value of the MakerBot shares and additional amount invested in cash by the Company, representing a share of 46.5% in the new entity.

On April 3, 2023, the Company completed the acquisition of the additive manufacturing materials business of Covestro AG for an aggregate purchase price of $60.5 million, including cash and shares and we are obligated to pay additional payments.

90

During 2023, the Company completed several transactions, including acquisitions of an entity and additional assets, for a total consideration of $22 million.

See note 3 to our consolidated financial statements for further details on the business combination transactions.

### *Intangibles*

Most of our identifiable intangible assets were recognized as part of business combinations we have executed in the current and prior periods. Our identifiable intangible assets are considered definite life intangible assets and are primarily comprised of developed technology, trademarks and trade names, customer relationships and patents. Definite life intangible assets are amortized using the straight-line method over their estimated period of useful life.

Our determination of the fair value of the intangible assets acquired involves the use of significant estimates and assumptions. Refer to the "Business combination" section above. We believe that the fair value assigned to the assets acquired and liabilities assumed are based on reasonable assumptions and estimates that a market participant would use. Should conditions differ from management's estimates at the time of the acquisition, including changes in volume or timing to current expectations of future revenue growth rates and forecasted margins, or changes in market factors outside of our control, such as discount rates, material write-downs of intangible assets may be required, which would adversely affect our operating results.

We monitor events and changes in circumstances that could indicate carrying amounts of intangible assets may not be recoverable. We review the carrying amounts of our intangible assets for potential impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Impairment indicators may include any significant changes in the manner of our use of the assets or the strategy of our overall business, certain reorganization initiatives, significant negative industry or economic trends and significant decline in our share price for a sustained period.

When such events or changes in circumstances occur, we compare the carrying amounts of the asset or assets groups with their respective estimated undiscounted future cash flows. If the asset or assets group are determined to be impaired, an impairment charge is recorded in the amount by which the carrying amount of the asset or assets group exceed their fair value.

During the years ended December 31, 2023 and 2022, we did not record any impairment charges related to our definite life intangible assets.

In 2023, additional intangible assets of $30.6 million were recognized by us as part of our assets and other acquisitions, as mentioned above.

### *Goodwill*

Goodwill reflects the excess of the consideration transferred plus the fair value of any non-controlling interest in the acquiree at the acquisition date over the fair values of the identifiable net assets acquired. Goodwill is not amortized but rather is tested for impairment annually at the reporting unit level, or whenever events or circumstances present an indication of impairment. The goodwill balance as of December 31, 2023 and 2022 resulted from our recent acquisitions. No goodwill impairment was recorded during the years ended December 31, 2023 and 2022. In 2023, additional goodwill of $34.8 million were recognized by us as part of our acquisitions, as mentioned above.

Determining the fair value of our reporting units requires significant judgment, including judgments about the appropriate terminal growth rates, weighted average costs of capital and the amounts and timing of projected future cash flows. Fair value determinations are sensitive to changes in underlying assumptions, estimates, and market factors. Projected future cash flows are based on our most recent budget, forecasts and strategic plans as well as certain growth rate assumptions. Potential changes in our costs and operating structure, the expected timing of utilization of synergies, strategic opportunities, negative effect of exchange rates and overall weakness in the 3D printing marketplace, could negatively impact our near-term cash-flow projections and could trigger a potential impairment of our goodwill. In addition, failure to execute our strategic plans as well as increases in weighted average costs of capital could negatively impact the fair value of our reporting units, and increase the risk of goodwill impairment in the future.

We will continue to monitor the fair value of our reporting units to determine whether events and changes in circumstances such as further deterioration in the business climate or operating results, further significant decline in our share price, changes in management's business strategy or downward changes of our cash flows projections, warrant further interim impairment testing.

See note 8 to our consolidated financial statements for further details on the goodwill impairment test in 2023.

## ITEM 6. DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES.

### A.   Directors and Senior Management.

The following table lists the names and ages of our current directors, as well as the names, ages and positions of the current members of our senior management, as of the filing date of this annual report:

| Name | Age | Position |
| --- | --- | --- |
| Dov Ofer | 69 | Chairman of the Board of Directors |
| S. Scott Crump | 70 | Director |
| Aris Kekedjian | 57 | Director |
| John J. McEleney | 61 | Director |
| David Reis | 63 | Director |
| Michael Schoellhorn | 58 | Director |
| Yair Seroussi | 68 | Director |
| Adina Shorr | 63 | Director |
| Yoav Zeif | 57 | Chief Executive Officer |
| Eitan Zamir | 47 | Chief Financial Officer |

*Dov Ofer* has served as our Chairman of the Board since May 2020 and as a director since July 2017. While serving as a director (prior to his appointment as our Chairman), Mr. Ofer served on the oversight committee of the Board, which guided our executive management during an interim period prior to the appointment of our current, permanent chief executive officer. Mr. Ofer served as the Chief Executive Officer of Lumenis Computerized Systems Ltd. From 2007 to 2013, Mr. Ofer served as Chief Executive Officer of Lumenis Ltd. (Nasdaq: LMNS), a medical laser device company. From 2005 to 2007, he served as Corporate Vice President and General Manager of HP Scitex (formerly a subsidiary of Scailex Corporation Ltd. (TASE: SCIX)), a producer of large format printing equipment. From 2002 to 2005, Mr. Ofer served as President and Chief Executive Officer of Scitex Vision Ltd. Prior to joining Scitex, Mr. Ofer held various managerial positions in the emerging Israeli high-tech sector and participated in different mergers and acquisitions within the industry. Currently, Mr. Ofer serves as chairman of Hanita Coatings RCA Ltd., chairman of Plastopil Hazorea Company Ltd. (TASE: PPIL), vice chairman of Scodix Ltd. and director of Kornit Digital Ltd. and Orbix Medical Ltd. He holds a B.A. in Economics from the Hebrew University in Israel as well as an M.B.A. from the University of California Berkeley in California.

*S. Scott Crump* has served as our director since November 2021. Mr. Crump previously served as our Chairman of the Executive Committee of the Board and our Chief Innovation Officer from February 2015 and February 2013, respectively, in each case until May 2020, at which time he was appointed our Chief External Affairs and Innovation Officer, which he served as through August 2020. Mr. Crump also served from June 2018 through March 2020 on the oversight committee of our Board that helped to support our interim chief executive officer in the management of our company during an interim period, and our current CEO, Mr. Yoav Zeif, during Mr. Zeif's initial period at our company. After leaving his position as a director on the Board in 2020, Mr. Crump served as a technology consultant to the Board. Mr. Crump previously served as Chairman of the Board of our company from the Stratasys, Inc.- Objet Ltd. merger until February 2015, as Chairman, Chief Executive Officer, President, Treasurer and a director of Stratasys, Inc. from its inception in 1988 until the Stratasys, Inc.- Objet Ltd. merger, and as Chief Financial Officer of Stratasys from February 1990 to May 1997. Mr. Crump was, with Lisa H. Crump, his wife, a co-founder of Stratasys, Inc., and he is the inventor of our FDM technology. Mr. Crump holds a B.S. in mechanical engineering from Washington State University.

*Aris Kekedjian* has served as our director since having been appointed by the Board in November 2023. Mr. Kekedjian served as Chairman and Chief Executive Officer of Trinity Biotech from October 2022 to December 2023. He served as President and Chief Executive Officer of Icahn Enterprises from April 2021 to January 2022. Prior to that, Mr. Kekedjian held various roles of increasing responsibility at General Electric and GE Capital from 1989 to 2019, including Head of Corporate Development and Chief Investment Officer of GE; Managing Director and Global Head, Business Development of GE Capital; and Managing Director, Global Corporate Development and CEO of GE Capital in the MEA region. During his tenure at GE and GE Capital, Mr. Kekedjian guided the company through multiple phases of growth and transformation, including through the 2008 financial crisis and a series of multibillion-dollar mergers that helped reposition disparate assets into leading businesses. In addition, he previously served as a director of Xerox Holdings Corporation and XPO Logistics. Mr. Kekedjian holds a Bachelor of Commerce degree in Finance and International Business from Concordia University in Montreal, Canada.

*John J. McEleney* has served as a director of our Company since the Stratasys, Inc.- Objet Ltd. merger, and, before that, as a director of Stratasys, Inc. from 2007 until the Stratasys, Inc.- Objet Ltd. merger. He is the co-founder of Onshape Inc., a venture backed start-up company focused on applying modern computing to the 3D product design market. Prior to Onshape he was the Chief Executive of Cloud Switch, which was acquired by Verizon. He served as a director of SolidWorks Corporation, a wholly owned subsidiary of Dassault Systemes S.A. (Nasdaq: DASTY), from June 2000 to May 2008, and also served as its Chief Executive Officer from 2001 until June 2007. Mr. McEleney joined SolidWorks in 1996, serving in several capacities, including Chief Operating Officer and Vice President, Americas Sales. Prior to joining SolidWorks, Mr. McEleney held several key management positions at CAD software pioneer Computervision and at defense contractor Raytheon. Mr. McEleney also serves as a director of Newforma, a privately held software company. He holds a B.S. in Mechanical Engineering from the University of Rochester, an M.S. in Manufacturing Engineering from Boston University and an M.B.A. from Northeastern University.

93

*David Reis* has served as our director from June 2013 to the present time. For parts of that period, he served as our Vice Chairman of the Board, as an Executive Director and as a key member of the oversight committee of the Board, which guided our executive management during an interim period prior to the appointment of our current, permanent chief executive officer. Since 2017, Mr. Reis serves as Chairman at Enercon Technologies Ltd., Tuttnauer Ltd and Highcon Ltd. He also served as a Director of Objet from 2003 until the closing of the Stratasys-Objet merger. Mr. Reis served as the Stratasys Chief Executive Officer from March 2009 until June 30, 2016 (and, prior to the Stratasys-Objet merger, as Objet's CEO). Previously, he served as Chief Executive Officer and President of NUR Macroprinters Ltd. (NURMF.PK), a wide format printer manufacturer that was acquired by HP, from February 2006 to March 2008. Prior to joining NUR, Mr. Reis served as the Chief Executive Officer and President of ImageID, an automatic identification and data capture solution provider, and of Scitex Vision (Nasdaq & TASE: SCIX), a developer and manufacturer of wide-format printers. Mr. Reis holds a B.A. in Economics and Management from the Technion-Israel Institute of Technology and an M.B.A. from the University of Denver. Reis is also a graduate of the Harvard Business School Advanced Management Program.

*Michael Schoellhorn* has served as our director since November 2020. Since February 2019 Mr. Schoellhorn has served as Airbus' (Toulouse, France) Chief Operating Officer and a member of its Executive Committee. He has been a member of the Supervisory Board of Airbus Operations GmbH, Hamburg since 2019 and was appointed as its chairman in 2020. Prior to joining Airbus, Mr. Schoellhorn served as Chief Operating Officer and a member of the Management Board at BSH Home Appliances GmbH (Munich, Germany), a leading manufacturer of home appliances owned by the Robert Bosch Group (Stuttgart,Germany), from January 2015 until 2019. Prior to that, Mr. Schoellhorn started his career as a management trainee with Bosch in 1999 and held various operational senior management positions in the automotive sector of Robert Bosch GmbH - in the US, the Czech Republic, and Germany, until he was appointed Executive Vice President for Manufacturing and Quality in 2012. Mr. Schoellhorn studied at IMD Business School (Lausanne, Switzerland), Tepper School of Business (Pittsburgh, USA), Bosch-Carnegie-Institute (Pittsburgh, USA), and the Robert-Bosch- Kolleg (Stuttgart, Germany). He holds a degree in Mechanical Engineering and a PhD in Control Engineering, both from the Helmut Schmidt University. Mr. Schoellhorn served in the German armed forces, as an officer and a helicopter pilot, from 1984 until 1994. He is a member of the presidency of BDLI (the German aerospace industries association), and of the Baden Baden Entrepreneur Talks, a discussion forum for German business and political leaders.

*Yair Seroussi* has been a member of the board of directors of Stratasys since 2017 and is serving as the chairman of the audit committee. He is the chairman of Enlight renewable energy since 2018, listed on NSDAQ & TASE, and the chairman of ZIM integrated shipping services Ltd, NYSE, a global shipping operator. He is currently on the board of directors of Mediterranean towers Ltd. Mr. Seroussi was previously on the board of directors of DSP Group Inc. Mr. Seroussi brings immense experience to the board room, having served as Chairman of Bank Hapoalim, Israel's largest bank and of the Association of Banks in Israel. Mr. Seroussi served as head of Morgan Stanly Israel for 16 years. Before, He served in senior positions at the Israeli ministry of finance, was head of the office of ministry, stationed in the US, and was head of the commodities division, based in NY. In addition to his various professional roles, Mr. Seroussi servs in nonprofit organizations, He is the chairman of Tovanot B'Hinuch (a nonprofit organization helping Periphery schools to excel), sits on the board of governors at the Hebrew University, Weizman Institutes and the Shenkar College of Engineering, Design and Art, and he acts as chairman of the Eli Hurvitz institute of strategic management at the Tel Aviv University. Mr. Seroussi holds a B.A. in Economics and Political Science from the Hebrew University in Jerusalem.

*Adina Shorr* has served as our director since having been appointed by the Board in July 2018, and was re-elected by our shareholders at our 2018 annual general meeting of shareholders. Ms. Shorr has been the Chief Executive Officer of Scodix, a company that provides solutions to commercial printers, since September 2018. Prior to that time, she served as Chief Executive Officer and Chairman of the Board of Lucidlogix Technologies Ltd. from November 2013 to August 2018. Before that, Ms. Shorr had served as the Chief Executive Officer of CellGuide Ltd. (which was acquired by Lucidlogix) from October 2009 through October 2013. Ms. Shorr served as the Chief Executive Officer and President of Objet Ltd. (formerly known as Objet Geometries, Ltd.), one of the two predecessor companies to Stratasys Ltd., for a six-year period ending in March 2009, and also served as its President. She has extensive experience in leadership and management of technology, systems and solutions stemming from her over twenty-year career in the high-tech sector, both in the United States and Israel. She served as Corporate Vice President of Leaf Products at Creo Inc. from March 2000 to March 2003, where she initiated and led in 2000 the establishment of Leaf Products, a start-up for professional digital photography within Creo. Prior to that time, Ms. Shorr served for nine years at Scitex, four years of which she served as the President of the Scitex Input Division. Beginning in 1991, she worked in the United States for IBM in a sales support capacity and for Unisys in Program Management and was responsible for the management of the business facets of the Unisys Network Computing Division. Ms. Shorr has served as a director of Advanced Vision Technology Ltd. since June 2014 and was a director of Objet Geometries Ltd. and then Stratasys Ltd. from May 2012 to June 2013. Ms. Shorr holds an MBA and a BA, both with honors, from Michigan State University in East Lansing, Michigan.

*Yoav Zeif* has served as our chief executive officer since February 18, 2020. Prior to joining our company, from 2018 until February 2020, Mr. Zeif was a partner in the New York office of McKinsey & Company, a global strategic advisory firm that is based in New York. Before serving in that role, Mr. Zeif served as President of the Americas Division, Head of Product Offering and Chief Commercial Officer at Netafim, the world's largest micro-irrigation company, from 2013 to 2018. Prior to that, he served as Senior Vice President of Products and Marketing at Makhteshim (now Adama Ltd.), a global crop-protection company, where he managed the entire portfolio of products and all global commercial relationships. Yoav obtained an Executive MBA from the Kellogg School of Management at Northwestern University and a Ph.D. in International Economics from Bar-Ilan University.

*Eitan Zamir* has served as our Chief Financial Officer since February 2022. He joined Stratasys in 2019 and thereafter has overseen all external financial reporting, accounting, tax, treasury, and Sarbanes-Oxley compliance for the organization along with extensive involvement in capital raising and M&A activities. Prior to joining Stratasys, Mr. Zamir was a Partner at PriceWaterhouseCoopers (PwC), based in Tel Aviv and New York. Mr. Zamir is a certified public accountant who earned his bachelor's degree, with honors, in accounting and economics from the Hebrew University in Jerusalem, and a Master of Science with an emphasis in financial management from Tel Aviv University.

**Arrangements for Election of Directors and Members of Management; Family Relationships**

There are no arrangements or understandings pursuant to which any of our directors or members of senior management were selected for their roles. There are also no family relationships among any directors or members of our senior management.

**B.    Compensation.**

The following table presents all compensation that we paid, or accrued, during the year ended December 31, 2023 to all persons who served as a director or as a member of senior management of our company at any time during the year. The table includes amounts that we paid to reimburse any of these persons for costs incurred in providing us with services during that period.

| | Salaries, Fees, Bonuses Commissions, and Related Benefits Paid or Accrued[1] | Pension, Retirement and Other Similar Benefits Accrued |
|---|---|---|
| All directors and members of senior management as a group[2] | $ 2,178,325 [3] | $ 243,393 |

Pursuant to the Companies Law, the fees payable to our directors and our chief executive officer require approval by (i) the compensation committee of our board, (ii) the board of directors and (iii) our shareholders (in that order). Please see "Compensation Policy and Committee" in Item 6.C ("Board Practices") below for further information regarding the requirements under the Companies Law in connection with the compensation of directors.

### Director Compensation

The following table sets forth the directors' fees, salary or other compensation (excluding value attributable to RSU grants and stock option grants, and excluding reimbursement for reasonable expenses incurred in connection with services) that are payable to each of our current directors, based on the most recent approval for non-employee director compensation provided by our shareholders at our November 2021 annual general meeting of shareholders:

---

[1] Does not include the value attributable to stock option or restricted stock unit (RSU) grants. For a discussion of stock option and RSU grants to our directors and members of senior management, see below.

[2] Comprised of the current directors and senior management members listed in the table under "Directors and Senior Management" in Item 6.A above, except that it only includes amounts paid to, or accrued for, Aris Kekedjian as a director since his appointment in November 2023, and it also includes amounts paid to, or accrued for, Ms. Ziva Patir, who served as a director from the start of 2023 until stepping down in November 2023 following 10 years of service as a director.

[3] This compensation amount for the year ended December 31, 2023 excludes an aggregate of $0.5 million of bonuses that were paid in 2023 in respect of services that had been performed during the previous year.

96

| Name of Director | Annual Fee/Salary[4] | Annual Board Committee Retainer (and/or Chairman Retainer) |
|---|---|---|
| Dov Ofer | $200,000[5] | $— |
| S. Scott Crump | $60,000 | $— |
| Aris Kekedjian | $60,000 | $10,000[6] |
| John J. McEleney | $60,000 | $30,000[7] |
| David Reis | $60,000 | $10,000[8] |
| Michael Schoellhorn | $60,000 | $— |
| Yair Seroussi | $60,000 | $20,000[9] |
| Adina Shorr | $60,000 | $10,000[10] |

### *Director/Officer Equity Compensation*

Grants to independent/non-employee directors

At our 2021 annual general meeting of shareholders, our shareholders (in addition to approving the above-listed annual cash fee amounts) approved the following annual equity package for each of our independent and/or non-executive directors, which, as of the present time, includes all current members of the board:

**Value of Grants:** Annual grants of $140,000 value, consisting of 50% RSUs (with $70,000 value) and 50% options to purchase ordinary shares (with $70,000 value).

**Deemed Value of RSUs/options:** The number of RSUs to be granted will be determined by dividing $70,000 by the fair market value of a single ordinary share, determined based on the average of the closing prices of an ordinary share on the trading days during the 30-day period following the annual general meeting at which the director is elected or re-elected. The number of options to be granted will be determined by dividing $70,000 by the Black-Scholes value of an option to purchase one ordinary share, as of the date of the annual general meeting of shareholders at which the director is elected or re-elected.

**Exercise Price (for options):** Equal to the fair market value of our ordinary shares, determined based on the average of the closing prices of an ordinary share on the trading days during the 30-day period following the election or re-election of the director by our shareholders.

**Vesting Schedule:** Each of the RSUs and options vest equally on a monthly basis until the earlier of (i) the first anniversary of the grant date, or (ii) the end of the term of the applicable director at the next annual general meeting of shareholders after the grant date, at which such director's directorship may be extended or terminated (which we refer to as the Full Vesting Date), provided that all such RSUs and options shall be fully vested at the Full Vesting Date.

---

[4] The amounts reflected in the "Annual Fee/Salary" column do not include additional annual retainer amounts payable to each director who serves (including as chairman) on a committee of our board of directors, which additional amounts are reflected in the "Annual Board Committee Retainer (and/or Chairman Retainer)" column.

[5] Mr. Ofer's compensation as our Chairman of the Board was approved by our shareholders at our 2020 annual general meeting of shareholders in November 2020.

[6] Constitutes the $10,000 annual retainer for serving on the audit committee.

[7] Constitutes of the $20,000 annual retainer for serving as chairman of the compensation committee, plus a $10,000 annual retainer for serving on the audit committee.

[8] Constitutes the $10,000 annual retainer for serving on the compensation committee.

[9] Constitutes the $20,000 annual retainer for serving as chairman of the audit committee.

[10] Constitutes the $10,000 annual retainer for serving on the compensation committee.

**Other Terms:** The other terms of the RSUs/ options to purchase ordinary shares granted annually to our non-employee directors shall be in accordance with our then- effective equity incentive plan (currently, our 2022 Share Incentive Plan (defined below)). For a description of the terms of our stock option and share incentive plans, see "Share Ownership - Stock Option and Share Incentive Plans" in Item 6.E below.

### *Office Holder Compensation*

The table below outlines the compensation granted to our five most highly compensated senior office holders during or with respect to the year ended December 31, 2023, in the disclosure format of Regulation 21 of the Israeli Securities Regulations (Periodic and Immediate Reports), 1970. We refer to the five individuals for whom disclosure is provided herein as our "Covered Executives."

For purposes of the table and the summary below, and in accordance with the above-mentioned securities regulations, "compensation" includes base salary, bonuses, equity-based compensation, retirement or termination payments, benefits and perquisites such as car, phone and social benefits and any undertaking to provide such compensation.

98

*Summary Compensation Table*

**Information Regarding the Covered Executive[11]**

| Name and Principal Position[12] | Base Salary | Variable Compensation[13] | Benefit and Perquisites [14] | Total Compensation, Excluding Equity-Based Compensation | Equity-Based Compensation[15] | Total |
|---|---|---|---|---|---|---|
| Yoav Zeif, CEO | $ 569,600 | $ 398,720 | $ 252,905 | $ 1,221,224 | $ 1,909,004 | $ 3,130,228 |
| Richard Garrity, Chief Industrial Business Unit Officer | $ 344,126 | 153,336 | 34,088 | 531,549 | 657,690 | $ 1,189,239 |
| Yossi Azarzar, COO | 292,937 | 102,528 | 84,750 | 480,215 | 662,168 | $ 1,142,384 |
| Christian Alvarez, CRO | $ 450,000 | $ 300,207 | $ 58,481 | $ 808,689 | $ 244,183 | $ 1,052,872 |
| Eitan Zamir, CFO | 282,092 | 108,234 | 117,140 | 507,466 | 501,647 | $ 1,009,113 |

Members of our senior management are eligible for bonuses each year. The bonuses are payable upon meeting objectives and targets that are set annually by our Chief Executive Officer and approved by our compensation committee and our board of directors, in that order. These same corporate bodies also set the bonus targets for our Chief Executive Officer. In accordance with a December 2012 amendment to the Companies Law, we have adopted a compensation policy that governs the compensation of our directors and senior management and which has been approved (both initially, and then in updated form) by (i) the compensation committee of our board, (ii) the board of directors and (iii) our shareholders (most recently, at our November 2021 annual general meeting of shareholders) (in that order). Please see "Compensation Policy and Committee" in Item 6.C ("Board Practices") below for further information.

---

[11] All amounts reported in the table are in terms of cost to the Company in U.S. dollars, as recorded in our financial statements.

[12] All current executive officers listed in the table are full-time employees or consultants of our company. Cash compensation amounts denominated in currencies other than the U.S. dollar were converted into U.S. dollars at the average conversion rate for 2023.

[13] Amounts reported in this column refer to commission, incentive and the maximum contractual bonus payments potentially payable for 2023.

[14] Amounts reported in this column include benefits and perquisites, including those mandated by applicable law. Such benefits and perquisites may include, to the extent applicable to the Covered Executive, payments, contributions and/or allocations for savings funds, pension, severance, vacation, house or house allowance, car or car allowance, medical insurances and benefits, risk insurances (e.g., life, disability, accident), convalescence pay, payments for social security, tax gross-up payments, sign-up and relocation bonus and other benefits and perquisites consistent with our guidelines.

[15] Amounts reported in this column represent the expense recorded in our financial statements for the year ended December 31, 2023 with respect to equity-based compensation. Equity-based compensation is determined based on the awards' fair value on their grant date. Assumptions and key variables used in the calculation of such amounts are described in Note 11 to our audited consolidated financial statements, which are included in Item 18 of this annual report.

99

## C.    Board Practices.

### Board of Directors

Under the Companies Law, the management of our business is vested in our board of directors. Our board of directors may exercise all powers and may take all actions that are not specifically granted to our shareholders or to management. Our board of directors serves as the primary corporate body responsible for risk management for our company, including cybersecurity risks, and periodically consults with the management of our company to obtain updates concerning, and internally discusses, the most material risks currently facing our company, and how those risks are being mitigated. Our executive officers are responsible for our day-to-day management and have individual responsibilities established by our board of directors. Our Chief Executive Officer is appointed by, and serves at the discretion of, our board of directors, subject to the employment agreement that we have entered into with him. All other executive officers are also appointed by our board of directors, subject to the terms of any applicable employment agreements that we may enter into with them.

Under our amended articles, our board of directors must consist of at least seven and not more than 11 directors, including, to the extent applicable, at least two external directors required to be elected under the Companies Law.

In May 2016, we elected to be governed by a then-newly-adopted exemption under the Companies Law regulations that exempts us from appointing external directors and from complying with the Companies Law requirements related to the composition of the audit committee and compensation committee of our board of directors. Our eligibility for that exemption is conditioned upon: (i) the continued listing of our ordinary shares on the Nasdaq Stock Market (or one of a few select other non-Israeli stock exchanges); (ii) there not being a controlling shareholder (generally understood to be a 25% or greater shareholder) of our company under the Companies Law; and (iii) our compliance with the Nasdaq Listing Rules requirements as to the composition of (a) our board of directors-which requires that we maintain a majority of independent directors (as defined under the Nasdaq Listing Rules) on our board of directors and (b) the audit and compensation committees of our board of directors (which require that such committees consist solely of independent directors (at least three and two members, respectively), as described under the Nasdaq Listing Rules). At the time that it determined to exempt our company from the external director requirement, our board affirmatively determined that we meet the conditions for exemption from the external director requirement, including that a majority of the members of our board, along with each of the members of the audit and compensation committees of the board, are independent under the Nasdaq Listing Rules.

As a result of our election to be exempt from the external director requirement under the Companies Law, each of our directors is elected annually, at our annual general meeting of shareholders. The vote required for the election of each director is a majority of the voting power represented at the meeting and voting on the election proposal. Following our 2023 annual general meeting of shareholders that took place in August 2023, as well as an appointment and resignation of board members in November 2023, the current members of our board consist of the Chairman— Dov Ofer, S. Scott Crump, Aris Kekedjian, John J. McEleney (Chairman of the Compensation Committee), David Reis, Michael Schoellhorn, Yair Seroussi (Chairman of the Audit Committee) and Adina Shorr. For more information, please see "Election of Directors" in Item 10.B ("Memorandum and Articles of Association") below.

Our board of directors may appoint directors to fill vacancies on the board, for a term of office equal to the remaining period of the term of office of the director(s) whose office(s) have been vacated.

100

In accordance with the exemption available to foreign private issuers under the Nasdaq Listing Rules, we do not follow the requirements of the Nasdaq rules with regard to the process of nominating directors. Instead, we follow Israeli law and practice, in accordance with which our board of directors (based on the recommendation of the executive committee thereof) is authorized to recommend to our shareholders director nominees for election. Under the Companies Law and our amended articles, nominations for directors may also be made by any shareholder holding at least one percent (1%) of our outstanding voting power. However, any such shareholder may make such a nomination only if a written notice of such shareholder's intent to make such nomination (together with certain documentation required under the Companies Law) has been delivered to our registered Israeli office within seven days after we publish notice of our upcoming annual general meeting (or within 14 days after we publish a preliminary notification of an upcoming annual general meeting).

In addition to its role in making director nominations, under the Companies Law, our board of directors must determine the minimum number of directors who are required to have accounting and financial expertise. Under applicable regulations, a director with accounting and financial expertise is a director who, by reason of his or her education, professional experience and skill, has a high level of proficiency in and understanding of business accounting matters and financial statements. See "—External Directors" in this Item 6.C below. He or she must be able to thoroughly comprehend the financial statements of the company and initiate debate regarding the manner in which financial information is presented. In determining the number of directors required to have such expertise, our board of directors must consider, among other things, the type and size of our company and the scope and complexity of its operations. Our board of directors has determined that our company requires one director with such expertise.

### External Directors

Under the Companies Law, the boards of directors of companies whose shares are publicly traded, including companies with shares traded in the United States, are generally required to include at least two members who qualify as external directors.

Our election to exempt our company from compliance with the external director requirement can be reversed at any time by our board of directors, in which case we would need to hold a shareholder meeting to once again appoint external directors, whose election would be for a three-year term. The election of each external director would require a majority vote of the shares present and voting at a shareholders meeting, provided that either:

- the majority voted in favor of election includes a majority of the shares held by non-controlling shareholders who do not have a personal interest in the election of the external director (other than a personal interest not deriving from a relationship with a controlling shareholder) that are voted at the meeting, excluding abstentions, which we refer to as a disinterested majority; or

- the total number of shares held by non-controlling, disinterested shareholders (as described in the previous bullet-point) voted against the election of the director does not exceed two percent (2%) of the aggregate voting rights in the company.

The term "controlling shareholder" is defined in the Companies Law as a shareholder with the ability to direct the activities of the company, other than by virtue of being an office holder. A shareholder is presumed to be a controlling shareholder if the shareholder holds 50% or more of the voting rights in a company or has the right to appoint the majority of the directors of the company or its general manager (i.e., its CEO).

For further information concerning the Companies Law provisions related to external directors, please see "Item 6. Directors, Senior Management and Employees-C. Board Practices-Board of Directors-External Directors" in our annual report on Form 20-F for the year ended December 31, 2015, which we filed with the SEC on March 21, 2016.

***Board Committees***

*Audit Committee*

Under the Companies Law, the board of directors of a public company must appoint an audit committee. The audit committee must consist of at least three directors. To the extent a company is required to appoint external directors, this committee must include all of the external directors, one of whom must serve as chairman of the committee. There are additional requirements as to the composition of the audit committee under the Companies Law. However, when we elected to exempt our company from the external director requirement, we concurrently elected to exempt our company from all of such requirements (which exemption is conditioned on our fulfillment of all Nasdaq Listing Requirements related to the composition of the audit committee).

The members of our audit committee consist of Aris Kekedjian, John McEleney and Yair Seroussi. Mr. Seroussi serves as chairman of the committee. Our board of directors has determined that each of Messrs. Kekedjian, McEleney and Seroussi meets the independence requirements set forth in the Listing Rules of the Nasdaq Stock Market and in Rule 10A-3 under the Exchange Act.

Our board of directors has determined that Mr. Seroussi qualifies as an audit committee financial expert, as defined under Item 16A of the SEC's Form 20-F, and has the requisite financial sophistication set forth in the Nasdaq rules and regulations.

Our board of directors has adopted an audit committee charter that sets forth the responsibilities of the audit committee consistent with the rules of the SEC and the Listing Rules of the Nasdaq Stock Market, as well as the requirements for such committee under the Companies Law, including the following responsibilities:

- oversight of our independent registered public accounting firm and recommending the engagement, compensation or termination of engagement of our independent registered public accounting firm to the board of directors in accordance with Israeli law;

- recommending the engagement or termination of the person filling the office of our internal auditor; and

- recommending the terms of audit and non-audit services provided by the independent registered public accounting firm for pre-approval by our board of directors.

Our audit committee provides assistance to our board of directors in fulfilling its legal and fiduciary obligations in matters involving our accounting, auditing, financial reporting, internal control and legal compliance functions by pre-approving the services performed by our independent accountants and reviewing their reports regarding our accounting practices and systems of internal control over financial reporting. Our audit committee also oversees the audit efforts of our independent accountants and takes those actions that it deems necessary to satisfy itself that the accountants are independent of management.

102

Under the Companies Law, our audit committee is responsible for (i) determining whether there are deficiencies in the business management practices of our company, including in consultation with our internal auditor or the independent auditor, and making recommendations to the board of directors to improve such practices, (ii) determining whether to approve certain related party transactions (including transactions in which an office holder has a personal interest and whether such transaction is extraordinary) (see "-Approval of related party transactions under Israeli Law" below in this Item 6.C), (iii) determining standards and policies for determining whether a transaction with a controlling shareholder or a transaction in which a controlling shareholder has a personal interest is deemed insignificant or not and the approval requirements (including, potentially, the approval of the audit committee) for transactions that are not insignificant including the types of transactions that are not insignificant, (iv) where the board of directors approves the working plan of the internal auditor, to examine such working plan before its submission to the board and propose amendments thereto, (v) examining our internal controls and internal auditor's performance, including whether the internal auditor has sufficient resources and tools to dispose of its responsibilities, (vi) examining the scope of our auditor's work and compensation and submitting a recommendation with respect thereto to our board of directors or shareholders, depending on which of them is considering the appointment of our auditor and (vii) establishing procedures for the handling of employees' complaints as to the management of our business and the protection to be provided to such employees. Our audit committee may not approve an action or a related party transaction, or take any other action required under the Companies Law, unless at the time of approval a majority of the committee's members are present, which majority consists of unaffiliated directors including at least one external director.

*Compensation Committee and Compensation Policy*

Following the adoption of a December 2012 amendment to the Companies Law, we appointed a compensation committee and established a policy regarding the terms of engagement of office holders, or a compensation policy. Such compensation policy was set by our board, after considering the recommendations of our newly-appointed compensation committee, and was approved by our shareholders in September 2013. In February 2015 and again in September 2018 and November 2021, following approval by our compensation committee and board, our shareholders approved amended and restated versions of our compensation policy at an extraordinary general meeting of shareholders and at our 2018 and 2021 annual general meetings of shareholders (respectively).

The compensation policy serves as the basis for decisions concerning the financial terms of employment or engagement of our office holders, including exculpation, insurance, indemnification or any monetary payment or obligation of payment in respect of employment or engagement. The compensation policy also relates to certain factors, including advancement of our objectives, our business and our long-term strategy, and creation of appropriate incentives for executives. It also considers, among other things, our risk management, size and the nature of our operations. The compensation policy furthermore considers the following additional factors:

- the knowledge, skills, expertise and accomplishments of the relevant director or executive;

- the director's or executive's roles and responsibilities and prior compensation agreements with him or her;

- the relationship between the terms offered and the average compensation of the other employees of our company, including those (if any) employed through manpower companies;

- the impact of disparities in salary upon work relationships in our company;

- the possibility of reducing variable compensation at the discretion of the board of directors; and the possibility of setting a limit on the exercise value of non-cash variable compensation; and

- as to severance compensation, the period of service of the director or executive, the terms of his or her compensation during such service period, our company's performance during that period of service, the person's contribution towards our company's achievement of its goals and the maximization of its profits, and the circumstances under which the person is leaving our company.

The compensation policy also includes the following principles:

•   the link between variable compensation and long-term performance and measurable criteria;

•   the relationship between variable and fixed compensation, and the ceiling for the value of variable compensation;

•   the conditions under which a director or executive would be required to repay compensation paid to him or her if it was later shown that the data upon which such compensation was based was inaccurate and was required to be restated in our financial statements; and

•   the minimum holding or vesting period for variable, equity-based compensation.

The compensation policy must also consider appropriate incentives from a long-term perspective and maximum limits for severance compensation.

Under the December 2012 amendment to the Companies Law, our compensation committee is responsible for recommending the compensation policy to our board of directors for its approval (and subsequent approval by our shareholders) and is charged with duties related to the compensation policy and to the compensation of our office holders as well as functions related to approval of the terms of engagement of office holders, including:

•   recommending whether our compensation policy should continue in effect, if the then-current policy has a term of greater than three (3) years (approval of the continuation of an existing compensation policy for a company such as ours must in any case occur every three years);

•   recommending to our board periodic updates to the compensation policy;

•   assessing implementation of the compensation policy; and

•   determining whether the compensation terms of the chief executive officer of our company need not be brought to approval of the shareholders (under special circumstances).

As to the composition of the compensation committee, under the Companies Law, if a company is required to appoint external directors, the committee must consist of at least three (3) members, including all of the external directors, one of whom must serve as chairman of the committee. There are additional requirements as to the composition of the audit committee under the Companies Law. However, when we elected to exempt our company from the external director requirement, we concurrently elected to exempt our company from all of such requirements (including the three-member minimum). Our exemption under the Companies Law is conditioned on our fulfillment of all Nasdaq listing requirements related to the composition of the compensation committee.

The compensation committee is subject to the same Companies Law restrictions as the audit committee as to who may not be present during committee deliberations (as described under "-Approval of Related Party Transactions Under Israeli Law—Fiduciary Duties of Directors and Executive Officers—Disclosure of Personal Interests of an Office Holder" below).

The Nasdaq Listing Rules also require that the compensation of the chief executive officer and all other executive officers of our company be determined, or be recommended to the board for determination, by a compensation committee consisting solely of independent directors (subject to a minimum of two committee members).

We initially appointed our compensation committee in mid-2013. The committee currently consists of John McEleney, David Reis and Adina Shorr. Mr. McEleney serves as chairman of the committee. Our board of directors has determined that each of Mr. McEleney, Mr. Reis and Ms. Shorr meets the independence requirements set forth in the Listing Rules of the Nasdaq Stock Market and in Rule 10C-1 under the Exchange Act.

Our board of directors has adopted a compensation committee charter that sets forth the responsibilities of the compensation committee consistent with the rules of the SEC and the Listing Rules of the Nasdaq Stock Market, as well as the requirements for such committee under the Companies Law, including the following responsibilities:

104

- review and approval of the compensation of our Chief Executive Officer and each of our other executive officers;

- approval of transactions involving office holders' compensation (including non-employee director compensation) pursuant to Sections 272, 273, and 275 of the Companies Law;

- review, revision and approval of our compensation policy, and review, approval and oversight of the implementation of our compensation policies, incentive-based compensation plans and equity-based compensation plans; and

- review and recommendation, to the entire board of directors, of our management succession planning.

*Nominating Committee*

Our board of directors does not currently have a nominating committee, as director nominations are made in accordance with the terms of our articles, as described in "- Board of Directors" above. We rely upon the exemption available to foreign private issuers under the Listing Rules of the Nasdaq Stock Market from the Nasdaq listing requirements related to independent director oversight of nominations to our board of directors and the adoption of a formal written charter or board resolution addressing the nominations process. Also see Item 16.G "Corporate Governance" below.

*Internal Auditor*

Under the Companies Law, the board of directors of an Israeli public company must appoint an internal auditor recommended by the audit committee and nominated by the board of directors. An internal auditor may not be:

- a person (or a relative of a person) who holds more than 5% of the company's outstanding shares or voting rights;

- a person (or a relative of a person) who has the power to appoint a director or the general manager of the company;

- an office holder (including a director) of the company (or a relative thereof); or

- a member of the company's independent accounting firm, or anyone on his or her behalf.

The role of the internal auditor is to examine, among other things, our compliance with applicable law and orderly business procedures. Hila Barr-Hoisman, of Deloitte Israel & Co., has served as our internal auditor since May 2023.

**Approval of Related Party Transactions Under Israeli Law**

***Fiduciary Duties of Directors and Executive Officers***

The Companies Law codifies the fiduciary duties that office holders owe to a company. Each person listed in the table under Item 6.A "Directors and Senior Management" is an office holder under the Companies Law.

An office holder's fiduciary duties consist of a duty of care and a duty of loyalty. The duty of care requires an office holder to act with the level of care with which a reasonable office holder in the same position would have acted under the same circumstances. The duty of loyalty requires that an office holder act in good faith and in the best interests of the company. The duty of care includes a duty to use reasonable means to obtain:

- information on the advisability of a given action brought for his or her approval or performed by virtue of his or her position; and

- all other important information pertaining to these actions.

The duty of loyalty requires an office holder to act in good faith and for the benefit of the company, and includes a duty to:

- refrain from any conflict of interest between the performance of his or her duties to the company and his or her other duties or personal affairs;

- refrain from any activity that is competitive with the company;

- refrain from exploiting any business opportunity of the company to receive a personal gain for himself or herself or others; and

- disclose to the company any information or documents relating to the company's affairs which the office holder received as a result of his or her position as an office holder.

*Disclosure of Personal Interests of an Office Holder*

The Companies Law requires that an office holder promptly disclose to the board of directors any personal interest that he or she may have and all related material information known to him or her and any documents concerning any existing or proposed transaction with the company. An interested office holder's disclosure must be made promptly and in any event no later than the first meeting of the board of directors at which the transaction is considered. A "personal interest" includes an interest of any person in an act or transaction of a company, including a personal interest of one's relative or of a corporate body in which such person or a relative of such person is a 5% or greater shareholder, director or general manager or in which he or she has the right to appoint at least one director or the general manager, but excluding a personal interest stemming from one's ownership of shares in the company. A personal interest furthermore includes the personal interest of a person for whom the office holder holds a voting proxy or the interest of the office holder with respect to his or her vote on behalf of the shareholder for whom he or she holds a proxy even if such shareholder itself has no personal interest in the approval of the matter. An office holder is not, however, obliged to disclose a personal interest if it derives solely from the personal interest of his or her relative in a transaction that is not considered an extraordinary transaction. Under the Companies Law, an "extraordinary transaction" is defined as any of the following:

- a transaction other than in the ordinary course of business;

- a transaction that is not on market terms; or

- a transaction that may have a material impact on a company's profitability, assets or liabilities.

If it is determined that an office holder has a personal interest in a transaction, approval by the board of directors is required for the transaction, unless the company's articles of association provide for a different method of approval. Further, so long as an office holder has disclosed his or her personal interest in a transaction, the board of directors may approve an action by the office holder that would otherwise be deemed a breach of duty of loyalty. However, a company may not approve a transaction or action that is adverse to the company's interest or that is not performed by the office holder in good faith. Approval first by the company's audit committee and subsequently by the board of directors is required for an extraordinary transaction with an office holder. Compensation of, or an undertaking to indemnify or insure, an office holder, requires approval by the compensation committee, the board of directors and, in certain cases (for directors, the chief executive officer, and any executive officer whose compensation terms do not conform to the then-existing compensation policy) the shareholders, in that order. Compensation of an individual office holder, including the chief executive officer (but excluding a director), that does not conform to the company's compensation policy may be adopted under special circumstances despite failure to obtain shareholder approval if, following the relevant shareholder vote, the compensation committee followed by the board once again approves the compensation, based on renewed and specific analysis of relevant factors.

106

Generally, a person who has a personal interest in a matter which is considered at a meeting of the board of directors, the audit committee or compensation committee may not be present at such a meeting or vote on that matter unless a majority of the board, audit committee or compensation committee (as appropriate) has a personal interest in the matter, or unless the chairman of the board, audit committee or compensation committee (as appropriate) determines that he or she should be present in order to present the transaction that is subject to approval. If a majority of the members of the board, audit committee or compensation committee has a personal interest in the approval of a transaction, then all directors may participate in discussions of the board of directors, audit committee or compensation committee on such transaction and the voting on approval thereof, but shareholder approval is also required for such transaction.

*Disclosure of Personal Interests of Controlling Shareholders*

Pursuant to Israeli law, the disclosure requirements regarding personal interests that apply to directors and executive officers also apply to a controlling shareholder of a public company. In the context of a transaction involving a shareholder of the company, a controlling shareholder also includes any shareholder who holds 25% or more of the voting rights if no other shareholder holds more than 50% of the voting rights. Two or more shareholders with a personal interest in the approval of the same transaction are deemed to be a single shareholder and may be deemed a controlling shareholder for the purpose of approving such transaction. Extraordinary transactions with a controlling shareholder or in which a controlling shareholder has a personal interest, or a transaction with a controlling shareholder or his or her relative, directly or indirectly, require the approval of the audit committee, the board of directors and the shareholders of the company, in that order. In addition, the shareholder approval must fulfill one of the following requirements:

- a disinterested majority; or

- the votes of shareholders who have no personal interest in the transaction and who are present and voting, in person, by proxy or by voting deed at the meeting, and who vote against the transaction may not represent more than two percent (2%) of the voting rights of the company.

To the extent that any such transaction with a controlling shareholder is for a period extending beyond three years, approval is required once every three years, unless the audit committee determines that the duration of the transaction is reasonable given the circumstances related thereto.

The engagement of a controlling shareholder as an office holder or employee requires the same approvals as are described immediately above, except that the approval of the compensation committee, rather than the audit committee, is required.

*Shareholder Duties*

Pursuant to the Companies Law, a shareholder has a duty to act in good faith and in a customary manner toward the company and other shareholders and to refrain from abusing his or her power in the company, including, among other things, in voting at the general meeting of shareholders and at class shareholder meetings with respect to the following matters:

- an amendment to the company's articles of association;

- an increase of the company's authorized share capital;

- a merger; or

- the approval of related party transactions and acts of office holders that require shareholder approval.

- In addition, a shareholder also has a general duty to refrain from discriminating against other shareholders.

In addition, certain shareholders have a duty of fairness toward the company. These shareholders include any controlling shareholder, any shareholder who knows that it has the power to determine the outcome of a shareholder vote or a shareholder class vote and any shareholder who has the power to appoint or to prevent the appointment of an office holder of the company or other power towards the company. The Companies Law does not define the substance of this duty of fairness, except to state that the remedies generally available upon a breach of contract will also apply in the event of a breach of the duty to act with fairness.

**Exculpation, Insurance and Indemnification of Directors and Officers**

Under the Companies Law, a company may not exculpate an office holder from liability for a breach of the duty of loyalty. An Israeli company may exculpate an office holder in advance from liability to the company, in whole or in part, for damages caused to the company as a result of a breach of duty of care but only if a provision authorizing such exculpation is inserted in its articles of association. Our amended articles include such a provision. The company may not exculpate in advance a director from liability arising out of a prohibited dividend or distribution to shareholders.

Under the Companies Law, a company may indemnify an office holder in respect of the following liabilities and expenses incurred for acts performed by him or her as an office holder, either in advance of an event or following an event, provided its articles of association include a provision authorizing such indemnification:

- financial liability incurred by or imposed on him or her in favor of another person pursuant to a judgment, including a settlement or arbitrator's award approved by a court. However, if an undertaking to indemnify an office holder with respect to such liability is provided in advance, then such an undertaking must be limited to events which, in the opinion of the board of directors, can be foreseen based on the company's activities when the undertaking to indemnify is given, and to an amount or according to criteria determined by the board of directors as reasonable under the circumstances, and such undertaking shall detail the above mentioned foreseen events and amount or criteria;

- reasonable litigation expenses, including attorneys' fees, incurred by the office holder as a result of an investigation or proceeding instituted against him or her by an authority authorized to conduct such investigation or proceeding, provided that (i) no indictment was filed against such office holder as a result of such investigation or proceeding; and (ii) no financial liability was imposed upon him or her as a substitute for the criminal proceeding as a result of such investigation or proceeding or, if such financial liability was imposed, it was imposed with respect to an offense that does not require proof of criminal intent; and

- reasonable litigation expenses, including attorneys' fees, incurred by the office holder or imposed by a court in proceedings instituted against him or her by the company, on its behalf, or by a third party, or in connection with criminal proceedings in which the office holder was acquitted, or as a result of a conviction for an offense that does not require proof of criminal intent.

Under the Companies Law, a company may insure an office holder against the following liabilities incurred for acts performed by him or her as an office holder if and to the extent provided in the company's articles of association:

- a breach of the duty of loyalty to the company, provided that the office holder acted in good faith and had a reasonable basis to believe that the act would not harm the company;

- a breach of duty of care to the company or to a third party, to the extent such a breach arises out of the negligent conduct of the office holder; and

- a financial liability imposed on the office holder in favor of a third party.

Under the Companies Law, a company may not indemnify, exculpate or insure an office holder against any of the following:

108

- a breach of fiduciary duty, except for indemnification and insurance for a breach of the duty of loyalty to the company to the extent that the office holder acted in good faith and had a reasonable basis to believe that the act would not prejudice the company;

- a breach of duty of care committed intentionally or recklessly, excluding a breach arising out of the negligent conduct of the office holder;

- an act or omission committed with intent to derive illegal personal benefit; or

- a fine or forfeit levied against the office holder.

Under the Companies Law, exculpation, indemnification and insurance of office holders must be approved by our compensation committee and our board of directors and, with respect to directors or controlling shareholders, their relatives and third parties in which such controlling shareholders have a personal interest, also by the shareholders. See "-Approval of Related Party Transactions Under Israeli Law—Fiduciary Duties of Directors and Executive Officers" above in this Item 6.C.

Our amended articles permit us to exculpate, indemnify and insure our office holders to the fullest extent permitted or to be permitted by the Companies Law.

We have obtained directors and officers liability, or D&O, insurance for the benefit of our office holders and intend to continue to maintain such coverage and pay all premiums thereunder to the fullest extent permitted by the Companies Law. Under our amended compensation policy (as approved by our shareholders at our 2021 annual general meeting), our D&O insurance is governed by the following guidelines:

i.   an aggregate maximum D&O insurance coverage level of $160 million comprised of up to $100 million of ABC (general) D&O insurance coverage and up to $60 million of Side A coverage, and

ii.  the payment of premiums and deductibles under each of the Company's D&O insurance policies (including D&O run-off and public offering insurance) that are consistent with market terms, and that are not material to our company.

. In addition, we have entered into agreements with each of our office holders undertaking to indemnify them to the fullest extent permitted by Israeli law.

**Directors' Service Contracts**

We are not presently party to any service contracts with any of our directors that provide for benefits upon termination of employment or other service.

## D.  Employees

The number of our full-time equivalent employees, and the distribution of employees (i) geographically and (ii) within the divisions of our company, in each case as of December 31, 2023, 2022 and 2021 are set forth in the two tables below.

109

| Region | 2023 | 2022 | 2021 |
|---|---|---|---|
| Americas* | 926 | 1,098 | 1,148 |
| Israel | 537 | 531 | 477 |
| Europe | 371 | 302 | 269 |
| Asia Pacific | 146 | 131 | 145 |
| **Total** | 1,980 1,980 | 2,062 | 2,039 |

| Division | Number of full-time equivalent employees | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Operations and support | 607 | 620 | 689 |
| Research and development | 393 | 360 | 358 |
| Customer service | 281 | 241 | 264 |
| Sales and marketing | 353 | 495 | 353 |
| General and administrative | 346 | 346 | 375 |
| **Total** | 1,980 | 2,062 | 2,039 |

* Includes employees in Latin America.

During the years covered by the above tables, we did not employ a significant number of temporary employees.

The size of our workforce decreased slightly in 2023 compared to 2022. The main reason for the decrease was the divestiture of part of our SDM division. The number of our operations and support employees decreased as a result of that divestiture, whereas our research and development, and customer service staff increased slightly, mainly due to the acquisition of two companies. Geographically, the distribution of our employees in 2023 continued the trend of the previous two years in partly shifting from the Americas (due to the divestiture of part of SDM) towards Israel and Europe, which increased mainly due to our acquisitions and due to our hiring in the United Kingdom, Italy, and towards Asia Pacific, mainly due to our acquisition of Covestro and our hiring of software personnel in India.

The size of our workforce did not change substantially in 2022 compared to 2021 The number of our employees in Israel and Europe grew slightly, whereas the number of employees in the Americas region (and in the United States in particular) decreased, mainly due to our divestiture of MakerBot (which was based in Brooklyn, New York).

The changes in 2022 as to the divisions in which our employees worked primarily reflect the revised categorization of some of our employees' positions following certain organizational restructurings, which we effected based on the recommendations of an outside consultant.

While our Israeli employees, and the vast majority of all of our employees globally are not, party to a collective bargaining agreement, certain provisions of the collective bargaining agreements between the Histadrut (General Federation of Labor in Israel) and the Coordination Bureau of Economic Organizations (including the Industrialists' Associations) are applicable to our employees in Israel by order of the Israel Ministry of Labor. These provisions primarily concern the length of the workday, commuting expenses, convalescence pay, and pension fund benefits for all employees. We generally provide our employees with benefits and working conditions beyond the required minimums.

We have never experienced any employment-related work stoppages. We believe that our relationship with our employees is good.

The employees of our subsidiaries are subject to local labor laws and regulations that vary from country to country.

**E.    Share Ownership.**

The following table lists, as of February 14, 2024, the number of our ordinary shares owned, and stock options and restricted share units (RSUs) held, by each of the directors and members of our senior management:

| Name | Shares of Stratasys[1] | | Stratasys stock options and RSUs[2] | | | |
| | Number of shares beneficially owned[4] | Percent of outstanding shares beneficially owned[5] | Number held[3] | | Exercise price per Share (for options) | Expiration Date (for options) |
| | | | Already vested or vesting within 60 days | Not vesting within 60 days | | |
|---|---|---|---|---|---|---|
| Dov Ofer<br>Chairman of the Board | 127,968[6] | * | 10,000 | — | $23.41 | July 18, 2027 |
| | | | 10,000 | — | $21.82 | September 13, 2028 |
| | | | 37,500 | — | $22.28 | April 10, 2028 |
| | | | 10,000 | — | $20.53 | December 31, 2029 |
| | | | 10,000 | — | $19.61 | November 30, 2030 |
| | | | 4,745 | — | $25.03 | November 23, 2031 |
| | | | 11,326 | — | $6.18 | December 26, 2032 |
| | | | 4,553 | 2,276 | $10.25 | August 8, 2033 |
| | | | 3,208 | 1,604 | $— | August 8, 2033 |
| S. Scott Crump<br>Director | 500,633[7] | * | 100,000 | — | $19.96 | April 6, 2027 |
| | | | 4,745 | — | $25.03 | November 23, 2031 |
| | | | 7,370 | — | $9.50 | September 15, 2032 |
| | | | 2277 | 4552 | $10.25 | August 8, 2033 |
| | | | 1,604 | 3,208 | $— | August 8, 2033 |
| John J. McEleney<br>Director | 73,660[8] | * | 10,000 | — | $21.44 | June 4, 2026 |
| | | | 10,000 | — | $23.41 | July 18, 2027 |
| | | | 10,000 | — | $19.59 | September 13, 2028 |
| | | | 10,000 | — | $20.53 | December 31, 2029 |
| | | | 10,000 | — | $19.61 | November 30, 2030 |
| | | | 4,745 | — | $25.03 | November 23, 2031 |
| | | | 7,370 | — | $9.50 | September 15, 2032 |
| | | | 2,277 | 4,552 | $10.25 | August 8, 2033 |
| | | | 1,604 | 3,208 | $— | August 8, 2033 |
| Aris Kekedjian<br>Director | 6,085 | * | 4,061 | 8,118 | $5.75 | November 16, 2033 |
| | | | 2,024 | 4,049 | $— | November 16, 2033 |
| David Reis<br>Director | 98,938[9] | * | 37,500 | — | $22.28 | October 4, 2028 |
| | | | 10,000 | — | $19.61 | November 30, 2030 |
| | | | 4,745 | — | $25.03 | November 23, 2031 |
| | | | 11,326 | — | $6.18 | December 26, 2032 |
| | | | 5,122 | 1,707 | $10.25 | August 8, 2033 |
| | | | 3,609 | 3,609 | $— | August 8, 2033 |
| Michael Schoellhorn<br>Director | 33,660[10] | * | 10,000 | — | $19.61 | November 30, 2030 |
| | | | 4,745 | — | $25.03 | November 23, 2031 |
| | | | 7,370 | — | $9.50 | September 15, 2032 |
| | | | 2,277 | 4,552 | $10.25 | August 8, 2033 |
| | | | 1604 | 3208 | $— | August 8, 2033 |
| Yair Seroussi<br>Director | 68,554[11] | * | 10,000 | — | $23.41 | July 18, 2027 |
| | | | 10,000 | — | $21.82 | September 13, 2028 |
| | | | 10,000 | — | $20.53 | December 31, 2029 |
| | | | 10,000 | — | $19.61 | November 30, 2030 |
| | | | 4,745 | — | $25.03 | November 23, 2031 |
| | | | 11,326 | — | $6.18 | December 26, 2032 |
| | | | 1,139 | 5,690 | $10.25 | August 8, 2033 |
| | | | 3,208 | 4,010 | $— | August 8, 2033 |
| Adina Shorr<br>Director | 94,468[12] | * | 10,000 | — | $22.47 | October 13, 2028 |
| | | | 10,000 | — | $20.53 | December 31, 2029 |
| | | | 10,000 | — | $19.61 | November 30, 2030 |
| | | | 4,745 | — | $25.03 | November 23, 2031 |
| | | | 11,326 | — | $6.18 | December 26, 2032 |
| | | | 2807 | 2005 | $— | August 8, 2033 |
| | | | 3,984 | 2,845 | $10.25 | August 8, 2033 |
| Yoav Zeif<br>Chief Executive Officer | 119,279[13] | * | — | 150,000 | $16.41 | February 18, 2030 |
| | | | — | 150,000 | $16.41 | February 18, 2030 |
| | | | 53,541 | 20,988 | $— | 0 |
| | | | 31,478 | 4,707 | $— | 0 |
| | | | | 16,632 | $— | February 22, 2032 |
| | | | 14,553 | 18,711 | $— | February 22, 2032 |
| | | | | 18,333 | | March 1, 2033 |
| | | | 9,167 | 27,500 | | March 1, 2033 |
| | | | | 18,333 | | December 21, 2033 |

* Constitutes less than 1% of our outstanding shares.

Eitan Zamir                                    *14                    *          December 21, 2033
*Chief Financial Officer

**Stock Option and Share Incentive Plans**

On September 16, 2022, our existing 2012 Omnibus Equity Incentive Plan (the "2012 Plan"), which became effective at the effective time of the Stratasys, Inc.- Objet Ltd. merger in December 2012, expired. In order to enable our Company to continue to provide share-based long-term incentive compensation after the expiration of the 2012 Plan, our compensation committee and our Board each approved our 2022 Share Incentive Plan (the "2022 Plan"), which our shareholders approved at our annual general meeting held on September 15, 2022. Outstanding awards under the 2012 Plan will continue to be subject to the terms of the 2012 Plan, notwithstanding the expiration of that plan.

The following sets forth certain information with respect to our current stock option and share incentive plans. The following descriptions are only a summary of each plan and each is qualified in its entirety by reference to the full text of the respective plans, which serve as exhibits to this annual report.

Upon the expiration of each of our stock option and share incentive plans, no further grants may be made thereunder, although any existing awards will continue in full force in accordance with the terms under which they were granted.

*2012 Omnibus Equity Incentive Plan*

For a description of our 2012 Plan, please see "Item 6. Directors, Senior Management & Employees—E. Share Ownership— Stock Option and Share Incentive Plans— 2012 Omnibus Equity Incentive Plan" in our annual report on Form 20-F for the year ended December 31, 2021, which we filed with the SEC on February 24, 2022.

**2022 Share Inactive Plan**

Under the 2022 Plan, we may grant equity-based incentive awards to attract, motivate and retain the talent for which we compete. Following the adoption of the 2022 Plan, we will no longer grant any awards under the 2012 Plan, though previously granted awards under the 2012 Plan will remain outstanding and will still be governed by the terms of the 2012 Plan.

**Authorized Shares**. Upon its effectiveness, the 2022 Plan had a total of 1,574,000 ordinary shares reserved and initially available for issuance, consisting of 1,296,494 newly authorized shares and 277,506 shares that will be rolled over from the 2012 Plan, which were already approved for issuance by our shareholders at previous annual general meetings (which shares will be unused under the 2012 Plan as of its expiration on September 16, 2022). Out of that initial pool of shares, the number of ordinary shares that may be issued upon the exercise of incentive stock options (within the meaning of Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the **"Code"**)) (**"Incentive Stock Options"**) is capped at 1,574,000.

In addition to the foregoing 1,574,000 ordinary shares initially available under the 2022 Plan, up to 5,432,789 ordinary shares that underlie outstanding awards under the 2012 Plan (and which were also already approved for issuance under the 2012 Plan by our shareholders at previous annual general meetings), may, (i) if the related award expires or is canceled, terminated, forfeited, repurchased or settled in cash in lieu of issuance of shares, for any reason, without having been exercised, or (ii) if permitted by us, if are tendered to pay (x) the exercise price of an award or (y) withholding tax obligations, will, in any such case, become available for issuance under the 2022 Plan.

Similarly, ordinary shares from among the initial 1,574,000 shares reserved under the 2022 Plan that become subject to an award and are ultimately not issued (for any of the foregoing reasons) will become available once again under the 2022 Plan.

In keeping with the recommendation of institutional shareholder and proxy advisory groups, **the 2022 Plan does not contain an "evergreen" provision that provides for an automatic annual increase in the number of ordinary shares available under the plan.** Instead, we will request shareholder approval for any increase in the pool of shares available under the 2022 Plan.

*Administration.* A duly authorized committee of our Board (which, based on prior authorization by our Board, is our compensation committee), or, in the absence of any such committee, the Board itself, will administer the 2022 Plan. Under the 2022 Plan, the administrator has the authority, subject to applicable law, to interpret the terms of the 2022 Plan and any award agreements or awards granted thereunder, designate recipients of awards, determine and amend the terms of awards and take all actions and make all other determinations necessary for the administration of the 2022 Plan.

*Eligibility*. The 2022 Plan provides for granting awards under various tax regimes, including, without limitation, in compliance with Section 102 of the Israeli Tax Ordinance (the "Ordinance") and Section 3(i) of the Ordinance, and, for awards granted to our United States employees or service providers, including those who are deemed to be residents of the United States for tax purposes, Section 422 of the Code and Section 409A of the Code.

*Awards.* The 2022 Plan provides for the grant of share options (including Incentive Stock Options and nonqualified stock options), ordinary shares, restricted shares, restricted share units and other share-based awards to employees, directors, officers, consultants, advisors and any other persons or entities who provides services to the company or any parent, subsidiary or affiliate thereof, subject to the terms and conditions of the 2022 Plan. Options granted under the 2022 Plan to our employees who are U.S. residents may qualify as Incentive Stock Options, or may be non-qualified stock options.

*Grant and Exercise.* All awards granted pursuant to the 2022 Plan will be evidenced by an award agreement in a form approved, from time to time, by the administrator in its sole discretion. Unless otherwise determined by the administrator and stated in the award agreement, and subject to the conditions of the 2022 Plan, awards vest and become exercisable under the following schedule: 25% of the shares covered by the award, on the first anniversary of the vesting commencement date determined by the administrator (and in the absence of such determination, the date on which such award was granted), and 6.25% of the shares covered by the award at the end of each subsequent three-month period thereafter over the course of the following three years; provided that the grantee remains continuously as an employee or provides services to the Company throughout such vesting dates. The exercise period of an award will be ten years from the date of grant of the award, unless otherwise determined by the administrator and stated in the award agreement.

*Termination of Employment.* In the event of termination of a grantee's employment or service with the Company or any of its affiliates (including by reason of death, disability or retirement), different rules apply as to the length of time during which all vested and exercisable awards held by such grantee as of the date of termination may be exercised after such date of termination. In the case of termination due to death during employment or service for the Company or any of its affiliates, or within the three month period (or such longer period of time as determined by the Board, in its discretion) after the date of termination, any outstanding awards shall automatically vest (to the extent not yet vested).

Any awards which are unvested as of the date of such termination (other than in the case of death, as described above) or which are vested but not then exercised within the applicable period following such date, will terminate and the shares covered by such awards shall again be available for issuance under the 2022 Plan.

Notwithstanding any of the foregoing, if a grantee's employment or services with us or any of our affiliates is terminated for "cause" (as defined in the 2022 Plan), all outstanding awards held by such grantee (whether vested or unvested) will terminate on the date of such termination and the shares covered by such awards shall again be available for issuance under the 2022 Plan. In the case of termination for cause, any shares issued upon exercise or (if applicable) vesting of awards, shall be deemed to be irrevocably offered for sale to us.

*Adjustments due to Transactions.* The 2022 Plan provides for appropriate adjustments to be made to the plan and to outstanding awards under the plan in the event of a share split, reverse share split, share dividend, distribution, recapitalization, combination, reclassification of our shares, consolidation, reorganization, extraordinary cash dividend or other similar occurrences.

In the event of a sale of all, or substantially all, of our ordinary shares or assets, a merger, consolidation amalgamation or similar transaction, or certain changes in the composition of the board of directors, or liquidation or dissolution, or such other transaction or circumstances that the Board determines to be a relevant transaction, then without the consent of the grantee, the administrator may make any determination as to the treatment of outstanding awards.

*Amendment and Termination.* The Board may suspend, terminate, modify or amend the 2022 Plan at any time; provided that no termination or amendment of the 2022 Plan shall affect any then outstanding award unless expressly provided by the board. Shareholder approval of any amendment to the 2022 Plan will be obtained to the extent necessary to comply with applicable law. The administrator at any time and from time to time may modify or amend any award theretofore granted under the 2022 Plan, including any award agreement, whether retroactively or prospectively.

Limitation on Option/Other Award Repricing. Consistent with our prior undertaking under the 2012 Plan to refrain from repricing options under that plan (which we undertook prior to our 2018 annual general meeting of shareholders), t**he 2022 Plan, as well, generally does not allow us to reprice options that we grant under the plan.** In keeping with the recommendation of institutional shareholder and proxy advisory groups, however, the 2022 Plan does allow us to cancel an existing award and replace it with another award (even with a lower exercise price) if the aggregate value of the new award (as determined under the Black-Scholes methodology or other valuation methodology chosen by the compensation committee) does not exceed that of the award being canceled, subject to the approval of our shareholders. That could be accomplished, for example, through the grant of a substitute award for a lesser number of shares with a lower exercise price. Similarly, the exercise price per share of an existing award may be reduced by the compensation committee by the amount of a dividend that we declare on our ordinary shares while the award is outstanding. That would enable a grantee to benefit from a dividend that we declare and that all of our shareholders receive.

By adopting the 2022 Plan and reserving 1,296,494 newly authorized shares for issuance under it (in addition to shares being carried over from the 2012 Plan, which were previously approved by our shareholders), we believe that we will have the flexibility to continue to provide equity incentives in amounts determined appropriate by the compensation committee, our Board, and our management, for an anticipated period of approximately one year. After that time, we will request shareholder approval for further reservation of shares under the 2022 Plan. We intend to file, soon after the filing of this annual report, a registration statement on Form S-8 to register the issuance of ordinary shares underlying options and RSUs granted or to be granted under the 2022 Plan.

### Employee Share Purchase Plan

Our Employee Share Purchase Plan, or ESPP, was approved by our shareholders at our 2021 annual general meeting of shareholders. The purpose of the ESPP is to enable eligible employees of the Company and its subsidiaries to use payroll deductions to purchase our ordinary shares and thereby acquire an ownership interest in the Company. The ESPP will be comprised of two distinct components: (1) the component intended to qualify for favorable U.S. federal tax treatment under Section 423 of the U.S. Internal Revenue Code of 1986, as amended (the "Section 423 Component"), and (2) the component not intended to be tax qualified under Section 423 of the Internal Revenue Code to facilitate participation for employees who are not eligible to benefit from favorable U.S. federal tax treatment and, to the extent applicable, to provide flexibility to comply with non-U.S. law and other considerations (the "Non Section 423 Component").

The maximum aggregate number of ordinary shares that may be purchased initially under the ESPP will be 5,200,000 shares (the "ESPP Share Pool"), subject to adjustment as provided for in the ESPP. There is furthermore no "evergreen" provision our ESPP.

*Administration.* Unless otherwise determined by the Board, the ESPP will be administered by the compensation committee, which will have the authority to interpret and determine eligibility under the plan, prescribe forms, rules and procedures relating to the plan, and otherwise do all things necessary or appropriate to carry out the purposes of the plan.

*Shares Subject to the ESPP.* As noted above, the ESPP Share Pool initially consists of 5,200,000 ordinary shares, subject to adjustment, as described below. Shares delivered upon exercise of purchase rights under the ESPP may be either shares of authorized but unissued share capital, treasury shares, or ordinary shares acquired in an open-market transaction. In the event of certain changes in our outstanding ordinary shares, including changes by reason of a share dividend, share split, reverse share split, split-up, recapitalization, merger, consolidation, reorganization, or other capital change, the aggregate number and type of shares available for purchase under the ESPP, the number and type of shares granted or purchasable during an offering period, and the purchase price per share under an outstanding purchase right shall be equitably adjusted as determined appropriate by the compensation committee.

If any purchase right granted under the ESPP expires or terminates for any reason without having been exercised in full or ceases for any reason to be exercisable in whole or in part, the unpurchased ordinary shares will again be available for purchase pursuant to offerings under the ESPP.

*Eligibility.* Participation in the Section 423 Component may be limited in the terms of any offering to employees of the Company and any of its designated subsidiaries (a) who customarily work 20 hours or more per week, (b) whose customary employment is for more than five months per calendar year, and (c) who satisfy the procedural enrollment and other requirements set forth in the ESPP. Under the Section 423 Component, designated subsidiaries include any subsidiary (within the meaning of

Section 424(f) of the Internal Revenue Code (sometimes referred to as the "Code") of the Company that has been designated by our Board or the compensation committee as eligible to participate in the plan (and if an entity does not so qualify within the meaning of Section 424(f) of the Code, it shall automatically be deemed to be a designated subsidiary in the Non-Section 423 Component). In addition, with respect to the Non-Section 423 Component, designated subsidiaries may include any corporate or non- corporate entity in which the Company has a direct or indirect equity interest or significant business relationship. Under the Section 423 Component, no employee may be granted a purchase right if, immediately after the purchase right is granted, the employee would own (or, under applicable statutory attribution rules, would be deemed to own) shares possessing 5% or more of the total combined voting power or value of all classes of shares of the Company or any of its subsidiaries. In addition, in order to facilitate participation in the ESPP, the compensation committee may provide for such special terms applicable to participants who are citizens or residents of a non-U.S. jurisdiction, or who are employed by a designated subsidiary outside of the United States, as the compensation committee may consider necessary or appropriate to accommodate differences in local law, tax policy or custom. Further to that allowance, we have filed an application with the Israeli Tax Authority for favorable treatment under Section 102 of the Israeli Tax Ordinance for shares purchased under the ESPP by employees who are Israeli residents. Except as permitted by

Section 423 or the Code, with respect to the Section 423 Component, such special terms may not be more favorable than the terms of rights granted under the Section 423 Component to eligible employees who are residents of the United States.

*General Terms of Participation.*

- *Offering Periods.* The ESPP allows eligible employees to purchase ordinary shares during certain offering periods, which may extend to up to 27 months. Our Board has approved an initial offering period of six months. Each offering period may be comprised of multiple purchase periods, all as may be determined by the compensation committee. The terms and conditions applicable to each offering period shall be set forth in an "Offering Document" adopted by the compensation committee, containing such terms and conditions as the compensation committee deems appropriate. The provisions of separate offerings or offering periods under the ESPP need not be identical.

- *Method of Participation.* Shares will be purchased under the ESPP on the last day of each purchase period, each a purchase date, using accumulated payroll deductions, unless the compensation committee provides otherwise with respect to the employees of a designated subsidiary in a manner consistent with Section 423 of the Code. In order to participate in the ESPP, an eligible employee must complete and submit to the administrator of the ESPP a payroll deduction and participant authorization form in accordance with procedures and prior to the deadlines prescribed by the administrator of the ESPP. Participation will be effective as of the first day of an offering period.

    Participants may elect payroll deductions of up to 15% of the participant's total eligible earnings per payroll period within an offering period. A participant may increase or decrease the percentage of compensation designated in his or her subscription agreement, or may suspend his or her payroll deductions, at any time during an offering period. However, the compensation committee may limit the number of changes a participant may make to his or her payroll deduction elections during each offering period (and in the absence of any specific designation by the compensation committee, a participant shall be allowed to decrease (but not increase) his or her payroll deduction elections one time during each offering period). A participant may withdraw all but not less than all of the payroll deductions credited to his or her account and not yet used to exercise his or her rights under the ESPP at any time by giving written notice to the Company in such form and timing acceptable to the Company. Upon withdrawal, any amount withheld from a participant's compensation will be returned to the participant, without interest, as soon as administratively practicable.

- *Grant and Exercise of Purchase Rights.* On the first day of each offering period, each participant automatically will be granted a right to purchase ordinary shares on the last day of each purchase period, subject to the limitations set forth in the ESPP. On the last day of each purchase period, the payroll deductions accumulated by each participant during such purchase period will be applied automatically to the purchase of ordinary shares at the purchase price in effect for that purchase period. However, no participant may, on any purchase date, purchase more than such number of ordinary shares as the compensation committee may prescribe. In addition, no participant will be granted a purchase right under the Section 423 Component that would permit the participant's right to purchase ordinary shares to accrue at a rate that exceeds $25,000 in fair market value for each calendar year, determined in accordance with Section 423 of the Internal Revenue Code.

- *Purchase Price.* The purchase price per share of our ordinary shares applicable to purchases during each purchase period under the ESPP will be eighty-five percent (85%) (or such greater percentage as the compensation committee may designate) of the lower of (i) the fair market value per share of our ordinary shares on the first day of the offering period or (ii) the fair market value per share of our ordinary shares on the last date of the purchase period.

- *Termination of Purchase Rights.* Upon the termination of a participant's employment with the Company or a designated subsidiary, or in the event the participant otherwise ceases to qualify as an eligible employee, any purchase right then held by the participant will be canceled. Payroll deductions accumulated by the participant during the offering period in which such purchase right terminates will be returned to the participant (or his or her designated beneficiary or legal representative), without interest, as soon as practicable thereafter, and the participant will have no further rights under the ESPP.

- *Shareholder Rights.* No participant will have any shareholder rights with respect to the ordinary shares covered by his or her purchase right until the shares are actually purchased on the participant's behalf. No adjustment will be made for dividends, distributions or other rights for which the record date is prior to the date of such purchase.

- *Transferability.* Purchase rights granted to participants under the ESPP are not assignable or transferable, other than by will, or the applicable laws of descent and distribution, and may be exercised only by the participant during his or her lifetime.

- *Amendment and Termination of the ESPP.* Our Board has the right to amend the ESPP to any extent and in any manner it may deem advisable, provided approval of the Company's shareholders shall be required to amend the ESPP to increase the aggregate number, or change the type, of shares that may be sold pursuant to rights under the ESPP (other than a permitted adjustments with respect to changes in the Company's capitalization) or to change the corporations or classes of corporations whose employees may be granted rights under the ESPP.

    Our Board also has the right at any time to terminate the ESPP. In connection with such a termination or suspension, each participant's accumulated payroll deductions will be returned to the participant without interest, or the offering period may be shortened so that the purchase of shares occurs prior to the termination of the ESPP.

- *Sub-Plans.* The compensation committee may adopt sub-plans applicable to particular designated subsidiaries or locations, which sub-plans may be designed to be outside the scope of Section 423 of the Code. The rules of such sub-plans may take precedence over other provisions of the ESPP, other than with respect to the number of shares available for issuance under the ESPP, but unless otherwise superseded by the terms of such sub-plan, the provisions of the ESPP shall govern the operation of such sub-plan.

- *Effective Date and Term.* The ESPP became effective in November 2021, upon approval by our 2021 annual general meeting of shareholders. No purchase rights will be granted under the ESPP after the earliest to occur of the date on which all shares available for issuance under the ESPP have been issued or the termination of the ESPP by our company.

- *Corporate Transactions.* In the event of certain transactions or events such as a consolidation, merger or similar transaction, a sale or transfer of all or substantially all of the Company's assets, or a dissolution or liquidation of the Company, the compensation committee may, in its discretion, provide that each outstanding purchase right will be assumed or substituted for a right granted by the acquirer or successor corporation or by a parent or subsidiary of such entity, will be cashed out, will be cancelled with accumulated payroll deductions returned to each participant, or that the offering period will end before the date of the proposed sale, merger or similar transaction.

- *New Plan Benefits.* Benefits and purchases of ordinary shares under the ESPP depend on elections made by employees and the fair market value of our ordinary shares on dates in the future. As a result, it is not possible to determine the benefits that will be received by executive officers and other employees in the future under the ESPP. As described above, no employee may purchase shares under the Section 423 Component at a rate that exceeds $25,000 in fair market value in any calendar year.

The following table presents certain share data information for the above-described share incentive and employee share purchase plans as at December 31, 2023:

| Plan | Total Ordinary Shares Reserved for Grant/Purchase | Aggregate Number of Awards Granted/Purchased out of Reserved, Net of Cancellations | Shares Available for Future Grants/Purchases | Aggregate Number of Awards/Shares Outstanding | Weighted Average Exercise Price of Outstanding Options |
|---|---|---|---|---|---|
| 2012 Plan | 10,000,000 | 8,534,204 | 1,465,796 | 2,684,167 | $ 27.62 |
| 2022 Plan | 1,296,494 | 2,244,187 | (947,693) | 2,025,451 | $ 13.46 |
| Employee Share Purchase Plan | 5,200,000 | 812,101 | 4,387,899 | 812,101 | |

### F. Disclosure of a registrant's action to recover erroneously awarded compensation.

Not applicable.

---

[1] All of our shares (including shares held by directors and members of senior management) have identical voting rights.

[2] For a description of our equity incentive plans, please see "Stock Option and Share Incentive Plans" in this Item below. All options and RSUs granted under such plans have been granted without payment of any cash consideration therefor by the grantees thereof.

[3] In accordance with Rule 13d-3 under the Exchange Act, the number of shares and the percentages shown for individual directors and officers include any ordinary shares underlying stock options and RSUs held by any such person that vest within 60 days of February 14, 2024 and that are also reflected in the column titled "Stratasys stock options and RSUs—Number held — Already vested or vesting within 60 days." Further in keeping with such Rule 13d-3, the computation of percentage ownership is based upon 69,750,397 ordinary shares outstanding at February 14, 2024, plus such number of ordinary shares as such person (but not any other person) had the right to receive upon the exercise or settlement of vested stock options or RSUs (as applicable) within 60 days thereof.

[4] Intentionally omitted.

[5] Each stock option is exercisable for one ordinary share, and each RSU represents the right to receive one ordinary share.

[6] Consists of (i) 26,636 ordinary shares that have been issued to Mr. Ofer following the vesting and settlement of RSUs, (ii) 3,208 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2024, as well as (iii) 98,124 ordinary shares issuable to Mr. Ofer upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2024.

[7] Consists of (i) 200,679 ordinary shares held by Mr. Crump,(ii) 176,294 ordinary shares owned of record by Mr. Crump's wife, (iii) 7,664 ordinary shares that have been issued to Mr. Crump following the vesting and settlement of RSUs, (iv) 114,392 ordinary shares issuable to Mr. Crump upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2024, and (v) 1,604 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2024.

[8] Consists of (i) 7,664 ordinary shares that have been issued to Mr. McEleney following the vesting and settlement of RSUs, (ii) 64,392 ordinary shares issuable to Mr. McEleney upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2024, and (iii) 1,604 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2024.

[9] Consists of (i) 26,636 ordinary shares that have been issued to Mr. Reis following the vesting and settlement of RSUs, (ii) 68,693 ordinary shares issuable to Mr. Reis upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2024, and (iii) 3,609 ordinary shares underlying RSUs that have vested and may be settled within 60 days of February 14, 2024.

[10] Consists of (i) 7,664 ordinary shares that have been issued to Mr. Schoellhorn following the vesting and settlement of RSUs, (ii) 24,392 ordinary shares issuable to Mr. Schoellhorn upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2023, and (iii) 1,604 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2024.

[11] Consists of (i) 8,136 ordinary shares that have been issued to Mr. Seroussi following the vesting and settlement of RSUs, and (ii) 57,210 ordinary shares issuable to Mr. Seroussi upon the exercise of options granted to him that have vested or will vest within 60 days of February 14, 2024, and (iii) 3,208 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2024.

[12] Consists of (i) 33,470 ordinary shares held by Ms. Shorr, (ii) 8,136 ordinary shares that have been issued to Ms. Shorr following the vesting and settlement of RSUs, and (iii) 50,055 ordinary shares issuable to Ms. Shorr upon the exercise of options granted to her that have vested or will vest within 60 days of February 14, 2024, and (iv) 2,807 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2024.

[13] Consists of (i) 7,766 ordinary shares held by Mr. Zeif, and (ii) 108,739 additional ordinary shares underlying RSUs that will vest and may be settled within 60 days of February 14, 2024, and (iii) 2,774 ordinary shares purchases as part of ESPP plan.

[14] Because Mr. Zamir beneficially owns less than 1% of our outstanding ordinary shares and his beneficial ownership has not previously been disclosed to our shareholders or otherwise made public, it is being omitted from this annual report pursuant to an allowance provided by the SEC's Form 20-F.

**ITEM 7. MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS.**

**A. Major Shareholders**

*Ownership by Major Shareholders*

The following table presents the beneficial ownership of our ordinary shares by each person who is known by us to be the beneficial owner of 5% or more of our outstanding ordinary shares (to whom we refer as our major shareholders), based on the most recent beneficial ownership reports filed with the SEC by such persons on or before February 14, 2024. The data presented is based on information provided to us, or disclosed in public filings with the SEC, by the major shareholders.

Beneficial ownership of shares is determined under rules of the SEC and generally includes any shares for which a person exercises sole or shared voting or investment power, or for which a person has or shares the right to receive the economic benefit of ownership of the shares. To the extent applicable, the table below also includes as beneficially owned by any major shareholder shares underlying options, warrants or other convertible securities that are exercisable or convertible within 60 days after February 14, 2024. Shares issuable upon the exercise or conversion of such convertible securities are deemed to be outstanding for the purpose of computing the ownership percentage of the person, entity or group holding such securities, but are not deemed to be outstanding for the purpose of computing the ownership percentage of any other person, entity or group. The ownership percentages reflected below are based on 69,750,397 ordinary shares outstanding as of February 14, 2024.

Except where otherwise indicated, and except pursuant to community property laws, we believe, based on information furnished by such owners, that the beneficial owners of the shares listed below have sole investment and voting power with respect to, and the sole right to receive the economic benefit of ownership of, such shares. The shareholders listed below do not have any different voting rights from any of our other shareholders. We know of no arrangements that would, at a subsequent date, result in a change of control of our company.

112

| Beneficial Owner | Ordinary Shares | Percentage Ownership |
|---|---|---|
| Nano Dimension Ltd. | 9,695,115[1] | 13.9% |
| Rubric Capital Management LP | 4,250,000[2] | 6.1% |
| Neuberger Berman Group LLC | 3,877,966[3] | 5.6% |
| Phoenix Holdings Ltd. | 3,640,906[4] | 5.2% |
| The Goldman Sachs Group, Inc. | 3,567,795[5] | 5.1% |
| Farhad Fred Ebrahimi and Mary Wilkie Ebrahimi | 3,549,961[6] | 5.1% |

[1] Represents shares beneficially owned as of December 23, 2023, as indicated in Amendment No. 12 to the statement of beneficial ownership on Schedule 13D filed by Nano Dimension Ltd. with the SEC on December 26, 2023. As indicated in that statement, Nano Dimension Ltd. possesses sole voting and investment power with respect to 9,695,015 of those ordinary shares beneficially owned by it.

[2] Represents shares beneficially owned as of December 31, 2023, as indicated in a statement of beneficial ownership on Schedule 13G filed by Rubric Capital Management LP with the SEC on February 12, 2024. As indicated in that report, Rubric Capital Management LP possesses shared voting and shared dispositive power with respect to all such 4,250,000 ordinary shares. Rubric Capital Management LP serves as investment adviser to certain investment funds and/or accounts that hold the subject ordinary shares. David Rosen serves as Managing Member of Rubric Capital Management GP LLC, the general partner of Rubric Capital Management LP.

[3] Represents shares beneficially owned as of December 31, 2023, as indicated in a statement of beneficial ownership on Schedule 13G filed by Neuberger Berman Group LLC ("Neuberger Berman") on February 12, 2024. As indicated in that report, Neuberger Berman possesses shared voting and shared dispositive power with respect to all 3,877,966 ordinary shares. Neuberger Berman Group LLC and its affiliates may be deemed to be beneficial owners of securities for purposes of Exchange Act Rule 13d-3 because they or certain affiliated persons have shared power to retain, dispose of or vote the securities of unrelated clients. Neuberger Berman Group LLC or its affiliated persons do not, however, have any economic interest in the securities of those clients. The clients have the sole right to receive and the power to direct the receipt of dividends from or proceeds from the sale of such securities.

[4] Represents shares beneficially owned as of December 31, 2023, as indicated in Amendment No. 3 to the statement of beneficial ownership on Schedule 13G filed by Phoenix Holdings Ltd. on February 12, 2024. As indicated in that report, Phoenix Holdings Ltd possesses shared voting and shared dispositive power with respect to all such 3,640,906 ordinary shares beneficially owned by it. Of such shares, 3,640,806 are held in an Israeli partnership. Ownership rights in that partnership belong to companies that are part of Phoenix Group. The amount of ownership rights held by such companies in the partnership changes frequently according to a mechanism provided in the partnership agreement. The remaining 100 ordinary shares are held by The Phoenix Investments House - trust funds.

[5] Represents shares beneficially owned as of December 29, 2023, as indicated in a statement of beneficial ownership on Schedule 13G filed by The Goldman Sachs Group, Inc. ("GS Group") on February 8, 2024. As indicated in that report, the GS Group possesses shared voting and shared dispositive power with respect to 3,561,021 of such ordinary shares beneficially owned by it. The securities being reported on by the GS Group, as a parent holding company, are owned, or may be deemed to be beneficially owned, by Goldman Sachs & Co. LLC ("Goldman Sachs"), a broker or dealer registered under Section 15 of the Act and an investment adviser registered under Section 203 of the Investment Advisers Act of 1940. Goldman Sachs is a subsidiary of the GS Group.

[6] Represents shares beneficially owned as of January 19, 2024, as indicated in a statement of beneficial ownership on Schedule 13D, filed by these shareholders with the SEC on January 26, 2024. As indicated in that statement, Farhad Fred Ebrahimi and Mary Wilkie Ebrahimi share voting and investment power with respect to all ordinary shares beneficially owned by them.

*Changes in Percentage Ownership by Major Shareholders*

Nano Dimension Ltd. ("Nano") filed its initial Schedule 13G on July 18, 2022, disclosing an ownership of 8,049,186 ordinary shares, making it one of our major shareholders. Its holdings of our ordinary shares increased during 2023. As of its last amended filing on Schedule 13D, filed on December 26, 2023, Nano owned 9,695,115 ordinary shares, constituting approximately 13.9% of our ordinary shares, making it the largest shareholder of the Company.

As of the end of 2022, a new significant shareholder, Phoenix Holdings Ltd., reported that together with its subsidiaries, it had acquired a 5.9% ownership stake in the Company. During 2023, its percentage ownership of our ordinary shares fell to 5.2%.

During 2021, the ownership of our ordinary shares by our former largest shareholder, ARK Investment Management LLC ("ARK"), decreased from 21.9% to 11.7%. In 2022, that ownership percentage decreased to 2.6%, whereby ARK was no longer a major shareholder.

During 2021, the ownership of our ordinary shares by PRIMECAP Management Company, one of our former major shareholders, decreased from 8.6% to 5.8%. In 2022, its ownership further declined to 4.8%, whereby it was no longer a major shareholder.

In 2021, the ownership of our ordinary shares by Sumitomo Mitsui Trust Holdings, Inc., another one of our former major shareholders, decreased from 7.3% to 6.9%. During 2022, its percentage ownership declined further, to 2.5%, whereby it was no longer a major shareholder.

During 2023, and/or early 2024, several new major shareholders acquired ownership of over 5% of our ordinary shares, including Rubric Capital Management, Neuberger Berman Group LLC, The Goldman Sachs Group, Inc., and Farhad Fred Ebrahimi and Mary Wilkie Ebrahimi.

*Record Holders*

Based upon a review of the information provided to us by our transfer agent, as of February 14, 2024, there were 74 holders of record of our shares, of which 50 record holders holding approximately 99.99% of our outstanding ordinary shares, had registered addresses in the United States. These numbers are not representative of the number of beneficial holders of our shares nor is it representative of where such beneficial holders reside, since many of these shares were held of record by brokers or other nominees. As of the said date, CEDE & Co, the nominee company of the Depository Trust Company (with a registered address in the United States), held of record approximately 99.6% of our outstanding ordinary shares on behalf of hundreds of firms of brokers and banks in the United States, who in turn held such shares on behalf of several thousand clients and customers.

*Potential Change in Control Transactions*

During 2023, we were involved in, and were the subject of, potential business combination transactions that would have been potentially transformative to the additive manufacturing industry. At the end of the third quarter of 2023, after none of such transactions had been completed (for various reasons), we initiated a whole-scale, comprehensive analysis of our strategic options, which we have been conducting together with our advisors during the fourth quarter of 2023 and the first quarter of 2024. We provide a brief overview of the relevant strategic transactions and processes below.

*Terminated Merger Agreement with Desktop Metal*

On May 25, 2023, we and Desktop Metal, Inc., ("Desktop Metal"), jointly announced our entry into a merger agreement, whereby our wholly-owned Delaware subsidiary ("Merger Sub") was to merge with and into Desktop Metal, with Desktop Metal surviving the merger as a wholly-owned subsidiary of ours. At the effective time of the merger, each share of Class A common stock of Desktop Metal issued and outstanding immediately prior to the effective time (other than shares of Class A common stock owned or held by (a) Desktop Metal as treasury stock, (b) a direct or indirect wholly-owned subsidiary of Desktop Metal or (c) Stratasys or Merger Sub) was to be converted automatically into the right to receive 0.123 ordinary shares of Stratasys. On September 28, 2023, we

114

held an extraordinary general meeting of shareholders, at which, among additional proposals, the merger was presented for the approval of our shareholders. As part of the merger proposal, our shareholders were also asked to approve (i) the adoption of amended and restated articles of association for our company effective as of the time of (and contingent on the effectiveness of) the merger, which were to include, among other changes to our existing articles of association, an increase of our authorized share capital, and (ii) the election of a slate of directors consisting of five designees of Stratasys and five designees of Desktop Metal, as well as the combined company's chief executive officer, as the members of our board of directors effective upon the effective time of the merger.

The merger proposal was not approved by our shareholders at that meeting, and accordingly, pursuant to our rights under the merger agreement, we terminated the merger agreement with Desktop Metal, effective immediately on September 28, 2023. As a result, we were required to, under the merger agreement, and actually did, pay to Desktop Metal a termination fee of $10.0 million.

*Uncompleted Tender Offer, Unsuccessful Board Contest and New Proposal of Nano Dimension*

On May 25, 2023, following the announcement of our then-prospective merger with Desktop Metal, Nano, a 14.1% shareholder of our company and a company operating in the 3D printing industry, launched a hostile partial tender offer whereby it sought to acquire—including shares already held by it— between 53% and 55% of our outstanding ordinary shares, at a price of $18.00 per share. The tender offer was subject to various conditions and was originally set to expire on June 26, 2023. Over the course of subsequent periods of time, the price offered by Nano in its tender offer was ultimately raised to $25.00 per share, with an accompanying reduction as to the percentage of our shares to be held by it upon consummation of the offer, to between 46% and 51%, and the offer was extended ultimately through July 31, 2023. The offer expired on July 31, 2023 and Nano did not receive enough tendered shares and was therefore unable to complete the purchase of any of our ordinary shares pursuant to the offer.

Nano also requested from our company, pursuant to its rights under the Israeli Companies Law as a 5% or greater shareholder, that we convene an extraordinary shareholder meeting at which a vote would be held on the removal of all of our directors (except for S. Scott Crump) and their replacement with officers of Nano whom it had nominated. After discussions with Nano and related court proceedings, we ultimately brought to a vote at our annual general meeting of shareholders held on August 8, 2023 a contested election of directors, at which our board's eight nominees and Nano's seven nominees were subject to election on a nominee-by-nominee basis, with the eight nominees receiving more "FOR" votes than "AGAINST" votes to be deemed elected. Based on that agreed voting format, at the annual meeting, each of our board's eight nominees, and none of Nano's seven nominees, were elected. We have also been subject to litigation with Nano in an Israeli district court regarding our shareholder rights plan, Nano's uncompleted tender offer, and the above-described contested board election. The litigation has not changed the outcome of any of the developments described above.

On December 23, 2023, while in the midst of our board-initiated process for consideration of strategic alternatives (as described under "Initiation of Strategic Alternatives Process" below), we received an unsolicited preliminary proposal from Nano to purchase all of our outstanding ordinary shares that it does not currently own at a price of $16.50 per share in cash. In response to that proposal, we announced on December 26, 2023 that our board would carefully review and consider Nano's unsolicited preliminary proposal as part of our strategic process.

*Offers by 3D Systems to Acquire Stratasys*

On May 30, 2023, and then again on June 27, 2023, we received an unsolicited non-binding indicative proposal from 3D Systems Corporation ("3D Systems") to merge with us. On July 13, 2023, we received an updated proposal from 3D Systems, pursuant to which it would merge with our company and pay as consideration to our shareholders $7.50 in cash and 1.5444 newly issued shares of common stock of 3D Systems per Stratasys

115

ordinary share. Our board initially determined that the 3D Systems proposal of July 13 would reasonably be expected to result in a "Superior Proposal" under our then-effective merger agreement with Desktop Metal and authorized our management to enter into discussions with 3D Systems with respect to the proposal. Following an extensive due diligence process, however, we communicated our concerns regarding the 3D Systems' proposal to 3D Systems and indicated that the last proposal was not itself a transaction that we would be prepared to enter into. 3D Systems revised its proposal on September 6, 2023, offering $7.00 in cash and 1.6387 newly issued shares of common stock of 3D Systems per Stratasys ordinary share. After consultation with our outside financial and legal advisors, our board of directors unanimously determined that the September 6 proposal continued to significantly undervalue our company and did not constitute a "Superior Proposal" pursuant to the terms of our then-effective merger agreement with Desktop Metal, and our board accordingly terminated discussions with 3D Systems.

*Initiation of Strategic Alternatives Process*

On September 28, 2023, following the failure of the vote for approval of the merger with Desktop Metal and our consequent termination of the related merger agreement, we announced that we had initiated a comprehensive process to explore strategic alternatives for our company. We noted that we are no longer subject to restrictions under that merger agreement regarding the solicitation of or entry into potential transactions. Our board has been conducting that process together with our advisors during the fourth quarter of 2023 and first quarter of 2024.

## B. Related Party Transactions.

Except as described below or elsewhere in this annual report, since January 1, 2023, we have had no transaction or loan, nor do we have any presently proposed transaction or loan, involving any related party described in Item 7.B of Form 20-F promulgated by the SEC.

*Indemnification Agreements*

Our amended articles permit us to exculpate, indemnify and insure each of our directors and office holders to the fullest extent permitted by the Companies Law. Effective upon the effective time of the Stratasys, Inc.- Objet Ltd. merger, we entered into indemnification agreements with each of our then-current directors and other office holders, under which we undertook to indemnify them to the fullest extent permitted by Israeli law, including with respect to liabilities resulting from the merger to the extent that these liabilities are not covered by insurance. We have entered into similar indemnification agreements with all directors and other office holders who have served as such since the Stratasys, Inc.- Objet Ltd. merger. We also put into place Directors and Officers liability insurance for each of our directors and other office holders upon the effectiveness of the Stratasys, Inc.-Objet Ltd. merger, and have renewed that policy as necessary to maintain continuous coverage since the merger.

*Employment and Consulting Agreements with Directors and Executive Officers*

*Employment agreement with our Chief Executive Officer*

In conjunction with his appointment as our chief executive officer, or CEO, Yoav Zeif is party to an employment agreement with us, effective as of February 18, 2020. Under the agreement, Mr. Zeif serves as our full-time CEO for an indefinite period (subject to the termination provisions referenced further below) and receives, in respect thereof, a monthly salary of NIS 175,000 (approximately $50,140, based on the current NIS-dollar exchange ratio). Mr. Zeif may be entitled to an annual cash bonus within a range of 50% to 150% of his annual base salary, as to be determined by our board of directors (following requisite approval from the compensation committee thereof) based on achievement of company-related goals (and subject to the achievement of threshold level goals for the receipt of a minimum bonus).

116

In addition to cash compensation, Mr. Zeif receives annual grants of RSUs. For his initial year of employment, he will receive RSUs that are equal in value to $800,000 (subject to a cap of 55,000 RSUs). In subsequent years, Mr. Zeif will be entitled to grants of RSUs equal in value to $1.2 million or $800,000, depending on whether the average closing Stratasys share price for the 30-day period prior to the grant date is $20 or above, or below $20, respectively, and in the latter case, the number of RSUs to be granted to Mr. Zeif will be capped at 55,000. Two-thirds of the RSUs that are granted for any such year (whether initial or subsequent) will be subject to a four-year vesting schedule (commencing on the one-year anniversary of the relevant grant date, followed by 12 equal quarterly vesting periods thereafter). The vesting of the remaining one- third of the RSUs granted in any such year will be conditioned on the satisfaction of performance-based metrics that will be determined by our board of directors and that will cover not more than four calendar years.

Besides annual equity compensation, Mr. Zeif received, within the first 14 days of his employment, a one-time, special upside grant of options to purchase 300,000 ordinary shares, with an exercise price that will equal the average of the Stratasys closing share price for the 30 days following his commencement of employment. These special upside options will vest and become exercisable in two groups of 150,000 options each, in accordance with the schedule described in the following sentence, if the average closing Stratasys share price reaches two respective levels— $10 or $20 above the 30-day average closing price prior to his commencement of employment— for a consecutive six-month period following the commencement of his employment. If and when the relevant closing price level is met for the requisite consecutive six-month period, the relevant 150,000 options will vest in equal installments of 18,750 each over the next eight consecutive quarters, assuming continued employment. Any options granted pursuant to the special upside grant that are not yet vested will be subject to accelerated vesting in the event that Mr. Zeif's employment is terminated or he resigns for good reason in connection with, or within 12 months following, a change of control transaction for which the value of our company (or our assets, if applicable) reflected in the transaction as of its closing date exceeds the respective price level that initially triggers vesting.

Under the employment agreement, Mr. Zeif is entitled to customary additional benefits, including a pension arrangement, disability insurance and severance pay contributions by us, study fund contributions by us, use of a car, annual vacation, sick leave and reimbursement for business-related, reasonably-necessary travel, lodging and related expenses. In the event of termination of Mr. Zeif's employment by our company (other than for cause, or due to Mr. Zeif's violation of his below-described undertakings) or by Mr. Zeif for good reason, Mr. Zeif will be entitled to an "adjustment" payment equal to six months' base salary, in addition to a three-month (in the first year of employment) or six-month (at any time thereafter) notice period (other than in a case of termination for cause, when that notice is not required).

In connection with his execution of the employment agreement, Mr. Zeif has agreed to certain customary undertakings in favor of our company that cover confidentiality, non-competition, non-solicitation and assignment of inventions.

In order to induce Mr. Zeif to accept our employment offer and in connection with his relocation from the United States to the our principal executive offices in Israel related to his hiring, we paid him a signing/relocation bonus of $300,000, of which $100,000 will be repayable if his employment is terminated by us for cause or he resigns other than for good reason during his first 12 months of employment.

*Employment agreement with our Chief Financial Officer*

In conjunction with his appointment as our chief financial officer, or CFO, effective as of March 1, 2022, Eitan Zamir is party to an employment agreement with us. Under the agreement, Mr. Zamir serves as our full-time CFO for an indefinite period (subject to the termination provisions under the agreement). The agreement provides for notice periods of varying duration for termination of the agreement by us or by Mr. Zamir, during which time he will continue to receive base salary and benefits (except for the accrual of vacation days). The agreement also contain customary provisions regarding non-competition, confidentiality of information and assignment of inventions. However, the enforceability of the non-competition provisions may be limited under applicable law.

117

Based on the approval of our compensation committee and board of directors in 2023, Mr. Zamir is entitled to certain severance benefits in the event he is terminated without cause, or he resigns for good reason, due to a potential change of control, or within 12 months (for purposes of unvested equity acceleration and leased car payments) or 24 months (for all other cash severance benefits) following an actual change in control, of our company. For purposes of his severance benefits, a change of control includes, among other things: (i) the then-current directors ceasing to constitute a majority of the board where the new directors are not approved by a majority of the then-current board; and (ii) a merger as a result of which pre-merger shareholders of our company own less than 55% of the combined company (that threshold is reduced to 50% if our CEO immediately prior to the merger is the CEO of the combined company immediately after the merger). In such a termination or resignation scenario, Mr. Zamir's severance benefits would consist of:

- a noncompete payment equal to 12 months of base salary;

- release of all amounts accumulated in pension, manager's insurance, and/or provident fund;

- prorated annual bonus (assuming criteria achieved at 120%) for year of termination and full annual bonus for prior completed year (assuming criteria achieved at 100%) if not yet paid;

- payment equal to 12 times his monthly leased car allowance; and

- full accelerated vesting of all unvested equity awards (including performance RSUs, which would convert to ordinary RSUs based on the assumption of achievement of performance goals at a level equal to the greater of (i) 100% or (ii) the actual performance level, subject to the occurrence of an actual change in control).

Consistent with our current compensation policy, Mr. Zamir's benefits due to a change in control would be capped, with respect to the aggregate value of the unvested equity acceleration (measured based on grant date value) and the leased car payment, to the sum of (i) $1 million, plus (ii) his full compensation for six months of employment.

## C. Interests of Experts and Counsel.

Not required.

## ITEM 8. FINANCIAL INFORMATION.

## A. Consolidated Statements and Other Financial Information.

The consolidated financial statements and other financial information for our company required by SEC are included in this annual report beginning on page F-1.

## Export Sales

The following table presents total export sales by Stratasys, Ltd for each of the fiscal years indicated (in thousands):

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Total Export Sales* | $228,941 | $226,767 | $211,899 |
| *as a percentage of Total Sales* | 36.5% | 34.8% | 34.9% |

\* Export sales, as presented, are defined as sales to customers located outside of North America and Israel (where our dual headquarters are located).

**Legal Proceedings**

We are a party to various legal proceedings incident to our business. Based upon the status of such cases, as determined with the advice of counsel, we have recorded provisions in our financial statements for amounts (if any) judged to be both quantifiable and probable to be paid. Except as noted below, there are no legal proceedings pending or threatened against us that we believe may have a significant effect on our financial condition, profitability and cash flows.

*Litigation with Nano Dimension regarding Stratasys' Rights Plan and Nano Dimension's tender offer*

On April 25, 2023, we were named as a defendant in an action filed by Nano in the Tel-Aviv District Court in which Nano sought declaratory relief declaring that our shareholder rights plan is both illegal and void, and also requested a court order enjoining us and our directors from intervening with, or hindering in any way, a tender offer that Nano at the time intended to launch to acquire our ordinary shares.

On June 8, 2023, in our statement of defense, we rejected all of Nano's claims, stating, among other things, that there was a substantial change of circumstance since Nano's action was filed due to Stratasys' entry into the merger agreement with Desktop Metal on May 25, 2023 and the launch of Nano's tender offer on May 25, 2023. We argued that our rights plan is legal under Israeli law, and that due to the many flaws and unlawful conditions of Nano's tender offer and Nano's conduct and circumstances, our board was obligated to get involved and protect us and our shareholders. We also submitted a counterclaim to the court, seeking an order restraining Nano from completing its tender offer until certain conditions were to be fulfilled.

On July 18, 2023, in the context of an interim procedural decision, the Israeli court took the opportunity to express its preliminary view on the legality of shareholder rights plans for Israeli companies. The court indicated that it is inclined to view rights plans as permissible under Israeli law; that the adoption of a rights plan by a board should be viewed "with suspicion"; and that the board would bear the burden of proving certain matters related to the adoption of such a plan.

After Nano's tender offer expired on July 31, 2023, the court decided that the litigation should be put on hold. On October 10, 2023, the court issued an order instructing the parties to inform the court whether they consented to the dismissal of the claim and counter-claim, with no order for costs. On November 15, 2023, Nano informed the court that it requested to resume the proceedings. On December 19, 2023, the court issued an order noting that, from the parties' written submissions, it was appropriate to isolate one question that requires determination: whether, under Israeli law, a company can adopt a 'poison pill'. The court further noted that Nano should consider either amending its claim or withdrawing it and filing a new one. The court emphasized that no new evidence would be allowed and that should Nano choose to proceed with the current action, the only question to be considered by the court is the validity of the poison pill under Israeli law. Nano is due to file its position by March 17, 2024.

*Litigation with Nano Dimension regarding Stratasys board election*

In a separate action, on July 13, 2023, Nano filed a motion in an Israeli court requesting that the court order, among other things, that (i) we correct the agenda sent out to our shareholders in advance of our 2023 annual general shareholder meeting scheduled for August 8, 2023, so that the agenda would include Nano's individual director nominees for our board, and (ii) we issue a new proxy statement and proxy card for the annual general shareholder meeting.

On July 28, 2023, Nano issued a press release in which it announced that it intended to withdraw its nominees for the board, which Nano reiterated in a press release that it issued on August 1, 2023.

On September 26, 2023, at the parties' request, the court dismissed the proceedings, without prejudice.

119

**Dividend Policy**

We have never paid cash dividends on our ordinary shares and do not anticipate that we will pay any cash dividends on our ordinary shares in the foreseeable future.

We intend to retain our earnings to finance the development of our business. Any future dividend policy will be determined by our board of directors based upon conditions then existing, including our earnings, financial condition, tax position and capital requirements, as well as such economic and other conditions as our board of directors may deem relevant. Pursuant to our articles of association, dividends may be declared by our board of directors. Dividends must be paid out of our profits and other surplus funds, as defined in the Companies Law, as of the end of the most recent year or as accrued over a period of the most recent two years, whichever amount is greater, provided that there is no reasonable concern that payment of a dividend will prevent us from satisfying our existing and foreseeable obligations as they become due. In addition, because we have received certain benefits under Israeli law relating to Approved Enterprises and Beneficiary Enterprises, our payment of dividends (out of tax- exempt income) may subject us to certain Israeli taxes to which we would not otherwise be subject. We are also restricted under our credit agreement with Bank of America from paying dividends. Please see the risk factors captioned "We do not anticipate paying any cash dividends in the foreseeable future. Therefore, if our share price does not appreciate, our shareholders may not recognize a return, and could potentially suffer a loss, on their investment in our ordinary shares," and "Even if we decide to pay dividends on our ordinary shares, we may be restricted from doing so or payment of such dividends may have adverse consequences for our company" in Item 3.D "Risk Factors-Risks related to an investment in our ordinary shares" above.

For a discussion of the applicable rates of withholding tax on dividends paid out of income derived from an Approved Enterprise or a Beneficiary Enterprise, see "Israeli Tax Considerations and Government Programs - The Law for the Encouragement of Capital Investments" in Item 4.B above.

## B. Significant Changes.

Other than as otherwise described in this annual report, no significant change has occurred in our operations since the date of our consolidated financial statements included in this annual report.

## ITEM 9. THE OFFER AND LISTING.

### A. Listing Details and C. Market.

Since December 3, 2012 (the first trading day after the effective time of the Stratasys, Inc.- Objet Ltd. merger), our ordinary shares have traded (and, prior to that time, Stratasys, Inc. common stock was traded) on the Nasdaq Global Select Market under the trading symbol "SSYS."

Our ordinary shares, par value NIS 0.01 per share, are registered on the books of our transfer agent, Continental Stock Transfer & Trust Company. There are no transfer restrictions apart from the requirement that any transfers comply with applicable securities laws and the rules of the Nasdaq Stock Market or any other securities exchange on which our ordinary shares may be listed in the future.

## ITEM 10. ADDITIONAL INFORMATION.

### A. Share Capital.

Not applicable

B.  Articles of Association.

The information called for by this Item 10.B of Form 20-F has been provided in Exhibit 2.2 to this annual report. The content of Exhibit 2.2 is incorporated by reference herein.

C.  Material Contracts.

We have not entered into any material contract within the two years prior to the date of this annual report, other than contracts entered into in the ordinary course of business, or as otherwise described herein in Item 4.A-"History and Development of the Company", Item 4.B-"Business Overview", Item 5.B-"Operating and Financial Review and Prospects—Liquidity and Capital Resources", Item 6.C-"Board Practices-Director Service Contracts" and Item 7.B-"Related Party Transactions".

D.  Exchange Controls.

There are currently no Israeli currency control restrictions on payments of dividends or other distributions with respect to our ordinary shares or the proceeds from the sale of ordinary shares, except for the obligation of Israeli residents to file reports with the Bank of Israel regarding certain transactions. However, legislation remains in effect pursuant to which currency controls can be imposed by administrative action at any time.

The ownership or voting of our ordinary shares by non-residents of Israel, except with respect to citizens of countries that are in a state of war with Israel, is not restricted in any way by our memorandum of association or amended articles or by the laws of the State of Israel.

E.  Taxation.

The following is a short summary of certain provisions of the tax environment to which shareholders may be subject. This summary is based on the current provisions of tax law. To the extent that the discussion is based on new tax legislation that has not been subject to judicial or administrative interpretation, we cannot assure you that the views expressed in the discussion will be accepted by the appropriate tax authorities or the courts.

The summary does not address all of the tax consequences that may be relevant to all purchasers of our ordinary shares in light of each purchaser's particular circumstances and specific tax treatment. For example, the summary below does not address the tax treatment of residents of Israel and traders in securities who are subject to specific tax regimes. As individual circumstances may differ, holders of our ordinary shares should consult their own tax adviser as to the United States, Israeli or other tax consequences of the purchase, ownership and disposition of ordinary shares. The following is not intended, and should not be construed, as legal or professional tax advice and is not exhaustive of all possible tax considerations. Each individual should consult his or her own tax or legal adviser.

**Israeli Taxation Considerations**

Israeli law generally imposes a capital gains tax on the sale of any capital assets by residents of Israel, as defined for Israeli tax purposes, and on the sale of assets located in Israel, including shares of Israeli companies, by both residents and non-residents of Israel unless a specific exemption is available or unless a tax treaty between Israel and the seller's country of residence provides otherwise. The Tax Ordinance distinguishes between "Real Capital Gain" and "Inflationary Surplus". The Inflationary Surplus is a portion of the total capital gain which is equivalent to the increase of the relevant asset's purchase price which is attributable to the increase in the Israeli consumer price index or, in certain circumstances, a foreign currency exchange rate, between the date of purchase and the date of sale. The Real Capital Gain is the excess of the total capital gain over the Inflationary Surplus.

121

### Israeli resident individuals

*Capital Gain*

As of January 1, 2006, the tax rate applicable to Real Capital Gain derived by Israeli individuals from the sale of shares which had been purchased on or after January 1, 2003, whether or not listed on a stock exchange, is 20%, unless such shareholder claims a deduction for interest and linkage differences expenses in connection with the purchase and holding of such shares, in which case the gain will generally be taxed at a rate of 25%. Additionally, if such shareholder is considered a "Significant Shareholder" (i.e., a person who holds, directly or indirectly, alone or together with another person who collaborates with such person on a permanent basis, 10% or more of any of the company's "means of control" (including, among other things, the right to receive profits of the company, voting rights, the right to receive the company's liquidation proceeds and the right to appoint a director)) at the time of sale or at any time during the preceding 12-month period, such gain will be taxed at the rate of 25%. Individual shareholders dealing in securities in Israel are taxed at their marginal tax rates applicable to business income (up to 47% in 2023, in addition to excess tax, if any, as described below) unless the benefiting provisions of an applicable treaty applies.

Notwithstanding the foregoing, pursuant to the Law for Change in the Tax Burden (Legislative Amendments) (Taxes), 2011, the capital gain tax rate applicable to individuals was raised from 20% to 25% from 2012 and onwards (or from 25% to 30% if the selling individual shareholder is a Significant Shareholder at any time during the 12-month period preceding the sale and\or claims a deduction for interest and linkage differences expenses in connection with the purchase and holding of such shares). With respect to assets (not shares that are listed on a stock exchange) purchased on or after January 1, 2003, the portion of the gain generated from the date of acquisition until December 31, 2011 will be subject to the previous capital gains tax rates (20% or 25%) and the portion of the gain generated from January 1, 2012 until the date of sale will be subject to the new tax rates (25% or 30%).

*Dividend Income*

Israeli residents who are individuals are generally subject to Israeli income tax for dividends paid on our ordinary shares (other than bonus shares or share dividends) at 25%, or 30% if the recipient of such dividend is a Significant Shareholder, at the time of distribution or at any time during the preceding 12-month period. However, dividends distributed from taxable income allocated and accrued during the benefits period of an Approved Enterprise or Beneficiary Enterprise are subject to withholding tax at the rate of 15% (and 20% with respect to Preferred Enterprise, Special Preferred Enterprise, Preferred Technology Enterprise and Special Preferred Technology Enterprise), if the dividend is distributed during the tax benefits period under the Investment Law or within 12 years after such period except with respect to an FIC, in which case the 12-year limit does not apply. An average rate will be set in case the dividend is distributed from mixed types of income (regular and Approved/ Beneficiary/ Preferred income).

### Israeli resident corporations

*Capital Gain*

Under current Israeli tax legislation, the tax rate applicable to Real Capital Gain derived by Israeli resident corporations from the sale of shares of an Israeli company is the general corporate tax rate. As described in "Israeli Tax Considerations and Government Programs-General Corporate Tax Structure" in Item 4.B above, the corporate tax rate was 24% in 2017, and is 23% since 2018.

122

*Dividend Income*

Generally, Israeli resident corporations are exempt from Israeli corporate tax on the receipt of dividends paid on shares of Israeli resident corporations. However, dividends distributed from taxable income accrued during the benefits period of an Approved Enterprise or Beneficiary Enterprise are subject to withholding tax at the rate of 15%, if the dividend is distributed during the tax benefits period under the Investment Law or within 12 years after that period, except with respect to a FIC, in which case the 12-year limit does not apply.

## Non-Israeli Residents

*Capital Gain*

Israeli capital gains tax is imposed on the disposal of capital assets by a non-Israeli resident if such assets are either (i) located in Israel; (ii) shares or rights to shares in an Israeli resident company, or (iii) represent, directly or indirectly, rights to assets located in Israel, unless a tax treaty between Israel and the seller's country of residence provides otherwise. As mentioned above, Real Capital Gain is generally subject to tax at the corporate tax rate (24% in 2017 and 23% since 2018), if generated by a company, or at the rate of 25% (for any asset other than shares that are listed on a stock exchange - 20% with respect to the portion of the gain generated up to December 31, 2011) or 30% (for any asset other than shares that are listed on a stock exchange - 25% with respect to the portion of the gain generated up to December 31, 2011), if generated by an individual who is Significant Shareholder at the time of sale or at any time during the preceding 12-month period (or claims a deduction for interest and linkage differences expenses in connection with the purchase and holding of such shares) from the sale of assets purchased on or after January 1, 2003. Individual and corporate shareholders dealing in securities in Israel are taxed at the tax rates applicable to business income (a corporate tax rate for a corporation and a marginal tax rate of up to 50% for an individual in 2023) unless contrary provisions in a relevant tax treaty applies.

Notwithstanding the foregoing, shareholders who are non-Israeli residents (individuals and corporations) should generally exempt from Israeli capital gains tax on any gains derived from the sale, exchange or disposition of shares publicly traded on the Tel Aviv Stock Exchange or on a recognized stock exchange outside of Israel, provided, among other things, that (i) such gains are not generated through a permanent establishment that the non-Israeli resident maintains in Israel; (ii) the shares were purchased after being listed on a recognized stock exchange and (iii) with respect to shares listed on a recognized stock exchange outside of Israel, such shareholders are not subject to the Israeli Income Tax Law (Inflationary Adjustments) 5745-1985. However, non-Israeli corporations will not be entitled to the foregoing exemptions if Israeli residents (a) have a controlling interest of more than 25% in such non-Israeli corporation, or (b) are the beneficiaries of or are entitled to 25% or more of the revenues or profits of such non-Israeli corporation, whether directly or indirectly. Such exemption is not applicable to a person whose gains from selling or otherwise disposing of the shares are deemed to be business income.

In addition, a sale of shares may be exempt from Israeli capital gains tax under the provisions of an applicable tax treaty. For example, under the U.S.-Israel Tax Treaty, to which we refer as the U.S.-Israel Treaty, the sale, exchange or disposition of shares of an Israeli company by a shareholder who is a U.S. resident (for purposes of the U.S.- Israel Treaty) holding the shares as a capital asset is exempt from Israeli capital gains tax unless either (i) the shareholder holds, directly or indirectly, shares representing 10% or more of the voting rights during any part of the 12-month period preceding such sale, exchange or disposition, (ii) the shareholder, if an individual, has been present in Israel for a period or periods of 183 days or more in the aggregate during the applicable taxable year, (iii) the capital gains arising from such sale are attributable to a permanent establishment of the shareholder which is maintained in Israel, (iv) the capital gain arising from such sale, exchange or disposition is attributed to real estate located in Israel, or (v) the capital gains arising from such sale, exchange or disposition is attributed to royalties on copyright or film. In any such case, the sale, exchange or disposition of such shares would be subject to Israeli tax, to the extent applicable; however, under the U.S.-Israel Treaty, a U.S. resident would be permitted to claim a credit for the Israeli tax against the U.S. federal income tax imposed with respect to the sale, exchange or disposition, subject to the limitations in U.S. laws applicable to foreign tax credits. The U.S.-Israel Treaty does not provide such credit against any U.S. state or local taxes.

123

In some instances where our shareholders may be liable for Israeli tax on the sale of their Ordinary Shares, the payment of the consideration may be subject to the withholding of Israeli tax at source. Shareholders may be required to demonstrate that they are exempt from tax on their capital gains in order to avoid withholding at source at the time of sale. Specifically, in transactions involving a sale of all of the shares of an Israeli resident company, in the form of a merger or otherwise, the Israel Tax Authority may require from shareholders who are not liable for Israeli tax to sign declarations in forms specified by this authority or obtain a specific exemption from the Israel Tax Authority to confirm their status as non-Israeli resident, and, in the absence of such declarations or exemptions, may require the purchaser of the shares to withhold taxes at source.

*Dividend Income*

Non-Israeli residents (whether individuals or corporations) are generally subject to Israeli income tax on the receipt of dividends paid on ordinary shares at the rate of 25% or 30% (if the dividend recipient is a Significant Shareholder at the time of distribution or at any time during the preceding 12-month period), 15% if the dividend is distributed from income attributed to our Approved Enterprise or Beneficiary Enterprise (and 20% with respect to Preferred Enterprise or 4% with respect to Preferred Technology Enterprise and Special Preferred Technology Enterprise if certain conditions are met). Such dividends are generally subject to Israeli withholding tax at a rate of 25% so long as the shares are registered with a nominee company (whether the recipient is a Significant Shareholder or not) and 15% if the dividend is distributed from income attributed to an Approved Enterprise or a Beneficiary Enterprise (and 20% if the dividend is distributed from income attributed to a Preferred Enterprise or 4% with respect to Preferred Technology Enterprise and Special Preferred Technology Enterprise if certain conditions are met), unless a reduced rate is provided under an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). For example, under the U.S.-Israel Treaty, the maximum rate of tax withheld at source in Israel on dividends paid to a holder of our ordinary shares who is a U.S. resident (for purposes of the U.S.-Israel Treaty) is 25%.

However, generally, the maximum rate of withholding tax on dividends, not generated by our Approved Enterprise or Beneficiary Enterprise, that are paid to a U.S. corporation holding at least 10% or more of our outstanding voting capital from the start of the tax year preceding the distribution of the dividend through (and including) the distribution of the dividend, is 12.5%, provided that no more than 25% of our gross income for such preceding year consists of certain types of dividends and interest.

Notwithstanding the foregoing, dividends distributed from income attributed to an Approved Enterprise or Beneficiary Enterprise are subject to a withholding tax rate of 15% for such U.S. corporation shareholder, provided that the condition related to our gross income for the previous year (as set forth in the previous sentence) is met. The aforementioned rates will not apply if the dividend income was generated through a permanent establishment of the U.S. resident that is maintained in Israel. If the dividend is attributable partly to income derived from an Approved Enterprise, a Beneficiary Enterprise or Preferred Enterprise, and partly to other sources of income, the withholding rate will be a blended rate reflecting the relative portions of the two types of income. U.S. residents who are subject to Israeli withholding tax on a dividend may be entitled to a credit or deduction for United States federal income tax purposes in the amount of the taxes withheld, subject to detailed rules contained in the Code.

A non-Israeli resident who receives dividends from which tax was withheld is generally exempt from the obligation to file tax returns in Israel with respect to such income, provided that (i) such income was not generated from business conducted in Israel by the taxpayer, (ii) the taxpayer has no other taxable sources of income in Israel with respect to which a tax return is required to be filed, and (iii) the taxpayer is not obligated to pay excess tax (as further explained below).

124

*Excess Tax*

Individuals who are subject to tax in Israel (whether any such individual is an Israeli resident or non-Israeli resident) are also subject to an additional tax at a rate of 3% on annual income exceeding NIS 721,560 for 2023, which amount is linked to the annual change in the Israeli consumer price index, including, but not limited to, dividends, interest and capital gain.

## U.S. Federal Income Tax Considerations

Subject to the limitations described in the following paragraphs, the discussion below describes the material U.S. federal income tax consequences to a beneficial owner of our ordinary shares, referred to in this discussion as a U.S. holder that is:

- an individual who is a citizen or resident of the United States for U.S. federal income tax purposes;

- a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States or of any state or the District of Columbia;

- an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source; or

- a trust, if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or the trust has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

This summary is not a comprehensive description of all of the tax considerations that may be relevant to each person's decision to purchase, hold or dispose of ordinary shares. This summary considers only U.S. holders that hold ordinary shares as capital assets.

This discussion is based on current provisions of the U.S. Internal Revenue Code of 1986, to which we refer as the Code, current and proposed Treasury regulations, and administrative and judicial decisions as of the date of this annual report, all of which are subject to change, possibly on a retroactive basis. This discussion does not address all aspects of U.S. federal income taxation that may be relevant to any particular shareholder based on the shareholder's individual circumstances. In particular, this discussion does not address the potential application of the alternative minimum tax or the U.S. federal income tax consequences to U.S. holders that are subject to special treatment, including U.S. holders that:

- are broker dealers or insurance companies;

- have elected mark-to-market accounting;

- are tax-exempt organizations;

- are financial institutions or financial services entities;

- are partnerships or other entities treated as partnerships for U.S. federal income tax purposes or partners thereof or members therein;

- hold ordinary shares as part of a straddle, hedge, conversion or other integrated transaction with other investments;

- own directly, indirectly or by attribution at least 10% of our voting power; or

- have a functional currency that is not the U.S. dollar.

In addition, this discussion does not address any aspect of state, local or non-U.S. tax laws, or the possible application of the U.S. federal estate or gift tax or any state inheritance, estate or gift tax.

125

Material aspects of U.S. federal income tax law relevant to a holder other than a U.S. holder, referred to in this discussion as a non-U.S. holder, are also discussed below.

Each prospective investor is advised to consult his or her own tax adviser for the specific tax consequences to that investor of purchasing, holding or disposing of our ordinary shares.

### *Taxation of Dividends Paid on Ordinary Shares*

Subject to the discussion below under "Tax Consequences if We Are a Passive Foreign Investment Company," a U.S. holder will be required to include in gross income as ordinary income the gross amount of any distribution paid on ordinary shares, including any Israeli taxes withheld from the amount paid, on the date the distribution is actually or constructively received, to the extent the distribution is paid out of our current or accumulated earnings and profits as determined for U.S. federal income tax purposes." In addition, under the Patient Protection and Affordable Care Act, higher income taxpayers must pay an additional 3.8 percent tax on net investment income to the extent certain threshold amounts of income are exceeded. See "Tax on Net Investment Income" in this Item below.

Dividends that are received by U.S. holders that are individuals, estates or trusts generally will be taxed at the rate applicable to long-term capital gains (a maximum rate of 15% or 20%, in case of taxpayers with annual taxable income which exceeds certain thresholds), provided those dividends meet the requirements of "qualified dividend income." Dividends that fail to meet these requirements, and dividends taxable to corporate U.S. holders, are taxed at ordinary income rates. No dividend received by a U.S. holder will be a qualified dividend (1) if the U.S. holder held the ordinary share with respect to which the dividend was paid for less than 61 days during the 121-day period beginning on the date that is 60 days before the ex-dividend date with respect to the dividend, excluding for this purpose, under the rules of Code Section 246(c), any period during which the U.S. holder has an option to sell, is under a contractual obligation to sell, has made and not closed a short sale of, is the grantor of a deep-in-the-money or otherwise nonqualified option to buy, or has otherwise diminished its risk of loss by holding other positions with respect to, the ordinary share (or substantially identical securities); or (2) to the extent that the U.S. holder is under an obligation (pursuant to a short sale or otherwise) to make related payments with respect to positions in property substantially similar or related to the ordinary share with respect to which the dividend is paid. If we were to be a "passive foreign investment company" (as that term is defined in the Code) for any year, dividends paid on our ordinary shares in that year or in the year following that year would not be qualified dividends. In addition, a non- corporate U.S. holder will be able to take a qualified dividend into account in determining its deductible investment interest (which is generally limited to its net investment income) only if it elects to do so, in which case the dividend will be taxed at ordinary income rates. Corporate holders will not be allowed a deduction for dividends received in respect of our ordinary shares.

Dividends on our ordinary shares will be foreign source passive income (or in some cases, general category income) for U.S. foreign tax credit purposes. Distributions in excess of earnings and profits will be applied against and will reduce, on a share-by-share basis, the U.S. holder's basis in the ordinary shares and, to the extent in excess of that basis, will be treated as gain from the sale or exchange of ordinary shares.

The amount of a distribution paid to a U.S. holder in a foreign currency will be the U.S. dollar value of the foreign currency calculated by reference to the spot exchange rate on the day the U.S. holder receives the distribution. A U.S. holder that receives a foreign currency distribution and converts the foreign currency into U.S. dollars after receipt will have foreign exchange gain or loss based on any appreciation or depreciation in the value of the foreign currency against the U.S. dollar, which will generally be U.S. source ordinary income or loss.

126

U.S. holders will have the option of claiming the amount of any Israeli income taxes withheld at source either as a deduction from gross income or as a dollar-for-dollar credit against their U.S. federal income tax liability. Individuals who do not claim itemized deductions, but instead utilize the standard deduction, may not claim a deduction for the amount of the Israeli income taxes withheld, but the amount may be claimed as a credit against the individual's U.S. federal income tax liability. The amount of foreign income taxes that may be claimed as a credit in any year is generally subject to complex limitations and restrictions, which must be determined on an individual basis by each shareholder. Those limitations include the provisions described in the following paragraphs, as well as rules that limit foreign tax credits allowable for a class of income to the U.S. federal income taxes otherwise payable on the net income in that class.

A U.S. holder will be denied a foreign tax credit for Israeli income tax withheld from dividends received on our ordinary shares:

- if the U.S. holder has not held the ordinary shares for at least 16 days of the 30-day period beginning on the date that is 15 days before the ex-dividend date; or

- to the extent that the U.S. holder is under an obligation to make related payments on substantially similar or related property.

Any days during which a U.S. holder has substantially diminished its risk of loss on the ordinary shares are not counted toward meeting the 16-day holding period required by the statute. A foreign tax credit for the Israeli tax can be deferred if the U.S. holder enters into certain types of arrangements to defer inclusion of the related dividend in income for tax purposes.

### *Taxation of the Disposition of Ordinary Shares*

Subject to the discussion below under "Tax Consequences if We Are a Passive Foreign Investment Company," upon the sale, exchange or other taxable disposition of our ordinary shares, a U.S. holder will recognize capital gain or loss in an amount equal to the difference between the U.S. holder's basis in the ordinary shares, which is usually the cost to the U.S. holder of the shares, and the amount realized on the disposition. Capital gain from the sale, exchange or other disposition of ordinary shares held more than one year is long-term capital gain and is eligible for a reduced rate of taxation in the case of non-corporate taxpayers. Gain or loss recognized by a U.S. holder on the sale, exchange or other disposition of ordinary shares generally will be treated as U.S. source income or loss for U.S. foreign tax credit purposes. The deductibility of capital losses is subject to limitations.

A U.S. holder that uses the cash method of accounting calculates the U.S. dollar value of foreign currency proceeds received on a sale as of the date on which the U.S. holder receives the foreign currency. However, a U.S. holder that uses an accrual method of accounting is required to calculate the value of the proceeds of the sale as of the date of sale and may therefore realize foreign currency gain or loss on a subsequent disposition of the foreign currency based on any subsequent appreciation or depreciation in the value of the foreign currency against the U.S. dollar. That gain or loss will generally be U.S. source ordinary income or loss.

### *Tax Consequences if We Are a Passive Foreign Investment Company*

We will be a passive foreign investment company, to which we refer as a PFIC, if 75% or more of our gross income in a taxable year, including our pro rata share of the gross income of any corporation in which we are considered to own 25% or more of the shares by value (subject to certain exceptions in the case of a U.S. corporation), is passive income. Alternatively, we will be considered to be a PFIC if at least 50% of our assets in a taxable year, ordinarily determined based on the quarter-end average fair market value of our assets over the taxable year and including the pro rata share of the assets of any corporation in which we are considered to own 25% or more of the shares by value (subject to certain exceptions in the case of a U.S. corporation), produce or are held for the production of passive income.

127

If we were a PFIC, and a U.S. holder did not make, as described below, a timely election either to treat us as a qualified electing fund or, if the election is available, to mark our shares to market, any excess distributions we pay to a U.S. holder would be taxed in a special way. Excess distributions are amounts paid on shares in a PFIC in any taxable year that exceed 125% of the average distributions paid on those shares in the shorter of:

- the three previous years; and
- the U.S. holder's holding period for ordinary shares before the present taxable year.

Excess distributions must be allocated ratably to each day that a U.S. holder has held our ordinary shares. A U.S. holder would then be required to include amounts allocated to the current taxable year and each prior year in which we were not a PFIC (but not before our first taxable year beginning after December 31, 1986) in its gross income as ordinary income for the current year. Further, a U.S. holder would be required to pay tax on amounts allocated to each prior taxable year in which we were a PFIC at the highest rate in effect for that year on ordinary income, and the tax for each such year would be subject to an interest charge at the rate applicable to deficiencies for income tax.

The entire amount of gain that is realized or treated as realized by a U.S. holder upon the sale or other disposition of ordinary shares (generally whether or not the disposition is a taxable transaction) will also be treated as an excess distribution and will be subject to tax as described in the preceding paragraph.

In some circumstances a U.S. holder's tax basis in our ordinary shares that were inherited from a deceased person who was a U.S. holder would not equal the fair market value of those ordinary shares as of the date of the deceased person's death but would instead be equal to the deceased's basis, if lower.

The special PFIC rules described above will not apply to a U.S. holder if that U.S. holder makes an election to treat us as a qualified electing fund, to which we refer as a QEF, in the first taxable year in which the U.S. holder owns ordinary shares, provided we comply with specified reporting requirements. Instead, a U.S. holder who has made such a QEF election is required for each taxable year in which we are a PFIC to include in income a pro rata share of our ordinary earnings as ordinary income and a pro rata share of our net capital gain as long-term capital gain, subject to a separate election to defer payment of the related tax. If deferred, the taxes will be subject to an interest charge. We would supply U.S. holders with the information needed to report income and gain under a QEF election if we were classified as a PFIC.

The QEF election is made on a shareholder-by-shareholder basis and can be revoked only with the consent of the Internal Revenue Service, to which we refer as the IRS. A shareholder makes a QEF election by attaching a completed IRS Form 8621, including the PFIC annual information statement, to a timely filed U.S. federal income tax return. If you are not required to file an income tax return or other return for the tax year, file the form directly with the IRS Service Center in Ogden, UT 84201-0201. Even if a QEF election is not made, a United States person who is a shareholder in a PFIC must file every year a completed IRS Form 8621 or other form as may be prescribed by the IRS pursuant to legislation requiring annual reports with respect to PFICs.

A U.S. holder of PFIC shares that are publicly traded may elect to mark the stock to market annually, recognizing as ordinary income or loss each year an amount equal to the difference as of the close of the taxable year between the fair market value of the PFIC shares and the U.S. holder's adjusted tax basis in the PFIC shares. Losses would be allowed only to the extent of net mark-to-market gain previously included in income by the U.S. holder under the election for prior taxable years. If the mark-to-market election were made, then the rules described above (other than the rules for excess distributions, which would apply to the first year the election is made if we were a PFIC in a prior year and a QEF election were not made for the first year we were a PFIC) would not apply for periods covered by the election.

Although we do not believe that we were a PFIC in 2023, we cannot assure you that the IRS will agree with that conclusion or that we will not become a PFIC in 2024 or in a subsequent year. The tests for determining PFIC status are applied annually, and it is difficult to make accurate predictions of future income and assets, which are relevant to this determination. U.S. holders who hold ordinary shares during a period when we are a PFIC will be subject to these rules, even if we cease to be a PFIC in later years, subject to specified exceptions for U.S. holders who made a QEF election in the first year they held our ordinary shares and we were a PFIC or if in a later year they made any of certain elections to purge the PFIC taint of our ordinary shares, which elections generally require the payment of tax. U.S. holders are urged to consult their tax advisers about the PFIC rules, including QEF and mark-to-market elections.

*Tax on Net Investment Income*

A U.S. holder that is an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from the tax, will be subject to a 3.8% tax on the lesser of (1) the U.S. holder's "net investment income" for the relevant taxable year and (2) the excess of the U.S. holder's modified adjusted gross income for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and $250,000, depending on the individual's circumstances). A U.S. holder's net investment income generally will include its dividends on our ordinary shares and net gains from dispositions of our ordinary shares, unless those dividends or gains are derived in the ordinary course of the conduct of trade or business (other than trade or business that consists of certain passive or trading activities). Net investment income, however, may be reduced by deductions properly allocable to that income. A U.S. holder that is an individual, estate or trust is urged to consult its tax adviser regarding the applicability of the Medicare tax to its income and gains in respect of its investment in our ordinary shares.

*Tax Consequences for Non-U.S. Holders of Ordinary Shares*

Except as described in "Information Reporting and Backup Withholding" below, a non-U.S. holder of ordinary shares will not be subject to U.S. federal income or withholding tax on the payment of dividends on, and the proceeds from the disposition of, ordinary shares, unless:

- the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States and, in the case of a resident of a country that has an income treaty with the United States, the income is attributable to a U.S. permanent establishment, or, in the case of an individual, a fixed place of business in the United States;

- the non-U.S. holder is an individual who holds the ordinary shares as a capital asset and is present in the United States for 183 days or more in the taxable year of the disposition and does not qualify for an exemption; or

- the non-U.S. holder is subject to tax under the provisions of U.S. tax law applicable to U.S. expatriates.

A non-U.S. holder is a beneficial owner of our ordinary shares that is (1) a nonresident alien as to the United States for U.S. federal income tax purposes; (2) a corporation created or organized in or under the law of a country, or any of its political subdivisions, other than the United States; or (3) an estate or trust that is not a U.S. holder.

*Information Reporting and Backup Withholding*

U.S. holders generally are subject to information reporting requirements for dividends paid in the United States on ordinary shares. Dividends paid in the United States to a U.S. holder on ordinary shares are subject to backup withholding at a rate of 28% unless the U.S. holder provides IRS Form W-9 or establishes an exemption. U.S. holders generally are subject to information reporting and backup withholding at a rate of 28% on proceeds paid from the disposition of ordinary shares unless the U.S. holder provides IRS Form W-9 or establishes an exemption.

129

The Foreign Account Tax Compliance Act, or FATCA, was enacted during 2014. FATCA generally requires foreign financial institutions (FFIs) to identify U.S. account holders and report them to the IRS or pay a 30% withholding tax. Nonfinancial foreign entities (or NFFEs) are required to report their substantial U.S. owners to withholding agents or pay a 30% withholding tax. FATCA's objective is to prevent tax evasion by requiring the disclosure of account holder information to the IRS. Because Stratasys is a publicly traded company that is not a financial institution, FATCA has less impact than the rules discussed above that are still in effect for withholding tax purposes.

A non-U.S. holder who effects the sale of his ordinary shares by or through a U.S. office of a broker is subject to both information reporting and backup withholding tax on the payment of the proceeds unless he certifies, under penalties of perjury, that he is not a U.S. person or otherwise establishes an exemption. If a non-U.S. holder sells his ordinary shares through a non-U.S. office of a non-U.S. broker and the sales proceeds are paid to the holder outside the United States, then information reporting and backup withholding generally will not apply to that payment. However, information reporting requirements, but not backup withholding, will apply to a payment of sales proceeds, even if that payment is made to a non-U.S. holder outside the United States, if the holder sells his ordinary shares through a non-U.S. office of a broker that is a U.S. person or has some other contacts with the United States. Those information reporting requirements will not apply, however, if the broker has documentary evidence in its records that the holder is a non-U.S. person and certain other conditions are met, or the holder otherwise establishes an exemption.

Backup withholding is not an additional tax. Rather, the amount of any backup withholding will be allowed as a credit against a U.S. or non-U.S. holder's U.S. federal income tax liability, and a taxpayer generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed the taxpayer's U.S. federal income tax liability by filing a refund claim with the IRS, provided in each case that required information is furnished to the IRS.

**Information Reporting by Certain U.S. Holders**

U.S. citizens and individuals taxable as resident aliens of the United States that own "specified foreign financial assets" with an aggregate value in a taxable year in excess of certain thresholds (as determined under Treasury regulations) and that are required to file a U.S. federal income tax return generally will be required to file an information report with respect to those assets with their tax returns. IRS Form 8938 has been issued for that purpose. "Specified foreign financial assets" include any financial accounts maintained by foreign financial institutions, foreign stocks held directly, and interests in foreign estates, foreign pension plans or foreign deferred compensation plans. Under those rules, our ordinary shares, whether owned directly or through a financial institution, estate or pension or deferred compensation plan, would be "specified foreign financial assets." Under Treasury regulations, the reporting obligation applies to certain U.S. entities that hold, directly or indirectly, specified foreign financial assets. Penalties can apply if there is a failure to satisfy this reporting obligation. A U.S. holder is urged to consult his tax adviser regarding his reporting obligation.

**F. Dividends and Paying Agents.**

Not applicable.

**G. Statement by Experts.**

Not applicable.

**H. Documents on Display.**

We are subject to the informational requirements of the Exchange Act. In accordance with these requirements, we are required to file reports and other information with the SEC. The SEC maintains a website that contains reports and information statements and other information about issuers, such as us, who file electronically with the SEC. The address of that website is *www.sec.gov*. The reports and other information filed by us with the SEC are also available at our website, at investors.stratasys.com. The web addresses of the SEC and our company have been included as inactive textual references only. Information on those websites is not part of this annual report.

As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of proxy statements, and our officers, directors and principal shareholders are exempt from the reporting and "short-swing" profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we are not required under the Exchange Act to file periodic reports and financial statements with the SEC as frequently or as promptly as United States companies whose securities are registered under the Exchange Act.

**I. Subsidiary Information.**

Not Applicable.

**J. Annual Report to Security Holders**

Not Applicable.

**ITEM 11. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK.**

Market risk is the risk of loss related to changes in market prices, including mainly interest rates and foreign exchange rates, of financial instruments that may adversely impact our consolidated balance sheets, statements of operations or cash flows.

*Foreign Currency Exchange Risk*

Due to our international operations, currency exchange rates impact our financial performance.

The majority of our balance sheet exposure relates to foreign currency assets and liabilities in entities which their functional currency is Euro. Our net Euro balance sheet exposure as of December 31, 2023 was approximately $39.3 million.

Our total revenues amounted to $627.6 million in 2023, of which approximately 16.3% were denominated in Euros. During 2023, our Euro-denominated revenues exceeded our Euro-denominated expenses. Conversely, our expenses denominated in shekels are higher than our expected shekel-denominated revenues. For those currencies which do not have a sufficient natural hedge within our operations (such as offsetting revenues and expenses recorded in a given currency, or some other hedge), we may choose to hedge in order to reduce the impact of currency fluctuations on our operating results. In 2023, we entered into hedging transactions to reduce our potential currency exposure related to the U.S. dollar against each of the Euro and the New Israeli Shekel. Our foreign exchange forward contracts in effect as of December 31, 2023 were for the conversion of €72.0 million into USD and $46.2 million into NIS.

The net effect of these risks stemming from currency exchange rate fluctuations on our operating results can be quantified as follows:

131

    i.    A change of 10% in the value of the Euro relative to the U.S. dollar in the year ended December 31, 2023 would have resulted in a change in the U.S. dollar reporting value of our consolidated operating income of $4.7 million for that year, mainly due to revenues earned in Euros.

    ii.    A change of 10% in the value of the shekel relative to the dollar in the year ended December 31, 2023 would have resulted in a change in the dollar-reported value of our consolidated operating income of $13.0 million, mainly due to shekel-recorded expenses.

We will continue to monitor exposure to currency fluctuations. Instruments that may be used to protect us against future risks may include foreign currency forward and swap contracts. These instruments may be used to selectively manage risks, but there can be no assurance that we will be fully protected against material foreign currency fluctuations. We do not use derivative financial instruments for speculative or trading purposes.

**Interest Rate Risk**

Our cash and cash equivalents are held primarily in bank deposits with maturities of less than 90 days, and our short-term bank deposits have maturities of more than 90 days. Both are subject to limited interest rate risk, with an average interest rate of 6.80%. A 10% change in interest rates would not have a material effect on our financial condition or results of operations.

**ITEM 12. DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES.**

Not Applicable.

132

**PART II**

**ITEM 13. DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES.**

None

**ITEM 14. MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS.**

None

**ITEM 15. CONTROLS AND PROCEDURES.**

a.   Disclosure Controls and Procedures.

We carried out an evaluation under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of December 31, 2023, the end of the period covered by this annual report. We maintain disclosure controls and procedures designed to ensure that the information required to be disclosed by us in filings and submissions under the Exchange Act, is recorded, processed, summarized, and reported within the time periods specified by the SEC's rules and forms, and that information required to be disclosed by us in reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and our management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Based on such evaluation, our chief executive officer and chief financial officer have concluded that our disclosure controls and procedures were effective as of December 31, 2023.

b.   Management's Annual Report on Internal Control Over Financial Reporting.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Our internal control system was designed to provide reasonable assurance to our management and board of directors regarding the reliability of financial reporting and the preparation and fair presentation of its published consolidated financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2023. In making our assessment, our management used the criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on such assessment, management has concluded that, as of December 31, 2023, our internal control over financial reporting is effective based on those criteria.

Kesselman & Kesselman, an independent registered public accounting firm in Israel and a member of PricewaterhouseCoopers International Limited, to which we refer as PwC, which audited the financial statements included in this annual report containing the disclosure required by this Item 15 has issued an attestation report regarding the effectiveness of our internal control over financial reporting.

133

c.    Attestation Report of Registered Public Accounting Firm.

PwC's attestation report regarding the effectiveness of our internal control over financial reporting is included in "Item 18-Financial Statements" on page F-1 of this annual report, which attestation report is incorporated by reference in this Item 15(c).

d.    Changes in Internal Control over Financial Reporting.

Based on the evaluation conducted by our management, with the participation of our chief executive officer and chief financial officer, pursuant to Rules 13a-15(d) and 15d-15(d) promulgated under the Exchange Act, our management (including such officers) have concluded that there were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the period covered by this annual report that have materially affected, or that are reasonably likely to materially affect, our internal control over financial reporting.

## ITEM 16A. AUDIT COMMITTEE FINANCIAL EXPERT.

Our board of directors has determined that Mr. Yair Seroussi, who serves on the audit committee of our board of directors, meets the requirements of an "audit committee financial expert", as defined in Item 407(d)(5) of SEC Regulation S-K and Item 16A of SEC Form 20-F and is an independent director, as defined in Rule 5600(a)(2) of the Nasdaq Listing Rules.

## ITEM 16B. CODE OF ETHICS.

We have adopted a Code of Business Conduct and Ethics, which we to which we refer as the code of ethics, that applies to all directors, officers, and employees of our company and its subsidiaries, including our principal executive officer, principal financial officer, principal accounting officer or controller and other persons performing similar functions for us. A copy of the code of ethics has been posted on our Internet website, http://investors.stratasys.com/governance.cfm and is incorporated herein by reference. The foregoing website has been provided as an inactive textual reference only, and the content of that website is not a part of this annual report.

## ITEM 16C. PRINCIPAL ACCOUNTANT FEES AND SERVICES.

The following table sets forth, for the years ended December 31, 2023 and 2022, the fees billed to us and our subsidiaries by our principal accountant[1].

---

[1] Comprised by fees billed by Kesselman & Kesselman, a member firm of PricewaterhouseCoopers International Limited, an independent registered public accounting firm (which served as our principal accountant with respect to the years ended December 31, 2023 and 2022).

134

| | Year ended | |
| | December 31, | |
| | **2023** | **2022** |
| Audit fees[2] | $ 1,028,700 | $ 843,700 |
| Audit-related[3] | 376,000 | 20,000 |
| Tax fees[4] | 133,000 | 140,000 |
| All other fees[5] | 1,800 | 19,800 |
| Total | $ 1,539,500 | $ 1,023,500 |

## ITEM 16D. EXEMPTIONS FROM THE LISTING STANDARDS FOR AUDIT COMMITTEES.

None.

## ITEM 16E. PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS.

None.

## ITEM 16F. CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT.

Not applicable.

## ITEM 16G. CORPORATE GOVERNANCE.

The Nasdaq Global Select Market requires companies with securities listed thereon to comply with its corporate governance standards. As a foreign private issuer, we are not required to comply with all of the rules that apply to listed domestic U.S. companies. Pursuant to Nasdaq Listing Rule 5615(a)(3), we have notified Nasdaq that with respect to the corporate governance practices described below, we will instead follow Israeli law and practice and accordingly will not follow the Nasdaq Listing Rules. Except for the differences described below, we do not believe there are any significant differences between our corporate governance practices and those that apply to a U.S. domestic issuer under the Nasdaq Global Select Market corporate governance rules.

---

[2] Audit fees consist of fees for professional services rendered by our principal accountant in connection with the audit of our consolidated annual financial statements and services that would normally be provided by our principal accountant in connection with statutory and regulatory filings or engagements.

[3] The audit-related fees for the year ended December 31, 2023 and 2022 were for due diligence related to acquisitions.

[4] Tax fees are fees for services rendered by our principal accountant in connection with tax compliance, tax planning and tax advice.

[5] All other fees are fees for other consulting services (if any) rendered by our principal accountant to us.

- Quorum for Shareholder Meetings: As permitted under the Companies Law, under a recent amendment adopted to our amended and restated articles of association, the quorum required for an ordinary meeting of shareholders consists of at least two shareholders present in person, by proxy or by other voting instrument, who hold at least 25% of the voting power of our shares (and in an adjourned meeting, with some exceptions, two shareholders, regardless of the voting power associated with their shares), instead of 33 1/3% of the issued share capital required under the Nasdaq Listing Rules.

- Executive Sessions of Independent Directors: Under the Companies Law, our independent directors (as defined under the Nasdaq Listing Rules) do not need to meet regularly in sessions at which only they are present, as is required of U.S. domestic issuers under Nasdaq Listing Rule 5605(b)(2).

- Independent Director Oversight of Nominations: Under Israeli law, there is no requirement to have an independent nominating committee or the independent directors of a company select (or recommend for selection) director nominees, as is required under Nasdaq Listing Rule 5605(e) for a U.S. domestic issuer. Our board of directors (based on the recommendation of the executive committee thereof) handles this process, as is permitted by our amended articles and the Companies Law. We also need not adopt a formal board resolution or charter addressing the director nominations process and such related matters as may be required under the U.S. federal securities laws, as Nasdaq requires for a U.S. issuer.

- Compensation Committee Charter: Under Israeli law, we are not required to adopt, and our company has not adopted, a formal written compensation committee charter for the compensation committee of our board of directors, as is generally require Nasdaq Listing Rules related to the composition, responsibilities and authority of the compensation committee.

- Shareholder Approval: Pursuant to Israeli law, we seek shareholder approval for all corporate actions requiring such approval under the requirements of the Companies Law, which are different from, or in addition to, the requirements for seeking shareholder approval under Nasdaq Listing Rule 5635. See "Item 6. Directors, Senior Management and Employees—C. Board Practices — Fiduciary Duties of Office Holders" in this annual report for a description of the some of the transactions requiring shareholder approval under the Companies Law.

## ITEM 16H. MINE SAFETY DISCLOSURE

Not applicable.

## ITEM 16I. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTION.

Not applicable.

## ITEM 16J. INSIDER TRADING POLICIES

Disclosure under this item is not yet required in this annual report.

## ITEM 16K. CYBERSECURITY

### *Risk management and strategy*

We maintain a corporate cyber risk management plan that is part of our business continuity strategy. The risk management plan has been in place for the past five years, and is updated annually to align with the latest cybersecurity trends and developments. The cyber risk management plan includes annual goals and activities that address relevant cyber risks that our Management Information Systems (MIS) department detects. The goals are presented and approved by our management annually.

Our strategy for cyber risk management contains seven layers, consisting of:

1. Firewall & Web Security

2. Network Security

3. Data Protection

4. Security Visibility & Awareness

5. Threat Intelligence

6. End Point Security

7. Code security

We maintain processes and procedures to address each layer of the strategy.

Our ISMS (Information Security Management System) is assessed and certified annually based on industry standards and best practice.

As part of the onboarding of every new vendor with whom we work, we conduct supply chain, TPRM (Third Party Risks Management) processes in order to assess potential risks associated with such vendor, in order to ensure that the vendor meets our cybersecurity requirements.

We maintain an Incident Response Policy as well as an Incident Response Team (comprised as described under "Governance" below), which are based upon and which adhere to, respectively, global principles for detecting, assessing, monitoring, and mitigating cyber incidents. The team conducts, periodically, a professional Table Top Exercise (TTX), together with our external advisors, in which we simulate mock real-time cybersecurity incidents that relate to current identified high risks.

We have in place corporate policies and procedures, including rules and protocols that our employees must abide by, and which reflect our approach to cybersecurity.

We work with external consultants as part of our cybersecurity risk management, but mainly for advisory purposes, such as building and executing cybersecurity plans and activities (for example, as advisors for our TTXs), conducting risk surveys and assessing regulatory or other legal risks. We do not, however, outsource processes or other company cybersecurity functions to third party service providers.

We are not aware of any previous cybersecurity incidents that have materially, or were reasonably likely to materially, affect our company (including business strategy, results of operations, or financial condition). As with virtually every other public company, we believe that a potential future material cybersecurity incident could potentially adversely affect our business operations in a material manner, due to the reliance that we place on our Management Information Systems for, among other things: effectively managing our accounting and financial functions, including maintaining our internal controls; managing our manufacturing and supply chain processes; and maintaining our research and development data. The failure of our management information systems to perform properly could disrupt our business and product development, which may result in decreased sales, increased overhead costs, excess or obsolete inventory, and product shortages, causing our business and operating results to suffer. Please see "Item 3.D. Risk Factors—Risks related to our business and financial condition— We rely on our management information systems…"

*Governance*

As part of our corporate cyber risk management plan, we prioritize the identification and management of cybersecurity risk at several levels, including board oversight and heavy involvement of our management on an ongoing basis. Our board of directors as a whole (rather than any committee or subcommittee of the board) is responsible for the oversight of risks from cybersecurity threats. The board conducts an annual security board meeting, in which our chief information officer (CIO) and chief information security officer (CISO) provide the

137

members of the board cybersecurity updates including risks and threats, and define relevant actions for the year to come.

Cybersecurity related activities are primarily handled at our company by an internal Management Information Systems department that is managed by an experienced CIO, and which includes a CISO and a designated "Global Information Security and IT Compliance" team, comprised of security analysts and engineers. The team's aspect-oriented programming (AOP) that addresses the relevant cyber risks that we detect, as well as our annual cybersecurity plan, are presented to, and approved by, our senior management team.

Our CISO, who has been a chief information security officer for seven years, holds an information security certification from the "See Security Academy", a leading educational institute for cybersecurity professionals, and is also a Certified Ethical Hacker (C|EH) accredited by the EC-Council, widely regarded as the industry's most robust, hands-on cybersecurity program. Our CISO has 15 years of experience in Information Systems and Technology, including ten years dedicated to Information Security, Incident Response, Cybersecurity, and Forensics.

Throughout the year, our management members interact in managing our cybersecurity risks, including via the following management processes:

    a.   The CIO reports on Management Information Systems operations including cybersecurity elements to our senior management team on a quarterly basis.

    b.   The CIO updates our chief operating officer (COO) as to the status of relevant cybersecurity projects and/or incidents on a weekly basis.

    c.   The CISO & CIO discuss the status of cybersecurity projects and/or incidents on a weekly basis.

We furthermore maintain an Incident Response Team (IRT), which is comprised of, among others, the CIO, CISO, chief legal officer (CLO) and representatives of the COO, the chief financial officer (CFO) and the Communications department. The IRT convenes on an as-needed basis following the suspected occurrence of a cybersecurity incident. The IRT is accompanied by outside legal counsel(s) that are familiar with the company and its IRT and are professionally equipped to provide real-time guidance and advice as may be required.

Our Management Information Systems maintains an "Online Service Desk" through which all cyber-related issues, including potential cybersecurity incidents, can be reported. Following initial review, the CIO, in consultation with our internal legal department, escalates a reported issue to the IRT, which then assembles to address the incident.

The IRT reports to our chief executive officer and/or board of directors on case-by-case basis, taking into consideration the specific incident factors and the degree of materiality of the incident.

138

**PART III**

**ITEM 17. FINANCIAL STATEMENTS.**

We have elected to provide financial statements and related information pursuant to Item 18.


**ITEM 18. FINANCIAL STATEMENTS**

The consolidated financial statements and the related notes required by this Item are included in this annual report beginning on page F-1.


139

**STRATASYS LTD.**

**CONSOLIDATED FINANCIAL STATEMENTS**

**December 31, 2023**

| **Index to Consolidated Financial Statements** | **Page** |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB name: Kesselman & Kesselman C.P.A and PCAOB ID:1309) | F-2 |
| Consolidated Balance Sheets at December 31, 2023 and 2022 | F-5 |
| Consolidated Statements of Operations and Comprehensive Loss for the Years Ended December 31, 2023, 2022 and 2021 | F-6 |
| Consolidated Statements of Changes in Equity for the Years Ended December 31, 2023, 2022 and 2021 | F-7 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2023, 2022 and 2021 | F-8 |
| Notes to the Consolidated Financial Statements | F-9 |

F-1



**Report of Independent Registered Public Accounting Firm**

To the board of directors and shareholders of Stratasys Ltd.
***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Stratasys Ltd. and its subsidiaries (the "Company") as of December 31, 2023 and 2022, and the related consolidated statements of operations and comprehensive loss, of changes in equity and of cash flows for each of the three years in the period ended December 31, 2023, including the related notes (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2023, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2023 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2023, based on criteria established in Internal Control - Integrated Framework (2013) issued by the COSO.

*Basis for Opinions*
The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Annual Report on Internal Control over Financial Reporting appearing under Item 15(b). Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

*Definition and Limitations of Internal Control over Financial Reporting*
A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.
Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.



*Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that (i) relate to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Goodwill Impairment Assessment – Stratasys-Core reporting unit*

As described in Note 8 to the consolidated financial statements, the Company's goodwill balance in respect of the Stratasys-Core reporting unit is $100 million as of December 31, 2023. Management conducts an impairment test in the fourth quarter of each year, or more frequently if events or circumstances indicate that the carrying value of goodwill may be impaired. Potential impairment is identified by comparing the fair value of a reporting unit to its carrying value, including goodwill. Fair value is estimated by management using a discounted cash flow model. Management's cash flow projections for the Stratasys-Core reporting unit includes significant judgments and assumptions relating to the cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate.

The principal considerations for our determination that performing procedures relating to the goodwill impairment assessment of the Stratasys-Core reporting unit is a critical audit matter are (i) the significant judgment by management when developing the fair value measurement of the reporting unit; (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumptions related to the cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's goodwill impairment assessment, including controls over the valuation of the Company's reporting units. These procedures also included, among others, testing management's process for developing the fair value estimate of the reporting unit, evaluating the appropriateness of the discounted cash flow model, testing the completeness, accuracy, and relevance of underlying data used in the model, and evaluating the significant assumptions used by management, including the cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate. Evaluating management's assumptions related to cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate involved evaluating whether the assumptions used by management were reasonable considering (i) the current and past performance of the reporting unit, (ii) the consistency with external market and industry data, and (iii) whether these assumptions were consistent with evidence obtained in other areas of the audit. Professionals with specialized skill and knowledge were used to assist in the evaluation of the Company's discounted cash flow model and the discount rate assumption.

*Purchase Price Allocation ("PPA") – Covestro Acquisition*

As described in Note 2 to the consolidated financial statements, on April 3, 2023, the Company completed the acquisition of the additive manufacturing materials business of Covestro AG ("Covestro") for a total consideration of $61 million. This resulted in $21.9 million of intangible assets being recorded in respect of customer relationship, technology and trade name. Fair value is estimated by management using a multi-period excess earnings method for customer relationships and a relief from royalty method for technology and tradename. Management's cash flow projections for the intangible assets acquired included significant judgments and assumptions relating to revenue growth rates, customer attrition rates, and discount rates for customer relationships and revenue growth rates, royalty rates, and discount rates for technology and tradename.

The principal considerations for our determination that performing procedures relating to the PPA including the valuation of the intangible assets acquired in the acquisition of Covestro is a critical audit matter are (i) there was a high degree of auditor judgment and subjectivity in applying procedures relating to the fair value measurement of intangible assets acquired due to the significant judgment by management when developing the estimate; (ii) significant audit effort was required in evaluating the significant assumptions relating to the estimate, such as revenue growth rates , customer attrition rates and discount rates for customer relationships and revenue growth rates, royalty rates, and discount rates for technology and tradename; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

F-3



Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the acquisition accounting, including controls over management's valuation of the intangible assets and controls over development of the assumptions related to the PPA including the valuation of the intangible assets. These procedures also included, among others (i) reading the purchase agreement; (ii) testing management's process for estimating the fair value of the customer relationships, technology and tradename acquired; (iii) evaluating the appropriateness of the multi-period excess earnings and relief from royalty methods used by management; (iv) testing the completeness and accuracy of the underlying data used in the multi-period excess earnings and relief from royalty methods; and (v) evaluating the reasonableness of the significant assumptions used by management related to revenue growth rates and discount rates for customer relationships and revenue growth rates, royalty rates, and discount rates for technology and tradename. Evaluating management's assumptions related to revenue growth rates for customer relationships, technology and tradename involved considering (i) the current and past performance of the Covestro business; (ii) the consistency with external market and industry data; and (iii) whether the assumptions were consistent with evidence obtained in other areas of the audit. Professionals with specialized skill and knowledge were used to assist in evaluating (i) the appropriateness of the multi-period excess earnings and relief from royalty methods and (ii) the reasonableness of the discount rate assumption for customer relationships and the royalty rate and discount rate assumptions for technology and tradename.

*Impairment Evaluation for Equity Method Investment in Ultimaker*

As described in Note 2 to the consolidated financial statements, the Company equity method investment in Ultimaker balance was $67.8 million as of December 31, 2023 after recording an impairment charge of $13.9 million. The carrying value of this equity method investment is evaluated for impairment when indicators of a loss in value below the carrying value exist, including, a lack of sustained earnings or a deterioration of market conditions, among others. The Company records an impairment charge, when the determined fair value is lower than carrying value, and such reduction in fair value is considered other-than-temporary. .Fair value is estimated by management using a discounted cash flow model. Management's cash flow projections for the equity investment includes significant judgments and assumptions relating to the cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate.

The principal considerations for our determination that performing procedures relating to the impairment assessment of the equity method investment is a critical audit matter are (i) the significant judgment by management when developing the fair value measurement of the equity method investment; (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumptions related to the cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate; and (iii) the audit effort involved the use of professionals with specialized skill and knowledge.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's impairment assessment, including controls over the valuation of the equity method investment. These procedures also included, among others, testing management's process for developing the fair value estimate of the equity method investment, evaluating the appropriateness of the discounted cash flow model, testing the completeness, accuracy, and relevance of underlying data used in the model, and evaluating the significant assumptions used by management, including the cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate. Evaluating management's assumptions related to cash flow projections (including revenue growth and associated operating profits margins), the long-term growth rates, and the discount rate involved evaluating whether the assumptions used by management were reasonable considering (i) the current and past performance of the equity method investment, (ii) the consistency with external market and industry data, and (iii) whether these assumptions were consistent with evidence obtained in other areas of the audit. Professionals with specialized skill and knowledge were used to assist in the evaluation of the Company's discounted cash flow model and the discount rate assumption.

/s/ Kesselman & Kesselman
Certified Public Accountants (Isr.)
A member firm of PricewaterhouseCoopers International Limited
Tel-Aviv, Israel
March 11, 2024
We have served as the Company's auditor since 2012.

F-4

**STRATASYS LTD.**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Consolidated Balance Sheets**

(in thousands, except per share data)

| December 31, | | 2023 | | 2022 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| | | | | |
| **Current assets** | | | | |
| Cash and cash equivalents | $ | 82,585 | $ | 150,470 |
| Short-term bank Deposits | | 80,000 | | 177,367 |
| Accounts receivable, net of allowance for credit losses of $1,449 and $861 as of December 31, 2023 and December 31, 2022, respectively | | 172,009 | | 144,739 |
| Inventories | | 192,976 | | 194,054 |
| Prepaid expenses | | 7,929 | | 5,767 |
| Other current assets | | 24,596 | | 27,823 |
| | | | | |
| Total current assets | | 560,095 | | 700,220 |
| **Non-current assets** | | | | |
| Property, plant and equipment, net | | 197,552 | | 195,063 |
| Goodwill | | 100,051 | | 64,953 |
| Other intangible assets, net | | 127,781 | | 121,402 |
| Operating lease right-of-use assets | | 18,895 | | 18,122 |
| Long-term investments | | 115,083 | | 141,610 |
| Other non-current assets | | 14,448 | | 18,420 |
| | | | | |
| Total non-current assets | | 573,810 | | 559,570 |
| | | | | |
| **Total assets** | $ | 1,133,905 | $ | 1,259,790 |
| | | | | |
| **LIABILITIES AND EQUITY** | | | | |
| | | | | |
| **Current liabilities** | | | | |
| Accounts payable | $ | 46,785 | $ | 72,921 |
| Accrued expenses and other current liabilities | | 36,656 | | 45,912 |
| Accrued compensation and related benefits | | 33,877 | | 34,432 |
| Deferred revenues- short-term | | 52,610 | | 50,220 |
| Operating lease liabilities - short-term | | 6,498 | | 7,169 |
| | | | | |
| Total current liabilities | | 176,426 | | 210,654 |
| | | | | |
| **Non-current liabilities** | | | | |
| Deferred revenues - long-term | | 23,655 | | 25,214 |
| Deferred income taxes | | 723 | | 5,638 |
| Operating lease liabilities - long-term | | 12,162 | | 10,670 |
| Contingent consideration | | 11,900 | | 23,707 |
| Other non-current liabilities | | 24,200 | | 24,475 |
| | | | | |
| Total non-current liabilities | | 72,640 | | 89,704 |
| | | | | |
| **Total liabilities** | $ | 249,066 | $ | 300,358 |
| | | | | |
| Commitments and contingencies (see note 11) | | | | |
| | | | | |
| **Equity** | | | | |
| Ordinary shares, NIS 0.01 nominal value, authorized 180,000 shares; 69,656 shares and 67,086 shares issued and outstanding at December 31, 2023 and December 31, 2022, respectively | $ | 195 | $ | 187 |
| Additional paid-in capital | | 3,091,649 | | 3,048,915 |
| Accumulated other comprehensive loss | | (7,079) | | (12,818) |
| Accumulated deficit | | (2,199,926) | | (2,076,852) |
| | | | | |
| Total equity | | 884,839 | | 959,432 |
| | | | | |
| **Total liabilities and equity** | $ | 1,133,905 | $ | 1,259,790 |

*The accompanying notes are an integral part of these consolidated financial statements.*

F-5

**STRATASYS LTD.**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Consolidated Statements of Operations and Comprehensive Loss**

**(in thousands, except per share data)**

| Years Ended December 31, | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Products | $ | 433,741 | $ | 452,124 | $ | 417,557 |
| Services | | 193,857 | | 199,359 | | 189,662 |
| | | 627,598 | | 651,483 | | 607,219 |
| **Cost of revenues** | | | | | | |
| Products | | 226,510 | | 234,601 | | 210,941 |
| Services | | 134,064 | | 140,415 | | 136,200 |
| | | 360,574 | | 375,016 | | 347,141 |
| **Gross profit** | | 267,024 | | 276,467 | | 260,078 |
| **Operating expenses** | | | | | | |
| Research and development, net | | 94,425 | | 92,876 | | 88,303 |
| Selling, general and administrative | | 260,179 | | 240,750 | | 250,937 |
| | | 354,604 | | 333,626 | | 339,240 |
| **Operating loss** | | (87,580) | | (57,159) | | (79,162) |
| Gain from deconsolidation of subsidiary | | — | | 39,136 | | — |
| Gain from step acquisition | | — | | — | | 14,400 |
| Financial income (expense), net | | 2,993 | | 229 | | (2,075) |
| **Loss before income taxes** | | (84,587) | | (17,794) | | (66,837) |
| Income tax expenses (benefit) | | 5,782 | | 5,454 | | (3,906) |
| Share in profit (losses) of associated companies | | (32,705) | | (5,726) | | 949 |
| **Net loss** | $ | (123,074) | $ | (28,974) | $ | (61,982) |
| Net loss attributable to Stratasys Ltd. | $ | (123,074) | $ | (28,974) | $ | (61,982) |
| **Net loss per ordinary share attributable to Stratasys Ltd. - basic and diluted** | $ | (1.79) | $ | (0.44) | $ | (0.98) |
| **Weighted average ordinary shares outstanding - basic and diluted** | | 68,666 | | 66,491 | | 63,471 |
| **Comprehensive loss** | | | | | | |
| Net loss | | (123,074) | | (28,974) | | (61,982) |
| Other comprehensive income (loss), net of tax: | | | | | | |
| Foreign currency translation adjustments | | 3,650 | | (2,175) | | (3,170) |
| Unrealized gains (losses) on derivatives designated as cash flow hedges | | 2,089 | | (1,872) | | 3,245 |
| Other comprehensive income (loss), net of tax | | 5,739 | | (4,047) | | 75 |
| Comprehensive loss | | (117,335) | | (33,021) | | (61,907) |
| **Comprehensive loss attributable to Stratasys Ltd.** | $ | (117,335) | $ | (33,021) | $ | (61,907) |

*The accompanying notes are an integral part of those consolidated financial statements.*

F-6

**STRATASYS LTD.**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Consolidated Statements of Changes in Equity**

**(in thousands)**

| Years Ended December 31, 2023, 2022, and 2021 | Ordinary Shares | | Additional Paid-In Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Equity |
|---|---|---|---|---|---|---|
| | Number of shares | Par Value | | | | |
| **Balances, January 1, 2021** | 56,617 | 155 | 2,753,955 | (1,985,896) | (8,846) | 759,368 |
| Issuance of shares in connection with stock-based compensation plans | 1,129 | 3 | 8,052 | — | — | 8,055 |
| Stock-based compensation | — | — | 30,977 | — | — | 30,977 |
| Public offering of ordinary shares, net | 7,931 | 24 | 218,826 | — | — | 218,850 |
| Other items | — | — | 444 | — | — | 444 |
| Reduction of redeemable non-controlling interest | — | — | 227 | — | — | 227 |
| Comprehensive income (loss) | — | — | — | (61,982) | 75 | (61,907) |
| **Balance as of December 31, 2021** | 65,677 | 182 | 3,012,481 | (2,047,878) | (8,771) | 956,014 |
| Issuance of shares in connection with stock-based compensation plans | 1,159 | 4 | 262 | — | — | 266 |
| Issuance of Common stock under employee stock purchase plan | 250 | 1 | 2,978 | — | — | 2,979 |
| Stock-based compensation | — | — | 33,461 | — | — | 33,461 |
| Other | — | — | (267) | — | — | (267) |
| Comprehensive loss | — | — | — | (28,974) | (4,047) | (33,021) |
| **Balance as of December 31, 2022** | 67,086 | 187 | 3,048,915 | (2,076,852) | (12,818) | 959,432 |
| Issuance of shares in connection with stock-based compensation plans | 1,690 | 5 | 6 | — | — | 11 |
| Issuance of Common stock under employee stock purchase plans | 562 | 2 | 5,913 | — | — | 5,915 |
| Issuance of shares as part of the Covestro acquisition | 318 | 1 | 5,201 | — | — | 5,202 |
| Stock-based compensation | — | — | 31,614 | — | — | 31,614 |
| Comprehensive income (loss) | — | — | — | (123,074) | 5,739 | (117,335) |
| **Balance as of December 31, 2023** | 69,656 | 195 | 3,091,649 | (2,199,926) | (7,079) | 884,839 |

*The accompanying notes are an integral part of those consolidated financial statements.*

F-7

**STRATASYS LTD.**
**CONSOLIDATED FINANCIAL STATEMENTS**

**Consolidated Statements of Cash Flows**

**(in thousands)**

| Years ended December 31, | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| **Cash flows from operating activities** | | | | | | |
| Net loss | $ | (123,074) | $ | (28,974) | $ | (61,982) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | | | | |
| Impairment of other long-lived assets | | 4,443 | | 3,865 | | 1,447 |
| Depreciation and amortization | | 48,973 | | 59,769 | | 56,096 |
| Stock-based compensation | | 31,614 | | 33,461 | | 30,977 |
| Foreign currency transaction loss (gain) | | 636 | | 9,090 | | 3,446 |
| Gain from step acquisition | | — | | — | | (14,400) |
| Gain from deconsolidation of subsidiary | | — | | (39,136) | | — |
| Share in net losses (profits) of associated companies | | 32,705 | | 5,726 | | (949) |
| Revaluation of investments | | 5,665 | | 3,778 | | (1,301) |
| Revaluation of contingent consideration | | (21,408) | | (15,805) | | — |
| Deferred income taxes, net and uncertain tax positions | | (1,764) | | 926 | | (12,380) |
| Other non-cash items, net | | 1,089 | | (2,778) | | 2,914 |
| | | | | | | |
| Change in cash attributable to changes in operating assets and liabilities: | | | | | | |
| Accounts receivable, net | | (25,653) | | (28,877) | | (25,003) |
| Inventories | | 4,571 | | (87,337) | | (53) |
| Other current assets and prepaid expenses | | 1,553 | | 5,758 | | (14,976) |
| Other non-current assets | | 11,047 | | 4,472 | | 10,460 |
| Accounts payable | | (27,445) | | 19,614 | | 28,492 |
| Other current liabilities | | 4,228 | | (17,707) | | 38,952 |
| Deferred revenues | | 408 | | 6,577 | | 8,872 |
| Other non-current liabilities | | (9,233) | | (7,827) | | (14,788) |
| **Net cash provided by (used in) operating activities** | $ | (61,645) | $ | (75,405) | $ | 35,824 |
| | | | | | | |
| **Cash flows from investing activities** | | | | | | |
| Cash paid for business combinations, net of cash acquired | | (72,118) | | — | | (20,553) |
| Purchase of property and equipment | | (13,551) | | (13,635) | | (24,981) |
| Investments in short-term bank deposits | | (111,448) | | (479,852) | | (361,000) |
| Proceeds from short-term bank deposits | | 208,815 | | 561,485 | | 129,000 |
| Investments in non-marketable equity securities | | (12,443) | | (69,148) | | (11,779) |
| Purchase of intangible assets | | (1,476) | | (6,117) | | (1,770) |
| Other investing activities | | (1,613) | | 54 | | (82) |
| **Net cash used in investing activities** | $ | (3,834) | $ | (7,213) | $ | (291,165) |
| | | | | | | |
| **Cash flows from financing activities** | | | | | | |
| Proceeds from public offering, net of issuance costs | | — | | — | | 218,850 |
| Proceeds from exercise of stock options | | 11 | | 266 | | 8,055 |
| Payment of contingent consideration | | (1,339) | | (2,754) | | — |
| Other financing activities | | (188) | | (281) | | 406 |
| **Net cash provided by (used in) financing activities** | $ | (1,516) | $ | (2,769) | $ | 227,311 |
| | | | | | | |
| **Effect of exchange rate changes on cash, cash equivalents and restricted cash** | | (827) | | (7,220) | | (893) |
| | | | | | | |
| **Net change in cash, cash equivalents and restricted cash** | | (67,822) | | (92,607) | | (28,923) |
| | | | | | | |
| **Cash, cash equivalents and restricted cash, beginning of year** | | 150,686 | | 243,293 | | 272,216 |
| **Cash, cash equivalents and restricted cash, end of year** | $ | 82,864 | $ | 150,686 | $ | 243,293 |
| | | | | | | |
| **Reconciliation of cash, cash equivalents and restricted cash reported in the consolidated balance sheets:** | | | | | | |
| Cash and cash equivalents | | 82,585 | | 150,470 | | 243,179 |
| Restricted cash included in other current assets | | 279 | | 216 | | 114 |
| **Total cash, cash equivalents and restricted cash shown in the statement of cash flows** | $ | 82,864 | $ | 150,686 | $ | 243,293 |
| | | | | | | |
| **Supplemental disclosure of cash flow information** | | | | | | |
| Cash paid during the year for: | | | | | | |
| Income taxes, net of tax refunds | $ | 2,152 | $ | 12,550 | $ | 2,418 |
| Non-cash investing and financing activities: | | | | | | |
| Transfer of inventories to fixed assets | | 9,551 | | 9,212 | | 2,673 |
| Transfer of fixed assets to inventories | | 222 | | 123 | | 977 |
| Contingent consideration | | 2,472 | | — | | 17,985 |
| Right-of-use assets obtained in exchange for new operating lease liabilities | | 7,142 | | 12,057 | | 5,955 |
| Issuance of Common stock under employee stock purchase plan | | 5,915 | | 2,978 | | — |
| Issuance of shares as part of Covestro acquisition (Refer to Note 2) | $ | 5,202 | $ | — | $ | — |

*The accompanying notes are an integral part of those consolidated financial statements.*

F-8

**Note 1. Nature of Operations and Summary of Significant Accounting Policies**

    a.   **Nature of Operations**

Stratasys Ltd. (collectively with its subsidiaries, the "Company" or "Stratasys") is a global leader in connected, polymer-based 3D printing solutions, across the entire manufacturing value chain. The Company leverages its competitive advantages, which include a broad set of best-in-class 3D printing platforms, software, a materials and technology partner ecosystem, innovative leadership, and global GTM infrastructure, in order to position itself to capture share in a significant and growing global marketplace, with a focus on manufacturing, which the Company views as having the largest and fastest growing total addressable market. The Company's approximately 2,600 granted and pending additive technology patents to date have been used to create models, prototypes, manufacturing tools, and production parts for a multitude of industries including aerospace, automotive, transportation, healthcare, consumer products, dental, medical, fashion and education. Stratasys' products and comprehensive solutions improve product quality, development time, cost, time-to-market and patient care. The Company's 3D ecosystem of solutions and expertise includes 3D printers, materials, software, expert services, and on-demand parts production.

    The Company has one operating segment, which generates revenues via the sale of its 3D printing systems, related services and consumables and by providing additive manufacturing ("AM") solutions. The Company operates mainly through offices in Israel, the United States, Germany, Hong Kong and Japan.

In October 2023, Israel was attacked by a terrorist organization and entered a state of war. As of the date of these financial statements, the war in Israel is ongoing and continues to evolve. One of the Company's global headquarters and one of its manufacturing facilities are located in Israel. As of the filing date of these financial statements, the Company's activities in Israel remain largely unaffected by the war. During the year ended December 31, 2023, the impact of the war on the Company's results of operations and financial condition is limited, but such impact may change, and could be significant, as a result of the continuation, escalation or expansion of the war. The Company continues to maintain business continuity plans backed by its inventory levels located outside of Israel.

    b.   **Summary of Significant Accounting Policies**

*Basis of Presentation*

    The consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States of America ("US GAAP").

*Principles of Consolidation*

    The accompanying consolidated financial statements include the accounts of Stratasys Ltd., and its subsidiaries. All intercompany balances and transactions, including profits from intercompany sales not yet realized outside the Company, have been eliminated in consolidation.

STRATASYS LTD.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

*Functional Currency and Foreign Currency Transactions*

A major part of the Company's operations is carried out by Stratasys Ltd. in Israel and its subsidiaries in the United States. The functional currency of these entities is the U.S. dollar ("dollar" or "$"). The functional currency of other subsidiaries is generally their local currency. The financial statements of those subsidiaries are included in the consolidated financial statements, based on translation into U.S. dollars. Assets and liabilities accounts are translated at year-end exchange rates, while revenues and expenses accounts are translated at average exchange rates during the year. The remeasurement adjustments of foreign currencies translation are included in the Company's shareholders' equity as a component of accumulated other comprehensive loss in the accompanying consolidated financial statements. Gains and losses arising from foreign currency remeasurements of monetary balances denominated in non-functional currencies are reflected in financial income (expenses), net in the consolidated statements of operations and comprehensive loss.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates using assumptions that affect the reported amounts of assets and liabilities and related disclosures at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates, and such differences may have a material impact on the Company's financial statements. As applicable to these consolidated financial statements, the most significant estimates relate to recoverability of intangibles and goodwill and purchase price allocation including contingent consideration.

In particular, a number of estimates have been and will continue to be affected by the war in Israel and other global events and other longer-term macroeconomic conditions, most prominently, the extent and speed at which inflation subsides, whether and when interest rate cuts are implemented by central banks, whether tight credit markets are loosened, and whether capital markets and global supply chains fully recover. As a result, the accounting estimates and assumptions may change over time. Such changes could have an additional impact on the Company's long-lived asset and intangible asset valuation; and the allowance for expected credit losses. These consolidated financial statements reflect the financial statement effects based upon management's estimates and assumptions utilizing the most currently available information.

*Fair Value Measurements*

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. A hierarchy has been established for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available.

Observable inputs are inputs that are developed using market data, such as publicly available information about actual events or transactions, and that reflect the assumptions that market participants would use when pricing the asset or liability. Unobservable inputs are inputs for which market data are not available and that are developed using the best information available about the assumptions that market participants would use when pricing the asset or liability. The fair value hierarchy categorizes into three levels. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities that the reporting entity can access at the measurement date. Level 2 inputs include inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly. Level 3 inputs are unobservable inputs for the asset or liability.

The fair value hierarchy gives the highest priority to quoted prices (unadjusted) in active markets for identical assets or liabilities (Level 1 inputs) and the lowest priority to unobservable inputs (Level 3 inputs). Categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Business Combinations*

The Company allocates the fair value of consideration transferred in a business combination to the assets acquired, liabilities assumed, and non-controlling interests in the acquired business based on their fair values at the acquisition date. Acquisition-related expenses and restructuring costs are recognized separately from the business combination and are expensed as incurred. The excess of the fair value of the consideration transferred plus the fair value of any non-controlling interest in the acquiree over the fair value of the assets acquired, liabilities assumed in the acquired business is recorded as goodwill. Fair value estimates are based on the assumptions management believes a market participant would use in pricing the asset or liability. The fair value of the consideration transferred may include a combination of cash, equity securities, earn out payments and deferred payments. The allocation of the consideration transferred in certain cases may be subject to revision based on the final determination of fair values during the measurement period, which may be up to one year from the acquisition date. The cumulative impact of revisions during the measurement period is recognized in the reporting period in which the revisions are identified. The Company includes the results of operations of the businesses that it has acquired in its consolidated results prospectively from the respective dates of acquisition. When the Company acquires net assets that do not constitute a business, as defined under U.S. GAAP, no goodwill is recognized and acquired IPR&D is expensed unless it has an alternative future use.

The Company records obligations in connection with its business combinations at fair value on the acquisition date. Key assumptions used to determine the estimated fair value of the contingent consideration amounts include: (a) internal cash flows forecasts for the relevant period during which the financial metrics should be achieved; and (b) a discount rate which reflects the weighted average cost of capital adjusted for the relevant risk associated with the operations and the uncertainty inherent in the Company's internally developed forecasts. Each reporting period thereafter, the Company revalues earn-out payments and deferred payments which are classified as liabilities and records the changes in their fair value in the consolidated statements of operations and comprehensive loss under selling, general and administrative expenses.

Changes in the fair value of the obligations in connection with its business combinations can result from adjustments to the discount rates, the Company's shares price, sales and profitability targets. These fair value measurements represent Level 3 measurements, as they are based on significant inputs not observable in the market. Significant judgment is required in determining the assumptions utilized as of the acquisition date and for each subsequent measurement period. Accordingly, changes in the assumptions described above could have a material impact on the Company's consolidated results of operations.

*Cash and Cash Equivalents*

All highly liquid investments, which include short-term bank deposits that are not restricted as to withdrawal or use, with maturities of ninety days or less when acquired, are considered to be cash equivalents.

*Bank Deposits*

Bank deposits with original maturity dates of more than three months but at balance sheet date are less than one year are included in short-term bank deposits. The fair value of bank deposits approximates the carrying value since they bear interest at rates close to the prevailing market rates.

*Accounts Receivable, net*

The Company maintains the allowance for estimated losses resulting from the inability of the Company's customers to make required payments. The allowance represents the current estimate of lifetime expected credit losses over the remaining duration of existing accounts receivable considering current market conditions and supportable forecasts when appropriate. The estimate is a result of the Company's ongoing evaluation of collectability, customer creditworthiness, historical levels of credit losses, and future expectations.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Allowance for credit losses due to the Company's accounts receivable amounted to $1.4 million and $0.9 million as of December 31, 2023 and 2022, respectively. Changes in the allowance for credit losses are recognized in selling, general and administrative expenses. Accounts receivable are written-off against the allowance for credit losses when management deems the accounts are no longer collectible.

The balance and the changes in the allowance for expected credit losses are comprised as follows:

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
| Balance at beginning of year | $ 860 | $ 517 | $ 870 |
| Change during the year, net | 725 | 420 | 50 |
| Bad debt written off | (136) | (77) | (403) |
| Balance at end of year | $ 1,449 | $ 860 | $ 517 |

***Derivative Instruments and Hedge Accounting***

The Company conducts its operations globally and may be exposed to global market risks and to the risk that its earnings, cash flows and equity could be adversely impacted by fluctuations in foreign currency exchange rates. As part of the Company's risk management strategy, the Company enters into transactions involving foreign currency exchange derivative financial instruments. For its non-hedging transactions, the Company manages its foreign currency exposures on a consolidated basis, which allows the Company to net exposures and take advantage of any natural hedging. The transactions are designed to manage the Company's net exposure to foreign currency exchange rates and to reduce the volatility of earnings and cash flows associated with changes in foreign currency exchange rates. Financial markets and currency volatility may limit the Company's ability to hedge these exposures. The Company does not enter into derivative transactions for trading purposes.

The Company recognizes these derivative instruments as either assets or liabilities in the consolidated balance sheets at their fair value. Derivatives in a gain position are reported in other current assets in the consolidated balance sheets and derivatives in a loss position are recorded in accrued expenses and other current liabilities in the consolidated balance sheets, on a gross basis.

When the Company enters into a derivative contract, it designates the derivative for accounting purposes, as either a hedging instrument which qualifies for hedge accounting or as a non-hedging instrument which does not qualify for hedge accounting. In order to qualify for hedge accounting, the Company formally documents at the inception of each hedging relationship the hedging instrument, the hedged item, the risk management objective and strategy for undertaking each hedging relationship, and the method used to assess hedge effectiveness.

For each hedging instrument that hedges the exposure to variability in expected future cash flows and that is designated and effective as a cash flow hedge, the unrealized gain or loss on the derivative instrument is reported as a component of accumulated other comprehensive loss in the Company's shareholders' equity and is reclassified into earnings in the same period and in the same line item in which the hedged transaction affects earnings. The cash flows associated with these derivatives are reported in the consolidated statements of cash flows consistently with the classification of cash flows from the underlying hedged items that these derivatives are hedging.

For non-hedging instruments, the Company records the changes in fair value of derivative instruments in financial income (expenses), net in the consolidated statements of operations and comprehensive loss. The cash flows associated with these derivatives are reflected as cash flows from operating activities in the consolidated statement of cash flows. Refer to Note 13 for further information regarding the Company's derivative and hedging activities.

F-12

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Inventories*

Inventories are stated at the lower of cost or net realizable value. Cost is determined mainly using standard cost, which approximates actual cost, on a first-in, first-out basis. Inventory costs consist of materials, direct labor and overhead. Net realizable value is determined based on estimated selling prices in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. The Company periodically assesses inventory for obsolescence and excess balances and reduces the carrying value by an amount equal to the difference between its cost and the net realizable value. The net realizable value is primarily estimated based on future demand forecasts, as well as, historical sales trends, product life cycle status and product development plans.

*Equity method investments*

The Company's investments in non-marketable equity securities in which it has the ability to exercise significant influence, but does not control through variable interests or voting interests, are accounted for under the equity method of accounting. Under the equity method, the Company recognizes its proportionate share of the comprehensive income or loss of the investee. The Company's share of profit or losses from equity method investments is included in share in net profits (losses) of associated companies.

The Company periodically reviews equity method investments for impairment in value whenever events or changes in circumstances indicate that the carrying amount of such investments may not be recoverable. The Company will record an impairment charge to the extent that the estimated fair value of an investment is less than its carrying value and the Company determines the impairment is other-than-temporary. Impairment charges, if applicable, are recorded in "Share in net profits (losses) of associated companies".

*Other Long-term Investments*

Other non-marketable equity securities without readily determinable fair value in which the Company does not have a controlling interest or significant influence are accounted for under the measurement alternative method. Under this method, the investments are carried at their original cost, less any impairment and adjusted for observable price changes for identical or similar instruments. Marketable securities are carried at fair value with changes in value recorded in Consolidated Statements of Operations and Comprehensive Loss.

Investments in convertible notes are carried at fair value utilizing a combination of discounted cash flows associated with the note and the fair value of the equity into which the note may be converted. This fair value measurement is based on significant unobservable inputs in the market and thus represents a Level 3 measurement within the fair value hierarchy. Refer to note 5.

The Company reviews its other long-term investments for potential impairment or other adjustments, which generally involves an analysis of the facts and changes in circumstances influencing the investments.

As of December 31, 2023 the amount presented under Long-term investments included investment in equity method investment in the amount of $67.8 million. see also Note 2. The balance of long-term investments represents investments in non-marketable equity securities without readily determinable fair value and convertible notes.

*Property, Plant and Equipment, net*

Property, plant and equipment are stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets, or in the case of leasehold improvements, the shorter of the lease term (including any renewal periods, if appropriate) or the estimated useful life of the asset.

Repairs and maintenance are charged to expense as incurred, while betterments and improvements that extend the useful life or add functionality of property, plant and equipment are capitalized.

Depreciation is computed primarily over the following periods:

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Useful Life in Years | | |
|---|---|---|---|
| Buildings | 25 | - | 40 |
| Machinery and equipment | 5 | - | 10 |
| Leasehold and buildings improvements | 5 | - | 10 |
| Computer equipment and software | 3 | - | 5 |
| Office equipment, furniture and fixtures | 5 | - | 14 |

The Company reviews the carrying amounts of property, plant and equipment for potential impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In evaluating recoverability, the Company groups assets and liabilities at the lowest level such that the identifiable cash flows relating to the group are largely independent of the cash flows of other assets and liabilities. The Company then compares the carrying amounts of the assets or asset groups with the related estimated undiscounted future cash flows. In the event impairment exists, an impairment charge is recorded at the amount by which the carrying amount of the asset or asset group exceeds the fair value. In addition, the remaining depreciation period for the impaired asset would be reassessed and, if necessary, revised.

*Other Intangible Assets, net*

Intangible assets and their useful lives are as follows:

| | Useful Life in Years | | |
|---|---|---|---|
| Developed technology | 5 | - | 10 |
| Patents | | | 10 |
| Trade names | 5 | - | 9 |
| Customer relationships | 5 | - | 10 |

Definite life intangible assets are amortized using the straight-line method over their estimated period of useful life. Amortization of acquired developed technology is recorded in cost of revenues. Amortization of trade names, customer relationships and patents is recorded under selling, general and administrative expenses.

For definite life intangible assets, the Company reviews the carrying amounts for potential impairment when events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. In evaluating recoverability, the Company groups assets and liabilities at the lowest level such that the identifiable cash flows relating to the group are largely independent of the cash flows of other assets and liabilities. The Company then compares the carrying amounts of the asset or assets groups with their respective estimated undiscounted future cash flows. If the definite life intangible asset or assets group are determined to be impaired, an impairment charge is recorded at the amount by which the carrying amount of the asset or assets group exceeds their fair value. Fair value is determined by using an applicable discounted cash flow model. In addition, the remaining amortization period for the impaired asset would be reassessed and, if necessary, revised. Refer to Note 9 for further information.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### *Goodwill*

Goodwill reflects the excess of the consideration transferred plus the fair value of any non-controlling interest in the acquiree at the business combination date over the fair values of the identifiable net assets acquired. Goodwill is an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized. The Company allocates goodwill to its reporting units based on the reporting unit expected to benefit from the business combination.

The primary items that generate goodwill include the value of the synergies between the acquired companies and the Company and the acquired assembled workforce, neither of which qualifies for recognition as an intangible asset.

Goodwill is not amortized but rather is tested for impairment annually in the fourth quarter at the reporting unit level, or whenever events or circumstances present an indication of potential impairment which requires an interim goodwill impairment analysis.

ASC 350, "Intangibles - Goodwill and other" ("ASC 350"), allows an entity to first assess qualitative factors to determine whether it is necessary to perform the two-step quantitative goodwill impairment test. If the qualitative assessment does not result in a more likely than not indication of impairment, no further impairment testing is required. If it does result in a more likely than not indication of impairment, the quantitative goodwill impairment test two-step impairment test is performed. Alternatively, ASC 350 permits an entity to bypass the qualitative assessment for any reporting unit and proceed directly to performing the quantitative first step of the goodwill impairment test. If the carrying value of the reporting unit exceeds its fair value, an impairment charge is recognized for the amount by which the carrying value exceeds the reporting unit's fair value. If the fair value of the reporting unit is determined to be greater than its carrying amount, the applicable goodwill is not impaired.

### *Retirement Plans and Employee Rights Upon Termination*

Under Israeli law, the Company is required to pay a severance payment to its employees in Israel upon dismissal of an employee or upon termination of employment in certain other circumstances. The Company makes ongoing deposits into its Israeli employee pension plans to fund their severance liabilities. For its employees who are employed under the Section 14 of the Severance Pay Law, 1963 ("Section 14"), the Company makes deposits with certain insurance companies for accounts controlled by each applicable employee in order to secure the employee's rights upon termination. In addition, the related obligations and amounts deposited on behalf of the applicable employees for such obligations are not presented on the Company's consolidated balance sheets, as the amounts funded are not under the control and management of the Company and the Company is legally released from the obligation to pay any severance payments to the employees once the required deposit amounts have been paid.

Severance pay liabilities with respect to the Company's employees in Israel who are not subject to Section 14, as well as employees who have special contractual arrangements, are provided for in the Company's consolidated financial statements based on the length of time that they work for the Israeli entity and their latest monthly salary. The Company's liabilities for those Israeli employees, in amounts of $2.5 million and $2.8 million as of December 31, 2023 and 2022, respectively, are presented as other non-current liabilities in the Company's consolidated balance sheets. These liabilities are recorded as if they were payable at each balance sheet date. These liabilities are partially funded by the purchase of insurance policies or by the establishment of pension funds with dedicated deposits in the funds. The amounts used to fund these liabilities are included in the Company's consolidated balance sheets under other non-current assets. As of December 31, 2023 and 2022, the Company had $2.1 million and $2.3 million, respectively, deposited in these insurance policies and pension funds. These policies are the Company's assets. However, under employment agreements and subject to certain limitations, any policy may be transferred to the ownership of the individual employee for whose benefit the funds were deposited.

In addition, the Company has liabilities for severance payments to its employees in other jurisdictions in accordance with local laws and practices of the countries in which they are employed.

F-15

Severance expenses for the years ended December 31, 2023, 2022 and 2021 were $4.3 million, $3.9 million and $3.4 million, respectively.

For its employees in the United States, the Company has a defined contribution retirement plan (the "Plan") under the provisions of Section 401(k) of the Internal Revenue Code of 1986, as amended (the "Code") that covers eligible U.S. employees as defined in the Plan. Participants may elect to contribute both pre-tax or after-tax ("Roth") up to 50% of annual taxable compensation, as defined by the Plan, up to a maximum amount prescribed by the Code. The Company, at its discretion, makes matching contributions equal to 4% of the participant's annual compensation. For the years ended December 31, 2023, 2022 and 2021 the Company made 401(k) Plan contributions of approximately $3.1 million, $3.7 million and $4.0 million, respectively.

### *Contingent Liabilities*

The Company is subject to various legal proceedings that arise from time to time in the ordinary course of business. The outcomes of the legal proceedings that are pending as of the date the financial statements are issued are subject to significant uncertainty. In assessing loss contingencies related to legal proceedings that are pending against the Company or unasserted claims that may result in such proceedings, the Company's management evaluates the perceived merits of any legal proceedings or unasserted claims as well as the perceived merits of the amount of relief sought or expected to be sought. Such assessment inherently involves an exercise of judgment. If the assessment of a contingency indicates that it is probable that loss would be incurred and the amount of the liability can be reasonably estimated, then the Company would record an accrual in the Company's financial statements based on its best estimate. Loss contingencies considered to be remote by management are generally not disclosed unless material. The respective legal fees are expensed as incurred.

### *Revenue Recognition*

The Company derives revenues from sales of additive manufacturing systems, consumables and services. The Company sells its products directly through its sales force, independent sales agents and indirectly through authorized resellers.

The Company determines revenue recognition through the following steps:

- Identification of the contract, or contracts, with a customer
- Identification of the performance obligations in the contract
- Determination of the transaction price
- Allocation of the transaction price to the performance obligations in the contract
- Recognition of revenue when, or as, the Company satisfies a performance obligation

Revenue is measured as the amount of consideration expected to be received in exchange for transferring goods or providing services to the end customer or to the reseller.

The amount of consideration is usually at fixed price at the contract inception. Consideration from shipping and handling are recorded on a gross basis within product revenue. Revenues are recorded net of any taxes assessed by various government entities, such as sales, use and value-added taxes.

Revenue from products, which consist of systems and consumables, is recognized when the customer has obtained control of the goods, generally at a point in time upon shipment or once delivery and risk of loss has transferred to the customer. The Company recognizes revenue on sales to resellers when the reseller has economic substance apart from the Company and the reseller is considered the principal for the transaction with the end-user customer. Service revenue derives from service type warranty and from the Company's direct manufacturing parts services. Revenue from service is recognized ratably on a straight-line basis over the time of the service, as control is transferred over time or as services are performed if not under contract.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company enters into contracts with customers that can include various combinations of products and services which are generally distinct and accounted for as separate performance obligations. Products or services that are promised to a customer can be considered distinct if both of the following criteria are met: (i) the customer can benefit from the products or services either on its own or together with other readily available resources, and (ii) the Company's promise to transfer the products or services to the customer is separately identifiable from other promises in the contract.

The transaction price is allocated to each distinct performance obligations on a relative standalone selling price ("SSP") basis and revenue is recognized for each performance obligation when control has passed. In most cases, the Company is able to establish SSP based on the observable prices of services sold separately in comparable circumstances to similar customers and for products based on the Company's best estimates of the price at which the Company would have sold the product regularly on a stand-alone basis. The Company reassesses the SSP on a periodic basis or when facts and circumstances change.

In assessing collectability as part of the revenue recognition process, the Company considers a number of factors in the evaluation of the creditworthiness of the customer, including past due amounts, payment history and financial condition. In some cases where collectability is not assured, payment terms are set partially or entirely as prepayment or customers may be required to furnish letters of credit.

See Note 4 for additional information related to disaggregation of revenue and other.

### Shipping and handling costs

Shipping and handling costs are classified as cost of revenues.

### Advertising

Advertising costs are expensed as incurred and were approximately $4.2 million, $5.1 million and $4.5 million, for the years ended December 31, 2023, 2022 and 2021, respectively.

### Research and Development Expenses

Research and development costs consist primarily of employee compensation expenses, materials, laboratory supplies, costs for related software and costs for facilities and equipment. Expenditures for research and development are expensed as incurred. Government reimbursements and other participations for development of approved projects are recognized as a reduction of expenses as the related costs are incurred. The Company is not required to pay royalties on sales of products developed using its government funding.

### Income Taxes

The Company and its subsidiaries are subject to income taxes in the jurisdictions in which they operate. The Company's provision for income taxes is based on income tax rates in the tax jurisdictions where it operates, permanent differences between financial reporting and tax reporting, and available credits and incentives.

Deferred taxes are determined utilizing the "asset and liability" method based on the estimated future tax effects of temporary differences between the carrying amount and tax bases of assets and liabilities under the applicable tax laws, and on enacted tax rates in effect when the deferred taxes are expected to be settled or realized. Deferred taxes for each jurisdiction are presented as a non-current net asset or liability, net of any valuation allowances.

Deferred taxes have not been provided on the following items:

1. Taxes that would apply in the event of disposal of investments in first-tier foreign subsidiaries, as it is generally the Company's intention to hold these investments, not to realize them.

2. Dividends distributable from the income of foreign companies as the Company does not expect these companies to distribute dividends in the foreseeable future. If these dividends were to be paid, the Company would have to pay additional taxes at a rate of up to 25% on the distribution, and the amount would be recorded as an income tax expense in the period the dividend is declared.

Amounts of tax-exempt income generated from the Company's prior Approved Enterprises (see note 10c), as the Company intends to permanently reinvest these profits and does not intend to distribute dividends from such income. If these dividends were to be paid, the Company would have to pay additional taxes at a rate up to 10% on the distribution, and the amount would be recorded as an income tax expense in the period the dividend is declared.

### Valuation Allowances

Valuation allowances are provided unless it is more likely than not that the deferred tax asset will be realized. In the determination of the appropriate valuation allowances, the Company considers future reversals of existing taxable temporary differences, the most recent projections of future business results, prior earnings history, carryback and carry forward and prudent tax strategies that may enhance the likelihood of realization of a deferred tax asset. Assessments for the realization of deferred tax assets made at a given balance sheet date are subject to change in the future, particularly if earnings of a subsidiary are significantly higher or lower than expected, or if the Company takes operational or tax positions that could impact the future taxable earnings of a subsidiary.

### Uncertain Tax Positions

The Company takes a two-step approach to recognizing and measuring uncertain tax positions. The first step is to evaluate the tax position for recognition by determining whether the weight of available evidence indicates that it is more likely than not that, on an evaluation of the technical merits, the position will be sustained on audit, including resolution of related appeals or litigation processes, if any.

The second step is performed only if the tax position meets the more-likely-than-not recognition threshold and is to measure the tax benefit as the amount which is more than 50% likely of being realized upon ultimate settlement. The Company reevaluates these tax positions quarterly and makes adjustments as required. The liabilities relating to uncertain tax positions are classified as non-current in the consolidated balance sheets unless the Company anticipates making payments within one year. The Company classifies interest and penalties recognized in the financial statements relating to uncertain tax positions under the provision for income taxes.

The Company presents unrecognized tax benefits as a reduction to deferred tax asset where a net operating loss, a similar tax loss, or a tax credit carryforward that are available, under the tax law of the applicable jurisdiction, to offset any additional income taxes that would result from the settlement of a tax position.

### Stock-Based Compensation

The Company measures and recognizes compensation expense for its equity classified stock-based awards, including stock-based option awards, restricted stock units ("RSUs") and performance stock units ("PSUs") under the Stratasys Ltd. 2012 Omnibus Equity Incentive Plan (the "2012 Plan") and the Stratasys Ltd. 2022 Share Incentive Plan (the "2022 Plan") based on estimated fair values on the grant date.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company calculates the fair value of stock-based option awards on the date of grant using the Black-Scholes option pricing model. The option-pricing model requires a number of assumptions, of which the most significant are the expected share price volatility and the expected option term. The computation of expected volatility is based on historical volatility of the Company's shares. The expected option term is calculated using the simplified method, as the Company concludes that its historical share option exercise experience does not provide a reasonable basis to estimate its expected option term. The interest rate for periods within the expected term of the award is based on the U.S. Treasury yield curve in effect at the time of grant. The Company's expected dividend rate is zero since the Company does not currently pay cash dividends on its shares and does not anticipate doing so in the foreseeable future.

Each of the above factors requires the Company to use judgment and make estimates in determining the percentages and time periods used for the calculation. If the Company were to use different percentages or time periods, the fair value of stock-based option awards could be different. The fair values of the Company's RSUs and PSUs are measured based on the fair value of the Company's ordinary shares on the date of grant. The fair value of shares to be issued under the employee stock purchase plan ("ESPP") are estimated using the Monte Carlo valuation model.

The Company recognizes compensation expenses for its stock-based option awards (including awards under its ESPP program) and RSUs on a straight-line basis over the requisite service period (primarily six-month period for the ESPP and a four-year period for the rest of the awards). The Company accounts for forfeitures as they occur. The Company recognizes compensation expenses for its PSUs based on the probability that the performance metrics will be achieved over the vesting period. At each reporting period the Company evaluates the probability that its PSUs will be earned and adjust its previously recognized compensation expense as necessary. If the achievement of the respective performance metrics is not probable or the respective performance are not met the Company reverses its previously recognized compensation expense.

### Restructuring Plan

The Company may incur restructuring charges in connection with certain initiatives designed to adjust the Company's cost and operating structure, improve efficiencies across the Company and to better align with the Company's long-term strategy and overall market conditions. Restructuring charges include employee severance and associated termination costs related to the reduction of workforce, costs related to facilities closures, impairment charges of the respective long-lived assets and contract termination costs. Restructuring charges for employees' termination costs are recognized when the required actions to execute the restructuring initiative were performed and the initiatives are probable and costs are estimable. Restructuring charges for facilities and contract terminations are recognized when the Company ceased using the rights conveyed by the contract. Significant judgments and estimates are involved in estimating the impact of restructuring plans on the Company's consolidated financial statements. Actual results may differ from these estimates.

### Loss per Share

Basic loss per share is computed by dividing net income (loss) attributable to ordinary shareholders of Stratasys Ltd. by the weighted average number of ordinary shares (including fully vested RSUs, PSUs and ordinary shares purchased under the Company's employee share purchase plan (the "ESPP")) outstanding for the reporting periods.

The denominator for diluted net loss per share is a computation of the weighted-average number of ordinary shares and the potential dilutive ordinary shares outstanding during the period. Potential dilutive shares outstanding include the dilutive effect of in-the-money options, ESPP and unvested RSUs using the treasury stock method. PSUs are considered contingently issuable shares for diluted net loss per share purposes and the dilutive impact, if any, is included in the weighted average shares as of the beginning of the period in which the performance conditions were satisfied.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Concentration of Credit Risk*

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, short term bank deposits, accounts receivables, and foreign currency exchange forward contracts. Most of the Company's cash and cash equivalents and bank deposits are invested in U.S. dollar instruments with major banks in the U.S., Israel and Europe. Management believes that the credit risk with respect to the financial institutions that hold the Company's cash and cash equivalents and bank deposits is low.

Concentration of credit risk with respect to accounts receivable is limited due to the relatively large number of customers and their wide geographic distribution. In addition, the Company seeks to mitigate its credit exposures to its accounts receivable by credit limits, credit insurance, ongoing credit evaluation and account monitoring procedures.

*Leases*

The Company determines if an arrangement is a lease at inception. Lease classification is governed by five criteria in ASC 842-10-25-2. If any of these five criteria is met, the Company classifies the lease as a finance lease; otherwise, the Company classifies the lease as an operating lease. When determining lease classification, the Company's approach in assessing two of the mentioned criteria is: (i) generally 75% or more of the remaining economic life of the underlying asset is a major part of the remaining economic life of that underlying asset; and (ii) generally 90% or more of the fair value of the underlying asset comprises substantially all of the fair value of the underlying asset.

Operating leases are included in operating lease right-of-use ("ROU") assets and operating lease liabilities in the consolidated balance sheet.

ROU assets represent Stratasys's right to use an underlying asset for the lease term and lease liabilities represent its obligation to make lease payments arising from the lease. Operating lease ROU assets and liabilities are recognized at the commencement date based on the present value of lease payments over the lease term. The Company uses its incremental borrowing rate based on the information available at the commencement date to determine the present value of the lease payments.

The standard also provides practical expedients for an entity's ongoing accounting. The Company elected the short-term lease recognition exemption for all leases with a term shorter than 12 months. This means that for those leases, the Company does not recognize ROU assets or lease liabilities, including not recognizing ROU assets or lease liabilities for existing short-term leases of those assets in transition, but recognizes lease expenses over the lease term on a straight-line basis. The Company also elected the practical expedient to not separate lease and non-lease components for all of the Company leases.

Lease terms will include options to extend or terminate the lease when it is reasonably certain that Stratasys will exercise or not exercise the option to renew or terminate the lease.

The Company is a party to several lease agreements for its facilities, the latest of which has been extended until June 2032. The Company has the option to extend certain agreements for additional periods, the earliest of which is until the start of February 2024 and the latest is until the end of June 2037. During the extended lease period, the aggregate annual rental payments will increase by 2% to 4% each year.

The Company also leases vehicles for its employees with different commencement and ending periods in Israel and Germany solely. The latest lease agreement is until the start of July 2026.

*Recently issued accounting pronouncements*

*Accounting Pronouncements Adopted in 2023*

F-20

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In October 2021, the Financial Accounting Standards Board (the "FASB") issued Accounting Standards Update ("ASU") 2021-08 "Business Combinations (Topic 805), Accounting for Contract Assets and Contract Liabilities from Contracts with Customers", which requires contract assets and contract liabilities acquired in a business combination to be recognized and measured by the acquirer on the acquisition date in accordance with Accounting Standards Codification ("ASC") 606, Revenue from Contracts with Customers. The guidance will result in the acquirer recognizing contract assets and contract liabilities at the same amounts recorded by the acquiree. The guidance should be applied prospectively to acquisitions occurring on or after the effective date. The guidance is effective for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years. The Company adopted this guidance effective January 1, 2023, with no material impact on its consolidated financial statements.

*Recently issued accounting pronouncements, not yet adopted*

In December 2023, the FASB issued ASU 2023-09 "Income Taxes (Topic 740): Improvements to Income Tax Disclosures". This guidance is intended to enhance the transparency and decision-usefulness of income tax disclosures. The amendments in ASU 2023-09 address investor requests for enhanced income tax information primarily through changes to disclosure regarding rate reconciliation and income taxes paid both in the U.S. and in foreign jurisdictions. ASU 2023-09 is effective for fiscal years beginning after December 15, 2024 on a prospective basis, with the option to apply the standard retrospectively. Early adoption is permitted. The Company is currently evaluating this guidance to determine the impact it may have on its consolidated financial statements disclosures.

In November 2023, the FASB issued ASU 2023-07 "Segment Reporting: Improvements to Reportable Segment Disclosures". This guidance expands public entities' segment disclosures primarily by requiring disclosure of significant segment expenses that are regularly provided to the chief operating decision maker and included within each reported measure of segment profit or loss, an amount and description of its composition for other segment items, and interim disclosures of a reportable segment's profit or loss and assets. Public entities with a single reportable segment are required to provide the new disclosures and all the disclosures required under ASC 280. The guidance is effective for fiscal years beginning after December 15, 2023, and interim periods within fiscal years beginning after December 15, 2024, with early adoption permitted. The amendments are required to be applied retrospectively to all prior periods presented in an entity's financial statements. The Company is currently evaluating this guidance to determine the impact it may have on its consolidated financial statements related disclosures.

## Note 2. Certain Transactions

*MakerBot and Ultimaker transaction ("Ultimaker")*

On August 31, 2022, Stratasys completed the merger of MakerBot (previously, a fully owned subsidiary) with Ultimaker, which together formed a new entity under the name Ultimaker. The Company recorded a net gain of $39.1 million from deconsolidation of MakerBot, representing the difference between the book value of MakerBot's net assets and the fair value allocated to such net assets in the transaction as follows:

|  | (U.S. $ in thousands) |
|---|---|
| Fair value, net | $ 55,751 |
| Net assets deconsolidated | (14,146) |
| Transaction expenses | (2,469) |
| Gain from deconsolidation of subsidiary | $ 39,136 |

Case 3:24-cv-09214-RS    Document 1-2    Filed 12/19/24    Page 704 of 870
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The Company accounts for its investment in the combined company Ultimaker according to the equity method in accordance with ASC Topic 323, as it has retained the ability to exercise significant influence but does not control the new entity. The Company recognized an equity method investment in a total amount of $105.6 million comprised of the assumed fair value of the MakerBot shares and additional amount invested in cash by the Company, representing a share of 46.5% in the new entity.

The allocation of the purchase price ("PPA") to the underlying net assets acquired and liability assumed resulted in the recognition of intangible assets with a value of $27.4 million, goodwill of $49.3 million and other net assets of $28.7 million. The value assigned to intangible assets is amortized over a period of 4 to 13 years and the related amortization is included under share in net losses (profits) from associated companies. The estimated fair values are based on the information that was available as of August 31, 2022.

During 2023, Ultimaker encountered difficulties in its business partially as a result of tighter competition and global market conditions. As a result, senior management at Ultimaker was replaced and the new management implemented a restructuring plan and additional steps to reduce cost and improve profitability. The Company considered such events as indicators of potential impairment and accordingly performed an impairment analysis for the investment in Ultimaker. Based on such valuation, the fair value of the investment was estimated below its carrying amount and such reduction in fair value was determined to be other than temporary. Accordingly the Company recorded an impairment charge at the amount of $13.9 million, which was recorded in share in losses of associated companies in the consolidated statements of operations and comprehensive loss. Management's cash flow projections for the fair value of the investment in Ultimaker includes significant judgments and assumptions relating to the cash flow projections, future growth and future profitability. Actual results could differ from those estimates, and such differences could be material and may result in other than temporary reduction in fair value, which could lead to additional impairments in the carrying value of the Ultimaker investment.

As of December 31, 2023 and December 31, 2022 the equity investment in Ultimaker amounts to $67.8 million and $100.2 million, respectively, which represents the original investment in Ultimaker, net of share in net losses for the years in the amounts of $32.4 million and $5.4 million, respectively.

*Covestro acquisition*

On April 3, 2023 (the "Covestro transaction date"), the Company completed the acquisition of the additive manufacturing materials business of Covestro AG. Covestro's additive manufacturing business is expected to give the Company the ability to accelerate innovative developments in 3D printing materials and to thereby further grow adoption of its newest technologies. Also, the Company acquired an IP portfolio comprised of hundreds of patents and pending patents, including all of the SOMOS™ portfolio.

The Covestro transaction is reflected in accordance with ASC Topic 805, "Business Combinations". The assets acquisition transaction meets the definition of a business and was accounted for as a "Business Combinations" transaction, using the acquisition method of accounting with the Company as the acquirer. The following table summarizes the fair value of the consideration transferred to Covestro AG for the Covestro transaction:

|  | U.S. $ in thousands |
|---|---|
| Cash payments | $ 53,815 |
| Issuance of ordinary shares to Covestro stockholders | 5,202 |
| Contingent consideration at estimated fair value | 659 |
| Other liability | 868 |
| Total consideration | $ 60,544 |

The fair value of the ordinary shares issued was determined based on the closing market price of the Company's ordinary shares on the Covestro transaction date.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

In accordance with ASC Topic 805, the estimated contingent consideration as of the Covestro transaction date was included in the purchase price. The total contingent payments could amount to a maximum aggregate amount of up to €37 million. The payment will be settled through the issuance of ordinary shares. The estimated fair value of the contingent consideration is based on management's assessment of whether, and at what level, the financial metrics will be achieved, and the present value factors associated with the timing of the payments. This fair value measurement is based on significant unobservable inputs in the market and thus represents a Level 3 measurement within the fair value hierarchy. Changes in the fair value of contingent consideration will be recorded in operating expenses. Refer to Note 5.

The following table summarizes the estimated fair values of the assets acquired and liabilities assumed at the Covestro transaction date. The estimated fair values are based on the information that was available as of April 3, 2023. The allocation of the purchase price to assets acquired and liabilities assumed is as follows:

|  | Allocation of Purchase Price |
|---|---|
|  | (U.S. $ in thousands) |
| Inventory | $ 10,342 |
| Fixed assets | 7,064 |
| Intangible assets | 21,929 |
| Other liabilities | (605) |
| Total identifiable net assets | 38,730 |
| Goodwill | $ 21,814 |

The allocation of the PPA to net assets acquired and liabilities assumed resulted in the recognition of intangible assets related to developed technology, customer relationship, and trade name. These intangible assets have a useful life of 7 to 10 years. The fair value estimate of the customer relationship was determined using a variation of the income approach known as the "Multi-Period Excess Earnings Approach". This valuation technique estimates the fair value of an asset based on market participants' expectations of the cash flows the asset would generate over its remaining useful life. The net cash flows were discounted to present value. The fair value estimate of the developed technology and trade name, were estimated using the "Relief from royalty" method. This valuation technique estimates the fair value of the asset based on the hypothetical royalty payment that a licensee would be required to pay in exchange for use of the asset. Goodwill was recorded as the residual amount by which the purchase price exceeded the provisional fair value of the net assets acquired and is expected to be fully deductible for tax purposes. Goodwill consists primarily of expected synergies of combining operations, the acquired workforce, and growth opportunities, none of which qualify as separately identifiable intangible assets.

Pro forma information giving effect to the acquisition has not been provided, as the results would not be material.

During 2023, the Company completed several transactions, including acquisitions of an entity and additional assets, for a total consideration of $22 million.

*Other long-term investments*

In addition to the investment in Ultimaker, other investments included under Long-term investments represents investments in non-marketable equity securities and convertible notes of several companies without readily determinable fair value in which the Company does not have a controlling interest or significant influence. One entity from this group became public during the first quarter of 2021 and accordingly the investment is now treated as a marketable equity investment. During 2023 and 2022, the Company invested a total of $11.5 million and $16.7 million in non-marketable equity securities and convertible notes of several companies.

Case 3:24-cv-09214-RS    Document 1-2    Filed 12/19/24    Page 706 of 870

*Restructuring plan*

During the year ended December 31, 2023, the Company initiated certain restructuring activities for some parts of its operations, as part of aligning the business to the Company's growth strategy and streamlining the organization for improved efficiency. In connection with these activities, certain operations were discontinued, and others were divested. These restructuring activities resulted in an impairment charge to fixed assets, inventory write-off, employees related expenses and other charges for a total amount of $19.2 million. During the year ended December 31, 2023 the Company recorded restructuring charges of $12.3 million, $2.7 million and $4.2 million under Cost of sales, Research and development and Selling, general and administrative, respectively. The restructuring activities were substantially completed by December 31, 2023.

## Note 3. Recent developments

*Termination of Merger Agreement with Desktop Metal*

On May 25, 2023, the Company and Desktop Metal, Inc. ("Desktop Metal"), jointly announced their entry into a merger agreement, whereby a wholly-owned Delaware subsidiary of the company was to merge with and into Desktop Metal, with Desktop Metal surviving the merger as a wholly-owned subsidiary of the Company. On September 28, 2023, the Company held an extraordinary general meeting of its shareholders, at which the merger was presented for the approval of the Company's shareholders. The merger proposal was not approved by the Company's shareholders at that meeting, and accordingly, pursuant to its rights under the merger agreement, Stratasys terminated the merger agreement with Desktop Metal, effective immediately on September 28, 2023. As a result, the Company recorded a termination fee of $10.0 million, which was included under selling, general & administrative expenses and was paid to Desktop Metal.

*Nano Dimension Tender Offer and Board Contest*

On May 25, 2023, following the announcement of the then-prospective merger with Desktop Metal, Nano Dimension Ltd. ("Nano"), a 14.1% shareholder of the Company, launched a hostile partial tender offer whereby it sought to acquire—including shares already held by it— between 53% and 55% of the Company's outstanding ordinary shares, at a price of $18.00 per share. The tender offer was subject to various conditions and was originally set to expire on June 26, 2023. Over the course of subsequent periods of time, the price offered by Nano in its tender offer was ultimately raised to $25.00 per share, with an accompanying reduction as to the percentage of Company shares to be held by it upon consummation of the offer, to between 46% and 51%, and the offer was extended ultimately through July 31, 2023. The offer expired on July 31, 2023 and Nano did not receive enough tendered shares and was therefore unable to complete the purchase of any of the Company ordinary shares pursuant to the offer. Nano has recently re-initiated its pursuit of an acquisition of the Company, announcing on December 23, 2023 a preliminary proposal to purchase all outstanding shares of the Company that it does not currently own for $16.50 per share in cash. The Company has acknowledged receipt of Nano's offer, and has indicated that its board of directors would consider it as part of the process to explore strategic alternatives for the Company.

The Company has also been subject to litigation with Nano in an Israeli district court regarding the Company's shareholder rights plan, Nano's tender offer, and the contested board election. The litigation has not changed the outcome of any of the developments described above. Please see note 11.

*3D Systems Offers*

On May 30, 2023, and then again on June 27, 2023, the Company received an unsolicited non-binding indicative proposal from 3D Systems Corporation ("3D Systems") to merge with the Company. On July 13, 2023, the Company received an updated proposal from 3D Systems, pursuant to which it would merge with the Company for $7.50 in cash and 1.5444 newly issued shares of common stock of 3D Systems per Stratasys ordinary share. The Stratasys board at first determined that the 3D Systems proposal of July 13th would reasonably be expected to result in a "Superior Proposal" under the merger agreement with Desktop Metal and

Case 3:24-cv-09214-RS     Document 1-2     Filed 12/19/24     Page 707 of 870
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

authorized Company management to enter into discussions with 3D Systems with respect to the proposal. Following an extensive due diligence process, Stratasys communicated its concerns regarding the 3D Systems' proposal to 3D Systems and indicated that the last proposal was not itself a transaction which Stratasys would be prepared to enter into. 3D Systems revised its proposal on September 6, 2023, offering $7.00 in cash and 1.6387 newly issued shares of common stock of 3D Systems per Stratasys ordinary share. After consultation with its outside financial and legal advisors, the Stratasys board of directors unanimously determined that the September 6 proposal continued to significantly undervalue Stratasys and did not constitute a "Superior Proposal" pursuant to the terms of the merger agreement with Desktop Metal, and accordingly terminated discussions with 3D Systems.

*Initiation of Strategic Alternatives Process*

On September 28, 2023, the Company announced that it has initiated a comprehensive process to explore strategic alternatives for the Company. The Company noted that following the termination of the merger agreement with Desktop Metal, Stratasys is no longer subject to restrictions under that agreement regarding the solicitation of or entry into potential transactions.

## Note 4. Revenues

Disaggregation of Revenues

The following table present the Company's revenues disaggregated by geographical region (based on the Company's customers' location) and revenue type for the years ended December 31, 2023, 2022 and 2021:

| | Year Ended December, 31 | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| | (U.S. $ in thousands) | | |
| **Americas** | | | |
| Systems | $ 108,998 | $ 130,959 | $ 124,311 |
| Consumables | 132,820 | 130,775 | 121,245 |
| Service | 147,952 | 153,694 | 142,767 |
| **Total Americas** | **389,770** | **415,428** | **388,323** |
| | | | |
| **EMEA** | | | |
| Systems | 51,617 | 53,527 | 42,077 |
| Consumables | 75,468 | 61,703 | 61,192 |
| Service | 28,857 | 26,430 | 27,027 |
| **Total EMEA** | **155,942** | **141,660** | **130,296** |
| | | | |
| **Asia Pacific** | | | |
| Systems | 27,031 | 40,106 | 33,110 |
| Consumables | 37,807 | 35,054 | 35,623 |
| Service | 17,048 | 19,235 | 19,867 |
| **Total Asia Pacific** | **81,886** | **94,395** | **88,600** |
| | | | |
| **Total Revenues** | $ **627,598** | $ **651,483** | $ **607,219** |

The following table present the Company's revenues disaggregated based on the timing of revenue recognized for the years ended December 31, 2023, 2022 and 2021:

| | Year Ended December, 31 | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| | (U.S. $ in thousands) | | |
| **Revenues recognized in point in time from:** | | | |
| Products | $ 433,741 $ | 452,124 $ | 417,55' |
| Services | 54,362 | 53,152 | 46,049 |
| Total revenues recognized in point in time | **488,103** | **505,276** | **463,60** |
| | | | |
| **Revenues recognized over time from:** | | | |
| Services | 139,495 | 146,207 | 143,61 |
| Total revenues recognized over time | **139,495** | **146,207** | **143,61** |
| | | | |
| **Total Revenues** | $ **627,598** $ | **651,483** $ | **607,21** |

Contract Assets and Contract Liabilities

Contract assets are recorded when the Company's right to consideration is conditional on constraints other than the passage of time. The Company had no material contract assets as of December 31, 2023 and 2022.

Contract liabilities include advance payments and billings in excess of revenue recognized. Contract liabilities are presented under deferred revenues. The Company's deferred revenues as of December 31, 2023 and 2022 were as follows:

| | December, 31 | |
|---|---|---|
| | **2023** | **2022** |
| | U.S. $ in thousands | |
| Deferred revenue (*) | $ 76,265 $ | 75,43 |

*Includes $23.7 million and $25.2 million under long term deferred revenue in the Company's consolidated balance sheets as of December 31, 2023 and December 31, 2022, respectively.

Revenue recognized in 2023 and 2022 that was included in deferred revenue balance as of January 1, 2023 and 2022 was $48.9 million and $44.0 million, respectively.

Remaining Performance Obligations

Remaining Performance Obligations ("RPO") represents contracted revenue that has not yet been recognized, which includes deferred revenue and amounts that will be invoiced and recognized as revenue in future periods. As of December 31, 2023 and 2022 the total RPO amounted to $100.5 million and $104.6 million, respectively. The Company expects to recognize $64.7 million of this RPO during the next 12 months, $20.1 million over the subsequent 12 months and the remaining $15.7 million thereafter.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Incremental Costs of Obtaining a Contract

Sales commissions earned mainly by the Company's sales agents are considered incremental costs of obtaining a contract with a customer as the Company expects the benefit of those commissions to be longer than one year. The majority of the sales commissions are not subject to capitalization as the commission expense is recognized as the related revenue is recognized. Sales commissions for initial contracts related to the service type warranty are deferred and then amortized on a straight-line basis over the expected customer relationship period (generally 5 years) if the Company expects to recover those costs. The Company determined the period of benefit by taking into consideration customer contracts including renewals, the technology and other factors. Amortization expense is included in selling, general and administrative expenses in the consolidated statements of operations. As of December 31, 2023 and 2022, the deferred commission amounted to $10.3 million and $9.6 million, respectively and presented under Other current assets and Other non-current assets.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Note 5. Fair Value Measurement**

The following tables summarize the Company's financial assets and liabilities that are carried at fair value on a recurring basis, on its consolidated balance sheets:

| | Dec 31, 2023 (U.S. $ in thousands) | | Dec 31, 2022 (U.S. $ in thousands) | |
|---|---|---|---|---|
| **Assets:** | **Level 2** | **Level 3** | **Level 2** | **Level 3** |
| Foreign exchange forward contracts not designated as hedging instruments | $ 164 | $ — | $ 159 | $ |
| Foreign exchange forward contracts designated as hedging instruments | 2,087 | — | 3 | |
| Convertible notes | — | 7,018 | | 1,8 |
| **Liabilities:** | | | | |
| Foreign exchange forward contracts not designated as hedging instruments | (51) | — | (38) | |
| Foreign exchange forward contracts designated as hedging instruments | (657) | — | (1,640) | |
| Contingent consideration[6] | — | (18,603) | | (38,3 |
| | $ 1,543 | $ (11,585) | $ (1,516) | $ (36,4 |

The fair value measurement for marketable securities is classified as Level 1 and amounts to $2.0 million and $2.8 million, as of December 31, 2023 and December 31, 2022, respectively.

The Company's foreign exchange forward contracts are classified as Level 2, as they are not actively traded and are valued using pricing models that use observable market inputs, including interest rate curves and both forward and spot prices for currencies (Level 2 inputs).

Contingent consideration represents liabilities recorded at fair value in connection with acquisitions, and thus represents a Level 3 measurement within the fair value hierarchy (refer to Note 2).

Other financial instruments consist mainly of cash and cash equivalents, short term deposits, current and non-current receivables, accounts payable and other current liabilities. The fair value of these financial instruments approximates their carrying values.

The following table summarizes the activity for those financial assets and liabilities where fair value measurements are estimated utilizing Level 3 inputs:

| | Dec 31, 2023 | Dec 31, 2022 |
|---|---|---|
| | (U.S. $ in thousands) | |
| Fair value at the beginning of the period | $ 38,341 | $ 55,919 |
| Acquisitions | 3,009 | — |
| Revaluation of Contingent considerations | (21,408) | (14,824) |
| Settlements of Contingent considerations | (1,339) | (2,754) |
| Fair value at the end of the period | $ 18,603 | $ 38,341 |

---

[6] Includes $6.7 million and $14.6 million under Accrued expenses and other current liabilities in the Company's consolidated balance sheets as of December 31, 2023 and December 31, 2022, respectively.

F-28

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

### Note 6. Inventories

Inventories consisted of the following:

| | | December 31, | |
| --- | --- | --- | --- |
| | | 2023 | 2022 |
| | | U.S. $ in thousands | |
| Finished Goods | $ | 86,908 $ | 81,564 |
| Work in Process | | 9,871 | 7,562 |
| Raw Materials | | 96,197 | 104,928 |
| | $ | 192,976 $ | 194,054 |

### Note 7. Property, Plant and Equipment, Net

Property, plant and equipment, net consisted of the following:

| | | December 31, | |
| --- | --- | --- | --- |
| | | 2023 | 2022 |
| | | (U.S. $ in thousands) | |
| Machinery and equipment | $ | 158,883 $ | 157,602 |
| Buildings and improvements | | 173,117 | 178,605 |
| Computer equipment and software | | 54,038 | 52,503 |
| Office equipment, furniture and fixtures | | 14,301 | 14,628 |
| Land | | 19,019 | 18,927 |
| | | 419,358 | 422,265 |
| Accumulated depreciation and amortization and impairment | | (224,185) | (230,220) |
| | | 195,173 | 192,045 |
| Construction work in progress | | 2,379 | 3,018 |
| | $ | 197,552 $ | 195,063 |

Depreciation expenses were $22.4 million, $22.6 million and $24.8 million in the years ended December 31, 2023, 2022 and 2021, respectively. During the years ended December 31, 2023, 2022 and 2021, the Company recorded impairment charges of $4.4 million, $3.8 million and $1.4 million, respectively, which were recorded in the consolidated statements of operations and comprehensive loss under cost of sales.

### Note 8. Goodwill

Changes in the carrying amount of the Company's goodwill for the years ended December 31, 2023 and 2022 were as follows:

| | | 2023 | 2022 |
| --- | --- | --- | --- |
| Balance at January 1, | $ | 64,953 $ | 65,144 |
| Goodwill acquired | | 34,773 | — |
| Currency translation adjustments | | 325 | (191) |
| Balance at December 31, | $ | 100,051 $ | 64,953 |

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The goodwill balance as of December 31, 2023 and 2022 was acquired as part of Covestro, Origin, RPS, XAAR and other acquisitions, and was allocated as part of Stratasys-Core reporting unit.

During the fourth quarter of 2021, the Company performed its annual impairment test for goodwill impairment. Based on the Company's qualitative analysis, which considered the Company's market valuation, its operation results and projections, and the timing of its goodwill acquisitions, no goodwill was determined to be impaired as of December 31, 2021.

During the fourth quarter of 2022, the Company noted that indicators of potential impairment existed which required an interim goodwill impairment analysis for Stratasys-Core reporting unit. These indicators included sustained decline in the Company's market capitalization during the last quarter primarily as a result of the global economy and the potential impact on the Company's business segment.

The Company performed a quantitative assessment for goodwill impairment for its Stratasys-Core reporting unit and concluded that the fair value of Stratasys-Core reporting unit significantly exceeded its carrying amount with a goodwill assigned to this reporting unit in the amount of $65.0 million. When evaluating the fair value of Stratasys-Core reporting unit under the income approach, the Company used a discounted cash flow model which utilized Level 3 measures that represent unobservable inputs. Key assumptions used to determine the estimated fair value include: (a) internal cash flows forecasts for 5 years following the assessment date, including expected revenue growth, costs to produce, operating profit margins and estimated capital needs; (b) an estimated terminal value using a terminal year long term future growth determined based on the growth prospects of the reporting unit; and (c) a discount rate which reflects the weighted average cost of capital adjusted for the relevant risk associated with the Stratasys-Core reporting unit operations and the uncertainty inherent in the Company's internally developed forecasts.

In order to assess the reasonableness of its cash flow projections used for its goodwill impairment analysis, the Company compared the aggregate fair value of its reporting units to its market capitalization and calculated the implied control premium. The Company believes that its fair value assessment is reasonably supported by its calculated market capitalization.

Based on the Company's assessment as of December 31, 2022, no goodwill was determined to be impaired.

*Goodwill impairment assessment for the year ended December 31, 2023*

During the fourth quarter of 2023, the Company performed its annual impairment test for goodwill impairment.

The Company performed a quantitative assessment for goodwill impairment for its Stratasys-Core reporting unit and concluded that the fair value of Stratasys-Core reporting unit exceeded its carrying amount by approximately 34%, with a carrying amount of goodwill assigned to this reporting unit in an amount of $100.0 million. When evaluating the fair value of Stratasys-Core reporting unit under the income approach, the Company used a discounted cash flow model which utilized Level 3 measures that represent unobservable inputs. Key assumptions used to determine the estimated fair value include: (a) internal cash flows forecasts for 4 years following the assessment date, including expected revenue growth, costs to produce, operating profit margins and estimated capital needs; (b) an estimated terminal value using a terminal year long- term future growth determined based on the growth prospects of the reporting unit; and (c) a discount rate which reflects the weighted average cost of capital adjusted for the relevant risk associated with the Stratasys-Core reporting unit operations and the uncertainty inherent in the Company's internally developed forecasts.

In order to assess the reasonableness of its cash flow projections used for its goodwill impairment analysis, the Company compared the aggregate fair value of its reporting units to its market capitalization and calculated the implied control premium. The Company believes that its fair value assessment is reasonably supported by its calculated market capitalization.

Actual results may differ from those assumed in the Company's valuation method. It is reasonably possible that the Company's assumptions described above could change in future periods. If any of these were to vary materially from the Company's plans, it may record impairment of goodwill allocated to this reporting unit in the future.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Based on the Company's assessment as of December 31, 2023, no goodwill was determined to be impaired.

The Company will continue to monitor the fair value of its Stratasys-Core reporting unit to determine whether events and changes in circumstances such as further deterioration in the business climate or operating results, significant decline in the Company's share price, changes in management's business strategy or downward changes of the Company's cash flows projections, warrant further interim impairment testing.

### Note 9. Other Intangible Assets, Net

Other intangible assets consisted of the following:

| | December 31, 2023 | | | December 31, 2022 | | |
|---|---|---|---|---|---|---|
| | Carrying Amount, net of Impairment | Accumulated Amortization | Net book value | Carrying Amount, net of Impairment | Accumulated Amortization | Net book value |
| | (U.S. $ in thousands) | | | | | |
| Developed technology | $ 403,180 $ | (300,780) $ | 102,400 $ | 387,603 $ | (283,671) $ | 103,932 |
| Patents | 19,396 | (10,246) | 9,150 | 17,508 | (8,970) | 8,538 |
| Trademarks and trade names | 22,286 | (15,936) | 6,350 | 16,278 | (14,030) | 2,248 |
| Customer relationships | 102,520 | (92,639) | 9,881 | 93,609 | (86,925) | 6,684 |
| Capitalized software development costs | 4,367 | (4,367) | — | 7,066 | (7,066) | — |
| | $ 551,749 $ | (423,968) $ | 127,781 $ | 522,064 $ | (400,662) $ | 121,402 |

*Amortization expenses*

Amortization expense relating to intangible assets for the years ended December 31, 2023, 2022 and 2021, was approximately $26.5 million, $37.1 million and $31.3 million, respectively.

As of December 31, 2023, estimated future amortization expense relating to definite life intangible assets for each of the next five years and thereafter were as follows:

| | Estimated amortization expenses |
|---|---|
| Year ending December 31, | (U.S. $ in thousands) |
| 2024 | $ 23,476 |
| 2025 | 21,000 |
| 2026 | 20,923 |
| 2027 | 20,083 |
| 2028 | 15,927 |
| 2029 and Thereafter | 26,372 |
| Total | $ 127,781 |

No impairment charges were recorded during 2023, 2022 and 2021.

**Note 10. Income Taxes**

   *a.   Deferred Tax Assets and Liabilities*

The components of the Company's deferred tax assets and liabilities as of December 31, 2023 and 2022 were as follows:

| | | December 31, 2023 | | December 31, 2022 |
|---|---|---|---|---|
| | | (U.S. $ in thousands) | | |
| **Deferred tax assets** | | | | |
| Tax losses carry forwards | $ | 682,095 | $ | 678,334 |
| Inventory related | | 2,241 | | 157 |
| Intangible assets | | 16,990 | | 11,321 |
| Provision for employee related obligations | | 703 | | 927 |
| Stock-based compensation expense | | 8,803 | | 10,242 |
| Deferred revenue | | 3,742 | | 1,575 |
| Allowance for credit losses | | 119 | | 66 |
| Research and development credit carry forwards | | 20,368 | | 17,658 |
| Research and development capitalization (including Section 174) | | 19,384 | | 11,454 |
| Basis difference in equity method investment | | 1,406 | | — |
| Other items | | 5,320 | | — |
| Gross deferred tax assets | | 761,171 | | 731,734 |
| Valuation allowance | | (737,560) | | (699,694) |
| Total deferred tax assets | | 23,611 | | 32,040 |
| | | | | |
| **Deferred tax liabilities** | | | | |
| Intangible assets | | (8,803) | | (10,988) |
| Property, plant and equipment | | (14,228) | | (14,652) |
| Basis difference in equity method investment | | — | | (8,852) |
| Other items | | — | | (1,903) |
| Total deferred tax liabilities | | (23,031) | | (36,395) |
| Net deferred tax assets (liabilities) | $ | 580 | $ | (4,355) |

The Company's deferred tax assets and liabilities are classified in the consolidated balance sheets as follows:

| | | December 31, 2023 | | | December 31, 2022 |
|---|---|---|---|---|---|
| | | (U.S. $ in thousands) | | | |
| Deferred tax assets (under "Other non-current assets") | $ | 1,303 | — $ | | 1,283 |
| Deferred tax liabilities | | 723 | — | | 5,638 |
| Net deferred tax assets (liabilities) | $ | 580 | — $ | | (4,355) |

As of December 31, 2023 and 2022 the Company had tax net operating losses carry-forward of approximately $702.1 million and $663.9 million, respectively. In addition, the Company incurred capital losses of $2,203.2 million in 2020 due to a legal reorganization of certain entities in the group. Those tax losses carry-forward resulted in deferred tax assets of approximately $682.1 million and $678.3 million, as of December 31, 2023 and 2022, respectively. As a result of losses incurred in the last few years, and since the near-term realization of these assets is uncertain, the Company recorded a full valuation allowance for its deferred tax assets that are not likely to be realized.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

Significant judgment is required in determining any valuation allowance recorded against deferred tax assets. In assessing the need for a valuation allowance, the Company considered all available evidence, including past operating results, the most recent projections for taxable income, and prudent and feasible tax planning strategies. The Company reassess its valuation allowance periodically and if future evidence allows for a partial or full release of the valuation allowance, a tax benefit will be recorded accordingly.

A reconciliation of the beginning and ending balances of valuation allowance is as follows:

|  | Valuation Allowance |
|---|---|
|  | U.S. $ in thousands |
| **Balance at January 1, 2021** | $ **661,979** |
| Additions | 31,141 |
| **Balance at December 31, 2021** | **693,120** |
| Additions | 8,788 |
| Decrease | (2,214) |
| **Balance at December 31, 2022** | **699,694** |
| Additions | 38,500 |
| Decrease | (634) |
| **Balance at December 31, 2023** | $ **737,560** |

Included in the net deferred tax are net operating loss and credit carryovers of $137.2 million which expire in years ending from December 31, 2032 through December 31, 2042, whereas some losses may be carried forward indefinitely, as discussed below

On December 22, 2017, the Tax Cuts and Jobs Act (the "Act") was enacted into law. The new legislation represents fundamental and dramatic modifications to the U.S. tax system. The Act contained several key tax provisions that impacted the Company's U.S. subsidiaries, including the reduction of the maximum U.S. federal corporate income tax rate from 35% to 21%, effective January 1, 2018. Other significant changes under the Act included, among others, a one-time repatriation tax on accumulated foreign earnings, a limitation of net operating loss deduction to 80% of taxable income, and indefinite carryover of post-2017 net operating losses. The Act also repealed the corporate alternative minimum tax for tax years beginning after December 31, 2017. Losses generated prior to January 1, 2018 will still be subject to the 20-year carryforward limitation and the alternative minimum tax. Other impacts due to the Act included the repeal of the domestic manufacturing deduction, modification of taxation of controlled foreign corporations, a base erosion anti-abuse tax, modification of interest expense limitation rules, modification of limitation on deductibility of excessive executive compensation, and taxation of global intangible low-taxed income.

The Act introduced new intangible income rules, Global Intangible Low-Taxed Income (GILTI) and Foreign Derived Intangible Income (FDII). The Company has analyzed the impact of GILTI/FDII and determined that no impact should be recorded due to the U.S. subsidiaries' net operating losses. Thus, the Company cannot elect to include these amounts in the measurement of its deferred taxes under U.S. GAAP.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

Effective in 2022, the Act requires all U.S. companies to capitalize, and subsequently amortize R&D expenses that fall within the scope of Section 174 over five years for research activities conducted in the United States and over fifteen years for research activities conducted outside of the United States, rather than deducting such costs in the year incurred for tax purposes. Although Congress is considering legislation that would repeal and defer this capitalization and amortization requirement for research activities performed in the United States, there is no assurance that this provision will be repealed or otherwise modified. As of financial year 2023, we have accounted for an estimate of the effects of the R&D capitalization, based on interpretation of the law as currently enacted. To the extent that this provision is not deferred, modified or repealed, and once our available Federal NOLs are fully utilized, we would incur an increase in our tax expenses and a decrease in our cash flows provided by operations. To date, we incurred immaterial tax expense and corresponding cashflow impact at State level only.

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act") was enacted into law in response to the economic fallout of the COVID- 19 pandemic in the United States. Among the many business-related provisions, some of which related to non-income taxes, were changes made to net operating losses (NOLs). The CARES Act amended Internal Revenue Code Section 172(b)(1) for tax years beginning in 2018, 2019 and 2020, requiring taxpayers to carry back NOLs arising in those years to the five preceding tax years, unless the taxpayer elects to waive or reduce the carryback period. To the extent unused as a carryback, these NOLs are now carried forward indefinitely. The CARES Act suspended the Tax Cuts and Jobs Act's 80% limitation on NOL deductions for tax years beginning in 2018, 2019 and 2020. The 80% limitation will be reinstated for tax years beginning after 2020, for NOLs arising in tax years after 2017.

The Company believes that all future profits of its subsidiaries will be indefinitely reinvested or that there is no expectation to distribute any taxable dividends from these subsidiaries. The determination of the amount of the unrecognized deferred tax liability related to the undistributed earnings is estimated as an immaterial amount.

b.   *Provision for Income Taxes*

Loss before income taxes for the years ended December 31, 2023, 2022 and 2021 was as follows:

|  | 2023 | 2022 | 2021 |
|---|---|---|---|
|  | (U.S. $ in thousands) | | |
| Domestic | $ (47,959) | $ (28,725) | $ (50,193) |
| Foreign | (36,628) | 10,931 | (16,644) |
|  | $ (84,587) | $ (17,794) | $ (66,837) |

The components of income taxes for the years ended December 31, 2023, 2022 and 2021 were as follows:

F-34

| | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| | | | | (U.S. $ in thousands) | | |
| **Current** | | | | | | |
| Domestic | $ | 8,238 | $ | 7,301 | $ | (14,146) |
| Foreign | | 2,874 | | 942 | | 2,141 |
| | | 11,112 | | 8,243 | | (12,005) |
| | | | | | | |
| **Deferred** | | | | | | |
| Domestic | | (3,993) | | (1,440) | | 8,745 |
| Foreign | | (1,337) | | (1,349) | | (646) |
| | | (5,330) | | (2,789) | | 8,099 |
| Total income taxes | $ | 5,782 | $ | 5,454 | $ | (3,906) |

A reconciliation of the statutory income tax rate and the effective income tax rate for the years ended December 31, 2023, 2022 and 2021 is set forth below:

| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Statutory tax rate | 23.0 % | 23.0 % | 23.0 % |
| Reduced tax rate under Israeli benefit programs | (5.0) | (4.3) | 0.1 |
| Exempted Profits release (see below) | — | (16.0) | — |
| Stock-based compensation expense | (3.8) | (16.1) | (3.5) |
| Permanent differences, net | 1.0 | (0.8) | (0.1) |
| Earnings taxed under foreign law with different tax rate | 27.0 | 24.7 | 10.8 |
| Valuation Allowance | (44.8) | (18.6) | (42.7) |
| Changes in uncertain tax positions | (3.8) | (22.1) | 17.9 |
| Withholding tax | (0.3) | — | — |
| Other | (0.1) | (0.5) | 0.3 |
| Effective income tax rate | (6.8)% | (30.7)% | 5.8 % |

*Uncertain tax positions*

Significant judgment is required in evaluating the Company's tax positions and determining its provision for income taxes. During the ordinary course of business, there are many transactions and calculations for which the ultimate tax determination is uncertain. The Company establishes reserves for tax-related uncertainties based on estimates of whether, and the extent to which, additional taxes will be due. These reserves are established when the Company believes that certain positions might be challenged despite its belief that its tax return positions are fully supportable. The Company adjusts these reserves in light of changing facts and circumstances, such as the outcome of a tax audit or changes in the tax law. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate.

A reconciliation of the beginning and ending balance of uncertain tax positions is as follows:

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Balance at beginning of year | $ 6,043 | $ 3,015 | $ 23,389 |
| Additions for tax positions related to the current year | 3,636 | 4,684 | 3,826 |
| Foreign currency impact | — | 181 | 2,918 |
| Decrease related to settlements with tax authorities and lapse of applicable statutes of limitation | (458) | (500) | (26,685) |
| Classification to DTA | (362) | (1,337) | (433) |
| Balance at end of year | $ 8,859 | $ 6,043 | $ 3,015 |

The Company's accrual for estimated interest and penalties was $0.7 million as of December 31, 2023.

The Company is subject to income taxes in the U.S., various states, Israel and certain other foreign jurisdictions. The Company files income tax returns in various jurisdictions with varying statutes of limitations. Tax returns of Stratasys Inc. submitted in the United States through 2016 tax year are considered to be final following the completion of the Internal Revenue Service examination. Tax returns of Stratasys Ltd. submitted in Israel through the 2019 tax year are considered to be final following the completion of the Israeli Tax Authorities examination upon audit. The expiration of the statute of limitations related to the various other foreign and state income tax returns that the Company and its subsidiaries file vary by state and foreign jurisdictions.

### c.  Basis of taxation:

The enacted statutory tax rates applicable to the Company's major subsidiaries outside of Israel are as follows:

Company incorporated in the U.S.— Federal tax rate of approximately 21%.

Company incorporated in Germany—tax rate of approximately 29%.

Company incorporated in Hong Kong—tax rate of approximately 16.5%.

A significant portion of the Company's income is taxed in Israel. The following is a summary of how the Company's income is taxed in Israel:

Corporate tax rates in Israel for 2018 and thereafter is 23%. The Company elected to compute its taxable income in accordance with Income Tax Regulations (Rules for Accounting for Foreign Investors Companies and Certain Partnerships and Setting their Taxable Income), 1986. Accordingly, the Company's taxable income or loss is calculated in U.S. dollars. Applying these regulations reduces the effect of foreign exchange rate fluctuations (of the NIS in relation to the U.S. dollar) on the Company's Israeli taxable income.

_Tax benefits under the Israeli Law for the Encouragement of Industry (Taxation), 1969_

The Company is an "Industrial Company" as defined by the Israeli Law for the Encouragement of Industry (Taxation), 1969, and, as such, is entitled to certain tax benefits including accelerated depreciation, deduction of public offering expenses in three equal annual installments and amortization of other intangible property rights for tax purposes.

Tax benefits under the Law for Encouragement of Capital Investments, 1959 (the "Investment Law")

_Tax incentives programs which were relevant for the company until financial year 2020_

Various industrial projects of the Company have been granted "Approved Enterprise" and "Beneficiary Enterprise" status, which provided certain benefits, including tax exemptions for undistributed income and reduced tax rates. Income not eligible for Approved Enterprise and Beneficiary Enterprise benefits is taxed at the regular corporate rate, which was 23% in 2021.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company is a Foreign Investors Company, or FIC, as defined by the Investment Law. FICs are entitled to further reductions in the tax rate normally applicable to Approved Enterprises and Beneficiary Enterprises, depending on the level of foreign ownership. When foreign (non-Israeli) ownership equal or exceeds 90%, the Approved Enterprise and Beneficiary Enterprise income is either tax-exempt for a limit period between two to ten years depending on the location of the enterprise or taxable at a tax rate of 10% for a 10 years period. The Company cannot assure that it will continue to qualify as a FIC in the future or that the benefits described herein will be granted in the future.

In the event of distribution of dividends (or deemed distribution, as described below) from the said tax-exempt income during the tax exemption period as described above, the amount distributed will be subject to tax in respect of the amount of dividend distributed (grossed up to reflect such pre-tax income that it would have had to earn in order to distribute the dividend) at the corporate tax rate that would have been otherwise applicable if such income had not been tax-exempted under the alternative benefits program. This rate generally ranges from 10% to 25%, depending on the level of foreign investment in the company in each year, as explained above, Dividends paid out of income attributed to Approved Enterprise or Beneficiary Enterprise (or out of dividends received from a company whose income is attributed to an Approved or Beneficiary Enterprise) are generally subject to withholding tax at the source at the rate of 15%, unless a lower rate is provided in a treaty between Israel and the shareholder's country of residence (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate).

The 15% tax rate is limited to dividends and distributions out of income derived during the benefits period and actually paid at any time up to 12 years thereafter. After this period, the withholding tax is applied at a rate of up to 30%, or at the lower rate under an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). In the case of an FIC, the 12-year limitation on reduced withholding tax on dividends does not apply.

On November 15, 2021, the Investment Law was amended to reduce the ability of companies to retain the tax-exempt profits. Effective August 15, 2021, dividend distributions (or deemed distribution, as described below), will be treated as if made on a pro-rata basis from all types of earnings, including Exempt Profits (as defined below).

In parallel to the above amendment, the Investment Law was amended to provide, on a temporary basis, a reduced corporate income tax on the distribution or release within a year from such amendment of tax-exempt profits derived by Approved and Benefited Enterprises, which we refer to as Exempt Profits (the "Temporary Provision"). The amount of the reduced tax will be determined based on a formula. In order to qualify for the reduction, the Company must invest certain amounts in productive assets and research and development in Israel.

Following a recent Israeli district court ruling (which is subject to deliberation of the Supreme Court), certain transactions (such as acquisitions and intercompany loans) may be treated as deemed dividend distributions for the purpose of the Encouragement Law triggering corporate tax on the respective amount of the transaction.

On November 13, 2022, according to the Temporary Provision, the Company released an amount of approximately $44.8 million out of its Exempt Profits and accordingly paid reduced tax of approximately $2.9 million.

As of December 31, 2023, remaining tax-exempt income of approximately $157.6 million is attributable to the Company's various Approved and Beneficiary Enterprise programs. If such tax-exempt income is distributed, it would be taxed at the reduced corporate tax rate applicable to such income, and taxes of approximately $15.8 million would be incurred as of December 31, 2023.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

*Tax incentives programs which may be relevant for the company starting from financial year 2021*

A January 2011 amendment to the Investment Law (the "2011 Amendment") created alternative benefit tracks to those previously in place, as follows: an investment grants track designed for enterprises located in certain development zones and two new tax benefits tracks ("Preferred Enterprise" and "Special Preferred Enterprise"), which provide for application of a unified tax rate to all preferred income of the Company, as defined in the Investment Law.

The 2011 Amendment canceled the availability of the benefits granted in accordance with the provisions of the Investment Law prior to 2011 and, instead, introduced new benefits for income generated by a "Preferred Company" through its "Preferred Enterprise" (as such terms are defined in the Investment Law) effective as of January 1, 2011 and thereafter. A Preferred Company is defined as either (i) a company incorporated in Israel which is not wholly owned by a governmental entity, or (ii) a limited partnership that: (a) was registered under the Israeli Partnerships Ordinance, and (b) all of its limited partners are companies incorporated in Israel, but not all of them are governmental entities; which has, among other things, Preferred Enterprise status and is controlled and managed from Israel. Pursuant to the 2011 Amendment, a Preferred Company was entitled to a reduced corporate tax rate of 16% with respect to its preferred income attributed to its Preferred Enterprise, unless the Preferred Enterprise was located in a certain development zone, in which case the rate was 9%. In 2017 and thereafter, the corporate tax rate for Preferred Enterprise which is located in a certain development zone was decreased to 7.5%, while the reduced corporate tax rate for other development zones remains 16%.

Dividends paid out of preferred income attributed to a Preferred Enterprise are generally subject to withholding tax at source at the rate of 20%, or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld (although, if such dividends are subsequently distributed to individuals or a non-Israeli company, withholding tax at a rate of 20% or such lower rate as may be provided in an applicable tax treaty will apply.

*New Tax benefits under the 2017 Amendment that became effective on January 1, 2017.*

The 2017 Amendment was enacted as part of the Economic Efficiency Law that was published on December 29, 2016, and was effective as of January 1, 2017. The 2017 Amendment provides new tax benefits for two types of "Technology Enterprises", as described below, and is in addition to the other existing tax beneficial programs under the Investment Law.

The 2017 Amendment provides that a technology company satisfying certain conditions will qualify as a "Preferred Technology Enterprise" and will thereby enjoy a reduced corporate tax rate of 12% on income that qualifies as "Preferred Technology Income," as defined in the Investment Law. The tax rate is further reduced to 7.5% for a Preferred Technology Enterprise located in development zone A. In addition, a Preferred Technology Company will enjoy a reduced corporate tax rate of 12% on capital gain derived from the sale of certain "Benefited Intangible Assets" (as defined in the Investment Law) to a related foreign company if the Benefited Intangible Assets were acquired from a foreign company on or after January 1, 2017 for at least NIS 200 million, and the sale receives prior approval from the Israeli Innovation Authority, to which we refer as the IIA.

F-38

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The 2017 Amendment further provides that a technology company satisfying certain conditions will qualify as a "Special Preferred Technology Enterprise" and will thereby enjoy a reduced corporate tax rate of 6% on "Preferred Technology Income" regardless of the company's geographic location within Israel. In addition, a Special Preferred Technology Enterprise will enjoy a reduced corporate tax rate of 6% on capital gain derived from the sale of certain "Benefited Intangible Assets" to a related foreign company if the Benefited Intangible Assets were either developed by an Israeli company or acquired from a foreign company on or after January 1, 2017, and the sale received prior approval from the IIA. A Special Preferred Technology Enterprise that acquires Benefited Intangible Assets from a foreign company for more than NIS 500 million will be eligible for these benefits for at least ten years, subject to certain approvals as specified in the Investment Law Dividends distributed by a Preferred Technology Enterprise or a Special Preferred Technology Enterprise, paid out of Preferred Technology Income, are generally subject to withholding tax at source at the rate of 20% or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israel Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld. If such dividends are distributed to a foreign company and other conditions are met, the withholding tax rate will be 4%.

In 2021, the Company noticed the Israeli tax authorities that it waived the Approved / Beneficiary Enterprise regime starting from tax year 2021. The Company is currently considering its qualification for the 2017 Amendment and the term and degree to which it may be qualified as a Preferred Technology Enterprise or Special Preferred Technology Enterprise.

*Pillar Two Taxation*

The OECD introduced Base Erosion and Profit Shifting ("BEPS") Pillar Two rules that impose a global minimum tax rate of 15% for large multinational corporations. On December 12, 2022, the EU Council announced that EU member states had reached an agreement to implement the minimum taxation component of 15% of the OECD's reform of international taxation. Other countries have also enacted or are expected to enact legislation to be effective as early as January 1, 2024, with general implementation of a global minimum tax by January 1, 2025. The OECD continues to release additional guidance and the Company is monitoring the new rules and country agreements. The Company is currently evaluating the potential impact on its consolidated financial statements and related disclosures and does not expect Pillar Two to have a material impact on its effective tax rate or consolidated financial statements in the foreseeable future.

## Note 11. Commitments and contingencies

*Legal proceedings*

*Litigation with Nano Dimension regarding Stratasys' Rights Plan and Nano Dimension's tender offer*

On April 25, 2023, the Company was named as a defendant in an action filed by Nano in the Tel-Aviv District Court in which Nano sought declaratory relief declaring that Stratasys' shareholder rights plan is both illegal and void, and also requested a court order enjoining the Company and its directors from intervening with, or hindering in any way, a tender offer that Nano at the time intended to launch to acquire Stratasys ordinary shares.

On June 8, 2023, in its statement of defense, the Company rejected all of Nano's claims, stating, among other things, that there was a substantial change of circumstance since Nano's action was filed due to Stratasys' entry into the Desktop Metal Merger Agreement on May 25, 2023 and the launch of Nano's tender offer on May 25, 2023. The Company argued that its rights plan is legal under Israeli law, and that due to the many flaws and unlawful conditions of Nano's tender offer and Nano's conduct and circumstances, The Company's board was obligated to get involved and protect the Company and its shareholders. The Company also submitted a counterclaim to the court, seeking an order restraining Nano from completing its tender offer until certain conditions were to be fulfilled.

F-39

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

On July 18, 2023, in the context of an interim procedural decision, the Israeli court took the opportunity to express its preliminary view on the legality of shareholder rights plans for Israeli companies. The court indicated that it is inclined to view rights plans as permissible under Israeli law; that the adoption of a rights plan by a board should be viewed "with suspicion"; and that the board would bear the burden of proving certain matters related to the adoption of such a plan.

After Nano's tender offer expired on July 31, 2023, the Tel-Aviv District Court decided that the litigation should be put on hold. On October 10, 2023, the court issued an order instructing the parties to inform it whether they consent to the dismissal of the claim and counter-claim, with no order for costs. On November 15, 2023, Nano informed the court that it requests to resume the proceedings. On December 19, 2023, the court issued an order noting that, from the parties' written submissions, it is appropriate to rule upon one critical question: whether, under Israeli law, a company can adopt a 'poison pill' (i.e., a shareholder rights plan). The court further noted that Nano should consider either amending its claim or withdrawing it and filing a new one. The court emphasized that no new evidence will be allowed and that should Nano choose to proceed with the current action, the only question to be considered by the court is the validity of the poison pill under Israeli law. Nano is due to file its position paper with the court by March 17, 2024.

*Litigation with Nano Dimension regarding Stratasys board election*

In a separate action, on July 13, 2023, Nano filed a motion in an Israeli court requesting that the court order, among other things, that (i) the Company correct the agenda sent out to its shareholders in advance of an annual general shareholder meeting scheduled for August 8, 2023, so that the agenda would include Nano's individual director nominees for the Company's board, and (ii) the Company issue a new proxy statement and proxy card for the annual general shareholder meeting.

On July 28, 2023, Nano issued a press release in which it announced that it intends to withdraw its nominees for the Company's board, which Nano reiterated in a press release that it issued on August 1, 2023.

On September 26, 2023, at the parties' request, the court dismissed the proceedings, without prejudice.

*Ordinary course litigation*

In addition to the foregoing litigations, the Company is also a party to various legal proceedings from time to time, the outcome of which, in the opinion of management, will not have a significant effect on the financial position, profitability or cash flows of the Company.

Royalty commitments

As part of its acquisition of XAAR 3D on November 1, 2021, the Company assumed a royalty liability to a third party in respect of the developed technology. Such liability was recorded based on a fair value estimate, which was determined using the valuation model used to value the developed technology and is recorded under other non-current liabilities. As of December 31, 2023 and 2022 the royalty liability amounted to $8.4 millions, $9.3 millions, respectively.

**Note 12. Equity**

**a.  Share capital**

The Company's issued share capital is composed of ordinary shares NIS 0.01 par value per share. Ordinary shares confer upon their holders the right to receive notice to participate and vote in general meetings of the Company, and the right to receive dividends if declared.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

The Company's ordinary shares are traded in the United States on the Nasdaq Global Select Market under the ticker symbol "SSYS". As of December 31, 2023 and 2022, there were 69,656 thousand ordinary shares and 67,086 thousand ordinary shares issued and outstanding, respectively. The increase in the issued and outstanding ordinary shares during 2023 was attributable to exercises of stock options and RSUs under the Company's stock-based compensation plans (including its ESPP). During 2022 the reserve pool under the 2022 Plan was increased by 1.5 million shares.

b.  **Stock-based compensation plans**

The Stratasys Ltd. 2012 Omnibus Equity Incentive Plan (the "2012 Plan"), which became effective upon closing of the Stratasys-Core merger, provides for the grant of options, restricted shares, RSUs, PSUs and other share-based awards to the Company's and its subsidiaries' respective directors, employees, officers, consultants, and to any other person whose services are considered valuable to the Company or any of its affiliates. Under the 2012 Plan, options, RSUs and PSUs generally have a contractual term of ten years from the grant date. Options granted become exercisable and RSUs are vested over the requisite service period, which is normally a four-year period beginning on the grant date, subject to continued service to the Company. PSUs are vested only upon the achievement of certain pre-determined performance metrics. Once the performance metrics are met, vesting of PSUs is subject to continued service to the Company over the requisite service period, which is normally a two-year to four-year period. The 2012 Plan expired pursuant to its own terms in September 2022.

As of December 31, 2023, there were an aggregate of 8,534,204 ordinary shares subject to outstanding awards under the 2012 Plan, and no further shares available for future equity awards under the 2012 plan, as all remaining shares under the plan were transferred to the new 2022 Plan (as described below) upon the expiration of the 2012 Plan. All outstanding awards under the 2012 Plan continue to remain subject to the terms of the 2012 Plan, but upon cancellation, forfeiture or expiration of any such awards for any reason, the underlying shares will be automatically transferred and added to the pool of shares available for issuance under the 2022 Plan.

The Stratasys Ltd. 2022 Share Incentive Plan (the "2022 Plan") became effective upon approval by the Company's shareholders at the Company's 2022 annual general meeting of shareholders that took place on September 15, 2022. The 2022 Plan provides for the grant of options, restricted shares, RSUs, PSUs and other share-based awards to the Company's and its subsidiaries' respective directors, employees, officers, consultants, and to any other person whose services are considered valuable to the Company or any of its affiliates. Under the 2022 Plan, options, RSUs and PSUs generally have a contractual term of ten years from the grant date. Options granted become exercisable and RSUs are vested over the requisite service period, which is normally a four-year period beginning on the grant date, subject to continued service to the Company. PSUs are vested only upon the achievement of certain pre-determined performance metrics. Once the performance metrics are met, vesting of PSUs is subject to continued service to the Company over the requisite service period, which is normally a two-year to four-year period. As of December 31, 2023, 518,103 ordinary shares were subject to existing awards under the 2022 Plan, including shares that may be rolled over from the Stratasys 2012 Plan, were available for future equity awards under the 2022 Plan.

*Stock options*

A summary of the stock option activity for the year ended December 31, 2023 is as follows:

|  | Number of Options | Weighted Average Exercise Price |
|---|---|---|
| Options outstanding as of December 31, 2022 | 1,619,559 | $ 27.62 |
| Granted | 66,811 | 13.99 |
| Exercised | (2,898) | 3.57 |
| Forfeited | (322,820) | 54.20 |
| Options outstanding as of December 31, 2023 | 1,360,652 | $ 20.67 |
| Options exercisable as of December 31, 2023 | 1,013,621 | $ 22.25 |

F-41

STRATASYS LTD.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

The following table summarizes information about stock options outstanding at December 31, 2023:

| | | | Options Outstanding | | | Options Exercisable | |
| Range of Exercise Prices | | | Outstanding options at December 31, 2023 | Weighted- Average Remaining Contractual Life in Years | Weighted- Average Exercise Price | Exercisable options at December 31, 2023 | Weighted-Average Exercise Price |
|---|---|---|---|---|---|---|---|
| $ | 3.52 $ | 19.61 | 523,052 | 6.68 $ | 16.11 | 176,021 $ | 16.22 |
| $ | 19.66 $ | 22.28 | 584,275 | 3.56 | 20.42 | 584,275 | 20.42 |
| $ | 22.47 $ | 103.36 | 253,059 | 2.75 | 30.57 | 253,059 | 30.57 |
| $ | 114.03 $ | 114.11 | 266 | 0.42 | 114.08 | 266 | 114.08 |
| | | | 1,360,652 | 4.61 $ | 20.67 | 1,013,621 $ | 22.25 |
| Aggregate intrinsic value (U.S. $ in thousands) | | | $ 121 | | | $ 90 | |

As of December 31, 2023, the weighted-average remaining contractual life of exercisable options was 3.9 year. The total intrinsic value of options exercised during 2023, 2022 and 2021 was approximately $0.0 million, $0.30 million and $5.19 million, respectively.

The Company used the Black-Scholes option-pricing model to determine the fair value of options granted during 2023, 2022 and 2021. The following assumptions were applied in determining the options' fair value on their grant date:

| | 2023 | | | 2022 | | | 2021 | | |
|---|---|---|---|---|---|---|---|---|---|
| Risk-free interest rate | 4.1% | — | 4.7% | 3.6% | — | 3.9% | 1.3% | — | 1.3% |
| Expected option term (years) | | 5.5 | | | 5.5 | | | 5.1 | |
| Expected share price volatility | 61.0% | — | 61.2% | 60.3% | — | 61.4% | 58.7% | — | 58.7% |
| Dividend yield | | — | | | — | | | — | |
| Weighted average grant date fair value | | $9.75 | | | $7.42 | | | $14.75 | |

As of December 31, 2023, the Company had 347,031 unvested options. As of December 31, 2023, the unrecognized compensation cost related to all unvested, equity- classified stock options of $642,154 is expected to be recognized as an expense on a straight-line basis over a weighted-average period of 2.0 years.

*Restricted Stock Units and Performance Stock Units*

A summary of the Company's RSUs and PSUs activity for the year ended December 31, 2023 is as follows:

| | Number of RSUs and PSUs | Weighted Average Grant Date Fair Value |
|---|---|---|
| Unvested RSUs and PSUs outstanding as of December 31, 2022 | 3,496,099 $ | 23.98 |
| Granted | 2,384,995 | 13.27 |
| Vested | (1,676,389) | 22.96 |
| Forfeited | (362,473) | 22.14 |
| Unvested RSUs and PSUs outstanding as of December 31, 2023 | 3,842,232 $ | 17.95 |

F-42

The total vesting-date value of equity classified RSUs vested during 2023 was $23.8 million. As of December 31, 2023, the unrecognized compensation cost related to all unvested equity classified RSUs and PSUs of $51.5 million is expected to be recognized as an expense on a straight-line basis over a weighted-average period of 2.5 years.

Stock-based compensation expense for stock options and equity classified RSUs included in the Company's Statements of Operations and Comprehensive Loss were allocated as follows:

| | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| | | (U.S. $ in thousands) | | |
| Cost of revenues | $ | 3,701 $ | 4,082 $ | 3,093 |
| Research and development, net | | 7,932 | 7,113 | 6,564 |
| Selling, general and administrative | | 19,981 | 22,266 | 21,320 |
| | $ | 31,614 $ | 33,461 $ | 30,977 |

*Employee Stock Purchase Plan*

In October 2021, the Company adopted the 2021 Employee Stock Purchase Plan (the "ESPP"). As of December 31, 2023, the maximum aggregate number of ordinary shares that may be purchased initially under the ESPP was 5,200,000 shares.

The ESPP is implemented through an offering every six months. According to the ESPP, eligible employees may use up to 15% of their salaries to purchase ordinary shares. The price of an ordinary share purchased under the ESPP is equal to 85% of the lower of the fair market value of the ordinary share on the beginning of each offering period or on the purchase date.

As of December 31, 2023, 812,101 ordinary shares had been purchased under the ESPP.

As of December 31, 2023, 4,387,899 ordinary shares are available for future issuance under the ESPP.

In accordance with ASC Topic 718, the ESPP is considered compensatory and, as such, results in recognition of stock-based compensation expenses.

c.  **Accumulated other comprehensive loss**

The following tables present the changes in the components of accumulated other comprehensive loss, net of taxes for the years ended December 31, 2023, 2022 and 2021:

| | | December 31, 2023 | | |
|---|---|---|---|---|
| | | Net unrealized gain (loss) on cash flow hedges | Foreign currency translation adjustments | Total |
| | | U.S. $ in thousands | | |
| Balance as of January 1, 2023 | $ | (299) $ | (12,519) $ | (12,818) |
| Other comprehensive loss before reclassifications | | (1,797) | 3,650 | 1,853 |
| Amounts reclassified from accumulated other comprehensive loss | | 3,886 | — | 3,886 |
| Other comprehensive income (loss), net of tax | | 2,089 | 3,650 | 5,739 |
| Balance as of December 31, 2023 | $ | 1,790 $ | (8,869) $ | (7,079) |

F-43

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

| | December 31, 2022 | | |
|---|---|---|---|
| | Net unrealized gain (loss) on cash flow hedges | Foreign currency translation adjustments | Total |
| | U.S. $ in thousands | | |
| Balance as of January 1, 2022 | $ 1,572 | $ (10,343) | $ (8,771) |
| Other comprehensive loss before reclassifications | (1,566) | (2,176) | (3,742) |
| Amounts reclassified from accumulated other comprehensive loss | (305) | — | (305) |
| Other comprehensive income (loss), net of tax | (1,871) | (2,176) | (4,047) |
| Balance as of December 31, 2022 | $ (299) | $ (12,519) | $ (12,818) |

| | December 31, 2021 | | |
|---|---|---|---|
| | Net unrealized gain (loss) on cash flow hedges | Foreign currency translation adjustments | Total |
| | U.S. $ in thousands | | |
| Balance as of January 1, 2021 | $ (1,673) | $ (7,173) | $ (8,846) |
| Other comprehensive loss before reclassifications | 3,668 | (2,603) | 1,065 |
| Amounts reclassified from accumulated other comprehensive loss | (423) | (567) | (990) |
| Other comprehensive income (loss), net of tax | 3,245 | (3,170) | 75 |
| Balance as of December 31, 2021 | $ 1,572 | $ (10,343) | $ (8,771) |

**d.  Rights plan**

On July 24, 2022, the Company's Board of Directors adopted a shareholder rights plan (the "Initial Rights Plan") to protect the interests of the Company's shareholders. Each Right entitled the registered holder thereof to purchase from the Company one ordinary share at a price of NIS 0.01 per share, subject to adjustment, once the Rights were to become exercisable, and subject to the exercise terms and conditions thereof described in a related Rights Agreement, dated as of July 25, 2022, between the Company and Continental Stock Transfer & Trust Company, as rights agent. The Rights were to become exercisable only if an entity, person, or group were to acquire beneficial ownership of 15% or more of the Company's outstanding ordinary shares in a transaction not approved by the Company's Board of Directors. The Initial Rights Plan initially had a 364-day term, expiring on July 24, 2023, which was extended to December 31, 2023. Under a Third Amendment to Rights Agreement, entered into on December 21, 2023, the Initial Rights Plan and related Rights Agreement were terminated in conjunction with the adoption of the New Rights Plan (as described below).

STRATASYS LTD.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

On December 21, 2023, prior to the expiration of the Initial Rights Plan, the Company's Board of Directors unanimously adopted a limited-duration shareholder rights plan (the "New Rights Plan", together with the Initial Rights Plan, collectively, the "Rights Plans") to protect the interests of the Company's shareholders, in replacement of the Initial Rights Plan. The New Rights Plan expires on December 19, 2024. The New Rights Plan, if triggered, will significantly dilute the ownership of any entity, person or group that acquires beneficial ownership of 15% or more of the Company's outstanding ordinary shares in a transaction not approved by the Company's Board of Directors. The New Rights Plan contains enhanced shareholder protections that are intended to limit the scope of the New Rights Plan. The New Rights Plan is designed to give all of the Company's shareholders (other than an offeror) a way to voice their position directly to the Company's Board of Directors on certain types of offers and whether the plan should apply to those offers, and in other circumstances to exempt an offer from the plan altogether.

The adoption of the Rights Plans was intended to protect the long-term interests of Stratasys and all Stratasys shareholders. The Rights Plans were designed to reduce the likelihood that any entity, person, or group would gain control of, or significant influence over, Stratasys through the open-market accumulation of the Company's shares without appropriately compensating all Stratasys shareholders for control. The Rights Plans were meant to encourage anyone seeking to gain a significant interest in Stratasys to negotiate directly with the Company's Board of Directors prior to attempting to control or significantly influence the Company. Further to those goals, the Rights could cause substantial dilution to a person or group that would acquire 15% or more of the ordinary shares of the Company or any existing holder of 15% or more of the ordinary shares who would acquire any additional ordinary shares.

e. **Public offering of ordinary shares**

During March 2021, the Company completed a public offering of its ordinary shares in an amount of $218.9 million, net of $11.1 million underwriting discounts and offering expenses. The total number of shares sold by the Company in the public offering was 7,931,034. The Company recorded a deferred tax asset in respect of a tax benefit, arising from the underwriting discounts and offering expenses, as an increase to Additional Paid-In Capital.

## Note 13. Derivatives and Hedging Activities

The Company carries out transactions involving foreign currency exchange derivative financial instruments. The transactions are designed to hedge the Company's exposure to change in relative value of currencies other than the U.S. dollar. The Company is primarily exposed to foreign exchange risk with respect to recognized assets and liabilities and forecasted transactions denominated in the New Israeli Shekel ("NIS") and, the Euro. Gains and losses on the hedging instruments offset losses and gains on the hedged items.

The following table summarizes the consolidated balance sheets classification and fair values of the Company's derivative instruments:

F-45

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

|  |  | Fair Value | | Notional Amount | |
| --- | --- | --- | --- | --- | --- |
|  |  | Dec 31, 2023 | Dec 31, 2022 | Dec 31, 2023 | Dec 31, 2022 |
|  |  | U.S. $ in thousands | | | |
| Assets derivatives -Foreign exchange contracts, not designated as hedging instruments | Other current assets | $ 164 | $ 159 | $ 82,873 | $ 101,733 |
| Assets derivatives -Foreign exchange contracts, designated as cash flow hedge | Other current assets | 2,087 | 3 | 51,830 | 4,900 |
| Liability derivatives -Foreign exchange contracts, not designated as hedging instruments | Accrued expenses and other current liabilities | (51) | (38) | 21,168 | 16,751 |
| Liability derivatives -Foreign exchange contracts, designated as cash flow hedge | Accrued expenses and other current liabilities | (657) | (1,640) | 74,054 | 72,273 |
|  |  | $ 1,543 | $ (1,516) | $ 229,925 | $ 195,657 |

Foreign exchange contracts not designated as hedging instruments

As of December 31, 2023, the notional amounts of the Company's outstanding exchange forward contracts, not designated as hedging instruments, were $104.0 million and were used to reduce foreign currency exposures of the Euro, New Israeli Shekel (the "NIS"),British Pound, Japanese Yen, Korean Won and Chinese Yuan. With respect to such derivatives, gain of $0.5 million and gain of $2.1 million were recognized under financial income (expenses) , net for the years ended December 31, 2023 and 2022, respectively. Such gains partially offset the revaluation losses of the balance sheet items, which are also recognized under financial income (expenses), net.

Cash Flow Hedging—Hedges of Forecasted Foreign Currency Payroll and other operating expenses

As of December 31, 2023 and 2022, the Company had in effect foreign exchange forward contracts for the conversion of $46.2 million and $64.4 million, respectively, into NIS. These foreign exchange forward contracts were designated as cash flow hedge for accounting purposes. The Company uses short-term cash flow hedge contracts to reduce its exposure to variability in expected future cash flows resulting mainly from payroll costs denominated in New Israeli Shekels. The changes in fair value of those contracts are included in the Company's accumulated other comprehensive loss.

Cash Flow Hedging—Hedges of Forecasted Foreign Currency Revenue

The Company transact business in U.S. Dollars and in various other currencies. The Company may use foreign exchange or forward contracts to hedge certain cash flow exposures resulting from changes in these foreign currency exchange rates. These foreign exchange contracts, carried at fair value, have maturities of up to twelve months. The Company enters into these foreign exchange contracts to hedge a portion of its forecasted foreign currency denominated revenue in the normal course of business and accordingly, they are not speculative in nature.

As of December 31, 2023, the Company had in effect foreign exchange forward contracts, designated as cash flow hedge for accounting purposes, for the conversion of €72.0 million into dollars.

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

To receive hedge accounting treatment, all hedging relationships are formally documented at the inception of the hedge, and the hedges must be highly effective in offsetting changes to future cash flows on hedged transactions. The Company record changes in fair value of these cash flow hedges in accumulated other comprehensive income (loss) in its consolidated balance sheets, until the forecasted transaction occurs. When the forecasted transaction occurs, we reclassify the related gain or loss to revenue. In the event the underlying forecasted transaction does not occur, or it becomes probable that it will not occur, the Company reclassifies the gain or loss on the related cash flow hedge from accumulated other comprehensive income (loss) to the same statement of operations line item as the hedged item. If the Company does not elect hedge accounting, or the contract does not qualify for hedge accounting treatment, the changes in fair value from period to period are recorded under financial income (expenses), net.

| | Revenues | | Cost of sales | | Research and development, net | | Selling, general and administrative | | Financial (expenses) income, net | | Other comprehensive income | |
| | December 31, | | December 31, | | December 31, | | December 31, | | December 31, | | December 31, | |
| | 2023 | 2022 | 2023 | 2022 | 2023 | 2022 | 2023 | 2022 | 2023 | 2022 | 2023 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | U.S. $ in thousands | | | | | |
| Line items in which effects of hedges are recorded | $ 627,598 | $ 651,483 | $ 360,574 | $ 375,016 | $ 94,425 | $ 92,876 | $ 260,179 | $ 240,750 | $ (2,993) | $ (229) | $ 5,739 | $ (4,047) |
| Foreign exchange contracts designated as hedging instrument | 1,578 | 3,625 | 472 | 243 | 1,604 | 950 | 3,030 | 1,941 | — | — | (1,797) | (1,566) |
| Foreign exchange contracts not designated as hedging instrument | — | — | — | — | — | — | — | — | (470) | (2,125) | — | — |

**Note 14. Entity-Wide Disclosure**

Revenues by geographic area for the years ended December 31, 2023, 2022 and 2021 were as follows*:

| | Year ended December 31, | | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| | | (U.S. $ in thousands) | |
| Americas (primarily the United States) | $ 389,770 | $ 415,428 | $ 388,323 |
| EMEA** | 155,942 | 141,660 | 130,296 |
| Asia Pacific | 81,886 | 94,395 | 88,600 |
| | $ 627,598 | $ 651,483 | $ 607,219 |

F-47

**STRATASYS LTD.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

\* Revenues are attributed to geographic areas based on the location of customer.

\*\* Revenues in Israel amounted to $5.5 million and $5.4 million for the years ended December 31, 2023 and 2022, respectively and are included under the EMEA region in the above table.

No single customer accounted for 10% or more of Company's total revenues, or Company's net accounts receivable, in any fiscal year presented.

Property, plant and equipment and right-of-use assets of lessees by geographical area were as follows:

| | Year Ended December 31, | |
| | 2023 | 2022 |
| --- | --- | --- |
| Americas (primarily the United States) | $59,473 | $ 63,158 |
| EMEA | 153,749 | 146,208 |
| Asia Pacific | 3,225 | 3,819 |
| | $216,447 | $ 213,185 |

Property, plant and equipment that were located in Israel amounted to $126.2 million and $130.6 million for the years ended December 31, 2023 and 2022, respectively and are included under the EMEA region in the above table.

Right-of-use assets of lessees that were located in Israel amounted to $0.8 million and $1.0 million for the years ended December 31, 2023 and 2022 respectively and are included under the EMEA region in the above table.

**Note 15. Net loss per Share**

The following table presents the computation of basic and diluted net loss per share:

| | Year ended December 31, | | |
| | 2023 | 2022 | 2021 |
| --- | --- | --- | --- |
| | (In thousands, except per share amounts) | | |
| **Numerator:** | | | |
| Net loss attributable to Stratasys Ltd. for basic and diluted net loss per share | $ (123,074) $ | (28,974) $ | (61,982) |
| | | | |
| **Denominator:** | | | |
| Weighted average shares – denominator for basic and diluted net loss per share | 68,666 | 66,491 | 63,471 |
| Net loss per share Basic and diluted | $ (1.79) $ | (0.44) $ | (0.98) |

The computation of diluted net loss per share for the years ended December 31, 2023, 2022 and 2021 excluded share awards of 5.2 million, 5.1 million and 4.8 million, respectively, because their inclusion would have had an anti-dilutive effect on the diluted net loss per share.

F-48

STRATASYS LTD.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### Note 16. Leases

The Company's operating lease expenses are recognized on a straight-line basis. Operating lease cost for the years ended December 31, 2023, 2022 and 2021, were as follows:

| | December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| | (U.S. $ in thousands) | | |
| **Operating lease cost:** | | | |
| Fixed payments and variable payments that depend on an index or rate | $10,090 | $8,951 | $10,196 |
| **Total operating lease cost** | **10,090** | **$8,951** | **$10,196** |

Cash flow and other information related to operating leases were as follows:

| | December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| | (U.S. $ in thousands) | | |
| Cash paid for amounts included in the measurement of lease liabilities | $8,885 | $8,372 | $9,829 |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $7,142 | $12,057 | $5,955 |

| | December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| | (U.S. $ in thousands) | | |
| Weighted-average remaining lease term — operating leases | 4.73 years | 4.11 years | 2.59 years |
| Weighted-average discount rate — operating leases | 4.47 % | 4.17 % | 4.58 % |

Maturities of operating lease liabilities were as follows:

| | December 31, |
|---|---|
| | 2023 |
| | (U.S. $ in thousands) |
| 2024 | $ 6,554 |
| 2025 | 4,035 |
| 2026 | 2,628 |
| 2027 | 2,109 |
| 2028 / and thereafter | 5,229 |
| Total operating lease payments | 20,555 |
| Less: imputed interest | (1,895) |
| Present value of lease liabilities | $ 18,660 |

F-49

**ITEM 19. EXHIBITS.**

**INDEX OF ATTACHED EXHIBITS**

| Exhibit Number | Document Description |
|---|---|
| 1.1 | Amended and Restated Articles of Association of Stratasys Ltd.[1] |
| 1.2 | Memorandum of Association of Stratasys Ltd. (formerly known as Objet Ltd.)[2] |
| 2.1 | Specimen ordinary share certificate of Stratasys Ltd.[3] |
| 2.2 | Description of ordinary shares of Stratasys Ltd* |
| 2.3 | Shareholder Rights Agreement, dated December 21, 2023, by and between Stratasys Ltd. and Continental Stock Transfer & Trust Company[4] |
| 4.1 | Stratasys Ltd. 2022 Share Incentive Plan, as amended[5] |
| 4.2 | Stratasys Ltd. 2012 Omnibus Equity Incentive Plan, as amended[6] |
| 4.3 | Stratasys Ltd. 2021 Employee Share Purchase Plan[7] |
| 4.4 | Form of Indemnification Agreement by and between Stratasys Ltd. (formerly known as Objet Ltd.) and each of its directors and executive officers[8] |
| 4.5 | OEM Purchase and License Agreement,effective as of May 5, 2011, by and between Stratasys Ltd. (formerly known as Objet Geometries Ltd.) and RicohPrinting Systems America, Inc.[9] |
| 4.6 | Assignment, dated June 1, 1994, from S. Scott Crump, James W. Comb, William R. Priedeman, Jr., and Robert Zinniel to Stratasys, Inc. (a subsidiary of Stratasys Ltd.) with respect to a patent application for a process and apparatus of support removal for three-dimensional modeling[10] |
| 4.7 | Stratasys Ltd. Compensation Policy for Executive Officers and Directors[11] |
| 4.8 | Employment Agreement, effective as of February 18, 2020, by and between Stratasys Ltd. and Yoav Zeif[12] |
| 8.1 | Subsidiary List of Stratasys Ltd.* |
| 12.1 | Certificate of Chief Executive Officer pursuant to Rule 13a-14(a)/Rule 15d-14(a) under the Exchange Act* |
| 12.2 | Certificate of Chief Financial Officer pursuant to Rule 13a-14(a)/Rule 15d-14(a) under the Exchange Act* |
| 13 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to Rule 13a-14(b)/Rule 15d-14(b) under the Exchange Act and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002* |
| 15.1 | Consent of Kesselman & Kesselman, a member firm of PricewaterhouseCoopers International Limited, an independent registered public accounting firm* |
| 97.1 | Stratasys Ltd. Policy for Recovery of Erroneously Awarded Compensation* |
| 101 | The following financial information from Stratasys Ltd.'s Annual Report on Form 20-F for the year ended December 31, 2023 formatted in XBRL (eXtensible Business Reporting Language): (i) Consolidated Balance Sheets at December 31, 2023 and 2022; (ii) Consolidated Statements of Operations and Comprehensive Income for the years ended December 31, 2023, 2022 and 2021; (iii) Consolidated Statements of Changes in Equity for the years ended December 31, 2023, 2022 and 2021; (iv) Consolidated Statements of Cash Flows for the years ended December 31, 2023, 2022 and 2021; and (v) Notes to Consolidated Financial Statements, tagged as blocks of text. |
| 104 | Cover Page Interactive Data File |

*Filed herewith

# Portions of this exhibit have been omitted and filed separately with the SEC pursuant to a confidential treatment request.

---

[1] Incorporated by reference to Appendix A to the registrant's proxy statement for its February 3, 2015 extraordinary general meeting of shareholders, attached as Exhibit a 99.1 to the registrant's report of foreign private issuer on Form 6-K furnished to the SEC on January 6, 2015

[2] Incorporated by reference to Exhibit 3.2 to the registrant's registration statement on Form F-4, SEC File No. 333-182025, filed with the SEC on June 8, 2012

[3] Incorporated by reference to Exhibit 4.1 to Amendment No. 3 to the registrant's registration statement on Form F-4, SEC File No. 333-182025, filed with the SEC on August 6, 2012

[4] Incorporated by reference to Exhibit 4.1 to the registrant's report of foreign private issuer on Form 6-K furnished to the SEC on December 21, 2023

[5] Incorporated by reference to Exhibit 99.1 to the registrant's report of foreign private issuer on Form 6-K furnished to the SEC on August 26, 2022

[6] Incorporated by reference to Exhibit 4.2 to the registrant's annual report on Form 20-F for the year ended December 31, 2022, filed with the SEC on March 3, 2023

[7] Incorporated by reference to Appendix A to the registrant's proxy statement for its 2021 annual general meeting of shareholders, attached as Exhibit 99.2 to the registrant's report of foreign private issuer on Form 6-K furnished to the SEC on October 13, 2021

[8] Incorporated by reference to Exhibit 10.7 to the registrant's registration statement on Form F-4, SEC File No. 333- 182025, filed with the SEC on June 8, 2012

[9] Incorporated by reference to Exhibit 10.10 to the registrant's registration statement on Form F-4, SEC File No. 333-182025, filed with the SEC on June 8, 2012

[10] Incorporated by reference to Amendment No. 1 to Stratasys, Inc.'s registration statement on Form SB-2 (SEC File No. 333-99108) filed with the SEC on December 20, 1995

[11] Incorporated by reference to Appendix B to the registrant's proxy statement for its 2021 annual general meeting of shareholders, attached as Exhibit 99.2 to the registrant's report of foreign private issuer on Form 6-K furnished to the SEC on October 13, 2021

[12] Incorporated by reference to Exhibit 4.8 to the registrant's annual report on Form 20-F for the year ended December 31, 2019, filed with the SEC on February 26, 2020

152

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report filed on its behalf.

STRATASYS LTD.

/s/ Yoav Zeif Yoav Zeif
Chief Executive Officer March 11, 2024

153

**Exhibit 2.2 Description of Stratasys Ltd. Ordinary Shares**

The Stratasys Ltd. (hereinafter, "we", "us", "our" or similar expressions) authorized share capital consists of 180 million ordinary shares, nominal value NIS 0.01 per share. As of February 14, 2024, 69,750,397 ordinary shares were issued and outstanding.

We may from time to time, by approval of a majority of our shareholders, increase our authorized share capital. Our fully paid ordinary shares are issued in registered form and are freely transferable under our amended and restated articles of association, as further amended (to which we refer herein as our amended articles). Under the Israeli Companies Law, 5759-1999, or the Companies Law, we are required to maintain a major shareholder register listing for shareholders holding 5% or more of our outstanding ordinary shares.

Our amended articles and the laws of the State of Israel do not restrict the ownership or voting of ordinary shares by non-residents of Israel, except with respect to individuals and entities that are residents of countries in a state of war with Israel, and except with respect to entities which are controlled by residents of countries in a state of war with Israel.

**Listing, Register Number and Purpose**

Our ordinary shares are listed and traded on the Nasdaq Global Select Market under the trading symbol "SSYS."

Our registration number at the Israeli Registrar of Companies is 51-260769-8. Our purpose under our memorandum of association includes every lawful purpose.

**Dividend and Liquidation Rights**

Holders of our ordinary shares are entitled to their proportionate share of any cash dividend, share dividend or dividend in kind declared with respect to our ordinary shares. We may declare dividends out of profits legally available for distribution. Under the Companies Law, a company may distribute a dividend only if the distribution does not create a reasonably foreseeable risk that the company will be unable to meet its existing and anticipated obligations as they become due. A company may only distribute a dividend out of the company's profits, as defined under the Companies Law.

Under the Companies Law, the declaration of a dividend does not require the approval of the shareholders of a company unless the company's articles of association provide otherwise. Our amended articles provide that our board of directors may declare and distribute dividends without the approval of the shareholders.

In the event of liquidation, holders of our ordinary shares will have the right to share ratably in any assets remaining after payment of liabilities, in proportion to the paid-up nominal value of their respective holdings. These rights may be affected by the grant of preferential liquidation or dividend rights to the holders of a class of shares that may be authorized in the future.

**Shareholder Meetings**

Holders of ordinary shares have one vote for each ordinary share held on all matters submitted to a vote of shareholders. This right may be changed if shares with special voting rights are authorized in the future.

Under the Companies Law, an annual general meeting of our shareholders is required to be held once every calendar year, but no later than 15 months from the date of the previous annual general meeting.

1

All meetings other than the annual general meeting of shareholders are referred to as extraordinary general meetings. Our board of directors may call extraordinary general meetings whenever it sees fit, at such time and place, within or outside of Israel, as it may determine. In addition, the Companies Law and our amended articles provide that our board of directors is required to convene an extraordinary general meeting upon the written request of (i) any two of our directors or one-quarter of our board of directors or (ii) one or more shareholders holding, in the aggregate, either (a) 5% of our outstanding issued shares and 1% of our outstanding voting power or (b) 5% of our outstanding voting power. The Chairman of the Board of Directors or any other person appointed for that purpose by the board of directors, presides at each of our general meetings. The Chairman of the Board of Directors is not entitled to vote at a general meeting in his capacity as Chairman.

Subject to the provisions of the Companies Law and the regulations promulgated thereunder, shareholders that are entitled to participate and vote at general meetings are the shareholders of record on a date decided by our board of directors, which may be between four and 40 days prior to the date of the meeting. Furthermore, the Companies Law and the amended articles require that resolutions regarding the following matters must be passed at a general meeting of our shareholders:

- amendments to the amended articles;

- appointment or termination of our auditors;

- appointment of directors and appointment and dismissal of external directors;

- approval of acts and transactions involving related parties, as defined by the Companies Law or pursuant to our amended articles;

- director compensation;

- increases or reductions of our authorized share capital;

- a merger; and

- the exercise of our board of directors' powers by a general meeting, if the board of directors is unable to exercise its powers and the exercise of any of its powers is required for our proper management.

The Companies Law and the amended articles require that a notice of any annual general meeting or extraordinary general meeting be provided to shareholders at least 21 days prior to the meeting, and if the agenda of the meeting includes the appointment or removal of directors, the approval of transactions with office holders or interested or related parties, or an approval of a merger, notice must be provided at least 35 days prior to the meeting.

Under the Companies Law and the amended articles, shareholders are not permitted to take action via written consent in lieu of a meeting.

**Voting Rights**

***Quorum requirements***

Pursuant to our amended articles, holders of ordinary shares have one vote for each share held on all matters submitted to a vote before the shareholders at a general meeting. The quorum required for a general meeting consists of at least two shareholders present in person, by proxy or written ballot who hold or represent between them at least 25% of the total outstanding voting rights. A meeting adjourned for lack of a quorum is generally adjourned to the same day in the following week at the same time and place or to a later time/date if so specified in the summons or notice of the meeting. At the reconvened meeting, any two or more shareholders present in person or by proxy constitute a lawful quorum.

2

*Vote requirements*

Our amended articles provide that all resolutions of our shareholders require the approval of a majority of the voting power present and voting at a general meeting, in person or by proxy, unless otherwise required by the Companies Law or by the amended articles. Under the Companies Law, each of (i) the approval of an extraordinary transaction with a controlling shareholder, and (ii) the terms of employment or other engagement of the controlling shareholder of the company or such controlling shareholder's relative (even if not extraordinary) requires, in addition to approval by the audit committee (or, in the case of a compensatory arrangement, the compensation committee) and the board of directors, approval by a special majority of the shareholders that fulfills one of the following requirements:

- the majority includes a majority of shareholders who lack a conflict of interest (referred to under the Companies Law as a "personal interest") in approval of the transaction or terms of employment or engagement (as applicable); or

- the votes of shareholders who have no conflict of interest in the transaction or terms of employment or engagement and who are present and voting, in person, by proxy or by voting deed at the meeting, and who vote against it, may not represent more than two percent (2%) of the voting rights of the company.

To the extent that any such transaction with a controlling shareholder is for a period extending beyond three years, approval is required once every three years, unless the audit committee determines that the duration of the transaction is reasonable given the circumstances related thereto.

The Companies Law generally requires a similar special majority for approval of the terms of employment of the chief executive officer (as with a transaction with a controlling shareholder that is described above), based on the fulfillment of either of the above two conditions, except that for each such condition, the votes of non-controlling shareholders who lack a conflict of interest (instead of just shareholders generally who lack a conflict of interest) count towards fulfillment of the relevant condition.

Under our amended articles, if the share capital is divided into classes, the alteration of the rights, privileges, preferences or obligations of any class of share capital will require approval by a majority of the voting power present and voting, in person or by proxy, at a class meeting of the class so affected (or such other percentage of the relevant class that may be set forth in the governing documents relevant to such class).

Israeli law provides that a shareholder of a public company may vote in a meeting and in a class meeting by means of a voting deed in which the shareholder indicates how he or she votes on resolutions relating to the following matters:

3

- appointment or removal of directors;

- approval of transactions with office holders or interested or related parties;

- approval of a merger or any other matter in respect of which there is a provision in the articles of association providing that decisions of the general meeting may also be passed by voting deed;

- approval of an arrangement or reorganization of the company pursuant to Section 350 of the Companies Law; and

- other matters which may be prescribed by Israel's Minister of Justice.

The provision allowing the vote by voting deed does not apply if, to the best knowledge of the company at the time of calling the general shareholders meeting, a controlling shareholder will hold on the record date for such shareholders meeting, voting power sufficient to determine the outcome of the vote.

*Shareholder Duties*

Pursuant to the Companies Law, a shareholder has a duty to act in good faith and in a customary manner toward the company and other shareholders and to refrain from abusing his or her power in the company, including, among other things, in voting at the general meeting of shareholders and at class shareholder meetings with respect to the following matters:

- an amendment to the company's articles of association;

- an increase of the company's authorized share capital;

- a merger; or

- the approval of interested party transactions and acts of office holders that require shareholder approval.

In addition, a shareholder also has a general duty to refrain from discriminating against other shareholders.

In addition, certain shareholders have a duty of fairness toward the company. These shareholders include any controlling shareholder, any shareholder who knows that it has the power to determine the outcome of a shareholder vote or a shareholder class vote and any shareholder who has the power to appoint or to prevent the appointment of an office holder of the company or other power towards the company. The Companies Law does not define the substance of this duty of fairness, except to state that the remedies generally available upon a breach of contract will also apply in the event of a breach of the duty to act with fairness.

*Access to Corporate Records*

Under the Companies Law and our amended articles, shareholders are provided access to the following corporate records: minutes of our general meetings; our shareholders register and principal shareholders register, articles of association and financial statements; and any document that we are required by law to file publicly with the Israeli Companies Registrar or the Israel Securities Authority. In addition, shareholders may request to be provided with any document related to an action or transaction requiring shareholder approval under the related party transaction provisions of the Companies Law. We may deny this request if we believe it has not been submitted in good faith or if such denial is necessary to protect our interest or protect a trade secret or patent.

4

**Modification of Class Rights**

The rights attached to any class of shares, such as voting, liquidation and dividend rights, may be amended by adoption of a resolution by the holders of a majority of the shares of that class present at a separate class meeting, or otherwise in accordance with the rights attached to such class of shares, as set forth in our amended articles.

**Transfer Agent and Registrar**

Our transfer agent and registrar in the United States is Continental Stock Transfer & Trust Company.

**Anti-Takeover Provisions**

*Full Tender Offer*

A person wishing to acquire shares of a public Israeli company and who could as a result hold over 90% of the target company's issued and outstanding share capital or voting rights is required by the Companies Law to make a tender offer to all of the company's shareholders for the purchase of all of the issued and outstanding shares of the company. A person wishing to acquire shares of a public Israeli company and who could as a result hold over 90% of the issued and outstanding share capital or voting rights of a certain class of shares is required to make a tender offer to all of the shareholders who hold shares of the relevant class for the purchase of all of the issued and outstanding shares of that class. If the shareholders who do not accept the offer hold less than 5% of the issued and outstanding share capital and voting rights of the company or of the applicable class, all of the shares that the acquirer offered to purchase will be transferred to the acquirer by operation of law (provided that a majority of the offerees that do not have a personal interest in such tender offer shall have approved it, which condition shall not apply if, following consummation of the tender offer, the acquirer would hold at least 98% of all of the company's outstanding shares and voting rights (or shares and voting rights of the relevant class)). However, shareholders may, at any time within six months following the completion of the tender offer, petition the court to alter the consideration for the acquisition. Even shareholders who indicated their acceptance of the tender offer may so petition the court, unless the acquirer stipulated that a shareholder that accepts the offer may not seek appraisal rights). If the shareholders who did not accept the tender offer hold 5% or more of the issued and outstanding share capital or voting rights of the company or of the applicable class, the acquirer may not acquire shares of the company that will increase its holdings to more than 90% of the company's issued and outstanding share capital or voting rights or 90% of the shares or voting rights of the applicable class, from shareholders who accepted the tender offer.

5

*Special Tender Offer*

The Companies Law provides that an acquisition of shares of a public Israeli company must be made by means of a special tender offer if as a result of the acquisition the purchaser could become a holder of 25% or more of the voting rights in the company, unless one of the exemptions in the Companies Law (as described below) is met. This rule does not apply if there is already another holder of at least 25% of the voting rights in the company. Similarly, the Companies Law provides that an acquisition of shares in a public company must be made by means of a tender offer if as a result of the acquisition the purchaser could become a holder of more than 45% of the voting rights in the company, if there is no other shareholder of the company who holds more than 45% of the voting rights in the company, unless one of the exemptions in the Companies Law is met.

A special tender offer must be extended to all shareholders of a company but the offeror is not required to purchase shares representing more than 5% of the voting power attached to the company's outstanding shares, regardless of how many shares are tendered by shareholders. A special tender offer may be consummated only if (i) at least 5% of the voting power attached to the company's outstanding shares will be acquired by the offeror and (ii) the number of shares tendered in the offer exceeds the number of shares whose holders objected to the offer.

If a special tender offer is accepted, then the purchaser or any person or entity controlling it or under common control with the purchaser or such controlling person or entity may not make a subsequent tender offer for the purchase of shares of the target company and may not enter into a merger with the target company for a period of one year from the date of the offer, unless the purchaser or such person or entity undertook to effect such an offer or merger in the initial special tender offer.

*Merger*

The Companies Law permits merger transactions if approved by each party's board of directors and, unless certain requirements described under the Companies Law are met, by a majority vote of each party's shares, and, in the case of the target company, a majority vote of each class of its shares, voted on the proposed merger at a shareholders meeting called with at least 35 days' prior notice.

For purposes of the shareholder vote, unless a court rules otherwise, the merger requires approval by a majority of the votes of shares represented at the shareholders' meeting that are held by parties other than the other party to the merger, or by any person (or group of persons acting in concert) who holds (or hold, as the case may be) 25% or more of the voting rights or the right to appoint 25% or more of the directors of the other party to the merger. If, however, the merger involves a merger with a company's own controlling shareholder or if the controlling shareholder has a personal interest in the merger, then the merger is instead subject to the same special majority approval that governs all extraordinary transactions with controlling shareholders (as described above under "Voting Rights—Vote requirements").

If the transaction would have been approved by the shareholders of a merging company but for the separate approval of each class or the exclusion of the votes of certain shareholders as provided above, a court may still approve the merger upon the request of holders of at least 25% of the voting rights of a company, if the court holds that the merger is fair and reasonable, taking into account the value of the parties to the merger and the consideration offered to the shareholders of the company that have petitioned the court to approve the merger.

Upon the request of a creditor of either party to the proposed merger, the court may delay or prevent the merger if it concludes that there exists a reasonable concern that, as a result of the merger, the surviving company will be unable to satisfy the obligations of any of the parties to the merger, and may further give instructions to secure the rights of creditors.

In addition, a merger may not be consummated unless at least 50 days have passed from the date on which a proposal for approval of the merger was filed by each party with the Israeli Registrar of Companies and at least 30 days have passed from the date on which the merger was approved by the shareholders of each party.

*Preferred Share Issuance*

Under the Companies Law, we are allowed to create and issue shares having rights different from those attached to our ordinary shares, including shares providing certain preferred rights, distributions or other matters and shares having preemptive rights. No preferred shares are currently authorized under our amended articles. In the future, if we do authorize, create and issue a specific class of preferred shares, such class of shares, depending on the specific rights that may be attached to it, may have the ability to frustrate or prevent a takeover or otherwise prevent our

6

shareholders from realizing a potential premium over the market value of their ordinary shares. The authorization and designation of a class of preferred shares will require an amendment to our amended articles, which requires the prior approval of the holders of a majority of the voting power present and voting, in person or by proxy, at the applicable general meeting of our shareholders. The convening of the meeting, the shareholders entitled to participate and the majority vote required to be obtained at such a meeting will be subject to the requirements set forth in the Companies Law as described above under "Voting Rights."

**Board of Directors**

Under the Companies Law, the management of our business is vested in our board of directors. Our board of directors may exercise all powers and may take all actions that are not specifically granted to our shareholders or to management. Our executive officers are responsible for our day-to-day management and have individual responsibilities established by our board of directors. Our Chief Executive Officer is appointed by, and serves at the discretion of, our board of directors, subject to any employment agreement that we may enter into with him. All other executive officers are also appointed by our board of directors, subject to the terms of any applicable employment agreements that we may enter into with them.

Under our amended articles, our board of directors must consist of at least seven and not more than 11 directors, including, to the extent applicable, at least two external directors required to be elected under the Companies Law.

In May 2016, we elected to be governed by a newly-adopted exemption under the Companies Law regulations that exempts us from appointing external directors and from complying with the Companies Law requirements related to the composition of the audit committee and compensation committee of our board of directors. Our eligibility for that exemption is conditioned upon: (i) the continued listing of our ordinary shares on the Nasdaq Stock Market (or one of a few select other non-Israeli stock exchanges); (ii) there not being a controlling shareholder (generally understood to be a 25% or greater shareholder) of our company under the Companies Law; and (iii) our compliance with the Nasdaq Listing Rules requirements as to the composition of (a) our board of directors—which requires that we maintain a majority of independent directors (as defined under the Nasdaq Listing Rules) on our board of directors and (b) the audit and compensation committees of our board of directors (which require that such committees consist solely of independent directors (at least three and two members, respectively), as described under the Nasdaq Listing Rules). At the time that it determined to exempt our company from the external director requirement, our board affirmatively determined that we meet the conditions for exemption from the external director requirement, including that a majority of the members of our board, along with each of the members of the audit and compensation committees of the board, are independent under the Nasdaq Listing Rules.

As a result of our election to be exempt from the external director requirement under the Companies Law, each of our directors is elected annually, at our annual general meeting of shareholders. The vote required for the election of each director is a majority of the voting power represented at the meeting and voting on the election proposal.

Our board of directors may appoint directors to fill vacancies on the board, for a term of office equal to the remaining period of the term of office of the director(s) whose office(s) have been vacated.

In accordance with the exemption available to foreign private issuers under the Nasdaq Listing Rules, we do not follow the requirements of the Nasdaq rules with regard to the process of nominating directors. Instead, we follow Israeli law and practice, in accordance with which our board of directors (based on the recommendation of the executive committee thereof) is authorized to recommend to our shareholders director nominees for election. Under the Companies Law and our amended articles, nominations for directors may also be made by any shareholder holding at least one percent (1%) of our outstanding voting power. However, any such shareholder may make such a nomination only if a written notice of such shareholder's intent to make such nomination (together with certain documentation required under the Companies Law) has been delivered to our registered Israeli office within seven days after we publish notice of our upcoming annual general meeting (or within 14 days after we publish a preliminary notification of an upcoming annual general meeting).

**Description of Rights to Purchase Stratasys Ltd. Ordinary Shares**

*Rights and Rights Agreement*

7

Our board of directors authorized, pursuant to a rights plan, adopted on July 24, 2022, (i) the issuance, on August 4, 2022, of one special purchase right, or Right, for each ordinary share outstanding at the close of business on August 4, 2022, or the Record Date, as well as (ii) the issuance of one Right for each ordinary share issued after the Record Date and prior to the earliest of the Issuance Date, the Redemption Date and the Expiration Date (as defined below) (including ordinary shares issued pursuant to the exercise, conversion or settlement of securities exercisable for, convertible into or that may be settled for, ordinary shares or rights, in each case, issued or granted prior to, and outstanding as of, the Issuance Date). Each Right represents the right to purchase one ordinary share, at a price of $0.01 per share, upon the terms and subject to the conditions described below.

The Rights were issued pursuant to a rights agreement, dated as of July 25, 2022, between the Company and Continental Stock Transfer & Trust Company, as rights agent. Each Right will allow its holder to purchase from us one ordinary share, at a purchase price of $0.01 per ordinary share, once the Rights become exercisable. Prior to exercise, each Right does not give its holder any dividend, voting, liquidation or other rights as a shareholder of ours.

*Exercise Period; Rights Certificates*

The Rights will not be exercisable until the earlier of: (a) the close of business on the tenth day after the public announcement or public disclosure that a person or group has become an "Acquiring Person" by obtaining beneficial ownership of 15% or more of our outstanding ordinary shares (subject to the parameters and exceptions described below and in the rights agreement), except if such person or group has become an Acquiring Person pursuant to an offer approved by a majority of the board; or (b) the close of business on the tenth business day (or a later date determined by the board before any person or group becomes an Acquiring Person) after a person or group begins a tender or exchange offer (except if such person or group has become an Acquiring Person pursuant to an offer approved by a majority of the board) which, if completed, would result in that person or group becoming an Acquiring Person. The earlier of such dates, upon which the Rights become exercisable, is referred to as the "Issuance Date".

If a shareholder's beneficial ownership of the then-outstanding ordinary shares as of the time of the public announcement of the rights plan was at or above 15% (including through entry into certain derivative positions), that shareholder's (or group of shareholders') then-existing ownership percentage was to be grandfathered and would not trigger the exercisability of the Rights, as that shareholder was not deemed to be an Acquiring Person. However, the Rights would become exercisable (and any such shareholder will be deemed to be an Acquiring Person) if at any time after such announcement, that shareholder increases its ownership percentage to an amount equal to or greater than the greater of (1) 15% and (2) the sum of (I) the lowest number of ordinary shares beneficially owned by such shareholder as a percentage of the outstanding ordinary shares as of any time from and after the time of the public announcement of the declaration of the Rights and (II) 0.001%.

Until the Issuance Date, the balances in the book-entry accounting system of the transfer agent for our ordinary shares or, in the case of certificated shares, ordinary shares certificates, also evidenced the Rights, and any transfer of ordinary shares or, in the case of certificated shares, certificates for ordinary shares, constituted a transfer of Rights. After that date, the Rights separated from the ordinary shares and are evidenced solely by Rights certificates that were mailed to all eligible holders of ordinary shares. Any Rights held by an Acquiring Person or any associate or affiliate thereof are void and may not be exercised.

In addition, in connection with the issuance or sale of ordinary shares following the Issuance Date and prior to the redemption, exchange, or expiration of the Rights, we (a) shall, with respect to ordinary shares so issued or sold pursuant to the exercise of share options or pursuant to any other award or right under any employee benefit plan or arrangement, granted or awarded as of the Issuance Date (including, for example, upon the vesting and settlement of our outstanding Restricted Share Units or purchase of ordinary shares under our 2021 Employee Share Purchase Plan), or upon the exercise, conversion or exchange of securities hereinafter issued by us (except as may otherwise be provided in the instrument(s) governing such securities), and (b) may, in any other case, if deemed necessary or appropriate by the board, issue Rights certificates representing the appropriate number of Rights in connection with such issuance or sale; provided, however, that (i) no such Rights certificate shall be issued if, and to the extent that, we shall be advised by counsel that such issuance would create a significant risk of material adverse tax consequences to our company or the person to whom such Rights certificate would be issued, and (ii) no such Rights certificate shall be issued if, and to the extent that, appropriate adjustment shall otherwise have been made in lieu of the issuance thereof.

*Flip-In/Flip-Over*

8

If a person or group becomes an Acquiring Person, then beginning on the Issuance Date, all holders of Rights except the Acquiring Person or any associate or affiliate thereof may, for a purchase price of $0.01 per one ordinary share, purchase one (1) ordinary share.

If our company is later acquired in a merger or similar transaction after the Issuance Date, all holders of Rights except the Acquiring Person or any associate or affiliate thereof may, for a purchase price of $0.01 per share, purchase one (1) times the number of shares of the acquiring corporation that each shareholder of our company is entitled to receive for each ordinary share held.

*Scope of "Acquiring Person" Definition*

An "Acquiring Person" is any person or entity who or which, together with all affiliates and associates of such person or entity, shall be the beneficial owner of 15% or more of our ordinary shares then outstanding, but shall not include our company, any subsidiary of our company, any employee benefit or share ownership plan of our company or any subsidiary of our company, or any entity holding ordinary shares for or pursuant to the terms of any such plan. Notwithstanding the foregoing, no person or entity shall become an "Acquiring Person" as the result of an acquisition of ordinary shares by our company which, by reducing the number of ordinary shares outstanding, increases the proportionate number of ordinary shares beneficially owned by such person or entity to 15% or more of the ordinary shares then outstanding; provided, however, that, if a person or entity shall become the beneficial owner of 15% or more of the ordinary shares then outstanding by reason of share purchases by our company and shall, after such share purchases by our company, become the beneficial owner of any additional ordinary shares of our company, then such person or entity shall be deemed to be an "Acquiring Person." Notwithstanding the foregoing, if our board determines in good faith that a person or entity that would otherwise be an "Acquiring Person" has become such inadvertently, and such person or entity divests as promptly as practicable a sufficient number of ordinary shares, so that such person or entity would no longer be an "Acquiring Person," as defined pursuant to the foregoing provisions of this paragraph, then such person or entity shall not be deemed to be an "Acquiring Person" for any purposes of the rights agreement. The definition of Acquiring Person is furthermore subject to the "grandfathering" scenarios described under "*Exercise Period; Rights Certificates*" above.

*Exchange*

Our board of directors may, at its option, at any time after any person or entity becomes an Acquiring Person, exchange all or part of the then outstanding and exercisable Rights (except for Rights that have become void) for ordinary shares at an exchange ratio of one ordinary share per Right, appropriately adjusted to reflect any adjustment in the number of Rights. However, the board will not be empowered to effect such exchange at any time after any person or entity (other than our company, any subsidiary of our company, any employee benefit or stock ownership plan of our company or any such subsidiary, or any entity holding ordinary shares for or pursuant to the terms of any such plan), together with all affiliates and associates of such person or entity, becomes the beneficial owner of 50% or more of the ordinary shares then outstanding.

Immediately upon the action of the board ordering the foregoing exchange, the right to exercise the Rights that are to be exchanged will terminate and the only right thereafter of a holder of such Rights shall be to receive that number of ordinary shares equal to the number of such Rights held by such holder multiplied by the exchange ratio. In the event that there shall not be sufficient ordinary shares issued but not outstanding or authorized but unissued to permit any exchange of Rights, we will take all such action as may be necessary to authorize additional ordinary shares for issuance upon exchange of the Rights.

*Special Tender Offer*

In connection with a special tender offer that is made in accordance with the provisions of the Companies Law, the board will consider the requirements of Section 330 of the Companies Law.

*Anti-Dilution Provisions*

Our board may adjust the purchase price of ordinary shares under each Right, the number of ordinary shares issuable under each Right, and the number of outstanding Rights to prevent dilution that may occur from a share dividend, a share split, or a reclassification of the ordinary shares. No adjustments of less than 1% will be made to the purchase price under the Rights.

*Amendments*

9

The terms of the rights agreement may be amended by our board without the consent of the holders of the Rights. After a person or group becomes an Acquiring Person, our board may not amend the rights agreement in a way that adversely affects holders of the Rights.

*Redemption*

The board may, at its option, at any time prior to such time that any person or entity becomes an Acquiring Person, redeem all but not less than all the then outstanding Rights. The redemption of the Rights by the board may be made effective at such time, on such basis and with such conditions as the board, in its sole discretion, may establish (the effective date of redemption is referred to as the Redemption Date). Immediately upon the effectiveness of the action of the board ordering the redemption of the Rights, and without any further action and without any notice, the right to exercise the Rights will terminate.

*Expiration*

The Rights will expire on July 24, 2023 (which we refer to as the Expiration Date).

10

**EXHIBIT 8.1**
**Subsidiaries**

| ENTITY | JURISDICTION OF INCORPORATION OR ORGANIZATION |
|---|---|
| Stratasys Solutions Ltd. | United Kingdom |
| Stratasys AP Limited | Hong Kong |
| Stratasys Direct, Inc. | California |
| Stratasys GMBH | Germany |
| REA Real Estate GmbH | Germany |
| Stratasys, Inc | Delaware |
| Stratasys Japan Co. Ltd. | Japan |
| Stratasys Korea Ltd. | Korea |
| Stratasys Latin America Representacao De Equipamentos Ltd. | Brazil |
| Stratasys Mexico S.A. de C.V. | Mexico |
| Stratasys Shanghai Ltd. | China |
| Stratasys Powder Production Aps. | Denmark |
| RP Support Ltd. | United Kingdom |
| Stratasys Distribution UK Ltd. | United Kingdom |
| Stratasys Power Production Ltd. | United Kingdom |
| Stratasys Netherlands BV | Netherlands |
| iSquared AG | Switzerland |
| Stratasys India Private Limited | India |
| Stratasys Singapore Pte. Ltd. | Singapore |

**Exhibit 12.1**

**CERTIFICATION PURSUANT TO RULE 13a-14(a)/RULE 15d-14(a) UNDER THE EXCHANGE ACT**

I, Yoav Zeif, certify that:

1. I have reviewed this annual report on Form 20-F of Stratasys Ltd.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;
4. The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f)) for the company and have:
    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c. Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d. Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and
5. The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):
    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and
    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 11, 2024

By /s/ Yoav Zeif
Yoav Zeif
Chief Executive Officer

Exhibit 12.2

**CERTIFICATION PURSUANT TO RULE 13a-14(a)/RULE 15d-14(a) UNDER THE EXCHANGE ACT**

I, Eitan Zamir, certify that:

1.  I have reviewed this annual report on Form 20-F of Stratasys Ltd.;
2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;
4.  The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f)) for the company and have:
    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c.  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d.  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and
5.  The company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):
    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and
    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: March 11, 2024

By /s/ Eitan Zamir
Eitan Zamir
Chief Financial Officer
(Principal Financial Officer and Principal Accounting Officer)

**Exhibit 13**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER PURSUANT TO RULE 13a-14(b)/RULE 15d-14(b) UNDER THE EXCHANGE ACT AND 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Stratasys Ltd. (the "Company") on Form 20-F for the year ended December 31, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), we, Yoav Zeif, Chief Executive Officer of the Company, and Eitan Zamir, Chief Financial Officer of the Company, certify, pursuant to Rule 13a-14(b)/Rule 15d-14(b) under the Securities Exchange Act of 1934, as amended and 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Dated: March 11, 2024

By /s/ Yoav Zeif Yoav Zeif
Chief Executive Officer

By /s/ Eitan Zamir Eitan Zamir
Chief Financial Officer

**Exhibit 15.1**



**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We hereby consent to the incorporation by reference in the Registration Statements on Form S-8 (Nos. 333-190963, 333-236880, 333-253694 333-262951, 333-262952 and 333-270249) and Form F-3 (No. 333-251938) of Stratasys Ltd. of our report dated March 11, 2024 relating to the financial statements and the effectiveness of internal control over financial reporting, which appears in this Form 20-F.

| | |
|---|---|
| Tel-Aviv, Israel | /s/ Kesselman & Kesselman |
| March 11, 2024 | Certified Public Accountants (Isr.) |
| | A member firm of PricewaterhouseCoopers International Limited |

**Exhibit 97.1**

**STRATASYS LTD.**
**POLICY FOR RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION**

Stratasys Ltd. (the "*Company*") has adopted this Policy for Recovery of Erroneously Awarded Compensation (the "*Policy*"), effective as of October 2, 2023 (the "*Effective Date*"). Capitalized terms used in this Policy that are not otherwise defined herein shall have the respective meanings assigned thereto in Section 11.

**1.     Persons Subject to Policy**

This Policy shall apply to and be binding and enforceable upon current and former Officers. In addition, the Committee and the Board may apply this Policy to persons who are not Officers, and such application shall apply in the manner determined by the Committee and the Board in their sole discretion.

**2.     Compensation Subject to Policy**

This Policy shall apply to Incentive-Based Compensation received on or after the Effective Date. For purposes of this Policy, the date on which Incentive-Based Compensation is "received" shall be determined under the Applicable Rules, which generally provide that Incentive-Based Compensation is "received" in the Company's fiscal period during which the relevant Financial Reporting Measure is attained or satisfied, without regard to whether the grant, vesting or payment of the Incentive-Based Compensation occurs after the end of that period.

**3.     Recovery of Compensation**

In the event that the Company is required to prepare a Restatement, the Company shall recover, reasonably promptly and in accordance with Section 4 below, the portion of any Incentive-Based Compensation that is Erroneously Awarded Compensation, unless the Committee and the Board have determined that recovery from the relevant current or former Officer would be Impracticable. Recovery shall be required in accordance with the preceding sentence regardless of whether the applicable Officer engaged in misconduct or otherwise caused or contributed to the requirement for the Restatement and regardless of whether or when restated financial statements are filed by the Company. For clarity, the recovery of Erroneously Awarded Compensation under this Policy will not give rise to any Officer's right to voluntarily terminate employment for "good reason" or due to a "constructive termination" (or any similar term of like effect) under any plan, program or policy of or agreement with the Company or any of its affiliates.

**4.     Manner of Recovery; Limitation on Duplicative Recovery**

The Committee and the Board shall, in their sole discretion, determine the manner of recovery of any Erroneously Awarded Compensation, which may include, without limitation, reduction or cancellation by the Company or an affiliate of the Company of Incentive-Based Compensation or Erroneously Awarded Compensation, reimbursement or repayment by any person subject to this Policy, and, to the extent permitted by law, an offset of the Erroneously Awarded Compensation against other compensation payable by the Company or an affiliate of the Company to such person. Notwithstanding the foregoing, unless otherwise prohibited by the Applicable Rules, to the extent this Policy provides for recovery of Erroneously Awarded Compensation already recovered by the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 or Other Recovery Arrangements, the amount of Erroneously Awarded Compensation already recovered by the Company from the recipient of such Erroneously Awarded Compensation may be credited to the amount of Erroneously Awarded Compensation required to be recovered pursuant to this Policy from such person.

**5.**    **Administration**

This Policy shall be administered, interpreted and construed by the Committee, which is authorized to make all determinations necessary, appropriate or advisable for such purpose. The Board may re-vest in itself the authority to administer, interpret and construe this Policy in accordance with applicable law, and in such event references herein to the "Committee" shall be deemed to be references to the Board. Subject to any permitted review by the applicable national securities exchange or association pursuant to the Applicable Rules, all determinations and decisions made by the Committee pursuant to the provisions of this Policy shall be final, conclusive and binding on all persons, including the Company and its affiliates, shareholders and employees. The Committee may delegate administrative duties with respect to this Policy to one or more directors or employees of the Company, as permitted under applicable law, including any Applicable Rules.

**6.**    **Interpretation**

This Policy shall be interpreted and applied in a manner that is consistent with the requirements of the Applicable Rules, and to the extent this Policy is inconsistent with such Applicable Rules, it shall be deemed amended to the minimum extent necessary to ensure compliance therewith.

**7.**    **No Indemnification; No Liability**

The Company shall not indemnify or insure any person against the loss of any Erroneously Awarded Compensation pursuant to this Policy, nor shall the Company directly or indirectly pay or reimburse any person for any premiums for third-party insurance policies that such person may elect to purchase to fund such person's potential obligations under this Policy. None of the Company, an affiliate of the Company or any member of the Committee or the Board shall have any liability to any person as a result of actions taken under this Policy.

**8.**    **Application; Enforceability**

Except as otherwise determined by the Committee or the Board, the adoption of this Policy does not limit, and is intended to apply in addition to, any Other Recovery Arrangements. Without limiting the foregoing, in the event of a conflict between this Policy and the Compensation Policy, the latter shall prevail, except with respect to the recovery of any portion of Incentive-Based Compensation that is Erroneously Awarded Compensation that would not be recoverable under the Compensation Policy, in which case this Policy shall prevail. Subject to Section 4, the remedy specified in this Policy shall not be exclusive and shall be in addition to every other right or remedy at law or in equity that may be available to the Company or an affiliate of the Company or is otherwise required by applicable law and regulations.

**9.**    **Severability**

The provisions in this Policy are intended to be applied to the fullest extent of the law; provided, however, to the extent that any provision of this Policy is found to be unenforceable or invalid under any applicable law, such provision will be applied to the maximum extent permitted, and shall automatically be deemed amended in a manner consistent with its objectives to the extent necessary to conform to any limitations required under applicable law.

**10.**    **Amendment and Termination**

The Board or the Committee may amend, modify or terminate this Policy in whole or in part at any time and from time to time in its sole discretion. This Policy will terminate automatically when the Company does not have a class of securities listed on a national securities exchange or association in the U.S.

2

11.    **Definitions**

"***Applicable Rules***" means Section 10D of the Exchange Act, Rule 10D-1 promulgated thereunder, the listing rules of the national securities exchange or association on which the Company's securities are listed, and any applicable rules, standards or other guidance adopted by the Securities and Exchange Commission or any national securities exchange or association on which the Company's securities are listed.

"***Board***" means the Board of Directors of the Company.

"***Compensation Policy***" means the Company's compensation policy for executive officers and directors, as adopted in accordance with the Israeli Companies Law 5759-1999 and as in effect from time to time.

"***Committee***" means the Compensation Committee of the Board or, in the absence of such a committee, a majority of the independent directors serving on the Board.

"***Erroneously Awarded Compensation***" means the amount of Incentive-Based Compensation received by a current or former Officer that exceeds the amount of Incentive-Based Compensation that would have been received by such current or former Officer based on a restated Financial Reporting Measure, as determined on a pre-tax basis in accordance with the Applicable Rules.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Financial Reporting Measure***" means any measure determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and any measures derived wholly or in part from such measures, including GAAP, IFRS and non-GAAP/IFRS financial measures, as well as share price and total shareholder return.

"***GAAP***" means United States generally accepted accounting principles.

"***IFRS***" means international financial reporting standards as adopted by the International Accounting Standards Board.

"***Impracticable***" means (a) the direct expense paid to third parties to assist in enforcing recovery would exceed the Erroneously Awarded Compensation; provided that the Company has (i) made reasonable attempt(s) to recover the Erroneously Awarded Compensation, (ii) documented such reasonable attempt(s) and (iii) provided such documentation to the relevant listing exchange or association, (b) the recovery would violate the Company's home country laws adopted prior to November 28, 2022 pursuant to an opinion of home country counsel; provided that the Company has (i) obtained an opinion of home country counsel, acceptable to the relevant listing exchange or association, that recovery would result in such a violation and (ii) provided such opinion to the relevant listing exchange or association, or (c) recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of 26 U.S.C. 401(a)(13) or 26 U.S.C. 411(a) and the regulations thereunder.

"***Incentive-Based Compensation***" means, with respect to a Restatement, any compensation that is granted, earned, or vested based wholly or in part upon the attainment of one or more Financial Reporting Measures and received by a person: (a) after such person began service as an Officer; (b) who served as an Officer at any time during the performance period for that compensation; (c) while the Company has a class of securities listed on a national securities exchange or association; and (d) during the applicable Three-Year Period.

"***Officer***" means each person who the Company determines serves as a Company officer, as defined in Section 16 of the Securities Exchange Act of 1934, as amended. As of the Effective Date of this Policy, the Company has determined that the Company's Chief Executive Officer, Chief Financial Officer and Executive Vice Presidents constitute the Officers who are subject to this Policy.

3

*"Other Recovery Arrangements"* means any clawback, recoupment, forfeiture or similar policies or provisions of the Company or its affiliates, including any such policies or provisions of such effect contained in any employment agreement, bonus plan, incentive plan, equity-based plan or award agreement thereunder or similar plan, program or agreement of the Company or an affiliate or required under applicable law (including, without limitation, the Compensation Policy).

"*Restatement*" means an accounting restatement to correct the Company's material noncompliance with any financial reporting requirement under securities laws, including a restatement that corrects an error in previously issued financial statements (a) that is material to the previously issued financial statements or (b) that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period.

"*Three-Year Period*" means, with respect to a Restatement, the three completed fiscal years immediately preceding the date that the Board, a committee of the Board, or the officer or officers of the Company authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare such Restatement, or, if earlier, the date on which a court, regulator or other legally authorized body directs the Company to prepare such Restatement. The "Three-Year Period" also includes any transition period (that results from a change in the Company's fiscal year) within or immediately following the three completed fiscal years identified in the preceding sentence. However, a transition period between the last day of the Company's previous fiscal year end and the first day of its new fiscal year that comprises a period of nine to 12 months shall be deemed a completed fiscal year.

4

**ACKNOWLEDGMENT OF AND CONSENT TO**
**STRATASYS LTD. POLICY FOR RECOVERY OF ERRONEOUSLY AWARDED COMPENSATION**

The undersigned has received a copy of the Policy for Recovery of Erroneously Awarded Compensation (the "*Policy*") adopted by Stratasys Ltd. (the "*Company*"), and has read and understands the Policy. Capitalized terms used in this Acknowledgment that are not otherwise defined herein shall have the respective meanings ascribed to such terms in the Policy.

As a condition of receiving Incentive-Based Compensation from the Company, the undersigned agrees that any Incentive-Based Compensation received on or after the Effective Date is subject to recovery pursuant to the terms of the Policy. To the extent the Company's recovery right conflicts with any other contractual rights the undersigned may have with the Company, the undersigned understands that the terms of the Policy shall supersede any such contractual rights. The terms of the Policy shall apply in addition to any right of recoupment against the undersigned under the Compensation Policy or applicable law and regulations.

_____
Date

_____
Signature

_____
Name

_____
Title

5

# EXHIBIT 20

**AMERICAN ARBITRATION ASSOCIATION**
**WILMINGTON, DELAWARE**

|  |  |
|---|---|
| FORMER SHAREHOLDERS OF ORIGIN LABORATORIES, INC., *by and through Shareholder Representative Fortis Advisors LLC*,<br><br>Claimants,<br><br>v.<br><br>STRATASYS LTD. and STRATASYS, INC.,<br><br>Respondents. | AAA No. _____<br><br>**ARBITRATION DEMAND FOR:**<br><br>1. **BREACH OF CONTRACT – DAMAGES**<br><br>2. **BREACH OF CONTRACT – SPECIFIC PERFORMANCE AND INJUNCTION**<br><br>3. **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>4. **PROMISSORY ESTOPPEL**<br><br>5. **UNJUST ENRICHMENT**<br><br>6. **QUANTUM MERUIT** |

**BRAUNHAGEY & BORDEN LLP**

351 California Street, 10th Floor
San Francisco, CA 94104

118 W. 22nd Street, 12th Floor
New York, NY 10011

*Attorneys for Claimants, Former Shareholders of Origin Laboratories, Inc., by and through Shareholder Representative Fortis Advisors LLC*

**TABLE OF CONTENTS**

STATEMENT OF DISPUTE ................................................................................................ 1

ARBITRATION AGREEMENT ......................................................................................... 3

PARTIES ............................................................................................................................ 4

JURISDICTION, VENUE, AND GOVERNING LAW ..................................................... 4

FACTS ............................................................................................................................... 5

I.    ORIGIN'S BACKGROUND ................................................................................... 6

     A.    Origin's Thesis: 3D Printing as Manufacturing ......................................... 6

     B.    Origin's Groundbreaking Intellectual Property ......................................... 7

     C.    The Origin One Printer .............................................................................. 11

II.   STRATASYS'S ACQUISITION OF ORIGIN .................................................... 11

     A.    The Beginning of the Origin-Stratasys Relationship .............................. 12

     B.    The Acquisition Agreement ...................................................................... 13

     C.    Mr. Prucha and Mr. Ong Work to Ensure a Successful Acquisition .................... 15

III.  STRATSYS AGREES TO SET THE EARN-OUT COMMENCEMENT DATE TO REFLECT COMMERCIAL REALITY ........................................... 16

     A.    Stratasys Imposes a Strategic Delay on Sales of Origin Products ....................... 16

     B.    Stratasys Agrees to a New EO Date Coinciding with the Launch of the Origin One Version 2.7 ................................................................ 17

          1.    ███████████████████████████ ............................................... 18

          2.    ███████████████████████████ ............................... 19

          3.    ██████████████████ ............................................... 20

          4.    ████████████████████ ............................................... 21

C.      Stratasys and the Origin Shareholders Rely on Their Written Agreement to Re-Set the EO Date ................................................................... 22

D.      Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success  26

E.      Stratasys Reneges on the Parties' Agreement in Order to Cheat the Shareholders Out of Their Bargained-For Consideration ........................................... 27

IV.      STRATASYS HAS VIOLATED ITS AGREEMENT ........................................ 29

A.      The Parties' Email Agreements Constitute Writings Under the Acquisition Agreement ..................................................................................... 29

B.      Re-Setting the EO Date Does Not Require Board Approval ................................ 31

C.      The Parties' Performance Evidences Agreement to Change the EO Date ........... 32

V.      STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER ............................................................................................... 34

CAUSES OF ACTION ............................................................................................ 37

PRAYER FOR RELIEF ............................................................................................ 43

ii

# TABLE OF AUTHORITIES

**CASES**                                                                                      **Page(s)**

*Camden Fitness, LLC v. Wandless Enterprises, Inc.*,
  2013 WL 8854873 (Del. Com. Pl. Feb. 11, 2013)................................................................ 30, 31

*Curtiss-Wright Corp. v. Schoonejongen*,
  514 U.S. 73 (1995)................................................................................................................... 31

*Haft v. Dart Grp. Corp.*,
  841 F. Supp. 549 (D. Del. 1993)............................................................................................. 33

*Hessler, Inc. v. Farrell*,
  226 A.2d 708 (Del. 1967) ........................................................................................................ 32

*Kuroda v. SPJS Holdings, L.L.C.*,
  971 A.2d 872 (Del. Ch. 2009)................................................................................................. 39

*Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.*,
  297 A.2d 28 (Del. 1972) .......................................................................................................... 33

*S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.*,
  2021 WL 3925937 (Del. Ch. Sept. 1, 2021) .......................................................................... 33

*Schoonejongen v. Curtiss-Wright Corp.*,
  143 F.3d 120 (3d Cir. 1998).................................................................................................... 32

*Triple H Fam. Ltd. P'ship v. Neal*,
  2018 WL 3650242 (Del. Ch. July 31, 2018)........................................................................... 30

*Zayo Grp., LLC v. Latisys Holdings, LLC*,
  2018 WL 6177174 (Del. Ch. Nov. 26, 2018) ......................................................................... 30

**STATUTES**

DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023).................................................................... 30

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019)....................................................................................... 30

iii

Claimants, the former shareholders of California-based Origin Laboratories, Inc., by and through Shareholder Representative Fortis Advisors LLC (hereinafter for convenience, the "Origin Shareholders" or the "Shareholders"), hereby allege against Respondents, Israel-based international technology conglomerate Stratasys Ltd. and Stratasys, Inc. (collectively, "Stratasys"), as follows:

## STATEMENT OF DISPUTE

1.      Origin was an innovative California startup company that sold its groundbreaking 3D printing technology to Respondent Stratasys, an Israeli technology conglomerate, for approximately $100 million pursuant to an agreement dated December 8, 2020 (the "Acquisition Agreement").



3.      The parties did just that. When Stratasys delayed the post-acquisition launch of Origin's products for its own strategic reasons, Stratasys and the Shareholders agreed to re-set the EO Date to coincide with the date that Origin's products *would* be available.  This agreement was for the express purpose of ensuring that the Origin Shareholders would retain the full benefit of their earn-out bargain, despite Stratasys's decision to delay the products' rollout. The parties affirmed this agreement in a series of in-person meetings and videoconferences, and they memorialized it in multiple writings—including in written communications with Stratasys's CEO. The parties unambiguously performed under that revised agreement, and the Shareholders

1

devoted substantial time and effort to ensuring the successful rollout of the Origin product line in reliance on that agreement.

4.     Stratasys finally made Origin's 3D printing products generally available to customers in February 2022—that is, seven months after the placeholder EO Date—and Origin's performance has far exceeded all projections. In fact, Stratasys has touted Origin's success in its recent SEC filings and releases, claiming that Origin is responsible for the largest first-quarterly growth in Stratasys's history and is operating as "an important growth engine" for Stratasys.

5.     But Stratasys now refuses to honor its agreement to re-set the EO Date and instead insists on calculating the Shareholders' earn-out payments based on the now-defunct July 1 placeholder date—which includes a seven-month period during which Stratasys *did not even offer those products for sale*. If Stratasys is permitted to renege on its deal, its gambit will deprive Origin's Shareholders of millions of dollars in bargained-for consideration. Stratasys meanwhile has unjustly enriched itself by hundreds of millions of dollars through its use of Origin's ground-breaking technology and patented know-how.

6.     Stratasys completed its scheme by sending a purported Earn-Out accounting statement to the Shareholders on August 29, 2022, falsely claiming that the Earn-Out Target for the first Earn-Out Period had not been met and that the Shareholders were entitled to zero dollars for the first Earn-Out Period.

7.     The Shareholders bring this suit to recover for Stratasys's bad faith dealings, including accelerated payment of the full $40 million in bargained-for earn-out payments that Stratasys has withheld. The Shareholders also seek disgorgement of the full amount by which Stratasys has unjustly profited from its misconduct, including all actual and expected revenue associated with the sale of Origin products and the value of Origin's products, intellectual

2

property, and services, estimated to be at least $400 million, as well as the *quantum meruit* value of the services that Stratasys unfairly induced Shareholders to provide.

8.      The Arbitrator should also enjoin Stratasys's ongoing misuse of Origin's patents and intellectual property until Stratasys fairly compensates the Shareholders—as it agreed to do under the Acquisition Agreement. The Arbitrator should also award the Shareholders their attorneys' fees and grant any other appropriate relief, as provided by the Acquisition Agreement.

## ARBITRATION AGREEMENT

9.      This dispute arises under the parties' Agreement and Plan of Merger and Reorganization dated December 8, 2020 (Ex. 1) (the "Acquisition Agreement"), § 11.5(a) of which provides for AAA arbitration before a single arbitrator in Wilmington, Delaware of "any and all claims . . . arising out of" Stratasys's acquisition of Origin:

> The parties hereto understand and irrevocably agree that any and all claims, grievances, demands, controversies, causes of action or disputes of any nature whatsoever (including, but not limited to, tort and contract claims, and claims upon any Legal Requirement) (hereinafter 'Disputes'), arising out of, in connection with, or in relation to this Agreement and the Ancillary Agreements shall be exclusively referred to and finally resolved by arbitration in Wilmington, Delaware. The arbitration will be conducted in English in accordance with the rules of the American Arbitration Association with one arbitrator. The parties hereto agree that a final determination of an arbitrator in accordance with the provisions hereof shall be conclusive and may be entered in any Court having jurisdiction.

10.      The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c)).

3

**PARTIES**

11.     The Origin Shareholders are represented by their designated Shareholder Representative Fortis Advisors LLC, pursuant to the parties' Acquisition Agreement.  Prior to the acquisition by Stratasys, the Origin Shareholders were shareholders of Origin Laboratories, Inc. ("Origin"), a California corporation that successfully developed innovative 3D printing technologies.

12.     Fortis Advisors LLC is a Delaware limited liability company that serves as the formal representative of the Shareholders of Origin in connection with the acquisition of Origin by Stratasys, Inc., as memorialized in the Acquisition Agreement.

13.     Stratasys Ltd. is a company incorporated under the laws of the State of Israel, with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

14.     Stratasys, Inc. is a Delaware corporation and a wholly owned subsidiary of Stratasys Ltd., with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

**JURISDICTION, VENUE, AND GOVERNING LAW**

15.     The American Arbitration Association has jurisdiction over this arbitration and venue is properly located in Wilmington, Delaware, pursuant to Section 11.5(a) of the Acquisition Agreement. The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c)).

16.     This dispute is governed by Delaware law pursuant to § 11.4 of the Acquisition Agreement, which states:

> This Agreement, and all claims (whether at law or in equity,
> whether in contract, tort, statute or otherwise) arising in whole or
> in part out of, related to, based upon, or in connection herewith or

4

the subject matter hereof will be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

## **FACTS**

17.    On December 8, 2020, Stratasys and the Shareholders entered into the Acquisition Agreement, pursuant to which Stratasys agreed to acquire Origin and its intellectual property for a total purchase price of approximately $100 million. The Acquisition Agreement contemplated payment of 60% of the purchase price up front, with the remaining 40% conditioned on Origin's post-acquisition performance over a three-year period that would begin to run on an agreed-upon commencement date (the "EO Date"). The Acquisition Agreement set a tentative EO Date but empowered the parties to modify that date by simple written agreement.

18.    On multiple occasions in 2021 and 2022, Stratasys and the Shareholders agreed to re-set the EO Date to correspond with the general availability of Origin's printers. In other words, the parties agreed that they would begin to measure the sales of Origin products only when those products were actually available for sale.

19.    In a transparent attempt to retain the full value of Origin and its intellectual property while depriving the Shareholders of the remainder of the purchase price, Stratasys has now reneged on its agreement and has taken the position that the EO Date was never re-set. It has done so only after inducing the Shareholders to devote substantial time, effort, and resources to creating post-acquisition value for Stratasys in reliance on Zeif's and Stratasys's promises. Zeif's and Stratasys's bad-faith conduct constitutes a breach of the Acquisition Agreement and the implied covenant of good faith and fair dealing, and it is also grounds for equitable relief, including disgorgement, under the doctrines of promissory estoppel, unjust enrichment, and quantum meruit.

5

## I.    ORIGIN'S BACKGROUND

20.    Origin was founded in 2015 by Christopher Prucha and Joel Ong based on their belief in the transformative potential of 3D printing. Mr. Prucha and Mr. Ong both came to 3D printing from backgrounds in software engineering rather than in hardware or manufacturing, which provided them with a viewpoint that was unique in the industry.

21.    Mr. Prucha was an engineer at Apple before founding Notion Labs, Inc., a collaboration platform and file-management tool now valued in excess of $10 billion. Mr. Ong established his engineering credentials at Google, where he worked on a variety of moonshot projects at Google X, among other things. Together, they launched Origin to take a software-first approach to 3D printing that no other participant in the industry was pursuing.

### A.    Origin's Thesis: 3D Printing as Manufacturing

22.    At the time of Origin's founding, the 3D printing industry was defined by two submarkets. Industry incumbents focused either on cheap, low-quality 3D printing as part of a temporary bubble of consumer interest, or they focused on more sophisticated 3D printing for the narrow purpose of rapid prototyping. Mr. Prucha and Mr. Ong recognized the self-limiting nature of these approaches and concluded that 3D printing could reach its potential only if it could be used for manufacturing on a broad scale—a multitrillion-dollar industry that dwarfed both the nascent and unpredictable consumer market for 3D printing and the prototyping industry.

23.    But the existing technology was limited by unsophisticated software built around a "closed materials" model, and the existing printers were not good enough to allow users to efficiently print functional parts. Moreover, the industry incumbents hamstrung their own printers by strictly limiting the material inputs and controlling the sale of those materials. In other words, the incumbents focused on short-term profits over potential long-term gain, and

6

they did not prioritize developing printers that could meet the needs of 3D-printing customers seeking production-scale manufacturing applications.

24.     These factors drove Mr. Prucha and Mr. Ong to devise a simple thesis for Origin: 3D-printing technology could be improved and made less expensive by developing better software to guide and govern the 3D-printing process. They planned to achieve this in two ways: (i) by developing granular real-time feedback through a detailed sensor apparatus that would ensure reliable and precise printing, and (ii) by partnering with chemical companies to allow end users to print parts from a wide array of new and experimental materials.

**B.      Origin's Groundbreaking Intellectual Property**

25.     Mr. Prucha and Mr. Ong soon discovered that in order to build Origin the way they wanted to, they would not be able to rely solely on the industry's incumbent hardware manufacturers because the focus-based limitations Mr. Prucha and Mr. Ong had identified with respect to the incumbent businesses themselves were also baked into every aspect of the industry's equipment manufacturers. The only solution was for Origin to develop both the software and hardware necessary to implement Mr. Prucha and Mr. Ong's vision.

26.     Origin did so, and it began shipping its first units in 2017 to overwhelming acclaim from customers. Origin continued to hone and improve its hardware, software, and material inputs to increase the quality and applicability of the system and to allow customers to print an ever-greater variety of end-usable parts with greater quality and reliability. In the years since then, Origin has pursued and secured broad patent protection for its printing process both in the United States and internationally—including in Japan, China, the European Union, and Canada.

27.     Key patents include the following, for which Mr. Prucha and Mr. Ong are inventors:

7

| Figure 1:  Key Patents Issued to Origin Founders | | | | |
|---|---|---|---|---|
| **Family Ref. No.** | **Title** | **Jurisdiction** | **Application No.** | **Date Filed** |
| ORGN-M01 | Method for Window Separation in an Additive Manufacturing Process | Canada | 3118364 | 2019-11-01 |
| | | China | 2019900012861 | 2019-11-01 |
| | | Europe | 19879943.9 | 2019-11-01 |
| | | Japan | 2021-600065 | 2019-11-01 |
| | | Patent Cooperation Treaty | PCT/US2019/059564 | 2019-11-01 |
| | | United States of America | 62/754411 | 2018-11-01 |
| | | United States of America | 16/672410 | 2019-11-01 |
| | | United States of America | 16/900560 | 2020-06-12 |
| | | United States of America | 16/941464 | 2020-07-28 |
| | | United States of America | 17/404,966 | 2021-08-17 |
| ORGN-M02 | System for Window Separation in an Additive Manufacturing Process | United States of America | 62/754430 | 2018-11-01 |
| | | United States of America | 16/672415 | 2019-11-01 |
| | | United States of America | 17/388598 | 2021-07-29 |

8

| Family Ref. No. | Title | Jurisdiction | Application No. | Date Filed |
|---|---|---|---|---|
| **Figure 1:  Key Patents Issued to Origin Founders** | | | | |
| ORGN-M03 | Method for Regulating Temperature at a Resin Interface in an Additive Manufacturing Process | Canada | 3136654 | 2020-04-17 |
| | | China | 2020900006647 | 2020-04-17 |
| | | Europe | 20791068.8 | 2020-04-17 |
| | | Japan | 2021-600157 | 2020-04-17 |
| | | Patent Cooperation Treaty | PCT/US2020/028783 | 2020-04-17 |
| | | United States of America | 62/835444 | 2019-04-17 |
| | | United States of America | 16/852078 | 2020-04-17 |
| | | United States of America | 17/066249 | 2020-10-08 |
| | | United States of America | 17/066372 | 2020-10-08 |
| ORGN-M04 | Method for Interlayer Feedback Control and Failure Prevention in an Additive Manufacturing Process | Canada | | 2020-08-03 |
| | | China | | 2020-08-03 |
| | | Europe | 20850214.6 | 2020-08-03 |
| | | Japan | | 2020-08-03 |
| | | Patent Cooperation Treaty | PCT/US2020/044803 | 2020-08-03 |
| | | United States of America | 62/882464 | 2019-08-02 |
| | | United States of America | 16/984102 | 2020-08-03 |
| | | United States of America | 17/518,510 | 2021-11-03 |
| ORGN-M05 | Method for Evaluating Photocurable Resins for an Additive Manufacturing System | United States of America | 62/972573 | 2020-02-10 |
| | | United States of America | 17/173174 | 2021-02-10 |

9

| **Figure 1:  Key Patents Issued to Origin Founders** | | | | |
|---|---|---|---|---|
| **Family Ref. No.** | **Title** | **Jurisdiction** | **Application No.** | **Date Filed** |
| ORGN-M06 | Origin Swab Documentation | United States of America | 63/007296 | 2020-04-08 |
| ORGN-M07 | Layer Segmentation: Texture and Dimensional Accuracy | United States of America | 63/218,247 | 2021-07-02 |
| ORGN-M08 | Method for Polymerizing Superficial Features in 3D-Printed Parts | United States of America | 63/300,621 | 2022-01-18 |
| ORGN-D01 | Additive Manufacturing Station | United States of America | 29/803,459 | 2021-08-12 |

28.     As this chart shows, Origin has secured (or is in the process of securing) patent protection for, among other things, (i) key components of the printing process, (ii) key portions of its physical hardware, (iii) the use of real-time sensor data to optimize the printing process, and (iv) the multivariate testing of new materials and formulations. In addition to these patent protections, Origin has developed a variety of proprietary technologies and protected trade secrets concerning its product and processes, and it maintains substantial documentation to protect that valuable intellectual property. And as explained below, Mr. Prucha and Mr. Ong have continued to devote themselves to developing, expanding, and protecting Origin's patent portfolio even after the acquisition by Stratasys.

29.     The most important aspect of Origin's software-based approach to 3D printing is the patented "Programmable PhotoPolymerization" process, or the "P3" process. The P3 process allows inexpensive and rapid production of high-quality and functional end-use parts. Among other things, the P3 process eliminates non-scalable and time-consuming post-processing—that

10

is, the need to extensively treat the product after printing, such as by sanding rough edges—which has historically inhibited 3D printing from being used for manufacturing at a large scale. Instead, the P3 process is capable of producing parts that are usable virtually straight out of the printer, increasing efficiency and operating with, in Stratasys's own words, "industry-leading accuracy, consistency, detail, and throughput."[1]

### C.    The Origin One Printer

30.    In 2019, Origin combined its insight and intellectual property into a flagship product and launched the Origin One printer to overwhelming demand and uniformly positive reviews. The Origin One combined the P3 process with the open-material model to permit users to print high-quality, functional products out of nearly any material chemistry—including newly developed materials—with minimal post-processing.

31.    The unique combination of the P3 process and the open-material model disrupted the industry incumbents, whose businesses turned on the (now outdated) "closed" model, and who relied on tightly controlled sales of material inputs. The Origin One's success threw the deficiencies of the old model into stark relief, and it led to lucrative partnerships with major manufacturers in a variety of industries, ranging from the Ford Motor Company in the automotive industry and the shoe company ECCO Sko A/S in the apparel industry.

32.    Although the industry has since followed Origin's lead and the open-material model is now nearly ubiquitous, Origin's technology remains best-in-class.

## II.    STRATASYS'S ACQUISITION OF ORIGIN

33.    In 2020, Stratasys agreed to acquire Origin for a total purchase price of approximately $100 million in recognition of Origin's paradigm-shifting 3D printing technology.

---

[1] https://www.stratasys.com/en/3d-printers/printer-catalog/p3/origin-one-printer/

Stratasys has since touted the acquisition, noting in multiple SEC filings that Origin's technology "has become an important growth engine for our company." (Ex. 2, Stratasys 2022 Annual Report).

### A.    The Beginning of the Origin-Stratasys Relationship

34.    Stratasys and Origin first worked together in March 2020 to produce 3D-printed sterile nasal swabs for use with COVID-19 tests. At the time, near the beginning of the pandemic, Origin was among the very first companies to receive clinical-trial approval for its 3D-printed nasal swabs.

35.    Because Stratasys had tried, but failed, to receive approval for its own 3D-printed swabs, the two companies entered a partnership to produce and distribute Origin's swabs. Through this partnership, each company learned about the other's strengths, abilities, and expertise. Mr. Prucha, Mr. Ong, and their Origin colleagues worked closely with Stratasys's sales and distribution teams, while Stratasys witnessed firsthand Origin's industry-leading design, products, and operations.

36.    Recognizing the value of further collaboration, Stratasys made Origin an unsolicited offer of acquisition in the spring of 2020. Origin was not initially interested, and the Origin board turned down Stratasys's offer without countering. Stratasys nevertheless presented an updated offer on more favorable terms, paving the way for negotiations that culminated in the acquisition six months later.

37.    As part of the negotiations, Stratasys engaged in an extensive technical diligence review through which it analyzed and confirmed the value of Origin's software-driven approach to 3D printing.

38.    Separate from the technical diligence process, the parties devoted substantial efforts to negotiating the mechanics and structure of the acquisition—including Stratasys's

12

proposal to structure the consideration it would pay to Origin in two parts: Stratasys would pay approximately 60% of the $100 million purchase price up front, and would pay the remaining 40% over a three-year period, conditioned on Origin's post-acquisition performance.

39.    The parties ultimately executed the Acquisition Agreement on December 8, 2020 and announced the acquisition shortly thereafter.

### B.    The Acquisition Agreement

40.    The Acquisition Agreement contemplated that a portion of the consideration for Origin and its intellectual property would take the form of three post-acquisition payments to the Shareholders keyed to the Origin business unit meeting certain revenue-based performance goals. (Acq. Agmt. § 2.3; Ex. D). In particular, the Acquisition Agreement established three "Earn-Out Periods" over three consecutive years, beginning with the EO Date. (*Id.* Annex I). The Acquisition Agreement then set out calculations of the applicable Earn-Out Payments based on whether the revenue attributable to Origin's products during each such period (the "Earn-Out Revenue") met the pre-determined threshold of the Earn-Out Target. (*Id.* Ex. D, § 7).

41.    In devising this structure, the parties recognized that the date selected as the EO Date—that is, the date on which the parties would begin measuring Origin's post-acquisition performance—would have a direct and major effect on whether the Earn-Out Targets were satisfied.

42.    Stratasys and the Shareholders understood and agreed that production, sales, and shipment of Origin printers following the acquisition might be delayed for some period while the new Origin business unit integrated into the larger Stratasys ecosystem and adapted to Stratasys's new strategic goals. The Acquisition Agreement therefore included a tentative EO Date of July 1, 2021—which itself was nearly seven months after the Acquisition Agreement was executed—but provided that that date could be easily changed to correspond to the post-

13

acquisition business reality, without the need either for a formal amendment or even a signed agreement.



44.     The parties also agreed on a mechanism through which Stratasys would keep the Shareholders apprised of Origin's progress towards satisfying the Earn-Out Target. Specifically, once the EO Date has passed and the Earn-Out Period begins, the Acquisition Agreement requires Stratasys to deliver Quarterly Reports to the Shareholders within 60 days of the close of each quarter during each Earn-Out Period. Those reports must "set[] forth [Stratasys's] good faith, non-binding, computation of the Revenue in respect of such quarterly period (the 'Quarterly Report'), together with such supporting documentation as reasonably determined by [Stratasys]." (*Id.* § 2.3(c)). This requirement provides transparency to the Shareholders and allows them to promptly bring any issues or disagreements to Stratasys's attention as those issues arise. (*See id.* (providing that the Shareholders would "notify Parent in the event that [they] dispute[] any element of such Quarterly Report" within "within twenty (20) business days" of receipt)).

45.     The parties also agreed to a dispute-resolution mechanism pursuant to which the parties must submit any disputes for binding arbitration under Delaware law and the rules of the American Arbitration Association. (*Id.* § 11.5(a)). That provision also provides that the non-

prevailing party is obligated "to pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (*Id.* § 11.5(c)).

46.     Finally, the parties agreed that if any provisions of the Acquisition Agreement "were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine." (*Id.* § 11.7(c)). The parties further agreed that a non-breaching party "shall be entitled to specific performance of the terms [of the Acquisition Agreement], in addition to any other remedy at law or equity." (*Id.*).

### C.     Mr. Prucha and Mr. Ong Work to Ensure a Successful Acquisition

47.     Stratasys's stock price skyrocketed following the acquisition announcement, increasing by more than 40% in the following two weeks from a low of $17.22 per share on December 8 to a high of $24.36 on December 23, 2020. From the outset, Mr. Prucha and Mr. Ong did everything they could to ensure a smooth transition—Mr. Prucha even appeared on an investor call on December 9, 2020 to discuss the transaction with Stratasys shareholders and to lay out the plans for Origin's integration with Stratasys.

48.     From those early days through the present, Mr. Prucha and Mr. Ong have taken every step to ensure a successful business combination—in large part because of the incentive provided by the Earn-Out Payments. For instance, they both worked around the clock during the period between executing the Acquisition Agreement and closing the transaction, including, among other things, negotiating assignments of all of Origin's customer contracts and retention agreements with the existing Origin team.

49.     Post-closing, Mr. Prucha and Mr. Ong ensured that Origin integrated its back-office functions, its operations and supply chain functions, and its tech function with Stratasys's existing functions. Origin also integrated its valuable intellectual property operations while

15

successfully continuing to file new provisional patent applications and to convert Origin's existing provisional applications.

50.    All of these tasks—a few mere housekeeping logistics, many others complicated and intricate—were critical to Stratasys's ability to immediately benefit from the addition of Origin to its business line.

51.    Throughout this transition, the Origin team also continued to produce and sell the Origin One printers. Although sales were temporarily halted following the acquisition, the supply chain and production process soon resumed, and the Origin business line was in full production by late spring 2021, in advance of the initial July 1, 2021 EO Date, as planned. Both new and old clients remained happy with the performance of the Origin One.

## III.    STRATASYS AGREES TO SET THE EARN-OUT COMMENCEMENT DATE TO REFLECT COMMERCIAL REALITY



### A.    Stratasys Imposes a Strategic Delay on Sales of Origin Products

53.    Although Origin was well-positioned to continue manufacturing and producing its printers beginning in spring 2021, Stratasys decided to pursue other strategic objectives intended to fully integrate the Origin printers under the Stratasys name. As a result, Stratasys instructed the Origin team to direct its focus away from production of the existing printer model and,

16

instead, to focus on developing new hardware for the Origin One that would be relaunched as a Stratasys product.

54.     This included developing an updated version of the Origin One printer that physically conformed to Stratasys's specifications while also taking steps to develop a specialized version of the printer intended for use in the dental industry, where Stratasys saw business opportunity. Stratasys further directed the Origin team to implement a suite of new features for the Origin One printers already in use by existing customers.

55.     Stratasys was within its rights to make these changes to the Origin team's focus, as it had acquired the company and sought to implement its own strategy and vision for its future.  But as a result of these new priorities, Stratasys halted production and sales of the Origin One printer entirely near the end of spring 2021.

**B.      Stratasys Agrees to a New EO Date Coinciding with the Launch of the Origin One Version 2.7**

56.     The interruption of Origin One sales had immediate and obvious implications for Origin's ability to meet its Earn-Out Targets under the Acquisition Agreement. That is because if the EO Date remained unchanged, there would be *no* Origin products offered for sale for most or all of the first Earn-Out Period, and Origin would be unable to meet its Earn-Out Target.

57.     The parties foresaw this exact circumstance, and it is what prompted them to include a mechanism in the Acquisition Agreement for easily changing the EO Date. Both sides knew that Stratasys may want to implement a new post-acquisition strategy that would be incompatible with a strict, unmovable EO Date. To permit Stratasys that flexibility without encroaching on the Shareholders' bargained-for earn-out compensation, the parties determined it was in their collective benefit that the EO Date could be readily re-set to reflect commercial reality.

17



18



19



20



70.    The only way to credit Stratasys's present litigation position that the EO Date has not been changed because the board did not approve it is to conclude—against all the evidence and common sense—both that (i) *Stratasys's own CEO* was so neutered that he somehow did not have the authority to negotiate and make commercial agreements on behalf of the company, and (ii) the Shareholders were wrong to rely on *Stratasys's own CEO's* representations to them that they had reached an agreement. Neither of these can possibly be true.



21



73.    Following the agreement to re-set the EO Date to coincide with the GA Date, Stratasys made the Origin One 2.7 generally available in February 2022. (Ex. 9 (Stratasys 2022 Form 6-K) (describing the "launch of the Origin One in mid-February"); *see also* Ex. 2 (Stratasys 2022 Annual Report) (noting that the "Origin One 3D Printer" has been "generally available since the beginning of 2022")). Because the Acquisition Agreement requires the EO Date to "fall[] on the first day of a calendar month," Stratasys's written agreement to move the EO Date to coincide with the GA Date results in re-setting the EO Date as February 1, 2022— that is, the "first day of a calendar month" capturing the general availability of the Origin One 2.7.

**C.    Stratasys and the Origin Shareholders Rely on Their Written Agreement to Re-Set the EO Date**

74.    Stratasys and the Shareholders shared an understanding that the EO Date had been changed, and this mutual understanding is demonstrated by their unambiguous conduct in reliance on the re-set EO Date.



22

76.    In fact, Stratasys did not provide the reports until July 2022, after the Shareholders, through their counsel, demanded that Stratasys abide by its agreement and pointed out Stratasys's failure to provide the Quarterly Reports that would have been required if the parties had not re-set the EO Date. Stratasys, faced with this plain evidence of the untrue nature of its position—and in a ham-fisted attempt to remake history—then issued all three of those reports simultaneously, as if somehow that would retroactively indicate that Stratasys had truly believed all along that the EO Date was July 1, such that its failure to perform on the basis of that date was a mere oversight. Stratasys's position is self-evidently false.

77.    The Shareholders likewise relied on the parties' agreement to change the EO Date to correspond to the GA Date. Among other things, Mr. Prucha, Mr. Ong, and Mr. Lee agreed to continue their employment at Stratasys following the acquisition long after they were contractually obligated to do so, despite their many documented concerns about certain of Stratasys's strategic and operational decisions. (*See, e.g.,* Ex. 3 (July 8, 2021 Email from Mr. Prucha)). They did so with the express expectation and understanding that the re-set EO Date would give them and the other Shareholders a full and fair opportunity to satisfy the Earn-Out Targets—and to receive the remainder of their bargained-for compensation under the Acquisition Agreement. The Shareholders also relied on the agreement to re-set the EO Date by not demanding the Quarterly Reports from Stratasys when they would otherwise have been due.

78.    Without the agreement to re-set the EO Date, Stratasys's decision to halt the sale of Origin printers would have made it nearly impossible for Origin to satisfy its Earn-Out Targets. But the parties' agreement aligned the Shareholders' incentives with those of Stratasys, and Mr. Prucha, Mr. Ong, and Mr. Lee continued to provide valuable services to Stratasys to ensure the success of the Origin business unit.

23

79.    During the months since Stratasys first agreed to re-set the EO Date, Mr. Prucha and Mr. Ong have not just contributed to the day-to-day operation of the company; they have also taken substantial steps to further expand Origin's portfolio of intellectual property. Among other things, Mr. Prucha and Mr. Ong have developed new innovations and techniques and have filed new applications with the USPTO, while also taking steps to protect and secure Origin's existing suite of patents. (*See supra* ¶¶ 47-51). Further, Mr. Prucha and Mr. Ong have made extensive efforts far exceeding their contractual commitments to build out and train a robust new-technology process team to ensure the continued protection of Origin's (now Stratasys's) intellectual property. Mr. Prucha and Mr. Ong's ongoing and future work in this regard has been—and is—expressly predicated on Stratasys's agreement to re-set the EO Date.

82.     Stratasys's success is directly attributable to Mr. Prucha and Mr. Ong's post-acquisition efforts—which they undertook relying on Stratasys's agreement to re-set the EO Date, which would enable the Shareholders to earn their full bargained-for earn-out compensation. It would be fundamentally inequitable and unjust for Stratasys to keep for itself the massive benefits that Mr. Prucha and Mr. Ong created without Stratasys being held to its bargain to re-set the EO Date.

25

86.    Stratasys's effort to cheat the Shareholders out of their bargained-for consideration—now that Stratasys has enjoyed the benefits of that bargain—is flatly contrary to the parties' agreement and Delaware law. In light of Stratasys's misconduct, the Shareholders are entitled to both enforce the contract and to their equitable portion of the substantial value they created.

**D.    Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success**

87.    Stratasys itself has recognized the substantial concrete benefits derived from acquiring Origin and using Origin's valuable intellectual property—as well as from the post-acquisition services provided by Mr. Prucha, Mr. Ong, and the other Shareholders. The company's Form 6-K for the first quarter of 2022 noted that Stratasys's product revenues "increased by $14.6 million, or 36.7%, for the three months ended March 31, 2022," and that this increase "reflected the highest first quarter total in five years, strengthened by the launch of the Origin One." (Ex. 9 (Stratasys 2022 Form 6-K)).

88.    Stratasys's corresponding earnings release touted the "early momentum and contribution from our new Origin P3" system, which it further noted was "designed for high-volume production of end-use parts." (Ex. 10 (May 16, 2022 Earnings Stmt.)). In fact, Origin's Q1 2022 sales exceeded Stratasys's own internal estimates at double digit rates. That momentum continued throughout 2022, with Stratasys noting that the Origin product line "continue[s] to

26

ramp, with excellent customer engagement across all of our new technology offerings." (Ex. 11 (August 3, 2022 Earnings Stmt.)).

89.     Stratasys continued to tout Origin's value in subsequent filings, noting in its 2022 Annual Report that Origin's technology "has become an important growth engine for our company" and explaining that the Origin acquisition "significantly strengthened our leadership in mass production for polymer 3D printing" because "Origin's pioneering approach to additive manufacturing of end-use parts has enabled us to serve a large market with manufacturing-grade 3D printers." (Ex. 2, Stratasys 2022 Annual Report).

90.     Origin's contribution to Stratasys goes beyond the numbers of the Origin business unit. Since the acquisition, Stratasys has recognized the value proposition of Origin's core insight: a software-driven approach to printing coupled with an open-material model will open the door for 3D printing to jump from the limited prototyping industry into the multitrillion-dollar manufacturing industry. Based on this recognition that 3D printing can be reliably used for manufacturing, Stratasys has incorporated Origin's paradigm-shifting open-material model into the majority of its 3D-printing business lines, not just the Origin One, which has allowed Stratasys to charge a premium across its business units.

91.     Stratasys's 2022 performance is largely due to Origin's products and services, which are the direct result of Mr. Prucha and Mr. Ong's post-acquisition commitment to the company in reliance on the parties' agreement regarding the EO Date.

E.     **Stratasys Reneges on the Parties' Agreement in Order to Cheat the Shareholders Out of Their Bargained-For Consideration**

27

93.     The only reason for this breach that Zeif provided was that the board had supposedly determined that there was "no benefit to Stratasys" to follow through on changing the EO Date, now that Stratasys had already enjoyed the benefits of the agreement. In other words, Stratasys reneged solely because it decided it would be in Stratasys's interest to do so—regardless of the deal the parties had already reached. By refusing to honor the contract, Stratasys completed its months-long scheme to dupe the Shareholders into creating massive benefits for the company while cheating them out of the compensation they are entitled to.

95.     Stratasys's effort to re-trade on the parties' deal is contrary to the parties' written agreements, the plain language of the Acquisition Agreement, and the parties' post-acquisition course of performance. It is also contrary to any sense of fairness or good faith—both because Stratasys seeks to deprive the Shareholders of their bargained-for benefit while continuing to

28

profit from Origin's valuable intellectual property, and because Stratasys seeks to drive a wedge between Mr. Prucha and Mr. Ong and the remaining Shareholders.

96.    Mr. Prucha and Mr. Ong did not accept Zeif's improper proposal, which was at odds with the deal Stratasys had already agreed to and was fundamentally unfair to the remaining Shareholders.

## IV.    STRATASYS HAS VIOLATED ITS AGREEMENT

97.    Stratasys and the Shareholders agreed that the EO Date would be re-set to coincide with the GA Date for version 2.7 of the Origin One printer. That agreement is memorialized in multiple writings—and is therefore effective under the plain language of the Acquisition Agreement.

### A.    The Parties' Email Agreements Constitute Writings Under the Acquisition Agreement

98.    The Acquisition Agreement states that the EO Date is "July 1, 2021 or such other date that falls on the first day of a calendar month as mutually agreed in writing by Parent and Seller Representative" (Acq. Agmt., Annex I).



100.    These email agreements are more than sufficient to satisfy the "agreed in writing" requirement of the Acquisition Agreement, which was specifically designed to account for post-acquisition business reality.

101.    The Acquisition Agreement is governed by Delaware law. (Acq. Agmt. § 11.4). Delaware recognizes a public policy in favor of giving full effect to the unambiguous intentions of businesspeople without placing undue emphasis on formalistic requirements. Because of that policy, Delaware courts hold that emails are sufficient to satisfy a "writing" requirement of the sort in the Acquisition Agreement. *See, e.g., Camden Fitness, LLC v. Wandless Enterprises, Inc.*, No. CPU5-12-000295, 2013 WL 8854873, at *3 n.7 (Del. Com. Pl. Feb. 11, 2013) ("Emails may be considered writings."); *see also* DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023) ("If a law requires a record to be in writing, an electronic record satisfies the law."); Black's Law Dictionary (11th ed. 2019) (defining "writing" as "any intentional recording of words in a visual form," including "e-mails, and any other media on which words can be recorded").

102.    Indeed, Delaware courts routinely find that essentially any unambiguous writing can be sufficient to reflect the parties' agreement. *See, e.g., Zayo Grp., LLC v. Latisys Holdings, LLC*, No. 12874-VCS, 2018 WL 6177174, at *14 (Del. Ch. Nov. 26, 2018) ("Toshiba's October 1, 2014 email . . . would have constituted written notice to Latisys that Toshiba intended to "materially modify" that contract."); *Triple H Fam. Ltd. P'ship v. Neal*, No. 12294-VCMR, 2018 WL 3650242, at *13 (Del. Ch. July 31, 2018), *aff'd*, 208 A.3d 703 (Del. 2019) ("This email exchange constitutes the written consent of the members to dissolve Omni."); *Camden Fitness*, 2013 WL 8854873, at *3 ("[E]ven if the contract modification should have been in writing, the emails of December 29, 2010, and February 26, 2011, constitute written modifications to the contract, evidencing [an] agreement to the new contract price of $155,000.00.").

### B.    Re-Setting the EO Date Does Not Require Board Approval

104.    Despite the parties' written agreement, Stratasys has taken the position that the re-setting of the EO Date is somehow ineffective because it was not formally approved by the Stratasys board. But the Acquisition Agreement includes no such requirement—it simply requires Stratasys to agree to any change in writing. And as a commercially sophisticated party, Stratasys knows that a CEO does not need board approval prior to entering into an agreement on behalf of his company. *See, e.g., Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 81 (1995) ("[A] corporation is bound by contracts entered into by its officers and agents acting on behalf of the corporation and for its benefit, provided they act within the scope of their express or implied powers." (citation omitted)).

105.    Moreover, Zeif has repeatedly demonstrated broad decision-making powers and authority on behalf of Stratasys, including with respect to all sorts of issues relating to the relaunch of the Origin One printer. Without seeking or requiring the board's approval, Zeif has (i) made decisions regarding the production and sale of the Origin One printers, (ii) directed the Origin team to develop new hardware, (iii) allocated resources to address and resolve manufacturing and performance issues as they arose, (iv) directed the Origin team to prioritize a separate product targeting the dental industry over the Origin One printer, (v) restarted production, and (vi) set the GA Date.

106.    Along with these decisions, Zeif also negotiated and bound the company in writing to a revised EO Date. Stratasys's last-minute claim that Zeif needed board approval for

31

that single item (but not the others) not only contradicts the plain language of the Acquisition Agreement, but it also deviates from the parties' course of post-acquisition performance over many months. *See, e.g., Hessler, Inc. v. Farrell*, 226 A.2d 708, 711–12 (Del. 1967) ("It is the law of this State that when, in the usual course of the business of a corporation, an officer or agent has been allowed to manage certain of its affairs, and when this is known to the other party to the contract, the authority of the officer to act for the corporation is implied from the past conduct never challenged by the corporate officials."); *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 128 (3d Cir. 1998) ("Implied actual authority . . . may be found through evidence as to the manner in which the business has operated in the past[.]").

107.    Stratasys's claim also runs contrary to its Articles of Association, which contemplate the grant of significant powers to the CEO. (Ex. 12, Amended and Restated Articles of Association of Stratasys Ltd., § 81.3; *see also Schoonejongen*, 143 F.3d at 127-28 ("Express authority to act on behalf of the corporation is usually manifested through a statute, the certificate of the corporation, the by-laws, or a board or shareholder action.").).

108.    Stratasys cannot undo Zeif's agreement on the company's behalf by now claiming that only the board can make such a deal.

### C.    The Parties' Performance Evidences Agreement to Change the EO Date

109.    Finally, both Stratasys and the Shareholders relied on the agreement to move the EO Date, which further evidences the clear terms of that deal.  As explained in Section III(C) above, Stratasys relied on and performed in accordance with that agreement by, among other things, not producing the Quarterly Reports that are mandated during the Earn-Out Periods until *after* it received the Shareholders demand letter on June 28, 2022.

110.    Stratasys's course of performance plainly shows its agreement to move the EO Date. In fact, had the parties *not* agreed to move the EO Date, Stratasys would have been in

32

material breach of the Acquisition Agreement for failing to satisfy this requirement, with the result that the full $40 million in earn-out proceeds would be due immediately. *See, e.g., S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.*, No. 2020-1069-MTC, 2021 WL 3925937, at *3 (Del. Ch. Sept. 1, 2021) (authorizing contract claim by shareholder representative to proceed against acquiring company that sought as damages "the sum total of all unpaid earn-out payments").

111.    And for their part, Shareholders Mr. Prucha, Mr. Ong, and Mr. Lee contributed substantial time and effort to the success of the Origin business unit post-acquisition, which they did in direct reliance on Stratasys's repeated agreements to re-set the EO Date—and which conferred substantial benefits on Stratasys in reliance on the Shareholders' reasonable expectation that the re-set EO Date would provide them with a fair opportunity to satisfy the Earn-Out Targets.

112.    Further, because Delaware law permits contract-modification through course of performance, the parties' conduct itself would act to re-set the EO Date even in the absence of a written agreement. Delaware law gives substantial weight to the ways in which businesspeople actually perform under a given contract. When, like here, a party's conduct evidences a plain intention to amend the terms of a written agreement, that implied amendment is binding. *See, e.g., Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 567 (D. Del. 1993) ("The Delaware Supreme Court has held that . . . the parties may, "by their conduct, substitute a new oral contract without a formal abrogation of the written agreement," even if that agreement contains an explicit clause to the contrary.'"); *Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.*, 297 A.2d 28, 33 (Del. 1972) (holding that "a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement" because "the parties have a

33

right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit"—"including a change in the provisions of the written agreement by the course of conduct of the parties").

113.    The parties' conduct is therefore further evidence of a mutual, unambiguous agreement to re-set the EO Date—and that change was legally effective either as an agreement in writing under the Acquisition Agreement or, alternatively, as a modification though their course of performance.[3] Stratasys cannot undo that agreement by belatedly claiming its own CEO somehow did not have the authority to act on the company's behalf.

## V.    STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER

114.    Since this dispute has arisen, the Shareholders have repeatedly—and fruitlessly—tried to engage in a productive commercial dialogue concerning Stratasys's agreement to re-set the EO Date.

115.    Indeed, shortly after Stratasys informed the Shareholders in March 2022 that Stratasys would renege on its repeated written agreement to re-set the EO Date, Mr. Prucha and Mr. Ong asked Zeif to reconsider that position and to abide by the Parties' prior agreement.

---

[3] For the same reason, Stratasys's repeated practice of directing all substantive communications concerning the EO Date to Mr. Prucha, Mr. Ong, and Mr. Lee as the representatives of the Shareholders—rather than to Fortis, the formal "Seller Representative"—effects a modification of the Acquisition Agreement's technical requirement that the "agreement in writing" be between Stratasys and the Seller Representative.

34

117.    Rather than engaging with the Shareholders or abiding by its unambiguous prior written agreements, Stratasys instead opted to double and triple-down on its position. In an attempt to undermine the undisputed evidence of its agreement to re-set the EO Date, Stratasys sent a letter on July 15, 2022, in which it informed the Shareholders that it intended to provide the Quarterly Reports—which would have been due months prior had the Parties *not* agreed to move the EO Date—"by no later than Wednesday, July 20, 2022." (Ex. 14, July 15, 2022 Stratasys Letter).

118.    Stratasys proceeded to provide "Quarterly Reports" that would have corresponded to the first, second, and third quarters of the first Earn-Out Period had the EO Date not been re-set.  (Ex. 15, July 20, 2022 Quarterly Statements).  Those Quarterly Reports demonstrated precisely why the parties agreed to re-set the EO Date: Stratasys had not even made the Origin products available for sale during much of those periods of time.[4] (*Id.*).

---

[4] Indeed, on August 29, 2022, Stratasys provided a purported "Earn-Out Schedule for the First Earn-Out Period" stating that the "First Earn-Out Payment is nil." (Ex. 16, Aug. 29, 2022 Earn-Out Schedule).



36

███████████████████████████

122.    Stratasys's conduct left the Shareholders with no choice but to file this Arbitration Demand in order to hold Stratasys to its agreement, to disgorge the unfair benefits that Stratasys's and Zeif's deliberate misrepresentations conferred on Stratasys, and to recover their costs and attorneys' fees incurred in enforcing their rights.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Contract - Damages)

123.    The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

124.    The Acquisition Agreement is a valid and binding written agreement between Stratasys and the Shareholders.

125.    Among other things, the Acquisition Agreement sets out the terms of the payments by Stratasys to the Shareholders in consideration for the acquisition of Origin— including the EO Date and other terms governing Stratasys's obligation to make Earn-Out Payments. The Acquisition Agreement also requires Stratasys to provide the Shareholders with Quarterly Reports within 60 days of the close of each quarter during each Earn-Out Period. The Acquisition Agreement also empowers the parties to change the EO Date through a simple agreement memorialized in writing, without the need either for a signed agreement or formal amendment.

126.    In writings dated August 25, 2021, October 12 and 21, 2021, and February 12, 2022, the parties agreed to set the EO Date to coincide with the GA Date for the Origin One Version 2.7 printer. This agreement was reflected by the parties' course of performance, which

37

demonstrated that all parties understood and relied upon their agreement to re-set EO Date. Based on that agreement, for instance, Stratasys did not provide the Quarterly Reports that it would have been required to provide absent an agreement to re-set the EO Date.

127.    Alternatively, the parties' course of performance was, itself, sufficient to modify the tentative EO Date—even assuming (contrary to fact) that the parties had not also agreed in writing to re-set the EO Date. *See, e.g., Haft*, 841 F. Supp. at 567 ("The Delaware Supreme Court has held that . . . the parties may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement, even if that agreement contains an explicit clause to the contrary." (internal quotations omitted)).

128.    The Acquisition Agreement therefore obligates Stratasys to treat February 1, 2022 as the EO Date for all purposes.

129.    Stratasys has violated this obligation by, among other things, refusing to treat February 1, 2022 as the EO Date for the purpose of calculating whether Origin's revenue satisfied the Earn-Out Targets. Stratasys has also violated this obligation by failing to timely provide the required Quarterly Reports following the re-set EO Date.

130.    Stratasys's breach has materially harmed the Shareholders.

131.    Among other things, Stratasys's breach has deprived the Shareholders of a full and fair opportunity to satisfy the relevant Earn-Out Targets—and to receive the tens of millions of dollars in Earn-Out Payments conditioned on such satisfaction. The Shareholders are therefore entitled to full payment of $40 million in Earn-Out Payments on an accelerated basis.

**SECOND CAUSE OF ACTION**
**(Breach of Contract – Specific Performance and Injunction)**

132.    The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

38

133.    Stratasys has breached its obligations under the Acquisition Agreement by refusing to compensate the Shareholders for Origin's valuable suite of intellectual property while continuing to profit from its ongoing use of that same intellectual property. Stratasys has agreed that its conduct causes "irreparable damage" to the Shareholders and that the Shareholders can receive "no adequate remedy at law."  (Acq. Agmt. § 11.7(c)).

134.    The Shareholders are therefore entitled to "specific performance of the terms of the" Acquisition Agreement, "in addition to any other remedy at law or equity." (Acq. Agmt. § 11.7(c)). Among other things, Stratasys must perform under the Acquisition Agreement by treating the EO Date as February 1, 2022 for all purposes.

135.    The Shareholders are also entitled to an injunction to prevent the ongoing irreparable harm they suffer each day that Stratasys refuses to provide the bargained-for consideration in exchange for its use of Origin's intellectual property. Among other things, any such injunction must (i) prevent Stratasys from using or profiting from Origin's intellectual property unless and until Stratasys fairly compensates the Shareholders and (ii) tolling the applicable EO Periods during the period of such injunction until a commercially reasonable date following the full re-introduction of the Origin product line into the market.

**THIRD CAUSE OF ACTION**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

136.    The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

137.    The Acquisition Agreement is a valid and binding written agreement between Stratasys and the Shareholders and is governed by Delaware law.

138.    "The implied covenant of good faith and fair dealing inheres in every contract" under Delaware law. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

Pursuant to that covenant, a party must "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." (*Id.*).

139.    Stratasys has breached the covenant of good faith and fair dealing by, among other things, interfering with the Shareholders' opportunity to satisfy the Earn-Out Targets and to receive the full amount of the bargained-for Origin purchase price.

140.    Stratasys accomplished this breach by deliberately delaying the general availability of Origin's products long past the tentative EO Date and then reneging on its written agreement to re-set the EO Date to coincide with the GA Date, after it had used that agreement to wrongly induce the Shareholders to perform on the basis of that promise. Stratasys now takes the false and self-serving position that the first Earn-Out Period includes eight months when the Origin products were not available for sale.

141.    Stratasys's breach of its covenants has materially and unfairly harmed the Shareholders.

142.    Among other things, Stratasys's breach has deprived the Shareholders of a full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments.

**FOURTH CAUSE OF ACTION**
**(Promissory Estoppel)**

143.    The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

144.    In multiple written and oral communications between July 2021 and February 2022, Stratasys promised to re-set the EO Date to coincide with the GA Date. These promises were clear and unambiguous, and Stratasys reasonably expected that the Shareholders would

40

take action (and/or forbear from taking certain actions) in reliance on Stratasys's promise to re-set the EO Date.

145.    The Shareholders did, in fact, rely on Stratasys's promise. Among other things, Mr. Prucha, Mr. Ong, and Mr. Lee relied on Stratasys's promise by devoting substantial time, effort, and resources for the benefit of Stratasys, all of which far exceeded any duties or obligations they owed to the company. During this period, Mr. Prucha, Mr. Ong, and Mr. Lee provided extremely valuable services to Stratasys, at substantial burden and opportunity cost to themselves, in direct reliance on Stratasys's and Zeif's promises to them.

146.    The Shareholders also relied on Stratasys's promise by not demanding that Stratasys provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set.

147.    Stratasys's repudiation of its clear and unambiguous promise has caused and continues to cause the Shareholders significant harm, including without limitation to the extent they have been deprived of the full and fair opportunity to satisfy the relevant Earn-Out Targets.

148.    Stratasys's promise is binding and enforceable, and injustice can be avoided only by enforcement of the promise to re-set the EO Date.

### FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

149.    The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

150.    Stratasys's conduct has induced the Shareholders—including Mr. Prucha, Mr. Ong, and Mr. Lee—to perform valuable services for Stratasys. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and

has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions.

151.    Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

152.    The Shareholders have been damaged by, among other things, losing the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction. Stratasys also induced Mr. Prucha, Mr. Ong, and Mr. Lee to assume significant personal burdens for Stratasys's benefit, including foregoing the opportunity to engage in other, more lucrative, professional endeavors.

153.    There is no justification for Stratasys's conduct: it knowingly induced the Shareholders to provide valuable services with the intention of profiting from those services to the Shareholders' detriment.

154.     Under principles of equity, Stratasys should not be permitted to retain the benefits it gained because of its wrongdoing.

155.    The Shareholders therefore seek disgorgement of the full amount by which Stratasys has been unjustly enriched as a result of the substantial time, effort, and resources the Shareholders contributed to Stratasys—upon information and belief, an amount no less than $400 million.

### SIXTH CAUSE OF ACTION
### (Quantum Meruit)

156.    The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

157.    Stratasys's conduct has induced Shareholders—including Mr. Prucha, Mr. Ong, and Mr. Lee—to perform valuable services for Stratasys with the expectation that the Shareholders would receive recompence from Stratasys, including the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction.

158.    Shareholders performed those services under circumstances that put Stratasys on notice that the Shareholders had relied on Stratasys's promises.  Among other things, the Shareholders did not object to Stratasys's failure to provide the Quarterly Reports that would otherwise have been due, absent an agreement to re-set the EO Date.  Instead, Shareholders continued to provide valuable services to Stratasys in reliance on their mutual agreement.

159.    The Shareholders therefore seek fair recompence for the contributions that Zeif and Stratasys induced Shareholders, on false pretenses, to make for Stratasys's benefit, in an amount to be determined by the arbitrator.

### **PRAYER FOR RELIEF**

WHEREFORE, the Shareholders pray for an award against Stratasys as follows:

A.    Specific performance of Stratasys's obligations under the Acquisition Agreement, including the obligation to treat February 1, 2022 as the EO Date for all purposes.

B.    Enforcement of Stratasys's promise to re-set the EO Date to February 1, 2022.

C.    Compensatory damages from Stratasys equal to the full amount of Earn-Out Payments due under the Acquisition Agreement, of $40 million.

D.    Disgorgement of the full amount by which Stratasys has been unjustly enriched in an amount to be determined by the Arbitrator, but reasonably believed to exceed $400 million.

E.    Recompence for the value of the services provided by Shareholders to Stratasys in reliance on Stratasys's promise to re-set the EO Date to February 1, 2022.

43

F.      An injunction preventing Stratasys from using Origin's intellectual property until Stratasys fairly compensates the Shareholders, while also tolling the calculation of the EO Payments until a commercially reasonable date following the full re-introduction of the Origin product line into the market.

G.      Pre- and post-judgment interest from Stratasys.

H.      All attorneys' fees, expenses, and costs.

I.      Such other and further relief as the Arbitrator deems just and proper.

44

Dated: May 19, 2023

Respectfully submitted,

**BRAUNHAGEY & BORDEN LLP**

By: _____

J. Noah Hagey, Esq.
351 California Street, 10th Floor
San Francisco, CA 94104
Tel.: 415-599-0210
Fax: 415-276-1808
hagey@braunhagey.com

Douglas S. Curran, Esq.
Christman Rice, Esq.
Lily (Haeun) Kim, Esq.
118 W. 22nd Street, 12th Floor
New York, NY 10011
Tel.: 646-829-9403
Fax: 646-403-4089
curran@braunhagey.com
rice@braunhagey.com
kim@braunhagey.com

*Attorneys for Claimants, Former
Shareholders of Origin Laboratories, Inc.,
by and through Shareholder Representative
Fortis Advisors LLC*

# EXHIBIT 21

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**WILMINGTON, DELAWARE**

|  |  |
|---|---|
| FORMER SHAREHOLDERS OF ORIGIN LABORATORIES, INC., *by and through Shareholder Representative Fortis Advisors LLC*,<br><br>Claimants,<br><br>v.<br><br>STRATASYS LTD. and STRATASYS, INC.,<br><br>Respondents. | ICDR Case No. 01-23-0002-3975<br><br>**ARBITRATION DEMAND FOR:**<br><br>1. **BREACH OF CONTRACT – DAMAGES**<br><br>2. **BREACH OF CONTRACT – SPECIFIC PERFORMANCE AND INJUNCTION**<br><br>3. **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>4. **PROMISSORY ESTOPPEL**<br><br>5. **UNJUST ENRICHMENT**<br><br>6. **QUANTUM MERUIT**<br><br>7. **FRAUD** |

**BRAUNHAGEY & BORDEN LLP**

747 Front Street, 4th Floor
San Francisco, CA 94111

118 W. 22nd Street, 12th Floor
New York, NY 10011

*Attorneys for Claimants, Former Shareholders of Origin Laboratories, Inc., by and through Shareholder Representative Fortis Advisors LLC*

**TABLE OF CONTENTS**

STATEMENT OF DISPUTE ................................................................................................ 1

ARBITRATION AGREEMENT .......................................................................................... 4

PARTIES ............................................................................................................................ 4

JURISDICTION, VENUE, AND GOVERNING LAW ..................................................... 5

FACTS ............................................................................................................................... 6

I.      ORIGIN'S BACKGROUND ................................................................................... 7

        A.      Origin's Thesis: 3D Printing as Manufacturing ........................................ 7

        B.      Origin's Groundbreaking Intellectual Property ........................................ 8

        C.      The Origin One Printer ............................................................................ 11

II.     STRATASYS'S ACQUISITION OF ORIGIN ..................................................... 12

        A.      The Beginning of the Origin-Stratasys Relationship .............................. 12

        B.      The Parties Negotiate the Terms of the Acquisition ............................... 13

        C.      The Acquisition Agreement ..................................................................... 17

        D.      Chris and Joel Work to Ensure a Successful Acquisition ....................... 20

III.    STRATASYS REPRESENTS THAT IT HAS AGREED TO SET THE
        EARN-OUT COMMENCEMENT DATE TO REFLECT
        COMMERCIAL REALITY .................................................................................. 21

        A.      Stratasys Delays the Sale of Origin Products ......................................... 21

        B.      Stratasys Tells the Shareholders That It Agrees to a New EO Date Coinciding
                with the Launch of the Origin One Version 2.7 ...................................... 22

                1.      ████████████████████████████████████ ............................. 23

                2.      ████████████████████████████████████ ......................... 24

                3.      ████████████████████████████ .................................... 25

                4.      ███████████████████████████ .................................... 26

C. The Shareholders Rely on Stratasys' Representations and Agreement to Re-Set the EO Date ...................................................................................... 27

D. Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success. 31

E. Stratasys Reneges on the Parties' Agreement in Order to Cheat the Shareholders Out of Their Bargained-For Consideration ............................................. 33

IV. STRATASYS VIOLATED ITS REPRESENTATIONS, PROMISES AND AGREEMENT(S) ........................................................................... 34

A. The Parties' Emails Constitute Writings Under the Acquisition Agreement ....... 35

B. Re-Setting the EO Date Does Not Require Board Approval ............................... 36

C. The Parties' Performance Evidences Stratasys's Representations that It Had Agreed to Change the EO Date ........................................................... 38

V. STRATASYS HAS DEFRAUDED THE SHAREHOLDERS ....................................... 40

A. Stratasys Fraudulently Induced the Shareholders' Execution of the Acquisition Agreement ................................................................................... 40

B. Stratasys Defrauded the Shareholders by Lying About Its Intention to Re-Set the EO Date ...................................................................................... 43

C. Stratasys Concealed Its Fraud Until At Least March 23, 2022 ........................... 43

VI. STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER ............................................................................................ 44

CAUSES OF ACTION ................................................................................................... 46

PRAYER FOR RELIEF ................................................................................................. 58

iii

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Abry P'rs V, L.P. v. F & W Acq. LLC*,
  891 A.2d 1032 (Del. Ch. 2006) ........................................................................ 43, 57

*Brown v. SAP Am., Inc.*,
  No. C.A. 98-507-SLR, 1999 WL 803888 (D. Del. Sept. 13, 1999) ........................................ 58

*Camden Fitness, LLC v. Wandless Enterprises, Inc.*,
  No. CPU5-12-000295, 2013 WL 8854873 n.7 (Del. Com. Pl. Feb. 11, 2013) .................. 35, 36

*CLP Toxicology, Inc. v. Casla Bio Holdings LLC*,
  No. CV 2018-0783-PRW, 2020 WL 3564622 (Del. Ch. June 29, 2020) ................................... 3

*Curtiss-Wright Corp. v. Schoonejongen*,
  514 U.S. 73 (1995) ............................................................................................. 37

*Falco v. Alpha Affiliates, Inc.*,
  No. CIV. A. 97-494, 2000 WL 727116 (D. Del. Feb. 9, 2000) ............................................... 57

*Fortis Advisors LLC v. Johnson & Johnson*,
  No. CV 2020-0881-LWW, 2021 WL 5893997 (Del. Ch. Dec. 13, 2021) ................................. 3

*Haft v. Dart Grp. Corp.*,
  841 F. Supp. 549 (D. Del. 1993) ..................................................................... 39, 47

*Hessler, Inc. v. Farrell*,
  226 A.2d 708 (Del. 1967) ................................................................................. 37

*Kuroda v. SPJS Holdings, L.L.C.*,
  971 A.2d 872 (Del. Ch. 2009) ........................................................................... 49

*Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*,
  28 A.3d 436 (Del. 2011) ................................................................................... 57

*Norton v. Poplos*,
  443 A.2d 1 (Del. 1982) ..................................................................................... 58

*Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.*,
  297 A.2d 28 (Del. 1972) ................................................................................... 39

*Prairie Cap. III, L.P. v. Double E Holding Corp.*,
  132 A.3d 35 (Del. Ch. 2015) ............................................................................ 43

iv

*Schoonejongen v. Curtiss-Wright Corp.*,
   143 F.3d 120 (3d Cir. 1998)..................................................................... 37, 38

*S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.*,
   No. 2020-1069-MTC, 2021 WL 3925937 (Del. Ch. Sept. 1, 2021)......................................... 38

*Stephenson v. Capano Dev., Inc.*,
   462 A.2d 1069 (Del. 1983) ................................................................................ 58

*Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*,
   No. CVN19C11092PRWCCLD, 2021 WL 117036 (Del. Super. Ct. Jan. 13, 2021) ............... 57

*Triple H Fam. Ltd. P'ship v. Neal*,
   No. 12294-VCMR, 2018 WL 3650242 (Del. Ch. July 31, 2018)............................................ 36

*Zayo Grp., LLC v. Latisys Holdings, LLC*,
   No. 12874-VCS, 2018 WL 6177174 (Del. Ch. Nov. 26, 2018) ................................................ 36

**STATUTES**

DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023)..................................................................... 35

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019) ..................................................................... 35, 36

Claimants, the former shareholders of California-based Origin Laboratories, Inc., by and through Shareholder Representative Fortis Advisors LLC (hereinafter for convenience, the "Origin Shareholders" or the "Shareholders"), hereby allege against Respondents, Israel-based international technology conglomerate Stratasys Ltd. and Stratasys, Inc. (collectively, "Stratasys"), as follows:

<u>**STATEMENT OF DISPUTE**</u>

1.    Origin Laboratories was an innovative California startup company founded in 2015 by Chris Prucha and Joel Ong based on a simple insight: by developing sophisticated 3D-printing software, Origin could produce high-quality, usable parts that would bring 3D-printing out of the realm of hobbyists and into the much larger manufacturing market.  Origin represented the culmination of Chris and Joel's efforts and impressive software engineering experience— Chris as an Apple engineer and previous co-founder of a separate collaboration platform; Joel as an engineer on moonshot initiatives at Google X.  Respondent Stratasys, a publicly traded Israeli technology conglomerate, approached Chris and Joel in 2020 with an unsolicited acquisition offer, and Stratasys ultimately purchased Origin for approximately $100 million pursuant to an Agreement and Plan of Merger and Reorganization, dated December 8, 2020 (the "Acquisition Agreement").



3.      Following the acquisition, Stratasys and its executives again repeatedly reassured the Shareholders that it would calculate their entitlement to the agreed-upon Earn-Out Payments based on the *actual* sales of Origin's products and services, and would thus re-set the EO Date. Accordingly, when Stratasys delayed the post-acquisition launch of Origin's products, Stratasys again promised, orally and in writing, that the EO Date would coincide with the general availability of Origin's products.  In reliance on those representations, promises, and agreements, the Shareholders continued to perform for the company, including by designing new technology and assisting with patent applications on novel concepts accruing to Stratasys's benefit.

4.      Stratasys finally made Origin's 3D printing products generally available to customers in February 2022—that is, seven months after the placeholder EO Date—and Origin's performance has far exceeded all projections.  Stratasys touted Origin's success in its recent SEC filings and releases, claiming that Origin is responsible for the largest first-quarterly growth in Stratasys's history and is operating as "an important growth engine" for Stratasys.  Even beyond the sale of Origin-branded products, Stratasys has integrated Origin's sophisticated suite of intellectual property throughout its business and, as a result, Stratasys's enterprise value has substantially increased.

5.      Unfortunately, Stratasys's representations and inducements were not truthful, and Stratasys appears never to have had any intention of launching Origin's products by the

2

placeholder EO Date or moving that date to coincide with the products' general availability. Instead, Stratasys insists on using the defunct July 1 placeholder date as the basis from which to calculate the Shareholders' Earn-Out—even though Stratasys *did not offer the products for sale during that period*.  By delaying the launch while insisting that the EO Date remains unchanged, Stratasys effectively reduces the purchase price by 40%, because the later Earn Out Periods assume increasing growth targets.

6.      The Shareholders bring this suit to recover for Stratasys's fraud and bad faith dealings, including accelerated payment of the full $40 million in bargained-for earn-out payments that Stratasys has withheld.  Stratasys' intentional deceit both before and after the transaction closed was designed to deprive Origin's Shareholders of millions of dollars in bargained-for consideration. Stratasys meanwhile has unjustly enriched itself by hundreds of millions of dollars through its use of Origin's ground-breaking technology and patented know-how—and has rejected all of the Shareholders' efforts to resolve this dispute short of litigation.

7.      The Shareholders accordingly seek full remedies and to deprive Stratasys of the fruits of its misconduct.  In addition to payment of the Earn Out, the Shareholders thus seek disgorgement of the amount by which Stratasys has unjustly profited from its misconduct, including all actual and expected revenue associated with Origin's products and services and the value of Origin's products, intellectual property, and services, estimated to be at least $400 million.[1]  The Shareholders also seek the *quantum meruit* value of the services that Stratasys

---

[1] The Shareholders recognize that claims exceeding their expectation damages under the Acquisition Agreement may be perceived as unusual.  But Stratasys's deliberately fraudulent and deceptive conduct has deprived the Shareholders both of 40% of the agreed-upon consideration and of the bargained-for certainty of a fairly calculated purchase price.  In such circumstances, Delaware law supports disgorgement of a wrongdoer's ill-gotten gains and recognizes that any other outcome would incentivize deceit by granting the wrongdoer a windfall or "free option." *See, e.g., CLP Toxicology, Inc. v. Casla Bio Holdings LLC,* No. CV 2018-0783-PRW, 2020 WL 3564622, at *21 (Del. Ch. June 29, 2020) (permitting claims seeking disgorgement under theory of fraudulent inducement / unjust enrichment); *Fortis Advisors LLC v. Johnson & Johnson*, No. CV 2020-0881-LWW, 2021 WL 5893997, at *12 (Del. Ch. Dec. 13, 2021) (permitting fraud claims seeking to recover in excess of contractual "capped damages"

unfairly induced Shareholders to provide.  Finally, unless and until Stratasys fully compensates the Shareholders in connection with any award hereunder, Stratasys should be enjoined from further use of any patents and intellectual property developed by Origin or the Shareholders.

## ARBITRATION AGREEMENT

8.      This dispute arises under the parties' Agreement and Plan of Merger and Reorganization dated December 8, 2020 (Ex. 1) (the "Acquisition Agreement"), § 11.5(a) of which provides for AAA arbitration before a single arbitrator in Wilmington, Delaware of "any and all claims . . . arising out of" Stratasys's acquisition of Origin:

> The parties hereto understand and irrevocably agree that any and all claims, grievances, demands, controversies, causes of action or disputes of any nature whatsoever (including, but not limited to, tort and contract claims, and claims upon any Legal Requirement) (hereinafter 'Disputes'), arising out of, in connection with, or in relation to this Agreement and the Ancillary Agreements shall be exclusively referred to and finally resolved by arbitration in Wilmington, Delaware. The arbitration will be conducted in English in accordance with the rules of the American Arbitration Association with one arbitrator. The parties hereto agree that a final determination of an arbitrator in accordance with the provisions hereof shall be conclusive and may be entered in any Court having jurisdiction.

9.      The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c)).

## PARTIES

10.     The Origin Shareholders are represented by their designated Shareholder Representative Fortis Advisors LLC, pursuant to the parties' Acquisition Agreement.  Prior to

---

because "[t]o find otherwise would ignore the delicate balance that Delaware courts have struck between supporting freedom of contract and condemning fraud").

4

the acquisition by Stratasys, the Origin Shareholders were shareholders of Origin Laboratories, Inc. ("Origin"), a California corporation that successfully developed innovative 3D printing technologies.

11.    Fortis Advisors LLC is a Delaware limited liability company that serves as the formal representative of the Shareholders of Origin in connection with the acquisition of Origin by Stratasys, Inc., as memorialized in the Acquisition Agreement.

12.    Stratasys Ltd. is a company incorporated under the laws of the State of Israel, with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

13.    Stratasys, Inc. is a Delaware corporation and a wholly owned subsidiary of Stratasys Ltd., with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

## JURISDICTION, VENUE, AND GOVERNING LAW

14.    The American Arbitration Association has jurisdiction over this arbitration and venue is properly located in Wilmington, Delaware, pursuant to Section 11.5(a) of the Acquisition Agreement. The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c)).

15.    This dispute is governed by Delaware law pursuant to § 11.4 of the Acquisition Agreement, which states:

> This Agreement, and all claims (whether at law or in equity, whether in contract, tort, statute or otherwise) arising in whole or in part out of, related to, based upon, or in connection herewith or the subject matter hereof will be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

**FACTS**

16.     On December 8, 2020, Stratasys and the Shareholders entered into the Acquisition Agreement, pursuant to which Stratasys agreed to acquire Origin and its intellectual property for a total purchase price of approximately $100 million. The Acquisition Agreement contemplated payment of 60% of the purchase price up front, with the remaining 40% conditioned on Origin's post-acquisition performance over a three-year period that would begin to run on an agreed-upon commencement date (the "EO Date"). The Acquisition Agreement set a tentative EO Date but empowered the parties to modify that date by simple written agreement.  In order to induce the Shareholders' execution of the Acquisition Agreement, Stratasys repeatedly promised the Shareholders that it would treat them fairly, would modify the EO Date to coincide with the post-acquisition roll-out of the Origin product line, and would not take any actions intended to interfere with the Shareholders' ability to Earn Out Targets.  Stratasys made those promises in writing prior to the execution of the Acquisition Agreement, and memorialized the broad concept in the Acquisition Agreement itself.

17.     On multiple occasions in 2021 and 2022, Stratasys and the Shareholders abided by those prior promises and agreed to re-set the EO Date to correspond with the general availability of Origin's printers. In other words, the parties agreed that they would begin to measure the sales of Origin products only when those products were actually available for sale.

18.     In a transparent attempt to retain the full value of Origin and its intellectual property while depriving the Shareholders of the remainder of the purchase price, Stratasys has now reneged on its agreement and has taken the position that the EO Date was never re-set. It has done so only after lying to the Shareholders and inducing them to devote substantial time, effort, and resources to creating post-acquisition value for Stratasys in reliance on Zeif's and Stratasys's promises.  Zeif's and Stratasys's fraudulent and bad-faith conduct constitutes a

breach of the Acquisition Agreement and the implied covenant of good faith and fair dealing.  It also establishes the Shareholders' entitlement to relief for Stratasys's fraud and fraudulent inducement, as well as for equitable relief and disgorgement under the doctrines of promissory estoppel, unjust enrichment, and quantum meruit.

## I.    ORIGIN'S BACKGROUND

19.    Origin was founded in 2015 by Christopher Prucha and Joel Ong based on their belief in the transformative potential of 3D printing. Chris and Joel both came to 3D printing from backgrounds in software engineering rather than in hardware or manufacturing, which provided them with a viewpoint that was unique in the industry.

20.    Chris was an engineer at Apple before founding Notion Labs, Inc., a collaboration platform and file-management tool now valued in excess of $10 billion. Joel established his engineering credentials at Google, where he worked on a variety of moonshot projects at Google X, among other things. Together, they launched Origin to take a software-first approach to 3D printing that no other participant in the industry was pursuing.

### A.    Origin's Thesis: 3D Printing as Manufacturing

21.    At the time of Origin's founding, the 3D printing industry was defined by two submarkets. Industry incumbents focused either on cheap, low-quality 3D printing as part of a temporary bubble of consumer interest, or they focused on more sophisticated 3D printing for the narrow purpose of rapid prototyping. Chris and Joel recognized the self-limiting nature of these approaches and concluded that 3D printing could reach its potential only if it could be used for manufacturing on a broad scale—a multitrillion-dollar industry that dwarfed both the nascent and unpredictable consumer market for 3D printing and the prototyping industry.

22.    But the existing technology was limited by unsophisticated software built around a "closed materials" model, and the existing printers were not good enough to allow users to

7

efficiently print functional parts. Moreover, the industry incumbents hamstrung their own printers by strictly limiting the material inputs and controlling the sale of those materials. In other words, the incumbents focused on short-term profits over potential long-term gain, and they did not prioritize developing printers that could meet the needs of 3D-printing customers seeking production-scale manufacturing applications.

23. These factors drove Chris and Joel to devise a simple thesis for Origin: 3D-printing technology could be improved and made less expensive by developing better software to guide and govern the 3D-printing process. They planned to achieve this in two ways: (i) by developing granular real-time feedback through a detailed sensor apparatus that would ensure reliable and precise printing, and (ii) by partnering with chemical companies to allow end users to print parts from a wide array of new and experimental materials.

## B. Origin's Groundbreaking Intellectual Property

24. Chris and Joel soon discovered that in order to build Origin the way they wanted to, they would not be able to rely solely on the industry's incumbent hardware manufacturers because the focus-based limitations Chris and Joel had identified with respect to the incumbent businesses themselves were also baked into every aspect of the industry's equipment manufacturers. The only solution was for Origin to develop both the software and hardware necessary to implement Chris and Joel's vision.

25. Origin did so, and it began shipping its first units in 2017 to overwhelming acclaim from customers. Origin continued to hone and improve its hardware, software, and material inputs to increase the quality and applicability of the system and to allow customers to print an ever-greater variety of end-usable parts with greater quality and reliability. In the years since then, Origin has pursued and secured broad patent protection for its printing process both in

8

the United States and internationally—including in Japan, China, the European Union, and

Canada.

26.    Key patents and patent applications include the following, for which Chris and

Joel are inventors:

| Figure 1: Key Patents Issued to Origin Founders | | | | |
|---|---|---|---|---|
| **Family Ref. No.** | **Title** | **Jurisdiction** | **Application No.** | **Date Filed** |
| ORGN-M01 | Method for Window Separation in an Additive Manufacturing Process | Canada | 3118364 | 2019-11-01 |
| | | China | 2019900012861 | 2019-11-01 |
| | | Europe | 19879943.9 | 2019-11-01 |
| | | Japan | 2021-600065 | 2019-11-01 |
| | | Patent Cooperation Treaty | PCT/US2019/059564 | 2019-11-01 |
| | | United States of America | 62/754411 | 2018-11-01 |
| | | United States of America | 16/672410 | 2019-11-01 |
| | | United States of America | 16/900560 | 2020-06-12 |
| | | United States of America | 16/941464 | 2020-07-28 |
| | | United States of America | 17/404,966 | 2021-08-17 |
| ORGN-M02 | System for Window Separation in an Additive Manufacturing Process | United States of America | 62/754430 | 2018-11-01 |
| | | United States of America | 16/672415 | 2019-11-01 |
| | | United States of America | 17/388598 | 2021-07-29 |
| ORGN-M03 | Method for Regulating Temperature at a Resin Interface in an Additive Manufacturing Process | Canada | 3136654 | 2020-04-17 |
| | | China | 2020900006647 | 2020-04-17 |
| | | Europe | 20791068.8 | 2020-04-17 |
| | | Japan | 2021-600157 | 2020-04-17 |
| | | Patent Cooperation Treaty | PCT/US2020/028783 | 2020-04-17 |
| | | United States of America | 62/835444 | 2019-04-17 |
| | | United States of America | 16/852078 | 2020-04-17 |
| | | United States of America | 17/066249 | 2020-10-08 |
| | | United States of America | 17/066372 | 2020-10-08 |
| ORGN-M04 | Method for Interlayer Feedback Control and Failure Prevention in an | Canada | | 2020-08-03 |
| | | China | | 2020-08-03 |
| | | Europe | 20850214.6 | 2020-08-03 |

9

| | | | | |
|---|---|---|---|---|
| | Additive Manufacturing Process | Japan | | 2020-08-03 |
| | | Patent Cooperation Treaty | PCT/US2020/044803 | 2020-08-03 |
| | | United States of America | 62/882464 | 2019-08-02 |
| | | United States of America | 16/984102 | 2020-08-03 |
| | | United States of America | 17/518,510 | 2021-11-03 |
| ORGN-M05 | Method for Evaluating Photocurable Resins for an Additive Manufacturing System | United States of America | 62/972573 | 2020-02-10 |
| | | United States of America | 17/173174 | 2021-02-10 |
| ORGN-M06 | Origin Swab Documentation | United States of America | 63/007296 | 2020-04-08 |
| ORGN-M07 | Layer Segmentation: Texture and Dimensional Accuracy | United States of America | 63/218,247 | 2021-07-02 |
| ORGN-M08 | Method for Polymerizing Superficial Features in 3D-Printed Parts | United States of America | 63/300,621 | 2022-01-18 |
| ORGN-D01 | Additive Manufacturing Station | United States of America | 29/803,459 | 2021-08-12 |

27.     As this chart shows, Origin has secured (or was in the process of seeking) patent protection for, among other things, (i) key components of the printing process, (ii) key portions of its physical hardware, (iii) the use of real-time sensor data to optimize the printing process, (iv) the multivariate testing of new materials and formulations, and (v) light control and other software techniques for improving the accuracy, quality, and repeatability of manufactured parts. In addition to these patent protections, Origin has developed a variety of proprietary technologies and protected trade secrets concerning its product and processes, and it maintains substantial documentation to protect that valuable intellectual property. And as explained below, Chris and Joel have continued to devote themselves to developing, expanding, and protecting Origin's patent portfolio even after the acquisition by Stratasys.

10

28.     The most important aspect of Origin's software-based approach to 3D printing is the patented "Programmable PhotoPolymerization" process, or the "P3" process. The P3 process allows inexpensive and rapid production of high-quality and functional end-use parts. Among other things, the P3 process eliminates non-scalable and time-consuming post-processing—that is, the need to extensively treat the product after printing, such as by sanding rough edges—which has historically inhibited 3D printing from being used for manufacturing at a large scale. Instead, the P3 process is capable of producing parts that are usable virtually straight out of the printer, increasing efficiency and operating with, in Stratasys's own words, "industry-leading accuracy, consistency, detail, and throughput."[2]

### C.     The Origin One Printer

29.     In 2019, Origin combined its insight and intellectual property into a flagship product and launched the Origin One printer to overwhelming demand and uniformly positive reviews. The Origin One combined the P3 process with the open-material model to permit users to print high-quality, functional products out of nearly any material chemistry—including newly developed materials—with minimal post-processing.

30.     The unique combination of the P3 process and the open-material model disrupted the industry incumbents, whose businesses turned on the (now outdated) "closed" model, and who relied on tightly controlled sales of material inputs. The Origin One's success threw the deficiencies of the old model into stark relief, and it led to lucrative partnerships with major manufacturers in a variety of industries, ranging from the Ford Motor Company in the automotive industry and the shoe company ECCO Sko A/S in the apparel industry.

---

[2]  https://www.stratasys.com/en/3d-printers/printer-catalog/p3/origin-one-printer/ (last accessed May 18, 2023).

31.     Although the industry has since followed Origin's lead and the open-material model is now nearly ubiquitous, Origin's technology remains best-in-class.

## II.     STRATASYS'S ACQUISITION OF ORIGIN

32.     In 2020, Stratasys agreed to acquire Origin for a total purchase price of approximately $100 million in recognition of Origin's paradigm-shifting 3D printing technology. Stratasys has since touted the acquisition, noting in multiple SEC filings that Origin's technology "has become an important growth engine for our company." (Ex. 2, Stratasys 2022 Annual Report).

### A.     The Beginning of the Origin-Stratasys Relationship

33.     Stratasys and Origin first worked together in March 2020 to produce 3D-printed sterile nasal swabs for use with COVID-19 tests. At the time, near the beginning of the pandemic, Origin was among the very first companies to receive clinical-trial approval for its 3D-printed nasal swabs.

34.     Because Stratasys had tried, but failed, to receive approval for its own 3D-printed swabs, the two companies entered a partnership to produce and distribute Origin's swabs. Through this partnership, each company learned about the other's strengths, abilities, and expertise. Chris, Joel , and their Origin colleagues worked closely with Stratasys's sales and distribution teams, while Stratasys witnessed firsthand Origin's industry-leading design, products, and operations.

35.     Recognizing the value of further collaboration, Stratasys made Origin an unsolicited offer of acquisition in the spring of 2020. Origin was not initially interested, and the Origin board turned down Stratasys's offer without countering. Stratasys nevertheless presented an updated offer on more favorable terms, paving the way for negotiations that culminated in the acquisition six months later.

**B.**     **The Parties Negotiate the Terms of the Acquisition**

36.     The Parties negotiated the terms of Stratasys's acquisition of Origin throughout the remainder of 2020.  During the early stages of those negotiations, Stratasys was largely represented by Ronen Lebi, its Vice President of Corporate Development.

37.     As part of the negotiations, Stratasys engaged in an extensive technical diligence review through which it analyzed and confirmed the value of Origin's software-driven approach to 3D printing.  This diligence review involved, among other things, in-person visits to Origin's facilities by key Stratasys personnel, including Yoav Zeif (Stratasys's CEO), Guy Menchik (Stratasys's Chief Technology Officer), Richard Garrity (Stratasys's Chief Industrial Business Officer, then the President of Stratasys Americas), Omer Krieger (Stratasys's Executive Vice President), and Amir Kleiner (Stratasys's VP Global Operations), among others.

38.     Separate from the technical diligence process, the parties devoted substantial efforts to negotiating the mechanics and structure of the acquisition—including Stratasys's proposal to structure the consideration it would pay to Origin in two parts: Stratasys would pay approximately 60% of the $100 million purchase price up front, and would pay the remaining 40% over a three-year period, conditioned on Origin's post-acquisition performance.

39.     The earn out portion of the purchase price was a hotly contested issue, and disagreements between the Parties as to the precise structure repeatedly threatened to de-rail the acquisition.  Indeed, in the fall of 2020, the Shareholders expressed their intention to terminate the negotiations and walk away from the contemplated transaction based on their dissatisfaction over the treatment of the earn out issue, among other issues.

40.     In order to resurrect the floundering negotiations, Yoav Zeif—Stratasys's CEO— stepped in and largely took over for Lebi as Stratasys's primary representative for the purposes of negotiating the acquisition.  Zeif specifically requested that representatives of the

13

Shareholders attend an in-person meeting to negotiate the earn out structure. Stratasys also arranged a meeting by videoconference between the Origin Shareholders and Stratasys's board members, including Dov Ofer, chairman of the board, and John J. McEleney, a member of the board.

41.    Zeif's request culminated in an in-person meeting between representatives of the Shareholders (including Chris and Jeffrey Lee) and representatives of Stratasys (including Zeif, Lebi, Krieger, and Garrity) at Stratasys's U.S. headquarters in Eden Prairie, Minnesota. That meeting ran from approximately October 4, 2020 to October 6, 2020. At that meeting, the Parties negotiated, among other things, the post-acquisition sales "goals" underpinning the Earn-Out Payments; the governance mechanisms for the earn out regime; the circumstances under which the Earn-Out payments would be contractually accelerated; and the sources of revenue that would count against Origin's sales "goals" for the purpose of satisfying the earn out requirements. The Parties memorialized their agreed-upon positions with respect to these and other issues, including in contemporaneous notes jointly compiled by the Parties on a white board and captured via photograph.

42.    At the October 2020 meeting, the Shareholders expressed three main concerns about the earn out portion of the purchase price. Stratasys—acting through Zeif, its CEO— provided concrete promises and assurances intended to allay those concerns. And throughout these discussions and separate from Stratasys's responses to the Shareholders' specific concerns, Zeif repeatedly reassured the Shareholders that Stratasys intended to remit the full amount of the Earn-Out Payments to the Shareholders. Stratasys's promises and assurances materially induced the Shareholders' decision to proceed with the acquisition.

14

43.     *First*, the Shareholders expressed concerns that Stratasys would not fairly calculate the Earn-Out Payments.  The Shareholders thus sought assurance that Stratasys would base its calculations on the *actual* sales of Origin's products and services following the acquisition—and not, for instance, on periods of time when Stratasys was not offering Origin's products and services for sale.  Through Zeif and others, Stratasys promised that it would only begin to calculate the Shareholders' earn out entitlement once Stratasys actually launched—and began selling—Origin products.

44.     These promises are memorialized in contemporaneous notes of the October 2020 meeting, including in the joint whiteboard notes indicating that Stratasys promised a "flex start date" for the Earn-Out periods and stating that "Origin picks start date" for the calculations. These promises were later expressly incorporated into the Acquisition Agreement, including in the provisions giving the parties the flexibility to re-set the EO Date set by simple written agreement, (Acq. Agmt. Annex I; § 2.3), and also in the Acquisition Agreement's explicit requirement that Stratasys "shall not take . . . any action with the primary intention of avoiding the achievement of the targets for any Earn-Out Payment," (*id* § 2.3(g)(iii)).

45.     *Second*, the Shareholders expressed concerns that Stratasys would calculate their earn out entitlement narrowly and would, for instance, not give the Shareholders "credit" for sales of Stratasys-branded products and services that incorporated Origin's intellectual property (including its P3 system).  The Shareholders thus sought assurances that Stratasys would base its calculations on the sale of *all* products or services incorporating any of Origin's intellectual property.  Speaking on behalf of Stratasys, CEO Zeif and others promised that Stratasys would broadly calculate the Shareholders' earn out entitlement based on the sale of all products that incorporated Origin's intellectual property.

15

46.     These promises are memorialized in the contemporaneous notes of the October 2020 meeting, including in the joint whiteboard notes, which state that "Revenues + bookings for all Origin-related business is counted" towards the earn out targets, including "HW [hardware], SW [software], materials, services, etc."  Stratasys also made these promises explicitly in the Acquisition Agreement itself, including in its promises to broadly credit all revenues associated with Origin's intellectual property towards the Shareholders' Earn-Out Targets.  (Acq. Agmt., Exhibit D.)

47.     *Third*, the Shareholders expressed concerns that, even after Stratasys formally launched the Origin products, Stratasys would delay or deprioritize the sales of products that would count towards the Shareholders' Earn-Out Targets.  The Shareholders thus sought assurances that Stratasys would not do so.  Through Zeif and others, Stratasys promised that it would take all commercially reasonable efforts to prioritize the sale of the Origin products and all other products that would count towards the Earn-Out Targets and would not interfere with the Shareholders' satisfaction of those Targets.

48.     These promises are memorialized in the contemporaneous notes of the October 2020 meeting, including in the joint whiteboard notes indicating that Stratasys would not cannibalize the sales of Origin's products by pushing "competitive products."  These promises are also explicitly incorporated into the Acquisition Agreement itself, in which Stratasys promised that it "shall not take . . . any action with the primary intention of avoiding the achievement of the targets for any Earn-Out Payment." (Acq. Agmt. § 2.3(g)(iii)).

49.     In explicit reliance on these and other promises Stratasys made as part of "mechanisms of managing the EO risk," the Shareholders agreed to resume formal negotiations

16

of the proposed acquisition.  The parties ultimately executed the Acquisition Agreement on December 8, 2020 and announced the acquisition shortly thereafter.

### C.    The Acquisition Agreement

50.    The Acquisition Agreement contemplated that a portion of the consideration for Origin and its intellectual property would take the form of three post-acquisition payments to the Shareholders keyed to the Origin business unit meeting certain revenue-based performance goals. (Acq. Agmt. § 2.3; Ex. D). In particular, the Acquisition Agreement established three "Earn-Out Periods" over three consecutive years, beginning with the EO Date. (*Id.* Annex I). The Acquisition Agreement then set out calculations of the applicable Earn-Out Payments based on whether the revenue attributable to Origin's products during each such period (the "Earn-Out Revenue") met the pre-determined threshold of the Earn-Out Target. (*Id.* Ex. D, § 7).

51.    In devising this structure, the parties recognized that the date selected as the EO Date—that is, the date on which the parties would begin measuring Origin's post-acquisition performance—would have a direct and major effect on whether the Earn-Out Targets were satisfied.

52.    As they had discussed throughout negotiations of the acquisition—including at the October 2020 meeting—Stratasys and the Shareholders understood and agreed that production, sales, and shipment of Origin printers following the acquisition might be delayed for some period while the new Origin business unit integrated into the larger Stratasys ecosystem and adapted to Stratasys's new strategic goals. The Acquisition Agreement therefore included a tentative EO Date of July 1, 2021—which itself was nearly seven months after the Acquisition Agreement was executed—but provided that that date could be easily changed to correspond to the post-acquisition business reality, without the need either for a formal amendment or even a signed agreement.



54.      Reflecting the Parties' agreement—at the October 2020 meeting and elsewhere—that the Shareholders' entitlement to Earn-Out Payments would be calculated based on the sale of any products or services that incorporated Origin's intellectual property, the Acquisition Agreement also set out a broad definition of revenue sources that would count against the Earn-Out Targets.  Specifically, the Acquisition Agreement provided that "Revenue" for purposes of Earn-Out calculations would include:

> [S]ales or leases of Company Products and Company Services (in each case, including any and all amalgamations, derivatives, enhancements, further developments, improvements, new versions, rebranding, repackaging and updates which are substantially based on or derived from the Company Products and Company Services, or their respective updates and derivations, which shall be referred to collectively as "Derivatives") (including the sales or provision of other hardware, software, materials, services, subscriptions and warranties specifically (A) designed for, or (B) acquired, leased or licensed from Parent or its Affiliates (including the Business Unit) for, any Company Product, Company Service or Derivative)[.]

(Acq. Agmt., Exhibit D).

55.      The Acquisition Agreement further defined "Company Products" as "the products produced, developed, sold or licensed by [Origin] in the current operation of the business as of the date hereof, including the Primary Product[,]" which is in turn defined as "the Company's

18

'Origin One' printer, versions 2.6 and 2.6.1." The Acquisition Agreement defined "Company Services" as "any and all services provided by [Origin] in the current operation of the business." (Acq. Agmt., Annex I.)

56.    The parties also agreed on a mechanism through which Stratasys would keep the Shareholders apprised of Origin's progress towards satisfying the Earn-Out Target. Specifically, once the EO Date has passed and the Earn-Out Period begins, the Acquisition Agreement requires Stratasys to deliver Quarterly Reports to the Shareholders within 60 days of the close of each quarter during each Earn-Out Period. Those reports must "set[] forth [Stratasys's] good faith, non-binding, computation of the Revenue in respect of such quarterly period (the 'Quarterly Report'), together with such supporting documentation as reasonably determined by [Stratasys]." (Id. § 2.3(c)). This requirement provides transparency to the Shareholders and allows them to promptly bring any issues or disagreements to Stratasys's attention as those issues arise. (See id. (providing that the Shareholders would "notify Parent in the event that [they] dispute[] any element of such Quarterly Report" within "within twenty (20) business days" of receipt)).

57.    The parties also agreed to a dispute-resolution mechanism pursuant to which the parties must submit any disputes for binding arbitration under Delaware law and the rules of the American Arbitration Association. (Id. § 11.5(a)). That provision also provides that the non-prevailing party is obligated "to pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Id. § 11.5(c)).

58.    Finally, the parties agreed that if any provisions of the Acquisition Agreement "were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be

19

difficult to determine." (*Id.* § 11.7(c)). The parties further agreed that a non-breaching party "shall be entitled to specific performance of the terms [of the Acquisition Agreement], in addition to any other remedy at law or equity." (*Id.*).

### D. Chris and Joel Work to Ensure a Successful Acquisition

59. Stratasys's stock price skyrocketed following the acquisition announcement, increasing by more than 40% in the following two weeks from a low of $17.22 per share on December 8 to a high of $24.36 on December 23, 2020. From the outset, Chris and Joel did everything they could to ensure a smooth transition—Chris even appeared on an investor call on December 9, 2020 to discuss the transaction with Stratasys shareholders and to lay out the plans for Origin's integration with Stratasys.

60. From those early days through the present, Chris and Joel have taken every step to ensure a successful business combination—in large part because of the incentive provided by the Earn-Out Payments. For instance, they both worked around the clock during the period between executing the Acquisition Agreement and closing the transaction, including, among other things, negotiating assignments of all of Origin's customer contracts and retention agreements with the existing Origin team.

61. Post-closing, Chris and Joel ensured that Origin integrated its back-office functions, its operations and supply chain functions, and its tech function with Stratasys's existing functions. Origin also integrated its valuable intellectual property operations while successfully continuing to file new provisional patent applications and to convert Origin's existing provisional applications.

62. All of these tasks—a few mere housekeeping logistics, many others complicated and intricate—were critical to Stratasys's ability to immediately benefit from the addition of Origin to its business line.

63.     Throughout this transition, the Origin team also continued to produce and sell the Origin One printers. Although sales were temporarily halted following the acquisition, the supply chain and production process soon resumed, and the Origin business line was in full production by late spring 2021, in advance of the initial July 1, 2021 EO Date, as planned. Both new and old clients remained happy with the performance of the Origin One.

III.   **STRATASYS REPRESENTS THAT IT HAS AGREED TO SET THE EARN-OUT COMMENCEMENT DATE TO REFLECT COMMERCIAL REALITY**



A.     **Stratasys Delays the Sale of Origin Products**

67.     Although Origin was well-positioned to continue manufacturing and producing its printers beginning in spring 2021, Stratasys decided to pursue other strategic objectives. As a result, Stratasys instructed the Origin team to direct its focus away from production of the existing printer model and, instead, to focus on developing new hardware for the Origin One that would be relaunched as a Stratasys product.

21

68.     This included developing an updated version of the Origin One printer that physically conformed to Stratasys's specifications while also taking steps to develop a specialized version of the printer intended for use in the dental industry, where Stratasys saw business opportunity. Stratasys further directed the Origin team to implement a suite of new features for the Origin One printers already in use by existing customers. As a result of these new directives, Stratasys halted production and sales of the Origin One printer entirely near the end of spring 2021.

69.     During this same period, Stratasys *also* began incorporating Origin's intellectual property into its own product and service lines and prioritized the development of those other lines of business over the Origin business unit.  In other words, Stratasys substantially delayed Origin's launch while it raced ahead with sales of its own competing products and services, giving rise to the precise issues that the Shareholders had foreseen and raised, including in the Parties' October 2020 meeting.

**B.      Stratasys Tells the Shareholders That It Agrees to a New EO Date Coinciding with the Launch of the Origin One Version 2.7**

70.     The interruption of Origin One sales had immediate and obvious implications for Origin's ability to meet its Earn-Out Targets under the Acquisition Agreement. That is because if the EO Date remained unchanged, there would be *no* Origin products offered for sale for most or all of the first Earn-Out Period, and Origin would be unable to meet its Earn-Out Target.

71.     The Shareholders foresaw this exact circumstance, and it is what led to the concerns they raised at the October 2020 meeting—in response to which Stratasys assured the Shareholders that it would treat them fairly and ensure that their earn out entitlement would be calculated fairly.  Those promises were memorialized in writing and subsequently instantiated in the Acquisition Agreement, including the provision allowing the parties to easily change the EO

22

23

Date to reflect commercial reality and the provision forbidding Stratasys from interfering with the Shareholders' ability to satisfy the Earn-Out Targets.



24



24





84.    The only way to credit Stratasys's present litigation position that the EO Date has not been changed because the board did not approve it is to conclude—against all the evidence and common sense—both that (i) *Stratasys's own CEO* was so neutered that he somehow did not have the authority to negotiate and make commercial agreements on behalf of the company, and (ii) the Shareholders were wrong to rely on *Stratasys's own CEO's* representations to them that they had reached an agreement. Neither of these can possibly be true.





87.     Following Stratasys's representation that it had agreed to re-set the EO Date to coincide with the GA Date, Stratasys made the Origin One 2.7 generally available in February 2022. (Ex. 9 (Stratasys 2022 Form 6-K) (describing the "launch of the Origin One in mid-February"); *see also* Ex. 2 (Stratasys 2022 Annual Report) (noting that the "Origin One 3D Printer" has been "generally available since the beginning of 2022")). Because the Acquisition Agreement requires the EO Date to "fall[] on the first day of a calendar month," Stratasys's written representations concerning its agreement to move the EO Date to coincide with the GA Date results in re-setting the EO Date as February 1, 2022—that is, the "first day of a calendar month" capturing the general availability of the Origin One 2.7.

### C.     The Shareholders Rely on Stratasys' Representations and Agreement to Re-Set the EO Date

88.     Based on Stratasys's conduct and repeated agreement, the Shareholders believed that Stratasys and the Shareholders shared an understanding that the EO Date had been changed, and the existence of this mutual understanding is demonstrated by their unambiguous conduct in reliance on the re-set EO Date.



90.    In fact, Stratasys did not provide the reports until July 2022, after the Shareholders, through their counsel, demanded that Stratasys abide by its agreement and pointed out Stratasys's failure to provide the Quarterly Reports that would have been required if the parties had not re-set the EO Date. Stratasys, faced with this plain evidence either of its fraud or of the untrue nature of its position—and in a ham-fisted attempt to remake history—then issued all three of those reports simultaneously, as if somehow that would retroactively absolve Stratasys for its conduct.  Stratasys's position is self-evidently false.

91.    The Shareholders likewise relied on Stratasys's representation that it had agreed to change the EO Date to correspond to the GA Date. Among other things, Chris, Joel, and Jeffrey Lee agreed to continue their employment at Stratasys following the acquisition long after they were contractually obligated to do so, despite their many documented concerns about certain of Stratasys's strategic and operational decisions. (*See, e.g.,* Ex. 3 (July 8, 2021 Email from Chris)). They did so with the express expectation and understanding that the re-set EO Date would give them and the other Shareholders a full and fair opportunity to satisfy the Earn-Out Targets—and to receive the remainder of their bargained-for compensation under the Acquisition Agreement. The Shareholders also relied on the agreement to re-set the EO Date by not demanding the Quarterly Reports from Stratasys when they would otherwise have been due.

28

92.     Without the agreement to re-set the EO Date, Stratasys's decision to halt the sale of Origin printers would have made it nearly impossible for Origin to satisfy its Earn-Out Targets. But based on Stratasys's representations that it had agreed to re-set the EO Date, the Shareholders reasonably believed that Stratasys had aligned the parties, interests—and based on that understanding, Chris, Joel, and Jeffrey Lee continued to provide valuable services to Stratasys to ensure the success of the Origin business unit.

93.     During the months since Stratasys first represented that it had agreed to re-set the EO Date, Chris and Joel have not just contributed to the day-to-day operation of the company; they have also taken substantial steps to further expand Origin's portfolio of intellectual property. Among other things, Chris and Joel have developed new innovations and techniques and have filed new applications with the USPTO, while also taking steps to protect and secure Origin's existing suite of patents. (*See supra* ¶¶ 47-51). Further, Chris and Joel have made extensive efforts far exceeding their contractual commitments to build out and train a robust new-technology process team to ensure the continued protection of Origin's (now Stratasys's) intellectual property. Chris and Joel's ongoing and future work in this regard has been—and is—expressly predicated on Stratasys's representations concerning its agreement to re-set the EO Date.



96.    Stratasys's success is directly attributable to Chris and Joel's post-acquisition efforts—which they undertook relying on Stratasys's representations concerning its agreement to re-set the EO Date, which would enable the Shareholders to earn their full bargained-for earn-out compensation. It would be fundamentally inequitable and unjust for Stratasys to keep for itself the massive benefits that Chris and Joel based on their reliance on Stratasys's false representations.



30



100.    Stratasys's effort to cheat the Shareholders out of their bargained-for consideration—now that Stratasys has enjoyed the benefits of that bargain—is flatly contrary to Stratasys's prior representations concerning the parties' agreement, as well as Delaware law. In light of Stratasys's misconduct, the Shareholders are entitled to both enforce the contract and to their equitable portion of the substantial value they created.

**D.    Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success**

101.    Stratasys itself has recognized the substantial concrete benefits derived from acquiring Origin and using Origin's valuable intellectual property—as well as from the post-acquisition services provided by Chris, Joel, and the other Shareholders. The company's Form 6-K for the first quarter of 2022 noted that Stratasys's product revenues "increased by $14.6 million, or 36.7%, for the three months ended March 31, 2022," and that this increase "reflected

31

the highest first quarter total in five years, strengthened by the launch of the Origin One." (Ex. 9 (Stratasys 2022 Form 6-K)).

102.    Stratasys's corresponding earnings release touted the "early momentum and contribution from our new Origin P3" system, which it further noted was "designed for high-volume production of end-use parts." (Ex. 10 (May 16, 2022 Earnings Stmt.)). In fact, Origin's Q1 2022 sales exceeded Stratasys's own internal estimates at double digit rates. That momentum continued throughout 2022, with Stratasys noting that the Origin product line "continue[s] to ramp, with excellent customer engagement across all of our new technology offerings." (Ex. 11 (August 3, 2022 Earnings Stmt.)).

103.    Stratasys continued to tout Origin's value in subsequent filings, noting in its 2022 Annual Report that Origin's technology "has become an important growth engine for our company" and explaining that the Origin acquisition "significantly strengthened our leadership in mass production for polymer 3D printing" because "Origin's pioneering approach to additive manufacturing of end-use parts has enabled us to serve a large market with manufacturing-grade 3D printers." (Ex. 2, Stratasys 2022 Annual Report).

104.    Origin's contribution to Stratasys goes beyond the numbers of the Origin business unit. Since the acquisition, Stratasys has recognized the value proposition of Origin's core insight: a software-driven approach to printing coupled with an open-material model will open the door for 3D printing to jump from the limited prototyping industry into the multitrillion-dollar manufacturing industry. Based on this recognition that 3D printing can be reliably used for manufacturing, Stratasys has incorporated Origin's paradigm-shifting open-material model into the majority of its 3D-printing business lines, not just the Origin One, which has allowed Stratasys to charge a premium across its business units.

32

105.     Stratasys's 2022 performance was largely due to Origin's products and services. And Stratasys's more recent earnings releases and investor statements continue to tout the success of the Origin product line and Origin's intellectual property more broadly—including the new "P3 Business Unit" founded exclusively for the purpose of monetizing Origin's intellectual property. For instance, in its 2023 Annual Report, Stratasys extensively discussed the P3 technology, including that the "P3-based systems, which [Stratasys] added to [its] solutions portfolio via the acquisition of Origin, offer a best-in-class combination of detail, mechanical properties and throughput for mass manufacturing production parts" and that the P3 technology "dramatically expand the total addressable market across medical, dental, consumer goods, automotive, commercial goods, and service bureaus."  (Ex. 19, Stratasys 2023 Annual Report).

### E.     Stratasys Reneges on the Parties' Agreement in Order to Cheat the Shareholders Out of Their Bargained-For Consideration



107.     The only reason for this breach that Zeif provided was that the board had supposedly determined that there was "no benefit to Stratasys" to follow through on changing the EO Date, now that Stratasys had already enjoyed the benefits of the agreement. In other words, Stratasys reneged solely because it decided it would be in Stratasys's interest to do so. By refusing to honor its express representations and promises to the Shareholders, Stratasys completed its months-long scheme to dupe the Shareholders into creating massive benefits for the company while cheating them out of the compensation they are entitled to.

33



109.    Stratasys's effort to do so is contrary to its prior written representations, the plain language of the Acquisition Agreement, and the parties' post-acquisition course of performance. It is also contrary to any sense of fairness or good faith—both because Stratasys seeks to deprive the Shareholders of their bargained-for benefit while continuing to profit from Origin's valuable intellectual property, and because Stratasys seeks to drive a wedge between Chris and Joel and the remaining Shareholders.

110.    Chris and Joel did not accept Zeif's improper proposal, which was at odds with the deal Stratasys had already agreed to and was fundamentally unfair to the remaining Shareholders.

## IV.    STRATASYS VIOLATED ITS REPRESENTATIONS, PROMISES AND AGREEMENT(S)

111.    Stratasys repeatedly represented to the Shareholders that the EO Date would be re-set to coincide with the GA Date for version 2.7 of the Origin One printer. That representation

34

is memorialized in multiple writings—and it therefore constitutes an effective agreement to re-set the EO Date under the plain language of the Acquisition Agreement.

**A.    The Parties' Emails Constitute Writings Under the Acquisition Agreement**

112.    The Acquisition Agreement states that the EO Date is "July 1, 2021 or such other date that falls on the first day of a calendar month as mutually agreed in writing by Parent and Seller Representative" (Acq. Agmt., Annex I).



114.    These emails are more than sufficient to satisfy the "agreed in writing" requirement of the Acquisition Agreement, which was specifically designed to account for post-acquisition business reality.

115.    The Acquisition Agreement is governed by Delaware law. (Acq. Agmt. § 11.4). Delaware recognizes a public policy in favor of giving full effect to the unambiguous intentions of businesspeople without placing undue emphasis on formalistic requirements. Because of that policy, Delaware courts hold that emails are sufficient to satisfy a "writing" requirement of the sort in the Acquisition Agreement. *See, e.g., Camden Fitness, LLC v. Wandless Enterprises, Inc.*, No. CPU5-12-000295, 2013 WL 8854873, at *3 n.7 (Del. Com. Pl. Feb. 11, 2013) ("Emails may be considered writings."); *see also* DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023) ("If a law requires a record to be in writing, an electronic record satisfies the law."); Black's Law

35

Dictionary (11th ed. 2019) (defining "writing" as "any intentional recording of words in a visual form," including "e-mails, and any other media on which words can be recorded").

116.    Indeed, Delaware courts routinely find that essentially any unambiguous writing can be sufficient to reflect the parties' agreement. *See, e.g., Zayo Grp., LLC v. Latisys Holdings, LLC*, No. 12874-VCS, 2018 WL 6177174, at *14 (Del. Ch. Nov. 26, 2018) ("Toshiba's October 1, 2014 email . . . would have constituted written notice to Latisys that Toshiba intended to "materially modify" that contract."); *Triple H Fam. Ltd. P'ship v. Neal*, No. 12294-VCMR, 2018 WL 3650242, at *13 (Del. Ch. July 31, 2018), *aff'd*, 208 A.3d 703 (Del. 2019) ("This email exchange constitutes the written consent of the members to dissolve Omni."); *Camden Fitness*, 2013 WL 8854873, at *3 ("[E]ven if the contract modification should have been in writing, the emails of December 29, 2010, and February 26, 2011, constitute written modifications to the contract, evidencing [an] agreement to the new contract price of $155,000.00.").



**B.    Re-Setting the EO Date Does Not Require Board Approval**

118.    Despite its written representations, Stratasys has taken the position that its written promises to re-set the EO Date are somehow ineffective because they was not formally approved by the Stratasys board. But the Acquisition Agreement includes no such requirement—it simply requires Stratasys to agree to any change in writing. And as a commercially sophisticated party,

36

Stratasys knows that a CEO does not need board approval prior to entering into an agreement on behalf of his company. *See, e.g., Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 81 (1995) ("[A] corporation is bound by contracts entered into by its officers and agents acting on behalf of the corporation and for its benefit, provided they act within the scope of their express or implied powers." (citation omitted)).

119.    Moreover, Zeif has repeatedly demonstrated broad decision-making powers and authority on behalf of Stratasys, including with respect to all sorts of issues relating to the relaunch of the Origin One printer. Without seeking or requiring the board's approval, Zeif has (i) made decisions regarding the production and sale of the Origin One printers, (ii) directed the Origin team to develop new hardware, (iii) allocated resources to address and resolve manufacturing and performance issues as they arose, (iv) directed the Origin team to prioritize a separate product targeting the dental industry over the Origin One printer, (v) restarted production, and (vi) set the GA Date.

120.    Along with these decisions, Zeif also negotiated and represented to the Shareholders that he had bound the company in writing to a revised EO Date. Stratasys's last-minute claim that Zeif needed board approval for that single item (but not the others) not only contradicts the plain language of the Acquisition Agreement, but it also deviates from the parties' course of post-acquisition performance over many months. *See, e.g., Hessler, Inc. v. Farrell*, 226 A.2d 708, 711–12 (Del. 1967) ("It is the law of this State that when, in the usual course of the business of a corporation, an officer or agent has been allowed to manage certain of its affairs, and when this is known to the other party to the contract, the authority of the officer to act for the corporation is implied from the past conduct never challenged by the corporate officials."); *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 128 (3d Cir. 1998) ("Implied

37

actual authority . . . may be found through evidence as to the manner in which the business has operated in the past[.]”).

121.    Stratasys's claim also runs contrary to its Articles of Association, which contemplate the grant of significant powers to the CEO. (Ex. 12, Amended and Restated Articles of Association of Stratasys Ltd., § 81.3; *see also Schoonejongen*, 143 F.3d at 127-28 (“Express authority to act on behalf of the corporation is usually manifested through a statute, the certificate of the corporation, the by-laws, or a board or shareholder action.”).).

122.    Stratasys cannot undo Zeif's representations on the company's behalf by now claiming that only the board can make such a deal.

### C.    The Parties' Performance Evidences Stratasys's Representations that It Had Agreed to Change the EO Date

123.    Finally, Shareholders relied on Stratasys's representations that it had agreed to move the EO Date—and from the Shareholders' perspective, Stratasys's conduct *also* appeared to reflect reliance on what they understood to be a mutual agreement.  As explained in Section III(C) above, Stratasys appeared to perform in accordance with that agreement by, among other things, not producing the Quarterly Reports that are mandated during the Earn-Out Periods until *after* it received the Shareholders demand letter on June 28, 2022.

124.    Stratasys's course of performance is consistent with its representations to the Shareholders that it had agreed to move the EO Date. In fact, had the parties *not* agreed to move the EO Date, Stratasys would have been in material breach of the Acquisition Agreement for failing to satisfy this requirement, with the result that the full $40 million in earn-out proceeds would be due immediately. *See, e.g., S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.*, No. 2020-1069-MTC, 2021 WL 3925937, at *3 (Del. Ch. Sept. 1, 2021) (authorizing contract claim

by shareholder representative to proceed against acquiring company that sought as damages "the sum total of all unpaid earn-out payments").

125.    And for their part, Shareholders Chris, Joel, and Jeffrey Lee contributed substantial time and effort to the success of the Origin business unit post-acquisition, which they did in direct reliance on Stratasys's repeated agreements to re-set the EO Date—and which conferred substantial benefits on Stratasys in reliance on the Shareholders' reasonable expectation that the re-set EO Date would provide them with a fair opportunity to satisfy the Earn-Out Targets.

126.    Further, because Delaware law permits contract-modification through course of performance, the parties' conduct itself would act to re-set the EO Date even in the absence of a written agreement. Delaware law gives substantial weight to the ways in which businesspeople actually perform under a given contract. When, like here, a party's conduct appears to evidence a plain intention to amend the terms of a written agreement, that implied amendment is binding. *See, e.g., Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 567 (D. Del. 1993) ("The Delaware Supreme Court has held that . . . the parties may, "by their conduct, substitute a new oral contract without a formal abrogation of the written agreement," even if that agreement contains an explicit clause to the contrary.'"); *Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.*, 297 A.2d 28, 33 (Del. 1972) (holding that "a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement" because "the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit"—"including a change in the provisions of the written agreement by the course of conduct of the parties").

39

127.    The parties' conduct is therefore further evidence of a mutual, unambiguous agreement to re-set the EO Date—and that change was legally effective either as an agreement in writing under the Acquisition Agreement or, alternatively, as a modification though their course of performance.[4] Stratasys cannot undo its represented agreement by belatedly claiming its own CEO somehow did not have the authority to act on the company's behalf.

## V.    STRATASYS HAS DEFRAUDED THE SHAREHOLDERS

128.    Stratasys repeatedly and knowingly lied to the Shareholders in order to induce their reliance and to reap substantial ill-gotten gains.  By lying to the Shareholders, Stratasys was able to secure and monetize Origin's valuable intellectual property while paying only a fraction of the agreed-upon purchase price.  And by using that intellectual property, Stratasys has generated (and will continue to generate) hundreds of millions of dollars in revenue and increased enterprise value.

129.    Stratasys's fraud on the Shareholders takes at least three separate forms.

### A.    Stratasys Fraudulently Induced the Shareholders' Execution of the Acquisition Agreement

130.    Stratasys's false pre-acquisition promises fraudulently induced the Shareholders' execution of the Acquisition Agreement.  Indeed, the Shareholders had already "called off" the potential acquisition by the early fall of 2020—but Stratasys induced them to resume negotiations and ultimately consummate the transaction based on false pretenses.

---

[4] For the same reason, Stratasys's repeated practice of directing all substantive communications concerning the EO Date to Chris, Joel, and Jeffrey Lee as the representatives of the Shareholders—rather than to Fortis, the formal "Seller Representative"—effects a modification of the Acquisition Agreement's technical requirement that the "agreement in writing" be between Stratasys and the Seller Representative.

40



41

132.    Each of those promises was false, and Stratasys knew that each promise was false at the time because Stratasys had no intention of fairly calculating the Shareholders' earn out entitlements—or of paying the Shareholders *any* Earn-Out Payment at all.  Instead, Stratasys planned to prevent the Shareholders from satisfying the Earn-Out Targets, including by delaying the launch of Origin's products, by illicitly funneling Origin's intellectual property into other Stratasys products that it refused to count towards the Earn-Out Target,[5] and by prioritizing those (and other) Stratasys products over the Origin line.



134.    Were it not for Stratasys's repeated false statements, the Shareholders would never have entered into the Acquisition Agreement.

135.     In light of Stratasys's explicitly false statements—including the false statements incorporated into the Acquisition Agreement itself as Stratasys's explicit representations, warranties, and obligations—Stratasys cannot avail itself of any defenses based on purported contractual disclaimers of reliance or limitations of liability.  Among other reasons, Delaware law does not allow a party either to contract around its own deliberate fraud or to enjoy the benefits of clauses purporting to limit liability and/or reliance where such clauses appear in

---

[5] Stratasys's post-acquisition patent filings indicate that Stratasys has used Origin's intellectual property to pursue patent protection for non-Origin products in Stratasys's portfolio.  (*See, e.g.,* Patent Application GB202303302D0 ("Method for dimensional compensation of a 3D object to be formed by an additive manufacturing apparatus"); Patent Application CA212628S ("Removable tray for 3d printer"); Patent Application US20240066798A1 ("Local z print head positioning system in a 3d printer").)

42

contracts that *also* include knowingly false representations by the wrongdoer. *See, e.g., Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1051 (Del. Ch. 2006) (allowing buyer's fraud claim to proceed because he "alleged, with specificity, precisely what [of seller's] statements were materially false and why they were false[,]" and because the allegedly false statements were included in the contract itself); *Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015) (declining to dismiss fraud claim based on contractual representations).

**B.    Stratasys Defrauded the Shareholders by Lying About Its Intention to Re-Set the EO Date**

136.    Stratasys separately defrauded the Shareholders following the acquisition by, among other things, lying to the Shareholders both orally and in writing about Stratasys's agreement to re-set the EO Date so as to coincide with the general availability of Origin's products and services.

137.    Were it not for Stratasys's repeated false statements, the Shareholders—acting through Chris, Joel , and Jeffrey Lee—would not have provided the extremely valuable services from July 2021 through February 2022 that allowed Stratasys to monetize Origin's intellectual property.

**C.    Stratasys Concealed Its Fraud Until At Least March 23, 2022**

138.    Stratasys also fraudulently concealed its misconduct until at least March 23, 2022, when it finally informed the Shareholders that it would *not* agree to re-set the EO Date—but only after Stratasys's lies had induced the Shareholders' reliance for more than a year.

43



140.    Were it not for Stratasys's repeated lies and efforts to hide the truth, the Shareholders would have discovered the truth much earlier.  But in light of those lies, the Shareholders could not have known they had been defrauded any earlier than March 23, 2022.

## VI.    STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER

141.    Since this dispute has arisen, the Shareholders have repeatedly—and fruitlessly—tried to engage in a productive commercial dialogue concerning Stratasys's agreement to re-set the EO Date.

142.    Indeed, shortly after Stratasys informed the Shareholders in March 2022 that Stratasys would renege on its repeated written agreement to re-set the EO Date, Chris and Joel asked Zeif to reconsider that position and to abide by the Parties' prior agreement.



144.    Rather than engaging with the Shareholders or abiding by its unambiguous prior written agreements, Stratasys instead opted to double and triple-down on its position. In an attempt to undermine the undisputed evidence of its agreement to re-set the EO Date, Stratasys sent a letter on July 15, 2022, in which it informed the Shareholders that it intended to provide

44

the Quarterly Reports—which would have been due months prior had the Parties *not* agreed to move the EO Date—"by no later than Wednesday, July 20, 2022." (Ex. 14, July 15, 2022 Stratasys Letter).

145.    Stratasys proceeded to provide "Quarterly Reports" that would have corresponded to the first, second, and third quarters of the first Earn-Out Period had the EO Date not been re-set.  (Ex. 15, July 20, 2022 Quarterly Statements).  Those Quarterly Reports demonstrated precisely why the parties agreed to re-set the EO Date: Stratasys had not even made the Origin products available for sale during much of those periods of time.[6] (*Id.*).

---

[6] Indeed, on August 29, 2022, Stratasys provided a purported "Earn-Out Schedule for the First Earn-Out Period" stating that the "First Earn-Out Payment is nil." (Ex. 16, Aug. 29, 2022 Earn-Out Schedule).



149.    Stratasys's conduct left the Shareholders with no choice but to file this Arbitration

Demand in order to hold Stratasys to its agreement, to disgorge the unfair benefits that

Stratasys's and Zeif's deliberate misrepresentations conferred on Stratasys, and to recover their

costs and attorneys' fees incurred in enforcing their rights.

## CAUSES OF ACTION[8]

### FIRST CAUSE OF ACTION
### (Breach of Contract - Damages)

150.    The Shareholders reallege each paragraph of this Arbitration Demand as if fully

set forth herein.

---

[8] Consistent with its role as shareholder representative, Fortis asserts all of the Causes of Action herein on behalf of the Shareholders.  To the extent that Stratasys intends to argue that Fortis lacks standing to pursue one or more of these Causes of Action because the claims belong to an individual rather than to the Shareholders collectively, the Shareholders respectfully disagree.  The Shareholders nevertheless reserve the right to amend this Arbitration Demand to bring claims on individually on behalf of one or more of the Shareholders—although the Shareholders do not believe that such a course is either necessary, efficient, or economical.

46

151.    The Acquisition Agreement is a valid and binding written agreement between Stratasys and the Shareholders.

152.    Among other things, the Acquisition Agreement sets out the terms of the payments by Stratasys to the Shareholders in consideration for the acquisition of Origin—including the EO Date and other terms governing Stratasys's obligation to make Earn-Out Payments. The Acquisition Agreement also requires Stratasys to provide the Shareholders with Quarterly Reports within 60 days of the close of each quarter during each Earn-Out Period. The Acquisition Agreement also empowers the parties to change the EO Date through a simple agreement memorialized in writing, without the need either for a signed agreement or formal amendment.

153.    In writings dated August 25, 2021, October 12 and 21, 2021, and February 12, 2022, the parties agreed to set the EO Date to coincide with the GA Date for the Origin One Version 2.7 printer. This agreement was reflected by the parties' course of performance, which demonstrated that all parties understood and relied upon their agreement to re-set EO Date. Based on that agreement, for instance, Stratasys did not provide the Quarterly Reports that it would have been required to provide absent an agreement to re-set the EO Date.

154.    Alternatively, the parties' course of performance was, itself, sufficient to modify the tentative EO Date—even assuming (contrary to fact) that the parties had not also agreed in writing to re-set the EO Date. *See, e.g., Haft*, 841 F. Supp. at 567 ("The Delaware Supreme Court has held that . . . the parties may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement, even if that agreement contains an explicit clause to the contrary." (internal quotations omitted)).

155. The Acquisition Agreement therefore obligates Stratasys to treat February 1, 2022 as the EO Date for all purposes.

156. Stratasys has violated this obligation by, among other things, refusing to treat February 1, 2022 as the EO Date for the purpose of calculating whether Origin's revenue satisfied the Earn-Out Targets. Stratasys has also violated this obligation by failing to timely provide the required Quarterly Reports following the re-set EO Date.

157. Stratasys's breach has materially harmed the Shareholders.

158. Among other things, Stratasys's breach has deprived the Shareholders of a full and fair opportunity to satisfy the relevant Earn-Out Targets—and to receive the tens of millions of dollars in Earn-Out Payments conditioned on such satisfaction. The Shareholders are therefore entitled to full payment of $40 million in Earn-Out Payments on an accelerated basis.

**SECOND CAUSE OF ACTION**
**(Breach of Contract – Specific Performance and Injunction)**

159. The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

160. Stratasys has breached its obligations under the Acquisition Agreement by refusing to compensate the Shareholders for Origin's valuable suite of intellectual property while continuing to profit from its ongoing use of that same intellectual property. Stratasys has agreed that its conduct causes "irreparable damage" to the Shareholders and that the Shareholders can receive "no adequate remedy at law." (Acq. Agmt. § 11.7(c)).

161. The Shareholders are therefore entitled to "specific performance of the terms of the" Acquisition Agreement, "in addition to any other remedy at law or equity." (Acq. Agmt. § 11.7(c)). Among other things, Stratasys must perform under the Acquisition Agreement by treating the EO Date as February 1, 2022 for all purposes.

48

162.    The Shareholders are also entitled to an injunction to prevent the ongoing irreparable harm they suffer each day that Stratasys refuses to provide the bargained-for consideration in exchange for its use of Origin's intellectual property. Among other things, any such injunction must (i) prevent Stratasys from using or profiting from Origin's intellectual property unless and until Stratasys fairly compensates the Shareholders and (ii) tolling the applicable EO Periods during the period of such injunction until a commercially reasonable date following the full re-introduction of the Origin product line into the market.

### THIRD CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

163.    The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

164.    The Acquisition Agreement is a valid and binding written agreement between Stratasys and the Shareholders and is governed by Delaware law.

165.    "The implied covenant of good faith and fair dealing inheres in every contract" under Delaware law. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). Pursuant to that covenant, a party must "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." (*Id.*).

166.    Stratasys has breached the covenant of good faith and fair dealing by, among other things, interfering with the Shareholders' opportunity to satisfy the Earn-Out Targets and to receive the full amount of the bargained-for Origin purchase price.

167.    Stratasys accomplished this breach by deliberately delaying the general availability of Origin's products long past the tentative EO Date and then reneging on its written agreement to re-set the EO Date to coincide with the GA Date, after it had used that agreement to

wrongly induce the Shareholders to perform on the basis of that promise. Stratasys now takes the false and self-serving position that the first Earn-Out Period includes eight months when the Origin products were not available for sale.

168.     Stratasys's breach of its covenants has materially and unfairly harmed the Shareholders.

169.     Among other things, Stratasys's breach has deprived the Shareholders of a full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments.

## FOURTH CAUSE OF ACTION
### (Promissory Estoppel)

170.     The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

171.     In multiple written and oral communications between July 2021 and February 2022, Stratasys promised to re-set the EO Date to coincide with the GA Date. These promises were clear and unambiguous, and Stratasys reasonably expected that the Shareholders would take action (and/or forbear from taking certain actions) in reliance on Stratasys's promise to re-set the EO Date.

172.     The Shareholders did, in fact, rely on Stratasys's promise. Among other things, Chris, Joel, and Jeffrey Lee relied on Stratasys's promise by devoting substantial time, effort, and resources for the benefit of Stratasys, all of which far exceeded any duties or obligations they owed to the company. During this period, Chris, Joel, and Jeffrey Lee provided extremely valuable services to Stratasys, at substantial burden and opportunity cost to themselves, in direct reliance on Stratasys's and Zeif's promises to them.

173.    The Shareholders also relied on Stratasys's promise by not demanding that Stratasys provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set.

174.    Stratasys's repudiation of its clear and unambiguous promise has caused and continues to cause the Shareholders significant harm, including without limitation to the extent they have been deprived of the full and fair opportunity to satisfy the relevant Earn-Out Targets.

175.    Stratasys's promise is binding and enforceable, and injustice can be avoided only by enforcement of the promise to re-set the EO Date.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

176.    The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

177.    Stratasys's conduct has induced the Shareholders—including Chris, Joel, and Jeffrey Lee—to perform valuable services for Stratasys. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions.

178.    Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

179.    The Shareholders have been damaged by, among other things, losing the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction. Stratasys also induced Chris, Joel, and

51

Jeffrey Lee to assume significant personal burdens for Stratasys's benefit, including foregoing the opportunity to engage in other, more lucrative, professional endeavors.

180. There is no justification for Stratasys's conduct: it knowingly induced the Shareholders to provide valuable services with the intention of profiting from those services to the Shareholders' detriment.

181. Under principles of equity, Stratasys should not be permitted to retain the benefits it gained because of its wrongdoing.

182. The Shareholders therefore seek disgorgement of the full amount by which Stratasys has been unjustly enriched as a result of the substantial time, effort, and resources the Shareholders contributed to Stratasys—upon information and belief, an amount no less than $400 million.

## SIXTH CAUSE OF ACTION
### (Quantum Meruit)

183. The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

184. Stratasys's conduct has induced Shareholders—including Chris, Joel, and Jeffrey Lee —to perform valuable services for Stratasys with the expectation that the Shareholders would receive recompence from Stratasys, including the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction.

185. Shareholders performed those services under circumstances that put Stratasys on notice that the Shareholders had relied on Stratasys's promises. Among other things, the Shareholders did not object to Stratasys's failure to provide the Quarterly Reports that would

52

otherwise have been due, absent an agreement to re-set the EO Date. Instead, Shareholders continued to provide valuable services to Stratasys in reliance on their mutual agreement.

186. The Shareholders therefore seek fair recompence for the contributions that Zeif and Stratasys induced Shareholders, on false pretenses, to make for Stratasys's benefit, in an amount to be determined by the arbitrator.

## SEVENTH CAUSE OF ACTION[9]
### (Fraud)

187. The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

188. As alleged herein, Stratasys engaged in deliberate fraud against the Shareholders intending to deprive them of the full purchase price for their company in at least three ways: (a) by engaging in misrepresentations of material facts intending to induce the Shareholders to execute the Acquisition Agreement; (b) by engaging in misrepresentations of material fact intending to induce the Shareholders to perform valuable services for Stratasys's benefit after the acquisition; and (c) by withholding and omitting material facts before and after the acquisition which Stratasys was obligated to truthfully disclose and not conceal or otherwise refrain from disclosing.

---

[9] In the interest of consistency, the Shareholders' Amended Arbitration Demand preserves the numbering of causes of action One through Six and adds the fraud claim as a Seventh Cause of Action. But for the avoidance of doubt, the conduct and misrepresentations at issue in this count are central to the Shareholders' demands for relief.



190. Stratasys memorialized each of these pre-acquisition promises in writing, including in the parties' joint, contemporaneous notes of the October 2020 meeting. Stratasys also explicitly made each of these promises as part of the representations, warranties, and/or obligations explicitly set out in the Acquisition Agreement itself. (*See, e.g.,* Acq. Agmt. § 2.3; *id.* at Annex I; *id.* at Exhibit D.)



192.    Stratasys's pre-acquisition misrepresentations were intended to induce the Shareholders' execution of the Acquisition Agreement.

193.    The Shareholders reasonably relied on Stratasys's representations, including by agreeing to the terms of the Acquisition Agreement and by fully complying with their obligations thereunder by, among other things, transferring ownership of Origin and its valuable suite of intellectual property to Stratasys and ensuring a successful integration of Origin into Stratasys.

194.    *Second*, after the acquisition, Stratasys made deliberate, knowingly false representations of material fact with the intent to induce the Shareholders to provide valuable services to Stratasys.



196.    Stratasys memorialized these statements in writing, including in the correspondence between and among Zeif, Lebi, and representatives of the Shareholders in which Zeif and Lebi represented that Stratasys had agreed to, and would, re-set the EO Date as promised.

197.    Each of those statements—and many others—were false, and Stratasys knew of the falsity at the time.  Stratasys's false statements were intended to induce the Shareholders' reliance.

198.    The Shareholders reasonably relied on Stratasys's representations, including by performing valuable services for Stratasys with the expectation that the Shareholders would receive the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions.  Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

199.    *Third*, Stratasys concealed material facts from the Shareholders before, during, and following the Parties' execution of the Acquisition Agreement, as well as before, during, and following the Parties' negotiations regarding re-setting the EO Date.

200.    Among other things, Stratasys concealed until at least March 23, 2022 that the representations by which it had induced the Shareholders' reliance were knowingly false. Stratasys accomplished this concealment by repeatedly reassuring the Shareholders that it had, in fact, re-set the EO Date to correspond with the launch of the Origin product line—including in written correspondence from Zeif, Lebi, and other representatives of Stratasys from July 2021 through February 2022.

201.    Stratasys further concealed its misconduct by failing to provide the Quarterly Reports that it was contractually obligated to provide following the EO Date.  Had Stratasys provided such reports, the Shareholders would have learned the truth: that contrary to what it had promised, Stratasys had *not* re-set the EO Date.



203.    Stratasys engaged in this concealment intentionally in order to delay the Shareholders' discovery of their fraud so that the Shareholders would (a) continue to provide the valuable services described herein and (b) delay in seeking to challenge Stratasys's fraudulent scheme.  Had the Shareholders known the truth, they would have uncovered Stratasys's fraud and misconduct earlier.

204.    As a result of Stratasys's fraud, any of Stratasys's would-be protections or limitations on liability or reliance as set forth in the Acquisition Agreement or elsewhere were procured by fraud and are therefore void and unenforceable.  *See, e.g., Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, No. CVN19C11092PRWCCLD, 2021 WL 117036, at *11 (Del. Super. Ct. Jan. 13, 2021) ("Delaware courts refuse to enforce contracts purporting to condone—or at least insulate—intentional fraud."); *Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011) ("If the fraud relates to the inducement to enter the contract, then the agreement is 'voidable' at the option of the innocent party."); *Abry P'rs V, L.P.*, 891 A.2d at 1051 (allowing buyer's fraud claim to proceed over contractual anti-reliance provisions because buyer "alleged, with specificity, precisely what [of seller's] statements were materially false and why they were false[,]" and because the allegedly false statements were included in the contract itself); *see also Falco v. Alpha Affiliates, Inc.*, No. CIV. A. 97-494, 2000 WL 727116, at *9 (D.

57

Del. Feb. 9, 2000); *Brown v. SAP Am., Inc.*, No. C.A. 98-507-SLR, 1999 WL 803888, at *9 (D. Del. Sept. 13, 1999); *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982).

205.    Further, as a result of Stratasys's fraud, the Shareholders have suffered damages in an amount to be determined by the Arbitrator.

206.    Stratasys's conduct entitles the Shareholders to all remedies for fraud under Delaware law, including disgorgement of all unlawful earnings or enrichments received or retained by Stratasys as a result of its wrongful conduct—upon information and belief, an amount no less than $400 million dollars.

207.    Stratasys's conduct was gross, oppressive, and/or aggravated and therefore entitles the Shareholders entitled to punitive damages, pre-judgment and post-judgment interest, attorney's fees, costs, and such additional relief as the Arbitrator may deem appropriate. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076-77 (Del. 1983).

### PRAYER FOR RELIEF

WHEREFORE, the Shareholders pray for an award against Stratasys as follows:

A.    Specific performance of Stratasys's obligations under the Acquisition Agreement, including the obligation to treat February 1, 2022 as the EO Date for all purposes.

B.    Enforcement of Stratasys's promise to re-set the EO Date to February 1, 2022.

C.    Compensatory damages from Stratasys equal to the full amount of Earn-Out Payments due under the Acquisition Agreement, of $40 million.

D.    Disgorgement of the full amount by which Stratasys has been unjustly enriched in an amount to be determined by the Arbitrator, but reasonably believed to exceed $400 million.

E.    Recompence for the value of the services provided by Shareholders to Stratasys in reliance on Stratasys's promise to re-set the EO Date to February 1, 2022.

F.    An injunction preventing Stratasys from using Origin's intellectual property until Stratasys fairly compensates the Shareholders, while also tolling the calculation of the EO Payments until a commercially reasonable date following the full re-introduction of the Origin product line into the market.

G.    Punitive and exemplary damages in the amount to be determined by the Arbitrator.

H.    Pre- and post-judgment interest from Stratasys.

I.    All attorneys' fees, expenses, and costs.

J.    Such other and further relief as the Arbitrator deems just and proper.

59

Dated: August 2, 2024

Respectfully submitted,

**BRAUNHAGEY & BORDEN LLP**

By: _____

J. Noah Hagey, Esq.
747 Front Street, 4th Floor
San Francisco, CA 94111
Tel.: 415-599-0210
Fax: 415-276-1808
hagey@braunhagey.com

Christman Rice, Esq.
Kelsie Docherty, Esq.
David Berman, Esq.
Lily (Haeun) Kim, Esq.
118 W. 22nd Street, 12th Floor
New York, NY 10011
Tel.: 646-829-9403
Fax: 646-403-4089
rice@braunhagey.com
docherty@braunhagey.com
berman@braunhagey.com
kim@braunhagey.com

*Attorneys for Claimants, Former
Shareholders of Origin Laboratories, Inc.,
by and through Shareholder Representative
Fortis Advisors LLC*

60