# Exhibit B

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| J. Noah Hagey (SBN: 262331); BraunHagey & Borden LLP, 747 Front Street, 4th Floor San Francisco, CA 94111 | |

TELEPHONE NO.: (415) 599-0210   FAX NO. : (415) 276-1808
EMAIL ADDRESS: hagey@braunhagey.com
ATTORNEY FOR *(Name):* Fortis Advisors LLC

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
 STREET ADDRESS: 400 McAllister St.
 MAILING ADDRESS: 400 McAllister St.
 CITY AND ZIP CODE: San Francisco, CA 94102
 BRANCH NAME: Civic Center Courthouse

**ELECTRONICALLY**
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/21/2024**
**Clerk of the Court**
BY: AUSTIN LAM
**Deputy Clerk**

CASE NAME:
 FORTIS ADVISORS LLC v. STRATASYS LTD., STRATASYS, INC. and YOAV ZEIF

| **CIVIL CASE COVER SHEET** [x] **Unlimited** (Amount demanded exceeds $35,000) [ ] **Limited** (Amount demanded is $35,000 or less) | **Complex Case Designation** [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | CASE NUMBER: **CGC-24-619152** JUDGE: DEPT.: |
|---|---|---|

*Items 1–6 below must be completed (see instructions on page 2).*

1.  Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[x] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2.  This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
    a. [ ] Large number of separately represented parties
    b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
    c. [ ] Substantial amount of documentary evidence
    d. [ ] Large number of witnesses
    e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
    f. [ ] Substantial postjudgment judicial supervision

3.  Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4.  Number of causes of action *(specify):* Four
5.  This case [ ] is [x] is not a class action suit.
6.  If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 21, 2024
J. Noah Hagey
_____
(TYPE OR PRINT NAME)        ►        _____
                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET** CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

Print this form | Save this form | Clear this form

J. Noah Hagey, Esq. (SBN: 262331)
   hagey@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Christman Rice (*pro hac vice* forthcoming)
   rice@braunhagey.com
Lily (Haeun) Kim, Esq. (*pro hac vice* forthcoming)
   kim@braunhagey.com
Iqra Asghar, Esq. (*pro hac vice* forthcoming)
   asghar@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 403-4089

*ATTORNEYS FOR PLAINTIFF*
*FORTIS ADVISORS LLC*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/21/2024**
**Clerk of the Court**
BY: AUSTIN LAM
Deputy Clerk

**CGC-24-619152**

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| FORTIS ADVISORS LLC, a Delaware limited liability company, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> STRATASYS LTD., an Israeli corporation, STRATASYS, INC., a Delaware corporation, and YOAV ZEIF, <br><br> Defendants. | Case No. _____ <br><br> **NOTICE OF LODGING OF DOCUMENTS PURSUANT TO CRC 2.551(b)(3)(A)(iii)** |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to California Rule of Court 2.551(b)(3)(A)(iii), Plaintiff Fortis Advisors LLC ("Fortis"), in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc. (the "Shareholders"), hereby give notice to the above-captioned Defendants that Fortis conditionally lodged its Complaint and Exhibits 1-21 to the Complaint under seal.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to California Rule of Court 2.551(b)(3)(A)(iii), the Complaint and Exhibits 1-21 to the Complaint will be placed in the public court file unless Defendants timely file a motion or application to seal the documents under the rule.

Dated:  October 21, 2024

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

By: _____
    J. Noah Hagey

*Attorneys for Plaintiff Fortis Advisors LLC*

Case 3:24-cv-09214-RS    Document 1-3    Filed 12/19/24    Page 6 of 369

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **MAR 26, 2025**

**TIME:** **10:30 am**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

> CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order   **without an appearance**   at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

### ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

> **IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**
>
> (SEE LOCAL RULE 4)

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**



# Superior Court of California, County of San Francisco
## Information Sheet
## Voluntary Expedited Jury Trial Summary

The San Francisco Superior Court encourages the use of Voluntary Expedited Jury Trials ("EJTs") in appropriate cases.  EJTs provide an excellent opportunity to resolve your client's case in an expeditious and inexpensive way.  Voluntary EJTs are authorized by statute.  CCP §§ 630.01.

EJTs can resolve your entire case **or** a single important case critical issue that, once adjudicated, can promote resolution of the entire case (for example: course and scope of employment, causation of an injury, whether a contract was formed, etc.)  EJTs promote equal access to civil justice as they are less expensive, consume fewer courtroom days, provide flexibility throughout, encourage high/low agreements to limit risk, and feature streamlined pre-trial procedures.

These are highlights of an EJT (C.C.P. §§ 630.01 et seq. and Rules of Court 3.1549 - 3.1553):

- Parties encouraged to submit a joint jury questionnaire;

- 8 jurors (6 must agree);

- 3 peremptory challenges per side;

- 5-hour time limit per side <u>unless agreed otherwise and approved;</u>

- One to two court days completion <u>unless agreed otherwise and approved;</u>

- Option to present evidence by stipulation and objection;

- High/low arrangement option;

- Limited appeal (misconduct by judge or jury substantially affecting parties' rights or corruption, or bad faith.)

If the parties agree to the Voluntary EJT, they should file and serve the completed and signed (Proposed) Consent Order for Voluntary Expedited Jury Trial, Judicial Council Form EJT-020.

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY |
|---|---|
| | *(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
STRATASYS LTD., an Israeli corporation, STRATASYS, INC., a Delaware corporation, and YOAV ZEIF

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
FORTIS ADVISORS LLC, a Delaware limited liability company, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Civic Center Courthouse

400 McAllister St., San Francisco, CA 94102

| CASE NUMBER: |
|---|
| *(Número del Caso):* |
| **CGC-24-619152** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
J. Noah Hagey; BraunHagey & Borden LLP; 747 Front Street, 4th Floor; San Francisco, CA 94111; Telephone: (415) 599-0210

| DATE: | | Clerk, by | | , Deputy |
|---|---|---|---|---|
| *(Fecha)* **10/22/2024** | | *(Secretario)* **AUSTIN LAM** | | *(Adjunto)* |

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|
| Judicial Council of California | | *www.courts.ca.gov* |
| SUM-100  [Rev. July 1, 2009] | | |

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

Print this form    Save this form    Clear this form

POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>J. Noah Hagey, Esq. (SBN: 262331),hagey@braunhagey.com<br>BRAUNHAGEY & BORDEN LLP<br>747 Front Street, 4th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 599-0210 Facsimile: (415) 276-1808 | *FOR COURT USE ONLY*<br><br>**ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**10/24/2024**<br>**Clerk of the Court**<br>**BY: SAHAR ENAYATI**<br>**Deputy Clerk** |
| ATTORNEY FOR *(Name)*:  Plaintiff: | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
STREET ADDRESS: 400 MC ALLISTER ST.  1ST FLOOR
CITY AND ZIP CODE: SAN FRANCISCO, CA 94102
BRANCH NAME: CIVIL CENTER COURTHOUSE

| | |
|---|---|
| PLAINTIFF/PETITIONER: FORTIS ADVISORS LLC, a Delaware limited liability company, et al.<br>DEFENDANT/RESPONDENT: STRATASYS LTD., an Israeli corporation, et al. | CASE NUMBER:<br><br>CGC-24-619152 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>Origin |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☑ Summons

   b. ☑ Complaint

   c. ☑ Alternative Dispute Resolution (ADR) package

   d. ☐ Civil Case Cover Sheet

   e. ☐ Cross-Complaint

   f. ☑ other *(specify documents)*: **See attached Document List**

3. a. Party served *(specify name of party as shown on documents served)*:

   **STRATASYS, INC., a Delaware corporation**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:

   **CT Corporation System, Registered Agent by serving Daisy Montenegro - Process Specialist & Authorized Agent**

   Age: 31-35 | Weight: 181-200 Lbs | Hair: Black | Sex: Female | Height: 5'7 - 6'0 | Eyes: Brown | Race: Latino

4. Address where the party was served:  **330 N Brand Blvd Ste 700**
   **Glendale, CA 91203-2336**

5. I served the party *(check proper box)*

   a. ☑ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **10/23/2024**   (2) at *(time):* **11:00 AM**

   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):*                        **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| | | |
|---|---|---|
| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>**POS010-1/SF230823** |

| PETITIONER: FORTIS ADVISORS LLC, a Delaware limited liability company, et al. | CASE NUMBER: |
|---|---|
| RESPONDENT: STRATASYS LTD., an Israeli corporation, et al. | CGC-24-619152 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                                   *(2) from (city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

    a. ☐ as an individual defendant.

    b. ☐ as the person sued under the fictitious name of *(specify):*

    c. ☐ as occupant.

    d. ☑ On behalf of **STRATASYS, INC., a Delaware corporation**
       under the following Code of Civil Procedure section:

       ☑ 416.10 (corporation)            ☐ 415.95 (business organization, form unknown)
       ☐ 416.20 (defunct corporation)       ☐ 416.60 (minor)
       ☐ 416.30 (joint stock company/association)   ☐ 416.70 (ward or conservatee)
       ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
       ☐ 416.50 (public entity)             ☐ 415.46 (occupant)
                                        ☐ other:

7. **Person who served papers**

    a. Name: **Dion Jones - Nationwide Legal, LLC REG: 12-234648**

    b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**

    c. Telephone number: **(510) 444-4690**

    d. **The fee** for service was: **$ .00**

    e. I am:

       (1) ☐ not a registered California process server.

       (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

       (3) ☑ registered California process server:
          (i) ☐ owner     ☐ employee     ☑ independent contractor.
          (ii) Registration No.: **2013128925**
          (iii) County: **Los Angeles**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **10/24/2024**

**Nationwide Legal, LLC
1625 Clay Street 4th Floor
Oakland, CA 94612
(510) 444-4690
www.nationwideasap.com**

_____
**Dion Jones**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶

POS-010 [Rev January 1, 2007]        **PROOF OF SERVICE OF SUMMONS**        Page 2 of 2

# Nationwide Legal, LLC

1625 Clay Street 4th Floor
Oakland, CA 94612
Phone: (510) 444-4690    Fax: (510) 444-4529

Continued from Proof of Service

**CLIENT:** BRAUNHAGEY & BORDEN LLP

**CLIENT FILE #:** Origin                                    **DATE:** October 24, 2024

**SUBJECT:** STRATASYS, INC., a Delaware corporation

**SERVED:** daisy Montenegro  - Process Specialist

Summons; Complaint; Alternative Dispute (ADR) package; COMPLAINT JURY TRIAL DEMANDED REDACTED - [PUBLIC - REDACTS MATERIALS FROM CONDITIONALLY SEALED RECORD]COMPLAINT JURY TRIAL DEMANDED UNREDACTED - [MAY NOT BE EXAMINED WITHOUT COURT ORDER - CONTAINS MATERIAL FROM CONDITIONALLY SEALED RECORD MATERIALS SHALL BE UNSEALED AFTER TEN (10) DAYS ABSENT FILING OF A MOTION TO SEAL PURSUANT TO CRC 2.551(b)];NOTICE OF LODGING OF DOCUMENTS PURSUANT TO CRC 2.551(B)(3)(A)(III); NOTICE TO PLAINTIFF;



POS-010

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*<br>J. Noah Hagey, Esq. (SBN: 262331)<br>hagey@braunhagey.com<br>BRAUNHAGEY & BORDEN LLP<br>747 Front Street, 4th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 599-0210<br>Facsimile: (415) 276-1808<br><br>ATTORNEY FOR *(Name):* Plaintiff: | *FOR COURT USE ONLY*<br><br>**ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**10/28/2024**<br>**Clerk of the Court**<br>**BY: RONNIE OTERO**<br>**Deputy Clerk** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
STREET ADDRESS: 400 MC ALLISTER ST.  1ST FLOOR
CITY AND ZIP CODE: SAN FRANCISCO, CA 94102
BRANCH NAME: CIVIL DIVISION

| | |
|---|---|
| PLAINTIFF/PETITIONER: FORTIS ADVISORS LLC, a Delaware limited liability company, et al.<br>DEFENDANT/RESPONDENT: STRATASYS LTD., an Israeli corporation, et al. | CASE NUMBER:<br>CGC-24-619152 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.:<br>Origin |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☐ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **See attached Document List**

3. a.  Party served *(specify name of party as shown on documents served):*
   **STRATASYS, LTD., an Israeli corporation**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **CT Corporation System, Registered Agent Jessie Gastelum  - Process Specialist & Authorized Agent**
   **Age: 31-35 | Weight: 181-200 Lbs | Hair: Blond | Sex: Female | Height: 5'1 - 5'6 | Eyes: Brown | Race: Latino**

4. Address where the party was served:  **330 N Brand Blvd Ste 700**
   **Glendale, CA 91203-2336**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **10/24/2024**   (2) at *(time):* **12:25 PM**

   b. ☐ **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

   (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

   (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

   (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.

   (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):* from *(city):*                    **or** ☐ a declaration of mailing is attached.

   (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Approved for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

**POS010-1/SF230823A**

PETITIONER: FORTIS ADVISORS LLC, a Delaware limited liability company, et al.

Case 3:24-cv-09214-RS    Document 1-3    Filed 12/19/24    Page 13 of 369

RESPONDENT: STRATASYS LTD., an Israeli corporation, et al.

CGC-24-619152

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                    *(2) from (city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **STRATASYS, LTD., an Israeli corporation**
    under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☑ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**

a. Name: **Dion Jones - Nationwide Legal, LLC REG: 12-234648**

b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**

c. Telephone number: **(510) 444-4690**

d. **The fee for service was: $ .00**

e. I am:

    (1) ☐ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☑ registered California process server:

        (i) ☐ owner    ☐ employee    ☑ independent contractor.

        (ii) Registration No.: **2013128925**

        (iii) County: **Los Angeles**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **10/24/2024**

**Nationwide Legal, LLC**
**1625 Clay Street 4th Floor**
**Oakland, CA 94612**
**(510) 444-4690**
**www.nationwideasap.com**

_____
**Dion Jones**
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶ ~signature~

# Nationwide Legal, LLC

1625 Clay Street 4th Floor
Oakland, CA 94612
Phone: (510) 444-4690   Fax: (510) 444-4529

Continued from Proof of Service

**CLIENT:** BRAUNHAGEY & BORDEN LLP

**CLIENT FILE #:** Origin                                              **DATE:** October 24, 2024

**SUBJECT:** STRATASYS, LTD., an Israeli corporation

**SERVED:** Jessie gastelum  - Process Specialist

Summons; Complaint; Alternative Dispute (ADR) package; COMPLAINT JURY TRIAL DEMANDED REDACTED - [PUBLIC - REDACTS MATERIALS FROM CONDITIONALLY SEALED RECORD]COMPLAINT JURY TRIAL DEMANDED UNREDACTED - [MAY NOT BE EXAMINED WITHOUT COURT ORDER - CONTAINS MATERIAL FROM CONDITIONALLY SEALED RECORD MATERIALS SHALL BE UNSEALED AFTER TEN (10) DAYS ABSENT FILING OF A MOTION TO SEAL PURSUANT TO CRC 2.551(b)];NOTICE OF LODGING OF DOCUMENTS PURSUANT TO CRC 2.551(B)(3)(A)(III); NOTICE TO PLAINTIFF;



J. Noah Hagey, Esq. (SBN: 262331)
  hagey@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Christman Rice (*pro hac vice* pending)
  rice@braunhagey.com
Lily (Haeun) Kim, Esq. (*pro hac vice* pending)
  kim@braunhagey.com
Iqra Asghar, Esq. (*pro hac vice* forthcoming)
  asghar@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403
Facsimile: (646) 403-4089

*ATTORNEYS FOR PLAINTIFF*
*FORTIS ADVISORS LLC*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**11/06/2024**
**Clerk of the Court**
**BY: ERNALYN BURA**
**Deputy Clerk**

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| FORTIS ADVISORS LLC, a Delaware limited liability company, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> STRATASYS LTD., an Israeli corporation, STRATASYS, INC., a Delaware corporation, and YOAV ZEIF, <br><br> Defendants. | Case No. CGC-24-619152 <br><br> **PROOF OF SERVICE** |

Case No. CGC-24-619152

PROOF OF SERVICE

I, Harinh Lee, declare:

I am over the age of 18 years and not a party to this action. My business address is BraunHagey & Borden LLP; 118 W 22nd Street, 12th Floor, New York, NY 10011, which is located in the county where the service described below occurred.

I certify that on November 6, 2024, I caused courtesy copies of the document(s) listed below to be sent from my email address, lee@braunhagey.com, to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Additionally, I certify that on November 6, 2024, pursuant to California Rules of Court, Rule 9.40(e), a copy of the motion and verified application has been served to the State Bar of California with the required $50 fee for this application via their website (https://admissions.calbar.ca.gov/s/pro-hac-vice-application).

**Documents Served:**

1. **NOTICE OF MOTION AND MOTION FOR CHRISTMAN RICE TO APPEAR AS COUNSEL PRO HAC VICE; VERIFIED APPLICATION OF CHRISTMAN RICE**
2. **[PROPOSED] ORDER GRANTING VERIFIED APPLICATION OF CHRISTMAN RICE**
3. **NOTICE OF MOTION AND MOTION FOR LILY (HAEUN) KIM TO APPEAR AS COUNSEL PRO HAC VICE; VERIFIED APPLICATION OF LILY (HAEUN) KIM**
4. **[PROPOSED] ORDER GRANTING VERIFIED APPLICATION OF LILY (HAEUN) KIM**
5. **PROOF OF SERVICE**

**Parties Served:**

Richard Zelichov
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4704
Tel: 310-595-3180
Email: Richard.zelichov@us.dlapiper.com

I certify and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: November 6, 2024

_____
Harinh Lee

Case No. CGC-24-619152

PROOF OF SERVICE

POS-015

| | | |
|---|---|---|
| **ATTORNEY OR PARTY WITHOUT ATTORNEY:** STATE BAR NO: 262331<br>NAME: J. Noah Hagey<br>FIRM NAME: BraunHagey & Borden LLP<br>STREET ADDRESS: 747 Front Street, 4th Floor<br>CITY: San Francisco        STATE: CA        ZIP CODE: 94111<br>TELEPHONE NO.: (415) 599-0210    FAX NO. : (415) 276-1808<br>E-MAIL ADDRESS: hagey@braunhagey.com<br>ATTORNEY FOR (Name): Fortis Advisors, LLC | | **FOR COURT USE ONLY**<br><br>**ELECTRONICALLY**<br>**FILED**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**11/19/2024**<br>**Clerk of the Court**<br>**BY: YOLANDA TABO**<br>**Deputy Clerk** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS:   400 McAllister St.
MAILING ADDRESS:   400 McAllister St.
CITY AND ZIP CODE:     San Francisco, CA 94102
BRANCH NAME:   Civic Center Courthouse

Plaintiff/Petitioner:   Fortis Advisors, LLC
Defendant/Respondent:   Stratasys Ltd., Stratasys, Inc., and Yoav Zeif

| | |
|---|---|
| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>CGC-24-619152 |

TO *(insert name of party being served):* Stratasys Ltd.

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:   November 4, 2024

Christman Rice
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*

1. [X] A copy of the summons and of the complaint.
2. [X] Other *(specify):*

   Alternative Dispute (ADR) package; Notice of Lodging of Documents Pursuant to CRC 2.551(b)(3)(a)(iii); Notice to Plaintiff

*(To be completed by recipient):*

Date this form is signed:   11/18/2024

RICHARD ZELICHOV OBO STRATASYS LTD.
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
ATTORNEY FOR STRATASYS LTD.

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>*www.courtinfo.ca.gov* |

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

[ Print this form ]   [ Save this form ]   [ Clear this form ]

**POS-015**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY: STATE BAR NO: 262331<br>NAME: J. Noah Hagey<br>FIRM NAME: BraunHagey & Borden LLP<br>STREET ADDRESS: 747 Front Street, 4th Floor<br>CITY: San Francisco   STATE: CA   ZIP CODE: 94111<br>TELEPHONE NO.: (415) 599-0210   FAX NO. : (415) 276-1808<br>E-MAIL ADDRESS: hagey@braunhagey.com<br>ATTORNEY FOR (Name): Fortis Advisors, LLC | *FOR COURT USE ONLY*<br><br>**ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**11/19/2024**<br>**Clerk of the Court**<br>**BY: YOLANDA TABO**<br>**Deputy Clerk** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS:   400 McAllister St.
MAILING ADDRESS:   400 McAllister St.
CITY AND ZIP CODE:     San Francisco, CA 94102
BRANCH NAME:   Civic Center Courthouse

Plaintiff/Petitioner:  Fortis Advisors, LLC
Defendant/Respondent:  Stratasys Ltd., Stratasys, Inc., and Yoav Zeif

| | |
|---|---|
| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>CGC-24-619152 |

TO *(insert name of party being served):* Yoav Zeif

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:  November 14, 2024

Christman Rice
(TYPE OR PRINT NAME)                                    ► _____ (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*

1.  [x] A copy of the summons and of the complaint.
2.  [x] Other *(specify):*

Alternative Dispute (ADR) package; Notice of Lodging of Documents Pursuant to CRC 2.551(b)(3)(a)(iii); Notice to Plaintiff

*(To be completed by recipient):*

Date this form is signed: _____11/18/2024_____

RICHARD ZELICHOV OBO YOAV ZEIF
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

► _____ (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
ATTORNEY FOR YOAV ZEIF

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>*www.courtinfo.ca.gov* |

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

| Print this form | Save this form | | Clear this form |

RICHARD H. ZELICHOV (SBN 193858)
*richard.zelichov@us.dlapiper.com*
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel:    310.595.3000
Fax:    310.595.3300

Attorney for Defendants
STRATASYS LTD., STRATASYS, INC., &
YOAV ZEIF

F I L E D
Superior Court of California
County of San Francisco

NOV 2 7 2024

CLERK OF THE COURT
BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| FORTIS ADVISORS LLC, a Delaware limited liability company, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc., <br><br> Plaintiff, <br><br> v. <br><br> STRATASYS LTD., an Israeli corporation; STRATASYS, INC., a Delaware corporation; and YOAV ZEIF, <br><br> Defendants. | Case No.: CGC-24-619152 <br><br> **JOINT STIPULATION AND [PROPOSED] ORDER REGARDING TIMING OF DEFENDANTS' RESPONSE TO PLAINTIFF'S COMPLAINT** |

JOINT STIPULATION AND [PROPOSED] ORDER REGARDING
TIMING OF DEFENDANTS' RESPONSE TO PLAINTIFF'S COMPLAINT
CASE NO.: CGC-24-619152

## JOINT STIPULATION

Plaintiff Fortis Advisors, LLC, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc., ("Plaintiff") and Defendants Stratasys Ltd., Stratasys, Inc., and Yoav Zeif (collectively "Defendants") hereby stipulate to the following:

WHEREAS, on October 21, 2024, Plaintiff filed a complaint and exhibits attached thereto (collectively, the "Complaint") against Defendants;

WHEREAS, Plaintiff served Stratasys, Inc. by delivering the Complaint, Notice of Lodging, and certain other documents to CT Corporation System at 330 N. Brand Boulevard, Glendale, California on October 23, 2024;

WHEREAS, Stratasys, Ltd., and Yoav Zeif acknowledged receipt of the Complaint on November 18, 2024;

WHEREAS, Defendants' deadlines to the respond to the Complaint are different based on the service on Stratasys, Inc., and acknowledgement of service by Stratasys, Ltd., and Yoav Zeif;

WHEREAS, the parties agree to consolidate such deadlines and any motion practice related thereto on a coordinated briefing schedule;

WHEREAS, the parties have agreed that Defendants shall answer or otherwise respond to the Complaint by December 20, 2024;

WHEREAS, the parties have agreed that Plaintiff shall file its opposition to any motions filed by Defendants in response to the Complaint by January 24, 2025;

WHEREAS, the parties have agreed that Defendants shall file their reply in support of any motions filed by Defendants in response to the Complaint by February 14, 2025.

WHEREAS, Plaintiff and Defendants retain all rights and do not waive any of their respective arguments, including with respect to the anticipated response of Defendants to the Complaint.

NOW, THEREFORE, THE PARTIES HEREBY AGREE AND STIPULATE that Defendants shall answer or otherwise respond to the Complaint by December 20, 2024, Plaintiff shall file its opposition to any motions filed by Defendants in response to the Complaint by

JOINT STIPULATION AND [PROPOSED] ORDER REGARDING
TIMING OF DEFENDANTS' RESPONSE TO PLAINTIFF'S COMPLAINT
CASE NO.: CGC-24-619152

January 24, 2025, and Defendants shall file their reply in support of any motions filed by Defendants in response to the Complaint by February 14, 2025.

IT IS SO STIPULATED.

Dated: November 21, 2024

**BRAUNHAGEY & BORDEN LLP**
747 Front Street, 4th Floor
San Francisco, CA 94111
Tel: (415) 599-0210
Fax: (415) 276-1808

By: */s/ J. Noah Hagey*
J. Noah Hagey

*Attorney for Plaintiff*
FORTIS ADVISORS, LLC

**BRAUNHAGEY & BORDEN LLP**
118 W 22nd Street, 12th Floor
New York, NY 10011
Tel: (646) 829-9403
Fax: (646) 403-4089

By: */s/ Christman Rice*
Christman Rice
Lily (Haeun) Kim

*Attorneys for Plaintiff*
FORTIS ADVISORS, LLC

Dated: November 21, 2024

**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel:    310.595.3000
Fax:    310.595.3300

By: */s/ Richard Zelichov*
Richard Zelichov

*Attorney for Defendants*
STRATASYS LTD.,
STRATASYS, INC., &
YOAV ZEIV

JOINT STIPULATION AND [PROPOSED] ORDER REGARDING
TIMING OF DEFENDANTS' RESPONSE TO PLAINTIFF'S COMPLAINT
CASE NO.: CGC-24-619152

# [PROPOSED] ORDER

PURSUANT TO THE STIPULATION OF PLAINTIFF AND DEFENDANTS, IT IS SO ORDERED that Defendants shall answer or otherwise respond to the Complaint by December 20, 2024. ~~Plaintiff shall file its opposition to any motions filed by Defendants in response to the Complaint by January 24, 2025, and Defendants shall file their reply in support of any motions filed by Defendants in response to the Complaint by February 14, 2025.~~

Dated: ⟨\2b\2⟩

_____
Judge of the Superior Court (R&I)
HAROLD KAHN

---

1

[PROPOSED] ORDER GRANTING JOINT STIPULATION REGARDING
TIMING OF DEFENDANTS' RESPONSE TO PLAINTIFF'S COMPLAINT
CASE NO.: CGC-24-619152

RICHARD H. ZELICHOV (SBN 193858)
richard.zelichov@us.dlapiper.com
**DLA PIPER LLP (US)**
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, California 90067-4704
Tel:    310.595.3000
Fax:    310.595.3300

Attorney for Defendant
STRATASYS, INC.

**FILED**
Superior Court of California
County of San Francisco

**DEC 18 2024**

CLERK OF THE SUPERIOR COURT
By _Victor Pa Pamela_
Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| FORTIS ADVISORS LLC, a Delaware limited liability company, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc., <br><br> Plaintiff, <br><br> v. <br><br> STRATASYS LTD., an Israeli corporation; STRATASYS, INC., a Delaware corporation; and YOAV ZEIF, <br><br> Defendants. | Case No.: CGC-24-619152 <br><br> **[PROPOSED] ORDER GRANTING MOTION TO SEAL PORTIONS OF COMPLAINT AND CERTAIN EXHIBITS THERETO** <br><br> Date:       December 17, 2024 <br> Time:       9:30 a.m. <br> Dept.:       302 <br><br> Complaint Filed:  October 21, 2024 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

On December 17, 2024, at 9:30 a.m. in Department 302 of the above-entitled Court, the Motion ("Motion") filed by Defendant Stratasys, Inc. ("Stratasys") for an Order sealing portions of the Complaint and Certain Exhibits thereto came on regularly for hearing.

Having considered the Motion and all papers submitted relating thereto, the evidence presented, oral argument of counsel, and good cause appearing therefor:

1.  There exists an overriding interest that overcomes the public's access rights because of portions of the Complaint and certain exhibits thereto contain sensitive and confidential business information the disclosure of which may harm Defendant's ability to operate competitively.

2.  The overriding interest supports sealing the records Defendant identified in its Motion to Seal.

3.  A substantial probability exists that the overriding interest will be harmed or prejudiced if the record is not sealed.

4.  The proposed sealing is narrowly tailored.

5.  No less restrictive means exist to achieve the overriding interest.

Accordingly, **Stratasys, Inc.'s unopposed motion to seal portions of complaint and certain exhibits thereto is GRANTED.** The Clerk of the Court is directed to keep the following documents sealed permanently sealed in accordance with California Rules of Court 2.550 and 2.551:

Complaint and Exhibits thereto (Transaction ID # 74808972) (Conditionally Sealed) Filed by Plaintiff Fortis Advisors LLC, a Delaware Limited Liability, in its Capacity as Shareholders of Origin Laboratories, Inc., filed on October 21, 2024.

**IT IS FURTHER ORDERED** that Exhibit A to the Declaration of Richard Zelichov shall be placed in the Court's public file.

**IT IS SO ORDERED.**

Dated:_____12/17/24_____    _____ _Ue_____
                              JUDGE OF THE SUPERIOR COURT
                                        2    RICHARD B. ULMER

# Exhibit C

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: 262331 | FOR COURT USE ONLY |
|---|---|---|

NAME: J. Noah Hagey

FIRM NAME: BraunHagey & Borden LLP

STREET ADDRESS: 747 Front Street, 4th Floor

CITY: San Francisco     STATE: CA     ZIP CODE: 94111

TELEPHONE NO.: (415) 599-0210     FAX NO. : (415) 276-1808

E-MAIL ADDRESS: hagey@braunhagey.com

ATTORNEY FOR (Name): Fortis Advisors, LLC

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco

STREET ADDRESS:    400 McAllister St.

MAILING ADDRESS:    400 McAllister St.

CITY AND ZIP CODE:       San Francisco, CA 94102

BRANCH NAME:   Civic Center Courthouse

Plaintiff/Petitioner:  Fortis Advisors, LLC

Defendant/Respondent:  Stratasys Ltd., Stratasys, Inc., and Yoav Zeif

| **NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL** | CASE NUMBER:<br>CGC—24-619152 |
|---|---|

TO *(insert name of party being served):* Stratasys Ltd.

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing:   November 4, 2024

Christman Rice
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing):*

1. ☒ A copy of the summons and of the complaint.
2. ☒ Other *(specify):*

Alternative Dispute (ADR) package; Notice of Lodging of Documents Pursuant to CRC 2.551(b)(3)(a)(iii); Notice to Plaintiff

*(To be completed by recipient):*

Date this form is signed:   11/18/2024

RICHARD ZELICHOV OBO STRATASYS LTD.
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
ATTORNEY FOR STRATASYS LTD.

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | **NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL** | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>*www.courtinfo.ca.gov* |
|---|---|---|

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

[ Print this form ]   [ Save this form ]     [ Clear this form ]

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: 262331 | FOR COURT USE ONLY |
|---|---|---|
| NAME: J. Noah Hagey | | |
| FIRM NAME: BraunHagey & Borden LLP | | |
| STREET ADDRESS: 747 Front Street, 4th Floor | | |
| CITY: San Francisco    STATE: CA    ZIP CODE: 94111 | | |
| TELEPHONE NO.: (415) 599-0210    FAX NO.: (415) 276-1808 | | |
| E-MAIL ADDRESS: hagey@braunhagey.com | | |
| ATTORNEY FOR (Name): Fortis Advisors, LLC | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** San Francisco
STREET ADDRESS:   400 McAllister St.
MAILING ADDRESS:   400 McAllister St.
CITY AND ZIP CODE:    San Francisco, CA 94102
BRANCH NAME:   Civic Center Courthouse

Plaintiff/Petitioner:  Fortis Advisors, LLC

Defendant/Respondent:  Stratasys Ltd., Stratasys, Inc., and Yoav Zeif

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: CGC-24-619152 |
|---|---|

TO (insert name of party being served): Yoav Zeif

## NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing:  November 14, 2024

Christman Rice
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

## ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of (to be completed by sender before mailing):

1. [x] A copy of the summons and of the complaint.
2. [x] Other (specify):

   Alternative Dispute (ADR) package; Notice of Lodging of Documents Pursuant to CRC 2.551(b)(3)(a)(iii); Notice to Plaintiff

(To be completed by recipient):

Date this form is signed: ___11/18/2024___

RICHARD ZELICHOV OBO YOAV ZEIF
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶ _____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)
ATTORNEY FOR YOAV ZEIF

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**

[ Print this form ]  [ Save this form ]        [ Clear this form ]

# Exhibit D

**INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION**
**WILMINGTON, DELAWARE**

|  |  |
|---|---|
| FORMER SHAREHOLDERS OF ORIGIN LABORATORIES, INC., *by and through Shareholder Representative Fortis Advisors LLC*,<br><br>Claimants,<br><br>v.<br><br>STRATASYS LTD. and STRATASYS, INC.,<br><br>Respondents. | ICDR Case No. 01-23-0002-3975<br><br>**ARBITRATION DEMAND FOR:**<br><br>1. **BREACH OF CONTRACT – DAMAGES**<br><br>2. **BREACH OF CONTRACT – SPECIFIC PERFORMANCE**<br><br>3. **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING** |

**BRAUNHAGEY & BORDEN LLP**

747 Front Street, 4th Floor
San Francisco, CA 94111

118 W. 22nd Street, 12th Floor
New York, NY 10011

*Attorneys for Claimants, Former Shareholders of Origin Laboratories, Inc., by and through Shareholder Representative Fortis Advisors LLC*

## TABLE OF CONTENTS

STATEMENT OF DISPUTE ....................................................................................... 1

ARBITRATION AGREEMENT ................................................................................... 3

PARTIES ...................................................................................................................... 4

JURISDICTION, VENUE, AND GOVERNING LAW ............................................... 4

FACTS .......................................................................................................................... 5

I.      ORIGIN'S BACKGROUND ............................................................................. 6

        A.      Origin's Thesis: 3D Printing as Manufacturing ................................... 6

        B.      Origin's Groundbreaking Intellectual Property .................................... 7

        C.      The Origin One Printer ....................................................................... 10

II.     STRATASYS'S ACQUISITION OF ORIGIN ................................................ 11

        A.      The Beginning of the Origin-Stratasys Relationship .......................... 11

        B.      The Parties Negotiate the Terms of the Acquisition ........................... 12

        C.      The Acquisition Agreement ................................................................ 16

        D.      Chris and Joel Work to Ensure a Successful Acquisition ................... 19

III.    STRATASYS REPRESENTS THAT IT HAS AGREED TO SET THE
        EARN-OUT COMMENCEMENT DATE TO REFLECT
        COMMERCIAL REALITY ............................................................................ 20

        A.      Stratasys Delays the Sale of Origin Products ..................................... 21

        B.      Stratasys Tells the Shareholders That It Agrees to a New EO Date Coinciding
                with the Launch of the Origin One Version 2.7 .................................. 22

                1.      ████████████████████████████████████
                        ██████████████████████ ................................. 23

                2.      ████████████████████████████████████
                        ███████████████████████ ......................... 24

3. ██████████████████████████

██████████████ ........................................................... 25

4. ██████████████████████████

████████████████ ....................................................... 26

C. The Parties Rely on Their Agreement to Re-Set the EO Date ............................. 27

D. Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success. 31

E. Stratasys Reneges on the Parties' Agreement in Order to Cheat the Shareholders Out of Their Bargained-For Consideration ........................................................... 32

IV. STRATASYS VIOLATED ITS REPRESENTATIONS, PROMISES AND AGREEMENT(S) ........................................................................................ 34

A. The Parties' Emails Constitute Writings Under the Acquisition Agreement ....... 34

B. Re-Setting the EO Date Does Not Require Board Approval ................................. 36

C. The Parties' Performance Evidences Stratasys's Representations that It Had Agreed to Change the EO Date ............................................................................. 37

V. STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER ................................................................................................................... 39

CAUSES OF ACTION ................................................................................................. 42

PRAYER FOR RELIEF ............................................................................................... 45

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Camden Fitness, LLC v. Wandless Enterprises, Inc.*,
   No. CPU5-12-000295, 2013 WL 8854873 n.7 (Del. Com. Pl. Feb. 11, 2013) ........................ 35

*Curtiss-Wright Corp. v. Schoonejongen*,
   514 U.S. 73 (1995).................................................................................................................. 36

*Haft v. Dart Grp. Corp.*,
   841 F. Supp. 549 (D. Del. 1993).............................................................................................. 38

*Hessler, Inc. v. Farrell*,
   226 A.2d 708 (Del. 1967) ........................................................................................................ 37

*Kuroda v. SPJS Holdings, L.L.C.*,
   971 A.2d 872 (Del. Ch. 2009).................................................................................................. 44

*Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.*,
   297 A.2d 28 (Del. 1972) .......................................................................................................... 38

*Schoonejongen v. Curtiss-Wright Corp.*,
   143 F.3d 120 (3d Cir. 1998)..................................................................................................... 37

*S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.*,
   No. 2020-1069-MTC, 2021 WL 3925937 (Del. Ch. Sept. 1, 2021)......................................... 38

*Triple H Fam. Ltd. P'ship v. Neal*,
   No. 12294-VCMR, 2018 WL 3650242 (Del. Ch. July 31, 2018)............................................. 35

*Zayo Grp., LLC v. Latisys Holdings, LLC*,
   No. 12874-VCS, 2018 WL 6177174 (Del. Ch. Nov. 26, 2018) ............................................... 35

**STATUTES**

DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023)..................................................................... 35

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019) ....................................................................................... 35

Claimants, the former shareholders of California-based Origin Laboratories, Inc., by and through Shareholder Representative Fortis Advisors LLC (hereinafter for convenience, the "Origin Shareholders" or the "Shareholders"), hereby allege against Respondents, Israel-based international technology conglomerate Stratasys Ltd. and Stratasys, Inc. (collectively, "Stratasys"), as follows:[1]

## STATEMENT OF DISPUTE

1.     Origin Laboratories was an innovative California startup company founded in 2015 by Chris Prucha and Joel Ong based on a simple insight: by developing sophisticated 3D-printing software, Origin could produce high-quality, usable parts that would bring 3D-printing out of the realm of hobbyists and into the much larger manufacturing market.  Origin represented the culmination of Chris and Joel's efforts and impressive software engineering experience— Chris as an Apple engineer and previous co-founder of a separate collaboration platform; Joel as an engineer on moonshot initiatives at Google X.  Respondent Stratasys, a publicly traded Israeli technology conglomerate, approached Chris and Joel in 2020 with an unsolicited acquisition offer, and Stratasys ultimately purchased Origin for approximately $100 million pursuant to an Agreement and Plan of Merger and Reorganization, dated December 8, 2020 (the "Acquisition Agreement").

---

[1] Following Stratasys's continued jurisdictional objections, threats of vacatur, and intended refusal to comply with any resulting award from the Tribunal, the Shareholders have withdrawn their fraud and quasi-contract claims to state court, where they are now pending.  *See Fortis Advisors, LLC v. Stratasys, Ltd., et al.*, No. CGC-24-619152 (S.F. Superior Ct. 2024) (Shareholders' fraud complaint); *see also* Respondents' Mot. to Dismiss at 15-23 (Sept. 16, 2024) (asserting that Claimant's "extra-contractual claims . . . are not covered by the Merger Agreement's arbitration provision" and "the Tribunal lacks jurisdiction to arbitrate the extra-contractual claims," and threatening to seek vacatur and/or contest award enforcement in Israel under New York Convention).  Accordingly, and notwithstanding any allegation herein to the contrary in this Amended Demand, such fraud and quasi-contract claims will be exclusively litigated in that state court forum and not in this action.

1

3.      Following the acquisition, Stratasys and its executives again repeatedly reassured the Shareholders that it would calculate their entitlement to the agreed-upon Earn-Out Payments based on the *actual* sales of Origin's products and services, and would thus re-set the EO Date. Accordingly, when Stratasys delayed the post-acquisition launch of Origin's products, Stratasys again promised, orally and in writing, that the EO Date would coincide with the general availability of Origin's products.  In reliance on those representations, promises, and agreements, the Shareholders continued to perform for the company, including by designing new technology and assisting with patent applications on novel concepts accruing to Stratasys's benefit.

4.      Stratasys finally made Origin's 3D printing products generally available to customers in February 2022—that is, seven months after the placeholder EO Date—and Origin's performance has far exceeded all projections.  Stratasys touted Origin's success in its recent SEC filings and releases, claiming that Origin is responsible for the largest first-quarterly growth in Stratasys's history and is operating as "an important growth engine" for Stratasys.  Even beyond

2

the sale of Origin-branded products, Stratasys has integrated Origin's sophisticated suite of intellectual property throughout its business and, as a result, Stratasys's enterprise value has substantially increased.

5.    Unfortunately, Stratasys reneged on its agreement to re-set the EO Date and now insists on using the defunct July 1 placeholder date as the basis from which to calculate the Shareholders' Earn-Out—even though Stratasys *did not offer the products for sale during that period*.  By delaying the launch while insisting that the EO Date remains unchanged, Stratasys effectively reduces the purchase price by 40%, because the later Earn-Out Periods assume increasing growth targets.

6.    The Shareholders bring this suit to recover for Stratasys's breaches, including accelerated payment of the full $40 million in bargained-for Earn-Out payments that Stratasys has withheld, together with applicable attorneys' fees and costs.

**ARBITRATION AGREEMENT**

7.    This dispute arises under the parties' Agreement and Plan of Merger and Reorganization dated December 8, 2020 (Ex. 1) (the "Acquisition Agreement"), § 11.5(a) of which provides for AAA arbitration before a single arbitrator in Wilmington, Delaware of "any and all claims . . . arising out of" Stratasys's acquisition of Origin:

> The parties hereto understand and irrevocably agree that any and all claims, grievances, demands, controversies, causes of action or disputes of any nature whatsoever (including, but not limited to, tort and contract claims, and claims upon any Legal Requirement) (hereinafter 'Disputes'), arising out of, in connection with, or in relation to this Agreement and the Ancillary Agreements shall be exclusively referred to and finally resolved by arbitration in Wilmington, Delaware. The arbitration will be conducted in English in accordance with the rules of the American Arbitration Association with one arbitrator. The parties hereto agree that a final determination of an arbitrator in accordance with the provisions hereof shall be conclusive and may be entered in any Court having jurisdiction.

8.      The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c)).

## PARTIES

9.      The Origin Shareholders are represented by their designated Shareholder Representative Fortis Advisors LLC, pursuant to the parties' Acquisition Agreement.  Prior to the acquisition by Stratasys, the Origin Shareholders were shareholders of Origin Laboratories, Inc. ("Origin"), a California corporation that successfully developed innovative 3D printing technologies.

10.     Fortis Advisors LLC is a Delaware limited liability company that serves as the formal representative of the Shareholders of Origin in connection with the acquisition of Origin by Stratasys, Inc., as memorialized in the Acquisition Agreement.

11.     Stratasys Ltd. is a company incorporated under the laws of the State of Israel, with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

12.     Stratasys, Inc. is a Delaware corporation and a wholly owned subsidiary of Stratasys Ltd., with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

## JURISDICTION, VENUE, AND GOVERNING LAW

13.     The American Arbitration Association has jurisdiction over this arbitration and venue is properly located in Wilmington, Delaware, pursuant to Section 11.5(a) of the Acquisition Agreement. The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c)).

4

14.    This dispute is governed by Delaware law pursuant to § 11.4 of the Acquisition Agreement, which states:

> This Agreement, and all claims (whether at law or in equity, whether in contract, tort, statute or otherwise) arising in whole or in part out of, related to, based upon, or in connection herewith or the subject matter hereof will be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

15.    As noted in Footnote 1, *supra*, in light of Stratasys' (unfounded) objections and attacks on the Tribunal's jurisdiction over the Shareholders' fraud and other extra-contractual claims, this Demand solely and exclusively concerns the Shareholders' breach of contract-related claims.  The remainder of the parties' dispute is proceeding in California state court.

**FACTS**

16.    On December 8, 2020, Stratasys and the Shareholders entered into the Acquisition Agreement, pursuant to which Stratasys agreed to acquire Origin and its intellectual property for a total purchase price of approximately $100 million. The Acquisition Agreement contemplated payment of 60% of the purchase price up front, with the remaining 40% conditioned on Origin's post-acquisition performance over a three-year period that would begin to run on an agreed-upon commencement date (the "EO Date"). The Acquisition Agreement set a tentative EO Date but empowered the parties to modify that date by simple written agreement.  In order to induce the Shareholders' execution of the Acquisition Agreement, Stratasys repeatedly promised the Shareholders that it would treat them fairly, would modify the EO Date to coincide with the post-acquisition roll-out of the Origin product line, and would not take any actions intended to interfere with the Shareholders' ability to Earn-Out Targets.  Stratasys made those promises in

5

writing prior to the execution of the Acquisition Agreement, and memorialized the broad concept in the Acquisition Agreement itself.

17.     On multiple occasions in 2021 and 2022, Stratasys and the Shareholders abided by those prior promises and agreed to re-set the EO Date to correspond with the general availability of Origin's printers. In other words, the parties agreed that they would begin to measure the sales of Origin products only when those products were actually available for sale.

18.     In a transparent attempt to retain the full value of Origin and its intellectual property while depriving the Shareholders of the remainder of the purchase price, Stratasys has now reneged on its agreement and has taken the position that the EO Date was never re-set. Stratasys's bad-faith conduct constitutes a breach of the Acquisition Agreement and the implied covenant of good faith and fair dealing.

## I.     ORIGIN'S BACKGROUND

19.     Origin was founded in 2015 by Christopher Prucha and Joel Ong based on their belief in the transformative potential of 3D printing. Chris and Joel both came to 3D printing from backgrounds in software engineering rather than in hardware or manufacturing, which provided them with a viewpoint that was unique in the industry.

20.     Chris was an engineer at Apple before founding Notion Labs, Inc., a collaboration platform and file-management tool now valued in excess of $10 billion. Joel established his engineering credentials at Google, where he worked on a variety of moonshot projects at Google X, among other things. Together, they launched Origin to take a software-first approach to 3D printing that no other participant in the industry was pursuing.

### A.     Origin's Thesis: 3D Printing as Manufacturing

21.     At the time of Origin's founding, the 3D printing industry was defined by two submarkets. Industry incumbents focused either on cheap, low-quality 3D printing as part of a

6

temporary bubble of consumer interest, or they focused on more sophisticated 3D printing for the narrow purpose of rapid prototyping. Chris and Joel recognized the self-limiting nature of these approaches and concluded that 3D printing could reach its potential only if it could be used for manufacturing on a broad scale—a multitrillion-dollar industry that dwarfed both the nascent and unpredictable consumer market for 3D printing and the prototyping industry.

22.     But the existing technology was limited by unsophisticated software built around a "closed materials" model, and the existing printers were not good enough to allow users to efficiently print functional parts. Moreover, the industry incumbents hamstrung their own printers by strictly limiting the material inputs and controlling the sale of those materials. In other words, the incumbents focused on short-term profits over potential long-term gain, and they did not prioritize developing printers that could meet the needs of 3D-printing customers seeking production-scale manufacturing applications.

23.     These factors drove Chris and Joel to devise a simple thesis for Origin: 3D-printing technology could be improved and made less expensive by developing better software to guide and govern the 3D-printing process. They planned to achieve this in two ways: (i) by developing granular real-time feedback through a detailed sensor apparatus that would ensure reliable and precise printing, and (ii) by partnering with chemical companies to allow end users to print parts from a wide array of new and experimental materials.

**B.     Origin's Groundbreaking Intellectual Property**

24.     Chris and Joel soon discovered that in order to build Origin the way they wanted to, they would not be able to rely solely on the industry's incumbent hardware manufacturers because the focus-based limitations Chris and Joel had identified with respect to the incumbent businesses themselves were also baked into every aspect of the industry's equipment

manufacturers. The only solution was for Origin to develop both the software and hardware necessary to implement Chris and Joel's vision.

25.    Origin did so, and it began shipping its first units in 2017 to overwhelming acclaim from customers. Origin continued to hone and improve its hardware, software, and material inputs to increase the quality and applicability of the system and to allow customers to print an ever-greater variety of end-usable parts with greater quality and reliability. In the years since then, Origin has pursued and secured broad patent protection for its printing process both in the United States and internationally—including in Japan, China, the European Union, and Canada.

26.    Key patents and patent applications include the following, for which Chris and Joel are inventors:

| Figure 1:  Key Patents Issued to Origin Founders | | | | |
|---|---|---|---|---|
| Family Ref. No. | Title | Jurisdiction | Application No. | Date Filed |
| ORGN-M01 | Method for Window Separation in an Additive Manufacturing Process | Canada | 3118364 | 2019-11-01 |
| | | China | 2019900012861 | 2019-11-01 |
| | | Europe | 19879943.9 | 2019-11-01 |
| | | Japan | 2021-600065 | 2019-11-01 |
| | | Patent Cooperation Treaty | PCT/US2019/059564 | 2019-11-01 |
| | | United States of America | 62/754411 | 2018-11-01 |
| | | United States of America | 16/672410 | 2019-11-01 |
| | | United States of America | 16/900560 | 2020-06-12 |
| | | United States of America | 16/941464 | 2020-07-28 |
| | | United States of America | 17/404,966 | 2021-08-17 |
| ORGN-M02 | System for Window Separation in an Additive Manufacturing Process | United States of America | 62/754430 | 2018-11-01 |
| | | United States of America | 16/672415 | 2019-11-01 |
| | | United States of America | 17/388598 | 2021-07-29 |
| ORGN-M03 | Method for Regulating Temperature at a Resin | Canada | 3136654 | 2020-04-17 |
| | | China | 2020900006647 | 2020-04-17 |

8

| Figure 1: Key Patents Issued to Origin Founders | | | | |
| --- | --- | --- | --- | --- |
| Family Ref. No. | Title | Jurisdiction | Application No. | Date Filed |
| | Interface in an Additive Manufacturing Process | Europe | 20791068.8 | 2020-04-17 |
| | | Japan | 2021-600157 | 2020-04-17 |
| | | Patent Cooperation Treaty | PCT/US2020/028783 | 2020-04-17 |
| | | United States of America | 62/835444 | 2019-04-17 |
| | | United States of America | 16/852078 | 2020-04-17 |
| | | United States of America | 17/066249 | 2020-10-08 |
| | | United States of America | 17/066372 | 2020-10-08 |
| ORGN-M04 | Method for Interlayer Feedback Control and Failure Prevention in an Additive Manufacturing Process | Canada | | 2020-08-03 |
| | | China | | 2020-08-03 |
| | | Europe | 20850214.6 | 2020-08-03 |
| | | Japan | | 2020-08-03 |
| | | Patent Cooperation Treaty | PCT/US2020/044803 | 2020-08-03 |
| | | United States of America | 62/882464 | 2019-08-02 |
| | | United States of America | 16/984102 | 2020-08-03 |
| | | United States of America | 17/518,510 | 2021-11-03 |
| ORGN-M05 | Method for Evaluating Photocurable Resins for an Additive Manufacturing System | United States of America | 62/972573 | 2020-02-10 |
| | | United States of America | 17/173174 | 2021-02-10 |
| ORGN-M06 | Origin Swab Documentation | United States of America | 63/007296 | 2020-04-08 |
| ORGN-M07 | Layer Segmentation: Texture and Dimensional Accuracy | United States of America | 63/218,247 | 2021-07-02 |
| ORGN-M08 | Method for Polymerizing Superficial Features in 3D-Printed Parts | United States of America | 63/300,621 | 2022-01-18 |
| ORGN-D01 | Additive Manufacturing Station | United States of America | 29/803,459 | 2021-08-12 |

27.    As this chart shows, Origin has secured (or was in the process of seeking) patent protection for, among other things, (i) key components of the printing process, (ii) key portions

9

of its physical hardware, (iii) the use of real-time sensor data to optimize the printing process, (iv) the multivariate testing of new materials and formulations, and (v) light control and other software techniques for improving the accuracy, quality, and repeatability of manufactured parts. In addition to these patent protections, Origin has developed a variety of proprietary technologies and protected trade secrets concerning its product and processes, and it maintains substantial documentation to protect that valuable intellectual property. And as explained below, Chris and Joel have continued to devote themselves to developing, expanding, and protecting Origin's patent portfolio even after the acquisition by Stratasys.

28.     The most important aspect of Origin's software-based approach to 3D printing is the patented "Programmable PhotoPolymerization" process, or the "P3" process. The P3 process allows inexpensive and rapid production of high-quality and functional end-use parts. Among other things, the P3 process eliminates non-scalable and time-consuming post-processing—that is, the need to extensively treat the product after printing, such as by sanding rough edges— which has historically inhibited 3D printing from being used for manufacturing at a large scale. Instead, the P3 process is capable of producing parts that are usable virtually straight out of the printer, increasing efficiency and operating with, in Stratasys's own words, "industry-leading accuracy, consistency, detail, and throughput."[2]

### C.      The Origin One Printer

29.     In 2019, Origin combined its insight and intellectual property into a flagship product and launched the Origin One printer to overwhelming demand and uniformly positive reviews. The Origin One combined the P3 process with the open-material model to permit users

---

[2] *Origin One 3D Printer Support*, Stratasys, https://support.stratasys.com/en/Printers/P3-Printers/Origin-One (last accessed November 8, 2024).

10

to print high-quality, functional products out of nearly any material chemistry—including newly developed materials—with minimal post-processing.

30.     The unique combination of the P3 process and the open-material model disrupted the industry incumbents, whose businesses turned on the (now outdated) "closed" model, and who relied on tightly controlled sales of material inputs. The Origin One's success threw the deficiencies of the old model into stark relief, and it led to lucrative partnerships with major manufacturers in a variety of industries, ranging from the Ford Motor Company in the automotive industry and the shoe company ECCO Sko A/S in the apparel industry.

31.     Although the industry has since followed Origin's lead and the open-material model is now nearly ubiquitous, Origin's technology remains best-in-class.

## II.     STRATASYS'S ACQUISITION OF ORIGIN

32.     In 2020, Stratasys agreed to acquire Origin for a total purchase price of approximately $100 million in recognition of Origin's paradigm-shifting 3D printing technology. Stratasys has since touted the acquisition, noting in multiple SEC filings that Origin's technology "has become an important growth engine for our company." (Ex. 2, Stratasys 2022 Annual Report).

### A.     The Beginning of the Origin-Stratasys Relationship

33.     Stratasys and Origin first worked together in March 2020 to produce 3D-printed sterile nasal swabs for use with COVID-19 tests. At the time, near the beginning of the pandemic, Origin was among the very first companies to receive clinical-trial approval for its 3D-printed nasal swabs.

34.     Because Stratasys had tried, but failed, to receive approval for its own 3D-printed swabs, the two companies entered a partnership to produce and distribute Origin's swabs. Through this partnership, each company learned about the other's strengths, abilities, and

11

expertise. Chris, Joel , and their Origin colleagues worked closely with Stratasys's sales and distribution teams, while Stratasys witnessed firsthand Origin's industry-leading design, products, and operations.

35.    Recognizing the value of further collaboration, Stratasys made Origin an unsolicited offer of acquisition in the spring of 2020. Origin was not initially interested, and the Origin board turned down Stratasys's offer without countering. Stratasys nevertheless presented an updated offer on more favorable terms, paving the way for negotiations that culminated in the acquisition six months later.

**B.    The Parties Negotiate the Terms of the Acquisition**

36.    The Parties negotiated the terms of Stratasys's acquisition of Origin throughout the remainder of 2020.  During the early stages of those negotiations, Stratasys was largely represented by Ronen Lebi, its Vice President of Corporate Development.

37.    As part of the negotiations, Stratasys engaged in an extensive technical diligence review through which it analyzed and confirmed the value of Origin's software-driven approach to 3D printing.  This diligence review involved, among other things, in-person visits to Origin's facilities by key Stratasys personnel, including Yoav Zeif (Stratasys's CEO), Guy Menchik (Stratasys's Chief Technology Officer), Richard Garrity (Stratasys's Chief Industrial Business Officer, then the President of Stratasys Americas), Omer Krieger (Stratasys's Executive Vice President), and Amir Kleiner (Stratasys's VP Global Operations), among others.

38.    Separate from the technical diligence process, the parties devoted substantial efforts to negotiating the mechanics and structure of the acquisition—including Stratasys's proposal to structure the consideration it would pay to Origin in two parts: Stratasys would pay approximately 60% of the $100 million purchase price up front, and would pay the remaining 40% over a three-year period, conditioned on Origin's post-acquisition performance.





14





49.     In explicit reliance on these and other promises Stratasys made as part of "mechanisms of managing the EO risk," the Shareholders agreed to resume formal negotiations of the proposed acquisition.  The parties ultimately executed the Acquisition Agreement on December 8, 2020 and announced the acquisition shortly thereafter.

### C.     The Acquisition Agreement

50.     The Acquisition Agreement contemplated that a portion of the consideration for Origin and its intellectual property would take the form of three post-acquisition payments to the Shareholders keyed to the Origin business unit meeting certain revenue-based performance goals. (Acq. Agmt. § 2.3; Ex. D). In particular, the Acquisition Agreement established three "Earn-Out Periods" over three consecutive years, beginning with the EO Date. (*Id.* Annex I). The Acquisition Agreement then set out calculations of the applicable Earn-Out Payments based on whether the revenue attributable to Origin's products during each such period (the "Earn-Out Revenue") met the pre-determined threshold of the Earn-Out Target. (*Id.* Ex. D, § 7).

51.     In devising this structure, the parties recognized that the date selected as the EO Date—that is, the date on which the parties would begin measuring Origin's post-acquisition performance—would have a direct and major effect on whether the Earn-Out Targets were satisfied.

16

52.     As they had discussed throughout negotiations of the acquisition—including at the October 2020 meeting—Stratasys and the Shareholders understood and agreed that production, sales, and shipment of Origin printers following the acquisition might be delayed for some period while the new Origin business unit integrated into the larger Stratasys ecosystem and adapted to Stratasys's new strategic goals. The Acquisition Agreement therefore included a tentative EO Date of July 1, 2021—which itself was nearly seven months after the Acquisition Agreement was executed—but provided that that date could be easily changed to correspond to the post-acquisition business reality, without the need either for a formal amendment or even a signed agreement.



54.     Reflecting the Parties' agreement—at the October 2020 meeting and elsewhere—that the Shareholders' entitlement to Earn-Out Payments would be calculated based on the sale of any products or services that incorporated Origin's intellectual property, the Acquisition Agreement also set out a broad definition of revenue sources that would count against the Earn-Out Targets.  Specifically, the Acquisition Agreement provided that "Revenue" for purposes of Earn-Out calculations would include:

17

> [S]ales or leases of Company Products and Company Services (in each case, including any and all amalgamations, derivatives, enhancements, further developments, improvements, new versions, rebranding, repackaging and updates which are substantially based on or derived from the Company Products and Company Services, or their respective updates and derivations, which shall be referred to collectively as "Derivatives") (including the sales or provision of other hardware, software, materials, services, subscriptions and warranties specifically (A) designed for, or (B) acquired, leased or licensed from Parent or its Affiliates (including the Business Unit) for, any Company Product, Company Service or Derivative)[.]

(Acq. Agmt., Exhibit D).

55.    The Acquisition Agreement further defined "Company Products" as "the products produced, developed, sold or licensed by [Origin] in the current operation of the business as of the date hereof, including the Primary Product[,]" which is in turn defined as "the Company's 'Origin One' printer, versions 2.6 and 2.6.1."  The Acquisition Agreement defined "Company Services" as "any and all services provided by [Origin] in the current operation of the business." (Acq. Agmt., Annex I.)

56.    The parties also agreed on a mechanism through which Stratasys would keep the Shareholders apprised of Origin's progress towards satisfying the Earn-Out Target. Specifically, once the EO Date has passed and the Earn-Out Period begins, the Acquisition Agreement requires Stratasys to deliver Quarterly Reports to the Shareholders within 60 days of the close of each quarter during each Earn-Out Period. Those reports must "set[] forth [Stratasys's] good faith, non-binding, computation of the Revenue in respect of such quarterly period (the 'Quarterly Report'), together with such supporting documentation as reasonably determined by [Stratasys]." (*Id.* § 2.3(c)). This requirement provides transparency to the Shareholders and allows them to promptly bring any issues or disagreements to Stratasys's attention as those issues arise. (*See id.* (providing that the Shareholders would "notify Parent in the event that [they]

18

dispute[] any element of such Quarterly Report" within "within twenty (20) business days" of receipt)).

57.    The parties also agreed to a dispute-resolution mechanism pursuant to which the parties must submit any disputes for binding arbitration under Delaware law and the rules of the American Arbitration Association. (*Id.* § 11.5(a)). That provision also provides that the non-prevailing party is obligated "to pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (*Id.* § 11.5(c)).

58.    Finally, the parties agreed that if any provisions of the Acquisition Agreement "were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine."  (*Id.* § 11.7(c)). The parties further agreed that a non-breaching party "shall be entitled to specific performance of the terms [of the Acquisition Agreement], in addition to any other remedy at law or equity." (*Id.*).

### D.    Chris and Joel Work to Ensure a Successful Acquisition

59.    Stratasys's stock price skyrocketed following the acquisition announcement, increasing by more than 40% in the following two weeks from a low of $17.22 per share on December 8 to a high of $24.36 on December 23, 2020. From the outset, Chris and Joel did everything they could to ensure a smooth transition—Chris even appeared on an investor call on December 9, 2020 to discuss the transaction with Stratasys shareholders and to lay out the plans for Origin's integration with Stratasys.

60.    From those early days through the present, Chris and Joel have taken every step to ensure a successful business combination—in large part because of the incentive provided by the Earn-Out Payments. For instance, they both worked around the clock during the period between executing the Acquisition Agreement and closing the transaction, including, among other things,

19

negotiating assignments of all of Origin's customer contracts and retention agreements with the existing Origin team.

61.    Post-closing, Chris and Joel ensured that Origin integrated its back-office functions, its operations and supply chain functions, and its tech function with Stratasys's existing functions. Origin also integrated its valuable intellectual property operations while successfully continuing to file new provisional patent applications and to convert Origin's existing provisional applications.

62.    All of these tasks—a few mere housekeeping logistics, many others complicated and intricate—were critical to Stratasys's ability to immediately benefit from the addition of Origin to its business line.

63.    Throughout this transition, the Origin team also continued to produce and sell the Origin One printers. Although sales were temporarily halted following the acquisition, the supply chain and production process soon resumed, and the Origin business line was in full production by late spring 2021, in advance of the initial July 1, 2021 EO Date, as planned. Both new and old clients remained happy with the performance of the Origin One.

## III.    STRATASYS REPRESENTS THAT IT HAS AGREED TO SET THE EARN-OUT COMMENCEMENT DATE TO REFLECT COMMERCIAL REALITY

64.    Over the following months, in the run-up to July 1 placeholder EO Date, Stratasys made the strategic decision to stop manufacturing and selling Origin products while it prioritized its other product lines and revamped—and prepared to re-launch—the Origin One.

65.    The Shareholders raised Stratasys's promises to adjust the EO Date (as reflected in the Agreement and Stratasys's repeated representations leading up thereto).

20

## A.    Stratasys Delays the Sale of Origin Products

67.    Although Origin was well-positioned to continue manufacturing and producing its printers beginning in spring 2021, Stratasys decided to pursue other strategic objectives. As a result, Stratasys instructed the Origin team to direct its focus away from production of the existing printer model and, instead, to focus on developing new hardware for the Origin One that would be relaunched as a Stratasys product.

68.    This included developing an updated version of the Origin One printer that physically conformed to Stratasys's specifications while also taking steps to develop a specialized version of the printer intended for use in the dental industry, where Stratasys saw business opportunity. Stratasys further directed the Origin team to implement a suite of new features for the Origin One printers already in use by existing customers. As a result of these new directives, Stratasys halted production and sales of the Origin One printer entirely near the end of spring 2021.

69.    During this same period, Stratasys *also* began incorporating Origin's intellectual property into its own product and service lines and prioritized the development of those other lines of business over the Origin business unit.  In other words, Stratasys substantially delayed Origin's launch while it raced ahead with sales of its own competing products and services, giving rise to the precise issues that the Shareholders had foreseen and raised, including in the Parties' October 2020 meeting.

21

**B.      Stratasys Tells the Shareholders That It Agrees to a New EO Date Coinciding with the Launch of the Origin One Version 2.7**

70.     The interruption of Origin One sales had immediate and obvious implications for Origin's ability to meet its Earn-Out Targets under the Acquisition Agreement. That is because if the EO Date remained unchanged, there would be *no* Origin products offered for sale for most or all of the first Earn-Out Period, and Origin would be unable to meet its Earn-Out Target.

71.     The Shareholders foresaw this exact circumstance, and it is what led to the concerns they raised at the October 2020 meeting—in response to which Stratasys assured the Shareholders that it would treat them fairly and ensure that their earn out entitlement would be calculated fairly.  Those promises were memorialized in writing and subsequently instantiated in the Acquisition Agreement, including the provision allowing the parties to easily change the EO Date to reflect commercial reality and the provision forbidding Stratasys from interfering with the Shareholders' ability to satisfy the Earn-Out Targets.



23



24





25



85.     The only way to credit Stratasys's present litigation position that the EO Date has not been changed because the board did not approve it is to conclude—against all the evidence and common sense—both that (i) *Stratasys's own CEO* was so neutered that he somehow did not have the authority to negotiate and make commercial agreements on behalf of the company, and (ii) the Shareholders were wrong to rely on *Stratasys's own CEO's* representations to them that they had reached an agreement. Neither of these can possibly be true.





88.     Following Stratasys's representation that it had agreed to re-set the EO Date to coincide with the GA Date, Stratasys made the Origin One 2.7 generally available in February 2022. (Ex. 9 (Stratasys 2022 Form 6-K) (describing the "launch of the Origin One in mid-February"); *see also* Ex. 2 (Stratasys 2022 Annual Report) (noting that the "Origin One 3D Printer" has been "generally available since the beginning of 2022")). Because the Acquisition Agreement requires the EO Date to "fall[] on the first day of a calendar month," Stratasys's written representations concerning its agreement to move the EO Date to coincide with the GA Date results in re-setting the EO Date as February 1, 2022—that is, the "first day of a calendar month" capturing the general availability of the Origin One 2.7.

## C.      The Parties Rely on Their Agreement to Re-Set the EO Date

89.     Both Stratasys's and the Shareholders' subsequent conduct demonstrated they shared an understanding that the EO Date had been changed.

91.     In fact, Stratasys did not provide the reports until July 2022, after the Shareholders, through their counsel, demanded that Stratasys abide by its agreement and pointed

27

out Stratasys's failure to provide the Quarterly Reports that would have been required if the parties had not re-set the EO Date. Stratasys, faced with this plain evidence of the untrue nature of its position—and in a ham-fisted attempt to remake history—then issued all three of those reports simultaneously, as if somehow that would retroactively absolve Stratasys for its conduct. Stratasys's position is self-evidently false.

92.    The Shareholders likewise relied on Stratasys's representation that it had agreed to change the EO Date to correspond to the GA Date. Among other things, Chris, Joel, and Jeffrey Lee agreed to continue their employment at Stratasys following the acquisition long after they were contractually obligated to do so, despite their many documented concerns about certain of Stratasys's strategic and operational decisions. (*See, e.g.,* Ex. 3 (July 8, 2021 Email from Chris)). They did so with the express expectation and understanding that the re-set EO Date would give them and the other Shareholders a full and fair opportunity to satisfy the Earn-Out Targets—and to receive the remainder of their bargained-for compensation under the Acquisition Agreement. The Shareholders also relied on the agreement to re-set the EO Date by not demanding the Quarterly Reports from Stratasys when they would otherwise have been due.

93.    Without the agreement to re-set the EO Date, Stratasys's decision to halt the sale of Origin printers would have made it nearly impossible for Origin to satisfy its Earn-Out Targets. But based on Stratasys's representations that it had agreed to re-set the EO Date, the Shareholders reasonably believed that Stratasys had aligned the parties, interests—and based on that understanding, Chris, Joel, and Jeffrey Lee continued to provide valuable services to Stratasys to ensure the success of the Origin business unit.

94.    During the months since Stratasys first represented that it had agreed to re-set the EO Date, Chris and Joel have not just contributed to the day-to-day operation of the company;

28

they have also taken substantial steps to further expand Origin's portfolio of intellectual property. Among other things, Chris and Joel have developed new innovations and techniques and have filed new applications with the USPTO, while also taking steps to protect and secure Origin's existing suite of patents. (*See supra* ¶¶ 47-51). Further, Chris and Joel have made extensive efforts far exceeding their contractual commitments to build out and train a robust new-technology process team to ensure the continued protection of Origin's (now Stratasys's) intellectual property. Chris and Joel's ongoing and future work in this regard has been—and is—expressly predicated on Stratasys's representations concerning its agreement to re-set the EO Date.





100.    Stratasys's effort to cheat the Shareholders out of their bargained-for consideration—now that Stratasys has enjoyed the benefits of that bargain—is flatly contrary to Stratasys's prior representations concerning the parties' agreement, as well as Delaware law. In light of Stratasys's misconduct, the Shareholders are entitled to enforce the contract.

30

**D.    Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success**

101.    Stratasys itself has recognized the substantial concrete benefits derived from acquiring Origin and using Origin's valuable intellectual property—as well as from the post-acquisition services provided by Chris, Joel, and the other Shareholders. The company's Form 6-K for the first quarter of 2022 noted that Stratasys's product revenues "increased by $14.6 million, or 36.7%, for the three months ended March 31, 2022," and that this increase "reflected the highest first quarter total in five years, strengthened by the launch of the Origin One." (Ex. 9 (Stratasys 2022 Form 6-K)).

102.    Stratasys's corresponding earnings release touted the "early momentum and contribution from our new Origin P3" system, which it further noted was "designed for high-volume production of end-use parts." (Ex. 10 (May 16, 2022 Earnings Stmt.)). In fact, Origin's Q1 2022 sales exceeded Stratasys's own internal estimates at double digit rates. That momentum continued throughout 2022, with Stratasys noting that the Origin product line "continue[s] to ramp, with excellent customer engagement across all of our new technology offerings." (Ex. 11 (August 3, 2022 Earnings Stmt.)).

103.    Stratasys continued to tout Origin's value in subsequent filings, noting in its 2022 Annual Report that Origin's technology "has become an important growth engine for our company" and explaining that the Origin acquisition "significantly strengthened our leadership in mass production for polymer 3D printing" because "Origin's pioneering approach to additive manufacturing of end-use parts has enabled us to serve a large market with manufacturing-grade 3D printers." (Ex. 2, Stratasys 2022 Annual Report).

104.    Origin's contribution to Stratasys goes beyond the numbers of the Origin business unit. Since the acquisition, Stratasys has recognized the value proposition of Origin's core

31

insight: a software-driven approach to printing coupled with an open-material model will open the door for 3D printing to jump from the limited prototyping industry into the multitrillion-dollar manufacturing industry. Based on this recognition that 3D printing can be reliably used for manufacturing, Stratasys has incorporated Origin's paradigm-shifting open-material model into the majority of its 3D-printing business lines, not just the Origin One, which has allowed Stratasys to charge a premium across its business units.

105.    Stratasys's 2022 performance was largely due to Origin's products and services. And Stratasys's more recent earnings releases and investor statements continue to tout the success of the Origin product line and Origin's intellectual property more broadly—including the new "P3 Business Unit" founded exclusively for the purpose of monetizing Origin's intellectual property. For instance, in its 2023 Annual Report, Stratasys extensively discussed the P3 technology, including that the "P3-based systems, which [Stratasys] added to [its] solutions portfolio via the acquisition of Origin, offer a best-in-class combination of detail, mechanical properties and throughput for mass manufacturing production parts" and that the P3 technology "dramatically expand the total addressable market across medical, dental, consumer goods, automotive, commercial goods, and service bureaus."  (Ex. 19, Stratasys 2023 Annual Report).

### E.    Stratasys Reneges on the Parties' Agreement in Order to Cheat the Shareholders Out of Their Bargained-For Consideration

107. The only reason for this breach that Zeif provided was that the board had supposedly determined that there was "no benefit to Stratasys" to follow through on changing the EO Date, now that Stratasys had already enjoyed the benefits of the agreement. In other words, Stratasys reneged solely because it decided it would be in Stratasys's interest to do so. By refusing to honor its express representations and promises to the Shareholders, Stratasys completed its months-long scheme to dupe the Shareholders into creating massive benefits for the company while cheating them out of the compensation they are entitled to.



109. Stratasys's effort to do so is contrary to its prior written representations, the plain language of the Acquisition Agreement, and the parties' post-acquisition course of performance. It is also contrary to any sense of fairness or good faith—both because Stratasys seeks to deprive the Shareholders of their bargained-for benefit while continuing to profit from Origin's valuable intellectual property, and because Stratasys seeks to drive a wedge between Chris and Joel and the remaining Shareholders.

110. Chris and Joel did not accept Zeif's improper proposal, which was at odds with the deal Stratasys had already agreed to and was fundamentally unfair to the remaining Shareholders.

## IV. STRATASYS VIOLATED ITS REPRESENTATIONS, PROMISES AND AGREEMENT(S)

111. Stratasys repeatedly represented to the Shareholders that the EO Date would be re-set to coincide with the GA Date for version 2.7 of the Origin One printer. That representation is memorialized in multiple writings—and it therefore constitutes an effective agreement to re-set the EO Date under the plain language of the Acquisition Agreement.

### A. The Parties' Emails Constitute Writings Under the Acquisition Agreement

112. The Acquisition Agreement states that the EO Date is "July 1, 2021 or such other date that falls on the first day of a calendar month as mutually agreed in writing by Parent and Seller Representative" (Acq. Agmt., Annex I).



114. These emails are more than sufficient to satisfy the "agreed in writing" requirement of the Acquisition Agreement, which was specifically designed to account for post-acquisition business reality.

115. The Acquisition Agreement is governed by Delaware law. (Acq. Agmt. § 11.4). Delaware recognizes a public policy in favor of giving full effect to the unambiguous intentions

of businesspeople without placing undue emphasis on formalistic requirements. Because of that policy, Delaware courts hold that emails are sufficient to satisfy a "writing" requirement of the sort in the Acquisition Agreement. *See, e.g., Camden Fitness, LLC v. Wandless Enterprises, Inc.*, No. CPU5-12-000295, 2013 WL 8854873, at *3 n.7 (Del. Com. Pl. Feb. 11, 2013) ("Emails may be considered writings."); *see also* DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023) ("If a law requires a record to be in writing, an electronic record satisfies the law."); Black's Law Dictionary (11th ed. 2019) (defining "writing" as "any intentional recording of words in a visual form," including "e-mails, and any other media on which words can be recorded").

116.    Indeed, Delaware courts routinely find that essentially any unambiguous writing can be sufficient to reflect the parties' agreement. *See, e.g., Zayo Grp., LLC v. Latisys Holdings, LLC*, No. 12874-VCS, 2018 WL 6177174, at *14 (Del. Ch. Nov. 26, 2018) ("Toshiba's October 1, 2014 email . . . would have constituted written notice to Latisys that Toshiba intended to "materially modify" that contract."); *Triple H Fam. Ltd. P'ship v. Neal*, No. 12294-VCMR, 2018 WL 3650242, at *13 (Del. Ch. July 31, 2018), *aff'd*, 208 A.3d 703 (Del. 2019) ("This email exchange constitutes the written consent of the members to dissolve Omni."); *Camden Fitness*, 2013 WL 8854873, at *3 ("[E]ven if the contract modification should have been in writing, the emails of December 29, 2010, and February 26, 2011, constitute written modifications to the contract, evidencing [an] agreement to the new contract price of $155,000.00.").

## B.    Re-Setting the EO Date Does Not Require Board Approval

118.    Despite its written representations, Stratasys has taken the position that its written promises to re-set the EO Date are somehow ineffective because they was not formally approved by the Stratasys board. But the Acquisition Agreement includes no such requirement—it simply requires Stratasys to agree to any change in writing. And as a commercially sophisticated party, Stratasys knows that a CEO does not need board approval prior to entering into an agreement on behalf of his company. *See, e.g., Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 81 (1995) ("[A] corporation is bound by contracts entered into by its officers and agents acting on behalf of the corporation and for its benefit, provided they act within the scope of their express or implied powers." (citation omitted)).

119.    Moreover, Zeif has repeatedly demonstrated broad decision-making powers and authority on behalf of Stratasys, including with respect to all sorts of issues relating to the relaunch of the Origin One printer. Without seeking or requiring the board's approval, Zeif has (i) made decisions regarding the production and sale of the Origin One printers, (ii) directed the Origin team to develop new hardware, (iii) allocated resources to address and resolve manufacturing and performance issues as they arose, (iv) directed the Origin team to prioritize a separate product targeting the dental industry over the Origin One printer, (v) restarted production, and (vi) set the GA Date.

120.    Along with these decisions, Zeif also negotiated and represented to the Shareholders that he had bound the company in writing to a revised EO Date. Stratasys's last-minute claim that Zeif needed board approval for that single item (but not the others) not only contradicts the plain language of the Acquisition Agreement, but it also deviates from the

36

parties' course of post-acquisition performance over many months.  *See, e.g., Hessler, Inc. v. Farrell*, 226 A.2d 708, 711–12 (Del. 1967) ("It is the law of this State that when, in the usual course of the business of a corporation, an officer or agent has been allowed to manage certain of its affairs, and when this is known to the other party to the contract, the authority of the officer to act for the corporation is implied from the past conduct never challenged by the corporate officials."); *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 128 (3d Cir. 1998) ("Implied actual authority . . . may be found through evidence as to the manner in which the business has operated in the past[.]").

121.    Stratasys's claim also runs contrary to its Articles of Association, which contemplate the grant of significant powers to the CEO. (Ex. 12, Amended and Restated Articles of Association of Stratasys Ltd., § 81.3; *see also Schoonejongen*, 143 F.3d at 127-28 ("Express authority to act on behalf of the corporation is usually manifested through a statute, the certificate of the corporation, the by-laws, or a board or shareholder action.").).

122.    Stratasys cannot undo Zeif's representations on the company's behalf by now claiming that only the board can make such a deal.

### C.    The Parties' Performance Evidences Stratasys's Representations that It Had Agreed to Change the EO Date

123.    Finally, Shareholders relied on Stratasys's representations that it had agreed to move the EO Date—and from the Shareholders' perspective, Stratasys's conduct *also* appeared to reflect reliance on what they understood to be a mutual agreement.  As explained in Section III(C) above, Stratasys appeared to perform in accordance with that agreement by, among other things, not producing the Quarterly Reports that are mandated during the Earn-Out Periods until *after* it received the Shareholders demand letter on June 28, 2022.

124. Stratasys's course of performance is consistent with its representations to the Shareholders that it had agreed to move the EO Date. In fact, had the parties *not* agreed to move the EO Date, Stratasys would have been in material breach of the Acquisition Agreement for failing to satisfy this requirement, with the result that the full $40 million in earn-out proceeds would be due immediately. *See, e.g., S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.*, No. 2020-1069-MTC, 2021 WL 3925937, at *3 (Del. Ch. Sept. 1, 2021) (authorizing contract claim by shareholder representative to proceed against acquiring company that sought as damages "the sum total of all unpaid earn-out payments").

125. And for their part, Shareholders Chris, Joel, and Jeffrey Lee contributed substantial time and effort to the success of the Origin business unit post-acquisition, which they did in direct reliance on Stratasys's repeated agreements to re-set the EO Date—and which conferred substantial benefits on Stratasys in reliance on the Shareholders' reasonable expectation that the re-set EO Date would provide them with a fair opportunity to satisfy the Earn-Out Targets.

126. Further, because Delaware law permits contract-modification through course of performance, the parties' conduct itself would act to re-set the EO Date even in the absence of a written agreement. Delaware law gives substantial weight to the ways in which businesspeople actually perform under a given contract. When, like here, a party's conduct appears to evidence a plain intention to amend the terms of a written agreement, that implied amendment is binding. *See, e.g., Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 567 (D. Del. 1993) ("The Delaware Supreme Court has held that . . . the parties may, "by their conduct, substitute a new oral contract without a formal abrogation of the written agreement," even if that agreement contains an explicit clause to the contrary.'"); *Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.*, 297

38

A.2d 28, 33 (Del. 1972) (holding that "a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement" because "the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit"—"including a change in the provisions of the written agreement by the course of conduct of the parties").

127.    The parties' conduct is therefore further evidence of a mutual, unambiguous agreement to re-set the EO Date—and that change was legally effective either as an agreement in writing under the Acquisition Agreement or, alternatively, as a modification though their course of performance.[4] Stratasys cannot undo its represented agreement by belatedly claiming its own CEO somehow did not have the authority to act on the company's behalf.

## V.    STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER

128.    Since this dispute has arisen, the Shareholders have repeatedly—and fruitlessly—tried to engage in a productive commercial dialogue concerning Stratasys's agreement to re-set the EO Date.

129.    Indeed, shortly after Stratasys informed the Shareholders in March 2022 that Stratasys would renege on its repeated written agreement to re-set the EO Date, Chris and Joel asked Zeif to reconsider that position and to abide by the Parties' prior agreement.

_____

[4] For the same reason, Stratasys's repeated practice of directing all substantive communications concerning the EO Date to Chris, Joel, and Jeffrey Lee as the representatives of the Shareholders—rather than to Fortis, the formal "Seller Representative"—effects a modification of the Acquisition Agreement's technical requirement that the "agreement in writing" be between Stratasys and the Seller Representative.

39

131.    Rather than engaging with the Shareholders or abiding by its unambiguous prior written agreements, Stratasys instead opted to double and triple-down on its position. In an attempt to undermine the undisputed evidence of its agreement to re-set the EO Date, Stratasys sent a letter on July 15, 2022, in which it informed the Shareholders that it intended to provide the Quarterly Reports—which would have been due months prior had the Parties *not* agreed to move the EO Date—"by no later than Wednesday, July 20, 2022." (Ex. 14, July 15, 2022 Stratasys Letter).

132.    Stratasys proceeded to provide "Quarterly Reports" that would have corresponded to the first, second, and third quarters of the first Earn-Out Period had the EO Date not been re-set.  (Ex. 15, July 20, 2022 Quarterly Statements).  Those Quarterly Reports demonstrated precisely why the parties agreed to re-set the EO Date: Stratasys had not even made the Origin products available for sale during much of those periods of time.[5] (*Id.*).

---

[5] Indeed, on August 29, 2022, Stratasys provided a purported "Earn-Out Schedule for the First Earn-Out Period" stating that the "First Earn-Out Payment is nil." (Ex. 16, Aug. 29, 2022 Earn-Out Schedule).



41

136.    Stratasys's conduct left the Shareholders with no choice but to file this Arbitration Demand in order to hold Stratasys to its agreement.

## CAUSES OF ACTION[7]

### FIRST CAUSE OF ACTION
### (Breach of Contract - Damages)

137.    By and through their designated Shareholder Representative, Fortis, the Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

138.    The Acquisition Agreement is a valid and binding written agreement between Stratasys and the Shareholders.

139.    Among other things, the Acquisition Agreement sets out the terms of the payments by Stratasys to the Shareholders in consideration for the acquisition of Origin—including the EO Date and other terms governing Stratasys's obligation to make Earn-Out Payments. The Acquisition Agreement also requires Stratasys to provide the Shareholders with Quarterly Reports within 60 days of the close of each quarter during each Earn-Out Period. The Acquisition Agreement also empowers the parties to change the EO Date through a simple agreement memorialized in writing, without the need either for a signed agreement or formal amendment.

140.    In writings dated August 25, 2021, October 12 and 21, 2021, and February 12, 2022, among others, the parties agreed to set the EO Date to coincide with the GA Date for the Origin One Version 2.7 printer. This agreement was reflected by the parties' course of

---

[7] Consistent with its role as Shareholder Representative under the parties' Acquisition Agreement (*see* Acq. Agmt. at 2), Fortis asserts all of the Causes of Action herein on behalf of the Shareholders.  Stratasys has not presented any motion to dismiss or otherwise preclude Fortis' conduct in this proceeding as Shareholder Representative for the amended contract-related claims herein. However, in the event  Stratasys later argues, and/or the Tribunal determines, that Fortis somehow lacks standing to pursue one or more of these Causes of Action because the claims belong to an individual rather than to the Shareholders collectively, the Shareholders reserve right to amend this Arbitration Demand to bring claims on individually on behalf of one or more of the Shareholders.

performance, which demonstrated that all parties understood and relied upon their agreement to re-set EO Date. Based on that agreement, for instance, Stratasys did not provide the Quarterly Reports that it would have been required to provide absent an agreement to re-set the EO Date.

141.    Alternatively, the parties' course of performance was, itself, sufficient to modify the tentative EO Date—even assuming (contrary to fact) that the parties had not also agreed in writing to re-set the EO Date. *See, e.g., Haft*, 841 F. Supp. at 567 ("The Delaware Supreme Court has held that . . . the parties may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement, even if that agreement contains an explicit clause to the contrary.") (internal quotations omitted).

142.    The Acquisition Agreement therefore obligates Stratasys to treat February 1, 2022 as the EO Date for all purposes.

143.    Stratasys has violated this obligation by, among other things, refusing to treat February 1, 2022 as the EO Date for the purpose of calculating whether Origin's revenue satisfied the Earn-Out Targets. Stratasys has also violated this obligation by failing to timely provide the required Quarterly Reports following the re-set EO Date.

144.    Stratasys's breach has materially harmed the Shareholders.

145.    Among other things, Stratasys's breach has deprived the Shareholders of a full and fair opportunity to satisfy the relevant Earn-Out Targets—and to receive the tens of millions of dollars in Earn-Out Payments conditioned on such satisfaction. The Shareholders are therefore entitled to full payment of $40 million in Earn-Out Payments on an accelerated basis.

## SECOND CAUSE OF ACTION
### (Breach of Contract – Specific Performance and Injunction)

146.    By and through their designated Shareholder Representative, Fortis, the Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

43

147.    Stratasys has breached its obligations under the Acquisition Agreement by refusing to compensate the Shareholders for Origin's valuable suite of intellectual property while continuing to profit from its ongoing use of that same intellectual property. Stratasys has agreed that its conduct causes "irreparable damage" to the Shareholders and that the Shareholders can receive "no adequate remedy at law."  (Acq. Agmt. § 11.7(c)).

148.    The Shareholders are therefore entitled to "specific performance of the terms of the" Acquisition Agreement, "in addition to any other remedy at law or equity." (Acq. Agmt. § 11.7(c)). Among other things, Stratasys must perform under the Acquisition Agreement by treating the EO Date as February 1, 2022 for all purposes.

## THIRD CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

149.    By and through their designated Shareholder Representative, Fortis, the Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

150.    The Acquisition Agreement is a valid and binding written agreement between Stratasys and the Shareholders and is governed by Delaware law.

151.    "The implied covenant of good faith and fair dealing inheres in every contract" under Delaware law. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). Pursuant to that covenant, a party must "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." (*Id.*)

152.    Stratasys has breached the covenant of good faith and fair dealing by, among other things, interfering with the Shareholders' opportunity to satisfy the Earn-Out Targets and to receive the full amount of the bargained-for Origin purchase price.

44

153.    Stratasys accomplished this breach by deliberately delaying the general availability of Origin's products long past the tentative EO Date and then reneging on its written agreement to re-set the EO Date to coincide with the GA Date, after it had used that agreement to wrongly induce the Shareholders to perform on the basis of that promise. Stratasys now takes the false and self-serving position that the first Earn-Out Period includes eight months when the Origin products were not available for sale.

154.    Stratasys's breach of its covenants has materially and unfairly harmed the Shareholders.

155.    Among other things, Stratasys's breach has deprived the Shareholders of a full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments.

## **PRAYER FOR RELIEF**

WHEREFORE, by and through their designated Shareholder Representative, Fortis, the Shareholders pray for an award against Stratasys as follows:

A.    Specific performance of Stratasys's obligations under the Acquisition Agreement, including the obligation to treat February 1, 2022 as the EO Date for all purposes.

B.    Enforcement of Stratasys's promise to re-set the EO Date to February 1, 2022.

C.    Compensatory damages from Stratasys equal to the full amount of Earn-Out Payments due under the Acquisition Agreement, of $40 million.

D.    Pre- and post-judgment interest from Stratasys.

E.    All attorneys' fees, expenses, and costs.

F.    Such other and further relief as the Arbitrator deems just and proper.

45

Dated: November 11, 2024

Respectfully submitted,

**BRAUNHAGEY & BORDEN LLP**

By: _____

J. Noah Hagey, Esq.
747 Front Street, 4th Floor
San Francisco, CA 94111
Tel.: 415-599-0210
Fax: 415-276-1808
hagey@braunhagey.com

Christman Rice, Esq.
Lily (Haeun) Kim, Esq.
118 W. 22nd Street, 12th Floor
New York, NY 10011
Tel.: 646-829-9403
Fax: 646-403-4089
rice@braunhagey.com
kim@braunhagey.com

*Attorneys for Claimants, Former
Shareholders of Origin Laboratories, Inc.,
by and through Shareholder Representative
Fortis Advisors LLC*

46

# Exhibit E

# EXHIBIT 21

J. Noah Hagey, Esq. (SBN: 262331)
hagey@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th FloorSan Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Christman Rice, Esq. (*pro hac vice* forthcoming)
  rice@braunhagey.com
Lily (Haeun) Kim, Esq. (*pro hac vice* forthcoming)
  kim@braunhagey.com
Iqra Asghar, Esq. (*pro hac vice* forthcoming)
  asghar@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

ATTORNEYS FOR PLAINTIFF

~~INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION~~

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/21/2024**
**Clerk of the Court**
BY: AUSTIN LAM
Deputy Clerk

~~WILMINGTON, DELAWARE~~

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

~~FORMER SHAREHOLDERS OF ORIGIN LABORATORIES, INC.,~~ *by and through* FORTIS ADVISORS LLC, a Delaware

~~Claimants~~Plaintiffs,

v.

STRATASYS LTD., an Israeli corporation, STRATASYS, INC., a Delaware corporation, and

Defendants.

Case No._____

**COMPLAINT**

**JURY TRIAL DEMANDED**

**UNREDACTED**

MAY NOT BE EXAMINED WITHOUT COURT ORDER - CONTAINS MATERIAL FROM CONDITIONALLY SEALED RECORD

MATERIALS SHALL BE UNSEALED AFTER TEN (10) DAYS ABSENT FILING OF A MOTION TO SEAL PURSUANT TO CRC 2.551(b)

Case No.

COMPLAINT

ICDR Case No. 01-23-0002-3975

Plaintiff Fortis Advisors LLC, in its capacity as Shareholder Representative of ARBITRATION DEMAND FOR:

1. BREACH OF CONTRACT – DAMAGES

2. BREACH OF CONTRACT – SPECIFIC PERFORMANCE AND INJUNCTION

3. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

4. PROMISSORY ESTOPPEL

5. UNJUST ENRICHMENT

6. QUANTUM MERUIT

7. FRAUD

BRAUNHAGEY & BORDEN LLP

747 Front Street, 4th FloorSan Francisco, CA 94111

118 W. 22nd Street, 12th Floor New York, NY 10011

*Attorneys for Claimants, Former Shareholders of Origin Laboratories, Inc., by and through Shareholder Representative Fortis Advisors LLC*

# TABLE OF CONTENTS

STATEMENT OF DISPUTE ........................................................................... 1

ARBITRATION AGREEMENT ...................................................................... 4

PARTIES .......................................................................................................... 4

JURISDICTION, VENUE, AND GOVERNING LAW ................................... 5

FACTS .............................................................................................................. 6

I.    ORIGIN'S BACKGROUND ................................................................... 7

      A.    Origin's Thesis: 3D Printing as Manufacturing ........................ 7

      B.    Origin's Groundbreaking Intellectual Property ........................ 8

      C.    The Origin One Printer ............................................................ 11

II.   STRATASYS'S ACQUISITION OF ORIGIN ...................................... 12

      A.    The Beginning of the Origin-Stratasys Relationship ............... 12

      B.    The Parties Negotiate the Terms of the Acquisition ............... 13

      C.    The Acquisition Agreement ..................................................... 17

      D.    Chris and Joel Work to Ensure a Successful Acquisition ........ 20

III.  STRATASYS REPRESENTS THAT IT HAS AGREED TO SET THE
      EARN-OUT COMMENCEMENT DATE TO REFLECT
      COMMERCIAL REALITY ................................................................. 21

      A.    Stratasys Delays the Sale of Origin Products ......................... 21

      B.    Stratasys Tells the Shareholders That It Agrees to a New EO Date Coinciding
            with the Launch of the Origin One Version 2.7 ...................... 22

            1.    ██████████████████████████████████████
                  ██████████████████████ .............................. 23

            2.    ██████████████████████████████████████
                  ████████████████████████ ........................... 24

            3.    ███████████████████████████████████
                  ██████████████ ......................................... 25

            4.    ███████████████████████████████████

████████████████████ ...................................................................................... 26

ii

C.  The Shareholders Rely on Stratasys' Representations and Agreement to Re-Set the EO Date ................................................................ 27

D.  Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success . 31

E.  Stratasys Reneges on the Parties' Agreement in Order to Cheat the Shareholders Out of Their Bargained-For Consideration ............................ 33

IV.  STRATASYS VIOLATED ITS REPRESENTATIONS, PROMISES AND AGREEMENT(S) ................................................................................. 34

A.  The Parties' Emails Constitute Writings Under the Acquisition Agreement ........ 35

B.  Re-Setting the EO Date Does Not Require Board Approval .......................... 36

C.  The Parties' Performance Evidences Stratasys's Representations that It Had Agreed to Change the EO Date ..................................................... 38

V.  STRATASYS HAS DEFRAUDED THE SHAREHOLDERS ........................... 40

A.  Stratasys Fraudulently Induced the Shareholders' Execution of the Acquisition Agreement .................................................................... 40

B.  Stratasys Defrauded the Shareholders by Lying About Its Intention to Re-Set the EO Date ........................................................................ 43

C.  Stratasys Concealed Its Fraud Until At Least March 23, 2022 ..................... 43

VI.  STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER .................................................................................... 44

CAUSES OF ACTION ................................................................................. 46

PRAYER FOR RELIEF ............................................................................... 58

iii

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Abry P'rs V, L.P. v. F & W Acq. LLC,*
891 A.2d 1032 (Del. Ch. 2006) .................................................. 43, 57

*Brown v. SAP Am., Inc.,*
No. C.A. 98-507-SLR, 1999 WL 803888 (D. Del. Sept. 13, 1999) .................. 58

*Camden Fitness, LLC v. Wandless Enterprises, Inc.,*
No. CPU5-12-000295, 2013 WL 8854873 n.7 (Del. Com. Pl. Feb. 11, 2013) ...... 35, 36

*CLP Toxicology, Inc. v. Casla Bio Holdings LLC,*
No. CV 2018-0783-PRW, 2020 WL 3564622 (Del. Ch. June 29, 2020) ............ 3

*Curtiss-Wright Corp. v. Schoonejongen,*
514 U.S. 73 (1995) ............................................................ 37

*Falco v. Alpha Affiliates, Inc.,*
No. CIV. A. 97-494, 2000 WL 727116 (D. Del. Feb. 9, 2000) ................... 57

*Fortis Advisors LLC v. Johnson & Johnson,*
No. CV 2020-0881-LWW, 2021 WL 5893997 (Del. Ch. Dec. 13, 2021) ............. 3

*Haft v. Dart Grp. Corp.,*
841 F. Supp. 549 (D. Del. 1993) ............................................. 39, 47

*Hessler, Inc. v. Farrell,*
226 A.2d 708 (Del. 1967) .................................................... 37

*Kuroda v. SPJS Holdings, L.L.C.,*
971 A.2d 872 (Del. Ch. 2009) ............................................... 49

*Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.,*
28 A.3d 436 (Del. 2011) ..................................................... 57

*Norton v. Poplos,*
443 A.2d 1 (Del. 1982) ...................................................... 58

*Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.,*
297 A.2d 28 (Del. 1972) ..................................................... 39

*Prairie Cap. III, L.P. v. Double E Holding Corp.,*

132 A.3d 35 (Del. Ch. 2015) ............................................................................................................... 43

*Schooneiongen v. Curtiss-Wright Corp.,*
  143 F.3d 120 (3d Cir. 1998) .................................................................... ~~37~~ 38

*S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.,*
  No. 2020-1069-MTC, 2021 WL 3925937 (Del. Ch. Sept. 1, 2021) ................. 38

*Stephenson v. Capano Dev., Inc.,*
  462 A.2d 1069 (Del. 1983) .................................................................... 58

*Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC,*
  No. CVN19C11092PRWCCLD, 2021 WL 117036 (Del. Super. Ct. Jan. 13, 2021) ............. 57

*Triple H Fam. Ltd. P'ship v. Neal,*
  No. 12294-VCMR, 2018 WL 3650242 (Del. Ch. July 31, 2018) .................. 36

*Zayo Grp., LLC v. Latisys Holdings, LLC,*
  No. 12874-VCS, 2018 WL 6177174 (Del. Ch. Nov. 26, 2018) ..................... 36

**STATUTES**

DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023) ..................................... 35

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019) .................................................... ~~35~~ 36

~~Claimants,~~ the former shareholders of ~~California-based~~ Origin Laboratories, Inc.~~, by and through Shareholder Representative Fortis Advisors LLC (hereinafter for convenience, the "Origin Shareholders" or~~ (the "Shareholders")~~,~~ hereby allege against ~~Respondents, Israel-based international technology conglomerate~~Defendants Stratasys Ltd.~~ and~~, Stratasys, Inc.~~,~~ (collectively, "Stratasys")~~,~~ and Yoav Zeif as follows:

## ~~STATEMENT OF DISPUTE~~INTRODUCTION

1. Origin Laboratories, Inc. ("Origin") was an innovative California startup company founded in 2015 by Chris Prucha and Joel Ong based on a simple insight: by developing sophisticated 3D-printing software, Origin could produce high-quality, usable parts that would bring 3D-printing out of the realm of hobbyists and into the much larger manufacturing market. Origin represented the culmination of Chris and Joel's ~~efforts and impressive software~~ engineering experience—Chris as an Apple engineer and previous co-founder of a separate collaboration platform; Joel as an engineer on moonshot initiatives at Google X. ~~Respondent~~ Stratasys, a publicly traded Israeli technology conglomerate, approached Chris and Joel in 2020 with an unsolicited acquisition offer, and Stratasys ultimately purchased Origin for approximately $100 million pursuant to an Agreement and Plan of Merger and Reorganization, dated December 8, 2020 (the "Acquisition Agreement") (Ex. 1).

3.      Following the acquisition, Stratasys and its executives again repeatedly reassured the Shareholders that it would calculate their entitlement to the agreed-upon Earn-Out Payments

based on the actual sales of Origin's products and services, and would thus re-set the EO Date. Accordingly, when Stratasys delayed the post-acquisition launch of Origin's products, Stratasys again promised, orally and in writing, that the EO Date would coincide with the general availability of Origin's products. In reliance on those representations, promises, and agreements, the Shareholders continued to perform for the company, including by designing new technology and assisting with patent applications on novel concepts accruing to Stratasys's benefit.

4.      Stratasys finally made Origin's 3D printing products generally available to customers in February 2022—that is, seven months after the placeholder EO Date—and Origin's performance thereafter has ~~far~~ exceeded all projections. Stratasys touted Origin's success in its ~~recent~~ SEC filings and releases, claiming that Origin is responsible for the largest first-quarterly growth in Stratasys's history and is operating as "an important growth engine" for Stratasys. Even beyond the sale of Origin-branded products, Stratasys has integrated Origin's sophisticated suite of intellectual property throughout its business and, as a result, Stratasys's enterprise value has substantially increased.

5.      Unfortunately, Stratasys's representations and inducements were not truthful, and Stratasys appears never to have had any intention of launching Origin's products by the

placeholder EO Date or moving that date to coincide with the products' general availability. Instead, Stratasys now insists on using the defunct July 1 placeholder date as the basis from which to calculate the Shareholders' Earn-Out—even though Stratasys *did not offer* the products for sale during that period. By delaying the launch ~~while~~and now insisting that the EO Date remains unchanged, Stratasys has effectively ~~reduces~~helped itself to a 40% reduction in the purchase price ~~by 40%~~for Origin and its intellectual property, because the later Earn Out Periods assume increasing growth targets.

6. The Shareholders bring this suit to recover for Stratasys's fraud and bad faith dealings, including accelerated payment of the full $40 million in bargained-for earn-out payments that Stratasys has withheld. ~~Stratasys' intentional deceit both before and after the transaction closed was designed to deprive Origin's Shareholders of millions of dollars in bargained-for consideration. Stratasys meanwhile has unjustly enriched itself by hundreds of millions of dollars through its use of Origin's ground-breaking technology and patented know-how—and has rejected all of the Shareholders' efforts to resolve this dispute short of litigation.~~

and ~~7.~~ ~~The Shareholders accordingly seek full remedies and to deprive Stratasys of the fruits of its misconduct. In addition to payment of the Earn Out, the Shareholders thus seek~~ disgorgement of the amount by which Stratasys has unjustly profited from its misconduct, including all actual and expected revenue associated with Origin's products and services and the value of Origin's products, intellectual property, and services, estimated to be at least $400 million.[1] The Shareholders also seek the quantum meruit value of the ~~services that Stratasys~~

---

[1] ~~The Shareholders recognize that claims exceeding their expectation damages under the Acquisition Agreement may be perceived as unusual. But Stratasys's deliberately fraudulent and deceptive conduct has deprived the Shareholders both of 40% of the agreed-upon consideration and of the bargained-for certainty of a fairly calculated purchase price. In such circumstances, Delaware law supports disgorgement of a wrongdoer's ill-gotten gains and recognizes that any other outcome would incentivize deceit by granting the wrongdoer a windfall or "free option." See, e.g., CLP Toxicology, Inc. v. Casla Bio Holdings LLC, No. CV 2018-0783-PRW, 2020 WL 3564622, at \*21 (Del. Ch. June 29, 2020) (permitting claims seeking disgorgement under theory of fraudulent inducement / unjust enrichment); Fortis Advisors LLC v. Johnson & Johnson, No. CV 2020-0881-LWW, 2021 WL 5893997, at \*12 (Del. Ch. Dec. 13, 2021) (permitting fraud claims seeking to recover in excess of contractual "capped damages"~~

services that Stratasys unfairly induced Shareholders to provide. Finally, unless and until Stratasys fully compensates

fully compensates the Shareholders in connection with any award hereunder, Stratasys should be enjoined from

enjoined from further use of any patents and intellectual property developed by Origin or the Shareholders.

## ARBITRATION AGREEMENT

8. This dispute arises under the parties' Agreement and Plan of Merger and Reorganization dated December 8, 2020 (Ex. 1) (the "Acquisition Agreement"), § 11.5(a) of which provides for AAA arbitration before a single arbitrator in Wilmington, Delaware of "any and all claims . . . arising out of" Stratasys's acquisition of Origin:

> The parties hereto understand and irrevocably agree that any and all claims, grievances, demands, controversies, causes of action or disputes of any nature whatsoever (including, but not limited to, tort and contract claims, and claims upon any Legal Requirement) (hereinafter 'Disputes'), arising out of, in connection with, or in relation to this Agreement and the Ancillary Agreements shall be exclusively referred to and finally resolved by arbitration in Wilmington, Delaware. The arbitration will be conducted in English in accordance with the rules of the American Arbitration Association with one arbitrator. The parties hereto agree that a final determination of an arbitrator in accordance with the provisions hereof shall be conclusive and may be entered in any Court having jurisdiction.

9. The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c))Shareholders.

## PARTIES

███████████████████████████████████████████





**PARTIES**

~~11~~9.    ~~Plaintiff~~ Fortis Advisors LLC is a Delaware limited liability company that serves as ~~the~~

the formal representative of the Shareholders of Origin in connection with the acquisition of Origin

by Stratasys, ~~Inc.,~~ as memorialized in the ~~Acquisition~~parties' Agreement~~.~~ and Plan of Merger and Reorganization

dated December 8, 2020 (Ex. 1) (the "Acquisition Agreement"). Prior to Stratasys's acquisition of

Origin, the Shareholders were shareholders of Origin Laboratories, Inc. ("Origin"), a corporation

organized under the laws of Delaware that successfully developed innovative 3D printing

technologies. Origin was founded, headquartered, and had its principal place of business in San

Francisco, California.

~~12.~~ 10.    Defendant Stratasys Ltd. is a company incorporated under the laws of the State of ~~Israel,~~

Israel, with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

~~13.~~ 11.    Defendant Stratasys, Inc. is a Delaware corporation and a wholly owned subsidiary ~~of~~

of Stratasys Ltd., with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

12.    Defendant Yoav Zeif is an individual domiciled in Israel. Mr. Zeif is the Chief Executive Officer of Stratasys.

### JURISDICTION, AND VENUE, ~~AND GOVERNING LAW~~

13.    The Court has personal jurisdiction over Stratasys pursuant to California Code of Civil Procedure § 410.10 because: (a) Stratasys conducts business in California; (b) Stratasys has availed itself of the laws and markets of California by soliciting business from entities and individuals located within the state of California, including by soliciting, negotiating, and consummating the acquisition of a California-based corporation at issue in this action; (c) Stratasys has engaged in fraudulent and tortious conduct and misrepresentations within California; and (d) Stratasys targeted its fraudulent tortious conduct and misrepresentations at the Shareholders in California with the knowledge that such conduct would cause harm to the Shareholders in California.

14.    The Court has personal jurisdiction over Zeif pursuant to California Code of Civil Procedure § 410.10 because: (a) Zeif conducts business in California; (b) Zeif has availed himself of the laws and markets of California by soliciting business from entities and individuals located within the state of California, including by soliciting, negotiating, and consummating the acquisition of a California-based corporation at issue in this action; (c) Zeif has engaged in fraudulent and tortious conduct and misrepresentations within California; and (d) Zeif targeted his fraudulent and tortious conduct and misrepresentations at the Shareholders in California with the knowledge that such conduct would cause harm to the Shareholders in California.

15.    As described more fully below, Stratasys and Zeif made knowingly false misrepresentations to the Shareholders they knew to be located in California in order to induce the Shareholders to enter into the Acquisition Agreement with the intent and expectation that the Shareholders would rely on those misrepresentations when making a decision to sell Origin at their

~~14.    The American Arbitration Association has jurisdiction over this arbitration and venue is properly located in Wilmington, Delaware, pursuant to Section 11.5(a) of the~~

Acquisition Agreement. The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c)).

15.     This dispute is governed by Delaware law pursuant to § 11.4 of the Acquisition Agreement, which states:

> This Agreement, and all claims (whether at law or in equity, whether in contract, tort, statute or otherwise) arising in whole or in part out of, related to, based upon, or in connection herewith or the subject matter hereof will be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

Case No.
COMPLAINT

California place of business. Stratasys and Zeif also made knowingly false statements to the Shareholders after they acquired Origin, during which time Stratasys and Zeif operated the Origin business unit in California. Such false statements were intended to, and did, induce the Shareholders to provide valuable services for Stratasys's benefit. As a result, Stratasys and Zeif were able to avail themselves of the benefit derived from acquiring Origin and using Origin's valuable intellectual property, as well as from valuable post-acquisition work that the Shareholders performed in California, which unjustly enriched Stratasys and is the gravamen of this action. Moreover, many of the potential witnesses are located in California or can easily travel to California and California has strong interest in deciding the claims arising out of foreign defendants' tortious conduct aimed at acquiring California's innovative start-up companies without paying the fair price, as here.

16.    Venue is proper in San Francisco County pursuant to California Code of Civil Procedure § 395.5 because Defendants made fraudulent statements to the Shareholders in San Francisco County and because the Shareholders' resulting injuries occurred in San Francisco County, among other reasons.

## FACTS

16.    On December 8, 2020, Stratasys and the Shareholders entered into the Acquisition Agreement, pursuant to which Stratasys agreed to acquire Origin and its intellectual property for a total purchase price of approximately $100 million. The Acquisition Agreement contemplated payment of 60% of the purchase price up front, with the remaining 40% conditioned on Origin's post-acquisition performance over a three-year period that would begin to run on an agreed-upon commencement date (the "EO Date"). The Acquisition Agreement set a tentative EO Date but empowered the parties to modify that date by simple written agreement. In order to induce the Shareholders' execution of the Acquisition Agreement, Stratasys repeatedly promised the Shareholders that it would treat them fairly, would modify the EO Date to coincide with the post-acquisition roll-out of the Origin product line, and would not take any actions intended to interfere with the Shareholders' ability to Earn Out Targets. Stratasys made those promises in writing prior to the execution

of the Acquisition Agreement, and memorialized the broad concept in the Acquisition Agreement itself.

17. On multiple occasions in 2021 and 2022, Stratasys and the Shareholders abided by those prior promises and agreed to re-set the EO Date to correspond with the general availability of Origin's printers. In other words, the parties agreed that they would begin to measure the sales of Origin products only when those products were actually available for sale.

18. In a transparent attempt to retain the full value of Origin and its intellectual property while depriving the Shareholders of the remainder of the purchase price, Stratasys has now reneged on its agreement and has taken the position that the EO Date was never re-set. It has done so only after lying to the Shareholders and inducing them to devote substantial time, effort, and resources to creating post-acquisition value for Stratasys in reliance on Zeif's and Stratasys's promises. Zeif's and Stratasys's fraudulent and bad-faith conduct constitutes a

~~breach of the Acquisition Agreement and the implied covenant of good faith and fair dealing. It also establishes the Shareholders' entitlement to relief for Stratasys's fraud and fraudulent inducement, as well as for equitable relief and disgorgement under the doctrines of promissory estoppel, unjust enrichment, and quantum meruit.~~

## I.    ORIGIN'S BACKGROUND

~~19~~17.   Origin was founded in <u>San Francisco, California, in</u> 2015 by Christopher Prucha and Joel Ong based on their belief in the transformative potential of 3D printing. Chris and Joel both came to 3D printing from backgrounds in software engineering rather than in hardware or manufacturing, which provided them with a viewpoint that was unique in the industry.

~~20~~18.   Chris was an engineer at Apple before founding Notion Labs, Inc., a collaboration platform and file-management tool now valued in excess of $10 billion. Joel established his engineering credentials at Google, where he worked on a variety of moonshot projects at Google X, among other things. Together, they launched Origin to take a software-first approach to 3D printing that no other participant in the industry was pursuing.

### A.    Origin's Thesis: 3D Printing as Manufacturing

~~21~~19.   At the time of Origin's founding, the 3D printing industry was defined by two submarkets. Industry incumbents focused either on cheap, low-quality 3D printing as part of a temporary bubble of consumer interest, or they focused on more sophisticated 3D printing for the narrow purpose of rapid prototyping. Chris and Joel recognized the self-limiting nature of these approaches and concluded that 3D printing could reach its potential only if it could be used for manufacturing on a broad scale—a multitrillion-dollar industry that dwarfed both the nascent and unpredictable consumer market for 3D printing and the prototyping industry.

~~22~~20.   But the existing technology was limited by unsophisticated software built around a "closed materials" model, and the existing printers were not good enough to allow users to

efficiently print functional parts. Moreover, the industry incumbents hamstrung their own printers by strictly limiting the material inputs and controlling the sale of those materials. In other words, the incumbents focused on short-term profits over potential long-term gain, and they did not prioritize developing printers that could meet the needs of 3D-printing customers seeking production-scale manufacturing applications.

21. These factors drove Chris and Joel to devise a simple thesis for Origin: 3D-printing technology could be improved and made less expensive by developing better software to guide and govern the 3D-printing process. They planned to achieve this in two ways: (i) by developing granular real-time feedback through a detailed sensor apparatus that would ensure reliable and precise printing, and (ii) by partnering with chemical companies to allow end users to print parts from a wide array of new and experimental materials.

**B.     Origin's Groundbreaking Intellectual Property**

22. Chris and Joel soon discovered that in order to build Origin the way they wanted to, they would not be able to rely solely on the industry's incumbent hardware manufacturers because the focus-based limitations Chris and Joel had identified with respect to the incumbent businesses themselves were also baked into every aspect of the industry's equipment manufacturers. The only solution was for Origin to develop both the software and hardware necessary to implement Chris and Joel's vision.

23. Origin did so, and it began shipping its first units in 2017 to overwhelming acclaim from customers. Origin continued to hone and improve its hardware, software, and material inputs to increase the quality and applicability of the system and to allow customers to print an ever-greater variety of end-usable parts with greater quality and reliability. In the years since then, Origin has pursued and secured broad patent protection for its printing process both in

the United States and internationally—including in Japan, China, the European Union, and Canada.

2624.    Key patents and patent applications include the following, for which Chris and Joel are inventors:

| Figure 1: Key Patents Issued to Origin Founders | | | | |
|---|---|---|---|---|
| **Family Ref.** | **Title** | **Jurisdiction** | **Application No.** | **Date Filed** |
| ORGN M01ORGN-M01 | Method for Window Separation in an Additive Manufacturing Process | Canada | 3118364 | 2019-11-01 |
| | | China | 2019900012861 | 2019-11-0 |
| | | Europe | 19879943.9 | 2019-11-0 |
| | | Japan | 2021-600065 | 2019-11-0 |
| | | Patent Cooperation Treaty | PCT/US2019/059564 | 2019-11-0 |
| | | United States of America | 62/754411 | 2018-11-0 |
| | | United States of America | 16/672410 | 2019-11-0 |
| | | United States of America | 16/900560 | 2020-06-1 |
| | | United States of America | 16/941464 | 2020-07-2 |
| | | United States of America | 17/404,966 | 2021-08-1 |
| ORGN M02ORGN-M02 | System for Window Separation in an Additive Manufacturing Process | United States of America | 62/754430 | 2018-11-01 |
| | | United States of America | 16/672415 | 2019-11-0 |
| | | United States of America | 17/388598 | 2021-07-2 |
| ORGN M03ORGN-M03 | Method for Regulating Temperature at a Resin Interface in an Additive Manufacturing Process | Canada | 3136654 | 2020-04-17 |
| | | China | 2020900006647 | 2020-04-1 |
| | | Europe | 20791068.8 | 2020-04-1 |
| | | Japan | 2021-600157 | 2020-04-1 |
| | | Patent Cooperation Treaty | PCT/US2020/028783 | 2020-04-1 |
| | | United States of America | 62/835444 | 2019-04-1 |
| | | United States of America | 16/852078 | 2020-04-1 |
| | | United States of America | 17/066249 | 2020-10-0 |
| | | United States of America | 17/066372 | 2020-10-0 |

| Figure 1: Key Patents Issued to Origin Founders | | | | |
|---|---|---|---|---|
| Family Ref. | Title | Jurisdiction | Application No. | Date Filed |
| ~~ORGN M04~~ORGN-M04 | Method for Interlayer Feedback Control and Failure Prevention in an Additive Manufacturing Process | Canada | | 2020-08-03 |
| | | China | | 2020-08-0 |
| | | Europe | 20850214.6 | 2020-08-0 |

| | | | | |
|---|---|---|---|---|
| | ~~Additive Manufacturing Process~~ | Japan | | 2020-08-03 |
| | | Patent Cooperation Treaty | PCT/US2020/044803 | 2020-08-0 |
| | | United States of America | 62/882464 | 2019-08-0 |
| | | United States of America | 16/984102 | 2020-08-0 |
| | | United States of America | 17/518,510 | 2021-11-0 |
| ~~ORGN-M05~~ORGN-M05 | Method for Evaluating Photocurable Resins for an Additive Manufacturing System | United States of America | 62/972573 | 2020-02-10 |
| | | United States of America | 17/173174 | 2021-02-10 |
| ~~ORGN-M06~~ORGN-M06 | Origin Swab Documentation | United States of America | 63/007296 | 2020-04-08 |
| ~~ORGN-M07~~ORGN-M07 | Layer Segmentation: Texture and Dimensional Accuracy | United States of America | 63/218,247 | 2021-07-02 |
| ~~ORGN-M08~~ORGN-M08 | Method for Polymerizing Superficial Features in 3D-Printed Parts | United States of America | 63/300,621 | 2022-01-18 |
| ~~ORGN-D01~~ORGN-D01 | Additive Manufacturing Station | United States of America | 29/803,459 | 2021-08-12 |

~~27~~25.   As this chart shows, Origin has secured (or was in the process of seeking) patent protection for, among other things, (i) key components of the printing process, (ii) key portions of its physical hardware, (iii) the use of real-time sensor data to optimize the printing process, (iv) the multivariate testing of new materials and formulations, and (v) light control and other software techniques for improving the accuracy, quality, and repeatability of manufactured parts. In addition to these patent protections, Origin has developed a variety of proprietary technologies and protected trade secrets concerning its product and processes, and it maintains substantial documentation to protect that valuable intellectual property. And as explained below, Chris and Joel have continued to devote themselves to developing, expanding, and protecting Origin's patent portfolio even after the acquisition by Stratasys.

2826.    The most important aspect of Origin's software-based approach to 3D printing is the patented "Programmable PhotoPolymerization" process, or the "P3" process. The P3 process allows inexpensive and rapid production of high-quality and functional end-use parts. Among other things, the P3 process eliminates non-scalable and time-consuming post-processing—that is, the need to extensively treat the product after printing, such as by sanding rough edges—which has historically inhibited 3D printing from being used for manufacturing at a large scale. Instead, the P3 process is capable of producing parts that are usable virtually straight out of the printer, increasing efficiency and operating with, in Stratasys's own words, "industry-leading accuracy, consistency, detail, and throughput[.]"[21]

C.    The Origin One Printer

2927.    In 2019, Origin combined its insight and intellectual property into a flagship product and launched the Origin One printer to overwhelming demand and uniformly positive reviews. The Origin One combined the P3 process with the open-material model to permit users to print high-quality, functional products out of nearly any material chemistry—including newly developed materials—with minimal post-processing.

3028.    The unique combination of the P3 process and the open-material model disrupted the industry incumbents, whose businesses turned on the (now outdated) "closed" model, and who relied on tightly controlled sales of material inputs. The Origin One's success threw the deficiencies of the old model into stark relief, and it led to lucrative partnerships with major manufacturers in a variety of industries, ranging from the Ford Motor Company in the automotive industry and the shoe company ECCO Sko A/S in the apparel industry.

[21] https://www.stratasys.com/en/3d-printers/printer-catalog/p3/origin-one-printer/ (last accessed May 18, 2023).

3129.    Although the industry has since followed Origin's lead and the open-material model is now nearly ubiquitous, Origin's technology remains best-in-class.

## II.    STRATASYS'S ACQUISITION OF ORIGIN

3230.    In 2020, Stratasys agreed to acquireacquired Origin for a total purchase price of approximately $100 million in recognition of Origin's paradigm-shifting 3D printing technology. Stratasys has since

*Origin One 3D Printer Support*, Stratasys, https://support.stratasys.com/en/Printers/P3-Printers/Origin-One (last accessed October 15, 2024).

touted the acquisition, noting in multiple SEC filings that Origin's technology "has become an important growth engine for our company." (Ex. 2, Stratasys 2022 Annual Report).)

### A.    The Beginning of the Origin-Stratasys Relationship

3331.    Stratasys and Origin first worked together in March 2020 to produce 3D-printed sterile nasal swabs for use with COVID-19 tests. At the time, near the beginning of the pandemic, Origin was among the very first companies to receive clinical-trial approval for its 3D-printed nasal swabs.

3432.    Because Stratasys had tried, but failed, to receive approval for its own 3D-printed swabs, the two companies entered a partnership to produce and distribute Origin's swabs. Through this partnership, each company learned about the other's strengths, abilities, and expertise. Chris, Joel, and their Origin colleagues worked closely with Stratasys's sales and distribution teams, while Stratasys witnessed firsthand Origin's industry-leading design, products, and operations.

3533.    Recognizing the value of further collaboration, Stratasys made Origin an unsolicited offer of acquisition in the spring of 2020. Origin was not initially interested, and the Origin board turned down Stratasys's offer without countering. Stratasys nevertheless presented an updated offer on more favorable terms, paving the way for negotiations that culminated in the acquisition six months later.

**B.      The Parties Negotiate the Terms of the Acquisition**

36~~34~~.    The Parties negotiated the terms of Stratasys's acquisition of Origin throughout the remainder of 2020. During the early stages of those negotiations, Stratasys was largely represented by Ronen Lebi, its Vice President of Corporate Development.

37~~35~~.    As part of the negotiations, Stratasys engaged in an extensive technical diligence review through which it analyzed and confirmed the value of Origin's software-driven approach to 3D printing. This diligence review involved, among other things, multiple in-person visits to Origin's facilities in San Francisco by key Stratasys personnel, including Yoav Zeif (Stratasys's CEO), Guy Menchik (Stratasys's Chief Technology Officer), Richard Garrity (Stratasys's Chief Industrial Business Officer, then the President of Stratasys Americas), Omer Krieger (Stratasys's Executive Vice President), and Amir Kleiner (Stratasys's VP Global Operations), among others.

38~~36~~.    Separate from the technical diligence process, the parties devoted substantial efforts to negotiating the mechanics and structure of the acquisition—including Stratasys's proposal to structure the consideration it would pay to Origin in two parts: Stratasys would pay approximately 60% of the $100 million purchase price up front, and would pay the remaining 40% over a three-year period, conditioned on Origin's post-acquisition performance.









4947.   In explicit reliance on these and other promises Stratasys made as part of "mechanisms of managing the EO risk," the Shareholders agreed to resume formal negotiations of the proposed acquisition. The parties ultimately executed the Acquisition Agreement on December 8, 2020 and announced the acquisition shortly thereafter.

C.      The Acquisition Agreement

48.    The Acquisition Agreement contemplated that a portion of the consideration for Origin and its intellectual property would take the form of three post-acquisition payments to the Shareholders keyed to the Origin business unit meeting certain revenue-based performance goals. (*Id*. § 2.3; Ex. D.) In particular, the Acquisition Agreement established three "Earn-Out Periods" over three consecutive years, beginning with the EO Date. (*Id*. Annex I.) The Acquisition Agreement then set out calculations of the applicable Earn-Out Payments based on whether the revenue attributable to Origin's products during each such period (the "Earn-Out Revenue") met the pre-determined threshold of the Earn-Out Target. (*Id*. Ex. D; § 7.)

49.    In devising this structure, the parties recognized that the date selected as the EO Date—that is, the date on which the parties would begin measuring Origin's post-acquisition performance—would have a direct and major effect on whether the Earn-Out Targets were satisfied.

50.    As they had discussed throughout negotiations of the acquisition—including at the October 2020 meeting—Stratasys and the Shareholders understood and agreed that production, sales, and shipment of Origin products and services following the acquisition might be delayed for some period while the new Origin business unit integrated into the larger Stratasys ecosystem and adapted to Stratasys's new strategic goals. The Acquisition Agreement therefore included a tentative EO Date of July 1, 2021—which itself was nearly seven months after the Acquisition Agreement was executed—but provided that that date could be easily changed to correspond to the post-acquisition business reality, without the need either for a formal amendment or even a signed agreement.



52. Reflecting the Parties' agreement—at the October 2020 meeting and elsewhere—that the Shareholders' entitlement to Earn-Out Payments would be calculated based on the sale of any products or services that incorporated Origin's intellectual property, the Acquisition Agreement also set out a broad definition of revenue sources that would count against the Earn-Out Targets. Specifically, the Acquisition Agreement provided that "Revenue" for purposes of Earn-Out calculations would include:

> [S]ales or leases of Company Products and Company Services (in each case, including any and all amalgamations, derivatives, enhancements, further developments, improvements, new versions, rebranding, repackaging and updates which are substantially based on or derived from the Company Products and Company Services, or their respective updates and derivations, which shall be referred to collectively as "Derivatives") (including the sales or provision of other hardware, software, materials, services, subscriptions and warranties specifically (A) designed for, or (B) acquired, leased or licensed from Parent or its Affiliates (including the Business Unit) for, any Company Product, Company Service or Derivative)[.]

(Id., Ex. D).

53. The Acquisition Agreement further defined "Company Products" as "the products produced, developed, sold or licensed by [Origin] in the current operation of the business as of the date hereof, including the Primary Product[,]" which is in turn defined as "the Company's 'Origin

'Origin One' printer, versions 2.6 and 2.6.1." The Acquisition Agreement defined "Company Services" as

"any and all services provided by [Origin] in the current operation of the business." (Acq*Id*. Agmt., Annex I.)

5654.    The parties also agreed on a mechanism through which Stratasys would keep the Shareholders apprised of Origin's progress towards satisfying the Earn-Out Target. Specifically, once the EO Date has passed and the Earn-Out Period begins, the Acquisition Agreement requires Stratasys to deliver Quarterly Reports to the Shareholders within 60 days of the close of each quarter during each Earn-Out Period. Those reports must "set[] forth [Stratasys's] good faith, non-bindingnon-binding, computation of the Revenue in respect of such quarterly period (the 'Quarterly Report'), together with such supporting documentation as reasonably determined by [Stratasys]." (*Id.* § 2.3(c))*.*) This requirement provides transparency to the Shareholders and allows them to promptly bring any issues or disagreements to Stratasys's attention as those issues arise. (*See id.* (providing that the Shareholders would "notify Parent in the event that [they] dispute[] any element of such Quarterly Report" within "within-twenty (20) business daysBusiness Days" of receipt))*.*)

57.    The parties also agreed to a dispute-resolution mechanism pursuant to which the parties must submit any disputes for binding arbitration under Delaware law and the rules of the American Arbitration Association. (*Id.* § 11.5(a)). That provision also provides that the non-prevailing party is obligated "to pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (*Id.* § 11.5(c)).

55.    The Shareholders explicitly relied on each of these representations (among others) by Stratasys in the Acquisition Agreement. Absent Stratasys's representations, the Shareholders would not have agreed to the acquisition.

5856.    ~~Finally, the~~The parties also agreed that if any provisions of the Acquisition

Agreement

"were not performed in accordance with their specific terms or were otherwise breached,

irreparable damage would occur, no adequate remedy at law would exist and damages would be

difficult to determine[.]" (*Id.* § 11.7(e.)). The parties further agreed that a non-breaching party "shall be entitled to specific performance of the terms [of the Acquisition Agreement], in addition to any other remedy to which they are entitled at law or in equity." (*Id.*).

**D.    Chris and JoelThe Shareholders Work to Ensure a Successful Acquisition**

5957.    Stratasys's stock price skyrocketed following the acquisition announcement, increasing by more than 40% in the following two weeks from a low of $17.22 per share on December 8 to a high of $24.36 on December 23, 2020. From the outset, Chris and Joelthe Shareholders did everything they could to ensure a smooth transition—Chris even appeared on an investor call on December 9, 2020 to discuss the transaction with Stratasys shareholders and to lay out the plans for Origin's integration with Stratasys.

6058.    From those early days through the present, Chris and Joelthe Shareholders have taken every step to ensure a successful business combination—in large part because of the incentive provided by the Earn-Out Payments. For instance, theyChris and Joel both worked around the clock during the period between executing the Acquisition Agreement and closing the transaction, including, among other things, negotiating assignments of all of Origin's customer contracts and retention agreements with the existing Origin team.

6159.    Post-closing, Chris and JoelStratasys operated Origin as a new business unit within Stratasys, operating out of Origin's pre-existing offices in San Francisco. The Shareholders ensured that Origin integrated its back-office functions, its operations and supply chain functions, and its tech

function with Stratasys's existing functions. Origin also integrated its valuable intellectual property

operations while successfully continuing to file new provisional patent applications and to convert

Origin's existing provisional applications.

6260.    All of these tasks—a few mere housekeeping logistics, many others complicated and

intricate—were critical to Stratasys's ability to immediately benefit from the addition of Origin to

its business line.

6361.    Throughout this transition, the Origin team in California also continued to produce

and sell the Origin One printers. Although sales were temporarily halted following the acquisition, the supply

the supply chain and production process soon resumed, and the Origin business line was in full production

production by late spring 2021, in advance of the initial July 1, 2021 EO Date, as planned. Both

new and old clients remained happy with the performance of the Origin One.

### III. STRATASYS REPRESENTS THAT IT HAS AGREED TO SET THE EARN-OUT COMMENCEMENT DATE TO REFLECT COMMERCIAL REALITY

6462.    Over the following months, inIn the run-up to July 1 placeholder EO Date, Stratasys

made the strategic decision to

stop manufacturing and selling Origin products and services while it prioritized its other product

lines and revamped—and prepared to re-launch—the Origin One.

6563.    The Shareholders thus raised Stratasys's prior promises to adjust the Earn-Out Date (as

(as reflected in the Agreement and Stratasys's repeated representations leading up thereto).



#### A.    Stratasys Delays the Sale of Origin Products

6765.    Although Origin was well-positioned to continue manufacturing and producing its

printers beginning in spring 2021, Stratasys decided to pursue other strategic objectives. As a

result, Stratasys instructed the Origin team in California to direct its focus away from production of the

the existing printer model and, instead, to focus on developing new hardware for the Origin One that

that would be relaunched as a Stratasys product.

66. This included developing an updated version of the Origin One printer that physically conformed to Stratasys's specifications while also taking steps to develop a specialized version of the printer intended for use in the dental industry, where Stratasys saw a business opportunity. Stratasys further directed the Origin team to implement a suite of new features for the Origin One printers already in use by existing customers. As a result of these new directives, Stratasys halted production and sales of the Origin One printer entirely near the end of spring 2021.

67. During this same period, Stratasys also began incorporating Origin's intellectual property into its own product and service lines and prioritized the development of those other lines of business over the Origin business unit. In other words, Stratasys substantially delayed Origin's launch while it raced ahead with sales of its own competing products and services, giving rise to the precise issues that the Shareholders had foreseen and raised, including in the Parties' October 2020 meeting.

### B. Stratasys Tells the Shareholders That It Agrees to a New EO Date Coinciding with the Launch of the Origin One Version 2.7

68. The interruption of Origin One sales had immediate and obvious implications for Origin's ability to meet its Earn-Out Targets under the Acquisition Agreement. That is because if the EO Date remained unchanged, there would be no Origin products or services offered for sale for most or all of the first Earn-Out Period, and Origin would be unable to meet its Earn-Out Target.

69. The Shareholders foresaw this exact circumstance, and it is what led to the concerns

~~concerns~~ they raised at the October 2020 meeting—in response to which Stratasys assured the Shareholders

~~Shareholders~~ that it would treat them fairly and ensure that their earn out entitlement would be calculated fairly.

Those promises were memorialized in writing and subsequently instantiated in the Acquisition

~~the Acquisition~~ Agreement, including the provision allowing the parties to easily change the EO

Date to reflect

commercial reality and the provision forbidding Stratasys from interfering with the Shareholders'

ability to satisfy the Earn-Out Targets.















84 83.   The only way to credit Stratasys's present litigation position that the EO Date has

not been changed because the board did not approve it is to conclude—against all the evidence and

and common sense—both that (i) Stratasys's own CEO was so neutered that he somehow did not have

have the authority to negotiate and make commercial agreements on behalf of the company, and (ii) the

(ii) the Shareholders were wrong to rely on Stratasys's own CEO's representations to them that they had

they had reached an agreement. Neither of these can possibly be true.





8786.    Following Stratasys's representation that it had agreed to re-set the EO Date to coincide with the GA Date, Stratasys made the Origin One 2.7 generally available in February 2022. (Ex. 9 (Stratasys 2022 Form 6-K) (describing the "launch of the Origin One in mid-February"); *see also* Ex. 2 (Stratasys 2022 Annual Report) (noting that the "Origin One 3D Printer"

Printer" has been "generally available since the beginning of 2022")).) Because the Acquisition Agreement

Agreement requires the EO Date to "fall[] on the first day of a calendar month," Stratasys's written

written representations concerning its agreement to move the EO Date to coincide with the GA Date results

Date results in re-setting the EO Date as February 1, 2022—that is, the "first day of a calendar month"

month" capturing the general availability of the Origin One 2.7.

**C.    The Shareholders Rely on Stratasys' Representations and Agreement to Re-Set the EO Date**

8887.    Based on Stratasys's conduct and repeated agreement, the Shareholders believed that Stratasys and the Shareholders shared an understanding that the EO Date had been changed. In

~~and the existence of this mutual understanding is demonstrated by their unambiguous conduct in~~

fact, Stratasys's own subsequent conduct reinforced the Shareholders' reasonable belief that

~~reliance on the~~Stratasys would abide by its promise to re-set the EO Date.



90~~90~~89.  In fact, Stratasys did not provide the reports until July 2022, after the Shareholders,

through their counsel, demanded that Stratasys abide by its agreement and pointed out Stratasys's

failure to provide the Quarterly Reports that would have been required if the parties had not re-set

the EO Date. Stratasys, faced with this plain evidence either of its fraud or of the untrue nature of

its position—and in a ham-fisted attempt to remake history—then issued all three of those reports

simultaneously, as if somehow that would retroactively absolve Stratasys for its conduct.

Stratasys's position is self-evidently false.

90.    The Shareholders themselves explicitly relied on Stratasys's representation that it

91.    ~~The Shareholders likewise relied on Stratasys's representation that it~~ had agreed
to change the EO Date to correspond to the GA Date. ~~Among other things,~~ The full group of Shareholders

relied on Stratasys's representations by, among other things, declining to take formal steps to

challenge Stratasys's failure to provide the Quarterly Statements that it would have been required

to provide had the EO Date not been re-set. For similar reasons, the Shareholders did not, at

the time, pursue their legal remedies against Stratasys for its scheme to delay the launch of

Origin's products and services because the Shareholders reasonably believed that they would nevertheless be given a full and fair opportunity to satisfy their Earn-Out Targets and received 40% of their bargained-for consideration by virtue of Stratasys's representations that it had agreed to re-set the EO Date.

91.    Individual Shareholders Chris, Joel, and Jeffrey Lee agreed separately relied on Stratasys's representations, including by agreeing to continue their employment at Stratasys following the acquisition long after they were contractually obligated to do so, despite their many documented concerns about certain of Stratasys's strategic and operational decisions. (*See, e.g.*, Ex. 3 (July 8, 2021 Email from Chris)).) They did so with the express expectation and understanding that the re-set EO Date would give them and the other Shareholders a full and fair opportunity to satisfy the Earn-Out Targets—and to receive the remainder of their bargained-for compensation under the Acquisition Agreement. The Shareholders also relied on the agreement to re-set the EO Date by not demanding the Quarterly Reports from Stratasys when they would otherwise have been due.

92.    Without the agreement to re-set the EO Date, Stratasys's decision to halt the sale of

Origin printers would have made it nearly impossible for Origin to satisfy its Earn-Out Targets. But based on Stratasys's representations that it had agreed to re-set the EO Date, the Shareholders reasonably believed that Stratasys had aligned the parties,' interests—and based on that understanding, Chris, Joel, and Jeffrey Lee continued to provide valuable services to Stratasys to ensure the success of the Origin business unit in California.

93.    During the months since Stratasys first represented that it had agreed to re-set the

EO Date, Chris and Joel have not just contributed to the day-to-day operation of the company; they have also taken substantial steps to further expand Origin's portfolio of intellectual property. Among other things, Chris and Joel have developed new innovations and techniques and have filed new applications with the USPTO, while also taking steps to protect and secure Origin's existing suite of patents. (*See supra* ¶¶11 47-51).) Further, Chris and Joel have made extensive efforts far exceeding their contractual commitments to build out and train a robust new-technology process team to ensure the continued protection of Origin's (now Stratasys's) intellectual property. Chris

and Joel's ongoing and future work in this regard has been—and is—expressly predicated on Stratasys's representations concerning its agreement to re-set the EO Date.



96.     Stratasys's success is directly attributable to Chris and Joel's post-acquisition efforts—which they undertook relying on Stratasys's representations concerning its agreement to re-set the EO Date, which would enable the Shareholders to earn their full bargained-for earn-out compensation. It would be fundamentally inequitable and unjust for Stratasys to keep for itself the massive benefits that Chris and Joel based on their reliance on Stratasys's false representations.



100.    Stratasys's effort to cheat the Shareholders out of their bargained-for consideration—now that Stratasys has enjoyed the benefits of that bargain—is flatly contrary to Stratasys's prior representations concerning the parties' agreement, as well as Delaware law. In light of Stratasys's misconduct, the Shareholders are entitled to both enforce the contract and to their equitable portion of the substantial value they created.

**D.    Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success**

101.    Stratasys itself has recognized the substantial concrete benefits derived from acquiring Origin and using Origin's valuable intellectual property—as well as from the post post-acquisitionacquisition services provided by Chris, Joel, and the other Shareholders. The company's Form 6-K for the first quarter of 2022 noted that Stratasys's product revenues "increased by $14.6 million, or 36.7%, for the three months ended March 31, 2022," and that this increase "reflected

the highest first quarter total in five years, strengthened by the launch of the Origin One[.]" (Ex. 9 (Stratasys 2022 Form 6-K)).)

102. Stratasys's corresponding earnings release touted the "early momentum and contribution from our new Origin P3" system, which it further noted was "designed for high-volume production of end-use parts." (Ex. 10 (May 16, 2022 Earnings Stmt.)).) In fact, Origin's Q1 2022 sales exceeded Stratasys's own internal estimates at double digit rates. That momentum

continued throughout 2022, with Stratasys noting that the Origin product line "continue[s] to ramp, with excellent customer engagement across all of our new technology offerings." (Ex. 11 (August 3, 2022 Earnings Stmt.)).)

103.    Stratasys continued to tout Origin's value in subsequent filings, noting in its 2022 Annual Report that Origin's technology "has become an important growth engine for our company" and explaining that the Origin acquisition "significantly strengthened our leadership in mass production for polymer 3D printing" because "Origin's pioneering approach to additive manufacturing of end-use parts has enabled us to serve a large market with manufacturing-grade 3D printers." (Ex. 2, (Stratasys 2022 Annual Report).)

104. Origin's contribution to Stratasys goes beyond the numbers of the Origin business unit. Since the acquisition, Stratasys has recognized the value proposition of Origin's core insight: a software-driven approach to printing coupled with an open-material model will open the door for 3D printing to jump from the limited prototyping industry into the multitrillion-dollar manufacturing industry. Based on this recognition that 3D printing can be reliably used for manufacturing, Stratasys has incorporated Origin's paradigm-shifting open-material model into the majority of its 3D-printing business lines, not just the Origin One, which has allowed Stratasys to charge a premium across its business units.

105.    Stratasys's 2022 performance was largely due to Origin's products and services. And Stratasys's more recent earnings releases and investor statements continue to tout the success of the Origin product line and Origin's intellectual property more broadly—including the new "P3 Business Unit" founded exclusively for the purpose of monetizing Origin's intellectual property. For instance, in its 2023 Annual Report, Stratasys extensively discussed the P3 technology, including that the "P3-based systems, which [Stratasys] added to [its] solutions portfolio via the acquisition of Origin, offer a best-in-class combination of detail, mechanical properties and throughput for mass manufacturing production parts" and that the P3 technology "dramatically expand the total addressable market across medical, dental, consumer goods, automotive, commercial goods, and service bureaus." (Ex. 19~ (Stratasys 2023 Annual Report).)

**E.    Stratasys ~~Reneges on the Parties' Agreement in Order to Cheat~~Cheats the Shareholders Out of Their Bargained-For Consideration**



107. The only reason for this breach that Zeif provided was that the board had supposedly determined that there was "no benefit to Stratasys" to follow through on changing the EO Date, now that Stratasys had already enjoyed the benefits of the agreement. In other words, Stratasys reneged solely because it decided it would be in Stratasys's interest to do so. By refusing to honor its express representations and promises to the Shareholders, Stratasys completed its months-long scheme to dupe the Shareholders into creating massive benefits for the company while cheating them out of the compensation they are entitled to.



109.    Stratasys's effort to do so is contrary to its prior written representations, the plain language of the Acquisition Agreement, and the parties' post-acquisition course of performance. It is also contrary to any sense of fairness or good faith—both because Stratasys seeks to deprive the Shareholders of their bargained-for benefit while continuing to profit from Origin's valuable



intellectual property, and because Stratasys seeks to drive a wedge between Chris and Joel and the

~~the~~ remaining Shareholders.

110. Chris and Joel did not accept Zeif's improper proposal, which was at odds with the

~~the~~ deal Stratasys had already agreed to and was fundamentally unfair to the remaining Shareholders.

## IV.    STRATASYS VIOLATED ITS REPRESENTATIONS, PROMISES AND AGREEMENT(S)

111.    Stratasys repeatedly represented to the Shareholders that it would re-set the EO ~~Date would be~~

~~re-set~~ to coincide with the GA Date for version 2.7 of the Origin One printer. That representation is

~~is~~ memorialized in multiple writings—and it therefore constitutes an effective agreement to re-set the

EO Date under the plain language of the Acquisition Agreement.

### A.    The Parties' Emails Constitute Writings Under the Acquisition Agreement

112. The Acquisition Agreement states that the EO Date is "July 1, 2021 or such other date that falls on the first day of a calendar month as mutually agreed in writing by Parent and Seller Representative<u>.</u>" (Acq. Agmt.~~,~~ Annex I~~)~~<u>.)</u>



114. These emails are more than sufficient to satisfy the "agreed in writing" requirement of the Acquisition Agreement, which was specifically designed to account for post-acquisition business reality.

~~115. The Acquisition Agreement is governed by Delaware law. (Acq. Agmt. § 11.4). Delaware recognizes a public policy in favor of giving full effect to the unambiguous intentions of businesspeople without placing undue emphasis on formalistic requirements. Because of that policy, Delaware courts hold that emails are sufficient to satisfy a "writing" requirement of the sort in the Acquisition Agreement. *See, e.g., Camden Fitness, LLC v. Wandless Enterprises, Inc.*, No. CPU5-12-000295, 2013 WL 8854873, at \*3 n.7 (Del. Com. Pl. Feb. 11, 2013) ("Emails may~~

be considered writings."); *see also* DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023) ("If a

law requires a record to be in writing, an electronic record satisfies the law."); Black's Law

Dictionary (11th ed. 2019) (defining "writing" as "any intentional recording of words in a visual form," including "e-mails, and any other media on which words can be recorded").

116. Indeed, Delaware courts routinely find that essentially any unambiguous writing can be sufficient to reflect the parties' agreement. *See, e.g., Zayo Grp., LLC v. Latisys Holdings, LLC*, No. 12874-VCS, 2018 WL 6177174, at *14 (Del. Ch. Nov. 26, 2018) ("Toshiba's October 1, 2014 email . . . would have constituted written notice to Latisys that Toshiba intended to "materially modify" that contract."); *Triple H Fam. Ltd. P'ship v. Neal*, No. 12294-VCMR, 2018 WL 3650242, at *13 (Del. Ch. July 31, 2018), *aff'd*, 208 A.3d 703 (Del. 2019) ("This email exchange constitutes the written consent of the members to dissolve Omni."); *Camden Fitness*, 2013 WL 8854873, at *3 ("[E]ven if the contract modification should have been in writing, the emails of December 29, 2010, and February 26, 2011, constitute written modifications to the contract, evidencing [an] agreement to the new contract price of $155,000.00.").



**B.      Re-Setting the EO Date Does Not Require Board Approval**

~~118~~116.          Despite its written representations, Stratasys has taken the position that its written promises to re-set the EO Date are somehow ineffective because they ~~was~~were not formally approved by the Stratasys board. But the Acquisition Agreement includes no such

requirement—it simply requires Stratasys to agree to any change in writing. And as a

commercially sophisticated party,

Stratasys knows that a CEO does not need board approval prior to entering into an agreement on behalf of his company. ~~See, e.g., Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 81 (1995) ("[A]~~ it is well within the scope of a CEO's powers to enter into an agreement on behalf of his company and the corporation is bound by ~~contracts entered into by its officers and agents acting on behalf of the corporation and for its benefit, provided they act within the scope of their express or implied powers." (citation omitted)).~~ such agreement.

~~119~~117. Moreover, Zeif has repeatedly demonstrated broad decision-making powers and authority on behalf of Stratasys, including with respect to all sorts of issues relating to the relaunch of the Origin One printer. Without seeking or requiring the board's approval, Zeif has (i) made decisions regarding the production and sale of the Origin One printers, (ii) directed the Origin team to develop new hardware, (iii) allocated resources to address and resolve manufacturing and performance issues as they arose, (iv) directed the Origin team to prioritize a separate product targeting the dental industry over the Origin One printer, (v) restarted production, and (vi) set the GA Date.

~~120~~118. Along with these decisions, Zeif also negotiated and represented to the Shareholders that he had bound the company in writing to a revised EO Date. Stratasys's last-minute claim that Zeif needed board approval for that single item (but not the others) not only contradicts the plain language of the Acquisition Agreement, but it also deviates from the parties' course of post-acquisition performance over many months. ~~See, e.g., Hessler, Inc. v. Farrell, 226 A.2d 708, 711–12 (Del. 1967) ("It is the law of this State that when, in the usual course of the business of a corporation, an officer or agent has been allowed to manage certain of its affairs, and when this is known to the other party to the contract, the authority of the officer to act for the corporation is implied from the past conduct never challenged by the corporate officials."); Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 128 (3d Cir. 1998) ("Implied~~, from which Zeif's authority to re-set the EO Date is implied.

actual authority . . . may be found through evidence as to the manner in which the business has operated in the past[.]").

121119.    Stratasys's claim also runs contrary to its Articles of Association, which contemplate the grant of significant powers to the CEO. (Ex. 12, (Amended and Restated Articles of Association of Stratasys Ltd.,) § 81.3; *see also Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d at120, 127-28 (3d Cir. 1998) ("Express authority to act on behalf of the corporation is usually

manifested through a statute, the certificate of the corporation, the by-laws, or a board or certificate of the corporation, the by-laws, or a board or shareholder action.").).

122120. Stratasys cannot undo Zeif's representations on the company's behalf by now claiming that only the board can make such a deal.

### C.    The Parties' Performance Evidences Stratasys's Representations that It Had Agreed to Change the EO Date

123121. Finally, Shareholders relied on Stratasys's representations that it had agreed to move

move the EO Date—and from the Shareholders' perspective, Stratasys's conduct also appeared to reflect

to reflect reliance on what they understood to be a mutual agreement. As explained in Section III(C) above,

Stratasys appeared to perform in accordance with that agreement by, among other things, not producing the Quarterly Reports that are mandated during the Earn-Out Periods until after it after it received the Shareholders demand letter on June 28, 2022.

124122.    Stratasys's course of performance is consistent with its representations to the

Shareholders that it had agreed to move the EO Date. In fact, had the parties not agreed to move the

the EO Date, Stratasys would have been in material breach of the Acquisition Agreement for failing to

~~failing to~~ satisfy this requirement, with the result that the ~~full~~ entire unpaid earn-out payments—$40 million ~~in earn-out proceeds~~

would be due immediately. ~~See, e.g., S'holder Reps. Servs. LLC v. Alexion Pharms., Inc., No.~~

~~2020-1069-MTC, 2021 WL 3925937, at *3 (Del. Ch. Sept. 1, 2021) (authorizing contract claim~~

by shareholder representative to proceed against acquiring company that sought as damages "the sum total of all unpaid earn-out payments").

~~125~~123. And for their part, Shareholders Chris, Joel, and Jeffrey Lee contributed substantial time and effort to the success of the Origin business unit post-acquisition, which they did in direct reliance on Stratasys's repeated agreements to re-set the EO Date—and which conferred substantial benefits on Stratasys in reliance on the Shareholders' reasonable expectation that the re-set EO Date would provide them with a fair opportunity to satisfy the Earn-Out Targets.

~~126. Further, because Delaware law permits contract-modification through~~124. In other words, the course of ~~performance, the parties'~~ conduct ~~itself~~of both Parties would act to re-set the EO Date even in the absence of a written agreement. ~~Delaware law gives substantial weight to the ways in which businesspeople actually perform under a given contract. When, like here, a party's conduct appears to evidence~~The Parties' conduct evidences a plain intention to ~~amend the terms of a written agreement, that implied amendment is binding. *See, e.g., Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 567 (D. Del. 1993) ("The Delaware Supreme Court has held that . . . the parties may, "by their conduct, substitute a new oral contract without a formal abrogation of the written agreement," even if that agreement contains an explicit clause to the contrary.'"); Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc., 297 A.2d 28, 33 (Del. 1972) (holding that "a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement" because "the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit"—"including a change in the provisions of the written agreement by the course of conduct of the parties").~~

amend the placeholder EO Date in the Acquisition Agreement and substitute with the EO Date that

coincides with the actual launch of the Origin products and services.

127125. The parties' conduct is therefore further evidence of a mutual, unambiguous

agreement to re-set the EO Date—and that change was legally effective either as an agreement in

writing under the Acquisition Agreement or, alternatively, as a modification though their course of

of performance.[43] Stratasys cannot undo its represented agreement by belatedly claiming its own CEO

CEO somehow did not have the authority to act on the company's behalf.

## V.    STRATASYS HAS DEFRAUDED THE SHAREHOLDERS

128126. Stratasys repeatedly and knowingly lied to the Shareholders in order to induce their

their reliance and to reap substantial ill-gotten gains. By lying to the Shareholders, Stratasys was able to

able to secure and monetize Origin's valuable intellectual property while paying only a fraction of the

of the agreed-upon purchase price. And by using that intellectual property, Stratasys has generated (and

will continue to generate) hundreds of millions of dollars in revenue and increased enterprise value.

129127.    Stratasys's fraud on the Shareholders takes at least three separate forms.

### A.    Stratasys Fraudulently Induced the Shareholders' Execution of the Acquisition Agreement

130128.    Stratasys's false pre-acquisition promises fraudulently induced the Shareholders'

execution of the Acquisition Agreement. Indeed, the Shareholders had already "called off" the

potential acquisition by the early fall of 2020—but Stratasys induced them to resume negotiations

negotiations and ultimately consummate the transaction based on false pretenses.

For the same reason, Stratasys's repeated practice of directing all substantive communications concerning the EO Date to Chris, Joel, and Jeffrey Lee as the representatives of the Shareholders—rather than to Fortis, the formal "Seller Representative"—effects a modification of the Acquisition Agreement's technical requirement that the "agreement in writing" be between Stratasys and the Seller Representative.



[3] For the same reason, Stratasys's repeated practice of directing all substantive communications concerning the EO Date to Chris, Joel, and Jeffrey Lee as the representatives of the Shareholders—rather than to Fortis, the formal "Seller Representative"—effects a modification of the Acquisition Agreement's technical requirement that the "agreement in writing" be between Stratasys and the Seller Representative.







132130. Each of those promises was false, and Stratasys knew that each promise was false at

the time because Stratasys had no intention of fairly calculating the Shareholders' earn out

entitlements—or of paying the Shareholders any Earn-Out Payment at all. Instead, Stratasys

planned to prevent the Shareholders from satisfying the Earn-Out Targets, including by delaying

the launch of Origin's products, by illicitly funneling Origin's intellectual property into other

Stratasys products that it refused to count towards the Earn-Out Target,[5] and by prioritizing those

(and other) Stratasys products over the Origin line.

134132. Were it not for Stratasys's repeated false statements, the Shareholders would never

have entered into the Acquisition Agreement.

135133.        In light of Stratasys's explicitly false statements—including the false statements

incorporated into the Acquisition Agreement itself as Stratasys's explicit representations,

warranties, and obligations—Stratasys cannot avail itself of any defenses based on purported

contractual disclaimers of reliance or limitations of liability. Among other reasons, Delaware law does not allow a party either to may not

contract around its own deliberate fraud or ~~to~~ enjoy the benefits of clauses purporting to limit liability

and/or reliance where such clauses appear in

~~Stratasys's post-acquisition patent filings indicate that Stratasys has used Origin's intellectual property to pursue patent protection for non-Origin products in Stratasys's portfolio. (*See, e.g.*, Patent Application GB202303302D0 ("Method for dimensional compensation of a 3D object to be formed by an additive manufacturing apparatus"); Patent Application CA212628S ("Removable tray for 3d printer"); Patent Application US20240066798A1 ("Local z print head positioning system in a 3d printer").)~~

contracts that also include knowingly false ~~representations by the wrongdoer. *See, e.g., Abry*~~

<u>representations by the wrongdoer.</u>

~~*P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1051 (Del. Ch. 2006) (allowing buyer's fraud~~

~~claim to proceed because he "alleged, with specificity, precisely what [of seller's] statements~~

~~were materially false and why they were false[,]" and because the allegedly false statements~~

~~were included in the contract itself); *Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d~~

~~35, 50 (Del. Ch. 2015) (declining to dismiss fraud claim based on contractual representations).~~

**B.    Stratasys Defrauded the Shareholders by Lying About Its Intention to Re-Set the EO Date**

~~136~~<u>134</u>. Stratasys separately defrauded the Shareholders following the acquisition by, <u>among</u>

~~among~~ other things, lying to the Shareholders both orally and in writing about Stratasys's <u>agreement to re-</u>

~~agreement to re-set~~<u>set</u> the EO Date so as to coincide with the general availability of Origin's products and services.

~~137~~<u>135</u>. Were it not for Stratasys's repeated false statements, the Shareholders—acting through Chris, Joel, and Jeffrey Lee—would not have provided the extremely valuable services from July 2021 through February 2022 that allowed Stratasys to monetize Origin's intellectual property.

**C.    Stratasys Concealed Its Fraud <u>and Other Misconduct</u> Until At Least March 23, 2022**

~~138~~<u>136</u>.    Stratasys also fraudulently concealed its misconduct until at least March 23, 2022,

when it finally informed the Shareholders that it would not agree to re-set the EO Date—but only

after Stratasys's lies had induced the Shareholders' reliance for more than a year.



140138.      Were it not for Stratasys's repeated lies and efforts to hide the truth, the Shareholders would have discovered the truth much earlier. But in light of those lies, the Shareholders could not have known they had been defrauded any earlier than March 23, 2022.

## VI. STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER

141139. Since this dispute has arisen, the Shareholders have repeatedly—and fruitlessly—tried to engage in a productive commercial dialogue concerning Stratasys's agreement to re-set the the EO Date.

142140. Indeed, shortly after Stratasys informed the Shareholders in March 2022 that Stratasys would renege on its repeated written agreement to re-set the EO Date, Chris and Joel asked Zeif to reconsider that position and to abide by the Parties' prior agreement.

144142. Rather than engaging with the Shareholders or abiding by its unambiguous prior written agreements, Stratasys instead opted to double and triple-down on its position. In an attempt to undermine the undisputed evidence of its agreement to re-set the EO Date,

Stratasys sent a letter on July 15, 2022, in which it informed the Shareholders that it intended to provide

the Quarterly Reports—which would have been due months prior had the Parties not agreed to move the EO Date—"by no later than Wednesday, July 20, 2022." (Ex. 14, (July 15, 2022 Stratasys Letter).)

~~145~~143. Stratasys proceeded to provide "Quarterly Reports" that would have corresponded to the first, second, and third quarters of the first Earn-Out Period had the EO Date not been re-set. (Ex. 15, (July 20, 2022 Quarterly Statements).) Those Quarterly Reports demonstrated precisely why the parties agreed to re-set the EO Date: Stratasys had not even made the Origin products available for sale during much of those periods of time.[64] (*Id.*).

~~147. Even then, the Shareholders continued to seek an amicable resolution of this dispute. Between August and December 2022, the Shareholders engaged in a protracted dialogue with Zeif, culminating in an in-person meeting between Zeif, Chris, and Jeffrey Lee in Salt Lake~~

[64] Indeed, on August 29, 2022, Stratasys provided a purported "Earn-Out Schedule for the First Earn-Out Period" stating that the "First Earn-Out Payment is nil." (Ex. 16, (Aug. 29, 2022 Earn-Out Schedule).)



149147.        Stratasys's conduct left the Shareholders with no choice but to file this Arbitrationseek legal recourse in

Demand in order to hold Stratasys to its agreement, to disgorge the unfair benefits that Stratasys's and Zeif's

deliberate misrepresentations conferred on Stratasys, and to recover their costs and attorneys' fees

incurred in enforcing their rights.

**CAUSES OF ACTION**[8]

**FIRST CAUSE OF ACTION**
**(Breach of Contract - Damages)**

## VII. STRATASYS DISCLAIMS ALL ARBITRAL JURISDICTION OVER THE SHAREHOLDERS' FRAUD AND EQUITY CLAIMS

148. On May 19, 2023, the Shareholders filed an arbitration demand against Stratasys before the International Center for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA"), pursuant to the arbitration clause in the Acquisition Agreement. (Ex. 20.)

150. The Shareholders reallege each paragraph of this filed an amended arbitration demand (the "Arbitration Demand as if fully") on August 2, 2024. (Ex. 21.) The Arbitration Demand included three causes of action sounding in contract that are not at issue in this proceeding, as well as the fraud and equity claims herein.



151. In other words, Stratasys has now waived any argument that the Shareholders' claims sounding in equity and fraud should be arbitrated.

## CAUSES OF ACTION

~~set forth herein.~~

~~* Consistent with its role as shareholder representative, Fortis asserts all of the Causes of Action herein on behalf of the Shareholders. To the extent that Stratasys intends to argue that Fortis lacks standing to pursue one or more of these Causes of Action because the claims belong to an individual rather than to the Shareholders collectively, the Shareholders respectfully disagree. The Shareholders nevertheless reserve the right to amend this Arbitration Demand to bring claims on individually on behalf of one or more of the Shareholders – although the Shareholders do not believe that such a course is either necessary, efficient, or economical.~~

151. The Acquisition Agreement is a valid and binding written agreement between Stratasys and the Shareholders.

152. Among other things, the Acquisition Agreement sets out the terms of the payments by Stratasys to the Shareholders in consideration for the acquisition of Origin — including the EO Date and other terms governing Stratasys's obligation to make Earn-Out Payments. The Acquisition Agreement also requires Stratasys to provide the Shareholders with Quarterly Reports within 60 days of the close of each quarter during each Earn-Out Period. The Acquisition Agreement also empowers the parties to change the EO Date through a simple agreement memorialized in writing, without the need either for a signed agreement or formal amendment.

153. In writings dated August 25, 2021, October 12 and 21, 2021, and February 12, 2022, the parties agreed to set the EO Date to coincide with the GA Date for the Origin One Version 2.7 printer. This agreement was reflected by the parties' course of performance, which demonstrated that all parties understood and relied upon their agreement to re-set EO Date. Based on that agreement, for instance, Stratasys did not provide the Quarterly Reports that it would have been required to provide absent an agreement to re-set the EO Date.

154. Alternatively, the parties' course of performance was, itself, sufficient to modify the tentative EO Date — even assuming (contrary to fact) that the parties had not also agreed in writing to re-set the EO Date. *See, e.g., Haft*, 841 F. Supp. at 567 ("The Delaware Supreme Court has held that . . . the parties may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement, even if that agreement contains an explicit clause to the contrary." (internal quotations omitted)).

155. The Acquisition Agreement therefore obligates Stratasys to treat February 1, 2022 as the EO Date for all purposes.

156. Stratasys has violated this obligation by, among other things, refusing to treat February 1, 2022 as the EO Date for the purpose of calculating whether Origin's revenue satisfied the Earn-Out Targets. Stratasys has also violated this obligation by failing to timely provide the required Quarterly Reports following the re-set EO Date.

157. Stratasys's breach has materially harmed the Shareholders.

158. Among other things, Stratasys's breach has deprived the Shareholders of a full and fair opportunity to satisfy the relevant Earn-Out Targets—and to receive the tens of millions of dollars in Earn-Out Payments conditioned on such satisfaction. The Shareholders are therefore entitled to full payment of $40 million in Earn-Out Payments on an accelerated basis.

## SECOND CAUSE OF ACTION
### (Breach of Contract – Specific Performance and Injunction)

159. The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

160. Stratasys has breached its obligations under the Acquisition Agreement by refusing to compensate the Shareholders for Origin's valuable suite of intellectual property while continuing to profit from its ongoing use of that same intellectual property. Stratasys has agreed that its conduct causes "irreparable damage" to the Shareholders and that the Shareholders can receive "no adequate remedy at law." (Acq. Agmt. § 11.7(c)).

161. The Shareholders are therefore entitled to "specific performance of the terms of the" Acquisition Agreement, "in addition to any other remedy at law or equity." (Acq. Agmt. § 11.7(c)). Among other things, Stratasys must perform under the Acquisition Agreement by treating the EO Date as February 1, 2022 for all purposes.

162. The Shareholders are also entitled to an injunction to prevent the ongoing irreparable harm they suffer each day that Stratasys refuses to provide the bargained-for consideration in exchange for its use of Origin's intellectual property. Among other things, any such injunction must (i) prevent Stratasys from using or profiting from Origin's intellectual property unless and until Stratasys fairly compensates the Shareholders and (ii) tolling the applicable EO Periods during the period of such injunction until a commercially reasonable date following the full re-introduction of the Origin product line into the market.

### THIRD CAUSE OF ACTION
**(Breach of the Covenant of Good Faith and Fair Dealing)**

163. The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

164. The Acquisition Agreement is a valid and binding written agreement between Stratasys and the Shareholders and is governed by Delaware law.

165. "The implied covenant of good faith and fair dealing inheres in every contract" under Delaware law. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). Pursuant to that covenant, a party must "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." (*Id.*).

166. Stratasys has breached the covenant of good faith and fair dealing by, among other things, interfering with the Shareholders' opportunity to satisfy the Earn-Out Targets and to receive the full amount of the bargained-for Origin purchase price.

167. Stratasys accomplished this breach by deliberately delaying the general availability of Origin's products long past the tentative EO Date and then reneging on its written agreement to re-set the EO Date to coincide with the GA Date, after it had used that agreement to

wrongly induce the Shareholders to perform on the basis of that promise. Stratasys now takes the false and self-serving position that the first Earn-Out Period includes eight months when the Origin products were not available for sale.

168. Stratasys's breach of its covenants has materially and unfairly harmed the Shareholders.

169. Among other things, Stratasys's breach has deprived the Shareholders of a full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments.

## FOURTH CAUSE OF ACTION
### (Promissory Estoppel)

170. The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

171. In multiple written and oral communications between July 2021 and February 2022, Stratasys promised to re-set the EO Date to coincide with the GA Date. These promises were clear and unambiguous, and Stratasys reasonably expected that the Shareholders would take action (and/or forbear from taking certain actions) in reliance on Stratasys's promise to re-set the EO Date.

172. The Shareholders did, in fact, rely on Stratasys's promise. Among other things, Chris, Joel, and Jeffrey Lee relied on Stratasys's promise by devoting substantial time, effort, and resources for the benefit of Stratasys, all of which far exceeded any duties or obligations they owed to the company. During this period, Chris, Joel, and Jeffrey Lee provided extremely valuable services to Stratasys, at substantial burden and opportunity cost to themselves, in direct reliance on Stratasys's and Zeif's promises to them.

173. The Shareholders also relied on Stratasys's promise by not demanding that Stratasys provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set.

174. Stratasys's repudiation of its clear and unambiguous promise has caused and continues to cause the Shareholders significant harm, including without limitation to the extent they have been deprived of the full and fair opportunity to satisfy the relevant Earn-Out Targets.

175. Stratasys's promise is binding and enforceable, and injustice can be avoided only by enforcement of the promise to re-set the EO Date.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

176. The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

177. Stratasys's conduct has induced the Shareholders—including Chris, Joel, and Jeffrey Lee—to perform valuable services for Stratasys. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions.

178. Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

179. The Shareholders have been damaged by, among other things, losing the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction. Stratasys also induced Chris, Joel, and

Jeffrey Lee to assume significant personal burdens for Stratasys's benefit, including foregoing the opportunity to engage in other, more lucrative, professional endeavors.

180. There is no justification for Stratasys's conduct: it knowingly induced the Shareholders to provide valuable services with the intention of profiting from those services to the Shareholders' detriment.

181. Under principles of equity, Stratasys should not be permitted to retain the benefits it gained because of its wrongdoing.

182. The Shareholders therefore seek disgorgement of the full amount by which Stratasys has been unjustly enriched as a result of the substantial time, effort, and resources the Shareholders contributed to Stratasys—upon information and belief, an amount no less than $400 million.

## SIXTH CAUSE OF ACTION
### (Quantum Meruit)

183. The Shareholders reallege each paragraph of this Arbitration Demand as if fully set forth herein.

184. Stratasys's conduct has induced Shareholders—including Chris, Joel, and Jeffrey Lee—to perform valuable services for Stratasys with the expectation that the Shareholders would receive recompence from Stratasys, including the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction.

185. Shareholders performed those services under circumstances that put Stratasys on notice that the Shareholders had relied on Stratasys's promises. Among other things, the Shareholders did not object to Stratasys's failure to provide the Quarterly Reports that would

~~otherwise have been due, absent an agreement to re-set the EO Date. Instead, Shareholders~~

~~continued to provide valuable services to Stratasys in reliance on their mutual agreement.~~

~~186. The Shareholders therefore seek fair recompence for the contributions that Zeif~~

~~and Stratasys induced Shareholders, on false pretenses, to make for Stratasys's benefit, in an~~

~~amount to be determined by the arbitrator.~~

### ~~SEVENTH~~**FIRST** CAUSE OF ~~ACTION⁹~~**ACTION**
**(Fraud)**

~~187~~152. The Shareholders reallege each paragraph of this ~~Arbitration Demand~~Complaint as if fully

set forth

herein.

~~188~~153. As alleged herein, Stratasys engaged in deliberate fraud against the Shareholders intending to deprive them of the full purchase price for their company in at least three ways: (a) by engaging in misrepresentations of material facts intending to induce the Shareholders to execute the Acquisition Agreement; (b) by engaging in misrepresentations of material fact intending to induce the Shareholders to perform valuable services for Stratasys's benefit after the acquisition and to refrain from challenging Stratasys's hidden misconduct intended to interfere with the Shareholders'

~~acquisition~~Earn-Out rights; and (c) by withholding and omitting material facts before and after the acquisition

which Stratasys was obligated to truthfully disclose and not conceal or otherwise refrain from

disclosing.

████████████████████████████████

~~⁹ In the interest of consistency, the Shareholders' Amended Arbitration Demand preserves the numbering of causes of action One through Six and adds the fraud claim as a Seventh Cause of Action. But for the avoidance of doubt, the conduct and misrepresentations at issue in this count are central to the Shareholders' demands for relief.~~



190 155.    Stratasys memorialized each of these pre-acquisition promises in writing, including

including in the parties' joint, contemporaneous notes of the October 2020 meeting. Stratasys also explicitly

also explicitly made each of these promises as part of the representations, warranties, and/or obligations explicitly

obligations explicitly set out in the Acquisition Agreement itself. (*See, e.g.*, Acq. Agmt. § 2.3; Annex I; Ex. D.)

*id.* at Annex I; *id.* at Exhibit D.)

192157.    Stratasys's pre-acquisition misrepresentations were intended to induce the

Shareholders' execution of the Acquisition Agreement.

193158. The Shareholders reasonably relied on Stratasys's representations, including by agreeing to the terms of the Acquisition Agreement and by fully complying with their obligations thereunder by, among other things, transferring ownership of Origin and its valuable suite of intellectual property to Stratasys and ensuring a successful integration of Origin into Stratasys.

194.    159.    Second, after the acquisition, Stratasys made deliberate, knowingly false

representations of material factfacts with the intent to induce the Shareholders to provide valuable services to Stratasys.



196161.    Stratasys memorialized these statements in writing, including in the correspondence between and among Zeif, Lebi, and representatives of the Shareholders in which Zeif and Lebi represented that Stratasys had agreed to, and would, re-set the EO Date as promised.

197162. Each of those statements—and many others—were false, and Stratasys knew of the falsity at the time. Stratasys's false statements were intended to induce the Shareholders' reliance.

198163. The Shareholders reasonably relied on Stratasys's representations, including by not demanding that Stratasys provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set, by delaying in seeking to challenge Stratasys's fraudulent scheme, and by performing valuable services for Stratasys with the expectation that the Shareholders would receive the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such

satisfaction. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions. Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

199164. Third, Stratasys concealed material facts from the Shareholders before, during, and following the Parties' execution of the Acquisition Agreement, as well as before, during, and following the Parties' negotiations regarding re-setting the EO Date.

200165. Among other things, Stratasys concealed until at least March 23, 2022 that the representations by which it had induced the Shareholders' reliance were knowingly false. Stratasys accomplished this concealment by repeatedly reassuring the Shareholders that it had, in fact, re-set the EO Date to correspond with the launch of the Origin product line—including in written correspondence from Zeif, Lebi, and other representatives of Stratasys from July 2021 through February 2022.

201166. Stratasys further concealed its misconduct by failing to provide the Quarterly Reports that it was contractually obligated to provide following the EO Date. Had Stratasys provided such reports, the Shareholders would have learned the truth: that contrary to what it had promised, Stratasys had not re-set the EO Date.

203168.    Stratasys engaged in this concealment intentionally in order to delay the Shareholders' discovery of their fraud so that the Shareholders would (a) continue to provide the valuable services described herein and (b) delay in seeking to challenge Stratasys's fraudulent

scheme. Had the Shareholders known the truth, they would have uncovered Stratasys's fraud and

misconduct earlier.

204169. As a result of Stratasys's fraud, any of Stratasys's would-be protections or

limitations on liability or reliance as set forth in the Acquisition Agreement or elsewhere were procured by fraud and are therefore void and unenforceable. *See, e.g., Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, No. CVN19C11092PRWCCLD, 2021 WL 117036, at *11 (Del. Super. Ct. Jan. 13, 2021) ("Delaware courts refuse to enforce contracts purporting to condone—or at least insulate—intentional fraud."); *Lincoln Nat. Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011) ("If the fraud relates to the inducement to enter the contract, then the agreement is 'voidable' at the option of the innocent party."); *Abry P'rs V, L.P.*, 891 A.2d at 1051 (allowing buyer's fraud claim to proceed over contractual anti-reliance provisions because buyer "alleged, with specificity, precisely what [of seller's] statements were materially false and why they were false[,]" and because the allegedly false statements were included in the contract itself); *see also Falco v. Alpha Affiliates, Inc.*, No. CIV. A. 97-494, 2000 WL 727116, at *9 (D.

procured by fraud and are therefore void and unenforceable.

~~Del. Feb. 9, 2000); *Brown v. SAP Am., Inc.*, No. C.A. 98-507-SLR, 1999 WL 803888, at *9 (D.~~

~~Del. Sept. 13, 1999); *Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982).~~

~~205~~170. Further, as a result of Stratasys's fraud, the Shareholders have suffered damages in

an amount to be determined by the ~~Arbitrator~~Court.

~~206~~    171.    Stratasys's conduct entitles the Shareholders to all remedies for fraud ~~under Delaware law~~, including

disgorgement of all unlawful earnings or enrichments received or retained by Stratasys as a result

of its wrongful conduct—upon information and belief, an amount no less than $400 million dollars.

~~207.~~    172.    Stratasys's conduct was gross, oppressive, and/or aggravated and therefore entitles

the Shareholders ~~entitled~~ to punitive damages, pre-judgment and post-judgment interest, attorney's fees,

costs, and such additional relief as the ~~Arbitrator~~Court may deem appropriate. *See Stephenson v. Capano*

*Dev., Inc.*, 462 A.2d 1069, 1076-77 (Del. 1983).

## SECOND CAUSE OF ACTION
### (Promissory Estoppel)

173. The Shareholders reallege each paragraph of this Complaint as if fully set forth herein.

175. These promises were clear and unambiguous, and Stratasys memorialized each of these pre-acquisition promises in writing, including in the parties' joint, contemporaneous notes of the October 2020 meeting. Stratasys also explicitly made each of these promises as part of the representations, warranties, and/or obligations explicitly set out in the Acquisition Agreement itself. (*See, e.g.*, Acq. Agmt. § 2.3; Annex I; Ex. D.)

176. Stratasys reasonably expected that the Shareholders would take action in reliance on these pre-acquisition promises regarding the EO mechanism. The Shareholders expressed concerns about the earn-out structure to Stratasys, and Stratasys made these specific promises to address those concerns and as part of "mechanisms of managing the EO risk."

177. The Shareholders reasonably relied on these promises, including by resuming formal negotiations of the acquisition, by agreeing to the terms of the Acquisition Agreement, and by fully complying with their obligations thereunder by, among other things, transferring ownership of Origin and its valuable suite of intellectual property to Stratasys and ensuring a successful integration of Origin into Stratasys.

178. In multiple written and oral communications between July 2021 and February 2022, Stratasys promised to re-set the EO Date to coincide with the GA Date. These promises were clear and unambiguous, and Stratasys reasonably expected that the Shareholders would take action (and/or forbear from taking certain actions) in reliance on Stratasys's promise to re-set the EO Date.

179. The Shareholders did, in fact, rely on Stratasys's promise. Among other things, Chris, Joel, and Jeffrey Lee relied on Stratasys's promise by devoting substantial time, effort, and resources for the benefit of Stratasys, all of which far exceeded any duties or obligations they owed to the company. During this period, Chris, Joel, and Jeffrey Lee provided extremely valuable services to Stratasys, at substantial burden and opportunity cost to themselves, in direct reliance on Stratasys's and Zeif's promises to them.

180. The Shareholders also relied on Stratasys's promise by not demanding that Stratasys provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set and by delaying in seeking to challenge Stratasys's fraudulent scheme.

181. Stratasys's repudiation of its clear and unambiguous promises has caused and continues to cause the Shareholders significant harm, including without limitation to the extent they have been deprived of the full and fair opportunity to satisfy the relevant Earn-Out Targets.

182. Stratasys's promises are binding and enforceable, and injustice can be avoided only by enforcement of the promises to re-set the EO Date and to fairly calculate the Shareholders' Earn-Out Payments by crediting the sale of all products and services incorporating Origin's intellectual property against the Earn-Out Targets as reflected in the Acquisition Agreement.

### THIRD CAUSE OF ACTION
### (Unjust Enrichment)

183. The Shareholders reallege each paragraph of this Complaint as if fully set forth herein.

184. Stratasys's conduct has induced the Shareholders—including Chris, Joel, and Jeffrey Lee—to perform valuable services for Stratasys. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions.

185. Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

186. Stratasys's conduct also induced the Shareholders to not demand Stratasys to provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set and to delay in seeking to challenge Stratasys's fraudulent scheme. As a result, Stratasys generated substantial revenue and profits from products or services incorporating Origin's intellectual property, but only paid a fraction of the true cost.

187. The Shareholders have been damaged by, among other things, losing the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction. Stratasys also induced Chris, Joel, and Jeffrey Lee to assume significant personal burdens for Stratasys's benefit, including foregoing the opportunity to engage in other, more lucrative, professional endeavors.

188. There is no justification for Stratasys's conduct: it knowingly induced the Shareholders to provide valuable services with the intention of profiting from those services to the Shareholders' detriment.

189. Under principles of equity, Stratasys should not be permitted to retain the benefits it

gained because of its wrongdoing.

190. The Shareholders therefore seek disgorgement of the full amount by which Stratasys has been unjustly enriched as a result of the substantial time, effort, and resources the Shareholders contributed to Stratasys—upon information and belief, an amount no less than $400 million.

## FOURTH CAUSE OF ACTION
### (Quantum Meruit)

191. The Shareholders reallege each paragraph of this Complaint as if fully set forth herein.

192. Stratasys's conduct has induced Shareholders—including Chris, Joel, and Jeffrey Lee—to perform valuable services for Stratasys with the expectation that the Shareholders would receive recompence from Stratasys, including the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction.

193. Shareholders performed those services under circumstances that put Stratasys on notice that the Shareholders had relied on Stratasys's promises. Among other things, the Shareholders did not object to Stratasys's failure to provide the Quarterly Reports that would otherwise have been due, absent an agreement to re-set the EO Date. The Shareholders also delayed in seeking to challenge Stratasys's fraudulent scheme. Instead, Shareholders continued to provide valuable services to Stratasys in reliance on their mutual agreement.

194. The Shareholders therefore seek fair recompence for the contributions that Zeif and Stratasys induced Shareholders, on false pretenses, to make for Stratasys's benefit, in an amount to be determined by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, the Shareholders pray ~~for an award against Stratasys as follows~~that the Court issue the following relief:

A. Damages in an amount to be determined at trial;
~~A. Specific performance of Stratasys's obligations under the Acquisition Agreement, including the obligation to treat February 1, 2022 as the EO Date for all purposes.~~

~~B. Enforcement of Stratasys's promise to re-set the EO Date to February 1, 2022.~~
~~C. Compensatory damages from Stratasys equal to the full amount of Earn-Out Payments due under the Acquisition Agreement, of $40 million.~~

~~D~~B. Disgorgement of the full amount by which Stratasys has been unjustly enriched in an amount to be determined by the ~~Arbitrator~~Court, but reasonably believed to exceed $400 million~~.~~;

~~E~~C. Recompence for the value of the services provided by Shareholders to Stratasys in reliance on Stratasys's promise to re-set the EO Date to February 1, 2022~~.~~;

~~F~~D.    An injunction preventing Stratasys from using Origin's intellectual property until Stratasys fairly compensates the Shareholders, while also tolling the calculation of the EO Payments until a commercially reasonable date following the full re-introduction of the Origin product line into the market~~.~~;

~~G~~E.    Punitive and exemplary damages in the amount to be determined ~~by the Arbitrator.~~at Trial;

~~H~~F.    Pre- and post-judgment interest ~~from Stratasys.~~;

~~I~~G.    ~~All~~The Shareholders' attorneys' fees, expenses, and costs~~.~~; and

~~J~~H.    ~~Such~~All such other and further relief as the ~~Arbitrator deems~~Court may deem just and proper.

Case No.
COMPLAINT

Dated: ~~August 2~~October 21, 2024

Respectfully submitted,

BRAUNHAGEY & BORDEN LLP

(Mod)

By: _____

J. Noah Hagey~~, Esq.~~

*Attorneys for Plaintiff Fortis Advisors LLC, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc.*

Case No.

COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial of all claims and causes of action triable before a jury.


Dated: October 21, 2024                          Respectfully submitted,

                                                 BRAUNHAGEY & BORDEN LLP
                                                 747 Front Street, 4th Floor
                                                 San Francisco, CA 94111
                                                 Tel.: 415-599-0210
                                                 Fax: 415-276-1808
                                                 hagey@braunhagey.com

                                                 Christman Rice, Esq.
                                                 Kelsie Docherty, Esq.
                                                 David Berman, Esq.
                                                 Lily (Haeun) Kim, Esq.
                                                 118 W. 22nd Street, 12th Floor

                                                         Case No.
                          COMPLAINT

New York, NY 10011

Tel.By: 646-829-9403

J. Noah Hagey

Fax: 646-403-4089

rice@braunhagey.com

docherty@braunhagey.com

berman@braunhagey.com

kim@braunhagey.com

_____

*Attorneys for* *Claimants, Former Shareholders**Plaintiff Fortis Advisors LLC, in its capacity as Shareholder Representative of the former shareholders* *of Origin Laboratories, Inc.**, by and through Shareholder Representative Fortis Advisors LLC*

Case No.

COMPLAINT

COMPLAINT

Case No.

| Summary report: Litera Compare for Word 11.2.0.54 Document comparison done on 10/26/2024 3:11:53 PM | |
|---|---|
| **Style name:** DLAPiper | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** C:\Users\rf44970\AppData\Local\Litera\Temp\2024-10-21 - Plaintiff - COMPLAINT [SEALED]-Ex. 21 (2024-08-02 - Origin - Amended Arbitration Demand).pdf | |
| **Modified filename:** C:\Users\rf44970\AppData\Local\Litera\Temp\2024-10-21 - Plaintiff - COMPLAINT [SEALED]-2024-10-21 - Complaint [SEALED].pdf | |
| **Changes:** | |
| Add | 846 |
| Delete | 897 |
| Move From | 71 |
| Move To | 71 |
| Table Insert | 2 |
| Table Delete | 1 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 1 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1889 |

# Exhibit F

J. Noah Hagey, Esq. (SBN: 262331)
hagey@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th FloorSan Francisco, CA 94111
Telephone: (415) 599-0210
Facsimile: (415) 276-1808

Christman Rice, Esq. (*pro hac vice* forthcoming)
  rice@braunhagey.com
Lily (Haeun) Kim, Esq. (*pro hac vice* forthcoming)
  kim@braunhagey.com
Iqra Asghar, Esq. (*pro hac vice* forthcoming)
  asghar@braunhagey.com
BRAUNHAGEY & BORDEN LLP
118 W 22nd Street, 12th Floor
New York, NY 10011
Telephone: (646) 829-9403

ATTORNEYS FOR PLAINTIFF

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/21/2024**
**Clerk of the Court**
BY: AUSTIN LAM
Deputy Clerk

~~INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION WILMINGTON, DELAWARE~~

~~INTERNATIONAL CENTRE FOR~~

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| ~~FORMER SHAREHOLDERS OF ORIGIN LABORATORIES, INC., *by and through*~~ FORTIS ADVISORS LLC, a Delaware ~~Claimants~~Plaintiffs, <br><br> v. <br><br> STRATASYS LTD., an Israeli corporation, STRATASYS, INC., a Delaware corporation, and <br><br> Defendants. | Case No. _____ <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** <br><br> **UNREDACTED** <br><br> MAY NOT BE EXAMINED WITHOUT COURT ORDER - CONTAINS MATERIAL FROM CONDITIONALLY SEALED RECORD <br><br> MATERIALS SHALL BE UNSEALED AFTER TEN (10) DAYS ABSENT FILING OF A MOTION TO SEAL PURSUANT TO CRC 2.551(b) |

Case No.

COMPLAINT

ICDR Case No. 01-23-0002-3975

Plaintiff Fortis Advisors LLC, in its capacity as Shareholder Representative of ARBITRATION DEMAND FOR:

1. BREACH OF CONTRACT – DAMAGES

2. BREACH OF CONTRACT – SPECIFIC PERFORMANCE

3. BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

BRAUNHAGEY & BORDEN LLP

747 Front Street, 4th FloorSan Francisco, CA 94111

118 W. 22nd Street, 12th Floor New York, NY 10011

*Attorneys for Claimants, Former Shareholders of Origin Laboratories, Inc., by and through Shareholder Representative Fortis Advisors LLC*

# TABLE OF CONTENTS

STATEMENT OF DISPUTE .................................................................................................. 1

ARBITRATION AGREEMENT .............................................................................................. 3

PARTIES .................................................................................................................................. 4

JURISDICTION, VENUE, AND GOVERNING LAW ......................................................... 4

FACTS ...................................................................................................................................... 5

I.    ORIGIN'S BACKGROUND ..................................................................................... 6

      A.    Origin's Thesis: 3D Printing as Manufacturing ............................................ 6

      B.    Origin's Groundbreaking Intellectual Property ............................................ 7

      C.    The Origin One Printer ................................................................................ 10

II.   STRATASYS'S ACQUISITION OF ORIGIN ...................................................... 11

      A.    The Beginning of the Origin-Stratasys Relationship .................................. 11

      B.    The Parties Negotiate the Terms of the Acquisition ................................... 12

      C.    The Acquisition Agreement ........................................................................ 16

      D.    Chris and Joel Work to Ensure a Successful Acquisition ........................... 19

III. STRATASYS REPRESENTS THAT IT HAS AGREED TO SET THE
     EARN-OUT COMMENCEMENT DATE TO REFLECT
     COMMERCIAL REALITY ..................................................................................... 20

      A.    Stratasys Delays the Sale of Origin Products ............................................. 21

      B.    Stratasys Tells the Shareholders That It Agrees to a New EO Date Coinciding

            with the Launch of the Origin One Version 2.7 .......................................... 22

            1.    ████████████████████████████████████████
               ████████████████████ ............................................... 23

            2.    ████████████████████████████████████████
               █████████████████████████ ........................................ 24

ii

3.    ████████████████████████████████ ████████████████ ................................. 25

4.    ████████████████████████████████ ██████████████ ................................. 26

C.    The Parties Rely on Their Agreement to Re-Set the EO Date ................... 27

D.    Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success ....... 31

E.    Stratasys Reneges on the Parties' Agreement in Order to Cheat the Shareholders Out of Their Bargained-For Consideration ................... 32

IV.    STRATASYS VIOLATED ITS REPRESENTATIONS, PROMISES AND AGREEMENT(S) ................... 34

A.    The Parties' Emails Constitute Writings Under the Acquisition Agreement ........ 34

B.    Re-Setting the EO Date Does Not Require Board Approval ................... 36

C.    The Parties' Performance Evidences Stratasys's Representations that It Had Agreed to Change the EO Date ................... 37

V.    STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER ................... 39

CAUSES OF ACTION ................... 42

PRAYER FOR RELIEF ................... 45

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Camden Fitness, LLC v. Wandless Enterprises, Inc.*,
   No. CPU5-12-000295, 2013 WL 8854873 n.7 (Del. Com. Pl. Feb. 11, 2013) .................. 35

*Curtiss-Wright Corp. v. Schoonejongen*,
   514 U.S. 73 (1995) .................................................................................................. 36

*Haft v. Dart Grp. Corp.*,
   841 F. Supp. 549 (D. Del. 1993) ............................................................................. 38

*Hessler, Inc. v. Farrell*,
   226 A.2d 708 (Del. 1967) ........................................................................................ 37

*Kuroda v. SPJS Holdings, L.L.C.*,
   971 A.2d 872 (Del. Ch. 2009) ................................................................................ 44

*Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.*,
   297 A.2d 28 (Del. 1972) .......................................................................................... 38

*Schoonejongen v. Curtiss-Wright Corp.*,
   143 F.3d 120 (3d Cir. 1998) ................................................................................... 37

*S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.*,
   No. 2020-1069-MTC, 2021 WL 3925937 (Del. Ch. Sept. 1, 2021) .......................... 38

*Triple H Fam. Ltd. P'ship v. Neal*,
   No. 12294-VCMR, 2018 WL 3650242 (Del. Ch. July 31, 2018) ............................. 35

*Zayo Grp., LLC v. Latisys Holdings, LLC*,
   No. 12874-VCS, 2018 WL 6177174 (Del. Ch. Nov. 26, 2018) ............................... 35

**STATUTES**

DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023) ..................................................... 35

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019) ...................................................................... 35

iv

~~Claimants,~~ the former shareholders of ~~California-based~~ Origin Laboratories, Inc.~~, by and through Shareholder Representative Fortis Advisors LLC (hereinafter for convenience, the "Origin Shareholders" or~~ (the "Shareholders")~~,~~ hereby allege against ~~Respondents, Israel-based international technology conglomerate~~Defendants Stratasys Ltd. ~~and~~, Stratasys, Inc.~~,~~ (collectively, "Stratasys")~~,~~ and Yoav Zeif as follows:~~1~~

### ~~STATEMENT OF DISPUTE~~INTRODUCTION

1. Origin Laboratories, Inc. ("Origin") was an innovative California startup company founded in 2015 by Chris Prucha and Joel Ong based on a simple insight: by developing sophisticated 3D-printing software, Origin could produce high-quality, usable parts that would bring 3D-printing out of the realm of hobbyists and into the much larger manufacturing market. Origin represented the culmination of Chris and Joel's ~~efforts and impressive software~~ engineering experience—Chris as an Apple engineer and previous co-founder of a separate collaboration platform; Joel as an engineer on moonshot initiatives at Google X. ~~Respondent~~ Stratasys, a publicly traded Israeli technology conglomerate, approached Chris and Joel in 2020 with an unsolicited acquisition offer, and Stratasys ultimately purchased Origin for approximately $100 million pursuant to an Agreement and Plan of Merger and Reorganization, dated December 8, 2020 (the "Acquisition Agreement") (Ex. 1).

_____

~~1 Following Stratasys's continued jurisdictional objections, threats of vacatur, and intended refusal to comply with any resulting award from the Tribunal, the Shareholders have withdrawn their fraud and quasi-contract claims to state court, where they are now pending. *See Fortis Advisors, LLC v. Stratasys, Ltd., et al.*, No. CGC-24-619152 (S.F. Superior Ct. 2024) (Shareholders' fraud complaint); *see also* Respondents' Mot. to Dismiss at 15-23 (Sept. 16, 2024) (asserting that Claimant's "extra-contractual claims . . . are not covered by the Merger Agreement's arbitration provision" and "the Tribunal lacks jurisdiction to arbitrate the extra-contractual claims," and threatening to seek vacatur and/or contest award enforcement in Israel under New York Convention). Accordingly, and notwithstanding any allegation herein to the contrary in this Amended Demand, such fraud and quasi-contract claims will be exclusively litigated in that state court forum and not in this action.~~



3.      Following the acquisition, Stratasys and its executives again repeatedly reassured the Shareholders that it would calculate their entitlement to the agreed-upon Earn-Out Payments

based on the actual sales of Origin's products and services, and would thus re-set the EO Date. Accordingly, when Stratasys delayed the post-acquisition launch of Origin's products, Stratasys again promised, orally and in writing, that the EO Date would coincide with the general availability of Origin's products. In reliance on those representations, promises, and agreements, the Shareholders continued to perform for the company, including by designing new technology and assisting with patent applications on novel concepts accruing to Stratasys's benefit.

4.      Stratasys finally made Origin's 3D printing products generally available to customers in February 2022—that is, seven months after the placeholder EO Date—and Origin's performance thereafter has far exceeded all projections. Stratasys touted Origin's success in its recent SEC filings and releases, claiming that Origin is responsible for the largest first-quarterly growth in Stratasys's history and is operating as "an important growth engine" for Stratasys. Even beyond

the sale of Origin-branded products, Stratasys has integrated Origin's sophisticated suite of intellectual property throughout its business and, as a result, Stratasys's enterprise value has substantially increased.

5.    Unfortunately, ~~Stratasys reneged on~~ its agreement to re-set the EO Date and Stratasys's representations and inducements were not truthful, and Stratasys appears never to have had any intention of launching Origin's products by the placeholder EO Date or moving that date to coincide with the products' general availability. Instead, Stratasys now insists on using the defunct July 1 placeholder date as the basis from which to calculate the Shareholders' Earn-Out—even though Stratasys *did not offer* the products for sale during that period. By delaying the launch ~~while~~and now insisting that the EO Date remains unchanged, Stratasys has effectively ~~reduces~~helped itself to a 40% reduction in the purchase price ~~by 40%~~for Origin and its intellectual property, because the later ~~Earn-Out~~Earn Out Periods assume increasing growth targets.

6.    The Shareholders bring this suit to recover for Stratasys's ~~breaches~~fraud and bad faith dealings, including accelerated payment of the full $40 million in bargained-for ~~Earn-Out~~earn-out payments that Stratasys has withheld and disgorgement of the amount by which Stratasys has unjustly profited from its misconduct, including all actual and expected revenue associated with Origin's products and services and the value of Origin's products, intellectual property, and services, estimated to be at least $400 million. The Shareholders also seek the quantum meruit value of the

~~has withheld, together with applicable attorneys' fees and costs.~~

services that Stratasys unfairly induced Shareholders to provide. Finally, unless and until Stratasys

fully compensates the Shareholders in connection with any award hereunder, Stratasys should be

enjoined from further use of any patents and intellectual property developed by Origin or the

~~ARBITRATION AGREEMENT~~ Shareholders.



8.    ~~The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c).)~~

contract-based claims in an ongoing arbitration (the "Arbitration") before the International Center for Dispute Resolution pursuant to an arbitration clause in the Acquisition Agreement. But Stratasys has now asserted that the claims at issue here fall outside the applicable arbitration clause and that the arbitral tribunal thus has no jurisdiction to hear or decide those claims. In relevant part, Stratasys has argued:

> . . . [T]he extra-contractual claims (counts four through seven of the Demand) . . . are not covered by the Merger Agreement's arbitration provision . . . For the reasons stated above, the Tribunal lacks jurisdiction to arbitrate the extra-contractual claims and therefore each of the extra-contractual claims should be dismissed.

(Respondents' Motion to Dismiss ¶¶ 58, 89, *Fortis Advisors LLC v. Stratasys Ltd. et al.,* No. 01-23-0002-3975 (AAA September 16, 2024).

8.    Because Stratasys has refused to submit to the jurisdiction of the arbitral Tribunal with respect to the Shareholders' fraud and equity claims, the Shareholders now bring those claims in this Court.

## PARTIES

9.    ~~The Origin Shareholders are represented by their designated Shareholder Representative Fortis Advisors LLC, pursuant to the parties' Acquisition Agreement. Prior to the acquisition by Stratasys, the Origin~~ Shareholders were shareholders of Origin Laboratories, Inc. ("Origin"), a ~~California corporation that successfully developed innovative 3D printing technologies.~~

~~10~~ 9.    Plaintiff Fortis Advisors LLC is a Delaware limited liability company that serves as the formal representative of the Shareholders of Origin in connection with the acquisition of Origin ~~by Stratasys, Inc., as memorialized in the Acquisition Agreement.~~

Case No.

COMPLAINT

by Stratasys, as memorialized in the parties' Agreement and Plan of Merger and Reorganization dated December 8, 2020 (Ex. 1) (the "Acquisition Agreement"). Prior to Stratasys's acquisition of Origin, the Shareholders were shareholders of Origin Laboratories, Inc. ("Origin"), a corporation organized under the laws of Delaware that successfully developed innovative 3D printing technologies. Origin was founded, headquartered, and had its principal place of business in San Francisco, California.

11. 10. Defendant Stratasys Ltd. is a company incorporated under the laws of the State of

Israel, with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

12 11. Defendant Stratasys, Inc. is a Delaware corporation and a wholly owned subsidiary of Stratasys Ltd., with its headquarters at 1 Holtzman St., Science Park, Rehovot 76124, Israel.

12. Defendant Yoav Zeif is an individual domiciled in Israel. Mr. Zeif is the Chief Executive Officer of Stratasys.

**JURISDICTION, AND VENUE, AND GOVERNING LAW**

13. The American Arbitration Association has Court has personal jurisdiction over this arbitration and venue is properly located in Wilmington, Delaware, pursuant to Section 11.5(a) of the Acquisition Agreement. The Acquisition Agreement further provides that the "non-prevailing party in connection with any Dispute resolved by litigation under this Section 11.5 shall pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (Acq. Agmt. § 11.5(c)). Stratasys pursuant to California Code of Civil Procedure § 410.10 because: (a) Stratasys conducts business in California; (b) Stratasys has availed itself of the laws and markets of California by soliciting business from entities and individuals located within the state of California, including by soliciting, negotiating, and consummating the acquisition of a California-based corporation at issue in this action; (c) Stratasys has engaged in fraudulent and tortious conduct and misrepresentations within California; and (d) Stratasys targeted its fraudulent tortious conduct and misrepresentations at the Shareholders in California with the knowledge that such conduct would cause harm to the Shareholders in California.

14. The Court has personal jurisdiction over Zeif pursuant to California Code of Civil Procedure § 410.10 because: (a) Zeif conducts business in California; (b) Zeif has availed himself of the laws and markets of California by soliciting business from entities and individuals located within the state of California, including by soliciting, negotiating, and consummating the acquisition of a California-based corporation at issue in this action; (c) Zeif has engaged in fraudulent and tortious conduct and misrepresentations within California; and (d) Zeif targeted his fraudulent and tortious conduct and misrepresentations at the Shareholders in California with the knowledge that such conduct would cause harm to the Shareholders in California.

15. As described more fully below, Stratasys and Zeif made knowingly false misrepresentations to the Shareholders they knew to be located in California in order to induce the

Shareholders to enter into the Acquisition Agreement with the intent and expectation that the

Shareholders would rely on those misrepresentations when making a decision to sell Origin at their

California place of business. Stratasys and Zeif also made knowingly false statements to the Shareholders after they acquired Origin, during which time Stratasys and Zeif operated the Origin business unit in California. Such false statements were intended to, and did, induce the Shareholders to provide valuable services for Stratasys's benefit. As a result, Stratasys and Zeif were able to avail themselves of the benefit derived from acquiring Origin and using Origin's valuable intellectual property, as well as from valuable post-acquisition work that the Shareholders performed in California, which unjustly enriched Stratasys and is the gravamen of this action. Moreover, many of the potential witnesses are located in California or can easily travel to California and California has strong interest in deciding the claims arising out of foreign defendants' tortious conduct aimed at acquiring California's innovative start-up companies without paying the fair price, as here.

16.     Venue is proper in San Francisco County pursuant to California Code of Civil Procedure § 395.5 because Defendants made fraudulent statements to the Shareholders in San Francisco County and because the Shareholders' resulting injuries occurred in San Francisco County, among other reasons.

14.     This dispute is governed by Delaware law pursuant to § 11.4 of the Acquisition Agreement, which states:

> This Agreement, and all claims (whether at law or in equity, whether in contract, tort, statute or otherwise) arising in whole or in part out of, related to, based upon, or in connection herewith or the subject matter hereof will be governed by and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

15.     As noted in Footnote 1, *supra*, in light of Stratasys' (unfounded) objections and attacks on the Tribunal's jurisdiction over the Shareholders' fraud and other extra-contractual claims, this Demand solely and exclusively concerns the Shareholders' breach of contract-related

claims. The remainder of the parties' dispute is proceeding in California state court.

**FACTS**

16. On December 8, 2020, Stratasys and the Shareholders entered into the Acquisition Agreement, pursuant to which Stratasys agreed to acquire Origin and its intellectual property for a total purchase price of approximately $100 million. The Acquisition Agreement contemplated payment of 60% of the purchase price up front, with the remaining 40% conditioned on Origin's post-acquisition performance over a three-year period that would begin to run on an agreed-upon commencement date (the "EO Date"). The Acquisition Agreement set a tentative EO Date but empowered the parties to modify that date by simple written agreement. In order to induce the Shareholders' execution of the Acquisition Agreement, Stratasys repeatedly promised the Shareholders that it would treat them fairly, would modify the EO Date to coincide with the post-acquisition roll-out of the Origin product line, and would not take any actions intended to interfere with the Shareholders' ability to Earn-Out Targets. Stratasys made those promises in

writing prior to the ~~execution of the Acquisition Agreement, and memorialized the broad concept in the Acquisition Agreement itself.~~

~~17.    On multiple occasions in 2021 and 2022, Stratasys and the Shareholders abided by those prior promises and agreed to re-set the EO Date to correspond with the general availability of Origin's printers. In other words, the parties agreed that they would begin to measure the sales of Origin products only when those products were actually available for sale.~~

~~18.    In a transparent attempt to retain the full value of Origin and its intellectual property while depriving the Shareholders of the remainder of the purchase price, Stratasys has now reneged on its agreement and has taken the position that the EO Date was never re-set. Stratasys's bad-faith conduct constitutes a breach of the Acquisition Agreement and the implied covenant of good faith and fair dealing.~~

## I.    ORIGIN'S BACKGROUND

~~19~~17.    Origin was founded in San Francisco, California, in 2015 by Christopher Prucha and Joel Ong based on their belief in the transformative potential of 3D printing. Chris and Joel both came to 3D printing from backgrounds in software engineering rather than in hardware or manufacturing, which provided them with a viewpoint that was unique in the industry.

~~20~~18.    Chris was an engineer at Apple before founding Notion Labs, Inc., a collaboration platform and file-management tool now valued in excess of $10 billion. Joel established his engineering credentials at Google, where he worked on a variety of moonshot projects at Google X, among other things. Together, they launched Origin to take a software-first approach to 3D printing that no other participant in the industry was pursuing.

### A.    Origin's Thesis: 3D Printing as Manufacturing

~~21~~19.    At the time of Origin's founding, the 3D printing industry was defined by two submarkets. Industry incumbents focused either on cheap, low-quality 3D printing as part of a

temporary bubble of consumer interest, or they focused on more sophisticated 3D printing for the narrow purpose of rapid prototyping. Chris and Joel recognized the self-limiting nature of these approaches and concluded that 3D printing could reach its potential only if it could be used for manufacturing on a broad scale—a multitrillion-dollar industry that dwarfed both the nascent and unpredictable consumer market for 3D printing and the prototyping industry.

22 20.    But the existing technology was limited by unsophisticated software built around a "closed materials" model, and the existing printers were not good enough to allow users to efficiently print functional parts. Moreover, the industry incumbents hamstrung their own printers by strictly limiting the material inputs and controlling the sale of those materials. In other words, the incumbents focused on short-term profits over potential long-term gain, and they did not prioritize developing printers that could meet the needs of 3D-printing customers seeking production-scale manufacturing applications.

23 21.    These factors drove Chris and Joel to devise a simple thesis for Origin: 3D-printing technology could be improved and made less expensive by developing better software to guide and govern the 3D-printing process. They planned to achieve this in two ways: (i) by developing granular real-time feedback through a detailed sensor apparatus that would ensure reliable and precise printing, and (ii ü) by partnering with chemical companies to allow end users to print parts from a wide array of new and experimental materials.

### B.    Origin's Groundbreaking Intellectual Property

24 22.    Chris and Joel soon discovered that in order to build Origin the way they wanted to, they would not be able to rely solely on the industry's incumbent hardware manufacturers because the focus-based limitations Chris and Joel had identified with respect to the incumbent businesses themselves were also baked into every aspect of the industry's equipment

manufacturers. The only solution was for Origin to develop both the software and hardware necessary to implement Chris and Joel's vision.

2523. Origin did so, and it began shipping its first units in 2017 to overwhelming acclaim from customers. Origin continued to hone and improve its hardware, software, and material inputs to increase the quality and applicability of the system and to allow customers to print an ever-greater variety of end-usable parts with greater quality and reliability. In the years since then, Origin has pursued and secured broad patent protection for its printing process both in the United States and internationally—including in Japan, China, the European Union, and Canada.

2624.    Key patents and patent applications include the following, for which Chris and Joel are inventors:

| Figure 1: Key Patents Issued to Origin Founders | | | | |
|---|---|---|---|---|
| **Family Ref.** | **Title** | **Jurisdiction** | **Application No.** | **Date Filed** |
| ~~ORGN-M01~~ORGN-M01 | Method for Window Separation in an Additive Manufacturing Process | Canada | 3118364 | 2019-11-01 |
| | | China | 2019900012861 | 2019-11-0 |
| | | Europe | 19879943.9 | 2019-11-0 |
| | | Japan | 2021-600065 | 2019-11-0 |
| | | Patent Cooperation Treaty | PCT/US2019/059564 | 2019-11-0 |
| | | United States of America | 62/754411 | 2018-11-0 |
| | | United States of America | 16/672410 | 2019-11-0 |
| | | United States of America | 16/900560 | 2020-06-1 |
| | | United States of America | 16/941464 | 2020-07-2 |
| | | United States of America | 17/404,966 | 2021-08-1 |
| ~~ORGN-M02~~ORGN-M02 | System for Window Separation in an Additive Manufacturing Process | United States of America | 62/754430 | 2018-11-01 |
| | | United States of America | 16/672415 | 2019-11-0 |
| | | United States of America | 17/388598 | 2021-07-2 |
| ~~ORGN-M03~~ORGN-M03 | Method for Regulating Temperature at a Resin Interface in an | Canada | 3136654 | 2020-04-17 |
| | | China | 2020900006647 | 2020-04-1 |

| Figure 1: Key Patents Issued to Origin Founders | | | | |
|---|---|---|---|---|
| Family Ref. | Title | Jurisdiction | Application No. | Date Filed |
| | Interface in an Additive Manufacturing Process | Europe | 20791068.8 | 2020-04-17 |
| | | Japan | 2021-600157 | 2020-04-1 |
| | | Patent Cooperation Treaty | PCT/US2020/028783 | 2020-04-1 |
| | | United States of America | 62/835444 | 2019-04-1 |
| | | United States of America | 16/852078 | 2020-04-1 |
| | | United States of America | 17/066249 | 2020-10-0 |
| | | United States of America | 17/066372 | 2020-10-0 |

| Figure 1: Key Patents Issued to Origin Founders | | | | |
|---|---|---|---|---|
| **Family Ref.** | **Title** | **Jurisdiction** | **Application No.** | **Date Filed** |
| ~~ORGN M04~~ORGN-M04 | Method for Interlayer Feedback Control and Failure Prevention in an Additive Manufacturing Process | Canada | | 2020-08-03 |
| | | China | | 2020-08-0 |
| | | Europe | 20850214.6 | 2020-08-0 |
| | | Japan | | 2020-08-0 |
| | | Patent Cooperation Treaty | PCT/US2020/044803 | 2020-08-0 |
| | | United States of America | 62/882464 | 2019-08-0 |
| | | United States of America | 16/984102 | 2020-08-0 |
| | | United States of America | 17/518,510 | 2021-11-0 |
| ~~ORGN M05~~ORGN-M05 | Method for Evaluating Photocurable Resins for an Additive Manufacturing System | United States of America | 62/972573 | 2020-02-10 |
| | | United States of America | 17/173174 | 2021-02-10 |
| ~~ORGN M06~~ORGN-M06 | Origin Swab Documentation | United States of America | 63/007296 | 2020-04-08 |
| ~~ORGN M07~~ORGN-M07 | Layer Segmentation: Texture and Dimensional Accuracy | United States of America | 63/218,247 | 2021-07-02 |
| ~~ORGN M08~~ORGN-M08 | Method for Polymerizing Superficial Features in 3D-Printed Parts | United States of America | 63/300,621 | 2022-01-18 |
| ~~ORGN D01~~ORGN-D01 | Additive Manufacturing Station | United States of America | 29/803,459 | 2021-08-12 |

~~27~~25.    As this chart shows, Origin has secured (or was in the process of seeking) patent protection for, among other things, (i) key components of the printing process, (ii) key portions

of its physical hardware, (iii) the use of real-time sensor data to optimize the printing process, (iv) the multivariate testing of new materials and formulations, and (v) light control and other software techniques for improving the accuracy, quality, and repeatability of manufactured parts. In addition to these patent protections, Origin has developed a variety of proprietary technologies and protected trade secrets concerning its product and processes, and it maintains substantial documentation to protect that valuable intellectual property. And as explained below, Chris and Joel have continued to devote themselves to developing, expanding, and protecting Origin's patent portfolio even after the acquisition by Stratasys.

2826.    The most important aspect of Origin's software-based approach to 3D printing is the patented "Programmable PhotoPolymerization" process, or the "P3" process. The P3 process allows inexpensive and rapid production of high-quality and functional end-use parts. Among other things, the P3 process eliminates non-scalable and time-consuming post-processing—that is, the need to extensively treat the product after printing, such as by sanding rough edges—which has historically inhibited 3D printing from being used for manufacturing at a large scale. Instead, the P3 process is capable of producing parts that are usable virtually straight out of the printer, increasing efficiency and operating with, in Stratasys's own words, "industry-leading accuracy, consistency, detail, and throughput[.]"[21]

### C.    The Origin One Printer

2927.    In 2019, Origin combined its insight and intellectual property into a flagship product and launched the Origin One printer to overwhelming demand and uniformly positive reviews. The Origin One combined the P3 process with the open-material model to permit users

---

[21] *Origin One 3D Printer Support*, Stratasys, https://support.stratasys.com/en/Printers/P3-Printers/Origin-One (last accessed November 8, 2024).

to print high-quality, functional products out of nearly any material chemistry—including newly developed materials—with minimal post-processing.

3028.   The unique combination of the P3 process and the open-material model disrupted the industry incumbents, whose businesses turned on the (now outdated) "closed" model, and who relied on tightly controlled sales of material inputs. The Origin One's success threw the deficiencies of the old model into stark relief, and it led to lucrative partnerships with major manufacturers in a variety of industries, ranging from the Ford Motor Company in the automotive industry and the shoe company ECCO Sko A/S in the apparel industry.

3129.   Although the industry has since followed Origin's lead and the open-material model is now nearly ubiquitous, Origin's technology remains best-in-class.

## II.    STRATASYS'S ACQUISITION OF ORIGIN

3230.   In 2020, Stratasys agreed to acquireacquired Origin for a total purchase price of approximately $100 million in recognition of Origin's paradigm-shifting 3D printing technology. Stratasys has since

[1]*Origin One 3D Printer Support*, Stratasys, https://support.stratasys.com/en/Printers/P3-Printers/Origin-One (last accessed October 15, 2024).

touted the acquisition, noting in multiple SEC filings that Origin's technology "has become an important growth engine for our company." (Ex. 2, Stratasys 2022 Annual Report).)

### A.    The Beginning of the Origin-Stratasys Relationship

3331.   Stratasys and Origin first worked together in March 2020 to produce 3D-printed sterile nasal swabs for use with COVID-19 tests. At the time, near the beginning of the pandemic, Origin was among the very first companies to receive clinical-trial approval for its 3D-printed nasal swabs.

3432.   Because Stratasys had tried, but failed, to receive approval for its own 3D-printed swabs, the two companies entered a partnership to produce and distribute Origin's swabs. Through this partnership, each company learned about the other's strengths, abilities, and

expertise. Chris, Joel, and their Origin colleagues worked closely with Stratasys's sales and distribution teams, while Stratasys witnessed firsthand Origin's industry-leading design, products, and operations.

3533.    Recognizing the value of further collaboration, Stratasys made Origin an unsolicited offer of acquisition in the spring of 2020. Origin was not initially interested, and the Origin board turned down Stratasys's offer without countering. Stratasys nevertheless presented an updated offer on more favorable terms, paving the way for negotiations that culminated in the acquisition six months later.

**B.        The Parties Negotiate the Terms of the Acquisition**

3634.    The Parties negotiated the terms of Stratasys's acquisition of Origin throughout the remainder of 2020. During the early stages of those negotiations, Stratasys was largely represented by Ronen Lebi, its Vice President of Corporate Development.

3735.    As part of the negotiations, Stratasys engaged in an extensive technical diligence review through which it analyzed and confirmed the value of Origin's software-driven approach to 3D printing. This diligence review involved, among other things, multiple in-person visits to Origin's facilities in San Francisco by key Stratasys personnel, including Yoav Zeif (Stratasys's CEO), Guy Menchik (Stratasys's Chief Technology Officer), Richard Garrity (Stratasys's Chief Industrial Business Officer, then the President of Stratasys Americas), Omer Krieger (Stratasys's Executive Vice President), and Amir Kleiner (Stratasys's VP Global Operations), among others.

3836.    Separate from the technical diligence process, the parties devoted substantial efforts to negotiating the mechanics and structure of the acquisition—including Stratasys's proposal to structure the consideration it would pay to Origin in two parts: Stratasys would pay approximately 60% of the $100 million purchase price up front, and would pay the remaining 40% over a three-year period, conditioned on Origin's post-acquisition performance.









4947.    In explicit reliance on these and other promises Stratasys made as part of "mechanisms of managing the EO risk," the Shareholders agreed to resume formal negotiations of the proposed acquisition. The parties ultimately executed the Acquisition Agreement on December 8, 2020 and announced the acquisition shortly thereafter.

### C.    The Acquisition Agreement

5048.    The Acquisition Agreement contemplated that a portion of the consideration for Origin and its intellectual property would take the form of three post-acquisition payments to the Shareholders keyed to the Origin business unit meeting certain revenue-based performance goals. (Acq. Agmt*Id*. § 2.3; Ex. D).) In particular, the Acquisition Agreement established three "Earn-Out Periods" over three consecutive years, beginning with the EO Date. (*Id*. Annex I).) The Acquisition Agreement then set out calculations of the applicable Earn-Out Payments based on whether the revenue attributable to Origin's products during each such period (the "Earn-Out Revenue") met the pre-determined threshold of the Earn-Out Target. (*Id*. Ex. D,; § 7).)

5149.    In devising this structure, the parties recognized that the date selected as the EO Date—that is, the date on which the parties would begin measuring Origin's post-acquisition performance—would have a direct and major effect on whether the Earn-Out Targets were satisfied.

5250.    As they had discussed throughout negotiations of the acquisition—including at the

October 2020 meeting—Stratasys and the Shareholders understood and agreed that production, sales, and shipment of Origin ~~printers~~products and services following the acquisition might be delayed for some period while the new Origin business unit integrated into the larger Stratasys ecosystem and adapted to Stratasys's new strategic goals. The Acquisition Agreement therefore included a tentative EO Date of July 1, 2021—which itself was nearly seven months after the Acquisition Agreement was executed—but provided that that date could be easily changed to correspond to the post-acquisition business reality, without the need either for a formal amendment or even a signed agreement.



5452.   Reflecting the Parties' agreement—at the October 2020 meeting and elsewhere—that the Shareholders' entitlement to Earn-Out Payments would be calculated based on the sale of

any products or services that incorporated Origin's intellectual property, the Acquisition

Agreement also set out a broad definition of revenue sources that would count against the Earn-Out

Targets. Specifically, the Acquisition Agreement provided that "Revenue" for purposes of Earn-Out Earn-

Out calculations would include:

> [S]ales or leases of Company Products and Company Services (in each case, including any and all amalgamations, derivatives, enhancements, further developments, improvements, new versions, rebranding, repackaging and updates which are substantially based on or derived from the Company Products and Company Services, or their respective updates and derivations, which shall be referred to collectively as "Derivatives") (including the sales or provision of other hardware, software, materials, services, subscriptions and warranties specifically (A) designed for, or (B) acquired, leased or licensed from Parent or its Affiliates (including the Business Unit) for, any Company Product, Company Service or Derivative)[.]

(~~Acq. Agmt~~*Id*., ~~Exhibit~~Ex. D).

~~55~~53.    The Acquisition Agreement further defined "Company Products" as "the products

produced, developed, sold or licensed by [Origin] in the current operation of the business as of the

~~the~~ date hereof, including the Primary Product[,]" which is in turn defined as "the Company's 'Origin

'~~Origin~~ One' printer, versions 2.6 and 2.6.1." The Acquisition Agreement defined "Company Services" as

"any and all services provided by [Origin] in the current operation of the business." (~~Acq~~*Id*. ~~Agmt.,~~ Annex I.)

~~56~~54.    The parties also agreed on a mechanism through which Stratasys would keep the

Shareholders apprised of Origin's progress towards satisfying the Earn-Out Target. Specifically,

once the EO Date has passed and the Earn-Out Period begins, the Acquisition Agreement requires

~~requires~~ Stratasys to deliver Quarterly Reports to the Shareholders within 60 days of the close of each

~~each~~ quarter during each Earn-Out Period. Those reports must "set[] forth [Stratasys's] good faith, non-

~~faith, non-binding~~binding, computation of the Revenue in respect of such quarterly period (the 'Quarterly Report'),

together with such supporting documentation as reasonably determined by [Stratasys]." (*Id*.

[Stratasys]." (*Id.* § 2.3(c)).) This requirement provides transparency to the Shareholders and allows them to promptly

bring any issues or disagreements to Stratasys's attention as those issues arise. (*See id.* (providing that the Shareholders would "notify Parent in the event that [they]

dispute[] any element of such Quarterly Report" within "~~within~~ twenty (20) ~~business days~~Business Days" of receipt)~~)~~.)

~~57.    The parties also agreed to a dispute-resolution mechanism pursuant to which the parties must submit any disputes for binding arbitration under Delaware law and the rules of the American Arbitration Association. (*Id.* § 11.5(a)). That provision also provides that the non-prevailing party is obligated "to pay the fees and expenses of the prevailing party, including reasonable attorneys' fees and costs." (*Id.* § 11.5(c)).~~

55.    The Shareholders explicitly relied on each of these representations (among others) by Stratasys in the Acquisition Agreement. Absent Stratasys's representations, the Shareholders would not have agreed to the acquisition.

~~58~~56.    ~~Finally, the~~The parties also agreed that if any provisions of the Acquisition Agreement "were not performed in accordance with their specific terms or were otherwise breached, irreparable damage would occur, no adequate remedy at law would exist and damages would be difficult to determine[.]" (*Id.* § 11.7~~(e.)~~). The parties further agreed that a non-breaching party "shall be entitled to specific performance of the terms [of the Acquisition Agreement], in addition to any other remedy to which they are entitled at law or in equity." (*Id.*)~~.~~

**D.    ~~Chris and Joel~~The Shareholders Work to Ensure a Successful Acquisition**

~~59~~57.    Stratasys's stock price skyrocketed following the acquisition announcement, increasing by more than 40% in the following two weeks from a low of $17.22 per share on December 8 to a high of $24.36 on December 23, 2020. From the outset, ~~Chris and Joel~~the Shareholders did everything they could to ensure a smooth transition—Chris even appeared on an investor call on December 9, 2020 to discuss the transaction with Stratasys shareholders and to lay out the plans for Origin's integration with Stratasys.

~~60~~58.    From those early days through the present, ~~Chris and Joel~~the Shareholders have taken every step to ensure a successful business combination—in large part because of the incentive provided by the Earn-Out Payments. For instance, ~~they~~Chris and Joel both worked around the clock during the period between executing the Acquisition Agreement and closing the transaction, including, among other things,

negotiating assignments of all of Origin's customer contracts and retention agreements with the existing Origin team.

6159.    Post-closing, ~~Chris and Joel~~Stratasys operated Origin as a new business unit within Stratasys, operating out of Origin's pre-existing offices in San Francisco. The Shareholders ensured that Origin integrated its back-office functions, its operations and supply chain functions, and its tech

function with Stratasys's existing functions. Origin also integrated its valuable intellectual property ~~operations while~~

operations while successfully continuing to file new provisional patent applications and to convert

Origin's existing provisional applications.

6260.    All of these tasks—a few mere housekeeping logistics, many others complicated and

~~and~~ intricate—were critical to Stratasys's ability to immediately benefit from the addition of Origin to

its business line.

6361.    Throughout this transition, the Origin team in California also continued to produce

and sell the Origin One printers. Although sales were temporarily halted following the acquisition,~~the supply~~

the supply chain and production process soon resumed, and the Origin business line was in full ~~production~~

production by late spring 2021, in advance of the initial July 1, 2021 EO Date, as planned. Both

new and old clients remained happy with the performance of the Origin One.

## III. STRATASYS REPRESENTS THAT IT HAS AGREED TO SET THE EARN-OUT COMMENCEMENT DATE TO REFLECT COMMERCIAL REALITY

6462.    ~~Over the following months, in~~In the run-up to July 1 placeholder EO Date, Stratasys

made the strategic decision to

stop manufacturing and selling Origin products and services while it prioritized its other product

lines and revamped—and prepared to re-launch—the Origin One.

6563. The Shareholders ~~65~~ thus raised Stratasys's prior promises to adjust the ~~EO~~Earn-Out Date

(as reflected in the Agreement and Stratasys's repeated representations leading up thereto).



### A.    Stratasys Delays the Sale of Origin Products

6765.    Although Origin was well-positioned to continue manufacturing and producing its

printers beginning in spring 2021, Stratasys decided to pursue other strategic objectives. As a

result, Stratasys instructed the Origin team in California to direct its focus away from production of

the existing printer model and, instead, to focus on developing new hardware for the Origin One

that would be relaunched as a Stratasys product.

6866.    This included developing an updated version of the Origin One printer that

physically conformed to Stratasys's specifications while also taking steps to develop a specialized

version of the printer intended for use in the dental industry, where Stratasys saw a business

opportunity. Stratasys further directed the Origin team to implement a suite of new features for the

Origin One printers already in use by existing customers. As a result of these new directives,

Stratasys halted production and sales of the Origin One printer entirely near the end of spring 2021.

6967.    During this same period, Stratasys also began incorporating Origin's intellectual

property into its own product and service lines and prioritized the development of those other lines

of business over the Origin business unit. In other words, Stratasys substantially delayed Origin's

launch while it raced ahead with sales of its own competing products and services, giving rise to

the precise issues that the Shareholders had foreseen and raised, including in the Parties' October

2020 meeting.

**B.      Stratasys Tells the Shareholders That It Agrees to a New EO Date Coinciding with the Launch of the Origin One Version 2.7**

~~70~~68.    The interruption of Origin One sales had immediate and obvious implications for Origin's ability to meet its Earn-Out Targets under the Acquisition Agreement. That is because if the EO Date remained unchanged, there would be no Origin products or services offered for sale for most or all of the first Earn-Out Period, and Origin would be unable to meet its Earn-Out Target.

~~71~~69.    The Shareholders foresaw this exact circumstance, and it is what led to the concerns they raised at the October 2020 meeting—in response to which Stratasys assured the Shareholders that it would treat them fairly and ensure that their earn out entitlement would be calculated fairly. Those promises were memorialized in writing and subsequently instantiated in the Acquisition Agreement, including the provision allowing the parties to easily change the EO Date to reflect commercial reality and the provision forbidding Stratasys from interfering with the Shareholders' ability to satisfy the Earn-Out Targets.

















85 83.   The only way to credit Stratasys's present litigation position that the EO Date has not been changed because the board did not approve it is to conclude—against all the evidence and and common sense—both that (i) Stratasys's own CEO was so neutered that he somehow did not have have the authority to negotiate and make commercial agreements on behalf of the company, and (ii) the (ii) the Shareholders were wrong to rely on Stratasys's own CEO's representations to them that they had they had reached an agreement. Neither of these can possibly be true.







8886.  Following Stratasys's representation that it had agreed to re-set the EO Date to coincide with the GA Date, Stratasys made the Origin One 2.7 generally available in February 2022. (Ex. 9 (Stratasys 2022 Form 6-K) (describing the "launch of the Origin One in ~~mid-February~~mid-February"); *see also* Ex. 2 (Stratasys 2022 Annual Report) (noting that the "Origin One 3D Printer" has been "generally available since the beginning of 2022")~~)~~.) Because the Acquisition Agreement requires the EO Date to "fall[] on the first day of a calendar month," Stratasys's written representations concerning its agreement to move the EO Date to coincide with the GA Date results in re-setting the EO Date as February 1, 2022—that is, the "first day of a calendar month" capturing the general availability of the Origin One 2.7.

C.    The ~~Parties Rely on Their~~**Shareholders Rely on Stratasys' Representations and** Agreement to Re-Set the EO Date

87.    Based on Stratasys's conduct and repeated agreement, the Shareholders believed

~~89.~~    ~~Both Stratasys's~~that Stratasys and the Shareholders~~' subsequent conduct demonstrated they~~ shared an understanding that the EO Date had been changed. In fact, Stratasys's own subsequent conduct reinforced the Shareholders' reasonable belief that Stratasys would abide by its promise to re-set the EO Date.

91~~89~~. In fact, Stratasys did not provide the reports until July 2022, after the Shareholders,

through their counsel, demanded that Stratasys abide by its agreement and pointed out Stratasys's

~~out Stratasys's~~ failure to provide the Quarterly Reports that would have been required if the parties had not re-set

the EO Date. Stratasys, faced with this plain evidence either of its fraud or of the untrue nature of

its position—and in a ham-fisted attempt to remake history—then issued all three of those reports

simultaneously, as if somehow that would retroactively absolve Stratasys for its conduct.

Stratasys's position is self-evidently false.

90. The Shareholders themselves explicitly relied on Stratasys's representation that it

92. ~~The Shareholders likewise relied on Stratasys's representation that it~~ had agreed
to change the EO Date to correspond to the GA Date. ~~Among other things,~~ The full group of Shareholders

relied on Stratasys's representations by, among other things, declining to take formal steps to

challenge Stratasys's failure to provide the Quarterly Statements that it would have been required

to provide had the EO Date not been re-set. For similar reasons, the Shareholders did not, at

the time, pursue their legal remedies against Stratasys for its scheme to delay the launch of

Origin's products and services because the Shareholders reasonably believed that they would

nevertheless be given a full and fair opportunity to satisfy their Earn-Out Targets and

received 40% of their bargained-for consideration by virtue of Stratasys's representations that it had agreed to re-set the EO Date.

91.    Individual Shareholders Chris, Joel, and Jeffrey Lee agreed separately relied on Stratasys's representations, including by agreeing to continue their employment at Stratasys following the acquisition long after they were contractually obligated to do so, despite their many documented concerns about certain of Stratasys's strategic and operational decisions. (*See, e.g.*, Ex. 3 (July 8, 2021 Email from Chris)).) They did so with the express expectation and understanding that the re-set EO Date would give them and the other Shareholders a full and fair opportunity to satisfy the Earn-Out Targets—and to receive the remainder of their bargained-for compensation under the Acquisition Agreement. The Shareholders also relied on the agreement to re-set the EO Date by not demanding the Quarterly Reports from Stratasys when they would otherwise have been due.

9392.    Without the agreement to re-set the EO Date, Stratasys's decision to halt the sale of of Origin printers would have made it nearly impossible for Origin to satisfy its Earn-Out Targets. But based on Stratasys's representations that it had agreed to re-set the EO Date, the Shareholders reasonably believed that Stratasys had aligned the parties,' interests—and based on that understanding, Chris, Joel, and Jeffrey Lee continued to provide valuable services to Stratasys to ensure the success of the Origin business unit in California.

9493.    During the months since Stratasys first represented that it had agreed to re-set the EO Date, Chris and Joel have not just contributed to the day-to-day operation of the company;

they have also taken substantial steps to further expand Origin's portfolio of intellectual property. Among other things, Chris and Joel have developed new innovations and techniques and have filed new applications with the USPTO, while also taking steps to protect and secure Origin's existing suite of patents. (*See supra* ¶¶ 11 47-51).) Further, Chris and Joel have made extensive efforts far exceeding their contractual commitments to build out and train a robust new-technology process team to ensure the continued protection of Origin's (now Stratasys's) intellectual property. Chris

and Joel's ongoing and future work in this regard has been—and is—expressly predicated on Stratasys's representations concerning its agreement to re-set the EO Date.



96.    Stratasys's success is directly attributable to Chris and Joel's post-acquisition efforts—which they undertook relying on Stratasys's representations concerning its agreement to re-set the EO Date, which would enable the Shareholders to earn their full bargained-for earn-out compensation. It would be fundamentally inequitable and unjust for Stratasys to keep for itself the massive benefits that Chris and Joel based on their reliance on Stratasys's false representations.

100.    Stratasys's effort to cheat the Shareholders out of their bargained-for consideration—now that Stratasys has enjoyed the benefits of that bargain—is flatly contrary to Stratasys's prior representations concerning the parties' agreement, as well as Delaware law. In light of Stratasys's misconduct, the Shareholders are entitled to both enforce the contract and to their equitable portion of the substantial value they created.

**D.    Stratasys Itself Touts Origin's Substantial Contributions to Stratasys's Success**

101.    Stratasys itself has recognized the substantial concrete benefits derived from acquiring Origin and using Origin's valuable intellectual property—as well as from the post post-acquisitionacquisition services provided by Chris, Joel, and the other Shareholders. The company's Form 6-K for the first quarter of 2022 noted that Stratasys's product revenues "increased by $14.6 million, or 36.7%, for the three months ended March 31, 2022," and that this increase "reflected the highest first quarter total in five years, strengthened by the launch of the Origin One[.]" (Ex. 9 (Stratasys 2022 Form 6-K)).)

102. Stratasys's corresponding earnings release touted the "early momentum and contribution from our new Origin P3" system, which it further noted was "designed for high high-volumevolume production of end-use parts." (Ex. 10 (May 16, 2022 Earnings Stmt.)).) In fact, Origin's Q1 2022 sales exceeded Stratasys's own internal estimates at double digit rates. That momentum

continued throughout 2022, with Stratasys noting that the Origin product line "continue[s] to

ramp, with excellent customer engagement across all of our new technology offerings." (Ex. 11 (August 3, 2022 Earnings Stmt.)).)

103.    Stratasys continued to tout Origin's value in subsequent filings, noting in its 2022 Annual Report that Origin's technology "has become an important growth engine for our company" and explaining that the Origin acquisition "significantly strengthened our leadership in mass production for polymer 3D printing" because "Origin's pioneering approach to additive manufacturing of end-use parts has enabled us to serve a large market with manufacturing-grade 3D printers." (Ex. 2, (Stratasys 2022 Annual Report).)

104. Origin's contribution to Stratasys goes beyond the numbers of the Origin business unit. Since the acquisition, Stratasys has recognized the value proposition of Origin's core

insight: a software-driven approach to printing coupled with an open-material model will open the door for 3D printing to jump from the limited prototyping industry into the ~~multitrillion~~ multitrillion-dollar~~dollar~~ manufacturing industry. Based on this recognition that 3D printing can be reliably used for manufacturing, Stratasys has incorporated Origin's paradigm-shifting open-material model into the majority of its 3D-printing business lines, not just the Origin One, which has allowed Stratasys to charge a premium across its business units.

105.    Stratasys's 2022 performance was largely due to Origin's products and services. And Stratasys's more recent earnings releases and investor statements continue to tout the success of the Origin product line and Origin's intellectual property more broadly—including the new "P3 Business Unit" founded exclusively for the purpose of monetizing Origin's intellectual property. For instance, in its 2023 Annual Report, Stratasys extensively discussed the P3 technology, including that the "P3-based systems, which [Stratasys] added to [its] solutions portfolio via the acquisition of Origin, offer a best-in-class combination of detail, mechanical properties and throughput for mass manufacturing production parts" and that the P3 technology "dramatically expand the total addressable market across medical, dental, consumer goods, automotive, commercial goods, and service bureaus." (Ex. 19~~,~~ (Stratasys 2023 Annual Report).)

E.    Stratasys ~~Reneges on the Parties' Agreement in Order to Cheat~~Cheats the Shareholders Out of Their Bargained-For Consideration



107. The only reason for this breach that Zeif provided was that the board had supposedly determined that there was "no benefit to Stratasys" to follow through on changing the EO Date, now that Stratasys had already enjoyed the benefits of the agreement. In other words, Stratasys reneged solely because it decided it would be in Stratasys's interest to do so. By refusing to honor its express representations and promises to the Shareholders, Stratasys completed its months-long scheme to dupe the Shareholders into creating massive benefits for the company while cheating them out of the compensation they are entitled to.



109.    Stratasys's effort to do so is contrary to its prior written representations, the plain

language of the Acquisition Agreement, and the parties' post-acquisition course of performance. It is also contrary to any sense of fairness or good faith—both because Stratasys seeks to deprive the Shareholders of their bargained-for benefit while continuing to profit from Origin's valuable intellectual property, and because Stratasys seeks to drive a wedge between Chris and Joel and the remaining Shareholders.



intellectual property, and because Stratasys seeks to drive a wedge between Chris and Joel and the

remaining Shareholders.

110. Chris and Joel did not accept Zeif's improper proposal, which was at odds with the

the deal Stratasys had already agreed to and was fundamentally unfair to the remaining Shareholders.

## IV.    STRATASYS VIOLATED ITS REPRESENTATIONS, PROMISES AND AGREEMENT(S)

111.    Stratasys repeatedly represented to the Shareholders that it would re-set the EO Date would be

re-set to coincide with the GA Date for version 2.7 of the Origin One printer. That representation is

is memorialized in multiple writings—and it therefore constitutes an effective agreement to re re-set the

set the EO Date under the plain language of the Acquisition Agreement.

### A.    The Parties' Emails Constitute Writings Under the Acquisition Agreement

112. The Acquisition Agreement states that the EO Date is "July 1, 2021 or such other date that falls on the first day of a calendar month as mutually agreed in writing by Parent and Seller Representative." (Acq. Agmt., Annex I).)



114. These emails are more than sufficient to satisfy the "agreed in writing" requirement

requirement of the Acquisition Agreement, which was specifically designed to account for post-acquisition

acquisition business reality.

115. The Acquisition Agreement is governed by Delaware law. (Acq. Agmt. § 11.4).

Delaware recognizes a public policy in favor of giving full effect to the unambiguous intentions

of businesspeople without placing undue emphasis on formalistic requirements. Because of that policy, Delaware courts hold that emails are sufficient to satisfy a "writing" requirement of the sort in the Acquisition Agreement. *See, e.g., Camden Fitness, LLC v. Wandless Enterprises, Inc.*, No. CPU5-12-000295, 2013 WL 8854873, at *3 n.7 (Del. Com. Pl. Feb. 11, 2013) ("Emails may be considered writings."); *see also* DEL. CODE ANN. tit. 2, § 12A-107(c) (West 2023) ("If a law requires a record to be in writing, an electronic record satisfies the law."); Black's Law Dictionary (11th ed. 2019) (defining "writing" as "any intentional recording of words in a visual form," including "e-mails, and any other media on which words can be recorded").

116. Indeed, Delaware courts routinely find that essentially any unambiguous writing can be sufficient to reflect the parties' agreement. *See, e.g., Zayo Grp., LLC v. Latisys Holdings, LLC*, No. 12874-VCS, 2018 WL 6177174, at *14 (Del. Ch. Nov. 26, 2018) ("Toshiba's October 1, 2014 email . . . would have constituted written notice to Latisys that Toshiba intended to "materially modify" that contract."); *Triple H Fam. Ltd. P'ship v. Neal*, No. 12294-VCMR, 2018 WL 3650242, at *13 (Del. Ch. July 31, 2018), *aff'd*, 208 A.3d 703 (Del. 2019) ("This email exchange constitutes the written consent of the members to dissolve Omni."); *Camden Fitness*, 2013 WL 8854873, at *3 ("[E]ven if the contract modification should have been in writing, the emails of December 29, 2010, and February 26, 2011, constitute written modifications to the contract, evidencing [an] agreement to the new contract price of $155,000.00.").

███████████████████████████████████████████

**B.      Re-Setting the EO Date Does Not Require Board Approval**

~~118~~116.         Despite its written representations, Stratasys has taken the position that its written promises to re-set the EO Date are somehow ineffective because they ~~was~~were not formally approved by the Stratasys board. But the Acquisition Agreement includes no such requirement—it simply requires Stratasys to agree to any change in writing. And as a commercially sophisticated party, Stratasys knows that a CEO does not need board approval prior to entering into an agreement on behalf of his company~~. *See, e.g., Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 81 (1995) ("[A]~~—it is well within the scope of a CEO's powers to enter into an agreement on behalf of his company and the corporation is bound by ~~contracts entered into by its officers and agents acting on behalf of the corporation and for its benefit, provided they act within the scope of their express or implied powers." (citation omitted)).~~such agreement.

~~119~~117. Moreover, Zeif has repeatedly demonstrated broad decision-making powers and authority on behalf of Stratasys, including with respect to all sorts of issues relating to the relaunch of the Origin One printer. Without seeking or requiring the board's approval, Zeif has (i) made decisions regarding the production and sale of the Origin One printers, (ii) directed the Origin team to develop new hardware, (iii) allocated resources to address and resolve manufacturing and performance issues as they arose, (iv) directed the Origin team to prioritize a separate product targeting the dental industry over the Origin One printer, (v) restarted production, and (vi) set the GA Date.

~~120~~118. Along with these decisions, Zeif also negotiated and represented to the Shareholders that he had bound the company in writing to a revised EO Date. Stratasys's last-minute claim that Zeif needed board approval for that single item (but not the others) not only contradicts the plain language of the Acquisition Agreement, but it also deviates from the

parties' course of post-acquisition performance over many months. *See, e.g., Hessler, Inc. v.*, from which Zeif's authority to re-set the EO Date is implied.

*Farrell*, 226 A.2d 708, 711–12 (Del. 1967) ("It is the law of this State that when, in the usual course of the business of a corporation, an officer or agent has been allowed to manage certain of its affairs, and when this is known to the other party to the contract, the authority of the officer to act for the corporation is implied from the past conduct never challenged by the corporate officials."); *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 128 (3d Cir. 1998) ("Implied actual authority . . . may be found through evidence as to the manner in which the business has operated in the past[.]").

121119.    Stratasys's claim also runs contrary to its Articles of Association, which contemplate the grant of significant powers to the CEO. (Ex. 12, (Amended and Restated Articles of Association of Stratasys Ltd.,) § 81.3; *see also Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d at120, 127-28 (3d Cir. 1998) ("Express authority to act on behalf of the corporation is usually

manifested through a statute, the certificate of the corporation, the by-laws, or a board or certificate of the corporation, the by-laws, or a board or shareholder action.").).

shareholder action.").)

122120. Stratasys cannot undo Zeif's representations on the company's behalf by now claiming that only the board can make such a deal.

### C.    The Parties' Performance Evidences Stratasys's Representations that It Had Agreed to Change the EO Date

123121. Finally, Shareholders relied on Stratasys's representations that it had agreed to move

move the EO Date—and from the Shareholders' perspective, Stratasys's conduct also appeared to reflect

to reflect reliance on what they understood to be a mutual agreement. As explained in Section III(C) above,

Stratasys appeared to perform in accordance with that agreement by, among other things, not producing the Quarterly Reports that are mandated during the Earn-Out Periods until after it ~~after it~~ received the Shareholders demand letter on June 28, 2022.

~~124~~122.    Stratasys's course of performance is consistent with its representations to the

Shareholders that it had agreed to move the EO Date. In fact, had the parties not agreed to move the

EO Date, Stratasys would have been in material breach of the Acquisition Agreement for failing to

satisfy this requirement, with the result that the ~~full~~ entire unpaid earn-out payments—$40 million ~~in earn-out proceeds would be due immediately. *See, e.g., S'holder Reps. Servs. LLC v. Alexion Pharms., Inc.*, No. 2020-1069-MTC, 2021 WL 3925937, at *3 (Del. Ch. Sept. 1, 2021) (authorizing contract claim by shareholder representative to proceed against acquiring company that sought as damages "the sum total of all unpaid earn-out payments").~~

would be due immediately.

~~125~~123. And for their part, Shareholders Chris, Joel, and Jeffrey Lee contributed substantial

time and effort to the success of the Origin business unit post-acquisition, which they did in direct

reliance on Stratasys's repeated agreements to re-set the EO Date—and which conferred substantial

benefits on Stratasys in reliance on the Shareholders' reasonable expectation that the re-set EO

Date would provide them with a fair opportunity to satisfy the Earn-Out Targets.

~~126. Further, because Delaware law permits contract modification through~~124. In other words, the course of ~~performance, the parties'~~ conduct ~~itself~~of both Parties would act to re-set the EO Date

even in the absence of a written agreement. ~~Delaware law gives substantial weight to the ways in which businesspeople actually perform under a given contract. When, like here, a party's conduct appears to evidence~~The Parties' conduct evidences a plain intention to ~~amend the terms of a written agreement, that implied amendment is binding. *See, e.g., Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 567 (D. Del. 1993) ("The Delaware Supreme Court has held that . . . the parties may, "by their conduct, substitute a new oral contract without a formal abrogation of the written agreement," even if that agreement contains an explicit clause to the contrary."); *Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc.*, 297~~

amend the placeholder EO Date in the Acquisition Agreement and substitute with the EO Date that

~~A.2d 28, 33 (Del. 1972) (holding that "a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement" because "the parties have a right to renounce or amend the agreement in any way they see fit and by any mode of expression they see fit" "including a change in the provisions of the written agreement by~~ coincides with the ~~course of conduct~~actual launch of the ~~parties")~~Origin products and services.

~~127~~125. The parties' conduct is therefore further evidence of a mutual, unambiguous

agreement to re-set the EO Date—and that change was legally effective either as an agreement in

writing under the Acquisition Agreement or, alternatively, as a modification though their course of

~~of~~ performance.[43] Stratasys cannot undo its represented agreement by belatedly claiming its own CEO

~~CEO~~ somehow did not have the authority to act on the company's behalf.

## V.        STRATASYS HAS DEFRAUDED THE SHAREHOLDERS

126. Stratasys repeatedly and knowingly lied to the Shareholders in order to induce their

reliance and to reap substantial ill-gotten gains. By lying to the Shareholders, Stratasys was able to

secure and monetize Origin's valuable intellectual property while paying only a fraction of the

agreed-upon purchase price. And by using that intellectual property, Stratasys has generated (and

will continue to generate) hundreds of millions of dollars in revenue and increased enterprise value.

127.    Stratasys's fraud on the Shareholders takes at least three separate forms.

### A.    Stratasys Fraudulently Induced the Shareholders' Execution of the Acquisition Agreement

128.    Stratasys's false pre-acquisition promises fraudulently induced the Shareholders'

execution of the Acquisition Agreement. Indeed, the Shareholders had already "called off" the

potential acquisition by the early fall of 2020—but Stratasys induced them to resume negotiations

and ultimately consummate the transaction based on false pretenses.



130. Each of those promises was false, and Stratasys knew that each promise was false at the time because Stratasys had no intention of fairly calculating the Shareholders' earn out entitlements—or of paying the Shareholders any Earn-Out Payment at all. Instead, Stratasys planned to prevent the Shareholders from satisfying the Earn-Out Targets, including by delaying the launch of Origin's products, by illicitly funneling Origin's intellectual property into other Stratasys products that it refused to count towards the Earn-Out Target, and by prioritizing those (and other) Stratasys products over the Origin line.

132. Were it not for Stratasys's repeated false statements, the Shareholders would never have entered into the Acquisition Agreement.

133. In light of Stratasys's explicitly false statements—including the false statements incorporated into the Acquisition Agreement itself as Stratasys's explicit representations, warranties, and obligations—Stratasys cannot avail itself of any defenses based on purported contractual disclaimers of reliance or limitations of liability. Among other reasons, a party may not contract around its own deliberate fraud or enjoy the benefits of clauses purporting to limit liability and/or reliance where such clauses appear in contracts that also include knowingly false representations by the wrongdoer.

**B.    Stratasys Defrauded the Shareholders by Lying About Its Intention to Re-Set the EO Date**

134. Stratasys separately defrauded the Shareholders following the acquisition by, among other things, lying to the Shareholders both orally and in writing about Stratasys's agreement to re-set the EO Date so as to coincide with the general availability of Origin's products and services.

135. Were it not for Stratasys's repeated false statements, the Shareholders—acting through Chris, Joel, and Jeffrey Lee—would not have provided the extremely valuable services from July 2021 through February 2022 that allowed Stratasys to monetize Origin's intellectual property.

**C.    Stratasys Concealed Its Fraud and Other Misconduct Until At Least March 23, 2022**

136. Stratasys also fraudulently concealed its misconduct until at least March 23, 2022,

when it finally informed the Shareholders that it would not agree to re-set the EO Date—but only

after Stratasys's lies had induced the Shareholders' reliance for more than a year.



138. Were it not for Stratasys's repeated lies and efforts to hide the truth, the

Shareholders would have discovered the truth much earlier. But in light of those lies, the

Shareholders could not have known they had been defrauded any earlier than March 23, 2022.

**~~V~~VI.    STRATASYS HAS REFUSED TO ENGAGE WITH THE SHAREHOLDERS' GOOD FAITH EFFORTS TO RESOLVE THIS MATTER**

~~128~~139. Since this dispute has arisen, the Shareholders have repeatedly—and fruitlessly—

tried to engage in a productive commercial dialogue concerning Stratasys's agreement to re-set the

~~the~~ EO Date.

~~129~~140. Indeed, shortly after Stratasys informed the Shareholders in March 2022 that

Stratasys would renege on its repeated written agreement to re-set the EO Date, Chris and Joel

asked Zeif to reconsider that position and to abide by the Parties' prior agreement.





142. Rather than engaging with the Shareholders or abiding by its unambiguous prior written agreements, Stratasys instead opted to double and triple-down on its position. In an attempt to undermine the undisputed evidence of its agreement to re-set the EO Date, Stratasys sent a letter on July 15, 2022, in which it informed the Shareholders that it intended to provide the Quarterly Reports—which would have been due months prior had the Parties not agreed to move the EO Date—"by no later than Wednesday, July 20, 2022." (Ex. 14 (July 15, 2022 Stratasys Letter).)

143. Stratasys proceeded to provide "Quarterly Reports" that would have corresponded to the first, second, and third quarters of the first Earn-Out Period had the EO Date not been re-set. (Ex. 15 (July 20, 2022 Quarterly Statements).) Those Quarterly Reports demonstrated precisely why the parties agreed to re-set the EO Date: Stratasys had not even made the Origin products available for sale during much of those periods of time.[54] (*Id.*)

Indeed, on August 29, 2022, Stratasys provided a purported "Earn-Out Schedule for the First Earn-Out Period" stating that the "First Earn-Out Payment is nil." (Ex. 16 (Aug. 29, 2022 Earn-Out Schedule).)





~~136~~147.      Stratasys's conduct left the Shareholders with no choice but to ~~file this Arbitration~~seek legal recourse in ~~Demand in~~ order to hold Stratasys to its agreement~~.~~, to disgorge the unfair benefits that Stratasys's and Zeif's deliberate misrepresentations conferred on Stratasys, and to recover their costs and attorneys' fees incurred in enforcing their rights.

## VII. STRATASYS DISCLAIMS ALL ARBITRAL JURISDICTION OVER THE SHAREHOLDERS' FRAUD AND EQUITY CLAIMS

148. On May 19, 2023, the Shareholders filed an arbitration demand against Stratasys before the International Center for Dispute Resolution ("ICDR") of the American Arbitration Association ("AAA"), pursuant to the arbitration clause in the Acquisition Agreement. (Ex. 20.) The Shareholders filed an amended arbitration demand (the "Arbitration Demand") on August 2, 2024. (Ex. 21.) The Arbitration Demand included three causes of action sounding in contract that are not at issue in this proceeding, as well as the fraud and equity claims herein.



151. In other words, Stratasys has now waived any argument that the Shareholders' claims sounding in equity and fraud should be arbitrated.

**CAUSES OF** ~~ACTION⁷~~**ACTION**

**FIRST CAUSE OF ACTION**
**(**~~Breach of Contract - Damages~~**Fraud)**

~~137. By and through their designated Shareholder Representative, Fortis, the~~
152. The Shareholders reallege each paragraph of this ~~Arbitration Demand~~Complaint as if fully set forth herein.

~~138. The Acquisition Agreement is a valid and binding written agreement between~~
153. As alleged herein, Stratasys engaged in deliberate fraud against the Shareholders intending to deprive them of the full purchase price for their company in at least three ways: (a) by engaging in misrepresentations of material facts intending to induce the Shareholders to execute the Acquisition Agreement; (b) by engaging in misrepresentations of material fact intending to induce the Shareholders to perform valuable services for Stratasys's benefit after the acquisition and to refrain from challenging Stratasys's hidden misconduct intended to interfere with the Shareholders'

Earn-Out rights; and (c) by withholding and omitting material facts before and after the acquisition which Stratasys was obligated to truthfully disclose and not conceal or otherwise refrain from disclosing.

139. Among other things, the Acquisition Agreement sets out the terms of the payments by Stratasys to the Shareholders in consideration for the acquisition of Origin— including the EO Date and other terms governing Stratasys's obligation to make Earn-Out Payments. The Acquisition Agreement also requires Stratasys to provide the Shareholders with Quarterly Reports within 60 days of the close of each quarter during each Earn-Out Period. The Acquisition Agreement also empowers the parties to change the EO Date through a simple agreement 155. Stratasys memorialized each of these pre-acquisition promises in writing, without the need either for a signed agreement or formalincluding amendment.

140. In writings dated August 25, 2021, October 12 and 21, 2021, and February 12, 2022, among others, the parties agreed to set the EO Date to coincide with the GA Date for the Origin One Version 2.7 printer. This agreement was reflected by the parties' course of

² Consistent with its role as Shareholder Representative under the parties' Acquisition Agreement (*see* Acq. Agmt. at 2), Fortis asserts all of the Causes of Action herein on behalf of the Shareholders. Stratasys has not presented any motion to dismiss or otherwise preclude Fortis' conduct in this proceeding as Shareholder Representative for the amended contract-related claims herein. However, in the event Stratasys later argues, and/or the Tribunal determines,

that Fortis somehow lacks standing to pursue one or more of these Causes of Action because the claims belong to an individual rather than to the Shareholders collectively, the Shareholders reserve right to amend this Arbitration Demand to bring claims on individually on behalf of one or more of the Shareholders.

~~performance, which demonstrated that all parties understood and relied upon their agreement to~~

in the parties' joint, contemporaneous notes of the October 2020 meeting. Stratasys also explicitly

made each of these promises as part of the representations, warranties, and/or obligations explicitly

set out in the Acquisition Agreement itself. (*See, e.g.*, Acq. Agmt. § 2.3; Annex I; Ex. D.)



157.    Stratasys's pre-acquisition misrepresentations were intended to induce the Shareholders' execution of the Acquisition Agreement.

158. The Shareholders reasonably relied on Stratasys's representations, including by agreeing to the terms of the Acquisition Agreement and by fully complying with their obligations thereunder by, among other things, transferring ownership of Origin and its valuable suite of intellectual property to Stratasys and ensuring a successful integration of Origin into Stratasys.

159.    Second, after the acquisition, Stratasys made deliberate, knowingly false representations of material facts with the intent to induce the Shareholders to provide valuable services to Stratasys.

61. Stratasys memorialized these statements in writing, including in the correspondence between and among Zeif, Lebi, and representatives of the Shareholders in which Zeif and Lebi represented that Stratasys had agreed to, and would, re-set the EO Date as promised.

162. Each of those statements—and many others—were false, and Stratasys knew of the falsity at the time. Stratasys's false statements were intended to induce the Shareholders' reliance.

163. The Shareholders reasonably relied on Stratasys's representations, including by not demanding that Stratasys provide the Quarterly Reports that it would have ~~been required to provide~~ ~~absent an agreement to re-set the EO Date.~~otherwise been obligated to provide had the EO Date not been re-set, by delaying in seeking to challenge Stratasys's fraudulent scheme, and by performing valuable services for Stratasys with the expectation that the Shareholders would receive the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such

satisfaction. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions. Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

164. Third, Stratasys concealed material facts from the Shareholders before, during, and following the Parties' execution of the Acquisition Agreement, as well as before, during, and following the Parties' negotiations regarding re-setting the EO Date.

165. Among other things, Stratasys concealed until at least March 23, 2022 that the representations by which it had induced the Shareholders' reliance were knowingly false. Stratasys accomplished this concealment by repeatedly reassuring the Shareholders that it had, in fact, re-set the EO Date to correspond with the launch of the Origin product line—including

in written correspondence from Zeif, Lebi, and other representatives of Stratasys from July 2021 through February 2022.

166. Stratasys further concealed its misconduct by failing to provide the Quarterly Reports that it was contractually obligated to provide following the EO Date. Had Stratasys provided such reports, the Shareholders would have learned the truth: that contrary to what it had promised, Stratasys had not re-set the EO Date.

168. Stratasys engaged in this concealment intentionally in order to delay the Shareholders' discovery of their fraud so that the Shareholders would (a) continue to provide the valuable services described herein and (b) delay in seeking to challenge Stratasys's fraudulent

scheme. Had the Shareholders known the truth, they would have uncovered Stratasys's fraud and

141. Alternatively, the parties' course of performance was, itself, sufficient to modify the tentative EO Date—even assuming (contrary to fact) that the parties had not also agreed in writing to re-set the EO Date. *See, e.g., Haft*, 841 F. Supp. at 567 ("The Delaware Supreme Court has held that . . . the parties may, by their conduct, substitute a new oral contract without a formal abrogation of the written agreement, even if that agreement contains an explicit clause to the contrary.") (internal quotations omitted).

142. The Acquisition Agreement therefore obligates Stratasys to treat February 1, 2022 as the EO Date for all purposes misconduct earlier.

143. Stratasys has violated this obligation by, among other things, refusing to treat February 1, 2022 as the EO Date for the purpose of calculating whether Origin's revenue satisfied the Earn-Out Targets. Stratasys has also violated this obligation by failing to timely provide the required Quarterly Reports following the re-set EO Date.

169. As a result of Stratasys's fraud, any of Stratasys's would-be protections or limitations on liability or reliance as set forth in the Acquisition Agreement or elsewhere were procured by fraud and are therefore void and unenforceable.

170. Further, as a result of Stratasys's fraud, the Shareholders have suffered damages in an amount to be determined by the Court.

144. 171. Stratasys's breach has materially harmedconduct entitles the Shareholders. to all remedies for fraud, including disgorgement of all unlawful earnings or enrichments received or retained by Stratasys as a result

145. Among other things, Stratasys's breach has deprived the Shareholders of a full and fair opportunity to satisfy the relevant Earn-Out Targets—and to receive the tens of millions of dollars in Earn-Out Payments conditioned on such satisfaction. The Shareholders are therefore entitled to full payment ofof its wrongful conduct—upon information and belief, an amount no less than $40400 million in Earn-Out Payments on an accelerated basisdollars.

172. Stratasys's conduct was gross, oppressive, and/or aggravated and therefore entitles the Shareholders to punitive damages, pre-judgment and post-judgment interest, attorney's fees, costs, and such additional relief as the Court may deem appropriate. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076-77 (Del. 1983).

**SECOND CAUSE OF ACTION**
**(Promissory Estoppel)**
**(Breach of Contract – Specific Performance and Injunction)**

146. By and through their designated Shareholder Representative, Fortis, the

173. The Shareholders reallege each paragraph of this ~~Arbitration Demand~~Complaint as if fully set forth

herein.

147. Stratasys has breached its obligations under the Acquisition Agreement by

continuing to profit from its ongoing use of that same intellectual property. Stratasys has agreed that its conduct causes "irreparable damage" to the Shareholders and that the Shareholders can receive "no adequate remedy at law." (Acq. Agmt. § 11.7(c)).

148. The Shareholders are therefore entitled to "specific performance of the terms of the" Acquisition Agreement, "in addition to any other remedy at law or equity." (Acq. Agmt. § 11.7(c)). Among other things, Stratasys must perform under the Acquisition Agreement by treating the EO Date as February 1, 2022 for all purposes.

**THIRD CAUSE OF ACTION**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

149. By and through their designated Shareholder Representative, Fortis, the

175. These promises were clear and unambiguous, and Stratasys memorialized each of these pre-acquisition promises in writing, including in the parties' joint, contemporaneous notes of the October 2020 meeting. Stratasys also explicitly made each of these promises as part of the representations, warranties, and/or obligations explicitly set out in the Acquisition Agreement itself. (*See, e.g.*, Acq. Agmt. § 2.3; Annex I; Ex. D.)

176. Stratasys reasonably expected that the Shareholders would take action in reliance on these pre-acquisition promises regarding the EO mechanism. The Shareholders expressed concerns about the earn-out structure to Stratasys, and Stratasys made these specific promises to address those concerns and as part of "mechanisms of managing the EO risk."

177. The Shareholders reasonably relied on these promises, including by resuming formal negotiations of the acquisition, by agreeing to the terms of the Acquisition Agreement, and by fully complying with their obligations thereunder by, among other things, transferring ownership of Origin and its valuable suite of intellectual property to Stratasys and ensuring a successful integration of Origin into Stratasys.

178. In multiple written and oral communications between July 2021 and February 2022, Stratasys promised to re-set the EO Date to coincide with the GA Date. These promises were clear and unambiguous, and Stratasys reasonably expected that the Shareholders would take action (and/or forbear from taking certain actions) in reliance on Stratasys's promise to re-set the EO Date.

179. The Shareholders did, in fact, rely on Stratasys's promise. Among other things, Chris, Joel, and Jeffrey Lee relied on Stratasys's promise by devoting substantial time, effort, and resources for the benefit of Stratasys, all of which far exceeded any duties or obligations they owed to the company. During this period, Chris, Joel, and Jeffrey Lee provided extremely valuable services to Stratasys, at substantial burden and opportunity cost to themselves, in direct reliance on Stratasys's and Zeif's promises to them.

180. The Shareholders also relied on Stratasys's promise by not demanding that Stratasys provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set and by delaying in seeking to challenge Stratasys's fraudulent scheme.

181. Stratasys's repudiation of its clear and unambiguous promises has caused and continues to cause the Shareholders significant harm, including without limitation to the extent they

have been deprived of the full and fair opportunity to satisfy the relevant Earn-Out Targets.

182. Stratasys's promises are binding and enforceable, and injustice can be avoided only

by enforcement of the promises to re-set the EO Date and to fairly calculate the Shareholders' Earn-Out Payments by crediting the sale of all products and services incorporating Origin's intellectual property against the Earn-Out Targets as reflected in the Acquisition Agreement.

**THIRD CAUSE OF ACTION**
**(Unjust Enrichment)**

183. The Shareholders reallege each paragraph of this ~~Arbitration Demand~~Complaint as if fully set forth herein.

~~150. The Acquisition Agreement is a valid and binding written agreement between Stratasys and the Shareholders and is governed by Delaware law.~~

~~151. "The implied covenant of good faith and fair dealing inheres in every contract" under Delaware law. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). Pursuant to that covenant, a party must "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." (*Id.*)~~

~~152. Stratasys has breached the covenant of good faith and fair dealing by, among other things, interfering with the Shareholders' opportunity to satisfy the Earn-Out Targets and to receive the full amount of the bargained-for Origin purchase price.~~

153.    Stratasys accomplished this breach by deliberately delaying the general availability of Origin's products long past the tentative EO Date and then reneging on its written agreement to re-set the EO Date to coincide with the GA Date, after it had used that agreement to wrongly induce the Shareholders to perform on the basis of that promise. Stratasys now takes the false and self-serving position that the first Earn-Out Period includes eight months when the Origin products were not available for sale.

154. Stratasys's breach of its covenants has materially and unfairly harmed the Shareholders.

184. Stratasys's conduct has induced the Shareholders—including Chris, Joel, and Jeffrey Lee—to perform valuable services for Stratasys. As a result of those services, Stratasys has secured and/or retained lucrative partnerships and other business relationships, and has generated substantial revenue and profits far beyond those it would have generated without the Shareholders' contributions.

185. Moreover, the Shareholders' services have allowed Stratasys to design, market, and sell the Origin One printer much sooner than it would otherwise have been able, generating increased revenue and substantial additional value for Stratasys as a company.

186. Stratasys's conduct also induced the Shareholders to not demand Stratasys to provide the Quarterly Reports that it would have otherwise been obligated to provide had the EO Date not been re-set and to delay in seeking to challenge Stratasys's fraudulent scheme. As a result, Stratasys generated substantial revenue and profits from products or services incorporating Origin's intellectual property, but only paid a fraction of the true cost.

187. The Shareholders have been damaged by, among other things, losing the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction. Stratasys also induced Chris, Joel, and Jeffrey Lee to assume significant personal burdens for Stratasys's benefit, including foregoing the opportunity to engage in other, more lucrative, professional endeavors.

188. There is no justification for Stratasys's conduct: it knowingly induced the Shareholders to provide valuable services with the intention of profiting from those services to the Shareholders' detriment.

Case No.

COMPLAINT

189. Under principles of equity, Stratasys should not be permitted to retain the benefits it gained because of its wrongdoing.

190. The Shareholders therefore seek disgorgement of the full amount by which Stratasys has been unjustly enriched as a result of the substantial time, effort, and resources the Shareholders contributed to Stratasys—upon information and belief, an amount no less than $400 million.

**FOURTH CAUSE OF ACTION**
**(Quantum Meruit)**

191. The Shareholders reallege each paragraph of this Complaint as if fully set forth herein.

155. Among other things, 192. Stratasys's breach has deprived conduct has induced Shareholders—including Chris, Joel, and Jeffrey Lee —to perform valuable services for Stratasys with the expectation that the Shareholders of a would receive recompence from Stratasys, including the full and fair opportunity to satisfy the relevant Earn-Out Targets and to receive millions of dollars in Earn-Out Payments conditioned on such satisfaction.

193. Shareholders performed those services under circumstances that put Stratasys on notice that the Shareholders had relied on Stratasys's promises. Among other things, the Shareholders did not object to Stratasys's failure to provide the Quarterly Reports that would otherwise have been due, absent an agreement to re-set the EO Date. The Shareholders also delayed in seeking to challenge Stratasys's fraudulent scheme. Instead, Shareholders continued to provide valuable services to Stratasys in reliance on their mutual agreement.

194. The Shareholders therefore seek fair recompence for the contributions that Zeif and Stratasys induced Shareholders, on false pretenses, to make for Stratasys's benefit, in an amount to be determined by the Court.

**PRAYER FOR RELIEF**

WHEREFORE, ~~by and through their designated Shareholder Representative, Fortis,~~ the Shareholders pray ~~for an award against Stratasys as follows~~ that the Court issue the following relief:

~~A.      Specific performance of Stratasys's obligations under the Acquisition Agreement, including the obligation to treat February 1, 2022 as the EO Date for all purposes.~~

A.      Damages in an amount to be determined at trial;

B.      Disgorgement of the full amount by which Stratasys has been unjustly enriched in an amount to be determined by the Court, but reasonably believed to exceed $400 million;

~~B~~C.      ~~Enforcement of~~Recompence for the value of the services provided by Shareholders to Stratasys in reliance on Stratasys's promise to re-set the EO Date to February 1, 2022~~.~~;

D.      An injunction preventing Stratasys from using Origin's intellectual property until Stratasys fairly compensates the Shareholders, while also tolling the calculation of the EO Payments until a commercially reasonable date following the full re-introduction of the Origin product line into the market;

COMPLAINT

Case No.

~~C~~E.    ~~Compensatory~~Punitive and exemplary damages ~~from Stratasys equal to~~in the ~~full~~ amount ~~of Earn-Out Payments due under the Acquisition Agreement, of $40 million.~~to be determined at Trial;

~~D~~F.    Pre- and post-judgment interest ~~from Stratasys.~~;

~~E~~G.    ~~All~~The Shareholders' attorneys' fees, expenses, and costs~~.~~; and

~~F~~H.    ~~Such~~All such other and further relief as the ~~Arbitrator deems~~Court may deem just and proper.

COMPLAINT                                         Case No.

Dated: ~~November 11~~October 21, 2024                    Respectfully submitted,

BRAUNHAGEY & BORDEN LLP


By: _____

J. Noah Hagey~~, Esq.~~

*Attorneys for Plaintiff Fortis Advisors LLC, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc.*

Case No.

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial of all claims and causes of action triable before a jury.


Dated: October 21, 2024                                      Respectfully submitted,

                                                             BRAUNHAGEY & BORDEN LLP
                                                             747 Front Street, 4th Floor
                                                             San Francisco, CA 94111
                                                             Tel.: 415-599-0210
                                                             Fax: 415-276-1808
                                                             hagey@braunhagey.com

                                                             Christman Rice, Esq.
                                                             Lily (Haeun) Kim, Esq.
                                                             118 W. 22nd Street, 12th Floor
                                                             New York, NY 10011


                                                                        Case No.
                                      COMPLAINT

~~Tel.~~By: ~~646-829-9403~~
J. Noah Hagey
~~Fax: 646-403-4089~~
~~rice@braunhagey.com~~
~~kim@braunhagey.com~~

*Attorneys for ~~Claimants, Former Shareholders~~Plaintiff Fortis Advisors LLC, in its capacity as Shareholder Representative of the former shareholders of Origin Laboratories, Inc.~~, by and through Shareholder Representative Fortis Advisors LLC~~*

Case No.

COMPLAINT

# Exhibit G

1

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

STRATASYS LTD. and                          :
STRATASYS, INC.,                            :
                                            :
              Plaintiffs,                   :
                                            :
      v                                     : C. A. No.
                                            : 2023-0773-JTL
CHRISTOPHER PRUCHA, JOEL ONG,               :
JEFFREY LEE and FORTIS ADVISORS LLC,        :
                                            :
              Defendants.                   :


                        - - -


                Chancery Courtroom No. 12A
                Leonard L. Williams Justice Center
                500 North King Street
                Wilmington, Delaware
                Wednesday, May 8, 2024
                3:15 p.m.


                        - - -


BEFORE: HON. J. TRAVIS LASTER, Vice Chancellor


                        - - -


         ORAL ARGUMENT AND RULINGS OF THE COURT ON
            CROSS-MOTIONS FOR SUMMARY JUDGMENT

2

APPEARANCES:

     ASHLEY R. ALTSCHULER, ESQ.
     HARRISON S. CARPENTER, ESQ.
     BENJAMIN STRAUSS, ESQ.
     ALEXANDER T. DICKINSON, ESQ.
     McDermott, Will & Emery LLP
       for Plaintiffs


     DAVID A. JENKINS, ESQ.
     Smith, Katzenstein & Jenkins LLP
         -and-
     DOUGLAS S. CURRAN, ESQ.
     of the New York Bar
     Brauhagey & Borden LLP
       for Defendants


                  - - -

3

ATTORNEY JENKINS:  Good afternoon, Your Honor.  David Jenkins for defendant.  These are cross-motions.  On our side, the motions will be argued, with the Court's permission, by Douglas Curran -- if you could stand, please -- from the firm of Brauhagey.  I will sit and listen.

THE COURT:  Great.

ATTORNEY JENKINS:  I think Mr. Altschuler has some introductions as well.

THE COURT:  Sure.

ATTORNEY ALTSCHULER:  Good afternoon, Vice Chancellor Laster.  Ashley Altschuler here on behalf of McDermott Will & Emery in Wilmington for my clients, the plaintiff, Stratasys Ltd. and Stratasys, Inc.

I'd like to introduce my colleagues who are in attendance with me here today.  They are Kevin Regan, Alex Dickinson, Ben Strauss, Harrison Carpenter, and from the client, John Folks.

THE COURT:  Thank you all for being here.  I appreciate it.

ATTORNEY ALTSCHULER:  Thank you, Your Honor.

ATTORNEY JENKINS:  Pursuant to the

4

Court's instructions, the parties have discussed how to handle the argument.  Mr. Curran is going to go first, Mr. Altschuler, and then the rebuttal.

THE COURT:  Okay.  Great.  Thank you.

ATTORNEY JENKINS:  You're welcome.

ATTORNEY CURRAN:  Hello, Your Honor.

Just on housekeeping first, the parties did meet and confer, at the Court's direction, about allocation of time.  We also note that Your Honor, in your initial November order, directed the parties to keep their arguments to under 30 minutes each.  We know we have 90 minutes here, but we will certainly endeavor to keep it under 30, probably even less than that.  But we'll respectfully reserve some time for rebuttal as well.

So we represent the defendants in this case.  The defendants here -- the true defendant is a shareholder representative, which is an entity, called Fortis, and Fortis is duly appointed pursuant to a merger agreement that the two parties executed in 2020 to represent the interests of the shareholders *writ large*.  Those are now the former shareholders of Origin.  Origin was the acquired company, and it was acquired by Stratasys, who is now the plaintiff in

5

this action.

The defendants also include three individuals, Chris Prucha, Joel Ong, and Jeffrey Lee. Our view is that those individuals have nothing to do with this dispute. They were -- they are not parties to the arbitration demand that has been asserted pursuant to the parties' agreements in AAA, and they have been sued here in the furtherance of this theory that Stratasys has that somehow secretly Fortis's claims that it's bringing pursuant to the merger agreement actually somehow really belong to those three individuals. And so that will be somewhat of a recurring theme that comes up throughout this argument, undoubtedly.

But our view is that, actually, this is all quite simple and quite straightforward, and we will briefly explain why.

So the merger agreement between the two parties was executed in December of 2020, and it has a robust arbitration provision, which could not possibly be any broader as far as these things go and as far as Delaware case law is concerned. And as set forth in the briefs, that's Section 11.5(a) of the merger agreement, which has the typical language that

6

Your Honor would expect, including "[T]he parties hereto understand and irrevocably agree that any and all claims, grievances, demands, controversies ... of any nature whatsoever (including, but not limited to, tort and contract claims, and claims upon any Legal Requirement) ... arising out of, in connection with, or in relation to this Agreement *and the Ancillary Agreements* shall be exclusively referred to and finally resolved by arbitration in Wilmington, Delaware.  The arbitration will be conducted in English in accordance with the rules of the American Arbitration Association with one arbitrator."

That provision is sufficient to put this dispute firmly in the purview of the *Willie Gary* case that expressly says that when an arbitration provision "generally provides for arbitration of all disputes," which this unquestionably does, number one; and two, when it "incorporates ... rules that empower arbitrators to decide questions of arbitrability[,]" that the threshold question of what's in and what's out of the arbitration goes to the arbitrator, not to the Court.  And, of course, that's because the potential irreparable injury of forcing a party who did not agree to arbitrate to nevertheless show up at

7

arbitration isn't remotely implicated in an instance in which the parties unquestionably agreed to send all such disputes to arbitration.

So if Stratasys has some arguments of whatever sort, whether in the hundred-plus pages of briefing that is now before the Court or some other argument that they've yet to make, they are free to do that in the arbitration. They've already submitted an answer in the arbitration. They submitted an amended answer in the arbitration.

Prior to the arbitration being stayed, the parties were duly working through the pre-arbitration process of rank and strike and picking all the arbitrators. So there's no question that that agreement was reached. And then, of course, the simple second requirement, which is that there must be rules that empower the arbitrators to decide questions of arbitrability. This is AAA; we're in the ICDR, which is the international part of AAA.

Just for the record, Article 21.1 is the rule that empowers the arbitrator to "rule on its own jurisdiction, including ... arbitrability ...."

Stratasys has a footnote in one of its briefs saying that it agrees that everything that I've

8

just said is accurate and true, but then they make another follow-on argument about this accounting referee provision, which is neither here nor there, and we're happy to get into that. But the point being that there is no dispute about whether the arbitration agreement was somehow agreed or not agreed or whatever.

So from our standpoint, that's it. And maybe if I were a braver litigant, I would just sit down and say, Judge, any of the rest of this with respect to contract claims, equity claims, accounting referees, anything else, that should all -- these same briefs should be submitted to the AAA, once he or she is appointed, and we can hash it out there because Your Honor doesn't have to spill any ink or use any brain cells thinking about any of these arguments.

Of course, I will preview our position for that because that's what we do, but I encourage Your Honor to jump in and ask any questions if there's anything in particular, in advance of opposing counsel's argument, that you would like to hear more about.

But from a high level, you have the contract claims and you have what has been called

9

equity claims throughout this briefing.  Stratasys tries to call that the earn-out claims, as though somehow that helps them say that they fall under the accounting referee provision.  But we will, nevertheless, discuss those two groups of claims separately.

The first is the contract claims, again, starting from the premise that the arbitration provision is quite large in scope, quite broad in scope.  It expressly says "any and all ... disputes ... (including, but not limited to, tort and contract claims ..." -- so there's really no dispute that somehow a contract claim that's based on the merger agreement, nevertheless, falls outside of the arbitration provision.

So the only real thing that we're talking about here is this accounting referee provision, which appears in the agreement under the earn-out provisions, not under the dispute resolution provisions, and that is Section 2.3, in particular.

And so Section 2.3(f), after -- note that this is (f), so after two pages and, you know, multiple sections, subsections, and sub-subsections, setting out the specifics of the earn-out payments --

10

and, of course, let me take a step back just to refresh the Court and for the record.

We have -- this transaction was a $100 million transaction. $60 million was paid in cash upon the close, $40 million was tied up in three years' worth of earn-out payments. And so the dispute here on the merits -- not that this is before the Court -- but on the merits is when does the earn-out provision start ticking. And, of course, Your Honor can see why there's a lot that depends on that because if you start counting before the products were actually in the market, which is what Stratasys asks to do, then, of course, it'll be much harder, if not impossible, to hit those earn-out provisions.

So at a high level, the contract has a placeholder saying that July 1st, 2021, which was approximately seven months after the close of the deal in December 2020, would be the start of the first earn-out period. However, it also says that a simple written agreement doesn't have to be a formalized amendment to the merger agreement or anything like that, but something memorialized in writing could kick that out to some other date that's agreed by the parties. That was in recognition of the fact that

11

there are business realities when a company acquires another company and integrates its products into its broader ecosystem.  Of course, there could be all sorts of reasons why the products don't actually get to market as anticipated, in this case on July 1st.

So the parties had a number of discussions, in-person meetings, teleconferences, video conferences, emails, writings, et cetera, with the CEO of Stratasys, who made a number of representations and confirmations over and over again in a multi-month period that he would, in fact -- that Stratasys would agree to kick that out until what is called the GA date, which is the general availability date, which is the term used in the industry to mean when the products are actually available.

So we now then get to the point where we ask for confirmation that -- well, so the agreement has been reached, then Stratasys comes back and says, actually, we're going to renege on that agreement.  We don't agree to do that.  We're still counting July 1st as the starting date.  That was news to everybody.

At that point, in March of 2022, that is when the dispute arose.  That is when my clients sought legal counsel and advice.  And a few months

12

later is when they sent their demand letter saying, hey, wait a second, you agreed to this, we relied on it, you specifically sought to induce us to rely on it, and so please confirm that you're not actually reneging.  And that's what led to the broader dispute.

So where we are, back to the contract claims -- as distinct from the equity claims, which we'll get to in a second -- the contract claims themselves are to enforce the alleged amendment of the merger agreement with respect to that starting date of the earn-out period.  And so, of course, from Fortis's view, this is a fundamental question of contract interpretation.  It involves Delaware law, including things like if you have a written amendment type of requirement in a contract, when and in what way does that affect the realities of businesspeople who are having meetings and sending emails back and forth and they plainly reached an agreement, but, you know, is there a way that, nevertheless, Stratasys can wiggle out of that by saying that there's some legal formality that was not issued, right.

Stratasys, on the other hand -- so from our standpoint, this is a simple, straightforward contract dispute.  Was that term amended or not.  We

13

think that the evidence is quite clear, but, again, that's for the arbitrator to decide.

What Stratasys has done is to say, well, because you're talking about anything that has to do with money that you're owed under the earn-out provision, you must be actually objecting to, quote, calculations. And if you look at 2.3(f), we're talking that's where you're supposed to -- that's the provision you're supposed to use to resolve disputes pertaining to calculations.

What I was pointing out to Your Honor before is that paragraph 2.3 or Section 2.3 in the merger agreement has many subsections in it, and it's only when we get to (f) where we talk about what happens if there is a dispute. Those preceding subsections have all of the time requirements, the reporting requirements, the schedule requirements of what you're supposed to do on a quarterly basis, on an annual business, who has how many business days to send a notice of dispute, who has how many business days to respond to that.

Then if, after that back-and-forth process, as required under the previous subsections of Section 2.3, nevertheless leads to a dispute, then you

14

look at 2.3(f)(i), which is the crux of Stratasys's arguments when it comes to the contract claims, and they say this is what -- this is the provision that kicks everything to a so-called accounting referee.

The issue, of course, is that -- it is clear from the face of the contract that this provision applies only in a narrow circumstance, and that circumstance is -- and this is the beginning of 2.3(f)(i), "If the Seller Representative" -- meaning Fortis -- "has timely and properly disputed any [of the] calculations shown in an Earn-Out Schedule, then during the [] (30) days immediately following [] delivery of [the] notice ... use [] commercially reasonable ... efforts ...."  If not, then it goes to an accounting referee.

And so by its terms, this applies when there is an accountant at Stratasys who put together an earn-out schedule, as defined and set forth in the previous parts of 2.3; that schedule gets sent to the shareholder representative; the shareholder representative sends that to its accountants, who are doing the accounting work on behalf of the shareholders, and those accountants say, wait a second, it looks like there's some discrepancy here or

15

column A doesn't line up with column Q, and there needs to be some reconciliation, hey, we need to send an objection letter saying we don't agree with your calculations that are set forth in the, quote, earn-out schedule, defined term.  That is -- and then, it, of course, makes sense to say, all right, well, if the parties can't hash it out, let's have a professional accounting referee, which is defined earlier in the agreement to mean an accounting firm of national repute, or something along those lines.  So you would hire a PricewaterhouseCoopers, both sides split the fee, and you ask PricewaterhouseCoopers to serve as the neutral accountant to say who's right and who's wrong, and how do you reconcile column A and column Q when it's not otherwise reconciled.

What it doesn't mean and what it can't possibly mean is if there's actually a dispute about the contract such that you have to look to Delaware case law, you have to look to the intent of the parties, potentially parol evidence.  You have arguments being made in both directions with respect to modification by performance, even if a writing that is memorializing the amendment is somewhat ambiguous, when and in what way can you consider parol evidence.

16

Their view is that all of those arguments that go to when the earn-out -- when the earn-out date actually occurred nevertheless somehow should be submitted to an accountant at PricewaterhouseCoopers to resolve. Obviously, that doesn't make any sense. So you have the issue of a narrow -- it only applies in a narrow circumstance. You have the limitation of who the accounting referee is in the first place.

And then also there is the express language in 2.3(f)(i) that indicates or that sets forth what the accounting referee can do. And what the accounting referee can do is issue his or her own report that says, here's how I would account for these things. So I see your discrepancy in A and Q. I have this third way that actually kind of resolves it, and this is the final resolution and that both parties have agreed that this is the final resolution because I'm the accounting referee.

There is no way, there is no mechanism through which somehow, even if the absurdity of it were set aside for a second, there's no mechanism through which any of these issues, some of which, many of which, are before the Court now, could be briefed

17

up to an accounting referee, but there certainly is no explanation in Stratasys and its many, many pages of briefing has never sought to explain how and in what way this dispute would be litigated in front of an accounting referee who is supposed to make decisions about what Delaware case law means in various circumstances and the legal import or not of certain emails that were sent back and forth between the parties and whether those satisfy Delaware law with respect to amendment.

The facial applicability of the accounting referee provision plainly doesn't fit this particular set of facts.  It can't possibly fit this particular set of facts.  And -- but even if -- even, again, setting all that aside, you nevertheless also have a requirement that the -- that any invocation of an accounting referee must be done, quote, promptly. And, of course, that wasn't done here.

And we -- Fortis sent its demand letter in June of 2022, so almost two years ago at this point.  No schedules of any sort had been issued. One of the key indicators of Stratasys's understanding and its performance that, in our view, indicated that an amendment was actually agreed is that the quarterly

18

reports that Stratasys would have had to have been sending starting at the end of -- at the close of the first quarter, which would have been back in 2021, if you start counting when they say you should, which is July 1st, 2021, they -- by the time that Fortis issued its demand letter to Stratasys bringing this all to its attention and saying, hey, why did you renege on your agreement, Stratasys should have at that point already issued three quarterly accounting statements as called for by this provision.  They, of course, didn't do that.  This provision being 2.3.  It's one of the earlier provisions.  I think it's 2.3(c).

So then what happens is we say, we have this dispute.  By the way, your performance indicates that you didn't think that July 1st, 2020 -- 2021 was the beginning of the earn-out period either because you haven't done anything suggesting that you've been measuring anything.

So then in response, in one go, they issue us three quarterly statements saying, oh, right, so this cures the fact that we haven't issued any statements, and then a couple weeks after that they issue what they purport to be the first earn-out, annual earn-out statement, saying it's been one year

19

and you don't get anything because we haven't sold enough of these products.

Again, this is all merits-based, but this is the backdrop against which we are considering this. And the reason I bring this up is to say what they didn't do, despite trying to, you know, create a record to somehow show that actually they thought all along that July 1st, 2021, was the earn-out date, what they didn't do is remotely, in any context, mention the accounting referee provision. They certainly didn't invoke it. And, again, there's a requirement to invoke it promptly, if at all. But they didn't invoke it. They didn't mention it. They didn't say, why are you sending us this letter and threatening arbitration under AAA because there's this accounting referee provision that you didn't go through?

And that continued through the filing of the arbitration demand, which was in May of 2023, so about a year after that, after their conversations with the parties, negotiations outside sort of what's relevant here, but, nevertheless, Stratasys then answered the arbitration demand and didn't say anything about the accounting provision.

And, you know, they will tell you that

20

what they did do is object to the equity claims for reasons we'll get to in a second, but then they have, you know, some catchall language saying, we hereby reserve all rights to amend the answer or whatever, so they say there can't possibly be any waiver because we put that in there.

But the matter-of-fact is that nobody on the Stratasys side was thinking that this accounting referee provision would somehow apply to this dispute because it facially does not.  And so then we get forward to the complaint that was filed in this court over the summer of 2023.  That was an amended -- that complaint, initial complaint in this very case, did not mention anything about the accounting referee.

They then -- we filed a motion to dismiss.  We had a meet and confer in which we said, you're suing the wrong parties.  Fortis is the only entity in arbitration.  You're suing the three individuals.  They said -- I mean, they can speak for themselves, but effectively, they wanted to amend the complaint to name Fortis as a party as well.  We said, look, we still think that your complaint is bogus; however, rather than, you know, briefing up the --

21

whether or not you should be entitled to amend because of futility, we'll just do it on a motion to dismiss standard.  That's fine.  They didn't do anything until October, when they put in an amended complaint that wasn't the amended complaint that they sent to us to ask if we would agree that it would go in, it was their own new amended complaint, which is now the operative complaint here, which was filed on October 26, and now for the first time is where we see this accounting referee provision.  They try to excuse their delay by pointing to a decision by Your Honor, which, you know, is totally factually distinguishable in every way.  That case doesn't even have an arbitration provision in it.  It has an undefined accounting expert, sort of accounting true-up provision, I think, is the exact term.

And so then a couple interesting things about that.  As Your Honor will recall, the complaint was in aid of a TRO and a PI.  And Stratasys here made the representations to the Court that the reason that this is so urgent and the reason that it doesn't matter that they hadn't done anything about it and that they participated in arbitration for five months is because of this new, breaking development in

22

Delaware law based on Your Honor's decision in *ArchKey*.

What's interesting is that now that we're past the TRO-PI phase, the briefing that Stratasys submits to this court reads as though it is so obvious, the parties obviously agreed to carve out any earn-out dispute from the broader arbitration agreement, everybody knows this, they knew that then, they knew [sic] that now, and it just is -- it's at odds with their prior position, which is, wait a second, record-screech moment, we didn't know that we were able to do this until we saw Your Honor's ruling. And so, obviously, there's a lot of sort of, let's say, creative interpretation of contractual provisions that are going on here.

So that's -- so with respect to the contract claims, again, just to summarize it, is that the dispute has to do with the playing field on which this whole post-merger compensation scheme takes place. And it's not a small, little thing. It's $40 million of the $100 million that Stratasys agreed to pay, potentially. Right. So up to 40 percent of the compensation that our shareholders are entitled to comes down to how the earn-out provisions are

23

calculated.

And so when the CEO of Stratasys makes representations to the shareholders about agreeing to move the earn-out date in exchange for them continuing to do all sorts of work that they were not otherwise obligated to do, and those shareholders agreeing that they would do that in consideration for the moving of the earn-out date, and then Stratasys says, actually, we're not going to move it after all and you're entitled to zero dollars.  That's a major dispute, and it is worthy of a tribunal, like the AAA, resolving it.

It can't possibly be resolved by an accounting referee.  And the indications spread throughout this case are that really, on some level, Stratasys doesn't even actually believe, or at least, you know, until about October 26, 2023, did not believe that the accounting referee provision remotely applied either.

THE COURT:  Be mindful of your time.

ATTORNEY CURRAN:  Please.  Yes.

THE COURT:  It goes fast.

ATTORNEY CURRAN:  Yes, it does.  I will be quite brief with the equity claims.

24

So the equity claims are additional claims that have been brought.  It is no -- for whatever reason in the briefing, there has now been a dispute raised as to whether they're pled in the alternative or not.  There's some footnotes indicating that somehow Fortis is playing fast and loose with what it's representing to AAA versus Your Honor.

The reality is they're pled in the alternative because that's what Delaware law says. And what Delaware law says is if you file a breach of contract claim and then you also file equitable claims that apply in the event the contract doesn't apply, then those claims fall away if the contract applies. When we have a circumstance like this, where there's the dispute about what the contract says, obviously you're permitted to do that in the alternative. Everybody does that.  McDermott Will & Emery did that.

We have a case here, if Your Honor is interested, that was filed in the last three weeks by partners of these gentlemen sitting at this table that do the exact same thing in this very courthouse. That's not really in dispute.

But what is in dispute is whether those equitable claims can go to arbitration or not.

25

Again, we refer to the broad language of the arbitration provision, which says any and all claims of any sorts whatsoever, whether in -- whether contract, tort, or otherwise.

Interestingly, Stratasys has actually called these tort claims three different times in their briefing.  So if you were to take that as some sort of indication of what they view these claims to be, then they are expressly covered under that provision.

But what is certainly the case is that there is nothing that is preventing or somehow carving out equitable-based claims that pertain to the parties' agreements and their contractual relationship under the merger agreement from arbitration.  And so the only question is do these pertain to that or not.

As I briefly discussed a few minutes ago, this all has to do with conduct that the former Origin shareholders, who are represented by Fortis, that they undertook with -- in reliance on representations and promises that had been made by Stratasys through its CEO.

And so if Stratasys is correct that there was actually no binding amendment to the

26

earn-out date, then that means that our people were doing what -- were engaged in work that they are not compensated for, they obviously have equitable claims *quantum meruit*, whether it's *quantum meruit*, unjust enrichment, disgorgement, the typical sort of set of claims.

And so, you know, if Stratasys wants to stipulate that the agreement actually was modified and that they did actually agree to change the earn-out date, then we could have a conversation about whether those equity claims go forward or not.  But as long as that's in dispute, then there are equity claims that are valid and viable as well.

And the argument that Stratasys has made that said, well, you can't logically say that you have equity claims that depend on no contract existing while also invoking the arbitration provision of the underlying contract, that is self-evidently not correct because the dispute isn't about whether the broader contract, including the arbitration provision, is applicable.  Both sides agree and consent and say in their papers that it is binding.

The question is what happened -- I'm sorry, did the specific provision with respect to the

27

earn-out date get amended or not.  If the answer is yes or the answer is no, the arbitration agreement, nevertheless, still applies.

So -- and then the other ways that Stratasys tries to knock out the equity claims are really merits-based arguments, and that's set forth in our papers.  And I'd be happy to talk about it more, mindful of the time.

But the reality is Stratasys can make these arguments to the arbitrator.  They can say, these are not Fortis's claims to bring.  These are the individuals' claims to bring.  And then we have a dispute under Delaware law about how the equitable claims can be -- who has a right to bring them and how the damages are allocated and things like that.

And same thing with this whole idea that there's this other set of agreements that are the stockholder agreements that the individuals signed and executed that have nothing to do with Fortis, that do not -- that Fortis has not signed, that Fortis is not a party to.  And, of course, as I said at the top, those individuals are not parties to the arbitration.

And so I think I will respectfully stop there, but obviously happy to answer any of the

28

Court's questions, and will otherwise reserve the remainder of my time for rebuttal.

THE COURT:  Let's see what the other side says, and then you can come back up.

ATTORNEY ALTSCHULER:  Thank you, Your Honor.

Again, Ashley Altschuler from McDermott Will & Emery on behalf of Stratasys.

So we are here because Stratasys seeks summary judgment to enjoin the defendants on an abuse of an arbitration process in which the defendants purport to advance claims that, although are meritless, they should not even be arbitrated in the first instance.  Those are two different types of claims we talked about, the earn-out claims and the equity claims.

The problem is that in addition to their contractual earn-out claims, defendants here are trying to shoehorn $400 million, purportedly, worth of equitable claims into an arbitration clause in a merger agreement that the parties never agreed to arbitrate.

So the narrow issue before this court is really twofold.  It's whether any of the claims are

29

arbitrable, and, of course, the proverbial, well, who decides under the *Willie Gary* test.  So neither the contractual earn-out claims or the equity claims are arbitrable.

With respect to the earn-out claims, they concern a dispute over the calculation of earn-out payments.  The merger agreement unambiguously provides for a specific resolution procedure in which disputes over earn-out payments must be submitted to the accounting referee, and we heard that before with respect to 2.3(f) with respect to what Mr. Curran was arguing.

So consistent with Your Honor's ruling in the *ArchKey* case, parties agree -- who agree, as here, to a specific accounting referee process to govern their specific dispute regarding earn-out claims may not now circumvent that specific choice of dispute resolution by invoking what we call a much more general provision, which is in the merger agreement in Section 11.5.

Now, with respect to the equity claims, these equity claims have no relationship whatsoever to the merger agreement.  They must proceed in the Delaware courts, not in an arbitration in ICDR,

30

which, Your Honor, the record demonstrates and reflects the defendants have been running from any type of Delaware fora or any type of Delaware jurist or former jurist for any of those claims, and we believe that that is indicative that they wished instead to run from Delaware and be in front of an arbitrator in ICDR that has nowhere wherewithal or knowledge or experience whatsoever with M&A, equitable claims, or Chancery practice.

So the equity claims are based on alleged post-merger promises to the individual defendants.  Because they are post-merger promises, the merger agreement and the arbitration provision do not at all govern the equity claims.  The equity claims also, by definition, are extracontractual theories that presume the absence of any governing contract.  So the arbitration provision in the merger agreement, of course, cannot comply -- apply.

The equity claims also seek $400 million in damages, in violation of the stockholders agreements that were signed, signed by the individual defendants themselves, which actually limit, limit the aggregate merger consideration that is owed for the sale of the Origin to 100 million.

31

These stockholder agreements require that any disputes be litigated in Delaware courts, and that is not disputed.

So as a gating issue, it is this court, Your Honor, that -- not the ICDR that must determine what we call substantive arbitrability, the "who decides" question, for both the earn-out claims and the equity claims. Under *Willie Gary*, the default rule is that the question of substantive arbitrability is one for the Court, not for the arbitrator to decide.

Here, there is actually no clear and unmistakable evidence that the parties intended otherwise. So both the earn-out claims and the equity claims implicate dispute resolution provisions in the applicable agreements that are other than, other than the 11.5 provision in the merger agreement.

So the earn-out claims are specifically subject to the 2.3(f), and the equity claims are subject to stockholder agreements that have a venue of Delaware courts for their dispute.

So, Your Honor, with respect to the earn-out claims, this is for substantive arbitrability, the "who decides" question. The Court

32

should not here depart from the rule that it is the default for the Court to make the decision as to substantive arbitrability.  The fact that the earn-out claims are subject to the accounting referee provision belies the appearance of any clear and unmistakable evidence or intent for the arbitrator here to decide.

The existence of a specific accounting referee provision governing earn-out disputes is evidence against the parties' intent to substantive arbitrability questions to give to an arbitrator with respect to earn-out disputes.

So under the plain language of the merger agreement, the accounting referee provision applies to the earn-out claims because it is a dispute relating to the calculation of earn-out payments.  So here, what we've heard from my friend Mr. Curran is that the defendants argue that the earn-out claims supposedly do not involve, quote, a challenge to calculation of the earn-out payments.

But it is certain fact that Stratasys has calculated that the earn-out payment is zero for both the first and second earn-out periods. Defendants argue that calculation is incorrect. Defendants' own dispute notice, which are cited in the

33

record as Exhibit G to the plaintiffs' own opening brief, those notices demonstrate that defendants are wrong.  That notice states that, quote, "[they] will continue to object to any future earn-out calculations of any sort that rely on July 1, 2021 as the EO Date ...."

So going further from Exhibit J, taking their own words, defendants explicitly objected to the way that, "Stratasys has continued to calculate the Earn-Out Revenue ...."  So the earn-out claims, by defendants' own submissions, clearly involve a dispute over the calculation of the earn-out payments.

Indeed, if defendants accepted the earn-out calculations of Stratasys, there would be no dispute and we would not be here with respect to any earn-out claims.

So this court has recognized that arbitration provisions may be waived, and that -- when I say "arbitration provisions," I mean Section 11.5 in the merger agreement, with respect to certain specific categories of disputes, including as it relates to the question of substantive arbitrability.

And in Delaware, as we all know, the specific governs over the general.  Restatement

34

(Second) of Contracts, Section 203.

Here, the accounting referee provision acts as a specific, a specific dispute resolution provision that governs the earn-out claims.  This provision acts as a waiver of the general arbitration provision in Section 11.5, as it relates to the question of substantive arbitrability.  That's where we hit on the *Willie Gary* test, is that there is a specific, which is the accounting referee provision in 2.3(f), and there is the general, which is 11.5.  The specific here should trump the general.

And, as we know under Delaware law, where dispute implicates a -- conflicting dispute resolutions, and there's two different provisions, or could be more than two.  The question of substantive arbitrability must be decided by the Court.  That's the *AffiniPay* case, Your Honor, 2021 Westlaw 4262225 at 7.

So here, if anything, the accounting referee provision that we see in 2.(f) [sic], it creates a tension, a tension with the merger agreement Section 11.5, general provision, meaning that there can be no clear and unmistakable evidence that the parties intended to delegate to, quote, who decides,

35

end quote, question to an arbitrator with respect to the earn-out claims.

So, Your Honor, if I may, there was a question that Mr. Curran posed regarding, well, why did we take long, supposedly, to get to the -- a determination that 2.(f) did apply.  So we were aware, prior to this October period, that 2.(f) existed, how it operated, and how it worked.

We, unfortunately, did not have the benefit of Your Honor's decision in *ArchKey*, which we argue does actually create groundbreaking law with respect to the process in which parties are to go forth when there are specific provisions such as this.

So what we assumed and believed at the time, based on the state of the law, is that we had to go through the ICDR process to get through it, although reserving all rights, which we did, if there were to be a change in the law, and there was.  But we had to go through the ICDR process, get some sort of decision there on how the arbitrator wants to bifurcate either damages with respect to earn-out payments and with respect to equity claims.  And if, in fact, there was going to be some damage calculation, then we would feel that we'd have to go

36

back to the accounting referee in 2.(f) and post-arbitration have that referee work it out, but we didn't have the benefit of *ArchKey*, which, when Your Honor ruled, regardless of whether there was an arbitration process, regardless of whether it was a court deciding, Your Honor ruled in that case in very similarly worded clauses.

Your Honor said, I'm going to allow -- command first that the accounting referee does its work with respect to the post-closing purchase price adjustments at issue in that case.  Let them do their work, and then I will follow up and clean up anything left that the accounting referee is unable to decide.

Armed with the benefit of Your Honor's thinking in that case, we very promptly, within three days, notified our friends on the other side of the origination of *ArchKey*, and we hope that they take a look at it, as were we.  And then from there, we exercised our right, which we'd done back earlier in the case before when we filed our answer to the arbitration demand, that, in fact, we were reserving our rights to come back and argue anything beyond that we'd already argued in the answer.  That's the real reason why it took longer than expected, but it was a

37

calculated judgment on our part based on nuances in Delaware law.

If I may, Your Honor, now I'll move onto the substantive arbitrability for the equity claims.

So this court, not the arbitrator, must decide the substantive arbitrability of the equity claims for three reasons:

First, the equity claims have no relationship to the merger agreement, which contains the parties' agreement to arbitrate, 11.5.

Second, the equity claims do not belong to Fortis, which is the stockholder representative.  They belong, as pled, to the individual defendants in their individual capacities as former executives of Origin, and they're former employees of Stratasys.

Third, the equity claims implicate the stockholder agreements, which, as I discussed, contain a different venue provision, calling for Delaware courts to decide claims with respect to those agreements.

So with respect to the first prong, there's no relation to the merger agreement.  The

38

equity claims have no relation to the merger agreement. There are purportedly alternative claims, as claimed in the defendants' reply at 24, which are premised upon inapplicability of the merger agreement. Claims for unjust enrichment, promissory estoppel, and *quantum meruit* rely on the inapplicability of any agreement. So they are, therefore, equitable claims that are outside of the merger agreement.

So if the merger agreement is not applicable or enforceable here, then the arbitration provision in the merger agreement cannot evince a clear and convincing intent to arbitrate those claims.

So defendants here argue that the equity claims can be pled in the alternative, but this actually misses the mark on their substantive arbitrability arguments. Just because the equity claims may be viable when pled as alternative claims in a court which has jurisdiction over them does not mean that they can be, in fact, arbitrated.

So the equity claims here are either governed by the merger agreement, in which case the equity claims would actually be duplicative of the earn-out claims, okay. And it would be subject to the accounting referee provision. Or the merger agreement

39

does not govern, in which case the merger agreement's arbitration provision, 11.5, does not apply.  The second prong, the equity claims do not belong to Fortis.

The stockholder representative here is Fortis.  The equity claims belong, as pled, to the individual defendants in their individual capacities as former executives of Origin and former employees of Stratasys.

So if you look, Your Honor, at the harm that's alleged in those equity claims, the individual defendants claim they were undercompensated for the work that they performed for Stratasys after the merger.  So after the merger agreement, they were employees of Stratasys, they claim that they provided value that they were not compensated for.

This cannot be shared among all of the former Origin stockholders who were represented by Fortis.  The harm that's alleged in the equity claims only could have damaged those three individual defendants who are defendants here.  The equity claims are personal claims that belong to individual defendants.  They're not governed by the merger agreement.

40

So because of that, the Court must determine substantive arbitrability.  This is also not just a mere standing argument where an arbitrator can assess whether Fortis has the standing to bring it.  Whether Fortis actually has standing in the arbitration or not, Stratasys never agreed to arbitrate with the individual defendants.  So forcing Stratasys to arbitrate even the issue of standing for these claims would cause my client, Stratasys, irreparable harm.

So the individual defendants are not parties to the merger agreement.  That contains the arbitration clause, 11.5.  The equity claims are personal claims.  And each of the equity claims are premised on the allegation that they provided extremely valuable services to Stratasys.  That was post-merger.

So looking beyond is that Stratasys had actually agreed to arbitrate with Fortis.  Fortis is the representative party in the merger agreement, but Fortis actually has no right to bring equitable claims on behalf of the individual defendants.  The defendants here argue that the individual defendants supposedly are not parties to the arbitration, so the

41

equity claims cannot be individual claims.  But this is actually disingenuous and the result of what we call artful pleading.

Fortis, the party that brought the arbitration demand, is here an agent and nothing more. It's an agent of the parties who actually have the claims, the individual defendants.

Fortis cannot have claims separate from those of its principals, who are the three individual defendants.  And those three individual defendants are bound by the very stockholder agreements that they signed themselves.  They have separate agreements for dispute resolutions that include the Delaware courts to be the arbiter.

So knowing this disparity, we originally sought some clarity from the defendants' counsel and as to who the identity of the true parties in interest were in the arbitration, and because the demand is signed on behalf of, quote, claimants, plural, defendants' counsel confirmed that "shareholders" is a defined term in the arbitration demand and is used to refer to Mr. Prucha, Ong, and Lee without meaning.

The term "claimants" appears to be

42

subsumed within the definition of "shareholders" in the arbitration demand.  And the arbitration demand was deliberately vague as to the identity of the true claimants in the arbitration.  So because the individual defendants are not parties to the merger agreement, they cannot enforce the arbitration agreement here.

The last prong, Your Honor, is the equity claims, which is with respect to the stockholder agreements.  So as discussed, these equity claims implicate these agreements.  And interestingly, as Your Honor knows, the equity claim -- the stockholder agreements contain a cap on the aggregate merger consideration that is available to the defendants from the merger.  This was a $100 million merger, 60 was paid up front, 60 million was paid up front, and there's $40 million of dispute in the earn-out process.  There's a cap.

Defendants are now seeking four times as much, $400 million, than the maximum merger consideration in their arbitration demand for their equity claims.  They seek disgorgement of no less than $400 million.  So the equity claims are seeking hundreds of millions more than ever was contemplated

43

in the merger agreement with Fortis.

The Delaware court, when considering the merits of the equity claims, must consider whether the damages are limited by the stockholder agreements. Those stockholders signed agreements that said that there was a cap on the merger consideration.

Defendants now are trying to blow right through that and trying to keep it away from Your Honor and instead make that argument in front of some unknown arbitrator in ICDR.

THE COURT:  Tell me where the cap is on the stockholder agreement.

ATTORNEY ALTSCHULER:  Yes, Your Honor.

I have it in Section 7.  Do you have Section 7 of the agreement?

THE COURT:  "Agreement to be Bound"?

ATTORNEY ALTSCHULER:  Yes, "the right to receive its portion of the Aggregate Merger Consideration as provided in the Merger Agreement and detailed in the Final Allocation Schedule shall constitute Stockholder's sole and exclusive right in respect of Stockholder's ownership of capital stock, or rights to purchase or receive capital stock or other security, of the Company, or status as a

44

stockholder of the Company."

THE COURT:  Got it.  Thank you.

ATTORNEY ALTSCHULER:  I also would like to point out, Your Honor, Section 1 -- I'm sorry, Section 2, (f), as in Frank, in the middle it says "Stockholder confirms that, if Merger I is consummated, it has no right or claim for or with respect to any additional consideration with respect to the Company Capital Stock except as set forth in the Merger Agreement."

So the stockholder agreements here, they actually provide the Delaware court with the exclusive jurisdiction for determinations based on the stockholders agreement.  That's in Section 8(o) and 9(o).

Now, the merger agreement grants jurisdiction for certain disputes to the arbitrator.  That would be the merger agreement disputes with respect to what we see in Section 2.3(f) with respect to, for example, an earn-out payment.

So to the extent that the equity claims implicate the merger agreement's arbitration provision at all, we now have two conflicting provisions.  And we'd also have Section 11.5, there

45

would be conflicting with the arbitration -- I'm sorry, with the dispute resolution procedures in the stockholders agreements.  And when we have those conflicts, Delaware law says one can't -- the arbitrator cannot make that decision.  There's not clear and convincing evidence that there was an intent for the "who decides" to go to the arbitrator, and therefore it is for the Court to decide.

So, Your Honor, I see my time is about five more minutes.

THE COURT:  Okay.

ATTORNEY ALTSCHULER:  And I'd like to now turn to the question of the earn-out claims and the equity claims are not arbitrable.

So now that we've discussed at length the issue of the who decides, whether it's Your Honor or whether it is an arbitrator, an unknown arbitrator, we now argue that the earn-out claims, nor the equity claims, are actually arbitrable.

So this is somewhat repetitive of what we argued before, but we can see in 2.3(f), it says that "Any dispute relate[d] to any calculations of an Earn-Out Payment ...."  That is the procedure for resolving those, and that's what we're arguing should

46

happen here. I've given my reasons why it came out when it did, but ever since we've known about 2.3(f)'s applicability to come after or to come before any other proceeding, we have vociferously argued and amended our pleadings to make that abundantly clear.

So when looking at the merger agreement as a whole, the arbitration clause here, it has a carve-out, and that's 2.3(f) for earn-out payments. And it makes it very clear that this would be finally resolved by the accounting referee. "The resulting determination of the amount of the relevant Earn-Out Payment shall [be] final, binding and non-appealable ...."

Now, Mr. Curran makes note that it would be irrational for an accountant firm, whether it's the big four or otherwise, to be in a position of arbitrating, as an accounting referee, an issue with respect to earn-out claims when all they should be doing is plugging in numbers and opining on what the numbers should be.

Well, I, myself, and I imagine almost everyone in the courtroom has used the arbitrating divisions of big four accounting firms, if not smaller firms, to arbitrate cases soup to nuts, including

47

factual determinations, judge-like rulings, procedures, et cetera. I happen to have done it for eight years of my career. And the reason being is that a lot of these earn-out provisions, as well as post-purchase price closing adjustments, they all call for an accounting arbitrator, an accounting referee. And those accountants are perfectly capable of adjudicating the entire dispute, start to finish. So that argument to me fell on deaf ears.

But we do believe also that because it's an earn-out question in an accounting firm with an arbitrating arm that knows process would be far better equipped than right now an unknown arbitrator who we don't know where it's coming from who probably will not have such experience. We, of course, have requested that defendants agree to use four of our -- four esteemed Chancellors and Justices of the Delaware courts to step in and have an agreed-upon arbitration for everything. That was rejected.

We even asked to mediate in this court under 174, and that was rejected. So we can't get them to come back to a forum that we think will get it right, and therefore we have to at least push it to the most knowing referee, which we contend is the

48

accounting referee.

Quickly, I'll get to, because I'm running out of time, that the equity claims not being arbitrable, they belong exclusively to the three shareholders as individuals. They're not parties to the merger agreement; I've covered that. They're premised on the nonapplicability of the merger agreement and on the provision purportedly extremely valuable personal services to Stratasys. I had commented on that.

Stratasys never agreed to arbitrate anything with these individual defendants. The defendants are not the parties to the merger agreement, it's Fortis. So the questions that I would say is that if Fortis were to win the equity claims for promissory estoppel, unjust enrichment, and *quantum meruit*, so how would damages be distributed to the Origin shareholders that Fortis represents?

Would the amount owed to Prucha, Ong, and Mr. Lee for their services be distributed to the whole class of Origin shareholders that Fortis represents? I doubt that.

If Fortis somehow won $400 million in damages, allegedly, would the three shareholders be

49

limited in what they could recover by the stockholders agreements and the rest of the recovery would flow to other stockholders?  I suspect that Mr. Prucha, Ong, and Lee would say no.

The equity claims are premised on the inapplicability of the merger agreement, and therefore where we have available -- we have a case -- we have fully integrated and enforceable contracts. Defendants do not plead that the merger agreement is not enforceable.

Because the equity claims are by their very nature based on the promise -- the premise, I'm sorry, that the merger agreement is not applicable, then the equity claims cannot be arbitrated under the arbitration provision of the merger agreement.

I'll save the rest of my time for rebuttal.  Thank you, Your Honor.

THE COURT:  Thank you.

ATTORNEY CURRAN:  Your Honor, I'll just jump right into the equity claims which opposing counsel spent quite a bit of time on, and this false notion in particular, which I believe is their second point, that really these are claims that do not belong to Fortis but instead belong to these three

50

individuals.

First, let's define what we're talking about here. It is true that the three of them are, in fact, shareholders. The other shareholders are, as Your Honor might imagine, venture capital firms, private equity firms. They're disclosed. Everybody knows who they are.

So if you are at -- whereas, these three shareholders have a relationship with the company. They were former executives. They were hired on afterwards because Mr. Ong and Mr. Prucha, in particular, as the co-founders of the company that was acquired, have a lot -- a wealth of technical and business-based knowledge about what's going on.

The reality, though, is that those three individuals who were doing things for Stratasys that were above and beyond the things that they were hired to do for one specific reason, and that was in exchange for moving the earn-out date.

So the three of them undertook things that, of course -- I mean, it's a little bit -- it doesn't make a lot of sense to say, well, those three were acting in their individual capacities because none of the other shareholders were involved when

51

we're talking about, you know, like Floodgate as an entity, an institutional investor that owns a portion of the shares at stake here. They're not going to send one of their people to also troubleshoot the launch of these printers that they don't know anything about when they're a financial investor, right.

So -- but there are -- the reason that I bring this up is to say this is a fact-based dispute. We, of course, think we're right. Stratasys thinks they're right. That's fine. But there will be facts and evidence in discovery and testimony that's put on about whether these individuals were acting in their individual capacities or not.

And to give Your Honor just some very high-level indications that they were, in fact, operating for the shareholders *writ large*, such that if they did win $400 million in damages, as opposing counsel mentioned, it would go *pro rata* to the shareholders pursuant to their agreements.

And so number one, the only consideration that they were seeking in exchange for all of the specific things laid out in the arbitration demand was the movement of the earn-out date. There are other things that they were hired to do. They

52

reported to various people internally whenever, but when it came to the inducement to work hard, work long hours, put everything they had into making sure that the launch of the product went off without a hitch, it was because they wanted to protect the shareholders', *writ large*, ability to secure their earn-out payments, of which they would only receive their *pro rata* portion, of course.

But there also is this fact that proves the same point from the flip side of the coin. After the CEO, Yoav Zeif, of Stratasys made these representations about the movement of the EO date, and after he started to then backtrack and say, well, I don't know and, you know, we're going to have to bring it up to the board, he then tried to effectively buy off those three shareholders by saying, why don't we do this -- and this is all in the arbitration demand -- why don't we do this, I will -- Stratasys will offer a separate earn-out schedule specifically for you three, but the other shareholders are going to have to stick to the original schedule. And they said no, because we're not here in our individual capacity, we're doing this for the shareholders *writ large*.

And so that's -- for those reasons --

53

and if there's evidence going the other direction, okay, fine, that will come out in the course of the litigation, but it is not the case that Fortis is filing these claims really as, you know, like a dressed-up, make-believe version of these three individuals.

Rather, there is legal representation at Fortis, who we represent, and that's our client, and Fortis, in turn, represents the interests of the shareholders *writ large*.  So that's number one.

But then, Your Honor, when you look at -- and, actually, opposing counsel sort of inadvertently made this point.  When you look at the stockholder agreement and you look at Section 7(a), which Your Honor asked for and then read -- and then opposing counsel read from, that specifically pertains to consideration in connection with the merger.  That has nothing to do with damages.

So if it's the case that there are equity claims that are viable and that they pertain -- that they relate to the agreement, then it is not at odds with this provision to say that the individual shareholders who are bound by this contract will nevertheless potentially get their *pro rata* portion of

54

damages, which is not consideration, if Stratasys is actually correct that there wasn't any amendment to the underlying agreement, such that the earn-out date wasn't actually moved.

And so now we're in equity land, saying, look at all of this value we added for you on behalf of the shareholders, so we're entitled to that, separate and apart from any consideration because the consideration has to do with the merger agreement.

However, I want to pause there because we are so many layers down, we're talking about individual shareholders who are not parties to the arbitration. Fortis is the party to the arbitration. So it's a little interesting to hear opposing counsel repeatedly say that Fortis can't force Stratasys to show up at AAA arbitration to litigate claims against the individuals because Fortis never agreed to arbitrate claims against the individuals.

And we say, right, we're with you, we're on the same page. But it turns out the individuals aren't even parties to the arbitration, which is why, by the way, we moved to dismiss your complaint back in the summer, we told you that, and you said, great, we'll amend it to name Fortis as

55

well, because otherwise you're going to --

THE COURT:  Let me ask you this.
Assume you go forward in the arbitration and Stratasys raises the stockholders agreements and says, look, as a practical matter, Fortis is seeking incremental consideration on behalf of these stockholders.  This stockholders agreement is a defense to that.  They can't do indirectly what they couldn't do directly.  All right.

Are you at that point going to turn around and say, ah, ha, ha, ha, you can't even argue that defense to the arbitrator because there's a forum selection provision in that agreement that forces it to go to the Delaware courts.  And not only that, but this is an agreement involving individuals, and they're not here.  And so don't even raise this, it's procedurally improper.

ATTORNEY CURRAN:  Categorically, no, we would not do that.  And the reason for that is because that would be a defense to the claim brought by Fortis in the same way any other defense that Your Honor or we or opposing counsel can come up with, and you've got to prove up your defense, whether it's an affirmative defense or otherwise, that there's a

56

statute of limitations problem.

If there's a standing problem, that's separate and apart from whether Fortis owns the claims or doesn't or whatever. Maybe there's a causation problem; I don't know. But, you know, in the same way, they would say, now we're introducing evidence. They would have to -- to get to the point where that would even be relevant, Stratasys would first have to prove up to the arbitrator, with real facts and testimony, that actually these individuals were operating in their individual capacity and this is all some farce to get those three people more compensation for the deal when they agreed that the compensation they already received was sufficient, and that's not the case.

So this whole idea of this is really just because they're feeling, quote, undercompensated, which is what opposing counsel said, is just actually not correct.

With my couple remaining minutes, I would like to switch gears from the equity to the contract claims and just point out one particular point, to the extent the Court is interested in it, which is it is true that Fortis sent objection letters

57

pursuant to Section 2.3 and said, we object to the calculations.

As Your Honor might imagine, those objection letters, which are in the record, say what you would expect, what Your Honor would expect, which is, we've already explained to you in depth why we believe that this has been changed, and so the fact that you're sending us these things that are legally meaningless because the earn-out date was moved, obviously we object to that.

The reason that we did that is because there is a provision elsewhere in 2.3, and the letters refer only to Section 2.3 *writ large*, but 2.3(e), which basically says that if these calculations are sent out and you don't object within a certain amount of time, then they're deemed to be final.

So this obviously was, you know, Stratasys's effort to try to say, aha, these are final calculations because you didn't object, and it doesn't matter that separately you sent us some demand letter. We're just following the contours of the contract.

THE COURT:  Let me address you on that for a second.

Let's assume that there's 12 different

58

quarterly earn-out periods in play.  Let's assume we can label them A through L.  Seems to me that your beef is that you say that it shouldn't have started at A, you say it should have started at D and gone beyond L and included M and O, right.  So that's one type of dispute.  That's the dispute over which are the 12.

You could also have a dispute about the actual numbers, such as if we zoomed in on to period F, which happens to fall in both periods, you could believe that, in fact, the sales of product X were materially greater during that period and the numbers in that earn-out report were wrong, not because of the "which periods" question, but because of a numerical dispute question.

ATTORNEY CURRAN:  Correct.

THE COURT:  Do you have any numerical dispute questions as opposed to the "which periods" question?

ATTORNEY CURRAN:  So right now, hard to answer that question for the following reason, which is we -- so I understand Your Honor's question.  And in certain circumstances -- I thought you were just going to ask do we agree that that would go to an accounting referee if it is --

59

THE COURT:  Well, that's the follow-up.  My threshold question is do you have any disputes, because if you don't have any disputes, the follow-up question doesn't matter because there are no disputes.  But if you have some disputes, then, yes, you were right, that is the question.

ATTORNEY CURRAN:  And the reason I can't answer that directly is as follows.  There is case law which we allege, which says when you have an earn-out period -- and it effectively has to do with the breakdown of the relationship with the parties.  When you have our guys who are being retained to assist with the launch of the products and everybody -- you have Stratasys making SEC statements and disclosures saying that these products are so great and our company is doing so much better than it ever has in the past, obviously everybody's interests are aligned.

As soon as Stratasys starts saying, we're going to renege on this deal, we're not going to -- you know, we're not going to allow you to get the benefit that you bargained for, now you're in the realm of saying, well, is there -- is Stratasys not actually pursuing commercially reasonable efforts to

60

launch these products, is it intentionally holding them back, or is there some sort of fraud element as to what Stratasys is doing or not doing because they're aware there's this broader dispute.

So if you could somehow control for that and then say, you know, the world is the world and it marchs forward in periods A through L, and F would have been F whether there was a dispute or not, and then there was a numbers-based dispute, like Your Honor just articulated, then I think -- I have no problem saying we would agree that that would, in the first instance, go to the accounting referee, because then it's a question of, like, well, if the inventory was delivered in this period but then it was billed at this other period and the revenue came in when you count that and does it -- those accounting-based questions, which is just like, all right, let's have an expert who's going to be a neutral and resolve this.

But that is -- but there's Delaware law that permits the acceleration of all outstanding -- all outstanding amounts at the point that there is a breach.

I will also point out to Your Honor

61

that there is an anticipatory breach here as well, because at some point in this period in 2022 to 2023, when there were a number of potential negotiated resolution points here, we thought we had a deal --

THE COURT:  Let me interrupt you because I don't want you to run off.

Look, I view those as comparable to the "which periods" question.  You're talking about whether things were done in accordance with the contractual obligations for fulfilling the merger agreement.  You're not talking about, as you put it, whether the inventory was properly counted for the specific period.  So if there is a breach that accelerates, you're in arbitrator world.

ATTORNEY CURRAN:  Right.

THE COURT:  But if you're in a question of did they actually have the sales that they had during the period, that strikes me as accountant world.  You can then say, look, they only had 150 sales, and they accurately counted the 150 sales, but notwithstanding that, there's a breach because they didn't use -- and I will honestly say I have not delved into the details of whether there's a commercially reasonable efforts obligation or what the

62

parameter is because that's something I view as clearly for the arbitrator, at least not for me.

But then you could say, yeah, the numbers are okay, but they're okay in the sense that they're an actual count, but they are deeply flawed because these people started conspiring against us and being nasty and not doing what they should have done.

ATTORNEY CURRAN:  Correct.  And in the first instance, the reason it is so amplified in the first EO period is because it is also undisputed in the record that -- well, I don't want to say that because I -- it is a fact that the general availability of the date was February 2022, which is seven months after.

So Stratasys is trying to say your first 12-month EO period actually only includes five months of sales, so unless you're really, like, selling at, like, multiples of what people expected, there's zero chance that you're going to get that, and now we've got the benefit of carving off that five months of sale, which has some backup to it because when the products were off the market, you have sort of built up demand.  So now we got to, like, get rid of those five months of sale and then just move

63

forward, right.  And so it compounds itself.

THE COURT:  But there again, the question of whether the earn-out statement that went over to you accurately counted the number of sales in February of 2022 and the amount of revenue generated by those sales.  Those sales either happened or not.  What you want to do is get into a but-for world of nonbreach.

ATTORNEY CURRAN:  Correct.  And if I may, a very --

THE COURT:  Are you comfortable with the assertion -- I'm going to assert to you that the "our world" questions, the "as it actually happened" questions, are for the accountant, and the "but whatever would have happened in a hypothetical alternative world where there was no breach questions," which are all of the things that you've been talking about -- is it the right period, did they do everything they should have done, all these types of things -- that those would not be for the accountant, they'd either be for me or the arbitrator.

Do you agree with that?

ATTORNEY CURRAN:  Two responses.  One, maybe it's not even for the accounting referee because

64

potentially, the parties could agree at what the real-world numbers are.

THE COURT:  This would be nontrivial. There has to be a dispute over what the real-world numbers are.  They have to believe that, in fact, there were sales of 169 that happened during February of 2022.  And you have to believe that, no, there were sales of 180 because, you know, these people had signed up letters of intent, and those qualify as sales during that period, and therefore they should be counted, et cetera, or you have some disagreement over whether you have some discount they granted should properly be included in the pricing or something of that sort.

ATTORNEY CURRAN:  Right.  So we -- the annual statements -- they are required to do quarterly statements, but the annual statements are the things that matter.  And it says that effectively in the agreement, right.  The annual statements are sort of like -- or, sorry, the quarterly statements are there to have -- to allow you to keep an eye on things, but you don't waive your rights if you don't object.  It's only the accounting -- the annual statements.

So a part of it is they served a

65

purported annual statement in July or August of 2022 and sent it over -- we objected to that.  They have, of course, not served a statement that would have tracked from when we say the period was, which is February to February, which then would have been served 60 days after that.

So it's not as though -- we are not -- to use Your Honor's terminology, with respect to the world that we're in right now, we don't know what those numbers are because they've never given us an annual report that tracks what we believe and what they agreed the EO -- the earn-out schedule actually would be, which is February 1, '22, through January 31, '21 -- '23.

THE COURT:  When you get your annual statement, is it just for a year, or is there a per-month or per-quarter breakout that goes into that?

ATTORNEY CURRAN:  I don't know -- I don't know.

THE COURT:  Because this is the obvious next step, right.  You've got a three-year earn-out period, and regardless of whether you are A through L or D through O, the middle numbers are in that period.  So if you had any beef as to the actual

66

world counts as opposed to the hypothetical absent contractual breach counts about whatever the second-year earn-out statement is, like, the numbers in there are covered no matter what.

Now, you're right that for the two edges, the first and the third, there's going to be periods that are outside the range or misidentified, depending on how you want to think about it. But there's still a group of months in there where there are going to be accounting issues as to what actually happened in the real world as opposed to the but-for contractual world.

ATTORNEY CURRAN: Potentially, yes.

THE COURT: And do you dispute that those types of things would go to the accountant to figure out what actually happened in the real world as opposed to your but-for contractual breach work?

ATTORNEY CURRAN: So, yes, while reserving rights to say, because of your breach, these numbers are different than they should have been, and we can prove it.

THE COURT: Yes, but it's a but-for contractual world. That's not the real world; right? The real world is I drove home and I got home at

67

6:00 p.m., and we know that, right?  The but-for Laster sped home above the speed limit world is that Laster got home at 6:15 or 6:20 or something like that; right?

But there shouldn't be any dispute about whether in the real world I got home at 6:00. There could very well be a but-for world dispute about whether I would have gotten home at 6:15 or if I got home at 6:10 or I got home at 6:20, or maybe I would have gotten home at 7:00.  But what I'm saying is if somebody asked what actually happened, was it 6:00 or was it 6:02, that's for the accountant.

ATTORNEY CURRAN:  Your Honor, that is actually why -- I wasn't being flippant when I said maybe there's no dispute.  For instance, if this goes to arbitration, the arbitrator says, before we do anything else, I just want to establish how many products were actually -- I want both of you to agree on a month-by-month or quarter-by-quarter basis how many products were actually sold.

THE COURT:  Well, that's the ideal. Ideally, you would agree.  And if you don't agree, where do you think it goes?

ATTORNEY CURRAN:  So in that context,

68

what I would say to Your Honor is that would be part of the discovery process in the arbitration, and, and if -- maybe if Stratasys and we hire our experts who put their -- or use in-house people or whatever --

THE COURT:  You put this whole thing through a plenary arbitration when the whole point of figuring out what happened in the real world is to route that to the accountant.  Seems to me the answer would be, and what I would tell you to do -- and this is where the *ArchKey* analogy comes in.  If I were the arbitrator and I said, look, before we get into any of this, I want you to agree on what happened in the real world, I'd say they're the accountant, right.  The accountant is the guy who's supposed to tell you what happened in the real world.

But what you're telling me now is when the arbitrator says that, you're going to be like, oh, no, we've got to do discovery, we've got to have experts, we've got to do the whole nine yards.

ATTORNEY CURRAN:  No.  Your Honor, with respect to what I'm saying is, the -- if that is what the arbitrator says out of the box, it's like you all reserve all of your rights as to what would have been the but-for world if this didn't happen the way

69

that it did.  But as a baseline, we just want to establish -- we want both sides -- I want both sides to stipulate as to what actually happened.

I could imagine that now, okay, the arbitrator wants this, let's put our heads together, and I could imagine a scenario where the A through M or L periods that Your Honor mentioned before, maybe, you know, 10 of the 13 or 12, 10 of the 12 we can come to terms on and there's only one or two that there's a dispute about.  But the --

THE COURT:  And where do the one or two that you have a dispute over go?

ATTORNEY CURRAN:  Then I could see -- I could see that those would go to an accounting referee to do the accounting-based things.

But, Your Honor, what -- right now the -- what is absolutely undeniable is that we have an allegation that Stratasys, at a minimum, owes us the $10 million from the first earn-out period.  At a minimum, they applied the wrong dates to the earn-out period, which contravenes the agreed amendment to the provision that the parties agreed to.

THE COURT:  I understand.  I understand.

70

ATTORNEY CURRAN: Right. Okay. And so the point, though, is that there is -- you know, there is this reality that, by playing this out in court rather than going to arbitration, that, you know, our folks are -- you know, are forced to sit on those claims rather than actively pursue them. And that is what is causing harm.

The -- I was -- well, I think the only other -- the only other point that I wanted to make, Your Honor, was with respect to the *AffiniPay* case that opposing counsel made or identified, and that's the case that stands for the idea that if two parties, the same two parties, execute multiple contracts and those multiple contracts have varying conflict resolution provisions, then it's for the Court because it's not clear. Obviously, that's not the case here because it's not the same parties.

So with that, I am happy to answer any other questions, but it sounds like Your Honor is giving me the signal that you have a grasp on our argument, so I will leave it at that, and with thanks to the Court.

THE COURT: Thank you.

Mr. Altschuler.

71

ATTORNEY ALTSCHULER:  Yes, Your Honor. Thank you.

So with respect to the prior argument with Mr. Curran is that we agree that there needs to be a submission of this dispute to the accounting referee, first with respect to the earn-out payments. If anything, if anything, Your Honor, we don't know the scope of the dispute, because if you look to Exhibits F and G to plaintiffs' opening brief, these are the letters that Mr. Curran submitted on September 27, 2022, as well as September 26, 2023. These are the reasons why there was an objection to both the first and second earn-out periods.

The letters discuss their disagreements with respect to Stratasys's, quote, calculation of the earn-out revenue by deliberately using what they called the erroneous earn-out commencement dates.

So, yes, Your Honor, we're aware that there's a dispute there, and a factual dispute about whether or not there was an agreement to amend the earn-out period via the merger agreement.  We contend there was not.  There is no record of any board approval whatsoever, which is a requisite of the

72

merger agreement, written requisite and for board approval for that amendment.

With that said, all of that can easily, and will be debated, by the accounting referee as one of many issues that they -- that accounting referee will have to determine.

As Your Honor also points out, you know, July 1, 2021, is the date that was in the agreement. That's Section -- it's in annex 1 of the merger agreement, that's that definition for the earn-out commencement date, July 1, 2021.

So there will be a dispute with respect to that as to whether that date was pushed out, and that's something that the parties will do with the accounting referee.

But in addition, what we envision is there was a period that there was product that was generated, but it didn't support the threshold to get to that amount of product by July 1, 2021, and therefore, as I believe Your Honor envisions, there will be disputes that are perfectly capable of being handled by the accounting referee as to, well, can you -- can you-all agree on what the amount of product was, did it not meet that date, that go well beyond

73

what the earn-out period beginning date was, July 1, 2021, and if that had been amended.

So I believe an accounting referee, as I've used for purchase price disputes, as I've used for earn-outs before, would be perfectly capable in that respect.

Moving on, Your Honor, since we're about to close.

So Mr. Curran mentioned earlier an argument discussing about the money that would be received if there was a winning claim of the equity claims and how the division of those profits and proceeds would be allocated to the various former Origin shareholders.  That is not what is in dispute here with respect to the equitable claims, because what matters here is, well, who relied on the alleged promises, the alleged promises of, we'll pay you for all these great things you supposedly did for the company.  Who relied on those promises?  Well, the reliant -- who exactly relied on those promises is three people, Prucha, Ong, and Lee.

And the claims belong to the individuals because, based on the claim, based on the claim, they are the ones who actually individually

74

relied on the purported promises as opposed to, well, what would be the result of those claims and who would receive the benefit of it. So we don't want to put the cart before the horse with respect to that argument.

Finally, Your Honor, is that if you look to Section 11.5, this is an argument also that Mr. Curran touched on. This is in the arbitration provision, 11.5(a), there's a discussion there that -- where Mr. Curran believes that the arbitration clause in 11.5(a) is actually broad enough to contain and retain equity claims that could be tort claims brought by individual shareholders on behalf of Fortis or brought by Fortis on behalf of individual shareholders that are named the three, and thinks that 11.5(a) is large enough to consume that.

Well, we disagree because if you look to the language in 11.5(a), that it encompasses tort and contract claims, that those tort and contract claims, they have to arise out of the merger agreement. They do not arise out of extracontractual representations, or what is called here promises, that this clause specifically is talking about arbitrating disputes, whether they're in contract or tort, that

75

arise out of the merger agreement, not something that was different which is complete months after the merger agreement was even executed.  What they're trying to do is shoehorn in arguments that after we merged and had our merger agreement, received our $60 million, now we are employees of Stratasys, we think promises were made to us that were extracontractual and that provide for unjust enrichment and other equitable theories.  Well, please pay us for that and we want to arbitrate that.  That is not what 11.5, many months, if not years before, contemplated.

Any other questions, Your Honor?  I'll be glad to sit.

THE COURT:  Not from me.  Thank you.

ATTORNEY ALTSCHULER:  Thank you, Your Honor.

THE COURT:  I'm going to go ahead and give you-all a ruling now.  I gave this a lot of thought before.  I had some thoughts coming in.  I've appreciated your arguments, and it's been good to hear them.

We're here in Stratasys Ltd. and Stratasys, Inc. *v.* Prucha, et al.  We're on

76

cross-motions for summary judgment. There are no material facts in dispute. What we have is simply a disagreement over whether claims relating to a merger have to be arbitrated.

The acquirer here was Stratasys Ltd. I will call it the "Buyer." The entity being acquired was Stratasys, Inc. I will call it the "Company." The principal defendant is Fortis Advisors LLC, which serves as the seller's representative under the merger agreement; I will call it that. The other defendants are three of the selling stockholders. I will therefore call them the "Sellers."

The buyer agreed to acquire the company for total consideration of $100 million with $60 million due at signing and $40 million to be paid out if an earn-out came home.

Section 2.3(c) provides for a series of quarterly reports on earn-out periods that contain the financial figures for that quarter. There is then, on an annual basis, an earn-out report for the year as a whole. Section 2.3(d) provides for an accountant report if there are disputes over one of those earn-out schedules. The buyer contends that no earn-out was due. The seller's representative

77

contends in an arbitration that the buyer used the wrong earn-out dates to calculate the earn-out period and also breached its obligations in other ways.

Section 11.5 of the merger agreement calls for arbitration under the AAA rules.  The pertinent rules provide for an arbitrator to decide questions of substantive arbitrability.  The arbitration provision is expansive and extends to any claims arising out of, in connection with, or in relation to the agreements or ancillary agreements, which is a defined term encompassing the exhibits related to the merger and various stockholder agreements.  The arbitration provision specifically extends to causes of action or disputes of any nature whatsoever, including, but not limited to, tort and contract claims.

The seller's representative filed an arbitration.  They assert claims under the merger agreement in three separate counts.  They also assert noncontractual claims.  The first is a theory of promissory estoppel.  The second is a theory of unjust enrichment.  The third is a theory of *quantum meruit*.

It appears from the arbitration demand, and counsel has confirmed today, that the

78

seller's representative purports to pursue those claims for the benefit of all stockholders, such that any recovery would be distributed on a *pro rata* basis as incremental consideration, just as any recovery would if the seller's representative was able to obtain a result on one of the first three claims for breach of contract.

When determining where these disputes get decided, I must apply the plain meaning of the relevant contracts.  The arbitration provision implicates the framework for analyzing substantive arbitrability under *Willie Gary* and its progeny.  I'm drawing on *ArchKey*, *Gandhi-Kapoor*, *Fairstead*, and other recent cases.  I call those out because they've summarized the relevant law.  If I don't specifically cite a bunch of cases to you while I'm giving you my ruling today, those cases set out the principles that I'm applying.

The buyer contends that none of the claims that have been pursued in the arbitration are arbitrable.  The buyer says that a court must decide the question of substantive arbitrability because of conflicting dispute resolution provisions.

The first conflict that the buyer

79

points to is the ostensible conflict between the arbitration provision and the accountant true-up mechanism.  From the buyer's standpoint, you could view this two ways.  One is that there's a direct conflict between these two provisions that requires the Court to decide substantive arbitrability.  The other is that the carve-out for the accountant true-up mechanism means that there hasn't been a broad delegation of all claims to the arbitrator for purposes of *Willie Gary*.

In my view, whether the claims asserted in the arbitration fall under the arbitration provision or the accountant true-up mechanism is something that the arbitrator decides under *Willie Gary*.  These are two dispute resolution provisions in the same agreement.  They're supposed to work harmoniously together.

If there wasn't a *Willie Gary* provision in the merger agreement, which is the container contract in this case, the Court would decide what issues go to the arbitrator versus what issues go to the accountant for purposes of the accountant true-up mechanism.  By including an implied delegation clause in the arbitration provision under

80

*Willie Gary*, the parties charged the arbitrator with doing what the Court otherwise would do.  And so in my view, it is for the arbitrator to decide what goes to the accountant versus what goes to or what stays with the arbitrator.

If I, nevertheless, indulge the assumption that these are conflicting forum provisions and that I have to address substantive arbitrability, the contract claims are for the arbitrator.  The buyer contends that the earn-out claims present an earn-out dispute that have to go through the accountant mechanism.  The earn-out claims, I think, most clearly present breach of contract claims that are for the arbitrator to decide.  I think the plain intent of the parties under the accountant true-up mechanism is to provide an expedited method for resolving what actually happened in the real world.  In other words, what the numbers actually were based on what the buyer actually did, using the buyer's interpretation of what its obligations actually were.  The question for the accountant is whether, during a particular period, measurement the buyer actually sold a certain amount of units or actually generated a certain amount of revenue, or whether, as an accounting matter, the

81

earn-out statement for that quarter or for that year properly reflects the revenue that the buyer actually generated.

I don't think the accountant mechanism is intended to resolve disputes about what would have happened in a but-for world where, if the seller's representative is right, there was a contractual breach and the buyer would have acted differently. The accountant isn't expected to imagine an alternative world in which the buyer fulfilled its obligations in the manner that the seller's representative believes it should have.

As I look at the arbitration demand, we have a but-for world dispute. As I suggested with counsel, the main contention is that there were 12 quarterly periods, equating to three annual periods. You can think of them as periods A through L. That gives you 12 quarterly periods.

The seller's representative contends that the time started too early, so they claim it started seven months early. But for round numbers, I'm going to assume that it was three quarterly periods early. So what they think is that instead of starting in period A, the measurement period should

82

have started in period D.  What that would have meant is the three years ran for three periods beyond L, so it should have ended in O.  That's not a question for the accountant.  That's not a question for the true-up mechanism.  That's a question for the arbitrator to decide as a legal dispute.

What the accountant is supposed to do is to take one of those measurement periods -- so, for example, the middle annual period that would fall within either side's measurement period, regardless of when the time starts or stopped, and figure out what the buyer actually sold during that period.  And I think that's what my *ArchKey* decision points to as well.  *ArchKey* was about sending a dispute to an accounting true-up mechanism to figure out what actually happened.

Now, in *ArchKey*, the provision also called for the accountant true-up mechanism to assess bad faith, but it was bad faith from the standpoint of how out of whack was the buyer's proposed statement from what actually happened.  It was a what-happened dispute, not an if-they-hadn't-breached dispute.

So to the extent there are disputes over what actually happened in the real world -- i.e.,

83

what the buyer actually did historically -- I think those are for the accountant to figure out.  I think anything beyond that -- in other words, was it proper to start with period A versus was the buyer instead obligated to start with period D -- are for the arbitrator to decide.

And any related issues about whether the buyer had some obligation to use incremental efforts or to act in some way not in bad faith or something of that sort, those are issues for the arbitrator because those concern a but-for world in which the buyer was acting differently.

So in my view, the real disputes in this case are for the arbitrator to decide.  They don't get routed through the accountant true-up mechanism.  But as I said at the outset, I think that's actually for the arbitrator to decide what the arbitrator decides.  I'm only commenting on substantive arbitrability because, in the event that I'm wrong and that the existence of the arbitration provision and the accountant true-up mechanism in the same agreement somehow create a conflict, then it would be for me to rule.

As an aside, it's hard for me to

84

believe that the existence of the two provisions in the same agreement could create a conflict because otherwise we would have conflicts in virtually every acquisition agreement, and rather than arbitrators deciding these things, it would always come through us in the first instance.

That ruling was for the first three of the counts, the earn-out counts.

Then we get to what the parties have called the equitable claims. And the question is whether those fall outside the scope of the arbitration clause. Again, my first-order response is that the arbitrator gets to decide whether or not they fall within the scope of the arbitration clause. That's the meaning of the delegation agreement that *Willie Gary* implies.

The buyer has arguments about why the claims that are being asserted actually belong to other people. So the seller's representative has asserted the claims, but the claims are based on additional efforts that three executives of the sell-side company, the sellers, provided after the initial closing of the merger.

According to the buyer, any claim to

85

additional value or damages or anything of that sort from those efforts belongs to those individuals as individuals rather than to all stockholders.  The buyer concludes that the seller's rep. cannot pursue those claims on a *pro rata* basis.

I think it's for the arbitrator, in the first instance, to figure that out.  That's the type of defense that the buyer can raise in arbitration.  They can tell the arbitrator that these claims are really individual claims, they shouldn't even be here in the first place, and the seller's representative doesn't have standing to assert them. So those are all arguments that can be advanced in the arbitration in the first instance.

So I think that those second three, the so-called equitable claims, the delegation clause covers them and the arbitrator gets to decide whether those are arbitrated.

That leaves the argument that the buyer raises under a stockholders agreement that each of the sellers entered into.  The buyer contends that those stockholders agreements have provisions in them that cap what the signatory stockholders can receive. Those are Section 2(f) and Section 7(a), and the buyer

86

points out that there is a mandatory Delaware forum selection clause in each stockholders agreement. That's in Section 8(o).  The buyer asserts, therefore, that if one views these claims as belonging individually to the stockholders, the selling stockholders, then the sellers have to pursue them individually in this court, at which point the caps in the stockholders agreement come into play.

I am prepared to accept that there is a conflict between the dispute resolution clauses in the merger agreement and in the stockholders agreements, with the merger agreement providing for broad arbitration and the stockholders agreements providing for mandatory adjudication in this forum. That means I have to decide the question of substantive arbitrability.

I think the implications of the caps are for the arbitrator to address.  They can be raised as a defense in the arbitration.

The stockholders agreements that the buyer is invoking are primarily voting agreements. They're primarily designed to lock in the sellers to voting in favor of the merger and not supporting a competing deal.  It's logical that one would select a

87

court, and particularly a Delaware court, to enforce those types of obligations because one needs to enforce them quickly.  One doesn't want to have to wait for AAA to set up an arbitration panel, even though they do a good job with that.  But that's what the forum provision there is talking about.

What the buyer is doing now is asserting a defense against the potential recovery that the stockholders representative can pursue because, for example, any incremental value that the three sellers would obtain for themselves has to be carved out, or maybe even the claim can't be brought at all.  I think those are defenses.  They are defenses that can be asserted in the arbitration. They are defenses that the arbitrator can consider. And because they are defenses, I don't think that the mandatory forum selection provision applies.

This is also a situation where I think it makes no sense to balkanize this dispute.  One would effectively have to have a full litigation in the arbitration to figure out the capacity in which people were suing and all the nuances of the claims, and then people would have to come back and start all over in Chancery to figure out whether these caps

88

somehow limited the potential recovery.

I don't think that the cap issue can be decided up front, as the buyer suggests.  I think it would have to be addressed afterwards, and it just makes no sense that you wouldn't have the same decision-maker deal with all of these things.  So that goes to arbitration.

The only dispute that leaves me with is the fee-shifting provision.  There's a prevailing party provision that applies to any dispute under, "this Section 11.5," which is the arbitration provision.  This is, indeed, a dispute under Section 11.5.  It's a dispute about whether Section 11.5 applies, but that's a dispute about Section 11.5.  As a result, the nonprevailing party must bear the fees and expenses of the prevailing party.  The nonprevailing party here is the buyer. The prevailing party here is the sellers and the seller's representatives.

Because I am ruling on the contractual fee-shifting provision, I don't have to go any further, but I personally would not view any of this as bad-faith conduct that would support fee-shifting under any basis other than the contractual provision.

89

Only the contractual provision is what comes into play here.

So for all those reasons, I'm denying the buyer's motion for summary judgment.  I'm granting the motion for summary judgment by the sellers and the seller's representative.

We still have an outstanding issue, which is to quantify the amount of fees and expenses that are due from the buyer under Section 11.5(c).  I want the parties to confer on that.  I don't have any desire to deal with a contested fee motion.  You guys know how I will play it.  If there is a dispute about reasonableness, you guys both will have to share what your fee numbers were.  And if the seller's fee number is in the same neighborhood as the buyer's, as far as I'm concerned, that's the end of it.

It's only if there's some radical disparity that I will start thinking about whether I have to do a more detailed analysis.

In my ideal world, you would agree on a number.  You'd submit to me a final implementing order that gets this thing done.  Then people can either hopefully go off and arbitrate, or if you-all want to go on to the next judicial forum, you can

90

certainly do that.

All right.  Those are my rulings. I'll look for orders on File & Serve as to the granting of the summary judgment.  But since the fee issue is still out there, granting or denying them doesn't constitute a final order that would start the time running for appeal.  I'm still going to need a final order from you-all to bring this matter to a close.  And, as I say, I hope that it won't require a contested fee motion before we can get there.

Thank you again for your arguments today.  I very much appreciate them.  Your briefing was very thorough.  I was able to give you an answer today because you-all did such a good job on the briefing.  And you also did a great job today answering my questions.

I hope everyone has a good afternoon. We stand in recess.

(Proceedings concluded at 5:03 p.m.)

- - -

91

CERTIFICATE

I, DOUGLAS J. ZWEIZIG, Official Court Reporter for the Court of Chancery of the State of Delaware, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the foregoing pages numbered 3 through 90 contain a true and correct transcription of the proceedings as stenographically reported by me at the hearing in the above cause before the Vice Chancellor of the State of Delaware, on the date therein indicated, except for the rulings, which were revised by the Vice Chancellor.

IN WITNESS WHEREOF I have hereunto set my hand at Wilmington, this 21st day of May, 2024.

```
        /s/ Douglas J. Zweizig
      ----------------------------
          Douglas J. Zweizig
          Official Court Reporter
        Registered Diplomate Reporter
        Certified Realtime Reporter
```